SHORT RECORD
NO. 24-1947
FILED 06/03/2024

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) ) | |
| *Plaintiff*, | ) ) | Case No. 1:13-cv-08564 |
| v. | ) ) | Chief Judge Rebecca R. Pallmeyer |
| ADRIANNE TODMAN, in her official capacity as Acting Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | |
| *Defendants*. | ) | |

## NOTICE OF APPEAL

Plaintiff Property Casualty Insurers Association of America ("PCI") * hereby appeals to the United States Court of Appeals for the Seventh Circuit from the District Court's judgment in this action (Dkt. 320), as well as all opinions and orders underlying the judgment, including the District Court's September 3, 2014 opinion and order (Dkts. 98-99); June 20, 2017 opinion and order (Dkt. 129); and March 26, 2024 opinion and order (Dkt. 319).

---

* Effective January 1, 2019, the American Insurance Association merged with and into PCI. Effective February 5, 2019, PCI re-domesticated and changed its name to the American Property Casualty Insurance Association.

Dated: May 24, 2024

Respectfully submitted,

s/ *Seth P. Waxman*

Rowe W. Snider (# 03125194)
Alyssa M. Gregory (# 6320588)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Tel.: (312) 443-0700
Fax: (312) 896-0336

Seth P. Waxman (*pro hac vice*)
  *Counsel of Record*
Catherine M.A. Carroll (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: seth.waxman@wilmerhale.com

Colleen Marie Campbell
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1225 17th Street, Suite 2600
Denver, CO 80202
Tel.: (720) 274-3135
Fax: (720) 274-3133

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 24, 2024, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to counsel of record in this case.

/s/ Seth P. Waxman

Seth P. Waxman (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Tel.: (202) 663-6000
Fax: (202) 663-6363
Email: seth.waxman@wilmerhale.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) ) | |
| *Plaintiff*, | ) ) | Case No. 1:13-cv-08564 |
| v. | ) ) | Chief Judge Rebecca R. Pallmeyer |
| ADRIANNE TODMAN, in her official capacity as Acting Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | |
| *Defendants*. | ) | |

## PLAINTIFF'S SEVENTH CIRCUIT DOCKETING STATEMENT

Plaintiff Property Casualty Insurers Association of America ("PCI")[*] respectfully

submits this Docketing Statement pursuant to Circuit Rule 3(c)(1) of the United States Court of

Appeals for the Seventh Circuit.

### I.     Jurisdiction of the District Court

This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 551-559, 701-

706; the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015; and the Fair Housing Act, 42 U.S.C.

§§ 3601-3619.  The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331

and was authorized to grant relief under 5 U.S.C. §§ 702, 705, 706.

---

[*] Effective January 1, 2019, the American Insurance Association merged with and into PCI.  Effective February 5, 2019, PCI re-domesticated and changed its name to the American Property Casualty Insurance Association.

## II.      Jurisdiction of the Court of Appeals

On March 26, 2024, the district court granted Defendants' motion for summary

judgment, denied Plaintiff's motion for summary judgment, and entered a final judgment in

favor of Defendants.  The Court of Appeals has jurisdiction under 28 U.S.C. § 1291.

## III.      Related Appellate Proceedings

There have been no prior or related appellate proceedings in this case.

## IV.      Notice of Appeal

Plaintiff timely filed a Notice of Appeal on May 24, 2024.

## V.      Current Occupant of Public Office

Adrianne Todman is the current occupant of the office of Acting Secretary of the U.S.

Department of Housing and Urban Development and is sued in her official capacity.

Dated: May 24, 2024                          Respectfully submitted,

                                             s/ *Seth P. Waxman*

Rowe W. Snider (# 03125194)                  Seth P. Waxman (*pro hac vice*)
Alyssa M. Gregory (# 6320588)                  *Counsel of Record*
LOCKE LORD LLP                               Catherine M.A. Carroll (*pro hac vice*)
111 South Wacker Drive                       WILMER CUTLER PICKERING
Chicago, IL 60606                              HALE AND DORR LLP
Tel.: (312) 443-0700                         2100 Pennsylvania Avenue, NW
Fax: (312) 896-0336                          Washington, DC 20037
                                             Tel.: (202) 663-6000
                                             Fax: (202) 663-6363
                                             E-mail: seth.waxman@wilmerhale.com

                                             Colleen Marie Campbell
                                             WILMER CUTLER PICKERING
                                               HALE AND DORR llp
                                             1225 17th Street, Suite 2600
                                             Denver, CO 80202
                                             Tel.: (720) 274-3135
                                             Fax: (720) 274-3133

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 24, 2024, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to counsel of record in this case.

s/ *Seth P. Waxman*
Seth P. Waxman (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Tel.: (202) 663-6000
Fax: (202) 663-6363
Email: seth.waxman@wilmerhale.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 13 C 8564 |
| SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) | |
| Defendants. | ) | |

## <u>ORDER</u>

The Court grants in part and denies in part PCI's motion for summary judgment [20], and

grants in part and denies in part HUD's motion to dismiss or for summary judgment [30].   The

Court dismisses PCI's McCarran-Ferguson claim for lack of subject matter jurisdiction.   With

respect to PCI's remaining claims, the Court grants summary judgment to PCI on its claims that

HUD's application of the Disparate Impact Rule to homeowners insurance was arbitrary and

capricious, and grants summary judgment to HUD on PCI's challenge to HUD's burden-shifting

framework.   The Court remands this case to the United States Department of Housing and

Urban Development for further proceedings consistent with this Memorandum, Opinion and

Order.   All pending dates and deadlines are stricken.


Date:   September 3, 2014

AMY J. ST. EVE
United States District Court Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 13 C 8564 |
| SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

In 2013, the United States Department of Housing and Urban Development ("HUD")

issued a final rule formalizing its recognition that liability under the Fair Housing Act ("FHA")

may arise from a facially neutral practice that has discriminatory effects on certain groups of

people, regardless of whether discriminatory intent exists (the "Disparate Impact Rule"). *See*

Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11460

(Feb. 15, 2013) (to be codified at 24 C.F.R. pt. 100). In addition to recognizing the availability

of discriminatory effects (*i.e.,* "disparate impact") liability under the FHA, the Disparate Impact

Rule also establishes a three-step burden-shifting approach to deciding disparate impact claims.

Plaintiff Property Casualty Insurers Association of America ("PCI") argues that HUD's refusal

to build exclusions or safe harbors for homeowners insurance into the Disparate Impact Rule

violates the McCarran-Ferguson Act and is arbitrary and capricious. PCI asks the Court to

invalidate the Rule as it relates to homeowners insurance under the Administrative Procedure Act and to enjoin HUD from applying the Rule to the homeowners insurance industry.

Before the Court are PCI's motion for summary judgment (R. 20) and Defendants' motion to dismiss or for summary judgment (R. 30).  For the following reasons, the Court grants in part and denies in part PCI's motion, and grants in part and denies in part Defendants' motion.

## BACKGROUND

This Administrative Procedure Act case involves the intersection between two important federal policies, the policy of ensuring that regulation of the insurance industry rests primarily with the states and the policy of providing for fair housing throughout the United States, which are reflected in the McCarran-Ferguson Act, 59 Stat. 33 (1945) (codified as amended at 15 U.S.C. §§ 1011, *et seq.*), and the Fair Housing Act ("FHA"), Pub. L. No. 90-284, 82 Stat. 81 (1968) (codified as amended at 42 U.S.C. §§ 3601-19), respectively.  The Court, therefore, provides a brief overview of these two federal statutes before turning to HUD's Disparate Impact Rule.

## I.    The McCarran-Ferguson Act

Congress enacted the McCarran-Ferguson Act in response to the Supreme Court's decision in *United States v. South-Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S. Ct. 1162, 88 L. Ed. 1440 (1944), in which the Court held that insurance transactions were subject to federal regulation under the Commerce Clause.  *See United States Dep't of Treasury v. Fabe,* 508 U.S. 491, 499, 113 S. Ct. 2202, 124 L. Ed. 2d 449 (1993); *SEC v. Nat'l Secs. Inc.,* 393 U.S. 453, 458, 89 S. Ct. 564, 21 L. Ed. 2d 668 (1969).  Prior to *South-Eastern Underwriters,* "it had been assumed . . . that [i]ssuing a policy of insurance is not a transaction of commerce" and, consequently, "the States enjoyed a virtually exclusive domain over the insurance industry."

*Fabe,* 508 U.S. at 499 (internal quotation marks and citations omitted).  Congress reacted quickly to *South-Eastern Underwriters*, passing the McCarran-Ferguson Act within a year of the decision to allay fears that the decision threatened the states' power to tax and regulate the insurance industry.  *See id.* at 499-500.

> Congress expressed the purpose of the McCarran-Ferguson Act in Section 1 of the Act:
>
> Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

15 U.S.C. § 1101; *see also Autry v. Northwest Premium Servs., Inc.,* 144 F.3d 1037, 1040 (7th Cir. 1998).  To accomplish this purpose, Congress "transformed the legal landscape by overturning the normal rules of pre-emption" and "creating a clear-statement rule . . . that state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise.  *Fabe,* 508 U.S. at 507.  Specifically, the McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically related to the business of insurance[.]"  15 U.S.C. § 1012(b).

Over the years, courts have developed a three-part inquiry for determining whether the McCarran-Ferguson Act preempts application of a particular federal statute.  First, courts inquire whether the federal statute at issue "specifically relate[s] to the business of insurance."  *Autry,* 144 F.3d at 1040-41 (quoting *Fabe,* 508 U.S. at 501).  Second, courts ask whether the state statute was enacted "for the purpose of regulating the business of insurance."  *Id.*  Finally, courts determine whether application of the federal statute will "invalidate, impair or supersede" the

state law. *Id.* If the court answers all three inquiries in the affirmative, the federal statute must give way to state law. *Id.*

In *Humana Inc. v. Forsyth,* 525 U.S. 299, 119 S. Ct. 710, 142 L. Ed. 2d 753 (1999), the Supreme Court rejected the view that the McCarran-Ferguson Act created "any sort of field preemption" as well as the "polar opposite view . . . that Congress intended a green light for federal regulation whenever the federal law does not collide head on with state regulation." *Id.* at 309. The Court, instead, construed the Act as adopting a middle-ground, holding that "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." *Id.* at 310. Accordingly, if a federal statute complements or duplicates a state's regulation of the insurance industry and does not interfere with a state's policies or administrative regime, McCarran-Ferguson preclusion does not apply. *See id.* at 313 (finding that the McCarran-Ferguson Act did not preclude the plaintiff's RICO claims because "RICO's private right of action and treble damages provision appears to complement Nevada's statutory and common-law claims for relief"); *NAACP v. American Family Mut. Ins. Co.,* 978 F.2d 287, 295 (7th Cir. 1992) ("Duplication is not conflict."); *Ojo v. Farmers Grp., Inc.,* 600 F.3d 1205, 1209-10 (9th Cir. 2010) (recognizing that the McCarran-Ferguson Act would not reverse-preempt the FHA where the FHA "complement[s]—rather than displace[s] and impair[s]" state law).

## II.    The Fair Housing Act

Congress enacted the FHA in 1968 "to provide, within constitutional limits, for fair housing throughout the United States." *See* 42 U.S.C. § 3601. The FHA makes it unlawful to, among other things, refuse to sell, rent, or "otherwise make unavailable or deny" housing to any

person "because of race, color, religion, sex, familial status, . . . national origin[,]" or handicap. 42 U.S.C. § 3604(a), (f)(1).  The FHA also makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" because of the person's race, color, religion, sex, familial status, national origin, or handicap.  *See id.* § 3604(b), (f)(2).  The FHA empowers HUD to enforce the Act and to issue regulations implementing the Act.  *See id.* §§ 2612, 3614a.

### A.    Disparate Impact Claims Under the FHA

HUD has long interpreted the FHA as prohibiting not only intentional discrimination on the basis of a person's protected characteristics, but also practices that have unwarranted discriminatory effects on minorities or other persons protected by the Act, regardless of whether there was an intent to discriminate.  *See* 78 Fed. Reg. 11460-62 nn.12-27 (Feb. 15, 2013) (collecting examples).  Put differently, HUD interprets the FHA as providing for both discriminatory intent and disparate impact liability.  *See id.*  All eleven circuit courts to have addressed this issue, including the Seventh Circuit, have agreed that the FHA provides for disparate impact liability at least in some cases.  *See, e.g., Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977) ("We therefore hold that at least under some circumstances a violation of section 3604(a) can be established by showing a discriminatory effect without a showing of discriminatory intent.").[1]  Neither the Supreme Court

---

[1] *See also Langlois v. Abington Hous. Auth.,* 207 F.3d 43, 49 (1st Cir. 2000); *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 935-36 (2d Cir. 1988); *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 146 (3d Cir. 1977); *Smith v. Town of Clarkton,* 682 F.2d 1055, 1065 (4th Cir. 1982); *Hanson v. Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir. 1986); *Arthur v. City of Toledo,* 782 F.2d 565, 574-75 (6th Cir. 1986); *United States v. City of Black Jack,* 508 F.2d 1179, 1184-85 (8th Cir. 1974); *Halet v. Wend Inv. Co.,* 672 F.2d 1305, 1311-12 (9th Cir. 1982); *Mountain Side Mobile Estates P'ship v. Secretary of Hous. & Urban Dev.,* 56 F.3d 1243, 1251 (10th Cir. 1995); *United States v. Marengo Cnty. Comm'n,* 731 F.2d 1546, 1559 n.20 (11th Cir. 1984).

nor the Circuit Court for the District of Columbia, however, has weighed in on whether the FHA allows for disparate impact liability.

### B.        Liability of Insurers Under the FHA

HUD also has long interpreted the FHA as prohibiting discrimination in the provision of homeowners insurance.  In 1989, HUD issued a regulation expressly stating that prohibited acts under the FHA include "[r]efusing to provide . . . property or hazard insurance for dwellings or providing such services or insurance differently because of race, color, religion, sex, handicap, familial status, or national origin."  *See Implementation of the Fair Housing Amendments Act of 1988,* 54 Fed. Reg. 3232, 3285 (codified at 24 C.F.R. § 100.70(d)(4)).  Several circuit courts, deferring to HUD's interpretation, have similarly interpreted the FHA as prohibiting intentionally discriminatory practices related to the provision and pricing of homeowners insurance.  *See, e.g., NAACP v. American Family Mut. Ins. Co.,* 978 F.2d 287, 301 (7th Cir. 1992), *cert. denied,* 508 U.S. 907 (1993) ("Section 3604 applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant."); *Ojo v. Farmers Grp. Inc.,* 600 F.3d 1205, 1208 (9th Cir. 2010) (*en banc*) (deferring to HUD's interpretation of the FHA as prohibiting discrimination in the provision of homeowner's insurance); *Nationwide Mut. Ins. Co. v. Cisneros,* 52 F.3d 1351, 1359-60 (6th Cir. 1995) (same).  *But see Mackey v. Nationwide Ins. Cos.,* 724 F.2d 419, 423-25 (4th Cir. 1984), *cert. denied* 516 U.S. 1140 (1996) (concluding that claims against the hazard insurance industry do not fall within the scope of the FHA).

As the Seventh Circuit explained in *American* Family, discrimination against minorities or other protected groups in the provision of homeowners insurance can make housing unavailable to those groups.  *American Family*, 978 F.2d at 300.  Put succinctly, "[l]enders

require their borrowers to secure property insurance.  No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable." *See id.* at 297.  Discrimination in the provision of homeowners insurance can also raise the cost of housing to minorities and other protected groups and frustrate their ability to live in integrated neighborhoods so that "[e]ven if they achieve their goal, they pay extra." *See id.* at 290.  For these reasons, the Seventh Circuit recognized in *American Family* that the FHA allows for claims against homeowners insurers who intentionally discriminate against individuals based on protected characteristics.

### C.    Disparate Impact Liability of Insurers Under the FHA

Although almost all circuit courts have recognized that the FHA allows for disparate impact liability and several circuit courts have separately recognized that the FHA allows for claims against homeowners insurers, few courts have addressed whether the FHA allows for disparate impact claims—as opposed to disparate treatment claims—against homeowners insurers.  In the same case in which the Seventh Circuit recognized that the FHA allows for claims against insurers who intentionally discriminate against individuals on the basis of a protected characteristic, the Seventh Circuit questioned whether the FHA would also allow for disparate impact liability against insurers.  *See id.*  The Seventh Circuit explained the issue as follows:

> Insurance works best when the risks in the pool have similar characteristics.  For example, term life insurance costs substantially more per dollar of death benefit for someone 65 years old than for one 25 years old, although the expected return per dollar of premium is the same to both groups because the older person, who pays more, also has a higher probability of dying during the term.  Auto insurance is more expensive in a city than in the countryside, because congestion in cities means more collisions.  Putting young and old, or city and country, into the same pool would lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out.  A single price for term life insurance would dissuade younger persons from insuring, because the price would be too steep for the coverage offered; the remaining older persons would pay a price appropriate to their age, but younger persons would lose the benefits of

7

insurance altogether.  To curtail adverse selection, insurers seek to differentiate risk classes with many variables.

Risk discrimination is not race discrimination.  Yet efforts to differentiate more fully among risks may produce classifications that could be generated by discrimination. . . .  No insurer openly uses race as a ground of ratemaking, but is a higher rate per $1,000 of coverage for fire insurance in an inner city neighborhood attributable to risks of arson or to racial animus?

*Id.* at 290-91.  Because of the difficulties that imposing disparate impact liability on insurers may create, the Seventh Circuit made clear in *American Family* that its interpretation of the FHA as applying to insurers extended only to disparate treatment liability, and it made no comment on whether the FHA also allows for disparate impact liability against insurers.  *See id.* at 291 ("All we decide is whether the complaint states claims on which the plaintiff may prevail if they establish that the insurer has drawn lines according to race rather than actuarial calculations.").

The Seventh Circuit's decision in *Doe v. Mutual of Omaha,* 179 F.3d 557 (7th Cir. 1999), also calls into question the viability of disparate impact claims against insurers, albeit in a different context and for different reasons than those at issue in *American Family*.  In *Mutual of Omaha,* the Seventh Circuit considered whether an insurer violated the Americans with Disabilities Act by including lower lifetime benefits limits for AIDS and AIDS-related conditions than for other conditions.  *See id.* at 558.  The Seventh Circuit ultimately concluded that the insurer-defendant had not violated the Americans with Disabilities Act because the Act did not require the insurer to alter its policies to make them equally valuable to the disabled and nondisabled.  *See id.* at 563.  The court also held that even if its interpretation of the Americans with Disabilities Act was wrong, the plaintiff's claim against the insurer "must fail anyway, because it is barred by the McCarran-Ferguson Act."  *Id.*  According to the Seventh Circuit, interpreting the Americans with Disabilities Act as the plaintiff desired—*i.e.,* as regulating the

content of insurance policies—would "interfere with a State's administrative regime" regulating insurance and, therefore, violate the McCarran-Ferguson Act. *See id.* at 563.

As the Seventh Circuit explained, "[s]tate regulation of insurance is comprehensive and includes rate and conversion issues, . . . so if federal courts are now to determine whether caps on disabling conditions (by no means limited to AIDS) are actuarially sound and consistent with principles of state law they will be stepping on the toes of state insurance commissioners." *Id.* In finding that the McCarran-Ferguson Act barred the plaintiffs' claim, the Seventh Circuit drew a distinction between discriminatory intent claims and disparate impact claims against insurers:

> It is one thing to say that an insurance company may not refuse to deal with disabled persons; the prohibition of such refusals can probably be administered with relatively little interference with state insurance regulation . . . . It is another thing to require federal courts to determine whether limitations on coverage are actuarially sound and consistent with state law. Even if the formal criteria are the same under federal and state law, displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with *state* law—obviously would interfere with the administration of the state law. The states are not indifferent to who enforces their laws.

*Id.* at 564 (emphasis in original).

In addition to the Seventh Circuit, the Eighth Circuit also has questioned the viability of disparate impact claims against insurers, noting that "at least with respect to insurers, the question [of whether the FHA provides for disparate impact liability] is not free from doubt." *See Saunders v. Farmers Ins. Exch.,* 537 F.3d 961, 964 (8th Cir. 2008). Other courts, however, have recognized—either implicitly or explicitly—that the FHA allows for disparate impact claims against insurers. *See Ojo,* 600 F.3d at 1208-10; *Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.,* 208 F. Supp. 2d 46, 60 (D.D.C. 2002) (rejecting the defendants' argument that disparate impact liability does not apply to the insurance industry because of the availability of the "business justification" defense and because the defendants pointed to nothing in the FHA that would justify carving out an exception for a particular type of organization).

The Ninth Circuit's decision in *Ojo* is particularly relevant to the present case.  In *Ojo,* the plaintiff, an African-American resident of Texas, claimed that a homeowners insurance company and its affiliates based their rates on a number of credit-score factors that disparately impacted minorities in violation of the FHA.  *See Ojo,* 600 F.3d at 1207.  The Ninth Circuit, sitting *en banc,* held as a matter of first impression that the FHA prohibits racial discrimination in the denial and pricing of homeowners insurance.  *See id.* at 1208.  In doing so, the Ninth Circuit made no distinction between disparate treatment claims and disparate impact claims.  Because the plaintiff based his claim entirely on the discriminatory effects of the defendants' policies and did not claim that the defendants intentionally discriminated against him, however, the Ninth Circuit implicitly held that disparate impact claims against insurers are cognizable under the FHA.

The Ninth Circuit then went on to address whether the McCarran-Ferguson Act nonetheless precluded the plaintiff's claim.  The Ninth Circuit identified the issue as

> whether application of the FHA to [the plaintiff's] case might invalidate, impair, or supersede the provisions of the Texas Insurance Code that authorize insurance companies to use credit scoring in setting insurance rates.  If Texas law permits insurance companies to use credit scores even if the factors used to compute scores may have a racially disparate impact, then allowing [the plaintiff] to sue [d]efendants under the FHA for this practice would impair Texas law.  On the other hand, if Texas law prohibits the use of credit-score factors that would violate the FHA on the basis of a disparate-impact theory, then the FHA would complement—rather than displace and impair—Texas law, and [the plaintiff's] FHA disparate-impact suit would not be reverse-preempted by the [McCarran-Ferguson Act].

*See id.* at 1209-10.  Because the Ninth Circuit determined that this question of Texas law was unsettled, it certified the question to the Supreme Court of Texas.  The Supreme Court of Texas, after performing an extensive review of the relevant provisions of the Texas Insurance Code, their legislative history, and similar provisions in other areas of Texas law, determined that Texas law permits race-neutral credit scoring even if it has a racially disparate impact.  *See Ojo*

*v. Farmers Grp., Inc.,* 356 S.W.3d 421, 422-34 (Tex. 2011). Accordingly, the Texas Supreme Court concluded that allowing a claim against Texas insurers for using completely race-neutral factors in credit scoring would frustrate Texas's regulatory policies.[2] *See id.*

### III.     HUD's Disparate Impact Rule

#### A.     The Proposed Rule

The above discussion provides the backdrop for the parties' dispute regarding HUD's Disparate Impact Rule. HUD issued a Notice of Proposed Rulemaking regarding the Disparate Impact Rule on November 16, 2011. *See Implementation of the Fair Housing Act's Discriminatory Effects Standard,* 76 Fed. Reg. 70921 (Nov. 16, 2011). In the Notice of Proposed Rulemaking, HUD traced the development of discriminatory effects liability under the FHA, noting that Congress intended the FHA's prohibition of housing discrimination to be "broad and inclusive" and that HUD and all eleven circuits to have addressed the issue had determined that the FHA allows for liability based on discriminatory effects without the need for a finding of intentional discrimination. *Id.* at 70922-23. HUD recognized, however, that "[w]hile the discriminatory effects theory of liability under the [FHA] is well established, there is minor variation in how HUD and the courts have applied that theory." *See* 76 Fed. Reg. at 70922-23. According to the Notice, the purpose of the Disparate Impact Rule was to "establish[] a uniform standard of liability for facially neutral housing practices that have a discriminatory effect." *Id.* at 70921.

To that end, the proposed rule set forth a three-step burden-shifting framework for evaluating disparate impact claims. In the first step, the plaintiff bears the burden of proving that

---

[2] The parties settled their remaining disputes and dismissed the pending appeal shortly after the Texas Supreme Court issued its opinion. *See Ojo v. Farmers Grp., Inc.,* No. CV-05-05818-JFW (9th Cir.), at R. 69, Order Granting the Parties' Stipulated Motion to Dismiss with Prejudice (June 24, 2011).

a housing practice either has a disparate impact on individuals with a protected characteristic or perpetuates segregation in the housing market. *See id.* at 70923-24. In the second step, the burden shifts to the defendant to prove that the challenged practice "has a necessary and manifest relationship to one or more of the defendant's . . . legitimate, nondiscriminatory interests." *See id.* at 70924. If the defendant satisfies this burden, the plaintiff may still establish liability in the third step by proving a less discriminatory method of serving the same interests. *See id.* HUD explained in the Notice of Proposed Rulemaking that it had adopted this framework because it is consistent with the discriminatory effects standard Congress adopted for Title VII cases and it prevents either party from having to prove a negative. *See id.*

The proposed rule defined discriminatory effects liability as applying "where a facially neutral housing practice actually or predictably results in a discriminatory effect on a group of persons (that is, a disparate impact), or on the community as a whole (perpetuation of segregation)." *Id.* at 70924. HUD specified that "[a]ny facially neutral action, e.g. laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the [FHA] and [the Disparate Impact Rule]." *Id.* HUD then provided examples of housing policies or practices that may have a disparate impact on protected groups. *See id.* Among the examples HUD provided was "the provision and pricing of homeowner's insurance." *Id.* HUD cited the Ninth Circuit's opinion in *Ojo*, 600 F.3d at 1207-08, in support of this example.

### B.    Comments from the Insurance Industry

HUD received nearly 100 public comments from various individuals and entities about the proposed rule. Three trade associations representing the homeowner's insurance industry, including PCI, were among those that submitted comments to HUD. (*See* Pl. L.R. 56.1 Stmt.

¶ 21; *see also* Admin. R. 372, 455, 553.)  The insurance industry's concerns regarding the proposed rule fell into four categories.

First, the insurance industry disputed that § 3604 of the FHA allows for disparate impact liability in any context.  The commenters noted that § 3604 proscribes conduct relating to the sale or rental of dwellings that is undertaken "because of" an individual's membership in a class protected under the statute.  According to the commenters, this language prohibits only *intentional* discrimination against protected individuals.  (*See* Admin. R. 374, 457-58, 554.)

Second, the insurance industry contended that application of the Disparate Impact Rule to homeowners insurance would violate the McCarran-Ferguson Act.  (*See id.* at 379-80, 456-57, 554.)  According to the commenters, suits challenging the disparate impact of industry-wide classifications would frustrate state policies or interfere with core rate-making functions of states' administrative regimes regulating the insurance industry.  (*See id.*)  One commenter argued that application of the Disparate Impact Rule to the homeowners insurance would similarly violate the common-law "filed rate" doctrine (*see id.* at 378), which bars private claims against insurers that rest on the alleged unreasonableness of a rate that the insurer filed with the state regulatory agency.  *See generally* 44 C.J.S. *Insurance* § 117 (West 2014).

Third, the insurance industry expressed concern that applying disparate impact liability to homeowners insurance is fundamentally incompatible with the use of actuarially sound insurance principles essential to risk-based pricing.  As one commenter put it, "[c]lassifying people and property by the risks they present and treating similar risk profiles in a similar manner is a form of reasonable and fair discrimination that is at the very heart of the business of insurance."  (*See* Admin. R. at 377; *see also id.* at 554 ("[R]isk discrimination is the foundation of insurance underwriting . . . .").)  Furthermore, the commenters argued that the Disparate Impact Rule

would require insurers to disregard the predictive value of valid risk factors, which, in turn, would put insurers in the untenable position of risking violation of state regulations prohibiting price discrimination among individuals with similar risk profiles. (*Id.* at 377-78.) The commenters also claimed that the Disparate Impact Rule may actually harm consumers by increasing adverse selection and, consequently, causing coverage to suffer. (*Id.*)

Fourth, the insurance industry commented that the three-step burden-shifting approach HUD adopted in the Rule was inappropriate. Two commenters argued that the burden-shifting framework the Supreme Court adopted in *Wards Cove Packing Co. v. Antonio,* 490 U.S. 642 (1989), should apply rather than the framework set forth in the proposed rule. (*See* Admin. R. at 381, 458-59.) One commenter also noted the difficulties that shifting the burden of proof to insurers would impose because insurers do not collect data on the race and ethnicity of insureds and, thus, could not assess whether facially neutral underwriting and rating factors would have a disparate impact on protected classes. (*See id.* at 383.)

For these reasons, the insurance industry requested that HUD either exempt insurance underwriting and pricing from the Disparate Impact Rule altogether or build safe harbors into the Rule for long-recognized actuarial risk factors, such as the age and condition of the property.[3] (*See id.* at 380, 383, 459, 554-55.)

###  C.     The Final Rule

HUD issued its final Disparate Impact Rule on February 15, 2013. *See* Final Rule, 78 Fed. Reg. at 11460 (Feb. 15, 2013). HUD acknowledged and responded to the insurance

---

[3] The insurance industry also urged HUD to withdraw the proposed rule pending the Supreme Court's decision in *Magner v. Gallagher,* 619 F.3d 823 (8th Cir. 2010*), cert. granted,* No. 10-1032 (2011), regarding whether disparate impact claims are cognizable under the FHA. The Supreme Court scheduled oral argument in *Magner* to take place shortly after the notice-and-comment period for the proposed rule. The case, however, settled before the Supreme Court issued a decision.

industry's comments in the preamble to the Final Rule.  HUD did not, however, make any changes to the Final Rule in response to their comments.  Instead, HUD determined that the framework it had adopted was flexible enough to accommodate the insurance industry's concerns on a case-by-case basis.

To begin with, HUD dismissed as contrary to well-established law the insurance industry's and others commenters' argument that the FHA does not provide for disparate impact liability.  HUD reiterated that both HUD and all eleven circuit courts to have addressed the issue had long interpreted the FHA to allow for discriminatory effects as well as discriminatory intent liability.  *See id.* at 11465-67.  HUD also noted that courts regularly borrow from Title VII standards in interpreting the FHA, and it is well-established that Title VII allows for discriminatory effects liability.  *See id.* at 11466.  Finally, HUD contended that the legislative history of the FHA supported its interpretation of the Act as providing for discriminatory effects liability.  *See id.* at 11467.

 Next, HUD determined that the insurance industry's concerns that application of the Disparate Impact Rule to the insurance industry would violate the McCarran-Ferguson Act or the filed-rate doctrine were unfounded because the Rule did not alter the analysis courts already employed in evaluating FHA claims against homeowners insurers.  *See id.* at 11474-75. Specifically, HUD provided the following, brief response to the industry's concerns that the Disparate Impact Rule would violate the McCarran-Ferguson Act and the filed-rate doctrine:

> HUD has long interpreted the [FHA] to prohibit discriminatory practices in connection with homeowner's insurance, and courts have agreed with HUD, including in *Ojo v. Farmers Group*.  Moreover, as discussed above, HUD has consistently interpreted the Act to permit violations to be established by proof of discriminatory effect.  By formalizing the discriminatory effects standard, the rule will not, as one commenter suggested, "undermine the states' regulation of insurance."  The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State

for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act. How the Act should be construed in light of McCarran-Ferguson depends on the facts at issue and the language of the relevant State law "relat[ing] to the business of insurance." Because this final rule does not alter the instruction of McCarran-Ferguson or its application as described in *Ojo v. Farmers Group*, it will not interfere with any State regulation of the insurance industry.

*Id.* at 11475 (footnotes omitted).[4]

In a similar vein, HUD also determined that the industry's concerns that the nature of insurance made the Disparate Impact Rule's application to the insurance industry inappropriate were "misplaced" because of the ability of an insurer to establish that the practice at issue has a legally sufficient justification. *See id.* HUD explained:

> HUD believes that these concerns are misplaced. First, they presume that once a discriminatory effect is shown, the policy at issue is per se illegal. This is incorrect. Rather as § 100.500 makes clear, the respondent or defendant has a full opportunity to defend the business justifications for its policies. This "burden-shifting framework" distinguishes "unnecessary barriers proscribed by the [FHA] from valid policies and practices crafted to advance legitimate interests." Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification.

*Id.* at 11475 (footnote omitted) (citing *Groach Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n,* 508 F.3d 366, 374-75 (6th Cir. 2007)). HUD went on to deny the insurance industry's request for exemptions or safe harbors related to insurance as unnecessary because "insurance practices with a legally sufficient justification will not violate the [FHA]." *Id.* Moreover, HUD explained, "creating exemptions beyond those found in the [FHA] would run contrary to Congressional intent." *Id.* (footnote omitted).

---

[4] HUD cited *Ojo,* 600 F.3d at 1208, *American Family,* 978 F.2d at 297-301, and *Nationwide Mut. Ins. Co. v. Cisneros,* 52 F.3d 1351, 1355-60 (6th Cir. 1995), in support of its assertion that courts have agreed that the FHA prohibits discriminatory practices in connection with homeowners insurance. *See id.* at 11475 n.139. HUD noted that the Fourth Circuit found in *Mackey v. Nationwide Ins. Cos.,*724 F.2d 419, 423-25 (4th Cir. 1984), that the FHA does not cover insurance. *See id.*

Finally, HUD rejected the commenters' argument that the burden-shifting framework adopted in the Disparate Impact Rule is unfair for insurers because they do not collect data on race and ethnicity. *See id.* In response to this concern, HUD stated:

> The burden of proof is not more difficult for insurers than for a charging party or plaintiff alleging that an insurance practice creates a discriminatory effect. The charging party or plaintiff must initially show the discriminatory effect of the challenged practice using appropriate evidence that demonstrates the effect. If the charging party or plaintiff makes that showing, the burden shifts to the insurer to show that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests.

*Id.* HUD also rejected the commenters' request for HUD to adopt the burden-shifting framework used in *Wards Cove* for proving disparate impact claims. *See id.* at 11469-73. HUD found that the framework it adopted, which it borrowed from Title VII cases, is appropriate and fairly balances the interests of all parties. *See id.*

## IV.    Procedural History

On November 27, 2013, PCI filed the present suit seeking to invalidate the Disparate Impact Rule as it applies to the provision and pricing of homeowners insurance. (*See* Compl. at 39.) PCI claims that the Disparate Impact Rule is invalid under the Administrative Procedure Act for a number of reasons. First, PCI argues that application of the Disparate Impact Rule to the insurance industry would violate the McCarran-Ferguson Act. (*See id.* at Count I.) Second, PCI argues that HUD's issuance of the Disparate Impact Rule was arbitrary and capricious because HUD failed to adequately consider the Rule's conflict with the McCarran-Ferguson Act, the filed rate doctrine, and the nature of insurance. (*See id.* at Counts II-IV.) Finally, PCI challenges the three-step burden-shifting framework HUD adopted in the Disparate Impact Rule as arbitrary, capricious, and not in accordance with law. (*See id.* at Counts V-VI.)

PCI moved for summary judgment on its claims (*see* R. 20, PCI Mot.), and HUD filed a cross-motion seeking dismissal of PCI's claims for lack of subject matter jurisdiction or, in the

alternative, summary judgment in HUD's favor on all claims.  (*See* R. 30, HUD Mot.)  The Court

heard oral argument on the parties' motions on August 19, 2014.[5]

### LEGAL STANDARD

The Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq.,* sets forth the extent

of judicial authority to review federal agency actions.  *See F.C.C. v. Fox Tele. Stations, Inc.,* 556

U.S. 502, 513-14, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009); *J.N. Moser Trucking, Inc. v. U.S.*

*Dep't of Labor,* 306 F. Supp. 2d 774, 781 (N.D. Ill. 2004).  Section 10(e) of the APA instructs

that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions

found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law."  *See* 5 U.S.C. § 706(2); *Little Co. of Mary Hosp. v. Sebelius,* 587 F.3d 849, 856 (7th Cir.

2009).  Judicial review of agency action under the APA is "narrow," and courts must limit their

review of the agency's action to the administrative record before the agency.  *See Judulang v.*

*Holder,* --- U.S. ---, 132 S. Ct. 476, 483, 181 L. Ed. 2d 449 (2011); *Association of Private Sector*

*Colls. & Univs. v. Duncan,* 681 F.3d 427, 441 (D.C. Cir. 2012).  A reviewing court "is not to

substitute its judgment for that of the agency."  *Judulang,* 132 S. Ct. at 483.

---

[5] The Court acknowledges and appreciates the *amicus curiae* who submitted briefs in this action.  The
American Civil Liberties Union, American Civil Liberties Union of Illinois, Chicago Area Fair Housing
Alliance, Chicago Lawyers' Committee for Civil Rights Under Law, Inc., LatinoJustice PRLDEF,
Lawyers' Committee for Civil Rights Under Law, National Association for the Advancement of Colored
People, NAACP Milwaukee Branch, NAACP Legal Defense & Educational Fund, Inc., National
Community Reinvestment Coalition, National Consumer Law Center, National Fair Housing Alliance,
National Housing Law Project, Poverty & Race Research Action Council, and Sherman Park Community
Association submitted a joint brief in support of HUD's motion.  (*See* R. 33.)  The State of Illinois also
submitted an *amicus curiae* brief in support of HUD's motion.  (*See* R. 80.)  The State of Oklahoma,
through its Insurance Commissioner, submitted an *amicus curiae* brief in support of PCI's motion (*see* R.
48), and the insurance commissioners of the States of Alabama, Louisiana, Mississippi, and Nevada
joined Oklahoma's brief.  (*See* R. 64.)  The American Financial Services Association, the Consumer
Mortgage Coalition, the Independent Community Bankers of American, and the Mortgage Bankers
Association also submitted a joint *amicus curiae* brief in support of PCI's motion.  (*See* R. 59-1.)

## ANALYSIS

### I.    Subject Matter Jurisdiction

Before the Court can address the merits of PCI's claims, it must assure itself that it has subject matter jurisdiction over those claims. *See Aljabri v. Holder,* 745 F.3d 816, 818-19 (7th Cir. 2014) (federal courts must "consider subject-matter jurisdiction as the first question in every case, . . . and must dismiss [a] suit if such jurisdiction is lacking"). Of particular relevance here, the Court must determine whether PCI has standing to assert its claims and whether PCI's claim that the Disparate Impact Rule violates the McCarran-Ferguson Act is ripe. The Court turns to the ripeness issue first.

#### A.    Ripeness

"Ripeness is a justiciability doctrine designed 'to prevent the courts through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 807-08, 123 S. Ct. 2026, 155 L. Ed. 2d 1017 (2003) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148-49, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967)). The ripeness doctrine stems "both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n,* 538 U.S. at 808 (quoting *Reno v. Catholic Social Servs., Inc.,* 509 U.S. 43, 57 n.18, 113 S. Cr. 2485, 125 L. Ed. 2d 38 (1993)). In *Abbott Laboratories*, the Supreme Court announced a two-factor test for evaluating the prudential aspects of whether agency action is ripe for judicial review. *See Abbott Labs.,* 387 U.S. at 149. Under the *Abbott Laboratories* test, courts evaluate "(1) the fitness of the issues for judicial

decision and (2) the hardship to the parties of withholding court consideration" in assessing the ripeness of the issue for judicial review. *Nat'l Park Hospitality Ass'n,* 538 U.S. at 808 (citing *Abbott Labs. v. Gardner,* 387 U.S. at 149).

### 1.     The Nature of PCI's McCarran-Ferguson Claim

Before turning to the ripeness factors, the Court must address the parties' disagreements regarding the nature of PCI's McCarran-Ferguson claim. PCI argues that its McCarran-Ferguson claim presents an as-applied challenge to the Disparate Impact Rule because PCI challenges the Rule only as it applies to a subset of conduct (*i.e.,* the provision and pricing of homeowners insurance), not as a whole. HUD, on the other hand, contends that PCI's claim presents a facial challenge to the Disparate Impact Rule because the claim does not turn on particular facts or require the Court to consider a specific application of the Rule to insurers. The parties also disagree on the standard the Court should apply if it finds that PCI's McCarran-Ferguson claim presents a facial challenge to the Rule. HUD argues that to succeed on a facial challenge, PCI must show that "no set of circumstances exists under which the regulation would be valid," (*see* Defs. Reply Br. at 7 (quoting *Reno v. Flores,* 507 U.S. 292, 301, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993)); *see also* R. 97, Defs. Supp. Br. at 5-8), whereas PCI contends that the appropriate standard is whether the regulation has a "plainly legitimate sweep." (*See* R. 96, Pl. Supp. Br. at 3-7.)

The Court agrees with HUD that PCI's McCarran-Ferguson claim presents a facial challenge to the Disparate Impact Rule. PCI does not challenge a particular, concrete application of the Rule to any of its members. Rather, it categorically challenges a broad range of potential applications of the Rule without relying on the facts of any particular application. Although PCI does not seek to invalidate the Rule outside the homeowners insurance context, its challenge is

more akin to a facial challenge than to an as-applied challenge, especially considering that the

McCarran-Ferguson Act itself only applies to the business of insurance. *See Peick v. Pension*

*Ben. Guar. Corp.,* 724 F.2d 1247, 1261 n.16 (7th Cir. 1983) ("The parties have argued

vigorously as to whether this is an 'as applied' or 'facial' challenge to the Act. Given the

minimal or nonexistent record with respect to the actual operation of the MPPAA in the situation

presented in this case, we do not think that the case can properly be considered an 'as applied'

challenge."); *Alliance of Auto Mfrs., Inc. v. Currey,* 984 F. Supp. 2d 32, 46-47 (D. Conn. 2013)

(finding that the plaintiff presented a facial challenge because the plaintiff had not alleged "any

unconstitutional application of the law apart from the general applicability of the law to all

manufacturers who transact business with in-state dealers").

    The precise standard that applies to facial challenges remains a matter of dispute. *See*

*United States v. Stevens,* 559 U.S. 460, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010); *A Woman's*

*Choice-E. Side Women's Clinic v. Newman,* 305 F.3d 684, 687 (7th Cir. 2002). The Supreme

Court first announced the "no set of circumstances" standard in *United States v. Salerno,* 481

U.S. 739, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987), stating that a law will be held

unconstitutional in a facial challenge only when "no set of circumstances exists under which the

Act would be valid." *See id.* at 745. The "no set of circumstances" standard was not the decisive

factor in *Salerno*, however, and the Supreme Court has not always applied this standard in

evaluating facial challenges to the constitutionality of statutes or regulations. *See Newman,* 305

F.3d at 687. Faced with "irreconcilable directives" from the Supreme Court, the Seventh Circuit

determined in *Newman* that the language of *Salerno*—which a subsequent Supreme Court

decision referred to as a "suggestion," *see Troxel v. Ganville,* 530 U.S. 57, 85 n.6, 120 S. Ct.

2054, 147 L. Ed. 2d 49 (2000)—must give way to the Supreme Court's later holdings in which the Court did not apply the *Salerno* standard. *See Newman,* 305 F.3d at 687.

Since *Newman,* the Seventh Circuit has applied the "no set of circumstances" standard to a facial challenge to an interagency coordination agreement. *See Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs,* 335 F.3d 607, 619 (7th Cir. 2003) ("[T]o prevail on a facial challenge, [the plaintiff] 'must establish that no set of circumstances exists under which the [regulation] would be valid.'" (quoting *Reno,* 507 U.S. at 301)); *see also Fields v. Smith,* 653 F.3d 550, 557 (7th Cir. 2011) (applying the "no set of circumstances" standard to a facial challenge to the constitutionality of a statute). More recently, the Court of Appeals for the District of Columbia also applied the "no set of circumstances" standard in evaluating facial challenges to agency regulations, noting that this standard applied to "both the constitutional challenges and the statutory challenge[s]." *Association of Private Sector Colls. & Univs. v. Duncan,* 681 F.3d 427, 442 (D.C. Cir. 2012) (alteration in original) (quoting *Reno,* 507 U.S. at 301; *see also Sherley v. Sebelius,* 644 F.3d 388, 397 (D.C. Cir. 2011) (applying the "no set of circumstances" standard to the plaintiff's claim that the National Institutes of Health's guidelines for stem cell research were facially invalid under the Dickey-Wicker Amendment barring funding for research in which a human embryo is destroyed). HUD argues that the takeaway from these cases is that the "no set of circumstances" standard continues to govern facial, non-constitutional challenges to a regulation. (*See* Defs. Supp. Br. at 5-6.)

The Court finds that the "no set of circumstances" standard is the appropriate standard for evaluating PCI's claim that the McCarran-Ferguson Act precludes disparate impact claims based on the provision and pricing of homeowners insurance. *See Wisconsin Cent., Ltd. v. Shannon,* 539 F.3d 751, 761 (7th Cir. 2008). In *Wisconsin Central,* the plaintiff, an interstate railroad

company, argued that the federal Railway Labor Act and, more generally, Congress's vast regulation of the railways preempted the overtime provisions in Illinois's Minimum Wage Law. *See id.* at 755.  The Seventh Circuit held that the plaintiff's preemption challenge under the Railway Labor Act was not ripe because the Act only precludes claims that depend on an interpretation of a collective bargaining agreement's terms and, although it was clear that the court would need to consult the collective bargaining agreements to decide the plaintiff's claim, it was not yet clear whether the court would need to *interpret* the terms of the agreement.  *See id.* at 759-61.

In reaching this conclusion, the Seventh Circuit stated that "if it is evident that the result of a process must lead to . . . preemption, it would defy logic to hold that the process itself cannot be preempted and that a complaint seeking that result would not raise a ripe issue."  *Id.* at 761 (quoting *NE Hub Partners, L.P. v. CNG Transmission Corp.,* 239 F.3d 333, 348 (3d Cir. 2001)). The Seventh Circuit further explained that where the circumstances at issue "would not invariably lead to a finding of preemption," the plaintiff's claim was not ripe for consideration. *See id.* at 761.  Accordingly, the Seventh Circuit held that because "scenarios exist where it would be unnecessary for the [collective bargaining agreements] to be interpreted in order to resolve the claim . . . the district court lacked jurisdiction to rule on [the plaintiff's] counts concerning preemption under the [Railway Labor Act]."  *Id.*  The Seventh Circuit found that the plaintiff's field preemption claim, on the other hand, was ripe for review because it presented a purely legal issue and, if the court found that field preemption applied, it would completely bar all enforcement of Illinois's overtime regulations against the plaintiff.  *See id.* at 761-62.

Under this reasoning, the Court finds that the appropriate standard under which to evaluate PCI's McCarran-Ferguson Act claim is essentially identical to the "no set of

circumstances" standard applied in *Home Builders Association of Greater Chicago v. U.S. Army Corps of Engineers* and *Association of Private Sector Colleges and Universities v. Duncan*. PCI can succeed on its facial challenge only if the McCarran-Ferguson Act would invariably preempt application of the Disparate Impact Rule to the provision and pricing of homeowners insurance. In other words, it can succeed only if no set of circumstances exists under which the regulation would be valid. *Cf. Wisconsin Cent.,* 539 F.3d at 761. With this standard in mind, the Court now turns to consideration of *Abbott Laboratories*' two-factor test for ripeness.

### 2. Ripeness Test

#### a. Fitness of the Issue for Judicial Decision

Where judicial review of an agency's action "involves purely legal claims in the context of a facial challenge to a final rule, a petition is 'presumptively reviewable.'" *Owner-Operator Ind. Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.,* 656 F.3d at 586 (quoting *Sabre, Inc. v. Department of Transp.,* 429 F.3d 1113, 1119 (D.C. Cir. 2005)). Despite this presumption, however, an issue is not fit for judicial decision where it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States,* 523 U.S. 296, 300, 118 S. Ct. 1257, 140 L. Ed. 2d 406 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580-81, 105 S. Ct. 3325, 87 L. Ed. 2d 409 (1985)). Nor is an issue fit for judicial decision if "further factual development would 'significantly advance [the court's] ability to deal with the legal issues presented.'" *Nat'l Park Hospitality Ass'n,* 538 U.S. at 812 (quoting *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.,* 438 U.S. 59, 82, 98 S. Ct. 2620, 57 L. Ed. 2d 595 (1978)). Under these standards, the issue of whether the McCarran-Ferguson Act precludes application of the Disparate Impact Rule to the provision and pricing of homeowners insurance is not yet fit for judicial review. Although this question is a "purely legal one," the

contours of the purported controversy are not sufficiently fleshed out to allow for judicial resolution of the issues at this time. *See Nat'l Park Hospitality Ass'n,* 538 U.S. at 808.

To begin with, the Supreme Court expressly rejected an interpretation of the McCarran-Ferguson Act as creating "any sort of field preemption" in *Humana. See Humana,* 525 U.S. at 309. Under *Humana,* McCarran-Ferguson preclusion applies only when (1) a federal law directly conflicts with state regulation, (2) application of a federal law would frustrate a declared state policy, or (3) application of a federal law would interfere with a State's administrative regime. *See id.* at 310. Courts that have considered McCarran-Ferguson challenges to housing discrimination claims since *Humana* have looked to the particular, allegedly discriminatory practices at issue and the particular insurance regulations and administrative regime of the state in which those practices occurred. *See, e.g., Ojo,* 600 F.3d at 1203-05 (certifying to the Supreme Court of Texas the question of whether Texas law permits an insurance company to price insurance using a credit-score factor that has a racially disparate impact); *Saunders v. Farmers Ins. Exch.,* 537 F.3d 961, 965-68 (8th Cir. 2008) (analyzing Missouri's regulatory regime and the "precise federal claims asserted"—*i.e.,* that insurance companies charged higher premiums to homeowners in minority communities—in determining whether McCarran-Ferguson preclusion applied); *cf. AmSouth Bank v. Dale.* 386 F.3d 763, 781 (6th Cir. 2004) ("[W]hen assessing whether a general federal statute that creates a cause of action 'impairs' the operation of state law, the proper inquiry is whether the particular suit being brought would impair state law."). As these cases demonstrate, the McCarran-Ferguson analysis is more akin to the case-by-case analysis required for finding preemption under the Railway Labor Act than to the categorical analysis that applies in cases of field preemption. *Cf. Wisconsin Cent.,*539 F.3d at 755-60.

PCI argues, however, that even though the McCarran-Ferguson Act does not establish field preemption, the Act does preclude all disparate impact claims based on the provision and pricing of homeowners insurance because federal adjudication of those claims would necessarily interfere with states' administrative regimes for regulating insurance.  PCI relies heavily on *Doe v. Mutual of Omaha Ins. Co.,* 179 F.3d 557 (7th Cir. 1999), in support of this argument.  In *Mutual of Omaha,* the Seventh Circuit found that permitting federal courts to determine whether caps on coverage in a health insurance policy are actuarially sound and consistent with principles of state law would result in them "stepping on the toes of state insurance commissioners."  *See id.* at 564.  Accordingly, the Seventh Circuit stated that even if the formal criteria for determining whether limitations on coverage are actuarially sound and consistent with state law, "displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with *state* law—obviously would interfere with the administration of state law.  The states are not indifferent to who enforces their laws."  *Id.* (emphasis in original.)

According to PCI, it follows from *Mutual of Omaha* that the McCarran-Ferguson Act bars all claims brought under the Disparate Impact Rule because the second step of the Rule's burden-shifting approach requires courts to evaluate whether the challenged practice "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" of the defendant and whether those interests could be served by another practice with a less discriminatory effect.  *See* 24 C.F.R. § 100.500.  PCI argues that, in the insurance context, this analysis will necessarily require courts to determine whether the challenged practices are actuarially sound and consistent with state law—something that *Mutual of Omaha* prohibits federal courts from doing.

Although *Mutual of Omaha* supports PCI's argument that the McCarran-Ferguson Act bars any claims that require courts to determine whether an insurer's practices are actuarially sound and consistent with state law,[6] it does not necessarily establish that PCI's broad facial challenge is fit for judicial decision.  A myriad of insurance practices may affect the provision and pricing of homeowners insurance, and some of those practices may have a disparate impact on protected groups under the FHA.  In the absence of an actual, concrete application of disparate impact liability to the homeowners insurance industry, the Court can only speculate about what types of disparate impact claims HUD or private plaintiffs may assert against insurers and whether the McCarran-Ferguson Act will preclude those claims.  Variations among state regulatory regimes, moreover, provide an additional variable that may complicate any hypothetical McCarran-Ferguson analysis.  While some states require insurers to use risk-based pricing, other states merely permit risk-based pricing, but do not require it.  Accordingly, some insurance practices in some states may rest on business justifications rather than actuarially sound principles or state law requirements.  Under *Mutual of Omaha*, the McCarran-Ferguson Act would not necessarily preclude claims based on these practices because it is not clear that such claims would raise the question of whether the insurer's practices are actuarially sound and

---

[6] During oral argument, HUD argued that the language at issue in *Mutual of Omaha* is dicta because the Court's holding turned on a statutory interpretation issue with respect to the Americans with Disabilities Act, not on the application of McCarran-Ferguson preclusion.  The Court disagrees.  The Seventh Circuit's decision in *Mutual of Omaha* rested *both* on its interpretation of the Americans with Disabilities Act *and* its determination that interpreting the Americans with Disabilities Act "as regulating the content of insurance policies is barred by the McCarran-Ferguson Act."  *See Mutual of Omaha,* 179 F.3d at 564.  HUD also argued that reading *Mutual of Omaha* as holding that McCarran-Ferguson preclusion bars any claim that would require the court to evaluate whether an insurer's practices are actuarially sound and consistent with state law—rather than just the specific claim at issue in that case—would conflict with *Humana*.  The Seventh Circuit's opinion, however, plainly establishes that the court intended its holding to bar more than just the specific claim at issue.  Indeed, the actual claims at issue in *Mutual of Omaha* did not require the Seventh Circuit to determine whether the defendant's practices were actuarially sound and in accordance with state law because the defendant stipulated that they were not.  *Id.* at 564.  *Mutual of Omaha* is binding on this Court.

consistent with state law.  As matters now stand, there are simply "too many imponderables" to allow the Court to determine whether the McCarran-Ferguson Act categorically applies to all disparate impact claims that may fall within the scope of PCI's McCarran-Ferguson challenge. *See Clean Air Implementation Project v. EPA,* 150 F.3d 1200, 1205 (D.C. Cir. 1998).

Under the circumstances, "further factual development would 'significantly advance [the Court's] ability to deal with the legal issues presented'" in PCI's McCarran-Ferguson claim.  *See Nat'l Park Hospitality,* 538 U.S. at 812.  Similar to the situation in *National Park Hospitality,* both parties here rely on examples of challenges to specific insurance practices to which McCarran-Ferguson preclusion applies and point to specific state insurance laws to support their respective arguments.  *See id.*  Accordingly, the Court finds that judicial resolution of whether McCarran-Ferguson preclusion applies to disparate impact claims should await a concrete dispute regarding a particular insurance practice.  *See id.* (finding that an APA claim asserting that the National Park Service's regulations regarding the concession management program for national parks violated the Contract Disputes Act of 1978 was not ripe because the parties' arguments depended in part on the characteristics of certain types of concession contracts and the respondents acknowledged that some (but not all) types of the contracts might fall within the scope of Contract Disputes Act); *see also Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158, 163-64, 87 S. Ct. 1520, 18 L. Ed. 2d 697 (1967) (holding that the petitioner's challenge to the regulations promulgated by the Commissioner of Food and Drugs exceeded his statutory authority where the regulation served notice only that the Commissioner may under certain circumstances order inspection of certain facilities and data and "[a]t this junction we have no idea whether or when such an inspection will be ordered and what reasons the Commissioner will give to justify his order"); *Texas v. United States,* 523 U.S. 296, 301, 118 S. Ct. 1257, 140 L.

Ed. 2d 406 (1998) ("Determination of the scope . . . of legislation in advance of its immediate

adverse effect in the context of a concrete case [often] involves too remote and abstract an

inquiry for the proper exercise of the judicial function." (quoting *Longshoremen v. Boyd,* 347

U.S. 222, 224, 74 S. Ct. 447, 98 L. Ed. 650 (1954))); *Wisconsin Cent.,* 539 F.3d at 760 (finding

that the question of whether the RLA and the Labor Management Relations Act preempted a

state law was not fit for judicial decision because it required a "case-by-case factual analysis to

determine the extent to which a state law claim will require interpretation of a [collective

bargaining agreement]."); *Clean Air Implementation Project,* 150 F.3d at 1205 ("Given the

universe of all possible evidence that might be considered 'credible,' it is impossible for us to

decide now what impact the [EPA's rule permitting the use of 'credible evidence' to prove or

disprove violations of the Clean Air Act] will have.").[7]

---

[7] In addition to *Mutual of Omaha,* PCI also cites several out-of-circuit cases in which courts decided as a purely legal question that McCarran-Ferguson preclusion applied in support of its ripeness argument. In each of those cases, however, the court considered a challenge to particular conduct in a particular state (or states), and, as a result, the court was able to evaluate whether resolution of the plaintiff's particular claim would invalidate, impair, or supersede the state's insurance regulations. *See American Bankers Ins. Co. of Fla. v. Inman,* 436 F.3d 490 (5th Cir. 2006) (holding that McCarran-Ferguson preclusion applied where application of the Federal Arbitration Act would invalidate a Mississippi statute prohibiting the arbitration of disputes regarding uninsured motorist coverage); *La Barre v. Credit Acceptance Corp.,* 175 F.3d 640 (8th Cir. 1999) (finding that the McCarran-Ferguson Act precluded application of RICO to the activities of two defendants but not to the activities of a third defendant); *Datacor, Inc. v. Heritage Warranty Ins. Risk Retention Grp., Inc.,* No. 4:09-CV-1123 (CEJ), 2009 WL 5062137 (E.D. Mo. Dec. 16, 2009) (concluding that a Nebraska statute exempting arbitration provisions found in insurance contracts from the rule favoring enforcement of agreements to arbitrate precluded application of the Federal Arbitration Act to compel arbitration of plaintiff's insurance-related claim); *In re Managed Care Litig.,* 185 F. Supp. 2d 1310 (S.D. Fla. 2002) (holding that the McCarran-Ferguson Act barred the RICO claims of the plaintiffs residing in California, Florida, New Jersey, and Virginia because those states did not allow for private causes of action by victims of insurance fraud). These cases do not support a finding that PCI's McCarran-Ferguson claim, which is divorced from any concrete application of the Disparate Impact Rule, is ripe for review. *See Wisconsin Cent.,* 539 F.3d at 759 ("[C]ases are unripe when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts." (quoting *Lehn v. Holmes,* 364 F.3d 862, 867 (7th Cir. 2004))).

### b.  Hardship to the Parties of Withholding Court Consideration

Turning to the second ripeness factor under *Abbott Labs.*, PCI also fails to establish that withholding judicial determination of its McCarran-Ferguson claim will cause its members hardship.  *Abbott Labs.,* 387 U.S. at 149; *Nat'l Park Hosp.*, 538 U.S. at 808.  There is no dispute that the McCarran-Ferguson Act, where it applies, trumps any claims brought under the Disparate Impact Rule—just as it trumped any disparate impact claims brought against insurers before HUD issued the Rule.  Accordingly, even though the Disparate Impact Rule may expand the exposure of PCI's members to disparate impact liability generally, it does nothing to prevent PCI's members from challenging disparate impact claims as preempted by the McCarran-Ferguson Act.  Nor does it change the analysis that courts apply in deciding whether the McCarran-Ferguson Act precludes a specific claim.

Accordingly, the only hardship that PCI's members might suffer from the Court withholding a decision on the merits here is the burden of having to challenge disparate impact claims under the McCarran-Ferguson Act on a case-by-case basis rather than in one fell swoop.  As a general rule, the additional burden to a litigant of case-by-case adjudication is not a sufficient hardship to justify judicial review of an otherwise unripe claim.  *See Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 734-35, 118 S. Ct. 1665, 140 L. Ed. 2d 921 (1998) (although it would be "easier, and certainly cheaper," for the respondent to mount one legal challenge to an agency's plan rather than several challenges to specific decisions made pursuant to that plan, "the Court has not considered this kind of litigation cost saving sufficient by itself to justify review in a case that would otherwise be unripe"); *Clean Air Implementation Project,* 150 F.3d at 1205 ("If the [EPA's] credible evidence rule has in fact altered [emission standards], petitioners can raise that as a defense in an enforcement action.  The burden of participating in

future proceedings does not 'constitute sufficient hardship for the purposes of ripeness.'"

(quoting *Florida Power & Light Co. v. EPA,* 145 F.3d 1414, 1421 (D.C. Cir. 1998))).  To the

contrary, the ripeness doctrine already "reflects a judgment that the disadvantages of a premature

review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of—

even repetitive—post-implementation litigation."  *Ohio Forestry Ass'n,* 523 U.S. at 735

(collecting cases).[8]

    In *Wisconsin Central,* the Seventh Circuit recognized that, in the preemption context, the

plaintiff may satisfy the hardship requirement by establishing a "possibility that it will need to

defend itself in an enforcement action ultimately preempted."  *See* 539 F.3d at 761.  The Seventh

Circuit also explained that this type of hardship makes a preemption claim ripe only when the

circumstances at issue "would invariably lead to a finding of preemption."  *Id.*  As discussed

above, the Court is not in a position to determine whether the McCarran-Ferguson Act will

necessarily preempt all disparate impact claims based on the provision or pricing of homeowners

insurance.  PCI, therefore, has not established that withholding consideration of its McCarran-

Ferguson claim will cause its members hardship under the analysis in *Wisconsin Central.*

    In sum, the Court finds that judicial determination of whether McCarran-Ferguson

preclusion applies to the broad range of potential claims that may fall within PCI's McCarran-

Ferguson challenge is best left for a concrete dispute challenging a particular insurance practice,

---

[8] PCI claims that, unlike in the *Ohio Forestry Association* and *Clean Air Implementation Project* cases, its members face the additional hardship of having to "either cease engaging in the core insurance practices of state-regulated risk-based pricing and underwriting or risk substantial liability under the Disparate Impact Rule."  (*See* Pl. Resp. Br. at 18.)  This argument, however, has no merit with respect to PCI's McCarran-Ferguson claim because the Disparate Impact Rule does not alter the application or effect of McCarran-Ferguson preclusion.  *Cf. Toilet Goods Ass'n,* 387 U.S. at 164-65 (finding no hardship where the petitioners already had a statutory duty to permit inspections of their factories and "no irremediable adverse consequences flow from requiring a later challenge to [the] regulation by a manufacturer who refuses to allow this type of inspection).

and withholding judicial decision until that time will not impose a hardship on PCI's members. Accordingly, PCI's claim that the Disparate Impact Rule violates the McCarran-Ferguson is not ripe, and the Court lacks jurisdiction to decide it.

### B.    Standing

Next, the Court considers whether PCI has standing to assert its remaining claims.[9]  The question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Bennett v. Spear,* 520 U.S. 154, 162, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997).  To establish constitutional standing, a plaintiff must show (1) an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) a causal connection between the plaintiff's injury and the complained-of conduct, and (3) a likelihood that a favorable decision will redress the plaintiff's injury.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); *Clapper v. Amnesty Int'l USA,* --- U.S. ----, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013).  Apart from the constitutional limitations on standing, federal courts have also created self-imposed prudential limits on their exercise of federal jurisdiction.  *See, e.g., G&S Hldgs. LLC v. Continental Cas. Co.,* 697 F.3d 534, 541 (7th Cir. 2012).  Unlike constitutional standing requirements, however, "prudential limitations on standing can be waived."  *Korte v. Sebelius,* 735 F.3d 654, 668 (7th Cir. 2013).  Here, HUD has raised objections only to PCI's constitutional standing, not its prudential standing.  The Court, therefore, limits its discussion to the constitutional requirements for standing.[10]

---

[9] Because the Court has determined that PCI's McCarran-Ferguson claim is not ripe, the Court need not determine whether PCI has standing to assert that claim.

[10] Although the Court has discretion to overlook HUD's waiver, the Court sees no reason to do so in this case.

An organization such as PCI has standing to sue on behalf of its members even if the organization itself has not suffered an injury if it can show that "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000). Only the first requirement of associational standing—that PCI's members have standing to sue in their own right—is at issue here. To meet this requirement, PCI must show that at least one of its members has standing to assert the claims PCI has brought. *See Warth v. Seldin,* 422 U.S. 490, 511, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975); *see also Consumer Fed'n of Am. v. Federal Commc'ns Comm'n,* 348 F.3d 1009, 1012 (D.C. Cir. 2003) ("It is enough [for associational standing] if just one member of the groups has standing.").

As an initial matter, when the plaintiff is "an object of the action (or forgone action) at issue . . . there is ordinarily little question that the action or inaction has caused him injury." *See Owner-Operator Ind. Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.,* 656 F.3d 580, 586 (7th Cir. 2011) (quoting *Lujan,* 504 U.S. at 561-62); *Fund for Animals, Inc. v. Norton,* 322 F.3d 728, 733-34 (D.C. Cir. 2003) (a party's standing to seek judicial review of administrative action is generally "self-evident" when the party is an object of the action at issue). This case is no exception. PCI's member companies, which provide homeowners insurance across the United States (*see* Pl. L.R. 56.1 Stmt. ¶ 2), are among the "objects" of the Disparate Impact Rule, and, as explained below, they satisfy the requirements for constitutional standing.

### 1.    Injury in Fact

First, PCI's members have suffered an "injury in fact" because the Disparate Impact Rule increases their exposure to disparate impact liability under the FHA.  Although the Disparate Impact Rule simply confirmed preexisting legal standards in some circuits, it went beyond established law in others.  The Seventh and Eighth Circuits, for example, had expressly declined to decide whether disparate impact liability applies to the insurance industry under the FHA, *see American Family,* 978 F.2d at 290; *Saunders,* 537 F.3d at 964, and neither the Supreme Court nor the Court of Appeals for the District of Columbia has decided whether the FHA allows for disparate impact claims before HUD issued the Disparate Impact Rule.  The increased exposure of PCI's members to disparate impact claims under the Rule satisfies the "injury in fact" requirement of Article III standing.  *Cf. Johnson v. Allsteel, Inc.,* 259 F.3d 885, 888 (7th Cir. 2001) (granting increased discretion to an ERISA plan administrator increased the plan participant's risk of having his claim for benefits denied, and "[t]he increased risk the participant faces as a result is an injury-in-fact").

Additionally, officers of several of PCI's member companies submitted declarations averring that, as a practical matter, the Disparate Impact Rule will require the company to begin collecting and reviewing information regarding applicants' race, color, ethnicity, national origin, religion, and disability status to monitor their compliance with the Rule.  The declarants represented that doing so will cause their companies to incur costs related to determining what additional data they need and how to obtain it, collecting the data in accord with federal and state laws, and monitoring the data to ensure compliance with the Rule.  (*See* R. 44-2, Cracas Decl. ¶¶ 6-12; R. 44-3, Dawdy Decl. ¶¶ 11-14; R. 44-4, Zaleski Decl. ¶¶ 10-13, 18-20; R. 44-5, Drogan Decl. ¶¶ 7, 10-12.)  HUD has put forward no evidence rebutting the declarations PCI submitted,

so the Court accepts the declarants' representations as true. The compliance costs reported by PCI's members alone are sufficient to satisfy the "injury in fact" requirement of Article III standing. *See Virginia v. Am. Booksellers Ass'n, Inc.,* 484 U.S. 383, 392, 108 S. Ct. 636, 98 L. Ed. 2d 782 (1988) (holding that the plaintiffs had suffered an injury in fact where "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution"); *Association of Private Sector Colls. & Univs. v. Duncan,* 681 F.3d 427 (D.C. Cir. 2012) ("If states bend to the Department's will, [Appellant's] members are harmed because they will face even greater compliance costs." (alteration in original)); *Keller v. City of Fremont,* 719 F.3d 931, 947 (8th Cir. 2013) (recognizing that a party has standing to challenge a law that "imposes compliance burdens on those it regulates or controls, and compliance is coerced by the threat of enforcement" (internal quotations omitted)).

### 2.    Causation

Second, the injuries PCI's members have suffered are fairly traceable to the Disparate Impact Rule. PCI and others in the insurance industry urged HUD to exempt insurers from the Disparate Impact Rule or at least build safe harbors into the Rule for insurers' consideration of long-recognized actuarial risk factors. HUD refused to do so, and as a result, PCI's members now face exposure to disparate impact liability in jurisdictions that had not previously recognized disparate impact claims against insurers. Furthermore, as the declarations PCI submitted establish, its members' increased exposure to disparate impact liability will cause them to incur additional costs collecting, analyzing, and monitoring data to ensure their compliance with the Disparate Impact Rule. (*See* Cracas Decl. ¶¶ 6-12; Dawdy Decl. ¶¶ 11-14; Zaleski Decl. ¶¶ 10-13, 18-20; Drogan Decl. ¶¶ 7, 10-12.)

HUD argues that any injuries PCI's members suffered "are the result of the longstanding administrative and judicial recognition of disparate impact liability under the FHA and the coverage of insurers under the FHA," not HUD's issuance of the Disparate Impact Rule.  (*See* Def. Resp. Br. at 13-15.)  As explained above, however, the Disparate Impact Rule did more than merely confirm preexisting legal requirements; it exposed PCI's members to disparate impact claims in some jurisdictions where the circuit court had not yet recognized the viability of such claims.  Accordingly, the present case is distinguishable from *National Association of Home Builders v. U.S. Army Corps of Engineers,* 663 F.3d 470 (D.C. Cir. 2011), upon which HUD relies, where the "only alteration of the baseline circumstances was in favor of [the plaintiffs]." *See id.* at 474.  Here, the Disparate Impact Rule works *against* PCI's members by increasing their exposure to disparate impact liability, not in their favor.

Additionally, as the Court of Appeals for the District of Columbia recognized in *National Association of Home Builders,* "the historical baseline is not the only possible measure of injury." *See id.* at 475.  The D.C. Circuit recently confirmed that plaintiffs "need not show that [an agency directive] rendered them worse off than the status quo ante" to establish Article III standing; "[t]hey may alternatively show that, had the [agency] taken the course of action that they claim the law required, they would have been better off." *See Nat'l Envtl. Dev. Ass'n Clean Air Project v. EPA,* 752 F.3d 999, 1006 (D.C. Cir. 2014).  Under this approach, "[t]he consequences of the agency's action must, for causation purposes, be assessed not by reference to the status quo ante but instead to other actions [the agency] could have taken." *Id.*  Because PCI's members would have been better off if HUD had exempted homeowners insurers from the Disparate Impact Rule, created safe harbors in the Rule for long-recognized actuarial risk factors, and/or adopted the insurance industry's proposed burden-shifting framework for proving

36

disparate impact claims—as PCI claims HUD should have done—PCI has satisfied the causation requirement of Article III standing. *See id.*

### 3. Redressability

Third, PCI's members satisfy the redressability requirement of Article III standing. In its remaining claims, PCI argues (1) that HUD's decision that the Disparate Impact Rule applies to homeowners insurance was arbitrary and capricious because HUD did not give adequate consideration to comments from PCI and other insurance industry members regarding the inappropriateness of applying disparate impact liability to insurers, and (2) the burden-shifting framework HUD adopted is contrary to law. The first argument presents a procedural challenge to the Disparate Impact Rule. In the context of procedural challenges, the plaintiff does not need to show that the agency would alter its rules upon following the proper procedures in order to establish redressability. *See Iowa League of Cities v. EPA,* 711 F.3d 844, 871 (8th Cir. 2013) (collecting cases); *see also Lujan,* 504 U.S. at 572 n.7 ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."). The plaintiff need only demonstrate "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *See Iowa League of Cities,* 711 F.3d at 871 (quoting *Massachusetts v. EPA,* 549 U.S. 497, 518, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007)). Because there is "some possibility" that granting PCI's requested relief—namely remanding the case to HUD to explain its decision or adopt changes to the Disparate Impact Rule—will prompt HUD to reconsider its decision that the Rule applies to homeowners insurers, PCI has satisfied the redressability requirement of Article III standing with respect to its procedural claim. *See id.*; *Massachusetts v. EPA,* 549 U.S. at 518; *see also Sugar Cane Growers Co-op. of Fla. v.*

*Veneman,* 289 F.3d 89, 94-95 (D.C. Cir. 2002) ("A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result.").

PCI also satisfies the redressability requirement with respect to its challenge to HUD's burden-shifting framework. PCI argues that HUD should have adopted the burden-shifting framework applied in *Wards Cove*. A ruling in PCI's favor on this issue will result in a more favorable burden of proof to PCI's members, thereby decreasing their exposure to disparate impact liability. This potential is sufficient to demonstrate redressability.

## II.     Merits of PCI's Remaining Claims

Having found that PCI has standing to assert its remaining claims, the Court now turns to the merits of those claims. First, PCI challenges HUD's determination that the Disparate Impact Rule applies to homeowners insurance as arbitrary and capricious because HUD did not give adequate consideration to various substantive comments from the insurance industry. Second, PCI argues that the burden-shifting framework HUD adopted is contrary to law. The Court addresses PCI's argument that application of the Disparate Impact Rule to homeowners insurance was arbitrary and capricious first.

### A.     Was HUD's Application of the Disparate Impact Rule to Homeowners Insurers Arbitrary and Capricious?

#### 1.     Standard of Review

Review of an agency's action under the arbitrary and capricious standard is narrow and highly deferential. *See Indiana Forest Alliance, Inc. v. U.S. Forest Serv.,* 325 F.3d 851, 858-59 (7th Cir. 2003); *Cassell v. Napolitano,* No. 12-cv-9786, 2014 WL 1303497, at *6 (N.D. Ill. Mar. 31, 2014). To determine whether an agency action is arbitrary or capricious, a reviewing court

must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *See Indiana Forest Alliance,* 325 F.3d at 858-59 (quoting *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989)).  Courts will not vacate an agency's decision unless the agency

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausibly that it could not be ascribed to a difference in view of the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 658, 127 S. Ct. 2518, 168 L. Ed. 2d 467 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)).

A reviewing court must ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S.,* 463 U.S. at 43; *see also F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 513, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009).  The court, however, may not substitute its judgment for the judgment of the agency.  *See Fox Television Stations,* 556 U.S. at 513; *see also Environmental Law & Policy Ctr. v. U.S. Nuclear Regulatory Comm'n,* 470 F.3d 676, 682 (7th Cir. 2006).  With these standards in mind, the Court turns to PCI's specific challenges to HUD's actions as arbitrary and capricious.

### 2.     HUD's Consideration of the McCarran-Ferguson Act

First, PCI argues that HUD failed to adequately consider the insurance industry's comments that application of the Disparate Impact Rule to homeowners insurance would violate the McCarran-Ferguson Act.  (*See* Admin. R. 372-83, 553-56.)  HUD provided the following response to the insurance industry's comments regarding the McCarran-Ferguson Act:

> HUD has long interpreted the [FHA] to prohibit discriminatory practices in connection with homeowner's insurance, and courts have agreed with HUD, including in *Ojo v. Farmers Group*. Moreover, as discussed above, HUD has consistently interpreted the Act to permit violations to be established by proof of discriminatory effect. By formalizing the discriminatory effects standard, the rule will not, as one commenter suggested, "undermine the states' regulation of insurance." The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by the State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act. How the Act should be construed in light of McCarran-Ferguson depends on the facts at issue and the language of the relevant State law "relat[ing] to the business of insurance." Because this final rule does not alter the instruction of McCarran-Ferguson or its application as described in *Ojo v. Farmers Group*, it will not interfere with any State regulation of the insurance industry.

Final Rule, 78 Fed. Reg. at 11475. In short, HUD determined that the question of whether McCarran-Ferguson preclusion applies should be left to a case-by-case basis determination based on the facts at issue and the relevant state laws.

As an initial matter, the Court notes that its determination that PCI's McCarran-Ferguson claim is not ripe for judicial review does not necessarily mean that HUD's decision to leave application of McCarran-Ferguson preclusion for a case-by-case determination was not arbitrary and capricious. Federal agencies, unlike federal courts, have rule-making authority, and they can address issues through rule-making that federal courts cannot because of constitutional or prudential limitations on their jurisdiction. *See SEC v. Chenery Corp.,* 332 U.S. 194, 202, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947) ("Since the [SEC], unlike a court, does have the ability to make new law prospectively through the exercise of its rule-making powers, it has less reason to rely upon ad hoc adjudication to formulate new standards of conduct . . . ."). Indeed, "[r]ule-making is an essential component of the administrative process and . . . is often the preferred procedure for the evolution of agency policies." *Trans-Pac. Freight Conference of Japan/Korea v. Fed.*

*Mar. Comm'n,* 650 F.2d 1235, 1244-45 (D.C. Cir. 1980); *see also Chenery,* 332 U.S. at 202

("The function of filling in the interstices of [a statute] should be performed, as much as possible,

through this quasi-legislative promulgation of rules to be applied in the future.").

> Rule-making has several advantages over piecemeal adjudication:
>
> Rule-making permits more precise definition of statute standards than would
> otherwise arise through protracted, piecemeal litigation of particular issues.  It
> allows all those who may be affected by a rule an opportunity to participate in the
> deliberative process, while adjudicatory proceedings normally afford no such
> protection to nonparties.  And because rule-making is prospective in operation
> and general in scope, rather than retroactive and condemnatory in effect,
> interested parties are given advance notice of the standards to which they will be
> expected to conform in the future, and uniformity of result is achieved.

*See Trans-Pac. Freight Conference of Japan/Korea,* 650 F.2d at 1244-45.  Rule-making,

however, is not always the best method for creating standards.  *See Chenery,* 332 U.S. at 202.

When a problem arises that that agency could not have reasonably foreseen, for example, or

when the agency does not have "sufficient experience with a particular problem to warrant

rigidifying its tentative judgment into a hard and fast rule," case-by-case determinations may be

more beneficial than rule-making.  *See id.* at 202-03.  The same is true when a problem is "so

specialized and varying in nature as to be impossible of capture within the boundaries of a

general rule."  *See id.* at 203.

> The decision of whether to address an issue through general rule-making or case-by-by

determinations lies largely within the agency's discretion.  *See Shays v. Federal Election

Comm'n,* 424 F. Supp. 2d 100, 113 (D.D.C. 2006) (citing *Chenery,* 332 U.S. at 203).  An

agency's reliance on case-by-case adjudication, however, can amount to an abuse of discretion in

some cases.  *See id.*  Furthermore, an agency's failure to provide a reasoned explanation for

relying on case-by-case adjudication may render its decision arbitrary and capricious.  *See id.* at

116; *see also Williams Natural Gas Co. v. F.E.R.C.,* 872 F.2d 438, 450 (D.C. Cir. 1989)

("Issuance of the [Notice of Proposed Rulemaking] . . . oblige[d] the agency to consider the comments it received and to articulate a reasoned explanation for its decision.").

HUD's one-paragraph response to the insurance industry's detailed concerns that applying the Disparate Impact Rule to homeowners insurance would violate the McCarran-Ferguson Act fails to provide a reasoned explanation to prefer case-by-case application of McCarran-Ferguson preclusion over rule-making.  To begin with, the fact that the McCarran-Ferguson Act does not preclude HUD from issuing regulations that may apply to insurance policies does not mean that HUD can simply disregard the likelihood that McCarran-Ferguson preclusion will apply in promulgating its regulations.  *Cf. Shays,* 424 F. Supp. 2d at 116 ("The question . . . is not whether the Commission has statutory authority to bring enforcement actions, but whether it acted rationally here by refusing to promulgate a rule in favor of its purported preference for piecemeal adjudications . . . .").

Furthermore, although HUD recognized that application of McCarran-Ferguson preclusion depends on the facts at issue and the relevant State laws, it made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers.  In other words, HUD made no attempt to determine whether the benefits of proceeding by case-by-case adjudications outweighed the benefits of including an exemption or safe harbors for insurers in the Disparate Impact Rule.  HUD's lack of analysis is particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha,* 179 F.3d at 563-64, and the Eighth Circuit's similar recognition in *Saunders,* 537 F.3d at 967, that "a suit challenging the racially disparate impact of industry-wide rate classifications may usurp core rate-making functions of the State's administrative regime."  Based on the record, HUD has failed to consider this important aspect of the issue.

Finally, HUD's statement that the Disparate Impact Rule would not alter the McCarran-Ferguson analysis performed in *Ojo v. Farmers Group* does not explain why case-by-case adjudication is more appropriate than rule-making.  Courts do not have rule-making authority; unlike agencies, they can only decide issues through case-by-case adjudications.  Moreover, while HUD cited *Ojo* to support its position that case-by-case adjudication is appropriate, it failed to even acknowledge *Mutual of Omaha* and *Saunders*, which called into question the viability of many (if not most) disparate impact claims against insurers in light of the McCarran-Ferguson Act.

Although HUD had discretion to decide whether to proceed by case-by-case adjudication or rule-making, it needs to provide a reasoned explanation for preferring case-by-case adjudication over rule-making.  HUD's failure to do so was arbitrary and capricious.  *See Shays,* 424 F. Supp. 2d at 116 (the Federal Election Committee's lack of explanation for its conclusion that adjudication is preferable to rulemaking for specific groups rendered its purported preference for piecemeal adjudications an abuse of discretion); *see also Chamber of Commerce of U.S. v. Federal Election Comm'n,* 69 F.3d 600, 606 (D.C. Cir. 1995) (holding that the agency's regulation was arbitrary and capricious because the agency failed to provide a reasoned explanation for including certain exemptions).  The Court, therefore, remands this case to HUD for further explanation.

### 3.    HUD's Consideration of the Filed-Rate Doctrine

Second, PCI claims that HUD failed to adequately consider whether the Disparate Impact Rule violated the filed-rate doctrine.  The filed-rate doctrine "forbids courts from invalidating or modifying rates that have been filed with regulatory agencies."  *See Schilke v. Wachovia Mortgage, FSB,* 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011) (citing *Goldwasser v. Ameritech*

*Corp.,* 222 F.3d 390, 402 (7th Cir. 2000); *Arsberry v. Illinois,* 244 F.3d 558, 562 (7th Cir.

2001)).  Put differently, the doctrine "bars courts from altering filed rates, and, by extension,

prohibits a court from awarding a plaintiff damages based on the difference between a filed rate

and an allegedly lawful rate."  *Id.*

    During the notice-and-comment period, National Association of Mutual Insurance

Companies ("NAMIC") expressed concern that applying the Disparate Impact Rule to

homeowners insurance would violate the filed-rate doctrine.  (*See* Admin. R. at 378.)  In its Final

Rule, HUD grouped NAMIC's comment regarding the filed-rate doctrine with the insurance

industry's comments regarding the McCarran-Ferguson Act.  *See* Final Rule, 78 Fed. Reg. at

11474 ("Some commenters stated that application of the disparate impact standard would

interfere with state regulation of insurance in violation of the McCarran-Ferguson Act . . . or the

common law 'filed rate doctrine.'").  In its response to those questions, however, HUD

referenced only the McCarran-Ferguson Act; it did not mention the filed-rate doctrine.

    HUD's failure to separately discuss the filed-rate doctrine, on its own, does not render the

Disparate Impact Rule's application to homeowners insurers arbitrary and capricious.  The

purpose of the filed-rate doctrine is very similar to the purpose of the McCarran-Ferguson Act—

preventing courts from interfering with state's regulatory regimes, and where the filed-rate

doctrine applies, the McCarran-Ferguson Act almost certainly applies too.  Accordingly, HUD's

response (or lack thereof) to NAMIC's filed-rate doctrine argument alone does not make its

actions arbitrary and capricious.  *See Alaska Dep't of Envtl. Conservation v. EPA,* 540 U.S. 461,

497, 124 S. Ct. 983, 15 L. Ed. 2d 967 (2004) ("Even when an agency explains its decision with

'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the

agency's path may reasonably be discerned.'" (quoting *Bowman Trasp., Inc. v. Arkansas-Best*

*Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974))).  In failing to give

adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson

Act, however, HUD also failed to give adequate consideration to NAMIC's comments regarding

the filed-rate doctrine.  Accordingly, on remand, HUD must explain its decision regarding the

filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-

Ferguson comments.

### 4.     HUD's Consideration of the Nature of Insurance

Third, PCI claims that HUD did not adequately address the effect the Disparate Impact

Rule would have on the insurance industry due to the nature of insurance.  During the notice-

and-comment period, members of the insurance industry raised several concerns about the

inappropriateness of applying disparate impact liability to insurers based on the fundamental

nature of insurance.  The commenters noted that "[t]he foundation of the business of insurance,

and in particular underwriting and rate-making, is classifying insurance applicants and

policyholders by risk.  Insurers make decisions based on actuarial and business principles that

group policyholders for the purpose of treating those with similar risk profiles similarly."  (*See*

Admin. R. at 376); *see also American Family,* 978 F.2d at 290 ("Insurance works best when the

risks in the pool have similar characteristics.").  The very essence of risk-based pricing involves

"identify[ing] relationships between factors and risk of loss and allocate[ing] costs accordingly."

(*See* Admin. R. at 376.)  The insurance industry argued that applying disparate impact liability to

insurers could jeopardize their use of actuarially sound underwriting factors that are "at the very

heart of the business of insurance."[11]  (*See id.* at 376-77.)  Additionally, the insurance industry

---

[11] Factors commonly used in pricing homeowners insurance include "claim history of the applicant, construction material(s), distance from a fire station, dog/breed of dog owned, fire suppression devices, home-based business presence and type, lead paint potential (constructed pre-1978), loss history of

argued that preventing insurers from classifying people and properties by the risks they present and treating similar risk profiles in a similar way—regardless of the disparate impact this may have on certain groups—would increase adverse selection and decrease the availability of coverage.  (*See id.* at 377-78.)

> HUD provided the following response to these comments:
>
> HUD believes that these concerns are misplaced.  First, they presume that once a discriminatory effect is shown, the policy at issue is per se illegal.  This is incorrect.  Rather, as § 100.500 [of the Disparate Impact Rule] makes clear, the respondent or defendant has an opportunity to defend the business justifications for its policies.  This "burden-shifting framework" distinguishes "unnecessary barriers proscribed by the Act from valid policies and practices crafted to advance legitimate interests."  Thus if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification.

Final Rule, 78 Fed. Reg. at 11475.  HUD went on to state that "[c]reating exemptions or safe harbors related to insurance is unnecessary because, as discussed above, insurance practices with a legally sufficient justification will not violate the Act.  Moreover, creating exemptions beyond those found in the Act would run contrary to Congressional intent."  *Id.* (citing *Groach Associates #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n,* 508 F.3d 366, 374-75 (6th Cir. 2007)).

HUD's response to the insurance industry's concerns that exposing them to disparate impact liability would undermine the fundamental nature of insurance was arbitrary and capricious.  HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework.  The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation

---

property, roofing material, trampoline use, slab versus basement and the present of an operational security system."  (*See* Admin. R. at 376.)

to consider the substance of the insurance industry's concerns raised during the notice-and-comment period.  *See State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43 (an agency rule is arbitrary and capricious where the agency "entirely failed to consider an important aspect of the problem").

HUD relies on *Groach* to justify its decision not to create categorical exemptions to disparate impact liability.  *See* Final Rule, 78 Fed. Reg. at 11475 nn.140-41.  In *Groach*, however, the Sixth Circuit expressly found that "if *no* disparate-impact challenge to a particular practice ever could succeed under the burden-shifting framework, then a court categorically may bar *all* disparate-impact challenges to that practice."  *See* 508 F.3d at 375 (emphasis in original). Indeed, the Sixth Circuit saw "no reason to require courts to engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success . . . ."  *Id.* at 376.  *Groach*, therefore, supports the insurance industry's argument that HUD should include exemptions from the Disparate Impact Rule or create safe harbors in the Rule for insurance practices that plaintiffs would have no chance of successfully challenging under the burden-shifting framework.  *See id.*

The insurance industry properly raised its concerns about the application of disparate liability to insurers during the notice-and-comment period, and HUD had an obligation to respond to the substance of those concerns or, alternatively, provide a reasoned explanation why case-by-case determinations of the insurers' arguments are preferable to rule-making.  *See Shays,* 424 F. Supp. 2d at 116; *Williams Natural Gas Co.,* 872 F.2d at 450.  HUD's failure to do so makes the Disparate Impact Rule's application to homeowners insurance arbitrary and capricious.  *See Shays,* 424 F. Supp. 2d at 116.  Accordingly, the Court remands this case to HUD for further explanation.

**B.     Is HUD's Burden-Shifting Approach Contrary to Law?**

Finally, PCI contests HUD's adoption of the three-step burden-shifting approach outlined in the Disparate Impact Rule as contrary to law.  Specifically, PCI argues that HUD's burden-shifting approach is contrary to the approach the Supreme Court adopted for disparate impact claims in *Wards Cove Packing Co. v. Antonio,* 490 U.S. 642, 109 S. Ct. 2115, 104 L. Ed. 2d 733 (1989).[12]

HUD's burden-shifting approach, like the *Wards Cove* approach, consists of three steps: the first step centers on whether a practice has a disparate impact on protected groups; the second step concerns whether the defendant has a legitimate business reasons for engaging in the practice; and the third step evaluates whether a less discriminatory alternative would also serve the defendant's legitimate business interests.  Several differences, however, exist between the two approaches.  First, the *Wards Cove* approach requires the plaintiff to challenge a *particular* practice, whereas HUD has indicated that a plaintiff may be able "to challenge the decision-making process as a whole."  *See* 78 Fed. Reg. at 11469.  Second, *Wards Cove* requires the plaintiff to show that the challenged practice creates a "significant" disparate impact, whereas HUD's framework does not require a showing that the alleged disparate impact is "significant."  Third, under the *Wards Cove* approach*,* the burden of proof always remains with the plaintiff, and only the burden of production shifts to the defendant.  In HUD's framework, on the other hand, the defendant bears the burden of proof—not just the burden of production—in the second step.  Fourth, *Wards Cove* does not require the defendant's legitimate business interest to be

---

[12] In 1991, Congress established a statutory framework for proving disparate impact claims in the Title VII context that was less burdensome on plaintiffs than the *Wards Cove* standard.  *See* 42 U.S.C. § 2000e-2(k); *see also Smith v. City of Jackson, Miss.,* 544 U.S. 228, 240, 125 S. Ct. 1536, 161 L. Ed. 2d 410 (2005).  The Supreme Court, however, has continued to apply the *Wards Cove* framework outside the Title VII context.  In *Smith,* for example, the Supreme Court held that the *Wards Cove* standard continues to govern age discrimination claims brought under the Age Discrimination in Employment Act ("ADEA").  *See* 544 U.S. at 240-41.

"essential" or "indispensable" for it to pass muster in the second step, but HUD's framework requires the defendant to prove that its business interest was "necessary." Fifth, in *Wards Cove,* the Supreme Court held that any alternative practice the plaintiff offered in the third step must be "equally effective" as the challenged practice. HUD, on the other hand, has determined that an "equally effective" standard is inappropriate.

Pursuant to *Chevron v. U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), courts must defer to agency interpretation of a statute where Congressional intent is unclear, and a statute affords an agency authority under the statute.[13] A two-step analysis applies for determining whether *Chevron* deference applies. In the first step of the *Chevron* analysis, the court must determine whether "the intent of Congress is clear" regarding the precise question at issue. *See Barnhart v. Walton,* 535 U.S. 212, 218, 122 S. Ct. 1265, 152 L. Ed. 2d 330 (2002) (citing *Chevron,* 467 U.S. at 842-43). If "the statue speaks clearly 'to the precise question at issue,' [a court] 'must give effect to the unambiguously expressed intent of Congress.'" *Id.* If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue," the Court proceeds to the second step of the *Chevron* analysis, in which the Court defers to any reasonable agency interpretation of the statute. *See Castro v. Chicago Hous. Auth.,* 360 F.3d 721, 727 (7th Cir. 2004). With respect to the first step of the *Chevron* analysis, the FHA is silent regarding how the FHA or a private plaintiff should prove a housing discrimination claim. Accordingly, resolution of this issue rests on the second step of the *Chevron* analysis, and the Court must uphold HUD's adoption of the three-step burden-shifting framework as long as it is a reasonable interpretation of the FHA.

---

[13] There is no dispute here that Congress authorized HUD to implement and administer the FHA. *See* 42 U.S.C. § 3614a.

The burden-shifting framework HUD adopted in the Disparate Impact Rule reflects HUD's reasonable accommodation of the competing interests at stake—*i.e.,* the public's interest in eliminating discriminatory housing practices and defendants' (including insurer-defendants') interest in avoiding costly or frivolous litigation based on unintentional discriminatory effects of their facially neutral practices.  HUD's framework is largely consistent with the framework courts have developed on their own for analyzing disparate impact claims.  Although the approaches adopted in each circuit varied before the Disparate Impact Rule, the most recent decisions applied the same approach adopted by HUD.  *See Inclusive Communities Project, Inc. v. Texas Dept. of Hous. & Comm'ty Affairs,* 747 F.3d 275, 281-82 (5th Cir. 2014) (collecting cases).  Additionally, the approach HUD adopted is similar to the statutory approach Congress adopted for Title VII disparate impact cases.  *See* 42 U.S.C. § 2000e-2(k).  Courts have repeatedly turned to Title VII precedent for guidance evaluating disparate impact liability under the FHA (Title VIII) and vice versa.  *See, e.g., Kyles v. J.K. Guardian Sec. Servs., Inc.,* 222 F.3d 289, 295 (7th Cir. 2000) ("Courts have recognized that Title VIII is the functional equivalent of Title VII, . . . and so the provisions of these two statutes are given like construction and application." (citations omitted)); *Inclusive Communities Project,* 747 F.3d at 282.  Under these circumstances, HUD's adoption of the three-step burden-shifting approach outlined in the Disparate Impact Rule was reasonable and the Court defers to it.  *See, e.g., Castro,* 360 F.3d at 727; *see also United States v. Boyle,* 469 U.S. 241, 246 n.4, 105 S. Ct. 687, 83 L. Ed. 2d 622 (1985) (finding that an agency's interpretation that is "consistent with Congress' intent, and over 40 years of case law" merits deference); *Inclusive Communities Project,* 747 F.3d at 282.

Additionally, although PCI raises challenges to specific aspects of HUD's framework, HUD considered and responded to those challenges during the notice-and-comment period.

Unlike HUD's responses to several of the insurance industry's other concerns, HUD provided reasoned explanations for rejecting the commenters' challenges to HUD's burden-shifting approach. *See* Final Rule, 78 Fed. Reg. at 11469, 11471-74. In sum, PCI has provided no basis for the Court to invalidate HUD's burden-shifting approach.[14]

---

[14] PCI argues in its briefs that HUD's burden-shifting approach violates the APA's requirement that the proponent of a proposed "order"—*i.e.,* a proposed finding of a violation of the FHA—must bear the burden of proof. *See* 5 U.S.C. § 556(c). Neither PCI nor the other members of the insurance industry that commented on the proposed Disparate Impact Rule, however, raised this issue during the notice-and-comment period. PCI contends that, although insurance industry commenters did not cite 5 U.S.C. § 556(d), their argument that the burden of persuasion must remain with the plaintiff at each step of the disparate impact analysis was sufficient to preserve the § 556(d) issue. The Court disagrees. The insurance industry's comments regarding HUD's burden-shifting framework dealt exclusively with its appropriateness in light of *Wards Cove*. Those comments failed to put HUD on notice of PCI's argument under § 556(d) and give HUD an opportunity to pass on it. The issue is therefore waived. *See Koretoff v. Vilsack,* 707 F.3d 394, 398 (D.C. Cir. 2013) ("We require 'the argument [petitioner] advances here' to be raised before the agency, not merely the same general legal issue.'" (quoting *Nuclear Energy Inst., Inc. v. EPA,* 373 F.3d 1251, 1291 (D.C. Cir. 2004) (per curiam)).

**CONCLUSION**

For the reasons explained above, the Court grants in part and denies in part PCI's motion for summary judgment, and grants in part and denies in part HUD's motion to dismiss or for summary judgment. The Court dismisses PCI's McCarran-Ferguson claim for lack of subject matter jurisdiction. With respect to PCI's remaining claims, the Court grants summary judgment to PCI on its claims that HUD's application of the Disparate Impact Rule to homeowners insurance was arbitrary and capricious, and grants summary judgment to HUD on PCI's challenge to HUD's burden-shifting framework. The Court remands this case to HUD for further proceedings consistent with this Memorandum, Opinion and Order.

**DATED: September 3, 2014**                    **ENTERED**

AMY J. ST. EVE
United States District Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 13-CV-8564 |
| BENJAMIN S. CARSON, SR., in his official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Plaintiff Property Casualty Insurers Association of America ("PCI") moves pursuant to Federal Rule of Civil Procedure 15(a)(2) to file a First Amended Complaint. (R. 107.) Defendants the United States Department of Housing and Urban Development ("HUD") and Benjamin Carson, in his official capacity as Secretary of HUD (collectively, "Defendants"), oppose PCI's motion. For the following reasons, the Court grants in part and denies in part PCI's motion.

**BACKGROUND**[1]

**I.     Promulgation of the Disparate Impact Rule**

In 2013, HUD issued a final rule recognizing that liability under the Fair Housing Act ("FHA") may arise from a facially neutral practice that has discriminatory effects on certain

---

[1] The Court presumes the parties' familiarity with the relevant facts and the Court's September 2014 Memorandum Opinion and Order in this case. (*See* R. 99.) The Court, however, provides a brief summary and describes the relevant developments since September 2014.

groups of people, regardless of whether discriminatory intent exists (the "Disparate Impact Rule" or the "Rule").  (R. 99 at 1.)  The Disparate Impact Rule also established a three-step burden-shifting approach to deciding disparate-impact claims.  (*Id.*)  Under this approach, the plaintiff initially bears the burden of proving that a housing practice has a disparate impact on individuals with a protected characteristic or perpetuates segregation in the housing market.  (*Id.* at 11–12, 17.)  The burden then shifts to the defendant to prove that the challenged practice "has a necessary and manifest relationship to one or more of the defendant's . . . legitimate, nondiscriminatory interests."  (*Id.* at 12, 17 (quoting Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. 70921, 70924 (Nov. 16, 2011)).)  If the defendant satisfies this burden, the plaintiff may still establish liability by proving a less discriminatory method of serving the same interests.  (*Id.* at 12, 17.)

In its proposed rule, HUD included "the provision and pricing of homeowner's insurance" as an example of a housing policy or practice that may have a disparate impact on protected groups.  (*Id.* at 12 (quoting Implementation of the Fair Housing Act's Discriminatory Effects Standard, 76 Fed. Reg. at 70924).)  PCI, among other associations representing the homeowners insurance industry, submitted comments to HUD.  (*Id.* at 12–13.)  The industry representatives (1) disputed whether the FHA allowed for disparate-impact liability in any context; (2) contended that application of the Disparate Impact Rule to homeowners insurance would violate the McCarran-Ferguson Act and the "filed rate" doctrine; (3) argued that imposing disparate-impact liability on homeowners insurance is incompatible with the nature of insurance, which relies on risk-based pricing; and (4) contended that the burden-shifting framework outlined in the proposed rule was inappropriate.  (*Id.* at 13–14.)  Based on these arguments, the insurance industry requested that HUD either exempt insurance underwriting and pricing from

the Disparate Impact Rule or build safe harbors into the Rule for certain actuarial risk factors, like the age and condition of the property. (*Id.* at 14.) The industry's comments failed to persuade HUD, which did not make any changes to the Disparate Impact Rule in its final rule. (*Id.* at 15–17.) HUD found the Rule sufficiently flexible to alleviate the industry's concerns on a case-by-case basis. (*Id.* at 15.)

## II.     The Current Litigation from the Filing of the Complaint Until the Court's September 2014 Memorandum Opinion and Order

PCI filed suit in November 2013 seeking to invalidate the Disparate Impact Rule as it applies to the provision and pricing of homeowners insurance. (R. 1; R. 99 at 17.) As the Court described in its September 2014 opinion, PCI claimed the Disparate Impact Rule was invalid under the Administrative Procedure Act ("APA") for a variety of reasons:

> First, PCI argues that application of the Disparate Impact Rule to the insurance industry would violate the McCarran-Ferguson Act. (*See* [R. 1] at Count I.) Second, PCI argues that HUD's issuance of the Disparate Impact Rule was arbitrary and capricious because HUD failed to adequately consider the Rule's conflict with the McCarran-Ferguson Act, the filed rate doctrine, and the nature of insurance. (*See id.* at Counts II-IV.) Finally, PCI challenges the three-step burden-shifting framework HUD adopted in the Disparate Impact Rule as arbitrary, capricious, and not in accordance with law. (*See id.* at Counts V-VI.)

(R. 99 at 17.) PCI moved for summary judgment and HUD filed a cross-motion seeking dismissal for lack of subject matter jurisdiction or, in the alternative, summary judgment in HUD's favor on all claims. (*See* R. 20; R. 30; R. 99 at 17–18.)

The Court began its analysis by addressing its jurisdiction. It concluded that PCI's claim that the Disparate Impact Rule violates the McCarran-Ferguson Act was not ripe for review but that PCI had standing to assert its remaining claims. (R. 99 at 32, 38.) The Court then turned to the merits of PCI's claim that the Disparate Impact Rule's application to homeowners insurance

3

was arbitrary and capricious because HUD did not give adequate consideration to various comments from the insurance industry.

First, PCI argued that HUD had failed to adequately consider the insurance industry's comments that application of the Disparate Impact Rule to homeowners insurance would violate the McCarran-Ferguson Act.  (R. 99 at 39.)  HUD had "determined that the question of whether McCarran-Ferguson preclusion applies should be left to a case-by-case basis determination based on the facts at issue and the relevant state laws."  (*Id.* at 40.)  The Court concluded that "[a]lthough HUD had discretion to decide whether to proceed by case-by-case adjudication or rule-making, it [failed] to provide a reasoned explanation for preferring case-by-case adjudication over rule-making."  (*Id.* at 43.)  The Court noted that HUD's explanation "that the McCarran-Ferguson Act does not preclude HUD from issuing regulations that may apply to insurance policies does not mean that HUD can simply disregard the likelihood that McCarran-Ferguson preclusion will apply in promulgating its regulations."  (*Id.* at 42.)  Additionally, the Court explained that HUD "made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers."  (*Id.*)  The Court also noted that HUD had failed to acknowledge case law that "called into question the viability of many (if not most) disparate impact claims against insurers in light of the McCarran-Ferguson Act."  (*Id.* at 43.)  In the end, these shortcomings in HUD's analysis were arbitrary and capricious, and the Court therefore "remand[ed] this case to HUD for further explanation."  (*Id.*)

Second, PCI argued that HUD had failed to adequately consider whether the Disparate Impact Rule violated the filed-rate doctrine, which "forbids courts from invalidating or modifying rates that have been filed with regulatory agencies."  (*Id.* (quoting *Schilke v.*

*Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011)).)  The Court explained that

HUD grouped the industry's concerns regarding the filed-rate doctrine with their concerns

related to the McCarran-Ferguson Act but that HUD did not provide any response to the

industry's comments about the filed-rate doctrine.  (*Id.* at 44.)  HUD's "failure to separately

discuss the filed-rate doctrine," however, did not by itself render the Disparate Impact Rule's

application to the provision of homeowners insurance arbitrary and capricious.  (*Id.*)  The Court

reasoned that the purpose of the filed-rate doctrine was similar to that of the McCarran-Ferguson

Act, and that "where the filed-rate doctrine applies, the McCarran-Ferguson Act almost certainly

applies too."  (*Id.*)  Nevertheless, because HUD failed to adequately consider the industry's

comments regarding the McCarran-Ferguson Act, it also failed to adequately consider the filed-

rate doctrine.  (*Id.* at 45.)  Thus, the Court ruled that "on remand, HUD must explain its decision

regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's

McCarran-Ferguson comments."  (*Id.*)

    Third, PCI argued that HUD had failed to adequately address the effect that the Disparate

Impact Rule would have on the insurance industry due to the nature of insurance.  (*Id.*)  HUD

had explained that the industry's concerns were misplaced because they incorrectly ignore the

burden-shifting scheme and "presume that once a discriminatory effect is shown, the policy at

issue is per se illegal."  (*Id.* at 46 (quoting Final Rule, 78 Fed. Reg. at 11475).)  The Court found

HUD's response arbitrary and capricious because HUD "made no effort to evaluate the

substance of the insurance industry's concerns, disregarding them merely because insurers would

have an opportunity to raise their arguments as part of the burden-shifting framework."  (*Id.*)

The Court explained that the authority upon which HUD relied in fact supported PCI's argument

that "HUD should include exemptions from the Disparate Impact Rule or create safe harbors in

the Rule for insurance practices that plaintiffs would have no chance of successfully challenging under the burden-shifting framework." (*Id.* at 47.)  For these reasons, the Court determined that "HUD had an obligation to respond to the substance of [the industry's] concerns or, alternatively, provide a reasoned explanation why case-by-case determinations of the insurers' arguments are preferable to rule-making." (*Id.*)  Accordingly, the Court "remand[ed] the[e] case to HUD for further explanation." (*Id.*)

Having resolved PCI's contentions regarding the adequacy of HUD's consideration of the industry's comments, the Court turned to PCI's argument that HUD's burden-shifting approach was contrary to law.  (*Id.* at 48.)  After engaging in the analysis outlined in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and its progeny, the Court concluded that "PCI has provided no basis for the Court to invalidate the burden-shifting approach." (*Id.* at 49–51.)

To summarize, the Court (1) dismissed PCI's McCarran-Ferguson claim for lack of subject matter jurisdiction; (2) granted summary judgment to HUD on PCI's challenge to HUD's burden-shifting framework; and (3) granted summary judgment to PCI on its remaining claims that HUD's application of the Disparate Impact Rule to homeowners insurance was arbitrary and capricious.  (*Id.* at 52.)  As a result of the partial grant of summary judgment to PCI, the Court remanded the case to HUD for further proceedings consistent with the Court's opinion.  (*Id.*)  The Clerk of Court then filed an entry of judgment in which he summarized the Court's rulings.  (R. 100.)  The judgment noted that the Court remanded the case to HUD for further proceedings.  (*Id.*)  The Clerk also administratively closed the case.  The docket remained quiet until the filing of the current motion with the exception of various motions to withdraw as counsel and an order granting a motion to withdraw.  (*See* R. 102; R. 103; R. 104; R. 105; R. 106.)

### III.     Agency Proceedings upon Remand and PCI's Filing of the Current Motion

After the Court issued its opinion, PCI asked HUD to reopen the comment period, but HUD did not do so.  (R. 108, Mem. Supp. Mot. Leave to Am. Compl., at 3; R. 107-1, Proposed Am. Compl.. ¶¶ 7–8, 10–11.)  PCI nevertheless submitted comments to HUD.  (R. 108 at 3; R. 107-1 at ¶¶ 8, 10.)  On October 5, 2016, HUD published a supplemental explanation of the Disparate Impact Rule in the Federal Register.  *See* Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance, 81 Fed. Reg. 69012 (Oct. 5, 2016).  HUD reaffirmed the Disparate Impact Rule in full.  *Id.* at 69012.

PCI filed the motion before the Court seeking leave to amend its complaint.  (R. 107.) PCI argues that "HUD's supplemental explanation remains arbitrary and capricious in that it still fails adequately to address concerns raised in the Court's prior decision and fails altogether to address the Supreme Court's intervening decision in *Texas Department of Housing & Community Affairs v. The Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015)."  (*Id.*)

### LEGAL STANDARD

Under Rule 15(a)(2), "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Here, Defendants do not consent.  (R. 122.)  Under the Rule, "court[s] should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2). Nevertheless, "district courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile."  *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008); *see also Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017).  "A motion to amend should state with particularity the grounds for the motion and should be accompanied by the proposed amendment."  *Gonzalez-Koeneke v. West*, 791 F.3d 801, 806

(7th Cir. 2015) (quoting *Otto v. Variable Annuity Life Ins. Co.*, 814 F.2d 1127, 1139 (7th Cir. 1986)).

"District courts may refuse to entertain a proposed amendment on futility grounds when the new pleading would not survive a motion to dismiss." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 685 (7th Cir. 2014) (quoting *Gandhi v. Sitara Capital Mgmt., LLC*, 721 F.3d 865, 869 (7th Cir. 2013)). The Seventh Circuit has held that when the district court dismisses a plaintiff's original complaint, the court should generally give the plaintiff "at least one opportunity to try to amend her complaint before the entire action is dismissed." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015). Under such circumstances, a court should grant leave to amend "[u]nless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted." *Id.* at 519–20 (emphasis in original) (quoting *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004)). Denials of leave to amend are generally reviewed for abuse of discretion, but where a district court denies leave to amend based on futility, the appellate court will conduct de novo review using Rule 12(b)(6) standards. *Id.* at 524.

Relevant to a futility argument, "[a] motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A plaintiff's "[f]actual allegations must be enough to

raise a right to relief above the speculative level." *Id.* Put differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In determining the sufficiency of a complaint under the plausibility standard, courts must "accept all well-pleaded facts as true and draw reasonable inferences in [a plaintiff's] favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016); *see also Domanus v. Locke Lord LLP*, 847 F.3d 469, 478 (7th Cir. 2017).

## ANALYSIS

### I. Jurisdiction After Remanding to an Agency for Further Consideration

PCI argues that the Court did not divest itself of jurisdiction over this case when it remanded certain matters to HUD for further proceedings and that the Court's September 2014 decision in this case was not final and appealable. (R. 108 at 5–7; R. 125, Pl.'s Reply, 2–11.) Defendants argue that the "Court's order was . . . a final judgment for purposes of appeal," and that even if that were not the case, the Court relinquished jurisdiction in September 2014. (R. 122, Defs.' Opp. Br., 4–8.) The Court agrees with PCI.

### A. The Court Did Not Issue a Final, Appealable Order

The parties dispute whether the Court previously issued a final, appealable order. An order remanding a case to an administrative agency generally is not an appealable final order. *See Rush Univ. Med. Ctr. v. Leavitt*, 535 F.3d 735, 738 (7th Cir. 2008) ("Remand usually signifies that a decision is not final."); *Edgewater Found. v. Thompson*, 350 F.3d 694, 696 (7th Cir. 2003) ("Remands usually are not appealable, because they are not 'final' decisions; but remands that otherwise may escape appellate review may be reviewable immediately."); *Travis v. Sullivan*, 985 F.2d 919, 920 (7th Cir. 1993) ("[O]rdinarily an order remanding a case to an

administrative agency is not final."); *Crowder v. Sullivan*, 897 F.2d 252, 252 (7th Cir. 1990) (per curiam); *Kapco Mfg. Co. v. C & O Enters., Inc.*, 773 F.2d 151, 153 (7th Cir. 1985) ("[A]n order remanding a case to an administrative agency for reconsideration is almost always interlocutory."); *see also Sierra Club v. U.S. Dep't of Agric.*, 716 F.3d 653, 656 (D.C. Cir. 2013) ("It is black letter law that a district court's remand order is not normally 'final' for purposes of appeal under 28 U.S.C. § 1291." (citation omitted)); *Fla. Wildlife Fed'n, Inc. v. Adm'r*, 737 F.3d 689, 693 (11th Cir. 2013); 15B Charles Alan Wright et al., *Federal Practice & Procedure: Jurisdiction* § 3914.32 (2d ed. online 2017) (explaining that "[t]he general rule is that a remand is not appealable as a final decision" and that "[a] partial remand is even more clearly not final"); James T. O'Reilly, *Administrative Rulemaking* § 13:8 (online ed. 2017) (noting that subject to certain exceptions, "[a] decision of a district court remanding a case to an agency for further consideration does not qualify as an appealable collateral order").  There are, however, certain exceptions to the general rule.

One such exception exists where a district court remands to an agency "when the proceeding may end without further litigation—for, if the private claimant prevails, the agency cannot obtain judicial review of its own decision (even when that decision has been compelled by a judicial decision with which the agency disagrees)."  *Rush*, 535 F.3d at 738; *see Edgewater*, 350 F.3d at 697 (explaining that the Supreme Court in *Sullivan v. Finkelstein*, 496 U.S. 617 (1990), held that "remands that otherwise may escape appellate review may be reviewable immediately" and that remand is final "when the main question will not recur after the agency's new decision"); Wright et al., *supra*, § 3914.32 (noting the collateral order doctrine as an exception to the general rule regarding finality); *see also Sierra Club*, 716 F.3d at 656–57 (noting an exception that allows an immediate appeal where a government agency cannot

"challenge its own actions complying with a remand order"); *MCI Telecomm. Corp. v. Bellsouth Telecomm. Inc.*, 298 F.3d 1269, 1271 (11th Cir. 2002) (explaining that where a district court orders an agency to proceed under a particular legal standard on remand, the order is generally appealable "because the agency, forced to conform its decision to the district court's mandate, cannot appeal its own subsequent order").  Another exception exists where a district court remands to an agency for "a mechanical or otherwise 'ministerial' task, requiring no judgment or discretion."  *Crowder*, 897 F.2d at 252 (quoting *In re Riggsby*, 745 F.2d at 1156); *see also In re A.G. Fin. Serv. Ctr., Inc.*, 395 F.3d 410, 413 (7th Cir. 2005).

Neither of these exceptions applies to the current case.  First, the remand left HUD with far more than a "ministerial" task.  Indeed, the Court ordered HUD to carefully consider various complicated issues that the insurance industry raised in comments, analyze the issues, and fully explain its reasoning.  Moreover, it took more than two years until HUD issued its supplemental explanation.  Second, this is not a case where the Court's ruling would be effectively unreviewable after remand.  While the Court instructed HUD to give consideration to certain issues, it did not mandate or effectively mandate an outcome.  Rather, the Court simply ordered HUD to consider issues it had not.  Indeed, HUD *reaffirmed* the Disparate Impact Rule in all respects.  HUD did not find itself in the situation falling within the exception to the general rule on finality in which it could not obtain judicial review of its own decision because it was forced to comply with the district court's mandate, as when a district court orders an agency to proceed under a different standard of review.  *See MCI*, 298 F.3d at 1271.  The Court did not "compel[] . . . [a] decision with which the agency disagrees" that the agency could not appeal. *See Rush*, 535 F.3d at 738.  Nor is this is this a case in which the main questions would "not recur after the agency's new decision"—unless HUD ultimately agreed with PCI upon further

11

reflection or vice-versa. *See Edgewater*, 350 F.3d at 697. In short, the Court's remand was akin

to cases in which a district court remands to an administrative agency for consideration of

additional evidence. Such remand orders are not final or appealable. *See MCI*, 298 F.3d at 1271

(explaining that "there is a widely recognized distinction between remands where a district court

simply orders the agency to proceed under a 'certain legal standard'"—where an order is

appealable—and "situations where a district court remands for further consideration of

evidence"); *see also Edgewater*, 350 F.3d at 697 (explaining that in cases in which the court

remands to an agency and "postpone[s] adjudication until after additional evidence has been

analyzed," there is no final decision); *Flores v. United States*, No. 11-12119, 2015 WL 3887537,

at *6 (E.D. Mich. June 24, 2015) (concluding that a remand "for further factual determinations"

was not final and comparing such an action to "sentence six" remands in Social Security Act

cases in which courts remand for consideration of new evidence but "do[] not rule in any way as

to the correctness of the administrative determination" (quoting *Melkonyan v. Sullivan*, 501 U.S.

89, 98 (1991))).[2]

---

[2] Defendants argue that the Court's prior decision was "effectively final" and appealable. (R. 122 at 7.) They do not, however, provide an explanation as to why this is so—for example, by explaining how the Court's remand was similar to a remand requiring an agency to use a certain legal standard or reach a particular result. Defendants do cite, without further explanation, *Edgewater*, where the Seventh Circuit suggested that in the case before it, perhaps the agency remand was "otherwise unreviewable" from the agency's perspective because "only the [plaintiff] [could] seek judicial review of the new administrative decision, and only an immediate appeal could [have] vindicate[d] the agency's interest in avoiding pointless (if not *ultra vires*) administrative proceedings." 350 F.3d at 696. This statement, however, was dicta, as the court used qualifying language ("may well be") before stating its proposition, and the court ultimately determined that there was no final decision because the district court had remanded the case to the agency for consideration of additional evidence. *Id.* at 696–97. Moreover, the facts of *Edgewater* distinguish it from the current case. There, the parties agreed on the amount of money that a hospital owed Medicare and the amount Medicare owed the hospital in return. *Id.* at 695. They disputed, however, the agency's calculation of interest under a statute. *Id.* The district court remanded the case to the agency on grounds that neither party had raised as pertinent, including calculation of the amount that Medicare owed the hospital. *Id.* at 696. Thus, the Seventh Circuit was simply commenting on an unusual situation in which "[o]ne might have anticipated an appeal by the Administrator, on the ground that a district court lacks authority to treat the bureaucracy as an ombudsman that may be directed to inquire into whatever issues pique the judge's curiosity." (*Id.*) In the current case, in contrast, the Court remanded on grounds that the parties disputed. Finally, *Edgewater* reiterated the rule that "[r]emands usually are not appealable, because they are not 'final' decisions." *Id.* at 696.

Defendants make a number of counterarguments.  First, they cite cases for the proposition that when a court enters judgment and closes a case, the court lacks jurisdiction to allow the amendment of a complaint.  (R. 122 at 4–5.)  The cases Defendants cite—*Sparrow v. Heller*, 116 F.3d 204 (7th Cir. 1997); *Precision Brand Prod., Inc. v. Downers Grove Sanitary Dist.*, No. 08-CV-5549, 2009 WL 3853153 (N.D. Ill. Nov. 17, 2009); and *Camp v. Gregory*, 67 F.3d 1286 (7th Cir. 1995)—involved dismissals rather than agency remands.  Additionally, there was no final judgment in this case previously, which is what divests a court of jurisdiction.  *See Camp*, 67 F.3d at 1289.  While the Clerk of Court filed a document entitled "Judgment in a Civil Case" in this action and "closed" the case, closing a case is an administrative action and the judgment merely reiterated the Court's ruling—a partial dismissal on subject matter jurisdiction grounds, a remand to the agency for further proceedings, and a grant of summary judgment to HUD on PCI's challenge to HUD's burden-shifting framework.  (R. 100.)  The filing of this administrative document does not strip the Court of its jurisdiction.  *Edgewater*, 350 F.3d at 697–98 (explaining that an order is not necessarily final and appealable even if a district court says it is); *Flores*, 2015 WL 3887537, at *4–5 (explaining that the closure of a case was "made for statistical purposes" and that it was "appropriate to permit plaintiff to now seek final judgment"); *see also Stevens v. Santander Holdings USA Inc.*, 799 F.3d 290, 300 (3d Cir. 2015); *Young v. Prudential Ins. Co. of Am.*, 671 F.3d 1213, 1215–16 (11th Cir. 2012).

Second, Defendants argue that PCI "misstates the general rule regarding appealability of agency remands by citing to outdated cases holding that remands to agencies generally are not final, appealable orders."  (R. 122 at 6.)  Defendants rely primarily on a 1999 Seventh Circuit case, *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 979 (7th Cir. 1999), to support this proposition.  *Rush* and *Edgewater*, however, postdate

13

*Perlman* and reiterate the longstanding rule that remands to agencies generally are not final orders. This rule—which the Wright and Miller treatise as well as the decisions of other courts recognize, *see supra*—applies in this case. While *Perlman* does contain some language that suggests otherwise, *see* 195 F.3d at 979 (explaining that the Supreme Court's decisions in *Finkelstein* and *Forney v. Apfel*, 524 U.S. 266 (1998), "undermined" the premise that administrative remands were non-final and "completed the process of making administrative remands generally appealable"); (R. 122 at 6), Defendants ignore the context of this language. The *Perlman* court discussed Supreme Court cases dealing with "sentence four" remands in Social Security Act cases, where the text of the Social Security Act mandates that such remands are appealable. 195 F.3d at 978–79; *Forney v. Apfel*, 524 U.S. 266, 267, 269–70 (1998) (discussing *Finkelstein*, which "reasoned, primarily from the language of [42 U.S.C.] § 405(g)" that sentence four remands were appealable, and extending *Finkelstein*'s holding to cases in which the claimant rather than the agency seeks to appeal); *Finkelstein*, 496 U.S. at 619, 623–25 (holding that sentence four remands are immediately appealable by the agency, but expressly stating that "the issue before [the court] is not the broad question whether remands to administrative agencies are always immediately appealable"). Thus, the language from *Perlman* upon which Defendants rely is inapposite to the current case. Moreover, in *Edgewater*, a case the Seventh Circuit decided after *Perlman*, the court explained:

> To the extent that *Finkelstein*, *Schaefer*, and *Forney* can be generalized beyond § 405(g), we concluded in *Perlman*[, 195 F.3d at 979] . . . that the rule they establish is this: "If the district court finds that the [administrative] decision was erroneous and enters a judgment wrapping up the litigation, that decision is appealable even if extra-judicial proceedings lie ahead; but if the court postpones adjudication until after additional evidence has been analyzed, then it has not made a final decision."

350 F.3d at 697.  The current case is analogous to cases in which courts remand to an agency for examination of additional evidence.  It therefore falls within the general rule that "[r]emands usually are not appealable."  *Id.* at 696.

In short, the Court's September 2014 order remanding this case to HUD for further consideration of the insurance industry's comments was not a final, appealable order.

### B.     The Court Did Not Divest Itself of Jurisdiction

Defendants argue that "whether an agency remand is a final judgment for purposes of appeal is a separate question from the one relevant here: whether the Court divested jurisdiction over this action when it remanded the case to HUD for further proceedings, entered judgment, and the case was closed."  (R. 122 at 5.)  As support, Defendants cite *District Hospital Partners, L.P. v. Burwell*, No. 11-0116 (ESH), Dkt. No. 133, at 2 (D.D.C. Feb. 22, 2016), where the court explained that it did not retain jurisdiction expressly or implicitly upon an administrative remand "[a]lthough it certainly had the discretion to do so" even though the remand order was "not a final, appealable order."  The court explained that "the lack of a final, appealable order [does not] necessarily mean[] that the Court *must* have retained jurisdiction."  *District Hosp.*, No. 11-0116 (ESH), at 2 (emphasis in original).  Otherwise, the court reasoned, "there would be no discretion for district courts to exercise."  *Id.*  Other courts within the D.C. Circuit have said that "although courts have discretion to retain jurisdiction pending completion of a remand and to order progress reports in the meantime, this discretion is also exercised only in unusual circumstances, not present here, such as 'cases alleging unreasonable delay of agency action or failure to comply with a statutory deadline, or for cases involving a history of agency noncompliance with court orders or resistance to fulfillment of legal duties.'"  *Alegent Health-Immanuel Med. Ctr. v. Sebelius*, 917 F. Supp. 2d 1, 3 (D.D.C. 2012) (quoting *Baystate Med. Ctr.*

*v. Leavitt*, 587 F. Supp. 2d 37, 41 (D.D.C. 2008)); *Baystate*, 587 F. Supp. 2d at 41 (collecting cases).

The Court doubts that these non-binding cases are applicable here, where it was not the Court's intention to relinquish jurisdiction and the Court did not order progress reports or actively oversee proceedings during the remand. *See Alegent*, 917 F. Supp. 2d at 3; *Baystate*, 587 F. Supp. 2d at 41. Retaining jurisdiction to permit the parties to reopen the litigation after HUD completed its court-ordered review was prudent and efficient in this case. The Court simply ordered the agency to give further consideration to certain issues; it did not order a particular result. It is possible that HUD could have ignored the Court, complied entirely with the Court's order, or could have misapprehended the Court's order. In the event Plaintiffs believed that HUD had failed to comply with the Court's order, there was no reason to force Plaintiffs to refile simply to renew a challenge go HUD's actions during proceedings on remand. *See Am. Haw. Cruises v. Skinner*, 893 F.2d 1400, 1403 (D.C. Cir. 1990) ("A party not satisfied with the Coast Guard's decision after remand can come back to the district court with a challenge to the agency's reconsidered decision."); *see also Biodiversity Legal Found. v. Babbitt*, Nos. 96-5033, 96-5054, 96-5055, 1997 WL 150095, at *1 (D.C. Cir. 1997) ("Appellants/cross-appellees can raise their challenges to the district court's remand order, and the order denying reconsideration, once the district court issues a final order concluding the proceedings after remand."). Additionally, by retaining jurisdiction after remand proceedings completed, the Court avoided the inefficient and disfavored splitting of this case into piecemeal litigation for possible appeals of fully adjudicated claims. *See Cont'l Cas. Co. v. Anderson Excavating & Wrecking Co.*, 189 F.3d 512, 518 (7th Cir. 1999) (explaining that Federal Rule of Civil Procedure 54(b) orders "permit[] piecemeal appeal[s]. which [are] disfavored in the federal

system"); *Brown v. Patelco Credit Union*, No. 09-cv-5393, 2010 WL 5439714, at *3 (N.D. Ill. Dec. 28, 2010); *see also* Wright et al., *supra*, § 3914.32 (explaining that "[t]he general rule is that a remand is not appealable as a final decision" and that "[a] partial remand is even more clearly not final").

In sum, the Court did not intend to—and did not—strip itself of jurisdiction to consider the current motion nor would doing so have been an efficient course of action in light of the Court's non-final order remanding a portion of this case to HUD for further proceedings. The Court has the latitude to rule on the motion now before it, just as other courts have done under similar circumstances. *See Flores*, 2015 WL 3887537, at *4–5; *Swedish Am. Hosp. v. Sebelius*, No. 08-cv-2046 (D.D.C. Oct. 17, 2014) (reopening case after remand to agency in minute order); *Swedish Am. Hosp. v. Sebelius*, 773 F. Supp. 2d 1, 14 (D.D.C. 2011); *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 698 F. Supp. 2d 168, 171 (D.D.C. 2010) (noting that the court permitted amendment of a complaint after a remand to an agency); *Defs. of Wildlife v. Kempthorne*, No. 04-1230 (GK), 2006 WL 2844232, at *12 (D.D.C. Sept. 29, 2006) ("A court retains jurisdiction to enforce the terms of its remand order when an agency fails to meet them."), *on reconsideration in part sub nom.*, *Defs. of Wildlife v. Salazar*, 842 F. Supp. 2d 181 (D.D.C. 2012). Accordingly, the Court turns to the merits of the motion before it.

## II. Futility

Defendants argue that the Court should deny PCI's motion because the amendment would be futile. (R. 122 at 8.) The Court agrees in part.

First, Defendants contend that some of the counts in PCI's proposed amended complaint are duplicative of a count the Court previously dismissed or counts for which the Court entered summary judgment in favor of Defendants. (*Id.*) Count VI in the proposed amended complaint,

which alleges that the application of the Disparate Impact Rule to homeowners insurance violates the McCarran-Ferguson Act, is essentially the same as Count I of the original complaint, which the Court dismissed for lack of subject matter jurisdiction on ripeness grounds. (*Compare* R. 1 at ¶¶ 71–78, *with* R. 107-1 at ¶¶ 150–57; *see* R. 99 at 17, 31–32.) PCI appears to recognize that it has not altered this claim and indicates that "[a]t a minimum, th[e] claim[ is] properly included in the amended complaint to avoid any doubt that [it] ha[s] been preserved for appeal." (R. 125 at 14.) PCI does not point to any change of circumstance that renders the claim ripe, and the Court cannot discern such a change either. Accordingly, it is clear that the Court lacks jurisdiction over that claim. The Court denies PCI's motion with respect to Count VI.

Similarly, Count VII—in which PCI contends that the burden-shifting scheme is arbitrary and capricious, an abuse of discretion, and not in accordance with law, primarily under *Wards Cove Packaging Co. v. Antonio*, 490 U.S. 642 (1989)—and Count VIII—in which PCI contends that HUD failed to respond to comments regarding *Wards Cove*—are the same claims on which the Court granted summary judgment to Defendants. (*Compare* R. 1 at ¶¶ 99–108, *with* R. 107 ¶¶ at 158–67; *see* R. 99 at 17, 48–51.) PCI appears to recognize that these claims are duplicative of claims the Court has already resolved. (*See* R. 125 at 14–15.) Because the Court has already ruled on these counts against PCI, the Court denies PCI's motion with respect to Counts VII and VIII.

Second, Defendants argue that Count V of the proposed amended complaint—in which PCI claims that application of the Disparate Impact Rule to homeowners insurance is contrary to the FHA as interpreted by the Supreme Court in *Inclusive Communities*—is without merit. (R. 122 at 9.) The Supreme Court in *Inclusive Communities* affirmed the Fifth Circuit's adoption of HUD's burden-shifting approach and held that disparate-impact claims are cognizable under the

18

FHA. *See* 135 S. Ct. at 2514–15, 2525–26; *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 747 F.3d 275, 282 (5th Cir. 2014) ("We now adopt the burden-shifting approach in 24 C.F.R. § 100.500 for claims of disparate impact under the FHA."); *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, No. 3:08-CV-0546-D, 2015 WL 5916220, at *1, *3 (N.D. Tex. Oct. 8, 2015) (noting that the "[Supreme] Court did not disturb the Fifth Circuit's adoption of the HUD burden-shifting regimen"); *see also, e.g.*, *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016) (explaining that in *Inclusive Communities*, "[t]he Supreme Court implicitly adopted HUD's approach"); *Borum v. Brentwood Vill., LLC*, 218 F. Supp. 3d 1, 21–22 (D.D.C. 2016) (applying HUD's burden-shifting framework). In so ruling, the Supreme Court pointed out key limitations to disparate-impact liability to ensure that it is not imposed solely on the basis of a statistical disparity and instead targets "artificial, arbitrary, and unnecessary barriers." *Inclusive Cmtys.*, 135 S. Ct. at 2522 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). Accordingly, the Supreme Court noted that disparate-impact liability must "give housing authorities and private developers leeway to state and explain the valid interest served by their policies." *Id.* The Disparate Impact Rule does this in the second step of the burden-shifting scheme. Additionally, the Supreme Court explained that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* at 2523. The Supreme Court did not indicate that HUD's burden-shifting approach violates this principle. *See id.*; *see also* 24 C.F.R. § 100.500 ("[T]he plaintiff . . . has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect."); Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11460, 11469 (Feb. 15, 2013) ("Under th[e] rule, the charging party or plaintiff has the burden of proving that a challenged practice causes a

discriminatory effect.").[3]  The Supreme Court also cautioned that "[c]ourts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision," *Inclusive Cmtys.*, 135 S. Ct. at 2524, although the Court further explained that "that race may be considered in certain circumstances and in a proper fashion" and that "mere awareness of race in attempting to solve the problems facing inner cities does not doom that endeavor at the outset," *id.* at 2525.  The Supreme Court did not indicate that HUD's burden-shifting regime violates these principles about racial considerations.

In short, the Supreme Court in *Inclusive Communities* expressly approved of disparate-impact liability under the FHA and did not identify any aspect of HUD's burden-shifting approach that required correction.  While *Inclusive Communities* cautions courts about imposing disparate-impact liability under certain circumstances, *see, e.g.*, *id.* at 2524 ("Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision."); *id.* at 2523 ("Courts must therefore examine with care whether a plaintiff has made out a prima facie case of disparate impact and prompt resolution of these cases is important."), these concerns are best left for analysis in specific cases rather than in a facial, pre-enforcement challenge.  The Court therefore denies PCI's motion with respect to Count V, although the Court notes that it is possible that *Inclusive Communities* will be relevant to one or more of the remaining claims in the case in some fashion.

Third, Defendants challenge Counts II–IV, which allege that HUD failed to adequately consider the three issues the Court directed HUD to further examine upon remand.  Defendants spend a mere two pages on these arguments, (R. 122 at 11–12), and PCI addresses them in about three pages over two briefs, (R. 125 at 11–13; R. 108 at 8–9).  Given the importance and

---

[3] If the Disparate Impact Rule were applied in such a way that eliminated the need to prove causation, it would be contrary to the FHA under *Inclusive Communities*.  The Supreme Court's decision in *Inclusive Communities*, however, did not indicate that the Disparate Impact Rule is capable of such an application.

complexity of this case and given that the Court cannot discern based on the parties' briefs that these amended claims are clearly without merit, the Court grants PCI's motion with respect to these counts. This process will allow the parties to fully brief whether HUD satisfied its obligations pursuant to the Court's September 2014 order.[4]

### CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part PCI's motion. The motion is granted with respect to Counts I–IV and denied with respect to the remaining Counts.

DATED: June 20, 2017                    ENTERED

_____
AMY J. ST. EVE
United States District Court

---

[4] The Court also grants PCI's motion with respect to Count I (whether HUD adequately considered the impact of *Inclusive Communities*), particularly with respect to how, if at all, *Inclusive Communities* affects the various issues the Court ordered PCI to consider on remand.

21

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 13 C 8564** |
| **ADRIANNE TODMAN, in her official capacity as Acting Secretary of Housing and Urban Development,[1] and the UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case addresses the U.S. Department of Housing and Urban Development ("HUD")'s answer to a longstanding and difficult question: whether providers of homeowners insurance should face liability under the Fair Housing Act ("FHA") for making decisions based on risk that disparately impact people of color and other protected classes. The issue has been unresolved in the courts. In 2013, HUD tackled it head-on by refusing to exempt risk-based insurance practices from its new Disparate-Impact Rule, which established a uniform legal framework for FHA discriminatory effects claims. Plaintiff Property Casualty Insurers Association of America ("PCI")[2] sued HUD over this decision, alleging on behalf of its members in the insurance trade that the agency's refusal to recognize an exemption was both arbitrary and capricious and

---

[1]     Adrianne Todman became the Acting Secretary of Housing and Urban Development on March 22, 2024, and is herein substituted for Marcia Fudge as Defendant in this action. *See* FED. R. CIV. P. 25(d).

[2]     PCI has since merged with another insurance trade association and changed its name to the American Property Casualty Insurance Association, but continues to refer to itself as "PCI" in briefing for the sake of clarity. (*See* Mem. in Supp. of Pl.'s Renewed Mot. for Summ. J. [283] (hereinafter "Pl.'s Br.") at 4 n.4.) The court will do the same.

contrary to law.  Judge Amy St. Eve, then of this court, dismissed several of PCI's claims in 2014, but agreed that HUD had inadequately considered the issues at stake and ordered further analysis.

Now, after almost a decade of political uncertainty surrounding the Rule, the matter is again before the court.  HUD reinstated its 2013 Rule in substantively identical form last year; PCI argues that HUD's decision to do so remains arbitrary and capricious for the same reasons it raised earlier and more.   As explained in detail below, however, HUD has supplied what was missing before: a thorough and well-reasoned explanation for its decision to allow disparate-impact claims against risk-based insurance practices under the FHA.  The court therefore denies PCI's motion for summary judgment and grants HUD's cross-motion.

## BACKGROUND

PCI's challenge to HUD's Rule is the latest salvo in a legal debate stretching back almost to the FHA's enactment.  Much of this story was told in Judge St. Eve's 2014 decision, and the court will not repeat it in full here.  *See Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1024–34 (N.D. Ill. 2014) (hereinafter "*PCI*").  But the court presents the historical context for today's decision.

### I.    Pre-2014 Background

The central dispute here involves risk-based pricing and underwriting of insurance, or the processes for setting rates and making coverage decisions based on an estimation of the insured party's risk of future loss.  *See* Steven Plitt et al., *Couch on Insurance* §§ 1:9, 69:7, 69:14, 101:2 (3d ed.).  Homeowners insurers do this by using a host of actuarial factors correlated with past losses, such as a house's construction materials, its proximity to fire hydrants, and whether it has a security system.  (PCI's Statement of Facts [283-1] (hereinafter "Pl.'s SOF") ¶ 9.)  Insurers depend on risk classification to set premiums that accurately reflect the cost of providing insurance, and in turn, to remain solvent in a competitive marketplace.  (*Id.* ¶¶ 96–97.)  Not all of an insurer's practices, however, are risk-based: many other aspects of the business of insurance,

such as marketing, claims processing, and payment, do not involve actuarial decision-making. *See* Stephen M. Dane, *Race Discrimination is not Risk Discrimination: Why Disparate Impact Analysis of Homeowners Insurance Practices Is Here to Stay*, Banking & Fin. Servs. Pol'y Rep., June 2014, at 4 (Admin. Record [317] (hereinafter "R.") 004407); *Huskey v. State Farm Fire & Cas. Co.*, No. 22 C 7014, 2023 WL 5848164, at *11 (N.D. Ill. Sept. 11, 2023).

State law regulates the insurance industry, including the process by which insurers calculate their rates. *PCI*, 66 F. Supp. 3d at 1024–25. All states permit insurers to use risk-based pricing and underwriting methods, and many require them to do so. (Pl.'s SOF ¶ 94; R. 029157–62.) In other words, states allow (or mandate) insurers to "fairly" discriminate by treating people with similar risks similarly and different risks differently. But "unfair discrimination"—charging different rates to people in the same risk group, with no basis in cost for the differential—is widely proscribed under state law. *See* Plitt et al., *supra*, §§ 69:39, 69:40, 69:44. States vary in the degree to which they require insurers to seek prior approval of proposed rates by filing them in advance with the state's insurance commissioner or other regulatory body. *Id.* § 2:31; *see* Angelo Borselli, *Insurance Rates Regulation in Comparison with Open Competition*, 18 Conn. Ins. L.J. 109, 126 (2011).

The federal McCarran-Ferguson Act, 15 U.S.C. §§ 1011–15, confirms the states' primacy over insurance regulation. Passed in 1945, McCarran-Ferguson prohibits federal laws of general application from being "construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance," meaning that Congress must speak clearly if it wants to intervene in this area. 15 U.S.C. § 1012(b). McCarran-Ferguson thus creates a form of "reverse preemption" that prevents enforcement of otherwise-applicable federal statutes in such a way as to interfere with states' regulatory insurance regimes. The Act is complemented by the common-law "filed-rate doctrine," which forbids courts from revising rates that have been filed with and approved by a regulatory agency, at least in states where this is required. *See Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 607 (7th Cir. 2013).

In certain ways, however, these principles may collide with another important federal policy: ensuring fair access to housing through the United States.  The Fair Housing Act, enacted in 1968, makes it unlawful to "make unavailable or deny" housing, or to discriminate "in [its] terms, conditions, or privileges . . . or in the provision of services or facilities in connection therewith," based on a person's race, gender, or other protected characteristics.  42 U.S.C. § 3604(a), (b).  The Act's passage coincided with a growing understanding of homeowners insurance as an essential prerequisite to housing opportunity.[3]  Mortgage companies will typically not provide financing to borrowers who lack insurance coverage; thus, as the Seventh Circuit has recognized, "[n]o insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 298 (7th Cir. 1992).  HUD has long maintained that insurers' denial of this vital coverage to communities of color—a practice known as "insurance redlining"—has contributed to the problem of racial disparities in homeownership.[4]  Holding insurers liable under the FHA could change that.  But whether and to what extent the FHA can properly be applied to insurers has been hotly contested for decades—both because of the federalism principles embodied in McCarran-Ferguson, and because of the fundamental nature of insurance itself.

Since early in the FHA's history, both HUD and lower federal courts have interpreted its language to encompass disparate-impact as well as disparate-treatment theories of liability.  *See PCI*, 66 F. Supp. 3d at 1026 & n.1 (noting that eleven circuits, though not the Supreme Court or

---

[3]     *See* President's Nat'l Advisory Panel on Ins. in Riot-Affected Areas, *Meeting the Insurance Crisis of Our Cities* 1 (1968) (R. 032825) ("Without insurance, banks and other financial institutions will not—and cannot—make loans . . . housing cannot be constructed . . . [and] [e]fforts to rebuild our nation's inner cities cannot move forward.  Communities without insurance are communities without hope."); *Dunn v. Midwestern Indem., Mid-Am. Fire & Cas. Co.*, 472 F. Supp. 1106, 1109–12 (S.D. Ohio 1979).

[4]     *See Dunn*, 472 F. Supp. at 1109 & nn. 7–8 (citing 1978 memorandum from HUD's General Counsel); *Homeowners' Insurance Discrimination: Hearings before the S. Comm. on Banking, Housing and Urban Affairs*, 103 Cong. 50 (1994) (statement of HUD Assistant Sec'y Roberta Achtenberg).

the D.C. Circuit, had so held as of 2014). In other words, FHA defendants could be liable for conduct that, while facially neutral, had the unjustified effect of denying housing to members of a protected class. This theory, however, is in tension with the very concept of risk-based insurance decision-making, which differentiates between groups of people based on objective risk factors— factors that can themselves strongly correlate with protected-class membership. *See Am. Family*, 978 F.2d at 290 ("Risk discrimination is not race discrimination."). This could mean that purely risk-based insurance decisions that have a disparate impact on a protected class might violate the law. And even attempting to resolve this tension could require federal courts—rather than state insurance commissioners—to scrutinize insurers' ratemaking decisions, raising concerns under McCarran-Ferguson. In a case where plaintiffs challenged insurance policy caps as violative of the Americans with Disabilities Act, the Seventh Circuit reversed a ruling in plaintiffs' favor; the court held that "requir[ing] federal courts to determine whether limitations on coverage are actuarially sound and consistent with state law . . . obviously would interfere with the administration of the state law," and that "[t]he states are not indifferent to who enforces their laws." *Doe v. Mut. of Omaha*, 179 F.3d 557, 563–64 (7th Cir. 1999).

The question of whether insurers' risk-based practices could be subjected to disparate-impact liability under the FHA remained unsettled for many years. While HUD consistently sought to extend the FHA to the insurance industry, and passed a regulation in 1989 that swept insurers within the Act's scope, *see* 54 Fed. Reg. 3,232, 3,285 (Jan. 23, 1989) (codified at 24 C.F.R. § 100.70(d)(4)), the circuits split over whether insurers could be subject to both disparate-treatment and disparate-impact FHA liability, both, or neither.[5] And while HUD took the position in

---

[5] In 1984, the Fourth Circuit interpreted the FHA's text to exclude insurers entirely— in part due to the concerns over state authority and the business of insurance that a contrary reading would raise. *Mackey v. Nationwide Ins. Companies*, 724 F.2d 419, 423 (4th Cir. 1984). After HUD took a contrary position in its 1989 regulation, two circuits (the Seventh and Sixth) partially endorsed the agency's interpretation of the statute as to disparate-treatment claims against insurers, but declined to rule on disparate-impact claims. *Am. Family*, 979 F.2d at 290– 91, 301; *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1359–60, 1363 (6th Cir. 1995). The

Congressional hearings that its regulation contemplated liability for insurers under both theories, *see Homeowners' Insurance Discrimination: Hearings Before the S. Comm. on Banking, Housing and Urban Affairs*, 103 Cong. 19 (1994) (statement of HUD Assistant Sec'y Roberta Achtenberg), it never formally codified that position. *See* Gregory D. Squires, *Why An Insurance Regulation to Prohibit Redlining?*, 31 John Marshall L. Rev. 489, 499, 503–04 (1998) (describing failed attempts to promulgate a more detailed insurance regulation that might address this question); *Saunders v. Farmers Ins. Exch.* ("*Saunders II*"), 537 F.3d 961, 964 n.3 (8th Cir. 2008) (noting that "HUD ha[d] never applied a disparate impact analysis to insurers" as of 2008) (quoting *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1362 (6th Cir. 1995)).

## II.    The 2013 Rule

That changed in 2012, when HUD announced its intent to promulgate a new standardized framework for evaluating disparate-impact claims under the FHA. This framework, based on

---

Eighth Circuit also declined to decide whether the FHA permitted disparate-impact claims against insurers' risk-based practices, but held that if the FHA did allow for such a claim, it would be preempted under the McCarran-Ferguson Act in the circumstances of that case for interfering with Missouri's scheme of insurance regulation. *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 964–67 (8th Cir. 2008). In contrast, the Fifth Circuit held that a disparate-impact claim against an insurer was not preempted under McCarran-Ferguson, but its holding depended on a conclusion that the state insurance laws at issue did not specifically address the challenged practice. *DeHoyos v. Allstate Corp.*, 345 F.3d 290, 298–99 & n.5 (5th Cir. 2003). District courts in several other jurisdictions reached similar results. *See, e.g.*, *Lumpkin v. Farmers Grp., Inc.*, No. 05-2868 MA/V, 2007 WL 6996777, at \*7 (W.D. Tenn. July 6, 2007); *cf. Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d. 46, 61 (D.D.C. 2002) (rejecting an insurer's related argument framed in terms of states' "primary jurisdiction" over insurance regulation). The Ninth Circuit held that, in general, disparate-impact FHA claims are cognizable against insurers and do not run afoul of McCarran-Ferguson if they "would complement—rather than displace and impair—[state] law" regulating the insurance practice at issue. *Ojo v. Farmers Grp.*, 600 F.3d 1205, 1208, 1210 (9th Cir. 2010) (en banc). However, the Ninth Circuit then certified the specific question of whether Texas's insurance code permitted the challenged practice at issue to that state's supreme court, which confirmed that it did, meaning that the FHA challenge was preempted by McCarran-Ferguson. *Ojo v. Farmers Grp.*, 356 S.W.3d 421, 422 (Tex. 2011). In a related but distinct context, where Black plaintiffs alleged that the defendant insurer targeted and sold them life insurance policies with higher premiums and lower benefits than those sold to white purchasers in violation of 42 U.S.C. §§ 1981 and 1982, the Eleventh Circuit concluded those claims were not preempted under the McCarran-Ferguson Act. *Moore v. Liberty Nat. Life Ins. Co.*, 267 F.3d 1209, 1222–23 (11th Cir. 2001).

analogous caselaw from other civil-rights statutes, involved the three-step burden-shifting approach for evaluating disparate-impact claims that was already in use by many of the courts of appeals.[6]  Commenters from the insurance industry, including PCI, quickly weighed in on HUD's rulemaking, airing the same basic concerns about applying disparate-impact liability to homeowners insurance that had been raised in court for decades.  They requested that HUD exempt either risk-based insurance practices specifically, or insurance altogether, from the scope of its new Disparate-Impact Rule.  (*See* R. 000371–83, 000454–59, 000552–56.)

HUD rebuffed these concerns when it issued its final Rule in early 2013.  *See Implementation of the Fair Housing Act's Discriminatory Effects Standard: Final Rule*, 78 Fed. Reg. 11,460 (Feb. 15, 2013).  Its justification for doing so, however, consumed just half of a single page in the Federal Register.  HUD noted that "courts have agreed with HUD['s]" longstanding interpretation of the Act as applicable to insurers, citing the Ninth Circuit's decision in *Ojo v. Farmers Group*, 600 F.3d 1205 (9th Cir. 2010) (en banc) that McCarran-Ferguson did not per se preempt disparate-impact FHA claims, as well as the Seventh's in *American Family* and the Sixth's in *Nationwide*.  *Id.* at 11,475.  HUD did not, however, discuss the reasoning in these cases or explain in detail why they supported its position—particularly for the *Ojo* litigation, which ultimately ended in a finding by the Texas Supreme Court that the particular state insurance law at issue *was* incompatible with disparate-impact liability.  *Ojo v. Farmers Grp.*, 356 S.W.3d 421, 422 (Tex. 2011).  It took the position (in a single paragraph) that McCarran-Ferguson issues do not warrant a blanket exception for insurers, and could instead be addressed on a case-by-case basis by analyzing whether each state's regulatory regime was actually incompatible with a

---

[6]     Specifically, the proposed Rule required FHA disparate-impact plaintiffs to prove at the first step that a challenged housing practice has a disparate impact (or perpetuates segregation) with regard to a protected class.  At the second step, the defendant would have the burden of showing that the practice was supported by legitimate and nondiscriminatory interests.  At the third step, the plaintiff could show that a less-discriminatory alternative was available to serve the same interests. *See Implementation of the Fair Housing Act's Discriminatory Effects Standard: Proposed Rule*, 76 Fed. Reg. 70921, 70923–24 (Nov. 16, 2011).

federal disparate-impact remedy. *Id.* HUD rejected the industry's concerns about the fundamental nature of the insurance business in another, even shorter, paragraph, stating that insurer defendants would have the opportunity to provide "a legally sufficient justification" for their practices at step two of the burden-shifting approach. *Id.* HUD declined to create specific safe harbors for insurance pricing or other risk-based factors and practices in its Rule on the same basis, reasoning that insurers would have an adequate opportunity to justify these practices by litigating through the burden-shifting framework. *Id.* And in dismissing concerns about the costs imposed by requiring insurers to collect race and ethnicity data, HUD simply recited the steps of the burden-shifting framework and noted that the initial burden fell on the plaintiff to provide evidence of disparate impact. *Id.*

### III.    PCI's Lawsuit and the Court's 2014 Decision

PCI filed this lawsuit challenging HUD's Rule in late 2013. (*See* Compl. [1].) Its seven-count complaint made three basic claims: (1) HUD's decision to apply disparate-impact liability to homeowners insurance was contrary to law and in excess of the agency's jurisdiction in light of McCarran-Ferguson; (2) HUD had acted in an arbitrary and capricious manner by failing to adequately consider issues regarding McCarran-Ferguson, the filed-rate doctrine, and the nature of insurance; and (3) HUD's burden-shifting framework was both arbitrary and capricious and contrary to law. (*Id.* ¶¶ 71–108.) Both sides moved for summary judgment. (*See* PCI's Mot. for Summ. J. [20]; HUD's Mot. to Dismiss and/or for Summ. J. [30].)

In September 2014, the court dismissed PCI's lawsuit in part but granted summary judgment in its favor on several claims. PCI's facial attack on the Rule under McCarran-Ferguson, the court held, was nonjusticiable: as the Supreme Court held in *Humana, Inc. v. Forsyth*, McCarran-Ferguson does not impose "any sort of field preemption" and requires fact-intensive analysis to determine whether federal law directly conflicts with state regulation or whether its application would frustrate state policy or interfere with a state's administrative regime. 525 U.S. 299, 309–10 (1999). Accordingly, PCI's claim was unripe for decision in the absence of a

"concrete dispute regarding a particular insurance practice" and a particular set of state laws. *PCI*, 66 F. Supp. 3d at 1040. The court also granted summary judgment in HUD's favor on PCI's challenges to the burden-shifting framework, finding that the agency's adoption of the framework was adequately reasoned and entitled to deference. *Id.* at 1053.

The court found, however, that HUD had inadequately addressed the issues that commenters had identified concerning McCarran-Ferguson, the filed-rate doctrine, and the nature of insurance. Even if *this* case did not present a justiciable platform for addressing all of the Rule's potential conflicts with McCarran-Ferguson, the court held, HUD's one-paragraph justification for its conclusion that these conflicts should be worked out on a case-by-case basis—rather than avoided altogether via a blanket exemption or safe harbor—was flawed in several respects. HUD had failed to address "the likelihood that McCarran-Ferguson preclusion will apply" in any given case, as well as "how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.* at 1048. Moreover, the agency had failed to grapple with adverse caselaw that called the viability of disparate-impact claims against insurers' risk-based practices into question. *Id.* at 1049. HUD's failure to separately discuss the filed-rate doctrine was also arbitrary and capricious in light of these errors. *Id.* at 1050.

Further, the court held, HUD had made "no effort to evaluate the substance of the insurance industry's concerns" regarding the Rule's conflict with the nature of insurance. *Id.* at 1051. Even if insurers could present a legitimate and nondiscriminatory basis in defense of their risk-based practices under the burden-shifting framework, HUD still needed to justify its decision to "'require courts to engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success,'" rather than more carefully considering arguments for particular "exemptions from the Disparate Impact Rule" or "safe harbors" for practices that plaintiffs could not effectively challenge. *Id.* (quoting *Graoch*

*Assocs. # 33, L.P. v. Louisville/Jefferson Cnty. Metro Hum. Rels. Comm'n*, 508 F.3d 366, 376 (6th Cir. 2007)).  Accordingly, the court remanded the case to HUD for further explanation.  *Id.* at 1054.

## IV.    Post-Remand Developments

The most important development in the nine years that have passed since the court's remand order is the Supreme Court's decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015).  In *Inclusive Communities*, the Court resolved one of the longstanding legal questions hanging over this case at its inception, by holding that disparate-impact claims are cognizable under the FHA.  Left open in that ruling were a number of questions over *how* such claims may be properly litigated.  Soon after the Court's decision, PCI submitted comments to HUD stating that *Inclusive Communities* created significant new limitations on disparate-impact FHA liability, and that these limits further supported exempting homeowners insurance from the Rule.  (Pl.'s SOF ¶ 60; R. 004615–21.)

In October 2016, HUD issued a Supplemental Response in response to the court's remand order.  *Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance*, 81 Fed. Reg. 69,012 (Oct. 5, 2016).  This Response (for which HUD did not reopen the public comment period, though PCI submitted comments anyway; *see* R. 004416–4621) essentially reaffirmed the agency's original position on the Rule's applicability to insurance, but did so in much greater detail.  HUD noted that the FHA itself does not contain an exemption for insurance, either as enacted or as amended, and stated that creating such an exemption by regulation would be "unworkable and inconsistent with HUD's statutory mandate."  81 Fed. Reg. at 69,013.  Over the course of eight pages in the Federal Register, the Supplemental Response addressed issues with McCarran-Ferguson, the filed-rate doctrine, and the nature of insurance.  *Id.* at 69,014–19.  However, it did not substantively discuss *Inclusive Communities*.

PCI moved the court to amend its complaint [107] in response to the Supplemental Response and *Inclusive Communities*.  Its proposed amendments [107-1] listed counts that were substantively identical to those in its original complaint, including several that the court had

already dismissed or resolved in HUD's favor at summary judgment, as well as several new counts based on *Inclusive Communities*. The court granted PCI's motion in part and denied it in part. *Prop. Cas. Insurers Ass'n of Am. v. Carson*, No. 13 CV 8564, 2017 WL 2653069 (N.D. Ill. June 20, 2017). The court denied as futile PCI's amended counts challenging the Rule as violative of the McCarran-Ferguson Act and its counts challenging HUD's burden-shifting scheme, as these claims were foreclosed by the court's 2014 order. *Id.* at *8. In addition, the court denied PCI's attempt to add a direct challenge to the Rule as "contrary to law" under *Inclusive Communities*, finding that the Supreme Court had largely endorsed HUD's burden-shifting approach and that any issues its holding posed for applying disparate-impact liability to insurers were "best left for analysis in specific cases rather than in a facial, pre-enforcement challenge." *Id.* at *8–9. The court did, however, grant PCI's motion to amend with respect to the three arbitrary-and-capricious claims on which it had previously ruled in PCI's favor, as well as an additional claim that HUD's failure to address *Inclusive Communities* was also arbitrary and capricious. *Id.* at *9 & n.4. PCI filed an amended complaint consistent with the court's order [131] and moved for summary judgment again in late 2017 [136].

At that point, after a change in presidential administrations, the case went dormant for several years. In 2017, HUD proposed to replace the 2013 Rule with a new, more limited alternative. *See Reconsideration of HUD's Implementation of the Fair Housing Act's Disparate Impact Standard*, 83 Fed. Reg. 28,560 (June 20, 2018); *HUD's Implementation of the Fair Housing Act's Disparate Impact Standard: Proposed Rule*, 84 Fed. Reg. 42,854 (Aug. 19, 2019). This litigation, now reassigned to the undersigned judge following Judge St. Eve's appointment to the Seventh Circuit [157], was stayed several times to accommodate the agency's change in leadership and new rulemaking. It appeared ripe for a resolution when, in September 2020, HUD

issued a final revised Rule.[7]  *HUD's Implementation of the Fair Housing Act's Disparate Impact Standard: Final Rule*, 85 Fed. Reg. 60,288 (Sept. 24, 2020).  But before the parties could even begin with motion practice, the new Rule was itself declared arbitrary and capricious by another federal court, who stayed its enforcement, thus leaving the 2013 Rule in place.  *See Mass. Fair Hous. Ctr. v. United States Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 611–12 (D. Mass. 2020).  Only a few months later, another change in administrations resulted in yet another reversed course: the Biden Administration promptly directed that HUD reconsider its 2020 rulemaking.  *See Redressing Our Nation's and the Federal Government's History of Discriminatory Housing Policies*, 86 Fed. Reg. 7,487, 7,488 (Jan. 26, 2021).

What followed was another lengthy delay, as HUD announced its intent to "recodify its previously promulgated rule" via a notice of proposed rulemaking.[8]  *Reinstatement of HUD's Discriminatory Effects Standard: Proposed Rule*, 86 Fed. Reg. 33,590, 33,590 (June 25, 2021). This time, unlike in 2016, HUD did reopen its public comment period, and received more than 10,000 comments on its proposal.  (*See* HUD's Statement of Facts [295-2] (hereinafter "Def.'s SOF") ¶ 18.)  These included statements from PCI and other insurance industry representatives, as well as federal and state lawmakers and individual policyholders, that reiterated many of the

---

[7]    Like the 2013 Rule that sparked this lawsuit, HUD's 2020 Rule did not create a categorical exemption for the insurance industry or for risk-based practices specifically.  Instead, the 2020 Rule reaffirmed the position that the viability of disparate-impact claims against insurers would need to be decided on a case-by-case basis.  *See* 85 Fed. Reg. at 60,324–26.  The 2020 Rule did, however, add specific language mirroring McCarran-Ferguson's restrictions, and codified a new defense: a showing that defendants' challenged actions were "reasonably necessary to comply with" state law or other legal requirements.  *Id.* at 60,333 (to be codified at 24 C.F.R. § 100.500(d)(1), (e)).  Because the 2020 Rule never took effect, the question of what (if any) legal ramifications these changes might have had was never answered.  More generally, the 2020 Rule would have sharply limited disparate-impact liability by, as one court put it, imposing "new, onerous pleading requirements on plaintiffs" and altering the burden-shifting framework in defendants' favor.  *Mass. Fair Hous. Ctr.*, 496 F. Supp. 3d at 607–08.

[8]    While PCI moved for summary judgment a third time in April 2021 [222] before HUD had finished its rulemaking, the court struck this motion and HUD's opposition and cross-motion [231] without prejudice in February 2022.  (*See* Ord. [248].)

same legal and policy arguments against applying the Rule to insurance. (Pl.'s SOF ¶¶ 92–114; R. 028170–29162, 029271–553.) Other commenters, however, took the opposite position and urged HUD not to reverse its original position regarding liability for the insurance industry. (*E.g.*, R. 029163–86.)

Finally, in March 2023, HUD promulgated a new Rule that reinstated the 2013 burden-shifting framework in full. *Reinstatement of HUD's Discriminatory Effects Standard: Final Rule*, 88 Fed. Reg. 19,450 (Mar. 31, 2023). HUD's response to the new round of public commentary was substantial: the response spanned almost fifty pages in the Federal Register, including seventeen devoted exclusively to comments concerning insurance, *id.* at 19,463–80, and another six to *Inclusive Communities*, *id.* at 19,457–62. It is this record—along with HUD's 2016 Supplemental Response, which the agency reaffirmed and incorporated by reference in its 2023 rulemaking, *see id.* at 19,463 n.113—that the parties now present for the court's consideration.

PCI filed a Second Amended Complaint [274] a few months after HUD issued its rule.[9] Following yet another round of cross-motions for summary judgment [282, 295], the matter is at long last ready for the court's decision.

## LEGAL STANDARD

As before, this request for judicial review of an agency action is governed by the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* Thus, PCI argues that HUD's rulemaking here violates the APA's prohibition of "arbitrary [and] capricious" agency action. *Id.* § 706(2)(A). In considering such a challenge, the court's review is "narrow in scope"; the court will not "substitute [its] own policy judgment for that of the agency." *Cook Cnty. v. Wolf*,

---

[9]     This amended complaint makes "technical and non-substantive amendments clarifying that [PCI's] claims in this action challenge both the 2013 Rule and the substantively identical 2023 Reinstatement Rule." (*See* Joint Status Report [272] at 2.) While it reasserts all of PCI's claims, including those that the court previously dismissed from its original complaint and rejected as futile in its 2017 order on PCI's motion to amend, the parties have agreed that these claims are included solely to ensure that they are preserved for appeal. (*Id.* at 2–3.)

962 F.3d 208, 230 (7th Cir. 2020). Rather, the court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). As part of this explanation, the agency should "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).) The agency's action may be found arbitrary and capricious if it

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *State Farm*, 463 U.S. at 43). The court's review is limited to the reasons that the agency gave itself at the time of its decision. *Encino Motorcars*, 579 U.S. at 224; *see SEC v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943).

## DISCUSSION

### I.     Subject-Matter Jurisdiction

Before considering the merits of PCI's claims, the court addresses the threshold question of its jurisdiction. While Judge St. Eve held in 2014 that PCI had standing to assert its arbitrary-and-capricious claims and that they were ripe for review, *see PCI*, 66 F. Supp. 3d at 1042–46, HUD asks the court to revisit this determination in light of changed circumstances over the intervening nine years. As explained below, the court concludes that PCI has standing and that the issues are again ripe.

### A.     Standing

Article III of the Constitution requires a plaintiff to have "(1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be

redressed by a favorable judicial decision." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021). Constitutional standing is a jurisdictional requirement, and while a court's prior rulings generally control later phases of litigation as the law of the case, its "ongoing obligation to assure itself of its jurisdiction means that revisiting such matters is almost always on the table." *Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022).

An association like PCI has standing to sue on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (citation omitted). In 2014, the court concluded that all three requirements of this test were met[10]: PCI's individual members were "objects" of the Disparate-Impact Rule who faced concrete and tangible harms from the increased exposure and compliance costs that it posed, and these harms were both fairly traceable to the Rule and could be redressed by a favorable court decision on PCI's challenge. *PCI*, 66 F. Supp. 3d at 1043–46.

HUD argues that both of the cognizable injuries-in-fact that this court previously identified—increased exposure to disparate-impact liability and future compliance costs—have been called into question by the passage of time. It contends that, after eleven years of living with the 2013 Rule (and its 2023 reincarnation), PCI has failed to show that either of these supposedly imminent harms have in fact come to pass. The foundations for PCI's standing, HUD points out, are declarations from its members that date back to its original motion for summary judgment in 2014. (*See* Decl. of Peter Drogan [283-5]; Decl. of Ronald Zaleski [283-6]; Decl. of Michael Dawdy [283-7]; Decl. of Teresa C. Cracas [283-8].) But these declarations do not

---

[10]    HUD did not dispute the second and third elements of the associational standing test, so only the first—whether PCI's members had standing to sue in their own right—was at issue in the court's original decision. *PCI*, 66 F. Supp. 3d at 1043. This is also the case here.

establish that PCI's members actually ended up suffering any increased litigation costs from a Rule-related uptick in disparate-impact lawsuits, or that they ever incurred new expenses from collecting race-based data—making these harms, in HUD's view, purely conjectural.

And even if PCI could establish such costs, HUD argues, it would be unable to prove causation or redressability. As HUD sees things, the 2013 Rule merely reaffirmed preexisting regulatory and judicial law that would already have allowed for disparate-impact claims against insurers, and the Supreme Court's 2015 *Inclusive Communities* decision reinforced this body of law by confirming the viability of disparate-impact claims across all jurisdictions. Thus, in HUD's view, any disparate-impact-related harms that PCI's members face are not fairly traceable to the Rule, and vacating it would do nothing to decrease their potential exposure.

It is disappointing in this context that PCI has not collected updated declarations or advanced other evidence of what real-world impacts (if any) the Rule has had on the insurance industry. Such evidence might have simplified this dispute over standing and given the court a window into the underlying merits of PCI's challenges to the Rule. But the court will not toss out PCI's claims on this basis. As in 2014, a party's standing to seek review of administrative action is usually "self-evident" where they are an "object of the action (or forgone action) at issue." *Bonacci v. TSA*, 909 F.3d 1155, 1160 (D.C. Cir. 2018) (citation omitted); *see also Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 585 (7th Cir. 2011). Even if the Rule on its face applies to any provider of housing or housing-related services, HUD has made it abundantly clear from the get-go that the insurance industry is a particular target of its rulemaking. *See* 76 Fed. Reg. at 70,924. And while PCI's original member declarations are certainly aged, they are not necessarily stale, given the particular history of this case. HUD has reinstated its 2013 Rule in substantively identical form after nearly a decade of legal uncertainty regarding its viability and enforcement. Whether or not the litigation risks that these declarations anticipated in 2014 (*see, e.g.*, Cracas Decl. ¶ 13) have indeed come to pass in the meantime, the arguable end of this uncertainty by way of the Rule's reincarnation presents a new flashpoint for

them to manifest.  Thus, while HUD's arguments as to standing have some teeth, PCI has shown a sufficiently persuasive likelihood of concrete and imminent harm to its members—again, based on the unique circumstances presented by HUD's 360-degree turn—that the court is comfortable reaching the merits.

HUD also argues that because the Rule does not explicitly require PCI's members to collect race- and ethnicity-based data, they cannot assert standing based on compliance costs that are not in fact legally mandated.  It is true that a plaintiff cannot claim standing to challenge a regulation based on a misreading of what that regulation permits or requires.  *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1253–54 (D.C. Cir. 2018); *see Nat'l Ass'n of Mut. Ins. Cos. v. HUD* ("*NAMIC*"), No. CV 13-966 (RJL), ___ F. Supp. 3d ___, 2023 WL 6142257, at *9 (D.D.C. Sept. 19, 2023) (recognizing that the Rule does not "require those engaging in housing practices to collect or use data on individuals' protected characteristics").  HUD may well be correct here: while PCI's members may end up spending more to collect race-based data in order to defend themselves from disparate-impact claims, the court cannot conclude that this is *necessary* as a practical matter without seeing how such litigation actually plays out.  *See* 88 Fed. Reg. at 19,480 (noting that "[d]efendants need not present their own statistics" in a disparate-impact case, "but may defend in numerous other ways, including by showing that the data put forward by plaintiff is incorrect or wrongly analyzed, or by showing at step two that the challenged practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest").  Still, defending against increased disparate-impact litigation would certainly impose some costs on PCI's members, whether or not these are incurred beforehand or after a suit has already been filed.

Nor do PCI's claims fail on causation or redressability grounds.  The D.C. district court's recent opinion in *NAMIC* is persuasive on this point.  *NAMIC* was another challenge to HUD's 2013 Rule brought by another insurance trade association around the same time this case was

filed, but based on a different legal theory.[11]  In its September 2023 decision, the *NAMIC* court rejected HUD's similar arguments as to justiciability, noting that they "curiously undersell[] the Disparate-Impact Rule . . . [which] can hardly be said to have zero practical effect in light of preexisting legal duties.  If it did, why promulgate it in the first place?"  *NAMIC*, 2023 WL 6142257, at *6.

This court concurs.  As the history surveyed above shows, the viability of disparate-impact FHA claims against risk-based insurance practices had never been conclusively established across all circuits prior to HUD's rule.  *See* cases cited *supra* note 5.  HUD's goal in promulgating the Disparate-Impact Rule has always been to create a single, "consistent and predictable" standard for evaluating disparate-impact FHA claims across the country.  78 Fed. Reg. at 11,460.  Even if HUD is correct that the Rule "largely codified longstanding judicial and agency consensus regarding discriminatory effects law" in most respects, 88 Fed. Reg. at 19,450, there was no such consensus here.  By purporting to end this debate, the Rule makes a significant difference in the regulatory landscape—one that PCI's members are within their rights to contest.

**B.     Ripeness**

Next, the court turns to HUD's arguments that PCI's arbitrary-and-capricious claims are not ripe for resolution.  Ripeness is a concern about the proper timing of judicial intervention that is based on both constitutional and prudential considerations.  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808–09 (2003).  The test for constitutional ripeness is largely equivalent to that for Article III standing, which the court has already found to be satisfied here.  *See Chlorine Inst., Inc. v. Fed. R.R. Admin.*, 718 F.3d 922, 927 (D.C. Cir. 2013).  Prudential ripeness asks whether "[1] the claim is fit for judicial decision and [2] delay will cause some hardship to the

---

[11]     Specifically, the plaintiffs in *NAMIC* argued before the D.C. court—the only circuit not to have recognized disparate-impact claims as cognizable under the FHA prior to *Inclusive Communities*—that the Rule exceeded the scope of the FHA's text.  *Am. Ins. Ass'n v. HUD*, 74 F. Supp. 3d 30, 31–32 (D.D.C. 2014).  While the district court initially ruled against HUD on this theory, *id.* at 47, it reversed course following the Supreme Court's 2015 decision.

parties." *Owner-Operator Indep. Drivers Ass'n*, 656 F.3d at 586 (citing *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)).  Challenges to final agency rules, even if brought pre-enforcement, are "presumptively reviewable" if they involve purely legal claims for the court's determination.  *Id.* (citation omitted).

On the first prong of the *Abbott* prudential ripeness test, HUD appears to concede that PCI's arbitrary-and-capricious claims are purely legal, but contends that they are nevertheless unfit for judicial decision.  Its argument on this point tracks the court's reasoning for finding PCI's facial challenge to the Rule under McCarran-Ferguson unripe in 2014.  *See PCI*, 66 F. Supp. 3d at 1038–41.  Because PCI's challenge involves a host of conjectures as to the Rule's potential impacts and how courts might rule on future disparate-impact claims, HUD argues, the court lacks a principled basis to rule on whether its actions were in fact arbitrary and capricious and should await a more concrete dispute.  In other words, HUD claims that the "data" to determine whether the Rule is likely to run afoul of McCarran-Ferguson or other laws, or disrupt insurance markets— and thus whether the decision to promulgate it was arbitrary and capricious—is unknowable before the Rule goes into effect.  Further, HUD disputes that PCI's members will suffer any hardship from withholding review, since the Rule does not proscribe any direct conduct and PCI has produced no record evidence showing that its members have been forced to change any of their business practices.

The court rejects these arguments.  As the court noted in 2014, "its determination that PCI's McCarran–Ferguson claim is not ripe for judicial review does not necessarily mean that HUD's decision to leave application of McCarran–Ferguson preclusion for a case-by-case determination was not arbitrary and capricious."  *PCI*, 66 F. Supp. 3d at 1047.  Nothing has changed since.  PCI's arbitrary-and-capricious claim turns not on the actual occurrence of "contingent future events" related to the Rule's enforcement, but on the sufficiency of HUD's own predictive reasoning—how the agency itself anticipated and grappled with these possibilities—as set forth in the administrative record.  *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,

417 F.3d 1272, 1282 (D.C. Cir. 2005) (citation omitted). Indeed, HUD's argument is at odds with the very concept of pre-enforcement review, which "has become the norm" for final agency rules. *Owner-Operator Indep. Drivers Ass'n*, 656 F.3d at 586. It is true that the "legal" questions presented here are heavily inflected by "factual" elements, given the fact-intensive nature of the McCarran-Ferguson inquiry and the Rule's potential effects on the business of insurance. But while further information on the Rule's ultimate consequences could certainly shed light on whether HUD's decision to adopt it was in fact arbitrary and capricious, that kind of hindsight is neither required by the law nor necessary to evaluate the agency's deliberative process.

HUD's claim that PCI has failed to show hardship is similarly unavailing. Even if the Rule does not specifically permit or forbid any primary conduct, its effects on disparate-impact doctrine may well be "felt immediately by those subject to it in conducting their day-to-day affairs." *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967). As the *NAMIC* court observed, this makes it "a substantive rule which as a practical matter requires [PCI's members] to adjust [their] conduct immediately." *NAMIC*, 2023 WL 6142257, at *8 (citing *Nat'l Park Hosp. Ass'n*, 538 U.S. at 809). While HUD cites *Toilet Goods* for the opposite proposition—that PCI has never shown any such immediate impact on its membership—this, again, fails to account for the Rule's state of procedural limbo over the past nine years. Even if the Rule has technically been on the books all this time, its reinstatement creates a meaningful risk of increased disparate-impact litigation. This threat is all that is required to show hardship: "a person made to live in the shadow of a law that she believes to be invalid should not be compelled to wait and see if a remedial action is coming." *Owner-Operator Indep. Drivers Ass'n*, 656 F.3d at 586. PCI's surviving claims are ripe for the court's decision.

## II.    Merits of PCI's Claims

The court thus turns to the merits: whether HUD's decision to apply the 2013 Rule, and its 2023 successor, to risk-based insurance practices was arbitrary and capricious. Two important framing points from the court's 2014 opinion are worth repeating at the outset. First, it is a bedrock

principle of administrative law that agencies have discretion to select between rulemaking and case-by-case adjudication as their preferred method for making law. *Shays v. Fed. Election Comm'n*, 424 F. Supp. 2d 100, 113 (D.D.C. 2006) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)). But second, any action that an agency takes must be adequately reasoned, and the agency must weigh the pros and cons of each method before exercising this discretion. *Id.*

The court recognized in 2014 that HUD had the authority to create a Rule that left the extent of potential disparate-impact liability against insurers to be worked out ex post by the courts, rather than simply carving them out ex ante via an exemption or safe harbor. *PCI*, 66 F. Supp. 3d at 1048. But the court held that, given the serious concerns that the insurance industry raised concerning McCarran-Ferguson preemption, the filed-rate doctrine, and the fundamental nature of insurance itself, HUD's perfunctory response to these concerns was arbitrary and capricious. *Id.* at 1049–51. In light of the serious legal and policy issues presented by its chosen approach, the court concluded, HUD needed to more carefully address the application of disparate-impact liability in the insurance industry. The question now is whether it has adequately done so.

A.    **Was HUD's Consideration of the McCarran-Ferguson Act Arbitrary and Capricious?**

In 2014, the court concluded that in its original rulemaking, HUD had not adequately accounted for the potential clash between its Rule and McCarran-Ferguson. The court acknowledged that McCarran-Ferguson requires a case-by-case analysis to determine whether application of a federal law would conflict with a given state's regulations, *see Humana*, 529 U.S. at 313, but concluded that this did not excuse HUD's obligation to carefully assess the likelihood of such conflicts in any given case, in light of the obvious discordance between disparate-impact liability and risk-based insurance practices. 66 F. Supp. 3d at 1048. This omission was "particularly glaring" given the weight of caselaw—in particular, the Seventh Circuit's decision in

*Mutual of Omaha* and the Eighth's in *Saunders II*—suggesting that such cases against insurers might indeed routinely be preempted under McCarran-Ferguson. *Id.* at 1048–49.

HUD devoted three pages in its 2016 Supplemental Response and five pages in its 2023 rulemaking to addressing McCarran-Ferguson issues raised by the court and other commenters. Broadly, HUD stated that "[a]fter careful reconsideration . . . [it] continues to believe that case-by-case adjudication is preferable to creating the requested exemptions or safe harbors for insurance practices." 81 Fed. Reg. at 69,013; *see* 88 Fed. Reg. at 19,474. HUD reasoned that in light of the case-by-case nature of McCarran-Ferguson analysis, such "wholesale exemptions would be overbroad" and would undermine the Act's efficacy by excluding a host of claims that might not otherwise be preempted. 88 Fed. Reg. at 19,474. It presented a number of prior court decisions that, it contended, showcased the potential viability of disparate-impact insurance claims notwithstanding McCarran-Ferguson. *Id.* at 19,474–75. HUD also argued that a blanket exemption would be "overbroad and quickly outdated" in light of the variation between state regulatory regimes "as well as the ways in which a single state's insurance laws can change over time . . . ." *Id.* at 19,475. It noted, further, that state insurance codes were not "hermetically sealed" and needed to be read in context with other state laws, such as fair housing and antidiscrimination protections, that might harmonize with a federal disparate-impact remedy. *Id.* (citing *Humana*, 525 U.S. at 312). Finally, HUD disputed that the Rule's burden-shifting framework categorically forbade risk-based pricing or underwriting in a way that would inevitably raise McCarran-Ferguson issues. *Id.* at 19,475–76.

PCI finds several faults with these explanations. First, it argues, HUD failed to meaningfully answer the court's question of "how often" McCarran-Ferguson preemption might apply. It is true that no such estimate appears in the record, either in 2016 or 2023. But in fairness to HUD, it would be extremely difficult to find—and PCI does not offer—any principled way of coming up with a precise measure of this frequency. As an initial matter, "[t]he APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies."

*Prometheus Radio Project*, 592 U.S. at 427.  Nor is it clear that such a study would even be reliable here given the number of variables at play.  As the court previously recognized in dismissing PCI's facial attack on the Rule under McCarran-Ferguson, the likelihood of McCarran-Ferguson preemption in any given disparate-impact case would depend on a host of "imponderables," including the nature of the insurance practice at issue, the contours of state law, and the deciding court's own analysis.  *PCI*, 66 F. Supp. 3d at 1039–40.

The only way to even begin to assess this likelihood, in other words, is by reference to the relevant jurisdiction's caselaw—whether precedent strongly suggests that disparate-impact claims against insurers are likely to fail as a matter of law in light of McCarran-Ferguson.  On this score, HUD has presented a far more comprehensive survey of the legal landscape to back up its position than it did in 2013.  Rather than citing a single case's reasoning (*Ojo*) as it did before, HUD has presented a panoply of court decisions across multiple circuits, all of which found that a disparate impact claim could proceed against insurers without necessarily running afoul of McCarran-Ferguson.  HUD cites, for example, the Fifth Circuit's decision in *DeHoyos v. Allstate Corp.*, which rejected a McCarran-Ferguson defense against a disparate-impact claim where there was no "actual state insurance law which purportedly conflicted with the application of [federal law] to the particular insurance question at issue."  345 F.3d at 298; *see* 88 Fed. Reg. at 19,474.

PCI argues that this case misses the point, as do HUD's arguments on how state law can evolve and change over time.  PCI is specifically requesting an exemption (or safe harbor) for *risk-based* practices, which—it points out—all states have either permitted or required by law for decades.  (*See* Pl.'s SOF ¶ 94.)  But HUD has also provided a sampling of cases (albeit none that are binding precedent in this circuit) supporting its position that disparate-impact claims can proceed even against risk-based practices without violating McCarran-Ferguson.  In *Lumpkin v. Farmers Group* ("*Lumpkin II*"), for example, a federal district court held that "[b]ecause both the FHA and Tennessee insurance law prohibit racial discrimination, without an explicit exception for

actuarially sound scoring with disparate impact, they are in harmony."[12]  No. 05-2868 MA/V, 2007 WL 6996777, at *7 (W.D. Tenn. July 6, 2007).  HUD also cites several cases that were decided after this court's 2014 ruling and that found no inherent conflict between disparate-impact liability for risk-based practices and the McCarran-Ferguson Act.  *See* 88 Fed. Reg. at 19,463 n. 116, 19,475 nn. 220, 222.  The district courts in *Viens v. America Empire Surplus Lines Insurance Co.*, 113 F. Supp. 3d 555 (D. Conn. 2015), *Jones v. Travelers Casualty Insurance Co. of America*, No. C-13-02390 LHK, 2015 WL 5091908 (N.D. Cal. May 7, 2015), and *National Fair Housing Alliance v. Travelers Indemnity Co.*, 261 F. Supp. 3d 20 (D.D.C. 2017) all rejected McCarran-Ferguson defenses against insurers for making adverse pricing and underwriting decisions against landlords who rented to tenants receiving Section 8 housing assistance, even though these practices were arguably also based on objective risk and cost factors.

Whether HUD has adequately addressed the cases that come out the other way—in particular, *Mutual of Omaha*—is a harder question.  If read expansively, *Mutual of Omaha* establishes that the act of assessing whether an insurer's practices are "actuarially sound and consistent with state law" itself violates McCarran-Ferguson, full stop.  179 F.3d at 564.  In PCI's view, this holding necessarily precludes any disparate-impact claim against an insurer's risk-based pricing or underwriting practices, as any court evaluating such a claim would inevitably

---

[12]      PCI argues in a footnote that this case was wrongly decided and rests on a misreading of Tennessee law.  It claims that the *Lumpkin II* court erroneously conflated the concepts of "unfair" discrimination based solely on race with "fair" discrimination based on risk, and that while the former concept is banned under Tennessee's code, the latter is not only permitted but required.  *See* Tenn. Code Ann. §§ 56-5-103(a)(1), (d), -104(1).  But *Lumpkin II* did recognize this distinction, and concluded that the "[d]efendants read [Tennessee's law] too broadly to permit disparate impact as long as the rates are actuarially sound."  *Lumpkin II*, 2007 WL 6996777, at *6.  In other words, *Lumpkin II* specifically considered, and rejected, the underlying presumption that PCI makes in this case—that if a state has enacted an insurance provision requiring insurers to consider actuarial risk factors, insurers have an unquestioned defense to a disparate impact claim.  *Cf. Moore*, 267 F.3d at 1222 ("We are asked to assume that the abolition of one form of discrimination . . . amounts to a clear declaration by the state that all other forms of discrimination, however invidious, are acceptable.  We cannot construe Alabama's scheme of insurance regulation in such a formalistic and narrow way.").

need to engage in this forbidden inquiry. And while HUD cites the Eighth Circuit's decision in *Saunders II* in support of its contention that McCarran-Ferguson requires a case-by-case approach, that decision in fact cited *Mutual of Omaha* in expressing deep skepticism over whether a disparate-impact claim against risk-based practices could ever be viable. *See Saunders II*, 537 F.3d at 967–68 (citing *Mut. of Omaha*, 179 F.3d at 564).

In its rulemaking, HUD offered two responses to this adverse caselaw. First, it argues that *Mutual of Omaha* need not be applied as strictly as PCI urges. It cites this court's recognition that "[w]hile some states require insurers to use risk based pricing, other states merely permit risk-based pricing," and argues on this basis that "*Mutual of Omaha* does not necessarily preclude claims that challenge practices that rest on subjective business judgments, rather than actuarially sound principles or state law requirements." 88 Fed. Reg. at 19,476 (citing *PCI*, 66 F. Supp. 3d at 1039–41). In addition, HUD contends that the structure of the burden-shifting framework itself demonstrates that *Mutual of Omaha* does not doom any possible challenge to risk-based practices. As it reasons,

> [w]hile another risk-based practice could be a possible alternative at step three [of the burden-shifting paradigm], it is not necessarily the only alternative. And, even if the alternative is a risk-based practice, a court may not need to assess the actuarial soundness of the alternative practice. For example, the evidence might show that an insurer opted for one of two risk-based practices which were both equally actuarially sound and compliant with state law, even though one produced a greater discriminatory effect . . . . The court's analysis, therefore, would be limited to assessing the efficacy of the alternative risk-based practice in serving the insurer's business interests—the type of "unremarkable task" regularly undertaken by courts.

*Id.* (citing *DeHoyos*, 345 F.3d at 297 n.5).

This argument is logically appealing, but the court cannot predict how much purchase it will ultimately have without knowing more about how disputes against insurers' risk-based practices will actually unfold in practice. PCI argues that HUD's hypothetical is untethered from reality, and that in the vast majority of disputes over insurers' risk-based practices, courts will need to gauge the validity of the insurer's claims of actuarial objectivity in order to determine

whether those risk-based practices constitute a legally sufficient business justification at steps two and three. This prediction seems plausible and finds at least some support in statements HUD makes elsewhere in its rulemaking that call the objectivity of insurers' purportedly "risk-based" practices into question. As justification for its decision not to create a "risk-based" safe harbor, the agency suggests that "[e]ven practices such as ratemaking that are largely actuarially-based can incorporate an element of non-actuarially-based subjective judgment or discretion under state law," and that "a discriminatory effects claim can challenge an insurer's underwriting policies as 'not purely risk-based' without infringing on the insurer's 'right to evaluate homeowners insurance risks fairly and objectively.'" 88 Fed. Reg. at 19,468 (citing *Nat'l Fair Hous. All. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 60 (D.D.C. 2002)). The court addresses the merits of this argument below[13], but notes here that expecting federal courts, rather than state insurance commissioners, to draw this line between subjectivity and objectivity runs perilously close to what *Mutual of Omaha* forbids.

This leaves HUD's second major ground for disregarding *Mutual of Omaha*: that it simply disagrees with the case's holding and is not bound to follow it in crafting a nationwide rule. The agency notes that *Mutual of Omaha* and like cases are not binding outside their circuits, and that "in promulgating a rule of nationwide effect it is not bound to follow the decision of a single appellate court, but may reasonably conclude that the Act allows for a different result." *Id.* at 19,476 (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982, 983–84 (2005)). Because circuit caselaw is already inconsistent on this issue and could evolve further, HUD argues, it should not be obligated to create a carveout for all risk-based insurance practices based on a single Seventh Circuit holding.

On its own, this explanation is unsatisfying. In its 2014 ruling, this court did not direct HUD to address why *Mutual of Omaha* is not binding on other courts, but whether its reasoning was

---

13      *See* discussion *infra* Section II.C.

sufficiently persuasive that most if not all other courts would follow its lead—making a preemptive exemption appropriate. *See PCI*, 66 F. Supp. 3d at 1048–49. That said, HUD has shown that not all other jurisdictions have in fact strictly adhered to *Mutual of Omaha*'s stringent rule against federal-court review of purportedly actuarial insurance practices.[14] In particular, HUD cites the Fifth Circuit's holding in *DeHoyos* that, "[i]n engaging in the unremarkable task of determining whether specific conduct falls within the ambit of federal civil rights law, a court would no more become a 'super actuary' than the court becomes a 'super entrepreneur' each time the court must determine whether a discriminatory practice constitutes a business necessity." 345 F.3d at 297 n.5.; *see also, e.g.*, *Prudential*, 208 F. Supp. 2d at 60–61; *Lumpkin*, 2007 WL 6996777, at *7; *Viens*, 113 F. Supp. 3d at 572–73; *Jones*, 2015 WL 5091908, at *5; *Travelers Indem.*, 261 F. Supp. 3d at 35 n.4; *cf. Moore v. Liberty Nat. Life Ins. Co.*, 267 F.3d 1209, 1222 (11th Cir. 2001) (reaching a similar conclusion as to life insurance). This court and other district courts in this circuit are bound by *Mutual of Omaha* (as HUD concedes, *see* 88 Fed. Reg. at 19,476), and are thus barred from evaluating at least some aspects of insurers' risk-based practices. But case law cited by HUD at least shows that *Mutual of Omaha*'s underlying reasoning does not compel equivalent results elsewhere. And even within this circuit, it is worth asking whether the McCarran-Ferguson concerns raised in *Mutual of Omaha* are so inevitable that federal courts cannot even attempt to reconcile them.[15]

---

[14] Some of this can be traced back to deeper schisms in the underlying caselaw. For example, HUD points out that the Second Circuit has expressed skepticism over whether McCarran-Ferguson applies at all to "subsequently enacted civil rights legislation," a position that the Seventh Circuit has repudiated. 88 Fed. Reg. at 19,474 n.208 (citing *Viens*, 113 F. Supp. 3d at 572). *Compare Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1065 (2d Cir. 1982), *with Am. Family*, 978 F.2d at 294–95.

[15] Consider, for instance, *Huskey v. State Farm Fire & Cas. Co.*, No. 22 C 7014, 2023 WL 5848164 (N.D. Ill. Sept. 11, 2023), a recent disparate-impact challenge in this district to an insurer's claims-processing policies. In denying the defendant's motion to dismiss based on, *inter alia*, McCarran-Ferguson, the district court held that "disparate-impact liability under the FHA, as applied, seems to complement [rather than frustrate] Illinois insurance law," and that while "calculating the relative value of insurance policies is off-limits under the McCarran Ferguson Act

This is arguably underscored by the difference of opinion among the states over the Rule's implications for their policy schemes. HUD points to state antidiscrimination laws, several of which allow for equivalent disparate-impact claims against insurers, as evidence that the Rule does not per se conflict with states' regulatory regimes. 88 Fed. Reg. at 19,475. It cites *Viens*, *Jones*, and *Toledo Fair Housing Center v. Nationwide Mutual Insurance Co.*, 94 Ohio Misc. 2d 151, 157, 704 N.E.2d 667, 670 (Ohio Ct. Com. Pl. 1997), which all found that a disparate-impact remedy complemented, rather than frustrated, their respective states' insurance laws, as well as public commentary expressing that "the proposed rule does not undermine the state regulation of insurance and presents no conflict with McCarran-Ferguson." *Id.* at 19,474–75 & nn. 220–22. To provide a categorical exemption, HUD argues, "would deprive all states of this federal support in addressing discriminatory insurance practice—even those states that welcome or depend on such support." *Id.* at 19,475; *see also Am. Family*, 978 F.2d at 295 ("Duplication is not conflict."). HUD's position may read too much into the state laws themselves: in cases involving potentially conflicting statutes, it cannot always be presumed that the legislature anticipated their collision in advance. In other words, state legislatures may have been moved in one session to adopt insurance regulation, and in another to adopt antidiscrimination legislation, without any thought whatsoever as to how the two might interact. Then, absent further legislative action to resolve

---

. . . [t]here is no indication that State Farm's *liability* would hinge on its practices' actuarial soundness or consistency with Illinois law." *Id.* at *11. The *Huskey* court was prepared to revisit the issue if it later became clear through discovery that liability "depends on the actuarial soundness of its claims-handling policies *in a way that interferes* with Illinois's insurance policy or administrative regime." *Id.* (emphasis added). *Huskey* postdates HUD's 2023 rulemaking and cannot supply a post hoc justification for the agency's actions, *see Chenery*, 318 U.S. at 95, but it offers a useful illustration of the scope of *Mutual of Omaha*'s holding in practice. At minimum, it shows that *Mutual of Omaha* has no bearing on insurers' practices that are clearly not risk-based. And it suggests that, even where an insurer's risk-based practices are called into question, a court should at least consider whether examination of these practices would actually frustrate state law before simply assuming the question is foreclosed by *Mutual of Omaha*. *See Huskey*, 2023 WL 5848164, at *11 ("While the Seventh Circuit's reading of the McCarran-Ferguson Act is prophylactic to a degree, State Farm's arguments veer into the realm of field preemption. The Act is not so expansive.") (citations omitted).

this conflict, it falls to courts to hammer out a workable compromise. *Cf. Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When confronted with two [statutes] allegedly touching on the same topic, this Court is not at 'liberty to pick and choose among [them]' and must instead strive ' "to give effect to both." '") (citing *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).

As *Mutual of Omaha* declared, "[t]he states are not indifferent to who enforces their laws," 179 F.3d at 564, but there is reason in this case to consider the states' own comments on this issue. On one side, attorneys general from fourteen states and the District of Columbia[16] have weighed in as *amici* to voice their support for HUD's decision not to exempt the insurance industry from its Rule. (*See* States' Brief as *Amici Curiae* in Sup. of Defs.' Mot. for Summ. J. [309] (hereinafter "States' *Amicus* Supporting HUD").) This includes Illinois itself, which takes the position—notwithstanding *Mutual of Omaha*—that Illinois law "imposes disparate impact liability on insurance companies" and that the Rule "complement[s]" rather than "frustrat[es]" this administrative regime. (*Id.* at 11–14.) On the other, insurance commissioners from four states[17] have submitted an *amicus* brief arguing that their regulatory regimes would be disrupted by such a remedy. (*See* Brief of State Ins. Comm'rs in Supp. of Pl.'s Renewed Mot. for Summ. J. [292] (hereinafter "States' *Amicus* Opposing HUD").)

This diversity of opinion is significant, in the court's view. PCI tries to argue that the mere presence of complementary state fair-housing laws does not eliminate *Mutual of Omaha*'s concern over "who decides"—that the task of how to reconcile these laws with insurers' risk-based practices must be left to state insurance regulators, not federal courts.[18] But it is HUD's case-by-

---

[16]     The full list is: Illinois, California, Colorado, Delaware, Hawaii, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New York, North Carolina, Oregon, Washington, and the District of Columbia.

[17]     These states are: Idaho, Montana, Louisiana, and Oklahoma.

[18]     PCI also casts doubt on HUD's supporting *amici* attorneys general in its briefing, noting that they are not joined in their brief by any state insurance commissioners. But it offers

case approach, not PCI's requested blanket exemption, that presumes less about what state regulators want and need. It is clear from the administrative record and *amicus* submissions that several states want no part of a federal disparate-impact remedy that might disturb their administrative regimes. (*See* States' *Amicus* Opposing HUD at 7–10.) In these states, McCarran-Ferguson may very well end up preempting the Rule's application to certain risk-based insurance practices—a point that HUD acknowledges in its rulemaking. 88 Fed. Reg. at 19,474. A state that wishes to join this group in the future, after reassessing the Rule's effects in practice, "need only say so" by amending its regulations.[19] *Am. Family*, 978 F.2d at 297.

Other states, however, would welcome this added layer of federal protection in advancing their fair-housing objectives. (*See* States' *Amicus* Supporting HUD at 13–14.) These states also allow or permit risk-based decision-making under their insurance laws, but are willing to coordinate these laws with federal-court enforcement of the FHA and accept the policy results. The McCarran-Ferguson Act, as interpreted in *Humana*, gives them that prerogative. As both HUD and its supporting *amici* persuasively argue, it would be a perverse result indeed to instead use McCarran-Ferguson—a law that demands respect for states' individual policy choices—to cut off these divergent preferences at the pass. *Cf. FTC v. Travelers Health Ass'n*, 362 U.S. 293,

---

no reason for the court to question the authority of these attorneys general to represent their states' policy interests.

[19] The opposing *amici* states argue in their brief that HUD's actions were also arbitrary and capricious because the agency erroneously determined that the Rule did not have "federalism implications," which would have required HUD to "consult[] with State and local officials" as part of its rulemaking. (States' *Amicus* Opposing HUD at 13 (citing Exec. Order No. 13,132, § 6(c), 64 Fed. Reg. 43,255, 43,257–58 (Aug. 4, 1999))). In its 2023 rulemaking, HUD concluded that any potential federalism implications were "based solely on the assertion that this rule would interfere with McCarran-Ferguson," 88 Fed. Reg. at 19,497, which is borne out by the administrative record. (*See* R. 029137 (comment by PCI's successor APCIA raising Executive Order 13,132 in the context of potential McCarran-Ferguson issues)). Because HUD addressed McCarran-Ferguson in depth, as discussed above, the fact that it did not consult state regulators is not an independent basis for discarding the Rule.

298–300 (1960) (observing that the McCarran-Ferguson Act was not intended to allow a state to "regulate activities carried on beyond its own borders").

PCI offers several other objections to HUD's discussion on McCarran-Ferguson that merit only brief discussion. First, PCI argues that HUD arbitrarily failed to address how costly it would be for insurers to litigate the McCarran-Ferguson issue on a case-by-case basis. To a large extent, this argument tracks PCI's broader objection to the cost of case-by-case litigation that it raises elsewhere. The court will address this issue in greater depth below,[20] but for now, it suffices to say that the agency's decision was not clearly irrational in light of the legal arguments already addressed. If, as HUD concluded, disparate-impact claims have a meaningful chance of surviving preemption, its decision to allow these claims their day in court was a reasonable policy trade-off.

Second, PCI argues that the Supreme Court's intervening decision in *West Virginia v. EPA*, 597 U.S. ___, 142 S. Ct. 2587 (2022) renders HUD's reaffirmation of a case-by-case approach for resolving McCarran-Ferguson issues arbitrary and capricious. (*See* Mot. for Leave to File Notice of Suppl. Authority [251].) *West Virginia*, however, is inapplicable here. As an initial matter, that case involved a dispute over the level of deference owed to an agency's interpretation of its enabling statute, not—as here—a question of whether the agency acted in an arbitrary and capricious manner during a rulemaking. *Id.* at 2599–2600. HUD's underlying statutory authority to promulgate the Rule (and to apply it to the insurance industry) is not an issue before the court at this time.

Beyond this, HUD's rulemaking does not contravene the broader principles expressed in *West Virginia*. The *West Virginia* Court disfavored agency actions that make "decisions of vast economic and political significance" based on "novel reading[s]" of statutes without clear Congressional authorization. *Id.* at 2605. And the Court has otherwise warned against agency "intru[sions] into an area that is the particular domain of state law." *Ala. Ass'n of Realtors v. Dep't*

---

[20]     *See* discussion *infra* Section II.C.

31

*of Health & Hum. Servs.*, 594 U.S. __, 141 S. Ct. 2485, 2489 (2021).  HUD's actions here do not violate those prohibitions.  Courts and lawmakers have been aware of the close relationship between homeowners insurance and fair housing objectives for decades.  *See* 88 Fed. Reg. at 19,467 n.155 (outlining the "long and well documented" history of "discrimination in the homeowners insurance industry," including multiple Congressional hearings); *Am. Family*, 978 F.2d at 298; *Nationwide*, 52 F.3d at 1351.  HUD has consistently asserted its authority to regulate this important determinant of housing opportunity for over forty years, and Congress has never second-guessed this assertion.[21]  HUD's case-by-case approach does not trample on states' traditional prerogative to regulate the insurance industry and does not assume that McCarran-Ferguson will have no impact here.  *Compare* 88 Fed. Reg. at 19,474 (acknowledging that "[s]ome discriminatory effects claims against insurers will be preempted under McCarran-Ferguson and some will not," depending in part on the state law at issue), *with Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (striking down the CDC's attempt to regulate landlord-tenant relationships across all states through a single nationwide eviction moratorium).

In sum, the court finds that HUD's explanation as to McCarran-Ferguson is within the "zone of reasonableness" necessary to pass muster.  *Prometheus Radio Project*, 592 U.S. at 423.  The McCarran-Ferguson problem is undoubtedly tricky, but HUD on its second try has shown how enough future minds could differ on its resolution to justify a case-by-case approach.  Just as importantly, HUD engaged with a broad array of stakeholders in reaching this decision and considered their competing arguments.  Some have raised legitimate concerns about the Rule's effect on state insurance regulations, but others have argued that the Rule would work no mischief

---

[21]     *See Dunn*, 472 F. Supp. at 1109 & n.7 (noting that HUD has interpreted the FHA to prohibit insurance redlining since at least 1978); *Am. Family*, 978 F.2d at 300 (noting that Congress granted HUD rulemaking authority in its 1988 amendments to the FHA "with knowledge" of this interpretation); *Implementation of the Fair Housing Amendments Act of 1988: Final Rule*, 54 Fed. Reg. 3232, 3285 (Jan. 23, 1989) (codified at 24 C.F.R. § 100.70(d)(4)) (exercising this authority to codify HUD's interpretation of the FHA as prohibiting unequal provision of property or hazard insurance).

in their administrative schemes. HUD's justification for allowing this question to be worked out one state at a time was well-supported by the principles of federalism for which McCarran-Ferguson stands.

### B. Was HUD's Consideration of the Filed-Rate Doctrine Arbitrary and Capricious?

PCI's next challenge to HUD's Rule rests on the "filed-rate doctrine." This common-law rule "forbids courts from invalidating or modifying rates that have been filed with regulatory agencies." *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011), *aff'd sub nom. Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013). The doctrine has two animating concerns: a "historical antipathy to rate setting by courts, deemed a task they are inherently unsuited to perform competently," and "a policy of forbidding price discrimination" between litigants and non-litigants. *Arsberry v. Illinois*, 244 F.3d 558, 562 (7th Cir. 2001); *see also AT&T v. Cent. Off. Tel., Inc*, 524 U.S. 214, 221–23 (1998). In its 2014 opinion, the court found the former concern "very similar to the purposes of the McCarran-Ferguson Act," and noted that "where the filed-rate doctrine applies, the McCarran-Ferguson Act almost certainly applies too." *PCI*, 66 F. Supp. 3d at 1049. Thus, HUD's failure to adequately address the insurance industry's concerns regarding McCarran-Ferguson meant that it had also inadequately addressed concerns over the filed-rate doctrine. *Id.*

On remand, HUD addressed these concerns twice: first over the course of two pages in its 2016 Supplemental Response, and then in another two pages in its 2023 Reinstatement, which largely reiterated the same arguments made in 2016. 81 Fed Reg. at 69,017–18; 88 Fed. Reg. at 19,477–78. The agency pointed out that the doctrine has never been successfully used to defeat an FHA claim, and that several courts have rejected past attempts by insurers to do so. *Id.* at 19,478 (citing *Saunders v. Farmers Ins. Exch.* ("*Saunders I*"), 440 F.3d 940, 946 (8th Cir. 2006); *DeHoyos*, 345 F.3d at 297 n.5; *Lumpkin v. Farmers Grp., Inc.* ("*Lumpkin I*"), No. 05-2868 MA/V, 2007 WL 6996584, at *7–8 (W.D. Tenn. Apr. 26, 2007)). HUD described the "fit" between

the doctrine and disparate-impact FHA liability as "attenuated, at best," since disparate-impact claims "do not challenge the reasonableness of the insurance rates but rather their discriminatory effects." 81 Fed. Reg. at 69,018 (citing *Lumpkin I*, 2007 WL 6996584, at *8). It also noted that, unlike McCarran-Ferguson preemption (which arises from federal statutory law), interpreting the filed-rate doctrine as allowing for state ratemaking regulations to trump federal antidiscrimination law would "stand the Supremacy Clause on its head." *Id.* (quoting *Perryman v. Litton Loan Servicing, LP*, No. 14-CV-02261-JST, 2014 WL 4954674 (N.D. Cal. Oct. 1, 2014)). Finally, HUD called the underlying coherence of the doctrine itself into question, citing statements that "the law on the filed rate doctrine is extremely creaky," *id.* (citing *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 420 (1st Cir. 2000)), and that the doctrine is "weak and forcefully criticized," *id.* (citing *Cost Mgmt. Servs. v. Wash. Nat'l Gas Co.*, 99 F.3d 937, 946 (9th Cir. 1996)). In a similar vein to its McCarran-Ferguson arguments, HUD reasoned that the doctrine's application is highly fact-dependent and may vary significantly based on the "particular state's ratemaking structures," making a case-by-case approach more appropriate for accommodating these variations. *Id.*

HUD's first line of defense—that the Rule does not implicate the filed-rate doctrine at all—is unpersuasive. The agency splits hairs in its rulemaking and briefing by claiming that disparate-impact claims challenge the effects of discriminatory rates and the practices used to reach them, not their basic "reasonableness." As PCI correctly points out, the caselaw on the doctrine has been extended to encompass both challenges to the reasonableness of rates *and* to the manner in which they were adopted. *See, e.g.*, *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 410 (1986) (applying doctrine to bar claims "alleg[ing] that rates filed with the Interstate Commerce Commission . . . were fixed pursuant to an agreement forbidden by the Sherman Act"). The doctrine's underlying concerns—disuniformity in rates charged to consumers, and courts' lack of institutional competency to set rates—could potentially arise in a disparate-impact FHA

suit, since a court could be asked to evaluate (and potentially invalidate) the insurer's rate and the factors used to calculate it over the course of the burden-shifting process.

HUD's second argument regarding the Supremacy Clause, however, has more force. The filed-rate doctrine's origins can be traced back to the Supreme Court's decision in *Keogh v. Chicago & Northwest Railway*, 260 U.S. 156 (1922). The *Keogh* Court's holding rested on the principle that the antitrust laws require injury to "business or property" to establish standing, and the plaintiff could not prove that he was entitled to a lower rate. *Id.* at 163. While *Keogh* involved a challenge under federal law to a federal tariff—a rate filed with the Interstate Commerce Commission—its rule has since been applied to also bar federal-law challenges to rates set by state agencies. *See, e.g.*, *S. Branch LLC v. Commonwealth Edison Co.*, 46 F.4th 646, 650 (7th Cir. 2022); *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 20 (2d Cir. 1994); *Taffet v. S. Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992). Importantly, though, these cases involved claims under either antitrust laws or the federal Racketeer Influenced and Corrupt Organizations Act ("RICO")—both of which contain the same "business or property" requirement for standing. *See* 15 U.S.C. § 15(a); 18 U.S.C. § 1964(c).

In *Saunders I*, the Eighth Circuit held that *Keogh*'s rule was inapplicable to a challenge to state-regulated insurance rates under the FHA. It held that, unlike the challenges to rates filed with federal agencies in *Keogh* and *Square D*, "the Supremacy Clause tips any legislative competition in favor of the federal anti-discrimination statutes" over "rates filed with a state regulatory agency." 440 F.3d at 944. This issue, the Eighth Circuit reasoned, did not come into play in RICO or antitrust cases because of the "no-injury principle" inherent in those laws: a RICO or antitrust plaintiff would have no more standing to challenge a filed state rate than they would a federal rate. *Id.*; *see Taffett II*, 967 F.2d at 1494 (grounding the lack of distinction between federal and state rates in this rationale). But "standing to sue under . . . the [FHA] is far broader" and extends to any injury caused by a discriminatory housing practice. *Saunders I*, 440 F.3d at 944; *see* 42 U.S.C. §§ 3602(i), 3613(a). Thus, the *Saunders I* court concluded that "the judicially

35

created filed rate doctrine [should not] restrict Congress's broad grant of standing to seek judicial redress for race discrimination." 440 F.3d at 946.

While PCI urges that *Saunders I* is "inconsistent with the weight of caselaw" holding that the filed-rate doctrine applies to state agency rates, *see* 88 Fed. Reg. at 19,477, it only cites RICO and antitrust cases in support of this point; it provides no authority—and the court has found none itself—to question the Eighth Circuit's more specific conclusion as to the FHA. The *Saunders I* court ultimately concluded that the determinative question in clashes between federal civil-rights laws and state-regulated insurance prices was not the filed-rate doctrine, but McCarran-Ferguson preemption, *id* at 945—a matter that, as explained here, HUD has adequately addressed.

Even failing this—assuming *arguendo* that *Saunders I* was wrongly decided, and that FHA claims against insurers may in fact be barred by the filed-rate doctrine—HUD has made a solid argument for handling such claims on a case-by-case basis. By its very name, the "filed-rate doctrine" comes into play only if a rate is actually *filed* with the relevant regulatory agency. And as both HUD and its supporting state *amici* note, states are all over the map on whether and when they require insurers to file. Some use a "prior approval" system that requires preclearance before an insurer can even begin to use their proposed rate, others follow a "use and file" approach where the insurer must file their rates within a set amount of time after deploying them, and still others do not require state filing whatsoever. *See* 81 Fed. Reg. at 69,018 n.92 (citing 2 Nat'l Ass'n of Ins. Comm'rs, *Compendium of State Laws on Insurance Topics* § II–PA–10–21 (2011)); States' *Amicus* Supporting HUD at 9 (citing Borselli, *supra*, at 126). Illinois, for example, is a "use and file" state, and while it does require insurers to submit their rates to its Department of Insurance, the Seventh Circuit has questioned whether the filed-rate even applies to property-insurance claims in this state, as "it is not at all clear that the Department has the authority to

approve or disapprove" these rates once filed.[22]  88 Fed. Reg. at 69,018 n.92 (citing *Cohen*, 735 F.3d at 607); *see* 50 Ill. Admin. Code §§ 754.10(a)(2), 754.40(a).  In such states, the filed-rate doctrine may be a nonissue for FHA disparate-impact litigants.

The court thus accepts HUD's explanation as to the filed-rate doctrine.  The agency has presented substantial evidence that both the caselaw on the doctrine and the structures of states' administrative schemes vary significantly from jurisdiction to jurisdiction, and that at least some jurisdictions have found it completely inapplicable to FHA claims.  This diversity makes it impossible to conclude as a general matter that the doctrine will be outcome-determinative in any given case.  Accordingly, HUD's conclusion—that the filed-rate doctrine does not warrant a blanket exemption for risk-based pricing and underwriting of insurance—was not arbitrary and capricious.

### C.     Was HUD's Consideration of the Nature of Insurance Arbitrary and Capricious?

PCI's next challenge to HUD's Rule sounds not in law, but in policy.  The argument is a familiar one: that risk-based decision-making and disparate-impact liability are fundamentally incompatible, and that attempting to mix them will sow chaos in the insurance markets.  The Seventh Circuit recognized this conflict in *NAACP v. American Family Mutual Insurance*: "Insurance works best when the risks in the pool have similar characteristics. . . . Risk discrimination is not race discrimination.  Yet efforts to differentiate more fully among risks may produce classifications that could be generated by discrimination."  *Am. Family*, 978 F.2d at 290.

---

[22]     This holding is in tension with the general majority rule that "[i]t is the filing of the tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine." *S. Branch LLC*, 46 F.4th at 653 (7th Cir. 2022) (citing *Town of Norwood*, 202 F.3d at 419); *see also Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 853 (N.D. Ohio 2010); *but see Brown v. Ticor Title Ins. Co*, 982 F.2d 386, 394 (9th Cir. 1992) (finding filed-rate doctrine inapplicable in "[t]he absence of meaningful state review").  Regardless, there is clearly enough texture in states' administrative ratemaking schemes—and in the caselaw interpreting them—to make a uniform exemption inappropriate.

In its 2014 opinion, the court agreed with PCI that HUD's original rulemaking had failed to meaningfully engage with this thorny issue. *See PCI*, 66 F. Supp. at 1051.

Commenters raised these concerns yet again during HUD's 2023 rulemaking. They noted that the insurance industry "is predicated on setting rates and making underwriting decisions based on relevant, mathematical, and objective risk factors that accurately predict loss"; that this has been a "bedrock principle of state insurance regulation for more than 150 years"; and that "the insurance market functions best when each insured pays a rate that accurately reflects the cost of providing insurance to similarly-situated policy holders." 88 Fed. Reg. at 19,466. And they warned that forcing insurers to abandon risk-based decision-making would cause adverse selection by "overcharging low-risk customers and likely driving them from the markets," resulting in higher premiums for everyone. *Id.*

HUD responded to these arguments in its 2023 Reinstatement. It argued that the industry's concerns were overblown and that the Rule did not seek to interfere with legitimate and necessary risk-based practices. HUD cited the "long and well documented" history of discrimination in the homeowners insurance industry, beginning with overt racial discrimination and evolving into more "covert" forms over time. 88 Fed. Reg. at 19,467–68 & nn.155. As an example, HUD pointed out that insurers once denied communities of color access to insurance based on purportedly neutral factors like property age, value, and location, even though "data demonstrated that such restrictions were not justified by risk of loss." *Id.* at 19,468 & nn.156–57. This history, HUD argued, demonstrated how many seemingly "objective" actuarial factors are in fact infected by "non-actuarially-based subjective judgment" and may be subject to "discretion under state law," such as state statutes that allow insurers to rely on "judgment factors" in ratemaking. *Id.* at 19,468. Even factors that are genuinely objective "can vary by context" in their relevance and "may change over time as societal behaviors evolve, new technologies develop, and analytical capabilities improve." *Id.* at 19,469. And many insurance practices—"such as marketing, claims processing, and payment"—involve no actuarial decision-making whatsoever.

*Id.* at 19,468; *see Huskey*, 2023 WL 5848164, at *11. HUD reiterated the point that the "business necessity" defense under the burden-shifting framework protects objective risk-based practices for which there are no less-discriminatory alternatives. 88 Fed. Reg. at 19,467.

HUD also disputed concerns that the Rule would cause insurance markets to fail. HUD again asserted that the Rule simply reaffirms jurisprudence that already allowed for disparate-impact suits, and that its first ten years of existence have not seen the tidal wave of litigation that insurers predicted. *Id.* at 19,468. It also claimed that several states—namely, Connecticut, California, and Ohio—separately provide for disparate-impact liability against insurers under their own laws, and that the insurance industry has not collapsed in these jurisdictions. *Id.* at 19,467. And it noted that "discriminatory effects liability has proven workable in other contexts involving complex risk-based decisions, such as mortgage lending, without the need for exemptions or safe harbors." *Id.*

To summarize HUD's response, then, the agency asserts that the Rule does not per se prohibit discrimination in rate setting based upon risk of loss. It instead simply allows litigants to challenge whether insurance practices are truly founded in risk, and if so, whether there are effective less-discriminatory alternatives that do not harm the insurer's business. And according to the agency, the Rule's foundations in existing law undermine contentions that it will lay waste to the insurance industry.

In its earlier ruling, this court was unmoved by HUD's argument that the burden-shifting framework by itself would afford the opportunity for insurers to justify their "risk-based" practices as legitimate business necessities. *See PCI*, 66 F. Supp. 3d at 1050–51. Commenters raised the issue again in 2023, making the claim that *any* "less discriminatory alternative" identified by a plaintiff at step three "would necessarily correspond to a different risk than the factor at issue, identified through actuarially sound methodology." 88 Fed. Reg. at 19,467. PCI picks up this torch in its briefing, arguing that HUD's claim that insurers can choose among "alternative risk-

based practices" is fanciful and that the Rule will require "many if not most risk-based practices . . . to be eliminated from the underwriting process." (Pl.'s SOF ¶¶ 96–97 (quoting R. 028694).)

But this time around, HUD has added a new layer of analysis largely absent from its earlier rulemaking—the notion that "risk" is not a monolith. Rather, the business of insurance involves a myriad of different practices, not all of them governed by strict objectivity. At the outside, some practices (like marketing and claims processing) rely little or not at all on actuarial analysis. *See* 88 Fed. Reg. at 19,468; *Huskey*, 2023 WL 5848164, at *11. Venturing further inward, other practices (such as ratemaking and underwriting) aspire towards objectivity but may in fact incorporate a significant level of subjective discretion—both in their initial selection of risk factors, and in opportunities for business considerations to "override" actuarial calculations at a later stage in the process. *See* 88 Fed. Reg. at 19,468, 19,472–73; Dane, *supra*, at 4–5 (R. 004407–08) (noting that "[u]nderwriting guidelines are typically not the result of careful, statistical studies . . . [but] [r]ather . . . are often based on hunches and subjective stereotypes about classes of consumers and types and geographic location of property," and that state laws often allow rate filers to "modif[y], or ignore[]" actuarial conclusions based on "business judgment"). And at the "core" of the industry, some risk-based factors may genuinely be the only way for insurers to price and provide their products in a cost-effective manner, even if these factors necessarily correlate with race. HUD denies that the Rule poses any danger to these core factors. *See* 88 Fed. Reg. at 19,467. Its Rule is instead meant to give litigants the ability to parse out these distinctions and ensure that the factors insurers rely on are in fact legitimate ones.[23]

---

[23] This added nuance also makes HUD's theory perfectly compatible with *American Family*. That case declined to "resolve the question" of whether to allow FHA disparate-impact claims against insurers in light of the complex policy issues presented by the risk-based nature of insurance. *Am. Family*, 978 F.2d at 290; *see* 88 Fed. Reg. at 19,471 n.186 (making this same point). HUD has presented a theory for doing so here that, though not indisputable, is within the bounds of reasoned decision-making.

In light of this, PCI has not shown that it was unreasonable for HUD to refuse to carve out an exemption for "actuarial or risk-based calculations." (Pl.'s SOF ¶ 100). As the agency points out, there appears to be no clear or principled way of defining such an exemption ex ante, and there will likely always some slippage at the margins where subjectivity (and, potentially, bias) creeps in. 88 Fed. Reg. at 19,469. HUD's historical summary drives this point home. It shows that the homeowners insurance industry has previously raised risk as a shield for purportedly "objective" factors (like property location and age) without clearly substantiating that these factors had any meaningful relationship to the cost of providing insurance. *Id.* at 19,468 & n.156–57. There are countless other ways in which similar issues with insurers' methodologies might arise in the future.[24] Drawing this line will always require highly fact-intensive analysis. HUD's conclusion that this can best be done on a case-by-case basis was not unreasonable.

As the court has already acknowledged, inviting federal courts to engage in this analysis raises a wholly separate set of issues.[25] PCI's arguments on this score reveal complications for HUD: using the burden-shifting framework to assess which practices are sufficiently objective and necessary to constitute a legitimate "business justification" relieves concerns over the fundamental nature of insurance, but sharpens the institutional competence and federalism concerns embedded in McCarran-Ferguson and the filed-rate doctrine. Courts have for years

---

[24]     One example that HUD provides is "price optimization," or the use of quantitative tools to set an optimal price point for goods or services based on the seller's business considerations. Insurers are increasingly using price optimization to deviate their rates from actuarial cost models based on the price elasticity of demand (the measure of how sensitive customers will be to a price change). *See* 88 Fed. Reg. at 19,468 (citing Casualty Actuarial & Statistical (C) Task Force, *Price Optimization White Paper*, Nat'l Ass'n of Ins. Comm'rs 9 (Nov. 19, 2015), https://content.naic.org/sites/default/files/inline-files/committees_c_catf_related_price_ optimization_white_paper.pdf). HUD does not drive this point fully home by explaining how price optimization specifically results in discriminatory effects on protected classes under the FHA. But the example still supports the more general point that "[t]here is not, and never has been, an absolute homage to actuarial outcomes in the business or regulation of insurance." Dane, *supra*, at 6 (R. 004409).

[25]     *See* discussion *supra* Sections II.A–.B.

wrestled with the genuine tension between these principles. Having reviewed the administrative record, however, the court is satisfied that the agency has presented a well-reasoned case for letting the courts—in dialogue with state regulators—continue to play a role in working out this balance.

PCI is correct that, as this court observed, litigation of these issues can be costly, and should not proceed at all in cases where the plaintiffs have no reasonable chance to prevail. *PCI*, 66 F. Supp. 3d at 1051 (citing *Graoch*, 508 F.3d at 375–76). But the agency did consider such costs to insurers in its most recent rulemaking, and presented a valid case for why these claims would not be fruitless.[26] *See* 88 Fed. Reg. at 19,478. As the agency's cited sources illustrate, insurers have "been subject to discriminatory effects liability since well before the 2013 Rule," albeit not consistently and not across all jurisdictions. *See* 88 Fed. Reg. at 19,463 n.116, 19,464 n.132 (citing cases). At least some of these cases found it worthwhile to interrogate whether certain practices—like setting underwriting requirements based on factors like maximum dwelling age, minimum value, or replacement cost—evaluated risk "fairly and objectively" or were "*not* purely risk-based." *Prudential*, 208 F. Supp. 2d at 60; *see also Toledo Fair Hous. Ctr.*, 94 Ohio Misc. 2d at 163 (denying summary judgment based on "substantial questions of fact as to whether the [defendant's] underwriting guidelines in question are justified by business necessity"). HUD

---

[26] As a corollary point to its cost argument, PCI also complains that the Rule will require insurers to collect data on race and ethnicity in order to better defend against future disparate-impact suits. (*See, e.g.*, Pl.'s SOF ¶ 121.) The court has already expressed its skepticism of this argument in addressing the justiciability of PCI's claims. *See* discussion *supra* Section I.A. Nothing in the Rule requires collection of such data. *See* 24 C.F.R. § 100.500; 88 Fed. Reg. at 19,480; *NAMIC*, 2023 WL 6142257, at *9. In a disparate-impact challenge, it is the plaintiff who has the burden of presenting such evidence at step one, and a defendant may rebut this evidence in "numerous other ways, including by showing that the data put forward by plaintiff is incorrectly or wrongly analyzed," or by proving legitimate business necessity. 88 Fed. Reg. at 19,480. And if the Rule does spur PCI's members to collect at least some additional data on the racial impacts of their policies, such data could be relevant in a disparate-treatment challenge as well and could help insurers *reduce* costs from disparate-impact suits over time. *See* 88 Fed. Reg. at 19,469 (noting that "[t]his kind of self-examination . . . is intended not to lead to liability, but rather to protect entities from liability").

further notes that, while it "is unaware of any trial on the merits of a discriminatory effects claim against an insurer," many of these past legal challenges have survived motions to dismiss or motions for summary judgment and ultimately resulted in settlements or consent orders through which insurers agreed to adjust their practices in order to reduce potential harms to protected classes.[27] 88 Fed. Reg. at 19,471 n.187. In light of this varied body of caselaw, HUD did not act unreasonably in refusing to create a "categorical bar[]" based on a "generalized application of the burden-shifting framework." *Graoch*, 508 F.3d at 376.

For the same reasons, HUD adequately supported its conclusion that applying the Rule to risk-based insurance practices will not cause widespread market failures. Not all of HUD's points on this front hit the mark: as already noted, the absence of increased litigation under the Rule itself cannot be disentangled from its political instability over the past decade. Accordingly, the agency's repeated refrain that the Rule simply reaffirms preexisting caselaw fails to realistically acknowledge the possible consequences of its reinstatement. And while HUD cites several cases suggesting that disparate-impact claims against insurers are viable under certain states' laws, this is too small a dataset to draw any meaningful conclusions about the basic nature of the industry.[28] Further, while the agency makes an offhand reference to other risk-based

---

[27] *See, e.g.*, Consent Decree, *United States v. Nationwide Mut. Ins. Co.*, No. C2-97-291 (Mar. 10, 1997), https://www.justice.gov/crt/housing-and-civil-enforcement-cases-documents-367 (requiring insurer to revise policies making coverage decisions based on maximum dwelling age or minimum value); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 276 (W.D. Tex. 2007) (approving settlement requiring insurer to change credit scoring formula to reduce disparate impact on minority policyholders and applicants); Press Release, Nat'l Fair Hous. All., National Fair Housing Alliance Settles Disparate Impact Lawsuit with Travelers Indemnity Company (Feb. 23, 2018), https://nationalfairhousing.org/travelers (describing settlement prohibiting defendant insurer from considering rentals to Section 8 voucher holders in determining insurance coverage for rental properties).

[28] HUD specifically cites the decisions in *Viens*, *Jones*, and *Toledo Fair Housing Center* as evidence that "some states specifically provide for discriminatory effects liability against insurers under state law, further undermining the claim that providing for such liability as a matter of federal law threatens the fundamental nature of the industry." 88 Fed. Reg. at 19,467 & n.153 (first citing *Viens*, 113 F. Supp. 3d at 573 n.20; then citing *Jones*, 2015 WL 5091908, at *5; and then citing *Toledo Fair Hous. Ctr.*, 94 Ohio Misc. 2d at 157–59, 704 N.E.2d at 670–72). These

contexts in which disparate-impact liability has proven workable, such as mortgage lending, it does not substantiate this point with any sources or show how these industries are comparable to the insurance industry's deep dependence on risk-based methodologies.

Instead, it is the agency's review of the history and caselaw on disparate-impact claims that satisfies the court. PCI's parade of horribles about the Rule's possible effects on the insurance business merely resurrects claims that insurers have been making for decades to ward off liability. *See* 88 Fed. Reg. at 19,468 n.158; *see also, e.g.*, *Nevels v. W. World Ins. Co., Inc.*, 359 F. Supp. 2d 1110, 1123 (W.D. Wash. 2004) (rejecting claims that "applying the FHA to surplus lines insurers would 'wreak havoc on the states' regulatory scheme, restrict the availability of insurance coverage, and put the courts in the improper role of making complex decisions on insurance rates and coverage'"). The Rule could have at least some of these ill effects, but any prediction on this front is ultimately just that, and HUD acted within the scope of its expertise by concluding, based on relevant experience, that the Rule did not pose an existential threat to the industry.

Here, in its second bite at the apple, HUD has supplied a "logical rationale" for declining to provide insurers with a categorical exemption under the Rule. The court declines to "substitute [its] own policy judgment for that of the agency." *Wolf*, 962 F.3d at 230. It is certainly possible that filtering insurers' risk-based practices through a disparate-impact analysis will impose costs on the industry that would not otherwise exist. But achieving the FHA's remedial goal of "provid[ing], within constitutional limitations, for fair housing throughout the United States" can be costly for any sector subject to the Act, from landlords to mortgage lenders to local governments. 42 U.S.C. § 3601. HUD did not abuse its discretion in reaching the conclusion that it did here.

---

cases do support the more abstract proposition that disparate-impact liability can complement, rather than frustrate, states' administrative schemes, but they do not provide sufficient foundation for the empirical point that HUD tries to make here.

**D.    Was HUD's Consideration of *Inclusive Communities* Arbitrary and Capricious?**

PCI's final attack on HUD's Rule goes beyond the grounds laid out in the court's 2014 decision.  Citing the Supreme Court's intervening decision in *Inclusive Communities*, PCI argues that HUD's choice to maintain and ultimately reinstate the 2013 Rule was additionally arbitrary and capricious in light of the new limits on disparate-impact liability that the Supreme Court allegedly established in that decision.

As a brief recap, in its 2017 order addressing PCI's motion to amend its complaint, this court refused to allow PCI to add a new claim that HUD's Rule was "contrary to law" under the FHA.  *PCI*, 2017 WL 2653069, at *8–9.  The court did, however, allow PCI to add a claim concerning *Inclusive Communities* and to address "how, if at all, *Inclusive Communities* affects the various issues the Court ordered PCI to consider on remand."  *Id.* at *9 n.4.  The court's analysis here, then, focuses on that question.

In *Inclusive Communities*, the Supreme Court held that while disparate-impact claims were cognizable under the FHA, they should be limited to challenges against "artificial, arbitrary, and unnecessary barriers."  576 U.S. at 543 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)).  The Court further cautioned that "[c]ourts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision."  *Id.*  And the Court held that plaintiffs who base their claim on "a statistical disparity" must satisfy a "robust causality" requirement by "point[ing] to a defendant's policy or policies causing that disparity."  *Id.* at 542.

The practical effect of these phrases, and their relationship to HUD's Rule, is still a matter of dispute.  On one hand, a number of federal courts—including this court in 2017—have concluded that *Inclusive Communities* did not disturb the Rule's basic three-step burden-shifting approach.  *PCI*, 2017 WL 2653069, at *8–9 (finding that the Court "did not identify any aspect of HUD's burden-shifting approach that required correction"); *see also, e.g.*, *de Reyes v. Waples*

*Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424, 432 n.10 (4th Cir. 2018); *MHANY Mgmt. Inc. v. Cnty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016); *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 512–13 (9th Cir. 2016).   On the other hand, the Fifth Circuit held that *Inclusive Communities* "undoubtedly announce[d] a more demanding test than that set forth in the HUD regulation," but acknowledged a lack of consensus on the precise contours of this test.   *Inclusive Cmtys. Project v. Lincoln Prop. Co.*, 920 F.3d 890, 902–04 (5th Cir. 2019).

In its 2023 Reinstatement, HUD (unsurprisingly) took the position that "the 2013 Rule is consistent with *Inclusive Communities*" and denied any need to amend its language based on the Supreme Court's decision.   88 Fed. Reg. at 19,459.   The agency addressed both comments related to *Inclusive Communities* in general (over the course of six pages in the Federal Register, *see id.* at 19,457–62), and comments related to the decision's implications for the insurance industry in particular (over an additional two pages, *see id.* at 19,469–70).   HUD noted that the Supreme Court did not specifically address insurance in its decision, and that its expansive description of the FHA's purpose—to "eradicate discriminatory practices within a sector of our Nation's economy"—counseled against categorically exempting any particular industry from the Rule.   *Id.* at 19,464 (citing *Inclusive Cmtys.*, 576 U.S. at 539); *see also id.* at 19,469 n.166. The Reinstatement rejected the notion that requiring insurers to consider protected traits in the rating and underwriting process would run afoul of *Inclusive Communities*' warning against "injecting race into housing decisions."   *Id.* at 19,469.   And it argued that *Inclusive Communities*' supposed "limits" could be read as restating the existing requirements in the burden-shifting framework, rather than separate and heightened new pleading standards—meaning that insurers could still raise "business necessity" as a defense to disparate-impact suits.   *Id.* at 19,461–62, 19,470.

The court will not vacate or remand HUD's 2023 Rule based on its discussion of *Inclusive Communities.*   To do so would be inconsistent with both this court's earlier (2017) ruling and with the "large body of case law holding that insurers . . . can be held liable under the FHA," which "*Inclusive Communities* does not call . . . into question."   *Travelers Indem.*, 261 F. Supp. 3d at 29;

*see also, e.g.*, *Huskey*, 2023 WL 5848164, at *7–9; *NAMIC*, 2023 WL 6142257, at *8–12.  HUD did not, in its Final Rule, include a discrete section specifically responding to the court's 2017 directive to consider *Inclusive Communities*' relevance to the other issues presented on remand—namely, the McCarran-Ferguson Act, the filed-rate doctrine, and the nature of insurance.  There is, nevertheless, enough discussion of equivalent topics over the course of the agency's rulemaking to find the requisite "rational connection" satisfied.  *State Farm*, 463 U.S. at 43.

PCI raises three specific challenges to HUD's Rule based on phrases in the *Inclusive Communities* decision, but none move the court.  First, PCI claims that the kinds of risk-based insurance practices for which it is seeking an exemption are not the kinds of "artificial, arbitrary, and unnecessary" barriers that *Inclusive Communities* says the FHA was designed to prevent. 576 U.S. at 543.  But this language is consistent with HUD's description of the Rule's intended use: to sift out objective and necessary risk-based practices from those that are unsupported by actuarial science or replaceable by a less discriminatory alternative.  *See* 88 Fed. Reg. at 19,470; *Travelers Indem.*, 261 F. Supp. 3d at 30 ("[I]nsurance policies can create exactly the type of 'artificial, arbitrary, and unnecessary barriers' to housing that disparate-impact liability is suited to address.").[29]

Second, PCI argues that the Rule clashes with *Inclusive Communities*' "robust causality requirement" by allowing plaintiffs to hold insurers liable "based solely on a showing of a statistical

---

[29]     In any event, *Inclusive Communities* quoted the "artificial, arbitrary, and unnecessary" language from its earlier decision in *Griggs*, 401 U.S. at 431, and it is not clear that the Court meant this as an additional pleading requirement rather than simply a recital of established disparate-impact principles.  *See* 88 Fed. Reg. at 19,462 (reasoning that this language merely referenced a "short-hand formulation for the type of policy that traditionally has been held to create an unjustified discriminatory effect"); *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950 n.9 (9th Cir. 2021) (declining to address whether such a requirement exists); *but see Ellis v. City of Minneapolis*, 860 F.3d 1106, 1114 (8th Cir. 2017) (requiring plaintiff to plead facts sufficient to establish existence of "artificial, arbitrary, and unnecessary" policy).  Insurers can certainly raise the "artificial, arbitrary, and unnecessary" language as a defense in jurisdictions that have taken a more expansive view of this language, and may well prevail on this basis in litigation—but the state of the caselaw here does not warrant a blanket nationwide exemption on this basis.

disparity." 576 U.S. at 540. The court does not read the Rule as permitting such a result. HUD acknowledged in its 2023 rulemaking that "the [R]ule do[es] not use the precise words 'robust causality'" but also observed that "[w]hat *Inclusive Communities* requires is [not particular language but] that a court's examination of causality be robust." 88 Fed. Reg. at 19,461. Thus, under the burden-shifting framework, a plaintiff must "link a specific practice to a current or predictable disparity" as part of the prima facie case. *Id.*; *see* 24 C.F.R. § 100.500(c)(1); *NAMIC*, 2023 WL 6142257, at *11; *see also Travelers Indem.*, 261 F. Supp. 3d at 34 (holding that plaintiffs had pleaded sufficient facts to establish that insurer's policy of refusing to cover properties with Section 8 tenants was causally linked to racial and gender-based disparities).

PCI also briefly argues that HUD "staked out internally inconsistent positions" on *Inclusive Communities*' "policy or policies" requirement, by stating at one point in its rulemaking that a "specific practice" is required, 88 Fed. Reg. at 19,461, but later taking the position that plaintiffs could challenge "the decision-making process as a whole," *id.* at 19,485. The court sees no obvious inconsistency in these two statements. A regulated entity's overarching decision-making process can, if sufficiently pervasive, be a challengeable "policy" under *Inclusive Communities. See Cnty. of Cook v. Bank of Am. Corp.*, No. 14 C 2280, 2018 WL 1561725, at *9 (N.D. Ill. Mar. 30, 2018), *aff'd on other grounds*, 78 F.4th 970 (7th Cir. 2023) (noting that there is no requirement that "the 'specific' practice challenged in a disparate-impact claim must be limited to a single component").

And, PCI claims, it will be impossible to prove that insurers' practices are the cause of discriminatory effects, because insurers' discretion is limited by state law. But the diversity of both state regulatory schemes and individual insurers' risk-based practices, discussed earlier, undermines this argument. *See* 88 Fed. Reg. at 19,472–73, 19,475; States' *Amicus* Supporting HUD at 9. Even if all states permit or require risk-based practices under their laws, as PCI repeats several times, "insurers may not in fact be using risk factors that are actuarially sound or the least discriminatory set of risk factors that would achieve that end." 88 Fed. Reg. at 19,472. For

example, many states allow insurers to override actuarial calculations based on subjective "judgment factors."  *Id.* at 19,473.  Whatever added causality standard *Inclusive Communities* sets forth beyond the existing requirements of the burden-shifting framework (if any), it goes too far to presume that all claims against insurers would necessarily fail this standard.

Finally, PCI's argument that HUD arbitrarily failed to consider *Inclusive Communities*' guidance against "inject[ing] racial characteristics into every housing decision" goes nowhere. 576 U.S. at 543.  As both this court and the *NAMIC* court have already noted, the Disparate-Impact Rule does not "require those engaging in housing practices to collect or use data on individuals' protected characteristics."  *NAMIC*, 2023 WL 6142257, at *9; *see* discussion *supra* Section 1.A.  Even if the Rule does, in practice, spur insurers to collect this kind of data to safeguard themselves against litigation risk, "[t]his is no different from the analysis that any other entity regulated by the Fair Housing Act, such as mortgage lenders and housing providers, might want to perform to ensure compliance."  88 Fed. Reg. at 19,469; *see NAMIC*, 2023 WL 6142257, at *9 (deeming the plaintiff's similar argument "a complaint about any sort of disparate-impact liability that might apply to insurance practices").  Voluntary self-analysis is nothing like the "racial quotas" that troubled the *Inclusive Communities* Court—indeed, the Court specifically noted that "awareness of race" could be used to "encourage revitalization of communities that have long suffered the harsh consequences of segregated housing patterns."  576 U.S. at 545.  Given the long history of discriminatory insurance redlining that has contributed to these patterns, as HUD summarized at length in its rulemaking, *see* 88 Fed. Reg. at 19,467 n.155, it was reasonable for the agency to conclude that this language in *Inclusive Communities* does not warrant an insurance exemption.

## CONCLUSION

Reconciling risk-based insurance practices with disparate-impact liability under the FHA implicates questions of fairness, efficiency, and federalism that have troubled both courts and

commentators for decades. HUD's summary decision to apply its Disparate-Impact Rule to the insurance industry in 2013 gave short shrift to this complex and nuanced debate.

But the explanation that HUD puts before this court now—after nine years, multiple administrative proceedings, and dozens of pages in the Federal Register—is considerably more complete. This time around, HUD considered the concerns that the court posed, engaged with relevant stakeholders, marshaled others' expertise as well as its own, and documented its reasoning in detail. That HUD ultimately reached the same conclusion does not make this outcome less legitimate, any more than the court's 2014 remand mandated any particular outcome. If the court had believed that no amount of reappraisal could have cured the defects in HUD's reasoning, it would simply have vacated the rule. Instead, it gave the agency an opportunity to take a "hard look" at the relevant issues and present a well-reasoned case for applying disparate-impact liability to the insurance industry. That is all the arbitrary-and-capricious standard demands, and HUD has amply done so here.

Accordingly, the court denies PCI's motion for summary judgment [282] and grants HUD's cross-motion for summary judgment [295].

ENTER:

Dated: March 26, 2024

_____
REBECCA R. PALLMEYER
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
### FOR THE
### NORTHERN DISTRICT OF ILLINOIS

PROPERTY CASUALTY INSURERS
ASSOCIATION OF AMERICA,

Plaintiff(s),

v.

ADRIANNE TODMAN, in her official capacity
as Acting Secretary of Housing and Urban
Development, and the UNITED STATES
DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT,

Defendant(s).

Case No.  13-cv-8564
Judge Rebecca R. Pallmeyer

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $          ,

which ☐ includes          pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☒    in favor of defendant(s) Adrianne Todman and the United States Department of Housing and
Urban Development
and against plaintiff(s) Property Casualty Insurers Association of America.

Defendant(s) shall recover costs from plaintiff(s).

---

☐    other:

---

This action was *(check one)*:

☐ tried by a jury with Judge          presiding, and the jury has rendered a verdict.
☐ tried by Judge          without a jury and the above decision was reached.
☒ decided by Judge Rebecca R. Pallmeyer granting HUD's cross-motion for summary judgment [295] and
denying PCI's motion for summary judgment [282].

Thomas G. Bruton, Clerk of Court

Date: 3/26/2024

Christina Presslak , Deputy Clerk

# United States District Court
# Northern District of Illinois - CM/ECF NextGen 1.7.1.1 (Chicago)
# CIVIL DOCKET FOR CASE #: 1:13-cv-08564
# Internal Use Only

Property Casualty Insurers Association of America v. Donovan et al

Assigned to: Honorable Rebecca R. Pallmeyer

Cause: 05:702 Administrative Procedure Act

Date Filed: 11/27/2013
Date Terminated: 03/26/2024
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Property Casualty Insurers Association
of America**

represented by **Athena L. Katsampes**
Wilmer Cutler Pickering Hale and Dorr
LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6360
Email:
Athena.Katsampes@wilmerhale.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Catherine M.A. Carroll**
Wilmer Cutler Pickering Hale and Dorr
LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
202-663-6000
Email: Catherine.Carroll@wilmerhale.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rowe W. Snider**
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0700
Email: rsnider@lockelord.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa Marie Gregory**
Locke Lord LLP
111 S. Wacker Dr.
Chicago, IL 60606
(312) 443-0355
Email: alyssa.gregory@lockelord.com
*ATTORNEY TO BE NOTICED*


**Anuradha Sivaram**
Wilmer Cutler Pickering Hale and Dorr
LLP
2100 Pennsylvania Ave, NW
Washington, DC 20037
202-663-6605
Email:
anuradha.sivaram@wilmerhale.com
*TERMINATED: 05/08/2019*
*PRO HAC VICE*


**Ashlee Marie Knuckey**
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0694
Email: aknuckey@lockelord.com
*TERMINATED: 06/01/2021*


**Brian M. Boynton**
Wilmer Cutler Pickering Hale and Dorr
LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
(202) 663-6044
Email: brian.boynton@wilmerhale.com
*TERMINATED: 01/19/2021*
*PRO HAC VICE*


**Colleen Marie Campbell**
Wilmer Cutler Pickering Hale and Dorr
LLP
1225 Seventeenth St.
Ste 2600
Denver, CO 80202
202-663-6197
Email: colleen.campbell@wilmerhale.com
*ATTORNEY TO BE NOTICED*


**Jonathan G. Cedarbaum**
Wilmer Cutler Pickering Hale and Dorr
LLP

1875 Pennsylvania Ave., NW
Suite 5004E
Washington, DC 20006
(202) 663-6315
Email:
jonathan.cedarbaum@wilmerhale.com
*TERMINATED: 01/19/2021*
*PRO HAC VICE*

**Lynn Eisenberg**
Wilmer Cutler Pickering Hale And Dorr
Llp
1875 Pennsylvania Ave., N.w.
Washington, DC 20006
(202) 663-6809
Email: lynn.eisenberg@wilmerhale.com
*TERMINATED: 11/03/2014*
*PRO HAC VICE*

**Matthew J. Tokson**
Wilmer Cutler Pickering Hale And Dorr
Llp
1875 Pennsylvania Ave., N.w.
Washington, DC 20006
(202) 663-6783
Email: matthew.tokson@wilmerhale.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Peter Anthony Gabrielli**
Wilmer Cutler Pickering Hale and Dorr
LLP
1875 Pennsylvania Ave, NW
Room 6058E
Washington, DC 20006
(202) 663-6683
Email: peter.gabrielli@wilmerhale.com
*TERMINATED: 07/10/2018*
*PRO HAC VICE*

**Randolph D. Moss**
Wilmer Cutler Pickering Hale And Dorr
Llp
1875 Pennsylvania Ave., N.w.
Washington, DC 20006
(202) 663-6640
Email: randolph.moss@wilmerhale.com
*TERMINATED: 11/19/2014*
*PRO HAC VICE*

**Seth P Waxman**
Wilmer Cutler Pickering Hale and Dorr
LLP
2100 Pennsylvania Avenue, N.W.
Washington, DC 20037
202-663-6800
Email: seth.waxman@wilmerhale.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Shaun Donovan**
*in his official capacity as Secretary of*
*Housing and Urban Development*
*TERMINATED: 06/27/2017*

represented by **Emily Sue Newton**
U.S. Department of Justice, Civil Division,
Federal Programs
20 Massachusetts Ave NW
Washington, DC 20530
(202) 305-8356
Email: emily.s.newton@usdoj.gov
*TERMINATED: 01/04/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Paul Mosteller**
U.s. Dept. Of Justice, Civil Rights
Division, Housing Sect
950 Pennsylvania Ave Nw Nwb
Washington, DC 20530
(202) 305-0053
Email: daniel.mosteller@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Kyle R. Freeny**
U.S. Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Ave, NW
Suite 6109
Washington, DC 20001
202 514 5108
Email: kyle.freeny@usdoj.gov
*TERMINATED: 03/30/2017*

**Vinita Balakrishnan Andrapalliyal**
U.S. Department of Justice
P.O. Box 883
Washington, DC 20044
(202) 305-0845
Email: vinita.b.andrapalliyal@usdoj.gov

*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of Housing
and Urban Development**

represented by **Emily Sue Newton**
(See above for address)
*TERMINATED: 01/04/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James D Todd , Jr.**
U.S. Department of Justice, Civil Division
Ben Franklin Station
P.O. Box 883
Washington, DC 20044
(202) 514-3378
Email: james.todd@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**AUSA - Chicago**
United States Attorney's Office (NDIL -
Chicago)
219 South Dearborn Street
Chicago, IL 60604
Email: USAILN.ECFAUSA@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Daniel Paul Mosteller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kyle R. Freeny**
(See above for address)
*TERMINATED: 03/30/2017*

**Vinita Balakrishnan Andrapalliyal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ben Carson**
*in his official capacity as Secretary of
Housing and Urban Development*
*TERMINATED: 05/03/2023*

represented by **Emily Sue Newton**
(See above for address)
*TERMINATED: 01/04/2022*
*LEAD ATTORNEY*

**James D Todd , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Vinita Balakrishnan Andrapalliyal**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**Marcia L. Fudge**                   represented by **James D Todd , Jr.**
*in her official capacity as Secretary of*                   (See above for address)
*Housing and Urban Development*                   *LEAD ATTORNEY*
                                 *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Chicago Lawyers' Committee for Civil**                   represented by **Elizabeth Shuman Moore**
**Rights Under Law, Inc.**                   1839 W. Chase
                                 Chicago, IL 60626
                                 (312) 607-5025
                                 Email: bshuman-moore@clccrul.org
                                 *TERMINATED: 08/15/2018*
                                 *LEAD ATTORNEY*

                                 **Aneel Lachman Chablani**
                                 Chicago Lawyers Committee for Civil
                                 Rights
                                 100 N. LaSalle St.
                                 Ste. 600
                                 Chicago, IL 60602
                                 (312) 202-3658
                                 Email: achablani@clccrul.org
                                 *ATTORNEY TO BE NOTICED*

                                 **Jon Marshall Greenbaum,**
                                 Justice Legal Strategies PLLC
                                 1455 Pennsylvania Avenue NW, Suite 400
                                 Washington, DC 20004
                                 202-601-8678
                                 Email: jgreenbaum@justicels.com
                                 *TERMINATED: 04/11/2024*

                                 **Ruth Merewyn Greenwood**
                                 Election Law Clinic at Harvard Law
                                 School
                                 6 Everett St
                                 Suite 4105
                                 Cambridge, MA 02138
                                 202-560-0590
                                 Email: rgreenwood@law.harvard.edu
                                 *TERMINATED: 08/15/2018*

<u>Amicus</u>

**State of Oklahoma ex rel John D. Doak**                   represented by **Christopher D Wolek**
                                 Gibbs, Armstrong, Borochoff, Mullican &

Hart
601 South Boulder Ave
Suite 500
Tulsa, OK 74119
(918) 587-3939
Email: cwolek@gabmh.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael P. Womack**

Mullican & Hart
15 E Fifth St., Suite 2200
Suite 500
Tulsa, OK 74103
(918) 794-6500
Email: mwomack@mullicanhart.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel J. Mohan**

Mohan Groble Scolaro, P.C.
55 West Monroe Street
Suite 1600
Chicago, IL 60603
312-422-9999
Email: mohan@mohangroble.com
*ATTORNEY TO BE NOTICED*

**Fred Evan Karlinsky**

Colodny, Fass, Talenfeld, Karlinsky, Abate
& Webb
100 S.e. Third Avenue
23rd Floor
Fort Lauderdale, FL 33394
(954) 492-4010
Email: fkarlinsky@cftlaw.com
*PRO HAC VICE*

**Kerry Mohan**

Daley Mohan Groble, P.c.
55 West Monroe Street
Ste1600
Chicago, IL 60603
(312) 422-6527
Email: kmohan@daleymohan.com
*ATTORNEY TO BE NOTICED*

**Kevin William Baldwin**

Daley Mohan Groble PC
55 West Monroe Street
Suite 1600
Chicago, IL 60603-5001
312-422-6527
Email: kbaldwin@daleymohan.com
*TERMINATED: 07/02/2019*

**Maria Elena Abate**
Colodny, Fass, Talenfeld, Karlinsky, Abate
& Webb
100 S.e. Third Avenue
23rd Floor
Fort Lauderdale, FL 33394
(954) 492-4010
Email: mabate@cftlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael M. Marick**
Skarzynsk Black LLC
353 North Clark Street
Suite 3650
Chicago, IL 60654
312-946-4235
Email: mmarick@skarzynski.com
*ATTORNEY TO BE NOTICED*

**Timothy H Wright**
Skarzynsk Black LLC
353 North Clark Street
Suite 3650
Chicago, IL 60654
312-946-4232
Email: twright@skarzynski.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**The American Financial Services**　　represented by　**Andrew C. Glass**
**Association**　　　　　　　　　　　　　　　　K&L Gates LLP
One Congress Street
Suite 2900
Boston, MA 02114
617-261-3100
Email: andrew.glass@klgates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas William Marietti**
K&L Gates LLP

70 W. Madison St.
Suite 3100
Chicago, IL 60602
312 807 4221
Email: nicholas.marietti@klgates.com

**Paul F. Hancock**
K&L Gates LLP
200 South Biscayne Boulevard
Suite 3900
Miami, FL 33131
305 539 3300
Email: paul.hancock@klgates.com
*ATTORNEY TO BE NOTICED*

**Roger Lewis Smerage**
K&L Gates LLP
1 Lincoln Street
State Street Financial Center
Boston, MA 02111
(617) 261-3100
Email: roger.smerage@klgates.com
*TERMINATED: 06/19/2019*

**Todd Edward Pentecost**
K&L Gates LLP
70 West Madison
Suite 3300
Chicago, IL 60602
(312) 372-1121
Email: pentecostt@gtlaw.com
*TERMINATED: 04/05/2017*

**Amicus**

**The Consumer Mortgage Coalition**        represented by    **Andrew C. Glass**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas William Marietti**
(See above for address)

**Paul F. Hancock**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Roger Lewis Smerage**
(See above for address)
*TERMINATED: 06/19/2019*

**Todd Edward Pentecost**
(See above for address)
*TERMINATED: 04/05/2017*

**Amicus**

**The Independent Community Bankers of America**

represented by **Andrew C. Glass**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas William Marietti**
(See above for address)

**Paul F. Hancock**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Roger Lewis Smerage**
(See above for address)
*TERMINATED: 06/19/2019*

**Todd Edward Pentecost**
(See above for address)
*TERMINATED: 04/05/2017*

**Amicus**

**The Mortgage Bankers Association**

represented by **Andrew C. Glass**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas William Marietti**
(See above for address)

**Paul F. Hancock**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Roger Lewis Smerage**
(See above for address)
*TERMINATED: 06/19/2019*

**Todd Edward Pentecost**
(See above for address)
*TERMINATED: 04/05/2017*

**Amicus**

**Insurance Commissioners for States of Alabama, Louisiana, Mississippi and Nevada**

represented by **Maria Elena Abate**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Fred Evan Karlinsky**
(See above for address)
*PRO HAC VICE*

**Michael M. Marick**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Timothy H Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**State of Illinois**                    represented by **Alexandra Lane Reed**
                                         Office of the Illinois Attorney General
                                         100 W Randolph
                                         11th Floor
                                         Chicago, IL 60601
                                         773-771-4465
                                         Email: alexandra.reed@ilag.gov
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **Joyce C Otuwa**
                                         Equip For Equality
                                         20 N Michigan
                                         Ste. 300
                                         Chicago, IL 60602
                                         (312) 895-7310
                                         Email: joyce.ozeh@ilag.gov
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **Stephen Matthew Soltanzadeh**
                                         Denzin Soltanzadeh LLC
                                         190 S LaSalle Street
                                         Suite 2160
                                         Chicago, IL 60603
                                         3123807262
                                         Email: ssoltanzadeh@denzinlaw.com
                                         *TERMINATED: 10/26/2023*

**Amicus**

**American Civil Liberties Union**        represented by **Olga Akselrod**
**Foundation**                           American Civil Liberties Union
                                         125 Broad Street
                                         18th floor
                                         NY, NY 10004

Case: 24-1947     Document: 1-1     Filed: 06/03/2024     Pages: 174

(212) 549-2659
Email: oakselrod@aclu.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon Marshall Greenbaum,**
(See above for address)
*TERMINATED: 04/11/2024*

**Amicus**

| | | |
|---|---|---|
| **American Civil Liberties Union of Illinois** | represented by | **Ameri Rose Klafeta** |

Roger Baldwin Foundation of ACLU, Inc.
150 N Michigan Ave Ste 600
Chicago, IL 60601
312-201-9740
Email: AKlafeta@aclu-il.org
*ATTORNEY TO BE NOTICED*

**Jon Marshall Greenbaum,**
(See above for address)
*TERMINATED: 04/11/2024*

**Nusrat Jahan Choudhury**
Roger Baldwin Foundation Of Aclu, Inc.
150 N. Michigan Ave.
Ste. 600
Chicago, IL 60601
(312) 201-9740
Email: nchoudhury@aclu-il.org
*TERMINATED: 06/13/2023*

**Amicus**

| | | |
|---|---|---|
| **Attorney State of Idaho** | represented by | **John C Keenan** |
| Idaho Attorney General- Department of Insurance | | Idaho Office of the Attorney General |
| 700 W. State St. 3rd Floor | | Idaho Department of Insurance |
| Boise, ID 83720 | | 700 West State St., 3rd Floor |
| 2083344283 | | PO Box 83720-0043 |
| *ATTORNEY Appearance for amicus State* | | Boise, ID 83720-0043 |
| *of Idaho Department of Insurance* | | 208-334-4250 |
| | | Email: john.keenan@doi.idaho.gov |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 11/27/2013 | [1](#) | COMPLAINT filed by Property Casualty Insurers Association of America; Filing fee $ 400, receipt number 0752-8976040. (Attachments: # [1](#) Exhibit 1)(Snider, Rowe) (Entered: 11/27/2013) |
| 11/27/2013 | [2](#) | CIVIL Cover Sheet (Snider, Rowe) (Entered: 11/27/2013) |

| | | |
|---|---|---|
| 11/27/2013 | 3 | ATTORNEY Appearance for Plaintiff Property Casualty Insurers Association of America by Rowe W. Snider (Snider, Rowe) (Entered: 11/27/2013) |
| 11/27/2013 | 4 | ATTORNEY Appearance for Plaintiff Property Casualty Insurers Association of America by Ashlee Marie Knuckey (Knuckey, Ashlee) (Entered: 11/27/2013) |
| 11/27/2013 | | CASE ASSIGNED to the Honorable Amy J. St. Eve. Designated as Magistrate Judge the Honorable Susan E. Cox. (daj, ) (Entered: 11/27/2013) |
| 11/27/2013 | 5 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Property Casualty Insurers Association of America (Snider, Rowe) (Entered: 11/27/2013) |
| 11/27/2013 | | SUMMONS Issued as to All Defendants, U.S. Attorney, and U.S. Attorney General. (jp, ) (Entered: 11/27/2013) |
| 12/02/2013 | 6 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-8980925. (Boynton, Brian) (Entered: 12/02/2013) |
| 12/02/2013 | 7 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-8982343. (Tokson, Matthew) (Entered: 12/02/2013) |
| 12/02/2013 | 8 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-8983678. (Waxman, Seth) (Entered: 12/02/2013) |
| 12/02/2013 | 9 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-8984130. (Moss, Randolph) (Entered: 12/02/2013) |
| 12/03/2013 | 10 | ORDER ; Motions for leave to appear pro hac vice on behalf of Property Casualty Insurers Association of America by Brian Boynton 6 , Matthew Tokson 7 , Seth Waxman 8 and Randolph Moss 9 are granted. Initial status hearing set for January 13, 2014 at 8:30 a.m. in courtroom 1241. Parties shall refer to Judge St. Eve's web page at www.ilnd.uscourts.gov and file a joint status report by January 8, 2014 as set forth in the Initial Status Conferences procedure. Signed by the Honorable Amy J. St. Eve on 12/3/2013. Mailed notice. (ea, ) (Entered: 12/03/2013) |
| 12/06/2013 | 11 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-8999700. (Eisenberg, Lynn) (Entered: 12/06/2013) |
| 12/06/2013 | 12 | REQUEST for Clerk of Court to refund filing fee in the amount of $400.00, receipt no. 0752-8975921, (Snider, Rowe) (Entered: 12/06/2013) |
| 12/06/2013 | 13 | ORDER Signed by the Honorable Amy J. St. Eve on 12/6/2013: Lynn Eisenbergs motion for leave to appear pro hac vice on behalf of Property CasualtyInsurers Association of America 11 is granted. Mailed notice(ngm, ) (Entered: 12/06/2013) |
| 12/16/2013 | 14 | ATTORNEY Appearance for Defendants Shaun Donovan, United States Department of Housing and Urban Development by Kyle R. Freeny (Freeny, Kyle) (Entered: 12/16/2013) |
| 12/18/2013 | 15 | ATTORNEY Appearance for Defendants Shaun Donovan, United States Department of Housing and Urban Development by Daniel Paul Mosteller (Mosteller, Daniel) (Entered: 12/18/2013) |

| 01/08/2014 | 16 | STATUS Report by Shaun Donovan, Property Casualty Insurers Association of America, United States Department of Housing and Urban Development (Boynton, Brian) (Entered: 01/08/2014) |
|---|---|---|
| 01/13/2014 | 17 | MINUTE entry before the Honorable Amy J. St. Eve:Status hearing held on 1/13/2014 and continued to 8/7/2014 at 08:30 AM. The Administrative Record shall be turned over to the plaintiff by 2/7/14. Plaintiff's motion for summary judgment, up to 35 pages, shall be filed by 3/3/14. Defendants' response and cross-motion, up to 50 pages, shall be filed by 3/28/14. Defendants shall answer or otherwise plead by 3/28/14. Plaintiff's reply, up to 40 pages, shall be filed by 5/2/14. Defendants' reply, up to 25 pages, shall be filed by 5/30/14. Mailed notice (kef, ) (Entered: 01/13/2014) |
| 01/14/2014 | 18 | MINUTE entry before the Honorable Amy J. St. Eve: The court's 1/13/14 minute entry is corrected to read that plaintiff's motion for summary judgment, up to 35 pages, shall be filed by 2/14/14. All other dates stand. Mailed notice (kef, ) (Entered: 01/14/2014) |
| 02/12/2014 | 19 | CERTIFIED COPY OF ADMINISTRATIVE RECORD by Defendants Shaun Donovan, United States Department of Housing and Urban Development (Attachments: # 1 Index, # 2 Pages 1-209, # 3 Pages 210-378, # 4 Pages 379-516, # 5 Pages 517-645, # 6 Pages 646-804, # 7 Pages 805-881, # 8 Pages 882-1032, # 9 Pages 1033-1132, # 10 Pages 1133-1206, # 11 Pages 1207-1360, # 12 Pages 1361-1593, # 13 Pages 1594-1812, # 14 Certification)(Mosteller, Daniel) (Entered: 02/12/2014) |
| 02/14/2014 | 20 | MOTION by Plaintiff Property Casualty Insurers Association of America for summary judgment (Waxman, Seth) (Entered: 02/14/2014) |
| 02/14/2014 | 21 | MEMORANDUM OF LAW IN SUPPORT of the Plaintiff Property Casualty Insurers Association of America motion for summary judgment. 20 (Attachments: # 1 Statement of Undisputed Material Facts, # 2 Declaration of Robert Gordon)(Waxman, Seth)Docket Text Modified by Clerks Office) Modified on 2/18/2014 (ea, ). (Entered: 02/14/2014) |
| 02/18/2014 | 🔒 | (Court only) ***Motions terminated: MOTION by Plaintiff Property Casualty Insurers Association of America for summary judgment *(Memorandum of Law)* 21 (ea, ) (Entered: 02/18/2014) |
| 02/25/2014 | 🔓 22 | TRANSCRIPT OF PROCEEDINGS held on 1/13/14 before the Honorable Amy J. St. Eve. Court Reporter Contact Information: Joseph Rickhoff, 312-435-5562, joseph_rickhoff@ilnd.uscourts.gov. <P>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter/Transcriber or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.</P> Redaction Request due 3/18/2014. Redacted Transcript Deadline set for 3/28/2014. Release of Transcript Restriction set for 5/26/2014. (Rickhoff, Joseph) (Entered: 02/25/2014) |

| 03/18/2014 | 23 | MOTION by Defendants Shaun Donovan, United States Department of Housing and Urban Development for extension of time *(or to Modify Briefing Schedule) (Consented)* (Attachments: # 1 Text of Proposed Order)(Freeny, Kyle) (Entered: 03/18/2014) |
|---|---|---|
| 03/18/2014 | 24 | NOTICE of Motion by Kyle R. Freeny for presentment of extension of time 23 before Honorable Amy J. St. Eve on 3/24/2014 at 08:30 AM. (Freeny, Kyle) (Entered: 03/18/2014) |
| 03/19/2014 | 25 | MINUTE entry before the Honorable Amy J. St. Eve: Defendants' consent motion to modify briefing schedule 23 is granted. Defendants' response to plaintiff's motion for summary judgment and cross-motion shall be filed by 4/4/14. Defendants shall answer or otherwise plead to the complaint by 4/4/14. Plaintiff's combined opposition and reply shall be filed by 5/16/14. Defendants' reply shall be filed by 6/13/14. Status hearing set for 8/7/14 is stricken and reset to 8/26/14 at 8:30 a.m. No appearance is required on the 3/24/14 notice date. Mailed notice (kef, ) (Entered: 03/19/2014) |
| 03/25/2014 | 26 | MOTION by Amicus Chicago Lawyers' Committee for Civil Rights Under Law, Inc. for leave to file *A BRIEF AMICUS CURIAE* (Shuman Moore, Elizabeth) (Entered: 03/25/2014) |
| 03/25/2014 | 27 | NOTICE of Motion by Elizabeth Shuman Moore for presentment of motion for leave to file 26 before Honorable Amy J. St. Eve on 3/31/2014 at 08:30 AM. (Shuman Moore, Elizabeth) (Entered: 03/25/2014) |
| 03/26/2014 | 28 | MINUTE entry before the Honorable Amy J. St. Eve: Unopposed motion of the ACLU, ACLU-IL, CLCCRUL, CAFHA, LCCRUL, LDF, NCRC, NCLC and NFHA for leave to file a brief amicus curiae 26 is granted. Said brief, up to 25 pages, shall be filed by 4/18/14. No appearance is required on the 3/31/14 notice date. Mailed notice (kef, ) (Entered: 03/26/2014) |
| 04/04/2014 | 29 | MEMORANDUM by Shaun Donovan, United States Department of Housing and Urban Development in Opposition to motion for summary judgment 20 (Attachments: # 1 Response to Plaintiff's Statement of Undisputed Material Facts, # 2 Text of Proposed Order)(Freeny, Kyle) (Entered: 04/04/2014) |
| 04/04/2014 | 30 | MOTION by Defendants United States Department of Housing and Urban Development, Shaun Donovan to dismiss for lack of jurisdiction , MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, MOTION by Defendants United States Department of Housing and Urban Development, Shaun Donovan for summary judgment (Attachments: # 1 Text of Proposed Order, # 2 Statement of Undisputed Material Facts)(Freeny, Kyle) (Entered: 04/04/2014) |
| 04/04/2014 | 31 | MEMORANDUM by Shaun Donovan, United States Department of Housing and Urban Development in support of motion to dismiss/lack of jurisdiction,, Motion to Dismiss for Failure to State a Claim,, motion for summary judgment, 30 (Freeny, Kyle) (Entered: 04/04/2014) |
| 04/11/2014 | 32 | TRANSCRIPT OF PROCEEDINGS held on 1/13/14 before the Honorable Amy J. St. Eve. Court Reporter Contact Information: Joseph Rickhoff, 312-435-5562, joseph_rickhoff@ilnd.uscourts.gov. <P>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript |

| | | Restriction. After that date it may be obtained through the Court Reporter/Transcriber or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.</P> Redaction Request due 5/2/2014. Redacted Transcript Deadline set for 5/12/2014. Release of Transcript Restriction set for 7/10/2014. (Rickhoff, Joseph) (Entered: 04/11/2014) |
|---|---|---|
| 04/18/2014 | 33 | MEMORANDUM by Chicago Lawyers' Committee for Civil Rights Under Law, Inc. in Opposition to motion to dismiss/lack of jurisdiction,, Motion to Dismiss for Failure to State a Claim,, motion for summary judgment, 30 *Amicus Brief in Support of Defendants' Motion to Dismiss and/or for Summary Judgment* (Attachments: # 1 Appendix)(Shuman Moore, Elizabeth) (Entered: 04/18/2014) |
| 04/18/2014 | 34 | NOTICE by Chicago Lawyers' Committee for Civil Rights Under Law, Inc. re memorandum in opposition to motion, 33 (Shuman Moore, Elizabeth) (Entered: 04/18/2014) |
| 04/25/2014 | 35 | ATTORNEY Appearance for Amicus Chicago Lawyers' Committee for Civil Rights Under Law, Inc. by Elizabeth Shuman Moore (Shuman Moore, Elizabeth) (Entered: 04/25/2014) |
| 04/25/2014 | 36 | ATTORNEY Appearance for Amicus Chicago Lawyers' Committee for Civil Rights Under Law, Inc. by Ruth Merewyn Greenwood (Greenwood, Ruth) (Entered: 04/25/2014) |
| 05/15/2014 | 37 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-9485989. (Wolek, Christopher) (Entered: 05/15/2014) |
| 05/15/2014 | 38 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-9486083. (Womack, Michael) (Entered: 05/15/2014) |
| 05/15/2014 | 39 | ATTORNEY Appearance for Amicus State of Oklahoma ex rel John D. Doak by Kevin William Baldwin (Baldwin, Kevin) (Entered: 05/15/2014) |
| 05/15/2014 | 40 | MOTION by Amicus State of Oklahoma ex rel John D. Doak for leave to file *brief* (Baldwin, Kevin) (Entered: 05/15/2014) |
| 05/15/2014 | 41 | NOTICE of Motion by Kevin William Baldwin for presentment of motion for leave to file 40 before Honorable Amy J. St. Eve on 5/21/2014 at 08:30 AM. (Baldwin, Kevin) (Entered: 05/15/2014) |
| 05/16/2014 | 42 | MINUTE entry before the Honorable Amy J. St. Eve: Motion of the Oklahoma Insurance Commissioner's for leave to file a brief amicus curiae 40 is granted. Said brief, up to 20 pages, shall be filed on or before 5/30/14. No appearance is required on the 5/21/14 notice date. Mailed notice (kef, ) (Entered: 05/16/2014) |
| 05/16/2014 | 43 | ORDER: Motions for leave to appear pro hac vice by Christopher Wolek and Michael Womack on behalf of amicus curiae State of Oklahoma, ex rel. John D. Doak, Insurance Commissioner 37 38 are granted. Signed by the Honorable Amy J. St. Eve on May 16, 2014. Mailed notice (ph, ) (Entered: 05/16/2014) |
| 05/16/2014 | 44 | MEMORANDUM by Property Casualty Insurers Association of America in Opposition to motion to dismiss/lack of jurisdiction,, Motion to Dismiss for Failure to State a Claim,, motion for summary judgment, 30 (Attachments: # 1 |

|  |  | Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, # 2 Declaration of Teresa C. Cracas, # 3 Declaration of Michael Dawdy, # 4 Declaration of Ronald Joseph Zaleski, Sr., # 5 Declaration of Peter Drogan)(Boynton, Brian) (Entered: 05/16/2014) |
|---|---|---|
| 05/16/2014 | 45 | REPLY by Property Casualty Insurers Association of America to memorandum in opposition to motion, 29 (Attachments: # 1 Declaration of Teresa C. Cracas, # 2 Declaration of Michael Dawdy, # 3 Declaration of Ronald Joseph Zaleski, Sr., # 4 Declaration of Peter Drogan)(Boynton, Brian) (Entered: 05/16/2014) |
| 05/19/2014 | 46 | ATTORNEY Appearance for Amicus State of Oklahoma ex rel John D. Doak by Michael P. Womack (Womack, Michael) (Entered: 05/19/2014) |
| 05/19/2014 | 47 | ATTORNEY Appearance for Amicus State of Oklahoma ex rel John D. Doak by Christopher D Wolek (Wolek, Christopher) (Entered: 05/19/2014) |
| 05/30/2014 | 48 | MEMORANDUM *And In Opposition to Defendant's Motion to Dismiss and/or Motion for Summary Judgment* (Wolek, Christopher) (Entered: 05/30/2014) |
| 05/30/2014 | 49 | NOTICE by State of Oklahoma ex rel John D. Doak (Wolek, Christopher) (Entered: 05/30/2014) |
| 06/04/2014 | 50 | MOTION by Defendants Shaun Donovan, United States Department of Housing and Urban Development for extension of time to file response/reply *(Unopposed)* (Attachments: # 1 Text of Proposed Order)(Freeny, Kyle) (Entered: 06/04/2014) |
| 06/04/2014 | 51 | NOTICE by Shaun Donovan, United States Department of Housing and Urban Development re MOTION by Defendants Shaun Donovan, United States Department of Housing and Urban Development for extension of time to file response/reply *(Unopposed)* 50 (Freeny, Kyle) (Entered: 06/04/2014) |
| 06/05/2014 | 52 | NOTICE of Motion by Kyle R. Freeny for presentment of motion for extension of time to file response/reply 50 before Honorable Amy J. St. Eve on 6/10/2014 at 08:30 AM. (Freeny, Kyle) (Entered: 06/05/2014) |
| 06/09/2014 | 53 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-9556356. (Abate, Maria) (Entered: 06/09/2014) |
| 06/09/2014 | 54 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-9556492. (Karlinsky, Fred) (Entered: 06/09/2014) |
| 06/09/2014 | 55 | MINUTE entry before the Honorable Amy J. St. Eve: Defendants' unopposed motion for extension of time 50 is granted. Defendants' reply to their motion to dismiss/motion for summary judgment 30 shall be filed on 6/20/014. No appearance is required on the 6/10/14 notice date. Mailed notice (kef, ) (Entered: 06/09/2014) |
| 06/09/2014 | 56 | ORDER: Motions for leave to appear pro hac vice on behalf of Insurance Commissioners for Alabama, Mississippi and Nevada by Maria Elena Abate and Fred Evan Karlinsky 53 54 are granted. Signed by the Honorable Amy J. St. Eve on June 9, 2014. Mailed notice (ph, ) (Entered: 06/10/2014) |

| 06/11/2014 | 57 | ATTORNEY Appearance for Amicus Parties The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association by Todd Edward Pentecost (Pentecost, Todd) (Entered: 06/11/2014) |
|---|---|---|
| 06/11/2014 | 58 | ATTORNEY Appearance for Amicus Parties The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association by Nicholas William Marietti (Marietti, Nicholas) (Entered: 06/11/2014) |
| 06/11/2014 | 59 | MOTION by Amicus Parties The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association for leave to file *Amici Curiae Brief in Support of Plaintiff's Motion for Summary Judgment* (Attachments: # 1 Exhibit)(Marietti, Nicholas) (Entered: 06/11/2014) |
| 06/11/2014 | 60 | NOTICE of Motion by Nicholas William Marietti for presentment of motion for leave to file, 59 before Honorable Amy J. St. Eve on 6/18/2014 at 08:30 AM. (Marietti, Nicholas) (Entered: 06/11/2014) |
| 06/12/2014 | 61 | RESPONSE by Shaun Donovan, United States Department of Housing and Urban Development to MOTION by Amicus Parties The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association for leave to file *Amici Curiae Brief in Support of Plaintiff's* 59 (Freeny, Kyle) (Entered: 06/12/2014) |
| 06/12/2014 | 62 | ATTORNEY Appearance for Insurance Commissioners for States of Alabama, Louisiana, Mississippi and Nevada by Maria Elena Abate (Abate, Maria) Modified on 6/12/2014 (ea, ). (Entered: 06/12/2014) |
| 06/12/2014 | 63 | ATTORNEY Appearance for Insurance Commissioners for States of Alabama, Louisiana, Mississippi and Nevada by Fred Evan Karlinsky (Karlinsky, Fred) Modified on 6/12/2014 (ea, ). (Entered: 06/12/2014) |
| 06/12/2014 | 64 | MOTION by Insurance Commissioners for States of Alabama, Louisiana, Mississippi and Nevada in support of State of Oklahoma, Ex Rel., John D. Doak, Insurance Commissioner Amicus Curiae Brief (Abate, Maria) Modified on 6/12/2014 (ea, ). (Entered: 06/12/2014) |
| 06/12/2014 | 65 | ATTORNEY Appearance for Insurance Commissioners for States of Alabama, Louisiana, Mississippi and Nevada, Amicus State of Oklahoma ex rel John D. Doak by Timothy H Wright (Wright, Timothy) Modified on 6/12/2014 (ea, ). (Entered: 06/12/2014) |
| 06/12/2014 | 66 | ATTORNEY Appearance for Insurance Commissioners for States of Alabama, Louisiana, Mississippi and Nevada, Amicus State of Oklahoma ex rel John D. Doak by Michael M. Marick (Marick, Michael) Modified on 6/12/2014 (ea, ). (Entered: 06/12/2014) |
| 06/13/2014 | 67 | RESPONSE by Property Casualty Insurers Association of Americain Opposition to MOTION by Amicus Parties The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association for leave to file *Amici Curiae Brief in Support of Plaintiff's* 59 (Boynton, Brian) (Entered: 06/13/2014) |

| 06/16/2014 | 68 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-9580163. (Glass, Andrew) (Entered: 06/16/2014) |
| 06/16/2014 | 69 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-9580205. (Hancock, Paul) (Entered: 06/16/2014) |
| 06/16/2014 | 70 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-9580267. (Smerage, Roger) (Entered: 06/16/2014) |
| 06/16/2014 | 71 | REPLY by The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association to response to motion, 61 (Marietti, Nicholas) (Entered: 06/16/2014) |
| 06/16/2014 | 73 | ORDER: Motions for leave to appear pro hac vice on behalf of Amici Curiae the American Financial Services Association, the Consumer Mortgage Coalition, the Independent Community Bankers of America, and the Mortgage Bankers Association by Andrew Glass, Paul Hancock and Roger Smerage 68 69 70 are granted. Signed by the Honorable Amy J. St. Eve on June 16, 2014. Mailed notice (ph, ) (Entered: 06/17/2014) |
| 06/17/2014 | 72 | MINUTE entry before the Honorable Amy J. St. Eve: AFSA's motion for leave to file amicus curiae brief 59 is entered and taken under advisement. Ruling by mail. No appearance is required on the 6/18/14 notice motion date. Mailed notice (kef, ) Modified on 6/17/2014 (kef, ). (Entered: 06/17/2014) |
| 06/20/2014 | 74 | REPLY by Shaun Donovan, United States Department of Housing and Urban Development to MOTION by Defendants United States Department of Housing and Urban Development, Shaun Donovan to dismiss for lack of jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIMMOTION by Defendants United States Department of Housing and Urban Development, Shaun Donovan for summary judgment 30 (Freeny, Kyle) (Entered: 06/20/2014) |
| 06/27/2014 | 75 | ATTORNEY Appearance for Amicus State Of Illinois by Stephen Matthew Soltanzadeh (Soltanzadeh, Stephen) (Entered: 06/27/2014) |
| 06/27/2014 | 76 | MOTION by Amicus State Of Illinois for leave to file *Brief as Amicus Curiae* (Attachments: # 1 Exhibit Amicus Brief)(Soltanzadeh, Stephen) (Entered: 06/27/2014) |
| 06/27/2014 | 77 | NOTICE of Motion by Stephen Matthew Soltanzadeh for presentment of motion for leave to file 76 before Honorable Amy J. St. Eve on 7/9/2014 at 08:30 AM. (Soltanzadeh, Stephen) (Entered: 06/27/2014) |
| 06/30/2014 | 78 | MINUTE entry before the Honorable Amy J. St. Eve: Motions for leave to file amicus curiae briefs 59 64 76 are granted. No appearance is required on the 7/9/14 notice motion. Mailed notice (kef, ) (Entered: 06/30/2014) |
| 06/30/2014 | 79 | MEMORANDUM by The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association in support of motion for summary judgment 20 (Attachments: # 1 Exhibit A - Amici Curiae Brief to the United States Supreme Court)(Smerage, Roger) (Entered: 06/30/2014) |

| 07/07/2014 | 80 | BRIEF OF THE STATE OF ILLINOIS AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS MOTION FOR SUMMARY JUDGMENT by State Of Illinois (Soltanzadeh, Stephen) (Entered: 07/07/2014) |
|---|---|---|
| 07/08/2014 | 81 | MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file *a Response to the Brief of the State of Illinois as Amicus Curiae in Support of Defendants* (Attachments: # 1 Exhibit)(Waxman, Seth) (Entered: 07/08/2014) |
| 07/08/2014 | 82 | NOTICE of Motion by Seth P Waxman for presentment of motion for leave to file 81 before Honorable Amy J. St. Eve on 7/14/2014 at 08:30 AM. (Waxman, Seth) (Entered: 07/08/2014) |
| 07/09/2014 | 83 | MINUTE entry before the Honorable Amy J. St. Eve: Plaintiff's motion for leave to file a response to the brief of the State of Illinois as Amicus Curiae in support of defendants 81 is granted. Counsel shall separately file the response brief upon receipt of this order. No appearance is required on the 7/14/14 notice date. Mailed notice (kef, ) (Entered: 07/09/2014) |
| 07/09/2014 | 84 | RESPONSE by Plaintiff Property Casualty Insurers Association of America to other 80 *Brief of the State of Illinois as Amicus Curiae* (Waxman, Seth) (Entered: 07/09/2014) |
| 07/14/2014 | 85 | MINUTE entry before the Honorable Amy J. St. Eve: Status hearing set for 8/26/14 is stricken and reset to 8/27/2014 at 08:30 AM.Mailed notice (kef, ) (Entered: 07/14/2014) |
| 07/21/2014 | 86 | MOTION Request for Oral Argument by Property Casualty Insurers Association of America (Waxman, Seth) Docket Text Modified By Clerk's Office. (Entered: 07/21/2014) |
| 07/21/2014 | 87 | NOTICE of Motion by Seth P Waxman for presentment of before Honorable Amy J. St. Eve on 7/29/2014 at 08:30 AM. (Waxman, Seth) (Entered: 07/21/2014) |
| 07/22/2014 | 88 | NOTICE of Motion by Seth P Waxman for presentment of motion for miscellaneous relief 86 before Honorable Amy J. St. Eve on 7/29/2014 at 08:30 AM. (Waxman, Seth) (Entered: 07/22/2014) |
| 07/24/2014 | 89 | MINUTE entry before the Honorable Amy J. St. Eve: Plaintiff's request for oral argument 86 is granted. Oral argument set for 8/19/2014 at 01:00 PM. No appearance is required on the 7/29/14 notice date. Mailed notice (kef, ) (Entered: 07/24/2014) |
| 08/06/2014 | 90 | MINUTE entry before the Honorable Amy J. St. Eve: Oral argument set for 8/19/14 is reset from 1:00 p.m. to 1:30 p.m. Mailed notice (kef, ) (Entered: 08/06/2014) |
| 08/19/2014 | 91 | MINUTE entry before the Honorable Amy J. St. Eve: Oral argument on the parties' cross-motions for summary judgment and defendants' motion to dismiss held on 8/19/14. Status hearing set for 8/27/14 is stricken and reset to 9/30/14 at 8:30 a.m.Mailed notice (kef, ) (Entered: 08/20/2014) |

Case: 24-1947    Document: 1-1     Filed: 06/03/2024     Pages: 174

| | | |
|---|---|---|
| 08/20/2014 | 92 | MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file *additional authorities* (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Waxman, Seth) (Entered: 08/20/2014) |
| 08/20/2014 | 93 | NOTICE of Motion by Seth P Waxman for presentment of motion for leave to file 92 before Honorable Amy J. St. Eve on 8/25/2014 at 08:30 AM. (Waxman, Seth) (Entered: 08/20/2014) |
| 08/22/2014 | 94 | MINUTE entry before the Honorable Amy J. St. Eve: Plaintiff's motion for leave to submit additional authorities 92 is granted. No appearance is required on the 8/25/14 notice date. Mailed notice (kef, ) (Entered: 08/22/2014) |
| 08/22/2014 | 95 | MINUTE entry before the Honorable Amy J. St. Eve: During oral arguments, the parties disagreed about (1) whether Plaintiff's challenge to the Disparate Impact Rule as violating the McCarran-Ferguson Act constitutes a facial or as-applied challenge to the Rule and, (2) if it is a facial challenge, whether Reno v. Flores, 507 U.S. 292 (1993), provides the applicable test for judging the Rule's validity. The Court directs the parties to file simultaneous supplemental briefs addressing these issues by 8/26/14. The parties shall limit their briefs to no more than 8 pages.Mailed notice (kef, ) (Entered: 08/22/2014) |
| 08/26/2014 | 96 | MEMORANDUM by Property Casualty Insurers Association of America in support of motion for summary judgment 20 , *Supplemental Post-Argument Brief* (Waxman, Seth) (Entered: 08/26/2014) |
| 08/26/2014 | 97 | MEMORANDUM by Shaun Donovan, United States Department of Housing and Urban Development in support of motion to dismiss/lack of jurisdiction, Motion to Dismiss for Failure to State a Claim, motion for summary judgment,,, 30 (Freeny, Kyle) (Entered: 08/26/2014) |
| 09/03/2014 | 98 | ORDER: The Court grants in part and denies in part PCI's motion for summary judgment 20 , and grants in part and denies in part HUD's motion to dismiss or for summary judgment 30 . The Court dismisses PCI's McCarran-Ferguson claim for lack of subject matter jurisdiction. With respect to PCI's remaining claims, the Court grants summary judgment to PCI on its claims that HUD's application of the Disparate Impact Rule to homeowners insurance was arbitrary and capricious, and grants summary judgment to HUD on PCI's challenge to HUD's burden-shifting framework. The Court remands this case to the United States Department of Housing and Urban Development for further proceedings consistent with this Memorandum, Opinion and Order. All pending dates and deadlines are stricken. Signed by the Honorable Amy J. St. Eve on 9/3/2014.Mailed notice(sxw, ) (Entered: 09/04/2014) |
| 09/03/2014 | 99 | MEMORANDUM Opinion and Order. Signed by the Honorable Amy J. St. Eve on 9/3/2014. Mailed notice(sxw, ) (Entered: 09/04/2014) |
| 09/03/2014 | 100 | ENTERED JUDGMENT. (sxw, ) (Entered: 09/04/2014) |
| 09/21/2014 | 101 | TRANSCRIPT OF PROCEEDINGS held on 8/19/14 before the Honorable Amy J. St. Eve. Court Reporter Contact Information: Joseph Rickhoff, 312-435-5562, joseph_rickhoff@ilnd.uscourts.gov. <P>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court |

| | | Reporter/Transcriber or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.</P> Redaction Request due 10/13/2014. Redacted Transcript Deadline set for 10/22/2014. Release of Transcript Restriction set for 12/22/2014. (Rickhoff, Joseph) (Entered: 09/21/2014) |
|---|---|---|
| 10/01/2014 | 102 | WITHDRAWING *Brian M. Boynton* as counsel for Plaintiff Property Casualty Insurers Association of America and substituting Seth P Waxman as counsel of record (Waxman, Seth) (Entered: 10/01/2014) |
| 10/01/2014 | 🔒 | (Court only) *** Attorney Brian M. Boynton terminated. (ph, ) (Entered: 10/02/2014) |
| 10/31/2014 | 103 | MOTION by counsel for Plaintiff Property Casualty Insurers Association of America to withdraw as attorney *Lynn Eisenberg* (Waxman, Seth) (Entered: 10/31/2014) |
| 11/03/2014 | 104 | ORDER: Motion of withdrawal of Lynn Eisenberg 103 is granted. Lynn Eisenberg is given leave to withdraw as counsel for plaintiff Property Casualty Insurers Association of America. Signed by the Honorable Amy J. St. Eve on November 3, 2014. Mailed notice (ph, ) (Entered: 11/04/2014) |
| 11/19/2014 | 105 | WITHDRAWING *Randolph D. Moss* as counsel for Plaintiff Property Casualty Insurers Association of America and substituting Seth P Waxman as counsel of record (Waxman, Seth) (Entered: 11/19/2014) |
| 05/01/2015 | 106 | WITHDRAWING *Matthew J. Tokson* as counsel for Plaintiff Property Casualty Insurers Association of America and substituting Seth P Waxman as counsel of record (Waxman, Seth) (Entered: 05/01/2015) |
| 03/21/2017 | 107 | MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file *First Amended Complaint* (Attachments: # 1 Exhibit A - [Proposed] First Amended Complaint, # 2 Exhibit 1 to [Proposed] First Amended Complaint, # 3 Exhibit 2 to [Proposed] First Amended Complaint, # 4 Exhibit 3 to [Proposed] First Amended Complaint, # 5 Exhibit 4 to [Proposed] First Amended Complaint, # 6 Exhibit 5 to [Proposed] First Amended Complaint)(Waxman, Seth) (Entered: 03/21/2017) |
| 03/21/2017 | 108 | MEMORANDUM by Property Casualty Insurers Association of America in support of motion for leave to file, 107 (Waxman, Seth) (Entered: 03/21/2017) |
| 03/21/2017 | 109 | NOTICE of Motion by Seth P Waxman for presentment of motion for leave to file, 107 before Honorable Amy J. St. Eve on 3/30/2017 at 08:30 AM. (Waxman, Seth) (Entered: 03/21/2017) |
| 03/21/2017 | 110 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-12985668. (Cedarbaum, Jonathan) (Entered: 03/21/2017) |

| | | |
|---|---|---|
| 03/21/2017 | 112 | NOTICE OF EMAIL NOTIFICATION FAILURE, for document # 108 , 107 , 109 , 110 sent to Attorney Nicholas William Marietti returned as: Unknown Address Error. Mailed to attorney Nicholas William Marietti a Letter re: bounce back email and a Notification of Change of Address form. Notices have been set to No. Counsel must email the Clerk's Office at Docketing_ILND@uscourts.gov when a Notification of Change of Address has been filed to ensure electronic notification is reset. (ek, ) (Entered: 03/22/2017) |
| 03/22/2017 | 111 | ORDER: Motion for leave to appear pro hac vice on behalf of Property Casualty Insurers Association of America by Jonathan Cedarbaum 110 is granted. Signed by the Honorable Amy J. St. Eve on 3/22/2017. Mailed notice. (kp, ) (Entered: 03/22/2017) |
| 03/23/2017 | 113 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-12991889. (Sivaram, Anuradha) (Entered: 03/23/2017) |
| 03/24/2017 | 114 | ORDER: Motion for leave to appear pro hac vice on behalf of Property Casualty Insurers Association of America by Anuradha Sivaram 113 is granted. Signed by the Honorable Amy J. St. Eve on 3/24/2017. Mailed notice. (kp, ) (Entered: 03/24/2017) |
| 03/29/2017 | 115 | MINUTE entry before the Honorable Amy J. St. Eve: Plaintiff's motion for leave to amend complaint 107 is entered. A courtesy copy of the motion and memorandum in support shall be delivered to the courtroom deputy, room 1238. Response by 4/21/17. Reply by 5/1/17. Status hearing set for 6/21/17 at 8:30 a.m. No appearance is required on the 3/30/17 notice motion date. Mailed notice (kef, ) (Entered: 03/29/2017) |
| 03/30/2017 | 116 | WITHDRAWING *Kyle Freeny* as counsel for Defendants Shaun Donovan, United States Department of Housing and Urban Development and substituting Emily Sue Newton as counsel of record (Attachments: # 1 Appendix Notification of Party Contact Information)(Newton, Emily) (Entered: 03/30/2017) |
| 04/04/2017 | 117 | MOTION by Attorney Todd E. Pentecost to withdraw as attorney for The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association. No party information provided (Pentecost, Todd) (Entered: 04/04/2017) |
| 04/04/2017 | 118 | NOTICE OF EMAIL NOTIFICATION FAILURE, for document # 117 sent to Attorney Fred Evan Karlinsky returned as: Unknown Address Error. Mailed to attorney Fred Evan Karlinsky a Letter re: bounce back email and a Notification of Change of Address form. Notices have been set to No. Counsel must email the Clerk's Office at Docketing_ILND@uscourts.gov when a Notification of Change of Address has been filed to ensure electronic notification is reset. (ek, ) (Entered: 04/05/2017) |
| 04/05/2017 | 119 | ORDER: Motion to withdraw as counsel 117 is granted. Todd Pentecost is given leave to withdraw as counsel for The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America and The Mortgage Bankers Association. Signed by the Honorable Amy J. St. Eve on 4/5/2017. Mailed notice. (jjr, ) (Entered: 04/05/2017) |

| 04/05/2017 | 120 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-13040779. (Gabrielli, Peter) (Entered: 04/05/2017) |
|---|---|---|
| 04/06/2017 | 121 | ORDER: Motion for leave to appear pro hac vice by Peter Gabrielli on behalf of Property Casualty Insurers Association of America 120 is granted. Signed by the Honorable Amy J. St. Eve on 4/6/2017. Mailed notice. (kp, ) (Entered: 04/06/2017) |
| 04/21/2017 | 122 | RESPONSE by United States Department of Housing and Urban Developmentin Opposition to MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file *First Amended Complaint* 107 (Attachments: # 1 Mem. Op in Dist. Hosp. Partners, L.P. v. Burwell, No. 11-0116 (D.D.C. 2016))(Newton, Emily) (Entered: 04/21/2017) |
| 04/24/2017 | 123 | MAIL RETURNED, for document # 118 sent to Fred Evan Karlinsky returned as undeliverable, return to sender. No new contact information received; therefore future mailings will not be sent until a new address is provided to the Clerk's Office using a Notification of Change of Address or Pro Se Appearance form (ek, ) (Entered: 04/26/2017) |
| 04/28/2017 | 124 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-13121891. (Boynton, Brian) (Entered: 04/28/2017) |
| 05/01/2017 | 125 | REPLY by Plaintiff Property Casualty Insurers Association of America to motion for leave to file, 107 (Waxman, Seth) (Entered: 05/01/2017) |
| 05/03/2017 | 126 | ORDER: Motion for leave to appear pro hac vice on behalf of Property Casualty Insurers Association of America by Brian Boynton 124 is granted. Signed by the Honorable Amy J. St. Eve on 5/3/2017. Mailed notice. (kp, ) (Entered: 05/03/2017) |
| 06/13/2017 | 127 | MINUTE entry before the Honorable Amy J. St. Eve: Status hearing set for 6/21/17 is stricken and reset to 7/12/2017 at 08:30 AM.Mailed notice (kef, ) (Entered: 06/13/2017) |
| 06/20/2017 | 128 | MINUTE entry before the Honorable Amy J. St. Eve: The Court grants in part and denies in part PCI's motion for leave to file a First Amended Complaint 107 . PCI may file a First Amended Complaint consistent with the Court's opinion by June 27, 2017. Defendants must answer or otherwise plead by July 18, 2017. [For further details, see separate Memorandum Opinion and Order.] Mailed notice (kef, ) (Entered: 06/20/2017) |
| 06/20/2017 | 129 | MEMORANDUM Opinion and Order Signed by the Honorable Amy J. St. Eve on 6/20/2017:Mailed notice(kef, ) (Entered: 06/20/2017) |
| 06/21/2017 | 130 | MINUTE entry before the Honorable Amy J. St. Eve: Status hearing set for 7/12/17 is stricken and reset to 7/19/2017 at 08:30 AM.Mailed notice (kef, ) (Entered: 06/21/2017) |
| 06/27/2017 | 131 | *FIRST* AMENDED complaint by Property Casualty Insurers Association of America against United States Department of Housing and Urban Development, Ben Carson (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Waxman, Seth) (Entered: 06/27/2017) |

| | | |
|---|---|---|
| 07/07/2017 | 132 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to set a briefing schedule *and vacate pending status hearing* (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 07/07/2017) |
| 07/10/2017 | 133 | MINUTE entry before the Honorable Amy J. St. Eve: Joint motion to set briefing schedule 132 is granted. Defendants shall produce the certified administrative record to Plaintiff on or before 8/11/17. Plaintiff shall file an opening motion for summary judgment, not to exceed 20 pages, on or before 9/8/17. Defendants shall file a combined cross-dispositive motion for summary judgment and opposition to Plaintiff's motion, not to exceed 30 pages, on or before 10/6/17. Plaintiff shall file a combined opposition to Defendants' motion and a reply in support of its own motion, not to exceed 25 pages, on or before 11/3/17. Defendants shall file a reply in support of their cross-motion, not to exceed 15 pages, on or before 11/30/17. Defendants' obligation to answer or otherwise respond to the amended complaint shall be deferred pending a ruling on the parties' dispositive motions. Status hearing set for 7/19/17 is stricken and reset to 1/31/18 at 8:30 a.m. Mailed notice (kef, ) (Entered: 07/10/2017) |
| 08/11/2017 | 134 | CERTIFIED COPY OF ADMINISTRATIVE RECORD by Defendants Ben Carson, United States Department of Housing and Urban Development (Attachments: # 1 Administrative Record (AR) Index, # 2 AR - Part 1, # 3 AR - Part 2, # 4 AR - Part 3, # 5 AR - Part 4, # 6 AR - Part 5, # 7 AR - Part 6, # 8 AR - Part 7)(Newton, Emily) (Entered: 08/11/2017) |
| 08/18/2017 | 135 | ORDER: Defendants' oral request to unseal is granted. The Clerk's Office is directed to unseal the administrative record at R. 19 and 134 . Signed by the Honorable Amy J. St. Eve on 8/18/2017. Mailed notice (lf, ) (Entered: 08/18/2017) |
| 09/08/2017 | 136 | MOTION by Plaintiff Property Casualty Insurers Association of America for summary judgment (Waxman, Seth) (Entered: 09/08/2017) |
| 09/08/2017 | 137 | MEMORANDUM by Property Casualty Insurers Association of America in support of motion for summary judgment 136 (Attachments: # 1 Rule 56.1 Statement of Undisputed Material Facts)(Waxman, Seth) (Entered: 09/08/2017) |
| 09/08/2017 | 138 | NOTICE of Motion by Seth P Waxman for presentment of motion for summary judgment 136 before Honorable Amy J. St. Eve on 9/20/2017 at 08:30 AM. (Waxman, Seth) (Entered: 09/08/2017) |
| 09/19/2017 | 139 | MINUTE entry before the Honorable Amy J. St. Eve: A briefing schedule having already previously been set, notice of motion date of 9/20/17 on plaintiff's motion for summary judgment 136 is stricken. Mailed notice (kef, ) (Entered: 09/19/2017) |
| 09/27/2017 | 140 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development for extension of time *to file Defendants' cross-motion for summary judgment and opposition to Plaintiff's motion for summary judgment* (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 09/27/2017) |
| 09/28/2017 | 141 | MINUTE entry before the Honorable Amy J. St. Eve: Unopposed motion to extend summary judgment deadline 140 is granted. The Court hereby stays the |

| | | case for 60 days to enable the government to confer with the appropriate officials within the Executive Branch. Defendants shall file a combined cross-dispositive motion for summary judgment and opposition to Plaintiff's motion, not to exceed 30 pages, on or before 12/5/17. Plaintiff shall file a combined opposition to Defendants' motion and a reply in support of its own motion, not to exceed 25 pages, on or before 1/19/18. Defendants shall file a reply in support of their cross-motion, not to exceed 15 pages, on or before 2/15/18. Status hearing set for 1/31/18 is stricken and reset to 4/17/18 at 8:30 a.m. Mailed notice (kef, ) (Entered: 09/28/2017) |
|---|---|---|
| 12/04/2017 | 142 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to continue *the current stay of this case for an additional 60 days* (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 12/04/2017) |
| 12/11/2017 | 143 | NOTICE of Motion by Emily Sue Newton for presentment of motion to continue 142 before Honorable Amy J. St. Eve on 1/10/2018 at 08:30 AM. (Newton, Emily) (Entered: 12/11/2017) |
| 12/18/2017 | 144 | MINUTE entry before the Honorable Amy J. St. Eve: Defendants' motion to continue the current stay of this case for an additional 60 days 142 is granted. Plaintiff's motion for summary judgment 136 is denied without prejudice to refile if HUD decides to pursue the issue. Given that Plaintiff filed the motion on 9/8/17 and given the parties' requested delay, the Court will provide Plaintiff with the opportunity to file a new motion with updated law. Status hearing set for 4/17/18 is stricken and reset to 2/1/18 at 8:30 a.m. No appearance is required on the 1/10/18 notice motion date. Mailed notice (kef, ) (Entered: 12/18/2017) |
| 12/21/2017 | 145 | Notice by Ben Carson, United States Department of Housing and Urban Development (Newton, Emily) (Entered: 12/21/2017) |
| 01/19/2018 | 146 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to continue *the stay in this case for 60 days* (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 01/19/2018) |
| 01/19/2018 | 147 | NOTICE of Motion by Emily Sue Newton for presentment of motion to continue 146 before Honorable Amy J. St. Eve on 1/25/2018 at 08:30 AM. (Newton, Emily) (Entered: 01/19/2018) |
| 01/22/2018 | 148 | MINUTE entry before the Honorable Amy J. St. Eve: Defendants' motion to continue the current stay of this case for an additional 60 days 146 is granted. The stay of this case is extended to 4/3/18 at which time the parties shall file a joint status report, informing the Court of any updates relevant to this matter. Status hearing set for 2/1/18 is stricken and reset to 4/9/18 at 8:30 a.m. No appearance is required on the 1/25/18 notice motion date. Mailed notice (kef, ) (Entered: 01/22/2018) |
| 03/01/2018 | 149 | MINUTE entry before the Honorable Amy J. St. Eve: Status hearing set for 4/9/18 is stricken and reset to 4/12/2018 at 08:30 AM.Mailed notice (kef, ) (Entered: 03/01/2018) |

| | | |
|---|---|---|
| 04/03/2018 | 150 | MOTION by Plaintiff Property Casualty Insurers Association of America to stay regarding terminate hearings, set/reset hearings 149 , order on motion to continue,, terminate deadlines and hearings,, set/reset hearings, 148 *(and Joint Status Report)* (Attachments: # 1 Proposed Order)(Waxman, Seth) (Entered: 04/03/2018) |
| 04/03/2018 | 151 | NOTICE of Motion by Seth P Waxman for presentment of motion to stay, 150 before Honorable Amy J. St. Eve on 4/10/2018 at 08:30 AM. (Waxman, Seth) (Entered: 04/03/2018) |
| 04/09/2018 | 152 | *Unopposed* MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development for leave to appear as counsel telephonically *Unopposed* (Attachments: # 1 Text of Proposed Order, # 2 Notice of Filing) (Newton, Emily) (Entered: 04/09/2018) |
| 04/10/2018 | 153 | MINUTE entry before the Honorable Amy J. St. Eve: Defendants' motion for leave to appear telephonically 152 is granted. The Court will call Ms. Newton at the telephone number listed on the docket.Mailed notice (kef, ) (Entered: 04/10/2018) |
| 04/10/2018 | 154 | MINUTE entry before the Honorable Amy J. St. Eve: Motion hearing held on 4/10/2018. Motion to continue the stay in this case 150 is granted. The stay is continued until 5/10/18 at which time the parties shall file a joint status report informing the Court of any updates. Status hearing set for 4/12/18 is stricken and reset to 5/15/18 at 8:30 a.m. Mailed notice (kef, ) (Entered: 04/10/2018) |
| 05/10/2018 | 155 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to continue *the current stay & vacate the status hearing* (Attachments: # 1 Text of Proposed Order, # 2 Notice of Filing) (Newton, Emily) (Entered: 05/10/2018) |
| 05/14/2018 | 156 | MINUTE entry before the Honorable Amy J. St. Eve: Joint motion to continue the stay in the case and vacate the status hearing 155 is granted. The Court hereby stays the case until 6/25/18. The parties shall file a joint status report on 6/25/18. Status hearing and notice of motion date of 5/15/18 are stricken. Mailed notice (kef, ) (Entered: 05/14/2018) |
| 05/23/2018 | 157 | EXECUTIVE COMMITTEE ORDER: It appearing that cases previously assigned to the Honorable Amy J. St. Eve requires reassignment; therefore It is hereby ordered that the cases on the attached list are to be reassigned to the other judges of this Court as indicated, pursuant to Local Rule 40.1(f) within the guidelines of IOP 16. Case reassigned to the Honorable Rebecca R. Pallmeyer for all further proceedings. Honorable Amy J. St. Eve no longer assigned to the case. Signed by Executive Committee on 5/23/2018. (bg, ) (Entered: 05/23/2018) |
| 05/25/2018 | 158 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: This case has been reassigned from Judge St. Eve. The court adopts Judge St. Eve's previous order and directs that the parties submit their joint status report on or before 6/25/2018. Mailed notice. (etv, ) (Entered: 05/25/2018) |
| 06/25/2018 | 159 | MOTION by Plaintiff Property Casualty Insurers Association of America to stay *(Joint Status Report and Motion To Continue Stay)* (Attachments: # 1 Notice of Filing, # 2 Text of Proposed Order)(Waxman, Seth) (Entered: |

| | | |
|---|---|---|
| | | 06/25/2018) |
| 06/26/2018 | 160 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Joint status report and motion to continue stay 159 is granted to and including 10/19/2018, at which time the parties shall file a joint status report, without an appearance. Status hearing set for 10/25/2018 at 9:00 AM. Mailed notice. (etv, ) (Entered: 06/26/2018) |
| 07/06/2018 | 161 | MOTION by Attorney Peter A. Gabrielli to withdraw as attorney for Property Casualty Insurers Association of America. No party information provided (Waxman, Seth) (Entered: 07/06/2018) |
| 07/10/2018 | 162 | ORDER: Motion of withdrawal of Attorney Peter A. Gabrielli 161 is granted without an appearance. Signed by the Honorable Rebecca R. Pallmeyer on 7/10/2018. Mailed notice (lf, ) (Entered: 07/11/2018) |
| 08/08/2018 | 163 | WITHDRAWING *Daniel Mosteller* as counsel for Defendants Ben Carson, United States Department of Housing and Urban Development and substituting Emily Sue Newton as counsel of record (Newton, Emily) (Entered: 08/08/2018) |
| 08/15/2018 | 164 | ATTORNEY Appearance for Amicus Chicago Lawyers' Committee for Civil Rights Under Law, Inc. by Aneel Lachman Chablani (Chablani, Aneel) (Entered: 08/15/2018) |
| 08/15/2018 | 165 | WITHDRAWING *Elizabeth Shuman-Moore and Ruth Greenwood* as counsel for Amicus Chicago Lawyers' Committee for Civil Rights Under Law, Inc. and substituting Aneel Lachman Chablani as counsel of record (Chablani, Aneel) (Entered: 08/15/2018) |
| 10/19/2018 | 166 | STATUS Report by Ben Carson, United States Department of Housing and Urban Development (Attachments: # 1 Notice of Filing, # 2 Text of Proposed Order)(Newton, Emily) (Entered: 10/19/2018) |
| 10/19/2018 | | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development, Plaintiff Property Casualty Insurers Association of America to continue stay (Omitted Relief from motion 166 ) (sxb, ) (Entered: 10/22/2018) |
| 10/23/2018 | 167 | NOTICE of Motion by Emily Sue Newton for presentment of motion to continue before Honorable Rebecca R. Pallmeyer on 10/25/2018 at 08:30 AM. (Newton, Emily) (Entered: 10/23/2018) |
| 10/23/2018 | 168 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Parties' joint motion to continue stay and to vacate the status hearing is granted, without an appearance. Status hearing set for 10/25/2018 is stricken and re-set to 12/18/2018 at 9:00 AM. Mailed notice. (etv, ) (Entered: 10/23/2018) |
| 12/11/2018 | 169 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay (Attachments: # 1 Text of Proposed Order) (Newton, Emily) (Entered: 12/11/2018) |
| 12/11/2018 | 170 | NOTICE of Motion by Emily Sue Newton for presentment of motion to stay 169 before Honorable Rebecca R. Pallmeyer on 12/13/2018 at 08:45 AM. (Newton, Emily) (Entered: 12/11/2018) |

| 12/11/2018 | | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to vacate status hearing. (Omitted Relief from Motion 169 ). (smm, ) (Entered: 12/12/2018) |
|---|---|---|
| 12/12/2018 | 171 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Joint motion to continue stay and vacate status hearing 169 is granted without an appearance. Status hearing set for 12/18/2018 is stricken. The parties are directed to submit a written status report on 2/1/2019. Mailed notice. (etv, ) (Entered: 12/12/2018) |
| 03/14/2019 | 172 | STATUS Report by Ben Carson, United States Department of Housing and Urban Development (Newton, Emily) (Entered: 03/14/2019) |
| 03/15/2019 | 173 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Parties are directed to provide a joint status report as proposed in their report, on or before May 13, 2019. Mailed notice. (etv, ) (Entered: 03/15/2019) |
| 05/06/2019 | 174 | MOTION by Attorney Anuradha Sivaram to withdraw as attorney for Property Casualty Insurers Association of America. No party information provided (Waxman, Seth) (Entered: 05/06/2019) |
| 05/08/2019 | 175 | ORDER : Motion for withdrawal of Anuradha Sivaram 174 is granted. Signed by the Honorable Rebecca R. Pallmeyer on 5/8/2019. Mailed notice. (ek, ) (Entered: 05/09/2019) |
| 05/13/2019 | 176 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 05/13/2019) |
| 05/17/2019 | 177 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' suggestion, the court directs that the stay will remain in effect. Further joint written status report to be submitted on or before June 12, 2019. Mailed notice. (etv, ) (Entered: 05/17/2019) |
| 06/12/2019 | 178 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 06/12/2019) |
| 06/14/2019 | 179 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' request, this case remains stayed until July 12, 2019. On that date, the parties will file a joint status report proposing next steps for resolution. Mailed notice. (etv, ) (Entered: 06/14/2019) |
| 06/18/2019 | 180 | MOTION by Attorney Roger L. Smerage to withdraw as attorney for The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association. No party information provided (Smerage, Roger) (Entered: 06/18/2019) |
| 06/19/2019 | 181 | ORDER: Motion of Roger L. Smerage to withdraw 180 as counsel for Defendants is granted. Signed by the Honorable Rebecca R. Pallmeyer on 6/19/2019. Mailed notice(pk, ) (Entered: 06/20/2019) |
| 07/02/2019 | 182 | ATTORNEY Appearance for Amicus State of Oklahoma ex rel John D. Doak by Daniel J. Mohan (Mohan, Daniel) (Entered: 07/02/2019) |
| 07/02/2019 | 183 | WITHDRAWING *Kevin W. Baldwin* as counsel for Amicus State of Oklahoma ex rel John D. Doak and substituting Daniel J. Mohan as counsel of record (Mohan, Daniel) (Entered: 07/02/2019) |

| 07/11/2019 | 184 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 07/11/2019) |
|---|---|---|
| 07/26/2019 | 185 | ATTORNEY Appearance for Amicus State of Oklahoma ex rel John D. Doak by Kerry Mohan (Mohan, Kerry) (Entered: 07/26/2019) |
| 08/12/2019 | 186 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 08/12/2019) |
| 08/13/2019 | 187 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' joint request, the stay of this case remains in effect until September 11, 2019. On that date, the parties will file a joint staus report on the expected timing of further action by HUD and proposed next steps. Mailed notice (mw, ) (Entered: 08/13/2019) |
| 09/11/2019 | 188 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 09/11/2019) |
| 09/12/2019 | 189 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' joint request, the stay of this case remains in effect until November 18, 2019. On that date, the parties will file a joint status report on the expected timing of further action by HUD and proposed next steps. Notice mailed by judge's staff (ntf, ) (Entered: 09/12/2019) |
| 11/18/2019 | 190 | STATUS Report by Ben Carson, United States Department of Housing and Urban Development (Newton, Emily) (Entered: 11/18/2019) |
| 11/19/2019 | 191 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' joint request, the stay of this case remains in effect until January 17, 2020. On that date, the parties will file a joint status report on the expected timing of further action by HUD and proposed next steps. Notice mailed by judge's staff (ntf, ) (Entered: 11/19/2019) |
| 01/17/2020 | 192 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 01/17/2020) |
| 01/21/2020 | 193 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' joint request, the stay of this case remains in effect until March 17, 2020. On that date, the parties will file a joint status report on the expected timing of further action by HUD and proposed next steps. Notice mailed by judge's staff (ntf, ) (Entered: 01/21/2020) |
| 03/17/2020 | 194 | STATUS Report by Ben Carson, United States Department of Housing and Urban Development (Newton, Emily) (Entered: 03/17/2020) |
| 03/18/2020 | 195 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' joint request, the stay of this case remains in effect until May 18, 2020. On that date, the parties will file a joint status report on the expected timing of further action by HUD and proposed next steps. Notice mailed by judge's staff (ntf, ) (Entered: 03/18/2020) |
| 05/18/2020 | 196 | STATUS Report by Ben Carson, United States Department of Housing and Urban Development (Newton, Emily) (Entered: 05/18/2020) |
| 05/26/2020 | 197 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court thanks the parties for their recent status report and requests a further status report, as |

|  |  | proposed, on or before July 17, 2020. Notice mailed by judge's staff (ntf, ) (Entered: 05/26/2020) |
|---|---|---|
| 07/17/2020 | 198 | STATUS Report by Ben Carson, United States Department of Housing and Urban Development (Newton, Emily) (Entered: 07/17/2020) |
| 07/20/2020 | 199 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court has reviewed the parties' July 17, 2020 report and extends the stay now in effect, but only until August 5, 2020. The parties are directed to submit a further joint written status report on or before August 14, 2020. Notice mailed by judge's staff (ntf, ) (Entered: 07/20/2020) |
| 08/14/2020 | 200 | STATUS Report *(Joint)* by Property Casualty Insurers Association of America (Boynton, Brian) (Entered: 08/14/2020) |
| 08/17/2020 | 201 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court acknowledges receipt of the parties' joint status report. After consideration, the court agrees with Plaintiff that because after many months HUD has not yet adopted a new rule, the parties should proceed with summary judgment briefing in this case. Plaintiff has leave to renew its motion for summary judgment and submit that motion, with supporting memorandum, on or before September 23, 2020. Defendant's combined opposition to Plaintiff's motion for summary judgment and cross-motion for summary judgment to be filed on or before October 21, 2020. Plaintiff's combined opposition to Defendants' cross-motion for summary judgment, and reply brief in support of Plaintiff's own motion, to be filed on or before November 11. Defendants' reply brief in support of their cross-motion for summary judgment shall be filed on or before November 30, 2020. The court will set oral argument by telephone on 12/15/2020 at 9:30 a.m. Members of the public and media will be able to call in to listen to this hearing. The call-in number is 877-336-1839 and the access code is 6708061. Counsel of record will receive an email 10 minutes prior to the start of the telephonic hearing with instructions to join the call. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Notice mailed by judge's staff (ntf, ) (Entered: 08/17/2020) |
| 09/14/2020 | 202 | Notice & Request to Vacate Summary Judgment Schedule by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 09/14/2020) |
| 09/15/2020 | 203 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: On September 3, 2020, HUD issued a final rule, and the parties have moved jointly that the court vacate the summary judgment schedule. The motion 202 is granted. The court vacates the summary judgment schedule entered on 8/17/2020. Parties will submit a joint written status report on or before December 14, 2020, proposing next steps for resolution of this case. Notice mailed by judge's staff (ntf, ) (Entered: 09/15/2020) |
| 12/14/2020 | 204 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 12/14/2020) |

| 12/15/2020 | 205 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: As proposed in the parties' joint status report, the case remains stayed for 60 days. Parties are directed to submit a further joint written status report on or before February 12, 2021. Notice mailed by judge's staff (ntf, ) (Entered: 12/15/2020) |
|---|---|---|
| 01/19/2021 | 206 | NOTICE by Property Casualty Insurers Association of America *(of Withdrawal of Counsel)* (Boynton, Brian) (Entered: 01/19/2021) |
| 01/19/2021 | 207 | NOTICE by Property Casualty Insurers Association of America *(of Withdrawal of Counsel)* (Waxman, Seth) (Entered: 01/19/2021) |
| 02/03/2021 | 208 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-17892012. (Carroll, Catherine) (Entered: 02/03/2021) |
| 02/03/2021 | 209 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-17892077. (Sivaram, Anuradha) (Entered: 02/03/2021) |
| 02/03/2021 | 210 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-17892121. (Katsampes, Athena) (Entered: 02/03/2021) |
| 02/04/2021 | 211 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motions for leave to appear pro hac vice 208 , 209 , and 210 is granted. Attorneys Catherine M.A. Carroll, Athena L. Katsampes, and Anuradha Sivaram are given leave to file appearance forms on behalf of Plaintiff. Notice mailed by judge's staff (ntf, ) (Entered: 02/04/2021) |
| 02/12/2021 | 212 | STATUS Report *(Joint)* by Property Casualty Insurers Association of America (Carroll, Catherine) (Entered: 02/12/2021) |
| 02/16/2021 | 213 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' joint request, the stay of this case remains in effect until April 15, 2021. On that date, the parties will file a joint status report on the expected timing of further action by HUD and proposed next steps. Notices mailed by judge's staff (ntf, ) (Entered: 02/16/2021) |
| 04/15/2021 | 214 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 04/15/2021) |
| 04/23/2021 | 215 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Telephone status hearing set for 4/28/2021 at 9:45 a.m. Members of the public and media will be able to call in to listen to this hearing. Instructions and a link to the conference number are located on Judge Pallmeyer's website. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Notice mailed by judge's staff (ntf, ) (Entered: 04/23/2021) |
| 04/28/2021 | 216 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Telephone status hearing held. The court adopts the schedule proposed by the parties in their status report: Plaintiff's renewed motion for summary judgment shall be filed on or before May 28, 2021; Defendants' opposition and cross-motion for summary judgment shall be filed by June 25, 2021; Plaintiff's combined opposition to Defendants' cross-motion and reply brief in support of Plaintiff's motion for |

| | | |
|---|---|---|
| | | summary judgment shall be filed by July 16, 2021; Defendants' reply brief in support of their cross-motion for summary judgment shall be filed by July 30, 2021. Notice mailed by judge's staff (ntf, ) (Entered: 04/28/2021) |
| 05/27/2021 | 217 | MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file excess pages *(consent)*, MOTION by Plaintiff Property Casualty Insurers Association of America to Extend Briefing Deadlines in this Case *(consent)* (Waxman, Seth) (Entered: 05/27/2021) |
| 05/27/2021 | 218 | ATTORNEY Appearance for Plaintiff Property Casualty Insurers Association of America by Alyssa Marie Gregory (Gregory, Alyssa) (Entered: 05/27/2021) |
| 05/28/2021 | 219 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion 217 is granted. PCI has leave to file a memorandum in support of its motion for summary judgment of up to 25 pages and an accompanying statement of undisputed material facts of up to 100 numbered paragraphs. Defendants have leave to file an opposition brief of up to 35 pages and statement of additional facts of up to 100 numbered paragraphs. Briefing schedule is amended as follows: PCI's motion and reply brief in support of its summary judgment motion shall be filed by July 30, 2021, and Defendants' reply brief in support of its cross-motion for summary judgment shall be filed by August 13, 2021. Notice mailed by judge's staff (ntf, ) (Entered: 05/28/2021) |
| 05/28/2021 | 220 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Minute entry dated 5/28/2021 219 is amended as follows: Briefing schedule is amended as follows: Defendants' opposition and cross-motion for summary judgment shall be filed by July 9, 2021. Remainder of order to stand. Notice mailed by judge's staff (ntf, ) (Entered: 05/28/2021) |
| 05/28/2021 | 221 | MOTION by Plaintiff Property Casualty Insurers Association of America for summary judgment *(Renewed)* (Waxman, Seth) (Entered: 05/28/2021) |
| 05/28/2021 | 222 | MEMORANDUM by Property Casualty Insurers Association of America in support of motion for summary judgment 221 (Attachments: # 1 Statement of Undisputed Material Facts, # 2 Declaration of Seth P. Waxman, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8)(Waxman, Seth) (Entered: 05/28/2021) |
| 06/01/2021 | 223 | NOTICE OF WITHDRAWAL OF APPEARANCE by Property Casualty Insurers Association of America *of Ashlee M. Knuckey* (Knuckey, Ashlee) (Entered: 06/01/2021) |
| 06/17/2021 | 224 | ATTORNEY Appearance for Defendants Ben Carson, United States Department of Housing and Urban Development by Vinita Balakrishnan Andrapalliyal (Andrapalliyal, Vinita) (Entered: 06/17/2021) |
| 06/28/2021 | 225 | MOTION by Amicus Chicago Lawyers' Committee for Civil Rights Under Law, Inc. for leave to file *Amicus Curiae Brief* (Chablani, Aneel) (Entered: 06/28/2021) |
| 06/29/2021 | 226 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay *proceedings for 90 days* (Attachments: # 1 Text of Proposed Order)(Andrapalliyal, Vinita) (Entered: 06/29/2021) |

| 06/29/2021 | 227 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The Court adopts the parties proposed briefing schedule on Defendants' motion to stay proceedings for 90 days 226 as follows: Plaintiff's response in opposition shall be filed by 07/02/2021; Defendant's reply in support of its motion shall be filed by 07/06/2021. Notices mailed by judge's staff. (rbf, ) (Entered: 06/29/2021) |
|---|---|---|
| 06/29/2021 | 228 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The Unopposed Motion for Leave to File a Brief Amicus Curiae 225 is granted. Notices mailed by judge's staff. (rbf, ) (Entered: 06/29/2021) |
| 07/02/2021 | 229 | RESPONSE by Property Casualty Insurers Association of Americain Opposition to MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay *proceedings for 90 days* 226 (Waxman, Seth) (Entered: 07/02/2021) |
| 07/06/2021 | 230 | REPLY by Ben Carson, Shaun Donovan, United States Department of Housing and Urban Development to response in opposition to motion 229 , MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay *proceedings for 90 days* 226 (Andrapalliyal, Vinita) (Entered: 07/06/2021) |
| 07/09/2021 | 231 | MOTION by Defendants United States Department of Housing and Urban Development, Shaun Donovan, Ben Carson for summary judgment (Andrapalliyal, Vinita) (Entered: 07/09/2021) |
| 07/09/2021 | 232 | MEMORANDUM by Ben Carson, Shaun Donovan, United States Department of Housing and Urban Development *in Support of Motion for Summary Judgment, in Opposition to Plaintiff's Motion for Summary Judgment* (Attachments: # 1 Statement of Facts, # 2 Response to Plaintiff's Statement of Facts, # 3 Text of Proposed Order)(Andrapalliyal, Vinita) (Entered: 07/09/2021) |
| 07/16/2021 | 233 | Brief of Amicus Curiae ACLU, ACLU-IL, CAFHA, CLCCR, LCCRUL, LDF, NCLC and NFHA by Chicago Lawyers' Committee for Civil Rights Under Law, Inc. (Chablani, Aneel) (Entered: 07/16/2021) |
| 07/16/2021 | 234 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-18466800. (Akselrod, Olga) (Entered: 07/16/2021) |
| 07/23/2021 | 235 | NOTICE by Property Casualty Insurers Association of America *(of Withdrawal of Counsel)* (Katsampes, Athena) (Entered: 07/23/2021) |
| 07/23/2021 | 236 | MOTION by Defendant United States Department of Housing and Urban Development for extension of time (Newton, Emily) (Entered: 07/23/2021) |
| 07/26/2021 | 237 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion 236 is granted. Date for filing of PCI's reply brief is extended to August 6, 2021. Date for Defendants' reply brief is extended to August 20, 2021. Olga Akselrod's motion for leave to appear pro hac vice 234 is granted. Attorney Olga Akselrod is granted leave to file her appearance on behalf of the American Civil Liberties Union Foundation. Mailed notice. (rbf, ) (Entered: 07/26/2021) |
| 08/05/2021 | 238 | MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file *an Overlength Combined Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment (Unopposed)* (Waxman, Seth) (Entered: 08/05/2021) |

| | | |
|---|---|---|
| 08/06/2021 | 239 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion for leave to file an overlength combined opposition to defendants' cross-motion for summary judgment and rely in support of plaintiff's motion for summary judgment 238 is granted. Mailed notice. (rbf, ) (Entered: 08/06/2021) |
| 08/06/2021 | 240 | MEMORANDUM by Property Casualty Insurers Association of America in Opposition to motion for summary judgment 231 *and Reply in Support of its Motion for Summary Judgment 221* (Attachments: # 1 Response to Defendants' Statement of Undisputed Material Facts)(Waxman, Seth) (Entered: 08/06/2021) |
| 08/10/2021 | 241 | ATTORNEY Appearance for Amicus American Civil Liberties Union of Illinois by Nusrat Jahan Choudhury (Choudhury, Nusrat) (Entered: 08/10/2021) |
| 08/19/2021 | 242 | ATTORNEY Appearance for Amicus American Civil Liberties Union Foundation by Olga Akselrod (Akselrod, Olga) (Entered: 08/19/2021) |
| 08/19/2021 | 243 | MOTION by Defendant United States Department of Housing and Urban Development for leave to file excess pages (Newton, Emily) (Entered: 08/19/2021) |
| 08/20/2021 | 244 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The motion for leave to file excess pages 243 is granted. Defendants have leave to file a reply brief of 20 pages. Notices mailed. (psm, ) (Entered: 08/20/2021) |
| 08/20/2021 | 245 | REPLY by Defendant United States Department of Housing and Urban Development to motion for summary judgment 231 (Newton, Emily) (Entered: 08/20/2021) |
| 01/03/2022 | 246 | MOTION by Attorney Emily Sue Newton to withdraw as attorney for United States Department of Housing and Urban Development. No party information provided (Newton, Emily) (Entered: 01/03/2022) |
| 01/04/2022 | 247 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion by attorney Emily Sue Newton to withdraw as attorney for United States Department of Housing and Urban Development 246 is granted. Attorney Emily Sue Newton terminated. (rbf, ) (Entered: 01/04/2022) |
| 02/25/2022 | 248 | ORDER: In light of HUD's impending rulemaking, Plaintiff's and Defendants' motions for summary judgment 221 , 231 are stricken without prejudice to renewal on August 24, 2022. On or before that date, Defendants are instructed to update the court on HUD's proposed reinstatement of its 2013 disparate impact rule. Signed by the Honorable Rebecca R. Pallmeyer on 2/25/2022. Mailed notice(mjc, ) (Entered: 02/25/2022) |
| 08/24/2022 | 249 | STATUS Report *(Joint)* by Ben Carson, United States Department of Housing and Urban Development (Andrapalliyal, Vinita) (Entered: 08/24/2022) |
| 08/25/2022 | 250 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court thanks the parties for their recent status report. The report notes that HUD is reviewing some 10,000 comments it received in response to its Notice of Proposed Rulemaking specifically, the proposed Reinstatement of HUD's Discriminatory Effects Standard." The court agrees with Defendants that requiring them to respond to the briefing in this case while at the same time reconsidering the rule under challenge is problematic. The court also agrees, however, that the agency's stated plan to "publish[] a final rule later this year" is frustratingly |

|  |  | vague. For the reasons set forth in its February 25, 2022 order, the court will continue the stay of this case for another 90 days. Absent promulgation of a new rule by November 28, 2022, the court will lift the stay and proceed with briefing concerning the 2013 rule. Mailed notice. (cp, ) (Entered: 08/25/2022) |
|---|---|---|
| 08/29/2022 | 251 | MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file *Notice of Supplemental Authority* (Attachments: # 1 Notice of Supplemental Authority)(Waxman, Seth) (Entered: 08/29/2022) |
| 09/02/2022 | 252 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court acknowledges Plaintiff's Notice of Supplemental Authority 251 and directs the Defendants to file their response, if any, no more than five pages in length, on or before September 15, 2022. Mailed notice. (cp, ) (Entered: 09/02/2022) |
| 09/15/2022 | 253 | RESPONSE by Ben Carson, Shaun Donovan, United States Department of Housing and Urban Development to MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file *Notice of Supplemental Authority* 251 (Andrapalliyal, Vinita) (Entered: 09/15/2022) |
| 09/16/2022 | 254 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court acknowledges the government's response to Plaintiff's supplemental authority 253 and grants Plaintiff's motion for leave to file that authority 251 . Mailed notice. (cp, ) (Entered: 09/16/2022) |
| 11/23/2022 | 255 | ATTORNEY Appearance for Defendants Ben Carson, United States Department of Housing and Urban Development by James D Todd, Jr (Todd, James) (Entered: 11/23/2022) |
| 11/23/2022 | 256 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay regarding text entry,,, 250 , *Unopposed, for Another 30 Days in light of Defendants' Status Report* (Attachments: # 1 Text of Proposed Order)(Todd, James) (Entered: 11/23/2022) |
| 11/28/2022 | 257 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's unopposed motion to continue the stay of this case 256 is granted. Parties are directed to file a further status report on or before December 30, 2022. Mailed notice. (cp, ) (Entered: 11/28/2022) |
| 12/29/2022 | 258 | ANNUAL REMINDER: Pursuant to Local Rule 3.2 (Notification of Affiliates), any nongovernmental party, other than an individual or sole proprietorship, must file a statement identifying all its affiliates known to the party after diligent review or, if the party has identified no affiliates, then a statement reflecting that fact must be filed. An affiliate is defined as follows: any entity or individual owning, directly or indirectly (through ownership of one or more other entities), 5% or more of a party. The statement is to be electronically filed as a PDF in conjunction with entering the affiliates in CM/ECF as prompted. As a reminder to counsel, parties must supplement their statements of affiliates within thirty (30) days of any change in the information previously reported. This minute order is being issued to all counsel of record to remind counsel of their obligation to provide updated information as to additional affiliates if such updating is necessary. If counsel has any questions regarding this process, this LINK will provide additional information. Signed by the Executive Committee on 12/29/2022: Mailed notice. (tg, ) (Entered: 12/29/2022) |

| | | |
|---|---|---|
| 12/30/2022 | 259 | STATUS Report , *Joint* by Ben Carson, United States Department of Housing and Urban Development (Todd, James) (Entered: 12/30/2022) |
| 01/03/2023 | 260 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court has reviewed the parties' joint written status report. Defendant reports that on December 7, 2022, HUD transmitted the final rule to the Office of Management and Budget ("OMB") and requested expedited review. Defendant requests that the court continue the stay of this case "for another 30 days or until HUD's final rule is published in the Federal Register (whichever is sooner)" but only for purposes, at that time, of a further status report. Plaintiff asserts that as "HUD intends to reinstate the 2013 Rule," there is no reason for further delay, and the court can and should reinstate the parties' cross-motions for summary judgment. Defendant does not challenge the assertion that the likely result of further administrative process is reinstatement of the Rule that was the subject of Plaintiff's initial challenge. Within 14 days, Defendant's counsel is directed to advise the court whether they have a good-faith belief that the final rule will differ meaningfully from the 2013 Rule and, if so, the basis for that belief. Absent such a communication, the court will lift the stay, reinstate the parties' motions, and proceed to a hearing or ruling. Mailed notice. (cp, ) (Entered: 01/03/2023) |
| 01/12/2023 | 261 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay regarding text entry,,,,, 260 *and Status Report* (Attachments: # 1 Text of Proposed Order)(Todd, James) (Entered: 01/12/2023) |
| 01/19/2023 | 262 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff to file its response to defendant's motion to stay 261 by 1/24/2023. Defendants to reply by 1/31/2023. Mailed notice. (cp, ) (Entered: 01/19/2023) |
| 01/24/2023 | 263 | NOTICE by Seth P Waxman of Change of Address (Waxman, Seth) (Entered: 01/24/2023) |
| 01/24/2023 | 264 | NOTICE by Catherine M.A. Carroll of Change of Address (Carroll, Catherine) (Entered: 01/24/2023) |
| 01/24/2023 | 265 | NOTICE by Anuradha Sivaram of Change of Address (Sivaram, Anuradha) (Entered: 01/24/2023) |
| 01/24/2023 | 266 | RESPONSE by Property Casualty Insurers Association of Americain Opposition to MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay regarding text entry,,,,, 260 *and Status Report* 261 (Waxman, Seth) (Entered: 01/24/2023) |
| 01/30/2023 | 267 | MOTION by Attorney Anuradha Sivaram to withdraw as attorney for Property Casualty Insurers Association of America. No party information provided (Sivaram, Anuradha) (Entered: 01/30/2023) |
| 01/31/2023 | 268 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Attorney Anuradha Sivaram's motion to withdraw as counsel for Plaintiff 267 is granted. Mailed notice (cn). (Entered: 01/31/2023) |
| 01/31/2023 | 269 | REPLY by Ben Carson, United States Department of Housing and Urban Development to response in opposition to motion, 266 , MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay regarding text entry,,,,, 260 *and Status Report* 261 (Todd, |

|            |     | James) (Entered: 01/31/2023) |
|------------|-----|------------------------------|
| 03/17/2023 | 270 | STATUS Report by Ben Carson, United States Department of Housing and Urban Development (Todd, James) (Entered: 03/17/2023) |
| 03/20/2023 | 271 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court thanks counsel for the recent status report 270 and invites parties to submit a proposed agreed briefing schedule or written status report on or before April 27, 2023. Mailed notice. (cp, ) (Entered: 03/20/2023) |
| 04/27/2023 | 272 | STATUS Report *(Joint)* by Property Casualty Insurers Association of America (Waxman, Seth) (Entered: 04/27/2023) |
| 04/28/2023 | 273 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court thanks the parties for their recent status report 272 and, at their request, enters the following schedule: Plaintiff has leave to file its Second Amended Complaint on or before May 3, 2023. Defendants' answer is due on May 31, 2023. Plaintiff will file its motion for summary judgment on June 28, 2023. Defendants' combined memorandum in opposition to summary judgment and cross-motion for summary judgment will be filed on August 9, 2023. Plaintiff's combined opposition to Defendant's motion and reply in support of its own motion to be filed on August 30, 2023. Defendant's reply in support of its own motion for summary judgment will be filed on September 20, 2023. On September 29, 2023, the parties will file their joint excerpts from the administrative record. Defendants' motion to stay 261 is stricken as moot. Mailed notice. (cp, ) (Entered: 04/28/2023) |
| 05/03/2023 | 274 | *SECOND* AMENDED complaint by Property Casualty Insurers Association of America against Ben Carson, United States Department of Housing and Urban Development (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Waxman, Seth) (Entered: 05/03/2023) |
| 05/26/2023 | 275 | MOTION by Defendants Marcia L. Fudge, United States Department of Housing and Urban Development to stay regarding amended complaint, 274 *Defendants' Deadline to Answer*<br><br>(Attachments: # 1 Text of Proposed Order)(Todd, James) (Entered: 05/26/2023) |
| 05/30/2023 | 276 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's unopposed motion to stay deadline to respond to plaintiff's second amended complaint 275 is granted. Defendant's deadline to respond to plaintiff's second amended complaint is stayed until after the court resolves the parties' respective summary judgment motions. If the Court denies both summary judgment motions, defendants will respond to plaintiff's second amended complaint 14 days after any such decision. Mailed notice. (cp, ) (Entered: 05/30/2023) |
| 06/12/2023 | 277 | ATTORNEY Appearance for Amicus American Civil Liberties Union of Illinois by Ameri Rose Klafeta (Klafeta, Ameri) (Entered: 06/12/2023) |
| 06/12/2023 | 278 | MOTION by Attorney Nusrat Jahan Choudhury to withdraw as attorney for American Civil Liberties Union of Illinois. No party information provided<br><br>(Choudhury, Nusrat) (Entered: 06/12/2023) |

| 06/13/2023 | 279 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion to withdraw appearance 278 is granted; Attorney Nusrat Jahan Choudhury is terminated as counsel for American Civil Liberties Union of Illinois. Mailed notice. (cp, ) (Entered: 06/13/2023) |
|---|---|---|
| 06/26/2023 | 280 | MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file excess pages *(Consent)* <br><br>(Waxman, Seth) (Entered: 06/26/2023) |
| 06/27/2023 | 281 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Consent Motion for leave to file an overlength brief and overlength statement of undisputed material facts 280 is granted, as to the page lengths stated in the motion. Mailed notice. (cp, ) (Entered: 06/27/2023) |
| 06/28/2023 | 282 | MOTION by Plaintiff Property Casualty Insurers Association of America for summary judgment *(Renewed)* <br><br>(Attachments: # 1 Text of Proposed Order)(Waxman, Seth) (Entered: 06/28/2023) |
| 06/28/2023 | 283 | MEMORANDUM by Property Casualty Insurers Association of America in support of motion for summary judgment 282 (Attachments: # 1 Statement of Undisputed Material Facts, # 2 Declaration of Seth P. Waxman, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13)(Waxman, Seth) (Entered: 06/28/2023) |
| 08/01/2023 | 284 | MOTION by Defendants Marcia L. Fudge, United States Department of Housing and Urban Development to set a briefing schedule , *Amended* <br><br>(Attachments: # 1 Text of Proposed Order)(Todd, James) (Entered: 08/01/2023) |
| 08/02/2023 | 285 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion to re-set briefing schedule 284 is granted. As proposed, Defendants will file their combined: (i) opposition to Plaintiff's summary judgment motion. (ii) brief in support of Defendants' summary judgment motion, and (iii) response to Idaho's amicus brief by Tuesday, September 26, 2023; Plaintiff will file its combined reply & opposition brief by Tuesday, October 24, 2023; Defendants will file their reply brief by Tuesday, November 21, 2023; and the parties will file joint excerpts of the Administrative Record by December 1, 2023. Mailed notice (cn). (Entered: 08/02/2023) |
| 08/02/2023 | 286 | ATTORNEY Appearance for Plaintiff Property Casualty Insurers Association of America by Colleen Marie Campbell (Campbell, Colleen) (Entered: 08/02/2023) |
| 08/04/2023 | 287 | MOTION by Amicus Chicago Lawyers' Committee for Civil Rights Under Law, Inc. for leave to file *Amicus Curiae Brief* <br><br>(Chablani, Aneel) (Entered: 08/04/2023) |
| 08/04/2023 | 288 | ATTORNEY Appearance for Amicus State of Idaho by John C Keenan *Idaho Department of Insurance* (Keenan, John) (Entered: 08/04/2023) |

| 08/07/2023 | 289 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Unopposed motion for leave to file a brief AMICUS CURIAE 287 is granted. ACLU, ACLU-IL, CAFHA, CLCCR, LCCRUL, NCLC and NFHA are granted leave to File a Brief Amicus Curiae of no more than 25 pages on behalf of themselves and similarly positioned fair housing and civil rights organizations on or before October 3, 2023. Mailed notice. (cp, ) (Entered: 08/07/2023) |
|---|---|---|
| 08/08/2023 | 290 | MOTION by Amicus State of Idaho for leave to file *Amicus Curiae Brief; Extension of Time and Number of Pages*<br><br>(Keenan, John) (Entered: 08/08/2023) |
| 08/09/2023 | 291 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Without objection, Motion for leave to file Amicus Curiae brief, extend time to file brief and extend the number of pages of brief 290 is granted. The Director of the State of Idaho, Idaho Department of Insurance, the Commissioner of the Oklahoma Insurance Department, and the Commissioner of the Louisiana Department of Insurance are granted leave to extend the time to file an amicus curiae brief of 25 pages in length. Mailed notice. (cp, ) (Entered: 08/09/2023) |
| 08/25/2023 | 292 | Amicus Brief by State of Idaho *In Support of Renewed Motion for Summary Judgment* (Keenan, John) (Entered: 08/25/2023) |
| 09/25/2023 | 293 | MOTION by Defendants Marcia L. Fudge, United States Department of Housing and Urban Development for leave to file excess pages *Unopposed*<br><br>(Attachments: # 1 Text of Proposed Order)(Todd, James) (Entered: 09/25/2023) |
| 09/26/2023 | 294 | MOTION by Defendants Marcia L. Fudge, United States Department of Housing and Urban Development to be Excused from LR 56.1(b) requirement to respond to Plaintiff's Statement of Material Facts *Filed with Consent of Plaintiff*<br><br>(Attachments: # 1 Text of Proposed Order)(Todd, James) (Entered: 09/26/2023) |
| 09/26/2023 | 295 | MOTION by Defendants Marcia L. Fudge, United States Department of Housing and Urban Development for summary judgment<br><br>(Attachments: # 1 Supporting Memorandum of Law, # 2 Statement of Material Facts)(Todd, James) (Entered: 09/26/2023) |
| 09/26/2023 | 296 | MEMORANDUM by Marcia L. Fudge, United States Department of Housing and Urban Development in Opposition to motion for summary judgment 282 (Todd, James) (Entered: 09/26/2023) |
| 09/27/2023 | 297 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendants' unopposed motion for leave to file excess pages 293 and Defendants' consent motion for leave to be excused from responding to plaintiff's statement of material facts or, in the alternative, for extension of time to respond 294 are granted. Orders to enter. Mailed notice. (cp, ) (Entered: 09/28/2023) |
| 09/27/2023 | 298 | ORDER: Signed by the Honorable Rebecca R. Pallmeyer on 9/27/2023. Mailed notice. (cp, ) (Entered: 09/28/2023) |

| 09/27/2023 | 299 | ORDER: Signed by the Honorable Rebecca R. Pallmeyer on 9/27/2023. Mailed notice. (cp, ) (Entered: 09/28/2023) |
|---|---|---|
| 09/28/2023 | 300 | ATTORNEY Appearance for Amicus Parties American Civil Liberties Union Foundation, American Civil Liberties Union of Illinois, Chicago Lawyers' Committee for Civil Rights Under Law, Inc. by Jon Marshall Greenbaum, (Greenbaum,, Jon) (Entered: 09/28/2023) |
| 10/03/2023 | 301 | Amicus Brief by Chicago Lawyers' Committee for Civil Rights Under Law, Inc. *et al.* (Chablani, Aneel) (Entered: 10/03/2023) |
| 10/17/2023 | 302 | ATTORNEY Appearance for Amicus State of Illinois by Alexandra Lane Reed *Appearance for State of Illinois and amici States* (Reed, Alexandra) (Entered: 10/17/2023) |
| 10/17/2023 | 303 | MOTION by Amicus State of Illinois for leave to file *brief as amici curiae* , MOTION by Amicus State of Illinois for leave to file excess pages (Attachments: # 1 Amicus Brief)(Reed, Alexandra) (Entered: 10/17/2023) |
| 10/17/2023 | 304 | ATTORNEY Appearance for Amicus State of Illinois by Joyce C Otuwa (Otuwa, Joyce) (Entered: 10/17/2023) |
| 10/18/2023 | 305 | RESPONSE by Plaintiff Property Casualty Insurers Association of America to motion for leave to file, motion for leave to file excess pages 303 (Waxman, Seth) (Entered: 10/18/2023) |
| 10/20/2023 | 306 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion for leave to file amicus brief of 25 pages 303 is granted; the court extends by seven days, to October 31, 2023, PCI's deadline to file its combined Opposition to Defendants' Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment. Mailed notice. (cp, ) (Entered: 10/20/2023) |
| 10/20/2023 | 307 | RESPONSE by Defendants Ben Carson, Shaun Donovan, Marcia L. Fudge, United States Department of Housing and Urban Development to Response 305 *and Consent Motion to Extend Time to File Reply* (Andrapalliyal, Vinita) (Entered: 10/20/2023) |
| 10/20/2023 | 308 | MOTION by Defendants Ben Carson, Shaun Donovan, Marcia L. Fudge, United States Department of Housing and Urban Development for extension of time to file response/reply *(Consent motion)* (Andrapalliyal, Vinita) (Entered: 10/20/2023) |
| 10/20/2023 | 309 | Amicus Brief by State of Illinois *et al. In Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiff's Renewed Motion for Summary Judgment* (Reed, Alexandra) (Entered: 10/20/2023) |
| 10/23/2023 | 310 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: On Defendants' agreed motions 308 , the court grants and extends the date for submission of Plaintiff's opposition and reply brief to November 7, 2023, and extends the date for submission of Defendants' reply brief to December 12, 2023. Mailed notice. (cp, ) (Entered: 10/23/2023) |

| 10/25/2023 | 311 | Motion For Leave to Withdraw as Counsel by State of Illinois (Soltanzadeh, Stephen) (Entered: 10/25/2023) |
|---|---|---|
| 10/26/2023 | 312 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion for leave to withdraw as counsel 311 is granted. Attorney Stephen Matthew Soltanzadeh is terminated as counsel for Amicus State of Illinois. Mailed notice. (cp, ) (Entered: 10/26/2023) |
| 11/07/2023 | 313 | MEMORANDUM by Property Casualty Insurers Association of America in Opposition to motion for summary judgment 295 *and Reply in Support of Plaintiff's Motion for Summary Judgment 282* (Waxman, Seth) (Entered: 11/07/2023) |
| 11/29/2023 | 314 | MOTION by Plaintiff Property Casualty Insurers Association of America for extension of time to file *Joint Excerpts of the Administrative Record (Joint)* (Waxman, Seth) (Entered: 11/29/2023) |
| 11/30/2023 | 315 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Joint Motion to extend deadline to file joint excerpts of the administrative record 314 is granted. The deadline for filing joint excerpts of the Administrative Record is extended to 12/22/23. Mailed notice. (cp, ) (Entered: 11/30/2023) |
| 12/12/2023 | 316 | REPLY by Marcia L. Fudge, United States Department of Housing and Urban Development to MOTION by Defendants Marcia L. Fudge, United States Department of Housing and Urban Development for summary judgment 295 (Todd, James) (Entered: 12/12/2023) |
| 12/20/2023 | 317 | NOTICE by Marcia L. Fudge, United States Department of Housing and Urban Development *of Filing of Joint Appendix of Excerpts of Administrative Record* (Attachments: # 1 Index of Joint Appendix of Excerpts of Administrative Record, # 2 Joint Appendix- Part 1, # 3 Joint Appendix- Part 2, # 4 Joint Appendix - Part 3)(Todd, James) (Entered: 12/20/2023) |
| 12/28/2023 | 318 | ANNUAL REMINDER: Pursuant to Local Rule 3.2 (Notification of Affiliates), any nongovernmental party, other than an individual or sole proprietorship, must file a statement identifying all its affiliates known to the party after diligent review or, if the party has identified no affiliates, then a statement reflecting that fact must be filed. An affiliate is defined as follows: any entity or individual owning, directly or indirectly (through ownership of one or more other entities), 5% or more of a party. The statement is to be electronically filed as a PDF in conjunction with entering the affiliates in CM/ECF as prompted. As a reminder to counsel, parties must supplement their statements of affiliates within thirty (30) days of any change in the information previously reported. This minute order is being issued to all counsel of record to remind counsel of their obligation to provide updated information as to additional affiliates if such updating is necessary. If counsel has any questions regarding this process, this LINK will provide additional information. Signed by the Executive Committee on 12/28/2023: Mailed notice. (tg, ) (Entered: 12/28/2023) |
| 03/26/2024 | 319 | MEMORANDUM Opinion and Order: The court denies PCI's motion for summary judgment 282 and grants HUD's cross-motion for summary judgment 295 . Please see attached Memorandum Opinion and Order for further details. |

| | | Signed by the Honorable Rebecca R. Pallmeyer on 3/26/2024. Mailed notice. (cp, ) (Entered: 03/26/2024) |
|---|---|---|
| 03/26/2024 | 320 | ENTERED JUDGMENT. Mailed notice. (cp, ) (Entered: 03/26/2024) |
| 04/10/2024 | 321 | MOTION by Attorney Jon Greenbaum to withdraw as attorney for Chicago Lawyers' Committee for Civil Rights Under Law, Inc.. No party information provided <br><br> (Greenbaum,, Jon) (Entered: 04/10/2024) |
| 04/11/2024 | 322 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion to withdraw Jon Greenbaum as counsel on behalf of Lawyers' Committee for Civil Rights Under Law as amicus curiae 321 is granted. Attorney Jon Marshall Greenbaum is terminated as counsel for Lawyers' Committee for Civil Rights Under Law. Mailed notice. (cp, ) (Entered: 04/11/2024) |
| 05/24/2024 | 323 | NOTICE of appeal by Property Casualty Insurers Association of America regarding orders 99 , 129 , 320 , 319 , 98 Filing fee $ 605, receipt number AILNDC-22020723. Receipt number: n (Waxman, Seth) (Entered: 05/24/2024) |
| 05/24/2024 | 324 | DOCKETING Statement by Property Casualty Insurers Association of America regarding notice of appeal 323 (Waxman, Seth) (Entered: 05/24/2024) |
| 06/03/2024 | 325 | NOTICE of Appeal Due letter sent to counsel of record regarding notice of appeal 323 . (ph, ) (Entered: 06/03/2024) |
| 06/03/2024 | 326 | NOTICE of Appeal Due letter sent to counsel of record regarding notice of appeal 323 . (ph, ) (Duplicate of docket entry 325) Modified on 6/3/2024 (ph, ). (Entered: 06/03/2024) |