# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA,
*Plaintiff-Appellant*,

v.

ADRIANNE TODMAN, ACTING SECRETARY OF THE
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, AND
UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Illinois, No. 1:13-cv-08564
Before the Honorable Chief Judge Rebecca R. Pallmeyer

## APPELLANT'S APPENDIX
## VOLUME 2 (App.127-450)

ANDRES C. SALINAS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

ROWE W. SNIDER
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0700


August 14, 2024

SETH P. WAXMAN
CATHERINE M.A. CARROLL
JEREMY W. BRINSTER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com

COLLEEN MARIE CAMPBELL
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, CO 80202
(720) 274-3135

# APPENDIX TABLE OF CONTENTS

Page

## VOLUME 1
### (BOUND WITH BRIEF)

Order granting in part and denying in part cross-motions for summary judgment, dated September 3, 2014 (Dkt. 98)....................................................App.1

Memorandum Opinion re cross-motions for summary judgment, dated September 3, 2014 (Dkt. 99)..............................................................................App.2

Minute Entry granting in part and denying in part motion for leave to file First Amended Complaint, dated June 20, 2017 (Dkt. 128) .....................App.54

Memorandum Opinion re motion for leave to file First Amended Complaint, dated June 20, 2017 (Dkt. 129)......................................................App.55

Memorandum Opinion and Order denying PCI's motion for summary judgment and granting HUD's cross-motion, dated March 26, 2024 (Dkt. 319)...............................................................................................................App.76

Judgment, dated March 26, 2024 (Dkt. 320) ..................................................App.126

## VOLUME 2
### (SEPARATELY BOUND)

Docket sheet .......................................................................................................App.127

Implementation of the Fair Housing Act's Discriminatory Effects Standard, Final Rule, 78 Fed. Reg. 11460, dated February 15, 2013 (AR 611-634) ......................................................................................................App.151

Reinstatement of HUD's Discriminatory Effects Standard, 88 Fed. Reg. 19450, dated March 31, 2023 (AR 32,763-32,813) ...............................App.175

NAMIC comment to HUD, dated January 17, 2012 (AR 371-383)..............App.226

American Insurance Ass'n comment to HUD, dated January 17, 2012 (AR 454-459) ......................................................................................................App.239

PCI comment to HUD, dated January 17, 2012 (AR 552-556).....................App.245

Letter from PCI to HUD, dated September 25, 2014 (AR 4416-4418).........App.250

Letter from PCI to HUD, dated January 26, 2014 (AR 4496-4513) .............App.253

Letter from PCI to HUD, dated July 29, 2014 (AR 4615-4621) ...................App.271

Sharon Schuler comment to HUD, dated August 24, 2021
(AR 28,170-28,171) .......................................................................................App.278

American Family Insurance comment to HUD, dated July 30, 2021
(AR 28,192-28,195) .......................................................................................App.280

American National Property and Casualty Co. comment to HUD,
dated August 24, 2021 (AR 29,086-29,088)....................................................App.284

Farm Family Casualty Insurance Co. comment to HUD, dated August
24, 2021 (AR 29,089-29,091) ........................................................................App.287

PCI comment to HUD, dated August 24, 2021 (AR 29,111-29,162)............App.290

PCI's memorandum of law ISO motion for summary judgment, dated
February 14, 2014 (Dkt. 21) ..........................................................................App.342

Second Amended Complaint,[1] dated May 3, 2023 (Dkt. 274) ......................App.391

Notice of Appeal, dated May 24, 2024 (Dkt. 323) ........................................App.448

CERTIFICATE OF SERVICE

## CIRCUIT RULE 30(d) STATEMENT

I certify that the materials required by Circuit Rules 30(a) and (b) are

included in the appendix.

/s/ Seth P. Waxman
SETH P. WAXMAN

---

[1]     Exhibits to the complaint have been omitted as duplicative of material already included in the appendix or as unnecessary for inclusion under Circuit Rule 30(b).

# United States District Court
## Northern District of Illinois – CM/ECF NextGen 1.7.1.1 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:13–cv–08564

Property Casualty Insurers Association of America v. Donovan et al
Assigned to: Honorable Rebecca R. Pallmeyer
Case in other court: 24–01947
Cause: 05:702 Administrative Procedure Act

Date Filed: 11/27/2013
Date Terminated: 03/26/2024
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 11/27/2013 | 1 | COMPLAINT filed by Property Casualty Insurers Association of America; Filing fee $ 400, receipt number 0752–8976040. (Attachments: # 1 Exhibit 1)(Snider, Rowe) (Entered: 11/27/2013) |
| 11/27/2013 | 2 | CIVIL Cover Sheet (Snider, Rowe) (Entered: 11/27/2013) |
| 11/27/2013 | 3 | ATTORNEY Appearance for Plaintiff Property Casualty Insurers Association of America by Rowe W. Snider (Snider, Rowe) (Entered: 11/27/2013) |
| 11/27/2013 | 4 | ATTORNEY Appearance for Plaintiff Property Casualty Insurers Association of America by Ashlee Marie Knuckey (Knuckey, Ashlee) (Entered: 11/27/2013) |
| 11/27/2013 | | CASE ASSIGNED to the Honorable Amy J. St. Eve. Designated as Magistrate Judge the Honorable Susan E. Cox. (daj, ) (Entered: 11/27/2013) |
| 11/27/2013 | 5 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Property Casualty Insurers Association of America (Snider, Rowe) (Entered: 11/27/2013) |
| 11/27/2013 | | SUMMONS Issued as to All Defendants, U.S. Attorney, and U.S. Attorney General. (jp, ) (Entered: 11/27/2013) |
| 12/02/2013 | 6 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–8980925. (Boynton, Brian) (Entered: 12/02/2013) |
| 12/02/2013 | 7 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–8982343. (Tokson, Matthew) (Entered: 12/02/2013) |
| 12/02/2013 | 8 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–8983678. (Waxman, Seth) (Entered: 12/02/2013) |
| 12/02/2013 | 9 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–8984130. (Moss, Randolph) (Entered: 12/02/2013) |
| 12/03/2013 | 10 | ORDER ; Motions for leave to appear pro hac vice on behalf of Property Casualty Insurers Association of America by Brian Boynton 6 , Matthew Tokson 7 , Seth Waxman 8 and Randolph Moss 9 are granted. Initial status hearing set for January 13, 2014 at 8:30 a.m. in courtroom 1241. Parties shall refer to Judge St. Eve's web page at www.ilnd.uscourts.gov and file a joint status report by January 8, 2014 as set forth in the Initial Status Conferences procedure. Signed by the Honorable Amy J. St. Eve on 12/3/2013. Mailed notice. (ea, ) (Entered: 12/03/2013) |
| 12/06/2013 | 11 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–8999700. (Eisenberg, Lynn) (Entered: 12/06/2013) |
| 12/06/2013 | 12 | REQUEST for Clerk of Court to refund filing fee in the amount of $400.00, receipt no. 0752–8975921, (Snider, Rowe) (Entered: 12/06/2013) |
| 12/06/2013 | 13 | ORDER Signed by the Honorable Amy J. St. Eve on 12/6/2013: Lynn Eisenbergs motion for leave to appear pro hac vice on behalf of Property CasualtyInsurers Association of America 11 is granted. Mailed notice(ngm, ) (Entered: 12/06/2013) |

| 12/16/2013 | 14 | ATTORNEY Appearance for Defendants Shaun Donovan, United States Department of Housing and Urban Development by Kyle R. Freeny (Freeny, Kyle) (Entered: 12/16/2013) |
|---|---|---|
| 12/18/2013 | 15 | ATTORNEY Appearance for Defendants Shaun Donovan, United States Department of Housing and Urban Development by Daniel Paul Mosteller (Mosteller, Daniel) (Entered: 12/18/2013) |
| 01/08/2014 | 16 | STATUS Report by Shaun Donovan, Property Casualty Insurers Association of America, United States Department of Housing and Urban Development (Boynton, Brian) (Entered: 01/08/2014) |
| 01/13/2014 | 17 | MINUTE entry before the Honorable Amy J. St. Eve:Status hearing held on 1/13/2014 and continued to 8/7/2014 at 08:30 AM. The Administrative Record shall be turned over to the plaintiff by 2/7/14. Plaintiff's motion for summary judgment, up to 35 pages, shall be filed by 3/3/14. Defendants' response and cross−motion, up to 50 pages, shall be filed by 3/28/14. Defendants shall answer or otherwise plead by 3/28/14. Plaintiff's reply, up to 40 pages, shall be filed by 5/2/14. Defendants' reply, up to 25 pages, shall be filed by 5/30/14. Mailed notice (kef, ) (Entered: 01/13/2014) |
| 01/14/2014 | 18 | MINUTE entry before the Honorable Amy J. St. Eve: The court's 1/13/14 minute entry is corrected to read that plaintiff's motion for summary judgment, up to 35 pages, shall be filed by 2/14/14. All other dates stand. Mailed notice (kef, ) (Entered: 01/14/2014) |
| 02/12/2014 | 19 | CERTIFIED COPY OF ADMINISTRATIVE RECORD by Defendants Shaun Donovan, United States Department of Housing and Urban Development (Attachments: # 1 Index, # 2 Pages 1−209, # 3 Pages 210−378, # 4 Pages 379−516, # 5 Pages 517−645, # 6 Pages 646−804, # 7 Pages 805−881, # 8 Pages 882−1032, # 9 Pages 1033−1132, # 10 Pages 1133−1206, # 11 Pages 1207−1360, # 12 Pages 1361−1593, # 13 Pages 1594−1812, # 14 Certification)(Mosteller, Daniel) (Entered: 02/12/2014) |
| 02/14/2014 | 20 | MOTION by Plaintiff Property Casualty Insurers Association of America for summary judgment (Waxman, Seth) (Entered: 02/14/2014) |
| 02/14/2014 | 21 | MEMORANDUM OF LAW IN SUPPORT of the Plaintiff Property Casualty Insurers Association of America motion for summary judgment. 20 (Attachments: # 1 Statement of Undisputed Material Facts, # 2 Declaration of Robert Gordon)(Waxman, Seth)Docket Text Modified by Clerks Office) Modified on 2/18/2014 (ea, ). (Entered: 02/14/2014) |
| 02/25/2014 | 22 | TRANSCRIPT OF PROCEEDINGS held on 1/13/14 before the Honorable Amy J. St. Eve. Court Reporter Contact Information: Joseph Rickhoff, 312−435−5562, joseph_rickhoff@ilnd.uscourts.gov. <P>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter/Transcriber or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.</P> Redaction Request due 3/18/2014. Redacted Transcript Deadline set for 3/28/2014. Release of Transcript Restriction set for 5/26/2014. (Rickhoff, Joseph) (Entered: 02/25/2014) |
| 03/18/2014 | 23 | MOTION by Defendants Shaun Donovan, United States Department of Housing and Urban Development for extension of time *(or to Modify Briefing Schedule) (Consented)* (Attachments: # 1 Text of Proposed Order)(Freeny, Kyle) (Entered: 03/18/2014) |
| 03/18/2014 | 24 | NOTICE of Motion by Kyle R. Freeny for presentment of extension of time 23 before Honorable Amy J. St. Eve on 3/24/2014 at 08:30 AM. (Freeny, Kyle) (Entered: 03/18/2014) |
| 03/19/2014 | 25 | MINUTE entry before the Honorable Amy J. St. Eve: Defendants' consent motion to modify briefing schedule 23 is granted. Defendants' response to plaintiff's motion for summary judgment and cross−motion shall be filed by 4/4/14. Defendants shall answer or otherwise plead to the complaint by 4/4/14. Plaintiff's combined opposition and reply shall be filed by 5/16/14. Defendants' reply shall be filed by 6/13/14. Status hearing set for 8/7/14 is stricken and reset to 8/26/14 at 8:30 a.m. No appearance is |

| | | required on the 3/24/14 notice date. Mailed notice (kef, ) (Entered: 03/19/2014) |
|---|---|---|
| 03/25/2014 | 26 | MOTION by Amicus Chicago Lawyers' Committee for Civil Rights Under Law, Inc. for leave to file *A BRIEF AMICUS CURIAE* (Shuman Moore, Elizabeth) (Entered: 03/25/2014) |
| 03/25/2014 | 27 | NOTICE of Motion by Elizabeth Shuman Moore for presentment of motion for leave to file 26 before Honorable Amy J. St. Eve on 3/31/2014 at 08:30 AM. (Shuman Moore, Elizabeth) (Entered: 03/25/2014) |
| 03/26/2014 | 28 | MINUTE entry before the Honorable Amy J. St. Eve: Unopposed motion of the ACLU, ACLU–IL, CLCCRUL, CAFHA, LCCRUL, LDF, NCRC, NCLC and NFHA for leave to file a brief amicus curiae 26 is granted. Said brief, up to 25 pages, shall be filed by 4/18/14. No appearance is required on the 3/31/14 notice date. Mailed notice (kef, ) (Entered: 03/26/2014) |
| 04/04/2014 | 29 | MEMORANDUM by Shaun Donovan, United States Department of Housing and Urban Development in Opposition to motion for summary judgment 20 (Attachments: # 1 Response to Plaintiff's Statement of Undisputed Material Facts, # 2 Text of Proposed Order)(Freeny, Kyle) (Entered: 04/04/2014) |
| 04/04/2014 | 30 | MOTION by Defendants United States Department of Housing and Urban Development, Shaun Donovan to dismiss for lack of jurisdiction , MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, MOTION by Defendants United States Department of Housing and Urban Development, Shaun Donovan for summary judgment (Attachments: # 1 Text of Proposed Order, # 2 Statement of Undisputed Material Facts)(Freeny, Kyle) (Entered: 04/04/2014) |
| 04/04/2014 | 31 | MEMORANDUM by Shaun Donovan, United States Department of Housing and Urban Development in support of motion to dismiss/lack of jurisdiction,, Motion to Dismiss for Failure to State a Claim,, motion for summary judgment, 30 (Freeny, Kyle) (Entered: 04/04/2014) |
| 04/11/2014 | 32 | TRANSCRIPT OF PROCEEDINGS held on 1/13/14 before the Honorable Amy J. St. Eve. Court Reporter Contact Information: Joseph Rickhoff, 312–435–5562, joseph_rickhoff@ilnd.uscourts.gov. <P>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter/Transcriber or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.</P> Redaction Request due 5/2/2014. Redacted Transcript Deadline set for 5/12/2014. Release of Transcript Restriction set for 7/10/2014. (Rickhoff, Joseph) (Entered: 04/11/2014) |
| 04/18/2014 | 33 | MEMORANDUM by Chicago Lawyers' Committee for Civil Rights Under Law, Inc. in Opposition to motion to dismiss/lack of jurisdiction,, Motion to Dismiss for Failure to State a Claim,, motion for summary judgment, 30 *Amicus Brief in Support of Defendants' Motion to Dismiss and/or for Summary Judgment* (Attachments: # 1 Appendix)(Shuman Moore, Elizabeth) (Entered: 04/18/2014) |
| 04/18/2014 | 34 | NOTICE by Chicago Lawyers' Committee for Civil Rights Under Law, Inc. re memorandum in opposition to motion, 33 (Shuman Moore, Elizabeth) (Entered: 04/18/2014) |
| 04/25/2014 | 35 | ATTORNEY Appearance for Amicus Chicago Lawyers' Committee for Civil Rights Under Law, Inc. by Elizabeth Shuman Moore (Shuman Moore, Elizabeth) (Entered: 04/25/2014) |
| 04/25/2014 | 36 | ATTORNEY Appearance for Amicus Chicago Lawyers' Committee for Civil Rights Under Law, Inc. by Ruth Merewyn Greenwood (Greenwood, Ruth) (Entered: 04/25/2014) |
| 05/15/2014 | 37 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–9485989. (Wolek, Christopher) (Entered: 05/15/2014) |
| 05/15/2014 | 38 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–9486083. (Womack, Michael) (Entered: 05/15/2014) |

| | | |
|---|---|---|
| 05/15/2014 | 39 | ATTORNEY Appearance for Amicus State of Oklahoma ex rel John D. Doak by Kevin William Baldwin (Baldwin, Kevin) (Entered: 05/15/2014) |
| 05/15/2014 | 40 | MOTION by Amicus State of Oklahoma ex rel John D. Doak for leave to file *brief* (Baldwin, Kevin) (Entered: 05/15/2014) |
| 05/15/2014 | 41 | NOTICE of Motion by Kevin William Baldwin for presentment of motion for leave to file 40 before Honorable Amy J. St. Eve on 5/21/2014 at 08:30 AM. (Baldwin, Kevin) (Entered: 05/15/2014) |
| 05/16/2014 | 42 | MINUTE entry before the Honorable Amy J. St. Eve: Motion of the Oklahoma Insurance Commissioner's for leave to file a brief amicus curiae 40 is granted. Said brief, up to 20 pages, shall be filed on or before 5/30/14. No appearance is required on the 5/21/14 notice date. Mailed notice (kef, ) (Entered: 05/16/2014) |
| 05/16/2014 | 43 | ORDER: Motions for leave to appear pro hac vice by Christopher Wolek and Michael Womack on behalf of amicus curiae State of Oklahoma, ex rel. John D. Doak, Insurance Commissioner 37 38 are granted. Signed by the Honorable Amy J. St. Eve on May 16, 2014. Mailed notice (ph, ) (Entered: 05/16/2014) |
| 05/16/2014 | 44 | MEMORANDUM by Property Casualty Insurers Association of America in Opposition to motion to dismiss/lack of jurisdiction,, Motion to Dismiss for Failure to State a Claim,, motion for summary judgment, 30 (Attachments: # 1 Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, # 2 Declaration of Teresa C. Cracas, # 3 Declaration of Michael Dawdy, # 4 Declaration of Ronald Joseph Zaleski, Sr., # 5 Declaration of Peter Drogan)(Boynton, Brian) (Entered: 05/16/2014) |
| 05/16/2014 | 45 | REPLY by Property Casualty Insurers Association of America to memorandum in opposition to motion, 29 (Attachments: # 1 Declaration of Teresa C. Cracas, # 2 Declaration of Michael Dawdy, # 3 Declaration of Ronald Joseph Zaleski, Sr., # 4 Declaration of Peter Drogan)(Boynton, Brian) (Entered: 05/16/2014) |
| 05/19/2014 | 46 | ATTORNEY Appearance for Amicus State of Oklahoma ex rel John D. Doak by Michael P. Womack (Womack, Michael) (Entered: 05/19/2014) |
| 05/19/2014 | 47 | ATTORNEY Appearance for Amicus State of Oklahoma ex rel John D. Doak by Christopher D Wolek (Wolek, Christopher) (Entered: 05/19/2014) |
| 05/30/2014 | 48 | MEMORANDUM *And In Opposition to Defendant's Motion to Dismiss and/or Motion for Summary Judgment* (Wolek, Christopher) (Entered: 05/30/2014) |
| 05/30/2014 | 49 | NOTICE by State of Oklahoma ex rel John D. Doak (Wolek, Christopher) (Entered: 05/30/2014) |
| 06/04/2014 | 50 | MOTION by Defendants Shaun Donovan, United States Department of Housing and Urban Development for extension of time to file response/reply *(Unopposed)* (Attachments: # 1 Text of Proposed Order)(Freeny, Kyle) (Entered: 06/04/2014) |
| 06/04/2014 | 51 | NOTICE by Shaun Donovan, United States Department of Housing and Urban Development re MOTION by Defendants Shaun Donovan, United States Department of Housing and Urban Development for extension of time to file response/reply *(Unopposed)* 50 (Freeny, Kyle) (Entered: 06/04/2014) |
| 06/05/2014 | 52 | NOTICE of Motion by Kyle R. Freeny for presentment of motion for extension of time to file response/reply 50 before Honorable Amy J. St. Eve on 6/10/2014 at 08:30 AM. (Freeny, Kyle) (Entered: 06/05/2014) |
| 06/09/2014 | 53 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752−9556356. (Abate, Maria) (Entered: 06/09/2014) |
| 06/09/2014 | 54 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752−9556492. (Karlinsky, Fred) (Entered: 06/09/2014) |
| 06/09/2014 | 55 | MINUTE entry before the Honorable Amy J. St. Eve: Defendants' unopposed motion for extension of time 50 is granted. Defendants' reply to their motion to dismiss/motion for summary judgment 30 shall be filed on 6/20/014. No appearance is required on the 6/10/14 notice date. Mailed notice (kef, ) (Entered: 06/09/2014) |

| 06/09/2014 | 56 | ORDER: Motions for leave to appear pro hac vice on behalf of Insurance Commissioners for Alabama, Mississippi and Nevada by Maria Elena Abate and Fred Evan Karlinsky 53 54 are granted. Signed by the Honorable Amy J. St. Eve on June 9, 2014. Mailed notice (ph, ) (Entered: 06/10/2014) |
|---|---|---|
| 06/11/2014 | 57 | ATTORNEY Appearance for Amicus Parties The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association by Todd Edward Pentecost (Pentecost, Todd) (Entered: 06/11/2014) |
| 06/11/2014 | 58 | ATTORNEY Appearance for Amicus Parties The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association by Nicholas William Marietti (Marietti, Nicholas) (Entered: 06/11/2014) |
| 06/11/2014 | 59 | MOTION by Amicus Parties The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association for leave to file *Amici Curiae Brief in Support of Plaintiff's Motion for Summary Judgment* (Attachments: # 1 Exhibit)(Marietti, Nicholas) (Entered: 06/11/2014) |
| 06/11/2014 | 60 | NOTICE of Motion by Nicholas William Marietti for presentment of motion for leave to file, 59 before Honorable Amy J. St. Eve on 6/18/2014 at 08:30 AM. (Marietti, Nicholas) (Entered: 06/11/2014) |
| 06/12/2014 | 61 | RESPONSE by Shaun Donovan, United States Department of Housing and Urban Development to MOTION by Amicus Parties The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association for leave to file *Amici Curiae Brief in Support of Plaintiff's 59 (Freeny, Kyle) (Entered: 06/12/2014)* |
| 06/12/2014 | 62 | ATTORNEY Appearance for Insurance Commissioners for States of Alabama, Louisiana, Mississippi and Nevada by Maria Elena Abate (Abate, Maria) Modified on 6/12/2014 (ea, ). (Entered: 06/12/2014) |
| 06/12/2014 | 63 | ATTORNEY Appearance for Insurance Commissioners for States of Alabama, Louisiana, Mississippi and Nevada by Fred Evan Karlinsky (Karlinsky, Fred) Modified on 6/12/2014 (ea, ). (Entered: 06/12/2014) |
| 06/12/2014 | 64 | MOTION by Insurance Commissioners for States of Alabama, Louisiana, Mississippi and Nevada in support of State of Oklahoma, Ex Rel., John D. Doak, Insurance Commissioner Amicus Curiae Brief (Abate, Maria) Modified on 6/12/2014 (ea, ). (Entered: 06/12/2014) |
| 06/12/2014 | 65 | ATTORNEY Appearance for Insurance Commissioners for States of Alabama, Louisiana, Mississippi and Nevada, Amicus State of Oklahoma ex rel John D. Doak by Timothy H Wright (Wright, Timothy) Modified on 6/12/2014 (ea, ). (Entered: 06/12/2014) |
| 06/12/2014 | 66 | ATTORNEY Appearance for Insurance Commissioners for States of Alabama, Louisiana, Mississippi and Nevada, Amicus State of Oklahoma ex rel John D. Doak by Michael M. Marick (Marick, Michael) Modified on 6/12/2014 (ea, ). (Entered: 06/12/2014) |
| 06/13/2014 | 67 | RESPONSE by Property Casualty Insurers Association of Americain Opposition to MOTION by Amicus Parties The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association for leave to file *Amici Curiae Brief in Support of Plaintiff's 59 (Boynton, Brian) (Entered: 06/13/2014)* |
| 06/16/2014 | 68 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–9580163. (Glass, Andrew) (Entered: 06/16/2014) |
| 06/16/2014 | 69 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–9580205. (Hancock, Paul) (Entered: 06/16/2014) |
| 06/16/2014 | 70 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–9580267. (Smerage, Roger) (Entered: 06/16/2014) |

| | | |
|---|---|---|
| 06/16/2014 | 71 | REPLY by The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association to response to motion, 61 (Marietti, Nicholas) (Entered: 06/16/2014) |
| 06/16/2014 | 73 | ORDER: Motions for leave to appear pro hac vice on behalf of Amici Curiae the American Financial Services Association, the Consumer Mortgage Coalition, the Independent Community Bankers of America, and the Mortgage Bankers Association by Andrew Glass, Paul Hancock and Roger Smerage 68 69 70 are granted. Signed by the Honorable Amy J. St. Eve on June 16, 2014. Mailed notice (ph, ) (Entered: 06/17/2014) |
| 06/17/2014 | 72 | MINUTE entry before the Honorable Amy J. St. Eve: AFSA's motion for leave to file amicus curiae brief 59 is entered and taken under advisement. Ruling by mail. No appearance is required on the 6/18/14 notice motion date. Mailed notice (kef, ) Modified on 6/17/2014 (kef, ). (Entered: 06/17/2014) |
| 06/20/2014 | 74 | REPLY by Shaun Donovan, United States Department of Housing and Urban Development to MOTION by Defendants United States Department of Housing and Urban Development, Shaun Donovan to dismiss for lack of jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIMMOTION by Defendants United States Department of Housing and Urban Development, Shaun Donovan for summary judgment 30 (Freeny, Kyle) (Entered: 06/20/2014) |
| 06/27/2014 | 75 | ATTORNEY Appearance for Amicus State Of Illinois by Stephen Matthew Soltanzadeh (Soltanzadeh, Stephen) (Entered: 06/27/2014) |
| 06/27/2014 | 76 | MOTION by Amicus State Of Illinois for leave to file *Brief as Amicus Curiae* (Attachments: # 1 Exhibit Amicus Brief)(Soltanzadeh, Stephen) (Entered: 06/27/2014) |
| 06/27/2014 | 77 | NOTICE of Motion by Stephen Matthew Soltanzadeh for presentment of motion for leave to file 76 before Honorable Amy J. St. Eve on 7/9/2014 at 08:30 AM. (Soltanzadeh, Stephen) (Entered: 06/27/2014) |
| 06/30/2014 | 78 | MINUTE entry before the Honorable Amy J. St. Eve: Motions for leave to file amicus curiae briefs 59 64 76 are granted. No appearance is required on the 7/9/14 notice motion. Mailed notice (kef, ) (Entered: 06/30/2014) |
| 06/30/2014 | 79 | MEMORANDUM by The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association in support of motion for summary judgment 20 (Attachments: # 1 Exhibit A – Amici Curiae Brief to the United States Supreme Court)(Smerage, Roger) (Entered: 06/30/2014) |
| 07/07/2014 | 80 | BRIEF OF THE STATE OF ILLINOIS AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS MOTION FOR SUMMARY JUDGMENT by State Of Illinois (Soltanzadeh, Stephen) (Entered: 07/07/2014) |
| 07/08/2014 | 81 | MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file *a Response to the Brief of the State of Illinois as Amicus Curiae in Support of Defendants* (Attachments: # 1 Exhibit)(Waxman, Seth) (Entered: 07/08/2014) |
| 07/08/2014 | 82 | NOTICE of Motion by Seth P Waxman for presentment of motion for leave to file 81 before Honorable Amy J. St. Eve on 7/14/2014 at 08:30 AM. (Waxman, Seth) (Entered: 07/08/2014) |
| 07/09/2014 | 83 | MINUTE entry before the Honorable Amy J. St. Eve: Plaintiff's motion for leave to file a response to the brief of the State of Illinois as Amicus Curiae in support of defendants 81 is granted. Counsel shall separately file the response brief upon receipt of this order. No appearance is required on the 7/14/14 notice date. Mailed notice (kef, ) (Entered: 07/09/2014) |
| 07/09/2014 | 84 | RESPONSE by Plaintiff Property Casualty Insurers Association of America to other 80 *Brief of the State of Illinois as Amicus Curiae* (Waxman, Seth) (Entered: 07/09/2014) |
| 07/14/2014 | 85 | MINUTE entry before the Honorable Amy J. St. Eve: Status hearing set for 8/26/14 is stricken and reset to 8/27/2014 at 08:30 AM.Mailed notice (kef, ) (Entered: 07/14/2014) |

| | | |
|---|---|---|
| 07/21/2014 | 86 | MOTION Request for Oral Argument by Property Casualty Insurers Association of America (Waxman, Seth) Docket Text Modified By Clerk's Office. (Entered: 07/21/2014) |
| 07/21/2014 | 87 | NOTICE of Motion by Seth P Waxman for presentment of before Honorable Amy J. St. Eve on 7/29/2014 at 08:30 AM. (Waxman, Seth) (Entered: 07/21/2014) |
| 07/22/2014 | 88 | NOTICE of Motion by Seth P Waxman for presentment of motion for miscellaneous relief 86 before Honorable Amy J. St. Eve on 7/29/2014 at 08:30 AM. (Waxman, Seth) (Entered: 07/22/2014) |
| 07/24/2014 | 89 | MINUTE entry before the Honorable Amy J. St. Eve: Plaintiff's request for oral argument 86 is granted. Oral argument set for 8/19/2014 at 01:00 PM. No appearance is required on the 7/29/14 notice date. Mailed notice (kef, ) (Entered: 07/24/2014) |
| 08/06/2014 | 90 | MINUTE entry before the Honorable Amy J. St. Eve: Oral argument set for 8/19/14 is reset from 1:00 p.m. to 1:30 p.m. Mailed notice (kef, ) (Entered: 08/06/2014) |
| 08/19/2014 | 91 | MINUTE entry before the Honorable Amy J. St. Eve: Oral argument on the parties' cross−motions for summary judgment and defendants' motion to dismiss held on 8/19/14. Status hearing set for 8/27/14 is stricken and reset to 9/30/14 at 8:30 a.m.Mailed notice (kef, ) (Entered: 08/20/2014) |
| 08/20/2014 | 92 | MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file *additional authorities* (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Waxman, Seth) (Entered: 08/20/2014) |
| 08/20/2014 | 93 | NOTICE of Motion by Seth P Waxman for presentment of motion for leave to file 92 before Honorable Amy J. St. Eve on 8/25/2014 at 08:30 AM. (Waxman, Seth) (Entered: 08/20/2014) |
| 08/22/2014 | 94 | MINUTE entry before the Honorable Amy J. St. Eve: Plaintiff's motion for leave to submit additional authorities 92 is granted. No appearance is required on the 8/25/14 notice date. Mailed notice (kef, ) (Entered: 08/22/2014) |
| 08/22/2014 | 95 | MINUTE entry before the Honorable Amy J. St. Eve: During oral arguments, the parties disagreed about (1) whether Plaintiff's challenge to the Disparate Impact Rule as violating the McCarran−Ferguson Act constitutes a facial or as−applied challenge to the Rule and, (2) if it is a facial challenge, whether Reno v. Flores, 507 U.S. 292 (1993), provides the applicable test for judging the Rule's validity. The Court directs the parties to file simultaneous supplemental briefs addressing these issues by 8/26/14. The parties shall limit their briefs to no more than 8 pages.Mailed notice (kef, ) (Entered: 08/22/2014) |
| 08/26/2014 | 96 | MEMORANDUM by Property Casualty Insurers Association of America in support of motion for summary judgment 20 , *Supplemental Post−Argument Brief* (Waxman, Seth) (Entered: 08/26/2014) |
| 08/26/2014 | 97 | MEMORANDUM by Shaun Donovan, United States Department of Housing and Urban Development in support of motion to dismiss/lack of jurisdiction, Motion to Dismiss for Failure to State a Claim, motion for summary judgment,,, 30 (Freeny, Kyle) (Entered: 08/26/2014) |
| 09/03/2014 | 98 | ORDER: The Court grants in part and denies in part PCI's motion for summary judgment 20 , and grants in part and denies in part HUD's motion to dismiss or for summary judgment 30 . The Court dismisses PCI's McCarran−Ferguson claim for lack of subject matter jurisdiction. With respect to PCI's remaining claims, the Court grants summary judgment to PCI on its claims that HUD's application of the Disparate Impact Rule to homeowners insurance was arbitrary and capricious, and grants summary judgment to HUD on PCI's challenge to HUD's burden−shifting framework. The Court remands this case to the United States Department of Housing and Urban Development for further proceedings consistent with this Memorandum, Opinion and Order. All pending dates and deadlines are stricken. Signed by the Honorable Amy J. St. Eve on 9/3/2014.Mailed notice(sxw, ) (Entered: 09/04/2014) |
| 09/03/2014 | 99 | MEMORANDUM Opinion and Order. Signed by the Honorable Amy J. St. Eve on 9/3/2014. Mailed notice(sxw, ) (Entered: 09/04/2014) |

| 09/03/2014 | 100 | ENTERED JUDGMENT. (sxw, ) (Entered: 09/04/2014) |
|---|---|---|
| 09/21/2014 | 101 | TRANSCRIPT OF PROCEEDINGS held on 8/19/14 before the Honorable Amy J. St. Eve. Court Reporter Contact Information: Joseph Rickhoff, 312–435–5562, joseph_rickhoff@ilnd.uscourts.gov. <P>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter/Transcriber or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.</P> Redaction Request due 10/13/2014. Redacted Transcript Deadline set for 10/22/2014. Release of Transcript Restriction set for 12/22/2014. (Rickhoff, Joseph) (Entered: 09/21/2014) |
| 10/01/2014 | 102 | WITHDRAWING *Brian M. Boynton* as counsel for Plaintiff Property Casualty Insurers Association of America and substituting Seth P Waxman as counsel of record (Waxman, Seth) (Entered: 10/01/2014) |
| 10/31/2014 | 103 | MOTION by counsel for Plaintiff Property Casualty Insurers Association of America to withdraw as attorney *Lynn Eisenberg* (Waxman, Seth) (Entered: 10/31/2014) |
| 11/03/2014 | 104 | ORDER: Motion of withdrawal of Lynn Eisenberg 103 is granted. Lynn Eisenberg is given leave to withdraw as counsel for plaintiff Property Casualty Insurers Association of America. Signed by the Honorable Amy J. St. Eve on November 3, 2014. Mailed notice (ph, ) (Entered: 11/04/2014) |
| 11/19/2014 | 105 | WITHDRAWING *Randolph D. Moss* as counsel for Plaintiff Property Casualty Insurers Association of America and substituting Seth P Waxman as counsel of record (Waxman, Seth) (Entered: 11/19/2014) |
| 05/01/2015 | 106 | WITHDRAWING *Matthew J. Tokson* as counsel for Plaintiff Property Casualty Insurers Association of America and substituting Seth P Waxman as counsel of record (Waxman, Seth) (Entered: 05/01/2015) |
| 03/21/2017 | 107 | MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file *First Amended Complaint* (Attachments: # 1 Exhibit A – [Proposed] First Amended Complaint, # 2 Exhibit 1 to [Proposed] First Amended Complaint, # 3 Exhibit 2 to [Proposed] First Amended Complaint, # 4 Exhibit 3 to [Proposed] First Amended Complaint, # 5 Exhibit 4 to [Proposed] First Amended Complaint, # 6 Exhibit 5 to [Proposed] First Amended Complaint)(Waxman, Seth) (Entered: 03/21/2017) |
| 03/21/2017 | 108 | MEMORANDUM by Property Casualty Insurers Association of America in support of motion for leave to file, 107 (Waxman, Seth) (Entered: 03/21/2017) |
| 03/21/2017 | 109 | NOTICE of Motion by Seth P Waxman for presentment of motion for leave to file, 107 before Honorable Amy J. St. Eve on 3/30/2017 at 08:30 AM. (Waxman, Seth) (Entered: 03/21/2017) |
| 03/21/2017 | 110 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–12985668. (Cedarbaum, Jonathan) (Entered: 03/21/2017) |
| 03/21/2017 | 112 | NOTICE OF EMAIL NOTIFICATION FAILURE, for document # 108 , 107 , 109 , 110 sent to Attorney Nicholas William Marietti returned as: Unknown Address Error. Mailed to attorney Nicholas William Marietti a Letter re: bounce back email and a Notification of Change of Address form. Notices have been set to No. Counsel must email the Clerk's Office at Docketing_ILND@uscourts.gov when a Notification of Change of Address has been filed to ensure electronic notification is reset. (ek, ) (Entered: 03/22/2017) |
| 03/22/2017 | 111 | ORDER: Motion for leave to appear pro hac vice on behalf of Property Casualty Insurers Association of America by Jonathan Cedarbaum 110 is granted. Signed by the Honorable Amy J. St. Eve on 3/22/2017. Mailed notice. (kp, ) (Entered: 03/22/2017) |
| 03/23/2017 | 113 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–12991889. (Sivaram, Anuradha) (Entered: 03/23/2017) |

| | | |
|---|---|---|
| 03/24/2017 | 114 | ORDER: Motion for leave to appear pro hac vice on behalf of Property Casualty Insurers Association of America by Anuradha Sivaram 113 is granted. Signed by the Honorable Amy J. St. Eve on 3/24/2017. Mailed notice. (kp, ) (Entered: 03/24/2017) |
| 03/29/2017 | 115 | MINUTE entry before the Honorable Amy J. St. Eve: Plaintiff's motion for leave to amend complaint 107 is entered. A courtesy copy of the motion and memorandum in support shall be delivered to the courtroom deputy, room 1238. Response by 4/21/17. Reply by 5/1/17. Status hearing set for 6/21/17 at 8:30 a.m. No appearance is required on the 3/30/17 notice motion date. Mailed notice (kef, ) (Entered: 03/29/2017) |
| 03/30/2017 | 116 | WITHDRAWING *Kyle Freeny* as counsel for Defendants Shaun Donovan, United States Department of Housing and Urban Development and substituting Emily Sue Newton as counsel of record (Attachments: # 1 Appendix Notification of Party Contact Information)(Newton, Emily) (Entered: 03/30/2017) |
| 04/04/2017 | 117 | MOTION by Attorney Todd E. Pentecost to withdraw as attorney for The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association. No party information provided (Pentecost, Todd) (Entered: 04/04/2017) |
| 04/04/2017 | 118 | NOTICE OF EMAIL NOTIFICATION FAILURE, for document # 117 sent to Attorney Fred Evan Karlinsky returned as: Unknown Address Error. Mailed to attorney Fred Evan Karlinsky a Letter re: bounce back email and a Notification of Change of Address form. Notices have been set to No. Counsel must email the Clerk's Office at Docketing_ILND@uscourts.gov when a Notification of Change of Address has been filed to ensure electronic notification is reset. (ek, ) (Entered: 04/05/2017) |
| 04/05/2017 | 119 | ORDER: Motion to withdraw as counsel 117 is granted. Todd Pentecost is given leave to withdraw as counsel for The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America and The Mortgage Bankers Association. Signed by the Honorable Amy J. St. Eve on 4/5/2017. Mailed notice. (jjr, ) (Entered: 04/05/2017) |
| 04/05/2017 | 120 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–13040779. (Gabrielli, Peter) (Entered: 04/05/2017) |
| 04/06/2017 | 121 | ORDER: Motion for leave to appear pro hac vice by Peter Gabrielli on behalf of Property Casualty Insurers Association of America 120 is granted. Signed by the Honorable Amy J. St. Eve on 4/6/2017. Mailed notice. (kp, ) (Entered: 04/06/2017) |
| 04/21/2017 | 122 | RESPONSE by United States Department of Housing and Urban Development in Opposition to MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file *First Amended Complaint* 107 (Attachments: # 1 Mem. Op in Dist. Hosp. Partners, L.P. v. Burwell, No. 11–0116 (D.D.C. 2016))(Newton, Emily) (Entered: 04/21/2017) |
| 04/24/2017 | 123 | MAIL RETURNED, for document # 118 sent to Fred Evan Karlinsky returned as undeliverable, return to sender. No new contact information received; therefore future mailings will not be sent until a new address is provided to the Clerk's Office using a Notification of Change of Address or Pro Se Appearance form (ek, ) (Entered: 04/26/2017) |
| 04/28/2017 | 124 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752–13121891. (Boynton, Brian) (Entered: 04/28/2017) |
| 05/01/2017 | 125 | REPLY by Plaintiff Property Casualty Insurers Association of America to motion for leave to file, 107 (Waxman, Seth) (Entered: 05/01/2017) |
| 05/03/2017 | 126 | ORDER: Motion for leave to appear pro hac vice on behalf of Property Casualty Insurers Association of America by Brian Boynton 124 is granted. Signed by the Honorable Amy J. St. Eve on 5/3/2017. Mailed notice. (kp, ) (Entered: 05/03/2017) |
| 06/13/2017 | 127 | MINUTE entry before the Honorable Amy J. St. Eve: Status hearing set for 6/21/17 is stricken and reset to 7/12/17 at 08:30 AM.Mailed notice (kef, ) (Entered: 06/13/2017) |
| 06/20/2017 | 128 | MINUTE entry before the Honorable Amy J. St. Eve: The Court grants in part and denies in part PCI's motion for leave to file a First Amended Complaint 107 . PCI may file a First Amended Complaint consistent with the Court's opinion by June 27, 2017. |

| | | |
|---|---|---|
| | | Defendants must answer or otherwise plead by July 18, 2017. [For further details, see separate Memorandum Opinion and Order.] Mailed notice (kef, ) (Entered: 06/20/2017) |
| 06/20/2017 | 129 | MEMORANDUM Opinion and Order Signed by the Honorable Amy J. St. Eve on 6/20/2017:Mailed notice(kef, ) (Entered: 06/20/2017) |
| 06/21/2017 | 130 | MINUTE entry before the Honorable Amy J. St. Eve: Status hearing set for 7/12/17 is stricken and reset to 7/19/2017 at 08:30 AM.Mailed notice (kef, ) (Entered: 06/21/2017) |
| 06/27/2017 | 131 | *FIRST* AMENDED complaint by Property Casualty Insurers Association of America against United States Department of Housing and Urban Development, Ben Carson (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Waxman, Seth) (Entered: 06/27/2017) |
| 07/07/2017 | 132 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to set a briefing schedule *and vacate pending status hearing* (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 07/07/2017) |
| 07/10/2017 | 133 | MINUTE entry before the Honorable Amy J. St. Eve: Joint motion to set briefing schedule 132 is granted. Defendants shall produce the certified administrative record to Plaintiff on or before 8/11/17. Plaintiff shall file an opening motion for summary judgment, not to exceed 20 pages, on or before 9/8/17. Defendants shall file a combined cross−dispositive motion for summary judgment and opposition to Plaintiff's motion, not to exceed 30 pages, on or before 10/6/17. Plaintiff shall file a combined opposition to Defendants' motion and a reply in support of its own motion, not to exceed 25 pages, on or before 11/3/17. Defendants shall file a reply in support of their cross−motion, not to exceed 15 pages, on or before 11/30/17. Defendants' obligation to answer or otherwise respond to the amended complaint shall be deferred pending a ruling on the parties' dispositive motions. Status hearing set for 7/19/17 is stricken and reset to 1/31/18 at 8:30 a.m. Mailed notice (kef, ) (Entered: 07/10/2017) |
| 08/11/2017 | 134 | CERTIFIED COPY OF ADMINISTRATIVE RECORD by Defendants Ben Carson, United States Department of Housing and Urban Development (Attachments: # 1 Administrative Record (AR) Index, # 2 AR − Part 1, # 3 AR − Part 2, # 4 AR − Part 3, # 5 AR − Part 4, # 6 AR − Part 5, # 7 AR − Part 6, # 8 AR − Part 7)(Newton, Emily) (Entered: 08/11/2017) |
| 08/18/2017 | 135 | ORDER: Defendants' oral request to unseal is granted. The Clerk's Office is directed to unseal the administrative record at R. 19 and 134 . Signed by the Honorable Amy J. St. Eve on 8/18/2017. Mailed notice (lf, ) (Entered: 08/18/2017) |
| 09/08/2017 | 136 | MOTION by Plaintiff Property Casualty Insurers Association of America for summary judgment (Waxman, Seth) (Entered: 09/08/2017) |
| 09/08/2017 | 137 | MEMORANDUM by Property Casualty Insurers Association of America in support of motion for summary judgment 136 (Attachments: # 1 Rule 56.1 Statement of Undisputed Material Facts)(Waxman, Seth) (Entered: 09/08/2017) |
| 09/08/2017 | 138 | NOTICE of Motion by Seth P Waxman for presentment of motion for summary judgment 136 before Honorable Amy J. St. Eve on 9/20/2017 at 08:30 AM. (Waxman, Seth) (Entered: 09/08/2017) |
| 09/19/2017 | 139 | MINUTE entry before the Honorable Amy J. St. Eve: A briefing schedule having already previously been set, notice of motion date of 9/20/17 on plaintiff's motion for summary judgment 136 is stricken. Mailed notice (kef, ) (Entered: 09/19/2017) |
| 09/27/2017 | 140 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development for extension of time *to file Defendants' cross−motion for summary judgment and opposition to Plaintiff's motion for summary judgment* (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 09/27/2017) |
| 09/28/2017 | 141 | MINUTE entry before the Honorable Amy J. St. Eve: Unopposed motion to extend summary judgment deadline 140 is granted. The Court hereby stays the case for 60 days to enable the government to confer with the appropriate officials within the Executive Branch. Defendants shall file a combined cross−dispositive motion for summary judgment and opposition to Plaintiff's motion, not to exceed 30 pages, on or |

| | | |
|---|---|---|
| | | before 12/5/17. Plaintiff shall file a combined opposition to Defendants' motion and a reply in support of its own motion, not to exceed 25 pages, on or before 1/19/18. Defendants shall file a reply in support of their cross−motion, not to exceed 15 pages, on or before 2/15/18. Status hearing set for 1/31/18 is stricken and reset to 4/17/18 at 8:30 a.m. Mailed notice (kef, ) (Entered: 09/28/2017) |
| 12/04/2017 | 142 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to continue *the current stay of this case for an additional 60 days* (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 12/04/2017) |
| 12/11/2017 | 143 | NOTICE of Motion by Emily Sue Newton for presentment of motion to continue 142 before Honorable Amy J. St. Eve on 1/10/2018 at 08:30 AM. (Newton, Emily) (Entered: 12/11/2017) |
| 12/18/2017 | 144 | MINUTE entry before the Honorable Amy J. St. Eve: Defendants' motion to continue the current stay of this case for an additional 60 days 142 is granted. Plaintiff's motion for summary judgment 136 is denied without prejudice to refile if HUD decides to pursue the issue. Given that Plaintiff filed the motion on 9/8/17 and given the parties' requested delay, the Court will provide Plaintiff with the opportunity to file a new motion with updated law. Status hearing set for 4/17/18 is stricken and reset to 2/1/18 at 8:30 a.m. No appearance is required on the 1/10/18 notice motion date. Mailed notice (kef, ) (Entered: 12/18/2017) |
| 12/21/2017 | 145 | Notice by Ben Carson, United States Department of Housing and Urban Development (Newton, Emily) (Entered: 12/21/2017) |
| 01/19/2018 | 146 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to continue *the stay in this case for 60 days* (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 01/19/2018) |
| 01/19/2018 | 147 | NOTICE of Motion by Emily Sue Newton for presentment of motion to continue 146 before Honorable Amy J. St. Eve on 1/25/2018 at 08:30 AM. (Newton, Emily) (Entered: 01/19/2018) |
| 01/22/2018 | 148 | MINUTE entry before the Honorable Amy J. St. Eve: Defendants' motion to continue the current stay of this case for an additional 60 days 146 is granted. The stay of this case is extended to 4/3/18 at which time the parties shall file a joint status report, informing the Court of any updates relevant to this matter. Status hearing set for 2/1/18 is stricken and reset to 4/9/18 at 8:30 a.m. No appearance is required on the 1/25/18 notice motion date. Mailed notice (kef, ) (Entered: 01/22/2018) |
| 03/01/2018 | 149 | MINUTE entry before the Honorable Amy J. St. Eve: Status hearing set for 4/9/18 is stricken and reset to 4/12/2018 at 08:30 AM.Mailed notice (kef, ) (Entered: 03/01/2018) |
| 04/03/2018 | 150 | MOTION by Plaintiff Property Casualty Insurers Association of America to stay regarding terminate hearings, set/reset hearings 149 , order on motion to continue,, terminate deadlines and hearings,, set/reset hearings, 148 *(and Joint Status Report)* (Attachments: # 1 Proposed Order)(Waxman, Seth) (Entered: 04/03/2018) |
| 04/03/2018 | 151 | NOTICE of Motion by Seth P Waxman for presentment of motion to stay, 150 before Honorable Amy J. St. Eve on 4/10/2018 at 08:30 AM. (Waxman, Seth) (Entered: 04/03/2018) |
| 04/09/2018 | 152 | *Unopposed* MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development for leave to appear as counsel telephonically *Unopposed* (Attachments: # 1 Text of Proposed Order, # 2 Notice of Filing)(Newton, Emily) (Entered: 04/09/2018) |
| 04/10/2018 | 153 | MINUTE entry before the Honorable Amy J. St. Eve: Defendants' motion for leave to appear telephonically 152 is granted. The Court will call Ms. Newton at the telephone number listed on the docket.Mailed notice (kef, ) (Entered: 04/10/2018) |
| 04/10/2018 | 154 | MINUTE entry before the Honorable Amy J. St. Eve: Motion hearing held on 4/10/2018. Motion to continue the stay in this case 150 is granted. The stay is continued until 5/10/18 at which time the parties shall file a joint status report informing the Court of any updates. Status hearing set for 4/12/18 is stricken and reset to 5/15/18 at 8:30 a.m. Mailed notice (kef, ) (Entered: 04/10/2018) |

| | | |
|---|---|---|
| 05/10/2018 | 155 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to continue *the current stay & vacate the status hearing* (Attachments: # 1 Text of Proposed Order, # 2 Notice of Filing)(Newton, Emily) (Entered: 05/10/2018) |
| 05/14/2018 | 156 | MINUTE entry before the Honorable Amy J. St. Eve: Joint motion to continue the stay in the case and vacate the status hearing 155 is granted. The Court hereby stays the case until 6/25/18. The parties shall file a joint status report on 6/25/18. Status hearing and notice of motion date of 5/15/18 are stricken. Mailed notice (kef, ) (Entered: 05/14/2018) |
| 05/23/2018 | 157 | EXECUTIVE COMMITTEE ORDER: It appearing that cases previously assigned to the Honorable Amy J. St. Eve requires reassignment; therefore It is hereby ordered that the cases on the attached list are to be reassigned to the other judges of this Court as indicated, pursuant to Local Rule 40.1(f) within the guidelines of IOP 16. Case reassigned to the Honorable Rebecca R. Pallmeyer for all further proceedings. Honorable Amy J. St. Eve no longer assigned to the case. Signed by Executive Committee on 5/23/2018. (bg, ) (Entered: 05/23/2018) |
| 05/25/2018 | 158 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: This case has been reassigned from Judge St. Eve. The court adopts Judge St. Eve's previous order and directs that the parties submit their joint status report on or before 6/25/2018. Mailed notice. (etv, ) (Entered: 05/25/2018) |
| 06/25/2018 | 159 | MOTION by Plaintiff Property Casualty Insurers Association of America to stay *(Joint Status Report and Motion To Continue Stay)* (Attachments: # 1 Notice of Filing, # 2 Text of Proposed Order)(Waxman, Seth) (Entered: 06/25/2018) |
| 06/26/2018 | 160 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Joint status report and motion to continue stay 159 is granted to and including 10/19/2018, at which time the parties shall file a joint status report, without an appearance. Status hearing set for 10/25/2018 at 9:00 AM. Mailed notice. (etv, ) (Entered: 06/26/2018) |
| 07/06/2018 | 161 | MOTION by Attorney Peter A. Gabrielli to withdraw as attorney for Property Casualty Insurers Association of America. No party information provided (Waxman, Seth) (Entered: 07/06/2018) |
| 07/10/2018 | 162 | ORDER: Motion of withdrawal of Attorney Peter A. Gabrielli 161 is granted without an appearance. Signed by the Honorable Rebecca R. Pallmeyer on 7/10/2018. Mailed notice (lf, ) (Entered: 07/11/2018) |
| 08/08/2018 | 163 | WITHDRAWING *Daniel Mosteller* as counsel for Defendants Ben Carson, United States Department of Housing and Urban Development and substituting Emily Sue Newton as counsel of record (Newton, Emily) (Entered: 08/08/2018) |
| 08/15/2018 | 164 | ATTORNEY Appearance for Amicus Chicago Lawyers' Committee for Civil Rights Under Law, Inc. by Aneel Lachman Chablani (Chablani, Aneel) (Entered: 08/15/2018) |
| 08/15/2018 | 165 | WITHDRAWING *Elizabeth Shuman−Moore and Ruth Greenwood* as counsel for Amicus Chicago Lawyers' Committee for Civil Rights Under Law, Inc. and substituting Aneel Lachman Chablani as counsel of record (Chablani, Aneel) (Entered: 08/15/2018) |
| 10/19/2018 | 166 | STATUS Report by Ben Carson, United States Department of Housing and Urban Development (Attachments: # 1 Notice of Filing, # 2 Text of Proposed Order)(Newton, Emily) (Entered: 10/19/2018) |
| 10/19/2018 | | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development, Plaintiff Property Casualty Insurers Association of America to continue stay (Omitted Relief from motion 166 ) (sxb, ) (Entered: 10/22/2018) |
| 10/23/2018 | 167 | NOTICE of Motion by Emily Sue Newton for presentment of motion to continue before Honorable Rebecca R. Pallmeyer on 10/25/2018 at 08:30 AM. (Newton, Emily) (Entered: 10/23/2018) |
| 10/23/2018 | 168 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Parties' joint motion to continue stay and to vacate the status hearing is granted, without an appearance. Status hearing set for 10/25/2018 is stricken and re−set to 12/18/2018 at 9:00 AM. Mailed notice. (etv, ) (Entered: 10/23/2018) |

App.138

| | | |
|---|---|---|
| 12/11/2018 | 169 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay (Attachments: # 1 Text of Proposed Order)(Newton, Emily) (Entered: 12/11/2018) |
| 12/11/2018 | 170 | NOTICE of Motion by Emily Sue Newton for presentment of motion to stay 169 before Honorable Rebecca R. Pallmeyer on 12/13/2018 at 08:45 AM. (Newton, Emily) (Entered: 12/11/2018) |
| 12/11/2018 | | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to vacate status hearing. (Omitted Relief from Motion 169 ). (smm, ) (Entered: 12/12/2018) |
| 12/12/2018 | 171 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Joint motion to continue stay and vacate status hearing 169 is granted without an appearance. Status hearing set for 12/18/2018 is stricken. The parties are directed to submit a written status report on 2/1/2019. Mailed notice. (etv, ) (Entered: 12/12/2018) |
| 03/14/2019 | 172 | STATUS Report by Ben Carson, United States Department of Housing and Urban Development (Newton, Emily) (Entered: 03/14/2019) |
| 03/15/2019 | 173 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Parties are directed to provide a joint status report as proposed in their report, on or before May 13, 2019. Mailed notice. (etv, ) (Entered: 03/15/2019) |
| 05/06/2019 | 174 | MOTION by Attorney Anuradha Sivaram to withdraw as attorney for Property Casualty Insurers Association of America. No party information provided (Waxman, Seth) (Entered: 05/06/2019) |
| 05/08/2019 | 175 | ORDER : Motion for withdrawal of Anuradha Sivaram 174 is granted. Signed by the Honorable Rebecca R. Pallmeyer on 5/8/2019. Mailed notice. (ek, ) (Entered: 05/09/2019) |
| 05/13/2019 | 176 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 05/13/2019) |
| 05/17/2019 | 177 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' suggestion, the court directs that the stay will remain in effect. Further joint written status report to be submitted on or before June 12, 2019. Mailed notice. (etv, ) (Entered: 05/17/2019) |
| 06/12/2019 | 178 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 06/12/2019) |
| 06/14/2019 | 179 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' request, this case remains stayed until July 2, 2019. On that date, the parties will file a joint status report proposing next steps for resolution. Mailed notice. (etv, ) (Entered: 06/14/2019) |
| 06/18/2019 | 180 | MOTION by Attorney Roger L. Smerage to withdraw as attorney for The American Financial Services Association, The Consumer Mortgage Coalition, The Independent Community Bankers of America, The Mortgage Bankers Association. No party information provided (Smerage, Roger) (Entered: 06/18/2019) |
| 06/19/2019 | 181 | ORDER: Motion of Roger L. Smerage to withdraw 180 as counsel for Defendants is granted. Signed by the Honorable Rebecca R. Pallmeyer on 6/19/2019. Mailed notice(pk, ) (Entered: 06/20/2019) |
| 07/02/2019 | 182 | ATTORNEY Appearance for Amicus State of Oklahoma ex rel John D. Doak by Daniel J. Mohan (Mohan, Daniel) (Entered: 07/02/2019) |
| 07/02/2019 | 183 | WITHDRAWING *Kevin W. Baldwin* as counsel for Amicus State of Oklahoma ex rel John D. Doak and substituting Daniel J. Mohan as counsel of record (Mohan, Daniel) (Entered: 07/02/2019) |
| 07/11/2019 | 184 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 07/11/2019) |
| 07/26/2019 | 185 | ATTORNEY Appearance for Amicus State of Oklahoma ex rel John D. Doak by Kerry Mohan (Mohan, Kerry) (Entered: 07/26/2019) |

| 08/12/2019 | 186 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 08/12/2019) |
|---|---|---|
| 08/13/2019 | 187 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' joint request, the stay of this case remains in effect until September 11, 2019. On that date, the parties will file a joint staus report on the expected timing of further action by HUD and proposed next steps. Mailed notice (mw, ) (Entered: 08/13/2019) |
| 09/11/2019 | 188 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 09/11/2019) |
| 09/12/2019 | 189 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' joint request, the stay of this case remains in effect until November 18, 2019. On that date, the parties will file a joint status report on the expected timing of further action by HUD and proposed next steps. Notice mailed by judge's staff (ntf, ) (Entered: 09/12/2019) |
| 11/18/2019 | 190 | STATUS Report by Ben Carson, United States Department of Housing and Urban Development (Newton, Emily) (Entered: 11/18/2019) |
| 11/19/2019 | 191 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' joint request, the stay of this case remains in effect until January 17, 2020. On that date, the parties will file a joint status report on the expected timing of further action by HUD and proposed next steps. Notice mailed by judge's staff (ntf, ) (Entered: 11/19/2019) |
| 01/17/2020 | 192 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 01/17/2020) |
| 01/21/2020 | 193 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' joint request, the stay of this case remains in effect until March 17, 2020. On that date, the parties will file a joint status report on the expected timing of further action by HUD and proposed next steps. Notice mailed by judge's staff (ntf, ) (Entered: 01/21/2020) |
| 03/17/2020 | 194 | STATUS Report by Ben Carson, United States Department of Housing and Urban Development (Newton, Emily) (Entered: 03/17/2020) |
| 03/18/2020 | 195 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' joint request, the stay of this case remains in effect until May 18, 2020. On that date, the parties will file a joint status report on the expected timing of further action by HUD and proposed next steps. Notice mailed by judge's staff (ntf, ) (Entered: 03/18/2020) |
| 05/18/2020 | 196 | STATUS Report by Ben Carson, United States Department of Housing and Urban Development (Newton, Emily) (Entered: 05/18/2020) |
| 05/26/2020 | 197 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court thanks the parties for their recent status report and requests a further status report, as proposed, on or before July 17, 2020. Notice mailed by judge's staff (ntf, ) (Entered: 05/26/2020) |
| 07/17/2020 | 198 | STATUS Report by Ben Carson, United States Department of Housing and Urban Development (Newton, Emily) (Entered: 07/17/2020) |
| 07/20/2020 | 199 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court has reviewed the parties' July 17, 2020 report and extends the stay now in effect, but only until August 5, 2020. The parties are directed to submit a further joint written status report on or before August 14, 2020. Notice mailed by judge's staff (ntf, ) (Entered: 07/20/2020) |
| 08/14/2020 | 200 | STATUS Report *(Joint)* by Property Casualty Insurers Association of America (Boynton, Brian) (Entered: 08/14/2020) |
| 08/17/2020 | 201 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court acknowledges receipt of the parties' joint status report. After consideration, the court agrees with Plaintiff that because after many months HUD has not yet adopted a new rule, the parties should proceed with summary judgment briefing in this case. Plaintiff has leave to renew its motion for summary judgment and submit that motion, with supporting memorandum, on or before September 23, 2020. Defendant's combined opposition to Plaintiff's motion for summary judgment and cross−motion for summary judgment to be filed on or before October 21, 2020. Plaintiff's combined opposition to Defendants' cross−motion for summary judgment, and reply brief in support of Plaintiff's own |

| | | motion, to be filed on or before November 11. Defendants' reply brief in support of their cross–motion for summary judgment shall be filed on or before November 30, 2020. The court will set oral argument by telephone on 12/15/2020 at 9:30 a.m. Members of the public and media will be able to call in to listen to this hearing. The call–in number is 877–336–1839 and the access code is 6708061. Counsel of record will receive an email 10 minutes prior to the start of the telephonic hearing with instructions to join the call. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Notice mailed by judge's staff (ntf, ) (Entered: 08/17/2020) |
|---|---|---|
| 09/14/2020 | 202 | Notice & Request to Vacate Summary Judgment Schedule by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 09/14/2020) |
| 09/15/2020 | 203 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: On September 3, 2020, HUD issued a final rule, and the parties have moved jointly that the court vacate the summary judgment schedule. The motion 202 is granted. The court vacates the summary judgment schedule entered on 8/17/2020. Parties will submit a joint written status report on or before December 14, 2020, proposing next steps for resolution of this case. Notice mailed by judge's staff (ntf, ) (Entered: 09/15/2020) |
| 12/14/2020 | 204 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 12/14/2020) |
| 12/15/2020 | 205 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: As proposed in the parties' joint status report, the case remains stayed for 60 days. Parties are directed to submit a further joint written status report on or before February 12, 2021. Notice mailed by judge's staff (ntf, ) (Entered: 12/15/2020) |
| 01/19/2021 | 206 | NOTICE by Property Casualty Insurers Association of America *(of Withdrawal of Counsel)* (Boynton, Brian) (Entered: 01/19/2021) |
| 01/19/2021 | 207 | NOTICE by Property Casualty Insurers Association of America *(of Withdrawal of Counsel)* (Waxman, Seth) (Entered: 01/19/2021) |
| 02/03/2021 | 208 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752–17892012. (Carroll, Catherine) (Entered: 02/03/2021) |
| 02/03/2021 | 209 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752–17892077. (Sivaram, Anuradha) (Entered: 02/03/2021) |
| 02/03/2021 | 210 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752–17892121. (Katsampes, Athena) (Entered: 02/03/2021) |
| 02/04/2021 | 211 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motions for leave to appear pro hac vice 208 , 209 , and 210 is granted. Attorneys Catherine M.A. Carroll, Athena L. Katsampes, and Anuradha Sivaram are given leave to file appearance forms on behalf of Plaintiff. Notice mailed by judge's staff (ntf, ) (Entered: 02/04/2021) |
| 02/12/2021 | 212 | STATUS Report *(Joint)* by Property Casualty Insurers Association of America (Carroll, Catherine) (Entered: 02/12/2021) |
| 02/16/2021 | 213 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: At the parties' joint request, the stay of this case remains in effect until April 15, 2021. On that date, the parties will file a joint status report on the expected timing of further action by HUD and proposed next steps. Notices mailed by judge's staff (ntf, ) (Entered: 02/16/2021) |
| 04/15/2021 | 214 | STATUS Report by United States Department of Housing and Urban Development (Newton, Emily) (Entered: 04/15/2021) |
| 04/23/2021 | 215 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Telephone status hearing set for 4/28/2021 at 9:45 a.m. Members of the public and media will be able to call in to listen to this hearing. Instructions and a link to the conference number are located on Judge Pallmeyer's website. Persons granted remote access to proceedings are reminded |

| | | |
|---|---|---|
| | | of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Notice mailed by judge's staff (ntf, ) (Entered: 04/23/2021) |
| 04/28/2021 | 216 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Telephone status hearing held. The court adopts the schedule proposed by the parties in their status report: Plaintiff's renewed motion for summary judgment shall be filed on or before May 28, 2021; Defendants' opposition and cross–motion for summary judgment shall be filed by June 25, 2021; Plaintiff's combined opposition to Defendants' cross–motion and reply brief in support of Plaintiff's motion for summary judgment shall be filed by July 16, 2021; Defendants' reply brief in support of their cross–motion for summary judgment shall be filed by July 30, 2021. Notice mailed by judge's staff (ntf, ) (Entered: 04/28/2021) |
| 05/27/2021 | 217 | MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file excess pages *(consent)*, MOTION by Plaintiff Property Casualty Insurers Association of America to Extend Briefing Deadlines in this Case *(consent)* (Waxman, Seth) (Entered: 05/27/2021) |
| 05/27/2021 | 218 | ATTORNEY Appearance for Plaintiff Property Casualty Insurers Association of America by Alyssa Marie Gregory (Gregory, Alyssa) (Entered: 05/27/2021) |
| 05/28/2021 | 219 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion 217 is granted. PCI has leave to file a memorandum in support of its motion for summary judgment of up to 25 pages and an accompanying statement of undisputed material facts of up to 100 numbered paragraphs. Defendants have leave to file an opposition brief of up to 35 pages and statement of additional facts of up to 100 numbered paragraphs. Briefing schedule is amended as follows: PCI's motion and reply brief in support of its summary judgment motion shall be filed by July 30, 2021, and Defendants' reply brief in support of its cross–motion for summary judgment shall be filed by August 13, 2021. Notice mailed by judge's staff (ntf, ) (Entered: 05/28/2021) |
| 05/28/2021 | 220 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Minute entry dated 5/28/2021 219 is amended as follows: Briefing schedule is amended as follows: Defendants' opposition and cross–motion for summary judgment shall be filed by July 9, 2021. Remainder of order to stand. Notice mailed by judge's staff (ntf, ) (Entered: 05/28/2021) |
| 05/28/2021 | 221 | MOTION by Plaintiff Property Casualty Insurers Association of America for summary judgment *(Renewed)* (Waxman, Seth) (Entered: 05/28/2021) |
| 05/28/2021 | 222 | MEMORANDUM by Property Casualty Insurers Association of America in support of motion for summary judgment 221 (Attachments: # 1 Statement of Undisputed Material Facts, # 2 Declaration of Seth P. Waxman, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8)(Waxman, Seth) (Entered: 05/28/2021) |
| 06/01/2021 | 223 | NOTICE OF WITHDRAWAL OF APPEARANCE by Property Casualty Insurers Association of America *of Ashlee M. Knuckey* (Knuckey, Ashlee) (Entered: 06/01/2021) |
| 06/17/2021 | 224 | ATTORNEY Appearance for Defendants Ben Carson, United States Department of Housing and Urban Development by Vinita Balakrishnan Andrapalliyal (Andrapalliyal, Vinita) (Entered: 06/17/2021) |
| 06/28/2021 | 225 | MOTION by Amicus Chicago Lawyers' Committee for Civil Rights Under Law, Inc. for leave to file *Amicus Curiae Brief* (Chablani, Aneel) (Entered: 06/28/2021) |
| 06/29/2021 | 226 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay *proceedings for 90 days* (Attachments: # 1 Text of Proposed Order)(Andrapalliyal, Vinita) (Entered: 06/29/2021) |
| 06/29/2021 | 227 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The Court adopts the parties proposed briefing schedule on Defendants' motion to stay proceedings for 90 days 226 as follows: Plaintiff's response in opposition shall be filed by 07/02/2021; Defendant's reply in support of its motion shall be filed by 07/06/2021. Notices mailed |

App.142

| | | |
|---|---|---|
| | | by judge's staff. (rbf, ) (Entered: 06/29/2021) |
| 06/29/2021 | 228 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The Unopposed Motion for Leave to File a Brief Amicus Curiae 225 is granted. Notices mailed by judge's staff. (rbf, ) (Entered: 06/29/2021) |
| 07/02/2021 | 229 | RESPONSE by Property Casualty Insurers Association of Americain Opposition to MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay *proceedings for 90 days* 226 (Waxman, Seth) (Entered: 07/02/2021) |
| 07/06/2021 | 230 | REPLY by Ben Carson, Shaun Donovan, United States Department of Housing and Urban Development to response in opposition to motion 229 , MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay *proceedings for 90 days* 226 (Andrapalliyal, Vinita) (Entered: 07/06/2021) |
| 07/09/2021 | 231 | MOTION by Defendants United States Department of Housing and Urban Development, Shaun Donovan, Ben Carson for summary judgment (Andrapalliyal, Vinita) (Entered: 07/09/2021) |
| 07/09/2021 | 232 | MEMORANDUM by Ben Carson, Shaun Donovan, United States Department of Housing and Urban Development *in Support of Motion for Summary Judgment, in Opposition to Plaintiff's Motion for Summary Judgment* (Attachments: # 1 Statement of Facts, # 2 Response to Plaintiff's Statement of Facts, # 3 Text of Proposed Order)(Andrapalliyal, Vinita) (Entered: 07/09/2021) |
| 07/16/2021 | 233 | Brief of Amicus Curiae ACLU, ACLU–IL, CAFHA, CLCCR, LCCRUL, LDF, NCLC and NFHA by Chicago Lawyers' Committee for Civil Rights Under Law, Inc. (Chablani, Aneel) (Entered: 07/16/2021) |
| 07/16/2021 | 234 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752–18466800. (Akselrod, Olga) (Entered: 07/16/2021) |
| 07/23/2021 | 235 | NOTICE by Property Casualty Insurers Association of America *(of Withdrawal of Counsel)* (Katsampes, Athena) (Entered: 07/23/2021) |
| 07/23/2021 | 236 | MOTION by Defendant United States Department of Housing and Urban Development for extension of time (Newton, Emily) (Entered: 07/23/2021) |
| 07/26/2021 | 237 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion 236 is granted. Date for filing of PCI's reply brief is extended to August 6, 2021. Date for Defendants' reply brief is extended to August 20, 2021. Olga Akselrod's motion for leave to appear pro hac vice 234 is granted. Attorney Olga Akselrod is granted leave to file her appearance on behalf of the American Civil Liberties Union Foundation. Mailed notice. (rbf, ) (Entered: 07/26/2021) |
| 08/05/2021 | 238 | MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file *an Overlength Combined Opposition to Defendants' Cross–Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment (Unopposed)* (Waxman, Seth) (Entered: 08/05/2021) |
| 08/06/2021 | 239 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion for leave to file an overlength combined opposition to defendants' cross–motion for summary judgment and rely in support of plaintiff's motion for summary judgment 238 is granted. Mailed notice. (rbf, ) (Entered: 08/06/2021) |
| 08/06/2021 | 240 | MEMORANDUM by Property Casualty Insurers Association of America in Opposition to motion for summary judgment 231 *and Reply in Support of its Motion for Summary Judgment 221* (Attachments: # 1 Response to Defendants' Statement of Undisputed Material Facts)(Waxman, Seth) (Entered: 08/06/2021) |
| 08/10/2021 | 241 | ATTORNEY Appearance for Amicus American Civil Liberties Union of Illinois by Nusrat Jahan Choudhury (Choudhury, Nusrat) (Entered: 08/10/2021) |
| 08/19/2021 | 242 | ATTORNEY Appearance for Amicus American Civil Liberties Union Foundation by Olga Akselrod (Akselrod, Olga) (Entered: 08/19/2021) |

| | | |
|---|---|---|
| 08/19/2021 | 243 | MOTION by Defendant United States Department of Housing and Urban Development for leave to file excess pages (Newton, Emily) (Entered: 08/19/2021) |
| 08/20/2021 | 244 | MINUTE entry before the Honorable R. Pallmeyer: The motion for leave to file excess pages 243 is granted. Defendants have leave to file a reply brief of 20 pages. Notices mailed. (psm, ) (Entered: 08/20/2021) |
| 08/20/2021 | 245 | REPLY by Defendant United States Department of Housing and Urban Development to motion for summary judgment 231 (Newton, Emily) (Entered: 08/20/2021) |
| 01/03/2022 | 246 | MOTION by Attorney Emily Sue Newton to withdraw as attorney for United States Department of Housing and Urban Development. No party information provided (Newton, Emily) (Entered: 01/03/2022) |
| 01/04/2022 | 247 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion by attorney Emily Sue Newton to withdraw as attorney for United States Department of Housing and Urban Development 246 is granted. Attorney Emily Sue Newton terminated. (rbf, ) (Entered: 01/04/2022) |
| 02/25/2022 | 248 | ORDER: In light of HUD's impending rulemaking, Plaintiff's and Defendants' motions for summary judgment 221 , 231 are stricken without prejudice to renewal on August 24, 2022. On or before that date, Defendants are instructed to update the court on HUD's proposed reinstatement of its 2013 disparate impact rule. Signed by the Honorable Rebecca R. Pallmeyer on 2/25/2022. Mailed notice(mjc, ) (Entered: 02/25/2022) |
| 08/24/2022 | 249 | STATUS Report *(Joint)* by Ben Carson, United States Department of Housing and Urban Development (Andrapalliyal, Vinita) (Entered: 08/24/2022) |
| 08/25/2022 | 250 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court thanks the parties for their recent status report. The report notes that HUD is reviewing some 10,000 comments it received in response to its Notice of Proposed Rulemaking specifically, the proposed Reinstatement of HUD's Discriminatory Effects Standard." The court agrees with Defendants that requiring them to respond to the briefing in this case while at the same time reconsidering the rule under challenge is problematic. The court also agrees, however, that the agency's stated plan to "publish[] a final rule later this year" is frustratingly vague. For the reasons set forth in its February 25, 2022 order, the court will continue the stay of this case for another 90 days. Absent promulgation of a new rule by November 28, 2022, the court will lift the stay and proceed with briefing concerning the 2013 rule. Mailed notice. (cp, ) (Entered: 08/25/2022) |
| 08/29/2022 | 251 | MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file *Notice of Supplemental Authority* (Attachments: # 1 Notice of Supplemental Authority)(Waxman, Seth) (Entered: 08/29/2022) |
| 09/02/2022 | 252 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court acknowledges Plaintiff's Notice of Supplemental Authority 251 and directs the Defendants to file their response, if any, no more than five pages in length, on or before September 15, 2022. Mailed notice. (cp, ) (Entered: 09/02/2022) |
| 09/15/2022 | 253 | RESPONSE by Ben Carson, Shaun Donovan, United States Department of Housing and Urban Development to MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file *Notice of Supplemental Authority* 251 (Andrapalliyal, Vinita) (Entered: 09/15/2022) |
| 09/16/2022 | 254 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court acknowledges the government's response to Plaintiff's supplemental authority 253 and grants Plaintiff's motion for leave to file that authority 251 . Mailed notice. (cp, ) (Entered: 09/16/2022) |
| 11/23/2022 | 255 | ATTORNEY Appearance for Defendants Ben Carson, United States Department of Housing and Urban Development by James D Todd, Jr (Todd, James) (Entered: 11/23/2022) |
| 11/23/2022 | 256 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay regarding text entry,,, 250 , *Unopposed, for Another 30 Days in light of Defendants' Status Report* (Attachments: # 1 Text of Proposed |

| | | Order)(Todd, James) (Entered: 11/23/2022) |
|---|---|---|
| 11/28/2022 | 257 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's unopposed motion to continue the stay of this case 256 is granted. Parties are directed to file a further status report on or before December 30, 2022. Mailed notice. (cp, ) (Entered: 11/28/2022) |
| 12/29/2022 | 258 | ANNUAL REMINDER: Pursuant to Local Rule 3.2 (Notification of Affiliates), any nongovernmental party, other than an individual or sole proprietorship, must file a statement identifying all its affiliates known to the party after diligent review or, if the party has identified no affiliates, then a statement reflecting that fact must be filed. An affiliate is defined as follows: any entity or individual owning, directly or indirectly (through ownership of one or more other entities), 5% or more of a party. The statement is to be electronically filed as a PDF in conjunction with entering the affiliates in CM/ECF as prompted. As a reminder to counsel, parties must supplement their statements of affiliates within thirty (30) days of any change in the information previously reported. This minute order is being issued to all counsel of record to remind counsel of their obligation to provide updated information as to additional affiliates if such updating is necessary. If counsel has any questions regarding this process, this LINK will provide additional information. Signed by the Executive Committee on 12/29/2022: Mailed notice. (tg, ) (Entered: 12/29/2022) |
| 12/30/2022 | 259 | STATUS Report , Joint by Ben Carson, United States Department of Housing and Urban Development (Todd, James) (Entered: 12/30/2022) |
| 01/03/2023 | 260 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court has reviewed the parties' joint written status report. Defendant reports that on December 7, 2022, HUD transmitted the final rule to the Office of Management and Budget ("OMB") and requested expedited review. Defendant requests that the court continue the stay of this case "for another 30 days or until HUD's final rule is published in the Federal Register (whichever is sooner)" but only for purposes, at that time, of a further status report. Plaintiff asserts that as "HUD intends to reinstate the 2013 Rule," there is no reason for further delay, and the court can and should reinstate the parties' cross–motions for summary judgment. Defendant does not challenge the assertion that the likely result of further administrative process is reinstatement of the Rule that was the subject of Plaintiff's initial challenge. Within 14 days, Defendant's counsel is directed to advise the court whether they have a good–faith belief that the final rule will differ meaningfully from the 2013 Rule and, if so, the basis for that belief. Absent such a communication, the court will lift the stay, reinstate the parties' motions, and proceed to a hearing or ruling. Mailed notice. (cp, ) (Entered: 01/03/2023) |
| 01/12/2023 | 261 | MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay regarding text entry,,,,, 260 and Status Report (Attachments: # 1 Text of Proposed Order)(Todd, James) (Entered: 01/12/2023) |
| 01/19/2023 | 262 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff to file its response to defendant's motion to stay 261 by 1/24/2023. Defendants to reply by 1/31/2023. Mailed notice. (cp, ) (Entered: 01/19/2023) |
| 01/24/2023 | 263 | NOTICE by Seth P Waxman of Change of Address (Waxman, Seth) (Entered: 01/24/2023) |
| 01/24/2023 | 264 | NOTICE by Catherine M.A. Carroll of Change of Address (Carroll, Catherine) (Entered: 01/24/2023) |
| 01/24/2023 | 265 | NOTICE by Anuradha Sivaram of Change of Address (Sivaram, Anuradha) (Entered: 01/24/2023) |
| 01/24/2023 | 266 | RESPONSE by Property Casualty Insurers Association of Americain Opposition to MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay regarding text entry,,,,, 260 and Status Report 261 (Waxman, Seth) (Entered: 01/24/2023) |
| 01/30/2023 | 267 | MOTION by Attorney Anuradha Sivaram to withdraw as attorney for Property Casualty Insurers Association of America. No party information provided (Sivaram, Anuradha) (Entered: 01/30/2023) |

| 01/31/2023 | 268 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Attorney Anuradha Sivaram's motion to withdraw as counsel for Plaintiff 267 is granted. Mailed notice (cn). (Entered: 01/31/2023) |
|---|---|---|
| 01/31/2023 | 269 | REPLY by Ben Carson, United States Department of Housing and Urban Development to response in opposition to motion, 266 , MOTION by Defendants Ben Carson, United States Department of Housing and Urban Development to stay regarding text entry,,,,,, 260 *and Status Report* 261 (Todd, James) (Entered: 01/31/2023) |
| 03/17/2023 | 270 | STATUS Report by Ben Carson, United States Department of Housing and Urban Development (Todd, James) (Entered: 03/17/2023) |
| 03/20/2023 | 271 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court thanks counsel for the recent status report 270 and invites parties to submit a proposed agreed briefing schedule or written status report on or before April 27, 2023. Mailed notice. (cp, ) (Entered: 03/20/2023) |
| 04/27/2023 | 272 | STATUS Report *(Joint)* by Property Casualty Insurers Association of America (Waxman, Seth) (Entered: 04/27/2023) |
| 04/28/2023 | 273 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court thanks the parties for their recent status report 272 and, at their request, enters the following schedule: Plaintiff has leave to file its Second Amended Complaint on or before May 3, 2023. Defendants' answer is due on May 31, 2023. Plaintiff will file its motion for summary judgment on June 28, 2023. Defendants' combined memorandum in opposition to summary judgment and cross–motion for summary judgment will be filed on August 9, 2023. Plaintiff's combined opposition to Defendant's motion and reply in support of its own motion to be filed on August 30, 2023. Defendant's reply in support of its motion for summary judgment will be filed on September 20, 2023. On September 29, 2023, the parties will file their joint excerpts from the administrative record. Defendants' motion to stay 261 is stricken as moot. Mailed notice. (cp, ) (Entered: 04/28/2023) |
| 05/03/2023 | 274 | *SECOND* AMENDED complaint by Property Casualty Insurers Association of America against Ben Carson, United States Department of Housing and Urban Development (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Waxman, Seth) (Entered: 05/03/2023) |
| 05/26/2023 | 275 | MOTION by Defendants Marcia L. Fudge, United States Department of Housing and Urban Development to stay regarding amended complaint, 274 *Defendants' Deadline to Answer*<br><br>(Attachments: # 1 Text of Proposed Order)(Todd, James) (Entered: 05/26/2023) |
| 05/30/2023 | 276 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's unopposed motion to stay deadline to respond to plaintiff's second amended complaint 275 is granted. Defendant's deadline to respond to plaintiff's second amended complaint is stayed until after the court resolves the parties' respective summary judgment motions. If the Court denies both summary judgment motions, defendants will respond to plaintiff's second amended complaint 14 days after any such decision. Mailed notice. (cp, ) (Entered: 05/30/2023) |
| 06/12/2023 | 277 | ATTORNEY Appearance for Amicus American Civil Liberties Union of Illinois by Ameri Rose Klafeta (Klafeta, Ameri) (Entered: 06/12/2023) |
| 06/12/2023 | 278 | MOTION by Attorney Nusrat Jahan Choudhury to withdraw as attorney for American Civil Liberties Union of Illinois. No party information provided<br><br>(Choudhury, Nusrat) (Entered: 06/12/2023) |
| 06/13/2023 | 279 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion to withdraw appearance 278 is granted; Attorney Nusrat Jahan Choudhury is terminated as counsel for American Civil Liberties Union of Illinois. Mailed notice. (cp, ) (Entered: 06/13/2023) |

| 06/26/2023 | 280 | MOTION by Plaintiff Property Casualty Insurers Association of America for leave to file excess pages *(Consent)*<br><br>(Waxman, Seth) (Entered: 06/26/2023) |
|---|---|---|
| 06/27/2023 | 281 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Consent Motion for leave to file an overlength brief and overlength statement of undisputed material facts 280 is granted, as to the page lengths stated in the motion. Mailed notice. (cp, ) (Entered: 06/27/2023) |
| 06/28/2023 | 282 | MOTION by Plaintiff Property Casualty Insurers Association of America for summary judgment *(Renewed)*<br><br>(Attachments: # 1 Text of Proposed Order)(Waxman, Seth) (Entered: 06/28/2023) |
| 06/28/2023 | 283 | MEMORANDUM by Property Casualty Insurers Association of America in support of motion for summary judgment 282 (Attachments: # 1 Statement of Undisputed Material Facts, # 2 Declaration of Seth P. Waxman, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13)(Waxman, Seth) (Entered: 06/28/2023) |
| 08/01/2023 | 284 | MOTION by Defendants Marcia L. Fudge, United States Department of Housing and Urban Development to set a briefing schedule , *Amended*<br><br>(Attachments: # 1 Text of Proposed Order)(Todd, James) (Entered: 08/01/2023) |
| 08/02/2023 | 285 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion to re–set briefing schedule 284 is granted. As proposed, Defendants will file their combined: (i) opposition to Plaintiff's summaryjudgment motion. (ii) brief in support of Defendants' summary judgment motion, and (iii) response to Idaho's amicus brief by Tuesday, September 26, 2023; Plaintiff will file its combined reply & opposition brief by Tuesday, October 24, 2023; Defendants will file their reply brief by Tuesday, November 21, 2023; and the parties will file joint excerpts of the Administrative Record by December 1, 2023. Mailed notice (cn). (Entered: 08/02/2023) |
| 08/02/2023 | 286 | ATTORNEY Appearance for Plaintiff Property Casualty Insurers Association of America by Colleen Marie Campbell (Campbell, Colleen) (Entered: 08/02/2023) |
| 08/04/2023 | 287 | MOTION by Amicus Chicago Lawyers' Committee for Civil Rights Under Law, Inc. for leave to file *Amicus Curiae Brief*<br><br>(Chablani, Aneel) (Entered: 08/04/2023) |
| 08/04/2023 | 288 | ATTORNEY Appearance for Amicus State of Idaho by John C Keenan *Idaho Department of Insurance* (Keenan, John) (Entered: 08/04/2023) |
| 08/07/2023 | 289 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Unopposed motion for leave to file a brief AMICUS CURIAE 287 is granted. ACLU, ACLU–IL, CAFHA, CLCCR, LCCRUL, NCLC and NFHA are granted leave to File a Brief Amicus Curiae of no more than 25 pages on behalf of themselves and similarly positioned fair housing and civil rights organizations on or before October 3, 2023. Mailed notice. (cp, ) (Entered: 08/07/2023) |
| 08/08/2023 | 290 | MOTION by Amicus State of Idaho for leave to file *Amicus Curiae Brief; Extension of Time and Number of Pages*<br><br>(Keenan, John) (Entered: 08/08/2023) |
| 08/09/2023 | 291 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Without objection, Motion for leave to file Amicus Curiae brief, extend time to file brief and extend the number of pages of brief 290 is granted. The Director of the State of Idaho, Idaho Department of Insurance, the Commissioner of the Oklahoma Insurance Department, and the Commissioner of the Louisiana Department of Insurance are granted leave to extend the time to file an amicus curiae brief of 25 pages in length. Mailed notice. (cp, ) (Entered: 08/09/2023) |

| | | |
|---|---|---|
| 08/25/2023 | 292 | Amicus Brief by State of Idaho *In Support of Renewed Motion for Summary Judgment* (Keenan, John) (Entered: 08/25/2023) |
| 09/25/2023 | 293 | MOTION by Defendants Marcia L. Fudge, United States Department of Housing and Urban Development for leave to file excess pages *Unopposed* (Attachments: # 1 Text of Proposed Order)(Todd, James) (Entered: 09/25/2023) |
| 09/26/2023 | 294 | MOTION by Defendants Marcia L. Fudge, United States Department of Housing and Urban Development to be Excused from LR 56.1(b) requirement to respond to Plaintiff's Statement of Material Facts *Filed with Consent of Plaintiff* (Attachments: # 1 Text of Proposed Order)(Todd, James) (Entered: 09/26/2023) |
| 09/26/2023 | 295 | MOTION by Defendants Marcia L. Fudge, United States Department of Housing and Urban Development for summary judgment (Attachments: # 1 Supporting Memorandum of Law, # 2 Statement of Material Facts)(Todd, James) (Entered: 09/26/2023) |
| 09/26/2023 | 296 | MEMORANDUM by Marcia L. Fudge, United States Department of Housing and Urban Development in Opposition to motion for summary judgment 282 (Todd, James) (Entered: 09/26/2023) |
| 09/27/2023 | 297 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendants' unopposed motion for leave to file excess pages 293 and Defendants' consent motion for leave to be excused from responding to plaintiff's statement of material facts or, in the alternative, for extension of time to respond 294 are granted. Orders to enter. Mailed notice. (cp, ) (Entered: 09/28/2023) |
| 09/27/2023 | 298 | ORDER: Signed by the Honorable Rebecca R. Pallmeyer on 9/27/2023. Mailed notice. (cp, ) (Entered: 09/28/2023) |
| 09/27/2023 | 299 | ORDER: Signed by the Honorable Rebecca R. Pallmeyer on 9/27/2023. Mailed notice. (cp, ) (Entered: 09/28/2023) |
| 09/28/2023 | 300 | ATTORNEY Appearance for Amicus Parties American Civil Liberties Union Foundation, American Civil Liberties Union of Illinois, Chicago Lawyers' Committee for Civil Rights Under Law, Inc. by Jon Marshall Greenbaum, (Greenbaum,, Jon) (Entered: 09/28/2023) |
| 10/03/2023 | 301 | Amicus Brief by Chicago Lawyers' Committee for Civil Rights Under Law, Inc. *et al.* (Chablani, Aneel) (Entered: 10/03/2023) |
| 10/17/2023 | 302 | ATTORNEY Appearance for Amicus State of Illinois by Alexandra Lane Reed *Appearance for State of Illinois and amici States* (Reed, Alexandra) (Entered: 10/17/2023) |
| 10/17/2023 | 303 | MOTION by Amicus State of Illinois for leave to file *brief as amici curiae* , MOTION by Amicus State of Illinois for leave to file excess pages (Attachments: # 1 Amicus Brief)(Reed, Alexandra) (Entered: 10/17/2023) |
| 10/17/2023 | 304 | ATTORNEY Appearance for Amicus State of Illinois by Joyce C Otuwa (Otuwa, Joyce) (Entered: 10/17/2023) |
| 10/18/2023 | 305 | RESPONSE by Plaintiff Property Casualty Insurers Association of America to motion for leave to file, motion for leave to file excess pages 303 (Waxman, Seth) (Entered: 10/18/2023) |
| 10/20/2023 | 306 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion for leave to file amicus brief of 25 pages 303 is granted; the court extends by seven days, to October 31, 2023, PCI's deadline to file its combined Opposition to Defendants' Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment. Mailed notice. (cp, ) (Entered: 10/20/2023) |
| 10/20/2023 | 307 | RESPONSE by Defendants Ben Carson, Shaun Donovan, Marcia L. Fudge, United States Department of Housing and Urban Development to Response 305 *and Consent* |

| | | |
|---|---|---|
| | | *Motion to Extend Time to File Reply* (Andrapalliyal, Vinita) (Entered: 10/20/2023) |
| 10/20/2023 | 308 | MOTION by Defendants Ben Carson, Shaun Donovan, Marcia L. Fudge, United States Department of Housing and Urban Development for extension of time to file response/reply *(Consent motion)* |
| | | (Andrapalliyal, Vinita) (Entered: 10/20/2023) |
| 10/20/2023 | 309 | Amicus Brief by State of Illinois *et al. In Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiff's Renewed Motion for Summary Judgment* (Reed, Alexandra) (Entered: 10/20/2023) |
| 10/23/2023 | 310 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: On Defendants' agreed motions 308 , the court grants and extends the date for submission of Plaintiff's opposition and reply brief to November 7, 2023, and extends the date for submission of Defendants' reply brief to December 12, 2023. Mailed notice. (cp, ) (Entered: 10/23/2023) |
| 10/25/2023 | 311 | Motion For Leave to Withdraw as Counsel by State of Illinois (Soltanzadeh, Stephen) (Entered: 10/25/2023) |
| 10/26/2023 | 312 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion for leave to withdraw as counsel 311 is granted. Attorney Stephen Matthew Soltanzadeh is terminated as counsel for Amicus State of Illinois. Mailed notice. (cp, ) (Entered: 10/26/2023) |
| 11/07/2023 | 313 | MEMORANDUM by Property Casualty Insurers Association of America in Opposition to motion for summary judgment 295 *and Reply in Support of Plaintiff's Motion for Summary Judgment* 282 (Waxman, Seth) (Entered: 11/07/2023) |
| 11/29/2023 | 314 | MOTION by Plaintiff Property Casualty Insurers Association of America for extension of time to file *Joint Excerpts of the Administrative Record (Joint)* |
| | | (Waxman, Seth) (Entered: 11/29/2023) |
| 11/30/2023 | 315 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Joint Motion to extend deadline to file joint excerpts of the administrative record 314 is granted. The deadline for filing joint excerpts of the Administrative Record is extended to 12/22/23. Mailed notice. (cp, ) (Entered: 11/30/2023) |
| 12/12/2023 | 316 | REPLY by Marcia L. Fudge, United States Department of Housing and Urban Development to MOTION by Defendants Marcia L. Fudge, United States Department of Housing and Urban Development for summary judgment |
| | | 295 (Todd, James) (Entered: 12/12/2023) |
| 12/20/2023 | 317 | NOTICE by Marcia L. Fudge, United States Department of Housing and Urban Development *of Filing of Joint Appendix of Excerpts of Administrative Record* (Attachments: # 1 Index of Joint Appendix of Excerpts of Administrative Record, # 2 Joint Appendix– Part 1, # 3 Joint Appendix– Part 2, # 4 Joint Appendix – Part 3)(Todd, James) (Entered: 12/20/2023) |
| 12/28/2023 | 318 | ANNUAL REMINDER: Pursuant to Local Rule 3.2 (Notification of Affiliates), any nongovernmental party, other than an individual or sole proprietorship, must file a statement identifying all its affiliates known to the party after diligent review or, if the party has identified no affiliates, then a statement reflecting that fact must be filed. An affiliate is defined as follows: any entity or individual owning, directly or indirectly (through ownership of one or more other entities), 5% or more of a party. The statement is to be electronically filed as a PDF in conjunction with entering the affiliates in CM/ECF as prompted. As a reminder to counsel, parties must supplement their statements of affiliates within thirty (30) days of any change in the information previously reported. This minute order is being issued to all counsel of record to remind counsel of their obligation to provide updated information as to additional affiliates if such updating is necessary. If counsel has any questions regarding this process, this LINK will provide additional information. Signed by the Executive Committee on 12/28/2023: Mailed notice. (tg, ) (Entered: 12/28/2023) |

| 03/26/2024 | 319 | MEMORANDUM Opinion and Order: The court denies PCI's motion for summary judgment 282 and grants HUD's cross−motion for summary judgment 295 . Please see attached Memorandum Opinion and Order for further details. Signed by the Honorable Rebecca R. Pallmeyer on 3/26/2024. Mailed notice. (cp, ) (Entered: 03/26/2024) |
|---|---|---|
| 03/26/2024 | 320 | ENTERED JUDGMENT. Mailed notice. (cp, ) (Entered: 03/26/2024) |
| 04/10/2024 | 321 | MOTION by Attorney Jon Greenbaum to withdraw as attorney for Chicago Lawyers' Committee for Civil Rights Under Law, Inc.. No party information provided<br><br>(Greenbaum,, Jon) (Entered: 04/10/2024) |
| 04/11/2024 | 322 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion to withdraw Jon Greenbaum as counsel on behalf of Lawyers' Committee for Civil Rights Under Law as amicus curiae 321 is granted. Attorney Jon Marshall Greenbaum is terminated as counsel for Lawyers' Committee for Civil Rights Under Law. Mailed notice. (cp, ) (Entered: 04/11/2024) |
| 05/24/2024 | 323 | NOTICE of appeal by Property Casualty Insurers Association of America regarding orders 99 , 129 , 320 , 319 , 98 Filing fee $ 605, receipt number AILNDC−22020723. Receipt number: n (Waxman, Seth) (Entered: 05/24/2024) |
| 05/24/2024 | 324 | DOCKETING Statement by Property Casualty Insurers Association of America regarding notice of appeal 323 (Waxman, Seth) (Entered: 05/24/2024) |
| 06/03/2024 | 325 | NOTICE of Appeal Due letter sent to counsel of record regarding notice of appeal 323 . (ph, ) (Entered: 06/03/2024) |
| 06/03/2024 | 326 | NOTICE of Appeal Due letter sent to counsel of record regarding notice of appeal 323 . (ph, ) (Duplicate of docket entry 325) Modified on 6/3/2024 (ph, ). (Entered: 06/03/2024) |
| 06/03/2024 | 327 | TRANSMITTED to the 7th Circuit the short record on notice of appeal 323 . Notified counsel (ph, ) (Entered: 06/03/2024) |
| 06/04/2024 | 328 | ACKNOWLEDGMENT of receipt of short record on appeal regarding notice of appeal 323 ; USCA Case No. 24−1947. (jj, ) (Entered: 06/04/2024) |





# FEDERAL REGISTER

Vol. 78

No. 32

Friday,

February 15, 2013

Part IV

## Department of Housing and Urban Development

24 CFR Part 100
Implementation of the Fair Housing Act's Discriminatory Effects Standard;
Final Rule

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Part 100**

[Docket No. FR–5508–F–02]

**RIN 2529–AA96**

**Implementation of the Fair Housing Act's Discriminatory Effects Standard**

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, HUD.

**ACTION:** Final rule.

**SUMMARY:** Title VIII of the Civil Rights Act of 1968, as amended (Fair Housing Act or Act), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities on the basis of race, color, religion, sex, disability, familial status, or national origin.[1] HUD, which is statutorily charged with the authority and responsibility for interpreting and enforcing the Fair Housing Act and with the power to make rules implementing the Act, has long interpreted the Act to prohibit practices with an unjustified discriminatory effect, regardless of whether there was an intent to discriminate. The eleven federal courts of appeals that have ruled on this issue agree with this interpretation. While HUD and every federal appellate court to have ruled on the issue have determined that liability under the Act may be established through proof of discriminatory effects, the statute itself does not specify a standard for proving a discriminatory effects violation. As a result, although HUD and courts are in agreement that practices with discriminatory effects may violate the Fair Housing Act, there has been some minor variation in the application of the discriminatory effects standard.

Through this final rule, HUD formalizes its long-held recognition of discriminatory effects liability under the Act and, for purposes of providing consistency nationwide, formalizes a burden-shifting test for determining whether a given practice has an unjustified discriminatory effect, leading to liability under the Act. This final rule also adds to, and revises, illustrations of discriminatory housing practices found in HUD's Fair Housing Act regulations. This final rule follows a November 16, 2011, proposed rule and takes into consideration comments received on that proposed rule.

**DATES:** *Effective Date:* March 18, 2013.

**FOR FURTHER INFORMATION CONTACT:** Jeanine Worden, Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410–0500, telephone number 202–402–5188. Persons who are deaf, are hard of hearing, or have speech impairments may contact this phone number via TTY by calling the Federal Relay Service at 800–877–8399.

**SUPPLEMENTARY INFORMATION:**

## I. Executive Summary

### A. Purpose of Regulatory Action

*Need for the Regulation.* This regulation is needed to formalize HUD's long-held interpretation of the availability of "discriminatory effects" liability under the Fair Housing Act, 42 U.S.C. 3601 *et seq.,* and to provide nationwide consistency in the application of that form of liability. HUD, through its longstanding interpretation of the Act, and the eleven federal courts of appeals that have addressed the issue agree that liability under the Fair Housing Act may arise from a facially neutral practice that has a discriminatory effect. The twelfth court of appeals has assumed that the Fair Housing Act includes discriminatory effects liability, but has not decided the issue. Through four decades of case-by-case application of the Fair Housing Act's discriminatory effects standard by HUD and the courts, a small degree of variation has developed in the methodology of proving a claim of discriminatory effects liability. This inconsistency threatens to create uncertainty as to how parties' conduct will be evaluated. This rule formally establishes a three-part burden-shifting test currently used by HUD and most federal courts, thereby providing greater clarity and predictability for all parties engaged in housing transactions as to how the discriminatory effects standard applies.

*How the Rule Meets the Need.* This rule serves the need described above by establishing a consistent standard for assessing claims that a facially neutral practice violates the Fair Housing Act and by incorporating that standard in HUD's existing Fair Housing Act regulations at 24 CFR 100.500. By formalizing the three-part burden-shifting test for proving such liability under the Fair Housing Act, the rule provides for consistent and predictable application of the test on a national basis. It also offers clarity to persons seeking housing and persons engaged in housing transactions as to how to assess

potential claims involving discriminatory effects.

*Legal Authority for the Regulation.* The legal authority for the regulation is found in the Fair Housing Act. Specifically, section 808(a) of the Act gives the Secretary of HUD the "authority and responsibility for administering this Act." (42 U.S.C. 3608(a)). In addition, section 815 of the Act provides that "[t]he Secretary may make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out this title. The Secretary shall give public notice and opportunity for comment with respect to all rules made under this section." (42 U.S.C. 3614a.) HUD also has general rulemaking authority, under the Department of Housing and Urban Development Act, to make such rules and regulations as may be necessary to carry out its functions, powers, and duties. (See 42 U.S.C. 3535(d).)

### B. Summary of the Major Provisions

This rule formally establishes the three-part burden-shifting test for determining when a practice with a discriminatory effect violates the Fair Housing Act. Under this test, the charging party or plaintiff first bears the burden of proving its prima facie case that a practice results in, or would predictably result in, a discriminatory effect on the basis of a protected characteristic. If the charging party or plaintiff proves a prima facie case, the burden of proof shifts to the respondent or defendant to prove that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests. If the respondent or defendant satisfies this burden, then the charging party or plaintiff may still establish liability by proving that the substantial, legitimate, nondiscriminatory interest could be served by a practice that has a less discriminatory effect.

This rule also adds and revises illustrations of practices that violate the Act through intentional discrimination or through a discriminatory effect under the standards outlined in § 100.500.

### C. Costs and Benefits

Because the rule does not change decades-old substantive law articulated by HUD and the courts, but rather formalizes a clear, consistent, nationwide standard for litigating discriminatory effects cases under the Fair Housing Act,[2] it adds no additional costs to housing providers and others engaged in housing transactions. Rather,

---

[1] This preamble uses the term "disability" to refer to what the Act and its implementing regulations term a "handicap." Both terms have the same legal meaning. *See Bragdon v. Abbott,* 524 U.S. 624, 631 (1998).

[2] *See* nn. 12, 28, *supra,* discussing HUD administrative decisions and federal court rulings.

**App.152**

the rule will simplify compliance with the Fair Housing Act's discriminatory effects standard and decrease litigation associated with such claims by clearly allocating the burdens of proof and how such burdens are to be met.

## II. Background

The Fair Housing Act was enacted in 1968 (Pub. L. 90–284, codified at 42 U.S.C. 3601–3619, 3631) to combat and prevent segregation and discrimination in housing, including in the sale or rental of housing and the provision of advertising, lending, and brokerage services related to housing. The Fair Housing Act's "Declaration of Policy" specifies that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." [3] Congress considered the realization of this policy "to be of the highest priority." [4] The Fair Housing Act's language prohibiting discrimination in housing is "broad and inclusive;" [5] the purpose of its reach is to replace segregated neighborhoods with "truly integrated and balanced living patterns." [6] In commemorating the 40th anniversary of the Fair Housing Act and the 20th anniversary of the Fair Housing Amendments Act, the House of Representatives reiterated that "the intent of Congress in passing the Fair Housing Act was broad and inclusive, to advance equal opportunity in housing and achieve racial integration for the benefit of all people in the United States." [7] (See the preamble to the November 16, 2011, proposed rule at 76 FR 70922.)

The Fair Housing Act gives HUD the authority and responsibility for administering and enforcing the Act,[8] including the authority to conduct formal adjudications of Fair Housing Act complaints [9] and the power to promulgate rules to interpret and carry out the Act.[10] In keeping with the Act's "broad remedial intent," [11] HUD, as the following discussion reflects, has long interpreted the Act to prohibit practices that have an unjustified discriminatory effect, regardless of intent. (See also the

[3] 42 U.S.C. 3601.

[4] *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972) (internal citation omitted).

[5] Id. at 209.

[6] Id. at 211.

[7] H. Res. 1095, 110th Cong., 2d Sess., 154 Cong. Rec. H2280–01 (April 15, 2008) (2008 WL 1733432).

[8] *See* 42 U.S.C. 3608(a).

[9] *See* 42 U.S.C. 3610, 3612.

[10] *See* 42 U.S.C. 3614a.

[11] *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982).

preamble to the November 16, 2011, proposed rule at 76 FR 70922–23.)

In formal adjudications of charges of discrimination under the Fair Housing Act over the past 20 years, HUD has consistently concluded that the Act is violated by facially neutral practices that have an unjustified discriminatory effect on the basis of a protected characteristic, regardless of intent.[12] In one such formal adjudication, the Secretary of HUD reviewed the initial decision of a HUD administrative law judge and issued a final order stating that practices with an unjustified discriminatory effect violate the Act. In that case, the Secretary found that a mobile home community's occupancy limit of three persons per dwelling had a discriminatory effect on families with children.[13] When the housing provider appealed the Secretary's order to the United States Court of Appeals for the Tenth Circuit, the Secretary of HUD defended his order, arguing that statistics showed that the housing policy, while neutral on its face, had a discriminatory effect on families with children because it served to exclude them at more than four times the rate of families without children.[14] Similarly, on appeal of another final agency decision holding that a housing policy had a disparate impact on families with children,[15] the Secretary of HUD, in his brief defending the decision before the United States Court of Appeals for the Ninth Circuit, discussed in detail the text and legislative history of the Act, as well as prior pronouncements by HUD that proof of discriminatory intent is not

[12] *See, e.g., HUD v. Twinbrook Village Apts.,* No. 02–00025600–0256–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) ("A violation of the [Act] may be premised on a theory of disparate impact."); *HUD v. Carlson,* No. 08–91–0077–1, 1995 WL 365009 (HUD ALJ June 12, 1995) ("A policy or practice that is neutral on its face may be found to be violative of the Act if the record establishes a prima facie case that the policy or practice has a disparate impact on members of a protected class, and the Respondent cannot prove that the policy is justified by business necessity."); *HUD v. Ross,* No. 01–02–0466–18, 1994 WL 326437, at *5 (HUD ALJ July 7, 1994) ("Absent a showing of business necessity, facially neutral policies which have a discriminatory impact on a protected class violate the Act."); *HUD v. Carter,* No. 03–90–0058–1, 1992 WL 406520, at *5 (HUD ALJ May 1, 1992) ("The application of the discriminatory effects standard in cases under the Fair Housing Act is well established.").

[13] *HUD v. Mountain Side Mobile Estates P'ship,* No. 08–92–0010–1, 1993 WL 307069 (HUD Sec'y July 19, 1993), aff'd in relevant part, 56 F.3d 1243 (10th Cir. 1995).

[14] Brief for HUD Secretary as Respondent, *Mountain Side Mobile Estates P'ship v. HUD,* No. 94–9509 (10th Cir. 1994).

[15] *HUD v. Pfaff,* No. 10–93–0084–8, 1994 WL 592199, at *17 (HUD ALJ Oct. 27, 1994), rev'd on other grounds, 88 F.3d 739 (9th Cir. 1996).

required to establish liability under the Act.[16]

HUD has interpreted the Act to include discriminatory effects liability not only in formal adjudications, but through various other means as well. In 1980, for example, Senator Charles Mathias read into the Congressional Record a letter that the Senator had received from the HUD Secretary describing discriminatory effects liability under the Act and explaining that such liability is "imperative to the success of civil rights law enforcement." [17] In 1994, HUD joined with the Department of Justice and nine other federal regulatory and enforcement agencies in approving and adopting a policy statement that, among other things, recognized that disparate impact is among the "methods of proof of lending discrimination under the * * * [Fair Housing] Act." [18] In this Policy Statement on Discrimination in Lending (Joint Policy Statement), HUD and the other regulatory and enforcement agencies recognized that "[p]olicies and practices that are neutral on their face and that are applied equally may still, on a prohibited basis, disproportionately and adversely affect a person's access to credit," and provided guidance on how to prove a disparate impact fair lending claim.[19]

Additionally, HUD's interpretation of the Act is further confirmed by regulations implementing the Federal Housing Enterprises Financial Safety and Soundness Act (FHEFSSA), in which HUD prohibited Fannie Mae and Freddie Mac from engaging in mortgage purchase activities that have a discriminatory effect in violation of FHEFSSA.[20] In addressing a concern for how the impact theory might operate under FHEFFSA, HUD explained that "the disparate impact (or discriminatory effect) theory is firmly established by Fair Housing Act case law" and concluded that this Fair Housing Act disparate impact law "is applicable to all segments of the housing marketplace, including the GSEs" (government-sponsored enterprises).[21] In

[16] Brief for HUD Secretary as Respondent, *Pfaff v. HUD,* No. 94–70898 (9th Cir. 1996).

[17] 126 Cong. Rec. 31,166–31,167 (1980) (statement of Sen. Mathias reading into the record letter of HUD Secretary).

[18] Policy Statement on Discrimination in Lending, 59 FR 18266, 18269 (Apr. 15, 1994) ("Joint Policy Statement").

[19] *Id.*

[20] *See* 24 CFR 81.42 (2012).

[21] The Secretary of HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), 60 FR 61846, 61867 (Dec. 1, 1995).

promulgating this regulation, HUD also emphasized the importance of the Joint Policy Statement, explaining that "[a]ll the Federal financial regulatory and enforcement agencies recognize the role that disparate impact analysis plays in scrutiny of mortgage lending" and have "jointly recognized the disparate impact standard as a means of proving lending discrimination under the Fair Housing Act." [22]

Consistent with its longstanding interpretation of the Act, over the past two decades, HUD has regularly issued guidance to its staff that recognizes the discriminatory effects theory of liability under the Act. For instance, HUD's Assistant Secretary for Fair Housing and Equal Opportunity (FHEO) issued a memorandum in 1993 instructing HUD investigators to be sure to analyze complaints under the disparate impact theory of liability.[23] HUD's 1995 Title VIII Complaint Intake, Investigation and Conciliation Handbook (Enforcement Handbook), which set forth guidelines for investigating and resolving Fair Housing Act complaints, emphasized to HUD's enforcement staff that disparate impact is one of "the principal theories of discrimination" under the Fair Housing Act and required HUD investigators to apply it where appropriate.[24] HUD's 1998 version of the Enforcement Handbook, which is currently in effect, also recognizes the discriminatory effects theory of liability and requires HUD investigators to apply it in appropriate cases nationwide.[25]

In 1998, at Congress's direction, HUD published in the **Federal Register** previously-internal guidance from 1991 explaining when occupancy limits may violate the Act's prohibition of discrimination because of familial status, premised on the application of disparate impact liability.[26] More recently, HUD posted on its Web site guidance to its staff and others discussing how facially neutral housing policies addressing domestic violence can have a disparate impact on women in violation of the Act.[27]

Although several of the HUD administrative decisions, federal court holdings, and HUD and other federal agency public pronouncements on the discriminatory effects standard just noted were discussed in the preamble to HUD's November 16, 2011, proposed rule, HUD has described these events in the preamble to this final rule to underscore that this rule is not establishing new substantive law. Rather, this final rule embodies law that has been in place for almost four decades and that has consistently been applied, with minor variations, by HUD, the Justice Department and nine other federal agencies, and federal courts. In this regard, HUD emphasizes that the title of this rulemaking, "Implementation of the Fair Housing Act's Discriminatory Effects Standard," indicates that HUD is not proposing new law in this area.

As discussed in the preamble to the proposed rule (76 FR 70921, 70923), all federal courts of appeals to have addressed the question agree that liability under the Act may be established based on a showing that a neutral policy or practice has a discriminatory effect even if such a policy or practice was not adopted for a discriminatory purpose.[28] There is minor variation, however, in how evidence has been analyzed pursuant to this theory. For example, in adjudications, HUD has always used a three-step burden-shifting approach,[29]

as do many federal courts of appeals.[30] One federal court of appeals applies a multi-factor balancing test,[31] other courts of appeals apply a hybrid between the two,[32] and one court of appeals applies a different test for public and private defendants.[33]

Another source of variation in existing law is in the application of the burden-shifting test. Under the three-step burden-shifting approach applied by HUD and the courts, the plaintiff (or, in administrative adjudications, the charging party) first must make a prima facie showing of either a disparate impact or a segregative effect. If the discriminatory effect is shown, the burden of proof shifts to the defendant (or respondent) to justify its actions. If the defendant (or respondent) satisfies its burden, the third step comes into play. There has been a difference of approach among the various appellate courts and HUD adjudicators as to which party bears the burden of proof at this third step, which requires proof as to whether or not a less discriminatory alternative exists. All but one of the federal courts of appeals that use a burden-shifting approach place the ultimate burden of proving that a less discriminatory alternative exists on the plaintiff,[34] with some courts analogizing to the burden-shifting framework established for Title VII of the Civil Rights Act of 1964 (Title VII), which addresses employment discrimination.[35] The remaining court of appeals places the burden on the

---

[22] Id.

[23] Memorandum from the HUD Assistant Secretary for Fair Housing & Equal Opportunity, The Applicability of Disparate Impact Analysis to Fair Housing Cases (Dec. 17, 1993).

[24] HUD, No. 8024.1, *Title VIII Complaint Intake, Investigation & Conciliation Handbook* at 7–12 (1995).

[25] HUD, No. 8024.1, *Title VIII Complaint Intake, Investigation & Conciliation Handbook* at 2–27 (1998) ("a respondent may be held liable for violating the Fair Housing Act even if his action against the complainant was not even partly motivated by illegal considerations"); *id.* at 2–27 to 2–45 (HUD guidelines for investigating a disparate impact claim and establishing its elements).

[26] See 63 FR 70256 (Dec. 18, 1998) (publishing "Keating Memo" regarding reasonable occupancy standards); Quality Housing and Work Responsibility Act of 1998, Public Law 105–276, 112 Stat. 2461, § 589 (Oct. 21, 1998) (requiring publication of Keating Memo).

[27] Memorandum from HUD Office of Fair Housing & Equal Opportunity, Assessing Claims of Housing Discrimination Under the Fair Housing Act & the Violence Against Women Act 5–6 (Feb. 9, 2011). *http://www.hud.gov/offices/fheo/library/11-domestic-violence-memo-with-attachment.pdf.*

[28] *See, e.g., Graoch Assocs. #33, L.P.* v. *Louisville/Jefferson Cnty. Metro Human Relations Comm'n,* 508 F.3d 366, 374–78 (6th Cir. 2007); *Reinhart* v. *Lincoln Cnty.,* 482 F.3d 1225, 1229 (10th Cir. 2007); *Hallmark Developers, Inc.* v. *Fulton County, Ga.,* 466 F.3d 1276, 1286 (11th Cir. 2006); *Charleston Hous. Auth.* v. *U.S. Dep't of Agric.,* 419 F.3d 729, 740–41 (8th Cir. 2005); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 49–50 (1st Cir. 2000); *Simms* v. *First Gibraltar Bank,* 83 F.3d 1546, 1555 (5th Cir. 1996); *Jackson* v. *Okaloosa Cnty., Fla.,* 21 F.3d 1531, 1543 (11th Cir. 1994); *Keith* v. *Volpe,* 858 F.2d 467, 484 (9th Cir. 1988); *Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 937–38 (2d Cir. 1988), aff'd, 488 U.S. 15 (1988) (per curiam); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 148 (3d Cir. 1977); *Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 987–89 & n.3 (4th Cir. 1984); *Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290–91 (7th Cir. 1977); *United States.* v. *City of Black Jack,* 508 F.2d 1179, 1184–86 (8th Cir. 1974).

[29] *See, e.g., HUD* v. *Twinbrook Village Apts.,* No. 02–00025600–0256–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); *HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994) rev'd on other grounds, 88 F.3d 739 (9th Cir. 1996); *HUD* v.

[caption: second column footnotes]

*Mountain Side Mobile Estates P'ship.* 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993); *HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992); *see also* Joint Policy Statement, 59 FR 18269.

[30] *See, e.g., Charleston,* 419 F.3d at 740–42; *Langlois,* 207 F.3d at 49–50; *Huntington Branch,* 844 F.2d at 939.

[31] *See, e.g., Metro. Hous. Dev. Corp.,* 558 F.2d at 1290 (applying a four-factor balancing test).

[32] *See, e.g., Graoch,* 508 F.3d at 373 (balancing test incorporated as elements of proof after second step of burden-shifting framework); *Mountain Side Mobile Estates* v. *Sec'y HUD,* 56 F.3d 1243, 1252, 1254 (10th Cir. 1995) (incorporating a three-factor balancing test into the burden-shifting framework to weigh defendant's justification);.

[33] The Fourth Circuit has applied a four-factor balancing test to public defendants and a burden-shifting approach to private defendants. *See, e.g., Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 989 n.5 (4th Cir. 1984).

[34] *Compare Mt. Holly Gardens Citizens in Action, Inc.* v. *Twp. of Mount Holly,* 658 F.3d 375, 382 (3d Cir. 2011) (burden of proving less discriminatory alternative ultimately on plaintiff), *and Gallagher* v. *Magner,* 619 F.3d 823, 834 (8th Cir. 2010) (same), *and Graoch,* 508 F.3d at 373–74 (same), *and Mountain Side Mobile Estates,* 56 F.3d at 1254 (same), *with Huntington Branch,* 844 F.2d at 939 (burden of proving no less discriminatory alternative exists on defendant).

[35] *See, e.g., Graoch,* 508 F.3d at 373 ("[C]laims under Title VII and the [Fair Housing Act] generally should receive similar treatment").

**App.154**

defendant to show that no less discriminatory alternative to the challenged practice exists.[36] HUD's administrative law judges have, at times, placed this burden of proof concerning a less discriminatory alternative on the respondent and, at other times, on the charging party.[37]

Through this rulemaking and interpretative authority under the Act, HUD formalizes its longstanding view that discriminatory effects liability is available under the Act and establishes uniform standards for determining when a practice with a discriminatory effect violates the Fair Housing Act.

### III. The November 16, 2011, Proposed Rule

On November 16, 2011, HUD published a proposed rule in the **Federal Register** (76 FR 70921) addressing the discriminatory effects theory of liability under the Act. Specifically, HUD proposed adding a new subpart G to 24 CFR part 100, which would formalize the longstanding position held by HUD and the federal courts that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, regardless of whether the practice was adopted for a discriminatory purpose, and would establish uniform standards for determining when such a practice violates the Act.

In the proposed rule, HUD defined a housing practice with a "discriminatory effect" as one that "actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin."

A housing practice with a discriminatory effect would still be lawful if supported by a "legally sufficient justification." HUD proposed that a "legally sufficient justification" exists where the challenged housing practice: (1) Has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent or defendant; and (2)

those interests cannot be served by another practice that has a less discriminatory effect.

Consistent with its own past practice and that of many federal courts, HUD proposed a burden-shifting framework for determining whether liability exists under a discriminatory effects theory. Under the proposed burden-shifting approach, the charging party or plaintiff in an adjudication first bears the burden of proving that a challenged practice causes a discriminatory effect. If the charging party or plaintiff meets this burden, the burden of proof shifts to the respondent or defendant to prove that the challenged practice has a necessary and manifest relationship to one or more of its legitimate, nondiscriminatory interests. If the respondent or defendant satisfies this burden, the charging party or plaintiff may still establish liability by demonstrating that the legitimate, nondiscriminatory interest can be served by another practice that has a less discriminatory effect.

In the proposed rule, HUD explained that violations of various provisions of the Act may be established by proof of discriminatory effects, including 42 U.S.C. 3604(a), 3604(b), 3604(f)(1), 3604(f)(2), 3605, and 3606 (see 76 FR 70923 n.20), and that discriminatory effects liability applies to both public and private entities (see 76 FR 70924 n.40).

HUD also proposed to revise 24 CFR part 100 to add examples of practices that may violate the Act under the discriminatory effects theory.

### IV. Changes Made at the Final Rule Stage

In response to public comment, a discussion of which is presented in the following section, and in further consideration of issues addressed at the proposed rule stage, HUD is making the following changes at this final rule stage:

#### A. Changes to Subpart G

The final rule makes several minor revisions to subpart G in the proposed rule for clarity. The final rule changes "housing practice" to "practice" throughout proposed subpart G to make clear that the standards set forth in subpart G are not limited to the practices addressed in subpart B, which is titled "Discriminatory Housing Practices." The final rule replaces "under this subpart" with "under the Fair Housing Act" because subpart G outlines evidentiary standards for proving liability under the Fair Housing Act. The final rule also replaces the general phrase "prohibited intent" with

the more specific "discriminatory intent."

The final rule slightly revises the definition of discriminatory effect found in proposed § 100.500(a), without changing its meaning, to condense the definition and make it more consistent with terminology used in case law. Proposed § 100.500(a) provided that "[a] housing practice has a discriminatory effect where it actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin." Final § 100.500(a) provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."

To clarify "legally sufficient justification" and in particular, what HUD meant in the proposed rule by "a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests," HUD is revising the definition found in proposed § 100.500(b) to read as follows: "(1) A legally sufficient justification exists where the challenged practice:

(i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and (ii) Those interests could not be served by another practice that has a less discriminatory effect. (2) A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative * * *." This revision to the definition of "legally sufficient justification" includes changing "cannot be served," the phrasing used in the proposed rule, to "could not be served."

This revised definition of "legally sufficient justification" also appears in § 100.500(c)(2) and, in essentially the same form, in § 100.500(c)(3). The final rule also replaces the word "demonstrating" with "proving" in § 100.500(c)(3) in order to make clear that the burden found in that section is one of proof, not production.

In addition to these changes, the final rule makes several minor corrections to § 100.500. The final rule substitutes "42

---

[36] *Huntington Branch,* 844 F.2d at 939.

[37] *Compare, e.g., HUD v. Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992) (respondent bears the burden of showing that no less discriminatory alternative exists), *and HUD v. Twinbrook Village Apts.,* 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) (same), *with HUD v. Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (charging party bears the burden of showing that a less discriminatory alternative exists), *and HUD v. Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994) (same).

**App.155**

U.S.C. 3610" with "42 U.S.C. 3612" in § 100.500(c)(1) because the procedures for a formal adjudication under the Act are found in 42 U.S.C. 3612. Also in § 100.500(c)(1), the final rule changes "proving that a challenged practice causes a discriminatory effect" to "proving that a challenged practice caused or predictably will cause a discriminatory effect." This edit is required for consistency with the Fair Housing Act and § 100.500(a), which prohibit actions that predictably result in discrimination.

The final rule further corrects proposed § 100.500(c)(1) and (2) to replace "complainant" with "charging party" because in cases tried before HUD administrative law judges, the charging party—and not the complainant—has the same burden of proof as a plaintiff in court. Under the provisions of the Act governing adjudication of administrative complaints, an aggrieved person may file a complaint with the Secretary alleging a discriminatory housing practice, or the Secretary may file such a complaint,[38] but it is the Secretary who issues the charge of discrimination and prosecutes the case before the Administrative Law Judge, on behalf of the aggrieved person.[39] Any aggrieved person may intervene as a party in the proceeding,[40] in which case the intervener would bear the same burden of proof as the charging party or a plaintiff in a judicial action.

*B. Changes to Illustrations*

The illustrations added in this rule, as well as the existing illustrations in part 100, represent HUD's interpretation of conduct that is illegal housing discrimination under the Fair Housing Act. Liability can be established for the conduct illustrated in part 100 through evidence of intentional discrimination, or based on discriminatory effects pursuant to the standards set forth in subpart G, depending on the nature of the potential violation.

In order to make clear that the Fair Housing Act violations illustrated in part 100 may be proven through evidence of intentional discrimination or discriminatory effects, as the evidence permits, and that any potential discriminatory effects violation must be assessed pursuant to the standards set forth in § 100.500, the final rule amends paragraph (b) of § 100.5 to add at the end the following sentence: "The illustrations of unlawful housing discrimination in this part may be

38 42 U.S.C. 3610(a)(1)(A).
39 42 U.S.C. 3610(g)(2)(A), 3612.
40 42 U.S.C. 3612(c).

established by a practice's discriminatory effect, even if not motivated by discriminatory intent, consistent with the standards outlined in § 100.500."

The final rule revises the illustrations of discriminatory housing practices in the proposed rule, rephrasing them in more general terms. The language of the added illustrations, which in the proposed rule included paraphrasing the definition of discriminatory effect from subpart G, is revised to eliminate the paraphrasing, which is unnecessary after the addition to paragraph (b) of § 100.5. This revision is also intended to eliminate any potential negative implication from the proposed rule that the existing illustrations in part 100 could not be proven through an effects theory. In addition to this general streamlining of the illustrations in the proposed rule, the final rule makes the following specific revisions to the illustrations.

In order to avoid redundancy in HUD's Fair Housing Act regulations, this final rule eliminates proposed § 100.65(b)(6). The substance of proposed § 100.65(b)(6), which covers "Providing different, limited, or no governmental services such as water, sewer, or garbage collection" is already captured by existing § 100.65(b)(4), which prohibits "Limiting the use of privileges, services, or facilities associated with a dwelling," and existing § 100.70(d)(4), which prohibits "Refusing to provide municipal services * * * for dwellings or providing such services differently."

In response to public comment, the final rule adds "enacting" and "ordinance" to § 100.70(d)(5). These changes confirm that an ordinance is one type of land-use decision that is covered by the Act, under a theory of intentional discrimination or discriminatory effect, and that land-use decisions may discriminate from the moment of enactment. This final rule therefore revises proposed § 100.70(d)(5) to give the following as an illustration of a prohibited practice: "Enacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin." The final rule removes "cost" and "terms or conditions" from proposed § 100.120(b)(2) and adds them to § 100.130. This revision is not intended to make any substantive changes to HUD's interpretation of the Act's coverage, but rather is for organizational purposes only: § 100.120 addresses

discrimination in the making and provision of loans and other financial assistance, while § 100.130 addresses discriminatory terms or conditions. Other minor streamlining changes are made to existing § 100.120(b). Accordingly, this final rule revises § 100.120(b) to read as set forth in the regulatory text of the rule.

The final rule amends existing § 100.130(b)(2) to add "or conditions" and the term "cost" to the list of potentially discriminatory terms or conditions of loans or other financial assistance. It also adds new § 100.130(b)(3), which, in response to a public comment, illustrates that servicing is a condition of loans or other financial assistance covered by section 805.[41] Because, as noted above, at the final rule stage "terms and conditions" is removed from proposed § 100.120(b)(2), new § 100.130(b)(3) also addresses the provision of loans or other financial assistance with terms or conditions that have a discriminatory intent or effect. As a result of these changes, new § 100.130(b)(3) reads as follows: "Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin."

**V. The Public Comments**

The public comment period for the November 16, 2011, proposed rule closed on January 17, 2012. Ninety-six public comments were received in response to the proposed rule. Comments were submitted by a wide variety of interested entities, including individuals, fair housing and legal aid organizations, state and local fair housing agencies, Attorneys General from several States, state housing finance agencies, public housing agencies, public housing trade associations, insurance companies, mortgage lenders, credit unions, banking trade associations, real estate agents, and law firms.[42] This section of the preamble, which addresses significant issues raised in the public

41 42 U.S.C. 3605. Discrimination in residential mortgage servicing may also violate section 804 of the Act, 42 U.S.C. 3604.
42 All public comments on this rule can be found at *www.regulations.gov*, specifically at *http://www.regulations.gov/#!searchResults;rpp=50;po=0;dktId=HUD-2011-0138*.

**App.156**

comments, organizes the comments by subject category, with a brief description of the issue (or set of related issues) followed by HUD's response.

Many comments were received in support of the rule generally and in support of the proposed discriminatory effects standard in particular. This summary does not provide a response to comments that expressed support for the proposed rule. Supportive comments included statements asserting that the rule: advances the goals of the Fair Housing Act; offers a well-reasoned standard for analyzing discriminatory effects claims; provides a national standard for courts, housing providers, municipalities and the financial and insurance industries; provides clarity to housing providers, housing seekers, and others; will decrease litigation by clarifying the burdens of proof; and will help address a lack of adequate housing for older persons even though age is not a protected characteristic under the Act because older persons may be affected by practices with a discriminatory effect based on disability. Commenters stated that the rule is particularly necessary to maintain protections against discriminatory and abusive practices in the mortgage industry, as the Fair Housing Act covers activities in residential real estate-related transactions that may not be covered by the Equal Credit Opportunity Act (ECOA).[43] A commenter stated that the rule's flexible standard is appropriate, as no rigid formula fits the variety of practices that exist in a rapidly evolving housing market.

Several commenters supported discriminatory effects liability under the Act in general, stating that it is widely agreed that discriminatory effects analysis is critically important to vigorous enforcement of the Fair Housing Act, and that the rule is consistent with HUD's longstanding interpretation and the interpretation of the federal courts of appeals. Commenters in support of the importance of the effects test proffered the following: if the effects approach were no longer available, "the proverbial door to equal housing opportunity will be slammed in the face of many victims"; the effects analysis is particularly important with respect to

the protection of persons with disabilities and in familial status cases; municipal land use decisions are more likely to have a discriminatory effect on minorities when they unreasonably attempt to restrict affordable housing; the effects analysis is important to environmental justice investigations; the discriminatory effects standard encourages housing providers to develop creative ways to achieve their economic objectives while promoting diversity; the effects standard gives HUD and fair housing advocates the tools to reveal the effects of racism, poverty, disability discrimination, and adverse environmental conditions on the health and well-being of individuals protected by the law; the rule provides practical administrative guidance for HUD attorneys and administrative law judges, as well as for the state and local fair housing agencies that share responsibility with HUD for adjudicating fair housing complaints; and the disparate impact standard is important in addressing discrimination in lending and denial of access to credit, which are often the results of neutral policies that have a disparate impact on protected groups.

Some commenters supported the proposed rule's allocation of the burden of proof, stating that the rule is practical and supported by longstanding precedent, and that it provides clear guidance to housing providers and government agencies in adopting rules and policies and an objective method for courts to evaluate discriminatory effect claims. A commenter stated that the perpetuation of segregation theory of effects liability is supported by the legislative history of Title VIII and the obligation to affirmatively further fair housing found in 42 U.S.C. 3608(d).

Following are the remaining issues raised by the public comments and HUD's responses.

### A. Validity of Discriminatory Effects Liability Under the Act

*Issue:* Some commenters opposed the rule because, in their view, the Act's text cannot be interpreted to include liability under a discriminatory effects theory. Commenters stated that the Fair Housing Act does not include an effects standard because it does not use the phrase "adversely affect," as in Title VII, the Age Discrimination in Employment Act (ADEA), or the Americans with Disabilities Act. One of these commenters stated that the Fair Housing Act does not include any of the words in other statutes that have been interpreted as giving rise to disparate impact claims, such as "affect" and "tend to." A commenter found the

"otherwise make unavailable or deny" language in the Fair Housing Act unpersuasive evidence that Congress intended the Act to include an effects test because it is a catchall phrase at the end of a list of prohibited conduct, and it must be read as having a similar meaning as the specific items on the list.

Some commenters stated that the Act's prohibition of certain practices "because of," "on account of," or "based on" a protected classification necessitates a showing of discriminatory intent. A commenter stated that "because of" and "on account of," as used in every provision of the Act, require evidence of intent because the same phrases are used in two provisions of the Act that cannot plausibly be interpreted to employ discriminatory effects liability. In this regard, this commenter pointed to 42 U.S.C. 3631, which uses the phrase "because of" to create criminal liability for specific fair housing violations, and 42 U.S.C. 3617, which uses the phrase "on account of" to ban coercion and intimidation of those exercising fair-housing rights.

Other commenters expressed support for a rule setting out the discriminatory effects theory of liability. Some of these commenters stated that Congress intended that such liability exist and that the text of the Act readily supports this position. Commenters stated that discriminatory effects liability best effectuates Congress's broad, remedial intent in passing the Fair Housing Act and the Act's stated purpose of providing for fair housing, within constitutional limitations, throughout the country. Commenters pointed out, through examples of neutral practices with discriminatory results that they have encountered, that an effects theory of liability continues to be vital in achieving the Act's broad goal. Commenters stated that, consistent with HUD's interpretation of the Act, federal courts have unanimously held that liability may be established by proof of discriminatory effects.

*HUD Response:* As the preamble to the proposed rule and this final rule make clear, both HUD and the federal courts have long interpreted the Fair Housing Act to prohibit actions that have an unjustified discriminatory effect, regardless of whether the action was motivated by a discriminatory intent. Section 804(a) of the Act makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex,

---

[43] ECOA prohibits any creditor from discriminating in credit transactions on the basis of race, color, national origin, religion, age, sex, marital status, or public assistance program participation. *See* 15 U.S.C. 1691(a). By comparison, Section 805 of the Fair Housing Act prohibits any person whose business includes engaging in residential-related transactions from discriminating in such transactions on the basis of race, color, religion, sex, disability, familial status, or national origin. *See* 42 U.S.C. 3605.

familial status, or national origin." [44] Similarly, section 804(f)(1) makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." [45] This "otherwise make unavailable or deny" formulation in the text of the Act focuses on the effects of a challenged action rather than the motivation of the actor. In this way, the provisions are similar to the "otherwise adversely affect" formulation that the Supreme Court found to support disparate impact liability under Title VII and the ADEA.[46] And, indeed, the federal courts have drawn the analogy between Title VII and the Fair Housing Act in interpreting the Act to prohibit actions that have an unjustified discriminatory effect, regardless of intent.[47]

In addition, many of the Fair Housing Act's provisions make it unlawful "to discriminate" in certain housing-related transactions based on a protected characteristic.[48] "Discriminate" is a term that may encompass actions that have a discriminatory effect but not a discriminatory intent.[49] HUD's extensive experience in administering the Fair Housing Act and in investigating and adjudicating claims arising under the Act, which is

---

[44] 42 U.S.C. 3604(a).

[45] 42 U.S.C. 3604(f)(1).

[46] See *Griggs* v. *Duke Power Co.*, 401 U.S. 424, 431 (1971) (holding that Title VII includes a disparate impact standard); *Smith* v. *City of Jackson, Miss.*, 544 U.S. 228, 235 (2005) (affirming that the holding in *Griggs* provides the best reading of Title VII's text); *id.* at 240 (holding that section 4(a)(2) of the ADEA includes a disparate impact standard); *see also Nat'l Cmty. Reinvestment Coalition* v. *Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70, 78 (D.DC 2008) (holding that the Fair Housing Act encompasses disparate impact liability because, among other reasons, language in the Act is analogous to language in the ADEA found by the Supreme Court to include disparate impact).

[47] See *Resident Advisory Bd.* v. *Rizzo*, 564 F.2d 126, 146 (3d Cir. 1977) ("[I]n Title VII cases, by analogy to Title VII cases, unrebutted proof of discriminatory effect alone may justify a federal equitable response."); *Grooch*, 508 F.2d at 374 (quoting *Griggs*, 401 U.S. at 431) ("The Supreme Court held that Title VII, which uses similar language [to Title VIII], 'proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.' The same analysis justifies the existence of disparate-impact liability under the FHA.").

[48] See 42 U.S.C. 3604(b), 3604(f)(1), 3604(f)(2), 3605, and 3606.

[49] See, e.g., *Alexander* v. *Choate*, 469 U.S. 287, 299 (1985) (assuming without deciding that section 504 of the Rehabilitation Act of 1973, which prohibits "subject[ing] to discrimination" otherwise qualified handicapped individuals, "reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped"); *Board. of Ed.* v. *Harris*, 444 U.S. 130, 140–41 (1979) (concluding that the term "discrimination," as used in the 1972 Emergency School Aid Act, was ambiguous and proscribed actions that had a disparate impact).

discussed in this preamble and that of the proposed rule,[50] informs its conclusion that not only can the term "discriminate" be interpreted to encompass discriminatory effects liability, but it must be so interpreted in order to achieve the Act's stated purpose to provide for fair housing to the extent the Constitution allows.[51] Indeed, as far back as 1980, the HUD Secretary explained to Congress why discriminatory effects liability under the Fair Housing Act is "imperative to the success of civil rights enforcement." [52] Only by eliminating practices with an unnecessary disparate impact or that unnecessarily create, perpetuate, increase, or reinforce segregated housing patterns, can the Act's intended goal to advance equal housing opportunity and achieve integration be realized.[53] In keeping with the broad remedial goals of the Fair Housing Act,[54] HUD interprets the term "discriminate," as well as the language in sections 804(a) and 804(f)(1) of the Act, to encompass liability based on the results of a practice, as well as any intended effect.

The "because of" phrase found in sections 804 and 805 of the Act [55] and similar language such as "on account of" or "based on" does not signal that Congress intended to limit the Act's coverage to intentional discrimination. Both section 703(a)(2) of Title VII [56] and section 4(a)(2) of the ADEA [57] prohibit certain actions "because of" a protected characteristic, yet neither provision requires a finding of discriminatory intent.[58] Moreover, the fact that the phrases "on account of" and "because of" appear in sections 817 and 831 of the Fair Housing Act [59] does not

---

[50] See *supra* nn. 12–27; preamble to the November 16, 2011, proposed rule at 76 FR 70922–23.

[51] In enacting the Fair Housing Act, Congress expressed its desire to provide, within constitutional limitations, for fair housing throughout the United States. See 42 U.S.C. 3601.

[52] See 126 Cong. Rec. 31,166–31,167 (1980) (statement of Sen. Mathias) (reading into the record letter of HUD Secretary).

[53] See *supra* nn. 3–7; *infra* nn. 65–69.

[54] See *supra* note 11.

[55] 42 U.S.C. 3604 and 3605.

[56] 42 U.S.C. 2000e–2(a)(2).

[57] 29 U.S.C. 623(a)(2).

[58] See *Meacham* v. *Knolls Atomic Power Lab.*, 554 U.S. 84, 96 (2008) (explaining that, "in the typical disparate-impact case" under the ADEA, "the employer's practice is 'without respect to age' and its adverse impact (though 'because of age') is 'attributable to a nonage factor'"); *Resident Advisory Bd.* v. *Rizzo*, 564 F.2d 126, 147 (3d Cir. 1977) ("[T]he 'because of race' language is not unique to § 3604(a); that same language appears in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h), yet a prima facie case of Title VII liability is made out when a showing of discriminatory effect (as distinct from intent) is established.").

[59] 42 U.S.C. 3617 and 3631.

preclude finding discriminatory effects liability under the Act's other substantive provisions using the same language because, as discussed above, HUD bases its interpretation of those other provisions on other language not found in sections 817 and 831, such as the phrase "otherwise make unavailable or deny a dwelling" and the term "discriminate."

HUD's interpretation is confirmed by the fact that the Act's text contains three exemptions that presuppose that the Act encompasses an effects theory of liability. For one, section 805(c) of the Act allows "a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status." [60] If the Act prohibited only intentional discrimination, it would not be unlawful to "take into consideration factors other than" protected characteristics in the first instance, and this exemption would be superfluous. Second, section 807(b)(1) of the Act states that "[n]othing in this title limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." [61] Since "the number of occupants permitted to occupy a dwelling" is not a protected classification under the Act, this provision makes sense only as authorizing occupancy limits that would otherwise violate the Act based on an effects theory.[62] Indeed, in 1991, HUD issued a memorandum to its staff explaining when occupancy limits would violate the Act based on disparate impact liability, and Congress later directed HUD to publish these guidelines in the **Federal Register**. [63] Third, section 807(b)(4) of the Act states that "[n]othing in this title prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance." [64] As with the two exemptions discussed above, this provision would be wholly unnecessary if the Act prohibited only intentional discrimination.

---

[60] 42 U.S.C. 3605(c).

[61] 42 U.S.C. 3607(b)(1).

[62] See *City of Jackson*, 544 U.S. at 238–39 (explaining that the ADEA's provision that allows an employer "to take any action otherwise prohibited * * * where the differentiation is based on reasonable factors other than age discrimination" would be "simply unnecessary" if the ADEA prohibited only intentional discrimination).

[63] See *supra* note 26.

[64] 42 U.S.C. 3607(b)(4).

000000618

The legislative history of the Act informs HUD's interpretation. The Fair Housing Act was enacted after a report by the National Advisory Commission on Civil Disorders, which President Johnson had convened in response to major riots taking place throughout the country, warned that "[o]ur Nation is moving toward two societies, one black, one white—separate and unequal." [65] The Act's lead sponsor, Senator Walter Mondale, explained in the Senate debates that the broad purpose of the Act was to replace segregated neighborhoods with "truly integrated and balanced living patterns." [66] Senator Mondale recognized that segregation was caused not only by "overt racial discrimination" but also by "[o]ld habits" which became "frozen rules," [67] and he pointed to one such facially neutral practice—the "refusal by suburbs and other communities to accept low-income housing." [68] He further explained some of the ways in which federal, state, and local policies had formerly operated to require segregation and argued that "Congress should now pass a fair housing act to undo the effects of these past" discriminatory actions. [69]

Moreover, in the approximately 20 years between the Act's enactment in 1968 and its amendment in 1988, the nine federal courts of appeals to address the issue held that the Act prohibited actions with a discriminatory effect. [70] Congress was aware of this widespread judicial agreement when it significantly amended the Act in 1988. [71] At that

time, the House Committee on the Judiciary specifically rejected an amendment that would have provided that "a zoning decision is not a violation of the Fair Housing Act unless the decision was made with the intent to discriminate." [72] Instead of adding this intent requirement to the Act, Congress chose to maintain the Act's operative text barring discrimination and making unavailable or denying housing, to extend those prohibitions to disability and familial status, and to establish the exemptions discussed above that presuppose the availability of a discriminatory effects theory of liability. [73] The failed attempt in 1988 to impose an intent requirement on the Act followed five other failed attempts, in 1980, [74] 1981, [75] 1983, [76] 1985, [77] and 1987. [78]

*Issue:* Two commenters stated that, when promulgating regulations implementing the Fair Housing Amendments Act of 1988, HUD stated in the preamble that the "regulations are not designed to resolve the question of whether intent is or is not required to show a violation" of the Act. [79] A commenter faulted HUD for failing to explain what the commenter perceived as a change in its official interpretation of the Act, and urged HUD to eliminate disparate impact liability from the rule. Some commenters stated that President Reagan, when signing the Fair Housing Amendments Act of 1988, expressed his opinion that the amendment "does not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that [Fair Housing Act] violations may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent." [80] Some commenters also stated that, in 1988, the United States Solicitor General submitted an amicus brief to the U.S.

Supreme Court in *Huntington Branch, NAACP* v. *Town of Huntington* asserting that a violation of the Fair Housing Act requires a finding of intentional discrimination. [81]

*HUD Response:* While HUD chose not to use the regulations implementing the Fair Housing Amendments Act of 1988 to opine formally on whether a violation under the Act may be established absent discriminatory intent, it has never taken the position that the Act requires a finding of intentional discrimination. On the contrary, through formal adjudications and various other means, including other regulations, interpretive guidance, and statements to Congress, HUD has consistently construed the Act as encompassing discriminatory effects liability. [82] HUD's prior interpretations of the Act regarding the discriminatory effects standard are entitled to judicial deference. [83] Neither President Reagan's signing statement nor the Solicitor General's amicus brief in *Huntington Branch* affects or overrides the longstanding, consistent construction of the Act by HUD, the agency with delegated authority to administer the Act and to promulgate rules interpreting it. Moreover, the Department of Justice both before and after *Huntington Branch* has taken the position that the Fair Housing Act includes discriminatory effects liability. [84]

## B. Definition of Discriminatory Effect, § 100.500(a)

In order to make it more concise and more consistent with terminology used in case law without changing its substance, this final rule slightly revises the definition of "discriminatory effect."

Proposed § 100.500(a) provided that "A housing practice has a discriminatory effect where it actually or predictably: (1) Results in a disparate impact on a group of persons on the basis of race, color, religion, sex, handicap, familial status, or national origin; or (2) Has the effect of creating, perpetuating, or increasing segregated housing patterns on the basis of race, color, religion, sex, handicap, familial status, or national origin."

Final § 100.500(a) provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of

[65] Report of the National Advisory Commission on Civil Disorders 1 (1968).

[66] 90 Cong. Rec. 3422 (1968).

[67] 114 Cong. Rec. 3421 (1968).

[68] *Id.* at 2277.

[69] *Id.* at 2669.

[70] *See, e.g., Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 935–36 (2d Cir.), aff'd, 488 U.S. 15 (1988); *Hanson v. Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir. 1986); *Arthur v. City of Toledo,* 782 F.2d 565, 574–75 (6th Cir. 1986); *United States v. Marengo Cnty. Comm'n,* 731 F.2d 1546, 1559 n.20 (11th Cir. 1984); *Smith v. Clarkton,* 682 F.2d 1055, 1065 (4th Cir. 1982); *Halet v. Wend Inv. Co.,* 672 F.2d 1305, 1311 (9th Cir. 1982); *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 146 (3d Cir. 1977); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978); *United States v. City of Black Jack,* 508 F.2d 1179, 1184–85 (8th Cir. 1974).

[71] *See, e.g.,* H.R. Rep. No. 100–711, at 2182 (1988) (citing courts of appeals decisions in discussing a policy that could have a "discriminatory effect" on minority households "b[ecause minority households tend to be larger"); 134 Cong. Rec. 23711–12 (1988) (Statement of Sen. Kennedy) (noting unanimity of courts of appeals as to the disparate impact test); Fair Housing Amendments Act of 1987: Hearings Before the Subcomm. on the Constitution of the S. Comm. on the Judiciary, 100th Cong., 1st Sess. 529–557 (1987) (testimony of Prof. Robert Schwemm, Univ. of Ky. Law Sch.) (discussing "strong consensus" in federal courts of

appeals that the Fair Housing Act prohibited disparate impact discrimination).

[72] *See* H.R. Rep. No. 100–711, at 89–91 (1988) (dissenting views of Rep. Swindall).

[73] *See* Fair Housing Amendments Act of 1988, Pub. L. 100–430, 102 Stat. 1619 (1988).

[74] H.R. Rep. No. 96–865, at 2 (1980) (The Act "effectively proscribed housing practices with the intent or effect of discriminating on account of race, color, national origin, or religion."); 126 Cong. Rec. 31,164 (1980) (explaining that the addition of an intent requirement "would make a radical change in the standard of proof in title VIII cases") (statement of Sen. Bayh).

[75] 127 Cong. Rec. 22,156 (1981).

[76] 129 Cong. Rec. 808 (1983).

[77] S. 139, 99th Cong. § 6(e) (1985).

[78] 133 Cong. Rec. 7180 (1987).

[79] 54 FR 3232, 3235 (Jan. 23, 1989).

[80] Remarks on Signing the Fair Housing Amendments Act of 1988, 24 Weekly Comp. Pres. Doc. 1140, 1141 (Sept. 13, 1988).

[81] *See* Brief for United States as Amicus Curiae, *Town of Huntington v. Huntington Branch, NAACP,* 488 U.S. 15 (1988) (No. 97–1961).

[82] *See, e.g.,* nn. 12–27, *supra.*

[83] *See, e.g., United States v. Mead Corp.,* 533 U.S. 218, 230 & n.12 (2001) (*Chevron* deference is warranted for formal adjudications).

[84] *See United States. v. City of Black Jack,* 508 F.2d 1179, 1184–86 (8th Cir. 1974); *see also* Brief for the United States as Amicus Curiae, *Magner v. Gallagher,* 132 S. Ct. 1306 (2012) (No. 10–1032).

persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."

Commenters raised a number of issues with respect to the definition of "discriminatory effect."

*Issue:* Two commenters requested that HUD expand the definition of "housing practice" to include the language from the preamble to the proposed rule that provided examples of facially neutral actions that may result in a discriminatory effect, "e.g. laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria," to make clear that the Act does not apply only to housing "practices." 

*HUD Response:* The Act and HUD regulations define "discriminatory housing practice" broadly as "an act that is unlawful under section 804, 805, 806, or 818." [85] As HUD explained in the preamble to the proposed rule, any facially neutral actions, e.g., laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act. Given the breadth of the definition of "discriminatory housing practice," and the examples provided in the preamble to the proposed rule, HUD does not agree that it is necessary to provide those examples in the text of the regulation. The final rule does, however, replace "housing practice" with "practice" in order to make clear it applies to the full range of actions that may violate the Fair Housing Act under an effects theory.

*Issue:* A commenter stated that, in light of the Supreme Court's decision in *Wal-Mart Stores, Inc.* v. *Dukes,* [86] HUD should "remove those aspects of the proposed rule that would give rise to disparate impact liability based on the exercise of discretion."

*HUD Response:* HUD does not agree that the Supreme Court's decision in *Wal-Mart* means that policies permitting discretion may not give rise to discriminatory effects liability under the Fair Housing Act. The opinion in *Wal-Mart* did not address the substantive standards under the Fair Housing Act but instead addressed the issue of class certification under Title VII. Moreover, even in that context, the opinion in *Wal-Mart* does not shield policies that allow for discretion from liability under Title

VII. On the contrary, the Supreme Court confirmed that an employer who permits his managers to exercise discretion may be liable under Title VII pursuant to a disparate impact theory, "since an employer's undisciplined system of subjective decision-making can have precisely the same effects as a system pervaded by impermissible intentional discrimination." [87]

*Issue:* Some commenters asked HUD to remove the word "predictably" from the proposed definition. One commenter made this request out of concern that such a definition would make good faith compliance with the Act difficult, and another because claims based on a predictable impact are too speculative. Another commenter expressed support for the inclusion of "predictably" in the definition because discrimination cases often involve members of a protected class who predictably would be impacted by the challenged practice. As an example, the commenter stated that a challenge to a zoning or land use ordinance might focus on persons who would be excluded from residency by application of the ordinance.

*HUD Response:* HUD agrees with the latter commenter that the Act is best interpreted as prohibiting actions that predictably result in an unjustified discriminatory effect. HUD's interpretation is supported by the plain language of the Fair Housing Act, which defines "aggrieved person" as any person who "believes that such person will be injured by a discriminatory housing practice that is about to occur," [88] and which specifically authorizes HUD to take enforcement action and ALJs and courts to order relief with respect to discrimination that "is about to occur." [89] Moreover, courts interpreting the Fair Housing Act have agreed that predictable discriminatory effects may violate the Act. [90]

*Issue:* A commenter requested that the preamble or the text of the final rule make clear that reasonable data, such as data from the U.S. Census Bureau, data required by the Home Mortgage Disclosure Act (HMDA), and HUD data

[87] Id. at 2554 (internal brackets and quotation omitted).

[88] 42 U.S.C. 3602(i).

[89] See 42 U.S.C. 3610(g)(2)(A); 3612(g)(3); 3613(c)(1); 3614(d)(1)(A).

[90] See, e.g., Pfaff v. HUD, 88 F.3d at 745 ("'Discriminatory effect' describes conduct that actually or predictably resulted in discrimination."); United States. v. City of Black Jack, 508 F.2d at 1184 ("To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect.").

on the occupancy of subsidized housing units, can be used to demonstrate that a practice predictably results in a discriminatory effect.

*HUD Response:* The purpose of the rule, as identified in the November 16, 2011, proposed rule, is to formalize a long-recognized legal interpretation and establish a uniform legal standard, rather than to describe how data and statistics may be used in the application of the standard. The appropriate use of such data is discussed in other federal sources, including the Joint Policy Statement.

*Issue:* Several commenters expressed concern that the proposed rule did not explain the degree to which a practice must disproportionately impact one group over another. A few commenters expressed the opinion that, in order for a practice to violate the Act, the practice must result in a significant or non-trivial discriminatory effect. A commenter wrote that members of a protected class must be impacted in a manner that is "meaningfully different" from any impact on other individuals. Another commenter suggested defining a disparate impact as a 20 percent difference between the relevant groups. Another stated that the impact should be "qualitatively different." A commenter wrote that, in the lending context, a disparate impact should not exist where statistics only show that a protected class, on an aggregate basis, has not received as many loans as the general population. Another commenter stated concern that the rule would allow small statistical differences in the pricing of loans to be actionable.

*HUD Response:* As stated in the response to the preceding issue, this rule concerns the formalization of a long-recognized legal interpretation and burden-shifting framework, rather than a codification of how data and statistics may be used in the application of the standard. To establish a prima facie case of discriminatory effects liability under the rule, the charging party or plaintiff must show that members of a protected class are disproportionately burdened by the challenged action, or that the practice has a segregative effect. Whether a particular practice results in a discriminatory effect is a fact-specific inquiry. Given the numerous and varied practices and wide variety of private and governmental entities covered by the Act, it would be impossible to specify in the rule the showing that would be required to demonstrate a discriminatory effect in each of these contexts. HUD's decision not to codify a significance requirement for pleading purposes is consistent with the Joint

[85] 42 U.S.C. 3602(f); 24 CFR 100.20.

[86] 131 S. Ct. 2541 (2011).

Policy Statement,[91] the statutory codification of the disparate impact standard under Title VII,[92] and the Consumer Financial Protection Bureau's interpretation of the disparate impact standard under ECOA.[93]

*Issue:* Two commenters stated that, in order to establish a prima facie case of discriminatory effect liability, a charging party or plaintiff should have to identify a specific practice and show that the alleged discriminatory effect is caused by that specific practice, with a commenter referring to *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989), in support of this position.

*HUD Response:* HUD addressed this issue at the proposed rule stage, and its analysis is not changed in this final rule. Under this rule, the charging party or plaintiff has the burden of proving that a challenged practice causes a discriminatory effect.[94] In HUD's experience, identifying the specific practice that caused the alleged discriminatory effect will depend on the facts of a particular situation and therefore must be determined on a case-by-case basis. Moreover, as recognized in the employment context under Title VII, the elements of a decision-making process may not be capable of separation for analysis,[95] in which case it may be appropriate to challenge the decision-making process as a whole. For example, in a reverse redlining case, there may be multiple acts or policies which together result in a discriminatory effect.[96]

*Issue:* Commenters expressed concern with the definition of "discriminatory

effect" because it included a practice that has "the effect of creating, perpetuating, or increasing segregated housing patterns" based on protected class. A commenter asked that "segregation" be removed from the proposed definition. Another commenter expressed concern that this portion of the definition would extend liability beyond the factual circumstances of the cases HUD cited as examples in the proposed rule's preamble because, according to the commenter, most of those cases raised at least a suggestion of intentional discrimination. A commenter stated that "perpetuating" should be more clearly defined so that the rule states, for example, whether the term requires an attempt to segregate further, or merely a practice that continues existing patterns of segregation. Another commenter expressed the related opinion that "not explicitly fostering integration" should never form the basis for liability under the Act.

*HUD Response:* As discussed in the preambles to both the proposed rule and this final rule, the elimination of segregation is central to why the Fair Housing Act was enacted.[97] HUD therefore declines to remove from the rule's definition of "discriminatory effects" "creating, perpetuating, or increasing segregated housing patterns."[98] The Fair Housing Act was enacted to replace segregated neighborhoods with "truly integrated and balanced living patterns."[99] It was structured to address discriminatory housing practices that affect "the whole community" as well as particular segments of the community,[100] with the goal of advancing equal opportunity in housing and also to "achieve racial integration for the benefit of all people in the United States."[101] Accordingly, the Act prohibits two kinds of unjustified discriminatory effects: (1) harm to a particular group of persons by a disparate impact; and (2) harm to the community generally by creating, increasing, reinforcing, or perpetuating

segregated housing patterns.[102] Recognizing liability for actions that impermissibly create, increase, reinforce, or perpetuate segregated housing patterns addresses the purpose of the Act to replace segregated neighborhoods with "truly integrated and balanced living patterns." For example, the perpetuation of segregation theory of liability has been utilized by private developers and others to challenge practices that frustrated affordable housing development in nearly all-white communities and thus has aided attempts to promote integration.[103]

Moreover, every federal court of appeals to have addressed the issue has agreed with HUD's interpretation that the Act prohibits practices with the unjustified effect of perpetuating segregation.[104] In one such case, for example, the court of appeals held that a zoning ordinance that prevents the construction of multifamily housing in areas that are primarily white may violate the Act by "reinforcing racial

---

[91] *See* Joint Policy Statement, 59 FR 18,266, 18,269 (Apr. 15, 1994) (defining "disparate impact" as "a disproportionate adverse impact" on applicants a protected group).

[92] *See* 42 U.S.C. 2000e-2(k)(1)(A)(i) (complaining party must demonstrate "that a respondent uses a particular employment practice that causes a disparate impact").

[93] *See* 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)-2 (discriminatory effect may exist when a creditor practice "has a disproportionately negative impact on a prohibited basis").

[94] *See* 24 CFR 100.500(c); *see also* 76 FR 70925.

[95] *See* 42 U.S.C. 2000e-2(k)(1)(B)(i) ("[T]he complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice").

[96] *See, e.g., Hargraves* v. *Capital City Mortg. Corp,* 140 F. Supp. 2d 7, 20–22 (D.D.C. 2000) (finding that "predatory lending" in African American neighborhoods, which included exorbitant interest rates, lending based on the value of the asset rather than a borrower's ability to repay, profiting by acquiring the property through default, repeated foreclosures, and loan servicing procedures with excessive fees, could disparately impact African Americans).

[97] *See* nn. 6–7, 65–69 and accompanying text, *supra;* 76 FR 70922.

[98] As discussed in the "Definition of Discriminatory Effect" section, the final rule amends the definition of "discriminatory effect" to make it more concise and more consistent with terminology used in case law, but its substance is unchanged.

[99] *Trafficante,* 409 U.S. at 211 (citing 114 Cong. Rec. 3422 (Feb. 20, 1968) (statement of Senator Mondale)).

[100] *Trafficante,* 409 U.S. at 211 (citing 114 Cong. Rec. 2706 (1968) (Statement of Senator Javits)).

[101] H.R. Res. 1095, 110th Cong., 154 Cong. Rec. H2280–01 (April 15, 2008).

[102] *See, e.g., Graoch,* 508 F.3d at 378 (there are "two types of discriminatory effects which a facially neutral housing decision can have: The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups."); *Huntington Branch,* 844 F.2d at 937 ("the discriminatory effect of a rule arises in two contexts: adverse impact on a particular minority group and harm to the community generally by the perpetuation of segregation * * * recognizing this second form of effect advances the principal purpose of Title VIII to promote, open, integrated residential housing patterns.") (internal citations and quotation marks omitted]; *Metro. Housing Dev. Corp.* v. *Village of Arlington Heights,* 558 F.2d at 1290 ("There are two kinds of racially discriminatory effects which a facially neutral decision about housing can produce. The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.") (internal citations omitted]; *Hallmark Developers, Inc.* v. *Fulton County,* 386 F. Supp. 2d 1369, 1383 (N.D. Ga. 2005) ("Of course there are two kinds of racially discriminatory effect which can be produced by a racially neutral decision. If the decision or action perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.") (internal citations omitted).

[103] *See, e.g., Huntington Branch,* 844 F.2d at 937; *Arlington Heights,* 558 F.2d at 1291; *Black Jack,* 508 F.2d at 1184–86; *Summerchase Ltd. Pshp. I, et al.* v. *City of Gonzales, et al.,* 970 F. Supp. 522, 527–28 (M.D. La. 1997); *Dews,* 109 F. Supp. 2d at 567–68.

[104] *See supra* note 28.

**App.161**

segregation in housing." [105] For consistency with the terminology used in this case law, the final rule adds the term "reinforces" to the definition of "discriminatory effect."

In response to the comment regarding the facts of the cases HUD cited as examples in the proposed rule's preamble, HUD notes that those cases [106] are not exhaustive and therefore should not be viewed as the only ways that a violation of the Act may be established based on a discriminatory effects theory. Moreover, even if the facts of a particular case suggest intentional discrimination, in many instances both an intent to discriminate and a discriminatory effect may exist, and a charging party or plaintiff may bring a claim alleging either or both intent and effect as alternative theories of liability. Regardless, as explained throughout this preamble, and in case law, discriminatory intent is not required for a violation of the Act under an effects theory.

## C. Legally Sufficient Justification, § 100.500(b)(1)

In response to comments, this final rule slightly revises the first prong of "legally sufficient justification," as provided in the November 16, 2011, proposed rule, which is required to sustain a practice with a discriminatory effect under the Act.

Proposed § 100.500(b)(1) provided: "A legally sufficient justification exists where the challenged housing practice: (1) Has a necessary and manifest relationship to one or more legitimate, nondiscriminatory interests of the respondent * * * or defendant."

Final § 100.500(b)(1) provides: "A legally sufficient justification exists where the challenged practice: (1) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent * * * or defendant * * * A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative."

Comments were received with respect to proposed § 100.500(b)(1), some agreeing with the standard as stated; some recommending that § 100.500(b)(1) set either a higher or lower standard of proof for defendants and respondents; and some suggesting that HUD provide definitions for certain terms or use slightly different terms to make the regulatory provision easier to understand and apply.

### 1. Substantial, Legitimate, Nondiscriminatory Interests, § 100.500(b)(1)

*Issue:* Although some commenters supported the use of the phrase "legitimate, nondiscriminatory interest," a commenter asked that the final rule provide a definition of the phrase to ensure that the standard is applied uniformly. Commenters stated that the word "substantial" or "clearly" should modify the phrase "nondiscriminatory interests," reasoning that justifying discrimination with an interest that may be of little or no importance to the defendant or respondent would run contrary to Congress's goal of providing for fair housing within constitutional limitations.

*HUD Response:* HUD agrees that, in order to effectuate the Fair Housing Act's broad, remedial goal, practices with discriminatory effects cannot be justified based on interests of an insubstantial nature. Accordingly, HUD is making clear in this final rule that any interest justifying a practice with a discriminatory effect must be "substantial." A "substantial" interest is a core interest of the organization that has a direct relationship to the function of that organization. The requirement that an entity's interest be substantial is analogous to the Title VII requirement that an employer's interest in an employment practice with a disparate impact be job related.[107] HUD uses the more general standard of substantiality because there is no single objective, such as job-relatedness, against which every practice covered by the Fair Housing Act could be measured. The determination of whether goals, objectives, and activities are of substantial interest to a respondent or defendant such that they can justify actions with a discriminatory effect requires a case-specific, fact-based inquiry.

The word "legitimate," used in its ordinary meaning, is intended to ensure that a justification is genuine and not false,[108] while the word "nondiscriminatory" is intended to ensure that the justification for a challenged practice does not itself discriminate based on a protected characteristic. HUD and federal courts interpreting the Fair Housing Act have

been applying these concepts without incident.[109]

*Issue:* Commenters requested that "legitimate, nondiscriminatory interests" be replaced or equated with "business necessity." This would, in their view, be consistent with judicial interpretations of the Fair Housing Act, with HUD's regulations governing Fannie Mae and Freddie Mac, and with the Joint Policy Statement. Commenters stated that the Joint Policy Statement is well established and provides a clear, predictable standard to covered entities. Several commenters expressed concern that the proposed standard requiring a "legitimate" justification was weaker than, and would be interpreted as requiring less than, the "business necessity" standard.

*HUD Response:* In its adjudications under the Fair Housing Act, HUD has required respondents to prove that their challenged practices are justified by business necessity.[110] The other federal regulatory and enforcement agencies involved in the investigation of lending discrimination have taken the same approach.[111] The "substantial, legitimate, nondiscriminatory interest" standard found in § 100.500(b)(1) is equivalent to the "business necessity" standard found in the Joint Policy Statement. The standard set forth in this rule is not to be interpreted as a more lenient standard than "business necessity." HUD chooses not to use the phrase "business necessity" in the rule because the phrase may not be easily understood to cover the full scope of practices covered by the Fair Housing Act, which applies to individuals, businesses, nonprofit organizations, and public entities. Using the phrase "business necessity" might confuse litigating parties and the courts as to how the term might apply, for example, to a nonprofit organization that provides housing or housing-related services, or to a branch of state or local government carrying out its functions. The standards in § 100.500 apply equally to individuals, public entities, and for-

---

[105] *Huntington Branch,* 844 F.2d at 937–38.
[106] *See* 76 FR 70925.

[107] *See* 42 U.S.C. 2000e-2(k)(1)(A)(i).
[108] *See, e.g.,* Legitimate Definition, Merriam-Webster's Dictionary, *http://www.merriam-webster.com/dictionary/necessary* (last visited Mar. 15, 2012) (defining "legitimate" as "neither spurious nor false").

[109] *See, e.g., Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.,* 417 F.3d 898, 902 (8th Cir. 2005) (defendant must prove that challenged action is necessary to achieve "legitimate, non-discriminatory policy objectives"); *Charleston Hous. Auth. v. U.S. Dept. of Agric.* 419 F.3d 729 (same).
[110] *See, e.g.,* 1998 Enforcement Handbook at 2–30 (instructing HUD investigators that a respondent's policy must be justified by a "business necessity"); *HUD v. Carlson,* 1995 WL 365009, at *14 (HUD ALJ June 12, 1995) ("The Respondent has the burden to overcome the prima facie case by establishing a business necessity for the policy."); Joint Policy Statement, 59 FR at 18269 (requiring a challenged policy or practice to be "justified by 'business necessity' ").
[111] *See* Joint Policy Statement, 59 FR at 18269.

profit and nonprofit private entities because, as discussed below, neither the text of the Act nor its legislative history supports drawing a distinction among them. Accordingly, HUD has chosen terminology that, while equivalent to its previous guidance in the Joint Policy Statement, applies readily to all covered entities and all covered activities.

*Issue:* Some commenters expressed concern that the term "legitimate" allows for subjective review of a proffered justification.

*HUD Response:* HUD and courts have reviewed justifications proffered by covered entities for many years. While the review is very fact intensive, it is not subjective. Whether an interest is "legitimate" is judged on the basis of objective facts establishing that the proffered justification is genuine, and not fabricated or pretextual.[112] HUD and courts have engaged in this inquiry for decades without encountering issues related to the subjectivity of the inquiry. HUD therefore believes that concerns about subjective reviews of proffered justifications are not warranted.

*Issue:* A commenter requested that the final rule expressly state that increasing profits, minimizing costs, and increasing market share qualify as legitimate, nondiscriminatory interests. Similarly, another commenter asked that the final rule codify examples of tenant screening criteria such as rental history, credit checks, income verification, and court records that would be presumed to qualify as legally sufficient justifications.

*HUD Response:* HUD is not adopting these suggestions because the Fair Housing Act covers many different types of entities and practices, and a determination of what qualifies as a substantial, legitimate, nondiscriminatory interest for a given entity is fact-specific and must be determined on a case-by-case basis. Accordingly, the final rule does not provide examples of interests that would always qualify as substantial, legitimate, nondiscriminatory interests for every respondent or defendant in any context.

2. Relationship Between Challenged Practice and Asserted Interest, § 100.500(b)(1)

*Issue:* Several commenters expressed concern with HUD's use of the term "manifest" in the proposed requirement that the challenged practice have a "necessary and manifest relationship" to one or more legitimate, nondiscriminatory interests of the respondent or defendant. Commenters

expressed uncertainty about what the term was intended to mean and how it would be interpreted by HUD or by federal courts. Two commenters expressed concern that the term "manifest" may involve a subjective evaluation and others did not understand the evidentiary concept embodied in the term. A commenter urged HUD to make clear in the language of the final rule, in addition to the preamble, that a justification may not be hypothetical or speculative.

*HUD Response:* In the proposed rule, the term "manifest" was used to convey defendants' and respondents' obligation to provide evidence of the actual need for the challenged practices, instead of relying on speculation, hypothesis, generalization, stereotype, or fear. HUD recognizes that some commenters were confused by the term "manifest." In response to these concerns, HUD is replacing the term "manifest" in the final rule with the requirement, added in § 100.500(b)(2), that "a legally sufficient justification must be supported by evidence and may not be hypothetical or speculative." This language is intended to convey that defendants and respondents, relying on a defense under § 100.500(b)(1), must be able to prove with evidence the substantial, legitimate, nondiscriminatory interest supporting the challenged practice and the necessity of the challenged practice to achieve that interest. This language is consistent with HUD's longstanding application of effects liability under the Fair Housing Act, is easy to understand, can be uniformly applied by federal and state courts and administrative agencies, and is unlikely to cause confusion or unnecessary litigation about its meaning. HUD notes that this language is also consistent with the application of the standard by other federal regulatory and enforcement agencies under both the Fair Housing Act and ECOA,[113] with the approach taken under Title VII,[114] and with the approach taken by a number of federal courts interpreting the Fair Housing Act.[115]

[113] *See* Joint Policy Statement, 59 FR at 18269 ("The justification must be manifest and may not be hypothetical or speculative.")

[114] *See* 42 U.S.C. 2000e–2(k)(1)(A)(i) (the respondent must "*demonstrate* that the challenged practice is job related for the position in question and consistent with business necessity") (emphasis added).

[115] *See, e.g., Charleston Hous. Auth.* v. *U.S. Dep't of Agric.,* 419 F.3d 729, 741 (8th Cir. 2005) (the challenged housing practice must have a "manifest relationship" to the defendant's objectives); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d at 149 ("a justification must serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant") (emphasis added); *Huntington Branch,*

*Issue:* A commenter suggested that the phrase "necessary and manifest" should be defined.

*HUD Response:* As discussed above, HUD has removed the word "manifest" in the final rule in order to avoid any potential confusion. Thus, § 100.500(b)(1) is slightly revised at this final rule stage to state that a respondent or defendant seeking to defend a challenged practice with a discriminatory effect must prove that the practice "is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" of the respondent or defendant. In the proposed rule, as well as this final rule, HUD uses "necessary" in its ordinary, most commonly used sense.

*Issue:* Some commenters suggested that HUD remove the word "necessary" to make the standard found in § 100.500(b)(1) consistent with the Title VII standard set out in the Supreme Court's opinion in *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989). Commenters suggested various standards without the word "necessary," including requiring that the challenged practice have "a legitimate business purpose," that the challenged practice have "a legitimate nondiscriminatory purpose," or that the challenged practice be "rationally related to a legitimate, nondiscriminatory goal."

*HUD Response:* HUD declines to adopt the commenters' suggestion to remove "necessary" from the rule. HUD's substantial experience in administering the Fair Housing Act confirms that requiring a challenged practice with a discriminatory effect to be necessary best effectuates the broad, remedial goal of the Act. Indeed, in 1994 HUD and ten other federal agencies notified lenders of the requirement to justify the discriminatory effect of a challenged lending practice under the Fair Housing Act and ECOA by showing that the practice is necessary to their business.[116] Moreover, in 1997, HUD

*NAACP* v. *Town of Huntington,* 844 F.2d at 938, aff'd, 488 U.S. 15 (1988) (per curiam) (same).

[116] *See* Joint Policy Statement, 59 FR 18,269 (the second step of a disparate impact analysis under the Fair Housing Act and ECOA is to "determine whether the policy or practice is justified by 'business necessity.'"] Id. (giving an example of a policy that may violate the Fair Housing Act and ECOA since "the lender is unlikely to be able to show that the policy is compelled by business necessity"); *see also* Office of the Comptroller of the Currency, Federal Depository Insurance Corporation, Federal Reserve Board, Office of Thrift Supervision, National Credit Union Administration, The Interagency Fair Lending Examination Procedures app. at 28, August 2009, available at *http://www.ffiec.gov/pdf/fairappx.pdf.*

[112] *See* note 109, *supra.*

promulgated a regulation recognizing that section 805 of the Act[117] does not prevent consideration, in the purchasing of loans, of factors that are necessary to a business.[118] In addition, in 1988 the House Committee on the Judiciary, in advancing a bill amending the Fair Housing Act, recognized that liability should not attach when a justification is necessary to the covered entity's business.[119] HUD's view is also consistent with Congress's 1991 enactment of legislation codifying that, in the employment context, a practice that has a disparate impact must be consistent with "business necessity" and must also be "job related."[120] HUD also notes that a similar necessity requirement is found in ECOA, which requires that a challenged practice "meets a legitimate business need."[121] HUD's final rule therefore uses language that is consistent with its longstanding interpretation of the Fair Housing Act, comparable to the protections afforded under Title VII and ECOA, and fairly balances the interests of all parties.

*Issue:* A commenter expressed concern that requiring a "necessary" relationship may interfere with loss mitigation efforts, including those under the Home Affordable Modification Program (HAMP) and Home Affordable Refinance Program (HARP)—federal programs that encourage mortgage servicers to offer modifications of loans or refinances—because such efforts are voluntary and participation in them may not be perceived as "necessary."

*HUD Response:* Since at least the date of issuance of the Joint Policy Statement in 1994, lenders have been on notice that they must prove the necessity of a challenged practice to their business under both the Fair Housing Act and ECOA. This requirement has not prevented lenders or servicers from engaging in effective loss mitigation efforts. The mere fact that a policy is voluntarily adopted does not preclude it from being necessary to achieve a substantial, legitimate, nondiscriminatory interest. By formalizing the process of proving

business necessity in a rule that clearly allocates the burdens of proof among the parties, HUD is not changing substantive law, but merely clarifying the contours of an available defense so that lenders may rely upon it with greater clarity as to how it applies.

*Issue:* A commenter expressed the concern that requiring a respondent or defendant to prove necessity would subject the respondent or defendant to unnecessary and possibly frivolous investigations and litigation. Another commenter took the opposite position, stating that the rule would not create excessive litigation exposure for respondents or defendants because numerous procedural mechanisms exist to dispose of meritless cases. A commenter stated that, at the second stage of the burden-shifting analysis, a defendant should have the opportunity to demonstrate not only a legally sufficient justification, but also that the charging party or plaintiff did not satisfy its prima facie case because the challenged practice did not result in a discriminatory effect.

*HUD Response:* Given how the discriminatory effects framework has been applied to date by HUD and by the courts, HUD does not believe that the rule will lead to frivolous investigations or create excessive litigation exposure for respondents or defendants. As discussed above, since at least 1994, when the Joint Policy Statement was issued, lenders have known that they must prove the necessity of a challenged practice to their business. Moreover, HUD believes that promulgation of this rule—with its clear allocation of burdens and clarification of the showings each party must make—has the potential to decrease or simplify this type of litigation. For example, with a clear, uniform standard, covered entities can conduct consistent self-testing and compliance reviews, document their substantial, legitimate nondiscriminatory interests, and resolve potential issues so as to prevent future litigation. A uniform standard is also a benefit to entities operating in multiple jurisdictions. To the extent that the rule results in more plaintiffs being aware of potential effects liability under the Fair Housing Act, it should have the same impact on covered entities, resulting in greater awareness and compliance with the Fair Housing Act. Additionally, as a commenter noted, the Federal Rules of Civil Procedure provide various means to dispose of meritless claims, including Rules 11, 12, and 56. Moreover, a respondent or defendant may avoid liability by rebutting the charging party's or plaintiff's proof of

discriminatory effect.[122] If the fact-finder decides that the charging party or plaintiff has not proven that the challenged practice resulted in a discriminatory effect, liability will not attach.

*Issue:* A commenter expressed concern that, under the proposed rule, a legally sufficient justification under § 100.500(b)(1) may not be hypothetical or speculative but a discriminatory effect under § 100.500(a) may be, creating an imbalance in the burden of proof in favor of the charging party or plaintiff.

*HUD Response:* This comment indicates a misunderstanding of what § 100.500 requires. Requiring the respondent or defendant to introduce evidence (instead of speculation) proving that a challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests in order to benefit from the defense to liability is not different in kind from requiring the charging party or plaintiff to introduce evidence (not speculation) proving that a challenged practice caused or will predictably cause a discriminatory effect. As discussed in this preamble, the language of the Act makes clear that it is intended to address discrimination that has occurred or is about to occur, and not hypothetical or speculative discrimination.

### D. Less Discriminatory Alternative, § 100.500(b)(2)

Some comments were received with respect to § 100.500(b)(2) of the proposed rule. With that provision, HUD proposed that a practice with a discriminatory effect may be justified only if the respondent's or defendant's interests cannot be served by another practice with a less discriminatory effect. In response to these comments, the final rule makes one slight revision to the proposed provision by substituting "could not be served" for "cannot be served."

*Issue:* A commenter requested that HUD replace "cannot be served" with "would not be served" because, under the Supreme Court's analysis in *Wards Cove*, a plaintiff cannot prevail by showing that a less discriminatory alternative could in theory serve the defendant's business interest. This commenter also stated that, in order for liability to attach, a less discriminatory alternative must have been known to and rejected by the respondent or

---

[117] 42 U.S.C. 3605.

[118] *See* 24 CFR 100.125(c); *cf. Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.,* 417 F.3d, at 902 (the challenged practice must be "necessary to the attainment of" the defendant's objectives) (internal citation omitted); *see also Affordable Hous. Dev. Corp. v. City of Fresno,* 433 F.3d 1182, 1195 (9th Cir. 2006) (describing the Eighth Circuit's approach as "sound").

[119] H.R. Rep. No. 100–711, at 2191 (1988) ("The Committee does not intend that those purchasing mortgage loans be precluded from taking into consideration factors justified by business necessity.").

[120] *See* 42 U.S.C. 2000e–2(k)(1)(A).

[121] 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)(2).

[122] *See, e.g., Dothard v. Rawlinson,* 433 U.S. 321, 331 (1977) (Title VII case explaining that a defendant is "free to adduce countervailing evidence of his own" in order to discredit a plaintiff's evidence of disparate impact).

**App.164**

defendant. Other commenters stated that, in order for liability to attach, the alternative practice must be equally effective as the challenged practice, or at least as effective as the challenged practice, with some of these commenters pointing to *Wards Cove* in support of this position. A number of other commenters, on the other hand, cited to Fair Housing Act case law for the proposition that liability should attach unless the less discriminatory alternative would impose an undue hardship on the respondent or defendant under the circumstances of the particular case.

*HUD Response:* HUD agrees that a less discriminatory alternative must serve the respondent's or defendant's substantial, legitimate nondiscriminatory interests, must be supported by evidence, and may not be hypothetical or speculative. For greater consistency with the terminology used in HUD's (and other federal regulatory agencies') previous guidance in the Joint Policy Statement,[123] the final rule replaces "cannot be served" with "could not be served." A corresponding change of "can" to "could" is also made in § 100.500(c)(3) of the final rule. HUD does not believe the rule's language needs to be further revised to state that the less discriminatory alternative must be "equally effective," or "at least as effective," in serving the respondent's or defendant's interests; the current language already states that the less discriminatory alternative must serve the respondent's or defendant's interests, and the current language is consistent with the Joint Policy Statement, with Congress's codification of the disparate impact standard in the employment context,[124] and with judicial interpretations of the Fair Housing Act.[125] The additional modifier

"equally effective," borrowed from the superseded *Wards Cove* case, is even less appropriate in the housing context than in the employment area in light of the wider range and variety of practices covered by the Act that are not readily quantifiable. For a similar reason, HUD does not adopt the suggestion that the less discriminatory alternative proffered by the charging party or plaintiff must be accepted unless it creates an "undue hardship" on the respondent or defendant. The "undue hardship" standard, which is borrowed from the reasonable accommodation doctrine in disability law, would place too heavy a burden on the respondent or defendant.

In addition, HUD does not agree with the commenter who stated that *Wards Cove* requires the charging party or plaintiff to show that, prior to litigation, a respondent or defendant knew of and rejected a less discriminatory alternative,[126] or that *Wards Cove* even governs Fair Housing Act claims. HUD believes that adopting this requirement in the housing context would be unjustified because it would create an incentive not to consider possible ways to produce a less discriminatory result. Encouraging covered entities not to consider alternatives would be inconsistent with Congress's goal of providing for fair housing throughout the country.

*Issue:* Two commenters expressed concern that, under the proposed rule's language, the discriminatory effect of an alternative would be considered but a lender's concerns such as credit risk would be irrelevant.

*HUD Response:* HUD believes these commenters' concerns will not be realized in practice because a less discriminatory alternative need not be adopted unless it could serve the substantial, legitimate, nondiscriminatory interest at issue. The final rule specifically provides that the interests supporting a challenged practice are relevant to the consideration of whether a less discriminatory alternative exists. As stated in § 100.500(c)(3), the charging party or plaintiff must show that the less discriminatory alternative could serve the "interests supporting the challenged practice." Thus, if the lender's interest in imposing the challenged practice relates to credit risk, the alternative would also need to effectively address the lender's concerns about credit risk.

### E. Allocations of Burdens of Proof in § 100.500(c)

In the proposed rule, HUD set forth a burden-shifting framework in which the plaintiff or charging party would bear the burden of proving a prima facie case of discriminatory effect, the defendant or respondent would bear the burden of proving a legitimate, nondiscriminatory interest for the challenged practice, and the plaintiff or charging party would bear the burden of proving that a less discriminatory alternative exists.

*Issue:* Some commenters stated that the plaintiff or charging party should bear the burden of proof at all stages of the proceedings, either citing *Wards Cove* in support of this position or reasoning that, in our legal system, the plaintiff normally carries the burden of proving each element of his claim. Other commenters asked HUD to modify § 100.500(c)(3) in order to place the burden of proving no less discriminatory alternative on the defendant or respondent. Those recommending that the burden allocation be modified in this way reasoned that the respondent or defendant is in a better position to bear this burden because of greater knowledge of, and access to, information concerning the respondent's or defendant's interests and whether a less discriminatory alternative could serve them. Several commenters stated that this is particularly true in the context of government decisions, as complainants and plaintiffs will generally be outside the political decision-making process, and in the context of insurance and lending decisions, where proprietary information and formulas used in the decision making process may be vigorously protected.

Commenters stated that complainants and plaintiffs may not have the capacity to evaluate possible less discriminatory alternatives. Some commenters also pointed out that assigning this burden to the respondent or defendant may avoid intrusive and expensive discovery into a respondent's or defendant's decision-making process, and would incentivize entities subject to the Act to consider less discriminatory options when making decisions. Commenters also stated that courts have placed this burden of proof on the defendant, others have placed it on the party for whom proof is easiest, and reliance on Title VII is inappropriate because of the unique nature of less discriminatory alternatives in Fair Housing Act cases.

*HUD Response:* HUD believes that the burden of proof allocation in § 100.500(c) is the fairest and most

---

[123] *See* Joint Policy Statement, 59 FR at 18269 ("Even if a policy or practice that has a disparate impact on a prohibited basis can be justified by business necessity, it still may be found to be discriminatory if an alternative policy or practice could serve the same purpose with less discriminatory effect.")

[124] *See* 42 U.S.C. 2000e–2(k)(1)(A)(ii) ("the concept of 'alternative employment practice' " under Title VII "shall be in accordance with the law as it existed on June 4, 1989"); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975) ("[I]t remains open to the complaining party to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest.").

[125] *See, e.g., Darst-Webbe*, 417 F.3d at 906 ("plaintiffs must offer a viable alternative that satisfies the Housing Authority's legitimate policy objectives while reducing the [challenged practice's] discriminatory impact"); *Huntington*, 844 F.2d at 939 (analyzing whether the "[t]own's goal * * * can be achieved by less discriminatory means"); *Rizzo*, 564 F.2d at 159 (it must be analyzed whether an alternative "could be adopted

that would enable [the defendant's] interest to be served with less discriminatory impact.").

[126] *See Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 660–61 (1989).

reasonable approach to resolving the claims. As the proposed rule stated, this framework makes the most sense because it does not require either party to prove a negative. Moreover, this approach will ensure consistency in applying the discriminatory effects standard while creating the least disruption.because, as discussed earlier in this preamble, HUD and most courts utilize a burden-shifting framework,[127] and most federal courts using a burden-shifting framework allocate the burdens of proof in this way.[128] In addition, HUD notes that this burden-shifting scheme is consistent with the Title VII discriminatory effects standard codified by Congress in 1991.[129] It is also consistent with the discriminatory effects standard under ECOA,[130] which borrows from Title VII's burden-shifting framework.[131] There is significant overlap in coverage between ECOA, which prohibits discrimination in credit, and the Fair Housing Act, which prohibits discrimination in residential real estate-related transactions.[132] Thus, under the rule's framework, in litigation involving claims brought under both the Fair Housing Act and ECOA, the parties and the court will not face the burden of applying inconsistent methods of proof to factually indistinguishable claims. Having the same allocation of burdens under the Fair Housing Act and ECOA will also provide for less

[127] See supra notes 29–33.

[128] See supra notes 34, 35.

[129] See 42 U.S.C. 2000e–2(k).

[130] ECOA prohibits discrimination in credit on the basis of race and other enumerated criteria. See 15 U.S.C. 1691.

[131] See S. Rep. No. 94–589, at 4–5 (1976) ("[J]udicial constructions of antidiscrimination legislation in the employment field, in cases such as *Griggs v. Duke Power Company*, 401 U.S. 424 (1971), and *Albemarle Paper Co. v. Mood*, [422 U.S. 405 (1975)], are intended to serve as guides in the application of [ECOA], especially with respect to the allocations of burdens of proof."); 12 CFR 1002.6(a) ("The legislative history of [ECOA] indicates that the Congress intended an 'effects test' concept, as outlined in the employment field by the Supreme Court in the cases of *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) and *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness."); 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)–2 ("Effects test. The effects test is a judicial doctrine that was developed in a series of employment cases decided by the Supreme Court under Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), and the burdens of proof for such employment cases were codified by Congress in the Civil Rights Act of 1991 (42 U.S.C. 2000e–2).").

[132] See Joint Policy Statement, 59 FR 18266. Indeed, the Joint Policy Statement analyzed the standard for proving disparate impact discrimination in lending under the Fair Housing Act and under ECOA without any differentiation. See 59 FR 18269.

confusion and more consistent decision making by the fact finder in jury trials.

With respect to expressed concerns about the ability of plaintiffs or complainants to demonstrate a less discriminatory alternative, plaintiffs in litigation in federal courts may rely on Rule 26(b)(1) of the Federal Rules of Civil Procedure.for the discovery of information "that is relevant to any party's claim or defense,"[133] and parties in an administrative proceeding may rely on Rule 26(b)(1) and a similar provision in HUD's regulations.[134] The application of those standards would plainly provide for the discovery of information regarding the alternatives that exist to achieve an asserted interest, the extent to which such alternatives were considered, the reasons why such alternatives were rejected, and the data that a plaintiff or plaintiff's expert could use to show that the defendant did not select the least discriminatory alternative. An appropriately tailored protective order can be issued by the court to provide access to proprietary information in the context of cases involving confidential business information, such as those involving insurance or lending, while providing to respondents and defendants adequate protection from disclosure of this information. Moreover, as noted above, in administrative adjudications, it is the charging party, not non-intervening complainants, who bear this burden of proof.

### F. Application of Discriminatory Effects Liability

Comments were received with respect to how the discriminatory effects standard would be applied and how it might impact covered entities. These comments expressed varying concerns, including the retroactivity of the rule, its application to the insurance and lending industries, and its impact on developing affordable housing.

*Issue:* A commenter stated that each of the cases listed in the proposed rule as examples of practices with a segregative effect involved a government actor, while another commenter asked HUD to clarify whether liability may attach to private parties.

*HUD Response:* Liability for a practice that has an unjustified discriminatory effect may attach to either public or private parties according to the standards in § 100.500, because there is nothing in the text of the Act or its legislative history to indicate that

[133] Fed. R. Civ. P. 26(b)(1).

[134] See 24 CFR 180.500(b) ("parties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the proceeding").

Congress intended to distinguish the manner in which the Act applies to public versus private entities.[135]

*Issue:* A commenter expressed the opinion that the Fair Housing Act does not grant HUD the power to promulgate retroactive rules, and therefore HUD should make clear that the final rule applies prospectively only.

*HUD Response:* This final rule embodying HUD's and the federal courts' longstanding interpretation of the Act to include a discriminatory effects standard will apply to pending and future cases. HUD has long recognized, as have the courts, that the Act supports an effects theory of liability. This rule is not a change in HUD's position but rather a formal interpretation of the Act that clarifies the appropriate standards for proving a violation under an effects theory. As such, it "is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand."[136]

*Issue:* A commenter stated that the most appropriate remedy for a violation of the Act under an effects theory is declaratory or injunctive relief. This commenter expressed the opinion that the use of penalties or punitive damages generally does not serve the underlying purpose of the Fair Housing Act to remedy housing discrimination.

*HUD Response:* HUD disagrees with the commenter. The Fair Housing Act specifically provides for the award of damages—both actual and punitive— and penalties.[137]

*Issue:* Commenters from the insurance industry expressed a number of concerns about the application of the proposed rule to insurance practices. Some commenters stated that application of the disparate impact standard would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act (15 U.S.C. 1011–1015) or the common law "filed rate doctrine." Some commenters stated that HUD's use of *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205 (9th Cir. 2010), in the preamble of the proposed rule was not appropriate.

[135] See 42 U.S.C. 3602(f) (defining "discriminatory housing practice" as "an act that is unlawful under section 804, 805, 806, or 818," none of which distinguish between public and private entities); see also *Nat'l Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 59–60 & n.7 (D.D.C. 2002) (applying the same impact analysis to a private entity as to public entities, and noting that a "distinction between governmental and non-governmental bodies finds no support in the language of the [Act] or in [its] legislative history").

[136] *Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir. 1993) (quoting *Manhattan General Equip. Co. v. Comm'r*, 297 U.S. 129, 135 (1936)).

[137] See 42 U.S.C. 3612–14.

*HUD Response:* HUD has long interpreted the Fair Housing Act to prohibit discriminatory practices in connection with homeowner's insurance,[138] and courts have agreed with HUD, including in *Ojo v. Farmers Group.*[139] Moreover, as discussed above, HUD has consistently interpreted the Act to permit violations to be established by proof of discriminatory effect. By formalizing the discriminatory effects standard, the rule will not, as one commenter suggested, "undermine the states' regulation of insurance." The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance * * * unless such Act specifically relates to the business of insurance." McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act. How the Act should be construed in light of McCarran-Ferguson depends on the facts at issue and the language of the relevant State law "relat[ing] to the business of insurance." Because this final rule does not alter the instruction of McCarran-Ferguson or its application as described in *Ojo v. Farmers Group,* it will not interfere with any State regulation of the insurance industry.

*Issue:* Some commenters stated that liability for insurance practices based on a disparate impact standard of proof is inappropriate because insurance is risk-based and often based on a multivariate analysis. A commenter wrote that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk," or might be forced to violate state laws that require insurance rates to be actuarially sound estimates of the expected value of all future costs associated with an individual risk transfer.

138 *See, e.g.,* 24 CFR 100.70(d)(4) (Mar. 15, 1989) (defining "other prohibited sale and rental conduct" to include "refusing to provide * * * property or hazard insurance for dwellings or providing such * * * insurance differently" because of a protected class); 53 FR 44,992, 44,997 (Nov. 7, 1988) (preamble to proposed regulations stating that "discriminatory refusals to provide * * * adequate property or hazard insurance * * * has been interpreted by the Department and by courts to render dwellings unavailable").

139 *See Ojo v. Farmers Group, Inc.,* 600 F.3d at 1208; *NAACP v. American Family Mut. Ins. Co.,* 978 F.2d 287, 297–301 (7th Cir. 1993); *Nationwide Mut. Ins. Co. v. Cisneros,* 52 F.3d 1351, 1355–1360 (6th Cir. 1995). *But see Mackey v. Nationwide Ins. Cos.,* 724 F.2d 419, 423–25 (4th Cir. 1984) (pre-Fair Housing Amendments Act and regulations pursuant thereto holding that Act does not cover insurance).

*HUD Response:* HUD believes that these concerns are misplaced. First, they presume that once a discriminatory effect is shown, the policy at issue is *per se* illegal. This is incorrect. Rather, as § 100.500 makes clear, the respondent or defendant has a full opportunity to defend the business justifications for its policies. This "burden-shifting framework" distinguishes "unnecessary barriers proscribed by the [Act] from valid policies and practices crafted to advance legitimate interests." [140] Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification.

*Issue:* Some commenters asked HUD to exempt insurance pricing from the rule, exempt state Fair Access to Insurance Requirements ("FAIR") plans, or establish safe harbors for certain risk-related factors.

*HUD Response:* Creating exemptions or safe harbors related to insurance is unnecessary because, as discussed above, insurance practices with a legally sufficient justification will not violate the Act. Moreover, creating exemptions beyond those found in the Act would run contrary to Congressional intent.[141]

*Issue:* Another commenter stated that the "burden of proof issues" are difficult for insurers because they do not collect data on race and ethnicity and state insurance laws may prohibit the collection of such data.

*HUD Response:* The burden of proof is not more difficult for insurers than for a charging party or plaintiff alleging that an insurance practice creates a discriminatory effect. The charging party or plaintiff must initially show the discriminatory effect of the challenged practice using appropriate evidence that demonstrates the effect. If the charging party or plaintiff makes that showing, the burden shifts to the insurer to show that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests.

*Issue:* A commenter expressed concern that the rule may create strict liability for entities complying with contractual obligations set by third parties, including the federal government.

*HUD Response:* The commenter misconstrues the discriminatory effects standard, which permits a defendant or respondent to defend against a claim of discriminatory effect by establishing a legally sufficient justification, as specified in § 100.500.

140 *Graoch,* 508 F.3d at 374–75.
141 *See Graoch,* 508 F.3d at 375 ("we cannot create categorical exemptions from [the Act] without a statutory basis" and "[n]othing in the text of the FHA instructs us to create practice-specific exceptions").

*Issue:* Another commenter expressed concern that the citation to *Miller v. Countrywide Bank, N.A.,* 571 F. Supp. 2d 251 (D. Mass. 2008), in the preamble to the proposed rule suggested that liability could exist under the Act for the neutral actions of third parties and that such liability would be inconsistent with the Supreme Court's decision in *Meyer v. Holley,* 537 U.S. 280 (2003). This commenter requested that HUD revise the proposed rule to articulate the standard set forth in *Meyer.*

*HUD Response:* HUD does not agree with the commenter's suggestion. HUD recognizes that pursuant to *Meyer,* liability under the Act for corporate officers is determined by agency law. The proposed rule cited *Miller* as an example of how a lender's facially neutral policy allowing employees and mortgage brokers the discretion to price loans may be actionable under the Fair Housing Act. The decision in *Miller* is not inconsistent with the Supreme Court's ruling on agency in *Meyer,* and therefore HUD does not believe that the final rule needs to be revised in response to this comment.

*Issue:* Several commenters expressed concern that adoption of the proposed discriminatory effects standard would lead to lawsuits challenging lenders' use of credit scores, other credit assessment standards, or automated underwriting. A commenter stated that a lender's consideration of credit score or other credit assessment standards such as a borrower's debt-to-income ratio may have a disparate impact because of demographic differences. This commenter cited studies which indicate that borrowers who live in zip codes with a higher concentration of minorities are more likely to have lower credit scores and fewer savings. A commenter stated that credit scores are often used as the determining factor in a lender's origination practices and that certain underwriting software and investor securitization standards require a minimum credit score. The commenter further stated that HUD's Federal Housing Administration (FHA) program has recognized the value of credit scores in setting underwriting standards for FHA insured loans. According to the commenter, lenders have little ability or desire to override credit score standards, because manual underwriting is time consuming and staff-intensive. Another commenter expressed concern that, even if a lender was successful in defending its credit risk assessment practices under the burden-shifting approach, the lender would have to defend an expensive lawsuit and suffer harm to its reputation.

Commenters from the lending industry also stated that the rule may have a chilling effect on lending in lower income communities. A commenter stated that the rule will create uncertainty in a skittish market, so lenders will be cautious about lending in lower income communities for fear of a legal challenge. Some of these commenters reasoned that underwriting requirements and risk requirements pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act (the Dodd-Frank Act (Pub. L. 111–203, approved July 21, 2010)), such as ability to repay, down payment requirements, and qualified residential mortgages, may result in a disparate impact because of demographic differences. Another commenter explained that the rule would eliminate in-portfolio mortgage loans at community banks, which provide mortgage credit to borrowers who may not qualify for a secondary market transaction.

*HUD Response:* HUD does not believe that the rule will have a chilling effect on lending in lower income communities or that it will encourage lawsuits challenging credit scores, other credit assessment standards, or the requirements of the Dodd-Frank Act. As discussed above, the rule does not change the substantive law; eleven federal courts of appeals have recognized discriminatory effects liability under the Act and over the years courts have evaluated both meritorious and non-meritorious discriminatory effects claims challenging lending practices.[142] As HUD has reiterated, the rule formalizes a substantive legal standard that is well recognized by both courts and participants in the lending industry for assessing claims of discriminatory effects. Indeed, in the lending context, at least since the issuance of the Joint Policy Statement nearly 18 years ago, non-depository lenders, banks, thrifts, and credit unions have been on notice that federal regulatory and enforcement agencies, including HUD and the Department of Justice, may apply a disparate impact analysis in their examinations and investigations under both the Fair Housing Act and ECOA. The regulations and Staff Commentary implementing ECOA also explicitly prohibit unjustified discriminatory effects.[143] Thus, neither a chilling effect nor a wealth of new lawsuits can be expected as a result of this rule. Rather, HUD anticipates that this rule will encourage the many lenders and other entities that already conduct internal discriminatory effects analyses of their policies to review those analyses in light of the now uniform standard for a legally sufficient justification found in § 100.500. Indeed, lender compliance should become somewhat easier due to the rule's clear and nationally uniform allocation of burdens and clarification of the showings each party must make.

*Issue:* Some commenters expressed concern that faced with the threat of disparate impact liability, lenders might extend credit to members of minority groups who do not qualify for the credit.

*HUD Response:* The Fair Housing Act does not require lenders to extend credit to persons not otherwise qualified for a loan. As discussed previously, the final rule formalizes a standard of liability under the Act that has been in effect for decades. HUD is unaware of any lender found liable under the discriminatory effects standard for failing to make a loan to a member of a minority group who did not meet legitimate nondiscriminatory credit qualifications.

*Issue:* Several other commenters expressed a concern that discriminatory effects liability might have a chilling effect on efforts designed to preserve or develop affordable housing, including pursuant to HUD's own programs, because much of the existing affordable housing stock is located in areas of minority concentration. A commenter stated that resources designed to support the development of affordable housing will be "deflect[ed]" away so as to respond to claims of disparate impact discrimination. Another commenter requested that HUD issue guidance to the affordable housing industry as they administer HUD programs.

Other commenters expressed concern about potential liability for administrators of the federal Low-Income Housing Tax Credit (LIHTC) program. These commenters reasoned that the concentration of affordable housing stock in low-income areas, combined with federal requirements and incentives which encourage the deployment of tax credits in low-income communities, may result in discriminatory effects liability for agencies administering the LIHTC program. Several commenters asked HUD to specify in the final rule that the mere approval of LIHTC projects in minority areas alone does not establish a prima facie case of disparate impact under the Act or that locating LIHTC projects in low-income areas is a legally sufficient justification to claims of disparate impact discrimination. A commenter requested that HUD provide guidance to such agencies.

*HUD Response:* HUD does not expect the final rule to have a chilling effect on the development and preservation of affordable housing because, as discussed above, the rule does not establish a new form of liability, but instead serves to formalize by regulation a standard that has been applied by HUD and the courts for decades, while providing nationwide uniformity of application. The rule does not mandate that affordable housing be located in neighborhoods with any particular characteristic, but requires, as the Fair Housing Act already does, only that housing development activities not have an unjustified discriminatory effect.

Concerns of a chilling effect on affordable housing activities are belied by the prevalence of cases where the discriminatory effects method of proof has been used by plaintiffs seeking to develop such housing [144] and even by the less frequent instances where

---

[142] *Compare Ramirez v. GreenPoint Mortg. Funding, Inc.,* 633 F. Supp. 2d 922, 927–28 (N.D. Cal. 2008) (holding that the Act permits disparate impact claims and finding that plaintiffs adequately pled a specific and actionable policy that had a disparate impact on members of a protected class); *Miller v. Countrywide Bank, N.A.,* 571 F. Supp. 2d 251, 258 (D. Mass. 2008) (denying defendants motion to dismiss and finding that plaintiffs adequately pled a specific and actionable policy, a disparate impact, and facts raising a sufficient inference of causation); and *Hoffman v. Option One Mortg. Corp.,* 589 F. Supp. 2d 1009, 1011–12 (N.D. Ill. 2008) (holding that the Actpermits disparate impact claims and finding that plaintiffs adequately pled a specific and actionable policy, a disparate impact, and facts raising a sufficient inference of causation), *with Ng v. HSBC Mortgage Corp.,* No. 07–CV–5434, 2010 WL 889256, *12 (E.D.N.Y. Mar. 10, 2010) (dismissing plaintiff's claim of disparate impact discrimination and finding that the claim was "alleged with little more than buzzwords and conclusory labels").

[143] *See* 12 CFR 1002.6(a); 12 CFR part 1002, Supp. I, Official Staff Commentary, Comment 6(a)–2 ; *see also* Consumer Financial Protection Bureau Bulletin 2012–04 (Apr. 18, 2012) ("CFPB reaffirms that the legal doctrine of disparate impact remains applicable as the Bureau exercises its supervision and enforcement authority to enforce compliance with the ECOA.").

[144] *See, e.g., Huntington Branch,* 844 F.2d at 926 (reversing district court and finding Fair Housing Act violations based on discriminatory effect of town's refusal to rezone site for affordable housing); *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish,* 648 F. Supp. 2d 805 (E.D. La. 2009) (finding parish's subversion of attempts to develop affordable housing had a discriminatory effect in violation of the Fair Housing Act); *Dews v. Town of Sunnyvale,* 109 F. Supp. 2d 526 (N.D. Tex. 2000) (finding that developer established Fair Housing Act violation based on Town's rejection of development application under discriminatory effects method); *Sunrise Dev. v. Town of Huntington,* 62 F. Supp. 2d 762 (E.D.N.Y. 1999) (finding the plaintiff had established prima facie case of discriminatory effect and granting preliminary injunction requiring town to consider plaintiff's zoning application); *Summerchase Ltd. Pshp. I v. City of Gonzales,* 970 F. Supp. 522 (M.D. La. 1997) (denying defendant's motion for summary judgment on developer's claim that parish's denial of building permits for affordable housing development had a discriminatory effect in violation of the Fair Housing Act).

**App.168**

agencies administering affordable housing programs have been defendants.[145] Rather than indicating a chilling effect, existing case law shows that use of the discriminatory effects framework has promoted the development of affordable housing, while allowing due consideration for substantial, legitimate, nondiscriminatory interests involved in providing such housing. Moreover, recipients of HUD funds already must comply with a variety of civil rights requirements. This includes the obligation under Title VI of the Civil Rights Act of 1964 and its applicable regulations to refrain from discrimination, either by intent or effect, on the basis of race, color, or national origin; the obligation under the Fair Housing Act to affirmatively further fair housing in carrying out HUD programs; and HUD program rules designed to foster compliance with the Fair Housing Act and other civil rights laws. As discussed throughout this preamble, allegations of discriminatory effects discrimination must be analyzed on a case-by-case basis using the standards set out in § 100.500. HUD will issue guidance addressing the application of the discriminatory effects standard with respect to HUD programs.

*Issue:* Like commenters who requested "safe harbors" or exemptions for the insurance and lending industries, some commenters requested that the proposed rule be revised to provide "safe harbors" or exemptions from liability for programs designed to preserve affordable housing or revitalize existing communities. A commenter requested that the final rule provide safe harbors for state and local programs that have legitimate policy and safety goals such as protecting water resources, promoting transit orientated development, and revitalizing communities. Other commenters requested safe harbors or exemptions for entities that are meeting requirements or standards established by federal or state law or regulation, such as the Federal Credit Union Act, the Dodd-Frank Act, HAMP and HARP, or by government-sponsored enterprises or investors.

*HUD Response:* HUD does not believe that the suggested safe harbors or exemptions from discriminatory effects liability are appropriate or necessary. HUD notes that, in seeking these exemptions, the commenters appear to misconstrue the discriminatory effects

standard, which permits practices with discriminatory effects if they are supported by a legally sufficient justification. The standard thus recognizes that a practice may be lawful even if it has a discriminatory effect. HUD notes further that Congress created various exemptions from liability in the text of the Act,[146] and that in light of this and the Act's important remedial purposes, additional exemptions would be contrary to Congressional intent.

*Issue:* Several commenters expressed concern that in complying with the new Dodd-Frank Act mortgage reforms, including in determining that consumers have an ability to repay, a lender necessarily "will face liability under the Proposed Rule."

*HUD Response:* HUD reiterates that the lender is free to defend any allegations of illegal discriminatory effects by meeting its burden of proof at § 100.500. Moreover, if instances were to arise in which a lender's efforts to comply with the Dodd-Frank Act were challenged under the Fair Housing Act's discriminatory effects standard of liability, those same activities most likely would be subject to a similar challenge under ECOA and Regulation B, which also prohibit lending practices that have a discriminatory effect based on numerous protected characteristics.[147] The Dodd-Frank Act created the Consumer Financial Protection Bureau to combat both unfair and deceptive practices and discriminatory practices in the consumer financial industry, and it gave the Consumer Financial Protection Bureau authority to enforce ECOA.[148] *See* Dodd-Frank Act sections 1402–1403 (enacting section 129B of the Truth in Lending Act "to assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive," and, as part of that section, requiring the Consumer Financial Protection Bureau to create regulations that prohibit "abusive or unfair lending practices that promote disparities among consumers of equal credit worthiness but of different race, ethnicity, gender, or age"); *see also* Dodd-Frank Act section 1013(c) (establishing the Consumer Financial Protection Bureau's Office of Fair Lending and Equal Opportunity to provide enforcement of fair lending laws, including ECOA, and coordinate

fair lending efforts within the Bureau and with other federal and state agencies); *id.* section 1085 (transferring regulatory authority for ECOA to the Consumer Financial Protection Bureau).

*G. Illustrations of Practices With Discriminatory Effects*

Consistent with HUD's existing Fair Housing Act regulations, which contain illustrations of practices that violate the Act, the proposed rule specified additional illustrations of such practices. The November 16, 2011, rule proposed to add illustrations to 24 CFR 100.65, 100.70 and 100.120. The final rule revises these illustrations in the manner described below.

Because the illustrations in HUD's existing regulations include practices that may violate the Act based on an intent or effects theory, and proposed § 100.65(b)(6) describes conduct that is already prohibited in § 100.65(b)(4)—the provision of housing-related services— and § 100.70(d)(4)—the provision of municipal services—this final rule eliminates proposed § 100.65(b)(6). This will avoid redundancy in HUD's Fair Housing Act regulations, and its elimination from the proposed rule is not intended as a substantive change.

Commenters raised the following issues with respect to the proposed rule's illustrations of discriminatory practices.

*Issue:* A commenter stated that the examples specified by the proposed rule describe the types of actions that the commenter's "clients encounter regularly." Examples of potentially discriminatory laws or ordinances cited by commenters include ordinances in largely white communities that establish local residency requirements, limit the use of vouchers under HUD's Housing Choice Voucher program, or set large-lot density requirements. Commenters suggested that language should be added to proposed § 100.70(d)(5), which provides, as an example, "[i]mplementing land-use rules, policies or procedures that restrict or deny housing opportunities in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns" based on a protected class. Commenters stated that this example should include not just the word "implementing," but also the words "enacting" "maintaining," and/or "applying" because the discriminatory effect of a land-use decision may occur from the moment of enactment. A commenter suggested that the word "ordinances" should be added to the example to make clear that the Act applies to all types of exclusionary land-use actions.

[145] *Compare, e.g., In re Adoption of 2003 Low Income Housing Tax Credit Qualified Allocation Plan,* 369 N.J. Super. 2 (N.J. Sup. Ct. App. Div. 2004) *with Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs,* 749 F. Supp. 2d 48 (N.D. Tex. 2010).

[146] *See, e.g.,* 42 U.S.C. 3603(b)(1) (exempting from most of section 804 of the Act an owner's sale or rental of his single-family house if certain conditions are met).

[147] *See* 15 U.S.C. 1691 *et seq;* 12 CFR part 1002.

[148] *See* 12 U.S.C. 5491 *et seq.*

*HUD Response:* HUD reiterates that the illustrations contained in HUD's regulations are merely examples. The scope and variety of practices that may violate the Act make it impossible to list all examples in a rule. Nevertheless, HUD finds it appropriate to revise proposed § 100.70(d)(5) in this final rule in order to confirm that a land-use ordinance may be discriminatory from the moment of enactment. The final rule therefore changes "[i]mplementing land-use rules, policies, or procedures * * * " to "[e]nacting or implementing land-use rules, ordinances, policies, or procedures * * *." It is not necessary to add "maintaining" or "applying" to § 100.70(d)(5) because the meaning of these words in this context is indistinguishable from the meaning of "implementing."

Because the illustrated conduct may violate the Act under either an intent theory, an effects theory, or both, HUD also finds it appropriate to replace "in a manner that has a disparate impact or has the effect of creating, perpetuating, or increasing segregated housing patterns" because of a protected characteristic with "otherwise make unavailable or deny dwellings because of" a protected characteristic. As discussed in the "Validity of Discriminatory Effects Liability under the Act" section above, the phrase "otherwise make unavailable or deny" encompasses discriminatory effects liability. This revised language, therefore, is broader because it describes land-use decisions that violate the Act because of either a prohibited intent or an unjustified discriminatory effect. The final rule makes a similar revision to each of the illustrations so they may cover violations based on intentional discrimination or discriminatory effects.

*Issue:* A commenter requested that HUD add as an example the practice of prohibiting from housing individuals with records of arrests or convictions. This commenter reasoned that such blanket prohibitions have a discriminatory effect because of the disproportionate numbers of minorities with such records. The commenter stated further that HUD should issue guidance on this topic similar to guidance issued by the Equal Employment Opportunity Commission. Another commenter expressed concern that the rule would restrict housing providers from screening tenants based on criminal arrest and conviction records. This commenter also asked HUD to issue guidance to housing providers on appropriate background screening.

*HUD Response:* Whether any discriminatory effect resulting from a housing provider's or operator's use of criminal arrest or conviction records to exclude persons from housing is supported by a legally sufficient justification depends on the facts of the situation. HUD believes it may be appropriate to explore the issue more fully and will consider issuing guidance for housing providers and operators.

*Issue:* Several commenters suggested revisions to proposed § 100.120(b)(2), which specifies as an example "[p]roviding loans or other financial assistance in a manner that results in disparities in their cost, rate of denial, or terms or conditions, or that has the effect of denying or discouraging their receipt on the basis of race, color, religion, sex, handicap, familial status, or national origin." These commenters stated that proposed § 100.120(b)(2) does not contain language concerning the second type of discriminatory effect, i.e., creating, perpetuating or increasing segregation. They urged HUD to add language making clear that the provision of loans or other financial assistance may result in either type of discriminatory effect.

In addition, several commenters asked HUD to clarify that mortgage servicing with a discriminatory effect based on a protected characteristic may violate the Act.

*HUD Response:* As discussed above, proposed § 100.120(b)(2) is revised in the final rule to cover both intentional discrimination and discriminatory effects. HUD also agrees that residential mortgage servicing is covered by the Act. It is a term or condition of a loan or other financial assistance, covered by section 805 of the Act.[149] Accordingly, the final rule adds a § 100.130(b)(3), which provides an illustration of discrimination in the terms or conditions for making available loans or financial assistance, in order to show that discriminatory loan servicing (and other discriminatory terms or conditions of loans and other financial assistance) violate the Act's proscription on "discriminat[ing] * * * in the terms or conditions of [a residential real estate-related transaction]."

*Issue:* A commenter expressed concern that the language in proposed § 100.120(b)(2) would allow for lawsuits based only on statistical data produced under HMDA.

*HUD Response:* HUD and courts have recognized that analysis of loan level data identified though HMDA may indicate a disparate impact.[150] Such a showing, however, does not end the inquiry. The lender would have the opportunity to refute the existence of the alleged impact and establish a substantial, legitimate, nondiscriminatory interest for the challenged practice, and the charging party or plaintiff would have the opportunity to demonstrate that a less discriminatory alternative is available to the lender.

*Issue:* A commenter stated that HUD should not add any of the new examples unless the final rule makes clear that the specified practices are not *per se* violations of the Act, but rather must be assessed pursuant to the standards set forth in § 100.500. According to the commenter, the new examples may be misconstrued because they state only the initial finding described in § 100.500.

*HUD Response:* HUD agrees that, when a practice is challenged under a discriminatory effects theory, the practice must be reviewed under the standards specified in § 100.500. The final rule therefore adds a sentence to the end of § 100.5(b), which makes clear that discriminatory effects claims are assessed pursuant to the standards stated in § 100.500.

### H. Other Issues

*Issue:* A commenter requested that HUD examine the overall compliance burden of the regulation on small businesses, noting that Executive Order 13563 requires a cost-benefit analysis.

*HUD Response:* In examining the compliance burden on small institutions, the governing authority is the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*, which provides, among other things, that the requirements to do an initial and final regulatory flexibility analysis "shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." Thus, the focus is on whether the rule—and not the underlying statute or preexisting administrative practice and case law—will have a significant economic impact. For this rule, the impact primarily arises from the Fair Housing Act itself, not only as interpreted by HUD, but also as interpreted by federal courts. Because this final rule provides a uniform burden-shifting test for determining

---

[149] 42 U.S.C. 3605. Discrimination in residential mortgage servicing may also violate § 804 of the Act. 42 U.S.C. 3604.

[150] *See City of Memphis and Shelby Cnty. v. Wells Fargo, N.A.,* No. 09–2857–STA, 2011 U.S. Dist.

LEXIS 48522 at *45 (W.D. Tenn. May 4, 2011); *Mayor and City Council of Baltimore v. Wells Fargo Bank, N.A.,* No. JFM–08–62, 2011 U.S. Dist. LEXIS 44013 (D. Md. April 22, 2011); *Steele v. GE Money Bank,* No. 08–C–1880, 2009 U.S. Dist. LEXIS 11536 (N.D. Ill. Feb. 17, 2008); *Taylor v. Accredited Home Lenders, Inc.,* 580 F. Supp. 2d 1062 (S.D. Cal. 2008).

whether a given action or policy has an unjustified discriminatory effect, the rule serves to reduce regulatory burden for all entities, large or small, by establishing certainty and clarity with respect to how a determination of unjustified discriminatory effect is to be made.

The requirement under the Fair Housing Act not to discriminate in the provision of housing and related services is the law of the nation. We presume that the vast majority of entities both large and small are in compliance with the Fair Housing Act. Furthermore, for the minority of entities that have, in the over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will simply be the costs of compliance with a preexisting statute, administrative practice, and case law. Compliance with the Fair Housing Act has for almost 40 years included the requirement to refrain from undertaking actions that have an unjustified discriminatory effect. The rule does not change that substantive obligation; it merely formalizes it in regulation, along with the applicable burden-shifting framework.

Variations in the well-established discriminatory effects theory of liability under the Fair Housing Act, discussed earlier in the preamble, are minor and making them uniform will not have a significant economic impact. The allocation of the burdens of proof among the parties, described in the rule, are methods of proof that only come into play if a complaint has been filed with HUD, a state or local agency or a federal or state court; that is, once an entity has been charged with discriminating under the Fair Housing Act. The only economic impact discernible from this rule is the cost of the difference, if any, between defense of litigation under the burden-shifting test on the one hand, and defense of litigation under the balancing or hybrid test on the other. In all the tests, the elements of proof are similar. Likewise, the costs to develop and defend such proof under either the burden-shifting or balancing tests are similar. The only difference is at which stage of the test particular evidence must be produced. There would not, however, be a significant economic impact on a substantial number of small entities as a result of this rule.

Executive Order 13563 (Improving Regulations and Regulatory Review) reaffirms Executive Order 12866, which requires that agencies conduct a benefit/ cost assessment for rules that "have an

annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments or communities." As stated in Section VII of this preamble below, this rule is not "economically significant" within the meaning in Executive 12866, and therefore a full benefit/cost assessment is not required. This final rule does not alter the established law that facially neutral actions that have an unjustified discriminatory effect are violations of the Fair Housing Act. What this rule does is formalize that well-settled interpretation of the Act and provide consistency in how such discriminatory effects claims are to be analyzed.

## VI. This Final Rule

For the reasons presented in this preamble, this final rule formalizes the longstanding interpretation of the Fair Housing Act to include discriminatory effects liability and establishes a uniform standard of liability for facially neutral practices that have a discriminatory effect. Under this rule, liability is determined by a burden-shifting approach. The charging party or plaintiff in an adjudication first must bear the burden of proving its prima facie case of either disparate impact or perpetuation of segregation, after which the burden shifts to the defendant or respondent to prove that the challenged practice is necessary to achieve one or more of the defendant's or respondent's substantial, legitimate, nondiscriminatory interests. If the defendant or respondent satisfies this burden, the charging party or plaintiff may still establish liability by demonstrating that these substantial, legitimate, nondiscriminatory interests could be served by a practice that has a less discriminatory effect.

### A. Discriminatory Effect—Subpart G

#### 1. Scope

This final rule adds a new sentence to the end of paragraph (b) in § 100.5, which states: "The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent, consistent with the standards outlined in § 100.500."

#### 2. Discriminatory Effect Prohibited (§ 100.500)

Consistent with HUD's November 16, 2011, proposed rule, this final rule adds a new subpart G, entitled

"Discriminatory Effect," to its Fair Housing Act regulations in 24 CFR part 100. Section 100.500 provides that the Fair Housing Act may be violated by a practice that has a discriminatory effect, as defined in § 100.500(a), regardless of whether the practice was adopted for a discriminatory purpose. The practice may still be lawful if supported by a legally sufficient justification, as defined in § 100.500(b). The respective burdens of proof for establishing or refuting an effects claim are set forth in § 100.500(c). Section 100.500(d) clarifies that a legally sufficient justification may not be used as a defense against a claim of intentional discrimination. It should be noted that it is possible to bring a claim alleging both discriminatory effect and discriminatory intent as alternative theories of liability. In addition, the discriminatory effect of a challenged practice may provide evidence of the discriminatory intent behind the practice. This final rule applies to both public and private entities because the definition of "discriminatory housing practice" under the Act makes no distinction between the two.

#### 3. Discriminatory Effect Defined (§ 100.500(a))

Section 100.500(a) provides that a "discriminatory effect" occurs where a facially neutral practice actually or predictably results in a discriminatory effect on a group of persons protected by the Act (that is, has a disparate impact), or on the community as a whole on the basis of a protected characteristic (perpetuation of segregation). Any facially neutral action, e.g., laws, rules, decisions, standards, policies, practices, or procedures, including those that allow for discretion or the use of subjective criteria, may result in a discriminatory effect actionable under the Fair Housing Act and this rule. For examples of court decisions regarding policies or practices that may have a discriminatory effect, please see the preamble to the proposed rule at 76 FR 70924–25.

#### 4. Legally Sufficient Justification (§ 100.500(b))

Section 100.500(b), as set forth in the regulatory text of this final rule, provides that a practice or policy found to have a discriminatory effect may still be lawful if it has a "legally sufficient justification."

#### 5. Burden of Proof (§ 100.500(c))

Under § 100.500(c), the charging party or plaintiff first bears the burden of proving its prima facie case: that is, that a practice caused, causes, or predictably will cause a discriminatory effect on a

**App.171**

group of persons or a community on the basis of race, color, religion, sex, disability, familial status, or national origin. Once the charging party or the plaintiff has made its prima facie case, the burden of proof shifts to the respondent or defendant to prove that the practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant. If the respondent or defendant satisfies its burden, the charging party or plaintiff may still establish liability by proving that these substantial, legitimate, nondiscriminatory interests could be served by another practice that has a less discriminatory effect.

*B. Illustrations of Practices With Discriminatory Effects*

This final rule adds or revises the following illustrations of discriminatory housing practices:

The final rule adds to § 100.70 new paragraph (d)(5), which provides as an illustration of other prohibited conduct "[e]nacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings because of race, color, religion, sex, handicap, familial status, or national origin."

Section 100.120, which gives illustrations of discrimination in the making of loans and in the provision of other financial assistance, is streamlined, and paragraph (b)(2) now reads as set forth in the regulatory text of this final rule

In § 100.130, the final rule also amends paragraph (b)(2) and adds new paragraph (b)(3). The words "or conditions" is added after "terms," and "cost" is added to the list of terms or conditions in existing paragraph (b)(2). New paragraph (b)(3) includes servicing as an illustration of terms or conditions of loans or other financial assistance covered by section 805 of the Act; "Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin."

## VII. Findings and Certifications

*Regulatory Review—Executive Orders 13563 and 12866*

Executive Order 13563 ("Improving Regulation and Regulatory Review")

directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs, emphasizes the importance of quantifying both costs and benefits, of harmonizing rules, of promoting flexibility, and of periodically reviewing existing rules to determine if they can be made more effective or less burdensome in achieving their objectives. Under Executive Order 12866 ("Regulatory Planning and Review"), a determination must be made whether a regulatory action is significant and therefore, subject to review by the Office of Management and Budget (OMB) in accordance with the requirements of the order. This rule was determined to be a "significant regulatory action" as defined in section 3(f) of Executive Order 12866 (although not an economically significant regulatory action, as provided under section 3(f)(1) of the Executive Order).

This rule formalizes the longstanding interpretation of the Fair Housing Act to include discriminatory effects liability, and establishes uniform, clear standards for determining whether a practice that has a discriminatory effect is in violation of the Fair Housing Act, regardless of whether the practice was adopted with intent to discriminate. As stated in the Executive Summary, the need for this rule arises because, although all federal courts of appeals that have considered the issue agree that Fair Housing Act liability may be based solely on discriminatory effects, there is a small degree of variation in the methodology of proof for a claim of effects liability. As has been discussed in the preamble to this rule, in establishing such standards HUD is exercising its rulemaking authority to bring uniformity, clarity, and certainty to an area of the law that has been approached by HUD and federal courts across the nation in generally the same way, but with minor variations in the allocation of the burdens of proof.[151] A uniform rule would simplify compliance with the Fair Housing Act's discriminatory effects standard, and decrease litigation associated with such claims. By providing certainty in this area to housing providers, lenders, municipalities, realtors, individuals engaged in housing transactions, and courts, this rule would reduce the burden associated with litigating discriminatory effect cases under the Fair Housing Act by clearly establishing which party has the burden of proof, and how such burdens are to be met. Additionally, HUD believes the rule

may even help to minimize litigation in this area by establishing uniform standards. With a uniform standard, entities are more likely to conduct self-testing and check that their practices comply with the Fair Housing Act, thus reducing their liability and the risk of litigation. A uniform standard is also a benefit for entities operating in multiple jurisdictions. Also, legal and regulatory clarity generally serves to reduce litigation because it is clearer what each party's rights and responsibilities are, whereas lack of consistency and clarity generally serves to increase litigation. For example, once disputes around the court-defined standards are eliminated by this rule, non-meritorious cases that cannot meet the burden under § 100.500(c)(1) are likely not to be brought in the first place, and a respondent or defendant that cannot meet the burden under § 100.500(c)(2) may be more inclined to settle at the pre-litigation stage.

Accordingly, while this rule is a significant regulatory action under Executive Order 12866 in that it establishes, for the first time in regulation, uniform standards for determining whether a housing action or policy has a discriminatory effect on a protected group, it is not an economically significant regulatory action. The burden reduction that HUD believes will be achieved through uniform standards will not reach an annual impact on the economy of $100 million or more, because HUD's approach is not a significant departure from HUD's interpretation to date or that of the majority of federal courts. Although the burden reduction provided by this rule will not result in economically significant impact on the economy, it nevertheless provides some burden reduction through the uniformity and clarity presented by HUD's standards promulgated through this final rule and is therefore consistent with Executive Order 13563.

The docket file is available for public inspection in the Regulations Division, Office of the General Counsel, Room 10276, 451 7th Street SW., Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at 202–708–3055 (this is not a toll-free number). Individuals with speech or hearing impairments may access this number via TTY by calling the Federal Relay Service at 800–877–8339.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires

---

[151] *See, e.g.,* the extensive discussion of the various options in *Graoch,* 508 F.3d at 371–375.

an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. For the reasons stated earlier in this preamble in response to public comment on the issue of undue burden on small entities, and discussed here, HUD certifies that this rule will not have significant economic impact on a substantial number of small entities.

It has long been the position of HUD, confirmed by federal courts, that practices with discriminatory effects may violate the Fair Housing Act. As noted in the preamble to the proposed rule (76 FR 70921) and this preamble to the final rule, this long-standing interpretation has been supported by HUD policy documents issued over the last decades, is consistent with the position of other Executive Branch agencies, and has been adopted and applied by every federal court of appeals to have reached the question. Given, however, the variation in how the courts and even HUD's own ALJs have applied that standard, this final rule provides for consistency and uniformity in this area, and hence predictability, and will therefore reduce the burden for all seeking to comply with the Fair Housing Act. Furthermore, HUD presumes that given the over 40-year history of the Fair Housing Act, the majority of entities, large or small, currently comply and will remain in compliance with the Fair Housing Act. For the minority of entities that have, in the over 40 years of the Fair Housing Act's existence, failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will simply be the costs of compliance with a preexisting statute. The rule does not change that substantive obligation; it merely sets it forth in a regulation. While this rule provides uniformity as to specifics such as burden of proof, HUD's rule does not alter the substantive prohibitions against discrimination in fair housing law, which were established by statute and developed over time by administrative and federal court case law. Any burden on small entities is simply incidental to the pre-existing requirements to comply with this body of law. Accordingly, the undersigned certifies that this final rule will not have a significant economic impact on a substantial number of small entities.

*Environmental Impact*

This final rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

*Executive Order 13132, Federalism*

Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) Imposes substantial direct compliance costs on state and local governments and is not required by statute, or (ii) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This final rule does not have federalism implications and does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

*Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (UMRA) establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and on the private sector. This final rule does not impose any federal mandates on any state, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

List of Subjects in 24 CFR Part 100

Civil rights, Fair housing, Individuals with disabilities, Mortgages, Reporting and recordkeeping requirements.

For the reasons discussed in the preamble, HUD amends 24 CFR part 100 as follows:

## PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

■ 1. The authority citation for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

### Subpart A—General

■ 2. In § 100.5, add the following sentence at the end of paragraph (b):

#### § 100.5  Scope.

\*     \*     \*     \*     \*

(b) \* \* \* The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent,

consistent with the standards outlined in § 100.500.

\*     \*     \*     \*     \*

### Subpart B—Discriminatory Housing Practices

■ 3. In § 100.70, add new paragraph (d)(5) to read as follows:

#### § 100.70  Other prohibited conduct.

\*     \*     \*     \*     \*

(d) \* \* \*

(5) Enacting or implementing land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

### Subpart C—Discrimination in Residential Real Estate-Related Transactions

■ 4. In § 100.120, revise paragraph (b) to read as follows:

#### § 100.120  Discrimination in the making of loans and in the provision of other financial assistance.

\*     \*     \*     \*     \*

(b) Practices prohibited under this section in connection with a residential real estate-related transaction include, but are not limited to:

(1) Failing or refusing to provide to any person information regarding the availability of loans or other financial assistance, application requirements, procedures or standards for the review and approval of loans or financial assistance, or providing information which is inaccurate or different from that provided others, because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Providing, failing to provide, or discouraging the receipt of loans or other financial assistance in a manner that discriminates in their denial rate or otherwise discriminates in their availability because of race, color, religion, sex, handicap, familial status, or national origin.

■ 5. In § 100.130, revise paragraph (b)(2) and add new paragraph (b)(3) to read as follows:

#### § 100.130  Discrimination in the terms and conditions for making available loans or other financial assistance.

\*     \*     \*     \*     \*

(b) \* \* \*

(2) Determining the type of loan or other financial assistance to be provided with respect to a dwelling, or fixing the amount, interest rate, cost, duration or other terms or conditions for a loan or

**App.173**

other financial assistance for a dwelling or which is secured by residential real estate, because of race, color, religion, sex, handicap, familial status, or national origin.

(3) Servicing of loans or other financial assistance with respect to dwellings in a manner that discriminates, or servicing of loans or other financial assistance which are secured by residential real estate in a manner that discriminates, or providing such loans or financial assistance with other terms or conditions that discriminate, because of race, color, religion, sex, handicap, familial status, or national origin.

■ 6. In part 100, add a new subpart G to read as follows:

**Subpart G—Discriminatory Effect**

**§ 100.500  Discriminatory effect prohibited.**

Liability may be established under the Fair Housing Act based on a practice's discriminatory effect, as defined in paragraph (a) of this section, even if the practice was not motivated by a discriminatory intent. The practice may still be lawful if supported by a legally sufficient justification, as defined in paragraph (b) of this section. The burdens of proof for establishing a violation under this subpart are set forth in paragraph (c) of this section.

(a) *Discriminatory effect.* A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.

(b) *Legally sufficient justification.* (1) A legally sufficient justification exists where the challenged practice:

(i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and

(ii) Those interests could not be served by another practice that has a less discriminatory effect.

(2) A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative. The burdens of proof for establishing each of the two elements of a legally sufficient justification are set forth in paragraphs (c)(2) and (c)(3) of this section.

(c) *Burdens of proof in discriminatory effects cases.* (1) The charging party, with respect to a claim brought under 42 U.S.C. 3612, or the plaintiff, with respect to a claim brought under 42 U.S.C. 3613 or 3614, has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect.

(2) Once the charging party or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.

(3) If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.

(d) *Relationship to discriminatory intent.* A demonstration that a practice is supported by a legally sufficient justification, as defined in paragraph (b) of this section, may not be used as a defense against a claim of intentional discrimination.

Dated: February 8, 2013.

**John Trasviña,**

*Assistant Secretary for Fair Housing and Equal Opportunity.*

[FR Doc. 2013–03375 Filed 2–14–13; 8:45 am]

**BILLING CODE 4210-67-P**



# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR Part 100**

[Docket No. FR–6251–F–02]

RIN 2529–AB02

## Reinstatement of HUD's Discriminatory Effects Standard

**AGENCY:** Office of the Assistant Secretary for Fair Housing and Equal Opportunity, U.S. Department of Housing and Urban Development (HUD).

**ACTION:** Final rule.

**SUMMARY:** The Fair Housing Act prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities. This prohibition extends to practices with an unjustified discriminatory effect, regardless of whether there was an intent to discriminate. In 2013, HUD published a rule which formalized a burden-shifting test for determining whether a given practice has an unjustified discriminatory effect. In 2020, HUD published a rule that would have altered the standards set forth in the 2013 rule. However, a preliminary injunction prevented the 2020 rule from ever going into effect. On June 25, 2021, HUD published a proposed rule to recodify the 2013 rule. After considering public comments, HUD in this final rule reinstates and maintains the 2013 rule and rescinds the 2020 rule.

**DATES:** *Effective:* May 1, 2023.

**FOR FURTHER INFORMATION CONTACT:** Jeanine Worden, Associate General Counsel for Fair Housing, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410–0500, or telephone number 202–402–3330 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit: *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

### The Fair Housing Act and Its Goals

Title VIII of the Civil Rights Act of 1968, as amended ("Fair Housing Act" or "Act"), prohibits discrimination in the sale, rental, or financing of dwellings and in other housing-related activities because of race, color, religion,

sex (including sexual orientation and gender identity), disability, familial status, or national origin.[1] Through the Act, Congress expressed its intent to eradicate discrimination and proclaimed that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." [2] The Act's protections are meant to be "broad and inclusive." [3] Congress passed the Act in the wake of the assassination of Dr. Martin Luther King, Jr., recognizing that "residential segregation and unequal housing and economic conditions in the inner cities" were "significant, underlying causes of the social unrest" [4] and that both open and covert race discrimination were preventing integrated communities.[5] As the Supreme Court reiterated more recently, the Act's expansive purpose is to "eradicate discriminatory practices within a sector of the Nation's economy" and to combat and prevent segregation and discrimination in housing.[6] Congress considered the realization of this policy "to be of the highest priority." [7]

The Act gives HUD the authority and responsibility for administering and enforcing the Act, including the authority to conduct formal adjudications of complaints and to promulgate rules to interpret and carry out the Act.[8] Through that authority, HUD promulgates this rule.

### Discriminatory Effects Law Under the Fair Housing Act Prior to HUD's 2013 Rule

HUD's 2013 rule, titled "Implementation of the Fair Housing Act's Discriminatory Effects Standard" ("2013 Rule"), broke no new ground, but instead largely codified longstanding judicial and agency

consensus regarding discriminatory effects law. Courts had long found that discrimination under the Act may be established through evidence of discriminatory effects, *i.e.,* facially neutral practices with an unjustified discriminatory effect. Indeed, before HUD's issuance of the 2013 rule, all federal courts of appeals to have addressed the question had held that liability under the Act could be established by a showing that a neutral policy or practice either has a disparate impact on a protected group or creates, perpetuates, or increases segregation, even if such a policy or practice was not adopted for a discriminatory purpose.[9] As the Sixth Circuit explained, the Act "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." [10]

Consistent with this judicial consensus, HUD has for decades concluded that facially neutral practices that have an unjustified discriminatory effect on the basis of a protected characteristic, regardless of intent, violate the Act.[11] For example, in 1994, HUD, along with nine other agencies and the Department of Justice, issued a

---

[1] 42 U.S.C. 3601–3619, 3631. This preamble uses the term "disability" to refer to what the Act and its implementing regulations term a "handicap." *See, e.g., Hunt* v. *Aimco Props., L.P.,* 814 F.3d 1213, n.1 (11th Cir. 2016) (noting the term disability is generally preferred over handicap).

[2] 42 U.S.C. 3601.

[3] *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972).

[4] *Tex. Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.,* 576 U.S. 519, 529 (2015) (citing Report of the National Advisory Commission on Civil Disorders 91 (1968) (Kerner Commission Report).

[5] *Id.* at 529 (citing Kerner Commission Report).

[6] *Id.* at 539.

[7] *Trafficante,* 409 U.S. at 211 (1972).

[8] *See* 42 U.S.C. 3608(a), 3612, 3614a. The Supreme Court has recognized HUD's rulemaking authority in the specific context of this rule. *See Inclusive Cmtys. Project,* 576 U.S. at 527–28, 542; *see also id.* at 566–67 (Alito, J., dissenting) ("Congress also gave [HUD] rulemaking authority and the power to adjudicate certain housing claims").

[9] *See, e.g., Graoch Assocs. # 33, L.P.* v. *Louisville/Jefferson Cnty. Metro Hum. Rels. Comm'n,* 508 F.3d 366, 378 (6th Cir. 2007) (citing *Arthur* v. *City of Toledo, 782 F.2d 565, 575 (6th Cir. 1986)); Hallmark Developers, Inc.* v. *Fulton Cnty.,* 466 F.3d 1276, 1286 (11th Cir. 2006) (citing *Hous. Investors, Inc.* v. *City of Clanton, Ala.,* 68 F. Supp. 2d 1287, 1298 (M.D. Ala. 1999)); *Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 937 (2nd Cir. 1988) (citing *Metro Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977), *aff'd,* 488 U.S. 15 (1988) *(per curium); Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 987 n.3 (4th Cir. 1984) (citing *Metro Hous. Dev. Corp* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977)); *Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977) (citing *Trafficante* v. *Metro. Life Ins. Co.,* 409 U.S. 205, 209–10 (1972)); *United States.* v. *City of Black Jack,* 508 F. 2d 1179, 1184–86 (8th Cir. 1974).

[10] *Graoch Assocs. #33, L.P., 508 F.3d* at 374 (quoting *Griggs* v. *Duke Power Co.,* 401 U.S. 424, 431 (1971) (a Title VII case)).

[11] 78 FR 11460, 11461 (Feb. 15, 2013) *(citing, e.g., HUD* v. *Twinbrook Vill.Apts.,* HUD ALJ Nos. 02–00–0256–8, 02–00–0257–8, 02–00–0258–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001) ("A violation of the [Act] may be premised on a theory of disparate impact."); *HUD v. Carlson,* No. 08–91–0077–1, 1995 WL 365009 (HUD ALJ June 12, 1995) ("A policy or practice that is neutral on its face may be found to be violative of the Act if the record establishes a prima facie case that the policy or practice has a disparate impact on members of a protected class, and the Respondent cannot prove that the policy is justified by business necessity."); *HUD v. Ross,* No. 01–92–0466–18, 1994 WL 326437, at *5 (HUD ALJ July 7, 1994) ("Absent a showing of business necessity, facially neutral policies which have a discriminatory impact on a protected class violate the Act."); *HUD v. Carter,* No. 03–90–0058–1, 1992 WL 406520, at *5 (HUD ALJ May 1, 1992) ("The application of the discriminatory effects standard in cases under the Fair Housing Act is well established.").

**App.175**

joint policy statement that recognized disparate impact liability under the Act.[12] Although there had been some minor variation in the application of the discriminatory effects framework prior to the 2013 Final Rule, HUD and the federal appellate courts were largely in agreement. HUD has always used a three-step burden-shifting approach,[13] as did many federal courts of appeals prior to the 2013 Rule.[14]

### HUD's 2013 Discriminatory Effects Rule

In February 2013, after notice and public comment, and considering decades of case law, HUD published the 2013 Final Rule.[15] The 2013 Rule "formalize[d] [HUD's] long-held recognition of discriminatory effects liability under the Act and, for purposes of providing consistency nationwide, formalize[d] a burden-shifting test for determining whether a given practice has an unjustified discriminatory effect, leading to liability under the Act." [16] In promulgating the 2013 Rule, HUD noted the Act's "broad remedial intent;" [17] HUD's prior positions, including that discriminatory effects liability was "imperative to the success of civil rights law enforcement;" [18] and the consistent application of discriminatory effects liability in the four previous decades (with minor variations) by HUD, the Department of Justice, nine other federal agencies, and federal courts.[19]

Among other things, the 2013 Rule codified a three-part burden-shifting framework consistent with frameworks on which HUD and courts had long relied: (1) The plaintiff or charging party is first required to prove as part of the prima facie showing that a challenged practice caused or predictably will cause a discriminatory effect; (2) if the plaintiff or charging party makes this prima facie showing, the defendant or respondent must then prove that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the defendant or respondent; and (3) if the defendant or respondent meets its burden at step two, the plaintiff or charging party may still prevail by proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.[20]

### The 2015 Inclusive Communities Supreme Court Decision

In 2015, the Supreme Court confirmed that the Act provides for discriminatory effects liability in *Texas Department of Housing and Community Affairs* v. *Inclusive Communities Project, Inc.*[21] The State of Texas presented two questions to the Court (1) Whether disparate-impact claims are cognizable under the Act, and (2) if they are, what standards and burdens of proof should apply,[22] but the Court declined to consider the second question.[23] On the first question, the Court found that disparate-impact claims are cognizable, concluding that Congress's use of the phrase "otherwise make unavailable" in Section 804(a) of the Act and the term "discriminate" in Section 805(a) are each parallel to language that the Court had previously held to provide for discriminatory effects liability under other civil rights statutes.[24]

In reaching this holding, the Court explained that from its first decision to recognize disparate impact liability, in *Griggs* v. *Duke Power Co.,* it "put important limits" on the scope of liability.[25] For example, with respect to employment discrimination claims under Title VII of the Civil Rights Act of 1964, *Griggs* explained that an employer can justify a practice that has a disparate impact with a "business necessity" defense, such that Title VII "does not prohibit hiring criteria with a 'manifest relationship' to job performance." [26] Similarly, after holding that the Act provided for disparate impact liability, the *Inclusive Communities* Court noted that, under the Act, "disparate-impact liability has always been properly limited in key respects . . .'" [27] Quoting *Griggs,* the Court explained that it has always been true that disparate impact liability under the Act "mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies." [28]

The Court then sketched out some of these long-standing limitations on the scope of disparate-impact liability, including: (1) The requirement that "housing authorities and private developers [have] leeway to state and explain the valid interest served by their policies . . . analogous to the business necessity standard under Title VII;" and (2) the requirement that a "claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." [29]

### HUD's 2016 Notice: Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance

In 2016, HUD published a document ("2016 Notice") supplementing its response to certain comments concerning homeowners' insurance received during rulemaking for the 2013 Rule in accordance with the district court's decision in *Property Casualty Insurers Association of America (PCIAA)* v. *Donovan.*[30] In that Notice, HUD stated, among other things, that "[a]fter careful reconsideration of the insurance industry comments in accordance with the court's decision . . . HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with the broad fair

[12] 78 FR 11460, 11461 (citing 1994 Joint Policy Statement on Discrimination in Lending, 59 FR 18266, 18269 (Apr. 15, 1994)).

[13] *See, e.g., HUD* v. *Pfaff,* 1994 WL 592199, at *8 (HUD ALJ Oct. 27, 1994); *HUD* v. *Mountain Side Mobile Estates P'ship,* 1993 WL 367102, at *6 (HUD ALJ Sept. 20, 1993); *HUD* v. *Carter,* 1992 WL 406520, at *6 (HUD ALJ May 1, 1992); *Twinbrook Vill. Apts.,* HUDALJ Nos. 02–00–0256–8, 02–00–0257–8, 02–00–0258–8, 2001 WL 1632533, at *17 (HUD ALJ Nov. 9, 2001); *see also* 1994 Joint Policy Statement on Discrimination in Lending, 59 FR 18266, 18269 (Apr. 15, 1994) (applying three-step test without specifying where the burden lies at each step).

[14] *See, e.g., Oti Kaga, Inc.* v. *S. Dakota Hous. Dev. Auth.,* 342 F.3d 871, 883 (8th Cir. 2003); *Lapid-Laurel* v. *Zoning Bd. of Adjustment,* 284 F.3d 442, 466–67 (3d Cir. 2002); *Huntington Branch NAACP* v. *Town of Huntington,* 844 F.2d 926, 939 (2d Cir. 1988).

[15] 78 FR 11459.

[16] 78 FR 11460.

[17] *See also* 2011 Notice of Proposed Rulemaking, 76 FR 70922 (Nov. 16, 2011) ("In keeping with the 'broad remedial intent' of Congress in passing the Fair Housing Act, and consequently the Act's entitlement to a 'generous construction' HUD . . . has repeatedly determined that the Fair Housing Act is directed to the consequences of housing practices, not simply their purpose.") (citing *Havens Realty Corp* v. *Coleman,* 455 U.S. 363, 380 (1982); *City of Edmonds* v. *Oxford House, Inc.,* 514 U.S. 725, 731–732 (1995) (internal citations removed)).

[18] 78 FR 11460, 11461 (citing 126 Cong. Rec. 31,166–31,167 (1980) (statement of Sen. Mathias reading into the record letter of HUD Secretary)).

[19] 78 FR 11460, 11461–62.

[20] 78 FR 11460, 11482; *see, e.g., Inclusive Cmtys. Project, Inc.,* 576 U.S. at 527 (overviewing the 2013 Rule's burden shifting framework).

[21] *Inclusive Cmtys. Project, Inc.* 576 U.S. at 519, 519, 532–35.

[22] *See* Petition for a Writ of Certiorari, in *Tex. Dep't of Hous. & Cmty. Affairs et al.,* v. *Inclusive Cmtys. Project, Inc.,* 573 U.S. 991, 2014 U.S. S. Ct. Briefs LEXIS 1848, at *9; *See Questions Presented in,* https://www.supremecourt.gov/qp/13-01371qp.pdf.

[23] *Inclusive Cmtys. Project, Inc.,* 573 U.S. 991 (2014), 2014 U.S. LEXIS 4912 at *1 ("Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit granted limited to Question 1 presented by the petition."); *See also Questions Presented in, Inclusive Cmtys Project, Inc.,* 573 U.S. 991.

[24] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 534 (citing *Griggs* v. *Duke Power Co.,* 401 U.S. 424 (1971); *Bd. of Educ.* v. *Harris,* 444 U.S. 130 (1979); *Smith* v. *City of Jackson,* 544 U.S. 228, 233 (2005).

[25] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 531.

[26] *Id.* (quoting *Griggs,* 401 U.S. at 431–32).

[27] *Id.* at 540.

[28] *Id.* (quoting *Griggs,* 401 U.S. at 431).

[29] *Id.* at 541, 542.

[30] 81 FR 69012–13.

**App.176**

housing objectives and obligations embodied in the Act'' and that ''commenters' concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis.''[31]

*HUD's 2020 Disparate Impact Rule*

On June 20, 2018, HUD published an Advance Notice of Proposed Rulemaking (''ANPRM''), inviting public comment on ''what changes, if any'' to the 2013 Rule were necessary as a result of *Inclusive Communities.*[32] HUD then published a Notice of Proposed Rulemaking on August 19, 2019 (''2019 Proposed Rule'') proposing to change the 2013 Rule.[33]

In response to the 2019 Proposed Rule, HUD received approximately 45,000 comments, most of which opposed the proposed changes and many of which raised significant legal and policy concerns with the 2019 Proposed Rule. Commenters objected that the proposed changes did not align with case law, created problematic defenses and made discriminatory effects claims effectively impossible to plead and prove in many instances, thus contravening the core holding of *Inclusive Communities.*[34] On September 24, 2020, HUD published a final rule titled ''HUD's implementation of the Fair Housing Act's Disparate Impact Standard'' (''2020 Rule''), which, among other things removed the definition of discriminatory effect, added demanding pleading elements that made it far more difficult to initiate a case, altered the burden-shifting framework, created new defenses, and limited available remedies in disparate impact claims.[35]

*Massachusetts Fair Housing Ctr. v. HUD Order Staying Implementation of the 2020 Rule*

Following publication of the 2020 Rule, HUD was sued in five separate federal courts—: *Massachusetts Fair Housing Ctr., et al.* v. *HUD,* No. 3:20– cv–11765 (D. Mass.); *Nat'l Fair Hous. All., et al.* v. *HUD,* No. 3:20–cv–07388 (N.D. Cal.); *Open Cmtys., et al.* v. *HUD,* No. 3:20–cv–01587 (D. Conn.). The plaintiffs in each case contended that the 2020 Rule was invalid because it was inconsistent with the Act and its promulgation violated the Administrative Procedure Act (''APA''). Prior to the effective date of the 2020 Rule, the U.S. District Court for the

District of Massachusetts in *Massachusetts Fair Housing Ctr.* v. *HUD* issued a preliminary injunction staying the implementation and postponing the effective date of the 2020 Rule.[36] Because of this preliminary injunction, the 2020 Rule never took effect, and the 2013 Rule remained in effect.

In its order, the district court preliminarily found that many significant changes made by the 2020 Rule were likely not supported by *Inclusive Communities* or other case law. Similarly, the court concluded that the 2020 Rule did not appear to bring the clarity to the discriminatory effects framework that it was intended to foster, but rather introduced new concepts that had never been part of disparate impact case law without fully explaining their meaning. In support of its conclusions, the court identified numerous provisions in the 2020 Rule as problematic, including § 100.500(b) (''requiring at 'the pleadings stage,' among other things, that plaintiffs 'sufficiently plead facts to support' . . . '[t]hat the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law' ''); § 100.500(c)(2) (permitting defendants to '' 'rebut a plaintiff's allegation under (b)(1) . . . that the challenged policy or practice is arbitrary, artificial, and unnecessary by producing evidence showing that the challenged policy or practice' merely *'advances a valid interest'* '') (emphasis in original); § 100.500(c)(3) (requiring ''at the third step of the burden-shifting framework that the plaintiff prove 'a less discriminatory policy or practice exists that would serve the defendant's identified interest (or interests) in an *equally effective manner without imposing materially greater costs* on, or creating *other material burdens* for, the defendant' '' (emphasis in original)); § 100.500(d)(1) and (d)(2)(iii) (''conflating of a plaintiff's prima facie burden and pleading burden''); and § 100.500(d)(2)(i) (the outcome prediction defense).[37]

The district court found that the ''practical business, profit, policy consideration'' language, the ''outcome prediction'' defense, changes to the third element of the burden-shifting framework, and the conflating of a plaintiff's prima facie burden and pleading burden, ran the risk of ''effectively neutering'' discriminatory effects liability under the Act, and were

all likely unsupported by *Inclusive Communities* or other judicial decisions.[38] The district court also stated that the 2020 Rule's use of ''new and undefined terminology altered the burden-shifting framework, and perplexing defenses'' accomplished ''the opposite of clarity'' and were likely ''arbitrary and capricious.''[39] The court stated that ''[t]here can be no doubt that the 2020 Rule weakens, for housing discrimination victims and fair housing organizations, disparate impact liability under the Fair Housing Act. . . . In addition, the 2020 Rule arms defendants with broad new defenses which appear to make it easier for offending defendants to dodge liability and more difficult for plaintiffs to succeed. In short, these changes constitute a massive overhaul of HUD's disparate impact standards, to the benefit of putative defendants and to the detriment of putative plaintiffs.''[40]

*HUD's Reconsideration of the 2020 Rule and the 2021 Notice of Proposed Rulemaking*

On January 26, 2021, President Biden issued a Memorandum ordering the Department to ''take all steps necessary to examine the effects of the [2020 Rule], including the effect that amending the [2013 Rule] has had on HUD's statutory duty to ensure compliance with the Fair Housing Act'' and ''take any necessary steps . . . to implement the Fair Housing Act's requirements that HUD administer its programs in a manner that . . . furthers . . . HUD's overall duty to administer the Act [] including by preventing practices with an unjustified discriminatory effect.''[41]

Consistent with the President's Memorandum, HUD began a process to reconsider the 2020 Rule. On June 25, 2021, after reviewing prior public comments on the previous rulemakings described above, HUD's responses to those comments, HUD's 2016 supplemental explanation regarding the 2013 Rule's applicability to the insurance industry, legal precedent including *Inclusive Communities,* the *Massachusetts Fair Housing Center* court's order, and HUD's own experience with discriminatory effects cases over 40 years, HUD promulgated a proposed rule titled ''Reinstatement of HUD's Discriminatory Effects Standard'' (''proposed rule'') that proposed to recodify the 2013 Rule.[42] The proposed

---

[31] *Id.*

[32] 83 FR 28560.

[33] 84 FR 42854.

[34] *See, e.g.,* 85 FR 60317, 60319 (overview of some of the comments making these points).

[35] 85 FR 60288.

[36] *Mass. Fair Hous. Ctr.* v. *United States HUD,* 496 F. Supp. 3d 600, 611 (D. Mass. Oct. 25, 2020).

[37] *Id.* at 605–07, n.2, 610–11.

[38] *Id.* at 611.

[39] *Id.*

[40] *Id.* at 607.

[41] *See* 86 FR 7487, 7488.

[42] 86 FR 33590.

**App.177**

rule advocated returning to the 2013 Rule because HUD believed that the 2013 Rule established a workable framework that was more consistent with existing case law and the purpose of the Act than the 2020 Rule.

As HUD described in the proposed rule, in HUD's experience, the 2013 Rule set a more appropriately balanced standard for pleading, proving, and defending a fair housing case alleging that a policy or practice has a discriminatory effect. HUD believed that the 2013 Rule provided greater clarity about what each party must show by relying on concepts that have a long history in judicial and agency precedent and that it appropriately balanced the need to ensure that frivolous claims do not go forward with a realistic understanding of the practical challenges to litigating these claims. With regard to the 2020 Rule, HUD's experience investigating and prosecuting discriminatory effects cases informed its views that many of the points made by commenters and the District Court in *Massachusetts Fair Housing Center* were, in HUD's opinion, correct. In particular, the changes the 2020 Rule made, such as amending pleading standards, changing the burden shifting framework, and adding defenses, all operated to tip the scales in favor of respondents, introduced unnecessary confusion, may have precluded otherwise valid claims, and, at worst would have made discriminatory effects liability a practical nullity.

HUD further stated its belief that the 2013 Rule was more consistent with the Act's purpose; prior case law under the Act, including *Inclusive Communities;* other civil rights authorities, including the Equal Credit Opportunity Act and Title VII; and HUD's prior interpretations of the Act. In its 2020 Rule, HUD noted that the rule was intended to better reflect *Inclusive Communities,* but HUD now believes that the 2020 Rule was itself inconsistent with the holding of *Inclusive Communities,* which maintained the fundamentals of long-established disparate-impact precedent rather than changing them. Moreover, based on HUD's experience investigating and litigating discriminatory effects cases, HUD believed that the practical effect of the 2020 Rule's amendments was to severely limit HUD's and plaintiffs' use of the discriminatory effects framework in ways that would substantially diminish that frameworks' effectiveness in accomplishing the purposes that *Inclusive Communities* articulated.

By comparison, in HUD's experience, the 2013 Rule provided a workable and balanced framework for investigating and litigating discriminatory effects claims that is consistent with the Act, HUD's own guidance, *Inclusive Communities,* and other jurisprudence.

HUD noted that *Inclusive Communities* heavily relied on *Griggs,* which is the foundation of Title VII disparate impact jurisprudence, to illustrate the well-settled principles of disparate impact under the Act, and HUD believed *Inclusive Communities* to be fully supportive of the 2013 Rule. *Inclusive Communities* explained that in *Griggs,* "[w]hat is required by Congress [in Title VII cases] is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." [43] Quoting from its foundational decision in *Griggs,* the Supreme Court in *Inclusive Communities* observed that "[d]isparate impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies." [44] HUD proposed that this quotation from a seminal decision of longstanding disparate impact doctrine is properly read as maintaining existing law, not changing it. HUD highlighted that *Inclusive Communities* explicitly stated, "disparate-impact liability *has always been* properly limited in key respects" (emphasis added), making clear that the Court was not adding additional pleading or proof requirements or calling for a significant departure from pre-existing precedent under the Act and Title VII. [45] Furthermore, HUD stated that reading *Inclusive Communities* to support a heightened pleading standard is contradicted by the fact that the "heartland" cases cited by the Court would not have survived a motion to dismiss under that standard because plaintiffs in those cases did not have specific facts to plausibly allege that a policy or practice was arbitrary, artificial, or unnecessary until after discovery. [46] Finally, HUD explained

that because *Inclusive Communities* considered a judgment reached after discovery and bench trial, the Court had no occasion or opportunity to consider the proper pleading standards for cases brought under the Act. The parties did not brief or argue such questions to the Court, making it particularly unlikely that the Court intended to reach them.

For these reasons and others, HUD proposed that *Inclusive Communities'* quotation of *Griggs'* decades-old "artificial, arbitrary, and unnecessary" formulation would be best construed as maintaining continuity with longstanding disparate-impact jurisprudence, as reflected in the 2013 Rule. [47] HUD stated in the proposed rule its belief that other changes the 2020 Rule made would create problems that could be cured by a return to the 2013 Rule. For example, the 2020 Rule eliminated the 2013 Rule's definition of "discriminatory effect," stating that the definition was unnecessary because it "simply reiterated the elements of a disparate impact claim." [48] In eliminating this definition, the 2020 Rule erased "perpetuation of segregation" as a recognized type of discriminatory effect distinct from disparate impact, which was contrary to well established precedent. HUD proposed to reaffirm that perpetuation of segregation remains, as it always had been, a basis for contending that a policy has an unlawful discriminatory effect.

HUD described how the 2020 Rule also eliminated from the Act's prohibitions policies or practices that could "predictably result[] in a disparate impact on a group of persons," *i.e.,* those for which the disparate impact has not yet manifested but will predictably do so. HUD noted, as it stated in 2013, that the Act prohibits discrimination that is predictable because it defines an "aggrieved person" as any person who "believes that such person will be injured by a discriminatory housing practice that is about to occur." [49] HUD noted that courts have found that predictable discriminatory effects may violate the Act: "[t]o establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory

---

[43] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 578.

[44] *Id.* at 540.

[45] *Id.*

[46] *See, e.g., Town of Huntington, NY* v. *Huntington Branch, NAACP,* 488 U.S. 15 (1988); *United States* v. *City of Black Jack,* 508 F.2d 1179, 1184, 1187–88 (8th Cir. 1974) (specific facts produced during the case supported the court's determination that the policy was one of those "artificial, arbitrary, and unnecessary" practices that is properly invalidated under disparate impact doctrine); *Greater New Orleans Fair Hous. Action Ctr.* v. *St. Bernard Parish,* 641 F. Supp. 2d 563, 567–

568 (E.D. La. 2009) (relying on information gathered after the pleadings to find disparate impact).

[47] 86 FR 33594–5.

[48] 84 FR 42858.

[49] 42 U.S.C. 3602(i)(2).

**App.178**

effect." [50] HUD stated in the proposed rule that the 2020 Rule did not adequately explain how the Act and case law construing it can be read to require waiting until harm is inflicted before an action with predictable discriminatory effects can be challenged, nor did HUD perceive that any such explanation would be availing, given the plain language of the Act and the case law interpreting it.

In addition, in the 2021 proposed rule, HUD recognized and agreed with concerns that the 2020 Rule created new and confusing defenses at both the pleading and post-pleading stage, including the new defense allowing a defendant to show that the challenged policy or practice is "reasonably necessary to comply with a third-party requirement." [51] The 2020 Rule's preamble stated that this defense would not require a showing that the challenged policy is the only way to comply with such a requirement, only that the policy serves that purpose. In the 2021 proposed rule, HUD stated that this new defense was inconsistent with the Act, which specifies that state and local laws requiring or permitting discriminatory housing practices are invalid. HUD expressed its concern that the defense would preclude many otherwise proper discriminatory effects claims, because, for example, a plaintiff may not have any practical means of knowing whether some other party's policies also contributed to the defendant's practice. HUD reasoned that nothing in *Inclusive Communities* suggests this defense is required, let alone reasonable, for the agency to create.

HUD noted further in the proposed rule that the 2020 Rule also created a new "outcome prediction" defense which HUD believed would in practice exempt most insurance industry practices (and many other housing-related practices that rely on outcome predictions, such as lending practices) from liability under a disparate impact standard.[52] In the proposed rule, HUD stated that it considered this defense to be inconsistent with HUD's repeated finding, including in the 2020 Rule, that "a general waiver of disparate impact law for the insurance industry would be inappropriate." HUD reconsidered the defense and explained in the proposed rule that it believed the defense was unclear and would suggest that comparators be used, which were, in

HUD's experience, inappropriate. HUD stated that at the very least, the defense would introduce unnecessary confusion into the doctrine.

In the proposed rule, HUD explained that the 2020 Rule inappropriately limited remedies in discriminatory effects cases in three respects. It specified that "remedies should be concentrated on eliminating or reforming the discriminatory practice so as to eliminate disparities between persons in a particular protected class and other persons." It prohibited HUD in administrative proceedings from pursuing anything but "equitable remedies" except that "where pecuniary damage is proved, HUD will seek compensatory damages or restitution." And it restricted HUD from seeking civil penalties in discriminatory effects cases unless the respondent had been adjudged within the last 5 years to have committed intentional unlawful housing discrimination under the Act. In the proposed rule, HUD proposed that these limitations have no basis in law and run contrary to public interest and the purpose of the Act. While the 2020 Rule cited *Inclusive Communities* as supporting these limitations, HUD noted that no part of *Inclusive Communities* suggested such limitations. Moreover, HUD viewed these limitations as in conflict with the plain language of the Act, which provides in all cases for a wide variety of remedies, including injunctive relief, actual damages, punitive damages, and civil penalties. HUD clarified that whereas Congress explicitly has limited the remedies available in disparate impact cases under Title VII, it has chosen not to do so in cases brought under the Act.

In sum, HUD stated in the proposed rule that it believed that the 2013 Rule would be preferable to the 2020 Rule. It believed the 2013 Rule would be more consistent with judicial precedent construing the Fair Housing Act, including *Inclusive Communities,* as well as the Act's broad remedial purpose. Based on its experience interpreting and enforcing the Act, HUD also believed the 2020 Rule, if put into effect, threatened to limit the effectiveness of the Act's discriminatory effects doctrine in ways that are inconsistent with the doctrine continuing to play its critical role in "moving the Nation toward a more integrated society." [53] Furthermore, HUD stated that it believed that the 2013 Rule provided clarity, consistency, and a workable, balanced framework, recognized by the Supreme Court, under which to analyze discriminatory effects

claims, and under which HUD could better ensure it has the tools to further its "duty to administer the Act [ ] including by preventing practices with an unjustified discriminatory effect." [54]

## II. This Final Rule

HUD received 10,113 comments in response to the proposed rule. HUD reviewed and carefully considered these comments and, as explained in the responses to the comments below, HUD has decided to recodify the 2013 Rule. HUD has confirmed that the concerns it expressed in the proposed rule are consistent with the public comments received in response to the proposed rule, HUD's previous rulemakings and notices, and relevant discriminatory effects case law under the Act, including cases using the 2013 Rule and the 2020 Rule.

HUD continues to believe that, as compared to the 2020 Rule, the 2013 Rule more accurately describes discriminatory effects law in a manner that is consistent with both the Act and the Supreme Court's ruling in *Inclusive Communities.* As in the 2013 Rule, this final rule does not impose any new liability, but merely provides a consistent, nationwide framework for determining whether a given practice has an unjustified discriminatory effect, leading to liability under the Act. HUD believes the 2013 Rule best aligns with Fair Housing Act jurisprudence and is most consistent with the Act's remedial purposes. As described in greater detail below, HUD believes that the 2013 standard is consistent with and was implicitly endorsed by *Inclusive Communities.*

Moreover, even if the 2020 Rule were a permissible approach to discriminatory effects law and HUD had no doubts about the legality or appropriateness of the 2020 Rule under the Act, HUD would recodify the 2013 Rule as an exercise of the discretion Congress gave HUD to make rules under the Act.[55] The 2013 Rule's framework is practical and, in contrast to the novel and complicated 2020 Rule, has worked well in discriminatory effects cases. The 2013 Rule's framework adequately balances the interests of plaintiffs [56] and defendants and encourages the latter to seek a less discriminatory alternative

---

[50] *See Inclusive Cmtys. Project, Inc.*, 576 U.S. at 539–40 (describing *City of Black Jack,* 508 F.2d at 1184 as "at the heart of disparate-impact liability").

[51] 24 CFR 100.500(d)(1); 85 FR 60333.

[52] 24 CFR 100.500(d)(2)(i), 85 FR 60319, 60333.

[53] *Inclusive Cmtys. Project, Inc.*, 576 U.S. at 547.

[54] 86 FR 33594.

[55] *See generally* 42 U.S.C. 3614a.

[56] In the HUD administrative hearing process, HUD is referred to as the charging party and the housing providers who are alleged to have violated the Act are referred to as respondents. *See* 24 CFR 100.500. Rather than repeat those terms throughout this preamble, HUD uses the terms plaintiff and defendant to include the charging party and respondent.

when a policy or practice causes a discriminatory effect, without imposing an excessive burden on their substantial, legitimate, non-discriminatory interests. As described in greater detail below, HUD declines to create any exemptions or safe harbors in this rule or to proscribe specific conduct that per se has an unjustified discriminatory effect. As *Inclusive Communities* recognized in affirming that discriminatory effects claims are cognizable under the Act, "the [Fair Housing Act] must play an important part in avoiding the Kerner Commission's grim prophecy that '[o]ur Nation is moving toward two societies, one black, one white—separate and unequal.' "[57] For the reasons discussed in HUD's 2013 Rule, in the proposed rule, and below in response to the public comments, HUD rescinds the 2020 Rule and recodifies the 2013 Rule.

HUD adopts one amendment made by the 2020 Rule to HUD's general fair housing regulations at § 100.70(d)(5). This amendment provides additional illustrations of prohibited activities under the Fair Housing Act generally, though it is not specific to discriminatory effects cases. HUD proposed keeping these additional examples in the proposed rule and received no public comments specifically opposing these additions. In this final rule's amendatory instructions, HUD includes instructions to "republish" § 100.70(d)(5) without change from the 2020 Rule to clearly show that HUD is adopting this language in this final rule.

### III. Public Comments

*General Comments in Support*

Commenters generally supported the proposed rule, which would reinstate the 2013 Rule. Commenters stated that the proposed rule is consistent with President Biden's memorandum directing agencies to redress America's history of housing discrimination and the 1994 interagency fair lending guidance under the Act and the Equal Credit Opportunity Act. Commenters also stated that the proposed rule is an important and appropriate exercise of HUD's rulemaking authority.

Among the supportive comments were those stating that the proposed rule: is appropriately broad, inclusive, and will be instrumental in ensuring optimal compliance with the Act and in challenging covert or latent discrimination that can be intentionally

or unintentionally embedded in facially neutral policies and practices; is critical for ensuring equal opportunity under the Act; would help secure equal opportunity in a wide variety of housing areas, including in land use and zoning, affordable and public housing, environmental permitting, air quality, and utility burdens; would be effective in protecting against housing discrimination based on all of the Act's protected characteristics, as well as related groups such as persons without English language proficiency or who are survivors of domestic violence or sexual assault; would advance sustainable homeownership and affordable housing programs; would benefit both real estate professionals and consumers; may prevent segregated housing patterns that might otherwise result from covert and illicit stereotyping; is essential to challenging blanket refusals to accept Housing Choice Vouchers, which are disproportionately used by people of color, households with children, and persons with disabilities; and would address de facto and de jure discrimination in housing policies, construction, and tenancy.

Commenters noted that the proposed rule's burden-shifting framework is consistent with long-standing case law, including *Inclusive Communities,* and well-established agency practice. Commenters explained that the proposed rule contains the traditional burden shifting framework for disparate impact claims, which was endorsed by the Supreme Court in *Inclusive Communities* and is consistent with the framework for disparate impact claims under Title VII and the Equal Credit Opportunity Act.

Commenters stated that out of more than 40 federal appellate and district court decisions in disparate-impact fair housing cases following *Inclusive Communities,* very few, other than *Inclusive Communities Project* v. *Lincoln Prop. Co.,*[58] found any inconsistency between the 2013 Rule and the Supreme Court's *Inclusive Communities* decision. Commenters pointed to *Avenue 6E Investments, LLC* v. *City of Yuma,*[59] which cited the 2013 Rule as authority for the proper burden-shifting framework without noting any inconsistencies between that rule and *Inclusive Communities,* and *Mhany Mgmt., Inc.* v. *Cnty. of Nassau,*[60] which found that the Supreme Court implicitly endorsed the 2013 Rule's framework in

*Inclusive Communities.*[61] Commenters also noted that the court in *Mhany Mgmt., Inc.* v. *Cnty. of Nassau,* as well as numerous other cases successfully utilized the 2013 Rule's burden shifting framework to reach decisions.

Commenters supporting the proposed rule stated that it provides a clear, simple, and effective standard that would promote consistency between judicial and administrative venues and throughout the housing industry. Commenters explained that this standard would maintain continuity for regulated entities and enable them to better comply with the Act, since this regulatory framework has been in place since 2013. Commenters described the framework as pragmatic, fostering fair and sound business practices and finding the appropriate balance between fair housing concerns and business necessities.

Commenters expressed support for the burden-shifting framework, describing it as clear, easy to follow, practical, and striking the appropriate balance between competing interests. Commenters stated that the 2013 Rule settled the law on several important issues, including whether the burden-shifting framework is appropriate and which party bears the burden of demonstrating the business necessity for a particular policy and the existence of a less discriminatory alternative. A commenter noted that the 2013 Rule is a fair and accurate codification of longstanding jurisprudence of discriminatory effects liability under the Act and posed no significant departure from previous HUD interpretation or the weight of judicial authority. Commenters noted that plaintiff's burden under the proposed rule is not easy to meet, which eliminates the danger of an onslaught of groundless litigation. A commenter described the proposed rule as balancing the need to prevent frivolous claims from moving forward with a process that allows potentially meritorious claims to be substantiated or disproved. A commenter compared the proposed rule's three-tiered framework to the 2020 Rule's five-tiered test, noting that the former provides a clear way to challenge policies that may unnecessarily restrict housing, while the latter is vague and allows discrimination to continue unchallenged. Comments also stated that the 2020 Rule conflicted with decades of legal precedent, including

---

[57] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 519, 546 (quoting Report of the National Advisory Commission on Civil Disorders 91 (1968) (Kerner Commission Report at 1).

[58] *Inclusive Communities Project* v. *Lincoln Prop. Co,* 920 F.3d 890 (5th Cir. 2019).

[59] *Avenue 6E Investments, LLC* v. *City of Yuma,* 818 F.3d 493, 510 (9th Cir. 2016).

[60] *Mhany Mgmt., Inc.* v. *Cnty. of Nassau.* 819 F.3d 581, 618–20 (2d Cir. 2016).

[61] *Avenue 6E Investments, LLC* v. *City of Yuma,* 818 F.3d 493, 510 (9th Cir. 2016); *Mhany Mgmt., Inc.* v. *Cnty. of Nassau,* 819 F.3d 581, 618–20 (2d Cir. 2016).

**App.180**

the Supreme Court's decision in *Inclusive Communities* and that discriminatory effects claims that sought to challenge neutral policies that actually caused discrimination would not survive under the test contained in the 2020 Rule.

*General Comments in Opposition*

Other commenters generally opposed the proposed rule, suggesting that HUD withdraw it and retain the 2020 Rule. A commenter stated that the 2020 Rule thoroughly explained its reasoning and was consistent with *Inclusive Communities.* Another commenter described the proposed rule as unclear and overly burdensome. Commenters also suggested that the proposed rule lacks limitations on how and where it applies, thus adding a new layer of complexity and uncertainty to discriminatory effects law. A commenter stated that the proposed rule would harm the people it purports to benefit by applying a complex, court-created legal framework to a public policy issue and requiring all issues to be resolved in expensive litigation in federal court. Another commenter stated that the proposed rule will not create a uniform mechanism to resolve discriminatory effects disputes but will instead encourage courts to develop alternative approaches to handling such cases. A commenter stated that HUD and others have used the 2013 Rule to bully housing providers into expanding access to housing even if landlords cite legitimate business reasons for restricting housing based on certain admission or occupancy policies.

*HUD Response:* HUD disagrees with the commenters who opposed the proposed rule. As discussed in the preamble to the proposed rule and elsewhere in this preamble, HUD believes that this final rule establishes the appropriate, balanced framework for assessing claims of discriminatory effects and is entirely consistent with *Inclusive Communities* and long-standing judicial precedent. In contrast, HUD finds that the 2020 rule, if retained, would limit liability in a manner inconsistent with the Act's purpose and judicial precedent. HUD further believes that some of the standards announced in the 2020 rule might lead some courts to develop alternative approaches to assessing discriminatory effects claims that are inconsistent with the text and broad remedial purposes of the Act. HUD believes that the framework in the proposed rule sets out a consistent nationwide approach to evaluating discriminatory effects claims and adopts the majority view of judicial opinions

interpreting the Act. As a result, this final rule affords housing providers the opportunity to maintain policies and practices so long as they do not have an unjustified discriminatory effect because of a protected characteristic. And it does not require allegations of discriminatory effects to be resolved in federal court. Rather, housing providers may avoid potential litigation and liability by reviewing their policies and practices to ensure that they do not have an unjustified discriminatory effect. The discriminatory effects framework is not intended to force housing providers to take any particular course of action but rather to ensure that an important goal of the Act—to safeguard fair housing throughout the country—is accomplished.

*General Comments Concerning Clarity*

*Issue:* Commenters disagreed about the clarity that would result from setting aside the 2020 Rule. A commenter stated that the 2020 Rule should be retracted because it created a legal landscape in which HUD, other federal regulators, and courts would have different standards for analyzing discriminatory effects claims, and because it created confusion that would disadvantage housing discrimination victims. However, other commenters asked HUD to retain the 2020 Rule so as to avoid confusion and uncertainty because different forms of the rule have been promulgated and retracted over the last several years. A commenter stated that HUD should recognize the practical implications of repeatedly and drastically changing policies and justification for those policies and requested that HUD solidify clear and consistent long-term standards in order to minimize confusion and uncertainty for federal funding recipients. The commenter said it makes little sense to change procedures with each new administration and that reinstating the 2013 Rule will provoke litigation and disputes between courts rather than provide clarity. Another commenter noted a particular concern about confusion for businesses and damage to their ability to know and comply with the law since litigation concerning the 2020 Rule is pending.

*HUD Response:* HUD agrees with the commenters who stated that the 2020 Rule introduced a new standard that is incompatible with the standards used by courts and other federal regulators, creating confusion and uncertainty. In contrast, this final rule will provide clarity consistent with well-established judicial and agency interpretations of the Act by eliminating the novel and undefined standards introduced by the

2020 Rule. HUD also notes that the 2020 Rule never went into effect and has never been enforced by HUD. HUD has considered potential reliance interests and believes that no significant reliance was created by the 2020 rule, because unlike a regulation that even briefly governed conduct or supplied benefits, the 2020 Rule never did so. While HUD proposed revising the rule in 2019 and subsequently issued a final rule in 2020, the 2013 Rule, which is recodified in this final rule, is and has been the only promulgated rule governing the standard for discriminatory effects liability that has ever taken effect since the Act became law in 1968. HUD agrees that the 2020 Rule introduced a new standard that is incompatible with the Act and with the standards used by courts and other federal regulators. Had HUD used the 2020 Rule, while other federal agencies and courts used rules analogous to the 2013 Rule or created their own rules in response to *Inclusive Communities,* there would be substantial confusion in discriminatory effects jurisprudence. HUD believes that it is important that those affected by or accused of discrimination know what standard governs their housing related activities and that that standard does not unnecessarily vary depending on the forum in which a case is decided. Having differing standards would increase litigation costs for the parties and likely result in the dismissal of claims in some forums that are upheld in others. Restoring the 2013 Rule will help ensure the consistency of federal discriminatory effects law and will avoid the confusion caused by the 2020 Rule.

This final rule sets out a usable and uniform framework that is fully consistent with the requirements established by courts, as well as the text and purpose of the Act.

*Comments Concerning Harmony Between Other State and Federal Civil Rights Statutes*

*Issue:* A commenter noted that the Rule will bring HUD's regulations back into conformity with state civil rights laws.

*HUD Response:* HUD acknowledges that many state courts and agencies that interpret and enforce civil rights laws utilize a burden-shifting framework that is similar to this final rule and that HUD's 2020 Rule created confusion and conflicting standards.[62] HUD believes that it is important for plaintiffs to have

[62] *See e.g., Tetro* v. *Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.,* 173 F.3d 988, 993 (6th Cir. 1999) (explaining that state civil rights statute is interpreted consistently with analysis used for federal civil rights statute).

**App.181**

access to consistent relief in state and federal jurisdictions.

*Issue:* Commenters applauded the rule for being consistent with other civil rights laws and their discriminatory effects liability frameworks, including Title VII and ECOA. A commenter also noted that courts, including the Supreme Court in *Inclusive Communities,* have often drawn on Title VII's jurisprudence when interpreting the Act and vice versa because of the similarities between the statutes' texts, structures, purposes, and dates of enactment. The commenter expressed support for the rule because it aligns with judicial precedent that interprets the Act and Title VII similarly. The commenter also stated that the proposed rule furthers the principle that language that is similar across statutes should be given similar meaning.

*HUD Response:* HUD agrees that the rule is consistent with other civil rights laws and their discriminatory effects liability frameworks, including Title VII of the Civil Rights Act of 1964, as amended (Title VII),[63] and the Equal Credit Opportunity Act (ECOA).[64] HUD acknowledges that courts have generally interpreted these statutes consistently and agrees that HUD should do the same to promote consistency and clarity, particularly for entities whose actions must be compliant with both ECOA and the Act.

HUD notes that the preamble to the 2013 Rule explained in great detail how its framework operates harmoniously with other civil rights laws, including Title VII and ECOA, and best effectuated the important goals of the Fair Housing Act.[65] As HUD noted in the 2013 Rule, the discriminatory effects framework borrowed from Title VII and *Griggs* is the fairest and most reasonable approach for resolving disparate impact claims, in part because it does not require either party to prove a negative, and it provides the parties the opportunity to obtain adequate information in discovery to meet their burdens.[66]

### Comments Concerning Massachusetts Fair Housing Center

*Issue:* Commenters stated that although the district court in *Massachusetts Fair Housing Center*[67] stayed implementation of the 2020 Rule, it did not require HUD to totally abandon the 2020 Rule. The

commenters stated that the decision primarily addressed three elements of the 2020 Rule—the outcome prediction defense, the requirement that plaintiffs present an equally effective alternative, and the conflation of the plaintiff's prima facie burden and their pleading burden. The commenters also stated that the court acknowledged the requirement that a plaintiff must plead that a challenged policy is ''arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective,'' may have some grounding in case law. The commenters also stated that the court did not address the 2020 Rule's recognition that the Act does not and cannot supplant state laws concerning insurance, or its codification of *Inclusive Communities'* guidance on remedies.

Other commenters stated that *Massachusetts Fair Housing Center* criticized the 2020 Rule for introducing onerous pleading standards, defenses that lacked precedent in case law, for conflicting with the remedial purpose of the Act, and for likely being arbitrary and capricious.

*HUD Response:* While the *Massachusetts Fair Housing Center* court enjoined HUD from implementing or enforcing the 2020 Rule in any manner and ordered HUD to ''preserve the status quo pursuant to the regulations in effect as of the date of this Order,'' [68] HUD is not basing its decision to abandon the 2020 Rule and recodify the 2013 Rule on the *Massachusetts Fair Housing Center* order. Rather, HUD declines to retain any part of the 2020 Rule's substantive disparate impact language based on its own interpretation of and decades of experience in implementing the Act. HUD also finds other aspects of the 2020 Rule that the court left unaddressed or uncriticized to be equally troublesome.

### Comments Concerning Inclusive Communities

*Issue:* Commenters supported reinstatement of the 2013 Rule because it is consistent with *Inclusive Communities.* Commenters stated that the Court cited the 2013 Rule with approval, noting each step in the 2013 Rule's burden-shifting framework without critique. Commenters also noted that multiple courts since *Inclusive Communities,* including courts of appeals, have read *Inclusive Communities* as affirming or implicitly adopting the test *and* have applied the 2013

Rule's framework.[69] A commenter pointed out that the district court in *Inclusive Communities* stated on remand that, ''[a]s a result of the Fifth Circuit's decision adopting the HUD regulations, and the Supreme Court's affirmance (without altering the burden-shifting approach), the following proof regimen now applies to *ICP's* disparate impact claim under the [Act].'' [70] A commenter also cited multiple district court decisions that have incorporated the language of *Inclusive Communities* when applying the 2013 Rule's framework.[71] Another commenter noted that *Inclusive Communities* endorsed ''heartland'' cases,[72] all of which used burden shifting frameworks consistent with the proposed rule. Commenters also stated that the 2020 Rule did not meaningfully address *MHANY Management, Inc., de Reyes* v. *Waples Mobile Home Park Limited Partnership,*

[63] 78 FR 11468–11471.

[64] *Id.*

[65] *Id.*

[66] 78 FR 11474.

[67] *Mass. Fair Hous. Ctr.* v. *United States HUD,* 496 F. Supp. 3d 600, 603 (D. Mass. Oct. 25, 2020).

[68] *Id.* at 612.

[69] *See. e.g., Mhany Mgmt., Inc.* v. *Cnty. of Nassau at 618–20; Oviedo Town Ctr. II, L.L.L.P.* v. *City of Oviedo,* 759 F. App'x 828, 834–35 (11th Cir. 2018); *de Reyes* v. *Waples Mobile Home Park L.P.,* 903 F.3d 415, 426 n.6, 428 (4th Cir. 2018); *see also Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 29–30 (D.D.C. 2017); *Nat'l Fair Hous. All.* v. *Bank of Am., N.A.,* 401 F. Supp. 3d 619, 631–632 (D. Md. 2019); *See, e.g., River Cross Land Co., LLC* v. *Seminole Cty.,* 2021 WL 2291344, at *66–69, 72–73, 75–76 (M.D. Fla. June 4, 2021); *Jones* v. *City of Faribault,* No. 18–1643 [JRT/HB], 2021 U.S. Dist. LEXIS 36531, at *48–49 (D. Minn. Feb. 18, 2021); *Conn. Fair Hous. Ctr.* v. *CoreLogic Rental Prop. Sols., LLC,* 478 F. Supp. 3d 259, 296 (Aug. 7, 2020) (and related decisions, *see CoreLogic,* No. 3:17–cv–705 (VLB), 2020 WL 401776 (D. Conn. Jan. 24, 2020)); *Borum* v. *Brentwood Vill., LLC,* 2020 U.S. Dist. LEXIS 54840, at *13 (D.D.C. Mar. 30, 2020); *NFHA* v. *Deutsche Bank Nat'l Trust,* 2019 WL 5963633 (N.D. Ill. Nov. 13, 2019); *Yellowstone Women's First Step House Inc.* v. *City of Costa Mesa,* 2019 U.S. Dist. LEXIS 221209, at *4 (C.D. Cal. Nov. 4, 2019); *Mass. Fair Hous. Ctr.,* 496 F. Supp. 3d at 611.

[70] *Inclusive Cmtys. Project, Inc.* v. *Tex. Dep't of Hous. & Cmty. Affairs,* 2015 WL 5916220 at *3 (N.D. Tex. 2015).

[71] *Prince George's Cty.* v. *Wells Fargo & Co.,* 397 F. Supp. 3d 752, 766 (D. Md. 2019); *Fortune Soc'y* v. *Sandcastle Hous. Dev. Fund Corp.,* 388 F. Supp. 3d 145, 172–173 (E.D.N.Y. 2019); *Conn. Fair Hous. Ctr.* v. *Corelogic Rental Prop. Sols., LLC,* 369 F. Supp. 3d 362, 377–78 (D. Conn. 2019); *Nat'l Fair Hous. All.* v. *Fannie Mae (''Fannie Mae''),* 294 F. Supp. 3d 940, 947 (N.D. Cal. 2018); *Paige* v. *N.Y.C. Hous. Auth.,* 2018 U.S. Dist. LEXIS 137238, at *9 (S.D.N.Y. Aug. 14, 2018); *R.I. Comm'n for Hum. Rights* v. *Graul,* 120 F. Supp. 3d 110, 123–24 (D.R.I. 2015); *Price* v. *Country Brook Homeowners Ass'n,* 2021 U.S. Dist. LEXIS 228914, at *5–6 (S.D. Ohio Nov. 30, 2021); *Pickett* v. *City of Cleveland,* No. 1:19 CV 2911, 2020 U.S. Dist. LEXIS 259242, at *9 (N.D. Ohio Sep. 29, 2020); *Winfield* v. *City of N.Y.,* No. 15CV5236–LTS–DCF, 2016 U.S. Dist. LEXIS 146919, at *18–19 (S.D.N.Y. Oct. 24, 2016); *Alexander* v. *Edgewood Mgmt. Corp.,* Civil Action No. 15–01140 (RCL), 2016 U.S. Dist. LEXIS 145787, at *6–7 (D.D.C. July 22, 2016).

[72] *See e.g. United States* v. *City of Black Jack, Mo.,* 508 F.2d 1179, 1184 (8th Cir. 1974); *Huntington Branch, NAACP* v. *Huntington,* 844 F.2d 926, 937 (2nd Cir. 1988); *Greater New Orleans Fair Housing Action Center* v. *St. Bernard Parish,* 641 F. Supp. 2d 563, 567–568 (E.D. La. 2009).

**App.182**

or *Avenue 6E Investments, LLC* v. *City of Yuma,* which found that the 2013 Rule remained valid after *Inclusive Communities.* A commenter added that in *Property Casualty Insurance Association of America* v. *Carson,*[73] a lawsuit directly challenging the validity of the 2013 Rule, the district court held that *Inclusive Communities* affirmed HUD's burden-shifting approach and did not identify any aspect of the approach that required correction.

Other commenters opposed the proposed rule, stating that it is inconsistent with *Inclusive Communities.* In support of this, commenters noted that the 2013 Rule preceded *Inclusive Communities* and stated that the 2013 Rule does not adequately incorporate the holdings of that case. Commenters requested that HUD retain the 2020 Rule or incorporate additional language from the *Inclusive Communities* decision into this final rule. Commenters stated that although *Inclusive Communities* mentioned the 2013 Rule, it did not endorse the rule. Others stated that the 2013 Rule does not align with the Supreme Court's caution against injecting racial considerations into every housing decision and perpetuating race-based considerations rather than moving beyond them. A commenter said that compliance with the rule, as opposed to *Inclusive Communities,* will lead to costly litigation. Commenters noted that the Supreme Court specifically limited the scope of *Inclusive Communities* to the first question presented (whether disparate impact claims were cognizable under the Act) so references to the 2013 Rule cannot be viewed as approving the 2013 framework. Commenters further stated that the Court in *Inclusive Communities* did not state that the 2013 Rule incorporates the appropriate limits of disparate impact liability.

Another commenter stated that courts, such as the court in *Woda Cooper Dev., Inc.* v. *City of Warner Robins,* Civ. No. 5:20–CV–159 (MTT), 2021 WL 1093630, *1, at *7 (M.D. Ga. Mar. 22, 2021), have struggled to apply the 2013 Rule's framework in the wake of *Inclusive Communities,* with some choosing to ignore the rule entirely. The commenter stated that *Inclusive Communities* identified a number of safeguards to prevent abusive disparate impact cases but did not provide detailed explanations of those safeguards or guidance on how courts should apply those safeguards. The commenter urged HUD to elaborate on those safeguards in the final rule.

*HUD Response:* HUD agrees with the commenters who stated that the 2013 Rule is consistent with the *Inclusive Communities* holding. The Court in *Inclusive Communities* did not call into question the 2013 Rule's framework for analyzing discriminatory effects claims, nor did it suggest that HUD should make any modifications to that framework. To the contrary, the Court cited HUD's 2013 Rule several times with approval.[74] For instance, the Court noted that the burden-shifting framework of *Griggs* and its progeny, adopted by HUD in the 2013 Rule and retained in this final rule, adequately balanced the interests of plaintiffs and defendants by giving housing providers the ability "to state and explain the valid interest served by their policies."[75] The Court also discussed the history of HUD's promulgation of the 2013 Rule, noted that lower courts had relied on it, and repeatedly cited its three-part burden shifting test.[76] Notably, other courts have recognized these findings and relied on the 2013 Rule's burden shifting framework without difficulty since *Inclusive Communities* was decided.[77] Moreover, HUD agrees that *Inclusive Communities'* discussion approving the holdings of the "heartland cases" supports reinstating the 2013 Rule.[78] HUD also agrees that the 2020 Rule did not adequately address the well-considered and thorough reasoning of *MHANY Mgmt., de Reyes,* and *Avenue 6E Investments, LLC,* each of which found that the 2013 Rule remained valid after *Inclusive Communities.*[79]

HUD disagrees with the commenters who stated that the 2020 Rule should be retained because it is consistent with and incorporates the "safeguards" described in *Inclusive Communities.* As discussed above, in *Inclusive Communities,* the Court did not express any disapproval of the 2013 Rule's framework or specify that it lacked any safeguards. Rather, the Court observed that "disparate-impact liability *has always been* properly limited in key respects," making clear that it was not calling for any significant departure from pre-existing precedent under the Act or the 2013 Rule.[80] HUD believes that had the Court intended to overhaul disparate impact jurisprudence, the Court would have done so expressly, rather than citing the 2013 Rule favorably. Moreover, HUD notes that the Court declined to accept certiorari on the proper standard for assessing disparate impact cases.[81] And, as noted above, multiple courts have since read *Inclusive Communities* as affirming or endorsing the 2013 Rule's burden-

---

[73] *Prop. Cas. Insurers Ass'n of Am.* v. *Carson,* 2017 WL 2653069, at *8–9 (N.D. Ill. June 20, 2017) (finding that HUD's 2013 adoption of the 3-step burden-shifting framework was a reasonable interpretation of the Act and that "in short, the Supreme Court in *Inclusive Communities* . . . did not identify any aspect of HUD's burden-shifting approach that required correction.")

[74] *Inclusive Cmtys. Project,* 576 U.S. at 527, 535–536, 541.

[75] *Id.* at 541.

[76] *Id.* at 527–28.

[77] *Supra* at n.69. *See also* Robert G. Schwemm, Housing Discrimination Law and Litigation § 10:5 (August 2022) ("[t]he basic structure and language of the HUD and *Inclusive Communities* standards are nearly identical" and "th[e] slight semantic variation [in the second step of the burden shifting framework] may not signal any real substantive difference . . ."; *de Reyes* v. *Waples Mobile Home Park L.P.,* 903 F.3d 415 fn4 (4th Cir. 2018) (while not relying on the 2013 Rule, the court noted that "[t]he HUD regulation is similar to the framework the Supreme Court ultimately adopted in *Inclusive Communities,* and indeed, some courts believe the Supreme Court implicitly adopted the HUD framework altogether").

[78] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 519, 539; *See e.g. Huntington* v. *Huntington Branch, NAACP,* 488 U.S. at 16–18; *United States* v. *City of Black Jack, Mo.,* 508 F.2d 1179, 1184, 1187–88 (8th Cir. 1974) (specific facts produced during the case supported the court's determination that the policy was one of those "artificial, arbitrary, and unnecessary" practices that is properly invalidated under disparate impact doctrine.); *Greater New Orleans Fair Hous. Action Ctr.* v. *St. Bernard Par.,* 641 F. Supp. 2d 563, 567–568 (E.D. La. 2009) (relying on information gathered after the pleadings to find illegal disparate impact).

[79] *See, e.g., de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415, 424, 432 n.10 (4th Cir. 2018) (noting that "[i]n *Inclusive Communities,* the Supreme Court explained that an FHA disparate-impact claim should be analyzed under a three-step, burden-shifting framework [and proceeding to outline the same framework as under the 2013 Rule]; further disagreeing that the HUD regulation and guidance conflict with *Inclusive Communities* and cannot be relied upon, and thus "afford[ing] the HUD regulation and guidance the deference it deserves") (citations omitted]; *MHANY Mgmt. Inc.* v. *Cnty. of Nassau,* 819 F.3d 581, 618–619 (2d Cir. 2016) (deferring to HUD's [2013] regulation, noting that "'the Supreme Court implicitly adopted HUD's [burden shifting] approach [in 24 CFR 100.500(c)]'"); *Avenue 6E Invs., LLC* v. *City of Yuma,* 818 F.3d 493, 512–513 (9th Cir. 2016) (citing *Inclusive Communities* and the 2013 Rule at 100.500(c) for the same proposition); *Nat'l Fair Hous. Alliance* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 29 (D.D.C. 2017) (citing *Inclusive Communities* and HUD's 2013 Rule at 100.500(c) as standing for the same proposition); *Prop. Cas. Insurers Ass'n of Am.* v. *Carson,* 2017 WL 2653069, at *8–9 (N.D. Ill. June 20, 2017) (finding that HUD's 2013 adoption of the three-step burden-shifting framework was a reasonable interpretation of the Act and that "in short, the Supreme Court in *Inclusive Communities* . . . did not identify any aspect of HUD's burden-shifting approach that required correction."); *Burbank Apartments Tenant Ass'n* v. *Kargman,* 474 Mass. 107, 126–27 (Mass. 2016) (explaining that it was following the "burden-shifting framework laid out by HUD and adopted by the Supreme Court in [*Inclusive Communities*].").

[80] *See Inclusive Cmtys. Project,* 576 U.S. at 540 (emphasis added).

[81] *Inclusive Cmtys. Project, Inc.,* 573 U.S. 991 (2014), 2014 U.S. LEXIS 4912 at *1 ("Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit granted limited to Question 1 presented by the petition."); *See also Questions Presented in, Inclusive Cmtys Project, Inc.,* 573 U.S. 991.

**App.183**

shifting framework.[82] Even if the Court did not endorse the 2013 Rule in *Inclusive Communities,* it did not discard or significantly alter preexisting disparate impact jurisprudence. The 2013 Rule adopts the majority view of preexisting law. HUD believes that to the extent that some courts have attempted to impose limitations greater than those described in the 2013 Rule, they have misread *Inclusive Communities.* Moreover, the 2013 Rule did not inject racial considerations into housing decisions, and nothing in *Inclusive Communities* indicates that the Court believed the Rule improperly did so. Accordingly, HUD continues to believe that the burden-shifting test articulated in the 2013 Rule is the most appropriate framework for litigating discriminatory effects claims consistent with the Act and *Inclusive Communities.*

*Issue:* Commenters cited *Lincoln Property, Oviedo, River Cross Land Co., County of Cook, Ill.* v. *Wells Fargo & Co,* and *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.* as evidence that several courts have held that the 2013 Rule was inconsistent with *Inclusive Communities.*[83] By contrast, other commenters stated that out of more than 40 federal appellate and district court decisions in disparate impact cases following *Inclusive Communities,*[84]

only *Lincoln Property,* an appellate decision, and district courts bound by *Lincoln Property,* found any inconsistency between the 2013 Rule and *Inclusive Communities.*[85]

*HUD Response:* HUD disagrees that the cases the commenters cited compel the conclusion that this rule is inconsistent with *Inclusive Communities.* As HUD has previously stated on many occasions, including in the preamble to the 2020 Rule, the 2013 Rule is consistent with *Inclusive Communities.*[86] The vast majority of courts to consider this issue subsequent

to *Inclusive Communities,* including at least three federal appellate courts, have agreed.[87] Multiple courts have specifically read *Inclusive Communities* to have affirmed or endorsed the 2013 Rule's burden-shifting framework.[88] For example, in *River Cross,* one of the decisions commenters characterized as demonstrating incompatibility between the 2013 Rule and *Inclusive Communities,* the court in fact recognized that *Inclusive Communities*

[82] *See, e.g., Prop. Cas. Insurers Ass'n,* 2017 WL 2653069, at *9 (N.D. Ill. June 20, 2017) ("[T]he Supreme Court in *Inclusive Communities* expressly approved of disparate-impact liability under the FHA and did not identify any aspect of HUD's burden-shifting approach that required correction."); *MHANY Mgmt., Inc.,*) (explaining that in *Inclusive Communities,* "[t]he Supreme Court implicitly adopted HUD's approach"); *de Reyes* v. *Waples Mobile Home Park Limited Partnership,* 903 F.3d 415 (4th Cir. 2018); *See Oviedo Town Ctr. II, L.L.L.P.* v. *City of Oviedo,* 759 F. App'x 828, 834–35 (11th Cir. 2018) (citing *Schwarz* v. *City of Treasure Island,* 544 F.3d 1201 (11th Cir. 2008)); *Nat'l Fair Hous. All.* v. *Bank of Am., N.A.,* 401 F. Supp. 3d 619, 631–632 (D. Md. 2019) (explaining that the Supreme Court in *Inclusive Communities* "[b]ive[ed] closely to regulations promulgated by HUD in 2013").

[83] *Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902 (5th Cir. 2019); *Oviedo Town Ctr. II, L.L.P.* v. *City of Oviedo, Florida,* 759 Fed. App'x 828, 833–35 (11th Cir. 2018) (per curiam); *River Cross Land Co., LLC* v. *Seminole Cty.,* 2021 WL 2291344, at *22–24 (M.D. Fla. June 4, 2021); *Cnty. of Cook, Ill.* v. *Wells Fargo & Co.,* 314 F. Supp. 3d 975, 990 (N.D. Ill. 2018); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017).

[84] *See, e.g., de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415 (4th Cir. 2018); *MHANY Mgmt. Inc.* v. *Cnty., of Nassau,* 819 F.3d 581 (2d Cir 2016); *Avenue 6E Invs., LLC* v. *City of Yuma,* 818 F.3d 493 (9th Cir. 2016); *Prince George's City.* v. *Wells Fargo & Co.,* (397 F. Supp. 3d 752, 766 (D. Md. 2019); *Fortune Soc'y* v. *Sandcastle Hous. Dev. Fund Corp.,* 388 F. Supp. 3d 145, 172–173 (E.D.N.Y. 2019); *Conn. Fair Hous. Ctr.* v. *Corelogic Prop. Sols. LLC,*, 369 F. Supp. 3d 362, 377–78 (D. Conn. 2019); *National Fair Hous All.* v. *Fed. Nat'l Mortg. Ass'n,*

294 F. Supp. 3d 940, 947 (N.D. Cal 2018]; *City of Philadelphia* v. *Wells Fargo & Co.,* No. 17–cv–2203, 2018 WL 424451, at *4 (E.D. Pa. Jan. 16, 2018); *Paige* v. *New York City Hous. Auth.,* No. 17–cv–7481, 2018 WL 3863451, at *3–4 (S.D.N.Y. Aug. 14, 2018); *Rhode Island Comm'n for Hum. Rights* v. *Graul,* 120 F. Supp. 3d 110, 123–24 (D.R.I. 2015); *Sams* v. *Ga West Gate LLC,* No. cv–415–282, 2017 WL 436281, at *5 (S.D. Ga. Jan. 30, 2017); *Winfield* v. *City of New York,* No. 15–cv–5236, 2016 WL 6208564, at *5 (S.D.N.Y. Oct. 24, 2016); *Alexander* v. *Edgewood Mgmt. Corp.,* No. 15–01140, 206 WL 5957673, at *2–3 (D.D.C. July 25, 2016); *Hall* v. *Philadelphia Hous. Auth.,* No. 17–5753, 2019 WL 1545183, at *5 & n.5 (E.D. Pa. Apr. 9, 2019); *Jackson* v. *Tryon Park Apartments, Inc.,* No. 6:18–cv–06238, 2019 WL 331635, at *1 (W.D.N.Y. Jan. 25, 2019); *Johnson* v. *Johnson,* No. 4:18–CV–04138–RAL, 2018 WL 5983508, at *2 (D.S.D. Nov. 14, 2018); *Ekas* v. *Affinity Prop. Mgmt.,* No. 3:16–cv–1636, 2017 WL 7360366, at *3 (D. Ore. Dec. 7, 2017); *Alms Residents Ass'n* v. *U.S. Dep't of Hous. & Urban Dev.,* No. 1:17–cv–605, 2017 WL 4553401, at *11 (S.D. Ohio Oct. 12, 2017); *Oviedo Town Ctr. II, L.L.L.P.* v. *City of Oviedo,* No. 6:16–cv–1005, 2017 WL 3621940, at *4 (M.D. Fla. Aug. 23, 2017), *aff'd,* 759 Fed. App'x 828 (11th Cir. ); *National Fair Housing. Alliance* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 29 (D.D.C. 2017); *Prop. Cas. Insurers Assoc.* v. *Carson,* 2017 WL 2653069 at *9 (N.D. Ill. June 20, 2017) ("[T]he Supreme Court in *Inclusive Communities* expressly approved of disparate-impact liability under the FHA and did not identify any aspect of HUD's burden-shifting approach that required correction"); *Martinez* v. *Optimus Props., LLC,* Nos. 2:16–cv–08598–SVW–MRW, 2017 WL 1040743, at *2 (C.D. Cal. Mar. 14, 2017); *Borum* v. *Brentwood Vill., LLC,* 218 F. Supp. 3d 1, 21–22 (D.D.C. 2016); *Khodeir* v. *Sayyed,* No. C 15–8763, 2016 WL 5817003, at *6 (S.D.N.Y. Sept. 28, 2016); *Crossroads Residents Organized for Stable and Secure ResiDencieS* v. *MSP Crossroads Apartments LLC,* No. C 16–233, 2016 WL 3661146, at *8 (D. Minn. July 5, 2016); *Azam* v. *City of Columbia Heights,* No. C No. 14–1044, 2016 WL 424966, at *10 (D. Minn. Feb. 3, 2016).

[85] *See Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902 (5th Cir. 2019). For district court decisions bound by *Lincoln Prop., see, e.g., Treece* v. *Perrier Condominium Owners Ass'n, Inc.,* —F. Supp. 3d—, No. 17–10153, 2021 WL 533720 (E.D. La. Feb. 12, 2021); *Inclusive Cmtys. Project, Inc.* v. *Heartland Community Ass'n,* 399 F. Supp. 3d 657 (N.D. Tex. 2019).

[86] *See* 85 FR 60299 (noting that the 2013 Rule is one but not the only "permissible interpretation of disparate impact liability under the FHA"). *See also* Defendants' Opposition to Plaintiff's Motion for Leave to Amend Complaint, *Prop. Cas. Ins. Assoc. of Am.* v. *Carson and the U.S. Dep't of Hous. and Urb. Dev.,* No. 1:13–cv–08564 (2017); Defendants' Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, *Am. Ins. Assoc.* v. *U.S. Dep't of Hous. and Urb. Dev. et al.,* No. 1:13–cv–00966 (RJL) (D.D.C. 2016).

[87] *See, e.g., de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415, 424, 432 n.10 (4th Cir. 2018) (noting that "[i]n *Inclusive Communities,* the Supreme Court explained that an FHA disparate-impact claim should be analyzed under a three-step, burden-shifting framework [and proceeding to outline the same framework as under the 2013 Rule]; further disagreeing that the HUD regulation and guidance conflict with *Inclusive Communities* and cannot be relied upon, and thus "afford[ing] the HUD regulation and guidance the deference it deserves") (citations omitted); *MHANY Mgmt. Inc.* v. *Cnty. of Nassau,* 819 F.3d 581, 618–619 (2d Cir. 2016) (deferring to HUD's [2013] regulation, noting that "the Supreme Court implicitly adopted HUD's [burden shifting] approach [in 24 CFR 100.500(c)]"); *Avenue 6E Invs., LLC* v. *City of Yuma,* 818 F.3d 493, 512–513 (9th Cir. 2016) (citing *Inclusive Communities* and the 2013 Rule at 100.500(c) for the same proposition); *Nat'l Fair Hous. Alliance* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 29 (D.D.C. 2017) (citing *Inclusive Communities* and HUD's 2013 Rule at 100.500(c) as standing for the same proposition); *Prop. Cas. Insurers Ass'n of Am.* v. *Carson,* 2017 WL 2653069, at *8–9 (N.D. Ill. June 20, 2017) (finding that HUD's 2013 adoption of the 3-step burden-shifting framework was a reasonable interpretation of the Act and that "in short, the Supreme Court in *Inclusive Communities* . . . did not identify any aspect of HUD's burden-shifting approach that required correction."); *Burbank Apartments Tenant Ass'n* v. *Kargman,* 474 Mass. 107, 126–27 (Mass. 2016) (explaining that it was following the "burden-shifting framework laid out by HUD and adopted by the Supreme Court in [*Inclusive Communities*].").

[88] *See, e.g., MHANY Mgmt. Inc.* v. *Cnty. of Nassau,* 819 F.3d 581, 618 (2d Cir 2016) ("the Supreme Court implicitly adopted HUD's approach"); *6E Invs., LLC* v. *City of Yuma,* 818 F.3d 493, 512–513 (9th Cir. 2016) (citing the 2013 Rule in describing the three-prong analytical structure set forth in *Inclusive Communities*); *Nat'l Fair Hous. Alliance* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20 (D.D.C. 2017) (stating that the Supreme Court "carefully explained that disparate-impact liability has always been properly limited" and that "disparate-impact liability under the FHA can be proven under a burden-shifting framework analogous to that used in employment discrimination cases.") (internal citations and quotations omitted); *Prop. Cas. Insurers Ass'n of Am.* v. *Carson,* 2017 WL 2653069, at *8–9 (N.D. Ill. June 20, 2017) (finding that HUD's 2013 adoption of the 3-step burden-shifting framework a reasonable interpretation of the Act, finding that "in short, the Supreme Court in *Inclusive Communities* . . . did not identify any aspect of HUD's burden-shifting approach that required correction."); *Burbank Apartments Tenant Ass'n* v. *Kargman,* 474 Mass. 107, 126–27 (Mass. 2016) (explaining that it was following the "burden-shifting framework laid out by HUD and adopted by the Supreme Court in [*Inclusive Communities*]."); *Jackson* v. *Tryon Park Apartments, Inc.,* No. 6:18–CV–06238 EAW, 2019 U.S. Dist. LEXIS 12473, at *11 (W.D.N.Y. Jan. 25, 2019) (noting that "the Supreme Court's 2015 *Inclusive Communities Project* ruling uph[eld] [HUD's 2013] regulation").

**App.184**

approvingly cited the 2013 Rule, applied the 2013 Rule, and found it to be easily reconciled with *Inclusive Communities*.[89] HUD has determined that the small number of courts that reached contrary conclusions misinterpreted the scope of the *Inclusive Communities* holding, and HUD declines to adopt the minority views of these courts.

In light of the views of a majority of courts and HUD's experience applying the Act, HUD finds that the Fifth Circuit's conclusions in *Lincoln Property* do not require it to change course.[90] In that case, the majority of a divided panel acknowledged that *Inclusive Communities* reviewed and affirmed the Fifth Circuit's earlier judgment in that case, remanding to the trial court to apply the 2013 Rule's burden-shifting framework, and that the Court did not explicitly call into question the 2013 Rule's requirements. Nonetheless, the *Lincoln Property* court found that because the Supreme Court in *Inclusive Communities* had not explicitly stated that it was adopting the 2013 Rule's framework, whether the Court accepted the framework or modified it remained unresolved.[91] The court construed language from *Inclusive Communities* as calling for courts to make it more difficult to plead a discriminatory effects claim in some fashion, but acknowledged that *Inclusive Communities* provided no clear direction as to how it was thus changing the law. While acknowledging that other appellate courts had interpreted *Inclusive Communities* to have "implicitly adopted the 2013 framework," the panel's review of certain passages from *Inclusive Communities* and of subsequent decisions from the Fourth, Eighth, and Eleventh Circuits [92] led the panel to conclude simply that *Inclusive Communities* "announce[d] a more demanding test than that set forth in the HUD regulation" but "did not clearly delineate its meaning or requirements." [93] Finding no consensus even among those who believed

*Inclusive Communities* made some change, it concluded that the claim at issue in that case was not properly pleaded under any of several possible standards it could apply, making it unnecessary to state with more specificity how, in its view, *Inclusive Communities* had changed the law.

HUD believes *Lincoln Property's* language concerning a more demanding standard is not a reason to change the standard it promulgated in 2013. As stated earlier, HUD disagrees that anything in *Inclusive Communities* is inconsistent with the 2013 Rule's requirements for discriminatory effects claims. Rather, HUD agrees with the Fourth Circuit that the 2013 Rule "is similar to the framework the Supreme Court ultimately adopted in *Inclusive Communities*," and with its observation that "some courts believe the Supreme Court implicitly adopted the HUD framework altogether." [94] But even if the Fifth Circuit were correct in identifying inconsistencies between the 2013 Rule and *Inclusive Communities*, *Lincoln Property* does not provide persuasive reasoning for HUD to modify the 2013 Rule, because the court only found ambiguity in the law after *Inclusive Communities* rather than specifying the way in which HUD needed to change course. Additionally, the other circuit courts that have analyzed the robust causation discussion in *Inclusive Communities* have either defined it in a way that is consistent with this final rule or were similarly non-specific in explaining robust causality's meaning.[95]

HUD notes that, while acknowledging that other appellate courts had interpreted *Inclusive Communities* to have "implicitly adopted the 2013 framework," the Fifth Circuit panel's review of certain passages from *Inclusive Communities* as well as subsequent decisions from the Fourth, Eighth, and Eleventh Circuits,[96] led the panel to conclude that *Inclusive Communities* "undoubtedly

announce[d] a more demanding test than that set forth in the HUD regulation." [97] HUD believes that in two of these decisions, the courts gave more deference to the 2013 Rule than the commenters recognized.[98] Additionally, in the district court decisions cited by the commenters, and in *Lincoln Property's* progeny, HUD believes that the courts misread *Inclusive Communities* as creating heightened pleading standards.[99] Even *Lincoln Property* only requires a plaintiff to *plausibly* demonstrate a robust causal connection between a discriminatory practice and an alleged disparate impact.[100] HUD adopts the view of courts that found *Inclusive Communities* endorsed the 2013 Rule's framework.

HUD also notes that *Lincoln Property*—a suit between private parties—was decided without the benefit of input from HUD on what effect, if any, *Inclusive Communities* had on Fair Housing Act disparate impact claims. As the agency to which Congress has delegated the responsibility to interpret and enforce the Fair Housing Act, HUD believes that its reasonable reading of any ambiguities in the meaning of the Act following *Inclusive Communities* is entitled to deference.[101] Thus, to the extent *Lincoln Property* identified such an ambiguity and came to conclusions that conflict with those HUD has reached, HUD declines to adopt the court's conclusions. Any risk that litigants in the Fifth Circuit would be subject to a different standard than litigants elsewhere is created by the *Lincoln Property* decision, not by HUD's promulgation of this rule.

---

[89] *River Cross Land Co., LLC* v. *Seminole Cty.,* 2021 WL 2291344, at *66–69, 72–73, 75–76 (M.D. Fla. June 4, 2021).

[90] *Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d 890 (5th Cir. 2019).

[91] *Id.* at 902.

[92] *Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902–05 (5th Cir. 2019) (citing *de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415 (4th Cir. 2018); *Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1114 (8th Cir. 2017); *Oviedo Town Ctr. II, L.L.P.* v. *City of Oviedo,* 759 Fed. App'x 828 (11th Cir. 2018)) (pinpoint citations omitted).

[93] *See Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902 (5th Cir. 2019).

[94] *Reyes,* 903 F.3d at 424 n.4 (collecting cases).

[95] *See de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415, 424–27 (4th Cir. 2018) (explaining that identifying policy that causes disparity establishes robust causation); *Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1111 (8th Cir. 2017) (quoting *Inclusive Cmtys.,* but not defining robust causation beyond identifying the connection between a challenged policy and a disparate impact); *Oviedo Town Ctr. II, L.L.P.* v. *City of Oviedo,* 759 F. App'x 828, 834–36 (11th Cir. 2018) (plaintiff must make statistical showing sufficient to connect challenged policy and disparate impact)

[96] *Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902–05 (5th Cir. 2019) (citing *de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415 (4th Cir. 2018); *Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1114 (8th Cir. 2017); *Oviedo Town Ctr. II, L.L.P.* v. *City of Oviedo,* 759 Fed. App'x 828 (11th Cir. 2018)) (pinpoint citations omitted).

[97] *See Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d 890, 902 (5th Cir. 2019).

[98] *River Cross Land Co., LLC* v. *Seminole Cty.,* 2021 WL 2291344, at *66–69, 72–73, 75–76 (M.D. Fla. June 4, 2021); *Oviedo Town Ctr. II, L.L.P.* v. *City of Oviedo,* No. 6:16–cv–1005, 2017 WL 3621940, at *4 (M.D. Fla. Aug. 23, 2017) (utilizing 2013 Rule to analyze disparate impact claim)

[99] For example, the pleading standards used in *Oviedo Town Ct, II, L.L.P.* v. *City of Oviedo, Florida,* 759 Fed. App'x at 833–35, and *River Cross Land Co., LLC* v. *Seminole Cty.,* 2021 WL 2291344, at *22–24, are not inconsistent with the 2013 Rule. In addition, both *Cnty. of Cook, Ill.* v. *Wells Fargo & Co.,* 314 F. Supp. 3d 975, 990 (N.D. Ill. 2018) and *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d at 22, incorrectly relied on dicta when they stated that *Inclusive Communities* created higher pleading standards in disparate impact cases.

[100] *Inclusive Cmtys. Project, Inc.* v. *Lincoln Prop. Co.,* 920 F.3d at 899 (5th Cir. 2019).

[101] *National Cable & Telecommunications Assn.* v. *Brand X internet Services,* 545 U.S. 967, 980 (2005) (holding that agency interpretation of statute can override prior judicial interpretation when the statute is ambiguous and agency interpretation is reasonable).

**App.185**

In short, HUD does not believe that the cases cited by the commenters support revisions to the rule.

*Issue:* Commenters stated that the proposed rule conflicts with what they characterized as *Inclusive Communities'* holding that a "robust causality requirement . . . protects defendants from being held liable for racial disparities they did not create." Some commenters asked HUD to expressly add a robust causality requirement to the final rule, while others asked HUD to retain the 2020 Rule, stating that it appropriately reflected *Inclusive Communities'* robust causality requirement.

Some commenters urged HUD to adopt the view that, in stating that disparate impact claims may not be established simply by demonstrating a "statistical disparity" in outcomes, *Inclusive Communities* held that such claims must meet a higher causation standard than in the proposed rule. Other commenters stated that the proposed rule does not require proximate cause or a direct link between the policy and the discriminatory effect, which, they said, *Inclusive Communities* requires. Commenters said that if plaintiffs are not required to establish "robust causality" or "direct proximate cause," defendants would be liable in cases where discrimination does not actually exist. Commenters also stated that without an explicit robust causality requirement, race will be used in a pervasive way, leading to the use of numerical quotas and raising constitutional questions. Commenters stated that the requirement is necessary so that regulated entities can make practical business choices and profit-related decisions. A commenter suggested revising the proposed rule to provide that to establish robust causality, the plaintiffs have the burden of proving that a challenged practice is the sole and proximate cause, or reasonably predicted cause, of a discriminatory effect.

Commenters who supported the proposed rule said that it incorporates *Inclusive Communities'* protections for defendants who may fear liability for disparities their policies did not create. Commenters noted that the proposed rule does not permit liability based on statistical disparities alone.

*HUD Response:* The 2013 Rule and this final rule contain a robust causality requirement by requiring the plaintiff to prove at the first step of the framework that a challenged practice caused or predictably will cause a discriminatory effect. As discussed above, in HUD's view, the framework in this final rule, which includes the requirement that the

challenged practice causes a discriminatory effect, is consistent with *Inclusive Communities.* The *Inclusive Communities* Court did not announce a heightened causality requirement for disparate impact liability, a requirement which would find no support in the statutory text or case law. Rather, in considering a district court opinion where the trial court had found a violation of the Act without ever requiring the plaintiff to identify a causal link between a specific policy and the challenged disparate impact, the Court merely reiterated that plaintiffs must identify a causal link between the challenged practice and the alleged disparate impact that is sufficiently robust to permit that connection to be scrutinized at each stage of the case. The 2013 Rule, and this final rule require exactly that. The 2013 Rule and this final rule do not use the precise words "robust causality" and (as explained elsewhere in this preamble) nothing in *Inclusive Communities* requires these words. What *Inclusive Communities* requires is that a court's examination of causality be robust. Both the 2013 Rule and this final rule implicitly incorporate this requirement by requiring a plaintiff to link a specific practice to a current or predictable disparity. Ultimately, the error identified both by the Fifth Circuit and then by the Supreme Court in *Inclusive Communities* came from the district court's failure to fully apply the 2013 Rule's framework, not the 2013 Rule's framework itself. Through its framework this rule ensures that, as required by *Inclusive Communities,* defendants are not held liable for racial disparities they did not create.[102] The rule thus already requires a showing of causation, not just correlation, between the policy or practice and the disparate impact, and so is fully consistent with *Inclusive Communities.*

HUD also believes that the rule's burden-shifting framework does not preclude businesses from making business and profit-motivated choices, even if they cause a discriminatory effect, so long as they do not create an *unjustified* discriminatory effect. Once a plaintiff meets its burden of proving that a policy causes a disparate impact because of a protected characteristic, the burden then shifts to the defendant to prove that the policy is necessary to

serve the defendant's substantial, legitimate, nondiscriminatory interest. This safeguard allows housing providers and others to make practical business choices and profit-related decisions. The third step of the framework then shifts the burden back to the plaintiff to prove that an alternative policy would have a less discriminatory effect than the challenged policy. This rule balances the interests of the parties by allowing defendants to implement policies that meet their needs, as long as there is no unjustified discriminatory effect, while providing plaintiffs the opportunity to identify policies that serve those needs with less discriminatory effects based on protected characteristics.

HUD notes further that although the 2013 Rule has been in effect for ten years—with similar judicial precedent effective even longer, it is unaware of any case applying the 2013 Rule in a manner that would impose quotas.

*Issue:* Commenters requested that HUD include in the final rule a requirement that plaintiffs plead that the challenged policy is "artificial, arbitrary, and unnecessary" in addition to the traditional elements of a disparate impact claim, as the 2020 Rule did. Commenters stated that *Inclusive Communities* required this additional element when the Court stated that "[d]isparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers' " to "avoid the serious constitutional questions that might arise under the Act, for instance, if such liability were imposed based solely on a showing of a statistical disparity."[103] Another commenter explained that the district court in *Massachusetts Fair Housing Center* did not invalidate the "arbitrary, artificial, and unnecessary" language in the 2020 Rule, but rather noted that it came from *Inclusive Communities* and other case law, like *Ellis* v. *City of Minneapolis,* 860 F.3d 1106, 1112 (8th Cir. 2017).

Other commenters disagreed, stating that if such a requirement were added to the rule, it would be impossible to challenge discriminatory policies absent facts showing discriminatory intent, thus negating *Inclusive Communities'* holding that violations of the Act may be established through proof of disparate impact. The commenters explained that pleading that a policy is "artificial" is essentially pleading that a policy is pretextual—a showing required in cases alleging intentional discrimination, not discriminatory effects. Commenters also noted that the phrase "artificial, arbitrary, and

---

[102] *See Inclusive Cmtys. Project, Inc.,* 576 U.S. at 519, 542 (describing robust causality as requiring that a plaintiff draw a connection between the defendant's challenged policy causing the alleged disparity, noting that this ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create.)

[103] *Id.* at 540.

**App.186**

unnecessary'' originated in *Griggs* and pointed out that in applying this phrase in Fair Housing Act cases, courts have applied it consistent with the 2013 Rule's burden shifting framework, essentially using it as short-hand for the three-step framework, not as a separate, independent element. As examples, these commenters cited *City of Black Jack*,[104] which *Inclusive Communities* describes as a heartland case, as well as *Graoch Assocs. #33, L.P.* v. *Louisville/ Jefferson Cty. Metro Human Relations Comm'n*.[105] A commenter stated that the three-step burden-shifting framework, and especially the defense at the second step—that the policy was necessary to achieve a legitimate interest—already ensures that as the *Inclusive Communities* Court described, ''disparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies.''

*HUD Response:* HUD declines to add an ''artificial, arbitrary, and unnecessary'' pleading standard or substantive element to this final rule. As previously explained, HUD does not construe *Inclusive Communities* to require the agency to add specific elements or pleading standards for disparate impact cases that go beyond what ''has always'' been required.[106] Rather, when the *Inclusive Communities* Court quoted *Griggs'* decades-old formulation that disparate impact claims require the removal of artificial, arbitrary, and unnecessary barriers, it did so as part of restating the safeguards and requirements that it found (and HUD agrees) have always been a part of disparate impact jurisprudence. In this context, the Court quoted *Griggs'* short-hand formulation for the type of policy that traditionally has been held to create an unjustified discriminatory effect at the end of the burden shifting analysis. HUD believes that *Inclusive Communities,* following *Griggs* as well as earlier Fair Housing Act cases, went on to describe policies invalidated by longstanding precedent as either ''arbitrary'' or ''artificial'' as a shorthand for those found to violate the Fair Housing Act under traditional jurisprudence.[107] HUD does not believe

this language, when read in context, is best read to require the agency to impose a requirement for plaintiffs and the charging party to plead and prove, in addition to the traditional elements, that policies are artificial *and* arbitrary *and* unnecessary. HUD notes, moreover, that the source of this language is *Griggs*, a decades-old case at the bedrock of disparate impact jurisprudence, and notes that *Griggs* did not require plaintiffs to establish that the practice at issue met each of these three descriptors, let alone that such evidence be pleaded in a complaint. In addition, HUD believes that reading *Inclusive Communities* or other cases to support a heightened pleading standard for plaintiffs, such as in the 2020 Rule, is contradicted by the fact that the ''heartland'' cases cited favorably by the Court would not have survived a motion to dismiss under that standard because plaintiffs in those cases did not allege facts that would plausibly support a claim that a policy or practice was arbitrary, artificial, and unnecessary to the extent those terms are construed as requiring more than satisfaction of the traditional elements. Simply put, in HUD's experience implementing the Fair Housing Act, plaintiffs likely would not have had access to such facts until after discovery.[108] HUD further believes that adding such a standard would also conflict with the text and broad remedial purpose of the Act which provides ''within constitutional limitations, for fair housing throughout the United States.'' [109] HUD thus concludes that a heightened pleading and proof standard would frustrate the clearly expressed intent to use the maximum allowable power under the law to secure equal housing opportunity. Finally, HUD observes that *Inclusive Communities* did not specify how courts and agencies should apply a new pleading and proof standard, nor did it come close to clearly stating that it intended to create new elements. To the extent this leaves ambiguity in the law, as a matter of policy, HUD believes it is preferable to retain existing standards that have decades of case law and administrative actions specifying their content rather than impose ones that are undefined and untested.

### Comments on Bank of America

*Issue:* Commenters stated that the proposed rule is inconsistent with *Bank of America Corp.* v. *City of Miami*,[110] a 2017 Supreme Court case which held that ''proximate cause under the [Act]

requires some direct relation between the injury asserted and the injurious conduct alleged.'' A commenter suggested that HUD add the phrase ''some direct relation'' to the proposed rule's burden of proof standard. Another commenter suggested revising the proposed rule to provide that in order to establish a ''robust causal link,'' the plaintiffs have the burden of proving that a challenged practice is the sole and proximate cause, or reasonably predicted cause, of a discriminatory effect.'' Another commenter suggested that HUD state that the causation analysis must consider whether a practice is too remote to give rise to liability.

*HUD Response:* HUD believes that it is not required to add language to this rule to ensure consistency with *Bank of America*. In that case, which involved a municipality suing a lender on the theory that predatory lending practices had caused foreclosures which in turn eventually led to damages to the municipality such as reduced tax revenues, the Supreme Court held that, because actions for damages under the Act are akin to tort actions, such suits are ''subject to the common-law requirement that loss is attributable to the proximate cause, and not to any remote cause.'' [111] The Court declined to further explain the proximate cause requirement as applied to Fair Housing Act claims and did not suggest that such a requirement would otherwise alter analyses under the Act. For example, HUD believes that *Bank of America* has no impact on the ability of organizational plaintiffs to prove standing by tracing their injuries to the challenged policy.[112]

HUD believes, although the *Bank of America* decision was in the context of a disparate impact claim, it is not inherently specific to and does not create an additional burden for disparate impact claims. To the contrary, HUD believes that the proximate cause requirement *Bank of America* described for standing applies to all Fair Housing Act cases, not just disparate-impact claims, and so HUD does not believe it is appropriate to add a proximate-cause requirement to the regulatory requirements that are specific to disparate-impact claims. More broadly, this rule does not purport to address the requirements for Fair Housing Act standing, and neither *Bank of America* nor any other case requires HUD to add such considerations to this rule. Accordingly, HUD believes that

---

[104] *City of Black Jack,* 508 F.2d at 1184–1185.

[105] *Graoch Assocs. #33, L.P.,* 508 F.3d 366, 374–75 (6th Cir. 2007) (''We use the burden-shifting framework described above—and especially the final inquiry considering the strength of the plaintiff's statistical evidence and the strength of the defendant's business reason—to distinguish the artificial, arbitrary, and unnecessary barriers proscribed by the FHA from valid policies and practices crafted to advance legitimate interests.'').

[106] *Inclusive Cmtys.* 576 U.S. at 540.

[107] *Inclusive Cmtys. Project,* 576 U.S. at 539–541.

[108] *Supra* at n. 78.

[109] 42 U.S.C. 3601.

[110] 137 S. Ct. 1296 (2017).

[111] *Id.* at 1305.

[112] *Havens Realty Corp.* v. *Coleman,* 455 U.S. 363 (1982).

**App.187**

adding the suggested language to this final rule, which purports only to set out the framework for analyzing the merits of disparate impact claims, is unnecessary. Nothing in this rule creates a conflict with *Bank of America* or bars a court from applying its requirements. This rule simply does not touch on that subject matter.

HUD additionally observes that, in its view, *Bank of America* applies to claims such as the one in that case that involve unusual claims in which the policy challenged has an unusually attenuated connection to the alleged harm to the plaintiff. HUD does not construe *Bank of America* as having a larger impact on longstanding principles of Fair Housing Act standing.

*Discriminatory Effects as Applied to Insurance* [113]

*Issue:* Commenters asked HUD to exempt homeowners insurance—in whole or in part, as well as risk-based pricing and underwriting in particular— from liability for any unjustified discriminatory effects, advancing a number of reasons. Among other things, commenters stated that the fundamental nature of insurance does not allow discriminatory effects liability; such claims cannot succeed as a matter of law; and the McCarran-Ferguson Act [114] bars claims. A commenter said that applying the rule to insurers is unnecessary because there have been no allegations or findings of unlawful discriminatory effects against an insurer prior to or since 2013. Other commenters disagreed, stating that HUD should not create exceptions for any industry, including insurance, because such categorical exemptions are unworkable and inconsistent with the Act's purpose, which is broad and inclusive. Commenters also stated that exemptions would allow some discriminatory practices to go uncorrected.

*HUD Response:* HUD declines to provide an exemption for the insurance industry in whole or in part. HUD responds below to the specific reasons commenters advanced for exempting homeowners insurance. However, as a threshold matter, HUD lacks the authority to create exemptions that are not in the text of the Act. When Congress passed the Act in 1968 and amended it in 1988, it established exemptions for certain practices but not for insurance. [115] Furthermore, courts have routinely applied the Act to insurers and have found that discriminatory effects liability applies to insurers under the Act. [116] Moreover, nothing in this rule precludes insurers from raising a defense based on the McCarran-Ferguson Act [117] or from

arguing that claims cannot succeed as a matter of law in particular cases. What HUD is declining to do, and what it believes it has no authority to do, is provide a single industry or a set of specific practices a blanket exemption from liability from all claims regardless of whether those claims otherwise would satisfy the rule's (and the Act's) requirements.

As further explained above and below, the Fair Housing Act was intended to have a very broad impact on housing and communities across the country. The plain text, purpose, and structure purpose, structure, and plain language of the Act make clear that the Act was intended to apply to all sectors of the housing industry so that each would have common duties under the Act. For example, the plain text of the Act does not refer to an actor, but rather a prohibited action, meaning that all actors in all sectors of the housing industry are subject to the Act. [118] With regard to purpose, the Act was enacted to replace segregated neighborhoods with "truly integrated and balanced living patterns." [119] It was structured to address discriminatory housing practices that affect "the whole community" as well as particular segments of the community, [120] with the goal of advancing equal opportunity in housing, and to "achieve racial integration for the benefit of all people in the United States." [121]

---

[113] Many of the issues raised by commenters regarding the application to insurance in response to the proposed rule were also raised in commenting on the 2013 rule. HUD's 2016 Supplemental Responses covers these issues in depth. "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance." 81 FR 69012. In considering these comments, HUD has reviewed the 2016 Supplemental Responses and believes the responses made there continue to accurately reflect HUD's interpretation of discriminatory effects law.

[114] 15 U.S.C. 1011 *et.seq.*

[115] *See Sierra Club* v. *EPA,* 719 F.2d 436, 453 (D.C. Cir. 1983) ("The agency relies on its general authority under section 301 of the Act to 'prescribe such regulations as are necessary to carry out [its] functions under [the Act]' . . . EPA's construction of the statute is condemned by the general rule that when a statute lists several specific exceptions to the general purpose, others should not be implied."); *see, e.g., Colorado Pub. Int. Rsch. Grp., Inc.* v. *Train,* 507 F.2d 743, 747 (10th Cir. 1974) rev'd on other grounds, 426 U.S. 1 (1976) ("Another cardinal rule of statutory construction is that where the legislature has acted to except certain categories from the operation of a particular law, it is to be presumed that the legislature in its exceptions intended to go only as far as it did, and that additional exceptions are not warranted."); *Nat. Res. Def. Council, Inc.* v. *Costle,* 568 F.2d 1369, 1377 (D.C. Cir. 1977) (courts cannot manufacture a "revisory power" granting agency authority to act "inconsistent with the clear intent of the relevant statute"); *Alabama Power Co.* v. *Costle,* 636 F.2d 323, 357 (D.C. Cir. 1979) ("[T]here exists no general administrative power to create exemptions to statutory requirements based upon the agency's perceptions of costs and benefits."); *see also Graoch,* 508 F.3d at 375. ("[n]othing in the text of the FHA instructs us to create practice-specific exceptions.").

[116] *See Ojo* v. *Farmers Group, Inc.,* 600 F.3d 1205, 1208 (9th Cir. 2010) (finding that the Act applies to insurers; *NAACP* v. *Am. Fam. Mut. Ins. Co.,* 978 F.2d 287, 297–301 (7th Cir. 1992) (finding that the Act applies to insurers); *Nationwide Mut. Ins. Co.* v. *Cisneros,* 52 F.3d 1351, 1355–1360 (6th Cir. 1995) (finding that HUD's interpretation of the Act as applying to insurers was reasonable); *but see Mackey* v. *Nationwide Ins. Cos.,* 724 F.2d 419, 423–25 (4th Cir. 1984) (pre-Fair Housing Amendments Act and regulations pursuant thereto holding that Act does not cover insurance); *see also Dehoyos* v. *Allstate Corp.,* 345 F.3d 290, 293 (5th Cir. 2003) (affirming a district court's denial of a motion to dismiss allegations that a credit scoring system used by an insurer had an unjustified discriminatory effect because it resulted in higher rates for non-white customers); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017) (denying a motion to dismiss allegations that defendant's policy of declining to insure properties where landlords accept Section 8 vouchers has an unjustified discriminatory effect); *Viens* v. *Am. Empire Surplus Lines Ins. Co.,* 113 F. Supp. 3d 555, 558 (D. Conn. 2015) (denying motion to dismiss allegations that defendant insurer's insurance underwriting criteria that charge higher premiums or deny coverage to landlords who rent apartments to tenants receiving Section 8 housing assistance has an unjustified discriminatory effect); *Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am,* 208 F. Supp. 2d 46, 50, 60–61, 63 (D.D.C. 2002) (denying a motion to dismiss allegations that certain of defendant's minimum underwriting requirements for certain types of coverages, such as a "replacement cost" policy had an unjustified discriminatory effect).

[117] The McCarran-Ferguson Act specifically provides that "[n]o Act of Congress shall be

construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. 1012(b). As interpreted by the Supreme Court in *Humana* v. *Forsyth,* McCarran-Ferguson applies only when a particular application of a federal law directly conflicts with a specific state insurance regulation, frustrates a declared state policy, or interferes with a State's administrative regime. *Humana* v. *Forsythe,* 525 U.S. 299, 310 (1999) ("When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.").

[118] *E.g.* 42. U.S.C. 3604(a) ("it shall be unlawful to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny a dwelling to any person because of" a protected trait); *NAACP* v. *American Family Mut. Ins. Co.,* 978 F.2d 287, 298 (7th Cir. 1992) (noting that Congress banned an outcome while not saying who the actor is and holding that the Act applies to insurers); *see also Ojo* v. *Farmers Group Inc.,* 600 F.3d 1205, 1208 (9th Cir. 2010) (deferring to HUD's reasonable interpretation of the statutory language that the Act applies to insurance).

[119] *Trafficante,* 409 U.S. at 211 (citing 114 Cong. Rec. 3422 (Feb. 20, 1968) (statement of Senator Mondale)).

[120] *Trafficante,* 409 U.S. at 211 (citing 114 Cong. Rec. 2706 (1968) (Statement of Senator Javits)).

[121] H.R. Res. 1095, 110th Cong., 154 Cong. Rec. H2280–01 (April 15, 2008).

**App.188**

The Supreme Court in *Inclusive Communities* similarly noted that the Act ''was enacted to eradicate discriminatory practices within a sector of our Nation's economy'' and discussed that the viability of disparate impact claims is ''consistent'' with the Act's ''central purpose.'' [122] In order to ''eradicate'' discriminatory practices within the housing sector, as the Court acknowledged was the purpose of the Act, it would logically flow that the Act was intended to apply to all sectors of the housing industry. Notably, the court used strong language, saying the purpose was to ''eradicate,'' rather than weaker language like ''reduce,'' making clear that the Act was meant to reach all sectors, otherwise eradication would not be possible. Nor did the Court suggest that any portion of the housing sector was not reached by the Act.

In HUD's experience, insurance plays a significant role in the housing industry and in securing equal opportunity in housing in communities nationwide. Home seekers must be able to access mortgage insurance and homeowners insurance in order to become home owners. Multifamily housing owners and managers must be able to obtain property and hazard insurance in order to obtain financing and manage the risks of their operations. These examples show how different sectors of the housing economy interact, and how the exclusion of one sector of the housing economy from the Act's coverage would pose a barrier to equal opportunity in housing. In its fair housing investigations, HUD has encountered housing providers who will not rent to individuals with disabilities because of insurance-related concerns.[123] HUD is also aware that multifamily housing providers face barriers obtaining insurance when they attempt to lease to low-income families, including people of color and individuals with disabilities who use voucher programs to pay rent.[124]

Because of the pivotal role insurance plays in all types of housing, an exemption or safe harbor would undermine and be contrary to the Act's broad purposes.

Even if HUD had authority to exempt insurance categorically, HUD finds that such an exemption for a single industry would neither be workable nor consistent with the purpose of the Act. HUD makes this determination for the reasons it stated in its 2016 Supplemental Notice regarding this subject, some of which is reiterated here, as well as for the following additional reasons. Congress has stated that the Act is intended to provide for fair housing throughout the United States,[125] and the Supreme Court has recognized the Act's broad remedial purpose.[126] The Act's prohibitions on discrimination in housing are intended to eliminate segregated living patterns and move the nation toward a more integrated society.[127] Among other things, the Act requires HUD to affirmatively further fair housing in all of its housing-related programs and activities,[128] one of which is the administration and enforcement of the Act.[129] HUD finds that wholesale exemptions for insurance practices would contravene the text and purposes of the Act, and, as explained further below, would also likely be overbroad in most if not all instances, as such an

exemption would allow some practices with unjustified discriminatory effects to go uncorrected. HUD also finds that wholesale exemptions also would be likely to immunize potential intentional discrimination in the insurance market, because as the court in *Inclusive Communities* stated, ''disparate-impact liability under the [Fair Housing Act] also plays a role in uncovering discriminatory intent.'' [130] As the Court found in that case, the availability of disparate-impact claims, ''permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment.'' [131]

HUD notes that multiple court decisions have long found discriminatory effects claims against insurance practices to be actionable.[132] And even if the commenters were correct that the industry's practices generally will not give rise to discriminatory effects liability, that fact does not provide a sufficient justification for exempting the entire industry from liability in all circumstances, even where there is a practice with an unjustified discriminatory effect. Especially in light of the broad remedial purposes of the Act, HUD finds that the final rule strikes the appropriate balance for insurance industry practices. Furthermore, HUD notes that some types of discrimination are more difficult than others to prove, and this is particularly true when individuals who are denied a service or quoted a particular price for a service in a residential real estate-related transaction would typically have no way of knowing the specific reasons for a denial or pricing decision. Simply because claims are difficult to prove and may not end up in litigation does not mean that the underlying conduct can

---

[122] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 539.

[123] *See. e.g.* Charge, *HUD* v. *McClendon,* No. 09–04–1103–8, (2005), *https://www.hud.gov/sites/documents/DOC_14391.PDF* (alleging that landlord ''informed Complainant that she needed to seek housing elsewhere at a place for persons with moderate to severe disabilities because the property insurance only covered mild disabilities''); *HUD* v. *Twinbrook Vill. Apts.,* HUDALJ Nos. 02–00–0256–8, 02–00–0257–8, 02–00–0258–8, 2001 HUD ALJ LEXIS 82, (HUD ALJ Nov. 9, 2001) (respondent requested that complainants obtain insurance to cover any liability resulting from injury associated with ramps installed to make unit accessible).

[124] *See e.g. Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017) (denying motion to dismiss allegations that defendant's policy of declining to insure properties with Section 8 voucher tenants has an unjustified discriminatory effect); *Viens* v. *Am. Empire Surplus*

*Lines Ins. Co.,* 113 F. Supp. 3d 555, 558 (D. Conn. 2015) (denying motion to dismiss allegations that defendant insurer's underwriting criteria charging higher premiums or denying coverage to landlords who rent to tenants receiving Section 8 housing assistance has an unjustified discriminatory effect).

[125] *See* 42 U.S.C. 3601.

[126] *See Havens Realty Corp.,* 455 U.S. at 380 at 209 (recognizing Congress's ''broad remedial intent'' in passing the Act); *Trafficante,*409 U.S. at 209 (recognizing the ''broad and inclusive'' language of the Act); *see also Inclusive Cmtys. Project Inc.,* 576 U.S. at 539 (describing the ''central purpose'' of the Act as ''to eradicate discriminatory practices within a sector of our Nation's economy'').

[127] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 546–47; 114 Cong. Rec. 2276, 3422 (1968) (Statement of Sen. Mondale) (the purpose of the Act was to replace ''ghettos'' with ''truly integrated and balanced living patterns.''); 114 Cong. Rec. 2276, 9559 (1968) (Statement of Congressman Celler) (there is a need to eliminate the ''blight of segregated housing''); 114 Cong. Rec. 2276, 9591 (1968) (Statement of Congressman Ryan) (the Act is a way to ''achieve the aim of an integrated society'').

[128] 42 U.S.C. 3608(e)(5).

[129] *See, e.g.,* 42 U.S.C. 3608 (the Secretary's administrative responsibilities under the Act), 3609 (education, conciliation, conferences, and reporting obligations to further the purposes of the Act), 3610 (investigative authority), 3611 (subpoena power), 3612 (administrative enforcement authority), 3614a (rulemaking authority), 3616 (authority to cooperate with state and local agencies in carrying out the Secretary's responsibilities under the Act), 3616a (authority to fund of state and local agencies and private fair housing groups to eliminate discriminatory housing practices prohibited by the Act).

[130] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 540.

[131] *Id.*

[132] *See Dehoyos,* 345 F.3d at 293 (affirming a district court's denial of a motion to dismiss allegations that a credit scoring system had an unjustified discriminatory effect because it resulted in higher rates for non-white customers); *see also Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017) (denying a motion to dismiss allegations that defendant's policy of declining to insure properties where landlords accept Section 8 vouchers has an unjustified discriminatory effect); *Viens,* 113 F. Supp. 3d at 558 (denying motion to dismiss allegations that defendant insurer's insurance underwriting criteria that charge higher premiums or deny coverage to landlords who rent apartments to tenants receiving Section 8 housing assistance has an unjustified discriminatory effect); *Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am,* 208 F. Supp. 2d 46, 50, 48–49, 60–61 (D.D.C. 2002) (denying a motion to dismiss allegations that certain of defendant's minimum underwriting requirements for certain types of coverages, such as a ''replacement cost:'' policy had an unjustified discriminatory effect).

or should be exempted from regulation in all instances.

HUD finds that the concerns raised by the insurance industry do not outweigh these fundamental considerations. This rule sets out a framework by which liability under the Act may be determined; liability arises only for those insurance practices that actually or predictably result in a discriminatory effect and lack a legally sufficient justification. The framework takes into account any defendant's legitimate interest in the challenged practice—including an insurance defendant. As discussed below, HUD finds that any conflict with a specific state insurance law can and should be addressed on a case-by-case basis in the context of that state law.

In sum, the case-by-case approach set out in this final rule appropriately weighs the relevant factors, which include HUD's obligation to enforce the Act, the diversity of potential discriminatory effects claims, the variety of insurer business practices, and the differing insurance laws of the states, as they currently exist or may exist in the future. Given these considerations, HUD believes that it would be impossible for the agency to define the scope of insurance practices covered by an exemption with enough precision to avoid case-by-case disputes over its application. Accordingly, HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with HUD's statutory mandate.

*Issue:* Commenters stated that if HUD does not provide an exemption for insurance practices, insurers would be forced to evaluate whether their practices lead to segregation and to learn what statistical disparities are permissible.

*HUD Response:* HUD disagrees. Any obligation to evaluate practices comes from the language of the Act itself, not this final rule. As explained above, this final rule does not impose any new liability upon insurers, so it will not require insurers to start new reviews of their practices. Any such obligation to review their practices arose long before the 2013 Rule was promulgated and originates from the statutory language.[133] Judicial precedent applying

disparate impact analysis to insurance companies long predates the 2013 Rule, let alone this rule.[134] Any costs entities may now choose to incur will not be due to any new requirement, and in any case will simply be the ordinary costs of complying with any preexisting statute, administrative practice, and case law governing nondiscrimination in housing and housing-related practices. In any event, evaluating and re-evaluating current practices are not unreasonably burdensome activities for a business or industry to undertake. As explained elsewhere, many other industries, such as lending, engage in risk-based practices and show that it is possible to consistently evaluate and re-evaluate their policies and practices to endeavor to avoid those that may cause unjustified discriminatory effects. Yet those industries have not suffered the dire consequences that the insurance industry claims it will suffer. HUD does not believe the insurance industry stands on different footing from other industries in that respect such as to warrant differential treatment.

*Issue:* Commenters, citing *NAACP* v. *Am. Family Mut. Ins. Co.*,[135] asked HUD to exempt all homeowners insurance practices from liability for unjustified discriminatory effects, stating that the Act covers only insurance practices that make housing unavailable, thus effectively precluding homeownership. Homeowners insurance practices, they stated, do not make housing unavailable. In addition, citing *Southend Neighborhood Improvement Assoc.* v. *St. Clair*,[136] commenters stated that section 804(b)'s prohibition against discrimination in the provision of services in connection with the sale or rental of a dwelling applies only to

services generally provided by governmental units, such as police and fire protection or garbage collection, not insurance.

*HUD Response:* HUD declines to exempt homeowners insurance from liability for the reasons stated previously and explained more fully below. Neither *NAACP* nor *Southend Neighborhood Improvement Ass'n* support such an exemption. The commenters are incorrect in stating that insurance practices cannot make housing unavailable or that the Act only covers insurance practices that make housing unavailable. A discriminatory practice that precludes a person from obtaining homeowners or renters insurance may indeed make housing unavailable to that person, as insurance is usually required as a condition for obtaining a mortgage or a lease. Moreover, while section 804(a) prohibits discrimination that "make[s] unavailable" a dwelling, other provisions in the Act may prohibit insurance practices, including pricing, regardless of whether they make housing unavailable.[137] For example, section 805(a)[138] prohibits discrimination in the "terms or conditions" of "residential real estate-related transactions," and section 804(b)[139] prohibits discrimination in the "terms, conditions or privileges of sale or rental of a dwelling or in the provision of services . . . in connection therewith." Indeed, since 1989, HUD's fair housing regulations have specifically prohibited "[r]efusing to provide . . . property or hazard insurance for dwellings or providing such . . . insurance differently" because of a protected characteristic.[140]

[133] 42 U.S.C. 3601 *et. seq.; see, e.g., Dehoyos* v. *Allstate Corp.,* 345 F.3d 290, 293 (5th Cir. 2003); *see also* Owens v. *Nationwide Mut. Ins. Co.,* Civ. No. 3:03–CV–1184–H, 2005 U.S. Dist. LEXIS 15701, at *44–53 (N.D. Tex. Aug. 2, 2005); *Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am,* 208 F. Supp. 2d 46, 60–61 (D.D.C. 2002); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017).

[134] *See Dehoyos,* 345 F.3d 290, 293 (5th Cir. 2003) (affirming a district court's denial of a motion to dismiss allegations that a credit scoring system had an unjustified discriminatory effect because it resulted in higher rates for non-white customers); *see also Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017) (denying a motion to dismiss allegations that defendant's policy of declining to insure properties where landlords accept Section 8 vouchers has an unjustified discriminatory effect); *Viens,* 113 F. Supp. 3d 555, 558 (D. Conn. 2015) (denying motion to dismiss allegations that defendant insurer's insurance underwriting criteria that charge higher premiums or deny coverage to landlords who rent apartments to tenants receiving Section 8 housing assistance has an unjustified discriminatory effect); *Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am,* 208 F. Supp. 2d 46, 50, 48–49, 60–61 (D.D.C. 2002) (denying a motion to dismiss allegations that certain of defendant's minimum underwriting requirements for certain types of coverages, such as a "replacement cost" policy had an unjustified discriminatory effect).

[135] *NAACP* v. *American Family Mut. Ins. Co.,* 978 F.2d 287, (7th Cir. 1992).

[136] *Southend Neighborhood Improvement Assoc.* v. *St. Clair,* 743 F.2d 1207 (7th Cir. 1984).

[137] Depending on the circumstances, discriminatory insurance practices can violate 42 U.S.C. 3604(a), (b), (c), (f)(1), (f)(2), 3605, and 3617. *See, e.g., Cisneros,* 52 F.3d at 1360 (holding that HUD's interpretation that section 3604 of the Act prohibits discriminatory insurance underwriting is reasonable); *Nevels v. W. World Ins. Co.,* 359 F. Supp. 2d 1110, 1119–23 (W.D. Wash 2004) (recognizing that sections 3604(f)(1), 3604(f)(2), 3605 and 3617 of the Act cover insurance practices); *Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am.,* 208 F. Supp. 2d at 55–58 (holding that sections 3604(a), 3604(b), and 3605 of the Act prohibit discriminatory insurance underwriting practices); *Owens v. Nationwide Mut. Ins. Co.,* Civ. No. 3:03–CV–1184–H, 2005 U.S. Dist. LEXIS 15701, at *16–17 (N.D. Tex. Aug. 2, 2005) (holding that section 3604 of the Act prohibits discriminatory insurance practices); *Francia v. Mount Vernon Fire Ins. Co.,* No. CV084032039S, 2012 Conn. Super. LEXIS 665, at *24–25 (Conn. Super. Ct. Mar. 6, 2012) (relying on section 3604(c) to interpret an analogous state law as prohibiting a discriminatory statement in an insurance quote).

[138] 42 U.S.C. 3605(a).

[139] 42 U.S.C. 3604(b).

[140] 24 CFR 100.70(d)(4) (emphasis added). As used in this regulation, the phrase "property or

Continued

Courts have applied the Act's provisions to various insurance practices, including insurance pricing,[141] marketing and claims processing, irrespective of whether the discriminatory conduct occurred when the unit became available or in conjunction with or subsequent to the acquisition of a dwelling.[142]

In addition, HUD finds that the commenters have misconstrued the referenced cases. HUD notes, for example, that *NAACP* did not hold that the Act *only* prohibits insurance practices that effectively preclude homeownership; rather, the court, in considering whether the Act prohibited intentional insurance redlining practices, concluded that it did, and affirmed HUD regulations which "include, among the conduct prohibited by section 3604: 'Refusing to provide . . . property or hazard insurance for dwellings or providing such . . . insurance differently because of race.' " [143] In that case, the plaintiff brought suit under both section 804(a), asserting that the insurer made housing unavailable, and section 804(b), asserting that the insurer discriminated in the provision of services in connection with the sale or rental of a dwelling.[144] The Seventh Circuit, in discussing the viability of plaintiff's claims, stated that § 804 "applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant." [145] The

court could not read section 804(b) as requiring a showing that housing was otherwise made unavailable as that language is not present in section 804(b); rather it is in section 804(a). Accordingly, the court's quote cannot be read as applying to the section 804(b) claim especially because it was talking about the plaintiff's claims generally, including its section 804(a) claim, which has the "make unavailable" language. Thus, *NAACP* cannot be fairly read to hold that the Act only applies when insurance practices make housing unavailable.

Furthermore in *NAACP*, the Seventh Circuit also clarified its earlier statement regarding governmental services in *Southend Neighborhood Improvement Ass'n*.[146] In *NAACP*, the court stated, "[w]e once suggested in passing, [in *Southend*] that 'service' in section 3604 means 'services generally provided by governmental units,' but the subject was not before us—and the suggestion that section [804] is limited to governments is hard to reconcile with another plain-statement principle requiring Congress to be especially clear if it wants to regulate the conduct of state and local governments. . .So it is hard to understand section [804] as restricted to garbage collection and like services." [147]

*Issue:* Commenters stated that an exemption for insurance practices is warranted because the judicial and legislative branches have not specifically authorized HUD to become involved in insurance.

*HUD Response:* Congress authorized HUD to interpret and enforce the Act, and as discussed above, provided no exemption for insurance practices.[148] As also discussed above, courts have routinely applied the Act to insurance practices and have found that, as with other housing-related practices, insurers may be liable for practices that create discriminatory effects under the Act.[149]

In promulgating this final rule, HUD is exercising the authority Congress gave it.[150] Any liability originates from the Act itself, not HUD or the rule.

Fundamental Nature of Insurance

*Issue:* Commenters requested an exemption for insurance practices because of the fundamental nature of the industry, alleging that the proposed rule would fundamentally and problematically alter insurance practices. Commenters said that the foundation of the business of insurance is the ability to classify insurance policyholders by risk and that insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly. Commenters stated that the industry is predicated on setting rates and making underwriting decisions based on relevant, mathematical, and objective risk factors that accurately predict loss. Commenters said that risk-based pricing has been a bedrock principle of state insurance regulation for more than 150 years, acting as a primary tool for ensuring rates are adequate, not excessive, not unfairly discriminatory, accurately predictive of risk, and protective of the solvency of insurers. Commenters stated that the insurance market functions best when each insured pays a rate that accurately reflects the cost of providing insurance to similarly-situated policy holders. Commenters stated that although professional underwriters routinely avoid or exclude risks for which they lack expertise, underwriting judgment, or actuarial data, they still are required to consider similar factors bearing on risk of loss and do not consider protected traits.

Commenters noted that risk-based pricing is the primary tool to ensure that rates are not unfairly discriminatory, as defined by state insurance codes. Commenters stated that in the context of insurance, unfair discrimination means treating similar risks in a dissimilar manner, which is different from discrimination under the Act. They stated that a rate is unfairly discriminatory if the premium differences do not correspond to expected losses and average expenses.

Commenters stated that the proposed rule would force insurers to eliminate

---

hazard insurance for dwellings" includes insurance purchased by an owner, renter, or anyone else seeking to insure a dwelling. 42 U.S.C. 3602(b) (defining "dwelling" without reference to whether the residence is owner- or renter-occupied).

[141] *See, e.g., NAACP,* 978 F.2d at 301 ("Section 3604 of the Fair Housing Act applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant."); *Dehoyos,* 345 F.3d at 293 (holding that a claim alleging discriminatory insurance pricing was not barred by McCarran-Ferguson).

[142] *See, e.g., Franklin* v. *Allstate Corp.,* No. C–06–1909 MMC, 2007 U.S. Dist. LEXIS 51333, at *17–19 (N.D. Cal. July 3, 2007) (applying the Act to claims processing); *Burrell* v. *State Farm & Cas. Co.,* 226 F. Supp. 2d 427 (S.D.N.Y. 2002) (same); *see also Owens* v. *Nationwide Mut. Ins. Co.,* Civ. No. 3:03–CV–1184–H, 2005 U.S. Dist. LEXIS 15701, at *17 (N.D. Tex. Aug. 2, 2005) (Insurance practices are covered by the Act "whether the insurance is sought in connection with the maintenance of a previously purchased home or with an application to purchase a home."); *Lindsey* v. *Allstate Ins. Co.,* 34 F. Supp. 2d 636, 643 (W.D. Tenn. 1999) ("It would seem odd to construe a statute purporting to promote fair housing as prohibiting discrimination in providing property insurance to those seeking a home, but allowing that same discrimination so long as it takes place in the context of renewing those very same insurance policies.").

[143] *NAACP* v. *American Family Mut. Ins. Co.,* 978 F.2d 287, 290, 300 (7th Cir. 1992).

[144] *Id.* at 297.

[145] *Id.* at 301.

[146] *Id.* at 299.

[147] *Id.*

[148] 42 U.S.C. 3610; 42 U.S.C 3612; 42 U.S.C 3614a (HUD has the authority to make rules to carry out the Act).

[149] *See Dehoyos,* 345 F.3d at 293 (affirming a district court's denial of a motion to dismiss allegations that a credit scoring system had an unjustified discriminatory effect because it resulted in higher rates for non-white customers); *see also Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017) (denying a motion to dismiss allegations that defendant's policy of declining to insure properties where landlords accept Section 8 vouchers has an unjustified discriminatory effect); *Viens,* 113 F. Supp. 3d at 558 (denying motion to dismiss allegations that defendant insurer's insurance underwriting criteria that charge higher premiums or deny coverage to landlords who rent apartments to tenants receiving Section 8 housing assistance has an unjustified

discriminatory effect); *Nat'l Fair Hous. Alliance* v. *Prudential Ins. Co. of Am,* 208 F. Supp. 2d 46, 50, 48–49, 60–61 (D.D.C. 2002) (denying a motion to dismiss allegations that certain of defendant's minimum underwriting requirements for certain types of coverages, such as a "replacement cost:" policy had an unjustified discriminatory effect).

[150] 42 U.S.C. 3614a.

actuarially sound risk-based practices, which is central to the effective determination of insurance premiums, in favor of substitutes that are less effective at furthering an insurer's legitimate, nondiscriminatory interests. A commenter stated that the proposed rule would penalize insurers for relying on sound risk factors that disproportionately affect a protected class, because they would be held liable for disparities they did not create. A commenter stated that the rule will require uniform rates, regardless of risk. Commenters disagreed with the proposed framework's case-by-case analysis. For example, commenters stated that insurers implement polices accounting for risk factors through actuarially sound methodologies, and that it would be impossible for a plaintiff to identify a less discriminatory alternative because any alternative would necessarily correspond to a different risk than the factor at issue, identified through actuarially sound methodology. As a result, if the plaintiff's alternative was adopted, the risk challenged in the lawsuit would no longer be reflected in the price of insurance, resulting in overcharging low-risk customers and likely driving them from the markets.

Other commenters disagreed, stating that the proposed rule appropriately applies to insurance. A commenter stated that application of the 2013 Rule and 2016 Supplement[151] to insurance is consistent with sound actuarial practices because it accommodates underwriting decisions that satisfy the shifting burden framework. Commenters explained that ratemaking, though largely actuarially based, can incorporate elements of non-actuarially based subjective judgments. Commenters cited ratemaking, price optimization, and credit scoring as examples of insurance practices that are not entirely risk-based. Commenters further noted that consideration of these non-purely risk-based factors had not led to the demise of the industry. A commenter indicated that over the past few decades, the insurance industry has removed barriers that restrict homeowners insurers from writing policies in communities of color and, in response to disparate-impact challenges, some insurers have refined underwriting and pricing systems to eliminate arbitrary barriers to the availability of adequate homeowners coverage, resulting in business growth. Commenters concluded that subjecting insurers to disparate impact liability does not "threaten the fundamental nature of the insurance industry." Commenters noted that other risk-based industries, such as mortgage lending, are subject to liability for unjustified discriminatory effects under the Act and have not had to forego risk-based analysis to avoid liability under the Act.

*HUD Response:* HUD disagrees that the fundamental nature of insurance warrants the exemptions requested by some commenters, whose comments were premised upon the faulty assumption that the proposed rule generally prohibits risk-based practices. It does not. This final rule does not declare any activity per se unlawful. It merely provides a framework for determining if a particular policy or practice causes an unjustified and unlawful discriminatory effect. HUD recognizes that risk-based decision making is an important aspect of sound insurance practices, and nothing in this final rule prohibits insurers from making decisions that are in fact risk-based. Under the framework established by this rule, practices that actually are risk-based, and for which no less discriminatory alternative exists, will not give rise to discriminatory effects liability. The rule simply requires that if an insurer's practices are having a discriminatory effect and "an adjustment . . . can still be made that will allow both [parties'] interests to be satisfied," the insurer must make that change.[152]

Risk-based decision making is not unique to insurance, and discriminatory effects liability has proven workable in other contexts involving complex risk-based decisions, such as mortgage lending, without the need for exemptions or safe harbors. Indeed, all businesses covered by the Act make risk-based decisions. For example, landlords assess risk when they select tenants, set rental rates, and decide whether to require deposits. The Act requires that such risk-based determinations not be based on protected characteristics, in whole or in part. Moreover, some states specifically provide for discriminatory effects liability against insurers under state laws, further undermining the claim that providing for such liability as a matter of federal law threatens the fundamental nature of the industry.[153]

Unfortunately, the history of discrimination in the homeowners insurance industry is long and well documented,[154] beginning with insurers overtly relying on race to deny insurance to persons of color and evolving into more covert forms of discrimination.[155] For example,

---

[151] On October 5, 2016, HUD issued supplemental responses to insurance industry comments in accordance with the court's decision in *Property Casualty Insurers Association of America (PCIAA) v. Donovan,* which upheld the rule's burden-shifting framework for analyzing discriminatory effects claims as a reasonable interpretation of the Fair Housing Act, but that HUD had not adequately explained why case-by-case adjudication was preferable to using its rulemaking authority to provide exemptions or safe harbors related to homeowners insurance. 81 FR 69012; *Prop. Cas. Insurers Ass'n of Am.* v. *Donovan (PCIAA),* 66 F. Supp. 3d 1018, 1049–54 (N.D. Ill. 2014).

[152] *Avenue 6E Invs., LLC,* 818 F.3d at 513.

[153] *Viens,* 113 F. Supp. 3d at 573 n.20 (stating that Connecticut "provides a similar (albeit broader) protection against housing discrimination as the [Act]" and finding that McCarran-Ferguson does not bar an FHA disparate impact claim against an insurer related to a property located in Connecticut).; *Jones* v. *Travelers Cas. Ins. Co. of Am.,* Tr. of Proceedings Before the Honorable Lucy H. Koh U.S. District Judge, No.5:13-cv-02390 LHK (N.D. Cal. May 7, 2015), ECF No. 236 (holding that California law complements the Act and denying an insurer's motion to for summary judgment); *Toledo Fair Hous. Ctr.* v. *Nationwide Mut. Ins. Co,* 94 Ohio Misc. 2d at 157–159 (recognizing discriminatory effects liability in homeowners insurance under state law in part because the Superintendent of Insurance lacks "primary jurisdiction" over such claims).

[154] Although the discussion that follows focuses on race and national origin discrimination because of their historic prevalence, examples of discrimination in insurance against other protected classes exist as well. *See e.g., Nevels* v. *W. World Ins. Co.,* 359 F. Supp. 2d 1110 (W.D. Wash. 2004) (disability).

[155] *See generally, Homeowners' Insurance Discrimination: Hearings Before the S. Comm. on Banking, Housing and Urban Affairs, 103d Cong. (1994) [hereinafter 1994 Hearings]; Insurance Redlining Practices: Hearings before the Subcom. on Commerce, Consumer Protection & Competitiveness of the H. Comm. on Energy and Commerce, 103d Cong. (1993) [hereinafter Mar. 1993 Hearings]; Insurance Redlining: Fact or Fiction: Hearing before the Subcom. On Consumer Credit and Insurance of the H. Comm. on Banking, Finance & Urban Affairs, 103d Cong. (1993) [hereinafter Feb. 1993 Hearing]; Insurance Redlining: Fact Not Fiction [Feb. 1979] [hereinafter Comm'n on Civil Rights] (report of the Illinois, Indiana, Michigan, Minnesota, Ohio and Wisconsin Advisory Committees to the U.S. Commission on Civil Rights); President's National Advisory Panel on Insurance in Riot-Affected Areas, Meeting the Insurance Crisis of Our Cities (1968) [hereinafter Nat'l Advisory Panel].* Further, as the 2016 Supplement stated at times, agents were given plainly discriminatory instructions, such as "'get away from blacks' and sell to 'good, solid premium-paying white people,'" or they simply were told, "We don't write Blacks or Hispanics." *See* 139 Cong. Rec. 22,459 (1993) (statement of Rep. Joseph P. Kennedy, II); *see also,* e.g., Nat'l Advisory Panel, at 116 (quoting an insurance broker as explaining, "No matter how good [a customer] is, they [the insurers] take that into consideration, the fact he is a Negro."). Underwriting guidelines contained discriminatory statements, such as listing "population and racial changes" among "red flags for agents." Feb. 1993 Hearing at 19, 27 (statement of Gregory Squires, Prof. U. Wis. Milwaukee). Minorities were offered inferior products, such as coverage for repairs rather than replacement, or were subject to additional hurdles during the quote and underwriting process. 1994 Hearings at 15, 47–48 (statements of Deval Patrick, DOJ Ass't Attorney Gen. for Civil Rights); *id.* at 18–19, 51 (statements of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity). Additionally,

Continued

**App.192**

minorities were denied access to insurance through property-location and property-age restrictions, even when data demonstrated that such restrictions were not justified by risk of loss.[156] This history of discrimination led to persons of color being unjustifiably denied insurance policies or paying higher premiums.[157] As described more fully

discrimination took the form of insurers redlining predominantly minority neighborhoods and disproportionately placing agents and offices in predominately white neighborhoods. 1994 Hearings at 15, 47–48 (statements of Deval Patrick, DOJ Ass't Attorney Gen. for Civil Rights); *id.* at 18–19, 51 (statements of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity). Minorities also were denied access to insurance through property-location and property-age restrictions, even when data had demonstrated that such restrictions are not justified by risk of loss. *See, e.g.,* Comm'n on Civil Rights, at 34–39 ("The greater the minority concentration of an area and the older the housing, independent of fire and theft, the less voluntary insurance is currently being written."); 1994 Hearings, at 18 (statement of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity) (noting the "disparate impact on minority communities" of property age and value requirements, and explaining that "47 percent of black households, but just 23 percent of white households, live in homes valued at less than $50,000" and that "40 percent of black households compared to 29 percent of white households live in homes build before 1950."); *see also* Transcript of Proceedings Before the Hon. Lucy H. Koh at 29–33, *Jones* v. *Travelers Cas. Ins. Co. of Am,* (N.D. Cal. 2015) (No.5:13-cv-02390) ECF No. 236 (denying defendants motion for summary judgement on a claim alleging that defendant's policy of failing to insure properties that lease to Section 8 participants has an unlawful discriminatory effect because plaintiffs have "presented evidence purportedly establishing a correlation between members of protected classes and Section 8 tenants" and that plaintiffs have presented sufficient evidence that, presets a "factual question for the trier of fact as to whether [defendant] has legitimate, non-discriminatory justifications."); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 28–29 (D.D.C. 2017) (denying motion to dismiss claim alleging that defendant's policy of refusing to insure properties that are rented to Section 8 voucher holders had an unlawful discriminatory effect). In addition, HUD, for example, has issued charges against insurers for intentionally discriminating on the basis of religion by imposing less favorable policy terms on people of a particular religion, and on the basis of sex and familial status when an insurer refused to issue a mortgage insurance policy until the policyholder returned from maternity leave.

[156] *See, e.g.,* Comm'n on Civil Rights, *supra* n. 155 at 34–39 ("The greater the minority concentration of an area and the older the housing, independent of fire and theft, the less voluntary insurance is currently being written."); 1994 Hearings, *supra* n. 155, at 18 (statement of Roberta Achtenberg, HUD Ass't Sec'y of Fair Hous. & Equal Opportunity) (noting the "disparate impact on minority communities" of property age and value requirements, and explaining that "47 percent of black households, but just 23 percent of white households, live in homes valued at less than $50,000" and that "40 percent of black households compared to 29 percent of white households live in homes build before 1950.").

[157] *See, e.g.,* 139 Cong. Rec. 22,459 (1993) (statement of Rep. Joseph P. Kennedy, II) ("[S]hocking anecdotal evidence was supported by 12 years of data submitted by Missouri State Insurance Commissioner Jay Angoff. . . . It shows

in other responses, HUD believes that discriminatory effects liability continues to play an important role in preventing unjustifiable discrimination, including in the insurance industry.

Furthermore, HUD's long experience in administering the Act counsels that discriminatory effects liability does not threaten the fundamental nature of the insurance industry. Putting aside the length of time insurers have been subject to discriminatory effects liability under the statute itself, the industry has been subject to the 2013 Rule for ten years and the calamitous results commenters claimed would come to pass have not occurred. HUD's position that discriminatory effects liability applies to insurance dates back more than three decades, as does the industry's concern that such liability makes it "near impossible for an insurer to successfully defend himself." [158] HUD has maintained for decades that remedying discrimination in insurance, including in cases involving discriminatory effects claims, requires examination of each allegedly discriminatory insurance practice on a case-by-case basis, and HUD sees no reason to deviate now from this longstanding approach.

Based on its experience in administering and enforcing the Fair Housing Act, HUD believes that a broad exemption would immunize a host of potentially discriminatory insurance practices that do not involve actuarial or risk-based calculations, such as marketing, claims processing, and payment. In addition, a discriminatory effects claim can challenge an insurer's underwriting policies as "not purely risk-based" without infringing on the insurer's "right to evaluate homeowners insurance risks fairly and objectively." [159] For example, plaintiffs have challenged insurer policies that deny insurance to landlords because they rent to Section 8 voucher holders.[160] Even practices such as

that, in the cities of St. Louis and Kansas City, low-income minorities had to pay more money for less coverage than their white counterparts, despite the fact that losses in minority areas were actually less than those in white areas. This evidence directly challenges industry assertions that minorities are too risky to insure.").

[158] *Fair Housing Act: Hearings before the Subcom. on Civil and Constitutional Rights of the H. Comm. on the Judiciary,* 95th Cong. 20, 616 (1978) (statement of the Am. Ins. Ass'n.).

[159] *Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am.,* 208 F. Supp. 2d 46, 60 (D.D.C. 2002).

[160] Transcript of Proceedings Before the Hon. Lucy H. Koh at 29–33, *Jones* v. *Travelers Cas. Ins. Co. of Am,* (N.D.Cal. 2015) (No.5:13-cv-02390) ECF No. 236 (denying defendants motion for summary judgement on a claim alleging that defendant's policy of failing to insure properties that lease to Section 8 participants has an unlawful

ratemaking that are largely actuarially-based can incorporate an element of non-actuarially-based subjective judgment or discretion under state law. Indeed, many of the state statutes referenced by commenters that mandate that rates be reasonable, not excessive, not inadequate, or unfairly discriminatory, permit insurers, in the very same section of the insurance code, to rely on "judgment factors" in ratemaking. The example of price optimization practices, which some states have started regulating, illustrates how non-actuarial factors, such as price elasticity of market demand, can impact insurance pricing in a manner similar to the pricing of products in non-actuarial industries.[161] The term "price optimization" can refer to "the process of maximizing or minimizing a business metric using sophisticated tools and models to quantify business considerations," such as "marketing goals, profitability and policyholder retention." [162] The term "price elasticity of demand" refers to "the rate of response of quantity demanded due to a price change. Price elasticity is used to see how sensitive the demand for a good is to a price change." [163] Therefore, by using these practices, insurers are already using factors unrelated to risk to help determine price. Relying on factors unrelated to risk, therefore, has not doomed their business model.

HUD likewise declines to craft a safe harbor for any specific risk-based factor because it would be overbroad, foreclosing claims where the plaintiff could prove the existence of a less discriminatory alternative, such as an alternative risk-based practice.

For HUD to select a few factors for per se exemption as a matter of law based on commenters' bare assertions about

discriminatory effect because plaintiffs have "presented evidence purportedly establishing a correlation between members of protected classes and Section 8 tenants" and that plaintiffs have presented sufficient evidence that, presets a "factual question for the trier of fact as to whether [defendant] has legitimate, non-discriminatory justifications."); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 28–29 (D.D.C. 2017) (denying motion to dismiss claim alleging that defendant's policy of refusing to insure properties that are rented to Section 8 voucher holders had an unlawful discriminatory effect).

[161] Nat'l Ass'n of Ins. Comm'rs, Price Optimization White Paper (Nov. 19, 2015) *https://content.naic.org/sites/default/files/inline-files/committees_c_catf_related_price_optimization_white_paper.pdf* [hereinafter NAIC White Paper] at 9 ¶ 30 ("Price optimization has been used for years in other industries, including retail and travel. However, the use of model-driven price optimization in the U.S. insurance industry is relatively new.").

[162] *Id.* at 4 ¶ 14(a) (discussing the responses of state regulators to the rising increase in use of price optimization practices by insurance providers).

[163] *Id.* at 4 ¶ 14(f) (internal quotations omitted).

**App.193**

their actuarial relevance, without data and without a full survey of all factors utilized by the homeowners insurance industry, would also be arbitrary. Even if such data were available and a full survey performed, safe harbors for specific factors would still be overbroad because the actuarial relevance of a given factor can vary by context.[164] In addition, while use of a particular risk factor may be generally correlated with probability of loss, the ways in which an insurer uses that factor may not be. Furthermore, the actuarial relevance of any given factor may change over time as societal behaviors evolve, new technologies develop, and analytical capabilities improve.

The Act's broad remedial purpose is "to provide . . . for fair housing throughout the United States."[165] Thus, the Act plays a "continuing role in moving the Nation toward a more integrated society."[166] Ensuring that members of all protected classes can access insurance free from discrimination is necessary to achieve the Act's objective because obtaining a mortgage for housing typically requires obtaining insurance.[167] Likewise, obtaining insurance may be a precondition to securing a home in the rental market.[168] Insurance is also critical to maintaining housing because fire, storms, theft, and other perils frequently result in property damage or loss that would be too costly to repair or replace without insurance coverage.

In light of the long, documented history of discrimination in the homeowners insurance industry,[169] including the use of "risk factors" by insurers and regulators that were subsequently banned as discriminatory[170] and the non-actuarial or hybrid nature of many insurance practices, HUD considers it inappropriate to craft any exemptions or safe harbors for insurance practices. HUD's longstanding case-by-case approach can adequately address any concerns and better serves the Act's broad remedial purpose and HUD's statutory obligation to affirmatively further fair housing, including by supporting fair housing efforts undertaken by states.[171]

*Issue:* Commenters opposed the rule or requested an exemption because they believe the rule would force insurers to consider protected traits that are prohibited in the rating and underwriting process and are not risk predictive, contrary to *Inclusive Communities'* caution against injecting race into housing decisions. Commenters wrote that insurance works best when it is blind to protected traits, as they have no relationship to ratemaking or underwriting and that state insurance law prohibits them from using such data to make decisions concerning eligibility, underwriting, and pricing. Commenters also stated that the rule will require insurers to charge different rates for members of different protected classes but similar risk profiles, violating state insurance laws and regulations and compromising insurers' ability to set fair, accurate, and non-discriminatory rates and reliably predict the probable financial consequences of risk. Commenters stated that an insurer could be liable for considering a protected trait or not considering the trait.

*HUD Response:* HUD disagrees that this final rule will force insurers to consider protected traits of individuals in the rating and underwriting process. Instead, to ensure compliance, a regulated entity may wish to examine whether a facially neutral policy or practice causes an unjustified discriminatory effect, as defined by the regulation. This is no different from the analysis that any other entity regulated by the Fair Housing Act, such as mortgage lenders and housing providers, might want to perform to ensure compliance. *Inclusive Communities* rejected the argument that such an analysis would raise equal-protection concerns, reasoning that "awareness of race" can help "local housing authorities [that] choose to foster diversity and combat racial isolation with race-neutral tools."[172]

Such awareness of the impact of facially neutral actions can also benefit other housing providers and entities covered by the Act, including insurers, to achieve the goals that many commenters stated they share, *i.e.,* achieving a more equitable and just society. This sort of awareness of race (and other protected classes), combined with an understanding of how its own policies, practices, and assessment tools impact those protected classes, can inform the covered entity on whether its approach actually or predictably results in a discriminatory effect. HUD notes that awareness of protected traits and the impact of policies based on protected traits is different from considering or making decisions *based upon* a protected trait, which would constitute discriminatory treatment. Commenters pointed to no state law, and HUD knows of no state law, that prohibits insurers from examining their own underwriting factors and practices to determine whether these factors and practices unjustifiably cause a disparate impact on protected classes or otherwise serve as a proxy for race. This kind of self-examination is encouraged, generally, by this final rule, is consistent with *Inclusive Communities* and the Act, and is intended not to lead to liability under the Act but rather to protect entities from liability.[173] Indeed, lenders and others covered by the Act regularly engage in such self-examination without threat to their business models. In sum, the industry has been subject to the 2013 Rule for ten years, and iterations of the same burden-shifting framework as imposed by courts for even longer, and none of these dire outcomes predicted by the industry have come to pass.

*Issue:* Commenters stated that prohibiting risk-based pricing and underwriting, and forcing insurers to consider protected traits, would lead to negative consequences. Commenters stated that the proposed rule could lead to serious and damaging unintended consequences for the industry including, interfering with underwriting; destabilizing insurance coverage; threatening insurer solvency; distorting the market; collapsing the industry; and increasing insurance costs and premium rates, having a negative impact on policyholders and small businesses. As another example, commenters stated that the inability to rate risks will make it prohibitively expensive to insure high-risk properties so insurers will withdraw specific lines of business or insure only low-risk

---

[164] For example, in some high-crime neighborhoods the higher-than-average risk of loss from theft could be offset by a lower-than-average risk of other losses, such as those caused by weather. Therefore, the legitimacy of declining to issue insurance policies in all locations with high crime rates would depend on other features of those locations.

[165] 42 U.S.C. 3601; *See Havens Realty Corp.,* 455 U.S. at 380 (recognizing Congress's "broad remedial intent" in passing the Act); *Trafficante,* 409 U.S. at 209 (recognizing the "broad and inclusive" language of the Act); *see also Inclusive Cmtys. Project Inc.,* 576 U.S. at 538 (describing the "central purpose" of the Act as "to eradicate discriminatory practices within a sector of our Nation's economy").

[166] *Inclusive Cmtys. Project Inc.,* 576 U.S. at 547.

[167] *NAACP,* 978 F.2d at 297 ("No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable.").

[168] *See, e.g.,* Or. Rev. Stat. 90.222(1) ("A landlord may require a tenant to obtain and maintain renter's liability insurance in a written rental agreement.").

[169] See sources cited *supra* note 155.

[170] See sources cited *supra* note 155.

[171] *Cf. Crossroads Residents Organized for Stable and Secure ResiDencieS,* , 2016 U.S. Dist. LEXIS 86965 at *32 n.6 (declining to adopt a per se rule that a certain category of disparate impact claims could not be brought in part because "HUD has indicated a preference for case-by-case review of practices alleged to cause a disparate impact").

[172] *Inclusive Cmtys. Project Inc.,* 576 U.S. at 545.

[173] *See* 24. CFR. 100.140 (discussing voluntary self-testing conducted by lenders).

**App.194**

properties. Commenters stated, citing to *NAACP*, that charging the same rates to individuals posing different levels of risk results in lower-risk individuals subsidizing higher risks, eliminating incentives for insureds to mitigate risk, forcing low-risk consumers out of the market [174] and diminishing insurers' ability to broadly spread risk.

*HUD Response:* HUD disagrees with the commenters' views on the final rule's impact on the fundamental nature of insurance and that such negative consequences will come to pass. Each example is premised upon the faulty assumption that the rule prohibits risk-based practices or would require insurers to use protected traits. As explained in further detail above, it does not. The rule merely provides a framework for determining if a particular policy or practice causes an unlawful discriminatory effect. Furthermore, as noted above, insurers have been subject to discriminatory effects liability since well before the 2013 Rule and have been subject to the 2013 Rule for ten years, yet to HUD's knowledge the commenters' fears have not come to pass.[175] Certainly, no commenter has provided any evidence that such fears have materialized.

*Whether Inclusive Communities Supports an Insurance Exemption*

*Issue:* Commenters cited *Inclusive Communities* in support of their request for an exemption for risk-based insurance practices. Commenters stated that applying the rule to insurance would run afoul of the limitations on disparate impact liability articulated in *Inclusive Communities,* and affect their ability to accurately price for risk, making risk assessment more expensive, penalizing consumers, and adversely impacting the insurance market. Some commenters, citing *Inclusive Communities'* discussion of "legitimate business practices," asserted that risk-based insurance practices are examples of legitimate business practices and

merit an exemption. Commenters stated that restricting insurers' use of objective risk-based factors would run afoul of *Inclusive Communities* because it would undermine the Act's purpose and the free-market system by making insurers fearful of liability, restrict innovation, and hold insurers liable for disparities they did not create, irreparably distorting the market.

Other commenters opposed an exemption for insurers, with a commenter specifically noting that *Inclusive Communities* did not discuss exemptions from liability. One commenter noted in *Nat'l Fair Hou. All.* v. *Travelers Indemnity Co.,* the court rejected defendants' argument that *Inclusive Communities* introduced new standards such that insurers could not be held liable, stating that the refusal to provide insurance to Section 8 voucher holders remained the "type of clear, non-speculative, connection . . . that *Inclusive Communities* requires to make out a prima facie claim of disparate impact." [176]

*HUD Response:* HUD finds no support in *Inclusive Communities* for exempting the insurance industry from discriminatory effects liability. As discussed above, *Inclusive Communities* did not introduce any new limitations to discriminatory effects law, did not address the application of the 2013 Rule or disparate impact principles to risk-based homeowners insurance practices, and did not discuss or suggest exemptions to liability for insurers or anyone else. *Inclusive Communities* discusses "business necessity," [177] and "legitimate needs" [178] in the context of the Title VII disparate impact framework, which, like this rule, provides that a practice that is deemed a "business necessity" may still violate the statute if the plaintiff proves there is a less discriminatory alternative.[179] Rather than support an exemption for risk-based insurance practices, this language supports the framework of this final rule. The Court in *Inclusive Communities* also stated that governmental entities "must not be prevented from achieving legitimate objectives." [180] This requirement is

consistent with the final rule which, at the second step allows the defendant to show that a challenged practice serves a substantial, legitimate, non-discriminatory interest, so as to defeat a disparate impact claim unless the plaintiff can prove there is a less discriminatory alternative that serves that substantial, legitimate, nondiscriminatory interest.

*Issue:* Commenters stated that because the facts in *Inclusive Communities* involve decisions on the location of housing, which are distinguishable from the facts and decisions in insurance cases, the principles of *Inclusive Communities* are inapplicable to the insurance industry. This distinction, they said, supports an exemption for insurance.

*HUD Response:* HUD agrees that *Inclusive Communities* had different facts than a case involving insurance. That does not mean that *Inclusive Communities* supports an exemption or safe harbor for insurance. *Inclusive Communities* did not limit the use of discriminatory effects claims to any particular industry [181] and provides no support for exempting insurance practices. The Court's holding that discriminatory effects claims are cognizable under the Act applies to all such claims under the Act, and does not exclude practices particular to any industry, including insurance. HUD notes that the potential application of disparate-impact analysis to the insurance industry long predated *Inclusive Communities,* which generally reaffirmed disparate-impact doctrine.

*Whether Other Supreme Court Precedent Supports an Exemption*

*Issue:* Commenters stated that *Wards Cove* and *Watson* require an exemption for insurance because they set a higher burden of proof for plaintiffs than the proposed rule does.

*HUD Response:* HUD disagrees with the commenters. Neither *Wards Cove* nor *Watson* provide a basis for an exemption for insurance practices. Both cases, which involve Title VII claims, were decided prior to the Supreme Court's controlling precedent in *Inclusive Communities,* with which the final rule is consistent. And as explained more fully below, neither case necessitates a revision to plaintiff's burden of proof in Fair Housing Act cases. Simply stated, they provide no basis to exempt insurance practices.

---

[174] Some commenters quoted the Seventh Circuit in *NAACP* in support of their statement that considering protected traits would lead to adverse consequences: "putting young and old, or city and country, into the same pool would lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out.

[175] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 546 (the Court noted that the existence of disparate impact claims "for the last several decades 'has not given rise to . . . dire consequences.'"). To HUD's knowledge, insurers continue to use risk-based pricing. Commenters provided no evidence that over the past ten years this rule has resulted in an increased risk of insurer solvency, that it has caused any insurers to go out of business, that it has caused rates to increase, or that it has caused insurers to withdraw from insuring certain types of properties.

[176] *Nat'l Fair Hous. All.* v. *Travelers Indemnity Co.,* 261 F. Supp. 3d at 30 (D.D.C. 2017).

[177] *Inclusive Cmtys. Project Inc.,* 576 U.S. at 541.

[178] *Id.,* at 533.

[179] For instance, the court stated explained, describing the rule for Title VII that "[b]efore rejecting a business justification—or a governmental entity's analogous public interest—a court must determine that a plaintiff has shown that there is 'an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs." *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 533.

[180] *Inclusive Cmtys. Project, inc.,* 576 U.S. at 544.

[181] The Court stated "the issue here is whether, under a proper interpretation of the FHA, housing decisions with a disparate impact are prohibited," and did not limit the holding to certain fact patterns. *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 530.

**App.195**

*Whether Claims Against Insurers Will Fail as a Matter of Law*

*Issue:* Commenters stated that insurance practices should be exempt because challenges to risk-based pricing and underwriting will fail as a matter of law under *Inclusive Communities* and *Graoch.* They stated that insurance claims will fail as a matter of law because *Inclusive Communities* mandates the removal only of "artificial, arbitrary, or unnecessary barriers" and risk-based pricing does not create such barriers and because plaintiffs would be unable to identify less-discriminatory practices that will allow the insurer to pursue its valid interest. According to the commenters, this is because it is grounded in mathematics, is objective and fair, and advances substantial, legitimate, nondiscriminatory interests. Other commenters stated that making sure that insurance rates accurately reflect the risk of future loss is a valid interest and that *Inclusive Communities* requires that businesses have "leeway to state and explain the valid interest served by their policies." In addition, commenters said that the *Graoch* court held that categorical bars are justified when plaintiffs have no chance of success, a holding that commenters argued the proposed rule ignores.

Commenters further stated that all insurance claims will fail as a matter of law because there can never be a robust causal link between legitimate risk factors and any disparate impact. According to them, risk-based factors do not consider protected characteristics, and they are mandated or approved by state law, limiting insurer discretion. These commenters stated that any disparate impact caused by socioeconomic factors is beyond the control of insurers. Moreover, they stated that because state laws limit insurer discretion, these laws make it impossible to ascribe any discriminatory effects in underwriting and pricing to an insurer's own choices.

A commenter suggested that if HUD does not exempt or provide a defense for insurers, HUD should state in the final rule that disparate impact claims against risk-based pricing and underwriting practices cannot succeed. Commenters also asked HUD to commit not to bring disparate-impact challenges to risk-based insurance practices.

*HUD Response:* HUD disagrees with the commenters who claimed that lawsuits against insurers based on a discriminatory effects theory will necessarily fail as a matter of law and that therefore insurers are entitled to an exemption.[182] As discussed in detail above, courts have found that insurers are subject to discriminatory effects liability under the Act. HUD also declines to commit not to bring discriminatory effects challenges against insurers or to specify that any claims based on insurance practices will necessarily fail. As discussed at length, insurance practices may be subject to disparate impact liability and insurers may be proper defendants in lawsuits alleging disparate impact under the Act. Indeed, the Act requires HUD to file charges of discrimination if reasonable cause exists to believe discrimination occurred.[183]

*Graoch* provides no basis for such an exemption. First, the *Graoch* court stated that "we cannot create categorical exemptions from [the Act] without a statutory basis" and "[n]othing in the text of the [Act] instructs us to create practice-specific exceptions. Absent such instruction, we lack the authority to evaluate the pros and cons of allowing disparate-impact claims challenging a particular housing practice and to prohibit claims that we believe to be unwise as a matter of social policy." [184] While the *Graoch* court said that "categorical bars are justified when . . . plaintiffs have no chance of success," [185] it did not find such a situation and in fact noted the possibility of success on a claim against a landlord seeking to withdraw from a Section 8 program. It made no finding that challenges against insurance practices—which were not the subject of the lawsuit—were impossible under the Act.[186] To the extent that *Graoch* is

relevant, it establishes a high bar—the literal impossibility of making out a particular type of claim—that would have to be established before a categorical bar would be appropriate. And in HUD's belief, it is, in fact, possible for a claim against an insurer to succeed, as demonstrated by several court opinions, so the standard set out by *Graoch* is not met.[187]

Some comments are premised on the faulty assumption that *Inclusive Communities* introduced different standards for discriminatory effects claims. As explained above, *Inclusive Communities* described and endorsed the same disparate impact framework that this rule sets out. In that case, the Supreme Court explained, that policies and practices that are artificial, arbitrary, and unnecessary are invalid under the Act when the longstanding disparate impact elements as set forth in this rule are satisfied. However, the Court *did not* require plaintiffs to show that a policy or practice is artificial, arbitrary, and unnecessary *in addition to* proving an unjustified discriminatory effect. Rather, the Court, in quoting "artificial, arbitrary, and unnecessary" from the decades-old case *Griggs,* was describing the types of policies that will fail under the rule's traditional shifting

---

[182] *See Dehoyos,* 345 F.3d at 293; *see also; Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am,* 208 F. Supp. 2d 46,48 (D.D.C. 2002); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017).

[183] 42 U.S.C. 3610(g)(2)(A) ("If the Secretary determines that reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, the Secretary shall . . . immediately issue a charge on behalf of the aggrieved person").

[184] *Graoch,* 508 F.3d at 375.

[185] *Id.* at 376.

[186] The *Graoch* court did not identify homeowners insurance as an example of where application of the disparate impact rule is never appropriate. The court *in dicta* incorrectly read *NAACP* v. *Am. Family Mut. Ins. Co.* to hold "that insurers never can face disparate-impact liability for 'charging higher rates or declining to write insurance for people who live in particular areas.'" *Graoch,* 508 F.3d at 375. HUD believes that the *Graoch* court read *NAACP* incorrectly. *NAACP* overturned a dismissal of a claim under the Act, holding that it "is reversed to the extent it holds that the Fair Housing Act is inapplicable to property and casualty insurance written or withheld in connection with the purchase of real estate." *NAACP,* 978 F.2d at 302. The plaintiff in that case made claims of disparate treatment and disparate impact. *Id.* at 290. In discussing the two,

the *NAACP* court stated that it must presume that plaintiffs can prevail under a disparate treatment theory because the Supreme Court had not yet decided whether disparate impact is a viable legal theory under Title VIII and because of the nature of insurance. *Id.* The court ultimately narrowed the holding to state "[a]ll we decide is whether the complaint states claims on which the plaintiffs may prevail if they establish that the insurer has drawn lines according to race rather than actuarial calculations." *Id.* at 291. Further, *NAACP* was about redlining in insurance and does not describe any/all practices of the insurance industry. *Id.* at 290. So, even if *Graoch's* reading were correct, the holding, and *Graoch's* description of the holding is limited to one practice used by insurers.

[187] HUD is unaware of any trial on the merits of a discriminatory effects claim against an insurer, but notes that many have survived a motion to dismiss and subsequently settled. *See Dehoyos,* 345 F.3d at 293 (affirming a district court's denial of a motion to dismiss allegations that a credit scoring system had an unjustified discriminatory effect because it resulted in higher rates for non-white customers); *Nat'l Fair Hous. All.* v. *Travelers Indem. Co.,* 261 F. Supp. 3d 20, 22 (D.D.C. 2017) (denying a motion to dismiss allegations that defendant's policy of declining to insure properties where landlords accept Section 8 vouchers has an unjustified discriminatory effect); *Viens,* 113 F. Supp. 3d at 558 (denying motion to dismiss allegations that defendant insurer's insurance underwriting criteria that charge higher premiums or deny coverage to landlords who rent apartments to tenants receiving Section 8 housing assistance has an unjustified discriminatory effect*); Nat'l Fair Hous. All.* v. *Prudential Ins. Co. of Am,* 208 F. Supp. 2d 46, 48–50, (D.D.C. 2002) (denying a motion to dismiss allegations that certain of defendant's minimum underwriting requirements for certain types of coverages, such as a "replacement cost" policy had an unjustified discriminatory effect).

**App.196**

burden framework, which is consistent with this final rule. In other words, if a practice with a discriminatory effect is not necessary to achieve a substantial and legitimate interest, or when an alternative, less discriminatory practice exists, the challenged practice is invalid under the Act because it is artificial, arbitrary, or unnecessary. Insurance practices, like other practices related to housing, may sometimes create artificial, arbitrary, and unnecessary barriers. Further, as part of the disparate impact framework set forth in this rule, insurers, like all defendants, are provided the opportunity to show a valid interest supporting any practice challenged under the Act. Therefore, a specific exemption for insurers is unwarranted.

HUD finds that claims against insurers will not fail categorically as a matter of law. HUD believes, contrary to commenters' assertions, it is possible for plaintiffs to establish a causal connection between an insurance practice and a discriminatory effect. HUD also believes that it is possible for plaintiffs to prove a less discriminatory alternative. HUD notes that the fact that risk-based pricing does not facially consider protected characteristics provides no support for the contention that plaintiffs cannot—or should be precluded from the opportunity to— prove that a particular policy that defendants claim is risk-based causes an unjustified discriminatory effect. A violation of the Act based on a discriminatory effects claim requires proof of an unjustified discriminatory effect because of a trait protected by the Act, not proof of intentional discrimination. The fact that state laws mandate that rates be actuarially sound, or risk-based, does not necessarily negate causation because insurers may not in fact be using risk factors that are actuarially sound or the least discriminatory set of risk factors that would achieve that end. Specifically, an actuarially sound practice may nonetheless cause an unjustified discriminatory effect if a less discriminatory alternative is available that also is actuarially sound and otherwise complies with state law. As other examples, commenters referenced ratemaking, price optimization, and credit scoring as examples of largely actuarially based practices that can incorporate elements of non-actuarially based subjective judgment or discretion, and thus cause an unjustified discriminatory effect. HUD finds this comment persuasive. HUD acknowledges that there may be scenarios where plaintiffs will be unable

to show causation or demonstrate the existence of a less discriminatory alternative, but it is incorrect to say that all claims will fail as a matter of law. Thus, HUD declines to grant a categorical exemption on this basis.

*State Regulation*

*Issue:* Commenters stated that insurance practices should be exempted from discriminatory effects liability, with some advocating for retention of the 2020 Rule, because, according to the commenters, states are better at regulating insurance and should be the primary or sole regulators, and federal regulation creates a patchwork of rules, leading to higher costs. Commenters stated that the state regulatory system is comprehensive; protects consumers; effectively and efficiently regulates the insurance industry; ensures that premiums are actuarially justified and not excessive, inadequate, or unfairly discriminatory; and has increased affordability and availability over the past 150 years. Commenters stated that one of the primary aims of state regulation is to protect insurer solvency by ensuring that insurance providers charge premiums that adequately cover current and future claims and provide adequate surplus for capitalization, asset and reinsurance purchases and liquidity. Commenters also stated that state regulations already preclude the type of discrimination they believe the rule addresses, though others noted that unfair discrimination under insurance laws is not the same as discrimination under the Act. Commenters said that state regulators understand the unique conditions in their state affecting market and consumer needs; are structured so as to promote consistency and sufficiently flexible to promote innovation; and have always set the right regulations for local conditions. Commenters said that interfering with a system that works well will have negative effects, undermining state insurance regulations and consumer protection laws and upending the commonsense structure of state regulation. Commenters stated that federal regulation would subvert the role of state regulators and undermine the accuracy of risk-based pricing, leading to premium increases.

Commenters, citing to *Cole* v. *State Farm Insurance Co.* (Alaska 2006) and *Cain* v. *Fortis Insurance Co.* (S.D. 2005), stated that courts have recognized that state laws ensure that the insurance market functions fairly.[188] A commenter

stated that every state has effective civil and criminal insurance anti- discrimination laws, regulations, and enforcement divisions.

Other commenters, however, warned that a broad exemption for the homeowners insurance industry could go beyond underwriting practices to exclude unregulated practices like marketing, claims processing, and claims payment from disparate impact liability.

*HUD Response:* HUD disagrees with commenters who say that this final rule will upend the state regulatory system or create insurer insolvency. The rule recodifies the rule that has been in effect since 2013—and that itself codified jurisprudence which has included application to insurers for decades— during which time no such upending has occurred. The rule makes no change to the status quo, and so there is no basis for claims that it will upend anything. As discussed above, the rule does not prohibit risk-based pricing or modify the ability of states to regulate insurers as they have done for decades. And Congress has delegated authority to HUD to regulate under the Act.[189]

State regulators may effectively and efficiently ensure that premiums are actuarially justified and not excessive, inadequate, or unfairly discriminatory as defined by state insurance codes.[190] However, as commenters arguing for the exemption themselves recognize, "unfairly discriminatory" as defined by insurance codes, is related to treating similar risks differently, which is wholly distinct from housing practices that are unlawful because they discriminate because of the protected characteristics under the Act. State insurance codes generally require only that policies and practices are aimed at a legitimate objective without regard to whether that objective discriminates because of a protected characteristic or whether a less discriminatory

---

[188] *Cole* v. *State Farm Ins. Co.,* 128 P.3d 171 (Alaska 2006); *Cain* v. *Fortis Ins. Co.,* 694 NW 2d 709 (S.D. 2005).

[189] 42 U.S.C. 3614a.

[190] Commenters overstate *Cole* and *Cain* as "recogiz[ing] that state laws ensure that the insurance market functions fairly." In *Cole*, while recognizing that Alaska's state insurance laws prohibit certain discrimination, the court engaged in a further analysis of Alaska's human rights law, implicitly recognizing that the state insurance law may leave gaps to be filled by other anti- discrimination laws. *Cole*, 128 P.3d at 175–78. The case said nothing about how the state insurance code ensured that the insurance market functioned fairy. *Cain* also says nothing about how state insurance regulation ensures market functions fairly. *Cain*, 694 NW 2d at 714 (rejecting the policy holder's argument that she was discriminated against under South Dakota's unfair trade practices act by the health insurance company when it denied her coverage for gastric bypass surgery, analyzing whether she was discriminated against using Black's Law Dictionary's definition of discrimination).

**App.197**

alternative exists to achieve that objective. As an example, many state statutes mandating reasonable rates that are not excessive, inadequate, or unfairly discriminatory, permit insurers, via the very same section of the insurance code, to rely on discretionary "judgment factors" in ratemaking.[191] These judgment factors, although permissible under the insurance code, may result in unlawful discrimination under the Act. Moreover, it is the responsibility of HUD—not of state regulators—to promulgate regulations related to compliance with the Act.[192]

*McCarran-Ferguson Act*

*Issue:* Commenters stated that HUD should exempt all insurance practices, or at least risk-based pricing and underwriting, because imposing the rule on insurers would violate the McCarran-Ferguson Act. Commenters stated that the McCarran-Ferguson Act established the states as the primary regulator of insurance and that state insurance laws preempt federal laws, such as the Act, when (1) the federal law does not expressly relate to the business of insurance; (2) the state law is enacted for the purpose of regulating insurance; and (3) the application of federal law might "invalidate, impair, or supersede" state laws regulating insurance. Commenters stated that the Act is not expressly related to the business of insurance and therefore its application to insurers would be inconsistent with the McCarran-Ferguson Act.

Commenters, citing *Humana Inc.* v. *Forsyth*[193] stated that the rule contravenes the McCarran-Ferguson Act because it could invalidate or conflict with risk-based insurance pricing or underwriting policies that are permitted or required under state law. Commenters stated that state insurance laws permit or require risk-based pricing and underwriting, so any claim under the Act will always be preempted. Commenters said insurers would be caught between conflicting state and federal law and forced to either comply with state approved rates based on objective risk factors permitted or required by state law or comply with the Act by considering protected traits. Commenters stated that under state laws, insurers make underwriting decisions based on actuarial risk factors, and that risk-based differences in charges could affect demographic groups differently. Commenters also stated that the majority of states require insurers to set rates based on neutral actuarial factors, requiring insurers to take risk into account to remain solvent. Commenters said that permitting the showing of a less discriminatory alternative at step three of the burden shifting framework requires insurers to adopt alternate risk-based practices that are less effective and will result in less accurate pricing, in violation of state law. Commenters stated that the rule violates McCarran-Ferguson because a federal court may be called upon to enjoin the insurer's state-approved risk-based practice in favor of an alternative that may not be equally effective at predicting loss. Commenters stated that this violates state laws prohibiting inadequate rates and unfair discrimination between individuals with comparable risk profiles and would force insurers to use factors that are prohibited in the underwriting process.

Commenters, citing *Humana,* stated that federal law must not be read to authorize regulations that, if applied, would "frustrate any declared state policy or interfere with a State's administrative regime" concerning insurance.[194] Commenters further stated that the rule impermissibly interferes with the state regulatory system for various reasons. The proposed rule, they stated, would interfere with a state's administrative regime by substituting the judgment of a federal court for state regulators. They also cited *Saunders II,*[195] in support of the assertion that it is improper to empower federal courts to reject rates that were reviewed and approved by state regulators under state law. Commenters stated that even if a federal court does not reject the rate, allowing such a claim to proceed in federal court would render insufficient the assurance of lawfulness that the state approval provides. Commenters noted that the *Saunders II* court stated that "HUD has never applied a disparate-impact analysis to insurers" and expressed doubt that it could.[196] Commenters also cited *Ojo* v. *Farmers Insurance Company,*[197] which found that the McCarran-Ferguson Act barred a disparate impact claim against Farmers because it would frustrate Texas's regulatory policy, which does not prohibit an insurer from using race neutral factors in credit scoring to price insurance, even if it creates a disparate impact. A commenter pointed to *Dehoyos* v. *Allstate Corp,*[198] which stated that "a disparate impact claim goes to the heart of the risk adjustment that underlies the insurance business" to show that the proposed rule would interfere with a state's administrative regime.[199] Commenters stated that because unfair discrimination as defined by state insurance laws is different than discrimination prohibited by the Act, the rule disrupts states' regulatory regimes.

Commenters also cited to *Mutual of Omaha,*[200] stating that the proposed rule contravenes the McCarran-Ferguson Act because it allows courts—rather than states—to determine if rates are actuarially sound. Commenters stated that in *Mutual of Omaha,* the Seventh Circuit held that the McCarran-Ferguson Act preempted application of the Americans with Disabilities Act because it would require insurers to litigate whether the challenged insurance practices were actuarially sound, thus stepping on the toes of state regulators. Specifically, commenters stated that steps two and three of the burden shifting framework would force federal courts to second guess the actuarial soundness of state-regulated insurance. Commenters stated that under *Mutual of Omaha,* a case-by-case approach to whether McCarran-Ferguson preempts the Act's application is inappropriate because of the uniformity in state laws permitting or requiring the use of risk factors and because second guessing state regulators itself is improper, regardless of outcome.

Commenters stated that state anti-discrimination laws are irrelevant to whether the McCarran-Ferguson Act preempts a case under the Act, because McCarran-Ferguson asks only whether the application of federal law would invalidate, impair, or supersede state laws enacted for the purpose of regulating the business of insurance, and state antidiscrimination laws are not enacted for such purpose. Commenters said that even if a state's fair-housing law were identical to the Act and would permit a disparate-impact challenge to risk-based practices in state court, any federal litigation under the rule would still require federal courts to second-guess the actuarial soundness of insurance practices regulated by state law——

---

[191] *See e.g.,* Ga. Code Ann. 33–9–4; Mont. Code Ann. 33–16–201; *see also NAIC White Paper, supra* note 161 at 1 ¶ 5 ("Making adjustments to actuarially indicated rates is not a new concept; it has often been described as 'judgment.'").

[192] 42 U.S.C. 3614a.

[193] *Humana Inc.* v. *Forsyth,* 525 U.S. 299 (1999).

[194] *Id.* at 310.

[195] *Saunders* v. *Farmers Ins. Exch. (Saunders II),* 537 F.3d 961 (8th Cir. 2008).

[196] *Id.*

[197] *Ojo* v. *Farmers Grp., Inc.,* 356 SW.3d 421 (Tex. 2011).

[198] *Dehoyos* v. *Allstate Corp.,* 345 F.3d 290 (5th Cir. 2003)

[199] The commenter also said that the opinion is likely to be adopted by other courts.

[200] *Doe* v. *Mut. of Omaha,* 179 F.3d 557 (7th Cir. 1999).

**App.198**

contrary to the express holding of *Mutual of Omaha.*

Other commenters stated that the proposed rule does not undermine the state regulation of insurance and thus presents no conflict with McCarran-Ferguson. They stated that state authority to regulate insurance does not, on its own, create a conflict with federal law; rather this is a fact-specific determination that depends on the relevant state law, the conflict claimed and other case-specific variables. Commenters stated that many states have regulations that complement disparate-impact liability under the Act and, even if they do not, that does not necessarily mean there is a conflict with state law. Commenters cited *Dehoyos, Humana,* and *Wai* [201] to show that the need for a fact-specific inquiry depends on the relevant state law, the conflict claimed, and other case-specific variables. Commenters stated that the District of Columbia, California, and North Carolina, for example, expressly provide by statute for disparate impact claims. Commenters said that given the variation in state insurance laws, an exemption for insurers is inappropriate, and a case-by-case evaluation is the better approach.

*HUD Response:* HUD believes that the McCarran-Ferguson Act neither creates nor justifies a wholesale exemption for insurers from liability for policies and practices that have an unjustified discriminatory effect. Some discriminatory effects claims against insurers will be preempted under McCarran-Ferguson but others will not, depending on a host of case-specific variables, so wholesale exemptions would be overbroad. The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." [202] As interpreted by the Supreme Court in *Humana,* McCarran-Ferguson applies to preempt federal law only when a particular application of that law

directly conflicts with a specific state insurance regulation, frustrates a declared state policy, or interferes with a State's administrative regime. [203] That is, McCarran-Ferguson preemption is assessed on an application-by-application basis and does not operate at the wholesale level commenters sought here. Accordingly, the mere fact that a state has the authority to regulate insurance or has adopted ratemaking regulations does not on its own create the kind of conflict, frustration of purpose, or interference that triggers preemption under McCarran-Ferguson. [204] Rather, the inquiry required by *Humana* depends on the relevant state law and other case-specific variables. [205]

For example, in *Dehoyos* v. *Allstate,* the Fifth Circuit rejected a McCarran-Ferguson defense to a disparate impact claim where the insurer did not identify a specific state law that was impaired. [206] The Fifth Circuit reasoned that the Seventh Circuit's holding in *Doe* v. *Mutual of Omaha* that McCarran-Ferguson barred a particular claim of discrimination under the Americans with Disabilities Act did not foreclose *all* discriminatory effects claims against insurers. [207] Instead, the Fifth Circuit distinguished *Doe,* by explaining that "[i]n *Doe,* there was an actual state insurance law which purportedly conflicted with the application of the ADA to the particular insurance question at issue." [208] Thus, where no state law is impaired, McCarran-Ferguson will not require preemption of

a discriminatory effects claim against an insurer.

HUD finds that whether in fact a particular policy or practice would create a conflict so as to preempt the Act is highly fact specific and depends on the particular state law and fair housing allegations in question. Accordingly, HUD has determined that a case-by-case approach is necessary and justified. McCarran-Ferguson, by its nature, requires such case-by-case analyses and contains no requirement that HUD provide categorical exemptions. McCarran-Ferguson requires a fact-intensive inquiry that will vary state by state and by claim. Even those cases in which an impermissible impairment under McCarran-Ferguson was found support the case-by-case approach herein adopted by HUD rather than the wholesale exemption sought by some commenters. For example, in *Saunders* v. *Farmers Insurance Exchange,* prior to ruling that McCarran-Ferguson barred a discriminatory effects claim under the Act, [209] the Eighth Circuit remanded the case for further inquiry into the facts and Missouri law. [210]

Precedent also demonstrates that, in some instances, state law may not preempt discriminatory effects claims against insurers even when an insurer points to a specific state law and alleges that it is impaired. Although the commenters provided examples of cases in which state laws were found to preempt particular discriminatory effects claims, other cases provide examples of state laws that were not. For instance, in *Lumpkin* v. *Farmers Group (Lumpkin II),* the court rejected a McCarran-Ferguson defense to a disparate impact challenge to credit scoring in insurance pricing, holding that disparate impact liability in that context did not require the state's law mandating that "insurance rates cannot be 'unfairly discriminatory.'" [211] In so ruling, the court held it erroneous to read a state law prohibiting "unfairly discriminatory" rates "too broadly" and rejected the insurer's argument that such state laws require that practices with an unjustified discriminatory effect

---

[201] *See, e.g., Dehoyos,* 345 F.3d at 297–300 (rejecting McCarran-Ferguson reverse-preemption after appellant failed to indicate any state laws or declared regulatory policies which would conflict with federal civil rights statutes); *see also Humana Inc.,* 525 U.S. at 308 (1999) ("We reject any suggestion that Congress intended to cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise."); *Wai* v. *Allstate Ins. Co.,* 75 F. Supp. 2d 1, 5 (D.D.C. 1999) (rejecting defendant's argument for McCarran-Ferguson reverse-preemption after noting that Maryland law did not grant the state's insurance commissioner exclusive jurisdiction over discrimination claims).

[202] 15 U.S.C. 1012(b).

[203] *Humana,* 525 U.S. at 310 ("When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.").

[204] *Dehoyos* v. *Allstate Corp,* 345 F.3d 290 (5th Cir. 2003) (disparate impact under the Act); *Nationwide Mut. Ins. Co.* v. *Cisneros,* 52 F.3d 1351 (6th Cir. 1995) (disparate treatment under the Act); *Moore* v. *Liberty Nat'l Life Ins. Co.,* 267 F.3d 1209 (11th Cir. 2001) (disparate treatment in life insurance).

[205] *See PCIAA,* 66 F. Supp. 3d at 1038 ("McCarran-Ferguson challenges to housing discrimination claims [depend on] the particular, allegedly discriminatory practices at issue and the particular insurance regulations and administrative regime of the state in which those practices occurred.").

[206] *Dehoyos,* 345 F.3d at 293, 299.

[207] *Id.* at 298 n.6.

[208] *Id.* Although in HUD's view the Fifth Circuit persuasively distinguished the Seventh Circuit's holding in *Mutual of Omaha,* the case-by-case approach appropriately accommodates any variations among the circuits that may exist, now or in the future, as to how McCarran-Ferguson should be applied. This includes the Second Circuit's skepticism over whether McCarran-Ferguson applies at all to "subsequently enacted civil rights legislation." *Viens,*113 F. Supp. 3d at 572 (quoting *Spirt* v. *Teachers Ins. & Annuity Ass'n,* 691 F.2d 1054, 1065 (2d Cir. 1982)).

[209] *Saunders* v. *Farmers Ins. Exch.* (*Saunders II*), 537 F.3d 961, 963 (8th Cir. 2008).

[210] *Saunders* v. *Farmers Ins. Exch.* (*Saunders I*), 440 F.3d 940 (8th Cir. 2006). These variables included whether Missouri insurance law provided a private right of action to challenge the conduct at issue, and whether determinations by the state insurance agency were subject to judicial review. The court explained that "the mere fact of overlapping complementary remedies under federal and state law does not constitute impairment for McCarran-Ferguson purposes." *Id.* at 945–46

[211] *Lumpkin* v. *Farmers Grp.* (*Lumpkin II*), No. 05–2868 Ma/V, 2007 U.S. Dist. LEXIS 98949, at *19–21 (W.D. Tenn. July 6, 2007).

**App.199**

must be permitted "as long as the rates are actuarially sound." [212] The court then cited other provisions of the state's insurance code specifically dealing with credit scoring, concluding that they too were not impaired.[213]

The many ways in which one state's insurance laws can differ from another's, as well as the ways in which a single state's insurance laws can change over time, mean that even an exemption for specific insurance practices would be overbroad and quickly outdated. For example, variations in state insurance laws have resulted in discriminatory effects challenges to similar insurance practices surviving a McCarran-Ferguson defense in some states but not in others.[214] Precedent also demonstrates that the insurance laws of each state can change over time in significant ways,[215] and state insurance regulators respond to new practices as they become common and their effects become clear.[216] Given the variation in state insurance laws across more than 50 jurisdictions and over time, HUD declines to fashion a one-size-fits-all exemption that would be overbroad, quickly outdated, and inevitably insulate insurers engaged in otherwise unlawful discriminatory practices from liability under the Act that would not be precluded by McCarran-Ferguson.

A one-size-fits-all exemption is also inappropriate because insurance practices are not governed solely by "hermetically sealed" state insurance codes,[217] but are also governed by a range of other state laws, including state fair housing laws. Many state fair housing laws track the Act's applicability to insurance and provision of effects liability, indicating that those states do not consider disparate impact liability to conflict with the nature of insurance. Categorical exemptions or safe harbors of the types requested by some commenters would deprive all states of this federal support in addressing discriminatory insurance practices—even those states that welcome or depend on such support.[218] This outcome would be at odds with the purpose of McCarran-Ferguson to support the autonomy and sovereignty of each individual state in the field of insurance.[219] Connecticut's Discriminatory Housing Practices Act, for example, "provides similar (albeit broader) protection against housing discrimination as the [Act], which is [a] strong indication that application of the federal antidiscrimination law will not impair Connecticut's regulation of the insurance industry, but rather is complementary with Connecticut's overall regulatory scheme." [220] Similarly, a state court found that "the disparate-impact approach does not conflict with Ohio Insurance law" and thus allowed a disparate impact claim against an insurer to proceed under the state's fair housing law.[221] In another case where the court rejected a McCarran-Ferguson defense to a discriminatory effects claim against an insurer, the court explained that it was "not persuaded that California law would allow [the challenged] practice" and therefore " the [] Act complements California law in this regard." [222] Furthermore, the allocation of authority to enforce a state's protections against discrimination in insurance can impact whether McCarran-Ferguson is a viable defense to a discriminatory effects claim in a given state.[223] The case-by-case approach thus affirms state autonomy and furthers the Act's broad remedial goals by ensuring that HUD is not hindered in fulfilling its statutory charge to support and encourage state efforts to protect fair housing rights.[224]

Furthermore, HUD finds that comments claiming there is necessarily always a conflict with state laws in violation of the McCarran-Ferguson Act rest on the false presumption that this final rule prohibits the use of risk-based pricing or would require insurers to consider protected traits of individual insureds in making decisions. As described in greater detail above, it does not. HUD also disagrees with commenters who stated that even if a state fair housing law prohibits practices having an unjustified discriminatory effect, the rule contravenes McCarran-Ferguson. As courts have found, and HUD agrees, in such circumstances there would be no conflict between the federal and state law at issue.[225] Step three of the burden-shifting framework, allowing plaintiffs to prove a less discriminatory alternative, also does not necessarily interfere with the state regulation of insurance. All the rule requires is that if an insurer's practices have a discriminatory effect and "an adjustment . . . can still be made that will allow both [parties'] interests to be

---

[212] *Id.*

[213] *Id.*

[214] For example, in cases challenging the discriminatory effect of insurers' reliance on credit scores, the McCarran-Ferguson defense has failed in some states but succeeded in others. *Compare Dehoyos,* 345 F.3d 290 (McCarran-Ferguson defense fails) *and Lumpkin II,* 2007 U.S. Dist. LEXIS 98949 (same) with *Saunders II,* 537 F.3d 961 (McCarran-Ferguson defense succeeds) and *McKenzie v. S. Farm Bureau Cas. Ins. Co.,* No. 3:06CV013–B–A, 2007 U.S. Dist. LEXIS 49133 at *11 (N.D. Miss. July 5, 2007) (same); *see also PCIAA,* 66 F. Supp. 3d at 1039 ("Variations among state regulatory regimes . . . provide an additional variable that may complicate any hypothetical McCarran-Ferguson analysis.").

[215] *Compare Ojo* v. *Farmers Grp., Inc.,* 356 SW.3d 421, 430 (Tex. 2011) (recognizing a McCarran-Ferguson defense to a credit scoring disparate impact claim based on the state legislature "expressly authoriz[ing] the use of credit scoring in setting insurance rates in 2003") with *Dehoyos,* 345 F.3d 290 (rejecting a McCarran-Ferguson defense to the same type of claim based on Texas law in effect before 2003).

[216] *See, e.g., NAIC White Paper, supra* note 161 ¶¶ 39–42 (discussing the responses of state regulators to the rising increase in use of price optimization practices by insurance providers).

[217] *Humana,* 525 U.S. at 312.

[218] A commenter stated that this argument for failing to grant an exemption was arbitrary and capricious because the McCarran Ferguson Act is not intended to promote "federal support" for state enforcement of anti-discrimination laws and because state anti-discrimination laws are irrelevant to the McCarran-Ferguson analysis which only asks whether the application of federal law would invalidate, impair, or supersede state laws enacted for the purpose of regulating business insurance. HUD disagrees. First, state anti-discrimination laws are relevant to McCarran-Ferguson because they help inform whether there is a conflict with state law. *See Viens,* 113 F. Supp. 3d at 573 n.20 (the Connecticut Fair Housing Act "provides similar (albeit broader) protection against housing discrimination as the FHA, which is strong indication that application of the federal antidiscrimination law will not impair Connecticut's regulation of the insurance industry, but rather is complementary"). Second, the commenter misconstrues HUD's point. HUD is not saying that the McCarran-Ferguson Act is intended to promote federal support for state enforcement. HUD is explaining that state laws inform whether there is a conflict between state and federal law and that where the state laws are interpreted consistently with the federal law, this regulation is helpful to states enforcing their own state anti-discrimination laws.

[219] *See* 15 U.S.C. 1011 (explaining the purpose of McCarran-Ferguson as "the continued regulation . . . by the several States of the business of insurance is in the public interest").

[220] *Viens,* 113 F. Supp. 3d at 573 (finding that McCarran-Ferguson does not bar an FHA disparate impact claim against an insurer).

[221] *Toledo Fair Hous. Ctr.* v. *Nationwide Mut. Ins. Co,* 94 Ohio Misc. 2d 151, 157 (Ohio Cnty. Ct. 1997).

[222] *Jones* v. *Travelers Cas. Ins. Co. of Am.,* Tr. of Proceedings Before the Honorable Lucy H. Koh U.S. District Judge, No. C–13–02390 LHK (N.D. Cal. May 7, 2015), ECF No. 269–1.

[223] *Toledo,* 94 Ohio Misc. 2d at 157 (recognizing discriminatory effects liability in homeowners insurance under state law in part because the Superintendent of Insurance lacks "primary jurisdiction" over such claims).

[224] *See, e.g.,* 42 U.S.C. 3610(f); 24 CFR pt. 115 (HUD's Fair Housing Assistance Program); 42 U.S.C. 3608(d) (obligation to affirmatively further fair housing).

[225] *Viens,* 113 F. Supp. 3d at 573 n.20 (the Connecticut Fair Housing Act "provides similar (albeit broader) protection against housing discrimination as the FHA, which is strong indication that application of the federal antidiscrimination law will not impair Connecticut's regulation of the insurance industry, but rather is complementary"); *see also NAACP,* 978 F.2d 287, 295 (7th Cir. 1992) ("Having stood on the text to show that the McCarran-Ferguson Act governs the construction of the Fair Housing Act, American Family needs to show that the Fair Housing Act conflicts with state law. Duplication is not conflict.").

**App.200**

satisfied,'' the insurer must make that change.[226] It does not require insurers to violate state laws.

HUD disagrees with *Mutual of Omaha* to the extent it implied that any claim requiring a court to assess the actuarial soundness of a policy and/or whether a policy or practice is consistent with state law necessarily interferes with a state administrative regime. HUD notes that in promulgating a rule of nationwide effect it is not bound to follow the decision of a single appellate court, but may reasonably conclude that the Act allows for a different result.[227] HUD believes courts should continue to decide through a case-by-case assessment whether requiring a court to assess actuarial soundness or consistency with state law necessarily interferes with an administrative regime, as this is an underdeveloped area of the law and case law could evolve differently in the circuits.

In any event, disparate impact claims challenging insurance practices do not necessarily require courts to ascertain whether a practice complies with state law or is actuarially sound. Therefore, not all claims even implicate the reasoning of *Mutual of Omaha.*[228] As the Court in *PCI* explained, ''[w]hile some states require insurers to use risk-based pricing, other states merely permit risk-based pricing.''[229] Accordingly, *Mutual of Omaha* does not necessarily preclude claims that challenge practices that rest on subjective business judgments, rather than actuarially sound principles or state law requirements because in adjudicating such claims, the court would not necessarily need to ascertain whether the insurer's practices are actuarially sound and/or consistent with

state law. For example, a plaintiff may not dispute that an insurer's practice complies with state law, but rather may show that there are alternative practices that also comply with state law that do not cause a discriminatory effect. Such a claim would not require the court to evaluate whether the challenged practice complies with state law or is actuarially sound and thus would not run afoul of *Mutual of Omaha.* The analysis of the challenged practice instead focuses on whether or not it produces a discriminatory effect and, if the insurer states a legitimate interest justifying the practice, the plaintiff may show that there is a less discriminatory alternative that would serve defendant's substantial, legitimate, nondiscriminatory interest. While another risk-based practice could be a possible alternative at step three, it is not necessarily the only alternative. And, even if the alternative is a risk-based practice, a court may not need to assess the actuarial soundness of the alternative practice. For example, the evidence might show that an insurer opted for one of two risk-based practices which were both equally actuarially sound and compliant with state law, even though one produced a greater discriminatory effect. In such a case, the actuarial soundness of the alternative risk-based practice and its compliance with state law would already have been determined by the insurer itself. The court's analysis, therefore, would be limited to assessing the efficacy of the alternative risk-based practice in serving the insurer's business interests—the type of ''unremarkable task'' regularly undertaken by courts.[230] As the court in *PCI* stated, *Mutual of Omaha* called into question the viability of some disparate impact claims. HUD agrees, but notes that while *Mutual of Omaha* may prevent some claims from going forward due to the McCarran Ferguson Act in Seventh Circuit district courts, it does not necessarily preclude all claims. The Act's purpose is broad and inclusive, and because *Mutual of Omaha* would not prevent all claims against insurers from proceeding even in its own circuit, HUD believes it is important not to foreclose meritorious claims by creating a wholesale exemption; indeed, doing so would run counter to the Act's purposes. HUD believes that case-by-case adjudication is appropriate to balance the purpose of the Act and to

account for any differences that emerge in the circuits.

Finally, HUD disagrees that the rule will lead to a deluge of lawsuits. The industry has been subject to the 2013 Rule for ten years and a HUD regulation on insurance for well over 30 years [231] and commenters have provided no evidence of an uptick in lawsuits. And as explained above, the insurance industry was subject to disparate impact liability long before the 2013 Rule, with many courts using a framework similar to the rule. Therefore, because the statute itself is the source of liability and the rule merely provides a framework for assessing the evidence, the rule cannot be the cause of any increase in lawsuits going forward.

*Issue:* Commenters stated that applying the rule to insurance is contrary to Congressional intent because of the McCarran-Ferguson Act. A commenter noted that the McCarran-Ferguson Act specifically exempts the Sherman, Clayton, and Federal Trade Commission Acts but not the Fair Housing Act, so under the statutory canon of construction *expressio unius est exclusio alterius,*[232] Congressional intent was to exclude only the specified statutes from pre-emption. Therefore, commenters stated, an exemption for the insurance industry from the rule is justified.

*HUD Response:* HUD disagrees. Even assuming that at least some Fair Housing Act claims are pre-empted by McCarran-Ferguson, that does not mean that all disparate impact claims under the Act are categorically preempted. The fact that a statute is not specifically exempted from application of the McCarran-Ferguson Act simply means that the McCarran-Ferguson *analysis* may be applied on a case-by-case basis to claims brought under that non-exempt statute; it does not mean that McCarran-Ferguson categorically bars all such claims. The Supreme Court explained this in *Humana,* when it held that the McCarran Ferguson Act did not create a federal exemption and that claims under Racketeer Influenced Corrupt Organizations Act (''RICO''),[233] which like the Act is not explicitly listed as exempt from preemption, were not barred by McCarran-Ferguson.[234] Thus,

---

[226] *Avenue 6E Invs.,* 818 F.3d at 513.

[227] *Nat'l Cable & Telecomm.s Assn. v. Brand X internet Services,* 545 U.S. 967, 982, 983–84 (2005) (''A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to Chevron deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion. . ..'' ''the agency may, consistent with the court's holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes. In all other respects, the court's prior ruling remains binding law (for example, as to agency interpretations to which Chevron is inapplicable). The precedent has not been ''reversed'' by the agency, any more than a federal court's interpretation of a State's law can be said to have been ''reversed'' by a state court that adopts a conflicting (yet authoritative) interpretation of state law.'').

[228] *Mut. of Omaha,* 179 F.3d 557, 564 (7th Cir. 1999) (''requiring a federal court to decide whether an insurance policy is consistent with state law— obviously would interfere with the administration of the state law. The states are not indifferent to who enforces their laws.'')

[229] *PCIAA,* 66 F. Supp. 3d at 1039–41.

[230] *Dehoyos,* 345 F.3d at 297 n.5 (rejecting similar argument because a court does not become a ''super actuary'' every time it ''engag[es] in the unremarkable task of determining whether specific conduct falls within the ambit of federal civil rights law'').

[231] 24 CFR 100.70(D)(4).

[232] ''*Expressio unius est exclusion alterius*'' means the expression of one thing is the exclusion of the other. *Jennings* v. *Rodriguez,* 138 S. Ct. 830, 844 (2018).

[233] 18 U.S.C. 1961 *et seq.*

[234] *Humana Inc.,* 525 U.S. at 309–310 (''[w]e reject any suggestion that Congress intended to cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise.'' Ultimately, the court held that

**App.201**

HUD has determined that the arguments put forth by commenters regarding congressional intent and *expressio unius est exclusio alterius* to justify an exemption from discriminatory effects liability are unpersuasive.[235]

*Issue:* Commenters made various comments concerning the impact of *Inclusive Communities* on the McCarran Ferguson Act, including that *Inclusive Communities* did not invalidate McCarran-Ferguson or expand disparate impact liability to insurance; that applying the rule to insurance would bring about an undesirable "specter" of litigation in conflict with *Inclusive Communities;* and that the rule would increase the likelihood of a conflict between the Act and state laws regulating insurance because the rule does not conform to *Inclusive Communities.*

*HUD Response:* As discussed above, HUD believes that *Inclusive Communities* had no impact on the application of this final rule to insurance practices. *Inclusive Communities* also had no impact related to the application of the McCarran-Ferguson Act. HUD agrees that *Inclusive Communities* did not invalidate the McCarran-Ferguson Act, as the Court did not address insurance or McCarran-Ferguson. Nor did *Inclusive Communities* expand liability for unjustified discriminatory effects to insurers, who were subject to such liability long before the decision.[236] Moreover, since there is no conflict between this rule and *Inclusive Communities,* as discussed above, there is no likelihood of the rule leading to litigation in conflict with that precedent or with state laws.

*Issue:* Commenters requested that HUD retain the provision in the 2020 Rule that recognized the McCarran-Ferguson Act. Another commenter disagreed, stating that the 2020 Rule attempted to undermine the nuanced position HUD took in 2016, when it

stated that there is a circuit split as to whether McCarran-Ferguson applies at all to "subsequently enacted civil rights legislation" [237] This commenter also stated that HUD had no authority to interpret McCarran-Ferguson in the 2020 Rule.

*HUD Response:* HUD declines to retain the portion of the 2020 Rule that references the McCarran-Ferguson Act because it was confusing. While the 2020 Rule did not mention the McCarran-Ferguson Act in its regulatory text, it borrowed from some of the statute's language, stating that "[n]othing in this section is intended to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance." [238] HUD expressed in its 2019 Proposed Rule that this language was meant to "codify the general applicability of the 'reverse preemption' provisions of the McCarran-Ferguson Act as it applies to the Fair Housing Act" and "clarify that the Fair Housing Act does not 'specifically relate to the business of insurance." [239] In comments to that proposed rule, commenters stated that this language would create an exemption for insurance practices or preempt all such possible claims. HUD responded in the 2020 Rule that it was "neutral" as to McCarran-Ferguson's application in specific cases and pointed to cases in which the Act had been not preempted and cases in which it had been preempted.[240] HUD repeated that it was not exempting the insurance industry and was "only clarifying that its disparate impact rule is not specifically related to the business of insurance." [241]

HUD believes that some commenters appear to have misread the 2020 Rule to provide a complete exemption from disparate impact liability for insurers. It is plain from reading the 2020 Rule that it neither provided an exemption nor specified that McCarran-Ferguson reverse preemption always applies to insurance practices. It simply stated that the Fair Housing Act was not intended to "invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance." HUD has reconsidered the 2020 Rule and concludes that this provision does not clarify how the Act and the McCarran-Ferguson Act interact. Nothing in the McCarran-Ferguson Act requires HUD to make this statement and it is not HUD's responsibility to

interpret the McCarran-Ferguson Act. HUD has decided this statement is unnecessary and confusing, as evidenced by commenters' misreading of the provision, and declines to retain it.

As HUD stated in 2016, the agency has adopted a case-by-case approach on McCarran-Ferguson reverse preemption, as that law requires. This approach is appropriate given the variations in jurisprudence across circuits that currently exist and may continue to evolve over time.[242] HUD continues to believe that a case-by-case approach is appropriate. It therefore declines to incorporate the 2020 Rule's language into this final rule. HUD leaves it to the courts to decide, as they encounter individual cases, whether the McCarran-Ferguson Act preempts application of the Act in each case.

*Filed-Rate Doctrine*

*Issue:* Commenters stated that insurance practices merit an exemption because the proposed rule would violate the filed-rate doctrine, which prohibits federal courts from reexamining rates filed by a regulated entity and subject to the review and approval of a regulatory agency, as these rates are "presumed reasonable and unassailable in judicial proceedings brought by ratepayers." [243] Commenters stated that the Eighth Circuit decision in *Saunders* v. *Farmers Ins. Exch.,* on which HUD relied in the 2016 Supplement, is inconsistent with the weight of case law holding that the filed-rate doctrine bars challenges under federal laws to rates filed with state agencies.[244] Commenters stated that the proposed rule would upend the protections afforded the filed-rate doctrine, threatening the health, solvency, and competitiveness of the insurance market.

*HUD Response:* HUD disagrees that this final rule conflicts with the filed-rate doctrine. The doctrine primarily serves two purposes: preventing litigants from securing more favorable rates than their non-litigant competitors,

---

"[w]hen federal law does not directly conflict with state regulation, and where application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.").

[235] Although in HUD's view the Fifth Circuit persuasively distinguished the Seventh Circuit's holding in *Mutual of Omaha,* the case-by-case approach appropriately accommodates any variations among the circuits that may exist, now or in the future, as to how McCarran-Ferguson should be applied. *Dehoyos,* 345 F.3d at 298 n.6. This includes the Second Circuit's skepticism over whether McCarran-Ferguson applies at all to "subsequently enacted civil rights legislation." *Viens,* 113 F. Supp. 3d at 572 (quoting *Spirt* v. *Teachers Ins. & Annuity Ass'n,* 691 F.2d 1054, 1065 (2d Cir. 1982)).

[236] *See, supra* Comments Concerning Inclusive Communities.

[237] 81 FR 69012, 69016 n.50 (Oct. 5, 2016).

[238] 85 FR 60288, 60333.

[239] 84 FR 42854, 42860.

[240] 85 FR 60288, 60323

[241] *Id.*

[242] *Dehoyos,* 345 F.3d at 298 (finding McCarran-Ferguson does not preclude plaintiff's claims); *Mut. of Omaha,* 179 F.3d at 564 (finding McCarran Ferguson precludes plaintiff's claim); *Viens,* 113 F. Supp. 3d at 572 (expressing skepticism over whether McCarran-Ferguson applies to all "subsequently enacted civil rights legislation.") (quoting *Spirt* v. *Teachers Ins. & Annuity Ass'n,* 691 F.2d 1054, 1065 (2d Cir. 1982).)

[243] Commenters cited *Wegoland Ltd.* v. *NYNEX Copr.,* 27 F.3d 17, 18 (2d. Cir. 1994) and *Goldwasser* v. *Ameritech Corp.,* 222 F.3 390, 402 (7th Cir. 2000) in support of their assertion.

[244] Commenters relied on *Taffet* 967 F.2d 1483, 1494 (11th Cir. 1992)), *Square D,* 476 U.S. 409,417 (1986), *Wegoland Ltd.* v. *NYNEX Copr.,* 27 F.3d 17, 18 (2d. Cir. 1994); *Goldwasser,* and *Saunders II,* 537 F. 3d 961, 968 (8th Cir. 2008).

**App.202**

and preserving for agencies rather than courts the role of ratemaking.[245] HUD is not aware of any case, and no commenter cited one, in which a court has applied the filed-rate doctrine to defeat a claim under the Act, although several courts have rejected such attempts, including for discriminatory effects claims.[246] For example, *Wegoland Ltd.* held that "[t]he [filed-rate] doctrine bars suits against regulated utilities *grounded on the allegation that the rates charged by the utility are unreasonable.*"[247] (emphasis added). Whether a rate causes an unjustified discriminatory effect is a different issue than whether it is reasonable; discriminatory effects claims do not challenge the reasonableness of insurance rates but rather their discriminatory effects.[248]

Multiple courts examining the filed-rate doctrine in the context of Fair Housing Act claims have found the doctrine inapplicable, noting that the Supremacy Clause, rather than the filed-rate doctrine, applies.[249] Unlike filed-rate doctrine cases involving a conflict between *federal* ratemaking and a federal statute, applying the filed-rate doctrine to prioritize *state* ratemaking over a federal statute "would seem to stand the Supremacy Clause on its head."[250] Moreover, the filed-rate doctrine "does not preclude injunctive relief or prohibit the Government from seeking civil or criminal redress,"[251] which are types of relief often obtained for violations of the Act.[252] A filed-rate doctrine defense requires an examination of the facts in context of the laws and ratemaking structure at issue.[253] The case-by-case approach best accommodates these variations.[254]

As discussed above, HUD disagrees that the rule would threaten the health, solvency, and competitiveness of the market because no conflict exists with the filed-rate doctrine. Furthermore, insurers have been subject to the 2013 Rule for ten years, and disparate impact liability generally even longer, and the market effects alleged by commenters have not come to pass.

*Case-by-Case Adjudication Cost for Insurers*

*Issue:* Commenters opposed the rule's application to the insurance industry because case-by-case litigation in federal court is costly and, they contended, these costs outweigh the benefits. A commenter stated that even if a case is resolved in favor of the insurer, another suit with slightly altered facts may quickly follow. Commenters asserted that insurers would have to defend various risk factors on a regional basis, with courts possibly reaching inconsistent judgments. Commenters stated case-by-base adjudication would be a waste of judicial resources. Commenters also stated that requiring insurers to defend risk-based practices in court will make insurance less affordable. According to commenters, the costs are unjustified because rates are risk-based as required by state insurance law and have been approved by state regulators, and plaintiffs may bring claims that are hypothetical and speculative. Commenters stated that the vagueness and uncertainty of the rule threatens insurer insolvency.

Other commenters stated that the 2013 Rule, 2016 Supplement, and proposed rule appropriately state that a case-by-case analysis is the correct approach for assessing whether discriminatory effects are unjustified for all industries, including insurers. Commenters explained that to create an exemption, HUD would need to outline highly specific standardized rules, which would not be possible as actuarial practices are constantly changing and evolving.

*HUD Response:* As demonstrated by the relatively few cases filed against insurance companies in the decades-long history of disparate impact liability and in the ten years since the 2013 Rule was promulgated, there is no reason to believe that a continued case-by-case approach will lead to increased litigation, increased expenses in defending against claims of unjustified discriminatory effects, insurer insolvency, or increased premiums for customers. Nor did commenters provide support for these assertions.

HUD also disagrees with comments predicting that the proposed rule would create increased compliance costs. As discussed above, insurers have been subject to discriminatory effects liability since well before the 2013 Rule and have been subject to the 2013 Rule for ten years, yet commenters have not demonstrated that the 2013 Rule has led to significantly higher compliance costs.[255] Prior to the 2013 Rule, in adjudications, HUD always used a three-step burden-shifting approach,[256] as did many federal courts of appeals,[257] but one federal court of appeals applied a multi-factor balancing test,[258] other courts of appeals applied a hybrid between the two,[259] and one court of appeals applied a different test for public and private defendants.[260] By formalizing the three-part burden-shifting test for proving such liability under the Act, the 2013 Rule provided for consistent and predictable

[245] *Wegoland Ltd.* v. *NYNEX Corp.*, 27 F.3d 17, 18–19 (2d Cir. 1994).

[246] *See Saunders I,* 440 F.3d at 946 ("The district court erred in invoking the judicially created [filed-rate] doctrine to restrict Congress's broad grant of standing to seek judicial redress for race discrimination."); *Dehoyos,* 345 F.3d at 297 n.5 (finding "unpersuasive" the argument that the [filed-rate] doctrine barred a Fair Housing Act disparate impact claim); *Lumpkin* v. *Farmers Grp., Inc. (Lumpkin I),* No. 05–2868 Ma/V, 2007 U.S. Dist. LEXIS 98994, at *20–22 (W.D. Tenn. Apr. 26, 2007) (ruling that "the [filed-rate] doctrine does not apply" to a Fair Housing Act disparate impact claim).

[247] *Wegoland Ltd.* v. *NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).

[248] *Lumpkin I,* 2007 U.S. Dist. LEXIS 98994, at *21; *Dehoyos,* 345 F.3d at 297 n.5 ("[T]he application of anti-discrimination laws cannot be reasonably construed to supplant the specific insurance rate controls of [states]."); *c.f. Taffet* 967 F.2d at 1490–1495 (stating that the claim should be precluded because it would focus on the reasonableness of the rate and stating "[a]ccordingly, a court reviewing the reasonableness of a utility rate 'shall not substitute its judgment for that of the [rate-approving entity] if there is any evidence to support its findings.'").

[249] *See, e.g., Saunders I,* 440 F.3d at 944; *Perryman* v. *Litton Loan Servicing, LP,* No. 14–cv–02261–JST, 2014 U.S. Dist. LEXIS 140479, at *20–22 (N.D. Cal. Oct. 1, 2014). As one court has stated, the filed-rate doctrine is a "weak and forcefully criticized doctrine." *Cost Mgmt. Servs.* v. *Wash. Natural Gas Co.,* 99 F.3d 937, 946 (9th Cir. 1996).

[250] *Perryman* v. *Litton Loan Servicing, LP,* No. 14–cv–02261–JST, 2014 U.S. Dist. LEXIS 140479, at *20–22 (N.D. Cal. Oct. 1, 2014).

[251] *In re Title Ins. Antitrust Cases,* 702 F. Supp. 2d 840, 849 (N.D. Ohio 2010); *see also Marcus* v. *AT&T Corp.,* 138 F.3d 46, 62 (2d Cir. 1998).

[252] *See* 42 U.S.C. 3612(g)(3), 3613(c), 3614(d).

[253] *Munoz* v. *PHH Corp.,* 659 F. Supp. 2d 1094, 1099 (E.D. Cal. 2009).

[254] *Saunders I,* 440 F.3d at 945.

[255] *Inclusive Cmtys.Project, Inc.,* 576 U.S. at 546 (the Court noted that the existence of disparate impact claims "for the last several decades 'has not given rise to . . . dire consequences.'").

[256] *See, e.g., HUD* v. *Twinbrook Vill. Apts.,* HUDALJ Nos. 02–00–0256–8, 02–00–0257–8, 02–00–0258–8, 2001 HUD ALJ LEXIS 82, at *46 (HUD ALJ Nov. 9, 2001); *HUD* v. *Pfaff,* 1994 HUD ALJ LEXIS 69, at *19 (HUD ALJ Oct. 27, 1994) rev'd on other grounds, 88 F.3d 739 (9th Cir. 1996); *HUD* v. *Mountain Side Mobile Estates P'ship,* 1993 HUD ALJ LEXIS 44, at *37 (HUD ALJ Mar. 22, 1993); *HUD* v. *Carter,* 1992 HUD ALJ LEXIS 72, at *15 (HUD ALJ May 1, 1992); *see also* 1994 Joint Policy Statement on Discrimination in Lending, 59 FR 18269.

[257] *See, e.g., Charleston Hous. Auth.* v. *U.S.D.A.,* 419 F.3d 729,740–42 (8th Cir. 2005); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 49–50 (1st Cir. 2000); *Huntington Branch* v. *NAACP of Huntington,* 844 F.2d 926, 939 (2d Cir. 1988).

[258] *See, e.g., Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283,1290 (7th Cir. 1977) (applying a four-factor balancing test).

[259] *See, e.g., Graoch,* 508 F.3d at 373 (balancing test incorporated as elements of proof after second step of burden-shifting framework); *Mountain Side Mobile Estates* v. *Sec'y HUD,* 56 F.3d 1243, 1252–1254 (10th Cir. 1995) (incorporating a three-factor balancing test into the burden-shifting framework to weigh defendant's justification).

[260] The Fourth Circuit has applied a four-factor balancing test to public defendants and a burden-shifting approach to private defendants. *See, e.g., Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 989 n.5 (4th Cir. 1984).

**App.203**

application of the test on a national basis. Reduced compliance costs would be expected to result because housing providers could look to a uniform standard at HUD and in the various courts across the country. It also offered clarity to persons seeking housing and persons engaged in housing transactions as to how to assess potential claims involving discriminatory effects. HUD now recodifies the burden shifting framework of the 2013 Rule, continuing the clarity, consistency, and predictability that accompanied that rule.

*Issue:* Commenters stated that HUD has provided no basis for the statement that it would cost as much for an insurer to demonstrate eligibility for an exemption for risk-based practices as it would to litigate the actuarial soundness of a challenged practice on a case-by-case basis in multiple jurisdictions at different points in time.

*HUD Response:* It appears that commenters may be referencing HUD's discussion from its 2016 Supplement of granting safe harbors for specific risk-based factors. In 2016, HUD did not discuss the cost to insurers of demonstrating eligibility for a general exemption for "risk-based practices." Rather, HUD discussed how the *arguments and evidence* that insurers would need to demonstrate to show they qualified for an exemption would be the same as the arguments and evidence that they would need to meet their burden at step two.[261] As HUD explained, if HUD were to provide a safe harbor for the use of any factor that an insurer could prove is purely risk-based, entitlement to the safe harbor would inevitably necessitate the insurer to establish it qualifies for the defense, *i.e.,* that the use of the factor is, in fact, risk-based.[262] If an insurance practice is provably risk-based, and a plaintiff cannot establish that a less discriminatory alternative exists, the insurer will have a legally sufficient justification under this final rule. The arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification. Consequently, on the one hand an exemption for all provably risk-based factors would offer little added value for insurers, in terms of avoiding litigation costs. On the other hand, an exemption would foreclose potentially meritorious claims in contravention of the Act's broad remedial goals and HUD's obligation to affirmatively further fair housing.

*Other Comments Related to Insurance*

*Issue:* Commenters urged HUD to retain the 2020 Rule for numerous reasons. Commenters said that different forms of this rule have been enacted and retracted over the past few years, leading to confusion and that reinstating the 2013 Rule would be a step backwards. A commenter stated that in 2013, HUD expanded the scope of the Act to cover the insurance industry. Commenters stated that the 2020 Rule did not apply to insurance, so this rule should not create liability for homeowners insurers. Commenters noted that retracting the 2020 Rule so soon after it was promulgated was problematic for policy holders and the insurance industry, as risk-based pricing should not be subject to fleeting changes in policy.

Other commenters stated that it makes practical sense for insurers to be covered by the proposed rule given a long and well documented history of discrimination in the insurance industry. Commenters noted that the insurance industry has been subject to discriminatory effects liability for several decades. A commenter noted that in the more than twenty years since the Act was amended, courts that have considered the issue have consistently held that the Act prohibits acts of discrimination by homeowners insurers.

*HUD Response:* HUD declines to retain the 2020 Rule and notes that the 2020 Rule also did not exempt insurers. Commenters appear to misunderstand HUD's prior rules. Insurance practices have long been subject to liability under a disparate impact theory; that liability did not begin with the 2013 Rule and did not end with 2020 Rule, which contained no exception for such practices. Indeed, since 1989, HUD's fair housing regulations have explicitly prohibited "[r]efusing to provide . . . property or hazard insurance for dwellings or providing such . . . insurance differently" because of a protected characteristic.[263] And the 2020 Rule explicitly stated that it "does not establish an insurance industry exemption." [264] Moreover, since the 2020 Rule never went into effect, there have been no changes in policy. In promulgating this final rule, HUD is recodifying a standard that has been in effect for ten years, has proven workable, and is supported by decades of caselaw both before and following its enactment.

*Issue:* A commenter requested that the rule include a specific defense for risk-based ratemaking, as provided in the 2020 Rule. Other commenters stated that HUD should add a substantive defense for risk-based practices whereby if a defendant can show it relied on risk-based practices at step two of the burden-shifting framework, the plaintiff should not have the opportunity to rebut the defense at step three.

*HUD Response:* HUD notes that the 2020 Rule did not in fact provide defenses specific to risk-based ratemaking and it declines to add such a defense now. Step two of the burden-shifting framework already provides a defense for substantial, legitimate nondiscriminatory interests, which will allow a defendant to prevail absent the plaintiff's ability to show a less discriminatory alternative. Eliminating the third step would remove the requirement for insurers to adopt the least discriminatory alternative that serves their substantial, legitimate, nondiscriminatory interest, undermining the purpose of the Act. In sum, by suggesting that the third step be eliminated, the commenter is asking for an exemption from liability for policies and practices having a discriminatory effect, which may have a legally sufficient justification, but for which a less discriminatory alternative may exist, which as explained above, HUD declines to do.

*Issue:* Commenters noted that in 2017, the U.S. Department of Treasury recommended that HUD reconsider whether its 2013 Rule is consistent with the McCarran-Ferguson Act, whether the disparate impact rule would have a disruptive effect on the availability of insurance, and whether the rule is reconcilable with actuarially sound principles.[265]

---

[261] *See* 81 FR 69012, 69017.

[262] HUD went on to further explain that "selecting a few factors for exemption . . . based on bare assertions about their actuarial relevance, without data and without a full survey of all factors utilized by the homeowners insurance industry, would . . . be arbitrary. Even if such data were available and a full survey performed, safe harbors for specific factors would still be overbroad because the actuarial relevance of a given factor can vary by context. Also, while use of a particular risk factor may be generally correlated with probability of loss, the ways in which an insurer uses that factor may not be. Furthermore, the actuarial relevance of any given factor may change over time as societal behaviors evolve, new technologies develop, and analytical capabilities improve." 81 FR 69017.

[263] 24 CFR 100.70(d)(4); 54 FR 3232, 3285 (Jan. 23, 1989).

[264] 85 FR 60288, 60324 (Oct. 6, 2020) ("This rulemaking does not establish an insurance industry exemption.")

[265] U.S. Dept. of Treasury, A Financial System that Creates Economic Opportunities: Asset Management and Insurance (2017) (formerly available at *https://home.treasury.gov/news/*

Continued

**App.204**

*HUD Response:* As discussed above in greater detail, HUD has considered these issues and finds that the 2013 Rule and its framework, as adopted in this rule, is consistent with the McCarran Ferguson Act, is reconcilable with actuarially sound principles, and would not have a disruptive effect on the availability of insurance. Treasury believes that HUD, in its reconsideration of the 2013 Rule, has addressed the concerns Treasury noted in the 2017 report regarding the Rule's application to the insurance industry. Treasury no longer has the concerns expressed in that report.

*Issue:* Commenters stated that the 2013 Rule and 2016 supplement adequately considered the issue of application to insurance and adequately addressed the industry's concerns. Other commenters stated that the 2016 Supplemental Explanation failed to adequately explain why the filed-rate doctrine would not bar challenges to insurance rates under the Act.

*HUD Response:* While these comments are outside the scope of this final rule, since HUD is now re-finalizing the 2013 Rule and responding to the current comments received in response to its 2021 Notice of Proposed Rulemaking, HUD agrees with the commenters who stated that the 2013 Rule and 2016 Supplement adequately considered the 2013 Rule's application to insurance and adequately addressed the industry's concerns. And this final rule thoroughly responds to comments from the insurance industry, including those concerning the filed-rate doctrine.

Section 100.5(d): Data Collection

*Issue:* Commenters disagreed about whether to include the 2020 Rule's language that nothing in HUD's fair housing regulations requires or encourages the collection of data relevant to characteristics protected by the Act. Some commenters opposed including such a provision, stating that: its inclusion was unnecessary and unwise; data collection can be used to identify policies and practices that may have a discriminatory effect; and discouraging data collection would have a grave effect on discriminatory effects litigation.

Other commenters asked HUD to include such a provision, stating that otherwise, the rule's burden shifting framework necessitates data collection, which will create unnecessary costs and be especially burdensome and expensive for insurers because they do not already collect this data.

Commenters stated that without the provision, the rule would expose businesses to liability risks by requiring them to obtain and store personal and potentially sensitive information about an individual's protected characteristics. Another commenter stated that requiring the collection of data would inappropriately shift the burden of proof from a plaintiff to a defendant.

Commenters also expressed concern that the only way for insurers to collect data regarding protected characteristics would be through self-reporting, which may result in incomplete or erroneous data, making compliance with the rule difficult. A commenter stated that disparate-impact challenges to risk-based practices in insurance would improperly inject race into the business of insurance by incentivizing or compelling insurers to collect and analyze data on protected characteristics to be able to mount a defense in the event of a disparate impact challenge. Commenters stated that insurers may be prohibited under state law from collecting protected trait data. Commenters added that: insurance company employees will be uncomfortable asking current or potential policy holders for information about their membership in a protected class; collecting demographic data regarding protected traits would invade customer's privacy; and asking about protected class characteristics could discourage applicants for insurance from seeking quotes.

*HUD Response:* HUD believes that this final rule need not include data collection language. HUD agrees that data collection can play an important role in assessing whether a policy or practice may have an unjustified discriminatory effect. HUD also agrees with the Court in *Inclusive Communities,* when it acknowledged that "awareness of race" can help industries "[that] choose to foster diversity and combat racial isolation with race-neutral tools." [266] This supports the idea that this Rule should not discourage the collection of this information. But HUD is also not requiring data collection. The purpose of this final rule is to recodify a long-recognized legal framework, not to describe how data and statistics may be collected, obtained, or used in the application of the framework.

HUD notes further that while data collection can be a means to identify practices that have or predictably will have a discriminatory effect, there are

other ways of identifying such practices that do not require examining a business' own client pool. For example, businesses can look to publicly available datasets or studies related to their practices to see if their practices cause or predictably will cause a discriminatory effect. As HUD explained regarding the use of criminal records, "[a]cross the United States, African Americans and Hispanics are arrested, convicted and incarcerated at rates disproportionate to their share of the general population. Consequently, criminal records-based barriers to housing are likely to have a disproportionate impact on minority home seekers." [267] A business need not collect data from its own clients to ascertain that relying on criminal records in its policies or practices likely has a discriminatory effect on certain populations. In addition, independent data gathering is not necessary to defend a lawsuit alleging discriminatory effects. Plaintiffs must meet their initial burden at step one to show a disparate impact. Defendants need not present their own statistics in response to this step one evidence, but may defend in numerous other ways, including by showing that the data put forward by plaintiff is incorrect or wrongly analyzed, or by showing at step two that the challenged practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest. This is true for all defending parties, including insurers, who bear no increased burden.

Moreover, concerns about how the rule would change industry practices—in particular what commenters say is the insurance industry practice of not collecting demographic data—do not square with the fact that current industry practice is based on a rule that has been in place, uninterrupted, since 2013, and based on the underlying law that has been in place for decades prior. Businesses that have not collected data over the past several decades will not be facing any change in the laws regulating their practices with HUD's recodification of the 2013 Rule.

*Issue:* Commenters requested that HUD clarify expectations and provide protections for lenders that collect demographic data for use in fair lending self-testing.

*HUD Response:* As discussed above, HUD believes that demographic data can be helpful in assessing whether a policy has an unjustified discriminatory effect. HUD notes further that lenders

[266] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 519, 542.

[267] "Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions" at 2 (April 4, 2016) (internal citations omitted).

routinely collect data on protected characteristics as part of their Home Mortgage Disclosure Act reporting obligations. However, HUD is not requiring either collection of demographic data or self-testing. It is unclear what ''protections'' commenters meant for HUD to provide to lenders who collect demographic data and use that data to engage in self-testing. HUD notes that the self-testing privilege as described in 42 U.S.C. 3614–1 already applies to lenders. This self-testing privilege will not provide a lender (or any other entity) with an exemption from liability under the Act, but if a complaint is made to HUD against a lender alleging practices that have an unjustified discriminatory effect, HUD is prohibited from obtaining self-testing results covered by this self-testing privilege to investigate a lender's compliance with the Act. Of note, HUD will not absolve a lender of potential liability merely because the lender collects demographic data and does self-testing. Doing so would abdicate HUD's basic obligation to enforce the Act by ceding substantive compliance authority from HUD to private lenders.

*Section 100.500: The Discriminatory Effects Rule*

Section 100.500(a): Removing ''Predictably'' From the Definition of Discriminatory Effect

*Issue:* Commenters asked HUD to remove the word ''predictably'' from the proposed rule's definition of discriminatory effects in § 100.500(a), asserting that it violates the Act. A commenter stated that the plain language of section 804(b) does not include practices that might result in a discriminatory effect. Other commenters asserted that the ''predictably results'' language violates *Inclusive Communities'* ''robust causality'' requirement. According to one commenter, this ''new'' robust causality standard requires a plaintiff to prove that a practice already caused the discriminatory effect, not just that a practice will predictably do so. Commenters similarly suggested that *Inclusive Communities'* bar on claims that are based solely on statistical evidence rules out claims based on predictable or hypothetical impacts.

Other commenters wrote in favor of retaining the ''predictably'' language in the rule. Commenters pointed out that courts, including *Inclusive Communities,* have interpreted the ''predictably'' language in the proposed rule to contain a ''robust causality'' requirement, including a bar on claims that are based solely on statistical

evidence of discriminatory effects. One commenter noted that the robust causality requirement that *Inclusive Communities* discusses is simply the 30-year-old requirement that a plaintiff, to prevail in a disparate impact challenge, must show that the disparate impact is causally related to, not merely correlated with, the identified practices of the defendant. Another commenter noted that in the very first case in which an appeals court recognized discriminatory effects liability, the 8th Circuit required the plaintiff to bear the burden of showing that defendants' conduct actually or predictably resulted in a discriminatory effect. One commenter noted that HUD in 2013 explained how the ''predictably'' language was supported by the plain language of the Act and case law, and HUD ignored this justification when it attempted to remove the language in the 2020 Rule.

One commenter acknowledged that ''predictability'' is a necessary element to assess the disparate impact of a policy and an issue that *Inclusive Communities* did not address. Other commenters noted multiple cases in which courts have utilized the proposed rule's predictably standard in practical, effective ways, such as in *Georgia Conference of the NAACP* v. *City of LaGrange,* and *Fortune Society* v. *Sandcastle.*[268]

A commenter noted that caselaw and practical common-sense support that one need not wait until actual harm is inflicted before an action can be challenged. Another commenter noted that removing the predictably standard would unnecessarily increase the risk of harm to communities by taking away the ability to make claims for reasonable, foreseeable harm.

*HUD Response:* HUD declines to remove ''predictably'' from this final rule's definition of discriminatory effects. As explained in the 2013 Rule, the plain language of the Act supports the inclusion of this language. The Act defines an ''aggrieved person'' as anyone who, among other things, ''believes that such person *will be* injured by a discriminatory housing practice that is *about to occur.*''[269] Furthermore, the Act explicitly authorizes HUD to take enforcement action and Administrative Law Judges (ALJs) and courts to order relief with respect to discrimination that ''*is about*

*to occur.*''[270] In addition, courts interpreting the Act have agreed that predictable discriminatory effects may violate the Act.[271] HUD further believes it would be contrary to HUD's duty to affirmatively further fair housing if it could not take action to prevent the harm of a predictable discriminatory effect and instead had to first allow individuals to be subjected to discrimination before any enforcement action could be taken. As explained above, the Court in *Inclusive Communities* did not announce a new ''robust causality'' requirement. Nor did it indicate any intention to exclude from liability cases that allege predictable discriminatory effects. Rather, the Court simply described the longstanding requirement that a plaintiff must establish a causal connection between the policy or practice and the discriminatory effect. *Inclusive Communities* explained that a plaintiff raising a ''disparate-impact claim relying on a statistical disparity'' must ''point to a defendant's policy or policies causing that disparity.''[272] Consistent with *Inclusive Communities,* this final rule requires—whether for a disparity that has already occurred or one that will occur—that the plaintiff point to a defendant's policy or policies that cause the disparity, and not rely on a statistical disparity alone.[273]

*Issue:* Commenters also objected to the ''predictably results'' language in proposed § 100.500(a) (and the ''predictably will cause'' language at § 100.500(c)(1)) saying that it is inconsistent with case law under Title VII and the Age Discrimination in Employment Act (ADEA). They stated that the Title VII cases *Wards Cove Packing Co.* v. *Atonio*[274] and *Watson* v. *Fort Worth Bank & Trust*[275] preclude

---

[268] *Ga. State Conf. of the NAACP* v. *LaGrange,* 940 F.3d 627 (11th Cir. 2019); *Fortune Soc'y* v. *Sandcastle Hous. Dev. Fund Corp.,* 388 F. Supp. 3d 145 (E.D.N.Y. 2019).

[269] 42 U.S.C. 3602(i)(2) (emphasis added).

[270] 42 U.S.C. 3610(g)(2)(A), 3613(c)(1), 3614(d)(1)(A) (emphasis added).

[271] *See, e.g., United States* v. *City of Black Jack, Mo.,* 508 F.2d 1179, 1184 (8th Cir. 1974) (''To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually *or predictably results* in racial discrimination; in other words, that is has a discriminatory effect.'') (emphasis added); *Fortune Soc'y* v. *Sandcastle Towers Hous. Dev. Fund Corp.,* 388 F. Supp. 3d 145 (E.D.N.Y. 2019).

[272] *Inclusive Cmtys. Project, Inc.*576 U.S. at 542.

[273] *See* 24 CFR 100.500(c)(1) (The . . . plaintiff . . . has the burden of proving *that a challenged practice caused or predictably will cause* a discriminatory effect)(emphasis added); 100.500(c)(a)(A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons . . . because of race, color, religion, sex, handicap, familial status, or national origin).

[274] *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989).

[275] *Watson* v. *Fort Worth Bank & Trust,* 487 U.S. 977 (1988).

**App.206**

discriminatory effects claims based on policies which predictably, rather than actually, cause a discriminatory effect. Commenters stated that in *Wards Cove,* the Supreme Court stated that ''[a] plaintiff must demonstrate that it is the application of a specific or particular . . . practice that has created the disparate impact under attack. Such a showing is an integral part of the plaintiff's prima facie case.'' [276] Commenters quoted *Watson,* which said that ''the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'' Similarly, a commenter cited *Meacham* v. *Knolls Atomic Power Lab'y* [277] for the proposition that plaintiffs in cases brought under the ADEA must prove an existing disparate impact—not a future one.

*HUD Response:* HUD believes that the commenters' reliance on these Title VII and ADEA cases is misplaced because these cases only considered the question of whether certain policies already had had a disparate impact, not whether they would ''predictably'' have one in the future.[278] Furthermore, the Act explicitly describes an aggrieved person as including ''any person who believes that such person will be injured by a discriminatory housing practice that is about to occur'' [279] Finally, courts interpreting the Act have agreed that predictable discriminatory effects may violate the Act.[280]

---

[276] *Wards Cove Packing Co.,* 490 U.S. at 657.

[277] *Meacham* v. *Knolls Atomic Power Lab'y* 554 U.S. 84 (2008).

[278] *See Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642 (1989) (examining whether the employer's policy or practice caused documented racial disparities at different positions at a cannery, not whether the employer's policy or practice would predictably cause disparities at different positions at the cannery); *Watson* v. *Fort Worth Bank & Trust,* 487 U.S. 977 (1988) (examining whether a bank's subjective promotion practices had a disparate impact on black employees, not whether the bank's practice would predictably have a disparate impact on black employees); *Meacham* v. *Knolls Atomic Power Lab'y,* 554 U.S. 84 (2008) (examining a case where the employer was alleged to have utilized a policy that a caused a disparate impact on ADEA protected employees, not where the employer was alleged to have utilized a policy that predictably would cause a disparate impact on ADEA protected employees).

[279] *See* 42 U.S.C. 3602(i)(2); *compare* 42 U.S.C. 2000e; 29 U.S.C. 630.

[280] *See, e.g., Pfaff* v. *HUD,* 88 F.3d at 745, 745 (9th Cir. 1996) (''Discriminatory effect' describes conduct that actually or predictably resulted in discrimination.''); *United States.* v. *City of Black Jack,* 508 F.2d at 1184 (''To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect.''); *Fortune Soc'y,* 388 F. Supp.

---

**Section 100.500(a): Perpetuation of Segregation in the Definition of Discriminatory Effect**

*Issue:* Commenters disagreed about the proposed rule's inclusion of perpetuation of segregation as a type of unlawful discriminatory effect. Some commenters stated that including liability for practices that perpetuate segregation is too broad and may have a chilling effect on the development of affordable housing. One commenter said that prohibiting practices that perpetuate, create, increase, or reinforce segregated housing patterns based on protected classes was a more stringent standard than *Inclusive Communities* announced. Another commenter stated that this language would expand liability to cover any action or any absence of action that reinforces or perpetuates segregated housing patterns, which is inconsistent with *Inclusive Communities'* requirement that plaintiffs demonstrate that the challenged practice is a direct cause of the disparate impact.

In contrast, other commenters stated that including the perpetuation of segregation provision is crucial to combatting segregation (including segregation based on disability and race), which is still a major problem today and can have devastating impacts on communities. Commenters said if HUD did not include this language, it would mean that HUD had adopted the view that perpetuation of segregation was not a central or relevant concern of disparate impact, that perpetuation of segregation was no longer a basis for liability under the Act, and/or that perpetuation of segregation liability would be collapsed into disparate impact liability, and only be evidence of a disparate impact claim, rather than an independent means of establishing a violation in and of itself. Commenters noted that reinstating the perpetuation of segregation language was important to eliminate the confusion that the 2020 Rule had caused through its removal, and to clarify that perpetuation of segregation is a distinct type of discriminatory effect under the Act. Commenters gave examples of activities which may unlawfully perpetuate segregation, including facially neutral zoning decisions whose real but disguised purpose is to exclude people of color, and the demolition or displacement of affordable housing

---

3d 145; *Conn. Fair Hous. Ctr* v. *CoreLogic Rental Prop. Sols., LLC,* No. 18–cv–705, 2021 U.S. Dist. LEXIS 60197, at *51 (D. Conn. Mar. 30, 2021); *Jones* v. *City of Faribault,* No. 18–1643 (JRT/HB), 2021 U.S. Dist. LEXIS 36531, at *55 (D. Minn. Feb. 18, 2021).

---

leading to severely limited opportunities for people of color. Commenters said that removing the perpetuation of segregation provision would conflict with *Inclusive Communities.* One commenter stated that federal appellate courts have long recognized perpetuation of segregation as a distinct basis for discriminatory effects liability.[281] Commenters stated that the 2020 Rule, which eliminated perpetuation of segregation, conflicted with HUD's duty to affirmatively further fair housing, which is a central goal of the Act.

*HUD Response:* HUD agrees with the latter commenters that perpetuation of segregation is prohibited by the Act and, as such, should be included in the definition of discriminatory effects in this rule. The elimination of segregation is a central goal of the Act, one that was highlighted by *Inclusive Communities* and has long been recognized by other courts.[282] *Inclusive Communities* also recognized that practices that perpetuate segregation independently violate the Act.[283] HUD also notes that every

---

[281] *See Mhany Mgmt., Inc.* v. *Cnty. Of Nassau,* 819 F.3d 618 (2d Cir. 2016) (finding that a discriminatory effect violating the Act could be shown by a disparate impact on a minority group or a segregative effect); *see also Avenue 6E Investments, LLC,* 818 F.3d 493 (9th Cir. 2016) (explaining that the City's action to prevent the project in question from being built had the effect of perpetuating segregation).

[282] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 528–531. *See, e.g., Avenue 6E Invs.* v. *City of Yuma,* 818 F.3d 493, 503 (9th Cir. 2016) (''[A]s the Supreme Court recently reaffirmed [in *ICP*], the FHA also encompasses a second distinct claim of discrimination, disparate impact, that forbids actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason.'') (emphasis added); *Graoch Assocs. # 33, L.P.* v. *Louisville/Jefferson County Metro Hum. Rels. Comm'n,* 508 F.3d 366, 378 (6th Cir. 2007) (there are ''two types of discriminatory effects which a facially neutral housing decision can have: The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups.''); *see also Huntington Branch, NAACP* v. *Huntington,* 844 F.2d 926, 937 (2nd Cir. 1988); *Metro. Housing Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977); *Nat'l Fair Hous. All.* v. *Bank of Am.,* 401 F. Supp. 3d 619, 641 (D. Md. 2019) (''Perpetuation of segregation is, in effect, an alternate avenue of pleading disparate impact under the FHA.'') (citing *Graoch,* 508 F.3d at 378); *Hallmark Developers, Inc.* v. *Fulton Cnty.,* 386 F. Supp. 2d 1369, 1383 (N.D. Ga. 2005); *Dews* v. *Town of Sunnyvale,* 109 F. Supp. 2d 526, 569 (N.D. Tex. 2000) (ruling that the defendant-town's zoning restrictions were racially motivated in violation of various civil rights laws and also had both a disparate impact and segregative effect that violated the Act).

[283] *Inclusive Cmtys. Project, Inc.* 576 U.S. at 540 (''[T]he FHA aims to ensure that those priorities can

---

federal court of appeals to have addressed the issue has agreed with HUD's interpretation in the 2013 Rule.[284] HUD finds that the rule is consistent with *Inclusive Communities'* causation requirement because it plainly requires that a practice "causes or will cause" a discriminatory effect. While *Inclusive Communities* did not directly address a claim brought under a "perpetuation of segregation" theory, it[285] discusses disparate impact's long-standing limits, including its causation requirement, as in harmony with its aim to prohibit "perpetuating segregation." HUD believes that eliminating the perpetuation of segregation language will cause inconsistency between HUD's rule and judicial precedent and create the mistaken impression that HUD believes that practices that perpetuate segregation are not practices which create discriminatory effects.

HUD also disagrees that the final rule would chill the development of affordable and fair housing, including in predominantly minority neighborhoods. Commenters did not provide, and HUD is not aware of, any support for the proposition that this rule would have such an effect. Instead, this rule provides a framework for plaintiffs to

challenge discriminatory housing decisions. And *Inclusive Communities* specifically noted that HUD's discriminatory effects rule recognized that disparate impact liability does not mandate that affordable housing be located in neighborhoods with any particular characteristic.[286] Eliminating the provision on perpetuation of segregation would also be inconsistent with HUD's duty to affirmatively further fair housing, which applies, *inter alia*, to HUD's program of administering, implementing, and enforcing the Fair Housing Act.[287]

In sum, HUD declines to eliminate the provision on perpetuation of segregation because doing so would lead to uncertainty over the state of the law, the provision is consistent with *Inclusive Communities* and well established caselaw, and doing so would undermine one of the core goals of the Act, *i.e.*, ending the perpetuation of segregation.[288]

Section 100.500: Racial Quotas or Unfair Advantages to Plaintiffs

*Issue:* Commenters expressed concern that the proposed rule's framework would cause them to adopt quotas to avoid unlawful disparities. One commenter stated that this is because the rule does not require any causal connection between the policy and any disparity and would therefore pose the risk that financial services and businesses would adopt a quota-based approach to avoid disparities. Another commenter similarly suggested that the proposed rule does not contain a robust causality requirement, stating that *Inclusive Communities* emphasized a robust causality requirement to prevent housing providers and businesses from resorting to racial quotas. Another commenter asserted that to align the rule with *Inclusive Communities'* robust causality requirement and therefore reduce the incentive for housing providers to use racial quotas, while still maintaining the essence of the 2013 Rule, HUD should modify the final rule to say that "discrimination on a group

of persons is predictable through a robust causal link by the challenged policy or practice."

In contrast, a commenter stated that the proposed rule would not require businesses to consider race or quotas. Other commenters stated that by requiring that a plaintiff prove that the challenged practice caused or predictably will cause a disparate impact rather than imposing liability based on statistical disparities alone or general societal discrimination, this rule addresses any concerns that disparate impact liability would cause defendants to resort to quotas.

*HUD Response:* HUD disagrees that this final rule will incentivize quotas. While the Court expressed concern in *Inclusive Communities* that "without adequate safeguards at the prima facie stage," disparate-impact liability might lead to the use of "numerical" or "racial quotas,[289] this rule already contains these "adequate safeguards." In particular, the rule requires plaintiffs to demonstrate that "a challenged *practice caused* or predictably *will cause*" (emphasis added) a discriminatory effect. Furthermore, it defines "a practice that has a discriminatory effect" as one where the practice "*actually or predictably results* in a disparate impact" (emphasis added) or in segregation cases, where the practice "creates, increases, reinforces or perpetuates segregated housing patterns." As explained previously in this preamble, this connection between the challenged practice and the discriminatory effect is the causality that *Inclusive Communities* spoke of when discussing how safeguards would prevent the use of racial quotas.[290] And it was in the context of the *Inclusive Communities* district court's failure to require this connection (by finding the defendant liable solely on discrepancies in outcomes, without requiring the plaintiff to show that a particular practice caused those outcomes) that the Fifth Circuit remanded the matter with instructions to follow the 2013 Rule,[291] a judgment

be achieved without arbitrarily creating discriminatory effects or perpetuating segregation"). *See also id.* at 539–540 (citing *United States* v. *City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974) and *Huntington Branch, N.A.A.C.P.* v. *Town of Huntington,* 844 F.2d 926, 934 (2d Cir.), *aff'd in part,* 109 S. Ct. 276 (1988), which were "perpetuation of segregation" cases and described as "heartland" disparate-impact liability cases).

[284] *See, e.g., Graoch Assocs. #33, L.P.* v. *Louisville/Jefferson Cnty. Met. Hum.n Rels. Comm'n,* 508 F.3d 366, 374–78 (6th Cir. 2007); *Reinhart* v. *Lincoln Cnty.,* 482 F.3d 1225, 1229– 1232 (10th Cir. 2007); *Hallmark Devs. s, Inc.* v. *Fulton Cnty., Ga.,* 466 F.3d 1276, 1286 (11th Cir. 2006); *Charleston Hous. Auth.* v. *U.S. Dep't of Agric.,* 419 F.3d 729, 740–41 (8th Cir. 2005); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 49– 50 (1st Cir. 2000); *Jackson* v. *Okaloosa Cnty., Fla.,* 21 F.3d 1531, 1543 (11th Cir. 1994); *Keith* v. *Volpe,* 858 F.2d 467, 484 (9th Cir. 1988); *Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 937–38 (2d. Cir. 1988), aff'd, 488 U.S. 15 (1988) (per curiam); *Resident Advisory Bd.* v. *Rizzo,* 564 F.2d 126, 148 (3d. Cir. 1977); *Betsey* v. *Turtle Creek Assocs.,* 736 F.2d 983, 987–89, n.3 (4th Cir. 1984); *Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290–91 (7th Cir. 1977); *United States.* v. *City of Black Jack,* 508 F.2d 1179, 1184–86 (8th Cir. 1974).

[285] *See Inclusive Cmtys. Project, Inc.,* 576 U.S. at 540– 41. ("[D]isparate-impact liability has always been properly limited in key respects . . . for instance, if such liability were imposed based solely on a showing of a statistical disparity. Disparate impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies. The FHA is not an instrument to force housing authorities to reorder their priorities. Rather, the FHA aims to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation.") (internal citations omitted).

[286] *Id.* at 542 (quoting 78 FR 11476).

[287] *See, e.g.,* 42 U.S.C. 3608(e)(5) (The Secretary of Housing and Urban Development shall— administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter); *Thompson v. United States HUD,* 348 F. Supp. 2d 398, 417 (D. Md. 2005) (finding that HUD's duty to affirmatively further fair housing under § 808(e) holds HUD's actions to a "high standard" which includes "'to have a commitment to desegregation'').

[288] *Inclusive Cmtys. Project, Inc..* at 540 ("[t]he FHA aims to ensure that those [legitimate] priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation.").

[289] *Id.* at 542–43.

[290] *See id.* at 540–43 (explaining that a robust causality requirement means that a plaintiff must "point to a defendant's policy causing [a] disparity" and "allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection" between the policy and the disparity/ imbalance, as opposed to simply relying on a statistical disparity or racial imbalance alone, and noting that this requirement safeguards against defendants being held liable for disparities they did not create, which might encourage the use of racial quotas).

[291] *See Inclusive Cmtys. Project, Inc.* v. *Tex. Dep't of Hous. and Cmty. Affairs,* 747 F.3d 275 (5th Cir 2014) (remanding the matter for application of
Continued

the Supreme Court ultimately affirmed. Crucially, therefore, far from invalidating the 2013 Rule for failing to require this connection, the Fifth Circuit and Supreme Court decisions both support HUD's position that that applying the 2013 Rule's framework is the correct method of ensuring that disparate impact liability does not improperly require the use of racial quotas.

Further, HUD's discussion above regarding the insurance underwriting processes explains the difference between being aware of protected traits to avoid discrimination (consistent with this final rule, *Inclusive Communities,* and the Act) and violating the Act by making decisions based upon a protected trait.[292]

In addition, it is unclear how the commenter's proposed alternative language, that ''discrimination on a group of persons is predictable through a robust causal link by the challenged policy or practice'' would improve the rule or disincentivize quotas. On the contrary, HUD believes modifying the rule to incorporate this language would create confusion about the causal link between the policy and the effect discussed by *Inclusive Communities.* For example, it is unclear what ''by'' means in the proposed sentence, and the sentence does not make clear that the *practice must cause* (predictably or actually) *the discriminatory effect.* HUD further believes incorporating the ''robust causal link'' language is unnecessary and could confuse people about a heightened standard that *Inclusive Communities* did not create, as detailed elsewhere in this preamble.

*Issue:* Commenters stated that the proposed rule would create an uneven playing field in favor of plaintiffs through the requirements and burdens placed on defendants, as compared to plaintiffs. Some commenters stated that the proposed rule requires defendants to show that their policy will *not* cause a disparate impact on a protected group. Other commenters said the proposed rule allows plaintiffs to use hypothetical or speculative evidence, or no evidence at all, to show that a practice causes a discriminatory effect, while at the same time requiring defendants to meet their burden at step two with evidence that is not hypothetical or speculative, thus placing the entire burden of proof on defendants. A commenter said the rule allows plaintiffs to raise hypothetical or speculative impacts at step one (because of the ''predictably results'' language), while barring defendants from raising hypothetical or speculative defenses at step two.

On the other hand, commenters supported HUD's continuation of the 2013 Rule's framework, stating that the 2020 Rule unjustifiably favors defendants because plaintiffs must meet a preponderance of the evidence standard to prove discrimination, but defendants are only required to show that a policy advances a legitimate interest. The commenters stated that this conflicts with well-established case law placing the burden on the defendant to prove that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.

*HUD Response:* HUD believes that the burdens and requirements in the rule are appropriately balanced, and that the concerns that the rule is tipped in favor of plaintiffs are based on misunderstandings of the rule.

First, the rule does not require a defendant to show that its policy or practice does not cause a disparate impact. In fact, this rule does not require any party to prove a negative. While a defendant may choose to present evidence that the defendant's policy does not cause a discriminatory effect to rebut the plaintiff's evidence that it does, the plaintiff has the ultimate burden of proving that a defendant's policy caused (or predictably will cause) a discriminatory effect.

Nor does this rule place a greater evidentiary burden on defendants than on plaintiffs or otherwise shift the burden of proof entirely onto defendants. Under the rule, the plaintiff must prove through evidence (not speculation) that a challenged practice caused or predictably will cause a discriminatory effect (step one). Assuming the plaintiff meets this burden, the defendant must prove through evidence (not speculation) that a challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests (step two). If the plaintiff fails to meet its step one burden, defendant prevails, and if the defendant fails to meet its step two burden, the plaintiff prevails. It is the plaintiff—not the defendant—who carries the burden at two of the three steps in the burden shifting framework, including the final one. As HUD said in the 2013 Rule: ''Requiring the respondent or defendant to introduce evidence (instead of speculation) proving that a challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests in order to benefit from the defense to liability is not different in kind from requiring the plaintiff to introduce evidence (not speculation) proving that a challenged practice caused or will predictably cause a discriminatory effect. As discussed in this preamble, the language of the Act makes clear that it is intended to address discrimination that has occurred or is about to occur, and not hypothetical or speculative discrimination.''

Although commenters specifically called out evidence that could support a complaint concerning a ''predictable'' disparate impact as ''hypothetical'' or ''speculative'' under the rule, this is incorrect. In the final rule's framework, neither the plaintiffs nor defendant may rely on hypothetical or speculative evidence. All parties must rely on evidence that is sufficiently rigorous and not speculative, and there is no requirement that either side rely solely on evidence of the already existing effects of defendants' adopted policy. For example, lenders routinely assess proposed policy changes using current data to determine whether, if adopted, the policy would have a disparate impact in the future. Data analysis like this—of the effects that a policy will have, rather than the effects a policy already has had—is neither ''hypothetical'' nor ''speculative'' and could be used by either a plaintiff or a defendant to support or rebut a predictable effects claim at step one. And just as a plaintiff can rely on evidence that the defendant's policy will predictably have certain effects, a defendant can rely on evidence that a proffered less discriminatory alternative to its policy will not work.

Moreover, characterizing the *impact* of a ''predictable effects'' showing at step one as ''hypothetical or speculative'' is incorrect. Even if the impact has not yet occurred, this final rule still requires that plaintiffs prove that it predictably will occur. If plaintiffs show only that the discriminatory impact is ''hypothetical,'' or ''speculative,'' they will not prevail. Defendants may prove that a policy or practice with a discriminatory effect was necessary to meet a substantial, legitimate, interest. Hypothetical or speculative defenses articulated in support of a policy or practice will not be sufficient, because defendants know the actual reason for the policy or practice at issue. Allowing defendants to present different reasons than their actual reasons for implementing policies with

---

HUD's 2013 Rule); *id* at 283–84 (concurring) (highlighting specifically the problem of the lower courts analysis as accepting plaintiffs relying on statistical evidence of disparity alone without a connection to an offending policy).

[292] *See supra* at *Discriminatory Effects as Applied to Insurance.*

discriminatory effects would allow pretextual reasons to justify discriminatory policies, thus defeating the important role of discriminatory effects liability in uncovering discriminatory intent,[293] and would permit, rather than remove, arbitrary and artificial barriers to housing.

Finally, HUD agrees with commenters who noted that the burden shifting framework in this rule strikes the appropriate balance between the interests of plaintiffs and defendants, and that the 2020 Rule upset this balance. For example, it required defendants to identify only a legitimate interest rather than an interest that is also substantial and nondiscriminatory. It removed the requirement that the defendant's challenged practice be necessary to achieving that legitimate interest. Additionally, the defendants' burden was reduced from one of proof to one of production. HUD notes that these changes were neither consistent with nor justified by the text of the Act or case law interpreting it.[294] And to the extent the Act and case law provide discretion, HUD exercises its policy judgment to maintain the 2013 Rule's burden shifting framework for the reasons stated above.

### Section 100.500(a) and (c)(1): Clarifying Causation

*Issue:* Commenters suggested HUD provide guidance to help clarify causation in the final rule or modify the causation standard in the rule to make it more detailed or specific. Some commenters asked HUD to clarify that a challenged practice may be too remote from the alleged discriminatory effect to give rise to liability. Other commenters criticized the proposed rule for not making clear that a plaintiff must identify a *specific* policy or practice that caused the alleged disparate impact (as opposed to challenging a more general array of practices), with some saying that *Wards Cove* requires this. Other

commenters suggested that the rule specify that the discriminatory impact be "significant" because *Wards Cove* and *Inclusive Communities* require it. According to the commenters, the latter's warning that race should not be used in a pervasive way or injected into every housing decision necessitates a "significant" discriminatory impact. Others suggested the rule needs to be clearer on what evidence is required to show causation and should establish statistical standards, with one commenter stating that the rule should require some threshold of showing credible, localized, statistical proof that a challenged practice has a discriminatory effect. A commenter said clarification is needed because HUD's 2016 Guidance on criminal records, by pointing to historic nationwide incarceration rates, shows that HUD has interpreted the proposed rule to allow the plaintiff to meet the initial burden using sweeping generalizations about statistics and impact with little or no showing of statistically valid discriminatory impact. The commenter further stated that courts have interpreted the initial burden under Title VII, including in *Wards Cove,* as much higher than the burden articulated in the rule, including requiring that the practice has an adverse impact on a specific protected class that is qualitatively different from other classes and that can be demonstrated to have a materially different impact based on statistics for the relevant geographic area.

In contrast, other commenters stated that the proposed rule already contains a sufficiently clear causation requirement. A commenter wrote that the 2013 Rule and federal jurisprudence have appropriately rejected any potential single test to define "discriminatory effect" through evaluating statistical evidence of causation, citing *Mt. Holly Gardens Citizens in Action, Inc.* v. *Twp. of Mount Holly, Bonasera* v. *City of Norcross,* and *Langlois* v. *Abington Hous. Auth.*[295] and noted that further defining "discriminatory effect" (including that a disparate impact is "significant") is inappropriate because of the wide variety of policies and practices challenged.

*HUD Response:* HUD believes that revising the causation requirement in this final rule is inappropriate. The final rule already requires plaintiffs to show a causal link between the challenged

practice and the alleged discriminatory result. That requirement, in turn, necessitates consideration of whether a challenged practice is too remote from the alleged discriminatory effect for liability to arise under the Act.

In HUD's experience, identifying the specific practice that caused the alleged discriminatory effect will depend on the facts of a particular situation and therefore must be determined on a case-by-case basis. As has been recognized in the employment context under Title VII after *Wards Cove,* the elements of a decision-making process may not be capable of separation for analysis,[296] in which case it may be appropriate to challenge the decision-making process as a whole. For example, in a reverse redlining case, there may be multiple acts or policies that together result in a discriminatory effect.[297] Finally, in some instances, the absence of a policy may amount to a practice.[298] And while *Wards Cove* limited plaintiffs' ability in an employment matter to aggregate multiple practices in showing that a practice or practices cause a disparate impact until Congress amended Title VII, *Inclusive Communities* did not endorse a wholesale application of *Wards Cove* to disparate impact cases under the Act. Indeed, the Court only cited *Wards Cove* for an uncontroversial and undisturbed portion of its holding, *i.e.,* that simply pointing to racial imbalances within a company is insufficient to show that a policy caused a disparate impact.[298] And *Inclusive Communities* explicitly noted when it cited *Wards Cove* that the "robust causality" requirement it attributed to *Wards Cove* did not incorporate any part

---

[293] *See Inclusive Cmtys. Project, Inc.,* 576 U.S. at 540 (describing discriminatory effects liability as playing a role in uncovering discriminatory intent).

[294] *See, e.g., MHANY Mgmt. Inc.* v. *Cnty. of Nassau,* 819 F.3d 581, 618–619 (2d Cir 2016) (deferring to HUD's [2013] regulation, noting that "the Supreme Court implicitly adopted HUD's [burden shifting] approach [in 24 CFR 100.500(c)]"); *Prop. Cas. Insurers Ass'n of Am.* v. *Carson,* 2017 WL 2653069, at *8–9 (N.D. Ill. June 20, 2017) (finding that HUD's 2013 adoption of the 3-step burden-shifting framework was a reasonable interpretation of the Act and that "in short, the Supreme Court in *Inclusive Communities* . . . did not identify any aspect of HUD's burden-shifting approach that required correction."); *Burbank Apartments Tenant Ass'n* v. *Kargman,* 474 Mass. 107, 126–27 (Mass. 2016) (explaining that in was following the "burden-shifting framework laid out by HUD and adopted by the Supreme Court in [Inclusive Communities].").

[295] *Mt. Holly Gardens Citizens in Action, Inc.* v. *Twp. of Mount Holly,* 658 F.3d 375, 382 (3d Cir. 2011); *Bonasera* v. *City of Norcross,* 342 F. App'x 581, 585 (11th Cir. 2009); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 50 (1st Cir. 2000).

[296] *See* 42 U.S.C. 2000e–2(k)(1)(B)(i) ("[T]he complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice").

[297] *See, e.g., Hargraves* v. *Capital City Mortg. Corp,* 140 F. Supp. 2d 7, 18–22 (D.D.C. 2000) (finding that "predatory lending" in African American neighborhoods, which included exorbitant interest rates, lending based on the value of the asset rather than a borrower's ability to repay, profiting by acquiring the property through default, repeated foreclosures, and loan servicing procedures with excessive fees, could disparately impact African Americans).

[298] *See, e.g., Miller* v. *Countrywide Bank, N.A.,* 571 F. Supp. 2d 251, 258 (D. Mass. 2008) ("Where the allocation of subjective decisionmaking authority is at issue, the 'practice' amounts to the *absence* of a policy, that allows racial bias to seep into the process. Allowing this 'practice' to escape scrutiny would enable companies responsible for complying with anti-discrimination laws to 'insulate' themselves by 'refrain[ing] from making standardized criteria absolutely determinative.'") (citing *Watson,* 487 U.S. at 990).

of the opinion that was superseded by Title VII's statutory amendments:

A robust causality requirement ensures that "[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact" and thus protects defendants from being held liable for racial disparities they did not create." *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642, 653 (1989), superseded by statute *on other grounds,* 42 U.S.C. 2000e–2(k) (emphasis added).[299]

HUD further declines to set statistical standards, including statistical thresholds, to require localized statistics, or note a "significance" requirement. HUD continues to believe, as it did in 2013, consistent with courts, that analyzing causation in these matters on a case-by-case basis is the best approach, especially given the wide variety of policies, practices, and discriminatory effects at issue in these types of cases.[300] Courts have recognized a variety of circumstances—both under the Act and Title VII—in which using national statistics, rather than local statistics, is appropriate.[301]

HUD's 2016 Guidance recognizes this, while also noting that "state or local statistics should be presented where available and appropriate based on a housing provider's market area or other facts particular to a given case." [302] The Supreme Court has recognized that a case-by-case approach is appropriate in the Title VII context when it comes to statistical thresholds and requirements and levels of significance.[303] And, as HUD noted in 2013, the decision not to codify a significance requirement is consistent with the 1994 Joint Policy Statement on Discrimination in Lending, the statutory codification of the disparate impact standard under Title VII, and the Consumer Financial Protection Bureau's interpretation of the disparate impact standard under ECOA.[304]

Section 100.500(c)(1): When Multiple Factors Produce Discriminatory Effects

*Issue:* Commenters stated that the "actually or predictably results" language in step one ignores situations in which multiple factors may produce discriminatory effects.

*HUD Response:* This rule requires plaintiffs to prove that the challenged policy caused or predictably will cause the alleged discriminatory effect. Therefore, plaintiffs are required to show that the policy they challenge is

a cause of a discriminatory effect. The rule does not require the challenged policy to be the sole factor that causes or predictably will cause the discriminatory effect. Such an approach is consistent with HUD's position that in disparate treatment cases, the Fair Housing Act is violated even if discriminatory animus was *only one of the factors* motivating the defendant's actions.[305]

---

[299] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 542.

[300] *See, e.g., Conn. Fair Hous. Ctr.* v. *CoreLogic Rental Prop. Sols., LLC,* 478 F. Supp. 3d 259, 296 (D. Conn. 2020) (noting the appropriateness of a case-by-case approach which considers not only statistics but all the surrounding facts and circumstances in judging the significance or substantiality of disparities in a Fair Housing Act disparate impact case) (citing *Chin* v. *Port Auth. of New York & New Jersey,* 685 F.3d 135, 153 (2d. Cir. 2012)); *Langlois* v. *Abington Hous. Auth.,* 207 F.3d 43, 50 (1st Cir. 2000) (*describing the issue of impact as "fact-bound" and applying Supreme Court's Watson holding that* "no single test controls in measuring disparate impact" to the Title VIII case before it). Courts have held the same in the Title VII context.

[301] *See, e.g., Conn. Fair Hous. Ctr.* v. *CoreLogic Rental Prop. Sols.,* 478 F. Supp. 3d 259, 292 (D. Conn. 2020) ("National or state general population statistics may be used as the appropriate comparison groups in at least three situations: First, national or state statistics are appropriate where there is no reason to suppose that the local characteristics would differ from the national statistics . . . . Second, studies based on general population data and potential applicant pool data" may be the "initial basis of a disparate impact claim, especially in cases [where] the actual applicant pool might not reflect the potential applicant pool, due to a self-recognized inability on the part of potential applicants to meet the very standards challenged as discriminatory . . . . Third, national or state general statistics are appropriate where actual applicant data is not available") (internal citations omitted); *Dothard* v. *Rawlinson,* 433 U.S. 321, 330 (1977) ("[R]eliance on general population demographic data was not misplaced where there was no reason to suppose that physical height and weight characteristics of Alabama men and women differ markedly from those of the national population."); *Griggs,* 401 U.S. at 430 (relying on general population data in finding disparate impact of diploma requirement on Black applicants); *EEOC* v. *Joint Apprenticeship Comm. of the Joint Indus. Bd. of the Elec. Indus.,* 186 F.3d 110, 119–120 (2d Cir. 1999) (finding that actual applicant pool data was based upon too small a sample size and use of general population and potential applicant data was thus appropriate); *El* v. *SEPTA,* 418 F. Supp. 2d 659, 668–69 (E.D. Pa. 2005) (finding that plaintiff proved prima facie case of disparate impact under Title VII based on national data from the U.S. Bureau of Justice Statistics and the Statistical Abstract of the U.S., which showed that People of Color were substantially more likely than whites to have a conviction), *aff'd on other grounds,* 479 F.2d 232 (3d Cir. 2007).

[302] "Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions" at 3 (April 4, 2016).

[303] *See, e.g., Watson* v. *Fort Worth Bank & Trust,* 487 U.S. 977, 995–96 n.3 (1988) ("We have emphasized the useful role that statistical methods can have in Title VII cases, but we have not suggested that any particular number of "standard deviations" can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination. Nor has a consensus developed around any alternative mathematical standard. Instead, courts appear generally to have judged the "significance" or "substantiality" of numerical disparities on a case-by-case basis . . . [W]e believe that such a case-by-case approach properly reflects our recognition that statistics 'come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances.'") (internal citations omitted); *See also Jones* v. *City of Bos.,* 752 F.3d 38, 52–53 (1st Cir. 2014) (outlining the difficulty in applying a rule to assess "practical significance" when analyzing causation in disparate impact cases, including outlining criticisms of EEOC's four-fifths rule to show "practical significance").

[304] 78 FR 11460, 11468–9.

[305] *See, e.g., HUD* v. *Cox et al,* HUDALJ 09–89–1641–1, 1991 HUD ALJ LEXIS 106, at *21 (HUD ALJ 1991) ("The Secretary need not prove that race was the sole factor motivating Respondents. He need only demonstrate by a preponderance of the evidence that race was one of the factors that motivated Respondents; that is, that race did in fact play a part in their decisional process."); *HUD* v. *Robert and Mary Jane Denton,* HUDALJ 05–90–0406–1, 1992 HUD ALJ LEXIS 60, at * 18–26 (HUD ALJ 1992) (finding that the mixed motive analysis from Title VII applies to the Act); *Community Services, Inc.* v. *Wind Gap Mun. Auth.,* 421 F.3d 179, 177 (3rd Cir. 2005) (to prevail in a disparate treatment claim under the Fair Housing Act, "a plaintiff must demonstrate that some discriminatory purpose was a 'motivating factor' behind the challenged action"); *Hamm* v. *Gahnna, Ohio,* 109 Fed. Appx. 744, 747 (6th Cir. 2004) (to establish intentional discrimination under the Fair Housing Act, "a plaintiff must present evidence showing that an impermissible 'discriminatory purpose was a motivating factor in the defendant's decision") (internal quotations and citations omitted); *Hadeed* v. *Abraham,* 103 Fed. Appx. 706, 707 (4th Cir. 2004) (reviewing Fair Housing Act claim based on the "a motiving factor" standard); *Moore* v. *Townsend,* 525 F.2d 482, 485 (7th Cir. 1975) (race is an "impermissible consideration" and it need only be established that race "played some part in the refusal to deal"); *Hanson* v. *Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir. 1986) (Fair Housing Act is violated if race "was a consideration and played some role in a real estate transaction"); *Green* v. *Century 21,* 740 F.2d 460, 464 (6th Cir. 1984) (Fair Housing Act is violated if race was "an effective reason" for defendant's refusal to sell); *Jordan* v. *Dellway Villa of Tenn., Ltd.,* 661 F.2d 588, 594 (6th Cir. 1981) (plaintiff is to recover if race "played a part" in his rejection); *Marable* v. *H. Walker & Assoc.,* 644 F.2d 390, 395 (5th Cir. 1981) (race may not be "one significant factor considered by the defendant in dealing with the plaintiff"); *Robinson* v. *12 Lofts Realty, Inc.,* 610 F.2d 1032, 1042–43 (2nd Cir. 1979) (Fair Housing Act is violated if race "is even one of the motivating factors," and racial motivation must not "play any role in the decision to deny [plaintiff's] application"); *Payne* v. *Bracher,* 582 F.2d 17, 18 (5th Cir. 1978) (race is not to be considered "in any way"); *U.S.* v. *Mitchell,* 580 F.2d 789, 791 (5th Cir. 1978) (Fair Housing Act is violated if race "was a consideration and played some role in the real estate transaction"); *Smith* v. *Anchor Bldg. Corp.* 536 F.2d 231, 233 (8th Cir. 1976) (race is an "impermissible factor"); *Williams* v. *Matthews Co.,* 499 F.2d 819, 826 (8th Cir. 1974) (same); *U.S.* v. *Pelzer Realty Co., Inc.,* 484 F.2d 438, 443 (5th Cir. 1973) (race need only be "one significant factor" that the defendant considered); *Stevens* v. *Dobs, Inc.* 483 F.2d 82, 84 (4th Cir. 1973) (liability is established if race was "an important element" in the defendant's decision.).

Section 100.500(c)(2): Proving That the Challenged Practice Is Necessary To Achieve One or More Substantial, Legitimate, Non-Discriminatory Interests

*Issue:* A commenter characterized the proposed rule as requiring defendants to show "hefty" evidence at step two that the policy or practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest, placing an almost insurmountable burden on defendants.

*HUD Response:* HUD disagrees that the rule places an insurmountable or unreasonable burden on defendants. Whether a defendant's own policy or practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the defendant is well within the knowledge of that defendant, who is uniquely able to meet this burden. Furthermore, the rule does not specify what evidence is necessary to meet this burden; it merely states that a legally sufficient justification must be supported "by evidence." [306]

As HUD explained in 2013, the requirement that a defendant prove with evidence the substantial, legitimate, nondiscriminatory interest supporting the challenged practice and the necessity of the challenged practice to achieve that interest is consistent with HUD's longstanding application of an effects framework under the Act, and is similar to the approach taken by other federal regulatory and enforcement agencies under ECOA [307] and Title VII.[308] This requirement is furthermore consistent with most federal courts' interpretations of the Act after *Inclusive Communities*.[309] Nowhere has HUD

[306] Some commenters mischaracterized the rule as prohibiting hypothetical or speculative evidence. What the rule prohibits is a hypothetical or speculative *justification* for the challenged practice. *See* 100.500(b)(2) ("A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative.").

[307] *See* 1994 Joint Policy Statement on Discrimination in Lending, 59 FR at 18269 ("The justification must be material and may not be hypothetical or speculative.").

[308] *See* 42 U.S.C. 2000e–2(k)(1)(A)(i) (the respondent must "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity").

[309] *See, e.g., Alexander* v. *Edgewood Mgmt. Corp.,* Civil Case No. 15–1140, 2019 U.S. Dist. LEXIS 111068 (D.D.C. June 25, 2019) ("If the plaintiff's prima facie burden is met, the burden shifts to the defendant to prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.") (citing *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. at 2514– 15; *Borum* v. *Brentwood Vill. LLC,* Civil Action No.: 16–1723 (RC), 2020 U.S. Dist. LEXIS 54840 at *13–14 (D.D.C. March 30, 2020) (deferring to HUD's 2013 Rule, including at 24 CFR 100.500(c)(2)); *Oviedo Town Ctr. II, L.L.L.P.* v. *City of Oviedo,* 2017

U.S. Dist. LEXIS 134930 (M.D. Fla. Aug. 23, 2017) (citing HUD's regulation and sating "[t]he burden then shifts to the defendant to prove that the challenged practice is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests." Such interests must be supported by evidence and may not be hypothetical or speculative.") (internal citations omitted)) (affirmed by *Oviedo Town Ctr, II, L.L.P.* v. *City of Oviedo, Florida,* 759 Fed. App'x 828 (11th Cir. 2018)); *NFHA* v. *Deutsche Bank Nat'l Trust,* No. 18 CV 839, 2019 WL 5963633 (N.D. Ill. Nov. 13, 2019) ("After a plaintiff establishes a prima facie showing of disparate impact, the burden shifts to the defendant to prove that the challenged practice is necessary to achieve . . . [a] legitimate, nondiscriminatory interest[.]") (citing *Inclusive Cmtys Project, Inc..,* 135 S. Ct. at 2514–15); *Fair Hous. Ctr. of Wash.* v. *Breier-Schuetz Props., LLC,* 743 F. App'x 116, 118 (9th Cir. 2018) (upholding summary judgment for plaintiff because defendant never justified its challenged policy as "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests") (citing HUD's rule and *Inclusive Cmtys Project, Inc..,* 135 S. Ct. at 2522); *Mhany Mgmt.* v. *Cty. of Nassau,* 819 F.3d 581 (2d. Cir. 2016) (announcing HUD's burden shifting framework as the proper framework for evaluating disparate impact claims, noting that the second step was already in line with the circuit's prior case law); *Treece* v. *Perrier Condo. Owners Ass'n,* 519 F. Supp. 3d 342, 353–54 (E.D. La. 2021) (explaining that "after ICP", once a plaintiff makes a prima facie case, including robust causation, the[] burden shift[s] to the defendant to show the challenged practice is necessary to achieve one or more of the defendant's substantial, legitimate, nondiscriminatory interests") (citing *Inclusive Cmtys. Project* v. *Lincoln Prop. Co.,* 920 F.3d 890, 901–02) (5th Cir. 2019); *Fair Hous. Rights Ctr.* v. *Morgan Props. Mgmt. Co.,* LLC, Civil Action No. 16–4677, 2018 U.S. Dist. LEXIS 108905, at *31 (E.D. Pa. June 29, 2018) ("If a disproportionate burden is established, the burden shifts to the defendant to establish whether it has a legitimate, non-discriminatory reason for its actions.. If the defendant can establish that reason, it must then also establish that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact.") (internal citations omitted); *de Reyes* v. *Waples Mobile Home Park L.P.,* 903 F.3d 415, 426 n.6, 428 (4th Cir. 2018) ("In *Inclusive Communities,* the Supreme Court explained that an FHA disparate-impact claim should be analyzed under a three-step, burden-shifting framework . . . Under the second step, the defendant has the burden of persuasion to 'state and explain the valid interest served by their policies.' [*Inclusive Cmtys. Project, Inc.*135 S. Ct.] at 2522 (stating that this step is analogous to Title VII's business necessity standard."); *Price* v. *County Brook Homeowners Ass'n.,* Civil Case No.: 1:21–cv–113, 2021 U.S. Dist. LEXIS 228914, at *6 (S.D. Ohio Nov. 30, 2021) ("Further, the Supreme Court recognized the U.S. Department of Housing and Urban Development's ("HUD") burden-shifting framework that is used to analyze disparate impact claims . . . [where at the second step,] the defendant to prove that the challenged practice is necessary to achieve a substantial, legitimate, nondiscriminatory interest.") (citing *Inclusive Cmtys. Project, Inc.,* 135 S. Ct. at 2514–15).

*Inclusive Communities* and *Wards Cove.* Some commenters stated that the proposed rule places a more onerous burden on defendants than what *Inclusive Communities* requires and that defendants should have only a burden of production at step two. Commenters said that although in *Inclusive Communities,* the Court did not address defendants' burden, it analogized it to the business necessity defense of Title VII under *Wards Cove,* which is one of production. They stated that the Court also made clear in *Wards Cove* that the defendant's obligation was only a burden of production and that this "conforms to the usual method for allocating persuasion and production burdens." They said that the *Inclusive Communities* Court instructed that disparate impact claims must be limited to give insurers latitude to consider market factors. Another commenter focused on the *Inclusive Communities* statement that "housing authorities and private developers [are provided] leeway to state and explain the valid interest served by their policies" and concluded that a defendant need only explain how its policy interests are reasonably served by the particular practice, rather than prove it.

Other commenters supported the proposed burden of proof on defendants. These commenters noted that *Wards Cove* is no longer good law because the Civil Rights Act of 1991 specifically placed the step two burden of proof on defendants under Title VII. Commenters stated that the proposed rule contains the necessary protections for defendants, allowing them "leeway to state and explain the valid interest served," consistent with *Inclusive Communities.* Commenters pointed out that *Inclusive Communities* specifically described defendants' burden as a burden of proof rather than production, and as "important and appropriate."

*HUD Response:* As HUD noted in 2016, in over 25 years of case law since *Wards Cove,* no circuit court of appeals had ever applied the *Wards Cove* burden-shifting framework to the Act.[310] Since then, only one circuit court of appeals has applied *Wards Cove's* holding that step two requires a defendant to produce, rather than prove, its interest. HUD believes that the court's explanation in that case of why it applied *Wards Cove* to the Fair Housing Act case before it is

[310] "Defendants' Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment" at 42 n.32, *American Insurance Association.* v. *Carson and the U.S. Dep't of Hous. and Urb. Dev.,* No. 1:13–cv–00966–RJL (D.D.C. August 30, 2016).

**App.212**

unpersuasive [311] and notes that it conflicts with the other circuits.[312] Moreover, as explained above, *Inclusive Communities'* sole reference to *Wards Cove* was limited to a discussion that was *not* overruled by statute, and had nothing to do with the burden under step two; it instead related to the causation analysis required as part of a plaintiff's prima facie case under § 100.500(c)(1).[313] Far from endorsing a burden-shifting framework to production, *Inclusive Communities* explicitly noted and approved of the requirement that defendants "prove" the necessity of their policies.[314] And contrary to what some commenters wrote, *Inclusive Communities* did *not,* analogize the business necessity defense to *Wards Cove's* Title VII standard (which is a burden of production); instead, *Inclusive Communities* analogized the business necessity defense to Title VII's modern standard (which is a burden of proof).[315] Further, *Inclusive Communities* specifically and favorably cited HUD's 2013 Rule as "properly limit[ing] disparate impact liability . . . to give housing authorities and private

developers leeway to state and explain the valid interest served by their policies." [316]

*Issue:* Commenters suggested revising the requirement that defendants show a policy is "necessary" in step two to something less burdensome. One commenter suggested HUD should require a defendant to show only that the challenged policy is rationally-related to a legitimate, nondiscriminatory interest of the defendant. Another urged HUD to require that a defendant show its practice simply serves a valid interest of the defendant. Other commenters stated that in *Wards Cove,* the Supreme Court expressly rejected a "necessity" requirement, concluding that such a requirement would impose a degree of scrutiny impossible to meet.

Other commenters disagreed, stating that the proposed rule is consistent with *Inclusive Communities,* which requires defendants to prove that the challenged practice is necessary to achieve a valid interest. They cited the Court's statement that a housing provider should be allowed to maintain a policy if it is "necessary to achieve a valid interest" and noted a lower standard would conflict with well-established disparate impact jurisprudence, including under Title VII. A commenter also noted that in 2013 HUD specifically rejected a suggestion to remove "necessary" from the rule, because "necessary" is clear, uniform, in compliance with the 1994 interagency guidance, and effectuated the Act's broad remedial goal.

*HUD Response:* HUD declines to change the defendant's burden in step two because doing so would be inconsistent with longstanding judicial and agency interpretations and because HUD believes that the defendant's burden in step two best effectuates the broad, remedial goals of the Act.[317] Moreover, the Court in *Ward's Cove* never expressly rejected a "necessity" requirement, but rather rejected a standard which required a showing that the challenged practice be *essential or indispensable to the employer's business.*[318] The proposed rule does not require a defendant to show that a challenged practice is essential or indispensable, but only that it is

necessary to achieve *a* substantial, legitimate, nondiscriminatory interest of that business.

Furthermore, the Court in *Inclusive Communities* specifically cited to the 2013 Rule's explanation of step two of the burden shifting approach as being analogous to the business necessity standard of Title VII when explaining that "this step of the analysis" of disparate impact liability is "an important and appropriate means of ensuring that disparate impact liability is properly limited." The opinion continued that housing authorities must prove their policies are "necessary" to achieve a valid interest, which mirrors the necessity requirement of this final rule.[319]

*Issue:* Commenters requested that HUD provide additional guidance in the final rule concerning what may constitute substantial, legitimate, nondiscriminatory interests. A commenter cited the 1994 Interagency Policy Statement on Discrimination in Lending, which describes factors that may be relevant to the legally sufficient justification, including cost and profitability. The commenter stated that the Policy Statement contains helpful guidance for lenders and urged HUD to reference the Policy Statement in this final rule.

Others stated that the proposed rule's failure to recognize practical business considerations, including profit making, as valid interests conflicts with *Inclusive Communities,* which stated that disparate impact liability must be limited to ensure that "regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system" and warned against "second-guessing" between "two reasonable approaches." They said that defendants must be given latitude to consider market factors.

In contrast, other commenters claimed that it is best to maintain a case-by-case approach so that no justification is automatically deemed a substantial, legitimate, non-discriminatory interest despite its disparate impact on a protected class.

Commenters expressed that profit should not be a legally sufficient justification and that the proposed rule makes clear that there are no automatically valid objectives, such as maximizing profit. Commenters stated that allowing defendants to justify discriminatory policies under the guise of profit would render the discriminatory effects framework completely toothless, because it would

---

[311] *Sw. Fair Hous. Council, Inc.* v. *Maricopa Domestic Water Improvement Dist.,* 17 F.4th 950, 960 (9th Cir. Nov. 12, 2021). The *Maricopa* case justified its application of the *Wards Cove* burden shifting framework to the Fair Housing Act by stating, first, that "[i]n *Wards Cove Packing Co.* v. *Atonio* the Supreme Court developed a three-step burden-shifting framework to address [disparate impact] claims." *Id.* HUD notes, however, this statement is incorrect, and that the burden shifting framework for Title VII cases was developed in 1975, in *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405, 425 (1975). Additionally, HUD notes that the *Wards Cove* framework was abrogated by the Civil Rights Act of 1991, which restored the *Albemarle* standard. Public Law 102–166, 105, 105 Stat. 1071, 1074 (1991), amending 42 U.S.C. 2000e–2. Also, the opinion states that "the Supreme Court has applied the [*Ward's Cove*] framework across federal antidiscrimination statutes," 17 F.4th at 960, but cites only a single instance in which the Supreme Court applied the *Wards Cove* framework to another federal antidiscrimination statute: *Smith* v. *City of Jackson,* 544 U.S. 228, 240 (2005) (applying *Wards Cove* to the ADEA). As HUD discusses earlier, the Supreme Court has acknowledged that the ADEA has a narrower scope than Title VII, and no other court has applied this standard, so HUD declines to adopt this reading of the Fair Housing Act's protections.

[312] *Mhany Mgmt.* v. *Cty. of Nassau,* 819 F.3d 581 (2d Cir. 2016); *Inclusive Cmtys. Project, Inc.* v. *Heartland Cmty. Ass'n,* 824 F. App'x 210 (5th Cir. 2020); *de Reyes* v. *Waples Mobile Home Park Ltd. P'ship,* 903 F.3d 415 (4th Cir. 2018).

[313] *See Inclusive Cmty's Project Inc.,* 576 U.S. at 542 ("[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact").

[314] *Id.* at 541. (describing the second step of HUD's burden shifting analysis as "important" and "appropriate" and as requiring that defendants "prove" their policies are necessary to achieve a valid interest).

[315] *Id.* (This step of the analysis is analogous to the business necessity standard under Title VII and provides a defense against disparate-impact liability") (citing HUD's 2013 Rule at 78 FR 11470).

[316] *Id.* ("[a]n important and appropriate means of ensuring that disparate-impact liability is properly limited is to give housing authorities and private developers leeway to state and explain the valid interest served by their policies. This step of the analysis is analogous to the business necessity standard under Title VII and provides a defense against disparate-impact liability") (citing HUD's 2013 Rule at 78 FR 11470).

[317] *See supra* n. 17, n. 126.

[318] *Wards Cove Packing Co.,* 490 U.S. at 659.

[319] *Inclusive Cmtys. Project, Inc.* 576 U.S. at 541.

**App.213**

make for-profit businesses virtually immune from challenges to their policies or practices that cause a discriminatory effect. A commenter stated that almost all discriminatory policies can be justified by profit. Commenters also stated that a profit defense would be inconsistent with disparate impact jurisprudence; run counter to HUD's mission; and encourage the continuation of profitable, but discriminatory policies. A commenter explained that courts have appropriately rejected profit and market factors as substantial, legitimate, nondiscriminatory interests in the lending arena, limiting the legitimate business justification defense to a lender's use of objective variables and practices to ascertain creditworthiness. A commenter gave as examples cases in which lenders had engaged in practices not related to creditworthiness, like subjective markup pricing, that caused disparate impacts, to show profit should not be considered a legally sufficient justification.[320]

*HUD Response:* HUD does not believe listing specific valid interests is necessary or appropriate and declines to alter the text of this rule. In promulgating the 2013 Rule, HUD did not state that profit or other business considerations could never be substantial, legitimate, nondiscriminatory interests; rather, HUD declined to explicitly name

*Issue:* Commenters stated that under *Inclusive Communities,* defendants are only required to show that the challenged practice is related to a *valid interest,* not that the practice is necessary or related to a *substantial interest.* Other commenters disagreed and stated that replacing the "substantial legitimate non-discriminatory interest" standard with a much lower and overly broad "valid interest" standard would make it too easy for defendants to rebut allegations of discrimination, allowing insubstantial business, profit, or policy considerations to defeat meritorious

increasing profits, minimizing costs, and increasing market shares as *per se* substantial, legitimate, nondiscriminatory interests. HUD explained that the Act covers many different types of entities and practices, and a determination of what qualifies as a substantial, legitimate, nondiscriminatory interest for a given entity is fact-specific and must be determined on a case-by-case basis.[321] HUD agrees that factors that may be relevant to a defendant's step two burden *could include* cost and profitability, as HUD and other agencies stated in the 1994 Interagency Policy Statement on Discrimination in Lending. However, recognizing interests as *per se* legitimate would undermine the effectiveness of disparate impact liability as a tool for rooting out policies that appear to be neutral but have been adopted for discriminatory reasons. HUD notes that *Inclusive Communities* highlighted disparate impact's important role in uncovering such disguised animus that escapes easy classification as disparate treatment.[322] Accordingly, this rule, like the 2013 Rule, does not list interests that would always qualify as substantial, legitimate, nondiscriminatory interests for every defendant in any context. But the rule still allows regulated entities to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system and does not require second guessing between two reasonable approaches. HUD thus concludes that creating per se defenses would erroneously weaken the rule and result in the dismissal of cases where the practices are not actually necessary to achieve a valid interest and, more concerning, where the seemingly valid interests put forward by defendants are acting to disguise a defendant's underlying actions that are motivated by discriminatory intent.

disparate impact claims, and would make it virtually impossible for plaintiffs to make a step three showing.

*HUD Response:* Nothing in *Inclusive Communities* suggests that the Court endorsed lowering the burden for defendants in step two of the discriminatory effects framework. When *Inclusive Communities* discussed the ability of defendants to state a "valid interest", it referred specifically to HUD's 2013 Rule and the second step of the burden shifting analysis[323] which requires that defendant show that its policy is necessary to achieve a substantial, legitimate, and nondiscriminatory interest.[324] HUD believes the Court in *Inclusive Communities,* like other courts and HUD itself, used "valid" as shorthand for the same concept that the 2013 Rule describes as "substantial, legitimate, and non-discriminatory."[325]

To the extent that commenters nonetheless ask HUD to substitute a "valid interest" standard out of a belief that the Court intended a lower standard rather than one synonymous with the existing step two standard, HUD believes that it would be inappropriate to do so. HUD notes that such a standard would not accord with the majority of judicial opinions concerning the Act, and so it would introduce unnecessary confusion.[326] Furthermore,

---

[320] *See Miller* v. *Countrywide Bank NA,* 571 F. Supp. 2d 251 (D. Mass. 2008); *see also Ramirez* v. *GreenPoint Mortg. Funding, Inc.,* 268 FRD. 627 (N.D. Cal. 2010); *Guerra* v. *GMAC, L.L.C.,* 2009 WL 449153 (E.D. Pa. Feb. 20, 2009); *Taylor* v. *Accredited Home Lenders, Inc.,* 580 F. Supp. 2d 1062 (S.D. Cal. 2008); *Ware* v. *Indymac Bank,* 534 F. Supp. 2d 835 (N.D. Ill. 2008); *Garcia* v. *Countrywide Fin. Corp.,* No. 07–1161 (C.D. Cal. Jan. 15, 2008), available at *www.nclc.org/unreported; Newman* v. *Apex Fin. Grp.,* 2008 WL 130924 (N.D. Ill. Jan. 11, 2008); *Martinez* v. *Freedom Mortg. Team,* 527 F. Supp. 2d 827 (N.D. Ill. 2007); *Jackson* v. *Novastar Mortg., Inc.,* 2007 WL 4568976 (W.D. Tenn. Dec. 20, 2007). *Cf. Tribett* v. *BNC Mortg.,* 2008 WL 162755 (N.D. Ill. Jan. 17, 2008) (consumer can refile complaint with more specificity); Complaint, *United States* v. *Countrywide Fin. Corp., Countrywide Home Loans, Inc. & Countrywide Bank,* No. CV–11–10540 (C.D. Cal. Dec. 21, 2011) (charging over 200,000 Hispanic and African American borrowers higher interest rates, fees, and costs for mortgage loans than non-Hispanic white borrowers and steering them into subprime loans), *available at www.justice.gov;* Stipulated Final Judgment & Order, *Fed. Trade Comm'n v. Golden Empire Mortg., Inc.,* No. CV09–03227 (C.D. Cal. Sept. 24, 2010) (charging Hispanic consumers higher prices for mortgages than similarly situated non-white consumers), *available at www.ftc.gov;* Order to Cease & Desist, Order for Restitution, and Order to Pay, *In re First Mariner Bank Balt., Md.,* No. FDIC–07–285b & FDIC–08–358k (Fed. Deposit Ins. Corp. Mar. 22, 2009), *available at www.fdic.gov;* Complaint, *United States* v. *AIG Fed. Sav. Bank,* No. 1:99-mc-09999 (D. Del. Mar. 4, 2010) (wholesale mortgage brokers charged higher fees to African American borrowers), *available at www.justice.gov.*

[321] 78 FR 11471.

[322] *Inclusive Cmtys. Project, Inc.* 576 U.S. at 540.

[323] *See Inclusive Cmtys. Project, Inc.,* 576 U.S. at 541 (explicitly citing 78 FR 11470 (where HUD states that 'the "substantial, legitimate, nondiscriminatory interest" standard found in § 100.500(b)(1) is equivalent to the "business necessity" standard' and that 'the requirement that an entity's interest be substantial is analogous to the Title VII requirement that an employer's interest in an employment practice with a disparate impact be job related') when explaining this "[t]his step of the analysis" which gives defendants leeway to state and explain "the valid interest" served by their policies).

[324] *Id.* at 527 (describing that the second step of the burden shifting framework requires a defendant to "prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" and is "analogous to the Title VII requirement that an employer's interest in an employment practice with a disparate impact be job related") (quoting 24 CFR 100.500(c)(2) and 78 FR 11470).

[325] *See, e.g., Inclusive Cmtys. Project, Inc.,* 576 U.S. at 541 (describing that defendants having leeway to state a "valid interest" as part the second step of the burden shifting framework, citing HUD's explanation of the 2nd step of the framework in the 2013 Rule, which describes the interest as substantial, legitimate, and nondiscriminatory at 78 FR 11470); *Treece* v. *Perrier Condo. Owners Ass'n,* 519 F. Supp. 3d 342, 353–54 (E.D. La. 2021) (referring to the defendant's "substantial, legitimate, nondiscriminatory interests" and "valid interest[s]" interchangeably); *supra* at *Whether Claims Against Insurers Will Fail as a Matter of Law* ("Further, as part of the disparate impact framework set forth in this rule, insurers, like all defendants, are provided the opportunity to show a valid interest supporting any practice challenged under the Act").

[326] *See supra* n. 309, 312, 314, 316.

**App.214**

as HUD stated in its 2013 Rule, "in order to effectuate the Act's broad, remedial goal, practices with discriminatory effects cannot be justified based on interests of an insubstantial nature." [327]

Section 100.500(c)(3): Proving an Alternative Practice That Could Serve the Interest With a Less Discriminatory Effect

*Issue:* Commenters asked HUD to place the evidentiary burden at step three on defendants, rather than plaintiffs. They cited to studies showing the difficulty plaintiffs have had succeeding with discriminatory effects claims over time, as well as Second Circuit precedent and the State of California's fair housing statute, which place the burden on defendants. [328] Commenters stated that this revision is necessary because issues of segregation and discrimination in housing and lending have not abated since the 2013 Rule and, in fact, housing is more unaffordable, many cities have seen increasing displacement of communities of color, and borrowers of color are substantially more likely than white borrowers to be denied conventional loans. These commenters also cited to the growing role of data analytics and online platforms in the housing sale and rental market, increasing risks that segments of society will be steered away from or denied housing in a way that is immune to examination of intent, and resulting in even more segregated housing patterns. These commenters cited a 2021 Harvard study finding that the gap between whites and African Americans in homeownership rate stands at 28.1 percentage points, with the gap between whites and Hispanics at 23.8 percentage points. [329]

*HUD Response:* HUD declines to place the step three burden on defendants. As explained in 2013, this rule's burden-shifting scheme is consistent with the majority view of courts interpreting the Act as well as the Title VII discriminatory effects standard codified by Congress in 1991, and the discriminatory effects standard under ECOA, which borrows from Title VII's burden-shifting framework. As HUD has explained, all but one of the federal

appeals courts to address the issue have [330] placed the burden at the third step on the plaintiff. HUD additionally notes the significant overlap in coverage between ECOA, which prohibits discrimination in any aspect of a credit transaction, and the Fair Housing Act, which prohibits discrimination in housing and residential real estate-related transactions. Thus, under the rule's framework, in litigation involving claims brought under both the Fair Housing Act and ECOA, the parties and the court will not face the burden of applying inconsistent methods of proof to claims based on the same underlying facts. Having the same allocation of burdens under the Fair Housing Act and ECOA will provide for less confusion and more consistent decision making by courts. Moreover, HUD continues to believe that this framework makes the most sense because it does not require either party to prove a negative.

*Issue:* Commenters criticized step three of the proposed rule, stating that it enables plaintiffs to prevail even if the less discriminatory alternative practice they present is unreasonable, less practical, less productive or less effective. Commenters asked HUD to revise step three to permit plaintiffs to prevail only if there is an alternative that is equally effective, is no more costly, or can be implemented at a reasonable cost, and does not impose an undue burden on a defendant or otherwise adversely affect the defendant's non-discriminatory policies and valid interests. Otherwise, commenters said, there would be no limit on what constitutes a reasonable alternative practice allowing plaintiffs to second-guess which of two reasonable approaches should be adopted.

Commenters stated that their proposed revisions to heighten a plaintiff's burden in step three are required by or consistent with *Inclusive Communities,* which held that the Act is not a tool for plaintiffs to force defendants to reorder their priorities or to displace valid governmental and private priorities, and that disparate impact liability must be limited so that employers and other regulated entities are able to make practical business choices and profit-related decisions. A commenter said that step three of the proposed rule is moot in light of *Inclusive Communities'* recognition that re-writing governmental policies exceeds the courts' remedial powers.

Commenters further stated that an equally effective standard for prevailing at step three of the analysis is required

by *Wards Cove.* According to the commenters, *Wards Cove* explicitly requires that a plaintiff demonstrate an alternative policy is an "equally effective" alternative and warns that courts should proceed with care before mandating alternative practices. [331] Commenters said that *Wards Cove* further noted that cost is relevant in determining whether an alternative is equally effective.

Other commenters supported retaining step three of the proposed rule, stating that the "less discriminatory alternative" requirement is consistent with judicial precedent and Congressional intent. They stated that an "equally effective alternative" requirement is not appropriate in the housing context where the practices covered by the Act are "not readily quantifiable."

Commenters stated that the step three burden articulated by the 2020 Rule should not be retained for various reasons. Commenters said that the 2020 Rule's requirement that plaintiffs identify an equally effective alternative created too high a burden on plaintiffs; put defendant's financial gain above ensuring access to fair housing; departed from established precedent and the core purpose of the Act without justification; lowered the burden for defendants, such that clearly meritorious claims would be dismissed and the effectiveness of disparate impact liability as an incentive to identify less discriminatory alternative practices would be severely weakened; and improperly required plaintiffs to prove that any alternative is equally effective and does not impose materially greater costs. A commenter explained that if the 2020 Rule were retained, with its increased burdens on plaintiffs at step three and reduced burdens on defendants at step two, meritorious claims would be dismissed because it would shift much of the defendant's burden of proof at step two to the plaintiff to disprove at step three, insulating from scrutiny many policies that have an unjustified discriminatory effect. A commenter noted that the 2020 Rule's language was neither consistent with nor required by *Inclusive Communities.* One commenter explained that under the 2020 Rule's reformulation of step three, even a policy with the most flagrantly discriminatory effects would pass legal muster so long as a less discriminatory alternative is even slightly more costly or burdensome, and even if the

---

[327] 78 FR 11470.

[328] *MHANY Mgmt.,* 819 F.3d at 617–19 (holding the 2013 Rule abrogated Second Circuit precedent placing the burden at the final stage on the defendant); Cal. Code Regs. tit. 2, § 12062 (Lexis Advance through Register 2022, No. 34, August 26, 2022).

[329] *See, e.g.,* Joint Ctr. for Housing Studies of Harvard Univ., The State of the Nation's Housing: 2021, at 3 *available at http://www.jchs.harvard.edu/sites/default/files/Harvard_JCHS_State_Nations_Housing_2021.pdf.*

[330] 78 FR 11462.

[331] *Wards Cove,* 490 U.S. at 661 (quoting *Furnco Construction Corp.* v. *Waters,* 438 U.S. 567, 578 (1978)).

**App.215**

alternative was still significantly profitable. A commenter pointed out that the term ''other material burdens'' in the 2020 Rule is undefined, broad and subjective, and forces plaintiffs to obtain information that is squarely in the purview of the defendant.

*HUD Response:* HUD declines to modify step three of the proposed framework or adopt the 2020 standard. As HUD explained in the 2013 Rule, the framework in this rule does not allow plaintiffs to impose untenable policies upon defendants because it still requires the less discriminatory alternative to ''serve the defendant's [substantial, legitimate, nondiscriminatory stated] interests.''[332] This rule's step three continues to be consistent with the 1994 Joint Policy Statement on Discrimination in Lending,[333] with the purpose of the Act and its goal to ''eradicate discriminatory practices within a sector of the Nation's economy,''[334] and with judicial interpretations of the Act, including *Inclusive Communities.*[335] HUD also

---

[332] 78 FR 11473.

[333] 59 FR 18269.

[334] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 539.

[335] *See, e.g., MHANY Mgmt.* v. *City of Nassau,* No. 05–cv–2301 (ADS)(ARL), 2017 U.S. Dist. LEXIS 153214, at \*25 (E.D.N.Y. Sep. 19, 2017) (''contrary to Garden City's assertions, courts have not imposed a heightened standard on plaintiffs at the third step in disparate impact cases under 24 CFR 100.500. Indeed, courts have followed the plain language of the [regulation.]'') (citing *Inclusive Communities Project,* 135 S. Ct. at 2518 (''[B]efore rejecting a . . . public interest[,] a court must determine that a plaintiff has shown that there is 'an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs' ''); *see also Keller* v. *City of Fremont,* 719 F.3d 931, 949 (8th Cir. 2013) (''[W]hether plaintiffs can show that 'a viable alternative means was available to achieve the legitimate policy objective without discriminatory effects.' '') (quoting *Gallagher* v. *Magner,* 619 F.3d 823, 834 (8th Cir. 2010)); *Theodora Rescue Comm.* v. *Volunteers of Am. of Washington,* No. C14–0981RSL, 2014 U.S. Dist. LEXIS 157279, at \*11 (W.D. Wash. Nov. 6, 2014) (''Even if the Court assumes that the Ninth Circuit will ultimately allow plaintiffs to rebut a showing of business necessity simply by identifying an alternative act or practice that would serve the identified interests with less discriminatory impact, plaintiff has not made that showing.'') (internal citations omitted); *Oviedo Town Ctr. II, L.L.L.P.* v. *City of Oviedo, Florida,* Case No. 6:16–cv–1005–Orl–37GJK, 2017 U.S. Dist. LEXIS 134930, at \*11 (M.D. Fla. Aug. 23, 2017) (''If the defendant satisfies its burden, the plaintiff may still prevail by proving that the defendant's interests could be served by another practice that has a less discriminatory effect.'') (citing 24 CFR 100.500(c)(3)); *Inclusive Communities Project, Inc.* v. *Lincoln Prop. Co.,* No. 3:17–CV–206–K, 2017 U.S. Dist. LEXIS 130818, at \*20 (N.D. Tex. Aug. 16, 2017) (''If the defendant meets its burden, the plaintiff must then show that the defendant's interests could be served by another practice that has a less discriminatory effect'' (citing 24 CFR 100.500(c)(3)). *See also Darst-Webbe Tenant Ass'n Bd. V. St. Louis Hous. Auth.,* 417 F.3d 898, 906 (8th Cir. 2005) (''plaintiffs must offer a viable alternative that satisfies the Housing Authority's legitimate policy objectives while reducing the

notes that a requirement that alternative policies be ''equally effective'' did not appear in *Inclusive Communities,* despite citation to the proposed source of the requirement, *Wards Cove,* and significant discussion of the checks on liability that have always been part of Fair Housing Act jurisprudence. HUD further notes that its position is supported by the *Massachusetts Fair Housing Center* court, which criticized the 2020 Rule's inclusion of this requirement as ''run[ning] the risk of effectively neutering disparate impact liability'' and described it as onerous and inadequately justified.[336] HUD, based on its own experience, agrees with the district court. Moreover, as discussed elsewhere in this preamble, *Wards Cove* construed Title VII, and the portions cited by commenters were barely tried, even in that context, having been superseded by the Civil Rights Act of 1991. In order to avoid unnecessary confusion and uncertainty, HUD declines to abandon a well-established standard in favor of a virtually untested one.

As to other concerns that commenters suggested required revisions to step three, HUD notes that an unreasonable alternative practice that creates an undue burden on defendant would not satisfy plaintiff's three-step burden. Nor will a proposed less discriminatory alternative fail simply because there will be some amount of increased cost associated with the alternative policy. And nothing in the rule suggests that reasonable, valid policies and priorities of defendants will be second guessed or forced to be reordered. Step one of the burden shifting framework ensures that the only policies which will be examined further are ones that cause a disparate impact because of a protected characteristic. Step three ensures that any alternative policy proposed is less discriminatory and actually serves the interest the defendant has already identified in step two. Moreover, HUD disagrees that *Inclusive Communities* rendered step three moot by stating that re-writing governmental policies exceeds the remedial powers of courts. *Inclusive Communities* did not say this. Indeed, there is no statement in *Inclusive Communities* indicating that courts lack the authority to invalidate policies that cause unjustified discriminatory effects.

---

[challenged practice's] discriminatory impact''); *Huntington,* 844 F.2d at 939 (analyzing whether the ''[t]own's goal . . . can be achieved by less discriminatory means''); *Rizzo,* 564 F.2d at 149 (it must be analyzed whether an alternative ''could be adopted that would enable [the defendant's] interest to be served with less discriminatory impact.'').

[336] *Mass. Fair Hous. Ctr.,* 496 F. Supp. 3d at 611.

In sum, HUD believes this provision and the structure of the burden shifting framework provide sufficient protections for defendants' business interests.

*Issue:* A commenter stated that step three of the proposed rule conflicts with *Inclusive Communities* because defendants can still be held liable despite establishing that their practices are substantial, legitimate, and nondiscriminatory at step two. One commenter criticized step three as unnecessary and inviting uncertainty and continued litigation. The commenter wrote that if the challenged practice is not artificial, arbitrary, and unnecessary, plaintiffs should not be permitted to substitute their proposed practices or business judgment for defendants' practices and judgment.

*HUD Response:* HUD disagrees. First, step two of the burden shifting framework requires the defendant to establish that its practice is necessary to achieve a substantial, legitimate, nondiscriminatory *interest* of the defendant—not that the defendant establish that the practice itself is substantial, legitimate and nondiscriminatory. By step two of the analysis, the plaintiff has *already* established that the practice itself causes or predictably will cause a discriminatory effect. Assuming the defendant meets its step two burden, the plaintiff then must establish that a less discriminatory alternative practice exists that still serves defendant's cited interest. HUD finds nothing in *Inclusive Communities* indicating that it is appropriate to cut off the inquiry after the second step.

Without step three, defendants with practices that have a discriminatory effect will have little incentive to examine their policies to determine if there are less discriminatory options to achieve their goals, thus allowing practices having unjustified discriminatory effects to continue unchecked. The suggestion that there should be no third step would eliminate a full assessment as to whether the same interest could be served in a less discriminatory way. The third step allows the plaintiff to offer an alternative policy that is less discriminatory and that still accomplishes the legitimate interest identified by the defendant. If the third step were eliminated, ''artificial, arbitrary, and unnecessary barriers'' would remain in place despite the fact that they are unnecessary to achieve the defendant's stated purpose.

*Issue:* A commenter said that the third step removes the Supreme Court's

**App.216**

requirement that the plaintiff not resort to reverse discrimination.

*HUD Response:* The commenter did not explain what it meant by reverse discrimination or how step three might cause a plaintiff to resort to such discrimination. It is possible that the commenter meant that the need to satisfy the third step causes the defendant to resort to reverse discrimination. However, there is nothing in step three, or any other part of the proposed rule that requires the plaintiff or anyone else to resort to any type of discrimination. To the contrary, step three encourages defendants to utilize practices that have the least discriminatory effect because of any protected characteristic.

Section 100.500(f) (2020 Rule Only): Limiting Damages and Other Penalties in Discriminatory Effects Cases

*Issue:* Commenters criticized the proposed rule for omitting provisions in the 2020 Rule that limit HUD's authority to seek damages and penalties in discriminatory effects cases. The commenters stated that the 2020 Rule was consistent with *Inclusive Communities'* statement that "even when courts do find liability under a disparate-impact theory, their remedial orders must be consistent with the Constitution" and that "remedial orders should concentrate on the elimination of the offending practice." One commenter suggested this means that the rule must only allow remedial orders that completely eliminate rather than only minimize the discriminatory effect. Commenters stated further that punitive or exemplary damages should not be allowed in discriminatory effects cases, noting that courts have applied a rigorous standard in assessing whether an award of punitive damages is proper. Commenters stated that because a discriminatory effects claim does not require a showing of defendant's state of mind, this type of claim cannot meet the standard for punitive damages.

*HUD Response:* HUD believes that limiting or suggesting favored remedies in this rule would be contrary to the plain language of the Act and its broad remedial purpose. The Act explicitly provides for punitive and compensatory damages, civil penalties (in cases brought by the Attorney General), and injunctive relief in federal court, and actual damages, injunctive and equitable relief and civil penalties in administrative hearings.[337] HUD does not believe that *Inclusive Communities* can be read to suggest that remedial orders should be the sole or favored

remedy in discriminatory effects cases or that civil penalties are somehow inappropriate.[338] Rather, the Court merely addressed what courts must keep in mind *when remedial* orders are issued. Nor does HUD believe *Inclusive Communities* can be read to limit remedial orders to only those that *completely* eliminate discriminatory effects. Moreover, well-established criteria in statute and in decades of judicial precedent set forth when penalties and punitive damages may be appropriate, thus preventing arbitrary awards. In any case, the availability of various remedies does not mean that they will be sought or granted in all cases; remedies are considered on a case-by-case basis.

*Comments Regarding Other Defenses and Safe Harbors*

*Issue:* Commenters stated that HUD should add a defense similar to the 2020 Rule's third-party defense allowing defendants to rebut plaintiff's prima facie case by showing that their discretion was materially limited by a third party. They said such a defense is necessary to protect defendants from being held liable for discriminatory conduct mandated by law. As an example, a commenter asserted that independent mortgage banks must follow guidelines set by federal agencies, including the government sponsored enterprises, the Department of Veterans Affairs, the Federal Housing Administration, and the Department of Agriculture, which may cause a disparate impact. The commenter stated that these mortgage banks should be granted a safe harbor in such situations. A commenter stated that *Inclusive Communities* requires a third-party defense because it stated that causation does not exist where the defendant's discretion is substantially limited and cited to a concurring opinion in the appellate court decision that included as an element of plaintiff's prima facie case that the defendant's policy or practice is not a result of a law that substantially limits defendant's discretion.

Commenters also stated that a third-party defense is necessary to protect insurers that conform to state laws and regulations on insurance in compliance with McCarran-Ferguson. They said that HUD cannot now say that the third-party defense is inconsistent with the Act when it said in the 2020 Rule that "in the event that unlawful discriminatory practices are mandated

by statute or court order, the most effective way to eliminate the discrimination is to remove or modify the underlying statute or order that mandated the unlawful discrimination." They also stated that HUD's proposal to remove the 2020 defense implies that HUD intends to improperly test the boundaries of its ability to preempt state regulations.

Other commenters supported HUD's proposal not to retain the third-party defense from the 2020 Rule, arguing that the defense would allow defendants to evade liability for illegal acts by showing that they complied with third party requirements that are themselves discriminatory. Commenters stated that the defense would deny plaintiffs the ability to address whether less discriminatory alternatives exist to the defendant's chosen method of meeting the third-party requirement. Commenters also stated that such a defense is contrary to the Act's preemption clause because it would prioritize compliance with local ordinances over federal civil rights obligations, even where there may be less discriminatory ways to comply with the third party's requirement, and even in exclusionary zoning cases. In addition, a commenter stated that a third-party defense would impede efforts to prevent algorithm-driven discrimination. Another commenter characterized the 2020 Rule's third-party defense as unnecessarily confusing and vague. A commenter stated that whether a party's discretion is limited by a third party should be addressed at the second step of the burden shifting framework, not at the pleading stage.

*HUD Response:* HUD disagrees that a third-party defense should be included in this rule. First, *Inclusive Communities* does not suggest that such a defense is necessary or appropriate. *Inclusive Communities* stated that if a plaintiff "cannot show a causal connection . . .—for instance, because federal law substantially limits the Department's discretion—that should result in dismissal of this case." As this passage suggests, if federal law requires defendants to act in a certain manner, plaintiffs may not be able to show that defendants' actions are the cause of a discriminatory effect. Such an argument already is available to defendants under this rule in appropriate cases and does not require revisions to this rule. And as noted in the 2013 Rule, the discriminatory effects standard already permits a defendant to defend against a claim of discriminatory effects by establishing a legally sufficient justification, as specified in § 100.500.

---

[337] 42 U.S.C. 3612(g)(3), 3613(c), 3614(d).

[338] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 544–45 (identifying considerations for court when designing remedial orders).

<span style="font-size:larger">**App.217**</span>

Thus, independent mortgage banks, for example, who follow federal guidelines, have multiple opportunities under the rule to defend their practices: first, at the prima facie stage, if federal guidelines, rather than the challenged practices are the cause of the discriminatory effect, and also at the second step of the burden shifting framework, by showing that the practice is truly necessary to comply with the federal guidelines.

That does not mean that, as the 2020 Rule allowed, any time defendants are subject to a third-party requirement, the plaintiff's case will necessarily fail. As other commenters explained, there may be multiple ways of complying with a third-party requirement, some of which have an unjustified discriminatory effect and some of which do not. In those cases, the defendant caused the effect by opting for one way of complying with a third-party requirement over another that does not cause such an effect. A third-party defense such as was included in the 2020 Rule would allow defendants to avoid the requirement to utilize a less discriminatory alternative to comply with a third party requirement.[339] Indeed, if the defense could be raised at the pleading stage (as permitted by the 2020 Rule), disparate impact claims could be dismissed based on mere assertions of third party requirements, without plaintiffs having any opportunity to challenge these assertions with the benefit of discovery. Without discovery, some plaintiffs would have no means of ascertaining whether the third-party obligation actually exists, and if so, whether it is the actual, legitimate reason for defendant's policy or practice, whether that obligation actually requires the defendant to implement the policy at issue or if there is a less discriminatory way to do so. This would essentially eliminate any meaningful inquiry into steps two and three of the burden shifting framework whenever the defendant asserts that its policy was required by a third party. Such a defense is inappropriate because it presumes that discrimination may be permitted without consideration of whether the third-party requirement is itself discriminatory or whether there are non-discriminatory ways to comply with that third-party requirement.

Moreover, such a defense would be inconsistent with the Act, which specifies that state and local laws requiring or permitting discriminatory housing practices are invalid.[340]

*Issue:* Commenters supported HUD's proposed removal of the "outcome prediction" defense that was inserted into the 2020 Rule, which was designed to shield certain policies based on algorithms from disparate impact liability with a "results-based approach." Commenters stated that the final rule's framework was the appropriate method of analyzing discriminatory effects claims involving algorithmic and machine learning technologies. A commenter noted that disparate impact litigation is a key mechanism for redressing discrimination in light of the increase of algorithms, which bring risks for perpetuating or amplifying patterns of discrimination through biased development, biased inputs, or bias arising from automatic adaptations from artificial intelligence. Another commenter stated that the potential for disparate impact liability protects borrowers and encourages lenders using these technologies to innovate in ways that expand access to credit. A commenter stated that the rule should clarify in the preamble that the Act applies to entities that rely on algorithms.

Commenters expressed numerous concerns about the defense. Commenters stated that this defense would have the practical effect of foreclosing many disparate impact claims based on algorithms and models and would shield such defendants from liability. Commenters stated that in creating this defense, the 2020 Rule impermissibly created exemptions for predictive models in the lending and insurance industry that have no basis in the Act or any other source of authority, because the Act does not grant HUD authority to create safe harbors or exceptions from discriminatory effects liability, and no court has ever held that entire categories of policies or practices that might otherwise be subject to challenge are exempt from such liability. Commenters also noted that HUD had previously explained why categorical exemptions from disparate impact liability are undesirable.

A commenter noted that the defense would shield a wide range of discriminatory policies and practices, because many discriminatory models would qualify for an exemption because of the 2020 Rule's novel "similarly situated individuals" analysis, for which there is no basis as a matter of law or as a matter of fact. As one commenter explained, it would be easy for defendants to show that a challenged policy or practice is intended to predict an outcome because that is what any predictive model claims to do, and it would be easy to show that the prediction represents a valid interest. Another commenter stated that the defense is based on an outdated academic theory of discrimination that relies on statistical disparities to absolve defendants of liability, without acknowledging the possibility that the defendant's policies contributed to the disparities.

Commenters noted that the defense would make it very difficult for plaintiffs to demonstrate that an alternative, less discriminatory policy would result in the *same* outcome, without imposing materially greater costs or other material burdens because there is no standard or agreed upon definition of algorithmic predictive performance or accuracy. Commenters also stated that the defense would make it difficult for plaintiffs to prevail because of the proprietary nature of algorithms; without knowing what the algorithm is and how it works, it is nearly impossible to demonstrate what the 2020 Rule requires: that the practice has a disproportionately adverse effect on members of the protected class, that there is a robust causal link between the algorithm and this adverse effect, and that this effect is significant.

Commenters also described the defense as ambiguous and difficult for parties and courts to apply. Another commenter described this and other defenses as confusing and harmful, noting that the defense would obfuscate discrimination in lender models and algorithmic systems.

Moreover, commenters noted that the defense was promulgated without public notice and comment and was not a "logical outgrowth" of the 2019 Proposed Rule, thereby violating the APA.

*HUD Response:* HUD agrees with the commenters that the defense is not appropriate to include in this rule. Upon HUD's consideration of these comments and in light of HUD's experience interpreting and handling cases under the Act, HUD has determined that the outcome prediction defense is unclear and not found in any case law.[341] The rule properly describes

---

[339] *Inclusive Cmtys. Project, Inc.,* 576 at 533 (analogizing to Title VII, the court said that "before rejecting a business justification—or, in the case of a governmental entity, an analogous public interest—a court must determine that a plaintiff has shown that there is "an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs."")) (internal citations omitted).

[340] 42 U.S.C. 3615.

[341] *Massachusetts Fair Hous. Ctr.* v. *HUD,* 2020 U.S. Dist. LEXIS 205633 (D. Mass. Oct. 25, 2020) (case no 20–11765–MGM) (calling the added defenses from the 2020 Rule "perplexing" and "accomplish[ing] the opposite of clarity" and

Continued

**App.218**

the framework to be used in cases involving algorithms and machine learning in housing and housing-related transactions. The defense, if retained, could in practice improperly exempt many housing-related practices that are increasingly reliant upon algorithms and automated processes that rely on outcome predictions, such as lending practices, from liability under a disparate impact standard. The defense would be inconsistent with HUD's repeated finding, including in the 2020 Rule, that "a general waiver of disparate impact law for the insurance industry would be inappropriate." [342] And although unclear, with its novel "compared to similarly situated individuals not part of the protected class" language, it appears that this defense would suggest using comparators that are, in HUD's experience, inappropriate, and would fail to consider the reasons why disparities are observed. At the very least, the defense introduces unnecessary confusion into disparate effects doctrine.

*Issue:* In addition to insurers, various other commenters requested safe harbors or exemptions. Commenters stated HUD should develop safe harbors for those who "followed rules set out by HUD in developing their operating policies." Another commenter seemed to similarly request specific protections for public housing agencies (PHAs) that have policies that are consistent with HUD rules for operation for federally assisted housing, are in compliance with otherwise legitimate laws, are approved for use in federally insured housing, or are for the purpose of eligibility criteria for enhancing housing opportunities for protected classes or other under-housed persons.

Commenters suggested that HUD should have, as a safe harbor, a process where HUD provides concrete guidance to housing providers so that the housing providers do not have to wait until litigation to discover that their policy may violate the Act. Another commenter requested a safe harbor for entities that implement written policies that identify non-discriminatory goals, explain how the policy is reasonably calculated to achieve that goal, and conclude that the policy does not impose a greater burden on members of protected classes than it does on the wider population. Some commenters

requested a safe harbor for credit unions that limit membership based on statutory requirements, explaining that while a disparate impact claim already would fail under the proposed rule because credit unions are legally unable to lend outside their membership, litigating these cases, even by just filing a motion to dismiss, is costly, particularly for small credit unions. They stated further that *Inclusive Communities* stated that where a causal connection between a policy and a disparate impact cannot be shown because federal law substantially limits discretion of the defendant, dismissal is appropriate.

Other commenters said no safe harbors should be provided for policies and practices that have discriminatory effects by limiting housing opportunities for protected groups. Commenters stated that the 2013 Rule, 2016 Supplement, and this rule appropriately apply a case-by-case disparate impact analysis to all housing related industries and agreed that this approach is consistent with the Act.

*HUD Response:* HUD agrees with commenters that advocate for a case-by-case approach rather than safe harbors. As explained above, HUD believes that it does not have the authority to create exemptions that do not appear in the statute. Moreover, even if a court were to find that HUD had such authority, HUD believes that a case-by-case approach appropriately implements HUD's obligations to enforce the Act to redress discrimination that exists in an entire sector of the economy and to affirmatively further fair housing. Moreover, safe harbors are unnecessary as regulated entities can defend themselves utilizing the second step of the burden shifting framework. Regulated entities may also use the burden shifting framework to assess their own existing policies and practices as well as new policies and practices that are under consideration in order to ascertain whether they may cause an unjustified discriminatory effect. HUD also emphasizes that entities' purported compliance with program specific rules does not guarantee compliance with the Fair Housing Act, and that the Fair Housing Act's mandate is to refrain from discrimination—including refraining from using policies or practices with unjustified discriminatory effects. The rule provides clarity as to how HUD and a court would analyze such a claim, allowing regulated entities to better comply with their obligations under the Act and prevent unjustified discriminatory effects in the first place. HUD notes further that *Inclusive Communities* provides no support for

any exemptions; the passage cited by commenters merely explains that courts dismiss lawsuits pursuant to the pleading standards in the Federal Rules of Civil Procedure.

*Comments Regarding Additional Explanations, Examples and Guidance*

*Issue:* Commenters suggested that HUD should provide additional examples of practices that can have unjustified discriminatory effects in the rule, its Preamble, or in future guidance. They suggested that HUD: note in the rule that policies or practices that result in the benign neglect of people with disabilities can have discriminatory effects; provide examples of specific zoning ordinances or other policies that restrict manufactured housing and may have a discriminatory effect; and discuss criminal records screening practices as examples of policies that may have an unjustified discriminatory effect on protected classes. One commenter suggested that HUD should outline less discriminatory alternatives to eviction in cases where a housing provider has a policy of evicting the household for certain types of lease violations.

*HUD Response:* HUD declines to insert examples of practices that may specifically have unlawful discriminatory effects into this rule. This rule is designed to provide a framework to help entities and courts assess whether a policy or practice may have an unjustified discriminatory effect, not to establish a list of practices that may be unlawful under a discriminatory effects theory. HUD has already issued Guidance on some topics, including certain criminal records screening practices [343] and certain zoning practices [344]—that may have unjustified discriminatory effects on protected classes.

While HUD believes the rule provides a sufficiently clear framework under which specific practices can be evaluated, HUD will consider issuing more guidance as it deems appropriate.

*Issue:* A commenter urged HUD to consider providing separate guidance related to the use of algorithms, artificial intelligence, and machine learning.

*HUD Response:* HUD appreciates this request and believes that the rule provides the appropriate framework for

---

noting that the outcome prediction defense was "not, as far as the court is aware, found in any judicial decision").

[342] 85 FR 60321 (citing "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance" 81 FR 69012)); *see also* 78 FR 11460, 11475.

[343] *See* "Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions" (April 4, 2016).

[344] *See* "Joint Statement of the Department of Housing and Urban Development and the Department of Justice[:] State and Local Land Use Laws and Practices and the Application of the Fair Housing Act" at 5 (November 10, 2016).

**App.219**

evaluating discriminatory effects liability for all claims under the Act, including as applied to algorithms, artificial intelligence, and machine learning. However, given the rapid evolution in this field, HUD will consider in the future whether to adopt more detailed guidance expanding on those particular types of claims.

*Issue:* A commenter asked HUD to specify that a one-off action, like the decision of a private developer to construct a new building in one location rather than another, is insufficient to establish disparate impact liability. Other commenters opposed this change, noting that a single zoning decision or single application of a zoning standard often results in or is, in fact, a community's policy or practice and can have wide discriminatory impacts. They noted that a "single event" limitation would essentially sanction many discriminatory zoning actions, even where *Inclusive Communities* specifically called suits targeting "zoning laws and other housing restrictions . . . that function to unfairly exclude minorities from certain neighborhoods without any sufficient justification . . . [as] resid[ing] at the heartland of disparate impact liability."

*HUD Response:* HUD believes that a so-called "one-off" action may, in certain cases, be sufficient to establish a practice that has an unjustified discriminatory effect. As noted throughout this preamble, HUD continues to find that discriminatory effects claims should be assessed on a case-by-case basis. A "one-off" exception would tend to protect siting decisions that may have been influenced by a community's desire to keep out people of a certain race, or against people with disabilities. And HUD agrees with commenters that this limitation may pose obstacles to meritorious zoning cases. HUD notes that an individual siting decision by a private housing developer, or a single zoning decision by a locality, will not result in an unjustified discriminatory effect liability so long as the developer or locality has a legally sufficient justification for that decision. HUD believes this fully protects localities and the individual siting decisions of private housing developers. Furthermore, while the Court in *Inclusive Communities* noted in dicta that it would be difficult to prove that a developer's one-time decision to build in one location rather than another was a policy that caused a disparate impact, it did not go so far as to say that such a scenario could never succeed under a disparate impact theory.

*Issue:* A commenter suggested that in the preamble to the final discriminatory effects rule and in separate guidance, HUD should outline potentially less discriminatory alternatives to eviction in cases where a housing provider has a policy of evicting the household for certain types of lease violations.

*HUD Response:* As discussed above, HUD believes that each discriminatory effects claim should be assessed on a case-by-case basis, including what less discriminatory alternatives might exist. HUD declines to provide additional guidance in this regulation but will consider in the future whether such guidance may be appropriate.

*Issue:* Commenters asked HUD to make revisions to various guidance documents including the 2016 Office of General Counsel Guidance entitled "Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions" (2016 Guidance) and a 2011 internal HUD memorandum for HUD's Fair Housing and Equal Opportunity headquarters and field staff entitled "Assessing Claims of Housing Discrimination against Victims of Domestic Violence under the Fair Housing Act (FHAct) and the Violence Against Women Act (VAWA)". Other commenters stated that the 2016 Guidance provided clarity.

*HUD Response:* While guidance is beyond the scope of this rulemaking, HUD will consider at a later date whether any revisions to guidance documents may be necessary or helpful.

*Comments Regarding Effects of the Proposed Rule*

*Issue:* Commenters stated that regulated entities will face increased litigation risks under the proposed rule. They said that the "specter of disparate-impact litigation" could discourage businesses from undertaking the activities that ensure a well-functioning housing market, undermining the Act's purpose and the free-market system. A commenter stated that the 2013 Rule created an uncertain legal environment where any adverse impact that a practice may have on a protected group invited the threat of a lawsuit over its discriminatory effect. As an example, this commenter stated that people of color are more likely to be tenants than homeowners, so the proposed rule invites tenant advocates to assert that any rule or policy that is adverse to actual or prospective renters may have a discriminatory effect while citing little or no statistical or evidentiary basis. Commenters stated that reinstating the 2013 Rule will increase litigation costs, with one commenter saying that this is

due to unclear, overly burdensome, and duplicative standards, saying that HUD itself recognized this in the 2019 Proposed Rule. A commenter also noted that the proposed rule would impose additional burdens on entities administering Community Development Block Grant disaster relief funding.

*HUD Response:* HUD disagrees that this rule will increase litigation risks in a manner that interferes with the free-market system and undermines the purpose of Act. This rule does not restrict valid free-market activity, but rather only regulates policies that have unjustified discriminatory effects and encourages businesses to develop and implement policies that achieve their substantial legitimate purposes in the least discriminatory manner. HUD believes the rule will further the goal of a vibrant, integrated, and open housing market. Furthermore, the rule does not create any new liability or burdens for businesses or declare any activity per se unlawful. It merely prescribes a method for evaluating liability under the Act. HUD believes that litigation and burdens concerning the Act is more properly attributable to the Act, rather than the rule. HUD notes that commenters' concerns are undermined by the fact that the rule has been in place since 2013 and in HUD's experience, no such increased litigation has occurred.

*Issue:* A commenter critiqued the rule for increasing the threat of challenges to certain types of landlord practices that the commenter characterized as justified by practical business decision making. For instance, the commenter stated, the rule allows landlords to be sued for occupancy restrictions that are stricter than state or local codes even though these restrictions advance housing providers' legitimate interests in limiting wear and tear, minimizing operational costs, and addressing issues with safety, overcrowding, and noise in multifamily properties. According to the commenter, advocates have increasingly used the rule to challenge occupancy restrictions with HUD and state agencies. The commenter also said that the rule allows lawsuits against landlords who purchase buildings that are largely populated by persons with certain protected characteristics and institute new rules that are facially neutral but have a disparate impact on protected classes, such as requiring existing tenants to provide valid government issued identification or requiring tenants to pay rent through direct deposit from a bank account. The commenter also mentioned the 2016 Guidance on criminal records, alleging that it has invited costly challenges to

**App.220**

all criminal records screening, and requires property owners to set up a "mini parole board" to review applicants with criminal records, even if there are legitimate reasons not to rent to persons with certain types of criminal records, including lesser offenses like disorderly conduct, illegal drug use, and nuisance conduct. Finally, the commenter stated that advocates are using the 2013 Rule against landlords who choose not to participate in the Section 8 program. The commenter described one class action case in which it represented the new owner of a building who decided to not accept Section 8 vouchers and wanted to raise rents to pay for costly improvements to the building, which allegedly had a discriminatory effect on residents with disabilities, African Americans and Hispanics who used Section 8 vouchers or could not afford higher rent. The commenter said that the claim survived a summary judgment motion because of the possibility that the plaintiffs might be able to show a less discriminatory alternative, such as raising rents less, doing less to improve the property, or looking for some public funding or subsidies to allow the owners to get a return on investment without discontinuing participation in Section 8 and raising rents.

*HUD Response:* HUD disagrees that the commenter's concerns merit revising the rule. The examples provided by the commenter are well within the types of cases that may or may not state a valid claim under the Act and may be decided through the rule's framework. While the practices cited by the commenter that have a discriminatory effect on protected classes may advance legitimate interests, these practices are still illegal if, for example, they are not necessary to achieve substantial, legitimate, nondiscriminatory interests of the defendant or there is a different practice that advances that same interest but has a less discriminatory effect. This is the essential framework of discriminatory effects liability that has developed in case law, whether the rule exists or not. For example, as noted in the 2013 Rule, even decades prior to the rule, unreasonable restrictions on occupancy that impose a discriminatory effect on families with children will result in liability.[345] Furthermore, the 2016 Guidance on criminal records sets out this well-established discriminatory effects framework. It does not require a "mini parole board" but rather posits that an individualized review of a person with a criminal record is likely to have a less discriminatory effect than

a policy that imposes an automatic categorical ban. To the extent the commenter disagrees with that assessment, its quarrel is with the Guidance's particularized application of this rule and not with the more general principles this rule sets out.

In sum, HUD believes that this rule strikes a reasonable balance, in accordance with the Act and with caselaw, between allowing policies that permit landlords to advance their interests, even if those policies disproportionately adversely impact protected classes, while requiring landlords to demonstrate that their policies are necessary to advance those interests.

*Issue:* A commenter stated that the proposed rule violates the constitutional principle of separation of powers because § 100.500(c) is an attempt by HUD to dictate rules of judicial procedure and evidence to the judicial branch. The commenter said the rule would unnecessarily produce complication throughout the federal courts because they have no obligation to use a standard dictated by the executive branch, and different courts will decide to follow the rule (or not) in different ways. The commenter requested that HUD rescind all provisions that address judicial standards of review, rules of procedure, and evidence. The commenter continued that HUD's reliance on Congress's delegation of certain authority under section 3608(a) is improper because that statutory provision does not mention the judiciary, standards of review, rules of procedure or evidence, or any directives for HUD to assume a role that is clearly the province of the judiciary.

*HUD Response:* The final rule sets out a framework for analyzing and proving cases under a theory of discriminatory effects and does not amend or establish rules of judicial or civil procedure or evidence. It remedies concerns expressed by many commenters that the 2020 Rule infringed upon the judicial branch by, for example, setting pleading standards, establishing a confusing burden that appeared to contradict the Federal Rules of Civil Procedure, and defining "plausibility" in such a way as to preclude substantively meritorious claims. HUD agrees that it does not have the authority to amend pleading standards, to modify the defenses under Federal Rule of Civil Procedure 12, or the rules of evidence. It does, however, have authority to "make rules . . . to carry out" the Act, including the prohibition of discrimination in

housing.[346] That is precisely what HUD is doing here.

*Comments Regarding the Administrative Procedure Act*

*Issue:* Commenters disagreed about whether the proposed rule violates the Administrative Procedure Act (APA). A commenter stated that HUD's reasoning for the proposed rule, that "the practical effect of the 2020 Rule's amendments is to severely limit HUD's and plaintiffs' use of the discriminatory effects framework in ways that substantially diminish that frameworks' effectiveness," does not satisfy APA requirements because HUD neither provided the essential facts on which its conclusion was based nor explained how those facts justified that conclusion, instead making a conclusory statement. Another commenter stated that reverting to the 2013 Rule, which was promulgated before *Inclusive Communities,* without adequately explaining the reversal would violate the APA.

Other commenters stated that the 2020 Rule violated the APA and that the proposed rule would rightfully reinstate the standard set forth in the 2013 Rule. Commenters stated that changes made by the 2020 Rule were arbitrary and capricious and contrary to law. Commenters also stated that the 2020 Rule failed to explain why it was deviating from legal standards and failed to address that courts have easily applied existing disparate impact case law and *Inclusive Communities.* Commenters also stated that the 2020 Rule violated the APA by failing to address numerous comments about the negative effects the rule would have, namely on plaintiffs' ability to successfully challenge housing discrimination in accordance with the Act.

*HUD Response:* HUD believes that the proposed rule and this final rule fully comply with the requirements of the APA. HUD disagrees with the assertion that HUD did not explain its proposed rule in light of *Inclusive Communities.* The proposed rule directly and thoroughly explained HUD's reason for believing that the 2013 Rule was consistent with and in fact supported by *Inclusive Communities.* The proposed rule also explained why HUD believed that the 2020 Rule was deficient. There, HUD provided a number of different reasons why it was proposing to change course from the position it had taken in 2020 and was proposing recodification of the 2013 Rule, not just that "the practical effect of the 2020 Rule's

---

[345] 78 FR 11461–11462.

[346] 42 U.S.C. 3614a.

**App.221**

amendments was to severely . . . diminish the [discriminatory effects] framework's effectiveness.'' [347] While the commenter characterized this statement as conclusory, HUD explained that this belief was ''based on HUD's experience investigating and litigating discriminatory effects cases.'' [348] HUD further explained that its experience informed ''it that many of the points made by commenters opposing the 2020 Rule and the Massachusetts District Court are correct, including that the changes the 2020 Rule makes, such as amending pleading standards, changing the burden shifting framework, and adding defenses, all favoring respondents, will at the very least introduce unnecessary confusion and will at worst make discriminatory effects liability a practical nullity.'' [349] Further, the APA requires in relevant part that a proposed rule make reference to the legal authority under which the rule is proposed and include either the terms or substance of the proposed rule or a description of the issues involved, all of which HUD did in the proposed rule.[350] Now, in this final rule, HUD has again explained that the Act vests HUD with the requisite authority, and has further explained why, having reconsidered the 2020 Rule, HUD is finalizing its proposal to recodify the 2013 Rule.[351]

Furthermore, this final rule explains HUD's position after consideration of the comments HUD received on the proposed rule. As explained in the proposed rule, the facts that spurred HUD's decision to recodify the 2013 Rule include the consistent concerns expressed through thousands of public comments regarding the effect of the 2020 Rule's changes on disparate impact jurisprudence and protected classes, the concerns raised by the court in *Massachusetts Fair Housing Center,* HUD's own experience in interpreting and applying the Act, which indicated that these criticisms are correct, and HUD's determination after examining case law that several provisions of the 2020 Rule were inconsistent with the purpose of the Act and judicial and agency precedent,[352] HUD expounds upon its reasoning in this final rule in responding to specific comments.

HUD is not ignoring facts or circumstances that underlay HUD's 2020 Rule; rather, HUD is acknowledging its change in position,

drawing on its experience in different ways than it did in the 2020 Rule, drawing on case law that did not exist when the 2020 Rule was promulgated, relying on other case law that the 2020 Rule downplayed and/or ignored, and drawing on new public comments about the final version of the 2020 Rule that did not exist when HUD decided to issue the 2020 Rule.

*Comments Regarding HUD's Findings and Certifications*

*Issue:* Commenters stated that HUD inappropriately and incorrectly assumed that reinstating the 2013 Rule ''would not have federalism implications,'' and asserted that HUD should have consulted with state regulators as required by Executive Order 13132 and acknowledged that the rule would interfere with state law in violation of McCarran-Ferguson in all or nearly all cases.

*HUD Response:* HUD stands by its certification that this rule—like the 2013 Rule it recodifies and the 2020 Rule it rescinds—does not have federalism implications. These commenters' assertion that this rule is inconsistent with Executive Order 13132 is based solely on the assertion that this rule would interfere with states' ability to regulate insurance in violation of McCarran-Ferguson. As discussed extensively above, HUD disagrees with this assertion and finds that this rule does not interfere with state insurance laws and is consistent with the McCarran-Ferguson. Therefore, this rule has no federalism implications. The existing relationship between the Act and McCarran-Ferguson, and therefore the Act and state insurance law, remains the same before and after this rule. Section 6 of Executive Order 13132 only requires consultation with the states when there are federalism implications, when a regulation has ''substantial direct effect on the States''; therefore, HUD has no obligation to consult with state regulators.

*Issue:* Commenters stated that the proposed rule would have an impact on regulated entities and that the proposed rule does not pass a basic cost benefit analysis. Another commenter stated that the proposed rule would eliminate economic burdens that the 2020 Rule imposed by removing ambiguity and uncertainty that would have led to expensive litigation and dispute resolution and would have imposed these expenses on plaintiffs, state governments, the public, and attorneys general.

*HUD Response:* HUD agrees that 2020 Rule would have been burdensome if it had not been enjoined and that the

proposed rule does not impose a significant economic impact, as further explained in HUD's certification. HUD stands by its certification that this rule will not have a significant economic impact. Because the rule does not change decades-old substantive law articulated by HUD and the courts, but rather formalizes a clear, consistent, nationwide standard for litigating discriminatory effects cases under the Fair Housing Act, it adds no additional costs to housing providers and others engaged in housing transactions. Rather, HUD believes that the rule will simplify compliance with the Fair Housing Act's discriminatory effects standard and decrease litigation associated with such claims by clearly allocating the burdens of proof and how such burdens are to be met.

*Other Comments*

*Issue:* A commenter stated that the proposed rule is unnecessary because credit unions have already carefully structured their policies to comply with the Act.

*HUD Response:* HUD appreciates the efforts of regulated entities to comply with the Act and its implementing regulations. However, HUD disagrees that any alleged current compliance provides a basis for retracting the rule or providing exemptions, particularly where policies may change in the future. HUD believes—and many commenters have stated—that this rule is a necessary tool for ensuring both new and continued compliance.

*Issue:* A commenter asserted that plaintiffs sometimes use the disparate impact framework to bring costly and lengthy litigation which is resolved without a court finding. A commenter suggested HUD include an extensive examination of disparate impact cases relating to residential lending activity from the standpoint of any actual discriminatory findings and court judgments and provide an accounting of cases brought in class action form, examining and reporting any monetary awards actually being delivered to the purported class.

*HUD Response:* This comment is outside the scope of the proposed rule because it is a criticism of plaintiffs who bring cases based on a disparate impact theory of liability and/or the disparate impact theory itself, rather than the final rule. HUD does not believe that conducting such an examination or finding that most disparate impact cases settle before a judicial determination, would inform any changes HUD should or should not make to the proposed rule. For these reasons, HUD declines to

---

[347] 86 FR 33593, 33594.

[348] *Id.*

[349] *Id.*

[350] See 5 U.S.C. 553(b)(1)–(3).

[351] *Supra* at n. 8.

[352] 86 FR 33593–33595.

conduct such an examination in this final rule.

## IV. Severability

Consistent with the requirements of the Administrative Procedure Act, HUD has carefully responded to all public comments received in response to its notice of proposed rulemaking. HUD has determined that the discriminatory effects standard and burden-shifting framework in this rule appropriately implement, and are fully consistent with, the Fair Housing Act and governing law, including *Inclusive Communities.* Furthermore, HUD's decision to not create exemptions for any industry covered by the Fair Housing Act is also fully consistent with the plain language of the Act and governing law, including the McCarran-Ferguson Act. As explained in 2013, 2016, and 2020, as well as in greater detail above, HUD is declining to provide any exemptions, including for the insurance industry, in whole or in part, including because HUD lacks the authority to create such exemptions under the Act.[353] Further, declining to provide exemptions for certain industries furthers congressional intent by effectuating the Act's broad remedial purpose.[354]

Through this rule, HUD is taking two separate actions. First, HUD rescinds the 2020 Rule, removing 24 CFR 100.500

and the second and third sentences of 24 CFR 100.5(b), thus nullifying the 2020 Rule and eliminating any and all legal effect that the 2020 Rule could have. Second, HUD adds a new 24 CFR 100.500 and a new second sentence to 24 CFR 100.5(b). The new language in both sections is identical to the language in those sections of the Code of Federal Regulations that took effect on March 18, 2013, which HUD refers to throughout this preamble as "the 2013 Rule." HUD intends the language promulgated today to be the only operative text.

HUD intends these separate actions to be legally severable. In particular, in the event that any portion of § 100.500 or § 100.5(b) of this final rule is held to be invalid or unenforceable, HUD intends that the rescission of the 2020 Rule be unaffected. HUD believes that it would be more consistent with the plain language and legislative history of the Act for the Code of Federal Regulations to contain no language regarding discriminatory effects liability and for litigants to rely on existing jurisprudence than for any provision of the 2020 Rule to remain in effect. HUD has made this determination for all the reasons described elsewhere in this preamble, including that the 2020 Rule is inconsistent with such jurisprudence. In addition to rescinding the 2020 Rule for the reasons described more fully in this preamble, HUD's rescission will serve to resolve three pending lawsuits, all of which challenge the 2020 Rule as arbitrary and capricious and inconsistent with *Inclusive Communities* and other case law.[355] Moreover, having no rule in place at all regarding discriminatory effects would be workable, as precedent proves; for decades prior to the 2013 Rule, there was no HUD rule on discriminatory effects liability, and litigants relied on caselaw.

HUD also intends that the rule be treated as severable in its applications to certain industries. Litigation brought by the insurance industry regarding the 2013 Rule is ongoing.[356] One of those cases, decided in the context of the 2013 Rule, has already upheld the rule's burden-shifting framework for analyzing discriminatory effects claims as a reasonable interpretation of the Act, but also held that HUD had not adequately explained why case-by-case

adjudication was preferable to using its rulemaking authority to provide exemptions or safe harbors related to homeowners insurance.[357] To resolve that suit, HUD issued the 2016 Supplemental Explanation.[358] The plaintiff filed an amended complaint and that litigation is pending. HUD believes, as described in greater detail above, that discriminatory effects liability can be properly applied to the insurance industry and that doing so is fully consistent with the Act's plain language and broad remedial purpose. However, should a court decide that the insurance (or any other) industry or certain types of insurance (or other) claims should be exempt from the Rule, HUD intends that this final rule remain in effect and apply to all other actors and claims covered by the Act. Moreover, in the event of such a court decision, this final rule would still function sensibly with respect to others covered by the Act, as nothing in this final rule's applicability to the insurance (or any other) industry affects its applicability to others covered by the Act.

## V. Findings and Certifications

*Regulatory Review—Executive Orders 13563 and 12866*

Executive Order 13563 ("Improving Regulation and Regulatory Review") directs agencies to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs, emphasizes the importance of quantifying both costs and benefits, of harmonizing rules, of promoting flexibility, and of periodically reviewing existing rules to determine if they can be made more effective or less burdensome in achieving their objectives. Under Executive Order 12866 ("Regulatory Planning and Review"), a determination must be made whether a regulatory action is significant and therefore, subject to review by the Office of Management and Budget ("OMB") in accordance with the requirements of the order. This rule was determined to be a "significant regulatory action" as defined in section 3(f) of Executive Order 12866 (although not an economically significant regulatory action, as provided under section 3(f)(1) of the Executive Order).

In its proposed rule, HUD invited comments on whether any further analysis was needed to assess the impact of the rule, given the fact that the rule would simply be retaining the status quo and would therefore have no

---

[353] *See Sierra Club* v. *EPA,* 719 F.2d 436, 453 (D.C. Cir. 1983) ("The agency relies on its general authority under section 301 of the Act to 'prescribe such regulations as are necessary to carry out [its] functions under [the Act]' . . . . EPA's construction of the statute is condemned by the general rule that when a statute lists several specific exceptions to the general purpose, others should not be implied."); *Colorado Pub. Int. Rsch. Grp., Inc.* v. *Train,* 507 F.2d 743, 747 (10th Cir. 1974), *rev'd on other grounds,* 426 U.S. 1 (1976) ("Another cardinal rule of statutory construction is that where the legislature has acted to except certain categories from the operation of a particular law, it is to be presumed that the legislature in its exceptions intended to go only as far as it did, and that additional exceptions are not warranted."); *Nat. Res. Def. Council, Inc.* v. *Costle,* 568 F.2d 1369, 1377 (D.C. Cir. 1977) (courts cannot manufacture a "revisory power" granting agency authority to act "inconsistent with the clear intent of the relevant statute"); *Alabama Power Co.* v. *Costle,* 636 F.2d 323, 357 (D.C. Cir. 1979) ("[T]here exists no general administrative power to create exemptions to statutory requirements based upon the agency's perceptions of costs and benefits."); *see also Graoch,* 508 F.3d at 375 ("[n]othing in the text of the FHA instructs us to create practice-specific exceptions.").

[354] *Inclusive Cmtys. Project, Inc.,* 576 U.S. at 539 (stating that the FHA "was enacted to eradicate discriminatory practices within a sector of our Nation's economy" and noting that the viability of disparate impact claims is "consistent" with the Act's "central purpose"); H.R. Res. 1095, 110th Cong., 154 Cong. Rec. H2280–01 (April 15, 2008) (explaining that the goal of the Act was to advance equal opportunity in housing and to "achieve racial integration for the benefit of all people in the United States.").

[355] *Massachusetts Fair Hous. Ctr., et al.* v. *HUD,* 496 F. Supp. 3d 600 (D. Mass. 2020); *Nat'l Fair Hous. All., et al.* v. *HUD,* No. 3:20–cv–07388 (N.D. Cal.); *Open Cmtys., et al.* v. *HUD,* No. 3:20–cv–01587 (D. Conn.).

[356] *Nat'l Ass'n. of Mut. Ins. Cos.* v. *HUD,* No. 1:13–cv–00966 (D.D.C); *Prop. Cas. Ins.. Ass'n. of Am.* v. *Fudge,* 1:13–cv–08564 (N.D. Ill.).

[357] *Prop. Cas. Ins. Ass'n of Am.* v. *Donovan,* 66 F. Supp. 3d 1018, 1049–54 (N.D. Ill. 2014).

[358] 81 FR 69012–13.

**App.223**

new impact on regulated entities. Specifically, HUD explained: "[b]ecause the 2020 Rule never took effect, and therefore did not affect the obligations of any regulated entities, this proposed rule is only recodifying the 2013 Rule and will have no impact on regulated entities except to affirm that the 2013 Rule remains in effect. Furthermore, the 2013 Rule itself had little direct effect on regulated entities because it only "formalize[d] the longstanding interpretation of the Fair Housing Act to include discriminatory effects liability" and "[was] not a significant departure from HUD's interpretation to date or that of the majority of federal courts." HUD stated further that it did not believe that additional analysis was needed on this point but invited comment.

Some commenters stated that the rule does not pass a cost benefit analysis, but they did not explain why this was so. Nor did they address HUD's explanation in the proposed rule as to why a deeper assessment of the impact of the rule was unnecessary. HUD continues to believe that this rule will provide significant benefits, while having no new impact on regulated entities, for the reasons explained earlier and summarized below.

As explained in 2013, a "uniform rule would simplify compliance with the Fair Housing Act's discriminatory effects standard, and decrease litigation associated with such claims. By providing certainty in this area to housing providers, lenders, municipalities, realtors, individuals engaged in housing transactions, and courts, this rule would reduce the burden associated with litigating discriminatory effect cases under the Fair Housing Act by clearly establishing which party has the burden of proof, and how such burdens are to be met. With a uniform standard, entities are more likely to conduct self-testing and check that their practices comply with the Fair Housing Act, thus reducing their liability and the risk of litigation. A uniform standard is also a benefit for entities operating in multiple jurisdictions. Also, legal and regulatory clarity generally serves to reduce litigation because it is clearer what each party's rights and responsibilities are, whereas lack of consistency and clarity generally serves to increase litigation. For example, once disputes around the court-defined standards are eliminated by this rule, non-meritorious cases that cannot meet the burden under § 100.500(c)(1) are likely not to be brought in the first place, and a respondent or defendant that cannot meet the burden under § 100.500(c)(2)

may be more inclined to settle at the pre-litigation stage." [359] And as HUD explains both in this rule and the proposed rule, *Inclusive Communities* did not disrupt this long-standing case law or the 2013 Rule; rather, it affirmed it, citing to HUD's 2013 Rule multiple times with approval. The Court articulated long-standing limitations on the scope of disparate impact liability, which HUD had already accounted for in the 2013 Rule.

When deciding whether to enact this rule, HUD also considered whether any part of the 2020 Rule should be retained, which is evidenced by our discussion of various parts of the 2020 Rule elsewhere. It decided that no substantive portion of the 2020 Rule should be incorporated into this rule. Only three additional illustrations of discriminatory practices under the Act at § 100.70(d) are incorporated from the 2020 Rule, which were not specifically objected to by commenters and present no substantive change from the 2013 Rule. The 2020 Rule would impose significant costs to the agency, the public, and regulated entities while affording little, if any, benefit. As described in further detail elsewhere in this preamble, the 2020 Rule introduced new and confusing standards, including standards not found anywhere in case law, that were largely untested. Accordingly, the 2020 Rule would require regulated entities to spend more resources attempting to ascertain what the 2020 Rule means and how to defend against any potential claims, as well as increased spending that could last for years as courts try to interpret what the 2020 Rule means. Relatedly, entities that are covered by the Fair Housing Act have a serious reliance interest in the 2013 Rule, which has been in place for ten years. Conversely, these entities should have little to no reliance interest in the 2020 Rule, which never went into effect.

Furthermore, HUD's experience investigating and litigating discrimination cases under various regulatory frameworks informs that the 2020 Rule would make it significantly more difficult, almost impossible, to bring a discriminatory effects claim, and significantly more difficult to provide sound guidance to housing providers attempting to comply with the Act, at great cost to the agency in terms of its mission and its resources. Extra staff time would need to be spent to determine how to apply the 2020 rule to current cases being investigated and new cases that will be filed, and to determine how to address various

guidance documents for the public and grantees which have been issued based on the 2013 Rule. Additionally, allowing unlawful discrimination to go unchecked and unremedied because of burdensome and confusing pleading and proof standards would come at great cost to the public who, as the Act mandates, are entitled to equal access to housing throughout the country.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act ("RFA") (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. This rule amends the Code of Federal Regulations to accurately reflect HUD's discriminatory effects regulation as it currently exists. As a result, all entities, big and small, have a responsibility to comply with the law.

As discussed above, this Rule will continue to apply the 2013 Rule, which has been in effect uninterrupted for ten years. HUD concludes, as it did when it published the 2013 Rule, that the majority of entities, large or small, currently comply and will remain in compliance with the Fair Housing Act. All entities, large and small, have been subject to the Fair Housing Act for over fifty years and subject to the 2013 Rule for ten years. For the minority of entities that have failed to institutionalize methods to avoid engaging in illegal housing discrimination and plan to come into compliance as a result of this rulemaking, the costs will be the costs of compliance with a preexisting statute and regulation. This rule does not change substantive obligations; it merely recodifies the regulation that more accurately reflects the law. Any burden on small entities is simply incidental to the pre-existing requirements to comply with this body of law. Furthermore, HUD anticipates that this rule will eliminate confusion for all entities, including small Fair Housing Advocacy organizations, by ensuring HUD's regulations accurately reflect current standards. Accordingly, the undersigned certifies that this rule will not have a significant economic impact on a substantial number of small entities. HUD invited comment on this certification in the proposed rule. HUD did not receive any comments providing analysis of the number of small entities which commenters believe may be affected by this regulation. Some commenters stated that application of discriminatory effects law to the

---

[359] *Id.*

**App.224**

business of insurance would harm small businesses. HUD has responded to these comments in this rule.

### Environmental Impact

This rule sets forth nondiscrimination standards. Accordingly, under 24 CFR 50.19(c)(3), this rule is categorically excluded from environmental review under the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

### Executive Order 13132, Federalism

Executive Order 13132 (entitled ''Federalism'') prohibits an agency from publishing any rule that has federalism implications if the rule either: (i) imposes substantial direct compliance costs on state and local governments and is not required by statute, or (ii) preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This rule does not have federalism implications and does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

### Unfunded Mandates Reform Act

Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) (''UMRA'') establishes requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and on the private sector. This rule does not impose any federal mandates on any state, local, or tribal governments, or on the private sector, within the meaning of the UMRA.

### List of Subjects in 24 CFR Part 100

Aged, Civil rights, Fair housing, Incorporation by reference, Individuals with disabilities, Mortgages, and Reporting and recordkeeping requirements.

For the reasons discussed in the preamble, HUD amends 24 CFR part 100 as follows:

## PART 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT

■ 1. The authority citation for 24 CFR part 100 continues to read as follows:

**Authority:** 42 U.S.C. 3535(d), 3600–3620.

### Subpart A—General

■ 2. Amend § 100.5 by revising paragraph (b) and removing paragraph (d) to read as follows:

### § 100.5 Scope.

\* \* \* \* \*

(b) This part provides the Department's interpretation of the coverage of the Fair Housing Act regarding discrimination related to the sale or rental of dwellings, the provision of services in connection therewith, and the availability of residential real estate-related transactions. The illustrations of unlawful housing discrimination in this part may be established by a practice's discriminatory effect, even if not motivated by discriminatory intent, consistent with the standards outlined in § 100.500.

\* \* \* \* \*

### Subpart B—Discriminatory Housing Practices

■ 3. In § 100.70, paragraph (d)(5) is republished to read as follows:

### § 100.70 Other prohibited sale and rental conduct.

\* \* \* \* \*

(d) \* \* \*

(5) Enacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin.

### Subpart G—Discriminatory Effect

■ 4. Revise § 100.500 to read as follows:

### § 100.500 Discriminatory effect prohibited.

Liability may be established under the Fair Housing Act based on a practice's discriminatory effect, as defined in paragraph (a) of this section, even if the practice was not motivated by a discriminatory intent. The practice may still be lawful if supported by a legally sufficient justification, as defined in paragraph (b) of this section. The burdens of proof for establishing a violation under this subpart are set forth in paragraph (c) of this section.

(a) *Discriminatory effect.* A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns

because of race, color, religion, sex, handicap, familial status, or national origin.

(b) *Legally sufficient justification.* (1) A legally sufficient justification exists where the challenged practice:

(i) Is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent, with respect to claims brought under 42 U.S.C. 3612, or defendant, with respect to claims brought under 42 U.S.C. 3613 or 3614; and

(ii) Those interests could not be served by another practice that has a less discriminatory effect.

(2) A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative. The burdens of proof for establishing each of the two elements of a legally sufficient justification are set forth in paragraphs (c)(2) and (3) of this section.

(c) *Burdens of proof in discriminatory effects cases.* (1) The charging party, with respect to a claim brought under 42 U.S.C. 3612, or the plaintiff, with respect to a claim brought under 42 U.S.C. 3613 or 3614, has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect.

(2) Once the charging party or plaintiff satisfies the burden of proof set forth in paragraph (c)(1) of this section, the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant.

(3) If the respondent or defendant satisfies the burden of proof set forth in paragraph (c)(2) of this section, the charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.

(d) *Relationship to discriminatory intent.* A demonstration that a practice is supported by a legally sufficient justification, as defined in paragraph (b) of this section, may not be used as a defense against a claim of intentional discrimination.

**Marcia L. Fudge,**
*Secretary.*

[FR Doc. 2023–05836 Filed 3–27–23; 4:15 pm]

**BILLING CODE 4210–67–P**

## Document Details

**Comment Submitted by Julie Gackenbach, Confrere Strategies, on behalf of National Association of Mutual Insurance Companies**

Document ID: HUD-2011-0138-0051   Document Type: Public Submission
This is comment on   Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
Docket ID: HUD-2011-0138
View Document:

Show Details

Attached are the comments of the National Association of Mutual Insurance Companies ("NAMIC") regarding implementation of the Fair Housing Act's discriminatory effects standard. (Docket No. FR-5508-P-01; RIN 2529-AA96) NAMIC believes it is premature in light of Supreme Court's pending consideration of Magner v. Gallagher for HUD to move forward with the proposed rule. NAMIC urges the Department to withdraw the proposed rule, pending the Supreme Court decision. Alternatively, HUD should suspend activity regarding the rule until the Supreme Court has ruled. NAMIC does not believe that Section 3604 supports inclusion of the disparate impact standards. At a minimum, NAMIC believes that pricing decisions and operations of FAIR plans should be excluded from the reach of the rule and regulatory safe harbors should be provided for recognized underwriting risk factors. NAMIC further believes that the McCarran-Ferguson Act precludes federal acts that would impair or supersede state laws and that application of the disparate impact standards would impair state unfair discrimination standards.

Attachments:

– Comment Submitted by Julie Gackenbach, Confrere Strategies, on behalf of Na...   View Attachment:

Title:
Comment Submitted by Julie Gackenbach, Confrere Strategies, on behalf of National Association of Mutual Insurance Companies (Attachment)

**App.226**



# NAMIC®

NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES

January 17, 2012

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW., Room 10276
Washington, DC 20410–0500.

Re: Docket No. FR–5508–P–01; RIN 2529–AA96
Implementation of the Fair Housing Act's Discriminatory Effects Standard

Dear Sir/Madam:

The National Association of Mutual Insurance Companies ("NAMIC") appreciates the opportunity to comment on the Department of Housing and Urban Development's ("HUD") proposed implementation of the Fair Housing Act's ("FHA") Discriminatory Effects Standard ("Proposed Rule").

NAMIC is the largest and most diverse property/casualty trade association in the country, with 1,400 regional and local mutual insurance member companies on main streets across America joining many of the country's largest national insurers who also call NAMIC their home. Member companies serve more than 135 million auto, home and business policyholders, writing in excess of $196 billion in annual premiums that account for 50 percent of the automobile/ homeowners market and 31 percent of the business insurance market. More than 200,000 people are employed by NAMIC member companies.

**Background**

The Fair Housing Act prohibits discrimination against any person in "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or

**App.227**

facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."[1]

HUD on November 16, 2011 proposed significant changes in the implementation of the Discriminatory Effects Standard.[2] The proposed rule purportedly would harmonize existing standards for determining when a housing practice with a discriminatory effect violates the FHA. The proposed rule also discusses liability standards where a facially neutral housing practice has a discriminatory effect.

In its proposal, HUD asserts that it has long interpreted the FHA to permit disparate-impact claims, meaning claims of discrimination even where there has been no intent to discriminate and no claim that any person was subject to discriminatory treatment, and has held that the Act is violated by facially neutral practices that have a disparate impact on protected classes.[3] According to HUD, violations of various provisions of the FHA may be established by proof of discriminatory effects, and discriminatory effects claims may be brought pursuant to the FHA under subsections (b) and (f)(2) of 42 U.S.C. § 3604 ("Section 3604"), which prohibit discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" a protected characteristic.

The recently proposed rule would solidify HUD's position on disparate-impact liability and prescribe standards for addressing disparate-impact claims. HUD proposes to add a new Subpart G, Prohibiting Discriminatory Effect, which would confirm that the Fair Housing Act may be violated by a housing practice that has a discriminatory effect, as defined in 24 C.F.R. § 100.500(a), regardless of whether the practice was adopted for a discriminatory purpose and regardless of whether any individual person was subjected to discriminatory treatment.

As examples of practices that may have a disparate impact on a class of persons, HUD cites the provision and pricing of homeowner's insurance. For support, HUD cites *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1207-8 (9th Cir. 2010) (*en banc*). However, as discussed further below, the *Ojo* case clearly reveals that the application of the disparate impact test for FHA liability is inappropriate in the context of insurance.

### *Magner v. Gallagher*

The proposed rule is being advanced by HUD even as the U.S. Supreme Court is currently considering the question of whether disparate impact claims are cognizable

---

[1] 42 U.S.C. § 3604(b).

[2] 76 Fed. Reg. at 70,921.

[3] *See, e.g., Mountain Side Mobile Estates P'ship v. HUD*, 56 F.3d 1243, 1251 (10th Cir. 1995).

under Section 3604.[4]  Oral argument is scheduled for February 27, 2012. In light of the
direct bearing the decision of the court will have on the issues at hand, we respectfully
request that HUD defer action on the proposed rule until the Supreme Court renders its
decision in the case.

The Solicitor General on behalf of the United States filed an amicus brief in the
case asking the Court to grant *Chevron* deference to the proposed rule.  We believe
that this position is misguided and that rather HUD should withdraw the proposed rule
pending consideration of the context and limitations of the Supreme Court's decision.
Although HUD asserts that the proposed rule reflects long-standing department policy,
*Chevron* deference should not be accorded to a proposed rule.  We believe the
interests of the American public would be better served by awaiting the decision of the
Supreme Court and drafting proposed regulations consistent with that decision.
Specifically, the Court in *Magner* is asked to determine whether disparate impact claims
are cognizable under the Fair Housing Act and, if such claims are cognizable, whether
they should they be analyzed under the burden shifting approach used by three circuits,
under the balancing test used by four circuits, under a hybrid approach used by two
circuits, or by some other test.  The questions before the Court lie at the heart of the
issues addressed in the proposed regulation and action on the proposed regulation is
premature in light of the pending Supreme Court decision.

**Statutory Construction**

As a threshold matter, NAMIC disputes that the disparate impact standard is
properly applicable under Section 3404 in any context.  Section 3604 prohibits only
*intentional* discrimination against individual persons. Section 3604 specifically
proscribes conduct relating to the sale or rental of dwellings that is undertaken against
an individual "because of" that person's membership in a class protected under the
statute. Section 3604 makes it unlawful to "refuse to sell or rent" or "otherwise make
unavailable or deny" housing to a person "because of" a protected characteristic,
including race.  HUD places the emphasis on the effect (deny or make unavailable),
rather than on the "because of" standard.  Such a reading fails to acknowledge the
"because of" standard serves as a threshold test.  The statutory language does not refer
to conduct that "adversely affects" or "tends to deprive" members of a protected class -
language that would substantiate the basis for disparate-impact causes of action - but
enumerates actions that may not be taken "because of" the individual's protected class.[5]

---

[4] *Magner v. Gallagher*, 619 F.3d 823 (8th Cir. 2010), *cert. granted*, No. 10-1032 (Docket) (U.S. Nov. 7,
2011).

[5] *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988) (plurality opinion) (construing Title VII
Section 703(a)(2)); *see also* Smith v. City of Jackson, 544 U.S. 228, 236 (2005) (plurality opinion)
(construing ADEA Section 4(a)(2)).

**App.229**

In contrast, Section 3604(a) is textually distinct from other statutory provisions that permit claims for disparate impact, such as Section 703(a)(2) of Title VII, 42 U.S.C. § 2000e-2(a)(2), Section 4(a)(2) of the ADEA, 29 U.S.C. § 623(a)(2), and Section 102 of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(b). Each of these provisions prohibit conduct that "adversely affects" a protected class, using language the Court has recognized as authorizing claims of disparate impact.[6] Section 3604 therefore does not provide a cause of action for disparate-impact discrimination and recovery is limited to claims of disparate treatment. As such, we believe the proposed rule exceeds HUD's statutory authority, including in the application of the disparate impact test to insurance, as discussed below.

**Disparate Impact and Insurance**

Disparate impact in the context of the proposed rule would be presumed to exist when a standard or practice has the effect of disproportionately harming members of a group defined by race, ethnicity, or sex – regardless of whether the challenged practice makes reference to these characteristics, or whether the resulting adverse group impact was intended. While the concept of disparate impact is problematic in the best of circumstances, its application in the context of insurance would be particularly difficult. While in 1992 the Seventh Circuit applied the FHA to insurance, the Court noted a distinction between "disparate treatment" (i.e., intentional unfair discrimination) and "disparate impact." The Court further noted that "risk discrimination is not race discrimination."[7]

The FHA has been applied to insurance through § 3604 and the existing HUD regulation – both of which use terminology indicating that discrimination consists of disparate *treatment* where there is *intentional* discrimination rather than merely discriminatory *effects*.[8] HUD asserts that the Department has long interpreted the FHA to permit disparate-impact claims. However, the Department fails to acknowledge that in 1988 the United States Solicitor General submitted an amicus brief before the Supreme Court arguing that a FHA violation requires proof of intentional discrimination. The parties in the case agreed to litigate under the disparate impact approach and while the Court did not disturb the theory, it specifically noted that "[W]e do not reach the question whether that test is the appropriate one."[9] The same year, President Ronald

---

[6] *See Griggs v. Duke Power Co.*, 401 U.S. 424, 426 n.1, 429–31.

[7] *NAACP v. American Family Mutual Insurance Co.*, 978 F.2d 287, 290 (7th Cir. 1992).

[8] *Id.* The Seventh Circuit applied the FHA and the 1989 HUD rules to insurance based on the conclusion that "Section 3604 is sufficiently pliable that its text can bear [HUD's] construction.

[9] *Town of Huntington v. Huntington Branch, NAACP*, 488 U.S. 15, 18 (1988).

**App.230**

Reagan, upon signing the Fair Housing Amendments Act of 1988, issued a statement expressing the view that the FHA requires proof of intentional discrimination to establish a violation.[10] In implementing the new legislative amendments in 1989, the Department adopted expansive rules related to the standards for proving a violation, yet it specifically declined to opine whether the FHA allows a disparate impact approach or required proof of intentional discrimination.[11] Under the Clinton Administration in 1994, several federal agencies issued a "Policy Statement on Discrimination in Lending" sanctioning the disparate impact approach, but acknowledged that the law on disparate impact was under development.[12] Thus, while the Department asserts that its "administrative law judges have held that the Act is violated by facially neutral practices that have a disparate impact on protected classes," the proposed regulation would be the first formal regulatory promulgation to that effect.

The foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk. Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly. Race or other protected class characteristics are not part of the risk assessment process. In addition, state insurance laws proscribe the use of prohibited factors in rating and underwriting practices of insurers, and states prohibit unfair discrimination in insurance. In the context of insurance, unfair discrimination includes treating similar risks in a dissimilar manner. Insurance regulation focuses on facially neutral underwriting or rating factors that reflect insurance risk. Accordingly, state insurance laws largely reflect the principles underpinning property/casualty insurance pricing.

To actuarially determine rates that most accurately measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly. This practice is the very essence of risk-based pricing. Common homeowners insurance factors include claim history of applicant, construction material (s), distance from a fire station, dog/breed of dog owned, fire suppression devices, home-based business presence and type, lead paint potential (constructed pre-1978), loss history of property, roofing material, trampoline use, slab versus basement and the presence of an operational security system. Under HUD's proposed rule, however, these and other common underwriting factors could be jeopardized, even though they

---

[10] President Ronald Reagan, *Remarks on Signing the Fair Housing Amendments Act of 1988* (Sept. 13, 1988) ("I want to emphasize that this bill does not represent any congressional or executive branch endorsement of the notion, expressed in some judicial opinions, that Title 8 violations may be established by a showing of disparate impact or discriminatory effects of a practice that is taken without discriminatory intent. Title 8 speaks only to intentional discrimination.").

[11] 54 Fed. Reg. 3235 (Jan. 23, 1989)

[12] Interagency Task Force on Fair Lending, *Policy Statement on Discrimination in Lending*, 59 Fed. Reg. 18266 (April 15, 1994).

**App.231**

do not intentionally discriminate, if they were found to have the "effect" of making unavailable or denying a dwelling to a certain percentage of a particular racial or ethnic group if that percentage is greater than the percentage of other groups that is similarly affected. To achieve a condition in which no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk- based variables would have to be eliminated from the underwriting process. In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk. This calls into question conclusions drawn simply from statistical samplings and underscores why the business of risk classification defies a disparate impact analysis.

State insurance laws prohibit insurance rates from being "excessive, inadequate, unreasonable or unfairly discriminatory." Classifying people and property by the risks they present and treating similar risk profiles in a similar manner is a form of reasonable and fair discrimination that is at the very heart of the business of insurance. "Unfair discrimination," on the other hand, has specific meaning in the insurance context. The concept of unfairly discriminatory insurance rates has historically been a cost-based concept. Principal 4 of Casualty Actuarial Society Statement of Ratemaking Principles, formally adopted in 1988, provides that "a rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer." [13] Under model legislation developed by the National Association of Insurance Commissioners, an insurer could be guilty of unfair discrimination by making underwriting and rating distinctions "between individuals or risks of the same class and essentially the same hazard" or when underwriting and rating decisions are unsupported by "the application of sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience."[14]

Given the differences, it is the exception rather than the rule where the "unfairly discriminatory" standard and the concept of disparate impact could be applied simultaneously to a risk classification plan without conflict. The proposed rule's standard for disparate impact would at a minimum be inconsistent with the risk-based insurance "unfair discrimination" standard. At worst, by requiring an insurer to disregard the predictive value of a valid factor, HUD would be placing insurers in the untenable position of risking violation of state prohibitions against "unfairly discriminatory" insurance rates. If a state regulator has found that a rate, rating factor, or territory does not unfairly discriminate (as well as not making the rate excessive or inadequate),

---

[13] Statement of Principles Regarding Property and Casualty Insurance Ratemaking: Adopted by the Board of Directors of the Casualty Actuarial Society, May 1988. <http://www.casact.org/standards/princip/sppcrate.pdf>

[14] "Unfair Discrimination," Sec. G (3), Unfair Trade Practices Act, NAIC Model Regulation Service, January 1993, pp. 880-884.

**App.232**

HUD's intervention via a finding of disparate impact or "discriminatory effect" could reverse the state regulator ruling and even make the resulting application unfairly discriminatory under state law. As such, the proposed rule would serve to undercut and even contradict the unfair discrimination standard in state law. If the standard of disparate impact prevails over the historical standard that mandates unfairly discriminatory rates, accurate risk assessment will be threatened, adverse selection will increase, and coverage availability will suffer. Perversely, application of the proposed rule could in fact harm all insurance consumers, including the very groups it purports to protect.

In addition to the "unfairly discriminatory" standard, pricing for property/casualty insurance falls squarely within the "filed rate doctrine." The filed rate doctrine, which has a long history of common-law development, imposes a limitation on private claims for damages based on challenges to filed rates. State regulated insurers generally are required to file rates with state regulators. The application of the filed rate doctrine to property/casualty prices properly balances the interests in ensuring nondiscriminatory treatment of rate-payers. The filed rate doctrine "recognizes that (1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack competence to set . . . rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime." [15] Imposing disparate impact analysis in the context of property/casualty pricing would similarly undermine the state-based regulatory regime. Indeed, a number of courts have recently found the disparate impact test may not be applied to insurance practices for precisely this reason, when addressing discrimination claims in the context of the McCarran-Ferguson Act.

## McCarran-Ferguson

The McCarran-Ferguson Act of 1945 [16] confirms the states' authority to regulate the "business of insurance," unless federal law specifically provides otherwise. State law governs the business of insurance and no act of Congress may interfere with state insurance law unless the federal act specifically relates to insurance. All states regulate the business of insurance within their borders, including the underwriting and rating practices of insurers. Although the courts have held that federal laws may *duplicate*

---

[15] *Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479, 489 (2d Cir. 1998) (internal quotation marks omitted; alteration in original).

[16] 15 U.S.C.A. § 1011 *et seq.*

state laws,[17] McCarran-Ferguson bars any application of federal law that would invalidate, impair or supersede state laws regulating the business of insurance.[18]

One of the cases HUD cites as purported support for its proposed rule, *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1207–8 (9th Cir. 2010) (en banc), plainly illustrates how the Department's overreach in applying disparate impact standards would undermine the states' regulation of insurance. In *Ojo*, the plaintiffs claimed that the use of credit-based insurance scoring had a disparate effect on minorities in violation of the FHA. The Ninth Circuit determined that the FHA does not specifically relate to insurance and that the relevant Texas law was enacted for the purpose of regulating insurance, and thus faced the question whether a ruling for the plaintiffs under the FHA might "invalidate, impair, or supersede" Texas law. The Ninth Circuit certified that question to the Texas Supreme Court. The Texas Supreme Court held: "In light of the fact that Texas only prohibits the use of credit score factors or rates *based on* race, or rates that differ *because of* race, we answer that application of the FHA to permit a cause of action for disparate impact resulting from the use of credit scoring in the field of insurance certainly might invalidate, impair, or supersede Texas law."[19] The court concluded that "[a]llowing a claim against Texas insurers for using completely race-neutral factors in credit scoring would frustrate the regulatory policy of Texas."[20]

The Eighth Circuit made a similar ruling in *Saunders v. Farmers Insurance Exchange*.[21] In that case, the court upheld the dismissal of class action disparate impact claims, citing the reverse-preemption impact of the McCarran-Ferguson Act, as well as the filed rate doctrine, which says that an insurer charging a rate that has been approved by the regulator cannot be sued for using that rate.[22] The court recognized that "a suit challenging the racially disparate impact of industry-wide rate classifications may usurp core rate-making functions of the State's administrative regime."

Other courts are in accord. A Nebraska federal court concluded that "it is difficult to envision how allowing [the plaintiff] to proceed" with a disparate-impact claim under

---

[17] *See American Family*, 978 F.2d 287.

[18] *See Saunders v. Farmers Ins. Exchange*, 537 F.3d 961 (8th Cir 2008).

[19] *Ojo v. Farmers Grp., Inc.*, __ S.W.3d __, No. 10-0245, 2011 WL 2112778, at *2 (Tex. May 27, 2011).

[20] *Id.* at *11.

[21] 537 F.3d 961 (8th Cir. 2008)

[22] *See Mackey v. Nationwide Ins. Co.*, 724 F.2d 419 (4th Cir. 1984); *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003); *Nationwide Mutual Ins. Co. v. Cisneros*, 52 F.3d 1351 (6th Cir. 19950; *NAACP v. American Family Mutual Ins. Co.*, 978 F.2d 287 (7th Cir. 1992); *Moore v. Liberty National Life Ins. Co.*, 267 F.3d 1209 (11th Cir. 2001).

**App.234**

*10*

Comments of the National Association of Mutual Insurance Companies                Page 9
Re: Docket No. FR–5508–P–01; RIN 2529–AA96
January 17, 2012

the FHA challenging the use of credit scores would not frustrate and/or interfere with
Nebraska's administrative regime.[23]  Likewise, a Mississippi federal court held that it
was "clear" that a disparate-impact claim under the FHA would impair a state regulation
that allowed the use of insurance scores not "based in whole or in part on race" where
the regulation "makes no reference to disparate impact."[24]

As these court decisions demonstrate, the disparate-impact analysis is
inappropriate in the context of insurance.  NAMIC therefore urges HUD to exempt
property/casualty coverage from the application of the newly proposed Subpart G,
Prohibiting Discriminatory Effect standards.  Specifically, HUD should:

• exempt insurance pricing from the discriminatory effects standards.  The application of
  the FHA to insurance has been limited to the Act's prohibition on "denying or making
  unavailable" dwellings by making homeowners insurance unavailable.  The decision to
  not write insurance is an underwriting decision based on a number of factors related to
  the anticipated risk of loss.  Pricing is a separate issue and would be subject to the
  filed rate doctrine.

If the Department insists on the inclusion of property/casualty insurance, NAMIC
strongly urges the Department to:

• provide regulatory safe harbors for long-recognized risk-related factors, such as use of
  prior insurance claims, age and condition of property, and distance from fire station.
  Failure to provide safe harbor protection for the use of factors historically allowed by
  state insurance regulators would subject insurers to baseless litigation and threaten
  the sound actuarial standards underpinning the insurance market; and

• exempt Fair Access to Insurance Requirements ("FAIR") Plans.  State FAIR plans
  provide insurance to individuals or cover risks that would otherwise be denied
  insurance due to a related high-risk problem.  FAIR plans generally utilize market
  survey data to determine rates and spread the cost of coverage through assessments
  on participating insurance companies or through assignment to risks to participating
  insurance companies.  Insurance companies participating in FAIR plans should be
  exempt from the discriminatory effects standards.  The state action doctrine would
  clearly apply since the operation of the FAIR plans facilitate private conduct that
  otherwise would not have occurred.

---

[23] *Taylor v. Am. Family Ins. Grp.*, No. 8:07CV493, 2008 WL 3539267, at *3 (D. Neb. Aug. 11, 2008).

[24] *McKenzie v. S. Farm Bureau Casualty Ins. Co.*, No. 3:06CV013, 2007 WL 2012214, at *3 (N.D. Miss.,
July 6, 2007).

## Burden of Proof

The proposed rule outlines a "three-step burden-shifting" approach to determining which party bears the burden of proof at each step of the process.

1. The plaintiff must first prove a prima facie case that the "practice caused, causes, or will cause a discriminatory effect on" a protected group.
2. Once the complainant or plaintiff has made its prima facie case, the burden of proof shifts to the respondent or defendant to prove that the challenged practice has a necessary and manifest relationship to one or more of the housing provider's legitimate, nondiscriminatory interests.
3. If the respondent or defendant satisfies its burden, the complainant or plaintiff may still establish liability by demonstrating that these legitimate, nondiscriminatory interests could be served by a policy or decision that produces a less discriminatory effect. (76 FR 70925, 70927).

The Supreme Court in *Wards Cove Packing Co. v. Atonio*[25] set forth a burden-shifting framework governing disparate-impact claims under non-Title VII statutes such as the FHA.[26] The *Wards Cove* burden-shifting framework involves a similar three-step process, but differs in significant respects. Under *Wards Cove*, the plaintiff must first make a prima facie showing that a specific practice of the defendant causes a "significantly disparate impact" on a protected class.[27] Second, the *Wards Cove* standard provides that if the plaintiff makes the prima facie showing, the defendant must come forward with evidence that the "challenged practice serves, in a significant way, [its] legitimate . . . goals."[28] Third, under *Wards Cove,* the plaintiff must then prove that the defendant refused to adopt an alternative practice that would have served its goals equally as effectively without causing the disparate impact.[29]

Although most lower courts have applied a burden- shifting approach in the FHA context, they generally have failed to adhere to the instruction of *Wards Cove*. The most common deviation is mistakenly shifting the burden of persuasion, as opposed to the burden of production, to the defendant at the second step in the analysis. The proposed rule replicates this error.

---

[25] 490 U.S. 642 (1989).

[26] *See Smith*, 544 U.S. at 240.

[27] *Wards* Cove, 490 U.S. at 658.

[28] *Id*. at 659.

[29] *Id*. at 660–61.

**App.236**

The proposed rule differs from the *Wards Cove* standard in several fundamental ways. In the first step, the proposed rule significantly lowers the standard for demonstrating a "discriminatory effect." In the second step, the proposed rule profoundly narrows the standard for allowing the defendant to rebut the presumption of unlawful discrimination that results from the plaintiff's showing of a discriminatory effect, by requiring the defendant to show that the challenged practice has "a necessary and manifest relationship" to one or more "legitimate, nondiscriminatory interest[s]," instead of adopting a "legitimate goal" standard. In the third and final step, the proposed rule merely provides that the plaintiff may demonstrate that legitimate, nondiscriminatory interests "could be served by a policy that produces a less discriminatory effect." Unlike the Wards Cove standard, the third step in the Department's proposed rule gives no consideration to whether the preferred alternative practice is "equally as effective" as the challenged practice.

Moreover, the process of determining whether there exists an alternative practice that produces a "less discriminatory effect" would require an insurer to explicitly take race and ethnicity into account in its analysis. This would directly violate state insurance laws prohibiting "unfair discrimination," which proscribe the use of race and ethnicity and instead require insurers to rely solely on risk in developing underwriting and rating practices.

NAMIC urges HUD to follow the *Wards Cove* standards. Specifically, in step two the defendant must able to rebut the plaintiff's prima facie showing of unlawful discrimination by showing only that the challenged practice is significantly related to the achievement of its legitimate business goals. In step three, the plaintiff must bear the burden to identify an alternative "equally as effective as the challenged practice in serving the [defendant's] legitimate business goals" and "reduce[s] the . . . disparate impact of practices currently being used." This alternative must also be as effective in meeting the business reason as the challenged practice. In the case of an insurer's use of a predictive model, the plaintiff should bear the burden of proving that the alternative is as predictive. Similarly the plaintiff must bear the burden of proving that the alternative is not subject to patent or is otherwise proprietary, that it is not more expensive even if it is as effective, and that it is not more difficult to implement than the challenged practice. When the statutory text is silent on allocation of the burden of persuasion, the ordinary default rule is that the plaintiff bears the risk of proving their claims.[30] The FHA is silent on burden-shifting allocations and HUD should not attempt to use the regulatory process to shift the burden of persuasion to the defendant.

---

[30] *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009),*quoting Schaffer v. Weast*, 546 U.S. 49, 56 (2005); *see Smith*, 544 U.S. at 240.

**App.237**

The burden of proof issues are particularly difficult for insurers. Unlike banks, real estate settlement practices or rental real estate practices, insurers do not collect data on race and ethnicity. Without collecting such data indicative of protected class, insurers could not assess whether its facially neutral risk-related underwriting and rating factors have a disparate impact or discriminatory effect on protected classes. State insurance laws prohibit the use or consideration of prohibited factors like race and ethnicity and insurers should not be required to collect that data to protect themselves from disparate impact or discriminatory effects claims.

NAMIC urges HUD to conform the burden of proof standards in Subpart G(4) ((§ 100.500(c)) to the *Wards Cove* standards.

**Conclusion**

NAMIC believes it is premature in light of Supreme Court's pending consideration of *Magner v. Gallagher* for HUD to move forward with the proposed rule. NAMIC urges the Department to withdraw the proposed rule, pending the Supreme Court decision. Alternatively, HUD should suspend activity regarding the rule until the Supreme Court has ruled. NAMIC does not believe that Section 3604 supports inclusion of the disparate impact standards. At a minimum, NAMIC believes that pricing decisions and operations of FAIR plans should be excluded from the reach of the rule and regulatory safe harbors should be provided for recognized underwriting risk factors. NAMIC further believes that the McCarran-Ferguson Act precludes federal acts that would impair or supersede state laws and that application of the disparate impact standards would impair state unfair discrimination standards.

Sincerely,

Robert Detlefsen, Ph.D.
Vice President, Public Policy
National Association of Mutual Insurance Companies
122 C Street, NW, Suite 450
Washington, D.C. 20001
202-628-1558
www.namic.org

## Document Details

Comment Submitted by Stef Zielezienski, American Insurance Association

**Document ID:** HUD-2011-0138-0070   **Document Type:** Public Submission
**This is comment on** Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
**Docket ID:** HUD-2011-0138
**View Document:**

Show Details

Attached please find in PDF format comments of the American Insurance Association in response to a proposed rule issued by the Department of Housing and Urban Development implementing the Fair Housing Act's discriminatory effects standard.

Attachments:

| – Comment Submitted by Stef Zielezienski, American Insurance Association (Att... | View Attachment: |
|---|---|
| **Title:** Comment Submitted by Stef Zielezienski, American Insurance Association (Attachment) | |



American Insurance Association

2101 L Street NW
Suite 400
Washington, DC 20037
202-828-7100
Fax 202-293-1219
www.aiadc.org

January 17, 2011

<u>VIA FEDERAL eRULEMAKING PORTAL</u>

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 7th Street SW
Room 10276
Washington, DC 20410

Re: 24 CFR Part 100 [Docket No. FR-5508-P-01] RIN 2529-AA96,
Department of Housing and Urban Development Proposed Rule Implementing the Fair
Housing Act's Discriminatory Effects Standard

Ladies and Gentlemen:

The American Insurance Association (AIA) appreciates the opportunity to submit comments on the Department of Housing and Urban Development's (HUD) notice published in the November 16, 2011, Federal Register, seeking public comment on a proposed rule regarding "Implementation of the Fair Housing Act's Discriminatory Effects Standard" ("Proposed Rule").[1] AIA represents approximately 300 major U.S. insurance companies that provide all lines of property-casualty insurance to U.S. consumers and businesses, writing more than $117 billion annually in premiums. Our members are subject to comprehensive regulation by the states, and they therefore have a substantial interest in any proposal that would seek to add

---

[1] 76 Fed. Reg. 70921 - 70927 (November 16, 2011).

regulation or enforcement at the federal level. More specifically, as many AIA members write homeowners' insurance, they have an important interest in any regulation pertaining to the Fair Housing Act (FHA). Consistent with those interests, AIA respectfully submits the following comments on the proposed rule.

## REFERENCES TO INSURANCE AND THE *"OJO V. FARMERS"* LITIGATION SHOULD BE DELETED FROM THE PREDICATE TO THE PROPOSED RULE.

The predicate to the Proposed Rule, describing the proposal's scope, includes in its list of examples of potential "Disparate Impact" discrimination, the following statement: "the provision and pricing of homeowner's insurance (see *Ojo v. Farmers Group, Inc.*, 600 F.3rd 1205, 1207-8 (9th Cir. 2010))."[2] As discussed more fully below, the inclusion of the homeowner's insurance example is inappropriate as it fails to describe the principles announced in the *Ojo* decision, ignoring the decision's discussion of the impact of state law pursuant to the McCarran-Ferguson Act. Under the McCarran Act's "reverse pre-emption" principle, state insurance law trumps the application of any federal law to state regulated insurance, except under very narrow circumstances, which are not met here.

In the *Ojo* litigation, the U.S. Circuit Court of Appeals for the Ninth Circuit (en banc) sought the opinion of the Texas Supreme Court on whether Texas insurance law prohibited disparate impact discrimination.[3] The case arose in relation to the use of credit scoring by the insurer in setting homeowner's insurance rates and premiums. The Ninth Circuit quoted the applicable McCarran-Ferguson Act language, as follows:

> "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance."[4]

The appeals court then set forth the decision-making standard:

> "If Texas law permits insurance companies to use credit scores even if the factors used to compute scores may have a racially disparate impact that could violate the FHA, then allowing Ojo to sue Defendants under FHA for this practice would

---

[2] *Id.* at 70924.
[3] *Ojo v. Farmers Group Inc*, 600 F.3d 1201(April 9, 2010).
[4] *Id.* at 1203.

000000456

impair Texas law... The outcome of this (case) turns on the extent to which Texas law permits insurance companies to use credit-score factors that may have a racially disparate impact that would constitute a FHA violation... *We agree to abide by the Supreme Court of Texas's decision in issuing our subsequent opinion in Ojo v. Farmers Group Inc.*[5]

Upon receiving the Ninth Circuit's certification of the state regulation question, the Texas Supreme Court determined that "the language of the [Texas] Insurance Code is inconsistent with a disparate impact theory of liability," holding that "Texas law does not prohibit an insurer from using race-neutral factors in credit-scoring to price insurance, even if doing so creates a racially disparate effect."[6]

Thus, since the *Ojo* litigation stands for the proposition that Texas insurance law reverse-pre-empts the FHA pursuant to the McCarran Ferguson Act, it is inappropriate for the HUD Proposed Rule to proceed as if that principle does not exist. As a result, we would strongly urge HUD to delete the insurance example from the rule's predicate.

## THE PROPOSED RULE INAPPROPRIATELY AND PREMATURELY ASSUMES THAT FHA COVERS DISPARATE IMPACT DISCRIMINATION CLAIMS.

The Proposed Rule assumes that the FHA covers disparate impact discrimination. This assumption, however, may be wrong. Indeed, it may well be that the FHA's jurisdiction is limited to deliberate discriminatory practices. As HUD knows, this question is currently before the U.S. Supreme Court in the *Magner* case.[7] In light of the currency of this issue, it obviously would have been better, procedurally and substantively, for HUD to have delayed its Proposed Rule until the Court had decided whether the FHA does, in fact, incorporate disparate impact discrimination situations and, if so, the proper analytical framework for deciding those cases.

However, since HUD has decided to publish its proposal during the pendency of the *Magner* litigation, we respectfully suggest that HUD promptly publish a supplemental Federal Register notice stating that the promulgation of any final regulation will be deferred until the Supreme Court's *Magner* decision is handed down. This approach would make certain that HUD is not regulating based on a hypothetical construction of the law. It would also spare HUD the

---

[5] *Id.* at 1204-05.
[6] *Ojo, et. al. v. Farmers Group Inc., et. al*, 54 Tex. Sup. Ct. J. 1068 (May 27, 2011).
[7] *Magner v. Gallagher*, 619 F.3d 823 (8th Cir. 2010), cert. granted, No. 10-1032 (Docket) (U.S. Nov. 7, 2011).

3

potential embarrassment of needing to amend its final regulation if the Supreme Court's decision is at variance with it.

## THE PROPOSAL'S ANALYTICAL FRAMEWORK FOR DETERMINING THE EXISTENCE OF ACTIONABLE DISPARATE IMPACT DISCRIMINATION IS CONFUSING AND INCONSISTENT WITH BOTH STATUTORY AND SUPREME COURT LAW.

The analytical framework that HUD proposes to use to determine whether there has been actionable disparate impact discrimination in individual cases is very difficult to understand and appears to be at variance with both the standard established for Title VII employment discrimination cases under the Civil Rights Act of 1991 and the alternative *Wards Cove*[8] analysis that has provided the basis for disparate impact analysis in non-Title VII employment related cases.[9]

We believe that the *Wards Cove* analysis provides the proper approach for FHA cases, and that the Title VII approach should be limited to employment cases arising under that title. Under the *Wards Cove* approach, the plaintiff in any FHA disparate impact case has the burden of persuasion *throughout* the entire process.[10] The plaintiff must prove that the challenged practice furthered no legitimate business goal identified by the defendant or that the plaintiff's proposed alternative business practice that would avoid the disparate impact would be "equally as effective as the challenged practice in serving the (defendant's) legitimate business needs." The proposed regulation, however, requires that a "necessary and manifest" business need be established.[11] This not only goes beyond *Wards Cove*, but also introduces a new and additional standard that is both "manifestly unfair" to the defendant and "manifestly unclear" in application. Under this analytical approach, it would not be enough to establish that the practice is "necessary" to the business; the defendant would be required to demonstrate that it was "manifestly" necessary. We do not believe that this is consistent with either Supreme Court or statutory law.

We believe that the Proposed Rule even goes beyond the 1991 Civil Rights Act. As we have stated, we believe that the disparate impact language in the Civil Rights Act of 1991 is limited to

---

[8] *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642 (1989)

[9] The Civil Rights Act of 1991 was enacted to, among other things, reverse the U.S. Supreme Court's decision in *Wards Cove*, as it applied to employment discrimination cases. Subsequent to the 1991 law, the *Wards Cove* analytical framework has been followed in non-Title VII disparate impact cases. *Smith v. City of Jackson*, 544 U.S. 228, 240 (2005) (plurality opinion)

[10] *See Wards Cove* at 659-60.

[11] 76 *Fed. Reg.* at 70927.

4

**App.243**

Title VII employment discrimination cases, and should not be exported to the FHA. But, even if that language were to be so exported, we believe that HUD's proposed regulatory language goes beyond it, as well. The Civil Rights Act also uses the term "business necessity."[12] It does not add the "manifest" concept. /

## CONCLUSION

In light of the Supreme Court's consideration of the *Magner* case, AIA strongly urges HUD, when finalizing any eventual regulation, to eliminate the references to homeowner's insurance in light of the principles enunciated in *Ojo*. We would also urge HUD to publish a supplemental notice in the Federal Register that it will delay any action on its proposal until the Supreme Court has ruled on *Magner* and then proceed in a manner consistent with that decision.

Respectfully submitted,

J. Stephen ("Stef") Zielezienski
Sr. Vice President & General Counsel
American Insurance Association

David F. Snyder
Vice President & Associate General Counsel, Public Policy
American Insurance Association

---

[12] 42 U.S.C. § 2000e-2(k)(1)(A): "An unlawful employment practice based on disparate impact is established under this subchapter only if—(1) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact... and the respondent fails to demonstrate that the challenged practice is... consistent with business necessity."

5

**App.244**

## Document Details

SHARE

Comment Submitted by Robert Woody, Property Casualty Insurers Association of America

Document ID: HUD-2011-0138-0084   Document Type: Public Submission
This is comment on   Proposed Rule: FR-5508-P-01 Implementation of the Fair Housing Acts Discriminatory Effects Standard
Docket ID: HUD-2011-0138
View Document:

Show Details

Please find attached PCI's comments on HUD's proposed rule on Implementation of the Fair Housing Act's Discriminatory Effects Standard

Attachments:

▼ Comment Submitted by Robert Woody, Property Casualty Insurers Association o...          View Attachment:

Title:
Comment Submitted by Robert Woody, Property Casualty Insurers Association of America (Attachment)

App.245



**PCI** Property Casualty Insurers
Association of America

Shaping the Future of American Insurance

Robert Woody
Senior Counsel, Policy

January 17, 2012

Regulations Division
Office of General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

RE:  Implementation of the Fair Housing Act's Discriminatory Effects Standard
     Proposed Rule [Docket No. FR-5508-P-01]

The Property Casualty Insurers Association of America (PCI) appreciates the opportunity
to provide comments in response to Department of Housing and Urban Development's
(HUD) proposed rule on the Fair Housing Act's (FHA) Discriminatory Effects Standard.
PCI is composed of more than 1000 member property casualty insurance companies
representing the broadest cross-section of insurers of any national trade association. PCI
members write over $174 billion in annual premium, representing 38.3 percent of the
nation's property casualty insurance.

The proposed rule seeks to ensconce in HUD's regulations a theory of legal liability
under which a housing practice that is found to have a "disparate impact" on a protected
class can be deemed to violate the FHA's proscription on racial discrimination in housing
practices even though the practice was not adopted for a racially discriminatory purpose.
The preamble to the proposed rule lists as one example of the types of activities that can
have a disparate impact and thus violate the FHA, "the provision and pricing of
homeowner's insurance." In support of that contention, the preamble cites the case of *Ojo
v. Farmers Group, Inc.*, 600 F.3d 1205, 1207-8 (9th Cir. 2010).

*As an initial matter, it is critical for HUD to recognize that homeowners' insurers do not
discriminate on the basis of race and, indeed, it would be illegal in all states for them to
do so.* The issue the rule presents for insurers is whether non-racially motivated and
sound actuarial underwriting principles recognized by state insurance regulators that
permit accurate risk-based pricing for consumers can be prohibited by federal regulators
who find them to have a "disparate impact" and whether such HUD actions would violate
a federal statute reserving the power to regulate insurance to the states.

**The Proposed Rule is Premature.** It is at best premature for HUD to propose this rule
when it raises key issues that are now pending before the U.S. Supreme Court in *Magner*

2600 South River Road, Des Plaines, IL 60018  Telephone 847-297-7800  Facsimile 847-297-5064  www.pciaa.net
© 2010 Property Casualty Insurers Association of America

App.246

*v. Gallagher.*[1] In that case, the Court will decide whether disparate impact claims are cognizable under the FHA and if so, what burden shifting approach should be applied. The proposed rule assumes that disparate impact claims are cognizable under the FHA and adopts its own burden shifting approach. HUD should suspend any further action on this rule at least until the Supreme Court has ruled on these issues.

**FHA Does Not Create Liability Based on Disparate Impact Theory.** The Supreme Court granted certiorari in the *Magner* case in part to resolve a split in the circuits on the question of whether disparate impact claims are cognizable under the FHA. PCI believes that the better view is that they are not. The statutory language of Section 3604 of the FHA prohibits discrimination in housing "*because of* race, color, religion, sex, familial status, or national origin" (emphasis added). Other federal statutes, such as the Civil Rights Act and the Americans with Disabilities Act prohibit conduct that "adversely affects" a protected class, which language has been interpreted as permitting disparate impact claims. Had Congress intended to authorize disparate impact claims in the FHA, it knew how to do so, but chose not to. HUD does not have the authority to substitute its contrary views for the will of the Congress.

**Disparate Impact Theory in Insurance Context.** The application of the proposed disparate impact rule in the insurance context is especially problematic. In 1945, Congress passed the McCarran-Ferguson Act,[2] which among other things, declared that insurance is regulated by the states and not by the federal government. In so doing, McCarran-Ferguson provided that state laws preempt contrary federal laws ("reverse preemption") when: (1) the federal law does not expressly relate to the business of insurance; (2) the state law is enacted for the purpose of regulating insurance; and (3) the application of the federal law might "invalidate, impair or supersede" state laws regulating insurance. Every state has extensive laws and regulations governing insurance underwriting practices and those laws naturally recognize the need for insurers to distinguish between different types and degrees of risk. Indeed, risk discrimination is the foundation of insurance underwriting and every state has considered at length the appropriate regulatory balance to prohibit unfair discrimination. HUD's reference to insurance in the preamble of the proposed rule suggests that it may use its disparate impact rule to become a federal regulator of insurance underwriting practices despite McCarran-Ferguson's explicit reservation of insurance regulatory powers to the states. There can be no question that, should HUD take such a position, it would prompt swift and vigorous legal challenge.

**HUD Misrepresents the Holding in the *Ojo* Case.** HUD's reference to the Ninth Circuit's decision in the *Ojo* case in support of its description of the FHA's application to insurance underwriting practices egregiously misrepresents the ultimate holding in the that case. The *Ojo* case involved an African-American plaintiff in Texas whose homeowners' insurance premiums were increased as a result of his credit scores and who alleged that this violated the FHA by virtue of a disparate impact on him and other racial minorities. Contrary to HUD's statement in the preamble, the Ninth Circuit did *not* opine

---

[1] 619 F.3d 823 (8th Cir. 2010), cert. granted, No 10-1032 (Docket) (U.S. Nov. 7, 2011).
[2] 15 U.S.C. § 1012.

000000554

2

**App.247**

on whether "the provision and pricing of homeowners insurance" is among the activities "that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." While the Ninth Circuit did find in *Ojo* that the FHA prohibits racial discrimination in the provision of homeowners' insurance generally (while also noting a split among the Circuits on the question), its ruling did not comment on the legitimacy of the disparate impact theory of liability. Instead, the Court's analysis focused appropriately on whether the McCarran-Ferguson Act's reverse preemption rule operated to prevent any attempted application of a federal disparate impact standard to homeowners insurance.

The Ninth Circuit initially found that the first two prongs of the McCarran reverse preemption test were clearly met, but certified to the Texas Supreme Court the third-prong question of whether the application of the federal disparate impact test invalidated, impaired, or superseded Texas law and was therefore preempted pursuant to the McCarran-Ferguson Act. The Texas Supreme Court found that, while Texas law prohibits the use of credit scores *based on* race, or rates that differ *because of* race, a cause of action based only on non-racially motivated actions that produce a disparate impact pursuant to the FHA could invalidate, impair or supersede Texas law. *Ojo v. Farmers Group, Inc.*, 2011 WL 2112778, at *11 (Tex. Sup. Ct. 2011). Therefore, the third prong of the McCarran-Ferguson test was met and, contrary to the impression given in the preamble to the proposed rule, the plaintiff in *Ojo* did <u>not</u> prevail.

HUD's misrepresentation and misuse of the finding in the *Ojo* case raises an alarming specter that the agency may seek to enforce its disparate impact rules to prevent insurers from using racially neutral credit scoring information to price insurance risks. We note that the Texas statute at issue in *Ojo* was based on the Unfair Trade Practices Model Act published by the National Association of Insurance Commissioners (NAIC) and the Model Act Regarding Use of Credit Information in Personal Insurance published by the National Conference of Insurance Legislators (NCOIL). A large majority of states have adopted laws based on those models, so the McCarran analysis employed by the Ninth Circuit in *Ojo* has impact throughout the country.

**Congress Does Not Want Federal Intrusion into Insurance Regulation.** Finally, we note that the Congress has considered on several occasions whether the federal government should interfere in the states' regulation of insurer underwriting practices with respect to questions of racial discrimination and has decided not to do so. For example, in 1993 Congress considered, but did not adopt, H.R. 1188, the "Antiredlining in Insurance Disclosure Act," which would have required insurers to report to the Secretary of Commerce certain information about personal insurance broken down by zip code. Had the Congress felt that federal intrusion into the area was warranted, it could have authorized such intrusion. Because it has not, HUD must refrain from doing so as well.

Should HUD finalize its rule over our objections, we urge that the text of the regulation include an express exemption for insurance underwriting practices. At a minimum, HUD

000000555

**App.248**

should clarify in the final rule the misleading statement in the proposed rule's preamble that incorrectly implies that HUD has regulatory authority over insurers.

Again, PCI appreciates the opportunity to comment and would be pleased to provide any additional information HUD may require as it considers this important issue.

Sincerely,

Robert W. Woody

000000556



**Property Casualty Insurers**
**Association of America**

Advocacy. Leadership. Results.

ROBERT GORDON
SENIOR VICE PRESIDENT
POLICY DEVELOPMENT AND RESEARCH

September 25, 2014

The Honorable Julian Castro, Secretary
The Honorable John Trasviña, Assistant Secretary
U.S. Department of Housing and Urban Development
451 17th Street, S.W.
Washington, DC 20410

Dear Secretary Castro and Assistant Secretary Trasviña:

On September 4, 2014, the United States District Court for the Northern District of Illinois issued the enclosed Memorandum Opinion and Order granting in part the motion for summary judgment filed by Property Casualty Insurers Association of America ("PCI") in *Property Casualty Insurers Association of America v. Donovan*, No. 13-8564. The Court remanded the case to HUD for further proceedings.

In its opinion, the Court ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in its Disparate Impact Rule (*Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013)) in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. Op. at 42. The Court further directed HUD to explain why application of its Rule to homeowners insurance did not violate the filed-rate doctrine, which forbids courts from invalidating or modifying rates that have been filed with regulatory agencies. *Id.* at 43. The Court also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 45. It noted that HUD's previous response to comments raising this issue was inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 46.

PCI intends to submit additional comments to HUD to address the issues identified in the Court's order. If there is a deadline for submitting comments, please let me know.

Additionally, PCI requests that HUD re-open the public comment period to inform others that the Agency expects to fully consider the complex issues presented by application of the Disparate Impact Rule to homeowner's insurance. The case-by-case application of disparate impact liability to insurers presents significant legal and compliance uncertainty, subjects insurers to conflicting regulatory requirements, imposes significant expenses on the property and casualty industry, and interferes with State regulation of insurance. We respectfully suggest that HUD should solicit public comments on this important issue.

**App.250**

Please contact me at (202) 639-0490 or Robert.Gordon@pciaa.net if you have any questions or information.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

cc:   Helen R. Kanovsky
      Jeanine Worden
      Kyle R. Freeny

**App.251**

**Property Casualty Insurers** Association of America
444 North Capitol Street NW, Suite 801, Washington, DC 20001-1508

# PCI

to:

Ms. Helen R. Kanovsky
U.S. Department of Housing and Urban
Development
451 17th Street, S.W.
Washington, DC 20410

204103

1011 0

CAP DISTRICT
MD 207
26 SEP '14
PM 2 L

Hasler       FIRST-CLASS MAIL
09/26/2014   US POSTAGE $000.48⁹
             ZIP 20001
             011D12603838

004418

**App.252**



**PCI**

**Property Casualty Insurers**
Association of America

Advocacy. Leadership. Results.

January 26, 2015

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

**Re:     Docket No. FR-5508-F-02, Implementation of the Fair Housing Act's
Discriminatory Effects Standard**

Dear Sir or Madam:

On September 4, 2014, Judge St. Eve of the U.S. District Court for the Northern
District of Illinois issued the enclosed Memorandum Opinion and Order in *Property
Casualty Insurers Association of America v. Donovan*, No. 13-8564 (*PCI*), remanding the
case to the Department of Housing and Urban Development (HUD) for further
consideration of whether HUD's Disparate Impact Rule (*Implementation of the Fair
Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013)) can
be applied to homeowners insurance.

On September 25, 2014, PCI informed HUD of its intent to submit additional
comments to HUD to address the issues identified in the Court's order and requested
HUD to re-open the public comment period to inform others that the Agency expects to
fully consider the complex issues presented by application of the Disparate Impact Rule
to homeowners' insurance. For the reasons explained below, the Disparate Impact Rule
cannot lawfully be applied to homeowners insurance. Application of the Rule to
homeowners insurance would impair state regulation of insurance in violation of the
McCarran-Ferguson Act, would fundamentally interfere with the provision of homeowners
insurance, and would impose needless costs on providers of homeowners
insurance and their customers. HUD should therefore exempt homeowners insurance
from the Rule.[1]

---

[1] HUD has not yet opened a public comment period, and On November 3, 2014, Judge Leon of the
U.S. District Court for the District of Columbia granted summary judgment to the plaintiffs and vacated the
Disparate Impact Rule in American Insurance Association v. U.S. Department of Housing and Urban
Development, No. 13-cv-00966 (D.D.C.). But PCI is submitting these comments now in an abundance of
caution, given the remand from Judge St. Eve.

**App.253**

444 North Capitol Street NW, Suite 801, Washington, DC 20001   Telephone 202-639-0490   Facsimile 202-639-0494   www.pciaa.net

# I.    BACKGROUND

## A.    The Business of Insurance

Insurance is a means by which one party (the insured) transfers risk to another party (the insurer) for an agreed-upon rate. For example, an insured purchases homeowners insurance so that, in the event that her home is damaged by a fire, the insurer will pay to repair her home. Insurance rates are based on an insured's risk of future losses, as well as the extent of coverage sought. The risk of future loss is also central to underwriting decisions, that is, decisions about whether to insure and how to price a particular risk or class of risk. *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* § 1:2; 1:6 (3d ed. 2013).

In order to calculate the risk of future loss, insurance actuaries use mathematics, statistics, and economics to estimate the probability that certain future events will occur and their financial implications. Actuaries examine numerous factors that correlate with losses. *See, e.g.*, Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985). For homeowners insurance, these factors may include, for instance, the types of construction materials used to build a house, any history of previous losses related to that home or similar units, the home's proximity to fire hydrants, and the presence or absence of a trampoline in the yard. Homeowners insurance actuaries do not consider race, gender, or any other protected characteristic when evaluating these factors. *See* Admin. Rec. 383; Decl. of Teresa C. Cracas ¶ 6 (stating that Cincinnati Insurance Company does not collect information on race or ethnicity); Decl. of Michael Dawdy ¶ 11 (State Auto Insurance Companies does not collect data on policyholders' race or ethnicity); Decl. of Ronald Joseph Zaleski, Sr. ¶ 11 (Selective Insurance Company of America does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); Decl. of Peter Drogan ¶ 7 (Amica Mutual Insurance Company does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates).

The insurance market operates most efficiently and fairly when every insured pays a rate that accurately reflects the cost of providing insurance to that consumer and similarly situated consumers. *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992); Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421. If insurers could not set rates based on neutral risk factors, the insurance industry could not function properly. Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards.

**App.254**

*See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty
Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—
A Primer*, 19 Conn. Ins. L. J. 29, 44 (2012). Such a pricing scheme would also greatly
reduce the financial incentive for customers to reduce risks, construct safer houses, and
maintain existing houses. Avraham, *The Economics of Insurance Law*, *supra* pp. 66-67.

### B.    State Regulation Of Insurance and The McCarran-Ferguson Act

The states have traditionally regulated the insurance industry, from the pricing of
insurance to the processing of claims. Indeed, until the mid-twentieth century, insurance
was largely immune from federal regulation because the business of insurance was not
considered "commerce" that could be regulated by Congress. *See Paul v. Virginia*, 75
U.S. (8 Wall.) 168 (1868). Shortly after the Supreme Court determined in *United States
v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of
insurance across state lines constituted interstate commerce susceptible to federal
regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, to
ensure that ruling would not undermine the states' long-standing regulation of insurance.
Today, "State regulation of insurance is comprehensive and includes rate and coverage
issues." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999).

In the McCarran-Ferguson Act, Congress expressly stated that "the continued
regulation and taxation by the several States of the business of insurance is in the public
interest." 15 U.S.C. § 1011. Accordingly, the Act provides that "[n]o Act of Congress
shall be construed to invalidate, impair, or supersede any law enacted by any State for the
purpose of regulating the business of insurance … unless such Act specifically relates to
the business of insurance." 15 U.S.C. § 1012(b). Thus, federal law must not be read to
authorize regulations that either "directly conflict with state regulation" of insurance or
whose "application … frustrate any declared state policy or interfere with a State's
administrative regime" concerning insurance. *Humana Inc. v. Forsyth*, 525 U.S. 299,
310 (1999).

### C.    The Fair Housing Act and the Disparate Impact Rule

The Fair Housing Act (FHA) makes it unlawful to "discriminate against any
person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the
provision of services or facilities in connection therewith, because of race, color, religion,
sex, familial status, or national origin." 42 U.S.C. § 3604(b). The Act makes no reference
to either disparate impact or homeowners insurance.

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of
the Fair Housing Act's Discriminatory Effect's Standard." *See* 76 Fed. Reg. 70921 (Nov.

**App.255**

16, 2011). In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate." *Id.* at 70921. The proposal identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." *Id.* at 70924.

Representatives of the insurance industry submitted comments explaining why disparate impact liability cannot lawfully be applied to homeowners insurance. The comments explained that HUD's Disparate Impact Rule would conflict with and impair state regulation of insurance in violation of the McCarran-Ferguson Act in numerous ways. For instance, the Rule would prohibit conduct that state law requires or authorizes, whether by statute, regulation, or under the "filed rate" doctrine, which bars private claims based on insurance rates filed with state regulatory entities. The comments also explained that the Rule would inject federal courts into decisions that would otherwise be made by state lawmakers or regulators. Moreover, as the comments described, the application of disparate impact liability to insurance would cripple the insurance industry by deterring the use of core insurance practices such as risk-based pricing and underwriting.

HUD promulgated its final Disparate Impact Rule on February 15, 2013. 78 Fed. Reg. 11460. The Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a) (2013). It further provides that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification," *id.* § 100.500, meaning that: (1) the challenged housing practice "[i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent" and (2) "[t]hose interests could not be served by another practice that has a less discriminatory effect," *id.* § 100.500(b).

### D. The Litigation Brought by PCI

On November 27, 2013, the Property Casualty Insurers Association of America (PCI) challenged both the Disparate Impact Rule as applied to the provision of homeowners insurance and HUD's process for issuance of the Rule, under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.* On September 3, 2014, the Court granted in part PCI's motion for summary judgment.

The Court ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. Op. at 42. Those conflicts, the Court explained, raised grave doubts about the Rule's consistency with the McCarran-Ferguson Act. The Court also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 45. It held that HUD's response to comments raising these issues had been inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 46.

### E. The Supreme Court's Grant of Certiorari in the *Inclusive Communities* Case and Judge Leon's Vacating of the Disparate Impact Rule

On October 2, 2014, the Supreme Court granted certiorari in *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, No. 13-1371, to address the question whether disparate impact claims of any sort are cognizable under the FHA. Oral argument took place on January 21, 2015. PCI, the American Insurance Association, and the National Association of Mutual Insurance Companies submitted a brief amicus curiae supporting petitioners, explaining that the FHA does not recognize disparate impact liability. The brief also explains that interpreting the FHA to permit disparate-impact liability would upend fundamental tenets of the insurance business and contravene the McCarran-Ferguson Act.

On November 3, 2014, Judge Leon of the U.S. District Court for the District of Columbia granted summary judgment to the plaintiffs and vacated the Disparate Impact Rule in *American Insurance Association v. U.S. Department of Housing and Urban Development*, No. 13-cv-00966 (D.D.C.). Judge Leon held that "the FHA unambiguously prohibits *only* intentional discrimination." Op. at 17. On December 18, 2014, the government filed its notice of appeal.

The Supreme Court is scheduled to decide later this year whether the FHA permits imposition of disparate impact liability altogether. It should hold that the FHA does not. But even if the Court were to interpret the FHA as allowing disparate impact claims in certain circumstances, disparate impact liability must not be extended to homeowners insurance. Reading the FHA to permit disparate impact claims regarding homeowners insurance would impair state regulation of insurance in violation of the McCarran-Ferguson Act, would fundamentally interfere with the provision of

**App.257**

homeowners insurance, and would impose needless costs on providers of homeowners insurance and their customers.

## II.    REQUEST FOR RELIEF

For the reasons set forth below, HUD should exempt homeowners insurance from its Disparate Impact Rule.

### A.    Disparate Impact Claims Are Not Cognizable Under The FHA

In *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project*, the Supreme Court is likely to rule that disparate impact claims are not cognizable under the FHA. As Judge Leon's recent decision in *American Insurance Association v. U.S. Department of Housing and Urban Development* indicates, a necessary consequence of that holding would be the vacating of the Disparate Impact Rule in its entirety. Whatever the Supreme Court ultimately decides, its opinion would be extremely important for HUD to consider before applying its Rule to insurers.

The Supreme Court is likely to hold that the FHA does not authorize disparate impact claims for several reasons. First, the FHA's terms indicate that it is limited to claims of intentional discrimination. The FHA prohibits various acts performed "*because of* race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604 (emphasis added). Accordingly, it only prohibits actions taken against persons because of their race or other protected characteristic. *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (interpreting similar wording in Title VI of the Civil Rights Act to reach only intentional discrimination). Actions taken for other reasons that happen to affect different racial, gender, religious, or other groups differently are not prohibited by the FHA because they are not actions performed "because of race" or other protected characteristics. They are, by definition, actions taken "because of" other factors.

An example from the insurance context may help to illustrate this point. An insurer might charge different customers different rates based on whether or not their homes contain a fire extinguisher. This insurance pricing factor may mean that more people of a particular national origin may pay higher or lower insurance rates than others. But insurers would not be charging different rates "because of" national origin. Indeed, they could not do so, because insurers do not currently obtain data about the national origin, race, color, religion, or disability status of their policyholders. PCI Reply Br. at 7; Decl. of Teresa C. Cracas ¶ 6; Decl. of Michael Dawdy ¶ 11; Decl. of Ronald Joseph Zaleski, Sr. ¶ 11; Decl. of Peter Drogan ¶ 7.

The FHA's legislative history also indicates that it does not authorize disparate impact claims. During floor debates, no Representative or Senator suggested that the FHA could be used to impose disparate impact liability. Instead, the debates show Congress's intention to prohibit intentional discrimination. *See, e.g.*, 114 Cong. Rec. 5643 (1968) (Mondale: "The bill permits an owner to do . . . everything he could ever do with property, except refuse to sell it to a person solely on the basis of his color or his religion. That is all it does. It does not confer any right."); 114 Cong. Rec. 2283 (Brooke: "A person can sell his property to anyone he chooses, as long as it is by personal choice and not because of motivations of discrimination."); 114 Cong. Rec. 2530 (Tydings: the problem Congress intended to address was "the deliberate exclusion from residential neighborhoods on grounds of race"); 114 Cong. Rec. 3421 (Mondale: "[T]he basic purpose of this legislation is to permit people who have the ability to do so to buy any house offered to the public if they can afford to buy it. It would not overcome the economic problem of those who could not afford to purchase the house of their choice."); 114 Cong. Rec. 3129 (Hatfield: the FHA prohibits a person being "denied the right to buy a home within a community according to his economic ability . . . merely because his skin is of a different color"); 114 Cong. Rec. 3252 (Scott: the FHA would ensure that individuals "can rent or buy the dwelling of their choice, if they have the money or credit to qualify").

## B. Application of the Disparate Impact Rule to Homeowners Insurance Would Impair State Laws Regulating Insurance and Thus Violate the McCarran-Ferguson Act

HUD must provide an exemption for homeowners insurance because application of the Disparate Impact Rule to homeowners insurance would impair state laws regulating insurance and therefore violate the McCarran-Ferguson Act. In *PCI*, the district court repeatedly criticized HUD for failing to explain how the Disparate Impact Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. Op. at 42. It concluded that HUD had acted arbitrarily and capriciously because "it made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.*

Once the evaluation required by the district court is undertaken, it becomes clear that inclusion of homeowners insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) impairing state laws requiring insurers to engage in risk-based pricing; (ii) impairing state laws permitting insurers to engage in risk-based pricing; (iii) impairing state laws and regulations providing for state administrative review of insurance rates; (iv) impairing

operation of the filed-rate doctrine; and (v) removing from state control and placing instead in the hands of federal judges the determination whether certain insurance pricing policies are permissible.

### 1. State Laws Requiring Insurers To Engage in Risk-Based Pricing

The vast majority of states—40 of 50—require insurers to set rates based on past losses, anticipated future losses, and other neutral actuarial factors. *See* Table I, *infra*. Indiana, for example, mandates that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, ... [and] to all other relevant factors, including trend factors, within and outside this state ...." Ind. Code Ann. § 27-1-22-3(a)(1). Wisconsin similarly requires insurers to give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and outside of this state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of this state," and "all other relevant factors." Wis. Stat. Ann. § 625.12(1). Numerous other state statutes contain the same or essentially the same requirements. *See, e.g.*, Ga. Code Ann. § 33-9-4(4); Md. Code Ann., Ins. § 11-205(c); Mass. Gen. Laws Ann. 174A, § 5; N.J. Stat. Ann. § 17:29A-4; N.Y. Ins. Law § 2304(a); Ohio Rev. Code Ann. § 3935.03; S.C. Code Ann. § 38-73-430; Tenn. Code Ann. § 56-5-304; Wash. Rev. Code Ann. § 48.19.030(3); *see generally* Table I, *infra*.

In compliance with these laws, insurers charge different rates to different customers based on the required actuarial risk factors. It is possible that the differences in risk-based rates charged to customers with different risks would affect various demographic groups differently. HUD's Disparate Impact Rule would impose *prima facie* liability on any insurer whose rates had a disparate impact on any group defined by a protected characteristic in 24 C.F.R. § 100.500(a), thus creating a conflict between the Rule and the laws of 40 of the 50 states. Application of the Disparate Impact Rule to insurers would therefore "impair" and "frustrate [a] declared state policy or interfere with a State's administrative regime" by imposing *prima facie* liability on a practice that is expressly required by state law. *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).

Moreover, the burden-shifting framework established by the Rule would result in insurers facing potential liability even for using actuarially justified risk factors. For example, insurers would be liable if their use of an actuarially justified factor was not "*necessary* to achieve a legitimate interest." 24 C.F.R. § 100.500(c) (emphasis added). And even if every risk factor were proved necessary, plaintiffs could still prevail by showing that insurers' interests could be served by another practice with a less discriminatory effect, even if the alternative practice were less effective than the use of actuarial risk factors. *Id.*; Admin. Rec. at 625.

**App.260**

HUD's rule would also interfere with insurers' compliance with state law and "hinder [the] operation" of that law by requiring insurers to defend in court their compliance with state law. *See id.* at 311; 24 C.F.R. § 100.500. *See Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1349 (D.C. Cir. 1995) (regulated parties are harmed when they are subject to conflicting state and federal authorities). HUD has suggested that insurance companies could challenge particular claims of disparate impact under a burden-shifting framework in federal court. But far from being an answer to McCarran-Ferguson Act concerns, the ability of companies to defend themselves in this way only confirms that the Disparate Impact Rule would run afoul of the McCarran-Ferguson Act. Subjecting companies to case-by-case adjudication in federal court would strip them of the ability to rely on state law and institutions that McCarran-Ferguson is designed to guarantee.

## 2. State Laws Permitting Insurers To Engage in Risk-Based Pricing and Underwriting

### a. State Insurance Laws

Every state has permitted insurers to charge different rates to different customers based on the customers' risk profiles. Under Wisconsin law, for example, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." Wis. Stat. Ann. § 625.11(4). Numerous other states use very similar language to expressly permit the grouping of insureds based on projected future risk. *See, e.g.*, Conn. Gen. Stat. § 38a-803(4); N.H. Rev. Stat. Ann. § 412:15(I)(d); Va. Code Ann. § 38.2-1904(A)(3). Under Indiana law,

> [r]isks may be grouped by classifications, by rating schedules, or by any other reasonable methods, for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both. Such standards may measure any difference among risks that can be demonstrated to have a probable effect upon losses or expenses.

Ind. Code § 27-1-22-3(a)(2). Many other state statutes contain very similar language expressly permitting the use of actuarial, risk-based pricing. *See, e.g.*, Ariz. Rev. Stat. Ann. § 20-356(4); Ark. Code Ann. § 23-67-209; Colo. Rev. Stat. § 10-4-403(4); 18 Del.

Code § 2503; Me. Rev. Stat. Ann. 24-A, § 2303(1)(G); Minn. Stat. Ann. § 70A.05(2); Nev. Rev. Stat. Ann. § 686B.060(2); S.D. Codified Laws § 58-24-6; Tex. Ins. Code Ann.§ 2251.052(c); *see generally* Table I, *infra*. As numerous courts have recognized, these laws ensure that insurance markets operate fairly and efficiently. *See, e.g., Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) (noting that "statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any ... of the terms and conditions of the insurance.'"); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Insurance Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. ... Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

Under the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits. *See, e.g., In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1558 n.9 (8th Cir. 1989) (under McCarran-Ferguson Act, states have "the power to permit practices that would otherwise violate federal...laws."); *Dexter v. Equitable Life Assurance Soc'y*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ.A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations). Yet that is precisely what the Disparate Impact Rule would do by re-interpreting the FHA to prohibit insurances practices expressly permitted by the laws of 47 states. *See* Table I, *infra*.

### b.    State Fair Housing Laws

HUD noted during the *PCI* litigation that some states have fair housing laws and that some state courts look to the FHA for guidance in interpreting those laws. HUD Mem. ISO Mot. to Dismiss at 28. HUD suggested that some of these state laws might in theory be interpreted to permit disparate impact claims against insurers. *Id.* Even in

**App.262**

states with fair housing laws, if the fair housing law does not specifically displace the state's insurance laws discussed above, then those insurance laws would remain valid. HUD did not show—and did not even claim— that any state's fair housing law displaces its insurance laws. Accordingly, if these valid state insurance laws requiring or permitting insurers to engage in risk-based pricing and underwriting conflict with the Disparate Impact Rule, then HUD's Rule is impermissible under the McCarran-Ferguson Act. PCI submits, based on the statutes described above, below, and in Table I, that state insurance laws in all 50 states clearly do conflict with the Disparate Impact Rule.

### c. Limitations on Use of Certain Risk Factors

HUD also noted during the *PCI* litigation that some states have laws restricting the discriminatory use of some factors in insurance pricing and underwriting, specifically credit history, geographic location, domestic violence victimization, and property age. HUD Mem. ISO Mot. to Dismiss at 26. As PCI pointed out in its responsive brief, these laws do not alleviate the conflict between the Disparate Impact Rule and state laws requiring or permitting insurers to engage in risk-based pricing and underwriting. Indeed, these laws prohibiting *discriminatory* use of certain risk factors permit insurers to rely on those factors so long as they do so in accordance with "sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience." Colo. Rev. Stat. § 10-3-1104(1)(f) (XIV) (permitting insurers to take geographic location into account so long as it is related to anticipated loss experience); *see also, e.g.*, Ark. Code Ann. § 23-66-206(14)(C) (permitting insurers to consider geographic location so long as it is not a mere pretext for discrimination); Ind. Code § 27-2-17-5(b) (same); Wis. Admin. Code Ins. § 6.68(3)(a) (same); Ala. Admin. Code r. 482-1-127.06 (prohibiting insurers from making decisions based solely on credit score or using credit history for any unfairly discriminatory reason); Alaska Stat. § 21.36.460(c) (permitting insurers to use credit history so long as they use it in combination with other substantive factors); N.Y. Ins. Law § 2802 (same); W. Va. Code Ann. § 33-17A-6(h) (same); Del. Code Ann. tit 18, § 4124 (permitting insurers to base decisions on age of property if decisions are "for a business purpose which is not a mere pretext for unfair discrimination"); Va. Code Ann. § 38.2-508(5) (same). These statutes thus delineate the extent to which insurers can use certain risk factors and which applications may be unfairly discriminatory. Therefore, they highlight the conflict between the Disparate Impact Rule's application to insurance pricing that uses standard actuarial factors and state laws' approval of insurers' reliance on just those factors.

**App.263**

3. **State Laws and Regulations Providing for State Administrative Review of Insurance Rates**

The overwhelming majority of states—47 of 50, plus the District of Columbia—require insurers to file their rates with state insurance commissioners for review and approval. *See* Table I, *infra*. Some states similarly require the filing of underwriting guidelines for a commissioner's review and inspection. *E.g.*, Conn. Gen. Stat. § 38a-689(a); Fla. Admin. Code Ann. r. 69O-170.013(1)(b); Ga. Code Ann. § 33-9-21(a); Kan. Stat. § 40-955 (a), (l); Ky. Rev. Stat. § 304.13-051(4); 24-A Me. Rev. Stat § 2938-A; Md. Code, Insurance, § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; Mo. Code Regs. Ann. tit. 20, § 500-9.100; N.H. ADC Ins. 3306.01(a); N.J. Stat. Ann. § 17:22-6.14a1; N.M. Stat. Ann. § 59A-17-5.1; 28 Tex. Admin. Code § 5.9342; Utah Admin. Code r. R590-127; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. State regulators carefully review insurance rates and underwriting guidelines to ensure that the rates are based on sound actuarial factors and are not excessive, inadequate, or unfairly discriminatory. *E.g.*, Wis. Stat. Ann. § 625.13; N.J. Stat. Ann. § 17:29A-7; Ind. Code Ann. § 27-1-22-5; Ga. Code Ann. § 33-9-26; Kan. Stat. § 40-955 (a), (l); Md. Code, Ins. § 27-501(h)(2); Mich. Comp. Laws Ann. § 500.2119; N.J. Stat. Ann. § 17:22-6.14a1; Vt. Stat. Ann. tit. 8, § 4688; W. Va. Code R. § 114-74-4. For example, in California, insurance companies must submit all rate changes for approval to the Insurance Commissioner. Cal. Ins. Code § 1861.05.

HUD's Disparate Impact Rule would "interfere with a State's administrative regime" and impair or invalidate these laws by substituting the judgment of a federal court for that of state regulators. *Humana*, 525 U.S. at 310. The laws governing rate filing and review provide for rate review, rate approval, and investigation of compliance with filed rates and related state laws, or some other procedure for state administrators to approve the insurance rates set in their states. If, under HUD's Rule, federal courts are empowered to reject rates reviewed and/or approved by state regulators under state laws and regulations, then these laws and regulations will be severely impaired or interfered with by the application of the Rule. *See, e.g.*, *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961 (8th Cir. 2008) ("[T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials. If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'"). Even if no such rejection were to occur, state administrative regimes would still be undermined, because approval of a rate or underwriting guideline by a state administrator would not establish that the rate was lawful. Approved rates would still be subject to challenge under HUD's Rule, and insurers would still be required to prove in federal court that every component of their rating and underwriting

plans and other business practices was necessary to achieve a substantial legitimate interest. *See* 24 C.F.R. § 100.500. Such interference with the states' insurance administration regimes is unlawful under the McCarran-Ferguson Act. *Humana*, 525 U.S. at 310.

### 4. The Filed-Rate Doctrine

HUD also must exempt homeowners insurance from the Rule in order to avoid conflict with the states' filed-rate doctrine. The filed-rate doctrine "bars courts from reexamining the reasonableness of rates that have been filed with regulatory commissions." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *see also, e.g.*, *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424 (1986).

The district court in *PCI* found that HUD had failed to discuss the filed-rate doctrine, and that this failure, coupled with the failure to give adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson Act, was arbitrary and capricious. Op. at 44-45. The court accordingly held that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-Ferguson comments." *Id.* at 45.

The filed-rate doctrine applies to the insurance industry and prohibits claims against insurers based on rates filed with regulatory authorities. *See, e.g.*, *McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F3d 229, 236-39, 242 (3rd Cir 2012); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011);; *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 907 (Minn. App. 2005); *see also, e.g.*, Cal. Ins. Code § 1860.1 ("No act done, action taken or agreement made pursuant to the authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."); *MacKay v. Superior Court*, 118 Cal. App. 4th 1427 (2010) (applying § 1860.1 to bar challenge to approved car insurance rates).

Applying the Disparate Impact Rule to insurance rates would undermine the filed-rate doctrine by allowing private lawsuits and government enforcement actions that question the permissibility of a filed rate. *See, e.g.*, *Square D*, 476 U.S. at 417; *Korte*, 27 F.3d at 19; *Taffet*, 967 F.2d at 1494 ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate.") (internal quotation marks omitted). Nor does the extent or the vigor of an agency's review of filed rates matter— the filed-rate doctrine applies whenever rates have been filed. *See Square D*, 476 U.S. at 417 n.19; *Goldwasser*, 222 F.3d at 402.

**App.265**

## 5. Displacement of the Regulation of Insurance from States to Federal Courts

HUD's basic response to the numerous indisputable conflicts between the Disparate Impact Rule and state laws regulating insurance described in the preceding sections is that the Rule's burden-shifting framework would allow defendant companies to raise these state-law considerations on a case-by-case basis. In response to a plaintiff's *prima facie* case, a company could rely on these state laws to show that its pricing or underwriting practices were "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." Far from alleviating the conflict between the Disparate Impact Rule and state insurance regulation, this response only confirms that the Rule makes the conflict inescapable.

As the Seventh Circuit has explained, the McCarran-Ferguson Act prohibits interpreting federal laws that do not specifically relate to the business of insurance in a way that would effectively move the regulation of insurance from the states into the federal courts. *See Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999) (McCarran-Ferguson prohibits the federal courts from "regulating the ... insurance industry" via litigation). That is just what the Rule's burden-shifting framework would do. In *Mutual of Omaha*, the Seventh Circuit explained that application of the Americans with Disabilities Act (ADA) to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." *Id.* at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA—"the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" (unless pursuant to a federal law specifically relating to insurance). *Id.*

HUD's Disparate Impact Rule would similarly lead to federal courts usurping core functions of the states' administrative regimes, including rate-making and underwriting, as well as all other insurance activities regulated by state law. State insurance commissioners currently regulate and supervise the insurance business, enforce insurance laws, and punish violators. *See, e.g.*, 1 Plitt et al., *Couch on Insurance* §§ 2:7-2:8. Under HUD's Rule, in order to avoid liability insurers would have to prove in federal court that their practices are "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests" and defeat the plaintiff's effort to show that "the challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c). That would necessarily involve an examination into whether use of that factor was legitimate, and federal courts would find themselves evaluating questions of actuarial soundness. Thus, in every case under the Rule

**App.266**

challenging risk-based pricing and underwriting, a federal court would be forced to evaluate the actuarial soundness of the challenged practice in violation of the McCarran-Ferguson Act. This displacement of insurance regulation to federal courts on the basis of a law that does not mention insurance is prohibited by the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

The *PCI* court found that HUD's failure to explain why it had not provided an exemption for homeowners insurance was "particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eight Circuit's similar recognition in *Saunders* that 'a suit challenging the racially disparate impact of industry-wide rate classifications may usurp core rate-making functions of the State's administrative regime." *Id.* That concern should preclude application of the Rule to risk-based pricing and underwriting of homeowners insurance.

## C. Peripheral Insurance Activities Not Mentioned in HUD's Rulemaking

In the Rule's preamble, HUD addressed the "provision and pricing of homeowner's insurance." 76 Fed. Reg. at 70924. During the course of the *PCI* litigation, however, HUD indicated that the Rule might also apply to other insurance practices, such as claims processing or marketing. HUD Reply Br. at 3. HUD should exempt from the Disparate Impact Rule all homeowners insurance practices, not just pricing and underwriting.

As an initial matter, the relevant provisions of the FHA do not apply to most peripheral insurance practices because those practices do not have a substantial enough effect on homeownership. As the Seventh Circuit has explained, 42 U.S.C. § 3604 only "applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir. 1992). The overwhelming majority of peripheral insurance practices could not "effectively preclude" the ownership of housing. Nor does 42 U.S.C. § 3604(b) address peripheral insurance practices. That section applies only to "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." That section does not include every type of service that might be performed on a dwelling, which would subject a massive amount of private sector activity to regulation and supervision by HUD. Rather, it refers only to "services generally provided by governmental units such as police and fire protection or garbage collection." *Southend Neighborhood Improvement Ass'n v. St. Clair Cnty.*, 743 F.2d 1207, 1210 (7th Cir. 1984). Because homeowners insurers provide no such services, they are not covered by § 3604(b).

**App.267**

In any event, regulating broad categories of insurance practices in federal court on the basis of a federal statute that does not specifically relate to insurance would violate the McCarran-Ferguson Act by displacing the regulation of such practices by state regulators and courts. States pervasively regulate such practices. *See, e.g.*, Wis. Stat. Ann. § 628.01-628.98 (regulating marketing); Utah Code Ann. 1953 §§ 31A-23a-101 *et. seq.* (same); R.I. Gen. Laws. § 27-3.2-4 (requirements for salespersons); Ind. Code § 27-4-1-4.5 (regulating claims settlement); N.Y. Ins. Law § 2601 (same); Alaska Stat. § 21.36.125 (same); Ga. Code Ann., §§ 33-6-30 *et. seq.* (same). To move the locus of this regulation from the states into federal courts on the basis of a statute that does not mention insurance would violate the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

PCI respectfully requests that HUD provide an exemption or safe harbor for insurance practices beyond just rate-setting and underwriting. That is the only approach consistent with the FHA and the controlling precedent of *Mutual of Omaha*.[2]

### D. Application of the Disparate Impact Rule to Homeowners Insurance Would Undermine the Fundamental Nature of Insurance

As members of the insurance industry commented during HUD's rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." Admin. R. at 376; *see also NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) ("Insurance works best when the risks in the pool have similar characteristics."). The essence of risk-based insurance practices is "identifying relationships between factors and risk of loss and allocat[ing] costs accordingly." Admin. R. at 376. As mandated or expressly permitted by state law, homeowners insurers use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk. They do not collect data on race or other protected class characteristics of insureds. *See id.*

HUD's Disparate Impact Rule would impose potential liability on insurers for using of any of these factors (or any combination thereof), because if any factor were found to have a different effect on any protected class listed in 24 C.F.R. § 100.500(a), then insurers would be *prima facie* liable for discrimination. Thus, to ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process. Admin. R. at 377.

---

[2] Absent creating a wholesale exemption for the provision and pricing of homeowners insurance, HUD should recognize that use of actuarially-sound, risk-based pricing and underwriting practices always constitutes a legitimate business interest. HUD should also require that any alternative proffered by a plaintiff or by HUD be equally effective to the challenged practice or combination of practices.

This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability, thus decreasing competition and the availability of insurance coverage. *See id.* at 377-78; *American Family Mut. Ins. Co.*, 978 F.2d at 290.

HUD initially responded to these concerns by noting that insurers would still have an opportunity to prove in court that the use of actuarial factors was necessary to achieve a substantial legitimate interest, at least so long as there did not exist an alternative practice that could serve the same interest with a less disparate effect. 78 Fed. Reg. 11475. The *PCI* court found that HUD's response to these concerns was inadequate and thus arbitrary and capricious. Op. at 46. "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* "The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period." *Id.*

Thus, it was not enough for HUD to impose *prima facie* liability on core insurance practices and then allow insurers the possibility of justifying their practices during the "Sisyphean" process of burden-shifting litigation. *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n.*, 508 F.3d 366, 376 (6th Cir. 2007). Rather, HUD should consider the costs to insurers of being subjected to such litigation, especially under a burden-shifting framework that places a difficult burden on defendants (proving that insurance practices are "necessary" to a substantial interest) and allows plaintiffs to win if they can show that an alternative exists that has less disparate impact. Indeed, under the burden-shifting framework adopted by HUD, some actuarially justified practices will not only be burdensome to justify and therefore likely relinquished, but will actually be prohibited. HUD expressly rejected a burden-shifting framework that would require plaintiffs or HUD to show that a proposed alternative approach is "equally effective," Admin. Rec. at 625. As a result, some actuarially justified factors will be prohibited because some other, less predictive factor may be used as a substitute. Federal courts reviewing insurance practices in all 50 states are likely to reach inconsistent judgments about which neutral risk factors violate the Fair Housing Act under this framework. They may also hold insurers liable for using neutral risk factors deemed acceptable by state courts. Moreover, HUD should consider the potential effects—including adverse selection and decreases in coverage—of imposing a rule of law that declares many core insurance practices unlawful (unless proven innocent in unpredictable litigation) and directs insurers to avoid all disparate impacts on protected groups.

### E. HUD Can and Should Exempt Homeowners Insurance from the Rule for the Reasons Set Forth Above

HUD has previously maintained that it cannot exempt homeowners insurance from the Disparate Impact Rule because "creating exemptions beyond those found in the Act would run contrary to Congressional intent." Admin. Rec. at 627. HUD based this assertion entirely on *Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human Relations Commission*, 508 F.3d 366 (6th Cir. 2007). But HUD ignored the *Groach* court's finding that "categorical bars *are justified*" when the "plaintiff has no chance of success" in any case. *Graoch*, 508 F.3d at 376 (emphasis added). Indeed, the *Groach* court went on to point to homeowners insurance as an example of when application of the Disparate Impact Rule is never appropriate. *Id.* at 290-91.

\* \* \*

The Supreme Court is expect to decide whether disparate impact claims are not cognizable under the Fair Housing Act. Regardless of the outcome of that case, however, application of the Disparate Impact Rule to homeowners insurance would impair state regulation of insurance in violation of the McCarran-Ferguson Act, interfere with the fair and efficient operation of the market for homeowners insurance, and impose needless costs on providers of homeowners insurance and their customers. HUD should therefore exempt homeowners insurance from the Disparate Impact Rule.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

Enclosures



**Property Casualty Insurers**
Association of America

Advocacy. Leadership. Results.

July 29, 2015

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 17th Street, SW
Washington, DC 20410

> **Re:** **Docket No. FR-5508-F-02, Implementation of the Fair Housing Act's Discriminatory Effects Standard**
>
> *Property Casualty Insurers Association of America v. Donovan*, **66 F. Supp.3d 1018 (N.D. Ill. 2014)**

Dear Sir or Madam:

On September 3, 2014, Judge St. Eve of the U.S. District Court for the Northern District of Illinois issued a memorandum opinion and order in *Property Casualty Insurers Association of America v. Donovan*, 66 F. Supp.3d 1018 (N.D. Ill. 2014) (*PCI*), granting summary judgment to PCI on its claims that the Department of Housing and Urban Development's (HUD's) "application of the Disparate Impact Rule to homeowners insurance was arbitrary and capricious." *Id.* at 1030. Judge St. Eve remanded the case to HUD for further consideration of whether the Disparate Impact Rule (*Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 Fed. Reg. 11460 (Feb. 15, 2013)) can lawfully be applied to homeowners insurance.

On September 25, 2014, PCI informed HUD of its intent to submit additional comments to HUD to address the issues identified in the district court's remand decision and requested that HUD re-open the public comment period to inform others that HUD expects to fully consider the complex issues presented by application of the Disparate Impact Rule (the "Rule") to homeowners insurance. On January 26, 2015, PCI submitted the promised additional comments to HUD setting forth the following reasons that the Disparate Impact Rule cannot lawfully be applied to homeowners insurance. PCI noted that application of the Rule to homeowners insurance would (i) impair state regulation of insurance in violation of the McCarran-Ferguson Act, (ii) fundamentally interfere with the provision of homeowners insurance, and (iii) impose needless costs on providers of homeowners insurance and their customers. Consistent with the relief PCI sought in the district court and the direction given by that court on remand to HUD, PCI requested that HUD exempt homeowners insurance from the Rule.

On June 25, 2015, the U.S. Supreme Court handed down its decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, No. 13-1371. The Supreme Court held that the Fair Housing Act (FHA) permits assertion

**App.271**

444 North Capitol Street NW, Suite 801, Washington, DC 20001   Telephone 202-639-0490   Facsimile 202-639-0494   www.pciaa.net

004615

of disparate-impact claims, but the Court emphasized that disparate-impact liability must be limited in key respects. The Supreme Court's explanation of those limitations further supports PCI's contention that homeowners insurance should be exempted from the Disparate Impact Rule. PCI thus submits these supplemental comments to take account of the Supreme Court's decision.[1]

## I.    The Supreme Court's Decision

In *Texas Department of Housing and Community Affairs*, the Supreme Court held that the FHA permits disparate-impact claims. But the Court stressed that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary and unnecessary barriers.'" Slip Op. at 21 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court identified the "heartland of disparate-impact suits" as those that target "artificial barriers to housing." Slip Op. at 18. In order to ensure that disparate-impact claims are properly limited, the Court held that two key "safeguards" must be put in place. *Id.* at 20, 22.

The first of those safeguards is "[a] robust causality requirement." *Id.* at 20. Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989). Referring approvingly to the opinion below of Fifth Circuit Judge Jones, the Court held up as a paradigmatic case of claims lacking the required causality element those where another "law substantially limits the [defendant's] discretion." *Id.* at 21.

A second safeguard to ensure that disparate-impact claims are "properly limited" is giving potential defendants "leeway to state and explain the valid interest served by their policy." *Id.* at 18. Homeowners insurers exemplify the potential defendants the Court had in mind, in that the extensive state regulation of their industry provides a quintessential case of the "valid interest[s]" to which the Court made reference. Businesses, the Court also stated, "must be given latitude to consider market forces." *Id.* at 19. Again, homeowners insurance markets, with their dependence on actuarially sound, risk-based pricing, form a perfect example of the market forces the Court indicated must be respected in determining the scope of disparate-impact liability.

The Supreme Court cautioned that without these two safeguards "disparate-impact liability might cause race to be used and considered in a pervasive way." *Id.* at

---

[1] HUD has not yet opened a public comment period. But PCI is submitting these comments now in an abundance of caution, given the remand from Judge St. Eve and HUD's statement in other litigation that it is "currently reviewing its regulation in light of the judgment" in *PCI*. Motion to Govern Future Proceedings and Response to Plaintiffs' Motion to Vacate and Remand, *American Insurance Ass'n v. United States Department of Housing and Urban Development*, No. 14-5321 (D.C. Cir. July 24, 2015).

20. "Interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." *Id.* at 21. These "limitations on disparate-impact liability," the Court instructed, "are also necessary to protect potential defendants against abusive disparate-impact claims." *Id.* at 21. The "specter of disparate-impact litigation," the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Id.* Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id.*

## II. The McCarran-Ferguson Act Requires an Exemption from Disparate-Impact Claims for Homeowners Insurance

In her September 3, 2014 decision remanding the *PCI* case to HUD, Judge St. Eve ordered HUD to explain why it had not provided an "exemption or safe harbors" for homeowners insurance in light of the potential conflicts between the Rule and state insurance laws and administrative regimes. *PCI,* 66 F. Supp.3d at 1027. Those conflicts, Judge St. Eve explained, raised grave doubts about the Rule's consistency with the McCarran-Ferguson Act. Judge St. Eve also directed HUD to address whether its Rule "could jeopardize [insurers'] use of actuarially sound underwriting factors that are 'at the very heart of the business of insurance.'" *Id.* at 1028. She held that HUD's responses to comments raising these issues had been inadequate because "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework." *Id.* at 1029.

In our January 26, 2015 comments, PCI discussed three reasons why HUD must provide an exemption for homeowners insurance.

*First,* application of the Disparate Impact Rule to homeowners insurance would impair state laws regulating insurance and therefore violate the McCarran-Ferguson Act. In *PCI,* the district court repeatedly criticized HUD for failing to explain how the Disparate Impact Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. *PCI,* 66 F. Supp.3d at 1027. It concluded that HUD had acted arbitrarily and capriciously because "it made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." *Id.*

The evaluation required by the district court shows that inclusion of homeowners insurance within the scope of the Disparate Impact Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) impairing state laws requiring insurers to engage

**App.273**

in risk-based pricing; (ii) impairing state laws permitting insurers to engage in risk-based pricing; (iii) impairing state laws and regulations providing for state administrative review of insurance rates; (iv) impairing operation of the filed-rate doctrine; and (v) removing from state control and placing instead in the hands of federal judges the determination whether certain insurance pricing policies are permissible.

*Second*, application of the Disparate Impact Rule to homeowners insurance would interfere with the provision of homeowners insurance. As members of the insurance industry commented during HUD's rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." *PCI*, Admin. R. at 376; *see also NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) ("Insurance works best when the risks in the pool have similar characteristics."). The essence of risk-based insurance practices is "identifying relationships between factors and risk of loss and allocat[ing] costs accordingly." *PCI*, Admin. R. at 376. As mandated or expressly permitted by state law, homeowners insurers use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk. They do not collect data on race or other protected class characteristics of insureds. *See id.*

HUD's Disparate Impact Rule would impose potential liability on insurers for using any of these factors (or any combination thereof), because if any factor were found to have a different effect on any protected class listed in 24 C.F.R. § 100.500(a), then insurers would be *prima facie* liable for discrimination. Thus, to ensure compliance with the Rule and avoid the risk of damaging liability, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process. *PCI*, Admin. R. at 377. This would cause adverse selection, motivating lower risk customers to forego insurance altogether and threatening insurers' viability, thus decreasing competition and the availability of insurance coverage. *See id.* at 377-78; *American Family Mut. Ins. Co.*, 978 F.2d at 290.

*Third*, application of the Disparate Impact Rule to homeowners insurance would impose needless costs on providers of homeowners insurance and their customers.

## III. The Supreme Court's Reasoning Confirms that an Exemption for Homeowners Insurance Is Required

The two key safeguards the Supreme Court established on disparate-impact claims in *Texas Department of Housing and Community Affairs* provide further support for each of PCI's three arguments.

Most fundamentally, the Supreme Court's determination that FHA disparate-impact claims must satisfy "[a] robust causality requirement" confirms that the Disparate

**App.274**

Impact Rule cannot be applied to homeowners insurance without running afoul of the McCarran-Ferguson Act and interfering in the lawful operation of homeowners insurance markets. Slip Op. at 20. In describing the causality requirement, the Court identified as a quintessential example of claims lacking the required causality element those where another "law substantially limits the [defendant's] discretion." *Id.* at 21. That is precisely the circumstance in which companies offering homeowners insurance find themselves. Application of disparate-impact liability under the FHA to homeowners insurers would leave them caught between conflicting federal and state legal regimes and thus place them in just the "double bind of liability" the Court instructed must be avoided. *Id.* at 19.

As PCI described at length in its January 26, 2015 comments, companies offering homeowners insurance are regulated by a panoply of state laws requiring the use of actuarially sound pricing methods for homeowners insurance, expressly delineating and permitting the use of such methods, and requiring the filing of homeowners insurance rates with state administrative bodies for approval. PCI January 26, 2015 Comments at 7-13. Those state laws mandate or expressly permit homeowners insurers to use neutral actuarial factors (such as loss history, distance from a fire station, building material, etc.) to determine risk and generally prohibit insurers from charging inadequate rates to various risk classifications. They thus "substantially limit" the discretion of homeowners insurance companies in a manner that would make it impossible to ascribe any apparently disparate effects of the companies' underwriting or pricing practices to their independent choices. As the Supreme Court emphasized, when companies' policies are subject to legal constraints of these sorts, it is the companies' obligation to comply with those legal requirements that is the cause of any resulting disparate effects, not the companies' own decisions. Interpreting the FHA to permit disparate-impact claims against companies in these circumstances would penalize them for following state law, placing them in the sort of "double bind of liability" the Court warned against. That is just what the McCarran-Ferguson Act prohibits.

The Supreme Court's instruction that disparate-impact claims be defined in a way that gives "latitude to consider market forces" also reinforces PCI's contention that disparate-impact liability should not be permitted against homeowners insurers. Slip Op. at 19. As PCI highlighted in its earlier comments, insurance markets run efficiently when insurance is priced in accord with actuarially sound, risk-based factors. PCI January 26, 2015 Comments at 2-3, 16-17. This sends appropriate and socially beneficial market signals about risk taking and risk mitigation. The extensive state-law framework governing the pricing of homeowners insurance is intended to promote such efficient operation. The "specter of disparate-impact litigation," however, as the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market and in particular actuarially sound, risk-based pricing. Slip Op. at 21. Unless that specter were vanquished, "the FHA would have

<div align="right">**App.275**</div>

undermined its own purpose as well as the free-market system." *Id*. Under the McCarran Ferguson Act regulation of the market for homeowners insurance is reserved to the states. Exempting homeowners insurance from disparate-impact claims is necessary to ensure that the threat of disparate-impact litigation does not impair states' legal regimes governing the pricing of homeowners' insurance or hinder the efficient operation of insurance market in accord with those state-law regimes.

Finally, the Supreme Court's caution that the FHA should not be interpreted to promote the use of racial (or other suspect) classifications supports each of PCI's arguments. "Interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision," the Court explained, would perversely "tend to perpetuate race-based considerations rather than move beyond them." Slip Op. at 21. But that is just what extending disparate-impact liability to homeowners insurers would do.

State law ensures that homeowners insurers price their products in accordance with risk-based, actuarially sound factors. State law does not permit reliance on, and homeowners insurers do not rely on, racial (or other suspect) classifications in pricing their products. Yet, the failure to exempt homeowners insurers from disparate-impact liability would effectively require them to compile data on the racial (and other suspect) characteristics of their customers in a defensive effort to ensure that they would not be accused of causing prohibited disparate impacts in insurance provision. Exempting homeowners insurance from disparate-impact liability would thus ensure compliance with the Supreme Court's direction that race-based considerations not be injected where they are properly absent. By introducing race-based considerations where none currently exist, the application of disparate-impact liability to homeowners insurers would, contrary to the McCarran-Ferguson Act, significantly undermine the state regulation of unfair discrimination. It would also interfere with the provision of homeowners insurance by imposing significant and needless costs on providers of homeowners insurance and their customers.

\*     \*     \*     \*

The Supreme Court's decision in *Texas Department of Housing and Community Affairs* strongly supports PCI's arguments that HUD should exempt homeowners insurance from the Disparate Impact Rule. For all the reasons given above and in PCI's earlier comments, HUD should act promptly to establish such an exemption.

Sincerely,

Robert Gordon
Senior Vice President
Policy Development and Research

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** kr6-skcs-z41b
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0007
Mass Mail Campaign 2: Comment Submitted by Sharon Schuler, Total as of 8/24/2021: 14

## Submitter Information

## General Comment

Thank you for the invitation to submit public comments in response to the Notice of Proposed Rulemaking issued by the U.S. Department of Housing and Urban Development (HUD) and titled Reinstatement of HUDs Discriminatory Effects Standard.

I am familiar with the disparate impact regulation issued by HUD in 2013and with the U.S. Supreme Courts Inclusive Communities decision in 2015, which upheld the concept of disparate impact liability but articulated some important limitations on its application. If HUDs current proposal is adopted, the 2013 version of the rule would be reinstated, once again applying disparate impact to homeowners and habitational insurers without the limitations recognized by the U.S. Supreme Court. This result would make the insurance industry less able to accurately price for risk and penalize many Americans.

As a property casualty insurance underwriter, it is my job to evaluate risk and determine which risks a company should agree to insure, and at what price. Risk-based pricing is fair and objective because it is based on data, and it is fundamental to the property casualty industry.

The property casualty insurance market works best when every insured pays a rate that accurately reflects the cost of providing insurance to policyholders that are similarly situated from a risk perspective. The new layer of federal regulation that HUD has asserted over homeowners, property, and hazard insurance conflicts with the McCarran Ferguson Act and would require insurers to charge different rates for members of protected classes than for policyholders that are not members of a protected class but who have a similar risk profile. This result would violate state insurance law and regulations that prohibit as unfairly discriminatory charging different rates for consumers with similar risk profiles.

Risk-based insurance underwriting is objective, but application of HUDs disparate impact rule to insurers threatens risk-based pricing because it would require insurers to consider information, such as race, which is data that insurers do not collect. In doing so, the reinstated rule would conflict with state laws that require rates to be based upon neutral, actuarially sound, risk-predictive factors. This would interfere with the ability of insurers to comply with state law and could dramatically increase compliance costs. Increased compliance costs could ultimately make insurance more expensive for consumers and policyholders.

**App.278**

For these reasons, I urge HUD to exempt actuarial risk-based pricing and underwriting of homeowners insurance from the Disparate Impact Rule.

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** krm-hz2o-0fgu
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0016
Comment Submitted by American Family Insurance

## Submitter Information

## General Comment

See attached file(s)

## Attachments

AFI HUD Comment

**App.280**

July 30, 2021

Via Federal eRulemaking Portal

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
451 Seventh Street, S.W., Room 10276
Washington, DC 20410

>    Re:    Docket No. HUD-2021-0033
>           Docket Name: FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

To whom it may concern:

American Family Insurance (AFI) is the nation's thirteenth-largest property/casualty insurance company and the eighth largest writer of homeowners insurance. Based in Madison, Wisconsin, we are owned solely by our policyholders and supporting them is our top priority. American Family serves millions of policyholders through a suite of auto, homeowners, life, business, and farm/ranch insurance products. We appreciate this opportunity to provide comment on HUD's recent proposal to reinstate the 2013 rule despite the limitations set forth by the US Supreme Court in its 2015 *Inclusive Communities* decision.

In the context of homeowners insurance, the 2013 Disparate Impact Rule does not comport with the standards and limitations articulated in *Inclusive Communities*. Further, the application of the rule to homeowners insurance violates the McCarran-Ferguson Act which leaves regulation of the "business of insurance" to the states in this circumstance where it hasn't been preempted by a federal law that "specifically relates to the business of insurance".

Insurance carriers are allowed by state insurance laws and regulations to consider a number of factors and characteristics in underwriting and rating insurance so that risk is fairly distributed and shared and the resulting premiums are adequate to cover exposures while not being excessive. Our premiums are determined based on loss costs and expenses related to providing coverage and servicing our policyholders and we must support all of our rate filings with actuarial, statistical and experience data. We do not collect "protected class" characteristics as they do nothing to further our ability to accurately rate and set premium and while definitions vary to some extent from state to state, our actions must not be unfairly discriminatory and we are generally prohibited from using factors such as race, religion and ethnicity as rating or

**App.281**

underwriting classifications. Including such factors would add a new layer of federal regulation and interfere with the ability of insurers to comply with state law, significantly increase compliance and litigation costs and altar pricing structures that have increased the availability and affordability of insurance, ultimately making insurance more expensive for consumers and policyholders.

Citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S. Ct. 849, 28 L.Ed.2d 158 (1971) at 431, the *Inclusive Communities* court made clear that the focus of the disparate-impact rule should be "removal of artificial, arbitrary, and unnecessary barriers". (*Id* at 2524) The highly regulated practices of homeowner insurers are anything but artificial or arbitrary.

To avoid any issue related to the use of prohibited protected class-based factors insurers have historically not gathered that information from prospective insureds. The burden shifting structure of the Disparate Impact Rule necessitates the gathering of such prohibited information to evaluate and analyze whether there is a disparate impact to any protected class through the use of developed rating factors and underwriting practices, thus promoting the thing that the S. Ct. cautioned against in saying that "[d]ifficult questions might arise if disparate-impact liability under the FHA caused race to be used and considered in a pervasive and explicit manner to justify governmental or private actions that, in fact, tend to perpetuate race-based considerations rather than move beyond them. Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision." (*Id* at 2524)

*Inclusive Communities* makes necessary other changes to the rule that are of a more general nature; the requirement that plaintiffs allege facts at the pleading stage that demonstrate a causal connection and not only rely on a statistical disparity and that the plaintiff's showing of an alternative practice to achieve the defendant's intended and legitimate business outcomes be as effective as the challenged practice. Both of these mandates support the proposition clearly stated by the Supreme Court that disparate impact liability under the FHA is not a tool for plaintiffs to force defendants to "reorder their priorities" or to "displace valid governmental and private priorities." (*Id* at 2522 and 2524) and further that "[d]isparate impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a free-enterprise system." (*Id* at 2523 (quoting *Wards Cove Packing Co., v. Antonio,* 490 U.S. 642, 653 (1989)).

To conclude, *Inclusive Communities* mandates changes that must be made to the Disparate Impact Rule to limit its use and clarify the focus on "removal of artificial, arbitrary, and unnecessary barriers" and to uphold the ability of entities to make practical business choices. Notwithstanding any changes to the Rule, homeowners' insurance carriers must be exempted from the Rule. The unique nature of the insurance industry based on the necessity of developing underwriting and rating practices to evaluate and fairly distribute risk exposures places it in a position to have to change its entire approach to incorporate protected class considerations throughout its decision-making where historically it has been able to avoid such consideration. This accomplishes exactly what the Supreme Court identified as the risk associated with using the disparate impact rule in a way that would tend to perpetuate race-based considerations rather than move beyond them. Insurance carriers already operate under the watchful eye of state Departments of Insurance that limit consideration of protected class

characteristics like race when making rating and underwriting decisions. Since the McCarran-Ferguson Act protects state insurance policies from federal interference, it is not only appropriate, but required that HUD exempt homeowners' insurers from the Disparate-Impact Rule.

Respectfully Submitted,

David C. Holman,
Chief Strategy Officer & Secretary
American Family Mutual Insurance Company, S.I.

Susan Anderson,
General Counsel
Homesite Group Incorporated

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** ksq-fe6i-wkx8
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0244
Comment Submitted by American National Property And Casualty Company

---

## Submitter Information

---

## General Comment

Please see attached letter submitted on behalf of American National Property And Casualty Company.

---

## Attachments

2021-08-24 FINAL ANPAC HUD Comment Letter

**App.284**



**AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY**

Service Center: One Moody Plaza, Galveston, TX 77550

August 24, 2021

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
Room 10276
451 Seventh Street, SW
Washington, DC 20410

**RE:**   **Reinstatement of HUD's Discriminatory Effects Standard**
          **Docket No. FR-6251-P-01**

Thank you for the opportunity to comment on the Notice of Proposed Rulemaking ("NPRM") titled "Reinstatement of HUD's Discriminatory Effects Standard" published on June 25, 2021.  This NPRM proposes to recodify the 2013 version of the Department of Housing and Urban Development's ("HUD") Disparate Impact Rule (the "2013 Rule") promulgated under the Fair Housing Act ("FHA").

American National Property And Casualty Company is a subsidiary of American National Insurance Company ("American National").  American National, founded in 1905 and headquartered in Galveston, Texas, and its subsidiaries offer a broad line of products and services, including life insurance, annuities, health insurance, credit insurance, pension products, and personal and commercial property and casualty insurance.  The American National companies operate in all 50 states, insuring over 5 million policyholders.

We respectfully ask that HUD amend the proposed rule to exempt insurance underwriting and rating practices from disparate impact liability.

The federal government has historically respected the primary and leading role of state governments in regulating the business of insurance.  The McCarran-Ferguson Act of 1945 prohibits the application of federal laws that would "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance" unless the federal law "specifically relates to the business of insurance."[1]  The result has been highly regulated but competitive insurance marketplaces that protect consumers and encourage innovation.

State laws extensively regulate the pricing and underwriting of insurance to ensure that rates are appropriate and that insurers do not unfairly discriminate between consumers.  For example, California prohibits premium rates that are unfairly discriminatory,[2] specifically prohibiting rates that consider "the race, language, color, religion, national origin, ancestry, age, political affiliation, or sexual orientation of any person."[3]  California also considers

---

[1] 15 U.S.C. §1012(b).
[2] CAL. INS. CODE §1861.05(a).
[3] 10 CCR §2632.4(a).

**App.285**

rates to be unfairly discriminatory if price differences "fail to reflect equitably the difference in expected losses and expenses."[4] All states have passed similar laws or regulations reflecting these principles.[5] The 2013 Rule proposed by HUD would challenge insurance rates reviewed and approved by state regulators under state laws. This would inevitably invalidate, impair, or supersede these laws, violating McCarran-Ferguson and expanding the enforcement of the FHA beyond its original purpose.

The ability of insurance companies to objectively rate risks based on the probability of future losses is the cornerstone of a healthy insurance system. Without risk-based insurance premiums, low-risk consumers would pay unjustifiably high premiums to subsidize other, more risky consumers. This can lead to adverse selection – those at low risk of a claim purchase less insurance or decide not to purchase at all because of the cost, while more risky consumers purchase cheaper insurance with higher limits. As a result, claims increase in frequency and severity while premiums become insufficient to pay for claims and the stability of the insurance system is threatened. Without an exemption in the proposed rule for insurance underwriting and rating, insurers could be faced with an impossible choice: either stick with state-approved rates based on objective risk-based pricing and face disparate impact litigation, or consider factors like race and ethnicity when rating policies and face adverse selection and state regulatory liability.

Finally, applying disparate impact liability to the business of insurance would also violate important constitutional principles recognized in the U.S. Supreme Court's decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*[6] The Court made clear in *Inclusive Communities* that disparate impact liability under the FHA cannot be imposed based on effects the defendant did not cause, cannot be applied in a manner that requires the pervasive consideration of race, and cannot be applied in a way that would interfere with, or require courts to second-guess, legitimate business choices. As discussed above, the busines of insurance depends on risk-based, non-discriminatory underwriting and rate-making processes. If applied to insurance, the 2013 Rule would necessarily violate each of these *Inclusive Communities* limitations. HUD should acknowledge this in its final rule and exempt insurance from disparate impact liability.

For the foregoing reasons, American National Property And Casualty Company respectfully requests that HUD amend its proposed rule to exempt the business of insurance.

Sincerely,

*Timothy A. Walsh*

Timothy A. Walsh
President & Chief Executive Officer
American National Property And Casualty Company

---

[4] CAL. INS. CODE §11732.5. See also, 1 CALIFORNIA INSURANCE LAW & PRACTICE §6A.04[4] ("While this definition has not been formally adopted for use in the evaluation of property-casualty rates under Proposition 103, in practice it is followed by the Department and its actuaries in their assessment of insurer rates, rating plans, and rating factors.").
[5] The Casualty Actuarial Society Statement of Ratemaking Principles explains that "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer." Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Principle 4 (May 1988), https://www.casact.org/professionalism/standards/princip/sppcrate.pdf.
[6] 576 U.S. 519 (2015).

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** ksq-fi6e-muth
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0245
Comment Submitted by Farm Family Casualty Insurance Company

---

## Submitter Information

---

## General Comment

Please see attached comment letter submitted on behalf of Farm Family Casualty Insurance Company.

---

## Attachments

2021-08-24 FINAL FFCIC HUD Comment Letter



August 24, 2021


Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
Room 10276
451 Seventh Street, SW
Washington, DC 20410

**RE:**     **Reinstatement of HUD's Discriminatory Effects Standard**
            **Docket No. FR-6251-P-01**

Thank you for the opportunity to comment on the Notice of Proposed Rulemaking ("NPRM") titled "Reinstatement of HUD's Discriminatory Effects Standard" published on June 25, 2021.  This NPRM proposes to recodify the 2013 version of the Department of Housing and Urban Development's ("HUD") Disparate Impact Rule (the "2013 Rule") promulgated under the Fair Housing Act ("FHA").

Farm Family Casualty Insurance Company is a subsidiary of American National Insurance Company ("American National").  American National, founded in 1905 and headquartered in Galveston, Texas, and its subsidiaries offer a broad line of products and services, including life insurance, annuities, health insurance, credit insurance, pension products, and personal and commercial property and casualty insurance.  The American National companies operate in all 50 states, insuring over 5 million policyholders.

We respectfully ask that HUD amend the proposed rule to exempt insurance underwriting and rating practices from disparate impact liability.

The federal government has historically respected the primary and leading role of state governments in regulating the business of insurance.  The McCarran-Ferguson Act of 1945 prohibits the application of federal laws that would "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance" unless the federal law "specifically relates to the business of insurance."[1]  The result has been highly regulated but competitive insurance marketplaces that protect consumers and encourage innovation.

State laws extensively regulate the pricing and underwriting of insurance to ensure that rates are appropriate and that insurers do not unfairly discriminate between consumers.  For example, California prohibits premium rates that are unfairly discriminatory,[2] specifically prohibiting rates that consider "the race, language, color, religion, national origin, ancestry, age, political affiliation, or sexual orientation of any person."[3]  California also considers rates to be unfairly discriminatory if price differences "fail to

---

[1] 15 U.S.C. §1012(b).
[2] CAL. INS. CODE §1861.05(a).
[3] 10 CCR §2632.4(a).

**App.288**

reflect equitably the difference in expected losses and expenses."[4]  All states have passed similar laws or regulations reflecting these principles.[5]  The 2013 Rule proposed by HUD would challenge insurance rates reviewed and approved by state regulators under state laws.  This would inevitably invalidate, impair, or supersede these laws, violating McCarran-Ferguson and expanding the enforcement of the FHA beyond its original purpose.

The ability of insurance companies to objectively rate risks based on the probability of future losses is the cornerstone of a healthy insurance system.  Without risk-based insurance premiums, low-risk consumers would pay unjustifiably high premiums to subsidize other, more risky consumers.  This can lead to adverse selection – those at low risk of a claim purchase less insurance or decide not to purchase at all because of the cost, while more risky consumers purchase cheaper insurance with higher limits.  As a result, claims increase in frequency and severity while premiums become insufficient to pay for claims and the stability of the insurance system is threatened.  Without an exemption in the proposed rule for insurance underwriting and rating, insurers could be faced with an impossible choice: either stick with state-approved rates based on objective risk-based pricing and face disparate impact litigation, or consider factors like race and ethnicity when rating policies and face adverse selection and state regulatory liability.

Finally, applying disparate impact liability to the business of insurance would also violate important constitutional principles recognized in the U.S. Supreme Court's decision in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*[6]  The Court made clear in *Inclusive Communities* that disparate impact liability under the FHA cannot be imposed based on effects the defendant did not cause, cannot be applied in a manner that requires the pervasive consideration of race, and cannot be applied in a way that would interfere with, or require courts to second-guess, legitimate business choices.  As discussed above, the busines of insurance depends on risk-based, non-discriminatory underwriting and rate-making processes.  If applied to insurance, the 2013 Rule would necessarily violate each of these *Inclusive Communities* limitations.  HUD should acknowledge this in its final rule and exempt insurance from disparate impact liability.

For the foregoing reasons, Farm Family Casualty Insurance Company respectfully requests that HUD amend its proposed rule to exempt the business of insurance.

Sincerely,

*Timothy A. Walsh*

Timothy A. Walsh
President & Chief Executive Officer
Farm Family Casualty Insurance Company

---

[4] CAL. INS. CODE §11732.5.  See also, 1 CALIFORNIA INSURANCE LAW & PRACTICE §6A.04[4] ("While this definition has not been formally adopted for use in the evaluation of property-casualty rates under Proposition 103, in practice it is followed by the Department and its actuaries in their assessment of insurer rates, rating plans, and rating factors.").
[5] The Casualty Actuarial Society Statement of Ratemaking Principles explains that "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer."  Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Principle 4 (May 1988), https://www.casact.org/professionalism/standards/princip/sppcrate.pdf.
[6] 576 U.S. 519 (2015).

# PUBLIC SUBMISSION

**As of:** August 27, 2021
**Tracking No.** ksq-gmhm-kwi4
**Comments Due:** August 24, 2021

**Docket:** HUD-2021-0033
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Comment On:** HUD-2021-0033-0001
FR-6251-P-01 Reinstatement of Discriminatory Effects Standard

**Document:** HUD-2021-0033-0251
Comment Submitted by American Property Casualty Insurance Association

---

## Submitter Information

---

## General Comment

Please see the attached comment from the American Property Casualty Insurance Association

---

## Attachments

APCIA Comment Letter re Reinstatement of HUD's Discriminatory Effects Standard (HUD-2021-0033)

**App.290**



August 24, 2021

Regulations Division
Office of the General Counsel
Department of Housing and Urban Development
Room 10276
451 Seventh Street, SW
Washington, DC 20410

RE: **FR-6251-P-01 - Reinstatement of HUD's Discriminatory Effects Standard**

**Docket No: HUD-2021-0033**

The American Property Casualty Insurance Association ("APCIA") appreciates the opportunity to provide comments in response to the Notice of Proposed Rulemaking ("NPRM") titled "Reinstatement of HUD's Discriminatory Effects Standard," published by the Department of Housing and Urban Development ("HUD") on June 25, 2021,[1] to recodify the 2013 Disparate-Impact Rule ("2013 Rule").[2] APCIA is the primary national trade association for home, auto, and business insurers. Its members make up nearly 60 percent of the U.S. property casualty insurance market. It has the broadest cross-section of home, auto, and business insurers and reinsurers of any national property casualty trade association, with member companies ranging in size from large to small and operating in all 50 states. APCIA's members write $412 billion in annual premiums. APCIA and its members have a direct interest in whether and how disparate-impact liability under the Fair Housing Act ("FHA") applies to property and casualty insurance, including homeowners insurance and commercial habitational insurance.[3] APCIA respectfully requests that HUD exempt risk-based pricing and underwriting of homeowners and commercial habitational insurance from disparate-impact liability under the 2013 Rule.

As explained below, reinstating the 2013 Rule without the requested exemption would ignore key limitations on disparate-impact liability articulated by the Supreme Court in cases like *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994-995 (1988), and *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 661 (1989)—and most recently in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc*., 576 U.S. 519 (2015) ("*Inclusive Communities*"), which was decided two years after HUD promulgated the 2013 Rule. These

---

[1] 86 Fed. Reg. 33,590 (June 25, 2021).

[2] Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460 (Feb. 15, 2013); 24 C.F.R. § 100.500.

[3] Commercial habitational insurance is commercial insurance that covers various kinds of properties in which people live other than single-family homes and includes apartment buildings, condominium buildings, and other multiple-family dwellings. These comments generally refer to homeowners and commercial habitational insurance but also apply to any other form of property and casualty insurance the provision of which HUD asserts to be subject to the FHA, whether sold in the admitted, non-admitted, or surplus lines markets. Admitted insurers—subject to full state insurance regulation—write 99% of the homeowners market.

1

**App.291**

key limitations dictated by the Supreme Court include that the plaintiff must bear the burden of proving a *robust* causal link between a defendant's challenged practice and an alleged disparity,[4] that the disparity is *significant*, beyond mere correlation,[5] that there is a direct relation between the alleged injury and alleged injurious conduct,[6] and that the defendant's legitimate interests could be served by an alternative practice that is *equally effective* as the challenged practice in advancing the defendant's valid interests.[7] None of those limitations is reflected in the 2013 Rule. Accordingly, at a minimum, any recodification of a disparate-impact rule must include these elements to conform with established Supreme Court precedent. Irrespective of whether HUD revises the Rule to align with Supreme Court precedent, APCIA requests that HUD exempt risk-based pricing and underwriting of homeowners and commercial habitational insurance from the Rule because disparate-impact liability would threaten the industry, violate the McCarran-Ferguson Act, and conflict with the filed-rate doctrine. At the very least, HUD should adjust any disparate-impact rule to recognize and accommodate these unique aspects of homeowners and commercial habitational insurance. To that end, this comment proceeds in five parts.

Part I provides relevant background and explains how HUD's disparate-impact rulemaking intersects with the business and legal context of the homeowners insurance industry. This Part first explains the business of insurance, state regulation of the insurance industry, and the McCarran-Ferguson Act's preemption of federal laws or rules that undermine the state insurance regulatory schemes. It then provides a history of HUD's disparate-impact rulemaking and details the critical impact of *Inclusive Communities* and the pending litigation brought by APCIA.

Part II takes a closer look at the impact of *Inclusive Communities* on jurisprudence governing disparate-impact claims under the FHA, concluding that the 2013 Rule does not comport with that decision or the underlying precedent on which that decision relied.

Part III then explains why HUD's 2013 Rule also cannot comport with the unique business and legal aspects of the insurance industry. It explains why an exemption from disparate-impact liability is necessary for risk-based pricing and underwriting of homeowners and commercial habitational insurance in light of the fundamental nature of insurance, the dictates of the McCarran-Ferguson Act, and the filed-rate doctrine. That exemption is warranted because there would be few if any cases in which a plaintiff could meet the robust causation requirement mandated by *Inclusive Communities* or escape the preclusive effect of the McCarran-Ferguson Act, making case-by-case litigation senseless. Part III also explains why case-by-case adjudication of disparate-impact claims on risk-based pricing and underwriting is inappropriate and wasteful of judicial resources, as any claim premised on such practices will necessarily fail—further justifying an exemption.

In the event HUD rejects the exemptions detailed in Part III, Part IV then provides HUD an alternative. It explains the various ways HUD's 2020 Rule—and HUD's own reasoning in support of that rule, in conjunction with the various comments HUD received as part of that rulemaking process—better comported with *Inclusive Communities* and the business and legal

---

[4] *Inclusive Communities*, 576 U.S. at 521.
[5] *Id.* at 542; *see also Watson*, 487 U.S. at 994-995.
[6] *Watson*, 487 U.S. at 994-995.
[7] *Wards Cove Packing Co.*, 490 U.S. at 661.

**App.292**

realities of the insurance industry. This Part also explains why the Massachusetts district court's injunction with respect to the 2020 Rule was limited in scope and in no way justifies total reversion to the 2013 Rule, especially in light of HUD's own reasoning that the 2020 Rule was necessary to comport with binding Supreme Court caselaw. Part IV explains which provisions of the 2020 Rule are both prudent and necessary to align HUD's disparate-impact rulemaking with the law.

Finally, in the event HUD grants neither the exemption described in Part III nor the specific accommodations detailed in Part IV, Part V explains the minimal steps HUD must take to mitigate the harmful effects of subjecting risk-based insurance practices to disparate-impact liability. Part V asks HUD to, at the very least, acknowledge the business realities of the homeowners and commercial habitational insurance industry and not take additional steps to launch disparate-impact challenges to risk-based pricing and underwriting, as such challenges will necessarily fail as a matter of law.

I.  BACKGROUND

    A.    The Business Of Insurance

Insurance is a means by which one party (the insured) transfers financial risk to another party (the insurer) for an agreed-upon rate. For example, an insured purchases homeowners insurance so that, in the event her home is damaged, the insurer will pay for related repairs. Insurance rates are based on an insured's loss history and risk of future losses, as well as the extent of coverage sought. The risk of future loss is also central to underwriting decisions—that is, decisions about whether to insure and how to price a particular risk or class of risk.[8]

In order to calculate the risk of future loss, insurance actuaries use mathematics, statistics, and economics to estimate the probability that certain future events will occur and to project their financial implications. Actuaries examine numerous factors that correlate with losses.[9] When underwriting property insurance for homeowners and commercial habitational risks, for example, underwriters have historically reviewed four categories of factors to assess the risk of property damage claims: (1) construction (e.g., frame, masonry, fire resistant, non-combustible, use of cladding, age and type of roof, age of wiring and plumbing system); (2) occupancy (e.g., habitational, manufacturing, office); (3) protection (e.g., alarms, sprinklers, smoke detectors, fire departments (paid or volunteer), water source and distance to fire station and water source, wind mitigation); and (4) exposure (e.g., the nature of the surrounding area, such as other buildings that may be more susceptible to loss, dry brush or woodlands v. paved parking areas, number of stories).[10] Other factors considered in underwriting and pricing insurance include, for instance, the value of the property and any history of previous losses related to the dwelling or similar units. *Homeowners and commercial habitational insurance actuaries do not consider FHA-*

---

[8] *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* §§ 1:2; 1:6 (3d ed. 2013).
[9] *See, e.g.*, Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985).
[10] *See* Christopher J. Boggs, *Understanding Commercial Property Underwriting and 'COPE'*, Ins. J., Feb. 3, 2015, https://www.insurancejournal.com/news/national/2015/02/03/356085.htm.

*protected characteristics when evaluating these factors.* Indeed, they do not have that data and may be prohibited from collecting it.[11]

The insurance market operates most efficiently and fairly when every insured pays a rate that accurately reflects the cost of providing insurance to that insured and similarly situated insureds—*i.e.*, a rate that accurately reflects the probability that future losses will occur and the likely cost of those losses.[12] If insurers could not set rates or make underwriting decisions based on objective risk factors that accurately predict loss, the insurance industry could not function properly. Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of hazards.[13] Such a scheme would greatly reduce the financial incentive for insureds to mitigate risks, construct safer houses, and maintain existing houses.[14]

Accurate pricing is also critical to ensuring the solvency of insurers. An insurer is considered insolvent when it lacks the financial resources to make promised payments to insureds, beneficiaries and claimants.[15] If an insurer sets a price too low or fails to accurately account for the risks involved with policies, it may not have sufficient funds to pay claims that are made.[16]

Thus, without the ability to engage in risk-based pricing and underwriting, insurance companies would likely be compelled to consider a number of mitigating actions, from ceasing to underwrite certain types of risks (habitational risks, for example) to exiting whole lines of business (*e.g.*, property) entirely.

---

[11] *See* A.R. 376, *PCI v. Carson*, No. 13-8564 (N.D. Ill. Feb. 12, 2014), ECF No. 19; *PCI v. Carson*, No. 13-8564 (N.D. Ill. May 16, 2014), ECF No. 44-2 ¶ 6, (insurer does not collect information on race or ethnicity); *id.* ECF No. 44-3 ¶ 11, (insurer does not collect data on policyholders' race or ethnicity); *id.* ECF No. 44-4 ¶ 11, (insurer does not consider data related to race, color, religion, national origin, or disability relevant to determining rates for homeowners insurance and does not collect such information); *id.* ECF No. 44-5 ¶ 7 (insurer does not collect data concerning race, color, or national origin of its policyholders and does not use such information in determining rates); *AIA v. Carson*, No. 13-966 (D.D.C. June 26, 2013), ECF No. 27-2 ¶ 4, (insurer does not collect or retain electronic records of race, color, or national origin and does not have capabilities to store and use such information); *id.* ECF No. 27-3 ¶ 9 (insurer does not collect or consider race, color, religion, or national origin in underwriting and rating homeowners' insurance); *id.* ECF No. 27-5 ¶ 5 (prior to the Disparate-Impact Rule, insurer did not collect date on race, color, religion, national origin, sex, familial status, or handicap of its policyholders).

[12] *See N.A.A.C.P. v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992); Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.

[13] See Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L.J. 29, 44 (2012).

[14] Avraham, *The Economics of Insurance Law*, 19 Conn. Ins. L.J. at 66-67.

[15] Robert W. Klein, Ph.D, National Association of Mutual Insurance Companies, *Insurance Regulation and the Challenge of Solvency II: Modernizing the System of U.S. Solvency Regulation* (2012), https://www.namic.org/pdf/publicpolicy/insRegSolvII.pdf.

[16] *See, e.g.*, Zain Mohey-Deen & Richard J. Rosen, *The Risks of Pricing New Insurance Products: The Case of Long-Term Care*, Chicago Fed Letter, no. 397, 2018, https://www.chicagofed.org/publications/chicago-fed-letter/2018/397 ("Underpricing a new product was the major cause of the insolvency of Penn Treaty . . . at the time the tenth-largest [long-term] insurer.").

**App.294**

## B.    State Regulation Of Insurance

The states have traditionally regulated the insurance industry—from pricing, underwriting, and claims handling, to company capital requirements and solvency.[17]  "State regulation of insurance is comprehensive and includes rate and coverage issues."  *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999).  Several features of state insurance regulation are relevant here.

First, state insurance law affirmatively permits risk-based pricing and underwriting.  Indeed, the vast majority of states not only permit risk-based pricing and underwriting but expressly require it by prohibiting insurers from charging "excessive, inadequate, or unfairly discriminatory rates."  As explained in the Casualty Actuarial Society Statement of Ratemaking Principles, "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer"—*i.e.*, if it is risk-based.[18]  For purposes of state insurance law, rates do not conform to this rating standard  if "premium differences . . . do not correspond to expected losses and average expenses or if there are expected average cost differences that are not reflected in the premium differences."[19]  With respect to the "unfairly discriminatory" component of this risk-based rating standard, state law prohibits rates that treat applicants and policyholders with similar risk profiles differently.[20]  Accordingly, state laws make clear that insurers must consider past losses and other relevant risk factors in developing insurance rates and that failing to take risk into account results in unfair discrimination.  *See infra* pp. 23-25.

Second, to protect consumers, state insurance commissioners review the rates charged by insurers.  The vast majority of states—49 out of 50 plus the District of Columbia—require insurers to file insurance rates with state regulators for review and/or approval.[21]  State regulators carefully review insurance rates—often with their own actuaries—to ensure that the rates reflect all of the factors required by state law and that the rates are not excessive, inadequate, or unfairly discriminatory.[22]

---

[17] Indeed, until the mid-twentieth century, insurance was largely immune from federal regulation because the business of insurance was not considered "commerce" that could be regulated by Congress.  *See Paul v. Virginia*, 75 U.S. 168 (1868).  Shortly after the Supreme Court determined in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of insurance across state lines constitutes interstate commerce susceptible to federal regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015 (1945), to ensure that the ruling would not undermine the states' long-standing regulation of insurance.

[18] Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Principle 4 (May 2021), https://www.casact.org/sites/default/files/2021-06/Statement%20of%20Principles%20Regarding%20P%26C%20Casualty%20Insurance%20Ratemaking_2021.pdf.

[19] Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 283 (internal quotation marks omitted).

[20] *Id.*; *see also infra* pp. 23-25.

[21] *See infra* p. 23-25.  As noted in footnote 3 *supra*, admitted insurers write 99% of the homeowners market.  Rate filing is also generally required for small-to-mid-market commercial habitational insurance.  A small percentage of the total market consists of large commercial habitational insurance able to utilize state laws exempting such risks from the ordinary rate-filing requirements and surplus line risks which are not subject to rate-filing requirements.

[22] *See, e.g.*, WIS. STAT. ANN. § 625.13 (1979) (amended 1983); *see also infra* pp. 23-25.

Third, under existing state laws, insurers are typically prohibited from taking FHA-protected characteristics into account,[23] and may not collect information about prospective insureds' membership in FHA-protected classes.[24]

One of the primary aims of state insurance regulation—and a central purpose of the prohibition against rates that are excessive, *inadequate*, or unfairly discriminatory—is to protect policyholders against the risk of insurer insolvency.[25] As part of solvency regulation, state regulators review insurers' capitalization, asset quality, reinsurance, and liquidity.[26] Insurers derive the funds needed to capitalize the business, purchase quality assets, purchase reinsurance, and facilitate overall liquidity not only from return on investments, the transfer of risk to reinsurers, and other surplus preservation strategies, but also from premiums retained after covered losses are paid. The aggregate difference between premiums collected and covered losses paid produces a significant portion of the surplus funding that ensures solvency and the insurer's ability to pay current and future claims. Rate regulation—including the requirement that rates accurately reflect an insured's risk profile—is thus an integral aspect of solvency regulation because it ensures that insurance companies charge premiums that are sufficient to cover current and future claims while ensuring that adequate surplus is available for capitalization, asset and reinsurance purchases, and liquidity.[27]

## C.    The McCarran-Ferguson Act

In the McCarran-Ferguson Act, Congress stated that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C. § 1011. Accordingly, the Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." *Id.* § 1012(b). Thus, federal law must not be read to authorize regulations that either "directly conflict with state regulation" of insurance or whose "application . . . [would] frustrate any declared state policy or interfere with a State's administrative regime" concerning insurance. *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999). A regulation requiring federal courts to "determine whether

---

[23] *See, e.g.*, CAL. INS. CODE § 679.71 (1973) (amended 2009) (prohibiting insurers from denying insurance or providing insurance on less favorable terms due to, among other things, an applicant's marital status, sex, race, color, religion, national origin, or ancestry); MD. CODE ANN. INS. § 27-501(c)(1) (1997) (amended 2020) (prohibiting insurers or insurance producers from inquiring about race, creed, color, or national origin in any manner of requesting general information related to an insurance application).

[24] *See, e.g.*, CAL. INS. CODE § 10141 (1969) (amended 2009).

[25] Shauhin Talesh, *Insurance Law As Public Interest Law*, 2 UC Irvine L. Rev. 985, 1005-06 (2012) ("As articulated by most states, the goals of insurance regulation include fair pricing of insurance, protecting insurance company solvency, preventing unfair practices by insurance companies, and ensuring the availability of insurance coverage.") (emphasis added); National Association of Insurance Commissioners, *The U.S. National State-Based System of Insurance Financial Regulation and the Solvency Modernization Initiative* § 2.3 (Aug. 14, 2013), https://www.naic.org/documents/committees_e_us_solvency_framework.pdf ("The state regulatory system in the United States has had over a 100 year history of solvency regulation.").

[26] *See, e.g.* National Association of Insurance Commissioners, Financial Analysis Handbook 25, 56, 63, 73 (2020), https://content.naic.org/sites/default/files/publication-fah-zu-financial-analysis-handbook.pdf (suggesting, among other factors, capitalization, asset quality, reinsurance, and liquidity as measures of solvency to be considered by state insurance regulators).

[27] Joshua Phares Ackerman, *The Unintended Federalism Consequences of the Affordable Care Act's Insurance Market Reforms*, 34 Pace L. Rev. 273, 283 (2014).

[challenged insurance practices] are actuarially sound and consistent with principles of state law" would violate the McCarran-Ferguson Act, as the Seventh Circuit concluded in *Mutual of Omaha*, 179 F.3d at 557.[28]

### D.     The Fair Housing Act And The Disparate-Impact Rule

The FHA makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). It further makes it unlawful "for any person or other entity whose business includes engaging in real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605(a). The FHA does not specifically relate to the business of insurance and thus is displaced by state laws regulating insurance, pursuant to McCarran-Ferguson, in the event of a conflict or interference with state law.

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effect's Standard." *See* 76 Fed. Reg. 70,921 (Nov. 16, 2011). In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate." *Id.* The proposal identified "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act." *Id.* at 70,924.

Representatives of the insurance industry submitted comments explaining why disparate-impact liability cannot lawfully be applied to homeowners insurance. The comments explained that HUD's Disparate-Impact Rule would conflict with and impair state regulation of insurance in violation of the McCarran-Ferguson Act in numerous ways. For instance, the Rule would prohibit conduct that state law requires or authorizes. The comments also explained that the Rule would inject federal courts into decisions that would otherwise be made by state lawmakers or regulators. Moreover, as the comments described, application of disparate-impact liability to risk-based pricing and underwriting of homeowners insurance would adversely affect the insurance industry by deterring the use of core insurance practices and would inject racial considerations. Finally, commenters noted that application of the Rule to homeowners insurance would violate the "filed-rate" doctrine, which bars private claims and collateral attacks based on insurance rates filed with state regulatory entities.

On February 15, 2013, HUD promulgated its final Disparate-Impact Rule, which remains in effect today. *See* 78 Fed. Reg. 11,460 (Feb. 15, 2013). The 2013 Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns

---

[28] Congress remains committed to the principle of leaving the regulation of insurance to the states. *See* Baird Webel, Cong. Research Serv., R44958 *Insurance Regulation: Legislation in the 115th Congress*, Summary (2018), https://crsreports.congress.gov/product/pdf/R/R44958 ("Since 1868, the individual states have been the primary regulators of insurance with the National Association of Insurance Commissioners (NAIC) acting to coordinate state actions and collect national data").

**App.297**

because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a) (2013). No showing of intent to discriminate is required. The Rule also provides that disparate-impact litigation under the FHA should proceed under a burden-shifting framework. Under that framework, a plaintiff must first demonstrate that a housing-related practice has a disparate effect on an FHA-protected class. 24 C.F.R.§ 100.500(c)(1) (2013). The defendant must then show that the practice is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). Notwithstanding such a showing, the defendant may still be found liable if the plaintiff establishes "that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3). The alternative identified by the plaintiff need not be "equally effective" as the challenged practice. 78 Fed. Reg. at 11,473. Thus, compliance with the Disparate-Impact Rule may require defendants to abandon sound, good-faith practices in favor of substitutes that are less effective at furthering the defendants' legitimate, nondiscriminatory interests.

In the final Rule, HUD declined to exempt risk-based pricing and underwriting of homeowners insurance or meaningfully address whether extension of disparate-impact liability would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act. The Rule's preamble merely asserted (without any support) that the McCarran-Ferguson Act applies only to courts, not federal agencies construing statutes during the rulemaking process: "McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs courts on how to construe federal statutes, including the Act." 78 Fed. Reg. at 11,475. HUD thus did not consider whether the Rule conflicts with state laws and policies that permit or require risk-based pricing and underwriting.

The Rule also failed to meaningfully address insurance industry comments demonstrating that application of disparate-impact liability is inconsistent with established risk-based insurance practices. HUD did not dispute that the use of risk factors will result in a disparate impact on some populations or that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk." 78 Fed. Reg. at 11,475 (quoting a comment). To the contrary, HUD acknowledged that insurers will have to justify in court any disparate impact caused by risk-based pricing and underwriting. HUD's sole response was that an insurance company "has a full opportunity to defend the business justifications for its policies." *Id.*; *see also id.* ("Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification."). HUD thus acknowledged the possibility that the use of risk-based pricing and underwriting could be a sufficient business justification for any resulting disparate impact. But HUD declined to confirm that the legitimate use of risk factors in fact is a legitimate business practice and went on to reject the insurance industry's requests for an exemption for insurance or a safe harbor for the use of risk-based pricing and underwriting. *Id.*

E.     **Litigation Challenges To The 2013 Rule**

All of the national property casualty insurance trade associations—including APCIA's predecessors American Insurance Association (AIA) and Property Casualty Insurers Association

of America (PCI)—filed lawsuits challenging the 2013 Rule.[29]  PCI filed suit in the U.S. District Court for the Northern District of Illinois.  *See PCI v. Carson*, No. 13-cv-8564 (N.D. Ill. Nov. 27, 2013), ECF No. 1.  PCI's suit focused on HUD's decision to apply the Disparate-Impact Rule to homeowners insurance.  On September 3, 2014, the court granted PCI's motion for summary judgment in part, concluding that HUD's explanation for adopting the 2012 Rule was arbitrary and capricious in several respects.  *See Prop. Cas. Insurers Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1046-52 (N.D. Ill. 2014) (*PCI I*).

First, the court rejected HUD's contention that it could disregard the McCarran-Ferguson Act entirely and held that HUD had provided insufficient justification for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims instead of granting an exemption for risk-based pricing and underwriting of homeowners insurance.  *Id.* at 1048.  In so holding, the court observed that HUD had made "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate-impact claims against insurers, finding "HUD's lack of analysis … particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eighth Circuit's similar recognition in *Saunders* [*v. Farmers Ins. Exch.*], 537 F.3d [961,] 967 [(8th Cir. 2008)]."  *PCI I*, 66 F. Supp. 3d at 1048.  The court noted that HUD had "failed to even acknowledge *Mutual of Omaha* and *Saunders*, which called into question the viability of many (if not most) disparate-impact claims against insurers in light of the McCarran-Ferguson Act."  *Id.* at 1049.

Second, the court determined that HUD had inadequately examined whether the filed-rate doctrine would bar application of the Rule.  *Id.* at 1050.  And finally, the court concluded that HUD had made "no effort to evaluate" the substance of the insurance industry's argument that the Rule would prevent the use of sound risk factors and thereby undermine the fundamental nature of the insurance business.  *Id.* at 1051.  Accordingly, the court remanded to HUD for further explanation of these issues.[30]

### F.    PCI's Post-Remand Comments

In September 2014, PCI informed HUD that it intended to submit additional comments addressing the issues that the district court had instructed HUD to consider on remand.  *See* Letter from PCI to HUD, at 1 (Sept. 25, 2014) (A.R. 4416).  PCI then submitted comments further explaining how the Disparate-Impact Rule would invalidate, impair, or supersede states' regulation of insurance and distort the homeowners insurance market.  *See* Letter from PCI to HUD, at 1-18 (Jan. 26, 2015) (A.R. 4496-4513).  PCI emphasized that the Rule's burden-shifting process would impose liability on homeowners insurers for providing and pricing insurance

---

[29] Both predecessors of APCIA—the American Insurance Association ("AIA") and the Property Casualty Insurers Association of America ("PCI")—filed lawsuits under the Administrative Procedure Act challenging the 2013 Disparate-Impact Rule. Effective January 1, 2019, AIA merged with and into PCI.  Effective February 5, 2019, PCI re-domesticated and changed its name to the American Property Casualty Insurance Association.  Prior to the merger of AIA and PCI, comments were filed by each separate trade in response to the 2018 ANPRM.

[30] AIA, along with co-plaintiff the National Association of Mutual Insurance Companies ("NAMIC"), filed a complaint in the U.S. District Court for the District of Columbia.  *See American Ins. Ass'n v. Carson*, No. 13-cv-966 (D.D.C. June 26, 2013).  The lawsuit challenged the validity of disparate-impact claims generally under the FHA, and the district court initially granted summary judgment in their favor.  Order Granting Motion for Summary Judgment, *American Ins. Ass'n v. Carson*, No. 13-cv-966 (D.D.C. Nov. 3, 2014), ECF No. 46.  HUD appealed, but before briefing began, the Supreme Court decided *Inclusive Communities*.

using sound risk-based methods. *Id.* at 8 (A.R. 4503). PCI explained that prohibiting those methods would violate the McCarran-Ferguson Act and the filed-rate doctrine, as well as harm the homeowners insurance industry. *See id.* at 9-18 (A.R. 4504-4513). PCI's comments also alerted HUD to the importance of the Supreme Court's upcoming consideration of the *Inclusive Communities* case. *See id.* at 5-6 (A.R. 4500-4501).[31]

### G. The Supreme Court's Decision In *Inclusive Communities*

On June 25, 2015, the Supreme Court issued its decision in *Inclusive Communities*. *See* 576 U.S. 519. In that decision, the Court held that the FHA permits disparate-impact claims. But the Court stressed that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary and unnecessary barriers.'" *Id.* at 543 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). The Court identified the "heartland of disparate-impact suits" as those that target "artificial barriers to housing." *Id.* at 540. In order to ensure that disparate-impact claims are properly limited, the Court held that key "safeguards" must be put in place. *Id.* at 542.

First, the Court made clear that claims cannot rest on statistical disparity alone but must satisfy a "robust causality requirement." *Id.* Such a requirement, the Court explained, "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)). A plaintiff must therefore allege facts or produce statistical evidence demonstrating a causal connection between the challenged practice and the alleged disparity. *Inclusive Communities*, 576 U.S. at 543. Referring approvingly to the opinion below of Fifth Circuit Judge Edith Jones, the Court explained that where another "law substantially limits the [defendant's] discretion," causation cannot be established. *Id.*

Second, a defendant must have "leeway to state and explain the valid interest served by their policies." *Id.* at 541. Businesses, the Court stated, "must be given latitude to consider market factors." *Id.* at 541-542. And they must be allowed to maintain practices that are "necessary to achieve a valid interest." *Id.*

The Supreme Court cautioned that without these safeguards "disparate-impact liability might cause race to be used and considered in a pervasive way." *Id.* at 542. "[I]nterpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." *Id.* at 543. These "limitations on disparate-impact liability," the Court instructed, "are also necessary to protect potential defendants against abusive disparate-impact claims." *Id.* at 544. The "specter of disparate-impact litigation," the Court recognized, could actually discourage businesses from undertaking the very activities that ensure a well-functioning housing market. *Id.* Unless that specter were vanquished, "the FHA would have undermined its own purpose as well as the free-market system." *Id.*

---

[31] APCIA hereby incorporates by reference PCI's September 25, 2014 letter (A.R. 4416) and January 26, 2015 letter (A.R. 4496) submitted to HUD.

## H.    PCI's Post-*Inclusive Communities* Comments

Shortly after the Supreme Court issued its decision in *Inclusive Communities*, PCI submitted further comments explaining that HUD must consider the Supreme Court's newly articulated limitations on disparate-impact liability.  *See* Letter from PCI to HUD (July 29, 2015) (A.R. 4615-4621).[32]  PCI emphasized that *Inclusive Communities* prohibited application of the Rule to legitimate business practices, including risk-based homeowners insurance practices.  *See id.* at 5-7 (A.R. 4619-4621).

## I.    HUD's Supplemental Explanation

As required by the district court in the *PCI I* case, on October 5, 2016, HUD published a supplemental explanation for its decision to apply the FHA to insurance practices entitled "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance."  *See* 81 Fed. Reg. 69,012 (Oct. 5, 2016) ("2016 Supplemental Explanation").  HUD did not dispute that state law uniformly permits and often requires insurers to consider risk factors.  *See id.* at 69,015. In fact, HUD "recognize[d] that risk-based decision making is an important aspect of sound insurance practice."  *Id.*  The 2016 Supplemental Explanation nevertheless rejected insurers' request for an exemption from the Disparate-Impact Rule, concluding that insurers can simply justify using risk-based factors on a case-by-case basis under the Rule's burden-shifting framework.  *See id.*  HUD thus insisted that "nothing in the Rule prohibits insurers from making decisions that are in fact risk-based."  *Id.*

HUD asserted that an exemption for insurance practices would be inappropriate because certain state anti-discrimination laws might apply to insurance, and an exemption would therefore "deprive all states of federal support in addressing discriminatory insurance practices," contrary to "the purpose of [the] McCarran-Ferguson [Act]."  81 Fed. Reg. at 69,016.  HUD also asserted in passing in its 2016 Supplemental Explanation that "McCarran-Ferguson requires a fact-intensive inquiry."  *Id.*

HUD did not dispute in the Supplemental Explanation that the filed-rate doctrine applies to insurance rates filed with state insurance commissions.  Instead, HUD argued that the filed-rate doctrine does not apply to FHA claims because they "'do not challenge the reasonableness of the insurance rates,' but rather their discriminatory effects."  81 Fed. Reg. at 69,018 (quoting *Lumpkin v. Farmers Grp., Inc.*, No. 05-2868, 2007 U.S. Dist. LEXIS 98994, at *21 (W.D. Tenn. Apr. 26, 2007)).  HUD also argued in the 2016 Supplemental Explanation that "the Supremacy Clause tips any legislative competition" between the Rule and state insurance regulations "in favor of the federal antidiscrimination statutes."  *Id.* (quoting *Saunders v. Farmers Ins. Exch.*, 440 F.3d 940, 944 (8th Cir. 2006) (*Saunders I*)).

---

[32] APCIA also incorporates this letter by reference.

**App.301**

### J. Treasury Recommends That HUD Reconsider Its Prior Rule

In October 2017, the U.S. Department of Treasury issued a report entitled "A Financial System That Creates Economic Opportunities Asset Management and Insurance."[33] Among other things, that report urged HUD to reconsider the Disparate-Impact Rule, stating:

> Treasury recommends that HUD reconsider its use of the disparate-impact rule. In particular, HUD should consider whether the disparate-impact rule, as applied, is consistent with McCarran-Ferguson and existing state law. HUD should also reconsider whether such a rule would have a disruptive effect on the availability of homeowners insurance and whether the rule is reconcilable with actuarially sound principles.[34]

### K. HUD's 2020 Rulemaking Revised The 2013 Rule

On August 19, 2019, HUD published a NPRM in the Federal Register. *See* 84 Fed. Reg. at 42,854. The NPRM proposed to make a number of important changes to the 2013 Rule to bring it into compliance with the limits set forth in *Inclusive Communities*. After soliciting and considering comments, on September 24, 2020, HUD published the 2020 Final Rule, "Implementation of the Fair Housing Act's Disparate Impact Standard," in the Federal Register. 85 Fed. Reg. at 60,288. In response to comments,[35] the Final Rule made several clarifying edits to the Proposed Rule but maintained the thrust of the Proposed Rule's improvements and alterations of the 2013 Rule.

As revised, the 2020 Rule made clear that disparate-impact claims are available under the FHA where a plaintiff proves a specific policy's or practice's discriminatory effect on members of a protected class. Consistent with *Inclusive Communities*, the 2020 Rule provided that plaintiffs bringing such claims must, to proceed past the pleading stage, plausibly allege facts supporting each of the following elements:

> (1) That the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law;

> (2) That the challenged policy or practice has a disproportionately adverse effect on members of a protected class;

> (3) That there is a robust causal link between the challenged policy or practice and the adverse effect on members of a protected class, meaning that the specific policy or practice is the direct cause of the discriminatory effect;

---

[33] *See* U.S. Dep't of the Treasury, *A Financial System That Creates Economic Opportunities Asset Management and Insurance* (Oct. 2017), https://www.treasury.gov/press-center/press-releases/Documents/A-Financial-System-That-Creates-Economic-Opportunities-Asset_Management-Insurance.pdf.

[34] *Id.* at 110.

[35] On August 19, 2018 and October 18, 2019, APCIA submitted extensive comments in response to HUD's Advance Notice of Proposed Rulemaking, 83 Fed. Reg. 28,560 (June 20, 2018) and Notice of Proposed Rulemaking, 84 Fed. Reg. 42,854 (Aug. 19, 2019), respectively. APCIA incorporates these August 19, 2018, and October 18, 2019, letters to HUD by reference.

(4) That the alleged disparity caused by the policy or practice is significant; and

(5) That there is a direct relation between the injury asserted and the injurious conduct alleged.

24 C.F.R. § 100.500(b).

Next, the 2020 Rule addressed the burdens of proof typical of litigation and consistent with *Inclusive Communities*. The 2020 Rule provided additional guidance on the three-part burden shifting framework in the 2013 Rule, and (as with the Proposed Rule) clarified that the ultimate burden always lies with the plaintiff. Specifically, the 2020 Rule required:

(1) A plaintiff must prove by the preponderance of the evidence each of the elements in [24 C.F.R. § 100.500(b)].

(2) A defendant or responding party . . . may rebut a plaintiff's allegation . . . that the challenged policy or practice is arbitrary, artificial, and unnecessary by producing evidence showing that the challenged policy or practice advances a valid interest (or interests) and is therefore not arbitrary, artificial, and unnecessary.

(3) If a defendant rebuts a plaintiff's assertion . . . the plaintiff must prove by the preponderance of the evidence either that the interest (or interests) advanced by the defendant are not valid or that a less discriminatory policy or practice exists that would serve the defendant's identified interest (or interests) in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant.

24 C.F.R. § 100.500(c).

The 2020 Rule also set forth defenses available to defendants at both the pleading and post-pleading stages of litigation. At the pleading stage, a defendant could prevail (consistent with the Rules of Civil Procedure) by demonstrating that the plaintiff failed to establish one of the elements required for pleading a disparate-impact case, or by showing that "the defendant's policy or practice was reasonably necessary to comply with a third-party requirement, such as a:

(i) Federal, state, or local law;

(ii) Binding or controlling court, arbitral, administrative order or opinion; or

(iii) Binding or controlling regulatory, administrative or government guidance or requirement.

24 C.F.R. § 100.500(d)(1). After the pleading stage, a defendant could prevail by establishing that:

(i) The policy or practice is intended to predict an occurrence of an outcome, the prediction represents a valid interest, and the outcome predicted by the policy or practice does not or would not have a disparate impact on protected classes compared to similarly

situated individuals not part of the protected class, with respect to the allegations under paragraph (b). This is not an adequate defense, however, if the plaintiff demonstrates that an alternative, less discriminatory policy or practice would result in the same outcome of the policy or practice, without imposing materially greater costs on, or creating other material burdens for the defendant.

(ii) The plaintiff has failed to establish that a policy or practice has a discriminatory effect under paragraph (c) of this section.

(iii) The defendant's policy or practice is reasonably necessary to comply with a third party requirement, such as a:

(A) Federal, state, or local law;

(B) Binding or controlling court, arbitral, administrative order or opinion; or

(C) Binding or controlling regulatory, administrative, or government guidance or requirement.

24 C.F.R. § 100.500(d)(2). Finally, the 2020 Rule incorporated the NPRM's reference regarding the application of the McCarran-Ferguson Act to the FHA, *see* 24 C.F.R. § 100.500(e) ("Business of Insurance), adding a paragraph concerning remedies to align the 2020 Rule with the Supreme Court's guidance in *Inclusive Communities*:

In cases where liability is based solely on a discriminatory effect theory, remedies should be concentrated on eliminating or reforming the discriminatory practice so as to eliminate disparities between persons in a particular protected class and other persons. In administrative proceedings under 42 U.S.C. § 3612(g) based solely on discriminatory effect theory, HUD will seek only equitable remedies, provided that where pecuniary damage is proved, HUD will seek compensatory damages or restitution; and provided further that HUD may pursue civil money penalties in discriminatory effect cases only where the defendant has previously been adjudged, within the last five years, to have committed unlawful housing discrimination under the Fair Housing Act, other than under this section.

24 C.F.R. § 100.500(f).

## L.    The District Court Enjoins The 2020 Rule

On October 25, 2020, the United States District Court for the District of Massachusetts issued a preliminary injunction enjoining implementation of the 2020 Rule. *See Mass. Fair Hous. Ctr. v. United States Dep't of Hous. & Urban Dev.*, 496 F. Supp. 3d 600 (D. Mass 2020) (*MFHC*). As a result, the 2020 Rule never took effect, and the 2013 Rule remains in effect today.

The district court's injunction did not touch upon every aspect of the 2020 Rule, but rather tailored its analysis to specific provisions that the court found sufficiently problematic at the preliminary stage to conclude that plaintiffs had a likelihood of success. Specifically, the

district court determined that the "additional language" in 24 C.F.R. § 100.500(b)(1)—providing examples of a valid interest or legitimate objective "'such as a practical business, profit, policy consideration'"—was not found in any judicial decision." *MFHC*, 496 F. Supp 3d. at 610. It found the same as to the "'outcome prediction' defense" located at 24 C.F.R. § 100.500(d)(2)(i), and the requirement in § 100.500(c)(3) that plaintiffs must prove that their alternative policy would serve a defendant's interests in "an *equally effective manner without imposing materially greater costs* on, or creating *other material burdens* for, the defendant." *MFHC*, 496 F. Supp 3d. at 610. Finally, the court cited as problematic an unspecified and undefined "conflat[ion]" of plaintiffs' prima facie and pleading burdens. *Id.* at 611.

Although the district court otherwise criticized the 2020 Rule for lack of clarity, it cited no other specific provision as contrary to law. Instead, the district court specifically noted that the 2020 Rule's "arbitrary, artificial, and unnecessary" standard comes "directly from *Inclusive Communities*." *Id.* at 610. The court said nothing about the 2020 Rule's recognition that the FHA does not (and cannot) supplant state laws concerning insurance, nor the 2020 Rule's codification of *Inclusive Communities'* guidance with respect to remedies in disparate impact cases.

## M.   HUD Issues Notice Of Intent To Reinstate The 2013 Rule

On June 25, 2021, HUD published a Proposed Rule titled "Reinstatement of HUD's Discriminatory Effects Standard." 86 Fed. Reg. 33,590. The Proposed Rule seeks to reinstate, virtually without alteration, the 2013 Rule in full, notwithstanding the reasoning HUD promulgated one year before during the 2020 Rule's notice-and-comment process—a process that identified significant gaps between the 2013 Rule and the Supreme Court's directions in *Inclusive Communities*. The proposed Reinstatement cites the Massachusetts district court's preliminary injunction as justification for reverting to the 2013 Rule but ignores the limitations in the district court's opinion, which cited only specific provisions of the 2020 Rule as problematic at the preliminary-injunction stage, and in no way justified wholesale reversion to the 2013 Rule that the 2020 Rule aimed to improve and clarify.

## N.   PCI's Renewed Legal Challenge

As explained above, litigation is pending challenging the 2013 Rule in the United States District Court for the Norther District of Illinois. *See Property Cas. Insurers Ass'n of Am. v. Carson*, No. 13-CV-8564 (N.D. Ill. Nov. 27, 2013). After HUD issued its 2016 Supplemental Explanation, PCI amended its complaint to bring a renewed challenge to the 2013 Rule. Dkt. 129. PCI subsequently moved for summary judgment, focusing its challenge on the adequacy of HUD's explanation in the 2016 Supplement. PCI argued that the Supplement is arbitrary and capricious because it fails to meaningfully consider the Supreme Court's 2015 decision in *Inclusive Communities* or explain how, without an exemption for risk-based pricing and underwriting of homeowners insurance, the Rule is consistent with the McCarran-Ferguson Act, the fundamental business of insurance, or the filed-rate doctrine. Dkt. 221. HUD filed a cross-motion for summary judgment, arguing that the Supplement adequately addresses industry comments and the *PCI I* Court's concerns. Dkt. 231. Summary judgment briefing was completed on August 20, 2021, and both PCI and HUD's cross-motions remaining pending.

## II. THE 2013 DISPARATE-IMPACT RULE CANNOT BE SQUARED WITH *INCLUSIVE COMMUNITIES* OR THE BEDROCK DISPARATE-IMPACT JURISPRUDENCE THE SUPREME COURT CITED

HUD cannot reinstate the 2013 Rule as previously formulated because it is inconsistent with the limitations set forth in *Inclusive Communities* and longstanding anti-discrimination jurisprudence. HUD is incorrect in claiming that *Inclusive Communities* endorsed the 2013 Rule. Nor is HUD correct in claiming that the 2013 Rule is aligned with the longstanding limits on the burden-shifting framework that the *Inclusive Communities* Court reiterated. In particular, the burden-shifting framework of the 2013 Rule permits plaintiffs to prevail in a wider range of cases than they would have been able to advance under the foundational body of anti-discrimination caselaw under Title VII and the ADEA—a corpus of jurisprudence which HUD itself contends underpins *Inclusive Communities*' analysis. For these reasons, the Rule is contrary to longstanding Supreme Court precedent—especially as applied to risk-based pricing and underwriting of homeowners and commercial habitational insurance.

### A. *Inclusive Communities* Did Not Endorse The 2013 Rule

The NPRM alleges that "the [*Inclusive Communities*] Court did not call into question the 2013 Rule's framework for analyzing discriminatory effects claims, nor did it suggest that HUD should make any modifications to its framework. To the contrary, the Court cited HUD's 2013 Rule multiple times with approval." 88 Fed. Reg. at 33,592.

This vastly overstates the Supreme Court's treatment of the Rule. Indeed, the *Inclusive Communities* Court made only a few glancing mentions of the Rule, none of which could fairly be characterized as approvals of its substance. The first reference merely restated the three steps of the 2013 Rule. *Inclusive Communities*, 576 U.S. at 527 (specifying that "[t]he regulation also established a burden-shifting framework for adjudicating disparate-impact claims" and describing the requirements of each step of the test). The second reference noted that the Fifth Circuit reversed the district court based on the 2013 Rule. *Id.* at 528. The third reference stated that the second step of the HUD test is analogous to the "business necessity" defense under Title VII but does not state that the HUD and Title VII standards are in alignment. *Id.* at 541 (noting HUD's explanation that it did not use the phrase "business necessity" because that "phrase may not be easily understood to cover the full scope of practices covered by the Fair Housing Act, which applies to individuals, businesses, nonprofit organizations, and public entities"). The final reference describes HUD's stated goals for the disparate-impact standard, but does not endorse HUD's burden-shifting framework. *Id.* at 542 (noting that "HUD itself recognized in its recent rulemaking, disparate-impact liability 'does not mandate that affordable housing be located in neighborhoods with any particular characteristic'").

None of these references amounts to an approval or endorsement of the Rule. Indeed, the validity of the 2013 Rule was not at issue in the case; in granting certiorari, the Supreme Court limited the scope of the case to the first question presented—whether disparate-impact claims are cognizable under the FHA. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 573 U.S. 991 (2014). Nowhere did the Court indicate that it was considering the validity of the 2013 Rule.

Accordingly, HUD's claim that the 2013 Rule was already determined to be consistent with *Inclusive Communities* is not accurate—as several courts have observed.[36]

**B.      The 2013 Rule's Burden-Shifting Framework Is Inconsistent With The Longstanding Precedent On Which *Inclusive Communities* Relied**

As explained in further detail below, each step of the 2013 Rule's burden-shifting framework diverges from the tests governing claims under related antidiscrimination statutes in ways that permit plaintiffs to plead and prevail on disparate-impact claims that violate the "safeguards" that *Inclusive Communities* set forth and that the Supreme Court has consistently articulated in interpreting the requirements of the burden-shifting framework for antidiscrimination cases.

*1.      The First Step Of The 2013 Rule's Burden-Shifting Framework Imposes A Significantly Lower Causation Standard Than The Supreme Court Has Required*

*Inclusive Communities* requires a showing of "robust causality" between a defendant's challenged policies and an alleged racial disparity. The Court explained that this requirement "protects defendants from being held liable for racial disparities they did not create." 576 U.S. at 542. Were the rule otherwise, insurers could be found liable for accurately pricing insurance based only on the risks a customer poses—the essence of the business of insurance—simply because the acts of a third party result in a disparity in the rates charged across different groups. For example, homeowners insurers assess the risk of future property loss by using risk-based factors like the proximity of a home to a fire station. But perhaps due to historic siting decisions by local governments, a municipality's fire departments might be located further from predominantly minority neighborhoods than predominantly non-minority locales. Were plaintiffs not required to make a "robust" showing of causality, a homeowners insurer could be held liable for a resulting disparity in homeowners insurance rates between minority and non-minority groups that is caused by a municipality's fire station siting decisions that the insurer had no role in creating or perpetuating.

Longstanding and foundational anti-discrimination jurisprudence is consistent with a "robust" causality requirement. *Id.* at 542. Specifically, Supreme Court cases foreclose claims based on any "predicted" differences between groups, as well as disparate-impact claims that rest on a showing of mere statistical difference. The 2013 Rule's first step erodes these long-standing causation standards by permitting plaintiffs to state claims for "predicted" harm; and allowing statistical disparities, standing alone, to establish causation.

The 2013 Rule allows plaintiffs to plead a prima facie case by showing a "predicted" statistical disparity, or a difference between groups hinging on a mere statistical disparity without more. 78 Fed. Reg. at 11,463. And nowhere does it prevent plaintiffs from prevailing in

---

[36] *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 902 (5th Cir. 2019); *Oviedo Town Ctr, II, L.L.P. v. City of Oviedo, Florida*, 759 Fed. App'x 828, 833-35 (11th Cir. 2018) (per curiam); *River Cross Land Co., LLC v. Seminole Cty.*, 2021 WL 2291344, at *22-24 (M.D. Fla. June 4, 2021*); County of Cook, Ill. v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 990 (N.D. Ill. 2018); *Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 22 (D.D.C. 2017).

**App.307**

disparate-impact challenges on such forms of proof alone. But in the seminal Title VII anti-discrimination cases of *Wards Cove*, and *Watson*, the Supreme Court set out a causation test that forecloses claims based on "predicted" future disparities. In *Wards Cove*, the Court instructed that "[a] plaintiff must demonstrate that it is the application of a specific or particular . . . practice that *has created* the disparate impact under attack. Such a showing is an integral part of the plaintiff's prima facie case." 490 U.S. at 657 (emphasis added). And in *Watson*, the Supreme Court made clear that "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question *has caused* the exclusion of applicants for jobs or promotions because of their membership in a protected group." 487 U.S. 994 (emphasis added). The Court thus articulated the standard under Title VII as a causal effect that "has" already occurred, clearly indicating that the Court did not contemplate claims for as-yet-unrealized disparities or challenges to practices that have not actually resulted in a cognizable disparity.

ADEA caselaw contains this same limitation. To prevail under the burden-shifting framework in those cases, a plaintiff must "'isolat[e] and identif[y] the specific employment practices that are allegedly responsible for any observed statistical disparities." *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 100 (2008) (quoting *Wards Cove*, 490 U.S. at 656). The fact that the disparities are meant to have *already* been "observed" further underscores that this standard requires proof of an existing disparate impact—not a future one. The burden-shifting test in anti-discrimination cases has thus long incorporated an inherent limit on causation by foreclosing claims for predicted or otherwise yet-to-be-observed disparities—claims that the 2013 Rule would allow under the first step of its burden-shifting test.

Additionally, the Supreme Court has repeatedly required a showing of more than a bare statistical difference to establish causality between a challenged practice and a disparate outcome. In *Inclusive Communities*, the Court explained that a disparate-impact claim challenges practices that have a '*disproportionately* adverse effect on minorities.'" 576 U.S. at 524 (citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (emphasis added). The Court also made clear that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact." *Id.* at 542 (quoting *Wards Cove*, 490 U.S. at 653). This formulation is consistent with the rigorous statistical requirements for showing discrimination that have been a foundation of anti-discrimination jurisprudence.

In *Watson*, the Court set out the standard for statistical evidence: "Our formulations . . . have consistently stressed that statistical disparities must be *sufficiently substantial* that they raise such an inference of causation." *Watson*, 487 U.S. at 994-995 (emphasis added). And in line with these directives, the Supreme Court has endorsed proof of a "statistically significant" difference between groups as sufficient to establish a Title VII violation. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308-311 (1977). Further, the Supreme Court also cautioned that statistical evidence must focus on disparities between comparable groups because, otherwise, the analysis is "nonsensical." *Wards Cove*, 490 U.S. at 651.

Consistent with this precedent, agencies and lower courts have similarly required that something more than a bare statistical difference must be shown to establish an actionable disparate impact—a statistical difference must be significant, and must be between comparable populations to support an inference of a meaningful disparity. For example, a long-used rule-of-thumb in Title VII cases is that a ratio of the percentages of protected class versus non-protected

class groups to pass a job test of less than four-fifths (0.80) is insufficient to satisfy the plaintiff's burden to show a significant disparity. *See, e.g.*, 29 C.F.R. § 1607.4(D) (2016) (EEOC's guidelines originally adopted in 1979; *see* Adoption of Questions and Answers To Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures, 44 Fed. Reg. 11,996 (Mar. 2, 1979)); *see also Gilty v. Village of Oak Park*, 919 F.2d 1247, 1255 (7th Cir. 1990) (rejecting disparate-impact claim because plaintiff's statistics did not reflect eligibility rate for the specific job, nor did he establish a causal connection between the specific employment practice and the disparate impact); *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 205 (2d Cir. 2020) (rejecting claim that employer's policy not to hire people with certain criminal convictions created a disparate impact on African-Americans because while national statistics show that African-Americans are more likely to have prior convictions than white people, the jobs in question required certain educational and technical credentials that made those national statistics irrelevant).

Nowhere does the 2013 Rule require that a statistical difference be significant or require a statistical difference between otherwise comparable groups. For example, the 2013 Rule would permit a plaintiff to state a claim by alleging that a particular risk-based practice has a disparate impact on racial minorities, even though it could be the case that there is no statistically significant difference in the rates charged to members of different racial groups resulting from that practice. That would not be a *disproportionate* impact on a protected class. *Inclusive Communities*, 576 U.S. at 524-525. Under established anti-discrimination caselaw, a plaintiff would be unable to show causality if their claim does not rest on a statistically significant difference between comparable populations, because that would undermine an "inference of causation," *Watson*, 487 U.S. at 995, let alone a "robust" showing of causality. *Inclusive Communities*, 576 U.S. at 542 ("[A] disparate impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies *causing* that disparity.") (emphasis added).

But the 2013 Rule would permit plaintiffs in this circumstance to at least set forth a prima facie case—if not completely prevail in litigation—by making a non-statistically significant showing of difference between populations that are not comparable in terms of objective risk factors. That would permit a showing of causation under circumstances that the Supreme Court has repeatedly found inadequate. It risks allowing defendants to be held "liable for racial disparities they did not create" based on a "mere correlation." *Id.* HUD's premise that step one of the burden-shifting test is consistent with the longstanding limits on disparate-impact liability that *Inclusive Communities* referenced is thus incorrect.

### 2. The Second Step Of The Rule's Burden-Shifting Test Is More Onerous For Defendants Than Inclusive Communities And Other Precedent Permit

At the second step of the 2013 Rule's burden-shifting framework, a defendant must prove that a challenged practice is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." 78 Fed. Reg. at 11,482. The *Inclusive Communities* Court described this step as "analogous to the business necessity standard under Title VII." 576 U.S. at 541. Historically, the Supreme Court has explained that a defendant merely bears the burden of production—not proof—at this step of the business-necessity test. The 2013 Rule thus imposes a

heavier burden on defendants to defend a challenged practice than the Supreme Court has historically allowed.

The *Inclusive Communities* Court explained that the second step of the burden-shifting test provides an "important and appropriate means of ensuring that disparate-impact liability is properly limited." 576 U.S. at 541. Analogizing to Title VII, the Court described that stage as allowing defendants "leeway to state and explain the valid interest served by their policies." *Id.* *Inclusive Communities* did not address whether the defendant's burden was one of production or proof. But the Title VII case law it drew on has long held that while defendants must introduce a justification for their challenged practice at the second stage of a burden-shifting test, it is ultimately the plaintiff's burden to persuade a finder of fact to disregard a defendant's justifications.

Decades before *Inclusive Communities* was decided, the Court made clear in *Wards Cove* that the defendant's obligation at step two of the burden-shifting inquiry was one of *production*—not *proof.* "In this phase," the Court explained, referring to the second step of the burden-shifting framework, "the [defendant] carries the burden of producing evidence of a business justification for his [challenged] practice. The burden of persuasion, however, remains with the disparate-impact plaintiff." 490 U.S. at 659. The Court noted that this "conforms with the usual method for allocating persuasion and production burdens in the federal courts." *Id.* at 659-60. The Court went so far as to clarify that prior precedent that may be seen as contrary was incorrect: *Id.* at 660 ("We acknowledge that some of our earlier decisions can be read as suggesting otherwise. … But to the extent that those cases speak of an employer's "burden of proof" with respect to a legitimate business justification defense, … they should have been understood to mean an employer's production—but not persuasion—burden.").

By requiring defendants to prove rather than introduce a justification for their practices, the 2013 Rule upends an established understanding of how defendants in anti-discrimination cases may defend their challenged practices—an understanding that *Inclusive Communities* brought into its discussion of the limitations on disparate-impact liability. This is at odds with the vision of *Inclusive Communities* that the second step of the burden-shifting test would "limit" disparate-impact liability and provide adequate "leeway" for defendants to justify their practices. *Id.* at 541.

Fundamentally, requiring defendants not just to identify, but to prove, their substantial, legitimate, and non-discriminatory interest in their challenged policy threatens to place the onus on them to show why they should not be held liable for practices beyond those that are "artificial, arbitrary, and unnecessary" to achieve a valid policy. *Inclusive Communities*, 576 U.S. at 540. Doing so tips the balance in favor of increased disparate-impact liability, and thus risks stymying the "practical business choices" that the Supreme Court has consistently acknowledged in its anti-discrimination jurisprudence that defendants should be able to make. Accordingly, the second step of the 2013 Disparate-Impact Rule is inconsistent with significant and long-established safeguards established by the Supreme Court.

### 3. The Third Step Of The Burden-Shifting Framework Allows Plaintiffs To Propose Alternative Practices That Are Not Equally Effective At

*Furthering Defendants' Interests, Contrary To Established Limits Set By The Supreme Court*

The 2013 Rule contemplates that even where a defendant meets its burden at the second step of the burden-shifting test, a plaintiff may still prevail at the third step by "proving that the [defendant's] substantial, legitimate, nondiscriminatory interests could be served by another practice that has a less discriminatory effect." 78 Fed. Reg. at 11,482. The Rule does not require that the proposed alternative be "equally effective" as the challenged practice at achieving the defendant's valid interests. That requirement, however, was mandated by the Supreme Court in *Wards Cove*, which specifically held that "any alternative practices which respondents offer up in this respect must be equally effective as petitioners' chosen hiring procedures in achieving petitioners' legitimate employment goals." 490 U.S. at 661.

The *Wards Cove* Court was clear about this limitation, explaining that because "'[c]ourts are generally less competent than employers to restructure business practices,' [they] should proceed with care before mandating that an employer must adopt a plaintiff's alternative selection or hiring practice in response to a Title VII suit." 490 U.S. at 661 (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 578 (1978)). The Court also noted that "'factors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals.'" *Id.* (quoting *Watson*, 487 U.S. at 998).

Allowing a disparate-impact plaintiff challenging a risk-based homeowners insurance practice to prevail at the third step of the burden-shifting test by demonstrating the availability of an alternative that is less effective in predicting losses, as the 2013 Rule does, contravenes this precedent by allowing liability for practices beyond those that are "artificial, arbitrary, and unnecessary" to achieve a valid policy. *Inclusive Communities*, 576 U.S. at 540 (quoting *Griggs*, 401 U.S. at 431). Additionally, in the context of risk-based pricing and underwriting of homeowners and commercial habitational insurance, it also threatens the very activities that ensure a well-functioning housing market and a vibrant and dynamic free-enterprise system. *Inclusive Communities*, 576 U.S. at 533. As explained above, insurance markets function efficiently when insurance is priced in accord with risk-based factors. *See supra* pp. 5-6. The extensive state-law framework governing the pricing of insurance, which includes safeguards against insurer insolvency, is intended to promote such efficient operation. Requiring homeowners and commercial habitational insurers to substitute less-effective practices for risk-based pricing and underwriting may actually prevent insurers from undertaking the very activities that ensure a well-functioning housing market and threatens to upend the "vibrant and dynamic" insurance industry. *Inclusive Communities*, 576 U.S. at 533. Unless HUD clarifies that step three requires proof of an "equally effective" alternative, reinstatement of the 2013 Rule will "undermine[] [the] purpose [of the FHA] as well as the free-market system." *Id.*

For these reasons, the 2013 Rule exceeds the limits of the burden-shifting analysis as articulated by longstanding Supreme Court anti-discrimination jurisprudence and as incorporated and explained by the Supreme Court in *Inclusive Communities*.

**C.    The 2013 Rule Lacks The Additional Safeguards That *Inclusive Communities* Announced Must Apply To Disparate-Impact Claims Under The FHA**

The *Inclusive Communities* Court warned that, without appropriate limits, disparate-impact suits could expand beyond the "heartland" of cases targeting artificial barriers to housing and instead involve courts in "second-guess[ing]" which of two reasonable approaches a defendant should follow when exercising its discretion. 576 U.S. at 540-41. To avoid that result, the Court announced that the "important and appropriate means of ensuring that disparate-impact liability is properly limited to give housing authorities and private developers leeway to state and explain the valid interest served by their policies." *Id.* at 541.

First, the *Inclusive Communities* Court made clear that when a "law substantially limits the [defendant's] discretion," causality cannot be shown. *Id.* at 543. That is the case here. Applying disparate-impact liability to risk-based pricing and underwriting by homeowners and commercial habitational insurers would leave them caught between conflicting federal and state legal regimes and thus place them in precisely the "double bind of liability" the Court instructed must be avoided. *Id.* at 542. As explained above, insurers are regulated by state laws that permit or require the use of risk-based pricing and underwriting and require the filing of rates with state administrative bodies for approval. *See supra* pp. 5-6. Those state laws mandate or expressly permit insurers to use neutral risk factors (such as loss history, distance from a fire station, building material, etc.) to determine risk and generally prohibit insurers from charging inadequate rates for various risk classifications. State laws thus "substantially limit" the discretion of insurers in a manner that would make it impossible to ascribe any disparate effects of underwriting or pricing practices to insurers' independent choices. When companies' policies are subject to legal constraints of these sorts, it is the companies' obligation to comply with those legal requirements that cause any resulting disparate effects, not the companies' own decisions. Interpreting the FHA to permit disparate-impact claims against companies in these circumstances would penalize them for following state law, placing them in the "double bind of liability" the Court warned against. Without taking this into account, the Rule permits plaintiffs to show causation in challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance where, under a faithful application of *Inclusive Communities*, they should not be able to do so.

Second, the *Inclusive Communities* Court explained that "interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" would perversely "tend to perpetuate race-based considerations rather than move beyond them." 576 U.S. at 543. But that is just what extending disparate-impact liability to homeowners and commercial habitational insurers would do. State law ensures that insurers price their products in accordance with risk-based factors. State law does not permit insurers to rely on, and homeowners and commercial habitational insurers do not rely on, classifications prohibited by the FHA. Yet exposing homeowners and commercial habitational insurers to disparate-impact liability would effectively require them to collect and analyze sensitive—and previously uncollected—data on the FHA-protected characteristics of their customers in a defensive effort to ensure that they will not be accused of causing prohibited disparate impacts. Exempting homeowners and commercial habitational insurance from disparate-impact liability would thus ensure compliance with the Supreme Court's direction that race-based considerations not be injected where they are properly absent. By introducing race-based considerations where none

**App.312**

currently exist, the application of disparate-impact liability to homeowners and commercial habitational insurers would, contrary to the teachings of *Inclusive Communities*, "perpetuate race-based considerations rather than move beyond them." *Id.*

Finally, *Inclusive Communities* cabined the remedies that should be sought in the typical disparate-impact case under the Rule. The Court explained that "even when courts do find liability under a disparate-impact theory, their remedial orders must be consistent with the Constitution. Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice." *Id.* at 544. The 2013 Rule omits any mention of a limitation on remedies, thereby inviting plaintiffs to seek additional remedies and permitting courts to award them.

Because applying disparate-impact liability to risk-based pricing and underwriting would run afoul of all of these limitations, HUD should grant an exemption for those activities.

## III.  HUD SHOULD EXEMPT RISK-BASED PRICING AND UNDERWRITING OF HOMEOWNER'S INSURANCE FROM DISPARATE-IMPACT LIABILITY UNDER THE FHA

As it has requested previously, including in response to HUD's Advanced Notice of Proposed Rulemaking and Notice of Proposed Rulemaking for the 2020 Disparate-Impact Rule, APCIA respectfully urges HUD to adopt an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance if it intends to reinstate the 2013 Rule. As explained below, such an exemption is necessary in light of the threat that disparate-impact liability poses to the business of insurance, the McCarran-Ferguson Act, and the filed-rate doctrine. An exemption is also justified because of the burdens that case-by-case litigation would impose on the homeowners and commercial habitational insurance industry and the consumers the industry serves.

### A.  Disparate-Impact Liability Threatens The Business Of Insurance

The 2013 Rule conflicts with the fundamental, risk-based nature of homeowners and commercial habitational insurance, discussed above. *See supra* pp. 5-6. As members of the insurance industry commented during HUD's prior rulemaking, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk."[37] The essence of risk-based insurance practices is "identify[ing] relationships between factors and risk of loss and allocat[ing] costs accordingly."[38] Quantifying the impact of any risk factor is a purely mathematical and unbiased statistical exercise. Far from the "artificial, arbitrary, and unnecessary" practices that may incur liability under the FHA under *Inclusive Communities*, 576 U.S. at 540, the assessment of risk is designed to precisely identify "the expected value of all future costs associated with an individual risk transfer."[39]

But despite the neutrality of insurance practices with respect to all FHA-protected characteristics, the 2013 Rule threatens to penalize insurers for relying on sound risk factors that

---

[37] *PCI v. Carson*, No. 13-8564 (N.D. Ill. Feb. 12, 2014), ECF No. 19-3, 19-5.
[38] *Id.*, ECF No. 19-3.
[39] Casualty Actuarial Society, *Statement of Principles Regarding Property and Casualty Insurance Ratemaking* at 57-58.

happen to disproportionately affect a class protected by the FHA.[40]  In addition to improperly holding defendants "liable for racial disparities they did not create," *Inclusive Communities*, 576 U.S. at 542 (citing *Wards Cove*, 490 U.S. at 653)—as discussed below— this would irreparably distort the market for homeowners and commercial habitational insurance.  Tying rates to risk factors ensures that prices accurately reflect an insurer's costs of covering particular classes of risk for similarly situated customers.[41]  Removing risk factors from the ratemaking calculus, or substituting less-effective factors, could make it prohibitively expensive for an insurer that is writing these risks at an inadequate rate to insure high-risk properties, perhaps eliminating coverage across the market.  It would also cause adverse selection, as customers with a low risk of loss would be charged more than necessary to cover their risk.  *See* Letter from PCI to HUD, at 2 (Jan. 26, 2015) (A.R. 4497) ("Lower-risk customers would be overcharged for insurance, while other customers would not pay a rate commensurate with their risk of fire and other hazards.").

The 2013 Rule's effects on homeowners and commercial habitational insurance pricing would also generate negative externalities beyond the insurance market.  Risk-based insurance pricing encourages safer practices.  For example, charging higher premiums to insure houses made of easily flammable materials discourages the use of those materials.  Eliminating risk factors from the pricing model could reduce such expedient disincentives.  *See, e.g.*, Avraham, *The Economics of Insurance Law*, 19 Conn. Ins. L.J. at 66-67.  Disallowing risk-based pricing inherently creates cross-subsidies from low-risk activities to high-risk activities, with the resulting unfairly discriminatory prices (as defined in state insurance law and regulations) creating moral hazards and forcing more low-risk activities and consumers out of the market.  *See id.* at 66-70, 111 (explaining that moral hazard occurs where insureds take "less than optimal care in protecting themselves against the insured risk" or "make less of an effort to minimize their loss should the risk occur," which poses an impediment to the efficiency of the insurance market).

HUD initially responded to these concerns by noting that insurers would still have an opportunity to prove in court that the use of risk factors was necessary to achieve a substantial legitimate interest, at least so long as there did not exist an alternative practice that could serve the same interest with a less disparate effect.  78 Fed. Reg. at 11,475.  The *PCI* court found that HUD's response to these concerns was inadequate and thus arbitrary and capricious.  *See PCI I*, 66 F. Supp. 3d at 1051.  "HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework."  *Id.*  "The ability of insurers to re-raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period."  *Id.*

Despite the district court's holding, HUD has not, to date, meaningfully addressed the effect of disparate-impact liability on the fundamental nature of homeowners and commercial habitational insurance.  In its 2016 Supplemental Explanation, HUD brushed aside the industry's

---

[40] Scholars have predicted that "protected classes, most if not all of the time, will not be evenly distributed throughout the various risk classifications."  Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284.
[41] Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.

concerns, concluding that they "date[] back more than three decades" during which HUD had taken the position that discriminatory-effects liability applies to insurance. 81 Fed. Reg. at 69,015. HUD also asserted that "[r]isk-based decision making is not unique to insurance, and discriminatory effects liability has proven workable in other contexts involving risk-based decisions." *Id.* HUD ultimately decided that "[a]fter careful reconsideration of the insurance industry comments in accordance with the court's decision . . . HUD has determined that categorical exemptions or safe harbors for insurance practices are unworkable and inconsistent with the broad fair housing objectives and obligations embodied in the Act." *Id.* at 69,012. It "continue[d] to believe that the commenters' concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis." *Id.*

The NPRM makes no effort to assess the impact of disparate-impact liability on the availability of coverage or insurer solvency either, despite comments from the insurance industry repeatedly raising this concern over the years, and despite a 2017 report from the U.S. Treasury Department encouraging HUD to reconsider whether disparate-impact liability would disrupt the availability of homeowners insurance and whether it is, in fact, "reconcilable with actuarially sound principles." *See supra* p. 12. Rather, the NPRM proposes a "return to the 2013 Rule," 86 Fed. Reg. at 33,595, which ostensibly includes requiring insurers to defend their practices in litigation under the Rule on a case-by-case basis under the original burden-shifting framework.

But case-by-case adjudication under the burden-shifting framework would only exacerbate the deleterious consequences of disparate-impact liability on the business of insurance. Any alternative risk factor proposed by a plaintiff at the third step of the burden-shifting test would necessarily correspond to a different risk than the one identified as relevant by sound risk-based methodologies. As a result, the original risk of loss would still exist, and it would not be correctly reflected in the price of insurance. *See PCI v. Carson*, No. 13-cv-8564 (N.D. Ill. May 16, 2014), ECF No. 44-4 ¶ 20 (eliminating factors in a risk and rate assessment "would compromise the actuarial soundness of the risk-based rating plans"). This would result in overcharging customers with a low risk of loss and likely driving many of them out of the market. The third step of the burden-shifting framework is accordingly a perfect example of the hazards of allowing plaintiffs to "second-guess which of two reasonable approaches" a defendant should adopt—a hazard that could undermine the insurance market entirely. *Inclusive Communities*, 576 U.S. at 541.

Moreover, the fact that risk-based insurance practices could withstand challenges under the 2013 Rule's burden-shifting framework does not remove the need for an express exemption. Forcing insurers to defend the use of risk factors in court would needlessly raise costs for the industry and customers and waste judicial resources. *See Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n*, 508 F.3d 366, 375 (6th Cir. 2007) ("[I]f *no* disparate-impact challenge to a particular practice ever could succeed under the burden-shifting framework, then a court categorically may bar *all* disparate-impact challenges to that practice."); *id.* at 376 (seeing "no reason to require courts to engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success").

### B. The Disparate-Impact Rule Cannot Be Reconciled With The McCarran-Ferguson Act

HUD should also provide an exemption for risk-based pricing and underwriting of homeowners and commercial habitational insurance because applying the 2013 Rule to invalidate, impair, or supersede state laws regulating insurance would violate the McCarran-Ferguson Act. But rather than propose such an exemption, the NPRM avoids any analysis of McCarran-Ferguson.

The court hearing PCI's challenge to the 2013 Rule criticized HUD for failing to explain how the Rule could be squared with the McCarran-Ferguson Act. The court held that HUD could not "simply disregard the likelihood that McCarran-Ferguson preclusion will apply" before promulgating its regulations. *See PCI I*, 66 F. Supp. 3d at 1048. It found that HUD had provided insufficient justification for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims over an exemption. *Id.* The court also observed that HUD had made "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate-impact claims against insurers, finding "HUD's lack of analysis ... particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*, 179 F.3d at 563-64, and the Eighth Circuit's similar recognition in *Saunders*, 537 F.3d at 967." *PCI I*, 66 F. Supp. 3d at 1048. As discussed *supra* at p. 11, HUD also failed to address this concern in its Supplemental Explanation in 2016.

That same critique applies to the NPRM, which does not adequately address the McCarran-Ferguson Act. In the NPRM, HUD does not mention McCarran-Ferguson, let alone grapple with the likelihood that McCarran-Ferguson Act would bar application of the Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance in all or most cases. This is wholly insufficient under the district court's analysis. *See PCI I*, 66 F. Supp. 3d at 1048.

Considering the 2013 Rule's clash with McCarran-Ferguson as the district court required confirms that subjecting homeowners and commercial habitational insurance to potential liability under the 2013 Rule would violate the McCarran-Ferguson Act in multiple respects, by (i) improperly requiring federal courts to determine whether challenged insurance practices are actuarially sound, (ii) contravening state laws that permit or require insurers to engage in risk-based pricing and underwriting; and (iii) impairing state laws and regulations that provide for state administrative review of insurance rates. The 2013 Rule's violation of the McCarran-Ferguson Act is most obvious in cases where an insurer's rates or underwriting guidelines are submitted to—and subject to review by—the states. In those instances, there can be no dispute that the 2013 Rule is inapplicable in light of McCarran-Ferguson. Indeed, had HUD actually consulted with state regulators as required by Executive Order 13132, rather than summarily and incorrectly declaring that reinstating the 2013 Rule "would not have federalism implications," 86 Fed. Reg. at 33,597, it could have reached no other conclusion but that the Rule's clash with state law will violate McCarran-Ferguson in all or nearly all cases challenging risk-based insurance practices.

### 1. Absent The Requested Exemption, The Rule Would Improperly Require Federal Courts To Determine Whether Challenged Practices Are Actuarially Sound

**App.316**

Under the McCarran-Ferguson Act, federal laws that do not specifically relate to the business of insurance cannot be interpreted or applied in a way that would effectively usurp States' primary role in regulating insurance. *See Mutual of Omaha*, 179 F.3d at 564 (McCarran-Ferguson prohibits the federal courts from "regulating the . . . insurance industry" via litigation). In *Mutual of Omaha*, the Seventh Circuit explained that applying the Americans with Disabilities Act ("ADA") to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." *Id.* The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA—"the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" (except as required by federal laws specifically relating to insurance). *Id.* Indeed, the district court in the *PCI* case observed that "*Mutual of Omaha* supports PCI's argument that the McCarran-Ferguson Act bars any claims that require courts to determine whether an insurer's practices are actuarially sound and consistent with state law." *PCI I*, 66 F. Supp. 3d at 1039; *see also id.* at 1028-29 (describing *Mutual of Omaha*). The court specifically rejected the argument previously made by HUD that the relevant language in *Mutual of Omaha* was dicta. *See id.* at 1039 n.6 ("*Mutual of Omaha* is binding on this Court.").

Applying the 2013 Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance would similarly result in federal courts second-guessing the actuarial soundness of state-regulated insurance practices. For example, to determine whether a challenged practice serves a "substantial" interest, or to evaluate a plaintiff's proffered less-discriminatory alternative, a federal court would necessarily have to examine whether using a particular risk factor was legitimate, whether a practice is actuarially sound, and which of two practices is more predictive of loss. Thus, in every case under the Rule challenging a risk-based pricing or underwriting practice, a federal court would be forced to evaluate the actuarial soundness of the challenged practice in violation of the McCarran-Ferguson Act. And in cases where plaintiffs prevail, a federal court would be called upon to enjoin the insurer's state-law-approved risk-based practice in favor of an alternative that may not be equally effective at predicting loss, which would violate state laws prohibiting inadequate rates and unfair discrimination between individuals with comparable risk profiles. *Supra* at pp. 3-4. This displacement of responsibility for insurance regulation from States to federal courts, based on a law that does not even mention insurance, is prohibited by the McCarran-Ferguson Act. *See Mutual of Omaha*, 179 F.3d at 564.

As noted, the *PCI* court found that HUD's failure to explain why it had not provided an exemption for homeowners insurance was "particularly glaring in light of the Seventh Circuit's reasoning in *Mutual of Omaha*." *PCI I*, 66 F. Supp. 3d at 1048. Despite the court's emphasis on *Mutual of Omaha*, HUD's NPRM again makes no effort to address the decision's key holding. HUD never addressed the clear holding of *Mutual of Omaha* that the *PCI* court noted and found applicable here: that the McCarran-Ferguson Act prohibits a federal court from determining whether an insurer's practices "are actuarially sound and consistent with state law." *Mutual of Omaha*, 179 F.3d at 564. And as explained, grappling with *Mutual of Omaha*'s key holding confirms that no possible explanation could justify denying the requested exemption because the 2013 Rule cannot be applied to risk-based pricing and underwriting of homeowners insurance consistent with McCarran-Ferguson.

## 2. *The Rule Would Conflict With State Laws Permitting Or Requiring Insurers To Engage In Risk-Based Pricing And Underwriting*

State insurance laws uniformly permit insurers to rely on risk factors in setting rates and making underwriting decisions. Under state insurance law, discrimination is prohibited only when it is "unfair." Unfair discrimination occurs only when insureds posing similar risks are treated differently. Differential treatment of insureds who pose different risks is uniformly allowed (and, indeed, required, as explained below). Under Wisconsin law, for example, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." WIS. STAT. ANN. § 625.11(4) (1969). As another example, Arizona law specifies:

> A rate is not unfairly discriminatory in relation to another in the same class if it reflects equitably the differences in expected losses and expenses. Rates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, if the rates reflect the differences with reasonable accuracy.

ARIZ. REV. STAT. ANN. § 20-383(D) (1980) (ameneded 1987); *see also, e.g.*, COLO. REV. STAT. ANN. § 10-4-403(1)(c) (1979) (amended 2006); MICH. COMP. LAWS ANN. § 500.2403(1)(d) (1956) (amended 1993); MINN. STAT. ANN. § 70A.04(4) (1969) (amended 1986); MO. ANN. STAT. § 379.318(4) (1972); NEV. REV. STAT. ANN. § 686B.050(4) (1971) (amended 1987); N.H. REV. STAT. ANN. § 412:15(I)(d) (2003) (amended 2021); N.M. STAT. ANN. § 59A-17-6(E) (1984) (amended 2007); N.C. GEN. STAT. ANN. § 58-40-20(e) (1977) (amended 1985); TENN. CODE ANN. § 56-5103(a), (d) (1983) (amended 1996). *See generally* Appendix I (attached).

The principle that discrimination is prohibited only if it is "unfair" is enshrined in both state insurance rating laws (like those quoted above) and state insurance unfair practices laws, which address both the pricing and provision of insurance more generally. *See* Appendix I; *see, e.g.*, IOWA CODE ANN. § 507B.4(3)(g)(2) (1955) (amended 2018) (specifying that it is an unfair trade practice to "[m]ak[e] or permit[] any unfair discrimination between insureds of the same class for essentially the same hazard in the amount of premium, policy fees, or rates charged for any policy or contract of insurance other than life or in the benefits payable thereunder, or in any of the terms or conditions of such contract, or in any other manner whatever.").

In addition, numerous states expressly permit the grouping of insureds based on projected future risk. *See, e.g.*, CONN. GEN. STAT. § 38a-803(4) (1971) (amended 1999); N.H. REV. STAT. ANN. § 412:15(I)(d) (2003) (amended 2021); VA. CODE ANN. § 38.2-1904(A)(3) (1973) (amended 2015). For example, under Indiana law,

> Risks may be grouped by classifications, by rating schedules, or by any other reasonable methods, for the establishment of rates and minimum premiums. Classification rates may be modified to produce rates for individual risks in accordance with rating plans which establish standards for measuring variations in

hazards or expense provisions, or both. Such standards may measure any difference among risks that can be demonstrated to have a probable effect upon losses or expenses.

IND. CODE ANN. § 27-1-22-3(a)(2) (1967) (amended 2011). Many other state statutes contain very similar language expressly permitting the use of risk-based pricing. *See, e.g.*, ARIZ. REV. STAT. ANN. § 20-356(4) (1990); ARK. ANN. § 23-67-209(b); COLO. REV. STAT. ANN. § 10-4-403(4) (1979) (amended 2006); DEL. CODE ANN. tit. 18 § 2503(5) (1953) (amended 2018); MD. CODE ANN. INS. § 11-205(f) (1957) (amended 1997); ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(G) (1969) (amended 2007); MINN. STAT. ANN. § 70A.05(2) (1969); NEV. REV. STAT. ANN. § 686B.060(2) (1971) (amended 2017); TEX. INS. CODE ANN. § 2251.052(c) (2005); *see generally* Appendix I.[42]

As numerous courts have recognized, these laws ensure that insurance markets operate fairly. *See, e.g.*, *Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) ("statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any . . . of the terms and conditions of the insurance.'") (quoting ALASKA STAT. §§ 21.36.090(c), 21.36.120(c)); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance.") (quoting S.D. CODIFIED LAWS § 58-33-26). And as discussed *supra* at pp. 3-4, preventing unfair discrimination in insurance means that insureds are charged commensurate with the risks they pose. *See Ins. Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. ... Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses."). And as explained *supra* at Part I.B., such accurate pricing is essential to the functioning of a market.

Moreover, the vast majority of states *require* insurers to set rates based on past losses, anticipated future losses, related loss expenses, and other neutral factors, which (taken together) form the foundation of risk-based pricing and underwriting as a mechanism for complying with state prohibitions against "unfair discrimination" and "inadequate" rates and their hedge against insurer solvency for the protection of insureds and claimants alike. *See* Appendix I; *see also PCI I*, 66 F. Supp. 3d at 1039 (noting that "some states require insurers to use risk-based pricing" and that others "merely permit risk-based pricing"). Indiana, for example, mandates that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, ... [and] to all other relevant factors, including trend factors, within and outside this state . . . ." IND. CODE ANN. § 27-1-22-3(a)(1) (1967) (amended 2011). Wisconsin similarly requires insurers to give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and outside of this

---

[42] APCIA's identification of the specific state laws at issue distinguishes this case from *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003).

state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of this state," and "all other relevant factors." Wis. Stat. Ann. § 625.12(1) (1975) (amended 2020). Numerous other state statutes contain the same or essentially the same requirements. *See, e.g.*, Ga. Code Ann. § 33-9-4(4) (1967) (amended 2008); Md. Code Ann. Ins. § 11-205(c) (1957) (amended 1997); Mass. Gen. Laws Ann. ch. 174A, § 5(3) (1947) (amended 1996); N.J. Stat. Ann. § 17:29A-4(c) (1944) (amended 1979); N.Y. Ins. Law § 2304(a) (1984) (amended 2014); Ohio Rev. Code Ann. § 3935.03(C) (1953); S.C. Code Ann. § 38-73-430(1) (1976) (amended 2004); Tenn. Code Ann. § 56-5104(1) (1983); Wash. Rev. Code Ann. § 48.19.030(3) (1947) (amended 1989); *see generally* Appendix I.

Indeed, as noted above, state insurance laws also make clear that failure to account for differences in expected losses constitutes prohibited "unfair discrimination." For example, Utah law provides that "[a] rate is unfairly discriminatory if price differentials fail to equitably reflect the differences in expected losses and expenses after allowing for practical limitations." Utah Code Ann. § 31A-19a-201(4)(a) (1985) (amended 1999); *see also, e.g.*, Ariz. Rev. Stat. Ann. § 20-383(D) (1980) (amended 1997); Colo. Rev. Stat. § 10-4-403(1)(c) (1979) (amended 2006); Mich. Comp. Laws Ann. § 500.2403(1)(d) (1956) (amended 1993); Minn. Stat. Ann. § 70A.04(4) (1969) (amended 1986); Mo. Ann. Stat. § 379.318(4) (1972); Nev. Rev. Stat. Ann. § 686B.050(4) (1971) (amended 1987); N.H. Rev. Stat. Ann. § 412:15(I)(d) (2003) (amended 2021); N.M. Stat. Ann. § 59A-17-6(E) (1984) (amended 2007); N.C. Gen. Stat. Ann. § 58-4020(e) (1977) (amended 1985); Tenn. Code Ann. § 56-5-103(a), (d) (1983) (amended 1996).

States similarly prohibit insurers from charging "inadequate rates," thereby requiring insurers to take risk into account to remain solvent. *See* Appendix I (the same state laws prohibiting unfair discrimination, and thus permitting risk discrimination, also prohibit "inadequate" rates). For example, Texas insurance law provides that "[a] rate may not be excessive, *inadequate*, unreasonable, or unfairly discriminatory for the risks to which the rate applies. Tex. Ins. Code Ann. § 2251.052 (2005) (emphasis added). A rate is "inadequate if it "is insufficient to sustain projected losses and expenses to which the rate applies" and "continued use of the rate endangers the solvency of an insurer using the rate[]." *Id.* § 2251.051(c). Other state statutes contain similar requirements. *See, e.g.,* N.Y. Ins. Law § 2303 (1984) (amended 1990) ("Rates shall not be excessive, *inadequate*, unfairly discriminatory, destructive of competition or *detrimental to the solvency of insurers*.") (emphases added); Colo. Rev. Stat. Ann. § 10-4-403 (1979) (amended 2006) ("Rates shall not be excessive, *inadequate*, or unfairly discriminatory" and "[c]oncerning inadequacy, rates are not inadequate unless clearly insufficient to sustain projected losses and expenses") (emphasis added); *see also* Appendix 1 (column 3). As explained by the Pennsylvania Superior Court:

> With or without regulation, it has always been in the public interest to have insurance premiums high enough to assure the payment of losses, and yet low enough to enable the public to secure protection upon the payment of a reasonable premium. To assure the availability of funds by insurers to pay losses, the state has long required insurance companies to be licensed, to maintain reserves and to submit to examination to determine solvency and

> compliance with the law. This has discouraged companies from
> charging 'inadequate' rates.

*Ins. Dep't v. City of Phila.*, 173 A.2d 811, 814 (Pa. 1961); *see also Engelman*, 692 A.2d at 480 (describing the prevention of inadequate insurance rates as one of the principal aims of the Maryland Insurance Code). Under the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits.[43] Yet undermining the states' efforts to guard against insurer insolvency by prohibiting inadequate rates is precisely what the 2013 Rule would do by re-interpreting the FHA to foreclose insurances practices expressly permitted or even required by state law.

In compliance with state insurance laws, insurers charge different rates to, and make different underwriting decisions about, customers who pose different risks or present different loss profiles. Despite these state-authorized differences, HUD's Disparate-Impact Rule would impose *prima facie* liability on any insurer whose rates had a disparate impact on any group defined by a FHA-protected characteristic, thus creating a conflict between the Rule and the laws of the vast majority of the states. The McCarran-Ferguson Act ensures that federal laws of general applicability do not "'invalidate, impair, or supersede' [a] State's law." *Humana*, 525 U.S. at 307. To invalidate means "to render ineffective," and to supersede is "to displace (and thus render ineffective) while providing a substitute rule." *Id.* (internal quotation marks omitted). To impair a State's law is to "hinder its operation or frustrate [a] goal of that law." *Id.* at 311 (internal quotation marks and citation omitted). Application of the 2013 Rule to insurers would "invalidate, impair, or supersede" state law and "frustrate [a] declared state policy or interfere with a State's administrative regime" by imposing *prima facie* liability on a practice that is expressly permitted or required by state law. *Id.* at 310.

HUD's rule would also interfere with insurers' compliance with state law and "hinder [the] operation" of that law by requiring insurers to defend in court their compliance with state law. *Humana*, 525 U.S. at 311; *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1349 (D.C. Cir. 1995) (regulated parties are harmed when they are subject to conflicting state and federal authorities). HUD has suggested that insurance companies could challenge particular claims of disparate impact under a burden-shifting framework in federal court. But, as explained *supra* pp. 26-27, far from being an answer to McCarran-Ferguson Act concerns, the ability of companies to defend themselves in this way only confirms that applying the 2013 Rule to risk-based pricing and underwriting of homeowners and commercial habitational insurance would run afoul of the McCarran-Ferguson Act.

---

[43] *See, e.g., In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1558 n.9 (8th Cir. 1989) (under McCarran-Ferguson Act, states have "the power to permit practices which would otherwise violate federal . . . laws."); *Dexter v. Equitable Life Assurance Soc'y of U.S.*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ. A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations).

**App.321**

### 3. *The Rule Would Conflict With State Laws And Regulations Providing For State Administrative Review Of Insurance Rates*

The overwhelming majority of states—49 of 50, plus the District of Columbia—require admitted insurers to file their rates with state insurance commissioners for review and approval. *See* Appendix I.[44] State regulators carefully review insurance rates and underwriting guidelines to ensure that the rates are based on sound risk factors and are not excessive, inadequate, or unfairly discriminatory. *E.g.*, WIS. STAT. ANN. § 625.13 (1979) (amended 1983); N.J. STAT. ANN. § 17:29A-7 (1944); IND. CODE ANN. § 27-1-22-5 (1967) (amended 2003); GA. CODE ANN. § 33-9-26 (1933) (amended 1967); KAN. STAT. ANN. § 40-955 (a), (l) (1997) (amended 2011); MD. CODE ANN., INS. § 27-501(h)(2); MICH. COMP. LAWS ANN. § 500.2119 (1956) (amended 2012); N.J. STAT. ANN. § 17:22-6.14a1 (2012); VT. STAT. ANN. tit. 8, § 4688 (1983) (amended 1989); W. VA. CODE R. § 114-74-4. For example, in California, insurance companies must submit all rate changes for approval to the Insurance Commissioner. CAL. INS. CODE § 1861.05(b) (1988) (amended 1993). Some states similarly require the filing of underwriting guidelines for a commissioner's review and inspection. *E.g.*, CONN. GEN. STAT. § 38a-689(a) (1982) (amended 2000); FLA. ADMIN. CODE ANN. r. 69O-170.013(1)(b); GA. CODE ANN. § 33-9-21(a) (1933) (amended 2020); KAN. STAT. ANN. § 40-955 (a), (l) (1997) (amended 2011); KY. REV. STAT. ANN. § 304.13-051(4) (1982) (amended 2010); ME. REV. STAT. ANN. tit. 24-A § 2938-A (1989) (amended 1995); MD. CODE ANN., INS., § 27-501(h)(2) (1997) (amended 2020); MICH. COMP. LAWS ANN. § 500.2119 (1956) (amended 2012); MO. CODE REGS. ANN. tit. 20, § 500-9.100; N.H. INS. 3306.01(a); N.J. STAT. ANN. § 17:22-6.14a1 (1971); N.M. STAT. ANN. § 59A-17-5.1 (2007); 28 TEX. ADMIN. CODE § 5.9342 (2005) (amended 2019); UTAH ADMIN. CODE R. R590-127; VT. STAT. ANN. tit. 8, § 4688 (1983) (amended 1989); W. VA. CODE R. § 114-74-4.

HUD's Disparate-Impact Rule would "interfere with a State's administrative regime" and impair, invalidate, or supersede these laws by substituting the judgment of a federal court for that of state regulators. *Humana*, 525 U.S. at 310. The laws governing rate filing provide for rate review, rate approval, and investigation of compliance with filed rates and related state laws, or some other procedure for state administrators to approve the insurance rates set in their states. If, under HUD's Rule, federal courts are empowered to reject rates reviewed and/or approved by state regulators under state laws and regulations, then these laws and regulations will be severely impaired, invalidated, or superseded by the application of the Rule. *See, e.g.*, *Saunders v. Farmers Ins. Exch.*, 537 F. 3d 961, 968 (8th Cir. 2008) (*Saunders II*) ("[T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials. If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'"). Even if no such rejection were to occur, state administrative regimes would still be undermined, because approval of a rate or underwriting guideline by a state regulator would not establish that the rate was lawful. Approved rates would still be subject to challenge under HUD's Rule, and insurers would still be required to litigate in federal court

---

[44] As previously noted, admitted insurers account for 99% of homeowners policies. *See supra* note 3. Rate filing is also generally required for small-to-mid-market commercial habitational insurance. A small percentage of the total market consists of large commercial habitational insurance able to utilize state laws exempting such risks from the ordinary rate-filing requirements and surplus line risks which are not subject to rate-filing requirements.

**App.322**

whether every component of their rating and underwriting plans and other business practices "advances a valid interest." *See* Proposed § 100.500(d)(1)(i). Such interference with the states' insurance administration regimes is not permitted under the McCarran-Ferguson Act. *Humana*, 525 U.S. at 310.

### 4. HUD Cannot Rely On Its Prior Justifications For Declining To Exempt Risk-Based Pricing And Underwriting Of Insurance

HUD previously justified denying an exemption for risk-based pricing and underwriting of insurance on the basis that certain state anti-discrimination laws might apply to insurance, and an exemption would therefore "deprive all states of federal support in addressing discriminatory insurance practices," contrary to "the purpose of [the] McCarran-Ferguson [Act]." 81 Fed. Reg. at 69,016. HUD cannot do so again to support its proposal to reinstate the 2013 Rule, as its justification is arbitrary and capricious. The McCarran-Ferguson Act is not intended to promote "federal support" for state enforcement of state antidiscrimination laws. State antidiscrimination laws are irrelevant to the McCarran-Ferguson Act analysis, which asks only whether the application of federal law would invalidate, impair, or supersede state laws enacted "for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). State antidiscrimination laws—which states may enforce themselves, if appropriate—are not enacted "for the purpose of regulating the business of insurance" and thus have no bearing on whether application of the Disparate-Impact Rule to risk-based pricing and underwriting would violate the McCarran-Ferguson Act.

Moreover, even if a state's fair-housing law were identical to the FHA and would permit a disparate-impact challenge to risk-based pricing and underwriting in state court, any federal litigation under HUD's Disparate-Impact Rule would still require federal courts applying federal law to second-guess the actuarial soundness of insurance practices regulated by state law—contrary to the express holding of *Mutual of Omaha*. *See* 179 F.3d at 564 ("Even if the formal criteria are the same under federal and state law, displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with *state* law—obviously would interfere with the administration of the state law."). HUD's previous reliance on snippets of discussion from out-of-circuit district court decisions and a state court decision, none of which addressed these issues,[45] provided no basis for disregarding the plain text of the McCarran-Ferguson Act and the Seventh Circuit's controlling decision in *Mutual of Omaha*.

Nor can HUD decline to exempt risk-based pricing and underwriting practices of homeowners and commercial habitational insurance on the grounds that the McCarran-Ferguson analysis requires a fact-based inquiry, as it has previously argued. 81 Fed. Reg. at 69,016. Under *Mutual of Omaha*, and in light of the uniform state laws permitting or requiring the use of risk factors, factual development is unnecessary to exempt risk-based pricing and underwriting. HUD relied on *Saunders I*, 440 F.3d at 946. But that court, reviewing a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, merely held that "the nature of plaintiffs' price

---

[45] *See* 81 Fed. Reg. at 69,016 (citing *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 573 n.20 (D. Conn. 2015); *Toledo Fair Hous. Ctr. v. Nationwide Mut. Ins. Co.*, 94 Ohio Misc. 2d 151, 157 (C.P. 1997); *Jones v. Travelers Cas. Ins. Co. of Am.*, No. C-13-02390, 2015 WL 5091908, at *5 (N.D. Cal. May 7, 2015)).

discrimination claims, the specific relief they [sought]," and the "extent of Missouri's insurance rate regulation" were not sufficiently clear "to decide the McCarran-Ferguson Act impairment issue." *Id.* Nowhere did the Eighth Circuit indicate that the plaintiffs had raised a disparate-impact theory of liability. When the case returned to the Eighth Circuit and it was clear that the plaintiffs were relying on a disparate-impact theory, the court noted that "HUD has never applied a disparate-impact analysis to insurers," *Saunders II*, 537 F.3d at 964 n.3 (quoting *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1362 (6th Cir. 1995)), and that there was "doubt" as to whether it could, *Saunders II*, 537 F.3d at 964. The court ultimately held that the plaintiffs' FHA challenge was foreclosed by the McCarran-Ferguson Act because it would "frustrate[] and interfere[] with" Missouri's administrative regime. *Id.* at 968. This hardly counsels against a categorical exemption for risk-based pricing and underwriting.

<p style="text-align:center">*     *     *</p>

For all of these reasons, application of the Disparate-Impact Rule to homeowners and commercial habitational insurance would "invalidate, impair, or supersede" state laws governing insurance.

## C. Applying The Disparate-Impact Rule To Risk-Based Pricing And Underwriting Of Homeowners Insurance Is Inconsistent With The Filed-Rate Doctrine

HUD also must exempt risk-based pricing of homeowners and commercial habitational insurance[46] from the Rule to avoid conflict with the filed-rate doctrine. The filed-rate doctrine "bars courts from reexamining the reasonableness of rates that have been filed with regulatory commissions." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000); *see also, e.g.*, *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424 (1986); *PCI I*, 66 F. Supp. 3d at 1049. The doctrine holds that such rates are "per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).[47]

The doctrine applies to the insurance industry and prohibits claims against insurers based on rates filed with regulatory authorities. *See, e.g., McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229, 236-39, 242 (3d Cir. 2012); *Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 835 (N.D. Ill. 2011), *aff'd sub nom. Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013); *Schermer v. State Farm Fire & Cas. Co.*, 702 N.W.2d 898, 907 (Minn. App. 2005), *aff'd*, 721 N.W.2d 307 (Minn. 2006); *In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 888-89 (N.D. Ohio 2010) (citing federal cases applying the filed-rate doctrine to insurance claims); *Milkman v. Am. Travellers Life Ins. Co.*, No. 3775, 2002 WL 778272, at *15 (Pa. Com. Pl. Apr. 1, 2002) (citing state cases applying the filed-rate doctrine to insurance claims); *Stevens v. Union Planters Corp.*, No. Civ. A. 00-cv-1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000); *see also, e.g.*, CAL. INS. CODE § 1860.1 (1947) ("No act done, action taken or agreement made pursuant to the

---

[46] The filed-rate doctrine applies to large commercial habitational insurance to the extent insurers file their rates. *See supra* pp. 3-4.

[47] The extent or the vigor of the agency's review of filed rates does not matter—the filed-rate doctrine applies whenever rates have been filed. *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 417 n.19 (1986); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000).

authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."); *MacKay v. Superior Court*, 188 Cal. App. 4th 1427 (2010) (applying § 1860.1 to bar challenge to approved car insurance rates); *McClain v. Shelter Gen. Ins. Co.*, No. 97-1139-cv-W-FJG, 2007 WL 844769, at *9-10 (W.D. Mo. Mar. 16, 2007) (noting as problematic that "[i]f the McCarran Ferguson Act were found not to apply, this Court would be forced to determine what a fair and non-discriminatory rate for the plaintiff's policies would have been.").

The district court in *PCI* found that HUD initially had failed to discuss the filed-rate doctrine, and that this failure, coupled with the failure to give adequate consideration to the insurance industry's comments regarding the McCarran-Ferguson Act, was arbitrary and capricious. *PCI I*, 66 F. Supp. 3d at 1050. The court accordingly held that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran-Ferguson comments." *Id.* As discussed *supra* at p. 11, HUD's Supplemental Explanation failed to adequately explain why the filed-rate doctrine would not bar challenges under the FHA to insurance rates filed with state agencies, as required in many states. After all, a challenge brought by an insured claiming that rates charged were higher because of the insured's race would require a court to assess the reasonableness of the rate filed with the state and, in successful challenges, invalidate it.

In the NPRM, HUD has again failed to address the filed-rate doctrine. But no amount of reasoned explanation could justify a failure to exempt risk-based pricing and underwriting of homeowners and commercial habitational insurance from the Rule, which would violate the filed-rate doctrine by allowing private lawsuits and federal government enforcement actions that question the permissibility of a filed rate. *See, e.g.*, *Square D*, 476 U.S. at 417; *Wegoland*, 27 F.3d at 19; *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (en banc) ("Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate.") (internal quotation marks omitted).

D.     **The Costs Of Subjecting Homeowners And Commercial Habitational Insurance To Disparate-Impact Liability Under The Burden-Shifting Framework Outweigh The Benefits, Warranting An Exemption**

In addition to the legal grounds for exempting homeowners and commercial habitational insurance from the Disparate-Impact Rule noted above,[48] the costs of subjecting the industry to case-by-case adjudication outweigh the benefits of doing so, warranting an exemption.

Requiring insurers using risk-based pricing or underwriting to needlessly defend themselves under the burden-shifting framework in every case would impose significant and wholly unjustified expenses on insurers and their customers, making insurance less affordable

---

[48] Each of the arguments discussed *supra* provide an independent justification for why the Disparate Impact Rule cannot and should not be applied to homeowners and commercial habitational insurance. Nevertheless, HUD has previously maintained that "creating exemptions beyond those found in the Act would run contrary to Congressional intent." 78 Fed. Reg. at 11,475. HUD has never explained how compliance with a federal statute or longstanding limitations articulated by the Supreme Court would be contrary to congressional intent.

for all. Under HUD's approach, in many cases insurers would have to defend each of the risk factors they use, perhaps even on a region-by-region basis, as different plaintiffs assert alleged disparate impacts among particular populations of insureds. HUD's response to this concern raised previously was that an exemption for risk-based insurance pricing would not reduce insurers' costs because "[t]he arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification." 81 Fed. Reg. at 69,017. HUD provided no basis, however, for its counterintuitive assumption that it would cost as much to demonstrate eligibility for an exemption for risk-based pricing and underwriting as it would to litigate the actuarial soundness of a challenged practice on a case-by-case basis in multiple jurisdictions at different points in time.

HUD also previously supported its assertion that it could not grant an exemption by citing to *Graoch*. But HUD ignored the *Graoch* court's finding that "categorical bars *are justified*" when the "plaintiff has no chance of success" in any case. 508 F.3d at 376 (emphasis added). Indeed, the *Graoch* court identified homeowners insurance as an example of when application of the Disparate-Impact Rule is never appropriate. *Id.* at 375. The district court in the *PCI* case recognized that case law HUD itself previously relied upon makes clear that there is no need to "engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success." *PCI I*, 66 F. Supp. 3d at 1051 (quoting *Graoch*, 508 F.3d at 375-76).

Moreover, the Rule would require insurers to establish not merely that a practice is purely risk-based; it would also require insurers to litigate the third step of the burden-shifting approach, disputing that less discriminatory alternatives exist. This would be especially difficult for insurers because—as noted above, *see supra* pp. 3-4—they do not collect data on subscribers' race, ethnicity, or other FHA-protected characteristics and have no other means of anticipating disparities. And assuming they could collect the necessary data to defend themselves, it would introduce race or ethnicity as a pervasive factor, which the Court in *Inclusive Communities* warned against, and intrude upon policyholders who would be required to self-report race and ethnicity data. *PCI v. Carson*, No. 13-cv-8564 (N.D. Ill. May 16, 2014), ECF No. 44-2 ¶¶ 11–12; *id.* ECF No. 44-3 ¶ 14.

It is not enough to assert, as HUD has previously done, that the costs of case-by-case litigation outweigh the supposed benefits without evaluating how often plaintiffs would likely prevail on challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance. Indeed, given the precise mathematical, statistical, and economic analysis required to accurately price and underwrite insurance, *supra* pp. 3-4, plaintiffs challenging homeowners insurers' practices under the Rule likely would *not* be able to identify alternative less-discriminatory risk-based practices that will nevertheless allow the insurer to pursue its valid interest—that is, charging premiums that accurately reflect their costs of covering particular classes of risk for similarly situated customers.[49] Under these circumstances, APCIA's requested exemption is warranted.

---

[49] Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421.

IV. **IF HUD DOES NOT GRANT AN EXEMPTION, IT SHOULD MODIFY AND CLARIFY THE RULE TO ADDRESS ISSUES UNIQUE TO RISK-BASED INSURANCE PRICING AND UNDERWRITING AND TO MORE CLOSELY CONFORM TO *INCLUSIVE COMMUNITIES***

If it does not grant an exemption, HUD should incorporate a number of additional safeguards and clarifications to account for the unique aspects of risk-based insurance practices and to conform with *Inclusive Communities*.

A. **HUD Has Previously Recognized The Necessity Of Additional Safeguards And Clarifications To The Rule**

As an initial matter, HUD has *already* recognized the need to conform the 2013 Rule "to the Supreme Court's 2015 ruling in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.* and to provide clarification regarding the application of the standard to State laws governing the business of insurance." 85 Fed. Reg. at 60,288. Specifically, in the 46-page Final Rule published on September 24, 2020, HUD thoroughly explained the policy and legal justifications for adopting several changes to the 2013 Rule, including the Supreme Court's requirements in *Inclusive Communities* that plaintiffs must plead sufficient facts demonstrating that "the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law" and a "robust causal link between the challenged policy or practice and the adverse effect on members of a protected class[.]" *Id.* at 60,332. And, as described below, HUD both addressed the burdens of proof in discriminatory-effect cases and established several defenses to conform the Rule to governing caselaw and best practices. In sum, HUD agreed with the many "comments in support of [the 2020 Rule]," and "agree[d] that it will bring clarity to litigants and further the Fair Housing Act's purpose. HUD also agree[d] that [the 2020 Rule] will benefit banks and landlords, while ensuring that disparate impact cases can continue consistent with Supreme Court precedent. . . . Lastly, HUD agree[d] with the comments that supported the change to § 100.5 and § 100.500(e) dealing with insurance." *Id.* at 60,292.

Now, citing an injunction from the United States District Court for the District of Massachusetts, HUD has proposed reversing course entirely—dismissing its one-year-old reasoning in full, and disregarding the several considered protections articulated and commended in the 2020 Rule. But the district court's injunction provides no basis for a total reversal of course. Rather, the district court—at a "very preliminary stage"—cited three specific provisions in the 2020 Rule that it held warranted an injunction, namely: the (i) "outcome prediction" defense; (ii) the requirement that a plaintiff's proffered less discriminatory alternative policy must serve the defendant's interests in an "*equally effective manner without imposing materially greater costs*" or otherwise "creating *other material burdens for*" the defendants; and (iii) an unidentified conflation of the plaintiff's prima facie burden and pleading burden. *MFHC*, 496 F. Supp. 3d at 610-611 (citations and quotation marks omitted). The district court did not cite any other flaw with the 2020 Rule, and in fact condoned the 2020 Rule's requirement that plaintiffs plead, at the outset, that a challenged policy is "arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective." *Id.* at 610 (quoting 24 C.F.R. § 100.500(b)(1)).

Accordingly, the district court's limited ruling does not justify wholesale rejection of HUD's prior reasoning in support of the 2020 Rule, especially with respect to the 2020 Rule's specific accommodations to the unique business of insurance. HUD's reversal of course with respect to those portions of the 2020 Rule not addressed by the district court amounts to an "unexplained inconsistency" in agency policy that alone is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2120 (2016). If HUD does not grant the exemptions explained *supra* Part III, APCIA respectfully suggests that HUD retain those portions of the 2020 Rule left untouched by the district court's injunction, including without limitation: (1) the 2020 Rule's specific pleading standards, *see* 24 C.F.R. § 100.500(b); (2) the 2020 Rule's third-party requirement defenses, *see* 24 C.F.R. § 100.500(d)(1) and (d)(2)(iii); (3) the 2020 Rule's provision relating to the state laws governing insurance, *see* 24 C.F.R. § 100.500(e); (4) the 2020 Rule's clarifications regarding the allocation of burdens of proof, *see* 24 C.F.R. § 100.500(c); and (5) the 2020 Rule's limitation of remedies available in disparate impact litigation, *see* 24 C.F.R. § 100.500(f). APCIA further urges HUD to adopt additional safeguards to the 2020 Rule's regulatory scheme as identified below, including a defense particular to risk-based pricing and underwriting.

**B.  HUD Should Retain And Expand The 2020 Rule's Specific Pleading Standards**

The 2020 Rule established that a plaintiff challenging an allegedly discriminatory policy or practice must sufficiently plead facts demonstrating: "(1) [t]hat the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law; (2) [t]hat the challenged policy or practice has a disproportionately adverse effect on members of a protected class; (3) [t]hat there is a robust causal link between the challenged policy or practice and the adverse effect on members of a protected class, meaning that the specific policy or practice is the direct cause of the discriminatory effect; (4) [t]hat the alleged disparity caused by the policy or practice is significant; and (5) [t]hat there is a direct relation between the injury asserted and the injurious conduct alleged." 24 C.F.R. § 100.500(b). As HUD explained in promulgating the 2020 Rule, these standards provide "greater clarity, in the wake of *Inclusive Communities*, regarding the requirements for bringing and defending against disparate impact claims," and further "clarify what evidence is needed in order to successfully challenge a policy or practice, which HUD believes will lead to a greater percentage of successful disparate impact claims while reducing the number of claims that are not appropriate under the disparate impact theory." 85 Fed. Reg. at 60,297. And as the district court explained when enjoining the 2020 Rule, the "arbitrary, artificial, and unnecessary" language incorporated into these standards "comes directly from *Inclusive Communities*, 576 U.S. at 540, 543, 544," *MFHC*, 496 F. Supp. 3d at 610, and other case law, *e.g.*, *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1112 (8th Cir. 2017) ("[Plantiffs] must still allege facts plausibly demonstrating that [the challenged policies] are arbitrary and unnecessary under the FHA.").

These pleading standards are as appropriate today as they were in 2020. They would provide courts and litigants alike with both the clarity and the protections demanded by *Inclusive Communities*—which specifically requires that plaintiffs make out a "prima facie case of disparate impact" and satisfy new "cautionary standards," including an initial showing of "robust

causality" lest a mere "statistical disparity" threaten respondents with costly litigation and compel their use of potentially unconstitutional "numerical quotas" or other explicit and suspect considerations of race. 575 U.S. at 542. Once again, HUD's own reasoning applies; HUD specifically recognized that *Inclusive Communities* "placed special emphasis on the importance of the plaintiff's prima facie burden," 84 Fed. Reg. at 42,855, including the "arbitrary, artificial, and unnecessary," and "robust causality" prime facie elements codified in the 2020 Rule, *id.* at 42,858-42,859. And HUD has already found that these standards provide "greater clarity" to plaintiffs, 86 Fed. Reg. at 33,594, contrary to the NPRM's wholly inconsistent *ipse dixit* that, somehow, the 2013 Rule "provides greater clarity" despite articulating *fewer* pleading standards.

APCIA reiterates that requiring plaintiffs to specifically plead a robust causal link between a challenged practice and a disparate impact to satisfy the standard mandated by *Inclusive Communities* is particularly important in suits involving insurance. That is so because there is often only a remote connection between the specific practices of homeowners and commercial habitational insurers and the housing opportunities and decisions of allegedly FHA-protected class members. *Supra* at pp. 3-4. In situations like that, it may be difficult, if not impossible, to meet the robust causation standard the *Inclusive Communities* Court held was necessary to ensure that disparate-impact liability does not raise constitutional concerns. *See* 576 U.S. at 543 (explaining that a plaintiff challenging the decision of a private developer to construct a new building in a particular location may not be able to show causation "because of the multiple factors that go into investment decisions about where to construct or renovate housing units"). The Court has also made clear that mere statistical disparities or correlation is insufficient to show that a challenged policy or practice was the cause of an existing disparate impact. *Id.* at 542. HUD should ensure that these concerns are reflected in any reinstatement of the 2013 Rule, by clarifying that the Rule does not reach practices with a mere "predicted" disparate impact but only ones that have occurred, that the causation analysis must consider whether a practice is too remote to give rise to liability, and that more than statistical correlation is required to establish causation.

## C.     HUD Should Retain And Expand The 2020 Rule's Third-Party Defense

The 2020 Rule permitted defendants to defeat a disparate-impact claim by "showing that the defendant's policy or practice was reasonably necessary to comply with a third-party requirement, such as a: (i) Federal, state, or local law; (ii) Binding or controlling court, arbitral, administrative order or opinion; or (iii) Binding or controlling regulatory, administrative or government guidance or requirement." 24 C.F.R. § 100.500(d)(1). HUD promulgated this defense to comply with the fact that *Inclusive Communities* "favorably cit[ed] the lower court's concurring opinion that included as an element of a plaintiff's prima facie case a demonstration that the defendant's policy or practice is not a result of a law that substantially limits the defendant's discretion. If the defendant's discretion is limited in such a way, the Supreme Court identified this as a lack of causal connection between the policy or practice and the disparate impact, and therefore the case should be dismissed." 85 Fed. Reg. at 60,316. Indeed, *Inclusive Communities* left no doubt as to this conclusion, explicitly stating that the plaintiff "cannot show a causal connection between the Department's policy and a disparate impact" if "federal law substantially limited the Department's discretion." 576 U.S. at 543.

**App.329**

Yet, HUD now claims—against this reality—that "nothing in *Inclusive Communities* suggests this defense is required, let alone reasonable, for HUD to create." 86 Fed. Reg. at 33,595. That position cannot be squared with the text of *Inclusive Communities* nor with HUD's prior reasoning. HUD also now claims that the third-party defense is "inconsistent with the Act, which specifies that state and local laws requiring or permitting discriminatory housing practices are invalid." *Id.* But HUD already considered, and rejected, this position, reasonably stating that "in the event that unlawful discriminatory practices are mandated by statute or court order, the most effective way to eliminate the unlawful discrimination is to remove or modify the underlying statute or order that mandated the unlawful discrimination. That also allows for a single legal proceeding to affect multiple actors, rather than requiring many lawsuits for all the entities affected by the statute or court order." 85 Fed. Reg. at 60,317. And this makes sense: no party should be held liable for actions compelled by law. Indeed, it was for this very reason that HUD introduced this defense in the first place, to avoid placing parties in a "'double bind of liability,' where they could be subject to suit under disparate impact for actions required for good faith compliance with another law." 84 Fed. Reg. at 42,860. HUD has offered no reason to depart from this considered approach in the 2020 Rule.

Not only should HUD retain the 2020 Rule's third-party defense, it should specifically clarify that the defense applies where state insurance law *permits* the challenged practice. As originally promulgated, the defense applies only if a "defendant shows that its discretion is materially limited by a third party such as through … [a] Federal, state, or local law." 84 Fed. Reg. at 42,854 (proposed 24 C.F.R. § 100.500(c)(1)(i)). A defendant's discretion to act is plainly limited where state law compels the defendant to engage in the challenged practice. In some cases, however, state law merely *permits* the challenged practice without compelling it. Where the state law at issue is a state insurance regulation, such permission ought to be sufficient given the limitations imposed by the McCarran-Ferguson Act.

As explained above, it is well established that, in light of the McCarran-Ferguson Act, a federal law must not be interpreted as prohibiting practices that state insurance law permits. *See, e.g.*, *In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1557 n.9 (8th Cir. 1989) (McCarran-Ferguson Act, states have "the power to permit practices which would otherwise violate federal … laws."); *Dexter Dexter v. Equitable Life Assurance Soc'y of U.S.*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ. A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (Telephone Consumer Protection Act of 1991 must be interpreted to avoid conflict with Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations). The mere fact that state law permits a practice might not, in most circumstances, preclude federal regulation of the practice. But insurance is different because of McCarran-Ferguson. Where a defendant can show that the practice challenged is permitted by state insurance law, it should be able to invoke a defense set forth in the Disparate-Impact Rule.

**D.      HUD Should Retain The 2020 Rule's Provision Relating To The State Laws Governing Insurance**

The 2020 Rule permitted defendants to defeat a disparate-impact claim by "showing that the defendant's policy or practice was reasonably necessary to comply with a third-party requirement, such as a: (i) [f]ederal, state, or local law; (ii) [b]inding or controlling court, arbitral, administrative order or opinion; or (iii) [b]inding or controlling regulatory, administrative or government guidance or requirement." 24 C.F.R. § 100.500(e). HUD's proposal in the NPRM to erase that provision is unexplained and troubling, as the provision reiterates well-settled principles of law under the McCarran-Ferguson Act—as HUD itself previously explained. 84 Fed. Reg. at 42,860 ("business of insurance" works to "codif[y] the general applicability of the 'reverse preemption' provisions of the McCarran-Ferguson Act as it applies to the Fair Housing Act."). HUD's proposal to delete the provision implies an intention to improperly test the boundaries of HUD's ability to preempt state regulation of insurance. HUD should clarify that the Disparate-Impact Rule should not be construed by courts to modify or limit in any manner the McCarran-Ferguson Act's prohibition of federal laws impairing state insurance regulatory schemes, especially in light of the potential false inference plaintiffs or HUD may suggest by HUD's deletion of this provision.

**E.      HUD Should Retain And Expand The 2020 Rule's Guidance With Respect To Burdens Of Proof**

The 2020 Rule helpfully clarified the pleading and post-pleading burdens of proof in discriminatory impact cases—specifically, that defendants at step two bear a burden of production, not of proof. 24 C.F.R. § 100.500. Any reinstatement of the 2013 Rule should maintain that clarification. As HUD explained, the 2020 Rule's burden-shifting approach is "similar to the 2013 Rule's burden shifting approach, but provides more detail and clarity following the Supreme Court's decision in *Inclusive Communities*. The 2013 Rule inappropriately required the defendant to prove that the challenged practice was necessary to achieve a substantial, legitimate, nondiscriminatory interest." 85 Fed. Reg. at 60,320. Thus the 2020 Rule made clear that the burden of proving a disparate-impact case remains always where it should: with the plaintiff. Again, HUD explained this reasoning in full, noting that requiring only a burden of production at step two is consistent with the business necessity standard in Title VII caselaw—an analogy specifically endorsed by *Inclusive Communities*, 576 U.S. at 541—and that production "is a more logical burden for the defendant because the defendant may effectuate a defense by challenging other elements of the plaintiff's case, without reaching the issue of a valid interest." 85 Fed. Reg. at 60,320. Or, stated succinctly: "It is ultimately the plaintiff's burden to prove a case, and the plaintiff must do so by rebutting any evidence produced by the defendant." *Id.*

Additionally, HUD should make clear as it did in 2020 that, at the third step of the burden-shifting test, a plaintiff must prove their alternative policy would serve a defendant's interests in "an equally effective manner." 85 Fed. Reg. at 60,333. That requirement is compelled not only by *Inclusive Communities* but by longstanding Supreme Court interpretation of the requirements of the burden-shifting test in anti-discrimination litigation. In its notice of proposed rulemaking for the 2020 Rule, HUD noted that the requirement that a plaintiff's

alternative be "equally effective" in achieving a valid interest derived from "existing disparate-impact caselaw." 84 Fed. Reg. at 42,860 (citing *Wards Cove*, 490 U.S. at 661).

HUD has cited no reason to depart from this reasoning, nor does *Inclusive Communities* permit it to do so—as it specifically requires that defendants be given "leeway to state and explain" their policies, not prove them to avoid liability, and requires that a plaintiff's alternative be "equally effective" at achieving a valid interest. 576 U.S. at 541. Nor does the district court's recent injunction justify leaving these important safeguards out of the Rule. The court cast doubt on this requirement because it was not aware of the requirement being articulated in "any judicial decision." *MFHC*, 496 F. Supp 3d. at 610. But as noted, this requirement has been a critical component of the third step of the burden-shifting framework since articulated in *Wards Cove*.

Accordingly, consistent with *Inclusive Communities* and prior Supreme Court caselaw, HUD should clarify that the plaintiff always carries the burden of establishing that the challenged policy or practice is based on arbitrary, artificial, and unnecessary barriers, even if the plaintiff has alleged sufficient plausible facts to survive a motion to dismiss at the pleading stage.

### F.     HUD Should Retain The 2020 Rule's Remedies Provision

The 2020 Rule clarified that in discriminatory-effects cases, "remedies should be concentrated on eliminating or reforming the discriminatory practice so as to eliminate disparities between persons in a particular protected class and other persons," and that HUD itself would seek only equitable remedies in administrative proceedings except in certain circumstances. 24 C.F.R. § 100.500(f). The 2020 Rule therefore restated the Supreme Court's explicit guidance in *Inclusive Communities* that, "even when courts do find liability under a disparate-impact theory, their remedial orders must be consistent with the Constitution. Remedial orders in disparate-impact cases should concentrate on the elimination of the offending practice." 576 U.S. at 544.

HUD has now proposed reversing course on this point as well, contradicting the clear language in *Inclusive Communities* and going so far as to say that "no part of *Inclusive Communities*" supported the 2020 Rule's remedies provision. 86 Fed. Reg. at 33,595. HUD also cites the fact that the Act provides "for a wide variety of remedies, including injunctive relief, actual damages, punitive damages, and civil penalties." *Id.* But this is a red herring; as HUD explained in promulgating the 2020 Rule, HUD did not, "and could not, make changes to the availability of punitive damages as a potential remedy in civil actions or civil money penalties in administrative proceedings." 85 Fed. Reg. at 60,303. Nor does APCIA suggest that HUD modify the remedies provided for in the Act. Rather, HUD should retain language in the 2020 Rule that codified the Supreme Court's explicit guidance in *Inclusive Communities* and committed to HUD's correct and necessary "understanding that relief in disparate impact cases should be focused on equitable remedies, such as eliminating or reforming a discriminatory practice, rather than monetary punishment, unless circumstances out of the ordinary warrant such." 85 Fed. Reg. at 60,304.

### G. HUD Should Codify A Defense For Risk-Based Pricing And Underwriting

In addition to retaining and expanding several portions of the 2020 Rule identified above, HUD should promulgate a defense that accounts for the unique concerns of the homeowners insurance industry. Specifically, for the reasons set forth above that support creation of a full exemption for risk-based pricing and underwriting, HUD should create a substantive defense for risk-based pricing and underwriting. If a defendant shows that it relied on risk-based pricing and underwriting, that should be a complete defense at Step 2 of the burden-shifting framework. The plaintiff should not have an opportunity to rebut the defense at Step 3.

As explained *supra* at pp. 26-34, allowing a plaintiff to litigate whether some other alternative risk factor would be less discriminatory but still "serve" the defendant's "interests"— albeit not in a manner that is equally effective at predicting loss—would impermissibly require federal courts to adjudicate the actuarial soundness of challenged insurance practices and even override state-law-approved risk-based practices. But that is precisely what the Seventh Circuit in *Mutual of Omaha* indicated a federal court cannot do in light of the McCarran-Ferguson Act. *See* 179 F.3d at 564. The court observed that if insurers were required to litigate whether their practices were "actuarially sound and in accordance with state law," then federal courts would "find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do." *Id.*

A defendant seeking to invoke the defense would need to establish that it applies. The defense would be inapplicable if the defendant were not in fact engaging in risk-based pricing and underwriting. If, for example, an insurer determined rates based in part on a factor considered not for its predictive value, but for its ability to exclude members of a FHA-protected class, the defense would be unavailing. The defense would apply only to efforts to engage in risk-based pricing and underwriting. As noted at the outset, nothing in the Rule would be deemed to exempt an insurer from claims of disparate treatment, in the event such insurer did in fact consider a FHA-protected characteristic in the sale, rental, or financing of dwellings or in other housing-related activities subject to the FHA.

### V. AT A MINIMUM, HUD SHOULD MAKE CLEAR IN THE FINAL RULE THAT DISPARATE-IMPACT CHALLENGES ARE INCONSISTENT WITH RISK-BASED PRICING AND UNDERWRITING

As explained above, we believe HUD should grant a broad exemption from disparate-impact liability for risk-based pricing and underwriting of homeowners and commercial habitational insurance. Alternatively, HUD should incorporate a defense for risk-based pricing and underwriting. If HUD does not take either step, however, it should at a minimum make clear in the preamble to the final rule that (1) disparate-impact challenges to risk-based pricing and underwriting cannot succeed, and (2) HUD will not bring such challenges.

### A. HUD Should Acknowledge Key Aspects Of Insurers' Defenses

In light of the significant limitations on disparate-impact liability mandated by the Supreme Court in *Inclusive Communities*, as well as the restraints imposed by the McCarran-Ferguson Act, disparate-impact challenges to risk-based pricing of homeowners and commercial

habitational insurance cannot succeed. HUD should acknowledge the numerous barriers to such claims in the preamble to any final rule to avoid spawning unnecessary litigation. Specifically, HUD should acknowledge the following:

- Risk-based pricing and underwriting are not "arbitrary, artificial, and unnecessary" practices, *Inclusive Communities*, 576 U.S. at 540, but instead advance "substantial, legitimate, nondiscriminatory interests." *Id.* at 527. Risk-based pricing and underwriting are critical to the appropriate provision of insurance, to accuracy in pricing, and to maintaining solvency because both are driven by expected losses and related expenses and neither relies on factors that are substitutes protected classes.

- For the reasons explained above, disparate-impact challenges to risk-based pricing and underwriting cannot satisfy the "robust causal link" and "direct cause" requirement of the NPRM. Using legitimate risk factors does not *cause* a disparate impact; any impact is caused by socioeconomic factors outside the control of insurers.

- Disparate-impact challenges to risk-based pricing and underwriting would improperly inject racial considerations into the business of insurance, requiring insurers to collect and analyze data on FHA-protected characteristics.

- State insurance regulations materially limit insurers' discretion to depart from risk-based pricing and underwriting, and insurers should not be held liable for complying with applicable state laws and regulations.

For all of the reasons noted above, disparate-impact challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance cannot succeed on the merits. HUD should acknowledge these barriers expressly in any final rule. Doing so will make clear to litigants that the requirements laid out in *Inclusive Communities* and related caselaw apply to these kinds of challenges and generally will foreclose them. This will bring added clarity and certainty to an area of the law that has already been unsettled by HUD's original 2013 adoption of the Disparate-Impact Rule and its sudden reversal of course in promulgating, and then rescinding, the 2020 Rule.

> **B.     HUD Should Also Commit Not To Bring Disparate-Impact Challenges To Risk-Based Pricing And Underwriting Of Homeowners And Commercial Habitational Insurance**

The FHA may be enforced by private parties, *see* 42 U.S.C. § 3613, or by HUD and the Attorney General, *see id.* §§ 3610, 3611, 3614. Government enforcement can move forward in administrative proceedings or federal court. *See id.* §§ 3612, 3614. For all of the reasons stated in these comments, HUD should commit not to institute disparate-impact challenges to risk-based pricing and underwriting of homeowners and commercial habitational insurance. Such claims will fail as a matter of law, and given the significant legal hurdles, are not an efficient use of HUD's resources.

Thus, regardless of whether HUD adopts an exemption or defense for risk-based pricing and underwriting of homeowners and commercial habitational insurance, it should commit in the final rule not to pursue disparate-impact challenges to those practices.

# APPENDIX I

**State Insurance Laws**

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Alabama | ALA. CODE § 27-13-27 | ALA. CODE § 27-13-27 | ALA. CODE § 27-13-3; ALA. CODE § 27-13-30 |
| Alaska | ALASKA STAT. § 21.39.030(a)(2) | ALASKA STAT. § 21.39.030(a)(1), (4); ALASKA STAT. § 21.36.090(c) | ALASKA STAT. § 21.39.040 |
| Arizona | ARIZ. REV. STAT. ANN. § 20-356(2); ARIZ. REV. STAT. ANN. § 20-383(D); ARIZ. REV. STAT. ANN. § 20-384(B) | ARIZ. REV. STAT. ANN. § 20-356(1), (4); ARIZ. REV. STAT. ANN. § 20-383(D); ARIZ. REV. STAT. ANN. § 20-384(C); ARIZ. REV. STAT. ANN. § 20-448(C) | ARIZ. REV. STAT. ANN. § 20-357 |
| Arkansas | ARK. CODE ANN. § 23-67-208(d); ARK. CODE ANN. § 23-67-209(a) | ARK. CODE ANN. § 23-67-208(d); ARK. CODE ANN. § 23-67-209(b); ARK. CODE ANN. § 23-67-210 | ARK. CODE ANN. § 23-67-211(a) |
| California | | CAL. INS. CODE § 1861.05(b) | CAL. INS. CODE § 1861.05(b)-(d); *see also* CAL. INS. CODE § 1860.1 |
| Colorado | COLO. REV. STAT. ANN. § 10-4-403(1)(c), (2) | COLO. REV. STAT. ANN. § 10-4-403(1)(c), (4); COLO. REV. STAT. ANN. § 10-3-1104(1)(f)(II) | COLO. REV. STAT. ANN. § 10-4-404; COLO. REV. STAT. ANN. § 10-4-406 |
| Connecticut | | CONN. GEN. STAT. § 38a-803(4) | CONN. GEN. STAT. § 38a-688; CONN. GEN. STAT. § 38a-663(9)-(10). |

**App.336**

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Delaware | DEL. CODE ANN. tit. 18, § 2503(a)(3) | DEL. CODE ANN. tit. 18, § 2503(a)(2), (a)(5); DEL. CODE ANN. tit. 18, § 2503(b); DEL. CODE ANN. tit. 18, § 2504(c) | DEL. CODE ANN. tit. 18, § 2504 |
| District of Columbia | D.C. CODE § 31-2703(b) | D.C. CODE § 31-2703(a), (c); D.C. CODE § 31-2231.13(c), (d) | D.C. CODE § 31-2704 |
| Florida | FLA. STAT. § 627.062(2)(e)(6) | FLA. STAT. § 627.062(1), (2)(e)(6) | FLA. STAT. § 627.062; FLA. STAT. § 627.0645 |
| Georgia | GA. CODE ANN. § 33-9-4(4) | GA. CODE ANN. § 33-9-4(1), (7) | GA. CODE ANN. § 33-9-21, GA. CODE ANN. § 33-9-9; GA. CODE ANN. § 33-9-26 |
| Hawaii | HAW. REV. STAT § 431:14-103(a)(2) | HAW. REV. STAT. § 431:14-103(a)(1), (5); HAW. REV. STAT. § 431:13-103(a)(7)(B) | HAW. REV. STAT. § 431:14-104(a); HAW. REV. STAT. § 431:14-106(a) |
| Idaho | IDAHO CODE ANN. § 41-1437(1) | IDAHO CODE ANN. § 41-1405(1); IDAHO CODE ANN. § 41-1437(3) | |
| Illinois | 215 ILL. COMP. STAT. ANN. 5/456(1) | 215 ILL. COMP. STAT. ANN. 5/456(1)(d); 215 ILL. COMP. STAT. ANN. 5/424(3) | 215 ILL. COMP. STAT. ANN. 5/457 |
| Indiana | IND. CODE ANN. § 27-1-22-3(a)(1) | IND. CODE ANN. § 27-1-22-3(a)(2), (a)(4); IND. CODE ANN. § 27-4-1-4(a)(7) | IND. CODE ANN. § 27-1-22-4(a); IND. CODE ANN. § 27-1-22-5(a) |
| Iowa | | IOWA CODE ANN. § 515F.4; IOWA CODE ANN. § 507B.4(3)(g) | IOWA CODE ANN. § 515F.5 |
| Kansas | KAN. STAT. ANN. § 40-953; KAN. STAT. ANN. § 40-954(a) | KAN. STAT. ANN. § 40-953; KAN. STAT. ANN. § 40-954(c) | KAN. STAT. ANN. § 40-955 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Kentucky | KY. REV. STAT. ANN. § 304.13-031(1)(c) | KY. REV. STAT. ANN. § 304.13-031(1)(b); KY. REV. STAT. ANN. § 304.13-031(1)(e); KY. REV. STAT. ANN. § 304.12-080(1) | KY. REV. STAT. ANN. § 304.13-051 |
| Louisiana | LA. REV. STAT. ANN. § 22:1454(B)(1) | LA. REV. STAT. ANN. § 22:1454(A), (B)(2); LA. REV. STAT. ANN. § 22:1964(7)(c); LA. REV. STAT. ANN. § 22:34 | LA. REV. STAT. ANN. § 22:1451; LA. REV. STAT. ANN. § 22:1464 |
| Maine | ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(C) | ME. REV. STAT. ANN. tit. 24-A, § 2303(1)(B), (G); ME. REV. STAT. ANN. tit. 24-A, § 2162(2) | ME. REV. STAT. ANN. tit. 24-A § 2304-A |
| Maryland | MD. CODE ANN., INS. § 11-205(c) | MD. CODE ANN., INS. § 11-205(d), (f); MD. CODE ANN., INS. § 27-212(e)(1) | MD. CODE ANN., INS. § 11-206 |
| Massachusetts | MASS. GEN. LAWS ANN. ch. 174A, § 5(a)(3); MASS. GEN. LAWS ANN. ch. 175A, § 5(a)(1) | MASS. GEN. LAWS ANN. ch. 174A, § 5(a)(2); MASS. GEN. LAWS ANN. ch. 175A, § 5(a)(3), (4) | MASS. GEN. LAWS ANN. ch. 174A, § 6; MASS. GEN. LAWS ANN. ch. 175A, § 6 |
| Michigan | MICH. COMP. LAWS ANN. § 500.2110(1); MICH. COMP. LAWS ANN. § 500.2403(1)(a), (d) | MICH. COMP. LAWS ANN. § 500.2110(3); MICH. COMP. LAWS ANN. § 500.2110a; MICH. COMP. LAWS ANN. § 500.2403(1)(c), (d) | MICH. COMP. LAWS ANN. § 500.2406; MICH. COMP. LAWS ANN. § 500.2408 |
| Minnesota | MINN. STAT. ANN. § 70A.04(4); MINN. STAT. ANN. § 70A.05(1) | MINN. STAT. ANN. § 70A.04(1), (4); MINN. STAT. ANN. § 70A.05(2) | MINN. STAT. ANN. § 70A.06 |
| Mississippi | MISS. CODE. ANN. § 83-2-3(1)(d), (2)(a) | MISS. CODE. ANN. § 83-2-3(1)(a), (d), (2)(b) | MISS. CODE. ANN. § 83-2-7 |
| Missouri | MO. ANN. STAT. § 379.318(1), (4) | MO. ANN. STAT. § 379.318(2), (4) | MO. ANN. STAT. § 379.321 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Montana | MONT. CODE ANN. § 33-16-201(2)(a) | MONT. CODE ANN. § 33-16-201(1)(a), (4); MONT. CODE ANN. § 33-18-210 | MONT. CODE ANN. § 33-16-203 |
| Nebraska | | NEB. REV. ST. § 44-7510(3) | NEB. REV. ST. § 44-7508 |
| Nevada | NEV. REV. STAT. ANN. § 686B.060(1); NEV. REV. STAT. ANN. § 686B.050(4) | NEV. REV. STAT. ANN. § 686B.050(1), (4); NEV. REV. STAT. ANN. § 686B.060(2); NEV. REV. STAT. ANN. § 686a-130(5) | NEV. REV. STAT. ANN. § 686B.070; NEV. REV. STAT. ANN. § 686B.090; NEV. REV. STAT. ANN. § 686B.110 |
| New Hampshire | N.H. REV. STAT. ANN. § 412:15(I)(d), (II)(a) | N.H. REV. STAT. ANN. § 412:15(I)(d); N.H. REV. STAT. ANN. § 412:15(II)(b) | N.H. REV. STAT. ANN. § 412:16 |
| New Jersey | N.J. STAT. ANN. § 17:29A-4(c); N.J. STAT. ANN. § 17:29A-7; N.J. STAT. ANN. § 17:29A-11 | N.J. STAT. ANN. § 17:29A-4; N.J. STAT. ANN. § 17:29A-7 | N.J. STAT. ANN. § 17:29A-6; N.J. STAT. ANN. § 17:29A-7 |
| New Mexico | N.M. STAT. ANN. § 59A-17-6(E); N.M. STAT. ANN. § 59A-17-7(A) | N.M. STAT. ANN. § 59A-17-6(A), (E); N.M. STAT. ANN. § 59A-17-7(B); N.M. STAT. ANN. § 59A-16-17(D) | N.M. STAT. ANN. § 59A-17-9 |
| New York | N.Y. INS. LAW § 2304(a) | N.Y. INS. LAW § 2303; N.Y. INS. LAW § 2304(b), (c) | N.Y. INS. LAW § 2305(a), (b) |
| North Carolina | N.C. GEN. STAT. ANN. § 58-40-20(e); N.C. GEN. STAT. ANN. § 58-40-25(1) | N.C. GEN. STAT. ANN. § 58-40-25(2); N.C. GEN. STAT. ANN. § 58-40-20(a), (e) | N.C. GEN. STAT. ANN. § 58-40-30; N.C. GEN. STAT. ANN. § 58-40-40; N.C. GEN. STAT. ANN. § 58-40-45 |
| North Dakota | N.D. CENT. CODE ANN. § 26.1-25-03(1)(a) | N.D. CENT. CODE ANN. § 26.1-25-03(1)(c) | N.D. CENT. CODE ANN. § 26.1-25-04 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Ohio | OHIO REV. CODE ANN. § 3935.03(C); OHIO REV. CODE ANN. § 3937.02(A) | OHIO REV. CODE ANN. § 3935.03(B); OHIO REV. CODE ANN. § 3937.02(C), (D); OHIO REV. CODE ANN. § 3901.21(M) | OHIO REV. CODE ANN. § 3935.04 |
| Oklahoma | | OKLA. STAT. ANN. tit. 36, § 902; OKLA. STAT. ANN. tit. 36, § 985 | OKLA. STAT. ANN. tit. 36, § 987 |
| Oregon | OR. REV. STAT. ANN. § 737.310(4) | OR. REV. STAT. ANN. § 737.310(1), (8); OR. REV. STAT. ANN. § 746.015(1) | OR. REV. STAT. ANN. § 737.205; OR. REV. STAT. ANN. § 737.325 |
| Pennsylvania | 40 PA. STAT. § 1183(a); 40 PA. STAT. § 1223(a)(3) | 40 PA. STAT. § 1183(c)-(d); 40 PA. STAT. § 1223(a)(2); 40 PA. STAT. § 1171.5(a)(7) | 40 PA. STAT. § 710-5(a); 40 PA. STAT. § 710-6; 40 PA. STAT. § 710-7 |
| Rhode Island | R.I. GEN. LAWS ANN. § 27-44-5(e)(1); R.I. GEN. LAWS ANN. § 27-6-4(3) | R.I. GEN. LAWS ANN. § 27-44-5(a), (d), (e)(2); R.I. GEN. LAWS ANN. § 27-6-4(2) | R.I. GEN. LAWS ANN. § 27-44-6(a) |
| South Carolina | S.C. CODE ANN. § 38-73-430(1); S.C. CODE ANN. § 38-73-330(3) | S.C. CODE ANN. § 38-73-430(3)-(4); S.C. CODE ANN. § 38-73-330(2) | S.C. CODE ANN. § 38-73-520 |
| South Dakota | S.D. CODIFIED LAWS § 58-24-6.1 | S.D. CODIFIED LAWS § 58-24-5; S.D. CODIFIED LAWS § 58-24-6; S.D. CODIFIED LAWS § 58-24-6.1; S.D. CODIFIED LAWS § 58-33-26 | S.D. CODIFIED LAWS § 58-24-10 |
| Tennessee | TENN. CODE ANN. § 56-5-103(d); TENN. CODE ANN. § 56-5-104(1) | TENN. CODE ANN. § 56-5-104(2) ; TENN. CODE ANN. § 56-5-103(a)(1), (d) | TENN. CODE ANN. § 56-5-105 |

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Texas | TEX. INS. CODE ANN. § 2251.051; TEX. INS. CODE ANN. § 2251.052(a) | TEX. INS. CODE ANN. § 2251.051; TEX. INS. CODE ANN. § 2251.052(b)-(c) | TEX. INS. CODE ANN. § 2251.101; TEX. INS. CODE ANN. § 2251.103 |
| Utah | UTAH CODE ANN. § 31A-19a-201(4)(a); UTAH CODE ANN. § 31A-19a-202(1)-(2) | UTAH CODE ANN. § 31A-19a-201(1), (4)(a); UTAH CODE ANN. § 31A-19a-202(3) | UTAH CODE ANN. § 31A-19a-203 |
| Vermont | VT. STAT. ANN. tit. 8, § 4685(d); VT. STAT. ANN. tit. 8, § 4686(1) | VT. STAT. ANN. tit. 8, § 4685(a), (d); VT. STAT. ANN. tit. 8, § 4686(2); VT. STAT. ANN. tit. 8, § 4724(7)(A) | VT. STAT. ANN. tit. 8, § 4688 |
| Virginia | VA. CODE ANN. § 38.2-1904(A), (B) | VA. CODE ANN. § 38.2-1904(A)(3) | VA. CODE ANN. § 38.2-1906 |
| Washington | WASH. REV. CODE ANN. § 48.19.030(3) | WASH. REV. CODE ANN. § 48.19.020; WASH. REV. CODE ANN. § 48.19.030(2)(b); WASH. REV. CODE ANN. § 48.18.480 | WASH. REV. CODE ANN. § 48.19.040; WASH. REV. CODE ANN. § 48.19.060 |
| West Virginia | W. VA. CODE § 33-20-3(a) | W. VA. CODE § 33-20-3(b), (c)(2); W. VA. CODE § 33-11-4(7)(c) | W.VA. CODE § 33-20-4 |
| Wisconsin | WIS. STAT. ANN. § 625.11(4); WIS. STAT. ANN. § 625.12(1) | WIS. STAT. ANN. § 625.12(2); WIS. STAT. ANN. § 625.11(1), (4) | WIS. STAT. ANN. § 625.13 |
| Wyoming | | WYO. STAT. ANN. § 26-14-105; WYO. STAT. ANN. § 26-13-112(c) | WYO. STAT. ANN. § 26-14-107 |

**App.341**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:13-cv-08564 |
| v. | ) ) | Judge Amy J. St. Eve |
| SHAUN DONOVAN, in his official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) | Magistrate Judge Susan E. Cox |
| Defendants. | ) ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF
THE PROPERTY CASUALTY INSURERS ASSOCIATION
OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**</u>

Rowe W. Snider (# 03125194)
Ashlee M. Knuckey (# 6300237)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Tel.: (312) 443-0700
Fax: (312) 896-0336
Email: rsnider@lockelord.com

Seth P. Waxman (*pro hac vice*)
Brian M. Boynton (*pro hac vice*)
Matthew J. Tokson (*pro hac vice*)
Lynn Eisenberg (*pro hac vice*)
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: seth.waxman@wilmerhale.com

*Attorneys for Plaintiff*

February 14, 2014

**App.342**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 5

   I.  THE PROVISION AND PRICING OF INSURANCE ............................................. 5

   II.  STATE REGULATION OF INSURANCE ............................................................. 7

   III. THE FAIR HOUSING ACT AND HUD'S DISPARATE IMPACT RULE ........... 10

       A.  The Proposed Disparate Impact Rule ........................................................ 10

       B.  Comments To The Rule ............................................................................. 11

       C.  The Final Rule ............................................................................................ 13

ARGUMENT ................................................................................................................. 15

   I.  APPLICATION OF THE DISPARATE IMPACT RULE TO INSURANCE WOULD VIOLATE THE MCCARRAN-FERGUSON ACT (COUNT I) .............................. 16

       A.  The Rule Would Interfere With State Administrative Regimes ................... 17

       B.  The Rule Would Invalidate And Impair State Insurance Laws Permitting Use Of Risk-Based Pricing ............................................................................. 20

       C.  The Rule Would Invalidate And Impair State Insurance Laws Requiring Risk-Based Pricing ........................................................................................... 23

       D.  The Rule Would Invalidate And Impair State Insurance Laws Providing For State Administrative Review of Insurance Rates ........................................... 24

   II.  HUD'S FAILURE TO ADDRESS THE MCCARRAN-FERGUSON ACT WAS ARBITRARY AND CAPRICIOUS (COUNT II) ...................................................... 26

   III. HUD'S FAILURE TO CONSIDER AND ADDRESS THE RULE'S EFFECT ON INSURERS WAS ARBITRARY AND CAPRICIOUS (COUNTS III & IV) ........... 28

       A.  HUD Failed To Weigh The Effect Of Applying Disparate Impact To Insurers ................................................................................................................ 29

       B.  HUD Failed To Acknowledge That Insurers Have A Legitimate Interest In Considering Actuarially Justified Risk Factors Or To Grant An Exemption For Insurance ................................................................................................. 30

   IV. HUD'S FAILURE TO ADDRESS THE FILED-RATE DOCTRINE WAS ARBITRARY AND CAPRICIOUS (COUNT V) ...................................................... 31

   V.  THE RULE'S BURDEN-SHIFTING FRAMEWORK IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW AS APPLIED TO INSURANCE (COUNT VI) ........................................................................................................ 32

CONCLUSION ............................................................................................................. 35

**App.343**

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Boulware v. Dep't of Insurance*,
No. CV 09-4325, 2009 WL 3830640 (C.D. Cal. Nov. 16, 2009)...........................20

*California Indep. Sys. Operator Corp. v. FERC*,
372 F.3d 395 (D.C. Cir. 2004) ...........................................................................27

*Camp v. Pitts*,
411 U.S. 138 (1973)..............................................................................................15

*Chair King, Inc. v. Houston Cellular Corp.*,
No. Civ.A. H-95-1066, 1995 WL 1760037 (S.D. Tex. Nov. 3, 1995) ..................20

*Dexter v. Equitable Life Assurance Society*,
527 F.2d 233 (2d Cir. 1975)..................................................................................20

*Director, Office of Workers' Comp. Programs v. Greenwich Collieries*,
512 U.S. 267 (1994)..............................................................................................34

*Doe v. Mutual of Omaha Insurance Co.*,
179 F.3d 557 (7th Cir. 1999) ........................................................................ passim

*Fax Telecommunicaciones Inc. v. AT&T*,
138 F.3d 479 (2d Cir. 1998)..................................................................................31

*Graoch Assocs.#33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n.*,
508 F.3d 366 (6th Cir. 2007) ..........................................................................30, 34

*Hill v. BellSouth Telecommunications, Inc.*,
364 F.3d 1308 (11th Cir. 2004) ............................................................................31

*Humana Inc. v. Forsyth*,
525 U.S. 299 (1999)..................................................................................17, 20, 25

*In re Title Insurance Antitrust Cases*,
702 F. Supp. 2d 840 (N.D. Ohio 2010)..................................................................31

*In re Workers' Compensation Insurance Antitrust Litigation*,
867 F.2d 1552 (8th Cir. 1989) ..............................................................................20

*Int'l Fabricare Institute v. EPA*,
972 F.2d 384 (D.C. Cir. 1992)...............................................................................26

iii

*Koretoff v. Vilsack,*
    707 F.3d 394 (D.C. Cir. 2013) ............................................................27

*Korte v. Allstate Insurance Co.,*
    48 F. Supp. 2d 647 (E.D. Tex. 1999) ..................................................31

*Little Co. of Mary Hospital v. Sebelius,*
    587 F.3d 849 (7th Cir. 2009) ..............................................................15

*Louisiana Public Service Commission v. FCC,*
    476 U.S. 355 (1986) ............................................................................27

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................................16

*McClain v. Shelter General Insurance Co.,*
    No. 97-1139-cv-W, 2007 WL 844769 (W.D. Mo. Mar. 16, 2007) ........32

*McKenzie v. S. Farm Bureau Casualty Insurance Co.,*
    No. 3:06-cv-013, 2007 WL 2012214 (N.D. Miss. July 6, 2007) ............23

*Metropolitan Housing Development Corp. v. Village of Arlington Heights,*
    558 F.2d 1283 (7th Cir. 1977) ............................................................11

*Motor Vehicles Mfrs.'s Ass'n v. State Farm Mutual Automobile Insurance Co.,*
    463 U.S. 29 (1983) .........................................................................28, 30

*N.L.R.B. v. Louis A. Weiss Mem'l Hospital,*
    172 F.3d 432 (7th Cir. 1999) ..............................................................34

*NAACP v. American Family Mut. Ins. Co.,*
    978 F.2d 287 (7th Cir. 1992) .............................................6, 7, 17, 29

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.,*
    656 F.3d 580 (7th Cir. 2011) ..........................................................16, 27

*Paul v. Virginia,*
    75 U.S. (8 Wall.) 168 (1868) ...............................................................7

*PPL Wallingford Energy LLC v. F.E.R.C.,*
    419 F.3d 1194 (D.C. Cir. 2005) ..........................................................26

*Rempfer v. Sharfstein,*
    583 F.3d 860 (D.C. Cir. 2009) ............................................................16

*Saunders v. Farmers Insurance Exchange,*
    537 F.3d 961 (8th Cir. 2008) ..............................................................25

iv

**App.345**

*Smith v. City of Jackson, Miss.*,
  544 U.S. 228 (2005)...................................................................................33

*Steadman v. SEC*,
  450 U.S. 91 (1981).....................................................................................34

*Stevens v. Union Planters Corp.*,
  No. Civ. A. 00-cv-1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000) ....................32

*Taylor v. American Family Insurance Group*,
  No. 8:07-cv-493, 2008 WL 3539267 (D. Neb. Aug. 11, 2008)...........................23

*United Mine Workers of America, Int'l Union v. Dole*,
  870 F.2d 662 (D.C. Cir. 1989)...................................................................28

*United States v. South-Eastern Underwriters Ass'n*,
  322 U.S. 533 (1944)....................................................................................7

*University Medical Center of S. Nevada v. Shalala*,
  173 F.3d 438 (D.C. Cir. 1999)...................................................................16

*Wabash Valley Power Ass'n v. Rural Electrification Admin.*,
  988 F.2d 1480 (7th Cir. 1993) ...................................................................27

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011)...............................................................................32

*Wards Cove Packing Co. v. Atonio*,
  490 U.S. 642 (1989).......................................................................... passim

*Wegoland Ltd. v. NYNEX Corp.*,
  27 F.3d 17 (2d Cir. 1994)...........................................................................31


**STATE CASES**

*Blackburn & McCune, PLLC v. Pre-Paid Legal Services, Inc.*,
  398 S.W.3d 630 (Tenn. Ct. App. 2010).....................................................31

*Blue Cross & Blue Shield of Delaware, Inc. v. Elliott*,
  479 A.2d 843 (Del. Super. Ct. 1984) ...................................................10, 25

*Cain v. Fortis Insurance Co.*,
  694 N.W.2d 709 (S.D. 2005) .....................................................................21

*Cole v. State Farm Insurance Co.*,
  128 P.3d 171 (Alaska 2006).......................................................................21

**App.346**

*Fire Insurance Rating Bureau v. Rogan*,
　91 N.W.2d 372 (Wis. 1958) .................................................................10, 25

*In re Universal Underwriters Life Insurance Co.*,
　685 N.W.2d 44 (Minn. Ct. App. 2004) ..................................................10

*Insurance Commissioner for the State v. Engelman*,
　692 A.2d 474 (Md. 1997) ......................................................................21

*Kuebler v. Equitable Life Assurance Society of the U.S.*,
　555 N.W.2d 496 (Mich. Ct. App. 1996) .................................................21

*Milkman v. Am. Travellers Life Insurance Co.*,
　No. 3375, 2002 WL 778272 (Pa. Com. Pl. Apr. 1, 2002) .................. 31-32

*Schermer v. State Farm Fire & Casualty Co.*,
　721 N.W.2d 307 (Minn. 2006) ...............................................................32


**FEDERAL STATUTES, CODES & REGULATIONS**

5 U.S.C. § 553(b)(2) .......................................................................................27

5 U.S.C. § 556(d) ...........................................................................................34

5 U.S.C. § 706 ...............................................................................................16

5 U.S.C. § 706(2) .............................................................................................3

5 U.S.C. § 706(2)(A) .............................................................................. passim

15 U.S.C. § 1011 ............................................................................................16

15 U.S.C. § 1012(b) ............................................................................1, 16, 17, 20

42 U.S.C. § 3604(b) .......................................................................................10

42 U.S.C. § 3604(f)(2) ....................................................................................10

42 U.S.C. § 3612(b) .......................................................................................34

42 U.S.C. § 3612(o) .......................................................................................34

24 C.F.R. § 100.70(d)(4) (2013) .....................................................................10

24 C.F.R. § 100.500 (2013) ...........................................................................13

24 C.F.R. § 100.500(a) (2013) .......................................................................13

24 C.F.R. § 100.500(b) (2013) ...............................................................13, 23

24 C.F.R. § 100.500(c)(1) (2013) ...........................................................15, 23

24 C.F.R. § 100.500(c)(2) (2013) ..................................................................15

24 C.F.R. § 100.500(c)(3) (2013) ..................................................................15

76 Fed. Reg. 70921 (Nov. 16, 2011)........................................................10, 11

78 Fed. Reg. 11460 (Feb. 15, 2013) ..................................................... passim


### STATE STATUTES, CODES & REGULATIONS

Idaho Code Ann. § 41-1427 ...........................................................................10, 25

215 Ill. Comp. Stat. 5/132 ..............................................................................10, 25

215 Ill. Comp. Stat. 5/132.3 ...........................................................................10, 25

215 Ill. Comp. Stat. 5/424(3) ............................................................................8, 21

Ill. Admin. Code Title 50, § 2603.40(a) ..............................................................8

Ind. Code Ann. § 27-1-22-3(a)(1) ..................................................................9, 24

Ind. Code Ann. § 27-1-22-4(a) .......................................................................9, 24

Ind. Code Ann. § 27-1-22-5 ..........................................................................10, 25

N.J. Stat. Ann. § 17:29A-7 ............................................................................10, 25

Ohio Revised Code Ann. § 3935.03 .............................................................10, 25

Ohio Revised Code Ann. § 3935.04 .............................................................10, 25

Wis. Stat. Ann. § 625.11(4) ..............................................................................8, 21

Wis. Stat. Ann. § 625.12(1) ..............................................................................9, 24

Wis. Stat. Ann. § 625.13 ...................................................................................9, 25

Wis. Stat. Ann. § 625.13(1) ..............................................................................9, 25

App.348

**RULES**

Fed. R. Civ. P. 56(a) .......................................................................................15


**OTHER AUTHORITIES**

1 Steven Plitt et al., *Couch on Insurance* (3d ed. 2013) ........................................5, 17

Alejandro Lazo, *Nearly one-third of U.S. Homeowners have no mortgage*, Jan. 10, 2013, Jan. 10, 2013. *available at* http://articles.latimes.com/2013/jan/10/business/la-fi-free-and-clear-20130110 .......................................................................................6

Casualty Actuarial Society's Statement of Principles Regarding Property and Casualty Insurance Ratemaking: Adopted by the Board of Directors of the Casualty Actuarial Society, May 1988*, available at* http://www.casact.org/professionalism/standards/princip/sppcrate.pdf. ........................5, 8, 21

Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403 (1985) .......................................................................................5, 6

Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates, Casualty Actuarial Society E-Forum* (Winter 2009....................................5, 6, 8, 18

Robert Detlefsen, *"Disparate Impact" Theory Provides No Support for Banning Credit Scoring in Insurance*, Legal Backgrounder, Apr. 8, 2005, *available at* http://www.wlf.org/upload/040805LBDetlefsen.pdf..................................................6

Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L. J. 29 (2012)....................................................................................................6, 29

State of New Jersey Department of Banking & Finance, *The Use of Occupation and Education Factors in Automobile Insurance* 51 (April 2008), *available at* http://www.state.nj.us/dobi/division_insurance/pdfs/ed_occ_april2008.pdf.........................18

**App.349**

## INTRODUCTION

In 2013, the United States Department of Housing and Urban Development ("HUD") issued a Final Rule entitled "Implementation of the Fair Housing Act's Discriminatory Effects Standard."[1]  The Rule purported to "formalize[]" the agency's belief "that liability under the Fair Housing Act ["FHA"] may arise from a facially neutral practice that has a discriminatory effect" on a group of persons defined by race, color, religion, sex, handicap, familial status, or national origin "regardless of whether there was an intent to discriminate."  78 Fed. Reg. at 11460, 11463 (A.R. 611, 614); (SUMF ¶ 14).  This case does not seek to vacate HUD's Disparate Impact Rule as a whole.[2]  Rather, it is a narrowly targeted challenge to HUD's unprecedented decision in that Rule to apply a disparate impact standard to homeowners, property, and hazard insurance ("homeowners insurance").  Whatever the merits of a disparate impact standard in the traditional housing context, HUD's application of the Rule to homeowners insurance violates the McCarran-Ferguson Act, as well as the Administrative Procedure Act ("APA"), and therefore should be vacated.

The McCarran-Ferguson Act was enacted in 1945 to safeguard the primary role of the states in regulating the business of insurance.  It provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).  The FHA does not specifically relate to the business of insurance and is thus subject to McCarran's limitations.  HUD has now—for the first time—

_____

[1] *See* 78 Fed. Reg. 11460 (Feb. 15, 2013) (A.R. 611) ("Disparate Impact Rule" or "Rule"); Plaintiffs Local Rule 56.1 Statement of Undisputed Material Facts ("SUMF") ¶ 14.  Citations to "A.R." are to the Administrative Record lodged with the Court on February 12, 2014.

[2] Plaintiff Property Casualty Insurers Association of America ("PCI") does not concede that the FHA embodies disparate impact liability.

**App.350**

adopted a rule purporting to apply a disparate impact standard to the provision of homeowners insurance.  Application of such a standard under the FHA would subject homeowners insurers to two fundamentally inconsistent regulatory regimes and requirements.  Federal courts would be asked to review and pass further judgment on the actuarial soundness of insurance practices comprehensively regulated under state law.  As the Seventh Circuit has made clear, the McCarran-Ferguson Act prohibits this kind of additional federal court review, which "obviously would interfere with the administration of state law."  *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999) (Posner, J.).  HUD's application of the Disparate Impact Rule to homeowners insurance is squarely foreclosed by the Seventh Circuit's decision in *Mutual of Omaha* and must be vacated for that reason alone.

In addition to impermissibly subjecting state-regulated insurance practices to federal court review, the Rule imposes a new standard on insurers that directly conflicts with state law standards for underwriting and rating of homeowners insurance.  It is well settled under state law that insurers are permitted to make rating and underwriting decisions on the basis of objective risk factors analyzed by certified insurance actuaries.  Indeed, most states *require* insurers to consider actuarially justified risk factors in rating homeowners insurance.  The Disparate Impact Rule, however, would impose liability on insurers under the FHA for doing precisely what is permitted and indeed required under these state laws.  By imposing liability for use of actuarially sound risk factors in compliance with state law, the Rule would invalidate and impair state laws permitting and requiring such use, and would thus violate the McCarran-Ferguson Act.

The APA prohibits agency action that is "not in accordance with law."  5 U.S.C. § 706(2)(A).  It thus required HUD to abide by the requirements of all federal laws, including the McCarran-Ferguson Act.  Because HUD's extension of the Rule to homeowners insurance

2

**App.351**

violates the McCarran-Ferguson Act, that decision must be held "unlawful and set aside" under the APA. *Id.* § 706(2). Unless that decision is vacated, homeowners insurers will be subjected to two conflicting and uncertain schemes of insurance regulation—a result that cannot be reconciled with the text, history, or purpose of the McCarran-Ferguson Act.

HUD's application of the Disparate Impact Rule to homeowners insurance was also "arbitrary" and "capricious" in violation of the APA. 5 U.S.C. § 706(2)(A). Under established principles of administrative law, an agency has an obligation to respond meaningfully to comments and to engage in reasoned decision-making. Settled case law also makes clear that an agency has no power to act unless authorized by federal law and that an agency must address the basis for its authority before taking action. *See infra* at pp. 27-28. HUD utterly disregarded these obligations. During the rulemaking process, the insurance industry explained in detail how applying the Rule to insurance would violate the McCarran-Ferguson Act. HUD offered no substantive response, seeking instead to sidestep the issue. Rather than consider whether applying the Rule to homeowners insurance would invalidate, impair, or supersede state law, HUD simply asserted—with no support whatsoever—that only courts, not agencies, must consider the McCarran-Ferguson Act. *See* 78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶ 23). This is not, and cannot be, the law. Agencies cannot ignore federal statutes. HUD's total refusal to consider the limits on its authority imposed by the McCarran-Ferguson Act is an independent reason to vacate HUD's application of the Rule to homeowners insurance.

HUD also disregarded the fundamental inconsistency between a disparate impact standard and established risk-based insurance practices. In order to provide homeowners insurance at premiums that reflect the risks being covered, insurers must rely on actuarial data regarding past losses. Insurers use an array of actuarial risk factors to group insureds into

3

different risk pools.  For example, insurers may consider (among many other risk factors) whether a house being insured is made of wood or brick because this factor bears on the risk of loss from fire.  Consideration of such objective, verifiable actuarial risk factors, which have developed through analysis of risk experience over time, is fundamental to the business of insurance.  HUD, however, did not even acknowledge that insurers have a legitimate business interest in considering actuarial risk factors, and HUD provided no reasoned explanation for refusing to create an exemption for risk-based insurance.

HUD further failed to address how the Disparate Impact Rule can be reconciled with state laws that require insurers to file their rates for state review and/or approval.  As commenters explained to HUD, the "filed rate" doctrine precludes challenges to rates approved by a state regulator—precisely what the Disparate Impact Rule would permit.  HUD acknowledged receiving these comments, but then inexplicably failed to provide any response to them whatsoever.  Under the APA, HUD was obligated to consider all comments and to provide a meaningful response.  HUD's failure to do so violated the APA.

Finally, the Rule's burden-shifting framework for determining what a plaintiff must prove to establish an FHA claim is contrary to law as applied to homeowners insurance.  HUD's proposed framework repeatedly deviates from the procedures required under settled precedent and the APA—and, in each case, the deviation disfavors insurers.  By adopting such a skewed framework, HUD has ensured that the use of actuarially sound risk factors approved under state law will subject insurers to FHA liability in many and uncertain circumstances.

For each of these independent reasons, the Court should vacate HUD's application of the Disparate Impact Rule to the provision of homeowners insurance.

**App.353**

## BACKGROUND

### I.     THE PROVISION AND PRICING OF INSURANCE

Insurance is a means of transferring the risk of loss from one party to another in exchange for an agreed-upon rate.  Traditionally, rates are determined based on numerous factors including the probability and amount of potential loss, policy limits, deductibles, and the insurer's cost of doing business.  *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* § 1:6 (3d ed. 2013).  The probability and amount of potential loss is also central to underwriting decisions—*e.g.*, decisions concerning whether to insure a particular risk or class of risk.  *Id.* at § 1:2.

Determinations about the probability and amount of potential losses are made by actuaries.  Actuaries are trained and certified professionals who apply mathematical, statistical, and economic expertise to analyze the financial implications of future contingent events with respect to insurance.[3]  When forecasting the probability and amount of potential loss, actuaries consider a host of verifiable factors that correlate with losses.  *See* Michael J. Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009); Kenneth S. Abraham, *Efficiency and Fairness in Insurance Risk Classification*, 71 Va. L. Rev. 403, 414 (1985).  For homeowners insurance, these factors might include, among many others, the types of construction materials used to build a house, history of previous losses, proximity to fire hydrants, and the presence of a security system.  (*See* Comments of the National Association of Mutual Insurance Companies (Jan. 17, 2012) (A.R. 372, 376).)  In applying these actuarial factors, insurers consider risk, not race or any other

---

[3] In setting property and casualty insurance rates, actuaries adhere to the Casualty Actuarial Society's Statement of Principles Regarding Property and Casualty Insurance Ratemaking: Adopted by the Board of Directors of the Casualty Actuarial Society, May 1988 ("CAS Principles").  The Statement of Principles are available at http://www.casact.org/professionalism/standards/princip/sppcrate.pdf.

**App.354**

protected characteristic. As the Seventh Circuit noted, "[r]isk discrimination is not race discrimination." *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) (Easterbrook, J.); *see also id.* at 298 ("[C]lassification of risks is important to insurance, and assigning higher rates to greater risks differs from assigning rates by race.").

Reliance on neutral, actuarially justified factors to calculate the probability and amount of potential losses is fundamental to the insurance industry's ability to correlate risks to rates. The insurance market operates most efficiently and fairly when each consumer pays a rate that accurately reflects the cost of providing insurance to that consumer and other similarly situated consumers. Abraham, *Efficiency and Fairness*, 71 Va. L. Rev. at 421. If insurers could not set rates based on neutral, actuarially justified factors and risk calculations, the insurance industry could not function properly.[4] If risk were not considered in setting rates, lower-risk customers would be overcharged for insurance relative to the risk of loss that they pose, and many lower-risk customers would choose not to purchase insurance rather than pay too much for it. *Id.* at 407, 422; (A.R. 378); (SUMF ¶ 39). Such adverse selection would cause prices to rise for all. *See* Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L. J. 29, 44 (2012). Those consumers who must have a minimum level of insurance to meet mortgage requirements and those who ultimately sustain uninsured losses, among others, would suffer from the Rule's risk distorting process, as would the insurance industry.[5]

---

[4] *See, e.g.*, Robert Detlefsen, *"Disparate Impact" Theory Provides No Support for Banning Credit Scoring in Insurance*, Legal Backgrounder, Apr. 8, 2005, at 1, *available at* http://www.wlf.org/upload/040805LBDetlefsen.pdf.

[5] *See* Alejandro Lazo, *Nearly one-third of U.S. homeowners have no mortgage, L.A. Times*, Jan. 10, 2013, *available at* http://articles.latimes.com/2013/jan/10/business/la-fi-free-and-clear-20130110.

6

**App.355**

The Seventh Circuit has described this very phenomenon:

> Insurance works best when the risks in the pool have similar characteristics.  For example, term life insurance costs substantially more per dollar of death benefit for someone 65 years old than for one 25 years old, although the expected return per dollar of premium is the same to both groups because the older person, who pays more, also has a higher probability of dying during the term.  Auto insurance is more expensive in a city than in the countryside, because congestion in cities means more collisions.  Putting young and old, or city and country, into the same pool would lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out.  A single price for term life insurance would dissuade younger persons from insuring, because the price would be too steep for the coverage offered; the remaining older persons would pay a price appropriate to their age, but younger persons would lose the benefits of insurance altogether.  To curtail adverse selection, insurers seek to differentiate risk classes with many variables.

*American Family*, 978 F.2d at 290 (noting the difference between disparate treatment claims and disparate impact claims in addressing the application of the McCarran-Ferguson Act).

## II.     STATE REGULATION OF INSURANCE

The provision and pricing of homeowners insurance has traditionally been regulated by state law.  Until the mid-twentieth century, insurance was largely immune from federal regulation because the business of insurance was not considered "commerce" that could be regulated by Congress.  *See Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1868).  Shortly after the Supreme Court determined in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of insurance across state lines was interstate commerce susceptible to federal regulation, Congress enacted the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, to ensure that decision did not undermine state regulation of insurance.

As the Seventh Circuit has noted, "[s]tate regulation of insurance is comprehensive and includes rate and coverage issues."  *Mutual of Omaha Ins. Co.*, 179 F.3d at 564.  Several features of state insurance regulation are relevant here.

7

**App.356**

*First*, state insurance law affirmatively permits risk-based pricing. Insurance law generally prohibits insurers from charging "excessive, inadequate, or unfairly discriminatory rates." As explained in the Casualty Actuarial Society Statement of Ratemaking Principles, "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an *actuarially sound* estimate of the expected value of all future costs associated with an individual risk transfer." CAS Principles 4. For purposes of state insurance law, rates are "unfairly discriminatory" if "premium differences . . . do not correspond to expected losses and average expenses or if there are expected average cost differences that are not reflected in the premium differences." Miller, *Disparate Impact and Unfairly Discriminatory Insurance Rates, Casualty Actuarial Society E-Forum* at 283 (internal quotation marks omitted).

For example, Illinois law prohibits "any unfair discrimination between individuals or risks *of the same class or of essentially the same hazard and expense element*." 215 Ill. Comp. Stat. 5/424(3) (emphasis added). Rates may differ on the basis of sex, sexual preference, or marital status if "such classification or differentiation is based upon expected claim costs and expenses *derived by applying sound actuarial principles* to relevant and reasonably current company or intercompany studies, claim costs and expense experience." Ill. Admin. Code tit. 50, § 2603.40(a) (emphasis added). Similarly, Wisconsin law provides:

> One rate is unfairly discriminatory in relation to another in the same class if it clearly fails to reflect equitably the differences in expected losses and expenses. Rates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy.

Wis. Stat. Ann. § 625.11(4). Other state laws include similar provisions. *See* Compl. ¶¶ 31-32; Appendix A (attached).

8

**App.357**

*Second*, many states not only permit risk-based pricing but expressly *require* insurers to consider past losses and other actuarially relevant factors in developing insurance rates. For example, the Indiana Code provides that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state, to conflagration and catastrophe hazards, if any, … [and] to all other relevant factors, including trend factors, within and outside this state …." Ind. Code Ann. § 27-1-22-3(a)(1). Wisconsin law likewise mandates that "[d]ue consideration shall be given" to "[p]ast and prospective loss and expense experience within and outside of this state"; "[c]atastrophe hazards and contingencies"; "[t]rends within and outside of this state"; and "all other relevant factors, including the judgment of technical personnel." Wis. Stat. Ann. § 625.12(1). Other states have similar laws. *See* Compl. ¶ 34; Appendix A.

*Third*, state insurance commissioners actively review the rates charged by insurers to protect consumers. The vast majority of states require insurers to file insurance rates with state regulators for review and/or approval. *See, e.g.*, Ind. Code Ann. § 27-1-22-4(a) ("Every insurer shall file with the commissioner every manual of classifications, rules, and rates, every rating schedule, every rating plan, and every modification of any of the foregoing which it proposes to use."); Wis. Stat. Ann. § 625.13(1) ("[E]very authorized insurer and every rate service organization licensed under s. 625.31 which has been designated by any insurer for the filing of rates under s. 625.15(2) shall file with the commissioner all rates and supplementary rate information and all changes and amendments thereof made by it for use in this state within 30 days after they become effective."); *see also* Appendix A; Compl. ¶ 35.

State regulators carefully review insurance rates—with the assistance of their own actuaries—to ensure that the rates reflect all of the factors required by state law and that the rates are not excessive, inadequate, or unfairly discriminatory. *See, e.g.*, Wis. Stat. Ann. § 625.13

**App.358**

(insurance commissioner shall prohibit the use of rates if he finds upon review that the rate is excessive, inadequate, or unfairly discriminatory); *In re Universal Underwriters Life Ins. Co.*, 685 N.W.2d 44, 47 (Minn. Ct. App. 2004).[6]  Even in those few states, like Illinois, where homeowners rates are not filed with the insurance commissioner, those rates are nonetheless subject to review.  *See* 215 Ill. Comp. Stat. 5/132, 5/132.3 (requiring periodic examinations of insurers for compliance with state laws); *see also* Idaho Code Ann. § 41-1427 (same).

## III.      THE FAIR HOUSING ACT AND HUD'S DISPARATE IMPACT RULE

The FHA makes it unlawful, among other things, "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b); *see also id.* § 3604(f)(2) (prohibiting discrimination because of "handicap").  The FHA makes no reference to either disparate impact or homeowners insurance.  HUD previously promulgated regulations applying the FHA to homeowners insurance, *see* 24 C.F.R. § 100.70(d)(4) (2013), but *before* adopting the Rule, it had *not* enacted regulations purporting to apply a disparate impact standard to homeowners insurance.

### A.      The Proposed Disparate Impact Rule

On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effect's Standard."  *See* 76 Fed. Reg. 70921 (Nov. 16, 2011)

---

[6] *See also, e.g.*, N.J. Stat. Ann. § 17:29A-7 (insurance commissioner must review and approve filed rates or disapprove them if they "are unreasonably high or excessive, or are not adequate for the safeness and soundness of the insurer, or are unfairly discriminatory between risks in this State involving essentially the same hazards and expense elements"); Ind. Code Ann. § 27-1-22-5; Ohio Revised Code Ann. §§ 3935.04, 3935.03; *Fire Ins. Rating Bureau v. Rogan*, 91 N.W.2d 372, 375 (Wis. 1958) (In reviewing proposed rates, the duty of the commissioner and his staff is to "estimate what future expenses and future losses will be."); *Blue Cross & Blue Shield of Delaware, Inc. v. Elliott*, 479 A.2d 843, 847 (Del. Super. Ct. 1984) ("The Commissioner must … determine whether or not the insurer's filed rates are 'excessive, inadequate or unfairly discriminatory'…." (citation omitted)).

**App.359**

(A.R. 1); (SUMF ¶ 9).  In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate."  76 Fed. Reg. at 70921 (A.R. 1); (SUMF ¶ 10).  The proposal cited "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act."  76 Fed. Reg. at 70924 (A.R. 4) (SUMF ¶ 11).  The proposal, however, did not even mention the McCarran-Ferguson Act, nor did it explain how the Rule could possibly be reconciled with state insurance laws that expressly permit or require risk-based pricing and underwriting.

The proposed rule also noted "some variation in the application of the discriminatory effects standard" among the courts.  76 Fed. Reg. at 70921 (A.R. 1); (SUMF ¶ 13).  HUD explained that while many federal courts use a "three-step burden-shifting approach," other courts—including the Seventh Circuit—"apply a multi-factor balancing test" and others apply a hybrid of the two.  76 Fed. Reg. at 70923 & n.24 (A.R. 3) (citing *Metro. Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977)).  To "establish[] a uniform standard of liability," HUD proposed to adopt a version of the "burden-shifting approach" that imposes extraordinary hurdles on insurers forced to justify every day actuarial practices.  76 Fed. Reg. at 70924 (A.R. 4); (SUMF ¶ 20, 54-62).

### B.  Comments To The Rule

Representatives of the insurance industry submitted detailed comments seeking an exemption from the proposed Rule and explaining why applying the Rule to homeowners insurance would be unlawful and ill-advised.  (*See* Comments of the Property Cas. Insurers Ass'n of America (Jan. 17, 2012) (A.R. 553); Comments of the Nat'l Ass'n of Mut. Ins. Cos.

**App.360**

(Jan. 17, 2012) (A.R. 372); Comments of the Am. Ins. Ass'n (Jan. 17, 2011) (A.R. 455); (SUMF ¶ 21).  These comments explained that:

- The use of actuarial factors to calculate risk would be limited by the application of disparate impact liability because any such factor could affect protected groups differently.  (*See* A.R. 376-377; SUMF ¶ 36).

- Application of disparate impact liability to homeowners insurance is fundamentally inconsistent with consideration of actuarially sound risk-based factors and would violate the McCarran-Ferguson Act.  (*See* A.R. 552; A.R. 376; SUMF ¶ 22).

- To ensure that "no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process" and insurers "would have to charge everyone the same rate, regardless of risk."  (A.R. 377; SUMF ¶ 36).

- Eliminating risk-based pricing would have significant negative consequences: "adverse selection will increase, and coverage availability will suffer.  Perversely, application of the proposed rule could in fact harm all insurance consumers, including the very groups it purports to protect."  (A.R. 378; SUMF ¶ 39).

- Because state laws expressly contemplate consideration of actuarially significant risk factors, the application of disparate impact liability would violate the McCarran-Ferguson Act.  (*See* A.R. 376, 379-380; SUMF ¶ 22).

- Pricing of homeowners insurance falls within states' common law "filed rate" doctrine, which bars private claims based on insurance rates filed with state regulatory entities. Applying disparate impact liability to insurance rates would undermine state regulators' approval of insurance rates.  (*See* A.R. 378; SUMF ¶ 43).

12

**App.361**

Given the inherent conflict between disparate impact liability and insurers' use of actuarial risk factors, representatives of the insurance industry made clear that the Rule could not lawfully apply to insurance and specifically asked HUD to exempt insurance underwriting and pricing from the Rule or to provide regulatory safe harbors for long-recognized actuarial risk factors, such as age and condition of a property or distance from a fire station. (*See* A.R. 555; A.R. 380; SUMF ¶¶ 45-46).

Finally, the insurance industry's comments explained that each step of HUD's proposed burden-shifting framework for resolving disparate impact claims conflicted with the Supreme Court's decision in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), and would stack the deck against insurers. (A.R. 381-382; SUMF ¶ 53).

### C.  The Final Rule

On February 15, 2013, HUD promulgated its final Disparate Impact Rule. 78 Fed. Reg. at 11460 (A.R. 612); (SUMF ¶ 14). The regulations adopted in the Rule provide that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.500(a) (2013). They further provide that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification," *id.* § 100.500, meaning that: (1) the challenged housing practice "[i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent" and (2) "[t]hose interests could not be served by another practice that has a less discriminatory effect," *id.* § 100.500(b).

Notwithstanding the insurance industry's comments, the final Rule did not meaningfully address whether extension of disparate impact liability to homeowners insurance would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act. The final Rule

13

merely asserted that the McCarran-Ferguson Act applies only to courts, not federal agencies construing statutes during the rulemaking process: "McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies. Rather, McCarran-Ferguson instructs *courts* on how to construe federal statutes, including the Act." 78 Fed. Reg. at 11475 (A.R. 627) (emphasis added); (SUMF ¶ 23). HUD thus did not consider whether the Rule conflicts with state laws and policies permitting risk-based pricing and underwriting.

The Rule also failed to meaningfully address insurance industry comments demonstrating that the application of disparate impact liability is inconsistent with established risk-based insurance practices. HUD did not dispute that the use of actuarial risk factors will result in a disparate impact on some populations or that "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk." 78 Fed. Reg. at 11475 (A.R. 627) (quoting a comment); (SUMF ¶ 36). To the contrary, HUD acknowledged that insurers will have to justify in court any disparate impact caused by risk-based pricing and underwriting— HUD's sole response was that an insurance company "has a full opportunity to defend the business justifications for its policies." *Id.*; *see also id.* (A.R. 627) ("Thus, even if a policy has a discriminatory effect, it may still be legal if supported by a legally sufficient justification."); (SUMF ¶ 38). HUD thus acknowledged *the possibility* that the use of risk-based pricing and underwriting could be a sufficient business justification for any resulting disparate impact. But HUD declined to confirm that the legitimate use of actuarial risk factors in fact *is* a legitimate business practice and went on to reject the insurance industry's requests for an exemption for insurance or a safe harbor for the use of risk-based pricing and underwriting. *See* 78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶ 47-48).

The Rule noted that "commenters stated that application of the disparate impact standard

**App.363**

would interfere with state regulation of insurance in violation of … the common law 'filed rate doctrine.'" 78 Fed Reg. at 11474 (A.R. 626); (SUMF ¶ 43-44). But despite acknowledging this issue, HUD altogether failed to address it. *See id.* at 11475 (A.R. 627); (SUMF ¶ 44).

Finally, HUD adopted its proposed burden-shifting framework. Under the final Rule, the plaintiff or charging party has the initial "burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1) (2013). If the plaintiff or charging party meets that burden, "the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). If the defendant or respondent meets its burden, the plaintiff or charging party "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3). HUD rejected a "significance requirement" for disparate impact liability, 78 Fed. Reg. at 11468 (A.R. 620); (SUMF ¶ 56), and declined to require an alternative practice that has a less discriminatory effect be "equally effective" at serving the defendant's substantial, legitimate, nondiscriminatory interest. 78 Fed. Reg. at 11473 (A.R. 625); (SUMF ¶ 62). The Rule also rejected comments urging HUD to require a plaintiff or charging party to challenge a "specific" practice. 78 Fed. Reg. at 11469 (A.R. 621); (SUMF ¶¶ 55-56).

## ARGUMENT

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Review under the APA is based on the administrative record that was before the agency when it issued the regulation or decision at issue. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009). As PCI

15

**App.364**

and HUD agreed in the January 8, 2014 Joint Status Report (*see* Dkt. No. 16 at 4), whether an agency's decision to promulgate a regulation was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706, is a question of law that is resolved by the Court on dispositive motions, *see, e.g., Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (review of agency action under the APA is based entirely on the agency's record and thus can be resolved at the motion to dismiss stage); *Univ. Med. Ctr. of S. Nevada v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) ("[T]he question whether HHS acted in an arbitrary and capricious manner is a legal one ....").[7]

## I.    APPLICATION OF THE DISPARATE IMPACT RULE TO INSURANCE WOULD VIOLATE THE MCCARRAN-FERGUSON ACT (COUNT I)

In Section 1 of the McCarran-Ferguson Act, Congress declared "that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."  15 U.S.C. § 1011.  Section 2 of the Act provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).  Under the McCarran-Ferguson Act, federal law is reverse-preempted if it "directly conflict[s] with state regulation" or when "application of the federal law

_____

[7] There can be "little question that" HUD's application of the Rule to homeowners insurance and refusal to grant an exemption for homeowners insurance have caused injury to PCI's members who are homeowners insurers because they are parties regulated under the Rule—they are the "object[s] of" HUD's actions.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Owner-Operator Indep. Drivers Ass'n v. Federal Motor Carrier Safety Admin.*, 656 F.3d 580, 585 (7th Cir. 2011).  Indeed, the administrative record demonstrates the severity of the harm posed by the Rule to the insurance industry, including PCI's members.  (*See* SUMF ¶¶ 66-73).

**App.365**

would … frustrate any declared state policy or interfere with a State's administrative regime." *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999).

Application of the Disparate Impact Rule to the pricing and underwriting of homeowners insurance would violate the McCarran-Ferguson Act. The FHA—which does not mention insurance and applies broadly to the provision of housing—plainly does not "specifically relate[] to the business of insurance." *See, e.g.*, *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287, 295 (7th Cir. 1992) ("The Fair Housing Act is an 'Act of Congress' that does not 'specifically relate [ ] to the business of insurance.'") (alteration in original)). Thus, application of the Disparate Impact Rule to homeowners insurance is preempted under the McCarran-Ferguson Act if it would "invalidate, impair, or supersede" state insurance law, 15 U.S.C. § 1012(b), or "frustrate any declared state policy or interfere with a State's administrative regime," *Humana*, 525 U.S. at 310. As explained below, it would do so in numerous respects.

### A. The Rule Would Interfere With State Administrative Regimes

Seventh Circuit precedent makes clear that application of the Disparate Impact Rule to homeowners insurance would violate the McCarran-Ferguson Act by fundamentally interfering with the comprehensive state administrative regimes that regulate insurance. The Rule impermissibly requires federal courts to determine whether the use of certain risk factors is actuarially justified and thus would "inject[] federal courts into the heart of the regulation of the insurance business by the states." *Mutual of Omaha*, 179 F.3d at 564.

As the Court of Appeals has explained, "[s]tate regulation of insurance is comprehensive" and covers ratemaking, scope of coverage, marketing, fees, and numerous other matters. *Mutual of Omaha*, 179 F.3d at 564; 1 Steven Plitt et al., *Couch on Insurance* §§ 2:7, 2:20 (3d ed. 2013); *see also infra* Part I.D. State insurance commissioners actively regulate and supervise the insurance business and enforce insurance laws and punish violators. 1 Plitt et al.,

17

**App.366**

*Couch on Insurance* §§ 2:7-2:8. Yet HUD's Rule contemplates that insurers will be forced to

justify their rate-making practices in federal court under a federal burden-shifting standard even

though one or more state insurance regulators have already reviewed the rates and determined

that they are not excessive, inadequate, or unfairly discriminatory. Comments from the

insurance industry explained that any risk-based factor could affect protected groups differently.

(*See* A.R. 376-377; SUMF ¶ 30); *see also* Miller, *Disparate Impact and Unfairly Discriminatory*

*Insurance Rates*, Casualty Actuarial Society E-Forum at 284 ("[P]rotected classes, most if not all

of the time, will not be evenly distributed throughout the various risk classifications.").[8] In the

final Rule, HUD did not dispute this basic proposition. *See* 78 Fed. Reg. at 11475 (A.R. 627);

(SUMF ¶ 31). Instead, HUD asserted that insurers will have to justify the disparate impact

caused by risk-based pricing and underwriting in federal court in challenges brought under the

FHA. *See* 78 Fed. Reg. 11475 (A.R. 627) (insurers will "ha[ve] a full opportunity to defend [in

court] the business justifications for its policies"); (SUMF ¶ 32).

Under HUD's burden-shifting framework, once a plaintiff shows that the use of an

actuarial factor would have a disparate impact, "the burden shifts to the insurer to show that the

challenged practice is necessary to achieve one or more of its substantial, legitimate,

nondiscriminatory interests." *See* 78 Fed. Reg. at 11475 (A.R. 627). Even if the insurer meets

that burden, it will lose if a plaintiff can convince the fact-finder that an interest "could be served

by another practice that has a less discriminatory effect." *Id.* at 11482 (A.R. 634). HUD has

rejected any requirement that such an alternative practice be "equally effective" at serving the

---

[8] *See also* State of New Jersey Department of Banking & Finance, *The Use of Occupation and Education Factors in Automobile Insurance* 51 (April 2008) ("[L]ong-accepted rating factors such as accidents, comprehensive claims, territory and perhaps moving violations all may appear to correlate with higher-than-average minority populations and lower-than-average income levels."), *available at* http://www.state.nj.us/dobi/division_insurance/pdfs/ed_occ_april2008.pdf.

**App.367**

defendant's substantial, legitimate, nondiscriminatory interest. *Id.* at 11473 (A.R. 625); (SUMF ¶ 62). Insurers thus must establish in federal court, to a jury, the strict necessity of each actuarial factor they relied upon in setting rates even though a state insurance regulator has already found the rates not to be excessive, inadequate, or unfairly discriminatory under state law. If an insurer fails to make this showing, then a federal court applying the Rule would have to declare the insurers' rates unlawful and order the insurer to make a new rate based on a set of court-approved risk factors that may be inconsistent with state law and that can only be approved by the states. Under the Rule, the final regulation of insurance rate-setting would thus be largely "displac[ed] … into federal court" which would "obviously interfere with the administration of state law." *Mutual of Omaha*, 179 F.3d at 564.

The Seventh Circuit has recognized that regulating core insurance practices under federal law in federal court litigation would interfere with a State's administrative regime and thus violate the McCarran-Ferguson Act. In *Mutual of Omaha*, the Seventh Circuit held that application of the Americans with Disabilities Act ("ADA") to health insurance policies would require insurers to litigate whether challenged insurance practices "are actuarially sound" and thus would impermissibly "step[] on the toes of state insurance commissioners." 179 F.3d at 564 (noting that it would violate the McCarran-Ferguson Act "to require federal courts to determine whether limitations on coverage are actuarially sound and consistent with state law"). The court explained that if insurers were required to litigate whether their practices are "actuarially sound and in accordance with state law"—as would be required under a defense set forth in the ADA— "the federal courts will then find themselves regulating the health-insurance industry, which McCarran-Ferguson tells them not to do" unless pursuant to a federal law specifically relating to insurance. *Id.*

19

**App.368**

The same is true here. Under the Disparate Impact Rule, insurers would have to litigate in federal court whether their core risk-based pricing and underwriting practices are "actuarially sound" in order to try to satisfy their burden of demonstrating a legitimate business justification for their practices. Federal courts would find themselves mired in disputes about whether risk factors other than those selected by insurers and permitted under state law would adequately serve insurers' business needs. This kind of comprehensive federal regulation of insurance practices—on the basis of the Fair Housing Act, a law that does not even mention insurance—is the exact problem that the McCarran-Ferguson Act is intended to prohibit, 15 U.S.C. § 1012(b); *Humana*, 525 U.S. at 310, and the exact issue decided in *Mutual of Omaha*.

## B. The Rule Would Invalidate And Impair State Insurance Laws Permitting Use Of Risk-Based Pricing

HUD's Disparate Impact Rule would also invalidate and impair state insurance laws permitting the use of risk-based pricing and underwriting. Under the McCarran-Ferguson Act, a federal law must give way if it would prohibit practices that state insurance law permits. *See, e.g., In re Workers' Comp. Ins. Antitrust Litig.*, 867 F.2d 1552, 1558 n.9 (8th Cir. 1989) (under the McCarran-Ferguson Act, states have "the power to permit practices that would otherwise violate federal…laws."); *Dexter v. Equitable Life Assurance Soc'y*, 527 F.2d 233, 236 (2d Cir. 1975) (same); *Boulware v. Dep't of Ins.*, No. CV 09-4325, 2009 WL 3830640, at *8 (C.D. Cal. Nov. 16, 2009) (the McCarran-Ferguson Act bars a plaintiff's claim that California law improperly permitted private funding of public insurance fraud prosecutions); *Chair King, Inc. v. Houston Cellular Corp.*, No. Civ.A. H-95-1066, 1995 WL 1760037, at *5 (S.D. Tex. Nov. 3, 1995) (holding that the Telephone Consumer Protection Act of 1991 was preempted by Texas insurance regulations implicitly permitting truthful and not misleading fax solicitations).

20

**App.369**

Here, the Disparate Impact Rule violates the McCarran-Ferguson Act because state insurance laws expressly *permit* consideration of actuarially justified risk factors. Under traditional state insurance law principles, "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an *actuarially sound* estimate of the expected value of all future costs associated with an individual risk transfer." CAS Principles 4; *see also supra* at p. 8. For example, as noted above, Illinois law prohibits only "unfair discrimination" that is "between individuals or risks *of the same class or of essentially the same hazard and expense element*." 215 Ill. Comp. Stat. 5/424(3) (emphasis added). Similarly, under Wisconsin law, "[r]ates are not unfairly discriminatory because different premiums result for policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." Wis. Stat. Ann. § 625.11(4).

The rule is the same across the states. *See* Appendix A; Compl. ¶ 31; *see also, e.g., Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) (noting that "statutes forbid 'unfair discrimination between insureds or property having like insuring or risk characteristics in any ... of the terms and conditions of the insurance.'"); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Insurance Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. … Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v.*

21

**App.370**

*Equitable Life Assurance Soc'y of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

Hornbook insurance law thus confirms that insurers may make distinctions based on the actuarial risk posted by insureds. But the Rule's dictates would prohibit exactly that. HUD did not dispute insurance industry comments explaining that at least *some* actuarial risk factors will turn out to have a disparate impact on some protected group of people. (*See* A.R. 676-677.) This tripwire will be particularly sensitive because HUD expressly declined to require that any disparate impact be "significan[t]." 78 Fed. Reg. at 11468 (A.R. 620). Rather than dispute that some actuarial risk factors will likely have a disparate impact, HUD asserted that insurers can simply defend each lawsuit brought against them—on a case-by-case basis—by demonstrating "the business justifications for its policies." 78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶ 38). But that is no answer. Requiring insurers to litigate this issue case-by-case would impose tremendous burdens on insurers and create crippling uncertainty and expense that would impair the ability of insurers to operate as permitted, and even required, by state insurance law. Insurers do not collect data about the race of their customers and thus have no way of knowing what actuarial risk factors might turn out to have a disparate impact on a particular group in a particular territory. (*See* A.R. 383; SUMF ¶ 33.) And, of course, they have no way of knowing with certainty how a jury will rule on their business justification defense, particularly under HUD's one-sided burden-shifting framework. Allowing the propriety of state-law authorized actuarial risk factors to be determined after-the-fact and on a case-by-case by a lay jury in federal court under federal law is unworkable and precisely what *Mutual of Omaha* held would violate the McCarran-Ferguson Act. *See* 179 F.3d at 564.

**App.371**

HUD's burden-shifting framework exacerbates this problem by ensuring that federal lay juries would end up overriding state insurance regulators' expert judgments in violation of the McCarran-Ferguson Act. Under HUD's new framework, insurers are prima facie liable for risk-based pricing unless they can meet their burden of proving that (1) use of that factor is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent" and (2) "[t]hose interests could not be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(b) (2013); *see also id.* § 100.500(c) (placing burden of proof on defendant once a disparate impact is shown). Moreover, HUD has rejected any requirement that the alternative practice under element (2) be "equally effective" at serving the defendant's substantial, legitimate, nondiscriminatory interest. 78 Fed. Reg. at 11473 (A.R. 625); (SUMF ¶ 62). Thus, insurers could be held liable for using actuarially sound risk factors approved by state regulators merely because they failed to use some other, less predictive factor. In this way, the Rule would inevitably impose liability on insurers for making actuarially sound judgments that were in full compliance with state law. This after-the-fact regulation through federal litigation is not permitted by the McCarran-Ferguson Act. *See McKenzie v. S. Farm Bureau Cas. Ins. Co.*, No. 3:06-cv-013, 2007 WL 2012214, at *3 (N.D. Miss. July 6, 2007) ("Mississippi has enacted a regulation authorizing the activity about which the plaintiff complains, and therefore the plaintiff's 'challenge to that practice under the auspices of the Fair Housing Act' is untenable." (emphasis removed)); *Taylor v. American Family Ins. Grp.*, No. 8:07-cv-493, 2008 WL 3539267, at *5 (D. Neb. Aug. 11, 2008).

### C. The Rule Would Invalidate And Impair State Insurance Laws Requiring Risk-Based Pricing

The Rule would also invalidate and impair state insurance laws *requiring* consideration of actuarial risk factors. The vast majority of states expressly require that insurers set rates based

**App.372**

on past losses and other actuarially relevant risk factors.  *See* Appendix A; *see also* Compl. ¶ 34.
For example, Indiana law mandates that "[d]ue consideration shall be given to the past and
prospective loss experience within and outside this state, to conflagration and catastrophe
hazards, if any, … [and] to all other relevant factors, including trend factors, within and outside
this state …."  Ind. Code Ann. § 27-1-22-3(a)(1).  Wisconsin law similarly requires insurers to
give "[d]ue consideration" to "[p]ast and prospective loss and expense experience within and
outside of this state," "[c]atastrophe hazards and contingencies," "[t]rends within and outside of
this state," and "all other relevant factors."  Wis. Stat. Ann. § 625.12(1).

These laws would be directly invalidated and impaired by applying disparate impact
liability to homeowners insurance.  Insurers charging different rates to different customers based
on their risk profiles (past payouts, risk factors, home attributes, etc.) would likely impact
different groups differently.  And, as explained above, under HUD's burden-shifting framework,
there is a high likelihood that use of some actuarially justified risk factor mandated by state law
will give rise to liability under HUD's interpretation of the FHA because a jury will determine
that some other less effective factor that serves the same general purpose could have been used
instead.  But subjecting insurers to liability if they charge different prices to different customers
based on differing risks directly contradicts the state laws *requiring* insurers to take such
differing risks into consideration when setting rates.

### D.  The Rule Would Invalidate And Impair State Insurance Laws Providing For State Administrative Review of Insurance Rates

The Rule would likewise invalidate and impair state laws providing for the review and
approval of insurance rates by state insurance commissioners.  Almost every state requires
insurers to file insurance rates with state regulators, and all states provide mechanisms for
regulators to review and/or approve such rates.  *See* Appendix A; Ind. Code Ann. § 27-1-22-4(a)

24

**App.373**

(requiring filing of rates); Wis. Stat. Ann. § 625.13(1) (same). State regulators carefully review insurance rates to ensure that the rates are based on sound actuarial factors and are not excessive, inadequate, or unfairly discriminatory. *See, e.g.*, Wis. Stat. Ann. § 625.13; N.J. Stat. Ann. § 17:29A-7; Ind. Code Ann. §27-1-22-5; Ohio Rev. Code Ann. §§ 3935.04, 3935.03; *Fire Ins. Rating Bureau*, 91 N.W. 2d at 375 (Wis. 1958); *Blue Cross & Blue Shield of Delaware, Inc.*, 479 A. 2d at 847 (Del. Super. Ct. 1984); *see also* 215 Ill. Comp. Stat. 5/132, 5/123.3 (requiring periodic examinations of insurers by the Director for compliance with state laws); Idaho Code Ann. § 41-1427 (same).

As the United States Court of Appeals for the Eighth Circuit concluded in *Saunders v. Farmers Insurance Exchange*, 537 F.3d 961 (8th Cir. 2008), state-law administrative rate review procedures would be impaired by the application of disparate impact liability to homeowners insurance. As the *Saunders* Court observed:

> [T]he Director of Insurance has been delegated the essentially legislative task of rate-making by reviewing Insurer risk classifications and pricing differentials. If a federal court may assess damages based upon what a non-discriminatory rate would have been, and then prescribe the future rate in an injunctive decree, '[a] more complete overlap with the state [agency's] pricing decisions is impossible to conceive.'

*Id.* at 968. The imposition of disparate impact liability on insurers who charge differing rates to different customers based on differing risk factors and loss histories would undermine—and essentially invalidate—state approvals of filed rates and state procedures for reviewing insurance rates. Imposing such liability in after-the-fact litigation would "frustrate [a] declared state policy [and] interfere with a State's administrative regime," and would therefore violate the McCarran-Ferguson Act. *Humana Inc.*, 525 U.S. at 310.

**App.374**

For all of these reasons, HUD's application of the Rule to homeowners insurance violates the McCarran-Ferguson Act and must be vacated as "not in accordance with law." 5 U.S.C. § 706(2)(A).

## II.     HUD'S FAILURE TO ADDRESS THE MCCARRAN-FERGUSON ACT WAS ARBITRARY AND CAPRICIOUS (COUNT II)

HUD's failure even to address whether application of its Disparate Impact Rule to insurance violated the McCarran-Ferguson Act was arbitrary and capricious in violation of the APA and is an independent basis to set aside HUD's application of the Rule to homeowners insurance.  Under the APA, "[a]n agency's 'failure to respond meaningfully' to objections raised by a party renders its decision arbitrary and capricious."  *PPL Wallingford Energy LLC v. F.E.R.C.*, 419 F.3d 1194, 1198 (D.C. Cir. 2005); *see also Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992).  Indeed, courts have "stressed that [u]nless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned."  *PPL Wallingford Energy*, 419 F.3d at 1198 (internal quotation marks omitted).  Here, HUD failed to meet that obligation.

During the rulemaking process, the insurance industry explained in detail that the application of disparate impact liability to insurance practices would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act.  (S*ee* A.R. 554; A.R. 375-381; SUMF ¶ 22.)  In its final Rule, however, HUD did not address whether extension of disparate impact liability to insurance practices would violate the McCarran-Ferguson Act.  Rather than grapple with this key issue, HUD claimed that the McCarran-Ferguson Act applies only to courts, not federal agencies construing statutes during the rulemaking process: "McCarran-Ferguson does not preclude HUD from issuing regulations that may apply to insurance policies.  Rather, McCarran-Ferguson instructs *courts* on how to construe federal

**App.375**

statutes, including the Act." 78 Fed. Reg. at 11475 (A.R. 627) (emphasis added); (SUMF ¶ 23). HUD thus failed to consider whether the Disparate Impact Rule conflicts with state laws and policies permitting the use of risk-based pricing and underwriting.

HUD's failure even to consider the McCarran-Ferguson Act requires vacatur of its application of the Rule to homeowners insurance. There is no support for HUD's novel contention that an agency need not consider whether its actions are consistent with federal law. It is certainly true that courts review agency actions, but that is as true under every other statute as it is with respect to the McCarran-Ferguson Act. The mere fact of judicial review obviously does not relieve agencies of their obligations to consider whether they are acting lawfully.

The Supreme Court has made clear that "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). An agency must identify "a source of authority in either the express language or the purpose and operation of [a statute] to justify" its regulations. *Wabash Valley Power Ass'n v. Rural Electrification Admin.*, 988 F.2d 1480, 1491 (7th Cir. 1993); *see also California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 398 (D.C. Cir. 2004) ("It is therefore incumbent upon [an agency] to demonstrate that some statute confers upon it the power it purport[s] to exercise ...."). Indeed, an agency has an obligation to examine its statutory authority to act. *See, e.g.*, 5 U.S.C. § 553(b)(2) ("The notice [of proposed rulemaking] shall include ... reference to the legal authority under which the rule is proposed ...."); *Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013) ("It is certainly true that agencies are required to ensure that they have authority to issue a particular regulation."). As a result, failure to consider a statutory limitation is "necessarily arbitrary and capricious." *Owner-Operator Indep. Drivers Ass'n v. Federal Motor*

**App.376**

*Carrier Safety Admin.*, 656 F.3d 580, 587-88 (7th Cir. 2011); *United Mine Workers of Am., Int'l Union v. Dole*, 870 F.2d 662, 667 (D.C. Cir. 1989) ("[A]gency failure to explicitly consider statutory limits on authority in [its] statement of basis and purpose renders [a] rulemaking defective.").

HUD thus was obligated to determine whether applying the Disparate Impact Rule to homeowners insurance was consistent with federal law. The McCarran-Ferguson Act limits the reach of federal statutes like the FHA that are not specific to insurance. To properly consider its statutory authority under the FHA and whether application of the Disparate Impact Rule to homeowners insurance was consistent with federal law, HUD necessarily had to consider the McCarran-Ferguson Act. Because HUD failed to consider the limitations on its authority and on its construction of the FHA imposed by the McCarran-Ferguson Act, it acted arbitrarily and capriciously, in violation of 5 U.S.C. § 706(2)(A).

## III.  HUD'S FAILURE TO CONSIDER AND ADDRESS THE RULE'S EFFECT ON INSURERS WAS ARBITRARY AND CAPRICIOUS (COUNTS III & IV)

Application of the Disparate Impact Rule to homeowners insurance was also arbitrary and capricious because HUD failed (A) to consider the Rule's effect on insurers and the insurance business; and (B) to acknowledge that insurers have a legitimate interest in considering actuarially justified risk factors and grant an exemption for insurance. An agency decision is arbitrary and capricious if the agency fails to consider the "relevant factors" and fails to engage in "reasoned decisionmaking." *Motor Vehicles Mfr.'s Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 52 (1983). Moreover, as noted above, an agency has an obligation to respond meaningfully to comments submitted to it. *See supra* at p. 26. Here, HUD failed to satisfy these obligations in two respects.

28

**App.377**

### A. HUD Failed To Weigh The Effect Of Applying Disparate Impact To Insurers

As insurers explained during the notice-and-comment process, "[t]he foundation of the business of insurance, and in particular underwriting and rate-making, is classifying insurance applicants and policyholders by risk." (A.R. 376; SUMF ¶ 27.) Without risk segmentation, the insurance industry would be radically different and might cease to function altogether. If every customer paid the same price, regardless of risk, then many lower-risk customers would choose not to purchase insurance rather than pay too much for it. This would cause prices to rise for remaining customers, causing more and more customers to forego insurance. It would also remove an incentive for the construction of safer houses and the maintenance of existing homes. *See, e.g.*, Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L. J. 29 at 66-67; (A.R. 378); *American Family*, 978 F.2d at 290. Yet, the use of neutral risk factors would be impaired by the application of disparate impact liability because *any* factor could affect protected groups differently. (A.R. 376-377 (emphasis added).)

In response to insurers' comments raising these concerns, HUD did not question the importance to the insurance industry of considering actuarial risk factors. (*See* SUMF ¶¶ 27-32.) Nor did HUD dispute that, as a statistical matter, "to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk." 78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶ 36. HUD's only response to these concerns was to note that an insurance company "has a full opportunity to defend [in court] the business justifications for its policies." 78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶ 56). But HUD failed to consider the harms to the insurance industry of deterring insurers from using neutral and otherwise valid actuarial factors in calculating risk; it failed to consider the potentially massive litigation costs and uncertainty that would result from imposing prima facie liability on insurers simply for engaging in the business of insurance in full compliance with state law; and it failed to weigh these costs against

29

**App.378**

any supposed benefits of applying its new rule to insurers. This failure to address the effect of the Rule on the insurance industry was arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A). *See State Farm*, 463 U.S. at 54-55 (an agency should weigh benefits and costs of potential regulation).

**B.      HUD Failed To Acknowledge That Insurers Have A Legitimate Interest In Considering Actuarially Justified Risk Factors Or To Grant An Exemption For Insurance**

In light of concerns that implementation of the Disparate Impact Rule would violate the McCarran-Ferguson Act and would have a significant negative impact on the business of insurance, commenters requested that HUD exempt insurance underwriting and pricing from the Disparate Impact Rule. (*See* A.R. 555; A.R. 380; SUMF ¶¶ 45-46.) HUD, however, failed to meaningfully address this request, rejecting it in a cursory two-sentence paragraph. *See* 78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶¶ 47-48).

HUD claimed that "[c]reating exemptions or safe harbors related to insurance is unnecessary because … insurance practices with a legally sufficient justification will not violate the Act." 78 Fed. Reg. at 11475 (A.R. 627); (SUMF ¶ 49). It also asserted that "creating exemptions beyond those found in the Act would run contrary to Congressional Intent." 78 Fed. Reg. at 11475 n.141 (A.R. 627) (citing *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n.*, 508 F.3d 366 (6th Cir. 2007)); (SUMF ¶ 50). But the very case HUD relied upon held that "categorical bars are justified" when there is "no reason to require courts to engage in the Sisyphean task of working through the burden-shifting framework in each individual case when the plaintiff has no chance of success." *Graoch,* 508 F.3d at 376.

The *Graoch* court explained "that if *no* disparate-impact challenge to a particular practice ever could succeed under the burden-shifting framework, then a court categorically may bar *all* disparate impact challenges to that practice." 508 F.3d at 375. HUD should have done precisely

30

that here in response to the insurance industry's request for an exemption.  It should have made

clear that the legitimate use of actuarial risk factors by insurers cannot give rise to disparate

impact liability because it is a legitimate business practice.  There was no reason for HUD to

require insurers to litigate that issue in individual cases and investigations across the country.[9]

## IV.  HUD'S FAILURE TO ADDRESS THE FILED-RATE DOCTRINE WAS ARBITRARY AND CAPRICIOUS (COUNT V)

The final Rule is also arbitrary and capricious because HUD failed to address comments

explaining that application of disparate impact liability to insurance would violate the filed-rate

doctrine.  The filed-rate doctrine provides that "any 'filed rate'—that is, one approved by the

governing regulatory agency—is per se reasonable and unassailable in judicial proceedings

brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994).  The

filed-rate doctrine maintains the separation of powers by "preserv[ing] the exclusive role of

agencies in approving rates." *Korte v. Allstate Ins. Co.*, 48 F. Supp. 2d 647, 650 (E.D. Tex.

1999).  It also prevents courts from having to set new rates themselves, thereby "keeping courts

out of the rate-making process." *Fax Telecomms. Inc. v. AT&T*, 138 F.3d 479, 489 (2d Cir.

1998); *see also Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1316 (11th Cir. 2004);

*Blackburn & McCune, PLLC v. Pre-Paid Legal Servs., Inc.*, 398 S.W.3d 630, 662 (Tenn. Ct.

App. 2010).

The filed-rate doctrine applies to insurance and bars claims against insurance companies

based on rates that have been submitted and approved by state regulatory agencies.  *See, e.g.*, *In*

*re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 888-89 (N.D. Ohio 2010) (citing federal cases

applying the filed-rate doctrine to insurance claims); *Milkman v. Am. Travellers Life Ins. Co.*,

---

[9] For the reasons explained in Section I above, the McCarran-Ferguson Act provided an additional basis for HUD to grant an exemption for the insurance industry.

31

**App.380**

No. 3375, 2002 WL 778272, at *15 (Pa. Com. Pl. Apr. 1, 2002) (citing state cases applying the filed-rate doctrine to insurance claims); *Stevens v. Union Planters Corp.*, No. Civ. A. 00-cv-1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000). This includes disparate impact discrimination claims based on insurance rates. *See Schermer v. State Farm Fire & Cas. Co.*, 721 N.W.2d 307 (Minn. 2006); *see also McClain v. Shelter Gen. Ins. Co.*, No. 97-1139-cv-W, 2007 WL 844769, at *9-10 (W.D. Mo. Mar. 16, 2007) (noting as problematic that "[i]f the McCarran Ferguson Act were found not to apply, this Court would be forced to determine what a fair and non-discriminatory rate for the plaintiff's policies would have been.").

Accordingly, commenters explained that applying disparate impact liability to insurance rates under the Rule would undermine state regulators' approval of insurance rates. (*See* A.R 378; SUMF ¶ 43.) HUD acknowledged in its Final Rule that "[s]ome commenters stated that application of the disparate impact standard would interfere with state regulation of insurance in violation of … the common law 'filed rate doctrine.'" 78 Fed Reg. at 11474 (A.R. 626); (SUMF ¶ 44). But HUD never addressed those comments. *See* 78 Fed Reg. 11460-11482 (A.R. 612-634); (SUMF ¶ 44). That alone is a basis to set aside HUD's application of the Rule to insurance. *See supra* at p. 26 (explaining that an agency must respond to comments).

## V.    THE RULE'S BURDEN-SHIFTING FRAMEWORK IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO LAW AS APPLIED TO INSURANCE (COUNT VI)

Application of the Disparate Impact Rule to homeowners insurance should also be set aside because HUD disregarded critical safeguards in the burden-shifting framework it adopted. In *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), the Supreme Court delineated the framework applicable to proving disparate impact liability in the Title XII context. Although the version of Title VII analyzed in *Wards Cove* has been superseded by statute, *see Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2555 (2011), the Supreme Court has continued to apply

the *Wards Cove* framework outside of the employment context, *see, e.g.*, *Smith v. City of Jackson, Miss.*, 544 U.S. 228 (2005) (applying the *Wards Cove* analysis to the ADEA). In the Disparate Impact Rule, HUD declined to incorporate the burden-shifting framework set forth in *Wards Cove*. This was improper in multiple respects, particularly as applied to insurance.

*First*, HUD implemented a framework that does not require a plaintiff to show that the challenged practice creates a "significant" disparate impact on a protected group. *Wards Cove* requires that, to demonstrate a prima facie case of disparate impact discrimination, a plaintiff must be able to show that the specific practice in question would cause a "significantly disparate impact" on a protected class. 490 U.S. at 658. Rather than apply this standard, the Rule requires only that plaintiffs demonstrate that the "challenged practice caused or predictably will cause a discriminatory effect." 78 Fed. Reg. at 11482 (A.R. 634). HUD expressly rejected a "significance" requirement. *Id.* at 11468 (A.R. 620); (SUMF ¶ 56). That is especially burdensome to the insurance industry because, as previously noted, almost any actuarial risk factor can have *some* disparate impact in some circumstances. (*See* SUMF ¶¶ 36-38.)

*Second*, the Rule rejects the Supreme Court's mandate in *Wards Cove* that "a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack." 490 U.S. at 657. Rather than apply this limitation, HUD indicated that a party may be permitted "to challenge the decision-making process as a whole." 78 Fed. Reg. at 11469 (A.R. 621); (SUMF ¶ 56). Allowing this type of claim would impose unwarranted burdens on insurers if they were subject to the Rule.

*Third*, HUD erred in shifting the burden of proof to the defendant after the plaintiff makes a prima facie showing of disparate impact. The Supreme Court in *Wards Cove* made clear that even after a plaintiff makes a prima facie case, the burden of persuasion "remains with

**App.382**

the disparate-impact plaintiff." 490 U.S. at 659-60. Similarly, under the APA, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d); *see also Steadman v. SEC*, 450 U.S. 91, 98 (1981) (discussing the proper construction of the APA standard). Because a charge brought by HUD under the FHA may be heard in an administrative proceeding, *see* 42 U.S.C. § 3612(b) & (o), the burden-shifting standards established in the Rule must satisfy the APA requirement that the proponent of a proposed "order"—here, a proposed finding of a violation of the FHA—bear the burden of proof. *See N.L.R.B. v. Louis A. Weiss Mem'l Hosp.*, 172 F.3d 432, 442 (7th Cir. 1999) (burden-shifting framework inconsistent with § 556(d)); *Director, Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 276-277 (1994) (same).

*Fourth*, the Rule incorrectly raises the showing that a defendant must make to rebut a plaintiff's prima facie case. In *Wards Cove*, the Supreme Court explicitly rejected a requirement that a legitimate business practice be strictly necessary: "[T]here is no requirement that the challenged practice be 'essential' or 'indispensable' to the employer's business for it to pass muster." 490 U.S. at 659. Even *Groach* (cited by HUD) required only a showing of a "legitimate business reason." 508 F.3d at 374. The Rule, however, requires that a defendant demonstrate that "the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." 78 Fed. Reg. at 11482 (A.R. 634); *see also id.* at 11471-11472 (A.R. 623-624).

*Finally*, the Rule fails to require a plaintiff to demonstrate that any proposed alternative practice it proffers will serve the defendant's legitimate business interest "equally effectively" as the challenged practice. The Supreme Court in *Wards Cove* held that "any alternative practices which respondents offer up in this respect must be equally effective as petitioners' chosen hiring

34

**App.383**

procedures in achieving petitioners' legitimate employment goals." 490 U.S. at 661. But HUD summarily rejected this standard, stating only that "the 'wider range and variety of practices covered by the [Fair Housing] Act ... are not readily quantifiable,'" making an "equally effective" standard inappropriate. 78 Fed. Reg. at 11473 (A.R. 625); (SUMF ¶ 62). Whatever merit HUD's position might have in the housing context, it makes no sense applied to insurance and, in fact, violates the McCarron-Ferguson Act. *See supra* p. 23.

Together, HUD's systematic tilting of each step of the burden-shifting framework against insurers would impose a significant and unwarranted burden on insurers if the Disparate Impact Rule were found to apply to them. Any minor statistical deviation could trigger the Rule. An insurer would then have the burden of showing in federal court that the risk factor challenged was strictly "necessary" to its business—a standard distinct from that applied under state insurance law. Even then, a plaintiff could prevail by merely suggesting some other less effective factor that has not been approved under state law. The result—systematic federal court second-guessing of state-approved, actuarially-sound insurance practices—cannot be what Congress intended. To the contrary, imposing such a regime is arbitrary and capricious and contrary to law.

## CONCLUSION

For each of the independent reasons stated above, the Court should grant PCI's motion and vacate HUD's application of the Disparate Impact Rule to homeowners insurance.

**App.384**

Dated:      February 14, 2014

Respectfully submitted,

By:  /s/ Seth P. Waxman

———————————————————

Seth P. Waxman (*pro hac vice*)
Brian M. Boynton (*pro hac vice*)
Matthew J. Tokson (*pro hac vice*)
Lynn Eisenberg (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND
DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: seth.waxman@wilmerhale.com

Rowe W. Snider (# 03125194)
Ashlee M. Knuckey (# 6300237)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Tel.: (312) 443-0700
Fax: (312) 896-0336
Email: rsnider@lockelord.com

*Attorneys for Plaintiff*

**App.385**

# APPENDIX A

**State Laws on Insurance Risk Requirements and Rate Filing**

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Alabama | Ala. Code § 27-13-27 | | Ala. Code § 27-13-3; Ala. Code § 27-13-30 |
| Alaska | Alaska Stat. § 21.39.030 | Alaska Stat. § 21.39.030 | Alaska Stat. § 21.39.040 |
| Arizona | Ariz. Rev. Stat. Ann. § 20-356; Ariz. Rev. Stat. Ann. § 20-383; Ariz. Rev. Stat. Ann. § 20-384 | Ariz. Rev. Stat. Ann. § 20-356(4); Ariz. Rev. Stat. Ann. § 20-384 | Ariz. Rev. Stat. Ann. § 20-357 |
| Arkansas | Ark. Code Ann. § 23-67-208(d); Ark. Code Ann. § 23-67-209 | Ark. Code Ann. § 23-67-209(b); Ark. Code Ann. § 23-67-210 | Ark. Code Ann. § 23-67-211(a) |
| California | | | Cal. Ins. Code § 1861.05(b) |
| Colorado | Colo. Rev. Stat. § 10-4-403 | Colo. Rev. Stat. § 10-4-403(4) | Colo. Rev. Stat. § 10-4-404; Colo. Rev. Stat. § 10-4-406 |
| Connecticut | | Conn. Gen. Stat. § 38a-803(4) | |
| Delaware | 18 Del. Code § 2503(a)(3) | 18 Del. Code § 2503(a)(5); 18 Del. Code § 2503(b) | 18 Del. Code § 2504 |
| Florida | | Fla. Stat. § 627.062(e)(6); Fla. Stat. § 626.9741 | Fla. Stat. § 627.062; Fla. Stat. § 627.0645 |
| Georgia | Ga. Code Ann. § 33-9-4(4) | Ga. Code Ann. § 33-9-4(7) | Ga. Code Ann. § 33-9-21, Ga. Code Ann. § 33-9-9; Ga. Code Ann. § 33-9-26 |
| Hawaii | | | Haw. Rev. Stat. § 431:14-104(a); Haw. Rev. Stat. § 431:14-106(a) |
| Idaho | Idaho Code Ann.§ 41-1437(1) | Idaho Code Ann.§ 41-1437(3) | |
| Illinois | | 215 Ill. Comp. Stat. 5/424(3); Ill. Admin. Code tit. 50, § 2603.40 | |
| Indiana | Ind. Code § 27-1-22-3(a)(1) | Ind. Code § 27-1-22-3(a)(2) | Ind. Code § 27-1-22-4(a); Ind. Code § 27-1-22-5(a) |
| Iowa | | Iowa Code Ann. § 515F.4 | Iowa Code Ann. § 515F.5 |
| Kansas | | Kan. Stat. Ann. § 40-953 | Kan. Stat. Ann. § 40-955 |
| Kentucky | Ky. Rev. Stat. Ann. § 304.13-057 | | Ky. Rev. Stat. Ann. § 304.13-051 |

1

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Louisiana | La. Rev. Stat. Ann. § 22:1454(B)(1) | La. Rev. Stat. Ann. § 22:1454(B)(2); La. Rev. Stat. Ann. § 22:1454(B)(5) | La. Rev. Stat. Ann. § 22:1451; La. Rev. Stat. Ann. § 22:1464 |
| Maine | Me. Rev. Stat. Ann. 24-A, § 2303(1)(C) | Me. Rev. Stat. Ann. 24-A, § 2303(1)(G) | Me. Rev. Stat. Ann. 24-A, § 2304-A |
| Maryland | Md. Code Ann., Ins. § 11-205(c) | Md. Code Ann., Ins. § 11-205(f) | Md. Code Ann., Insurance § 11-206 |
| Massachusetts | Mass. Gen. Laws Ann. 174A, § 5; Mass. Gen. Laws Ann. 175A, § 5 | Mass. Gen. Laws Ann. 175A, § 5(a)(3) | Mass. Gen. Laws Ann. 174A, § 6; Mass. Gen. Laws Ann. 175A, § 6 |
| Michigan | Mich. Comp. Laws Ann. § 500.2110; Mich. Comp. Laws Ann. § 500.2403(1)(a) | Mich. Comp. Laws Ann. § 500.2110(3); Mich. Comp. Laws Ann. § 500.2110a; Mich. Comp. Laws Ann. § 500.2403(1)(c) | Mich. Comp. Laws Ann. § 500.2406; Mich. Comp. Laws Ann. § 500.2408 |
| Minnesota | Minn. Stat. Ann. § 70A.04; Minn. Stat. Ann. § 70A.05(1) | Minn. Stat. Ann. § 70A.05(2) | Minn. Stat. Ann. § 70A.06 |
| Mississippi | Miss. Code. Ann. § 83-2-3(2)(a) | Miss. Code. Ann. § 83-2-3(2)(b) | Miss. Code. Ann. § 83-2-7 |
| Missouri | Mo. Ann. Stat. § 379.318(1) | Mo. Ann. Stat. § 379.318(2) | Mo. Ann. Stat. § 379.321 |
| Montana | Mont. Code Ann. § 33-16-201(2)(a) | Mont. Code Ann. § 33-16-201(4) | Mont. Code Ann. § 33-16-203 |
| Nebraska | | Neb.Rev.St. § 44-7510(3) | Neb. Rev. St. § 44-7508 |
| Nevada | Nev. Rev. Stat. Ann.§ 686B.060(1) | Nev. Rev. Stat. Ann. § 686B.060(2) | Nev. Rev. Stat. Ann. § 686B.110 (As modified by 2013 Nevada Laws Ch. 73 (S.B. 114)) |
| New Hampshire | N.H. Rev. Stat. Ann. § 412:15(II)(a) | N.H. Rev. Stat. Ann. § 412:15(II)(d) | N.H. Rev. Stat. Ann. § 412:16 |
| New Jersey | N.J. Stat. Ann. § 17:29A-4(c); N.J. Stat. Ann. § 17:29A-11 | N.J. Stat. Ann. § 17:29A-7 | N.J. Stat. Ann. § 17:29A-6; N.J. Stat. Ann. § 17:29A-7 |
| New Mexico | N.M. Stat. Ann. § 59A-17-7(A) | N.M. Stat. Ann. § 59A-17-7(B) | N.M. Stat. Ann. § 59A-17-9 |
| New York | N.Y. Ins. Law § 2304(a) | N.Y. Ins. Law § 2304(b), (c) | N.Y. Ins. Law § 2305(b); N.Y. Ins. Law § 2305(a) |
| North Carolina | N.C. Gen. Stat. Ann. § 58-40-25(1) | N.C. Gen. Stat. Ann. § 58-40-20 | N.C. Gen. Stat. Ann. § 58-40-40; N.C. Gen. Stat. Ann. § 58-40-45 |
| North Dakota | N.D. Cent. Code Ann. § 26.1-25-03(1)(a) | N.D. Cent. Code Ann. § 26.1-25-03(1)(c) | N.D. Cent. Code Ann. § 26.1-25-04 |

2

| State | State Laws Requiring Risk-Based Pricing | State Laws Permitting Risk-Based Pricing | State Laws Requiring Rate Filing and State Review and/or Approval of Filed Rates |
|---|---|---|---|
| Ohio | Ohio  Rev. Code Ann. § 3935.03; Ohio Rev..Code Ann.§ 3937.02(A) | Ohio Rev. Code Ann. § 3937.02(C) | Ohio Rev. Code Ann. § 3935.04 |
| Oklahoma | | Okla. Stat. Ann. tit. 36, § 985 | Okla. Stat. Ann. tit. 36, § 987 |
| Oregon | | Or. Rev. Stat. Ann. § 737.310 | Or. Rev. Stat. Ann. § 737.205; Or. Rev. Stat. Ann. § 737.325 |
| Pennsylvania | | | 40 PA. Cons. Stat. § 710-5(a); 40 PA. Cons. Stat. § 710-7 |
| Rhode Island | R.I. Gen. Laws Ann. § 27-44-5(e)(1) | R.I. Gen. Laws Ann. § 27-44-5(d) | R.I. Gen. Laws Ann.§ 27-44-6(a) |
| South Carolina | S.C. Code Ann. § 38-73-430(1) | S.C. Code Ann.§ 38-73-430(3) | S.C. Code Ann.§ 38-73-520 |
| South Dakota | S.D. Codified Laws § 58-24-6.1 | S.D. Codified Laws § 58-24-6 | S.D. Codified Laws § 58-24-10 |
| Tennessee | Tenn. Code Ann. § 56-5-304 | Tenn. Code Ann. § 56-5-303(d) | Tenn. Code Ann. § 56-5-305 |
| Texas | Tex. Ins. Code Ann.§ 2251.051; Tex. Ins. Code Ann.§ 2251.052(a) | Tex. Ins. Code Ann.§ 2251.052(c) | Tex. Ins. Code Ann.§ 2251.101; Tex. Ins. Code Ann.§ 2251.103 |
| Utah | Utah Code Ann. § 31A-19a-202 | Utah Code Ann.§ 31A-19a-201(4)(a) | Utah Code Ann.§ 31A-19a-203 |
| Vermont | Vt. Stat. Ann. tit. 8, § 4686(1) | Vt. Stat. Ann .tit. 8, § 4686(2) | Vt. Stat. Ann. tit. 8, § 4688(c); Vt. Stat. Ann. tit. 8, § 4688(a) |
| Virginia | Va. Code Ann. § 38.2-1904(A) | Va. Code Ann. § 38.2-1904(A)(3) | Va. Code Ann. § 38.2-1906 |
| Washington | Wash. Rev. Code Ann. § 48.19.030(3) | Wash. Rev. Code Ann. § 48.19.030(2)(b) | Wash. Rev. Code Ann. § 48.19.060 |
| West Virginia | | W. Va. Code § 33-20-3 | W.Va. Code § 33-20-4 |
| Wisconsin | Wis. Stat. Ann. § 625.12(1) | Wis. Stat. Ann. § 625.12(2); Wis. Stat. Ann.. § 625.11(4) | Wis. Stat. Ann. § 625.13 |
| Wyoming | | Wyo. Stat. Ann. § 26-14-105 | Wyo. Stat. Ann. § 26-14-107 |

3

**App.389**

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that, on February 14, 2014, I electronically filed the foregoing document

with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using

the CM/ECF system, which sent notification of such filing to counsel of record in this case.

 

                      _  s/  Seth P. Waxman_____ _____

Seth P. Waxman

WILMER CUTLER PICKERING HALE AND
DORR LLP

1875 Pennsylvania Avenue, NW

Washington, DC 20006

Tel.: (202) 663-6000

Fax: (202) 663-6363

Email: seth.waxman@wilmerhale.com

**App.390**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:13-cv-08564 |
| MARCIA L. FUDGE, in her official capacity as Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**<u>SECOND AMENDED COMPLAINT</u>**

Plaintiff Property Casualty Insurers Association of America ("PCI")[*] alleges as follows:

**<u>NATURE OF THE ACTION</u>**

1.       This is an action under the Administrative Procedure Act ("APA"), which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be [among other things] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706. Agency action must stand or fall based on the explanation and rationale actually given by the agency in its notice or decision. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

---

[*] Effective January 1, 2019, the American Insurance Association merged with and into PCI. Effective February 5, 2019, PCI re-domesticated and changed its name to the American Property Casualty Insurance Association.

2.      The agency action at issue here is the United States Department of Housing and Urban Development's ("HUD's") promulgation of a regulation purporting to "formalize" HUD's belief "that liability under the Fair Housing Act ("FHA") may arise from a facially neutral practice that has a discriminatory effect" on a group of persons defined by race, color, religion, sex, handicap, familial status, or national origin—"regardless of whether there was an intent to discriminate"—which HUD first adopted in 2013, and following a number of intervening events, reinstated on March 31, 2023.  *See* 78 Fed. Reg. 11,460, 11,460, 11,463 (Feb. 15, 2013) (the "2013 Rule") (attached as Exhibit 1); 88 Fed. Reg. 19,450 (Mar. 31, 2023) (the "2023 Reinstated Rule") (attached as Exhibit 2).  This lawsuit challenges HUD's application of this regulation—both the 2013 Rule and the substantively identical 2023 Reinstated Rule (jointly, the "Rule" or "Disparate Impact Rule")—to the underwriting, pricing, and provision of homeowners insurance and property and hazard insurance ("homeowners insurance") as arbitrary, capricious, an abuse of discretion, and otherwise contrary to law.

3.      As a matter of state law, homeowners insurers are required to charge rates that are not excessive, inadequate, or unfairly discriminatory.  Setting accurate and fair rates necessitates reliance on actuarial data from past losses that reveal differences in the risks posed by different pools of insureds.  Using this data, homeowners insurers can engage in risk segmentation by classifying insureds based on their risk profile and charging them different premiums.  Such risk-based underwriting and pricing is fundamental to the business of homeowners insurance, and the vast majority of states indeed mandate that insurers use actuarially significant risk factors.  *See* PCI Letter to HUD (Jan. 26, 2015), at 1 (attached as Exhibit 3), at 8; *see also id.* at Table 1 (showing statutes requiring risk-based pricing, organized by state).

4.      The Disparate Impact Rule would impair the ability of homeowners insurers to

**App.392**

price and underwrite insurance based upon risk. Rather than allow insurers' decisions to be guided by objective actuarial risk data—as contemplated by state law—the Disparate Impact Rule would require insurers to attempt to determine whether their underwriting and pricing decisions have a disparate impact on customers falling within a protected class and certain geography. Insurers would then have to adjust rates, possibly in violation of state law. The Rule would thus fundamentally change the business and regulation of insurance.

5. Application of the Disparate Impact Rule to homeowners insurance thus also cannot be reconciled with the McCarran-Ferguson Act. The McCarran-Ferguson Act, 15 U.S.C. §§ 1011- 1015, preserves the historic role of the states in regulating the business of insurance. It prohibits the application of federal laws that would "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance" unless the federal law "specifically relates to the business of insurance." *Id*. § 1012(b). The provision of homeowners insurance is extensively regulated by the states to ensure that insurance rates and practices are fair and reasonable.

6. The Court previously concluded that HUD acted in an arbitrary and capricious manner by failing to respond adequately to comments submitted by the homeowners insurance industry during the rulemaking proceeding leading to promulgation of the Disparate Impact Rule. The Court explained that "HUD's response to the insurance industry's concerns that exposing them to disparate impact liability would undermine the fundamental nature of insurance was arbitrary and capricious. HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework. The ability of insurers to raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate

**App.393**

HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period." *Prop. Cas. Ins. Ass'n of Am. v. Donovan*, 66 F. Supp. 3d 1018, 1051 (N.D. Ill. 2014). The Court also concluded that "HUD's one-paragraph response to the insurance industry's detailed concerns that applying the Disparate Impact Rule to homeowners insurance would violate the McCarran–Ferguson Act fails to provide a reasoned explanation to prefer case-by-case application of McCarran–Ferguson preclusion over rule-making." *Id.* at 1048. In addition, the Court held HUD did not adequately respond to the insurance industry's concerns that application of the rule to homeowners insurance would violate the "filed rate" doctrine, which precludes claims premised on rates that have been approved by a state regulator. The Court instructed HUD that "on remand, HUD must explain its decision regarding the filed-rate doctrine or institute a new rule, as it must with respect to the industry's McCarran–Ferguson comments." *Id.* at 1050. Accordingly, the Court ordered HUD to supplement its explanation of the Disparate Impact Rule by discussing the impact of the Rule on the homeowners insurance business and why they should not be exempted from its coverage.

7. After remand, PCI requested that HUD reopen the comment period so that PCI could submit additional comments addressing the issues identified in the Court's order. *See* PCI Letter to HUD (Sept. 25, 2014) (attached as Exhibit 4).

8. PCI next submitted to HUD a comment addressing the issues identified in the Court's order and reiterating the reasons why the Disparate Impact Rule was unlawful. *See* PCI Letter to HUD (Jan. 26, 2015). Among other points, the comment highlighted that 1) "the vast majority of states" require insurers to set rates based on "neutral actuarial factors," *id.* at 8; *see also id.* at Table 1; 2) the vast majority of states have expressly permitted insurers to group insureds based on risk, *id.* at 9; *see also id.* at Table 1; and 3) the vast majority of states "require

insurers to file their rates with state insurance commissioners for review and approval," *id.* at 12; *see also id.* at Table 1. The Disparate Impact Rule therefore violated the McCarran-Ferguson Act and the filed-rate doctrine.

9. Before HUD supplemented its explanation, the Supreme Court narrowly defined the scope of disparate-impact liability under the Fair Housing Act in *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). The Supreme Court emphasized that "disparate-impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Id.* at 2518. The Court also held plaintiffs must satisfy a "robust causality requirement" to establish a prima facie case beyond evidence of a mere statistical disparity. *Id.* at 2523. The Court specified that only "artificial, arbitrary, and unnecessary" practices should be eliminated by the Disparate Impact Rule. *Id.* at 2524. The Court warned against policies that would encourage the consideration of race "in a pervasive way," such as numerical quotas, as that would raise serious constitutional questions. *Id.* at 2523.

10. In light of this dispositive precedent, PCI submitted an additional comment to HUD explaining that homeowners insurers, due to their fundamental dependence on risk-based pricing, are precisely the types of actors whose practical business practices must be shielded from disparate-impact liability. *See* PCI Letter to HUD (July 29, 2015), at 2 (attached as Exhibit 5).

11. On October 5, 2016—nearly two years after this Court's remand order and over a year after the Supreme Court issued its decision in *Inclusive Communities*—HUD published its Supplemental Explanation. *See* 81 Fed. Reg. 69,012 (Oct. 5, 2016) (the "Supplemental

**App.395**

Explanation") (attached as Exhibit 6). Yet the Supplemental Explanation offers no meaningful discussion of the intervening, controlling *Inclusive Communities* decision. This failure to take account of *Inclusive Communities* was arbitrary and capricious. Nor does the Supplemental Explanation make any mention of the comment letters PCI submitted after this Court's remand.

12. This case has largely been on hold since HUD issued its Supplemental Explanation in response to this Court's remand order. In the intervening years, HUD has engaged in two new rulemaking processes based on the 2013 Rule.

13. HUD first considered amending the 2013 Rule. Beginning in 2018, HUD sought public comment on potential amendments to the 2013 Rule, and the agency ultimately proposed a new rule amending the 2013 Rule on August 19, 2019. *See* 84 Fed. Reg. 42,854 (Aug. 19, 2019). PCI filed a comment in response to this 2019 notice of proposed rulemaking. On September 24, 2020, HUD published a final rule amending the 2013 Rule. 85 Fed. Reg. 60,288 (Sept. 24, 2020) (the "2020 Rule"). But the 2020 Rule was enjoined by another court before it went into effect, *see Massachusetts Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 496 F. Supp. 3d 600 (D. Mass. 2020).

14. HUD then determined that it would reinstate the 2013 Rule. Accordingly, HUD proposed a new rule reinstating the 2013 Rule on June 25, 2021. 86 Fed. Reg. 33,590 (June 25, 2021) (attached as Exhibit 7). PCI, again, filed a comment in response to this 2021 notice of proposed rulemaking, PCI Letter to HUD (Aug. 24, 2021) (attached as Exhibit 8), as well as a supplemental comment addressing the Supreme Court's June 30, 2022 decision in *West Virginia et al. v. Environmental Protection Agency*, 142 S. Ct. 2587 (2022), PCI Letter to HUD (Aug. 29, 2022) (attached as Exhibit 9). On March 31, 2023, HUD published the 2023 Reinstated Rule, a new final rule reinstating and maintaining the 2013 Rule.

**App.396**

15.     The 2023 Reinstated Rule went into effect on May 1, 2023.

16.     HUD's reaffirmed decision to apply the Disparate Impact Rule to risk-based pricing practices in the homeowners insurance industry remains arbitrary and capricious and otherwise contrary to law.  HUD ignored the Court's instruction to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate-impact claims against insurers.  Rather, HUD cited—without support—that such wholesale bars would contravene the purpose of the McCarran-Ferguson Act.  Nor did HUD adequately address the filed-rate doctrine, ignoring cases in which courts found that doctrine to bar federal challenges to state insurance law.

17.     Like the original reasoning that the Court found unlawfully insufficient, the Supplemental Explanation fails to provide an adequate "response to the insurance industry's concerns that exposing them to disparate impact liability would undermine the fundamental nature of insurance." *Donovan*, 66 F. Supp. 3d at 1051.  For that reason, too, the Supplemental Explanation and the Rule it justifies are arbitrary and capricious.  In the Supplemental Explanation, HUD gives insufficient consideration to commenters' arguments that these particular underwriting and pricing practices should be exempt.  To the extent that the Supplemental Explanation considers these concerns at all, it addresses insurance practices more broadly, without paying attention to the particular concerns raised about homeowners insurance and about risk-based pricing and underwriting in particular.  And to the extent that it addresses the risk-based pricing of homeowners insurance, it contradicts itself and ignores comments that avoiding statistical disparities would require homeowners insurers to depart from risk-based pricing.  The Supplemental Explanation similarly fails to consider how application of a federal disparate-impact standard would affect the business of homeowners insurance, which is

**App.397**

dependent on effective risk segmentation. Nor does it adequately explain why the cost, time, and inconvenience of individualized litigation outweighed crafting an exception for the risk-based pricing of homeowners insurance. It also wholly disregards the costs homeowners insurance companies would incur in collecting data on race and other protected characteristics, which some states outlaw.

18. The Disparate Impact Rule is also contrary to law as established by *Inclusive Communities* in numerous respects. It compels the "pervasive" consideration of protected characteristics, stifles "practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system," and burdens actors who provide housing. *Inclusive Communities*, 135 S. Ct. at 2518.

19. The burden-shifting provisions of the Disparate Impact Rule are also contrary to the limitations outlined in *Inclusive Communities* when applied to the homeowners insurance industry, which operates by classifying risks based on a broad range of actuarial data. For one, the Rule impermissibly permits plaintiffs to state a prima facie claim of disparate impact merely by pointing to a statistical disparity and without establishing a robust causal connection between a defendant's policies and a racial disparity. Second, the Rule requires homeowners insurers to show on a case-by-case basis that challenged underwriting or pricing practices are necessary to achieve a legitimate business goal. This ignores the fact that all actuarially based pricing and underwriting is necessary to the legitimate business of the private competitive market for insurance, as well as the fact that state law typically mandates the use of actuarially significant factors. The Rule thus would not simply invalidate those policies that are "artificial, arbitrary, and unnecessary," but would inhibit "profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Id.* at 2518, 2524.

**App.398**

20.     Based on the facts set forth herein, the Court should declare that insofar as the Disparate Impact Rule purports to apply to the risk-based pricing of homeowners insurance, it was promulgated in contravention of the APA.

## PARTIES

21.     Property Casualty Insurers Association of America ("PCI") is an Illinois not-for-profit corporation with its headquarters in Chicago, Illinois.  It is a trade association of property and casualty insurers representing more than 1,000 member companies.  In 2015, PCI's members wrote over $202 billion in annual premiums and constituted 27% of the U.S. homeowners insurance market.  PCI's members sell homeowners insurance, subject to state insurance regulations, in every state of the United States.  PCI's mission is to promote and protect the viability of a competitive private insurance market for the benefit of consumers and insurers.  In bringing this lawsuit, PCI seeks to vindicate both its own interests and the interests of its members.

22.     Defendant Department of Housing and Urban Development ("HUD") is an executive agency of the United States Government, 5 U.S.C. §§ 101, 105, established by the Department of Housing and Urban Development Act of 1965, 42 U.S.C. § 3531 *et seq.*, Pub. L. No. 89−117, 79 Stat. 451.  HUD is headquartered at 451 Seventh Street SW, Washington, DC 20410.

23.     Defendant Marcia L. Fudge is the Secretary of the Department of Housing and Urban Development and is being sued in her official capacity.  Secretary Fudge is charged with implementing the Fair Housing Act and is responsible for the Department's promulgation of the challenged regulations.  Her official address is 451 Seventh Street SW, Washington, DC 20410.

## JURISDICTION AND VENUE

24.     This action arises under the APA.  This Court has subject-matter jurisdiction over

**App.399**

this action pursuant to 28 U.S.C. § 1331 and is authorized to grant relief under 5 U.S.C. §§ 702, 705, 706.

25.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff PCI resides in this district and no real property is involved in this action.

26.     This Court can grant declaratory and injunctive relief pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201, 2202.

## ALLEGATIONS

## I.     THE PROVISION AND PRICING OF INSURANCE

27.     Insurance is a means for transferring the risk of loss from one party, the insured, to another, the insurer.  Insurers group insureds into separate risk pools based on differences in risk profile.  In exchange for accepting an insured's risk, the insurer charges a rate appropriate for the insured's risk pool.  The rate is based on numerous factors, including the probability and amount of potential loss, policy limits, deductibles, and the insurer's cost of doing business.  *See, e.g.*, 1 Steven Plitt et al., *Couch on Insurance* § 1:6 (3d rev. ed. 2010).  The probability and amount of potential loss is also central to underwriting decisions—*e.g.*, decisions about whether to insure a particular risk or class of risk.  *Id.* at § 1:2.

28.     Determinations about the probability and amount of potential losses are made by actuaries.  Actuaries are credentialed professionals trained and skilled in the analysis, evaluation, and management of the financial implications of future contingent events, especially with respect to insurance.  In setting property and casualty insurance rates, actuaries adhere to the Casualty Actuarial Society's Statement of Principles Regarding Property and Casualty Insurance Ratemaking: Adopted by the Board of Directors of the Casualty Actuarial Society, May 1988, *available at* http://www.casact.org/professionalism/standards/princip/sppcrate.pdf.  These principles "provide the foundation for the development of actuarial procedures and standards of

**App.400**

practice" and, as such, provide essential guidance for insurers. *Id.*

29.    When forecasting the probability and amount of potential loss, insurers consider a host of actuarial factors that correlate with losses. *See* Michael J. Miller*, Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum 276, 284 (Winter 2009). For homeowners insurance, these factors might include, among many others, exposure to certain perils such as wind or hail, the types of construction materials used to build a house, house size, history of previous losses, geographic location, and proximity to fire hydrants. In applying these factors, insurers thus consider risk, not race or other protected characteristics. As the United States Court of Appeals for the Seventh Circuit has explained, "[r]isk discrimination is not race discrimination." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992) (Easterbrook, J.); *see also id.* at 298 ("[C]lassification of risks is important to insurance, and assigning higher rates to greater risks differs from assigning rates by race.").

30.    Reliance on neutral, actuarially justified factors to calculate the probability and amount of potential losses is fundamental to the ability of the insurance industry to correlate risks to rates. The insurance market operates most efficiently and fairly when each consumer pays a rate that accurately reflects the cost of providing insurance to that consumer and other similarly situated consumers. If insurers could not set rates based on neutral, actuarially justified factors and risk calculations, the insurance industry could not function. *See, e.g.,* Robert Detlefsen, *"Disparate Impact" Theory Provides No Support for Banning Credit Scoring in Insurance*, Legal Backgrounder, Apr. 8, 2005, at 1, *available at* http://www.wlf.org/upload/040805LBDetlefsen.pdf. If risk is not considered in setting prices, lower-risk customers are overcharged for insurance relative to the risk of loss that they pose. If this were to occur (notwithstanding state law discussed below), many lower-risk customers

**App.401**

would choose not to purchase insurance rather than pay too much for it. This problem of adverse selection would cause prices to rise. *See* Miller*, Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 284; Ronen Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L. J. 29, 44 (2012).

31.     The Court of Appeals for the Seventh Circuit has noted this very phenomenon:

> Insurance works best when the risks in the pool have similar characteristics. For example, term life insurance costs substantially more per dollar of death benefit for someone 65 years old than for one 25 years old, although the expected return per dollar of premium is the same to both groups because the older person, who pays more, also has a higher probability of dying during the term. Auto insurance is more expensive in a city than in the countryside, because congestion in cities means more collisions. Putting young and old, or city and country, into the same pool lead to adverse selection: people knowing that the risks they face are less than the average of the pool would drop out. A single price for term life insurance would dissuade younger persons from insuring, because the price would be too steep for the coverage offered; the remaining older persons would pay a price appropriate to their age, but younger persons would lose the benefits of insurance altogether. To curtail adverse selection, insurers seek to differentiate risk classes with many variables.

*Am. Family Mut. Ins. Co.*, 978 F.2d at 290 (noting the difference between disparate treatment claims and disparate-impact claims in addressing application of the McCarran-Ferguson Act).

32.     Additionally, if insurers were forced to disregard the actual risk of insuring a property (again, notwithstanding state law to the contrary), as would be required by the Disparate Impact Rule, it would severely disrupt the insurance market. Insurers who wanted to provide coverage for high-risk properties would not be permitted to charge adequate rates if they disproportionately affected insureds who met the criteria of a protected class. They would have to set their overall prices higher than those of their competitors, which could not be sustained in a competitive market. This would either jeopardize the insurer's solvency or result in a legitimate business decision not to offer such coverage.

**App.402**

33.     The inability to set rates based on neutral, actuarially justified factors would also create an artificial subsidy for the purchase of hazard-prone or poorly constructed houses.  For example, insurance rates on houses made of easily flammable materials would be similar to rates on houses built of safer materials, due to characteristics of the policyholder that are not correlated to risk of a property loss.  This would remove an incentive for the construction of safer houses and the maintenance of existing homes.  *See, e.g.*, Avraham, *The Economics of Insurance Law—A Primer*, 19 Conn. Ins. L. J. at 66-67.

## II.    STATE REGULATION OF INSURANCE

34.     Homeowners insurance is subject to extensive state regulation.  State regulatory regimes typically mandate the use of risk-based pricing based on actuarially significant risk factors.

35.     State law generally prohibits insurers from charging excessive, inadequate, or unfairly discriminatory insurance rates.  For purposes of insurance law, rates are "unfairly discriminatory" if "premium differences . . . do not correspond to expected losses and average expenses or if there are expected average cost differences that are not reflected in the premium differences."  Miller*, Disparate Impact and Unfairly Discriminatory Insurance Rates*, Casualty Actuarial Society E-Forum at 283 (internal quotation marks omitted).  As further explained in Principle 4 of Casualty Actuarial Society Statement of Ratemaking Principles, "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer."  Statement of Principles Regarding Property and Casualty Insurance Ratemaking: Adopted by the Board of Directors of the Casualty Actuarial Society, May 1988, *available at* http://www.casact.org/professionalism/standards/princip/sppcrate.pdf.

36.     The National Association of Insurance Commissioners ("NAIC") is a standard-

**App.403**

setting and regulatory support organization created and governed by state insurance regulators. NAIC establishes standards, model laws, and best practices, conducts peer review, and coordinates regulatory oversight.  NAIC's model code makes clear that an insurer is guilty of unfair discrimination when it makes underwriting and rating distinctions "between individuals or risks of the same class and of essentially the same hazard" or when underwriting and rating decisions are not supported by "the application of sound underwriting and actuarial principles related to actual or reasonably anticipated loss experience."  Unfair Trade Practices Act § 4(G)(3) (Model Regulation Service, July 2008).

37.    Insurers therefore must take into account actuarially significant risk factors in making underwriting decisions and setting rates.  These principles are consistently applied in state regulations and case law, as well as in model laws.

**A.    State Laws Permitting Consideration Of Actuarial Factors**

38.    State laws make clear that insurers are expected to consider actuarially significant risk factors.  For example, Illinois law prohibits "any unfair discrimination *between individuals or risks of the same class or of essentially the same hazard and expense element* because of the race, color, religion, or national origin of such insurance risks or applicants."  215 Ill. Comp. Stat. 5/424(3) (emphasis added).  Rates may differ on the basis of sex, sexual preference, or marital status if such "classification or differentiation is based upon expected claim costs and expenses *derived by applying sound actuarial principles* to relevant and reasonably current company or intercompany studies, claim costs and expense experience."  Ill. Admin. Code tit. 50, § 2603.40 (emphasis added).

39.    Similarly, Wisconsin law states: "One rate is unfairly discriminatory in relation to another in the same class if it clearly fails to reflect equitably the differences in expected losses and expenses.  Rates are not unfairly discriminatory because different premiums result for

**App.404**

policyholders with like loss exposures but different expense factors, or like expense factors but different loss exposures, so long as the rates reflect the differences with reasonable accuracy." Wis. Stat. Ann. § 625.11(4).

40.     West Virginia law specifies that risk-classification standards "may measure any differences among risks that can be demonstrated to have a probable effect upon losses or expenses."  W. Va. Code § 33-20-3(c)(2).  Virginia law provides that "[n]o rate shall be unfairly discriminatory if a different rate is charged for the same coverage and the rate differential (i) is based on sound actuarial principles or (ii) is related to actual or reasonably anticipated experience."  Va. Code Ann. § 38.2-1904(A)(3).  Maine law states that "[n]o risk classification may be based upon race, creed, national origin or the religion of the insured," Me. Rev. Stat. Ann. tit. 24-A, § 2303(1)(G), but a risk classification "based upon size, expense, management, individual experience, purpose of insurance, location or dispersion of hazard, or any other reasonable considerations" is not unreasonable or unfairly discriminatory "provided such classifications and modifications apply to all risks under the same or substantially similar circumstances or conditions," *id.* § 2303(2).  *See also* Tenn. Code Ann. § 56-5-103(d) ("A rate is not unfairly discriminatory because different premiums result for policyholders with like loss exposures with different expenses, or like expenses but different loss exposures, so long as the rate reflects the differences with reasonable accuracy.").

41.     Many other states' laws are to similar effect.  *See* Alaska Stat. § 21.39.030; Colo. Rev. Stat. § 10-4-403(1)(a); Del. Code Ann. tit. 18, § 2503(b); Mich. Comp. Laws § 500.2109(1)(C); *Cole v. State Farm Ins. Co.*, 128 P.3d 171, 177 (Alaska 2006) ("Alaska has other statutes that specifically protect insurance customers from discrimination. These statutes forbid "'unfair discrimination between insureds or property having like insuring or risk

**App.405**

characteristics in any ... of the terms and conditions of the insurance.'"); *Cain v. Fortis Ins. Co.*, 694 N.W.2d 709, 714 (S.D. 2005) ("SDCL 58-33-26 states in pertinent part: No insurer shall make or permit any unfair discrimination between insureds or property having like insuring or risk characteristics, in the premium or rates charged for insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the insurance."); *Ins. Comm'r for the State v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. § 241. … Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Kuebler v. Equitable Life Assurance Soc. of the U.S.*, 555 N.W.2d 496, 500 (Mich. Ct. App. 1996) ("The antidiscrimination statute seeks to eliminate price discrimination based on considerations other than risk and expenses.").

**B.      State Laws Mandating Consideration Of Actuarial Factors**

42.      Many states expressly require insurance companies to consider past loss and other actuarially relevant factors in developing insurance rates.  For example, Ind. Code Ann. § 27-1-22-3(a)(1) provides that "[d]ue consideration shall be given to the past and prospective loss experience within and outside this state … [and] to all other relevant factors, including trend factors, within and outside this state ….").  Wisconsin law similarly provides:

Due consideration shall be given to all of the following that apply:

(a)      Past and prospective loss and expense experience within and outside of this state.

(b)      Catastrophe hazards and contingencies.

(c)      Trends within and outside of this state.

(d)      Loadings for leveling premium rates over time or for dividends or savings to be allowed or returned by insurers to their policyholders, members or

**App.406**

subscribers.

(e)     Subject to s. 632.365, all other relevant factors, including the judgment of technical personnel.

Wis. Stat. Ann. § 625.12(1).

43.     Numerous other states have similar laws.  *See e.g.*, Ala. Code § 27-13-27(3)–(4) (requiring insurers to "[g]ive consideration to past experience within the state and without the state when necessary…[and to] all factors reasonably related to the kind of insurance involved"); Ariz. Rev. Stat. Ann. § 20-356(2) ("Due consideration shall be given to past and prospective loss experience within and outside this state, to catastrophe hazards, if any, to a reasonable margin for underwriting profit and contingencies, to dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members or subscribers, to past and prospective expenses within and outside this state and to all other relevant factors within and outside this state."); Ark. Code Ann. § 23-67-209(a) ("Due consideration must be given to past and prospective loss and expense experience within and outside this state .…"); Colo. Rev. Stat. § 10-4-403(1)(c) ("[U]nfair discrimination exists if, after allowing for practical limitations, price differentials fail to reflect equitably the differences in expected losses and expenses.); Del. Code Ann. tit. 18, § 2503(a)(3)(a) ("Due consideration shall be given to past and prospective loss experience within and outside the State"); Ga. Code Ann. § 33-9-4(4) ("Consideration shall be given to the extent applicable to past and prospective loss experience … and to all other factors, including judgment factors, deemed relevant within and outside this state"); Idaho Code § 41-1437(1) ("due consideration shall be given to past and prospective loss experience … and to all other relevant factors"); La. Rev. Stat. Ann. § 22:1454(B)(1) ("Due consideration shall be given to past and prospective loss and expense experience within and outside the state"); Me. Rev. Stat. Ann. tit. 24-A, § 2303(1)(C) ("Due consideration must be given … to past and prospective loss

**App.407**

experience … [and] to all other relevant factors within and outside this State"); Md. Code Ann., Ins. § 11-205(c)(1), (8) (requiring insurers to consider "past and prospective loss experience" and "all … relevant factors within and outside the state"); Mich. Comp. Laws § 500.2110(1) ("In developing and evaluating rates … due consideration shall be given to past and prospective loss experience … to underwriting practice and judgment; and to all other relevant factors within and outside this state."); Minn. Stat. § 70A.05(1) ("Due consideration shall be given to past and prospective loss and expense experience within and outside this state, to a reasonable provision for catastrophe hazards and contingencies, to clearly discernible trends within and outside this state, ... and to all other relevant factors, including the judgment of underwriters and raters."); Miss. Code. Ann. § 83-2-3(2)(a) ("Due consideration shall be given to past and prospective loss and expense experience … and to all other relevant factors, including the judgment of the filer."); Mo. Rev. Stat. § 379.318(1) (requiring insurers to consider "past and prospective loss experience," "conflagration and catastrophe hazards," "past and prospective expenses," "a reasonable margin for underwriting profit and contingencies," and "all other relevant factors, including trend factors"); Ohio Rev. Code Ann. § 3935.03(C) ("Consideration shall be given to: (1) Past and prospective loss experience within and outside this state; … (6) All other relevant factors within and outside this state"); Or. Rev. Stat. § 737.310 ("(3) Rates for each classification of coverage shall be based on the claims experience of insurers within Oregon on that classification of coverage unless that experience provides an insufficient base for actuarially sound rates.…"). *See also* Mont. Code Ann. § 33-16-201(2)(a); Neb. Rev. Stat. § 44-7502; Nev. Rev. Stat. § 686B.060; N.H. Rev. Stat. Ann. § 412:15(II)(a); N.J. Stat. Ann. §§ 17:29A-4(c), -11; N.M. Stat. Ann. § 59A-17-7; N.Y. Ins. Law § 2304(a); N.C. Gen. Stat. § 58-40-25(1); N.D. Cent. Code § 26.1-25-03(1); Okla. Stat. tit. 36, § 985; R.I. Gen. Laws § 27-44-5(e)(1); S.D. Codified

**App.408**

Laws § 58-24-6.1; Tenn. Code Ann. § 56-5- 104; Tex. Ins. Code Ann. § 2251.052; Utah Code Ann. § 31A-19a-201; Wash. Rev. Code § 48.19.030.

### C.   State Filed Rate Requirements

44.    In many states, proposed rates must be filed with state regulators for review and approval.  *See, e.g.*, Ala. Code § 27-13-30; Alaska Stat. § 21.39.040(a), (c); Ark. Code Ann. § 23-67-211(a); Cal. Ins. Code § 1861.05(b), (c); Colo. Rev. Stat. §§ 10-4-404, 10-4-406; Del. Code Ann. tit. 18, § 2504; Haw. Rev. Stat. § 431:14-104(a); Ky. Rev. Stat. Ann. § 304.13-051; La. Rev. Stat. Ann. § 22:1451(B); Neb. Rev. Stat. § 44-7508; N.J. Stat. Ann. § 17:29A-6, -7; N.D. Cent. Code § 26.1-25-04; Ohio Rev. Code Ann. § 3935.04; Wash. Rev. Code § 48.19.060.

### D.   State Administrative Mechanisms For Reviewing Rates

45.    In addition, many state regulatory regimes provide systems of administrative redress to review allegedly improper rates.  For example, Indiana law provides for rate review by the insurance commissioner:

> (a) Upon the commissioner's motion, or upon written request by any insured affected thereby or by any licensed insurance producer or broker, if such request is made in good faith and states reasonable grounds, the commissioner, if the commissioner shall have reason to believe that any filing is not in compliance with the applicable provisions of section 3 of this chapter, or in the case of an alleged violation of section 6 of the chapter if the commissioner finds on the basis of the information on file with the department that there has been a prima facie showing of a violation of that section, shall hold a hearing upon not less than ten (10) days written notice to the rating organization or insurer which made the filing in issue, specifying the items and matters to be considered and stating in what manner and to what extent noncompliance is alleged to exist.

> *      *      *

**App.409**

> (b) If, after such hearing, the commissioner finds, based upon a preponderance of the evidence adduced at such hearing and made a part of the record thereof, that such filing is not in compliance with the provisions of section 3 of this chapter, the commissioner shall immediately issue a written order to the parties specifying in detail in what respects and upon what evidence such noncompliance exists and stating when, within a reasonable period thereafter, such filing shall be deemed no longer effective.

Ind. Code Ann. § 27-1-22-5(a)–(b).

46.    Other states similarly permit review of insurance rates. *See* Ala. Code § 27-13-30 ("Whenever the commissioner shall find that rating systems theretofore approved by him, or which pursuant to Section 27-13-37 are effective without approval, provide for, result in or produce rates which are unreasonable or inadequate or which discriminate unfairly between risks in this state involving essentially the same hazards, he shall issue an order … directing that such rating systems be altered or revised …."); Alaska Stat. § 21.39.050(c); Ariz. Rev. Stat. Ann. § 20-358 (B) (includes a provision allowing "any person or organization aggrieved with respect to any filing or rating system which is in effect" to "make written application to the director" which may, after a hearing, result in disapproval of the rate); Del. Code Ann. tit. 18, § 2520 (permitting an appeal of filings by any aggrieved person or organization); Fla. Stat. § 627.0645(7); Ga. Code Ann. § 33-9-26; Haw. Rev. Stat. § 431:14-106(c), (e); Idaho Code § 41-1427; 215 Ill. Comp. Stat. 5/132.3; Iowa Code § 507.2; Md. Code Ann., Ins. § 11-208(d)-(e); Me. Rev. Stat. Ann. tit. 24-A, § 2306; Mich. Comp. Laws § 500.2416 (within thirty days); Minn. Stat. § 70A.11; Miss. Code. Ann. § 83-2-11; Mo. Ann. Stat. § 379.348; Mont. Code Ann. § 33-16-204; Neb. Rev. Stat. § 44-7508(13-15); N.H. Rev. Stat. Ann. §§ 412:19, 412:38; N.M. Stat. Ann. §§ 59A-17-13(B), 59A-17-30, 59A-17-33; N.Y. Ins. Law §§ 2319, 2320; N.C. Gen. Stat. § 58-40-100; N.D.

**App.410**

Cent. Code § 26.1-25-09; Ohio Rev. Code Ann. § 3937.04; Okla. Stat. tit. 36, §§ 989(B)–

990; Or. Rev. Stat. §§ 737.215, 737.225(3), 737.235, 737.340; R.I. Gen. Laws § 27-44-14;

S.C. Code Ann. § 38-73-1030; S.D. Codified Laws § 58-24-29; Tenn. Code Ann. §§ 56-5-

109, 56-5-115; Tex. Ins. Code Ann. §§ 2251.105, 2251.1031, 2252.052; Utah Code Ann. §§

31A-19a-217, 31A-19a-218; Va. Code Ann. § 38.2-1909 ("The Commission may investigate

and determine, … whether rates in this Commonwealth for the classes of insurance to which

this chapter applies are excessive, inadequate or unfairly discriminatory or whether loss

experience and other factors within the Commonwealth are being properly used to determine

the rates."); Vt. Stat. Ann. tit. 8, §§ 4700, 4704; Wash. Rev. Code § 48.19.310; W. Va. Code

§ 33-20-9; Wyo. Stat. Ann. § 26-14-106(d)-(g).

### E. Laws Prohibiting Collection Of Data On Race and Other Protected Characteristics

47.     In addition to other regulations concerning the provision of insurance, at least one

state prohibits the collection of information about protected characteristics.  *See* Md. Code Ann.,

Ins. § 27-501.

## III.    THE MCCARRAN-FERGUSON ACT

48.     Historically, insurance was largely immune from federal regulation because the

business of insurance was not considered "commerce" that could be regulated by Congress.

*See Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1868).  As a result, the states enjoyed a virtually

exclusive domain over the insurance industry, which is today one of the most heavily regulated

businesses in the country.  In 1944, the Supreme Court determined in *United States v. South-

Eastern Underwriters Ass'n*, 322 U.S. 533 (1944), that the provision of insurance across state

lines was interstate commerce that Congress could regulate.  Congress responded in 1945 by

enacting the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, which ensured that the

**App.411**

Supreme Court's decision in *South-Eastern Underwriters* did not undermine state regulation of insurance. The extensive state regulation of the business of insurance discussed above is a result of this long history of exclusive state control of this area.

49. Section 1 of the McCarran-Ferguson Act, 15 U.S.C. § 1011, provides: "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."

50. Subsection 2(b) of the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." The Supreme Court has recognized that the McCarran-Ferguson Act "is, in effect, a clear-statement rule." *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 507 (1993). Federal law cannot invalidate, impair, or supersede state regulation of insurance unless Congress states its intention to do so clearly and expressly.

51. Under the McCarran-Ferguson Act, federal law is reverse-preempted if it "directly conflict[s] with state regulation" or when "application of the federal law would . . . frustrate any declared state policy or interfere with a State's administrative regime." *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999); *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 563 (7th Cir. 1999) ("Direct conflict with state law is not required to trigger this prohibition; it is enough if the interpretation would 'interfere with a State's administrative regime.'").

52. The Act applies where federal law would impose liability for conduct permitted

**App.412**

by state law. *See, e.g., Ojo v. Farmers Gr.*, 356 S.W.3d 421, 434-35 (Tex. 2011) (disparate-impact challenge to use of credit scores reverse-preempted under McCarran-Ferguson Act because Texas's insurance law permits the use of credit scoring, despite any disparate impact that the use of credit scoring will produce, so long as the factors used in credit scoring are not themselves based on race); *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 968 (8th Cir. 2008) (disparate-impact claims under the Fair Housing Act impaired state law, which did not permit private cause of action for alleged discrimination by an insurer); *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 519 (6th Cir. 2010) ("We conclude that application of federal RICO in this case would impair Ohio's insurance regulatory scheme. The conduct at the heart of Plaintiffs' complaint implicates Ohio's law regarding payment of claims and the Ohio Department of Insurance is charged with administering the applicable state law. In this case, Plaintiffs have no common law remedy or private right of action. The state RICO statute is inapplicable and the damages available pursuant to federal RICO would far exceed the damages contemplated by the Ohio legislature when enacting its insurance regulatory scheme.").

53. The Seventh Circuit concluded in *NAACP v. American Family Insurance Co.* that the McCarran-Ferguson Act applies to the Fair Housing Act. *See* 978 F.2d at 293-95. Although the Court concluded that the McCarran-Ferguson Act does not reverse-preempt disparate *treatment* claims under the Fair Housing Act, the Court's analysis suggested that the outcome would be different for disparate-impact claims given "the nature of insurance" and its reliance on risk differentiation. *See id.* at 290 (describing problem of "adverse selection"); *id.* ("assum[ing] that the plaintiffs can establish disparate treatment and not just disparate impact of decisions made on actuarial grounds"); *id.* at 291 ("All we decide is whether the complaint states claims on which the plaintiffs may prevail if they establish that the insurer has drawn lines according to

race rather than actuarial calculations."); *id.* at 298 (noting difficulty applying "disparate impact paradigm" to insurance).

## IV.     THE FAIR HOUSING ACT

54.     Enacted as Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.*, the Fair Housing Act ("FHA"), as amended, makes it unlawful, among other things, "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b); *see also id.* § 3604(f)(2) (prohibiting discrimination because of "handicap").

55.     The FHA does not reference homeowners insurance in any context.  Congress was silent on the subject of homeowners insurance in the FHA.

## V.      THE DISPARATE IMPACT RULE

### A.      HUD's Proposed Rule

56.     On November 16, 2011, HUD issued a proposed rule entitled "Implementation of the Fair Housing Act's Discriminatory Effect's Standard."  *See* 76 Fed. Reg. 70,921 (Nov. 16, 2011).  In the notice of proposed rulemaking, HUD explained that it "interpreted the [FHA] to prohibit housing practices with a discriminatory effect, even where there has been no intent to discriminate."  *Id.* at 70,921.  HUD asserted that the purpose of the proposed rule was "to establish uniform standards for determining when a housing practice with a discriminatory effect violates the Fair Housing Act."  *Id.*

57.     In the notice of proposed rulemaking, HUD cited "the provision and pricing of homeowner's insurance" as an "[e]xample[] of a housing policy or practice that may have a disparate impact on a class of persons delineated by characteristics protected by the Act."  76 Fed. Reg. at 70,924.  The notice of proposed rulemaking did not reference the McCarran-

Ferguson Act, much less discuss how application of disparate-impact liability could possibly be reconciled with the historic consideration of actuarially significant risk-based factors in the pricing and underwriting of insurance.

### B. Comments From The Insurance Industry

58.     In response to HUD's unsupported assertion that its new Disparate Impact Rule would apply to the provision of homeowners insurance, the insurance industry submitted detailed comments explaining why doing so would be unlawful and ill-advised, including comments from PCI and two other insurance trade associations, the National Association of Mutual Insurance Companies ("NAMIC"), and the American Insurance Association ("AIA").  *See* Comments of the Property Casualty Insurers Ass'n of America, Docket No. FR-5508-P-01 (Jan. 17, 2012) ("PCI Comments"); Comments of the National Association of Mutual Insurance Companies, Docket No. FR-5508-P-01 (Jan. 17, 2012) ("NAMIC Comments"); Comments of the American Insurance Association, Docket No. FR-5508-P-01 (Jan. 17, 2011) ("AIA Comments").  The insurance industry commenters explained that application of disparate-impact liability to homeowners insurance is fundamentally inconsistent with consideration of actuarially sound risk-based factors and would violate the McCarran-Ferguson Act.  For example, PCI's Comments noted that "[e]very state has extensive laws and regulations governing insurance underwriting practices and those laws naturally recognize the need for insurers to distinguish between different types and degrees of risk.  Indeed, risk discrimination is the foundation of insurance underwriting and every state has considered at length the appropriate regulatory balance to prohibit unfair discrimination."  PCI Comments at 2.  Thus, imposing liability on insurers for their core practice of risk discrimination would be inappropriate and would impair state regulation of the insurance industry.  *See id.*  NAMIC's Comments further stated: "The foundation of the business of insurance, and in particular underwriting and rate-making, is

**App.415**

classifying insurance applicants and policyholders by risk. Insurers make decisions based on actuarial and business principles that group policyholders for the purpose of treating those with similar risk profiles similarly. Race or other protected class characteristics are not part of the risk assessment process." NAMIC Comments at 5. They further noted (at p. 5):

> To actuarially determine rates that most accurately measure loss potential, insurers identify relationships between factors and risk of loss and allocate costs accordingly. This practice is the very essence of risk-based pricing. Common homeowners insurance factors include claim history of applicant, construction material(s), distance from a fire station, dog/breed of dog owned, fire suppression devices, home-based business presence and type, lead paint potential (constructed pre-1978), loss history of property, roofing material, trampoline use, slab versus basement and the presence of an operational security system.

59.     NAMIC added that the use of factors to calculate risk would be limited by the application of disparate-impact liability because any factor could affect protected groups differently:

> Under HUD's proposed rule, . . . common underwriting factors could be jeopardized, even though they do not intentionally discriminate, if they were found to have the "effect" of making unavailable or denying a dwelling to a certain percentage of a particular racial or ethnic group if that percentage is greater than the percentage of other groups that is similarly affected. To achieve a condition in which no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process. In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk. This calls into question conclusions drawn simply from statistical samplings and underscores why the business of risk classification defies a disparate impact analysis.

NAMIC Comments at 5-6.

60.     The commenters also explained that eliminating risk-based pricing would have significant negative consequences: "adverse selection will increase, and coverage availability

**App.416**

will suffer.  Perversely, application of the proposed rule could in fact harm all insurance consumers, including the very groups it purports to protect."  NAMIC Comments at 7.

61.     The insurance industry further commented that because state laws expressly contemplate consideration of actuarially significant risk factors, the application of disparate-impact liability would violate the McCarran-Ferguson Act.  The comments noted that "[c]lassifying people and property by the risks they present and treating similar risk profiles in a similar manner is a form of reasonable and fair discrimination that is at the very heart of the business of insurance."  NAMIC Comments at 6; *see also* PCI Comments at 2.  As a matter of state insurance law, the term "[u]nfair discrimination" has a "specific meaning": "a rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer [in the insurance context]."  *Id.* (quoting Principal 4 of Casualty Actuarial Society's Statement of Ratemaking Principles).  The comments noted that courts have already held that the application of disparate-impact liability to insurers under the FHA would conflict with the laws of states such as Texas, Missouri, Nebraska, and Mississippi.  *Id.* at 8-9.

62.     In light of the inherent conflict between disparate-impact liability and actuarial risk based pricing and underwriting, the insurance comments requested that HUD exempt insurance underwriting and pricing from the Disparate Impact Rule.  *See* PCI Comments at 3; NAMIC Comments at 9.  In the alternative, commenters requested that HUD provide regulatory safe harbors for long-recognized actuarial risk factors, such as age and condition of a property or distance from a fire station.  *See* NAMIC Comments at 9.  Comments also requested that HUD exempt Fair Access to Insurance Requirements (FAIR) plans, which provide insurance to high-risk individuals who might otherwise be denied coverage.  *See id.*

**App.417**

63.     Finally, the insurance comments explained that HUD's "three-step burden-shifting" approach for resolving disparate-impact claims conflicted with the Supreme Court's decision in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), in numerous respects relevant to the insurance industry.  At the first step of the process, HUD improperly omitted the requirement that any disparate impact be "significant."  At the second step, HUD improperly shifted the burden of proof to the defendant and required a defendant to show that the challenged practice is "necessary" to serve a legitimate interest.  And at the third step, HUD erred by omitting the requirement that any proffered alternative practice be "equally as effective" as the challenged practice at serving the defendant's legitimate business interests.  *See* NAMIC Comments at 10-11; AIA Comments at 4.

### C.     The 2013 Rule

64.     On February 15, 2013, HUD promulgated the 2013 Rule, which, as noted above, was ultimately reinstated by the 2023 Reinstated Rule.  The 2013 Rule purports to "formalize[]" HUD's view that the FHA's prohibition on discrimination may be violated by practices that have a discriminatory effect in the absence of a discriminatory intent.  78 Fed. Reg. at 11,460.

65.     The  2013 Rule provides that "[a] practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."  *Id.* at 11,482.  It further provides that a challenged "practice [with a discriminatory effect] may still be lawful if supported by a legally sufficient justification," *id.*, meaning that: (1) the challenged housing practice "[i]s necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent" and (2) "[t]hose interests could not be served by another practice that has a less discriminatory effect," *id.*

**App.418**

66. Under the 2013 Rule, the plaintiff or charging party has the initial "burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." *Id.* If the plaintiff or charging party meets that burden, "the respondent or defendant has the burden of proving that the challenged practice is necessary to achieve one or more [of its] substantial, legitimate, nondiscriminatory interests." *Id.* If the defendant or respondent meets its burden, the plaintiff or charging party "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.*

67. HUD rejected a "significance requirement" for disparate-impact liability. *Id.* at 11,468. HUD also declined to require that an alternative "practice that has a less discriminatory effect" be "equally effective" at serving the defendant's substantial, legitimate, nondiscriminatory interest. *Id.* at 11,473. Accordingly, disparate-impact defendants may be liable under the HUD Rule for failing to adopt an alternative practice even when that practice is not as effective at serving their substantial, legitimate, nondiscriminatory interests.

68. Nor did HUD offer any meaningful response to comments noting that the proposed burden-shifting rules are at odds with settled law. Most notably, HUD never explained how the burden-shifting standards set for the Disparate Impact Rule can be reconciled with the Supreme Court's decision in *Wards Cove Packaging Co. v. Antonio*, 490 U.S. 642 (1989), or can sensibly be applied to the business of insurance. HUD's failure to apply settled law on the burden of proof and the process for adjudicating a disparate impact claim deprives insurers of a viable opportunity to demonstrate even on case-by-case basis that risk-based underwriting and pricing is justified by legitimate, non-discriminatory business purposes.

**App.419**

## VI.   PCI'S CHALLENGE TO APPLICATION OF THE DISPARATE IMPACT RULE TO THE PRICING OF HOMEOWNERS INSURANCE

69.     On November 27, 2013, PCI filed its original complaint, challenging the application of HUD's Disparate Impact Rule to the pricing of homeowners insurance as arbitrary and capricious and otherwise contrary to law.  The parties cross-moved for summary judgment, and HUD also moved to dismiss for lack of jurisdiction, arguing that PCI lacked standing and that its claims were unripe.

70.     In its September 3, 2014 decision, the Court granted summary judgment for PCI on its claims that HUD failed to adequately address several of the insurance industry's comments submitted during rulemaking.  *See Donovan*, 66 F. Supp. 3d at 1048-51.  The Court reasoned that HUD's one-paragraph response to the insurance industry's detailed comments failed to provide a reasoned explanation for preferring case-by-case adjudication of McCarran-Ferguson preclusion claims over rulemaking.  *Id.* at 1048.  The Court criticized HUD for making "no attempt" to determine how often McCarran-Ferguson preclusion would apply and whether entire categories of disparate-impact claims against insurers would be barred.  *Id.* The Court reached the same conclusion with respect to HUD's response to comments regarding the operation of the filed-rate doctrine.  The Court explained that HUD must, on remand, provide a reasoned explanation for preferring case-by-case adjudication over rule-making, which would involve determining whether the benefits of proceeding through case-by-case adjudications outweighed the benefits of including an exemption or safe harbors for insurers.  *Id.* at 1048-49.  The Court found arbitrary and capricious HUD's suggestion that insurers might defend their policies on a case-by-case basis as part of the burden-shifting framework of the Rule.  *Id.* at 1051.

71.     The court also concluded that HUD had acted in an arbitrary and capricious manner by failing to address the substance of the homeowners insurance industry's arguments

**App.420**

that the Rule would prevent the use of actuarially sound underwriting and risk assessment factors and thereby undermine the fundamental nature of the insurance business itself.  The Court explained that "HUD's response to the insurance industry's concerns that exposing them to disparate impact liability would undermine the fundamental nature of insurance was arbitrary and capricious.  HUD made no effort to evaluate the substance of the insurance industry's concerns, disregarding them merely because insurers would have an opportunity to raise their arguments as part of the burden-shifting framework.  The ability of insurers to raise their arguments on a case-by-case basis in subsequent proceedings, however, does not alleviate HUD of its obligation to consider the substance of the insurance industry's concerns raised during the notice-and-comment period."  *Id.*

72.     The Court dismissed without prejudice as unripe PCI's claim that the Rule violates the McCarran-Ferguson Act.  *Id.* at 1040-42.  The Court granted summary judgment in HUD's favor on PCI's claim that the Rule violates the requirements for disparate-impact liability established in *Wards Cove Packaging Co. v. Atonio*, 490 U.S. 642 (1989).  The Court held that the burden-shifting framework HUD adopted embodied a reasonable interpretation of the FHA, warranting deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984).  *See Donovan*, 66 F. Supp. 3d at 1052-53.

73.     The Court remanded the case to HUD for further proceedings.

## VII.     POST-REMAND PROCEEDINGS

### A.     PCI's Submission of Supplemental Comments

74.     Shortly after remand, PCI requested that HUD reopen the comment period.  *See* PCI Letter to HUD (Sept. 25, 2014).

75.     PCI next submitted to HUD a comment addressing the issues identified in the Court's order.  *See* PCI Letter to HUD (Jan. 26, 2015).  The comment repeated PCI's request for

an exemption for homeowners insurers because the Rule's application "would impair state regulation of insurance in violation of the McCarran-Ferguson Act, would fundamentally interfere with the provision of homeowners insurance, and would impose needless costs on providers of homeowners insurance and their customers." *Id.* at 1.

76. PCI particularly emphasized that calculating the risk of loss is fundamental to the business of insurance, *id.* at 2, 16–17, and that because the "vast majority of states" require insurers to set rates based on "neutral actuarial factors," the Disparate Impact Rule would violate the McCarran-Ferguson Act and "interfere with insurers' compliance with state law," *id.* at 8–9; *see also id.* at Table 1 (showing statutes requiring risk-based pricing, organized by state).

77. Likewise, forty-seven states have expressly permitted insurers to group insureds based on risk, and the Disparate Impact Rule interferes with that express permission. *Id.* at 9–10; *see also id.* at Table 1.

78. PCI also pointed out the flaws in HUD's assertion that state fair housing laws permit disparate-impact claims against insurers: namely, unless such state fair housing laws specifically displace insurance laws that require or expressly permit risk-based pricing and underwriting practices, the insurance laws remain valid and are shielded by the McCarran-Ferguson Act. *Id.* at 10–11.

79. The comment noted that forty-seven states and the District of Columbia "require insurers to file their rates with state insurance commissioners for review and approval." *Id.* at 12; *see also id.* at Table 1. The Disparate Impact Rule would therefore violate the McCarran-Ferguson Act by "substituting the judgment of a federal court for that of state regulators." *Id.* at 12–13. Similarly, the comment added that the Disparate Impact Rule would violate the filed-rate doctrine because it would allow "private lawsuits and government enforcement actions that

**App.422**

question the permissibility of a filed rate." *Id.* at 13.

80.    Finally, PCI explained that to the extent HUD intends to apply the Disparate

Impact Rule beyond the "provision and pricing of homeowners insurance" identified in the plain

text of the Rule, this would also be prohibited by the McCarran Ferguson Act. *Id.* at 15–16.

Homeowners insurance practices other than the provision and pricing of homeowners insurance

"do not have a substantial enough effect on homeownership" to constitute discriminatory

practices under the Fair Housing Act. *Id.* at 15 (citing 42 U.S.C. § 3604; *NAACP v. Am. Family

Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir. 1992) (Easterbrook, J.)). And because states regulate

such practices, subjecting the practices to the Disparate Impact Rule would violate the

McCarran-Ferguson Act. *Id.* at 16.

### B.    The Supreme Court's Decision in *Inclusive Communities*

81.    While this matter was before HUD on remand, the Supreme Court affirmed the

validity of disparate-impact liability under the FHA, but significantly narrowed its scope. *Tex.

Dep't of Housing and Cmty. Affairs v. The Inclusive Communities Project, Inc.*, 135 S. Ct. 2507

(2015).

82.    The Supreme Court observed that at the "heartland of disparate-impact liability"

lie suits against practices "that function unfairly to exclude minorities from certain

neighborhoods without sufficient justification." *Id.* at 2521–22. As such, it cautioned that the

"FHA is not an instrument to force housing authorities to reorder their priorities." *Id.* at 2522.

The Court explained that "[d]isparate-impact liability mandates the removal of artificial,

arbitrary, and unnecessary barriers, not the displacement of valid governmental policies." *Id.*

(internal quotation marks omitted). The Court noted that the "specter of disparate-impact

litigation" could discourage businesses from undertaking the very activities that ensure a well-

functioning housing market, which would undermine its very purpose as well as the free-market.

**App.423**

*Id.* at 2524. To that end, the Court emphasized the importance of limiting the scope of possible disparate-impact liability "so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Id.* at 2518. The Court identified several other key limitations:

83. First, the Court concluded that the disparate-impact doctrine has been, and should continue to be, limited to avoid the serious constitutional questions that might arise under the FHA if "liability were imposed based solely on a showing of statistical disparity." *Id.* at 2522. Rather, plaintiffs must satisfy a "robust causality requirement" that "ensures that '[r]acial imbalance . . . does not , without more establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* at 2523 (quoting *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 653 (1989)). Plaintiffs must "point to a defendant's policy or policies causing th[e] disparity" so that defendants are not "held liable for racial disparities they did not create." *Id.*. Thus, showing "racial imbalance . . . without more" does not support a disparate-impact claim. *Id.*

84. Second, the Court emphasized that only policies that are "artificial, arbitrary, and unnecessary" should give rise to disparate-impact liability. *Id.* at 2524. The Court encouraged giving defendants "leeway to state and explain the valid interest served by their policies" and entrepreneurs the "latitude to consider market factors." *Id.* at 2252–53. This would avoid putting defendants "in a double bind of liability, subject to suit whether they choose to rejuvenate a city core or to promote new low-income housing in suburban communities." *Id.* at 2253. The Court instructed that plaintiffs should not be allowed to "second-guess which of two reasonable approaches" a defendant should follow. *Id.* at 2522.

85. Finally, in cabining FHA disparate-impact claims, the Court stressed the

**App.424**

importance of encouraging administrative efficiency while discouraging the consideration of race. The Court held that "adequate safeguards at the prima facie stage" are critical to avoid the use of race "in a pervasive way," such as the use of numerical quotas, which would raise serious constitutional questions. *Id.* at 2523; *see also id.* at 2524 (warning against interpreting disparate-impact liability to be "so expansive as to inject racial considerations into every housing decision," which would perversely tend to "perpetuate race-based considerations rather than move beyond them"). The Court also noted that "prompt resolution" of disparate-impact cases is important, *id.* at 2523, as is avoiding "onerous costs on actors who make housing available." *Id.* (internal quotation marks omitted).

### C. PCI's Post-*Inclusive Communities* Submission of Supplemental Comments

86. In the wake of the Supreme Court's *Inclusive Communities* decision, PCI submitted an additional supplemental comment to HUD, requesting an exemption to the Disparate Impact Rule for homeowners insurers in accordance with *Inclusive Communities*. *See* PCI Letter to HUD (July 29, 2015).

87. PCI advised HUD that the Supreme Court's requirement of a "robust causality requirement" to state a disparate-impact claim precluded suits against homeowners insurers. *See id.* at 2. Because homeowners insurers are regulated by a "panoply" of state laws, their discretion is "substantially limit[ed]" and thus does not cause any disparate impacts. *Id.* PCI also noted that homeowners insurers exemplify the potential defendants that the Court had in mind when it required defendants to have "leeway to state and explain the valid interest served by their policy" and "latitude to consider market forces." *Id.* PCI explained that homeowners insurance markets, "with their dependence on actuarially sound, risk-based pricing, form a perfect example of the market forces the Court indicated must be respected in determining the scope of disparate-impact liability." *Id.*

**App.425**

88.     PCI also reiterated its prior comments explaining that application of the Rule would disrupt the homeowners insurance industry and interfere with the provision of such insurance.  To avoid liability for disparate impacts, insurers would have to avoid the use of actuarial risk factors in the underwriting and pricing process.  This would cause adverse selection, "motivating lower risk customers to forego insurance altogether threatening insurers' viability, thus decreasing competition and the availability of insurance coverage."  *Id.* at 4.

89.     Finally, PCI noted that application of the Rule would impose needless costs on homeowners insurers.  *Id.*

**D.     HUD's Supplemental Explanation**

90.     On October 5, 2016—nearly two years after the Court's remand order and more than a year after the Supreme Court's decision in *Inclusive Communities*—HUD published the Supplemental Explanation, titled, "Application of the Fair Housing Act's Discriminatory Effects Standard to Insurance."  81 Fed. Reg. 69,012 (Oct. 5, 2016).  HUD styled this document as an attempt "to supplement its responses to certain insurance industry comments to HUD's proposed rule."  *Id.* at 69,012.

91.     Despite conceding that "risk-based decision making is an important aspect of sound insurance practice," *id.* at 69,015, HUD refused to amend the Rule, concluding there should be no "categorical exemptions or safe harbors for insurance practices" and that "concerns regarding application of the discriminatory effects standard to insurance practices can and should be addressed on a case-by-case basis," *id.* at 60,912.

92.     Like HUD's responses to comments from the insurance industry during the initial rulemaking, the Supplemental Explanation does not meaningfully address comments regarding the application of the disparate-impact standard to the risk-based pricing of homeowners insurance.  The Explanation is arbitrary and capricious in numerous respects:

**App.426**

93.     First, HUD fails entirely to examine the impact of the Supreme Court's decision in *Inclusive Communities* on the continuing validity of the application of the Disparate Impact Rule to the risk-based pricing of homeowners insurance.  The Supplemental Explanation makes no mention of the broad limitations on FHA disparate-impact liability recognized by the Supreme Court.  Indeed, it only cites *Inclusive Communities* in a few footnotes.

94.     Second, nowhere in the Supplemental Explanation does HUD respond to this Court's observation that HUD had previously "made no attempt to evaluate how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers."  *Donovan*, 66 F. Supp. 3d at 1048.  Rather, HUD claims that it was "impossible . . . to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application."  81 Fed. Reg. at 69,014.  Thus, HUD ignores the Court's instructions on remand to determine whether there are any business practices for which disparate-impact challenges are wholly barred by McCarran-Ferguson preclusion, acknowledging instead that "[s]ome discriminatory effects claims against insurers will survive a McCarran-Ferguson defense depending on a host of case-specific variables."  *Id.* at 69,015.

95.     Moreover, HUD speculates that creating exemptions or safe harbors would "be at odds with the purpose of [the] McCarran-Ferguson [Act]."  81 Fed. Reg. 69,016.  HUD reasons that such exemptions would "deprive all states of federal support in addressing discriminatory insurance practices—even those states that welcome or depend on such support."  *Id.*  HUD, however, cites no authority to show that a purpose of the McCarran-Ferguson Act is to provide states with federal support for their various anti-discrimination laws that might affect insurers.  In fact, the Disparate Impact Rule could easily conflict with state insurance laws that prohibit

**App.427**

discrimination in the provision or pricing of insurance or that require insurers to rely on neutral, actuarial factors.

96.     Third, HUD provides an inadequate response to industry comments about how the filed-rate doctrine is inconsistent with disparate-impact challenges to state insurance laws.  HUD claims that "applying the filed rate doctrine to prioritize *state* ratemaking over a federal statute would seem to stand the Supremacy Clause on its head." *Id.* at 69,018 (internal quotation marks omitted).  In support, HUD cites *Saunders v. Farmers Ins. Exch. (Saunders I)*, 440 F.3d 940 (8th Cir. 2006).  HUD fails to acknowledge, however, that in subsequent proceedings, the *Saunders* court in fact found that Missouri's filed-rate doctrine barred a disparate-impact claim under the FHA.  And HUD overlooks a number of decisions that have found no Supremacy Clause problems in holding that the filed-rate doctrine bars federal challenges to state rate statutes*. See, e.g., Taffet v. S. Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992); *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 495 (8th Cir. 1992); *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*, 805 F. Supp. 1277, 1296 (D.S.C. 1992); *see also Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir. 1994).

97.     Fourth, much of the Supplemental Explanation only addresses insurance practices in general, rather than explaining why HUD could not create an exemption for the risk-based pricing of homeowners insurance.  For example, HUD declines to issue "a broad exemption for all insurance practices or all underwriting decisions . . . because doing so would immunize a host of potentially discriminatory insurance practices that *do not* involve actuarial or risk-based calculations."  81 Fed. Reg. at 69,017 (emphasis added).  Even if true, this statement does not explain why HUD declined to exempt pricing practices that are demonstrably actuarial or risk-based.  The Rule's burden-shifting framework not only targets non-actuarial factors, but also

**App.428**

allows plaintiffs to force homeowners insurers to replace purely risk-based practices—which HUD concedes are legitimate—with "alternatives" that may not be as economically effective.

98.     Fifth, when HUD does attempt to narrow its analysis to risk-based homeowners insurance practices, its responses are internally inconsistent and fail to address the commenters' precise concerns.  HUD insists, for example, that "nothing in the Rule prohibits insurers from making decisions that are in fact risk-based." *Id.* at 69,015.  But in the very next sentence, HUD states that "practices that an insurer can prove are risk-based, *and for which no less discriminatory alternative exists*, will not give rise to discriminatory effects liability." *Id.* (emphasis added).  This reaffirms that the Rule *will* prohibit homeowners insurers from making risk-based decisions whenever a plaintiff can force them to adopt an alternative practice.  HUD fails to acknowledge that its burden-shifting approach would undermine the very risk-based pricing practices it agrees are legitimate.

99.     Similarly, the Supplemental Explanation ignores comments explaining that insurers would have to curtail or even abandon risk-based pricing in order to prevent statistical disparities in homeowners insurance rates across protected groups. *See* NAMIC Comments at 6 ("To achieve a condition in which no statistical disparities exist in the average rate paid by different demographic groups, many if not most risk-based variables would have to be eliminated from the underwriting process. *In other words, to avoid creating a disparate impact, an insurer would have to charge everyone the same rate, regardless of risk.*  This calls into question conclusions drawn simply from statistical samplings and underscores why the business of risk classification defies a disparate impact analysis." (emphasis added)).

100.     Finally, the Supplemental Explanation inadequately addresses the ample comments concerning the burdens homeowners insurers would face if forced into case-by-case

**App.429**

adjudication for every risk-based pricing practice allegedly linked to a disparate impact. Commenters contended that such adjudication would be costly, particularly given the burdens associated with collecting racial data. HUD's only response is that "the arguments and evidence that would be necessary to establish whether a practice qualifies for the requested exemption would effectively be the same as the arguments and evidence necessary for establishing a legally sufficient justification." 81 Fed. Reg. at 69,017. This ignores the fact that the Rule's burden-shifting framework would require homeowners insurers not only to defend the legitimacy of their practices, but also to demonstrate that no less discriminatory alternative for those practices exists.

101. HUD did not consider that case-by-case adjudication could proceed in multiple forums and that collecting the necessary data would expose insurers to liability under state antidiscrimination statutes. Although HUD recognizes the "variation in state insurance laws" across jurisdictions and time, it merely used this fact as a justification for not granting an exemption for specific insurance practices. 81 Fed. Reg. at 69,016.

102. Rather, HUD defends its decision not to create an exception for homeowners insurance by concluding that "discriminatory effects liability has proven workable in other contexts involving risk-based decisions . . . without the need for exemptions or safe harbors." *Id.* But HUD identifies no support for the one example it cites: that of disparate-impact claims against mortgage lenders. *See id.* HUD relies on a 1994 "Policy Statement on Discrimination in Lending," which merely announced HUD's decision to apply disparate-impact liability to risk-based lending practices. *See* 59 Fed. Reg. 18,266 (Apr. 15, 1994). It said nothing of the decision's ultimate effect on homeowners or the mortgage lending industry. Next, HUD points to a document providing standard procedures for financial regulatory agencies to follow when

**App.430**

reviewing whether lenders engage in discriminatory practices. *See* OFFICE OF THE COMPTROLLER OF THE CURRENCY ET AL., INTERAGENCY FAIR LENDING EXAMINATION PROCEDURES (2009). This guide presents no information about the "workability" of disparate-impact liability in the mortgage lending context. Finally, the Explanation quotes a HUD official's assertion that in order to investigate discrimination in insurance practices, the agency will use the same techniques that it has used in other contexts. *See Homeowners' Insurance Discrimination: Hearings Before the S. Comm. on Banking, Housing & Urban Affairs*, 103d Cong. (1994), at 20. Like the other sources HUD cites, this document does not support the assertion that applying disparate-impact liability to risk-based pricing has proven "workable" for consumers, industries, or regulators.

### E. HUD's 2020 Rule

103. Following HUD's publication of the Supplemental Explanation, this case remained stayed for several years as HUD engaged in a new rulemaking process. HUD published an advance notice of proposed rulemaking on June 20, 2018, inviting public comment on possible amendments to the 2013 Rule. 83 Fed. Reg. 28,560 (June 20, 2018). On August 19, 2019, HUD proposed a new rule amending the 2013 Rule. 84 Fed. Reg. 42,854 (Aug. 19, 2019).

104. On September 24, 2020, HUD promulgated the 2020 Rule, a new final rule that amended the 2013 Rule. Before the 2020 Rule could go into effect, however, it was enjoined by another court. *See Massachusetts Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 496 F. Supp. 3d 600 (D. Mass. 2020). The 2013 Rule therefore remained in effect.

### F. HUD's 2023 Reinstated Rule

105. On June 25, 2021, HUD released a notice of proposed rulemaking stating that HUD intended to reinstate the 2013 Rule. 86 Fed. Reg. 33,590 (June 25, 2021).

106. On August 24, 2021, PCI submitted a comment in response to HUD's June 25,

**App.431**

2021 Notice of Proposed Rulemaking.  PCI's comment reiterated the objections previously

raised by the insurance industry and argued that the 2013 Rule could not be reconciled with

*Inclusive Communities*.

107.    On August 29, 2022, PCI submitted to HUD a supplemental comment addressing

the Supreme Court's recent decision in *West Virginia et al. v. Environmental Protection Agency*,

142 S. Ct. 2587 (2022).

108.    On March 31, 2023, HUD promulgated the 2023 Reinstated Rule, a new final rule

that reinstated the 2013 Rule.  In publishing the 2023 Reinstated Rule, HUD wrote, "After

considering public comments, HUD in this final rule reinstates and maintains the 2013 rule and

rescinds the 2020 rule."  88 Fed. Reg. at 19,450.  The 2023 Reinstated Rule provides additional

explanation and incorporates the Supplemental Explanation, stating that "HUD has reviewed the

2016 Supplemental Responses and believes the responses made there continue to accurately

reflect HUD's interpretation of discriminatory effects law."  *Id.* at 19,463 n.113.

109.    The 2023 Reinstated Rule went into effect on May 1, 2023.

## VIII.    THE DISPARATE IMPACT RULE IS INCONSISTENT WITH THE LIMITATIONS ON DISPARATE-IMPACT LIABILITY UNDER THE FAIR HOUSING ACT RECOGNIZED IN *INCLUSIVE COMMUNITIES*

110.    The Rule is inconsistent with the limitations on disparate-impact liability

recognized in *Inclusive Communities*.

111.    First, the reasoning in HUD's Supplemental Explanation confirms that the Rule

will be applied to a variety of risk-based practices, which will discourage businesses from

undertaking the very activities that ensure a well-functioning housing market.

112.    Second, the Supplemental Explanation confirms that in order to comply with the

Rule and avoid costly case-by-case adjudication, homeowners insurers must collect racial data,

often in violation of state law, to defend against disparate-impact claims.

**App.432**

113.     This ignores the limitation on disparate-impact liability to avoid the "serious constitutional questions" that will arise when race is "used and considered in a pervasive way and . . . inexorably lead governmental or private entities to use numerical quotas." *Inclusive Communities.*, 135 S. Ct. at 2523 (internal quotation marks omitted). Nor is it consistent with the Court's determination that disparate-impact liability should not be "so expansive as to inject racial considerations into every housing decision," which would perversely tend to "perpetuate race-based considerations rather than move beyond them." *Id.* at 2524. Moreover, this burdensome requirement conflicts with the Supreme Court's admonition against "impos[ing] onerous costs" on providers of housing and for "prompt resolution" of disparate-impact cases. *Id.* 2523.

114.     Third, under the burden-shifting test, a plaintiff may state a prima facie claim of disparate impact by identifying a statistical disparity or by challenging a homeowners insurer's entire decision-making process as creating a disparate impact. Indeed, the Rule provides that a plaintiff need only show that the challenged practice "caused or predictably will cause" a disparate impact.

115.     This runs afoul of the Supreme Court's construction of disparate-impact liability under the Fair Housing Act in *Inclusive Communities*. The Court emphasized that disparate-impact claims may not be premised on the simple existence of a racial disparity and must be subject to "a robust causality requirement." *Id.* at 2522–23. Plaintiffs must point to a defendant's specific policy or policies causing a disparity to state a prima facie claim. Thus, HUD's rule permitting plaintiffs to bring claims based on the mere existence of a statistical disparity or a lax causal connection between a defendant's actions and a disparity is contrary to law.

**App.433**

116.    Fourth, the Rule indicates that a defendant cannot defeat a disparate-impact challenge by pointing to a bona fide business justification for an insurance pricing practice. Once a prima facie case is established, the Rule requires the defendant to show that "the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."  Accordingly, the defendant's policy might give way to another, less discriminatory alternative.

117.    This exceeds the limitations that the Supreme Court placed on disparate-impact claims in *Inclusive Communities*.  The Court limited liability to policies that were "artificial, arbitrary, and unnecessary."  *Id.* at 2524.  The Court also instructed that housing authorities and private developers should have "leeway to state and explain the valid interest served by their policies" and entrepreneurs the "latitude to consider market factors."  *Id.* at 2252–53.  As the Rule invalidates policies that are not merely "artificial, arbitrary, and unnecessary" and does not give defendants latitude to explain why they support a valid interest, it is contrary to law.

118.    Similarly, under the Administrative Procedure Act, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof."  5 U.S.C. § 556(d); *see also Steadman v. SEC*, 450 U.S. 91 (1981).  Because a charge brought by HUD under the FHA may be heard in either an administrative or judicial proceeding, the burden-shifting standards established in the Disparate Impact Rule must satisfy the Administrative Procedure Act requirement that the proponent of a proposed "order"—here, a proposed finding of a violation of the FHA—bear the burden of proof.

## IX.    PCI AND ITS MEMBERS CONTINUE TO BE INJURED BY THE DISPARATE IMPACT RULE

119.    As the Court previously determined, "PCI's members have suffered an 'injury in fact' because the Disparate Impact Rule increases their exposure to disparate impact liability

**App.434**

under the FHA." *Donovan*, 66 F. Supp. 3d at 1043. Indeed, the Court recognized that the "compliance costs reported by PCI's members alone are sufficient to satisfy the 'injury in fact' requirement of Article III standing." *Id.* at 1044.

120. The Rule, as supplemented, continues directly to regulate PCI's member companies and to rewrite the rules of risk-based pricing and underwriting without any exemptions or safe harbors. The Rule thus continues to generate substantial uncertainty in the industry and requires PCI's member companies to expend substantial resources assessing how the Rule could possibly apply to the business of insurance. Moreover, to even attempt to comply with the Rule, PCI member companies must still spend enormous amounts of money and time (and possibly subject themselves to liability) (a) retrospectively and prospectively collecting data that they do not currently obtain about whether their customers fall within a protected class, (b) analyzing their pricing and underwriting criteria in light of the newly collected data to try to identify factors that could have a disparate impact, and (c) adopting entirely new underwriting and pricing practices. If PCI members are forced to disregard actuarial risk data in favor of protected class data, they will be unable to price insurance as accurately and competitively as they currently do, resulting in lost business, decreased availability of insurance, and potential insolvency.

121. Application of the Rule to risk-based pricing and underwriting by PCI members continues to place those members in an impossible position of either complying with state law regarding the pricing and underwriting of insurance or complying with the Rule. It is not possible, for example, to comply with state laws that require that insurers take into consideration past loss and other actuarially relevant factors in developing insurance rates while simultaneously disregarding any risk factor that happens to correlate with any of the

**App.435**

classifications covered by the Rule. This compliance exposure would injure PCI members.

122.    In addition, since the final Disparate Impact Rule was promulgated and supplemented, PCI has been required to devote a significant amount of time and resources— separate from time spent relating to this lawsuit—responding to the Rule for the benefit of its members and educating members about possible impacts of the Rule.

## CLAIMS FOR RELIEF

### COUNT I

**(Application of The Disparate Impact Rule To Homeowners Insurance Is Arbitrary, Capricious, Or An Abuse of Discretion Because Defendants Did Not Adequately Address The Supreme Court's Decision in *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project, Inc.*)**

123.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

124.    The Disparate Impact Rule and HUD's Supplemental Explanation constitute final agency action.

125.    In responding to comments from representatives of the insurance industry, the Supplemental Explanation does not adequately consider the impact of the Supreme Court's decision in *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015), on the applicability of disparate-impact liability to risk-based pricing practices in the homeowners insurance context.

126.    HUD's failure to address the impact of this intervening, controlling precedent in the Supplemental Explanation was arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

### COUNT II

**(Application Of The Disparate Impact Rule To Homeowners Insurance Is Arbitrary, Capricious, Or An Abuse of Discretion Because Defendants Did Not Adequately Address The Conflict Between The Rule And The McCarran-Ferguson Act)**

**App.436**

127.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

128.    The Disparate Impact Rule and HUD's Supplemental Explanation constitute final agency action.

129.    Comments submitted to HUD explained that extension of disparate-impact liability to insurance practices would interfere with state regulation of insurance in violation of the McCarran-Ferguson Act.

130.    HUD failed to address this issue in the Disparate Impact Rule.  It did not consider whether its Rule would invalidate, impair, or supersede state laws regulating the business of insurance.  HUD instead asserted that the McCarran-Ferguson Act applies only to courts, not federal agencies.  78 Fed. Reg. at 11,475.  There is no support for this assertion, and HUD cited none.

131.    The Court criticized HUD for not evaluating "how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers."  *Donovan*, 66 F. Supp. 3d at 1048.  Yet HUD does not address this concern in its Supplemental Explanation, claiming that it is "impossible . . . to define the scope of insurance practices covered by an exemption or safe harbor with enough precision to avoid case-by-case disputes over its application."  81 Fed. Reg. at 69,014.  Instead, the Supplemental Explanation asserts, without citing any support, that creating exemptions or safe harbors for entire categories of claims would "be at odds with the purpose of [the] McCarran-Ferguson [Act]."  *Id.* at 69,016.

132.    HUD was bound to comply with the McCarran-Ferguson Act and was required to consider statutory limits on its authority when issuing the Disparate Impact Rule.

133.    HUD's failure to adequately address whether the Disparate Impact Rule violates the McCarran-Ferguson Act was arbitrary, capricious, and an abuse of discretion, in violation of

**App.437**

5 U.S.C. § 706(2)(A).

## COUNT III

**(Application Of The Disparate Impact Rule To Homeowners Insurance Is Arbitrary, Capricious, Or An Abuse of Discretion Because Defendants Failed To Address The "Filed Rate" Doctrine)**

134.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

135.    The Disparate Impact Rule and HUD's Supplemental Explanation constitute final agency action.

136.    Comments submitted to HUD explained that application of the Disparate Impact Rule to homeowners insurance would violate the "filed rate" doctrine.

137.    HUD acknowledged these comments but failed to address whether application of the rule would violate the "filed rate" doctrine.

138.    The Court instructed HUD to "explain its decision regarding the filed-rate doctrine or institute a new rule." *Donovan*, 66 F. Supp. 3d at 1050.

139.    But HUD's Supplemental Explanation inadequately analyzes how the filed-rate doctrine affects disparate-impact challenges under the FHA to state insurance laws. The Explanation argues that barring federal challenges to state insurance laws under the filed-rate doctrine would "seem to stand the Supremacy Clause on its head." 81 Fed. Reg. at 69,018. However, the Supplemental Explanation fails to address a number of cases that have found that the Supremacy Clause poses no bar to finding that the filed-rate doctrine prohibits federal challenges to state rate statutes.

140.    HUD's failure to adequately address whether the filed rate doctrine might bar federal challenges to state insurance laws was arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

**App.438**

## COUNT IV

**(Application Of The Disparate Impact Rule To Homeowners Insurance Is Arbitrary, Capricious, Or An Abuse Of Discretion Because Defendants Did Not Adequately Consider The Rule's Impact On Insurers And The Business of Insurance)**

141.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

142.     The Disparate Impact Rule and HUD's Supplemental Explanation constitute final agency action.

143.     Comments submitted to HUD explained that the use of actuarial risk factors is critical to pricing and underwriting of homeowners insurance. Comments further explained that applying disparate-impact liability to the pricing and underwriting of homeowners insurance would limit insurers' ability to engage in risk-based pricing and underwriting.

144.     HUD failed to adequately address these concerns in the Disparate Impact Rule. HUD did not dispute that risk-based pricing and underwriting is of critical importance or that imposition of disparate-impact liability would prevent use of risk-based pricing and underwriting absent further justification. It stated only that insurers could attempt in case-by-case litigation to show that they have a legitimate business justification for their practices.

145.     The Court found arbitrary and capricious HUD's response to the insurance industry's concerns that exposing them to disparate-impact liability would undermine the fundamental nature of insurance. It criticized HUD for disregarding the arguments merely because insurers could reraise arguments on a case-by-case basis in subsequent proceedings. *Donovan*, 66 F. Supp. 3d 1051.

146.     The Supplemental Explanation does not respond to these concerns. It primarily addresses the Rule's broad effects on the insurance industry, rather than tailoring its analysis to risk-based pricing practices in the homeowners insurance context.

147.     To the extent that the Supplemental Explanation does respond to commenters'

**App.439**

concerns about the applicability of the Rule to risk-based pricing practices in the homeowners insurance context, its reasoning is internally inconsistent and does not address the commenters' precise arguments that avoiding statistical disparities would require homeowners insurers to depart from risk-based pricing.

148.    The Supplemental Explanation does not adequately consider commenters' concerns about how applying disparate-impact liability to the risk-based pricing of homeowners insurance would affect the homeowners insurance business, which depends on effective risk segmentation.  It thus does not consider the related impacts on homeowners insurers, consumers, and the free market.

149.    Nor does the Supplemental Explanation explain why the cost, time, and inconvenience of individualized litigation—including the expense of collecting racial data— outweighs crafting an exception for risk-based pricing of homeowners insurance.  Rather, the Explanation repeats without support that "an exemption for all provably risk-based factors would offer little added value for insurers."  81 Fed. Reg. at 69,017.

150.    None of the sources HUD cites in its Supplemental Explanation shows that applying disparate-impact liability to risk-based pricing has proven "workable" in other contexts.

151.    HUD's continued failure to adequately address commenters' concerns about the impact of the Disparate Impact Rule on the business of insurance was arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

## COUNT V

**(Application of the Disparate Impact Rule To Homeowners Insurance Is In Excess Of Statutory Jurisdiction, Authority, Or Limitations Or Is Not In Accordance With Law Because It Is Contrary To The FHA As Interpreted In the Supreme Court's Decision In *Texas Department of Housing and Community Affairs v. The Inclusive Communities Project, Inc.*)**

152.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

**App.440**

153.    The Disparate Impact Rule and HUD's Supplemental Explanation constitute final agency action.

154.    The Rule and Explanation undermine the homeowners insurance market and thereby burdens those who supply housing.

155.    The Rule and Explanation require homeowners insurers to consider race in setting rates.

156.    The Rule allows plaintiffs to state a prima facie claim of disparate impact based on an alleged statistical disparity alone, with no causal link between the challenged practice and the alleged disparity.

157.    The Rule does not merely invalidate policies that are "artificial, arbitrary, and unnecessary," but rather displaces any legitimate practice for which a less discriminatory alternative is available.

158.    The Rule does not give homeowners insurers sufficient latitude to explain why their policies support valid interests.

159.    The Rule places on defendants the burden of disproving the facts necessary to sustain plaintiffs' proposed orders.

160.    The Disparate Impact Rule and Explanation thus burden the homeowners insurance market and require insurers to pervasively consider race in their business activities. The Rule and Explanation also impermissibly shift the burden of persuasion to the defendant and fail to include the limitations expressly recognized by the Supreme Court.  They are thus in excess of HUD's statutory authority, jurisdiction, and limitations, and contrary to law as announced in *Inclusive Communities*.  The Rule and Explanation therefore should be invalidated. 5 U.S.C. §§ 706(2)(A), 706(2)(C).

**App.441**

## COUNT VI

**(Application of the Disparate Impact Rule To Homeowners Insurance Is In Excess Of Statutory Jurisdiction, Authority, Or Limitations Or Is Not In Accordance With Law Because It Violates The McCarran-Ferguson Act)**

161.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

162.    The Disparate Impact Rule and HUD's Supplemental Explanation constitute final agency action.

163.    The McCarran-Ferguson Act provides as follows:

A.      "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."  15 U.S.C. § 1011.

B.      "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1012(b).

164.    The Fair Housing Act does not specifically relate to the business of insurance.

165.    The Disparate Impact Rule and the Supplemental Explanation construe the Fair Housing Act to subject the provision and pricing of homeowners insurance to disparate-impact liability.

166.    Subjecting the provision and pricing of homeowners insurance to disparate-impact liability would invalidate, impair, or supersede state laws, regulations, and policy determinations regulating the business of insurance and impose a barrier to the regulation of the business of insurance by the several states.

167.    Among other things, subjecting the provision and pricing of homeowners

**App.442**

insurance to disparate-impact liability would:

> A.     Invalidate, impair, or supersede state laws, regulations, and policy determinations expressly contemplating, and often requiring, the use of risk-based pricing and underwriting of homeowners insurance;

> B.     Invalidate, impair, or supersede state laws, regulations, and policy determinations forbidding the consideration or use of protected characteristics in the provision and pricing of homeowners insurance.

> C.     Invalidate, impair, or supersede state laws, regulations, and policy determinations providing for the review and approval of insurance pricing and underwriting decisions by state regulators;

> D.     Invalidate, impair, or supersede state laws, regulations, and policy determinations establishing state administrative forums for the resolution of disputes relating to insurance rates and other insurance practices; and

168.    The Disparate Impact Rule, as supplemented, thus violates the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), and is in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and is not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## <u>COUNT VII</u>

**(The Burden-Shifting Framework in the Disparate Impact Rule is Arbitrary and Capricious, an Abuse of Discretion, and Not in Accordance with Law)**

169.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

170.    The Disparate Impact Rule and HUD's Supplemental Explanation constitute final agency action.

171.    In the absence of statutory direction to the contrary, the Supreme Court has held

**App.443**

that disparate impact liability must be premised on exacting standards in order to avoid unjustified, expensive, and time-consuming litigation. Under those standards, a plaintiff must make a prima facie showing that a specific practice of the defendant causes a "significantly disparate impact" on a protected class. *See Wards Cove Packaging Co.* v. *Antonio*, 490 U.S. 642, 658 (1989). If a plaintiff makes this prima facie showing, the defendant need only present evidence that the challenged practice serves its legitimate goals. *See id.* at 659. The burden of persuasion remains on the plaintiff. *See id.* When a defendant produces such evidence, the plaintiff may prevail only if he or she can prove that the defendant refused to adopt an alternative practice that would have served its goals equally effectively without causing the disparate impact. *See id.* at 660-61.

172. Similarly, under the Administrative Procedure Act, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d); *see also Steadman v. SEC*, 450 U.S. 91 (1981). Because a charge brought by HUD under the FHA may be heard in either an administrative or judicial proceeding, the burden-shifting standards established in the Disparate Impact Rule must satisfy the Administrative Procedure Act requirement that the proponent of a proposed "order"—here, a proposed finding of a violation of the FHA—bear the burden of proof.

173. In violation of the Administrative Procedure Act and the Supreme Court's direction regarding burden-shifting in disparate impact cases, the Disparate Impact Rule purports to shift the "burden of proof" to the respondent or defendant once the complainant has met its prima facie burden of showing a disparate impact. This would unfairly impose on insurers the burden of proving that their particular risk-based underwriting and pricing practices serve legitimate business goals, particularly where the conduct is authorized by governing state law.

**App.444**

That burden should properly rest on the party seeking fundamentally to alter the business of insurance by imposing disparate impact liability.

174.    The Disparate Impact Rule also disregards other limitations recognized by the Supreme Court.  The Disparate Impact Rule provides that a plaintiff need only show that the challenged practice "caused or predictably will cause" a disparate impact.  In contrast, the Supreme Court has held that a "significant[]" disparate impact is required to establish a prima facie case.  *Wards Cove*, 490 U.S. at 658.  This difference could be important in cases challenging insurance practices, where almost any risk-based underwriting and pricing decision will likely impact at least some groups differently.  Similarly, once a prima facie case is established, the Rule requires that the defendant or respondent show that "the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."  In contrast, the Supreme Court has expressly rejected reading a necessity requirement into a disparate impact framework, concluding that such a requirement would impose a degree of scrutiny impossible to meet.  *Id.* at 659 ("[T]here is no requirement that the challenged practice be "essential" or "indispensable" to the employer's business for it to pass muster: this degree of scrutiny would be almost impossible for most employers to meet[.]").  Insurers should not be required to show that each underwriting and pricing decision they make is by itself strictly "necessary," particularly where the use of risk-based underwriting and pricing as a whole is so plainly justified and where risk factors are identified and employed based on their relative, predicative qualities.  Moreover, although the Supreme Court has held that any "alternative practices" that a plaintiff might offer in lieu of allegedly an offending practice must be "equally effective," *see id.* at 661, HUD omitted that requirement from the Rule.  For insurers, however, any deviation from risk-based pricing and underwriting threatens to undermine the entire manner

**App.445**

in which insurance is provided.

175.     By impermissibly shifting the burden of persuasion to the defendant or respondent and failing to include the limitations required by settled law, the Disparate Impact Rule is arbitrary, capricious, and not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT VIII

### (The Burden-Shifting Framework In The Disparate Impact Rule Is Arbitrary And Capricious Because Defendants Did Not Adequately Address Relevant Limitations)

176.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

177.     Comments submitted to HUD explained that HUD's proposed burden-shifting rules were contrary to law. Although HUD responded to many of these comments, it failed to offer any reasoned explanation for why it was not bound by the Supreme Court's decision in *Wards Cove Packaging Co.* v. *Antonio*, 490 U.S. 642 (1989), and other law.  For the reasons explained above, HUD's failure to apply the proper burden-shifting framework under the Disparate Impact Rule will unfairly penalize insurers forced to defend their authorized underwriting and pricing practices.

178.     HUD's failure to address whether and how the Disparate Impact Rule can be reconciled with *Wards Cove* and other law was arbitrary, capricious, and an abuse of discretion, in violation of 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

179.     Declare invalid the application of the Disparate Impact Rule to the pricing and provision of homeowners insurance.

180.     Enjoin HUD and its officers from applying the Disparate Impact Rule to pricing and underwriting of homeowners insurance.

**App.446**

181.    Award Plaintiff its costs and reasonable attorneys' fees as appropriate; and

182.    Grant any such other relief that this Court deems just and appropriate.


Dated: May 3, 2023                          Respectfully submitted,

                                            PROPERTY CASUALTY INSURERS
                                            ASSOCIATION OF AMERICA

                                            /s/ *Seth P. Waxman*
                                            Seth P. Waxman (*pro hac vice*)
                                            Catherine M.A. Carroll (*pro hac vice*)
                                            WILMER CUTLER PICKERING HALE AND DORR LLP
                                            2100 Pennsylvania Avenue, NW
                                            Washington, DC 20037
                                            Tel.: (202) 663-6000
                                            Fax: (202) 663-6363
                                            E-mail: seth.waxman@wilmerhale.com

                                            Rowe W. Snider (# 03125194)
                                            Alyssa M. Gregory (# 6320588)
                                            LOCKE LORD LLP
                                            111 South Wacker Drive
                                            Chicago, IL 60606
                                            Tel.: (312) 443-0700
                                            Fax: (312) 896-0336
                                            Email: rsnider@lockelord.com

                                            *Attorneys for Plaintiff*

**App.447**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) ) | |
| *Plaintiff,* | ) ) | Case No. 1:13-cv-08564 |
| v. | ) ) | Chief Judge Rebecca R. Pallmeyer |
| ADRIANNE TODMAN, in her official capacity as Acting Secretary of Housing and Urban Development, and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) | |
| *Defendants.* | ) | |

## NOTICE OF APPEAL

Plaintiff Property Casualty Insurers Association of America ("PCI") * hereby appeals to the United States Court of Appeals for the Seventh Circuit from the District Court's judgment in this action (Dkt. 320), as well as all opinions and orders underlying the judgment, including the District Court's September 3, 2014 opinion and order (Dkts. 98-99); June 20, 2017 opinion and order (Dkt. 129); and March 26, 2024 opinion and order (Dkt. 319).

---

\* Effective January 1, 2019, the American Insurance Association merged with and into PCI. Effective February 5, 2019, PCI re-domesticated and changed its name to the American Property Casualty Insurance Association.

**App.448**

Dated: May 24, 2024

Respectfully submitted,

s/ *Seth P. Waxman*

Rowe W. Snider (# 03125194)
Alyssa M. Gregory (# 6320588)
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
Tel.: (312) 443-0700
Fax: (312) 896-0336

Seth P. Waxman (*pro hac vice*)
   *Counsel of Record*
Catherine M.A. Carroll (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Tel.: (202) 663-6000
Fax: (202) 663-6363
E-mail: seth.waxman@wilmerhale.com

Colleen Marie Campbell
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1225 17th Street, Suite 2600
Denver, CO 80202
Tel.: (720) 274-3135
Fax: (720) 274-3133

**App.449**

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 24, 2024, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which sent notification of such filing to counsel of record in this case.

/s/ Seth P. Waxman
Seth P. Waxman (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Tel.: (202) 663-6000
Fax: (202) 663-6363
Email: seth.waxman@wilmerhale.com

**App.450**

**CERTIFICATE OF SERVICE**

On August 14, 2024, I filed the foregoing using the CM/ECF system, which

effected service on all registered counsel.

/s/ Seth P. Waxman
SETH P. WAXMAN