No. 24-1947

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA,
*Plaintiff-Appellant,*

v.

ADRIANNE TODMAN and UNITED STATES DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT,

*Defendants-Appellees.*

APPEAL FROM THE U.S. DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, No. 1:13-CV-08564
THE HONORABLE REBECCA R. PALLMEYER

## BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF
## AMERICA AS *AMICUS CURIAE*
## IN SUPPORT OF APPELLANT AND REVERSAL

JONATHAN D. URICK
KEVIN R. PALMER
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, DC 20062

*Counsel for* Amicus Curiae
*Chamber of Commerce of the*
*United States of America*

PATRICK STRAWBRIDGE*
C'ZAR BERNSTEIN
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
patrick@consovoymccarthy.com
czar@consovoymccarthy.com

*Counsel of Record

*Counsel for* Amicus Curiae

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1947

Short Caption: Property Casualty Insurers Association of America v. Todman

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    Chamber of Commerce of the United States of America (amicus)

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    Consovoy McCarthy PLLC, U.S. Chamber Litigation Center

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        No parent corporations.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        No publicly held company owns ten percent or more of the amicus' stock.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
    N/A

Attorney's Signature: /s/ Patrick Strawbridge     Date: 8/21/2024

Attorney's Printed Name: Patrick Strawbridge

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [✔]   **No** [ ]

Address: 1600 Wilson Blvd., Suite 700

    Arlington, VA 22209

Phone Number: 703-243-9423     Fax Number:

E-Mail Address: patrick@consovoymccarthy.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __24-1947__

Short Caption: Property Casualty Insurers Association of America v.  Todman

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Chamber of Commerce of the United States of America (amicus)

_____

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Consovoy McCarthy PLLC, U.S. Chamber Litigation Center

_____

(3)     If the party, amicus or intervenor is a corporation:

   i)     Identify all its parent corporations, if any; and

   No parent corporations.

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   No publicly held company owns ten percent or more of the amicus' stock.

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ C'Zar Bernstein          Date: 8/21/2024

Attorney's Printed Name:  C'Zar Bernstein

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]   **No** [✔]

Address:  1600 Wilson Blvd., Suite 700

   Arlington, VA 22209

Phone Number:  703-243-9423          Fax Number: _____

E-Mail Address:  czar@consovoymccarthy.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1947

Short Caption: Property Casualty Insurers Association of America v.  Todman

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

     ☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Chamber of Commerce of the United States of America (amicus)

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Consovoy McCarthy PLLC, U.S. Chamber Litigation Center

(3)     If the party, amicus or intervenor is a corporation:

     i)     Identify all its parent corporations, if any; and

         No parent corporations.

     ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         No publicly held company owns ten percent or more of the amicus' stock.

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: /s/ Jonathan D. Urick     Date: 8/21/2024

Attorney's Printed Name:  Jonathan D. Urick

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address:  U.S. Chamber Litigation Center, 1615 H Street, N.W.

     Washington, DC 20062

Phone Number: (202) 463-5337     Fax Number: (202) 463-5302

E-Mail Address: jurick@uschamber.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1947

Short Caption: Property Casualty Insurers Association of America v. Todman

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    Chamber of Commerce of the United States of America (amicus)

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    Consovoy McCarthy PLLC, U.S. Chamber Litigation Center

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        No parent corporations.

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        No publicly held company owns ten percent or more of the amicus' stock.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Kevin R. Palmer    Date: 8/21/2024

Attorney's Printed Name:  Kevin R. Palmer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐  **No** ☑

Address:  U.S. Chamber Litigation Center, 1615 H Street, N.W.

    Washington, DC 20062

Phone Number: (202) 463-5337    Fax Number:  (202) 463-5302

E-Mail Address: kpalmer@uschamber.com

rev. 12/19 AK

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, *amicus curiae* Chamber of Commerce of the United States of America makes these disclosures: The Chamber is a nonprofit organization organized under the laws of the District of Columbia. It has no parent corporation, subsidiaries, or affiliates with any outstanding securities in the hands of the public. No publicly held company owns ten percent or more of its stock.

<u>/s/ Patrick Strawbridge</u>
Patrick Strawbridge

August 21, 2024

## TABLE OF CONTENTS

Table of Contents.................................................................................................. ii

Table of Authorities............................................................................................. iii

Interest of *Amicus Curiae* ................................................................................ 1

Introduction ......................................................................................................... 3

Summary of the Argument ................................................................................ 4

Argument .............................................................................................................. 8

   I.  The disparate-impact rule unlawfully departs from the Supreme Court's framework in *Inclusive Communities*. ................................................. 8

   II. The disparate-impact rule conflicts with the McCarran-Ferguson Act. ........... 15

   III.  The disparate-impact rule's illegality affects businesses beyond the insurance industry................................................................................................. 19

Conclusion............................................................................................................. 22

Certificate of Compliance.................................................................................. 23

Certificate of Service ......................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
576 U.S. 519 (2015)................................................................................passim

*Dexter v. Equitable Life Assur. Soc. of U.S.*,
527 F.2d 233 (2d Cir. 1975) ................................................................ 17

*Doe v. Mut. of Omaha Ins., Co.*,
179 F.3d 557 (7th Cir. 1999)............................................................passim

*Ellis v. City of Minneapolis*,
860 F.3d 1106 (8th Cir. 2017)............................................................ 11

*Hardie v. N.C.A.A.*,
876 F.3d 312 (9th Cir. 2017) .............................................................. 14

*Humana Inc. v. Forsyth*,
525 U.S. 299 (1999) .................................................................... 15, 17

*Inclusive Communities Project, Inc. v. Lincoln Prop. Co. (Inclusive Communities II)*,
920 F.3d 890 (5th Cir. 2019).................................................... 5, 10, 12

*Johnson v. U.S. R.R. Ret. Bd.*,
969 F.2d 1082 (D.C. Cir. 1992) ............................................................ 7

*Jones v. City of Boston*,
845 F.3d 28 (1st Cir. 2016) ................................................................ 14

*Khan v. City of Minneapolis*,
922 F.3d 872 (8th Cir. 2019) .............................................................. 11

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024) ......................................................... 4, 7, 9, 16

*Louis v. Saferent Solutions, LLC*,
2023 WL 4766192 (D. Mass.)............................................................. 20

*NAACP v. Am. Fam. Mut. Ins. Co.*,
978 F.2d 287 (7th Cir. 1992)...................................................... 6, 15, 18

*Ojo v. Farmers Group, Inc.*,
    356 S.W.3d 421 (Tex. 2011) ............................................................ 3, 17

*Ojo v. Farmers Group, Inc.*,
    600 F.3d 1205 (9th Cir. 2010) ............................................................. 17

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ......................................................... 6, 9, 11, 13

*Students for Fair Admissions, Inc. v. Harvard*,
    600 U.S. 181 (2023) ........................................................................ 4, 15

*Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*,
    17 F.4th 950 (9th Cir. 2021) ....................................................passim

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989) ........................................................................ 5, 6, 9

*Watson v. Fort Worth Bank & Trust*,
    487 U.S. 977 (1988) ...................................................................... 20, 21

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ......................................................................... 3, 19

**Statutes**

5 U.S.C. §706 ................................................................... 8, 9, 15, 22

15 U.S.C. §1607 ....................................................................................... 21

15 U.S.C. §1639b ...................................................................................... 21

15 U.S.C. §1640 ....................................................................................... 21

15 U.S.C. §1012 ....................................................................................... 15

15 U.S.C. §1639c ...................................................................................... 19

42 U.S.C. §3601 .......................................................................................... 1

42 U.S.C. §3604 .......................................................................................... 3

42 U.S.C. §3605 .......................................................................................... 3

**Other Authorities**

Ctr. for Capital Markets Competitiveness, *The Economic Benefits of Risk-Based Pricing For Historically Underserved Consumers in the U.S.* (2021), https://www.centerforcapitalmarkets.com/resource/rbp/ ......................................... 19

**Regulations**

12 C.F.R. §1026.43 ................................................................................ 19

24 C.F.R. §100.500 .............................................................................passim

38 C.F.R. §36.4340 ............................................................................... 20

78 Fed. Reg. 11,460 (Feb. 15, 2013).......................................................... 5, 20

78 Fed. Reg. 6,408 (Jan. 30, 2013) ............................................................ 19

85 Fed. Reg. 60,288 (Sept. 24, 2020) .......................................................passim

88 Fed. Reg. 19,450 (Mar. 31, 2023) ........................................................passim

## INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber, on behalf of its members, has a substantial interest in the outcome of this case. The Chamber and its members are strongly committed to the eradication of discrimination from the marketplace, and to ensuring that financial services are provided to all consumers in a fair and even-handed manner. Mindful of these goals, the Chamber's members are also concerned about the potential for overbroad liability for disparate-impact claims under the Fair Housing Act, 42 U.S.C. §3601 *et seq.*, and in particular under HUD's disparate-impact rule, 24 C.F.R. §100.500, which lacks critical safeguards the Supreme Court announced in *Inclusive Communities*.

---

[1] Counsel for all parties have consented to the filing of this *amicus curiae* brief. *See* Fed. R. App. P. 29(a)(2). No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* and their counsel, made any monetary contribution toward the preparation or submission of this brief.

This Court's ruling on whether HUD's disparate-impact rule is lawful and consistent with the safeguards announced in *Inclusive Communities* and the McCarran-Ferguson Act, as HUD contends, will provide important guidance to the Chamber and its members. Resolution of this question will reduce the uncertainty that presently exists in this area of the law and will promote compliance, to the benefit of businesses and the public.

## INTRODUCTION

The Fair Housing Act bans "making [un]available" housing or related services "because of race." 42 U.S.C. §§3604(a), (b), 3605(a). Although the Supreme Court held in *Inclusive Communities* that the FHA "encompasses disparate-impact claims," its "interpretation of the FHA" includes "safeguards" to protect racially neutral and rational "priorities" that further "legitimate objectives." 576 U.S. 519, 530-534, 544-45 (2015). HUD's new disparate-impact rule eliminates those safeguards, even going so far as to erase a defense based on compliance with state law. *Compare* 24 C.F.R. §100.500, *with* 85 Fed. Reg. 60,288, 60,333 (Sept. 24, 2020) ("2020 rule").

HUD is now one of several agencies exercising "unprecedented power over American industry." *See West Virginia v. EPA*, 597 U.S. 697, 728 (2022). Without the FHA's safeguards, the rule threatens to ban longstanding, neutral, and rational risk-based practices that are essential to the insurance and lending industries—areas far beyond HUD's "'technical and policy expertise.'" *Id.* at 729. When commenters warned about that result, HUD doubled down: "actuarially based practices" like "ratemaking, price optimization, and credit scoring" are targets of the rule, 88 Fed. Reg. 19,450, 19,472 (Mar. 31, 2023), even though they are consistent with state law, *e.g.*, *Ojo v. Farmers Group, Inc.*, 356 S.W.3d 421, 434-35 (Tex. 2011). HUD did so even though this Court held that federal courts cannot, as a matter of federalism, "determine" whether a practice is "actuarially sound and consistent with principles of state law" under the McCarran-Ferguson Act. *See Doe v. Mut. of Omaha Ins., Co.*, 179 F.3d 557, 563-64 (7th Cir. 1999). HUD's response: the agency "disagrees with *Mutual of*

*Omaha*" and "is not bound to follow" it, citing "*Chevron* deference." 88 Fed. Reg. at 19,476 & n.227.

*Chevron* has since been overruled, and under no body of law can agencies depart from "pre-existing judicial" interpretations of the FHA or the McCarran-Ferguson Act. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2265 (2024). HUD was, and remains, bound by the authoritative interpretations in *Inclusive Communities* and *Mutual of Omaha*. Because the disparate-impact rule conflicts with the FHA and the McCarran-Ferguson Act, as both have been construed by the Supreme Court and this Court, it is contrary to law and must be "set aside." 5 U.S.C. §706(2).

## SUMMARY OF THE ARGUMENT

**1.** *Inclusive Communities* struck a delicate balance between the requirements of the Constitution and the FHA. 576 U.S. 519 (2015). While the Constitution prohibits racial classifications not justified under strict scrutiny, *see Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181 (2023), FHA-based disparate-impact theories may under some circumstances lead regulated entities to abandon neutral policies or procedures in order to address racial outcomes, *Inclusive Communities*, 576 U.S. at 539-47. Because those two principles can pull in different directions, the Court in *Inclusive Communities* imposed safeguards around disparate-impact liability under the FHA. *Id.*

In 2020, HUD incorporated those safeguards into regulations that govern disparate-impact liability under the FHA. 85 Fed. Reg. at 60,332-33. But three years

later, in an about-face, HUD reinstated its pre-*Inclusive Communities* liability framework. *Prop. Cas. Insurers Ass'n of Am. v. Todman*, 2024 WL 1283581, at *7 (N.D. Ill.); 88 Fed. Reg. 19,450 (Mar. 31, 2023). That framework, initially drafted in 2013, 78 Fed. Reg. 11,460 (Feb. 15, 2013), omits at least four of the safeguards the Supreme Court later imposed.

First, the Supreme Court imposed a "robust causality requirement." *Inclusive Communities*, 576 U.S. at 542. It requires showing "that the challenged policy, and not some other factor or policy, caused the disproportionate effect." *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 962 (9th Cir. 2021). "In contrast, the HUD regulation contains no 'robust causation' requirement.'" *Inclusive Communities Project, Inc. v. Lincoln Prop. Co. (Inclusive Communities II)*, 920 F.3d 890, 902 (5th Cir. 2019).

Second, the Court explained that the FHA does not forbid private policies "unless they are 'artificial, arbitrary, and unnecessary.'" *Inclusive Communities*, 576 U.S. at 543. While the 2020 rule incorporated that limitation, 85 Fed. Reg. at 60,332-33, HUD eliminated it in 2023, 24 C.F.R. §100.500.

Third, the Court explained that a neutral policy that results in a disparate impact need not be "necessary" to achieve an entity's legitimate interests in order to be justified. *See Sw. Fair Hous. Council*, 17 F.4th at 967-68 (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 659 (1989)). HUD disagrees. *See* 24 C.F.R. §100.500(b)(1)(i), (c)(2).

Finally, the Supreme Court requires plaintiffs to propose alternative policies that are "equally effective," *see Sw. Fair Hous. Council*, 17 F.4th at 970 (citing *Wards Cove*, 490 U.S. at 661), or "equally valid," *Ricci v. DeStefano*, 557 U.S. 557, 589-90 (2009), before regulated entities can be held liable for not adopting them. But again, HUD rewrites the standard to require only that alternatives "*could* … serv[e]" entities' interests. 24 C.F.R. §100.500(b)(1)(ii), (c)(3) (emphasis added).

Failing each of these safeguards and rewriting each of these settled standards, HUD's revived pre-*Inclusive Communities* rule opens the door to requiring race to "be used and considered in a pervasive and explicit manner" across the economy, not just in the insurance industry. *See Inclusive Communities*, 576 U.S. at 543. Regulated entities may be required to replace neutral policies that have long advanced "substantial" interests with alternatives that are less effective, costlier, and more burdensome. *Compare* 85 Fed. Reg. at 60,332-33 (plaintiff must show the alternative policy "would serve the defendant's identified interest … in an equally effective manner without imposing materially greater costs on, or creating other material burdens for, the defendant"), *with* 24 C.F.R. §100.500 (eliminating that safeguard).

**2.** The rule also conflicts with this Court's interpretation of the McCarran-Ferguson Act. "That Act forbids construing" the FHA "to 'impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless" the FHA "'specifically relates to the business of insurance.'" *Mut. of Omaha*, 179 F.3d at 563. Because the FHA "does not specifically relate to the business of insurance," *NAACP v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287, 295 (7th Cir. 1992)

(cleaned up), the only question is whether HUD's interpretation of the FHA "'interferes with a State's administrative regime,'" *Mut. of Omaha*, 179 F.3d at 563.

*Mutual of Omaha* answers that question in the affirmative, in the context of rating and underwriting practices. "State regulation of insurance is comprehensive and includes rate and coverage issues." *Id.* at 564. Interpreting an anti-discrimination statute like the FHA to cover neutral and risk-based practices necessarily requires that "federal courts … determine whether" those practices "are actuarially sound and consistent with principles of state law," a result that the McCarran-Ferguson Act forbids. *Id.* HUD openly "disagrees," 88 Fed. Reg. at 19,476, even going so far as to eliminate the 2020 rule's defense based on compliance with state law, 85 Fed. Reg. at 60,333. But when "an agency honestly believes a circuit court has misinterpreted the law, there are two places it can go to correct the error: Congress or the Supreme Court." *Johnson v. U.S. R.R. Ret. Bd.*, 969 F.2d 1082, 1091-92 (D.C. Cir. 1992). In *this* Circuit, HUD and the district court were bound by this Court's interpretation of the McCarran-Ferguson Act. *See Loper Bright*, 144 S. Ct. at 2273.

**3.** Finally, although this challenge is brought by an insurance trade association, what this Court says about the new rule could apply to all of business. Like the insurance industry, the lending industry also engages in risk-based pricing. Rational consideration of neutral criteria for loans could affect groups differently and therefore risk exposure to liability under the rule even though federal agencies themselves often impose those criteria on the mortgage guarantees and insurance

they provide. Absent safeguards, the rule will pressure some entities to consider race and abandon longstanding, neutral, and previously uncontroversial business policies and practices.

*     *     *

The rule eliminates key safeguards, in direct conflict with *Inclusive Communities*' saving construction of the FHA. And the rule purports to cover neutral and rational risk-based practices, running afoul of *Mutual of Omaha* too. It is therefore unlawful and must be "set aside." 5 U.S.C. §706(2).

## ARGUMENT

HUD's disparate-impact rule effectively requires regulated entities—from home insurers to state governmental departments—to replace neutral policies that advance the substantial interests of businesses and consumers with policies that do so less effectively and that impose materially greater costs and burdens. The Supreme Court carefully crafted safeguards to ensure that the FHA never puts regulated entities in that position. But HUD's disparate-impact rule ignores key aspects of the Supreme Court's construction of the FHA. And it ignores this Court's construction of the McCarran-Ferguson Act too: the rule threatens longstanding risk-based insurance practices, even when State law requires or permits them. The rule is therefore unlawful and must be set aside.

## I.    The disparate-impact rule unlawfully departs from the Supreme Court's framework in *Inclusive Communities*.

*Inclusive Communities* acknowledged that broad disparate-impact liability raises constitutional concerns. As the Court explained, "disparate-impact liability has

8

always been properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA." *Inclusive Communities*, 576 U.S. at 540.

The Supreme Court has articulated several safeguards around disparate-impact liability. First, there is a "robust causality requirement" that plaintiffs must overcome at the prima-facie stage. *Id.* at 542. Second, policies are not unlawful "unless they are 'artificial, arbitrary, and unnecessary." *Id.* at 543. Third, a defendant need not show that its policy is *necessary* to serve "its legitimate interests." *See Sw. Fair Housing Council*, 17 F.4th at 967 (citing *Wards Cove*, 490 U.S. at 659). Finally, plaintiffs must propose alternative policies that are "equally effective," *see id.* at 970 (citing *Wards Cove*, 490 U.S. at 661), or "equally valid," *Ricci*, 557 U.S. at 589-90, at serving the defendant's valid interests.

By mandating these safeguards, the Supreme Court saved the FHA's disparate-impact provision from the constitutional problems that it might otherwise present—and at the same time, limited the scope of rulemaking that may derive from this provision. Any departure from the FHA's "single, best meaning" as the Supreme Court discerned it is therefore illegal. *Loper Bright*, 144 S. Ct. at 2266. Yet HUD has now recreated a rule it drafted prior to *Inclusive Communities*, and it pays its safeguards no heed. The rule is therefore unlawful because it exceeds the scope of HUD's authority to create liability under the FHA, as the Supreme Court has defined that scope. 5 U.S.C. §706(2)(C).

**1. "Robust causality."** *Inclusive Communities* recognized a key safeguard against disparate impact liability: a "robust causality requirement" applies "at the

9

prima facie stage" to "ensure[] that racial imbalance does not, without more, establish a prima facie case of disparate impact." 576 U.S. at 542 (cleaned up). The plaintiff must demonstrate "robust causality that shows, beyond mere evidence of statistical disparity, that the challenged policy, *and not some other factor or policy*, caused the disproportionate effect." *Sw. Fair Housing Council*, 17 F.4th at 962 (emphasis added). The 2020 rule incorporated this requirement by requiring plaintiffs to "plead facts to support … [t]hat there is a *robust* causal link between the challenged policy or practice and the adverse effect on members of a protected class, meaning that the specific policy or practice is the *direct cause* of the discriminatory effect." 85 Fed. Reg. at 60,332 (emphases added).

By contrast, the current rule appears to dilute the causation standard by declaring that "[l]iability may be established … based on a practice's discriminatory effect." 24 C.F.R. §100.500. A plaintiff must merely first prove "that a challenged practice caused or predictably will cause a discriminatory effect." *Id.* §100.500(c)(1). It follows that HUD's "regulation contains no 'robust causation' requirement," *Inclusive Communities II*, 920 F.3d at 902, unlike the 2020 rule.

**2. "Artificial, arbitrary, and unnecessary."** *Inclusive Communities* explained that "private policies are not contrary to the disparate-impact requirement *unless* they are 'artificial, arbitrary, *and* unnecessary.'" 576 U.S. at 540, 543, 544 (emphases added); *see id.* at 544-45 ("offending practice[s]" are those that "*arbitrarily* operat[e] invidiously to discriminate") (emphasis added) (cleaned up)). Courts of Appeals have recognized that "[u]nder *Inclusive Communities*, a plaintiff must, at the

very least, point to an 'artificial, arbitrary, and unnecessary' policy causing the problematic disparity." *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1114 (8th Cir. 2017); *see also Khan v. City of Minneapolis*, 922 F.3d 872, 874 (8th Cir. 2019) (similar); *Sw. Fair Hous. Council*, 17 F.4th at 967, 971-72 (similar).

HUD's 2020 rule faithfully incorporated this safeguard. 85 Fed. Reg. at 60,332-33 (plaintiff must allege that the practice "is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective" and defendant can "rebut" that allegation by "showing that the challenged policy or practice advances a valid interest … and is therefore not arbitrary, artificial, and unnecessary"). But not HUD's resurrected pre-*Inclusive Communities* rule. Under this rule, even neutral policies that advance "substantial" interests may be unlawful if they "could be served by another practice that has a less discriminatory effect." 24 C.F.R. §100.500(c)(3).

HUD's only defense to this patent syntactical tension is that its pre-*Inclusive Communities* rule and *Inclusive Communities*' "artificial, arbitrary, and unnecessary" test are identical in substance. *See* 88 Fed. Reg. at 19,471-72. But it is hard to see how a policy that advances a *substantial* or even a *legitimate interest* could be "arbitrary." *See Ricci*, 557 U.S. at 589 (extant "60/40 weighting" on an exam was "rational" and not "arbitrary" even though a proposed "30/70 weighting" would have had a less disparate racial impact); *Inclusive Communities*, 576 U.S. at 544 (distinguishing "arbitrary and unnecessary barriers" from "valid governmental and private priorities"). As one Court of Appeals held, *Inclusive Communities* "undoubtedly announce[d] a more demanding test than that set forth in the HUD

regulation." *Inclusive Communities II*, 920 F.3d at 902-03 & n.6 (holding that "the Supreme Court's language … is stricter than the regulation itself" and that the court was "bound to apply the stricter version of the burden-shifting analysis"). In short, HUD has fashioned an end-run around the Supreme Court by creating liability for neutral, valid, non-arbitrary policies after *Inclusive Communities* recognized a safeguard foreclosing such liability.

**3. Tailoring requirement.** Further, the disparate-impact rule is unlawful because it requires that the private practice be "*necessary* to achieve" substantial interests. 24 C.F.R. §100.500(c)(2) (emphasis added). The Courts of Appeals have instead interpreted the Supreme Court's safeguards to relieve the defendant of any requirement to "demonstrate that the challenged policy is 'essential' or 'indispensable' to its business—only that the policy 'serves, in a significant way,' its legitimate interests." *See Sw. Fair Hous. Council*, 17 F.4th at 967-68 (applying *Inclusive Communities* and *Wards Cove*) (cleaned up). HUD's pre-*Inclusive Communities* rule "render[s] the defense a nullity." *See id.* That result was intentional. By contrast, HUD's 2020 rule required the defendant to show only "that the challenged policy or practice advances a valid interest," 85 Fed. Reg. at 60,332-33—the kind of "rational tailoring" that this safeguard protects, *Sw. Fair Hous. Council*, 17 F.4th at 971, and the type of language the Supreme Court used, *Inclusive Communities*, 576 U.S. at 544 (distinguishing "valid … priorities" from "arbitrary[] and unnecessary barriers").

12

**4. Proposed alternatives.** Finally, the disparate-impact rule illegally allows a proposed alternative to suffice even if it is a *less* effective means of achieving the regulated entity's neutral and legitimate interest. 88 Fed. Reg. at 19,491. And HUD permits a proposed alternative to impose "materially greater costs" and "burdens." *Cf.* 85 Fed. Reg. at 60,332-33 (2020 rule).

 By contrast, under the 2020 rule, if a defendant had shown "that the challenged policy or practice advances" a non-arbitrary interest, the plaintiff was required to show that an alternative practice "would serve the defendant's identified interest … in an *equally effective* manner without imposing materially greater costs" or burdens. *Id.* at 60,332-33 (emphasis added). Again, this version of the rule complied with *Inclusive Communities*. But HUD eliminated the 2020 rule's careful adherence to that safeguard by returning to its 2013 language, requiring only that the plaintiff show "that the substantial … interes[t] supporting the challenged practice could be served by another practice." 24 C.F.R. §100.500(c)(3).

HUD admits that its rule does not require that the alternative be equally effective. *See* 88 Fed. Reg. at 19,491. That admission proves the illegality of the rule. *See Ricci*, 557 U.S. at 589 (no evidence that proposed alternative exam weighting "would be an equally valid way to determine whether candidates possess the proper mix of job knowledge and situational skills"); *Inclusive Communities*, 576 U.S. at 533 ("cases interpreting Title VII" like "*Ricci* … provide essential background and instruction" in the FHA context). Post-*Inclusive Communities*, Courts of Appeals have held that disparate-impact plaintiffs' "'proposed alternative(s) must be *equally*

*effective* as the defendant's chosen policy at serving the defendant's interest(s), taking into account factors such as the cost or other burdens that alternative policies would impose.'" *Sw. Fair Hous. Council*, 17 F.4th at 970 (cleaned up); *cf. Hardie v. N.C.A.A.*, 876 F.3d 312, 320 (9th Cir. 2017) ("The plaintiff's proposed alternative(s) must be 'equally effective' as the defendant's chosen policy at serving the defendant's interest(s)…"); *Jones v. City of Boston*, 845 F.3d 28, 34-35 & n.3 (1st Cir. 2016) (finding that plaintiffs' "proffered alternative equally [could] have met the [defendant's] needs"). For that reason, disparate-impact liability under the FHA requires plaintiffs "to provide evidence that equally effective and less discriminatory alternatives exist." *Sw. Fair Hous. Council*, 17 F.4th at 970. Ignoring "costs and burdens … incorrectly signals that justified, deliberate, and legitimate policies, which impact protected groups, violate the FHA." *Id.* at 971. The resurrected 2013 rule therefore illegally compels regulated entities to choose policies that less effectively advance their interests at higher costs, all to secure a different racial effect—the definition of the use of race "in a pervasive way," *see Inclusive Communities*, 576 U.S. at 542.

\*     \*     \*

The Supreme Court has carefully crafted safeguards to ensure that the FHA does not require a regulated entity to abandon a neutral policy that substantially advances its interests in favor of an alternative that is less effective, costlier, and more burdensome. The safeguards allow entities to maintain neutral policies

"rational[ly] tailor[ed]" to serve legitimate interests more effectively than available alternatives. *Sw. Fair Hous. Council*, 17 F.4th at 971.

HUD's disparate-impact rule undermines those protections by requiring neutral policies to survive something more like strict scrutiny. *Compare* 24 C.F.R. §100.500(c) (neutral policy must be "necessary to achieve" a "substantial" interest such that there are no "less" restrictive means), *with Harvard*, 600 U.S. at 206-07 ("'narrowly tailored'—meaning 'necessary'—to achieve" a compelling interest). "Were standards for proceeding with disparate-impact suits not to incorporate *at least* the safeguards discussed in" *Inclusive Communities*, "then disparate-impact liability might displace valid governmental and private priorities, rather than solely removing artificial, arbitrary, and unnecessary barriers." 576 U.S. at 544 (cleaned up). Because HUD's disparate-impact rule lacks those critical safeguards, this Court should set it aside. 5 U.S.C. §706(2).

## II.    The disparate-impact rule conflicts with the McCarran-Ferguson Act.

The McCarran-Ferguson Act declares that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance … unless such Act *specifically relates to the business of insurance*." 15 U.S.C. §1012(b) (emphasis added). It is settled law that "[t]he Fair Housing Act is an 'Act of Congress' that does not 'specifically relate to the business of insurance.'" *NAACP*, 978 F.2d at 295 (cleaned up). So, applied here, the McCarran-Ferguson Act prohibits HUD from imposing any interpretation of the FHA that "would … frustrate any declared state policy or interfere with a State's administrative regime." *See Humana Inc. v. Forsyth*, 525 U.S. 299, 309-10 (1999).

This Court's decision in *Mutual of Omaha* governs Appellant's McCarran-Ferguson Act claim. *See* D.Ct.Doc.274 ¶¶161-68. "State regulation of insurance is comprehensive and includes rate and coverage issues." 179 F.3d at 564. For that reason, "federal courts" cannot "determine whether" risk-based practices "are actuarially sound and consistent with principles of state law" without "stepping on the toes of state insurance commissioners." *Id.* Although the McCarran-Ferguson Act doesn't insulate intentional race-based exclusions from the reach of general federal anti-discrimination laws, targeting neutral and rational risk-based practices because of their possible unintended disparate effects inevitably requires "a *federal* court to decide whether an insurance policy is consistent with *state* law." *Id.* That result "obviously would interfere with the administration of the state law" because, as this Court explained, the "states are not indifferent to who enforces their laws." *Id.* In short, "an interpretation of" a general disparate-impact provision "as regulating the content of insurance policies is barred by the McCarran-Ferguson Act." *See id.*

HUD all but admits that its new rule conflicts with *Mutual of Omaha*. It says that it "disagrees with *Mutual of Omaha*" insofar as it held that assessing "actuarial soundness" or consistency with "state law necessarily interferes with a state administrative regime." 88 Fed. Reg. at 19,476; *but see Loper Bright*, 144 S. Ct. at 2265. Beyond registering its disagreement, HUD asserted that "disparate impact claims challenging insurance practices do not necessarily require" those assessments. 88 Fed. Reg. at 19,476. Following the district court here, HUD reasoned that only "some states require insurers to use risk-based pricing," while "other states merely

permit risk-based pricing." *Id.* at 19,476 & n.229 (cleaned up). In HUD's view, even if States permit practices like "ratemaking, price optimization, and credit scoring," there may be "a less discriminatory alternative" that "also is actuarially sound and otherwise [permitted by] state law." *Id.* at 19,472.

That reasoning establishes the illegality of HUD's new rule. The McCarran-Ferguson Act applies to any interpretation of the FHA that would forbid practices that state insurance law and policy "*permit*," not just those that they require. *See, e.g., Dexter v. Equitable Life Assur. Soc. of U.S.*, 527 F.2d 233, 236 (2d Cir. 1975). Hence, the Act led the Ninth Circuit to certify the question of "whether Texas law permits an insurance company to price insurance by using credit-score factors" to the Supreme Court of Texas. *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1207, 1209-10 (9th Cir. 2010) (en banc) (per curiam) (holding that "allowing" a plaintiff to sue "would impair Texas law" if "Texas law permits insurance companies to use credit scores"). The Texas court then answered this "dispositive question," *id.* at 1207, 1209, in the affirmative, *Ojo*, 356 S.W.3d at 434-35.

HUD's "interpretation" that the FHA applies to neutral and rational risk-based practices illegally "injects federal courts into the heart of the regulation of the insurance business by the states." *Mutual of Omaha*, 179 F.3d at 564. Now, whenever a plaintiff challenges a risk-based practice, like the pricing and underwriting of homeowners insurance, a *federal* court will have the responsibility to determine whether *state* law requires or permits it—even after state insurance regulators have already cleared the practice under state law. *See Humana*, 525 U.S. at 309-10 (cannot

"interfere with a State's administrative regime"). That inquiry into a State's own administrative process is exactly what *Mutual of Omaha* forbids.

HUD's elimination of the safeguards it put in the 2020 rule only compounds the new rule's illegality. The 2020 rule "provide[d] protection for defendants with policies or practices that are reasonably required by state law." 85 Fed. Reg. at 60,316. Thus, the 2020 rule required a plaintiff to "sufficiently plead facts to support" the element that "the challenged policy or practice is arbitrary, artificial, and unnecessary to a valid interest" like a "requirement of law." *Id.* at 60,333. At the pleading stage, the 2020 rule separately allowed a defendant to show that its "policy or practice was reasonably necessary to comply with a third-party requirement, such as … [f]ederal, state, or local law." *Id.* And as an additional safeguard, the 2020 rule clarified that it was not "intended to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance." *Id.* These protections dovetailed with *Inclusive Communities*: The FHA does not ban neutral practices unless they are arbitrary, and compliance with state laws that reverse-preempt the FHA under the McCarran-Ferguson Act is anything but arbitrary. *Supra* at 5, 10-12.

But HUD removed all these post-*Inclusive Communities* protections from its disparate-impact liability framework. *See* 24 C.F.R. §100.500. The new rule is thus doubly problematic: it unlawfully removes protections that themselves were designed to avoid unlawful application of the FHA to "the core of insurance." *See NAACP*, 978 F.2d at 294. That "highly consequential power" is "beyond what Congress could

18

reasonably be understood to have granted" in the FHA, *accord West Virginia*, 597 U.S. at 724, especially in the face of a statute that expressly leaves the regulation of insurance to the States.

### III. The disparate-impact rule's illegality affects businesses beyond the insurance industry.

The disparate-impact rule will not just "cause" the "pervasive" use of "race" in the insurance industry. *See Inclusive Communities*, 576 U.S. at 542-43. For example, the lending industry, like the insurance industry, engages in risk-based pricing. *See* Ctr. for Capital Markets Competitiveness, *The Economic Benefits of Risk-Based Pricing For Historically Underserved Consumers in the U.S.* (2021), https://www.centerforcapitalmarkets.com/resource/rbp/. Risk-based analysis requires looking at borrowers' credit profile—income, debt, credit score, and the like. These kinds of non-racial factors "correlat[e] with loan performance." *See* 78 Fed. Reg. 6,408, 6,527 (Jan. 30, 2013). For that reason, federal law requires certain lenders to verify that borrowers have a "reasonable ability to repay the loan." 15 U.S.C. §1639c(a)(1), (2). Lenders generally *must* make that determination based on similar factors. *See* 12 C.F.R. §1026.43(c)(2). With good reason: These race-neutral policies advance Congress's interest in preventing another "mortgage crisis." *See* 78 Fed. Reg. at 6,408 ("too many mortgages were made to consumers without regard to the consumer's ability to repay").

The disparate-impact rule threatens to force regulated entities to revisit these types of neutral policies. For example, consideration of credit scores might affect groups differently and therefore risk exposure to disparate-impact liability. HUD

originally downplayed that concern, asserting that the rule would not "encourage lawsuits challenging credit scores, or other credit assessment standards, or the requirements of the Dodd-Frank Act." 78 Fed. Reg. at 11,476. Unsurprisingly, ignoring *Inclusive Communities*' safeguards—against the weight of circuit authority—will result in FHA claims against similar policies by, for example, rental businesses.[2] The disparate-impact rule therefore creates a situation in which private entities may face claims of liability based on perfectly reasonable policies that federal agencies themselves impose on the mortgage guarantees and insurance they provide. *See, e.g.*, 38 C.F.R. §36.4340 (establishing credit standards, relating to a borrower's "income and expenses, and credit history," necessary to qualify for a mortgage guarantee from the Department of Veterans Affairs).

The result, as HUD originally admitted, is to encourage regulated "lenders … to conduct internal discriminatory effects analyses," 78 Fed. Reg. at 11,476, which—if not carefully managed—could lead to the "pervasive" use of race, *see Inclusive Communities*, 576 U.S. at 542. Larger and more sophisticated lenders may be able to conduct those analyses effectively and thereby mitigate the disparate-impact risk associated with their race-neutral credit standards. But entities without similar resources and expertise could feel "pressure" to adopt "inappropriate prophylactic measures" to balance the racial outcomes of their lending practices. *See Watson v.*

---

[2] *See, e.g.*, *Louis v. Saferent Solutions, LLC*, 2023 WL 4766192, at \*11-12 & n.8 (D. Mass.) (holding, despite noting the weight of contrary Court of Appeals authority, that plaintiff states a disparate-impact claim if a "policy that relies on credit scores to evaluate rental applications will have a disproportionate impact" on identified racial groups, even if the policy isn't "'arbitrary'").

*Fort Worth Bank & Trust*, 487 U.S. 977, 992-93 (1988) (plurality opinion). A framework in which an entity is pressured to abandon a neutral, valid, policy in favor of a less effective alternative raises the very constitutional concerns the Supreme Court worked to avoid in *Inclusive Communities*.

The 2020 rule also recognized a defense for all regulated entities for policies that are "reasonably necessary to comply with" federal law, 85 Fed. Reg. at 60,333, as *Inclusive Communities* requires, 576 U.S. at 543 (no causation if "federal law substantially limits … discretion"). The disparate-impact rule eliminates that safeguard too, *see* 24 C.F.R. §100.500, and explicitly notes that "mortgage banks" will be required to rely on HUD's naked assurances that all will be well, *see* 88 Fed. Reg. at 19,493. Regulated entities now have no protection from the costs and reputational damage associated with defending against any suits that might now be brought under the rule, but that the 2020 rule would have deterred through its adherence to safeguards. Worse, regulated entities may well be caught in a catch-22: risk liability either for disparate impact or for failing to comply with federal requirements. *See, e.g.*, 15 U.S.C. §§1607, 1639b, 1640 (allowing administrative and private enforcement, including for "the greater of actual damages" or the treble of the lender's "compensation or gain … plus the costs to the consumer of the action, including a reasonable attorney's fee").

HUD's disparate-impact rule creates pressure on businesses across the economy to abandon longstanding, neutral, and previously uncontroversial business policies and practices—like the actuarial policies Appellants emphasize here—in

21

favor of less effective alternatives. Because it lacks the critical safeguards set forth in *Inclusive Communities*, 576 U.S. at 544-45, HUD's rule is unlawful and must be set aside, 5 U.S.C. §706(2).

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment.

Dated: August 21, 2024

JONATHAN D. URICK
KEVIN R. PALMER
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, DC 20062

*Counsel for* Amicus Curiae
*Chamber of Commerce of the*
*United States of America*

Respectfully submitted,

 */s/ Patrick Strawbridge*
Patrick Strawbridge*
C'Zar Bernstein
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
Tel: (703) 243-9423
patrick@consovoymccarthy.com
czar@consovoymccarthy.com

* Counsel of Record

*Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 29(a)(5) and Cir. R. 29 because it contains 5,237 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) and Cir. R. 32 because it has been prepared in 12-point Century Schoolbook font. This brief has been scanned for viruses and is virus-free.


Dated: August 21, 2024                    */s/ Patrick Strawbridge*

                                          Counsel for *Amicus Curiae*

## CERTIFICATE OF SERVICE

I filed a true and correct copy of this brief with the Clerk of this Court via the CM/ECF system, which will notify all counsel.

Dated: August 21, 2024                    */s/ Patrick Strawbridge*

                                          Counsel for *Amicus Curiae*