No. 24-1947

In The

# United States Court of Appeals
# for the Seventh Circuit

Property Casualty Insurers Association of America,

*Plaintiff-Appellant*

*v.*

Adrianne Todman, in Her Official Capacity as Acting Secretary of Housing and Urban Development, and the United States Department of Housing and Urban Development

*Defendants-Appellee*

On Appeal from the United States District Court for the Northern District of Illinois, No. 13 C 8564
Before the Honorable Rebecca R. Pallmeyer, J.

## BRIEF FOR *AMICUS CURIAE* NATIONAL COUNCIL OF INSURANCE LEGISLATORS IN SUPPORT OF PLAINTIFF-APPELLANT URGING REVERSAL

Benjamin Levine
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661
(312) 902-5200
benjamin.levine@kattenlaw.com

Nat Shapo
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661
(312) 902-5200
nat.shapo@katten.com
*Counsel of Record*

*Counsel for* Amicus Curiae

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1947

Short Caption: Property Casualty Insurers Association of America v. Adrianne Todman

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    National Council of Insurance Legislators

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Katten Muchin Rosenman LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Benjamin Levine    Date: 8/21/2024

Attorney's Printed Name: Benjamin Levine

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: 525 W Monroe St

    Chicago, IL 60661

Phone Number: (312) 902-5200    Fax Number: (312) 902-1061

E-Mail Address: benjamin.levine@katten.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1947

Short Caption: Property Casualty Insurers Association of America v. Adrianne Todman

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    National Council of Insurance Legislators

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Katten Muchin Rosenman LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Nat Shapo    Date: 8/21/2024

Attorney's Printed Name: Nat Shapo

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ✔    **No** ☐

Address: 525 W Monroe St

    Chicago, IL 60661

Phone Number: (312) 902-5200    Fax Number: (312) 902-1061

E-Mail Address: nat.shapo@katten.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................... iii

STATEMENT OF IDENTITY AND INTEREST .................................... 1

SUMMARY OF ARGUMENT .................................................... 4

ARGUMENT ................................................................ 6

I.   MCCARRAN–FERGUSON ESTABLISHES THE
     CONTROLLING NATIONAL REGULATORY STANDARDS
     FOR INSURER DISCRIMINATION PRACTICES ......................... 6

     A.   Under the McCarran-Ferguson Act, State Legislatures
          Establish U.S. Insurance Regulatory Policy Absent
          Specific Contrary Direction by Congress ................... 6

     B.   Congress Directs the States to Occupy the Field of
          Competition and Trade Practices Regulation ............... 9

     C.   The States' Recognition of their Obligation to Legislate
          in Good Faith ........................................... 11

     D.   The States' Thoroughly Considered, Well-Developed
          Response to Congress' Inclusion of Robinson–Patman
          in McCarran–Ferguson .................................... 12

     E.   State Unfair Discrimination Laws Implement a
          Federal Policy of Cost-Based Pricing Directed by
          McCarran–Ferguson ...................................... 17

II.  THE STATE RATING LAWS IMPLEMENT, AS A MATTER
     OF CONGRESSIONAL POLICY, ROBINSON–PATMAN'S
     ECONOMIC, NOT SOCIAL, DISCRIMINATION
     PRACTICES ..................................................... 19

III. THE STATE RATING STATUTES, PURSUANT TO
     CONGRESS'S DELEGATION OF SUCH POLICY
     CHOICES, PROTECT DISCRETE, VULNERABLE
     CLASSES FROM DIRECT DISCRIMINATION. .......................... 23

IV.    MCCARRAN–FERGUSON'S STANDARD, SPECIFIC TO INSURER DISCRIMINATION PRACTICES, MUST TRUMP THE FAIR HOUSING ACT STANDARD, GENERAL TO HOUSING. ........................................................... 27

CONCLUSION .......................................................................... 30

CERTIFICATE OF COMPLIANCE ......................................... 31

CERTIFICATE OF SERVICE ................................................. 32

# TABLE OF AUTHORITIES

Page(s)

Cases

*Doukas v. Metro. Life Ins. Co.*,
    950 F. Supp. 422 (D.N.H. 1996)...........................................................19

*Hardware Mut. Cas. Co. v. Premo*,
    217 A.2d 698 (Conn. 1966)..................................................................19

*Ins. Co. of N. Am. v. Comm'r. of Ins.*,
    101 N.E.2d 335 (Mass. 1951).............................................................18

*Ins. Comm'r. for the State of Md. v. Engelman*,
    692 A.2d 474 (Md. 1997)......................................................................21

*Karlin v. Zalta*,
    201 Cal. Rptr. 379 (Cal. Ct. App. 1984)............................................18

*Life Ins. Ass'n of Mass. v. Comm'r. of Ins.*,
    530 N.E.2d 168 (1988) .........................................................................22

*Long Island Care at Home, Ltd. v. Coke*,
    551 U.S. 158 (2007)...............................................................................29

*Matter of Polan v. State of N.Y. Ins. Dep't*,
    3 A.D.3d 30 (N.Y. App. Div. 2003).....................................................21

*Morton v. Mancari*, 417 U.S. 535 (1974) ..............................................29

*Nationwide Mut. Ins. Co. v. Cisneros*,
    516 U.S. 1140 (1996), 1996 WL 33467770 ........................................20

*Pac. Fire Rating Bureau v. Ins. Co. of N. Am.*,
    321 P.2d 1030 (Ariz. 1958)..................................................................18

*Paul v. Virginia*,
    75 U.S. 168 (1868).....................................................................................7

*Radzanower v. Touche Ross & Co.*,
  426 U.S. 148 (1976)..............................................................28

*Telles v. Comm'r of Ins.*,
  574 N.E.2d 359 (Mass. 1991) ...............................................22

*Thompson v. IDS Life Ins. Co.*,
  549 P.2d 510 (Or. 1976) (en banc) .......................................21

*U.S. v. Olinger*, 759 F.2d 1293 (7th Cir. 1985) .....................29

*United States v. South-Eastern Underwriters Ass'n*,
  322 U.S. 533 (1944)...................................................7, 9, 12

**Statutes**

15 U.S.C. § 13(a)..............................................................5, 13, 27

15 U.S.C. § 1011 .......................................................................7-9

15 U.S.C. § 1012(a) ..............................................................8, 25

15 U.S.C. § 1012(b) ..............................................................8, 10

15 U.S.C. § 1013(a) ....................................................................10

15 U.S.C. § 1013(c) ......................................................................6

24 C.F.R.§ 100.500 .....................................3, 5, 6, 22, 26–28

Del. Code Title 18, § 2501 ........................................................18

Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.*.............3, 5, 6, 27–30

McCarran–Ferguson Act of 1945,
  15 U.S.C. §§ 1011–1015 ....................1–7, 9–12, 14–16, 18, 23, 25–29

Me. Rev. Stat. Title 24-A, § 2301 ...........................................18

PROPERTY AND CASUALTY MODEL RATING LAW NO. 1775,
  §§ 5A(3), 5A(4)(b) (NAIC 2010) .......................................24

PROPERTY/CASUALTY INSURANCE MODERNIZATION ACT
    §§ 6(A)(3)(A), 6(A)(3)(B), 3(Q) (NCOIL 2021) ................................ 23, 24

Robinson–Patman Anti-Price Discrimination Act of 1936,
    15 U.S.C. §13 ............................................ 2–5, 10, 12–19, 23, 26–28, 29

## Other Authorities

H.R. REP. NO. 79-143, at 1 (1945) ........................................... 13

S. REP. 407 (1947) ...................................................................... 16

90 CONG. REC. A4403 (Nov. 16, 1944) .................................... 13

91 CONG. REC. 1027–28 (Feb. 12, 1945) .................................. 13

91 CONG. REC. 1091 (Feb. 14, 1945) ........................................ 13

91 CONG. REC. 1092 (Feb. 14, 1945) ........................................ 14

91 CONG. REC. 1487 (Feb. 27, 1945) .............................. 4, 10, 23

1945 NAIC PROC. ....................................................................... 12

1946 NAIC PROC. ................................................................ 11, 17

1947 NAIC PROC. ................................................................ 11, 15

Brief for NAIC as Amicus Curiae Supporting Petitioner,
    *Nationwide Mut. Ins. Co. v. Cisneros*, 516 U.S. 1140
    (1996) (No. 95-714), 1996 WL 33467770 ........................... 20

Henry Stone & David A. Campbell, *Insurance and the
    Robinson–Patman Act*, 319 INS. L.J. 553, 564 (1949) ........................ 17

JON S. HANSON ET AL., MONITORING COMPETITION: A MEANS
    OF REGULATING THE PROPERTY AND LIABILITY INSURANCE
    BUSINESS 440 (NAIC 1974). ................................................ 17

NAIC, PRODUCT FILING REVIEW HANDBOOK 12 (2016) ........................... 20

N.Y. TIMES, June 6, 1944 .......................................................... 7

Pat McCarran, *Insurance as Commerce—After Four Years*,
    23 Notre Dame L. Rev. 299 (1948) ............................................. 12, 14

## GLOSSARY OF ABBREVIATIONS

**Department**:            United States Department of Housing and Urban Development

**FHA**:                 Fair Housing Act of 1968

**McCarran–Ferguson**:  McCarran–Ferguson Act of 1945

**NAIC**:               National Association of Insurance Commissioners

**NCOIL**:             National Council of Insurance Legislators

**Robinson–Patman**:   Robinson–Patman Anti-Price Discrimination Act of 1936

**Rule**:               The Department's disparate impact rule, 24 C.F.R. § 100.500.

## STATEMENT OF IDENTITY AND INTEREST[1]

The National Council of Insurance Legislators ("NCOIL") is a legislative organization comprised principally of State legislators serving on committees of jurisdiction over insurance regulation. NCOIL serves as an educational forum for policymakers, and develops and promulgates model laws focusing on insurance matters.

NCOIL has particular interest in ensuring the proper administration of the basic rules demarcating Federal and State authority over insurance regulation, as established in the McCarran–Ferguson Act of 1945 ("McCarran–Ferguson")—where Congress delegated to the States the primary responsibility to make and enforce regulatory policy over interstate insurance commerce, while retaining at all times its authority under the Commerce Clause to pass controlling legislation specific to insurance regulation.

Properly implementing both sides of this coin is NCOIL's core mission. It resists Federal encroachment upon the States' primary

---

[1] All parties to the appeal have consented in writing to the filing of this brief. No counsel for a party in this case authored this brief in whole or in part. No person or entity—other than *Amicus Curiae* and its counsel—made a monetary contribution specifically for the preparation or submission of this brief.

regulatory authority if not supported by an Act of Congress. But when Congress does provide specific substantive direction regarding insurance regulation, NCOIL punctiliously implements any such legislation. As discussed herein, this case implicates both of these concerns.

Congress included its first substantive direction to the States regarding insurance regulation in McCarran–Ferguson itself, which aggressively incentivized the States to occupy the fields of several enumerated Federal competition and trade practices statutes. In doing so, Congress specifically intended the States to apply Robinson–Patman Anti-Price Discrimination Act of 1936 ("Robinson–Patman") cost-based pricing standards to insurer discrimination practices.

State insurance legislators diligently followed Congress' direction with respect to regulation of insurer discrimination practices by promptly passing statutes in the late 1940s prohibiting "unfairly discriminatory" rates. These laws, like the Robinson–Patman Anti-Price Discrimination Act upon which they are modeled, address economic discrimination, not social class discrimination, and do not recognize disparate impact.

But now—without the support of any Act of Congress specific to insurer discrimination practices—the   United States Department of

Housing and Urban Development ("the Department") is attempting through its disparate impact rule ("the Rule"), 24 C.F.R. § 100.500, to apply the Fair Housing Act of 1968 ("FHA")—which is completely silent regarding insurer discrimination practices—to impose a radically different standard upon insurer discrimination practices, by rendering Robinson–Patman compliant cost-based pricing illegal when it results in a disparate effect upon protected social classes.

This improperly elevates the Fair Housing Act—a statute general to housing with no language specific to insurance or insurer discrimination practices—above McCarran–Ferguson, an Act of Congress specific to insurance and insurer discrimination practices. Because the States promptly codified and, for nearly eighty years, have enforced McCarran–Ferguson's Congressional policy favoring the Robinson–Patman Anti-Price Discrimination Act cost-based pricing standard for insurance regulation, NCOIL members' interests are substantially affected by the Court's consideration of this matter.

## SUMMARY OF ARGUMENT

The McCarran–Ferguson Act of 1945, 15 U.S.C. §§ 1011–1015, is best known for its unique procedural rule under which the States have primary regulatory authority over interstate insurance commerce, but it also directs the basic substantive contours of how the States must regulate. In what one of the law's main drafters labeled an "invitation to the States to legislate in good faith," 91 CONG. REC. 1487 (Feb. 27, 1945) (statement of Sen. O'Mahoney, the architect of the final compromise leading to passage of the bill), Congress established a three-year moratorium on the application of the Sherman, Clayton, Federal Trade Commission, and Robinson–Patman Acts to the business of insurance, after which they would apply in full force absent the States occupying their fields with regulatory legislation.

As Congress intended, the States promptly developed, through the National Association of Insurance Commissioners, and passed, through the State legislatures, a series of model laws to displace the Federal antitrust and competition laws. These included statutes which prohibit "unfairly discriminatory" rates, which were explicitly developed to mimic and displace the Robinson–Patman Anti-Price Discrimination Act of

1936, which prohibits "discriminat[ing] in price between different purchasers of commodities of like grade and quality . . . ." 15 U.S.C. § 13(a). Each of these State laws governing insurer discrimination practices under Robinson–Patman standards is the expression of an Act of Congress: McCarran–Ferguson.

The Robinson–Patman's Anti-Price Discrimination Act's standard codified in these State statutes is economic in nature. As uniformly applied by regulators and the courts, the State prohibitions on unfair discrimination mandate cost-based pricing based on risk of future loss. McCarran–Ferguson thus directs that a single core standard—risk-based pricing—be applied to every risk classification factor.

Robinson–Patman does not recognize protected social class or disparate impact liability, the subject of the Rule. But the Rule requires that a second core standard—protected social class disparate impact liability—be applied to every risk classification factor. This is intended to, and will result in, the invalidation of risk classification methods which meet the McCarran–Ferguson economic cost-based pricing standard, but which do not meet the Fair Housing Act social protected class disparate impact standard.

This cannot stand. Congressional policymaking cannot be overridden by a Federal agency. Statutory construction requires that the Rule implementing the Fair Housing Act, a general statute with no references to insurance or insurer discrimination practices may not render illegal practices that precisely meet the directions of McCarran–Ferguson, a statute specific to insurance and insurer discrimination practices.

## ARGUMENT

## I. MCCARRAN–FERGUSON ESTABLISHES THE CONTROLLING NATIONAL REGULATORY STANDARDS FOR INSURER DISCRIMINATION PRACTICES.

### A. Under the McCarran-Ferguson Act, State Legislatures Establish U.S. Insurance Regulatory Policy Absent Specific Contrary Direction by Congress.

In today's era of behemoth multi-thousand page statutes, the McCarran–Ferguson Act of 1945—all 426 words of it, as originally passed[2]—still represents successful lawmaking simplicity as it nears its 80th anniversary. Spawned by the United States Supreme Court's anomalous 1868 ruling that insurance was not interstate commerce

---

[2] A 2021 amendment to McCarran–Ferguson at 15 U.S.C. § 1013(c), specific to health insurance, added another 377 words.

subject to Federal oversight, *see Paul v. Virginia*, 75 U.S. 168 (1868), and

the Court's abrupt reversal of this prior holding on the eve of D-Day,[3] *see*

*United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944),

McCarran–Ferguson's passage just nine months later represented a

rapid legislative response to a substantial policymaking challenge: How

to regulate an enormous industry[4] without an established Federal

infrastructure or any experience at all in doing so, and how to do so while

an existential world war monopolized Washington's focus.

Congress recognized that, in the interim between *Paul* and *South-*

*Eastern Underwriters Ass'n*, the States had begun crafting a state-based

national regulatory system, and therefore chose to build on this work by

"declar[ing] that the continued regulation . . . by the several States of the

business of insurance is in the public interest," 15 U.S.C. § 1011, and

---

[3] Underneath the monumental stories introduced by the page-wide, eight column, all caps headline, "ALLIED ARMIES LAND IN FRANCE IN THE HAVRE-CHERBOURG AREA; GREAT INVASION IS UNDER WAY," the front page of the New York Times on June 6, 1944 included a less dramatic story under the headline, "Federal Law Held Ruling Insurance; Supreme Court, 4-3, Decides Business is Interstate and Subject to Trust Act." N.Y. TIMES, June 6, 1944.

[4] Which the Supreme Court described as follows: "Perhaps no modern commercial enterprise directly affects so many persons in all walks of life as does the insurance business." *Id.* at 540.

delegating primary regulatory authority to the States, while reserving its inherent authority to pass legislation governing the regulation of interstate insurance commerce at any time.   *See* 15 U.S.C. § 1011 ("silence on the part of the Congress shall not be construed to impose any barrier to the regulation . . . of such business by the several States"); 15 U.S.C. § 1012(a) ("The business of insurance . . . shall be subject to the laws of the several States which relate to the regulation . . . of such business."); 15 U.S.C. § 1012(b) ("No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . .").   This framework—whereby only an Act of Congress specific to insurance[5] can override state legislatures' establishment of insurance regulatory policy, and whereby there is no Federal agency with general regulatory power over the business of insurance (or even specific regulatory power unless expressly directed or

---

[5] For example, most prominently, the Patient Protection and Affordable Care Act of 2010, Public Law 111-148, 42 U.S.C. § 18001 et seq.

authorized by Congress)—prevails today.[6]

## B. Congress Directed the States to Occupy the Field of Competition and Trade Practices Regulation.

Having reserved Congressional authority to establish substantive standards governing insurance regulation, McCarran-Ferguson itself became the first Act of Congress to specifically do so. In delegating the supervision of an industry which "touches the home, the family, and the occupation or the business of almost every person in the United States," *South-Eastern Underwriters Ass'n*, 322 U.S. at 540, Congress insisted that the States meet this enormous responsibility by thoroughly regulating the basic trade practices of the business of insurance. McCarran-Ferguson accomplished this through a thoughtful carrot-and-stick mechanism: A three-year window during which the main Federal

---

[6] *See, e.g.*, Gramm-Leach-Bliley Financial Modernization Act of 1999, 15 U.S.C. § 6701(a) ("State Regulation of the Business of Insurance.--The Act entitled 'An Act to express the intent of Congress with reference to the regulation of the business of insurance' and approved March 9, 1945 (15 U.S.C. 1011 et seq.) (commonly referred to as the 'McCarran-Ferguson Act') remains the law of the United States."); Dodd-Frank Act Wall Street Reform and Consumer Protection Act of 2010, 31 U.S.C. § 313(k) ("Retention of Existing State Regulatory Authority.— Nothing in this section or section 314 shall be construed to establish or provide the Office or the Department of the Treasury with general supervisory or regulatory authority over the business of insurance.").

competition and trade practices laws would not apply to the business of insurance, but after which they would be "applicable . . . to the extent that such business is not regulated by State Law." 15 U.S.C. § 1012(b).

This moratorium, during which the Sherman, Clayton, Federal Trade Commission, and Robinson–Patman Acts did not apply,[7] was described by the broker of the final McCarran–Ferguson bill, Senator O'Mahoney, as "an invitation to the States to legislate in good faith," 91 CONG. REC. 1487 (Feb. 27, 1945), by which Congress specifically intended to incentivize the States to occupy the field of the Federal competition laws in the insurance marketplace, *see* 91 CONG. REC. 1478 (Feb. 27, 1945) ("the States are advised and warned that they have a moratorium of 3 years during which they may bring themselves into compliance by way of regulation") (statement of Sen. McCarran).

---

[7] *See* 15 U.S.C. § 1013(a) ("Until June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act [15 U.S.C. § 41 et seq.], and the Act of June 19, 1936, known as the Robinson–Patman Anti-Discrimination Act, shall not apply to the business of insurance or to acts in the conduct thereof.").

### C.    The States' Recognized their Obligation to Legislate in Good Faith.

The States well understood their mandate and immediately set out to collectively draft and then individually adopt model legislation occupying the field of the consumer protection statutes enumerated in McCarran–Ferguson. Hundreds of pages of the Proceedings of the National Association of Insurance Commissioners[8] ("NAIC") document these efforts as the main focus of state regulators and legislators throughout the three-year moratorium granted by Congress. *See, e.g.*, *Joint Report of the Comm. on Federal Legislation and the Comm. on Rates and Rating Organizations of the NAIC*, 1946 NAIC PROC. 95–101; 1947 NAIC PROC. at 141–235, 296–303, 380–413 (extensive reports and proposed model laws responsive to McCarran–Ferguson mandates).

Congress during this time closely monitored the States' compliance with its policy instructions—including Senator McCarran's Judiciary Committee, which "survey[ed] . . . the status of accomplishments and plans of the States" in response to the "feeling in the Congress that the Federal legislature has a positive responsibility to see to it that there is

---

[8] The NAIC was at the time the only State association dedicated to insurance regulation; NCOIL was formed in 1969.

adequate regulation of insurance . . . by the . . . States . . . ." Pat McCarran, *Insurance as Commerce—After Four Years*, 23 NOTRE DAME L. REV. 299, 303, 306 (1948).

### D. The States' Implemented a Thoroughly Considered, Well-Developed Response to Congress' Inclusion of Robinson–Patman in McCarran–Ferguson.

Because the *South-Eastern Underwriters Ass'n* decision upended settled doctrine and threatened the legality of the State system of regulation, *see, e.g.*, *Report of Subcomm. on Federal Legislation to the Executive Comm. of NAIC*, 1945 NAIC PROC. at 26–27 ("This decision completely reversed the fundamental basis underlying state regulation of the business by holding that insurance was commerce. . . . The practical effect of this may be to impair in some respects the well-established regulation by the states and the conduct of the business itself."), the States, primarily through the NAIC, immediately engaged with Congress regarding the legislative branch's response to having a substantial slice of the economy dropped into its lap overnight.[9]

---

[9] Justice Jackson vigorously objected to this extraordinary displacement in his partial dissent, *see South-Eastern Underwriters Ass'n*, 322 U.S. at 594–95 (Jackson, J., dissenting) ("To force the hand of Congress is no more the proper function of the judiciary than to tie the hands of Congress. To use my office, at a time like this, and with so little

During this process, NAIC prepared the earliest draft of proposed corrective legislation. *See, e.g.*, 90 CONG. REC. A4403 (Nov. 16, 1944) ("I wish to ask to have printed in the . . . Record . . . the text of the proposed legislation recommended by the [NAIC] . . . .") (statement of Sen. Carl Hatch). This draft exempted insurance from the Robinson–Patman Anti-Price Discrimination Act. *See* H.R. REP. NO. 79-143, at 1 (1945) ("Nothing contained in the . . . Act of June 19, 1936, known as the Robinson–Patman Antidiscrimination Act, shall apply to the business of insurance."). Robinson–Patman requires cost-based pricing by making it unlawful "for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . ." 15 U.S.C. § 13(a).

The proposed exemption from Robinson–Patman was rejected because Members concluded that "[i]t is unfair to legalize the practice of rate discrimination." 91 CONG. REC. 1091 (Feb. 14, 1945) (statement of

───────────────

justification in necessity, to dislocate the functions and revenues of the states and to catapult Congress into immediate and undivided responsibility for supervision of the nation's insurance businesses is more than I can reconcile with my view of the function of this Court in our society.").

Rep. Bailey); *see also* 91 CONG. REC. 1027–28 (Feb. 12, 1945) ("If you look at section 3 of the bill you will find that it exempts all the business of insurance companies . . . from the . . . Robinson–Patman Act . . . . I will not vote for the bill as . . . reported . . . unless section 3 is stricken[.]") (statement of Rep. Cochran); 91 CONG. REC. 1092 (Feb. 14, 1945) ("I doubt . . . Members . . . should . . . permanently exempt insurance from . . . the . . . Robinson–Patman Act.") (statement of Rep. Kefauver).

Senator McCarran explained that part of the "adequate regulation" Congress sought from McCarran–Ferguson was to "afford the public protection . . . against discrimination . . . ." McCarran, *supra*, at 306, 310. Instead of exempting insurance from Robinson–Patman, McCarran–Ferguson therefore explicitly included Robinson–Patman in the list of Federal statutes which would apply following the moratorium absent State action.

The NAIC extensively studied Congress' action and intent and concluded that, while Robinson–Patman's applicability to insurance before 1945 was unclear, absent State legislative action, McCarran–Ferguson's incorporation by reference of Robinson–Patman "implie[d] that after . . . 1948, the Robinson–Patman Act will apply to the business

14

of insurance . . . ." *Reports of All-Industry Subcomm. on Robinson–Patman Act*, 1947 NAIC PROC. 183–84; *see also id.* ("Our conclusion is that since Section I of Robinson–Patman amends the Clayton Law, it is included within the proviso of Section 2(b) of Public Law 15 [McCarran–Ferguson]. Being within the proviso, the price discrimination . . . subsection[ ] appl[ies] to insurance 'to the extent' that there is no state law regulating the specific activities prohibited by these sections."); *Address of President Robert E. Dineen, Rate Regulation–An Administrative Challenge*, 1947 NAIC PROC. 297 n.1 ("[T]he very fact that the Robinson–Patman Act is specifically mentioned in U.S. Public Law 15 [McCarran–Ferguson] is a clear indication that Congress intended its provisions to apply to the insurance business.").

NAIC understood that Congress expected a specific policy response by the States:  The uniform passage of unfair discrimination laws. *See id.* at 187–88 (explaining the "only way by which states may accomplish the ouster" of Robinson–Patman was "through the passage of rate regulatory laws" that "included . . . anti-discrimination sections," and recommending the "enactment in each State—either as an integral part

of the rating law or independently—of statutes . . . prohibiting unfair rate discriminations").

The States quickly passed and implemented NAIC's model laws, with their prohibitions on unfair discrimination, following the enactment of McCarran–Ferguson. Congress, closely monitoring the States' progress, and satisfied by their response to the Congressional "invitation . . . to legislate in good faith," extended the moratorium on the applicability of Robinson–Patman and the other Federal statutes enumerated in McCarran–Ferguson from January 1 to June 30, 1948, providing the States more time to pass McCarran–Ferguson compliant legislation. *See* S. REP. 407, at 1359 (1947) ("This bill extends the so-called moratorium provision of Public Law 15 . . . from January 1, 1948, until June 30, 1948. The committee is informed and is satisfied that an effort has been exerted by the insurance industry, the insurance commissioners, and the States in dealing with the matter of State regulation. . . . [I]t would appear most desirable to extend this moratorium period an additional 6 months . . . .").

E.    State Unfair Discrimination Laws Implement a Federal Policy of Cost-Based Pricing Directed by McCarran–Ferguson.

As Congress intended, the State unfair discrimination laws implemented as national regulatory policy the same basic anti-discrimination standard as Robinson–Patman:  Cost-based pricing and equal economic treatment of similarly situated consumers.  The NAIC President, New York Insurance Superintendent Robert Dineen, explained that "the rationale of" the "Robinson–Patman Act, the All-Industry [NAIC Model] Bills and the New York rating law" is "generally the same, namely, that where varying prices on the same articles are quoted to different buyers . . . the seller should be able to establish that the variations in price are fair and reasonable."  Henry Stone & David A. Campbell, *Insurance and the Robinson–Patman Act*, 319 INS. L.J. 553, 564 (1949).  His predecessor as NAIC President declared that "no state legislation should prevent the economic non-discriminatory rating of risks. . . . There should be no unfair discriminations . . . ." *Presidential Address to the Seventy Seventh Annual Meeting of NAIC*, 1946 NAIC PROC. 212–13 (NAIC President James McCormack).   And NAIC's landmark 1974 rate regulation treatise explained that Robinson–Patman

17

and the state unfair discrimination statutes apply the identical standard: "[I]f the costs are the same, the seller cannot discriminate price." JON S. HANSON ET AL., MONITORING COMPETITION: A MEANS OF REGULATING THE PROPERTY AND LIABILITY INSURANCE BUSINESS 440 (NAIC 1974).

The State rating laws, which include the Robinson–Patman-based unfair discrimination prohibition, explicitly recognize that they implement the affirmative, substantive Federal insurance regulatory public policy expressed by an Act of Congress, McCarran–Ferguson. *See, e.g.*, Me. Rev. Stat. tit. 24-A, § 2301 ("The purpose of this chapter is to promote the public welfare by regulating insurance rates, in accordance with the intent of Congress as expressed in Public Law 15—79th Congress [McCarran–Ferguson], to the end that they shall not be excessive, inadequate or unfairly discriminatory . . . ."); Del. Code tit. 18, § 2501 (same); *Karlin v. Zalta*, 201 Cal. Rptr. 379, 385 (Cal. Ct. App. 1984) ("There ensued precipitate state action to implement the McCarran Act and by 1950 every state had enacted rate regulatory legislation."); *Pac. Fire Rating Bureau v. Ins. Co. of N. Am.*, 321 P.2d 1030, 1032 (Ariz. 1958) ("Because the federal antitrust laws were, by Public Law 15, made inapplicable to insurance only to the extent that the business was

regulated by state law, each state proceeded to enact a rate law."); *Ins. Co. of N. Am. v. Comm'r of Ins.*, 101 N.E.2d 335, 338 (Mass. 1951) ("During the period of delay thus afforded [the McCarran–Ferguson moratorium], model laws were prepared by the [NAIC] . . . . These have now been adopted with few changes in almost every State.").

## II. THE STATE RATING LAWS IMPLEMENT, AS A MATTER OF CONGRESSIONAL POLICY, ROBINSON–PATMAN'S ECONOMIC, NOT SOCIAL, DISCRIMINATION PRACTICES.

The State unfair discrimination statutes establish an economic, cost-based pricing standard—which, with respect to insurance, means actuarially justified rates based on risk of future loss—for the regulation of insurer discrimination practices. *See, e.g., Doukas v. Metro. Life Ins. Co.*, 950 F. Supp. 422, 429 (D.N.H. 1996) ("[T]he insurance practice must either be based on actuarial data or on the company's actual or reasonably anticipated experience relating to the risk involved."). This is the same standard as Robinson–Patman—cost-based pricing. *See Hardware Mut. Cas. Co. v. Premo*, 217 A.2d 698, 704 (Conn. 1966) ("The effect of the Act is to permit the filing of a rating plan in which the individual insurer's judgment as to the expense provisions of a particular risk, or the probable hazards of a particular risk, may reflect the expected

cost to the insurer of providing the coverage for that risk and, in turn, the amount of premium to be charged the insured.").

Put another way:  Although in the common vernacular, the word "discrimination" generally connotes unacceptable stereotyping, its meaning in insurance—where grouping by characteristic is a necessary component of risk classification—is clinical and not pejorative.  Carriers assign insureds to "classes" determined by expected future costs and risk of loss.  For instance, because insurers cannot efficiently test each insured's driving skills, they must rely on the predictive power of group characteristics (age, moving violations, credit history, etc.) to set and charge an appropriate rate/premium.

Thus, the NAIC explained to the United States Supreme Court:  "In insurance, discrimination is not necessarily a negative term so much as a descriptive one."  Brief for NAIC as Amicus Curiae Supporting Petitioner, *Nationwide Mut. Ins. Co. v. Cisneros*, 516 U.S. 1140 (1996) (No. 95-714), 1996 WL 33467770 at *7; *see also* NAIC, PRODUCT FILING REVIEW HANDBOOK 12 (2016) ("'Unfairly discriminatory' is a concept often based on 'cost based pricing,' with the key word being 'unfairly.' . . . [I]t

is only unfairly discriminatory if it cannot be reasonably explained by differences in expected costs.").

High courts understand and apply these unique rules regarding insurer discrimination. *See, e.g.*, *Thompson v. IDS Life Ins. Co.*, 549 P.2d 510, 512 (Or. 1976) (en banc) ("The Insurance Commissioner is instructed to eliminate unfair discrimination, whereas the Public Accommodations Act prohibits *all* discrimination. The reason for the different standards . . . is that insurance . . . always involves discrimination . . . based on statistical differences and actuarial tables. The legislature specifically intended . . . to only prohibit *unfair* discrimination in the sale of insurance policies.") (emphasis in original).

Grouping insureds by the predictive accuracy of shared characteristics is therefore the lodestar of the unfair discrimination statutes. *See, e.g.*, *Ins. Comm'r. for the State of Md. v. Engelman*, 692 A.2d 474, 480 (Md. 1997) ("Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk."); *Matter of Polan v. State of N.Y. Ins. Dep't*, 3 A.D.3d 30, 33 (N.Y. App. Div. 2003) ("'[U]nfair discrimination' is a word of art used in the field of

21

insurance which, '[i]n a broad sense . . . means the offering for sale to customers in a given market segment identical or similar products at different probable costs' [citations omitted].").

The more accurate the discrimination, the fairer the grouping—and the better the legal footing. *See e.g.*, *Telles v. Comm'r of Ins.*, 574 N.E.2d 359, 361–62 (Mass. 1991) ("The statutory pattern which deals with insurance regulation authorizes insurers to 'discriminate fairly.' . . . '[T]he basic principle underlying statutes governing underwriting practices is that insurers have the right to classify risks and to elect not to insure risks if the discrimination is fair.' . . . '[T]he intended result of the . . . process is that persons of substantially the same risk will be grouped together . . . .'").

This creates a legal standard forbidding the subsidization of more risky insureds by less risky insureds. *See Life Ins. Ass'n of Mass. v. Comm'r. of Ins.*, 530 N.E.2d 168, 171 (1988) ("The intended result of the [risk classification] process is that persons of substantially the same risk will be grouped together, paying the same premiums, **and will not be subsidizing insureds who present a significantly greater hazard.**") (emphasis added).  But such forbidden subsidization is the exact result

required by the Department's Rule, which disallows rating factors which meet the cost-based pricing standard if they have a disparate effect on a protected class.

### III. THE STATE RATING STATUTES, PURSUANT TO CONGRESS'S DELEGATION OF SUCH POLICY CHOICES, PROTECT DISCRETE, VULNERABLE CLASSES FROM DIRECT DISCRIMINATION.

McCarran–Ferguson's terms are clear and well-stated. Substantively, the States were "invit[ed] . . . to legislate in good faith"[10] to occupy the fields of several Federal statutes, including Robinson–Patman's cost-based pricing anti-discrimination standard; while procedurally, they were given primary authority to set any further regulatory policy "in the public interest."

Given these instructions and authority, the States supplemented the unfair discrimination laws by prohibiting the most pernicious, intentional grouping of citizens by race, religion, and national origin, even if membership in such a protected class is predictive of future loss. These rules are enshrined in the NCOIL and NAIC model rating laws. *See* PROPERTY/CASUALTY INSURANCE MODERNIZATION ACT §§ 6(A)(3)(A),

---

[10] 91 CONG. REC. 1487 (Feb. 27, 1945) (Sen. O'Mahoney), *supra.*

6(A)(3)(B) (NCOIL 2021) ("'Unfairly discriminatory' refers either to rates that cannot be actuarially justified, or to rates that can be actuarially justified but are based on proxy discrimination.  It does not refer to rates that produce differences in premiums for policyholders with like loss exposures, so long as the rate reflects such differences with reasonable accuracy. . . . Risks may be classified in any way except that no risk may be classified on the basis of race, color, creed, or national origin.")[11]); PROPERTY AND CASUALTY MODEL RATING LAW No. 1775, §§ 5A(3), 5A(4)(b) (NAIC 2010) ("Unfairly Discriminatory Rates. Unfair discrimination exists if, after allowing for practical limitations, price differentials fail to reflect equitably the differences in expected losses and expenses. . . . Classification. Risks may be grouped by classifications for the establishment of rates and minimum premiums. . . . Such standards may

---

[11] NCOIL added the prohibition on proxy discrimination in order to address concerns raised by stakeholders regarding machine learning artificial intelligence and the possibility that such technology could be used as a way around the prohibition on the use of protected classes. *See* PROPERTY/CASUALTY INSURANCE MODERNIZATION ACT § 3(Q) ("'Proxy Discrimination' means the intentional substitution of a neutral factor for a factor based on race, color, creed, national origin, or sexual orientation for the purpose of discriminating against a consumer to prevent that consumer from obtaining insurance or obtaining a preferred or more advantageous rate due to that consumer's race, color, creed, national origin, or sexual orientation.").

measure any differences among risks that can be demonstrated to have a probable effect upon losses or expenses. No risk classification, however, may be based upon race, creed, national origin or the religion of the insured.").

These prohibitions are widely adopted by the States, and universally followed by insurers throughout the country: No insurer uses the core protected classes of race, religion, and national origin as a risk classification factor. These laws—passed by the States under their specific grant that the "business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business," 15 U.S.C. § 1012(a)—on their face regulate intentional disparate treatment, not unintentional effect.

Thus, McCarran–Ferguson, the core Federal insurance statute—a Federal statute specific to insurance and specific to insurance discrimination standards—has produced an intelligible, manageable policy regime over insurer discrimination standards consistent with basic insurance principles and with basic notions of social fairness. This regime does not permit a disparate impact standard, which under

controlling law is not to be applied absent a specific statutory basis—certainly not through a Federal agency acting on its own volition.

The Rule, however, turns this simple regime on its head. Under uniform State laws consistent with McCarran–Ferguson, only one core standard applies to every rating factor: Cost-based pricing under Robinson–Patman Anti-Price Discrimination Act standards. The States have supplemented this with a few, additional, discrete requirements, whereby socially pernicious factors, such as race, religion, and national origin, *supra*, may not be intentionally employed regardless of predictive accuracy. These categorical prohibitions are codified, and therefore represent explicit policy judgments by the primary regulators of the business of insurance under McCarran–Ferguson: elected State legislators.

The Rule, by contrast, would apply a second core standard to every single rating factor used by insurers. The core standard mandated by the Rule (protected class disparate impact) directly conflicts with the core standard required by the States and McCarran–Ferguson (Robinson–Patman cost-based pricing) because the Rule is designed to invalidate facially neutral rating factors compliant with the McCarran–Ferguson

regime whereby cost-based pricing trumps unless the classification factor is itself a statutorily protected class.

The Rule invalidates cost-based risk classification methods which result in a disparate effect on protected classes. Preventing the use of such a predictive factor will require insurers to treat differently those customers who have the same cost profile based on such a risk classification method. This by definition causes the carrier to "indirectly . . . discriminate in price between different purchasers of . . . like grade and quality," 15 U.S.C. § 13(a) (Robinson-Patman), in conflict with the plain language of the core standard, first established by Robinson–Patman, then adopted for insurance by McCarran-Ferguson and codified in State insurance laws nationwide.

## IV. MCCARRAN–FERGUSON'S STANDARD, SPECIFIC TO INSURER DISCRIMINATION PRACTICES, MUST TRUMP THE FAIR HOUSING ACT STANDARD, GENERAL TO HOUSING.

The Department's Rule pertains to subject matter (insurer discrimination practices) governed by a Federal statute specific to insurance (McCarran–Ferguson). The FHA, a statute general to housing and not specific to insurance, which indeed never uses the word "insurance," and which is silent with respect to the subject of this

submission—insurance discrimination practices—protects social classes and recognizes disparate impact. By comparison, McCarran–Ferguson, and the resulting State laws, establish a discrimination standard based on Robinson–Patman—an anti-discrimination statute which is economic, not social, in nature, and which does not recognize protected class disparate impact liability.

Statutory interpretation requires that the McCarran–Ferguson unfair discrimination regime specific to insurance, which establishes a core standard applicable to every insurer risk classification factor and does not recognize disparate impact against protected classes, must trump the Rule's attempt to apply a second core standard—disparate impact upon protected social classes—to every risk classification factor based on a statute, the Fair Housing Act, which is general to housing and is silent on insurance, a different topic altogether. *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ("It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum. . . . 'The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a

subject, and he has acted upon it, a subsequent statute . . . treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive provisions . . . .' [Citation omitted.]").

McCarran–Ferguson "deal[s] with [the] narrow, precise, and specific subject" at issue here:  Insurance discrimination practices.  *Id.* With respect to housing, the Fair Housing Act "treat[s] the subject in a general manner" with no reference to insurance or insurer discrimination practices, and it does "not expressly contradict[ ] the original act," McCarran–Ferguson.  *Id.*; *see also Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007) ("[N]ormally, the specific governs the general."); *Morton v. Mancari*, 417 U.S. 535, 550-551 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."); *U.S. v. Olinger*, 759 F.2d 1293, 1299 (7th Cir. 1985) (applying "the principle that a more specific  statute will be given precedence over a more general one, regardless of their temporal sequence").

Because McCarran-Ferguson imposes Robinson–Patman Anti-Price Discrimination Act standards upon insurer discrimination practices, and Robinson-Patman does not recognize protected social class disparate impact liability, a Federal disparate impact standard for insurer discrimination practices cannot be created by administrative rulemaking that implements a statute—the Fair Housing Act—that is silent with respect to insurance and insurer discrimination practices.

## CONCLUSION

For the foregoing reasons, NCOIL respectfully submits that this Court should reverse the judgment below.

Respectfully submitted,

*/s/  Benjamin Levine*
BENJAMIN LEVINE
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
(202) 625-3500

/s/*Nat Shapo*
NAT SHAPO
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
(312) 902-5200

AUGUST 21, 2024

## CERTIFICATE OF COMPLIANCE

I hereby certify that pursuant to Federal Rule of Appellate Procedure 29(a)(5), 32(a)(7), and 32(g), that the foregoing Brief of *Amicus Curiae* has been prepared in a proportionately spaced typeface in 14-point Century. This brief complies with the type-volume limitation of Circuit Rule 32(c) in that, according to the word-count function of the word-processing system used to generate the brief (Microsoft Word), the brief contains 5,821 words.

/s/ Nat Shapo

NAT SHAPO

COUNSEL FOR *AMICUS CURIAE*

AUGUST 21, 2024

# CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing document to be filed on August 21, 2024, with the Clerk of the Court for the Seventh Circuit Court of Appeals using the Court's electronic filing system, which will send a notice of electronic filing to all attorneys appearing in this matter.

*/s/ Nat Shapo*
NAT SHAPO
COUNSEL FOR *AMICUS CURIAE*

AUGUST 21, 2024