No. 24-1947

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, | ) ) ) | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| Plaintiffs-Appellant, | ) ) | |
| v. | ) ) | |
| ADRIANNE TODMAN, Acting Secretary of the Department of Housing and Urban Development; and UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) ) | No. 1:13-cv-08564 |
| | ) ) | The Honorable REBECCA R. PALLMEYER, |
| Defendants-Appellees. | ) | Judge Presiding. |

**BRIEF OF AMICI CURIAE ILLINOIS, DISTRICT OF COLUMBIA, ARIZONA, CALIFORNIA, COLORADO, DELAWARE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

**BRIAN L. SCHWALB**
Attorney General
District of Columbia

**CAROLINE S. VAN ZILE**
Solicitor General
**ASHWIN P. PHATAK**
Principal Deputy Solicitor General
400 6th Street NW, Suite 8100
Washington, D.C. 20001

Counsel for Amici Curiae

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General
**ALEX HEMMER**
Deputy Solicitor General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
alex.hemmer@ilag.gov

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION AND IDENTITY AND INTEREST OF AMICI STATES ...............1

SUMMARY OF ARGUMENT.........................................................................3

ARGUMENT ................................................................................................5

I.    Disparate-Impact Liability Is A Crucial Tool For Fighting Ongoing Housing Discrimination. ...................................................................5

      A.    Housing discrimination persists throughout the country, including in the homeowner's insurance industry. ......................................5

      B.    Disparate-impact claims help to redress housing discrimination that would otherwise go undetected. ...........................................11

II.   State Law Does Not Categorically Shield Homeowner's Insurers From Federal Disparate-Impact Liability. .....................................................14

      A.    States impose a wide range of statutory antidiscrimination regimes governing insurers...................................................................15

            1.    Many States permit disparate-impact claims in the housing context.....................................................................................15

            2.    State insurance codes do not categorically impose a contrary regime.....................................................................................18

      B.    State insurance codes do not categorically shield insurers from federal disparate-impact liability. ....................................................22

CONCLUSION .............................................................................................27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bowman v. City of Des Moines Mun. Hous. Agency,*
    805 N.W.2d 790 (Iowa 2011) .................................................................. 17

*Bryner v. Cardon Outreach, LLC,*
    428 P.3d 1096 (Utah 2018) .................................................................. 20

*Burbank Apartments Tenant Ass'n v. Kargman,*
    48 N.E.3d 394 (Mass. 2016) .................................................................. 17

*Colo. Civ. Rts. Comm'n v. Travelers Ins. Co.,*
    759 P.2d 1358 (Colo. 1988) .................................................................. 17

*Comm'n on Hum. Rts. & Opportunities v. Sullivan Assocs.,*
    739 A.2d 238 (Conn. 1999) .................................................................. 17

*Conn. Comm'n on Hum. Rts. & Opps. ex rel. Hurtado,*
    CHRO No. 8230394 .................................................................. 12

*Doe v. Mutual of Omaha Insurance Co.,*
    179 F.3d 557 (7th Cir. 1999) .................................................................. 23, 24

*Douglas v. Dorchester Props., Ltd.,*
    2022 WL 4358779 (N.D. Tex. 2022) .................................................................. 17

*Dussault v. RRE Coach Lantern Holdings, LLC,*
    86 A.3d 52 (Me. 2014) .................................................................. 17

*Ga. Dep't of Hum. Res. v. Montgomery,*
    284 S.E.2d 263 (Ga. 1981) .................................................................. 17

*Gerety v. Atl. City Hilton Casino Resort,*
    877 A.2d 1233 (N.J. 2005) .................................................................. 17

*Gonzalez v. N.M. Dep't of Health,*
    11 P.3d 550 (N.M. 2000) .................................................................. 17

*Hac v. Univ. of Hawaii,*
    73 P.3d 46 (Haw. 2003) .................................................................. 17

*Hobson v. Hansen*,
    269 F. Supp. 401 (D.D.C. 1967) .......................................................... 11

*Humana Inc. v. Forsyth*,
    525 U.S. 299 (1999) ........................................................................... 22

*Huskey v. State Farm Fire & Casualty Co.*,
    2023 WL 5848164 (N.D. Ill. Sept. 11, 2023)..................................... 13

*In re Estate of Kerr*,
    949 P.2d 810 (Wash. 1998)................................................................ 20

*In re Twp. of Warren*,
    622 A.2d 1257 (N.J. 1993)................................................................. 17

*Koester v. City of Novi*,
    580 N.W.2d 835 (Mich. 1998)........................................................... 17

*Lab'y Corp. of Am. v. Davis*,
    339 So. 3d 318 (Fla. 2022) ................................................................ 20

*Little Forest Med. Ctr. of Akron v. Oh. Civ. Rts. Comm'n.*,
    575 N.E.2d 1164 (Oh. 1991).............................................................. 17

*Lyman v. Montclair at Partridge Creek, LLC*,
    2023 WL 6096678 (E.D. Mich. 2023)................................................ 17

*Malibu Inv. Co. v. Sparks*,
    996 P.2d 1043 (Utah 2000) ............................................................... 17

*McGlawn v. Pa. Hum. Rels. Comm'n*,
    891 A.2d 757 (Pa. Commw. Ct. 2006)............................................... 12

*Miller v. Safeway, Inc.*,
    102 P.3d 282 (Alaska 2004)............................................................... 17

*Mont. Rail Link v. Byard*,
    860 P.2d 121 (Mont. 1993) ............................................................... 17

*Nat'l Fair Hous. All. v. Travelers Indem. Co.*,
    261 F. Supp. 3d 20 (D.D.C. 2017) .................................................... 14

*Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co. of America*,
    208 F. Supp. 2d 46 (D.D.C. 2002) ............................................... 2, 13

*New State Ice Co. v. Liebmann*,
    285 U.S. 262 (1932) ................................................................................. 16

*People v. N.Y. City Transit Auth.*,
    452 N.E.2d 316 (N.Y. 1983) ..................................................................... 17

*People v. R.L.*,
    634 N.E.2d 733 (Ill. 1994) ....................................................................... 17

*R.I. Comm'n for Hum. Rts. v. Graul*,
    120 F. Supp. 3d 110 (D.R.I. 2015) ........................................................... 12

*Rivera v. DLJ Props.*,
    2022 WL 3048229 (E.D. Tenn. 2022) ...................................................... 17

*San Antonio Ind. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973) ..................................................................................... 26

*Saville v. Quaker Hill Pl.*,
    531 A.2d 201 (Del. 1987) .......................................................................... 17

*Smith v. Town of Clarkton*,
    682 F.2d 1055 (4th Cir. 1982) .................................................................. 11

*State of Ind. Civ. Rts. Comm'n v. Cnty. Line Park, Inc.*,
    738 N.E.2d 1044 (Ind. 2000) ................................................................... 17

*State v. City of Sunnyside*,
    No. 101205-5, 2024 WL 3058780 (Wash. June 20, 2024) ....................... 17

*Support Ministries for Persons with AIDS, Inc. v. Vill. of Waterford*,
    808 F. Supp. 120 (N.D.N.Y. 1992) .......................................................... 12

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys.*,
    576 U.S. 519 (2015) .............................................................. 5, 6, 14, 17, 19, 20

*Toledo Fair Hous. Ctr. v. Nationwide Mutual Ins. Co.*,
    704 N.E.2d 667 (Ohio Ct. Common Pleas 1997) .................................... 16

*United States v. City of Black Jack*,
    508 F.2d 1179 (8th Cir. 1974) .................................................................. 11

*Viens v. Am. Empire Surplus Lines Ins. Co.*,
    113 F. Supp. 3d 555 (D. Conn. 2015) .................................................. 14

*Watson v. Fort Worth Bank & Trust*,
    487 U.S. 977 (1988) ............................................................................. 8

**Statutes and Regulations**

29 U.S.C. § 623 ............................................................................................ 18

42 U.S.C.
    § 3601 ................................................................................................ 1, 6
    § 3604 .................................................................................................. 18

24 C.F.R. § 100.500 ....................................................................................... 1

88 Fed. Reg. 19,450 (2023) .......................................................... 1, 23, 24, 26

Alaska Stat. § 18.80.240 ............................................................................... 15

Ariz. Rev. Stat. Ann. § 41-1491 ............................................................. 15, 17

Ark. Code Ann. § 16-123-204 ...................................................................... 15

Cal. Gov't Code
    § 12955 ................................................................................................ 15
    § 12955.8 ............................................................................................. 16

Colo. Rev. Stat.
    § 10-3-1104.9 ...................................................................................... 19
    § 24-34-502 .................................................................................... 15, 16

Conn. Gen. Stat. § 46a-64b .......................................................................... 15

D.C. Code
    § 2-1402.21 .......................................................................................... 15
    § 2-1402.68 .......................................................................................... 16
    § 31-2231.13 ........................................................................................ 20

Del. Code Ann.
    tit. 6, § 4603 ........................................................................................ 15
    tit. 18, § 2304 ...................................................................................... 19

Ga. Code Ann.
    § 8-3-202 .................................................................................. 15
    § 33-6-4 .................................................................................... 20

Haw. Rev. Stat. § 515-3 ................................................................ 15

Idaho Code § 67-5909 ................................................................... 15

215 Ill. Comp. Stat. 5/242 ............................................................ 19

775 Ill. Comp. Stat. 5/3-102 ................................................... 15, 16

Ind. Code § 22-9.5-5-1 .................................................................. 15

Iowa Code § 216.8 ......................................................................... 15

Kan. Stat. Ann. § 44-1016 ........................................................ 15, 17

Ky. Rev. Stat. Ann. § 344.360 ................................................... 15, 17

Mass. Gen. Laws ch. 151B, § 4 .................................................... 15

Md. Code Ann., State Gov't § 20-705 ....................................... 15, 17

Me. Rev. Stat. Ann. tit. 5, § 4581-A ............................................. 15

Mich. Comp. Laws § 37.2502 ...................................................... 15

Minn. Stat. § 363A.09 ............................................................... 15, 17

Mo. Rev. Stat. § 213.040 ........................................................... 15, 17

Mont. Code Ann. § 49-2-305 ........................................................ 15

N.C. Gen. Stat.
    § 41a-4 .................................................................................... 15
    § 41a-5 .................................................................................... 16

N.D. Cent. Code § 14-02.5-02 ................................................... 16, 17

N.H. Rev. Stat. Ann. § 354-A:10 ................................................ 16

N.J. Stat. Ann.
    § 10:5-12 ........................................................................................................ 16
    § 17:29B-4 ..................................................................................................... 19

N.M. Stat. Ann. § 28-1-7 ....................................................................................... 16

N.Y. Exec. Law
    § 296 ............................................................................................................... 16
    § 296-a ............................................................................................................ 16

Neb. Rev. Stat. § 20-318 ........................................................................................ 15

Ohio Rev. Code Ann. § 4112.02 ............................................................................ 16

Or. Rev. Stat. § 659A.421 ...................................................................................... 16

43 Pa. Stat. § 955 .................................................................................................... 16

R.I. Gen. Laws § 34-37-4 ....................................................................................... 16

S.C. Code Ann. § 31-21-40 ............................................................................... 16, 17

S.D. Codified Laws § 20-13-20 ............................................................................. 16

Tenn. Code Ann. § 4-21-601 .................................................................................. 16

Tex. Prop. Code Ann. § 301.021 ........................................................................... 16

Utah Code Ann. § 57-21-5 ..................................................................................... 16

Va. Code Ann. § 36-96.3 ................................................................................... 16, 17

Vt. Stat. Ann. tit. 9, § 4503 ............................................................................... 16, 17

W. Va. Code § 16B-18-5 ................................................................................... 16, 17

Wash. Rev. Code § 49.60.222 ............................................................................... 16

Wyo. Stat. Ann. § 40-26-103 ................................................................................. 17

## OTHER AUTHORITIES

Anderson, Michelle Wilde & Victoria Plaut, *Property Law: Implicit Bias and the Resilience of Spatial Colorlines*, in *Implicit Racial Bias Across the Law* (Justin D. Levinson & Robert J. Smith eds., 2012) ........................................................ 8

Bender, Mallika, et al., *Understanding Potential Influences of Racial Bias on P&C Insurance: Four Rating Factors Explored*, Cas. Actuarial Soc'y (2022), https://tinyurl.com/4su9rd52 .............................................................. 10

Dane, Stephen M., *The Potential for Racial Discrimination by Homeowners Insurers Through the Use of Geographic Rating Territories*, 24 J. Ins. Regul. 21, 21 (2006), https://tinyurl.com/mptfccze................................................. 9, 10, 11, 13

DeLong, Michael, *How Racial Discrimination in Homeowners Insurance Contributes to Systemic Racism and Redlining*, Consumer Fed. of Am. (June 17, 2022), https://tinyurl.com/wxeh346b .............................................................. 9

Flitter, Emily, *Black Homeowners Struggle to Get Insurers to Pay Claims*, N.Y. Times (Jan 1. 2021), https://tinyurl.com/27cbpjnw...................................................... 12

Langowski, Jamie, et al., *Qualified Renters Need Not Apply: Race and Housing Voucher Discrimination in the Metropolitan Boston Rental Housing Market*, 28 Geo. J. Poverty L. & Pol'y 35, 42 (2020) ........................................................... 7

Loh, Tracy Hadden, Christopher Coes & Becca Buthe, *The Great Real Estate Reset: Separate and Unequal: Persistent Residential Segregation Is Sustaining Racial and Economic Injustice in the U.S.*, Brookings Inst. (Dec. 16, 2020), https://tinyurl.com/2p8xx3ya .............................................................. 6

Menendian, Stephen, Samir Gambhir & Arthur Gailes, *The Roots of Structural Racism Project: Twenty-First Century Racial Residential Segregation in the United States*, Othering & Belonging Inst., Univ. of Cal., Berkeley (June 30, 2021), https://tinyurl.com/2kbuaamn ................................................... 6

Mosley, Roosevelt & Radost Wenman, *Methods for Quantifying Discriminatory Effects on Protected Classes in Insurance*, Cas. Actuarial Soc'y (2022), https://tinyurl.com/mr3kp3wf.............................................................. 13

Nat'l Advisory Comm'n on Civ. Disorders, *Report of the National Advisory Commission on Civil Disorders* (1968), https://tinyurl.com/3bc5k79s .............. 5

Porter, T.J., *Homeowners Insurance for People with Bad Credit*, Bankrate (June. 13, 2024), https://tinyurl.com/mufk63xj.................................................... 9

Quick, Kimberly & Richard D. Kahlenberg, *Attacking the White-Black Opportunity Gap that Comes from Residential Segregation*, Century Found. (June 25, 2019), https://tinyurl.com/y2kmma26 ................................................................... 7

*Race and Insurance*, Nat'l Ass'n for Race & Ins., https://tinyurl.com/yax3khr8 ............................................................... 9

Rothwell, Jonathan & Andre M. Perry, *How Racial Bias in Appraisals Affects the Devaluation of Homes in Majority-Black Neighborhoods*, Brookings Inst. (Dec. 5, 2022), https://tinyurl.com/ffj84fb7 .................................................................. 7

**INTRODUCTION AND**
**IDENTITY AND INTEREST OF AMICI STATES**

The amici States of Illinois, the District of Columbia, Arizona, California, Colorado, Delaware, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington (collectively, "amici States"), submit this brief in support of Defendants-Appellees Adrianne Todman, in her official capacity as Acting Secretary of the United States Department of Housing and Urban Development, and the United States Department of Housing and Urban Development (collectively, "HUD"), pursuant to Federal Rule of Appellate Procedure 29(a)(2).

Each of the amici States is charged with combating housing discrimination through enforcement of state and federal fair housing laws, including the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq.* Amici States also share an interest in protecting our residents and communities against housing discrimination in all its forms, along with the substantial social and economic harms that can result from such discrimination. The FHA's long-settled prohibition of facially neutral but effectively discriminatory housing practices — including those related to insurance — supports these policy goals.

Amici States therefore have a strong interest in preserving HUD's Discriminatory Effects Rule, 88 Fed. Reg. 19,450 (2023) (codified at 24 C.F.R. § 100.500), without the exemption for the homeowner's insurance industry that plaintiff requests. Accessible homeowner's insurance is critical to ending housing discrimination and promoting integration because insurance is "a prerequisite to

1

home ownership for most people in the country." *Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co. of America*, 208 F. Supp. 2d 46, 57 (D.D.C. 2002).  Interpreting state insurance codes categorically to insulate facially neutral but discriminatory insurance practices from FHA liability nationwide would contravene amici States' commitment to eliminating housing discrimination and would entrench barriers to homeownership for all Americans.

## SUMMARY OF ARGUMENT

The district court correctly granted HUD's motion for summary judgment. Plaintiff asserts three claims against the Rule, but all rest on the assertion that state insurance codes categorically preclude imposition of disparate-impact liability on the ratemaking practices of homeowner's insurers. That premise is flawed, and granting plaintiff the categorical exemption it seeks would weaken efforts to enforce the FHA.

Disparate-impact liability is a critical tool to fight housing discrimination — a major and ongoing cause of widespread residential segregation. The homeowner's insurance industry has often been the source of this discrimination. From setting rates to processing claims, homeowner's insurers have faced decades of litigation alleging racial discrimination in their practices. Many of these suits have succeeded on a disparate-impact theory of liability. The ongoing availability of disparate-impact claims is thus critical to combatting both intentional and unintended bias in the ratemaking and underwriting capacities of homeowner's insurers. Granting plaintiff the categorical exemption that it seeks would undermine this important civil-rights tool and frustrate Congress's aims in enacting the FHA.

Plaintiff's claims also fail on the merits. Each relies on the premise that state insurance codes uniformly permit insurers to rely on market-based risk factors in underwriting even if doing so produces discriminatory effects. But state insurance codes are varied, not uniform, and many States — including all amici States — do not read their codes to confer any such protections on insurers. State insurance codes do not categorically preclude imposition of federal disparate-impact liability on

homeowner's insurers in all States; rather, in many States such a standard is already part of the legal landscape that insurers face.  For this reason, HUD correctly (and, at minimum, reasonably) rejected plaintiff's request for a categorical exemption from liability under the Rule for its members' underwriting practices.  The district court thus correctly granted HUD summary judgment, and this Court should affirm its well-reasoned decision and uphold the Rule.

# ARGUMENT

## I.   Disparate-Impact Liability Is A Crucial Tool For Fighting Ongoing Housing Discrimination.

### A.   Housing discrimination persists throughout the country, including in the homeowner's insurance industry.

Congress enacted the FHA to root out racial discrimination from housing and housing-related services in order to spur greater residential integration throughout the United States.  Despite this ambition, housing discrimination persists in many areas of the country.  The homeowner's insurance industry is no exception.

Throughout the course of the twentieth century, various practices designed "to encourage and maintain the separation of races" — such as racially restrictive covenants and redlining — spurred rampant residential segregation.  *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys.*, 576 U.S. 519, 528-29 (2015).  By the end of the 1960s, President Lyndon Johnson's National Advisory Commission on Civil Disorders published a report finding that nearly two-thirds of non-white families lived in blighted neighborhoods but were prevented from finding better housing or moving to more integrated communities because of "both open and covert racial discrimination."  *Id.* at 529; *see* Nat'l Advisory Comm'n on Civ. Disorders, *Report of the National Advisory Commission on Civil Disorders* 13 (1968).[1]  The Commission recommended enacting "a comprehensive and enforceable open-occupancy law making it an offense to discriminate in the sale or rental of any housing . . . on the basis of race, creed, color, or national origin."  *Id.* at 263.  Congress responded by

---

[1] https://tinyurl.com/3bc5k79s.

5

passing the FHA, whose goal was to "provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.

Despite this major legislative achievement, "vestiges" of residential segregation persist in American social life. *Inclusive Cmtys.*, 576 U.S. at 528. According to one study, despite some modest progress, "the neighborhood of an average white resident in the 100 largest metropolitan areas" remained 71% white in 2018. Loh, Coes & Buthe, *The Great Real Estate Reset: Separate and Unequal: Persistent Residential Segregation Is Sustaining Racial and Economic Injustice in the U.S.*, Brookings Inst. (Dec. 16, 2020).[2] Other studies fail to find any improvement at all: One group of researchers has found that 81% of major metropolitan areas in the United States were more segregated in 2019 than in 1990. *See* Menendian, Gambhir, & Gailes, *The Roots of Structural Racism Project: Twenty-First Century Racial Residential Segregation in the United States*, Othering & Belonging Inst., Univ. of Cal., Berkeley (June 30, 2021).[3] No matter how it is measured, residential segregation in the United States remains deeply entrenched over a half a century after the passage of the FHA.

This widespread and entrenched segregation imposes real costs on minority communities. "Black children raised in integrated neighborhoods earn nearly $1,000 more as adults per year, and $4,000 more when raised in white neighborhoods, than those raised in highly segregated communities of color." *Id.* Homeownership rates

---

[2] https://tinyurl.com/2p8xx3ya.

[3] https://tinyurl.com/2kbuaamn.

are 30% higher in white neighborhoods, and 13% higher in integrated neighborhoods, than in highly segregated communities of color. *Id.* As segregation increases, life outcomes for Black Americans deteriorate: Scholars have found that, in "highly segregated" metropolitan areas, Black residents have worse employment levels, earnings, and even mortality rates than in neighborhoods that are less segregated. Quick & Kahlenberg, *Attacking the White-Black Opportunity Gap that Comes from Residential Segregation*, Century Found. (June 25, 2019).[4]

Persistent residential segregation is not just the result of historical practices. It also stems from contemporary forms of housing discrimination. To take just one example, a recent study found that white individuals in the Boston area seeking to tour apartments were able to arrange a viewing 80% of the time, while "similarly situated Black market-rate testers seeking to view the same apartments were only able to visit the property 48% of the time." Langowski *et al.*, *Qualified Renters Need Not Apply: Race and Housing Voucher Discrimination in the Metropolitan Boston Rental Housing Market*, 28 Geo. J. Poverty L. & Pol'y 35, 42 (2020). "In addition, housing providers showed white market-rate testers twice as many apartment units as Black market-rate testers and provided them with better service as measured by a number of different testing variables." *Id.* Black homeowners seeking to sell their homes or build wealth face similar obstacles. The Brookings Institute has found that homes in Black neighborhoods are consistently valued almost a quarter less than they would be in non-Black neighborhoods. *See* Rothwell & Perry, *How Racial Bias*

---

[4] https://tinyurl.com/y2kmma26.

*in Appraisals Affects the Devaluation of Homes in Majority-Black Neighborhoods*,

Brookings Inst. (Dec. 5, 2022).[5]

Discrimination can also include unconscious bias in discretionary decision-making and assertedly "neutral" policies and practices. Even well-intentioned actors who genuinely believe themselves to be fair and unbiased can draw conclusions and make decisions relying on race-based associations. Widespread discretionary decision-making can amplify these effects. In the housing context, these decisions can include landlords and real estate professionals evaluating prospective buyers and tenants, appraisers estimating property values, lenders and mortgage brokers determining creditworthiness, local governments and public agencies determining where to locate amenities and what land uses to approve, and private actors deciding how and where to invest money. *See* Anderson & Plaut, *Property Law: Implicit Bias and the Resilience of Spatial Colorlines*, *in Implicit Racial Bias Across the Law* 30-31 (Justin D. Levinson & Robert J. Smith eds., 2012). Such policies or practices that affect a large number of people, and that allow unconscious bias to influence decisions by multiple actors over numerous transactions, can have "precisely the same effects as a system pervaded by impermissible intentional discrimination." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990-91 (1988). These outcomes are appropriately remedied through the enforcement of anti-discrimination laws, but are likely impossible to address through claims of intentional discrimination alone.

---

[5] https://tinyurl.com/ffj84fb7.

The insurance industry is not immune to these broader issues. Indeed, in 2020, the National Association of Insurance Commissioners established a special committee to address issues of race and insurance. *See Race and Insurance*, Nat'l Ass'n for Race & Ins.[6] The committee concluded that "there is more to be done" to remedy discrimination in the industry. *Id.* (Background). The available evidence bears this conclusion out. The homeowner's insurance industry has been "battered by claims of race discrimination in the underwriting, marketing, advertising and sale of its products." Dane, *The Potential for Racial Discrimination by Homeowners Insurers Through the Use of Geographic Rating Territories*, 24 J. Ins. Regul. 21, 21 (2006).[7] Discrimination in homeowner's insurance can take many forms, such as offering insurance policies with inferior coverage, ignoring interested customers, imposing different terms and conditions based on neighborhood, refusing to underwrite buildings based on age or type of building material, requiring inspection reports in certain areas but not others, offering fewer or inferior options in one neighborhood versus another, or charging higher premiums to customers with lower credit scores. *See* DeLong, *How Racial Discrimination in Homeowners Insurance Contributes to Systemic Racism and Redlining*, Consumer Fed. of Am. (June 17, 2022);[8] Porter, *Homeowners Insurance for People with Bad Credit*, Bankrate (June.

---

[6] https://tinyurl.com/yax3khr8.

[7] https://tinyurl.com/mptfccze.

[8] https://tinyurl.com/wxeh346b.

13, 2024).[9]  All of these practices make it more difficult for members of minority groups to obtain homeowner's insurance.

      To be sure, lawsuits brought by fair-housing and civil-rights groups have led to important changes in the homeowner's insurance industry.  *See* Dane, *supra*, at 22. But the challenges are ongoing.  For instance, one prominent tool in ratemaking is "geographic rating," where insurers use geographic boundaries to charge different prices based on different loss costs.  This practice is generally race-neutral, "so long as the selection of the boundary lines is risk-based and does not discriminate on the basis of race."  *Id.* at 25.  If, however, insurers create geographic ratings on the basis of sub-geographies (*e.g.*, neighborhoods within the same city) with inadequate loss data, racially discriminatory patterns may arise.  That is because, at a municipal level, "fire protection, crime prevention and rebuilding costs are all the same," so "there is no actuarial reason to believe one geographic section of a city would lead to higher or lower losses than another section of the same city."  *Id.* at 25-26.  But because the majority of ZIP codes are racially segregated, more granular geographic ratings are likely to lead to unjustifiably higher premiums for certain racial groups. *See id.* at 26.  And geography is just one of several rating factors with the potential to amplify racial bias.  *See generally* Bender *et al.*, *Understanding Potential Influences of Racial Bias on P&C Insurance: Four Rating Factors Explored*, Cas. Actuarial Soc'y (2022) (also examining homeownership and creditworthiness).[10]  Thus, even facially

---

[9]  https://tinyurl.com/mufk63xj.

[10]  https://tinyurl.com/4su9rd52.

race-neutral criteria (such as adjusting base rates based on dividing territory by geographic markers like waterways or highways) can have pronounced disparate effects on racial minorities without any corresponding relationship to a loss-cost justification.  *See* Dane, *supra*, at 27.

### B. Disparate-impact claims help to redress housing discrimination that would otherwise go undetected.

Disparate-impact liability is a crucial tool to combat this ongoing housing discrimination.  As society has become less accepting of overtly discriminatory behavior, direct proof of intentional discrimination has become less available; actors "seldom, if ever, announce . . . their desire to discriminate."  *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064-65 (4th Cir. 1982).  But the absence of direct proof does not mean the absence of discrimination.  "Effect, and not motivation, is the touchstone of" detecting housing discrimination, both because "clever men may easily conceal their motivations," *United States v. City of Black Jack*, 508 F.2d 1179, 1185 (8th Cir. 1974), and because "the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme," *Hobson v. Hansen*, 269 F. Supp. 401, 497 (D.D.C. 1967), *aff'd sub nom. Smuck v. Hobson*, 408 F.2d 175 (D.C. Cir. 1969) (en banc).  Disparate-impact liability thus serves both as a surrogate for unearthing concealed, intentional discrimination and as a tool for uncovering real but unintended bias.

States have accordingly used disparate-impact claims to challenge many types of facially neutral housing policies that have a discriminatory effect on racial or other minorities.  These suits have targeted zoning ordinances, occupancy restrictions, and

English-language policies, among other practices.  *See, e.g.*, *McGlawn v. Pa. Hum. Rels. Comm'n*, 891 A.2d 757 (Pa. Commw. Ct. 2006) (lending practices of obtaining predatory and unfair sub-prime mortgage loans had disparate impact based on race); *Conn. Comm'n on Hum. Rts. & Opps. ("CHRO") ex rel. Hurtado*, CHRO No. 8230394 (landlord's English-only policy had disparate impact based on national origin and ancestry); *R.I. Comm'n for Hum. Rts. v. Graul*, 120 F. Supp. 3d 110 (D.R.I. 2015) (landlord's policy of limiting occupancy had disparate impact based on familial status); *Support Ministries for Persons with AIDS, Inc. v. Vill. of Waterford*, 808 F. Supp. 120 (N.D.N.Y. 1992) (city's application of a local zoning ordinance had disparate impact based on disability).

The dynamics of the homeowner's insurance industry illustrate the importance of disparate-impact claims in rooting out discrimination.  "Allegations of racism are tough to prove" against homeowner's insurers because "insurers have a lot of discretion and don't always provide detailed explanations for why claims are denied."  Flitter, *Black Homeowners Struggle to Get Insurers to Pay Claims*, N.Y. Times (Jan 1. 2021).[11]  Insurers also "have long argued that the size and timing of payouts, and the neighborhoods where claims are registered and addressed, are proprietary information, and that sharing that data would hurt their ability to compete."  *Id.*  Absent access to such data or to insurers' decision-making processes, evidence of a racialized effect may be the only way to ferret out discrimination.  This avenue has become even more critical in light of the increasing use of machine-

---

[11]  https://tinyurl.com/27cbpjnw.

learning algorithms in ratemaking and underwriting models. Such algorithms — and the data they are trained on — "can be fraught with inherent bias and discriminatory treatment, whether intentional or not." Mosley & Wenman, *Methods for Quantifying Discriminatory Effects on Protected Classes in Insurance*, Cas. Actuarial Soc'y 10 (2022).[12] Using biased data in such algorithms can subsequently "propagate . . . bias into the choices made from the models' predictions." *Id*. Effects-based tests are best suited to capture and rectify this form of algorithmic bias because they don't require a showing of intentional discrimination.

In part for that reason, disparate-impact claims have been important in redressing discrimination in the homeowner's insurance market. "Many traditional underwriting practices, like . . . [using] housing age and value . . . , have been successfully challenged under the [FHA] using a disparate impact analysis." Dane, *supra*, at 24; *see, e.g.*, *Nat'l Fair Hous. All.*, 208 F. Supp. 2d at 50, 59-61; *Toledo Fair Hous. Ctr. v. Nationwide Mutual Ins. Co.*, 704 N.E.2d 667, 669-71 (Ohio Ct. Common Pleas 1997). Recently, for instance, Black plaintiffs brought a putative class action against State Farm Insurance for "use of algorithmic decision-making tools that allegedly resulted in statistically significant racial disparities in how the insurer processed claims." *Huskey v. State Farm Fire & Casualty Co.*, 2023 WL 5848164, at *1 (N.D. Ill. Sept. 11, 2023). Plaintiffs claimed that the racial disparities stemmed from State Farm's use of algorithms that "scrutinize[d] Black policyholders' claims more than white policyholders' claims." *Id.* at *2. This additional scrutiny resulted

---

[12] https://tinyurl.com/mr3kp3wf.

in longer wait times, more paperwork, and more effort for Black claimants to receive payouts than for white claimants. *See id.* at *2-*3. The district court found that plaintiffs successfully stated a disparate-impact claim under the FHA. *See id.* at *6. Other courts have likewise held that the plaintiffs stated a claim under the FHA against homeowner's insurers whose underwriting criteria had a disparate impact on racial minorities. *See, e.g.*, *Nat'l Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 29-34 (D.D.C. 2017) (denying motion to dismiss disparate-impact claim that insurers unlawfully denied coverage to landlords who rented apartments to tenants receiving Section 8 housing assistance); *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 572-73 (D. Conn. 2015) (similar). Such lawsuits further the FHA's goal of "moving the Nation toward a more integrated society." *Inclusive Cmtys.*, 576 U.S. at 546-47.

## II.   State Law Does Not Categorically Shield Homeowner's Insurers From Federal Disparate-Impact Liability.

Plaintiff advances three claims against the Rule on appeal, but all rest on the same fundamental premise: that state insurance codes "in every State," PCI Br. 33, shield homeowner's insurers' pricing and underwriting activities from federal disparate-impact liability under the federal McCarran-Ferguson Act. Plaintiff says that the Rule itself violates the McCarran-Ferguson Act for this reason, *id.* at 26-43; that HUD acted arbitrarily and capriciously by failing to account for the Act, *id.* at 44-55; and that the Rule violates limitations on disparate-impact liability set out in *Inclusive Communities*, in that the state insurance codes plaintiff cites uniformly "break the 'casual connection,'" *id.* at 57 (citing *Inclusive Cmtys.*, 576 U.S. at 543),

between insurers' conduct and any resulting discrimination, *id.* at 55-62. But state insurance codes do not uniformly impose the rule that plaintiff describes, and so all three claims accordingly fail.

### A. States impose a wide range of statutory antidiscrimination regimes governing insurers.

The premise of plaintiff's argument, as discussed, is that insurance codes "in every State," PCI Br. 33, shield homeowner's insurers' pricing and underwriting activities from federal disparate-impact liability. But that premise is flawed. States impose a range of statutory antidiscrimination regimes on insurers, including regimes that — like the Rule — bar insurers not just from engaging in intentional discrimination, but also from acting in a way that yields discriminatory effects.

### 1. Many States permit disparate-impact claims in the housing context.

Essentially all States prohibit discrimination on the basis of race, sex, and other protected characteristics, and at least 43 expressly extend those rules to the housing context. These laws broadly prohibit those who work in that field — selling and renting housing, making and underwriting housing loans, and more — from discriminating against purchasers, renters, and other individuals.[13] The wording of

---

[13] *See* Alaska Stat. § 18.80.240; Ariz. Rev. Stat. Ann. § 41-1491 *et seq.*; Ark. Code Ann. § 16-123-204; Cal. Gov't Code § 12955; Colo. Rev. Stat. § 24-34-502; Conn. Gen. Stat. § 46a-64b; D.C. Code Ann. § 2-1402.21; Del. Code Ann. tit. 6, § 4603; Ga. Code Ann. § 8-3-202; Haw. Rev. Stat. § 515-3; Idaho Code § 67-5909(8); 775 Ill. Comp. Stat. 5/3-102; Ind. Code § 22-9.5-5-1; Iowa Code § 216.8; Kan. Stat. Ann. § 44-1016; Ky. Rev. Stat. Ann. § 344.360; Me. Rev. Stat. Ann. tit. 5, § 4581-A; Md. Code Ann., State Gov't § 20-705; Mass. Gen. Laws ch. 151B, § 4(3B); Mich. Comp. Laws § 37.2502; Minn. Stat. § 363A.09; Mo. Rev. Stat. § 213.040; Mont. Code Ann. § 49-2-305; Neb.

these statutes vary, but most are broad in scope, prohibiting individuals and entities

from (for instance) "discriminat[ing] against an individual because of disability, race,

creed, color, sex, sexual orientation," and other characteristics "in furnishing

facilities or services in connection with housing," Colo. Rev. Stat. § 24-34-502(1)(a)(I);

from engaging in "unlawful discrimination" in "the furnishing of facilities or services

in connection with" a "real estate transaction," 775 Ill. Comp. Stat. 5/3-102(B); and

more.

Importantly, many of these statutory regimes prohibit not just *intentional*

discrimination based on protected characteristics, but also conduct that has the *effect*

of discriminating based on those same characteristics (*i.e.*, disparate-impact

discrimination).  At least four States — California, Illinois, North Carolina, and the

District of Columbia — expressly provide by statute for disparate-impact claims in

the housing context.[14]  The supreme courts of at least 18 other States — Alaska,

Colorado, Connecticut, Delaware, Georgia, Hawaii, Indiana, Iowa, Maine,

---

Rev. Stat. § 20-318; N.H. Rev. Stat. Ann. § 354-A:10; N.J. Stat. Ann. § 10:5-12(g)-(h);
N.M. Stat. Ann. § 28-1-7(G)-(H); N.Y. Exec. Law §§ 296(2-a), (5), 296-a; N.C. Gen.
Stat. § 41a-4; N.D. Cent. Code § 14-02.5-02; Ohio Rev. Code Ann. § 4112.02(H); Or.
Rev. Stat. § 659A.421; 43 Pa. Stat. § 955(h); R.I. Gen. Laws § 34-37-4; S.C. Code Ann.
§ 31-21-40; S.D. Codified Laws § 20-13-20; Tenn. Code Ann. § 4-21-601; Tex. Prop.
Code Ann. § 301.021; Utah Code Ann. § 57-21-5; Vt. Stat. Ann. tit. 9, § 4503; Va.
Code Ann. § 36-96.3; Wash. Rev. Code § 49.60.222; W. Va. Code § 16B-18-5.

[14]  *See* Cal. Gov't Code § 12955.8(b) (defining unlawful housing practice to include
conduct that "caus[es] a discriminatory effect"); 775 Ill. Comp. Stat. 5/3-102(H) (eff.
Jan. 1, 2025) (defining housing discrimination to include the use of "methods that
have the effect of subjecting individuals to unlawful discrimination"); N.C. Gen. Stat.
§ 41A-5(a)(2) (prohibiting conduct that "has the effect, regardless of intent, of
discriminating" on the basis of a protected trait); D.C. Code § 2-1402.68 (deeming
unlawful any "practice which has the effect or consequence" of violating the statute).

Massachusetts, Michigan, Montana, New Jersey, New Mexico, New York, Ohio, Utah, and Washington — have likewise read their antidiscrimination statutes to encompass disparate-impact claims, either in the housing context or more broadly.[15]  Other courts have reached the same conclusion with respect to fair-housing statutes in at least three other States.[16]

In addition, the fair-housing statutes of many of the remaining States are also more fairly read to recognize disparate-impact claims.  As the Supreme Court explained in *Inclusive Communities*, under federal law, at least, a statute likely encompasses disparate-impact claims when its text "refers to the consequences of actions and not just to the mindset of actors," 576 U.S. at 533 — for instance, by

---

[15]  *See Comm'n on Hum. Rts. & Opportunities v. Sullivan Assocs.*, 739 A.2d 238, 255-56 (Conn. 1999) (recognizing disparate-impact liability in the housing context); *Saville v. Quaker Hill Pl.*, 531 A.2d 201, 205-06 (Del. 1987) (same); *State of Ind. Civ. Rts. Comm'n v. Cnty. Line Park, Inc.*, 738 N.E.2d 1044, 1049 (Ind. 2000) (same); *Bowman v. City of Des Moines Mun. Hous. Agency*, 805 N.W.2d 790, 798-99 (Iowa 2011) (same); *Dussault v. RRE Coach Lantern Holdings, LLC*, 86 A.3d 52, 61-62 (Me. 2014) (same); *Burbank Apartments Tenant Ass'n v. Kargman*, 48 N.E.3d 394, 407 (Mass. 2016) (same); *Malibu Inv. Co. v. Sparks*, 996 P.2d 1043, 1050-51 (Utah 2000) (same); *State v. City of Sunnyside*, 550 P.3d 31, 50 (Wash. 2024) (same); *see also Miller v. Safeway, Inc.*, 102 P.3d 282, 290 (Alaska 2004); *Colo. Civ. Rts. Comm'n v. Travelers Ins. Co.*, 759 P.2d 1358, 1370 (Colo. 1988); *Ga. Dep't of Hum. Res. v. Montgomery*, 284 S.E.2d 263, 265 (Ga. 1981); *Hac v. Univ. of Hawaii*, 73 P.3d 46, 55 (Haw. 2003); *Koester v. City of Novi*, 580 N.W.2d 835, 843 (Mich. 1998); *Mont. Rail Link v. Byard*, 860 P.2d 121, 125 (Mont. 1993); *Gerety v. Atl. City Hilton Casino Resort*, 877 A.2d 1233, 1237 (N.J. 2005); *In re Twp. of Warren*, 622 A.2d 1257, 1269 (N.J. 1993); *Gonzalez v. N.M. Dep't of Health*, 11 P.3d 550, 560 (N.M. 2000); *People v. N.Y. City Transit Auth.*, 452 N.E.2d 316, 318 (N.Y. 1983); *Little Forest Med. Ctr. of Akron v. Oh. Civ. Rts. Comm'n.*, 575 N.E.2d 1164, 1168 (Ohio 1991).

[16]  *See*, *e.g.*, *Lyman v. Montclair at Partridge Creek, LLC*, 2023 WL 6096678 (E.D. Mich. 2023); *Rivera v. DLJ Props.*, 2022 WL 3048229, at *2 (E.D. Tenn. 2022); *Douglas v. Dorchester Props., Ltd.*, 2022 WL 4358779, at *2 (N.D. Tex. 2022).

prohibiting practices that "would deprive . . . any individual of employment opportunities" because of a protected characteristic, 29 U.S.C. § 623(a)(2) (Age Discrimination in Employment Act), or conduct that would make housing "unavailable" based on such a characteristic, 42 U.S.C. § 3604(a) (FHA).  At least 12 additional state fair-housing statutes contain language broadly similar to federal statutes previously held by the Supreme Court to permit disparate-impact liability.[17]  Like these federal statutes, those state laws are arguably best read to permit disparate-impact liability as well.

A wide range of States thus permit disparate-impact claims arising in the housing context, including in the market for homeowner's insurance.  And, as discussed, *supra* pp. 11-14, private litigants and the States have enforced those statutes for decades to combat housing discrimination.

> **2.    State insurance codes do not categorically impose a contrary regime.**

Plaintiff offers a different account of state law.  PCI Br. 9-12, 28-29.  Plaintiff observes that essentially all States have enacted insurance codes that bar insurers from establishing rates that are "excessive, inadequate, or unfairly discriminatory," which it interprets to uniformly "permit" — and in some cases "require" — insurers to set rates based only on "actuarially relevant risk factors," even if doing so results

---

[17] *See, e.g.*, Ariz. Rev. Stat. Ann. § 41-1491.14(A); Kan. Stat. Ann. § 44-1016(a); Ky. Rev. Stat. Ann. § 344.360(1); Md. Code Ann., State Gov't § 20-705(1); Minn. Stat. § 363A.09(1)(1); Mo. Rev. Stat. § 213.040(1)(1); N.D. Cent. Code § 14-02.5-02(1); S.C. Code Ann. § 31-21-40(1); Vt. Stat. Ann. tit. 9, § 4503(a)(1); Va. Code Ann. § 36-96.3(A)(1); W. Va. Code § 16B-18-5(a); Wyo. Stat. Ann. § 40-26-103(A).

in discriminatory effects on minority groups.  *Id.* at 11.  But plaintiff offers little support for such a reading, many States do not read their insurance codes in such a manner, and so plaintiff's repeated assertions that state law is "uniform[]," *id.* at 9, 24, 34, 36, in this key respect are incorrect.

To start, some state insurance codes are best read to prohibit insurers from engaging in conduct that has a discriminatory effect, just as the Rule does.  As plaintiff recognizes, most state insurance codes prohibit insurers from setting rates that are "unfairly discriminatory."  PCI Br. 10; *see, e.g.*, 215 Ill. Comp. Stat. 5/242(3); Colo. Rev. Stat. § 10-3-1104.9(1)(a).  Plaintiff says that some States appear to define that term narrowly, deeming rates unfairly discriminatory only if they differentiate irrationally between actuarially identical risks.  PCI Br. 10.  But not all state insurance codes operate in this manner.  Some codes prohibit insurers from acting "in a way that unfairly discriminates" between individuals *regardless* of whether they are actuarially comparable.  *E.g.*, Colo. Rev. Stat. § 10-3-1104.9(1)(b); Del. Code Ann. tit. 18, § 2304(22); N.J. Stat. Ann. 17:29B-4(7)(c).  Other state insurance codes, like many federal and state antidiscrimination laws, "refer[] to the consequences of actions and not just to the mindset of actors," *Inclusive Cmtys.*, 576 U.S. at 533, and so are best read to prohibit insurers from engaging in conduct that has a discriminatory effect, not merely from engaging in intentional discrimination.  For instance, Delaware's insurance code provides that it is unlawful for insurers to "discriminate *in any way* because of the insured's race, color, religion, sexual orientation, gender identity or national origin."  Del. Code Ann. tit. 18, § 2304(22)

(emphasis added).  Other States' insurance codes prohibit insurers from "making *or permitting* any unfair discrimination," Ga. Code Ann. § 33-6-4(b)(8)(A)(ii) (emphasis added); *see also* D.C. Code § 31-2231.13(d) (similar) — language that focuses on "the consequences" of insurers' conduct rather than their "mindset[s]," *Inclusive Cmtys.*, 576 U.S. at 533, and so likewise are properly read to encompass disparate-impact theories of discrimination.

Regardless, even those state insurance codes that do not themselves prohibit insurers from engaging in conduct that may yield discriminatory effects must be read hand-in-hand with state antidiscrimination statutes that *do* recognize disparate-impact liability, as discussed.  *Supra* pp. 15-18.  Most States follow some form of the rule that "statutes relating to the same subject are to be read together as constituting a unified whole."  *In re Estate of Kerr*, 949 P.2d 810, 815 (Wash. 1998) (cleaned up); *see also, e.g.*, *Lab'y Corp. of Am. v. Davis*, 339 So. 3d 318, 324 (Fla. 2022); *Bryner v. Cardon Outreach, LLC*, 428 P.3d 1096, 1100 (Utah 2018).  Under that rule, statutory prohibitions on "unfair discrimination" by insurers in state insurance codes must be read together with state antidiscrimination statutes that sweep in disparate-impact liability.  Indeed, many States — including all 19 amici States — thus read the unfair-discrimination provisions that plaintiff cites, PCI Br. 9-10, to complement, rather than to displace, the general prohibitions on discrimination described above.

Plaintiff appears to take a different view of these state insurance codes, one in which they uniformly, "in every State, . . . tie 'unfair discrimination' to sound risk assessment and permit or require reliance on risk factors."  *Id.* at 33.  On plaintiff's

view, state insurance codes uniformly conflict with the imposition of disparate-impact liability, such that the Rule would "replace" state law with a "substitute" federal standard. *Id.* But that dramatically overstates the degree of uniformity in state law regarding the relationship between state insurance codes and antidiscrimination law. As discussed, *supra* pp. 18-20, state insurance codes differ: Some appear to adopt a more expansive understanding of what constitutes "unfair discrimination," whereas others can and are read to be complementary of state civil-rights statutes proscribing conduct that has discriminatory effects. Plaintiff's assertion that the States speak with one voice in this area is simply wrong, as the district court correctly held. *See* SA103-106 (reasoning, among other things, that state laws on this subject differ, and that many States "are willing to coordinate" state insurance codes with federal disparate-impact liability).

To be clear, amici States' argument is not that *every* State subjects insurers' conduct to disparate-impact liability or would prevent insurers from imposing rates that have a disparate effect on minority groups. The insurance commissioners of several States appear to suggest that their own state insurance codes should be read essentially as plaintiff suggests. *See* Idaho Amicus Br. 5-6. Those States are free to make that choice. Indeed, as the district court observed, a State that wants to enact such a regime "need only say so" and shield insurers operating in that State from the Rule's operation. SA105. But many States have made the opposite choice, enacting a regime under which insurers may not act in a manner that yields unjustified and avoidable discriminatory effects.

21

**B.    State insurance codes do not categorically shield insurers from federal disparate-impact liability.**

Because plaintiff's account of state law is flawed, *supra* pp. 15-21, its claims — all of which rest in substantial part on that account — fail either on the merits or as premature, as the district court correctly held.

Plaintiff's primary claim is that state insurance codes categorically, "in every State," PCI Br. 33, reverse-preempt the application of the Rule to its members' risk-based pricing and underwriting policies, *see id.* at 33-34.  That argument is wrong. As discussed, *supra* pp. 15-21, many States impose on insurers essentially the same duty that the Rule does, namely to refrain from setting rates that are discriminatory in effect, even if not motivated by discriminatory intent.  So although in *some* States it may be impossible for insurers to comply with both the Rule and state insurance codes, as plaintiff asserts — in which case state insurance codes would apply — that is not true in *every* State, as plaintiff implies.

That alone dispels plaintiff's primary argument.  The Supreme Court has emphasized that the question whether state statutes "reverse-preempt" federal law under the McCarran-Ferguson Act is a case-specific one, under which a court must consider whether the application of the federal law in question would "directly conflict with state regulation" or "frustrate [a] declared state policy or interfere with a State's administrative regime."  *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999). It cannot be answered using the kind of broad brush plaintiff employs, in which federal law must yield to an amorphous and undifferentiated understanding of state interests.  HUD correctly concluded that a case-by-case approach, under which an

insurer can assert a "conflict with a specific state insurance law" as a defense to liability in a specific case, *see* 88 Fed. Reg. at 19,465; *see also id.* at 19,474 (explaining that McCarran-Ferguson "by its nature[ ] requires such case-by-case analyses"), is preferable to the categorical exemption plaintiff seeks.  And the district court likewise correctly concluded that any conflict between federal and state law is best addressed through "a concrete dispute regarding a particular insurance practice," SA29, not by categorically setting aside the Rule as to plaintiff's members' ratemaking and underwriting practices.

Plaintiff's contrary argument appears to rest primarily on this court's 1999 opinion in *Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557 (7th Cir. 1999).  But *Mutual of Omaha* cannot bear the weight plaintiff places on it.  The court in *Mutual of Omaha* considered the application of the Americans with Disabilities Act ("ADA") to health insurance policies that capped the benefits awarded for AIDS.  *Id.* at 558-59.  It held that the ADA generally did not prohibit health insurers from establishing such caps.  *Id.* at 563.  But the court added that, even if the ADA did apply, the McCarran-Ferguson Act would bar the claims at issue, because subjecting insurers' coverage decisions to the ADA would have the effect of "requir[ing] federal courts to determine whether limitations on coverage are actuarially sound and consistent with state law."  *Id.* at 564.  But the court's conclusion was dicta multiple times over:  As it acknowledged, it was "not being asked" to decide whether the McCarran-Ferguson Act reverse-preempted the plaintiffs' federal claim, and was offering its view mainly in anticipation of "the next case."  *Id.*  And although the court observed that state

regulation of insurance generally "is comprehensive and includes rate and coverage issues," *id.*, it cited no specific state laws that it viewed as precluding imposition of federal law on any and all matters touching on insurance rates.  At most, the court in *Mutual of Omaha* hazarded a prediction about the way that federal and state law might interact in a future case.  But the court did not, as plaintiff appears to contend, impose a rule under which all federal statutes touching on insurance rates are reverse-preempted in each and every case, irrespective of the actual content of state law.  That rule cannot be squared with the Supreme Court's decision in *Humana* or with common sense.

Substantially the same reasoning requires rejection of plaintiff's remaining claims.  Plaintiff asserts that, even if state insurance codes do not immunize insurers across the board from the imposition of disparate-impact liability, HUD nonetheless acted arbitrarily and capriciously in denying insurers their requested exemption from that liability, given that *many* state insurance codes could be read to do so.  PCI Br. 44-55.  But the district court correctly rejected this argument, explaining that HUD considered the caselaw on both sides of this issue — that is, cases accepting insurers' McCarran-Ferguson Act defenses and cases rejecting those defenses — and concluded that "a blanket exemption would be 'overbroad.'"  SA97 (quoting 88 Fed. Reg. at 19,475); *see also* SA97-107.  Plaintiff's final argument — that the Rule contravenes the Supreme Court's opinion in *Inclusive Communities* (which plaintiff asserts set out a "robust causality requirement," PCI Br. 56, for imposition of disparate-impact liability) by subjecting insurers to disparate-impact liability even for practices that

are authorized by state law — fails for substantially the same reasons, namely that in many cases the practices prohibited by the Rule are likewise prohibited by state law. *Supra* pp. 15-21.  The district court thus correctly concluded that this claim lacked merit and that plaintiff was not entitled to amend its complaint to allege it.  SA74.

The district court also correctly relied on the amici States' amicus brief below, SA103-05, in reaching these conclusions.  Plaintiff challenges that reasoning, PCI Br. 51-53, but its arguments lack merit.  Plaintiff observes, for instance, that the amicus brief "focused on the . . . compatibility of the Rule with antidiscrimination provisions in state-fair housing laws," whereas the McCarran-Ferguson Act prohibits interference only with state insurance codes.  *Id.* at 51-52.  But amici's argument is that the Rule does *not* interfere with state insurance codes in amici's own States because insurers in those States are already subject to antidiscrimination prohibitions that substantially overlap with the Rule.  The Rule thus does not interfere with state insurance codes that already accommodate — either explicitly or together with the fair-housing laws plaintiff describes — the federal rule.  *Supra* pp. 15-21.  Similarly, although plaintiff argues that "it is the prerogative of the States . . . to determine whether and how disparate-impact liability can be accommodated without undermining insurance markets," PCI Br. 52-53, here amici States, at least, have done so, and — as the district court observed, SA104 — have concluded that enforcement of the Rule will complement state efforts to regulate the insurance market.

In the end, each State is entitled to determine for itself whether insurers operating within its borders should be allowed to engage in conduct that has unjustifiable discriminatory effects on individuals' equal access to housing. *See San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 50 (1973) ("[O]ne of the peculiar strengths of our form of government" is "each State's freedom to 'serve as a laboratory; and try novel social and economic experiments'") (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 280 (1932) (Brandeis, J., dissenting)). As HUD explained, plaintiff's proposed nationwide categorical exemption for insurers would "be at odds" with Congress's purpose of "support[ing] the autonomy and sovereignty of each individual state in the field of insurance." 88 Fed. Reg. at 19,475. The district court correctly rejected the argument that such an exemption is required by the McCarran-Ferguson Act or any other authority.

## CONCLUSION

For these reasons, this court should affirm the district court's judgment.

Respectfully submitted,

**BRIAN L. SCHWALB**
Attorney General
District of Columbia

**CAROLINE S. VAN ZILE**
Solicitor General

**ASHWIN P. PHATAK**
Principal Deputy Solicitor General
400 6th Street NW, Suite 8100
Washington, D.C. 20001

**KRIS MAYES**
Attorney General
State of Arizona
2005 N. Central Ave.
Phoenix, AZ 85004

**PHILIP J. WEISER**
Attorney General
State of Colorado
1300 Broadway, 10th Floor
Denver, CO 80203

**ANTHONY G. BROWN**
Attorney General
State of Maryland
200 Saint Paul Place
Baltimore, MD 21202

**KEITH ELLISON**
Attorney General
State of Minnesota
75 MLK Jr. Blvd.
St. Paul, MN 55155

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

/s/ Alex Hemmer
**ALEX HEMMER**
Deputy Solicitor General
115 South LaSalle Street
Chicago, IL 60603
(312) 814-5526
Alex.Hemmer@ilag.gov

**ROB BONTA**
Attorney General
State of California
1300 I Street
Sacramento, CA 95814

**KATHLEEN JENNINGS**
Attorney General
State of Delaware
820 N. French St.
Wilmington, DE 19801

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts
One Ashburton Place
Boston, MA 02108

**AARON D. FORD**
Attorney General
State of Nevada
100 North Carson Street
Carson City, NV 8970

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey
25 Market Street
Trenton, NJ 08625

**LETITIA JAMES**
Attorney General
State of New York
28 Liberty Street
New York, NY 10005

**ELLEN F. ROSENBLUM**
Attorney General
State of Oregon
1162 Court Street NE
Salem, OR 97301

**PETER F. NERONHA**
Attorney General
State of Rhode Island
150 South Main Street
Providence, RI 02903

**ROBERT W. FERGUSON**
Attorney General
State of Washington
P.O. Box 40100
Olympia, WA 98504

October 17, 2024

**RAÚL TORREZ**
Attorney General
State of New Mexico
201 3rd Street NW
Albuquerque, NM 87109

**JOSHUA H. STEIN**
Attorney General
State of North Carolina
114 W. Edenton Street
Raleigh, NC 27603

**MICHELLE A. HENRY**
Attorney General
Commonwealth of Pennsylvania
Strawberry Square, 16th Floor
Harrisburg, PA 17120

**CHARITY R. CLARK**
Attorney General
State of Vermont
109 State Street
Montpelier, VT 05609

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(A) and Circuit Rule 32(c) because it contains 6,410 words (excluding the parts exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)).  This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(a) because it has been prepared in a proportionally spaced typeface (12-point Century Schoolbook) using Microsoft Word.

<u>/s/ Alex Hemmer</u>
ALEX HEMMER

October 17, 2024

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on October 17, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.

All participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER