No. 24-1947

---

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

———————

PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA,

*Plaintiff-Appellant*,

*v.*

ADRIANNE TODMAN, ACTING SECRETARY OF THE DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT, AND UNITED STATES
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,

*Defendants-Appellees.*

———————

On Appeal from the United States District Court
for the Northern District of Illinois, No. 1:13-cv-08564
Before the Honorable Chief Judge Rebecca R. Pallmeyer

———————

**BRIEF FOR THE NATIONAL FAIR HOUSING ALLIANCE, LAWYERS'
COMMITTEE FOR CIVIL RIGHTS UNDER LAW, AMERICAN CIVIL
LIBERTIES UNION, NATIONAL CONSUMER LAW CENTER, CONSUMER
FEDERATION OF AMERICA, POVERTY & RACE RESEARCH ACTION
COUNCIL, CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER
LAW, AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS, OPEN
COMMUNITIES, SOUTH SUBURBAN HOUSING CENTER, FAIR HOUSING
CENTER OF CENTRAL INDIANA, HOPE FAIR HOUSING CENTER, AND
METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL
AS *AMICI CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE**

Thomas Silverstein
Brook Hill
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St. NW #900
Washington, DC 20005
(202) 662-8600
tsilverstein@lawyerscommittee.org
bhill@lawyerscommittee.org

Brian Corman
Alisa Tiwari
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Ave. NW,
Suite 500
Washington, DC 20005
(202) 408-4600
atiwari@cohenmilstein.com

Morgan Williams
NATIONAL FAIR HOUSING ALLIANCE
1331 Pennsylvania Ave. NW #650
Washington, DC 20004
(202) 898-1661
mwilliams@nationalfairhousing.org

***Attorneys for Amici***

October 17, 2024

## Corporate Disclosure Statement

*Amici* are nonprofit corporations. They have no parent corporations, nor does any corporation own 10% or more of their stock.

/s/ *Alisa Tiwari*
Alisa Tiwari
*Counsel for Amici Curiae*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-1947</u>

Short Caption: <u>Property Casualty Insurers Association of America v. Adrianne Todman, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    The National Fair Housing Alliance, Lawyers' Committee for Civil Rights Under Law, American Civil Liberties Union, Consumer Federation of America, National Consumer Law Center, Chicago Lawyers' Committee for Civil Rights Under Law, Poverty & Race Research Action Council, American Civil Liberties Union of Illinois, Open Communities, South Suburban Housing Center, Fair Housing Center of Central Indiana, HOPE Fair Housing Center, and Metropolitan Milwaukee Fair Housing Council

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Cohen Milstein Sellers & Toll PLLC

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

      None

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: _____     Date: <u>10/18/24</u>

Attorney's Printed Name: <u>Alisa Tiwari</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✓]   **No** [ ]

Address: <u>Cohen Milstein Sellers & Toll PLLC, 1100 New York Ave., N.W., Washington, D.C. 20005</u>

Phone Number: <u>(202) 408-4600</u>      Fax Number: <u>(202) 408-4699</u>

E-Mail Address: <u>atiwari@cohenmilstein.com</u>

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __24-1947__

Short Caption: __Property Casualty Insurers Association of America v. Adrianne Todman, et al.__

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    The National Fair Housing Alliance, Lawyers' Committee for Civil Rights Under Law, American Civil Liberties Union, Consumer Federation of America, National Consumer Law Center, Chicago Lawyers' Committee for Civil Rights Under Law, Poverty & Race Research Action Council, American Civil Liberties Union of Illinois, Open Communities, South Suburban Housing Center, Fair Housing Center of Central Indiana, HOPE Fair Housing Center, and Metropolitan Milwaukee Fair Housing Council

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Cohen Milstein Sellers & Toll PLLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: _____    Date: __10/18/24__

Attorney's Printed Name: __Brian C. Corman__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]   **No** [X]

Address: __Cohen Milstein Sellers & Toll PLLC, 1100 New York Ave., N.W., Washington, D.C. 20005__

Phone Number: __(202) 408-4600__    Fax Number: __(202) 408-4699__

E-Mail Address: __bcorman@cohenmilstein.com__

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-1947</u>

Short Caption: <u>Property Casualty Insurers Association of America v. Adrianne Todman, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
     <u>The National Fair Housing Alliance, Lawyers' Committee for Civil Rights Under Law, American Civil Liberties Union, Consumer Federation of America, National Consumer Law Center, Chicago Lawyers' Committee for Civil Rights Under Law, Poverty & Race Research Action Council, American Civil Liberties Union of Illinois, Open Communities, South Suburban Housing Center, Fair Housing Center of Central Indiana, HOPE Fair Housing Center, and Metropolitan Milwaukee Fair Housing Council</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
     <u>Cohen Milstein Sellers & Toll PLLC</u>

(3)    If the party, amicus or intervenor is a corporation:

     i)      Identify all its parent corporations, if any; and

          <u>None</u>

     ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

          <u>None</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

     <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

     <u>N/A</u>

Attorney's Signature:    <u>/s/ Thomas Silverstein</u>      Date: <u>10/18/24</u>

Attorney's Printed Name:   <u>Thomas Silverstein</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]   **No** [X]

Address:   <u>Lawyers' Committee for Civil Rights Under Law, 1500 K St., N.W., Suite 900, Washington, D.C. 20005</u>

Phone Number:   <u>(202) 662-8600</u>      Fax Number: _____

E-Mail Address:   <u>tsilverstein@lawyerscommittee.org</u>

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1947

Short Caption: Property Casualty Insurers Association of America v. Adrianne Todman, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The National Fair Housing Alliance, Lawyers' Committee for Civil Rights Under Law, American Civil Liberties Union, Consumer Federation of America, National Consumer Law Center, Chicago Lawyers' Committee for Civil Rights Under Law, Poverty & Race Research Action Council, American Civil Liberties Union of Illinois, Open Communities, South Suburban Housing Center, Fair Housing Center of Central Indiana, HOPE Fair Housing Center, and Metropolitan Milwaukee Fair Housing Council

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Cohen Milstein Sellers & Toll PLLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: _/s/ Brook Hill_    Date: 10/18/24

Attorney's Printed Name: Brook Hill

Please indicate if you are _Counsel of Record_ for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** [ ]  **No** [X]

Address: Lawyers' Committee for Civil Rights Under Law, 1500 K St., N.W., Suite 900, Washington, D.C. 20005

Phone Number: (202) 662-8600    Fax Number: _____

E-Mail Address: bhill@lawyerscommittee.org

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1947

Short Caption: Property Casualty Insurers Association of America v. Adrianne Todman, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

     The National Fair Housing Alliance, Lawyers' Committee for Civil Rights Under Law, American Civil Liberties Union, Consumer Federation of America, National Consumer Law Center, Chicago Lawyers' Committee for Civil Rights Under Law, Poverty & Race Research Action Council, American Civil Liberties Union of Illinois, Open Communities, South Suburban Housing Center, Fair Housing Center of Central Indiana, HOPE Fair Housing Center, and Metropolitan Milwaukee Fair Housing Council

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

     Cohen Milstein Sellers & Toll PLLC

(3)     If the party, amicus or intervenor is a corporation:

     i)     Identify all its parent corporations, if any; and

         None

     ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

     N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

     N/A

Attorney's Signature:    */s/ Morgan Williams*        Date: 10/18/24

Attorney's Printed Name:   Morgan Williams

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☒

Address:   National Fair Housing Alliance, 1331 Pennsylvania Ave., N.W., Suite 650, Washington, D.C. 20004

Phone Number: (202) 898-1661        Fax Number: 

E-Mail Address: mwilliams@nationalfairhousing.org

# TABLE OF CONTENTS

Page

Table of Authorities.................................................................i

Interest of Amici Curiae.........................................................v

Introduction & Summary of Argument ....................................1

Argument.............................................................................4

I.   Not every state approves underwriting guidelines and
     ratemaking procedures as actuarially sound. ...................4

     A.   Numerous states do not comprehensively review
          underwriting guidelines or rates. ...........................5

     B.   Prohibiting "excessive, inadequate, or unfairly
          discriminatory" rates is not the same as requiring
          underwriting and ratemaking to be purely risk-based. .......20

II.  Disparate impact liability would not universally displace
     state law requiring risk-based pricing and underwriting............26

     A.   State prohibitions of unfair discrimination are not
          strictly tied to accurately assessing risk. ...........26

     B.   Disparate impact liability would not, in practice,
          displace risk-based pricing either........................28

Conclusion ........................................................................31

# TABLE OF AUTHORITIES

Page

**Cases**

*Cohen v. American Security Insurance Co.,*
    735 F.3d 601 (7th Cir. 2013)...........................................................19

*Doe v. Mutual of Omaha Insurance Co.,*
    179 F.3d 557 (7th Cir. 1999)................................... 7, 15, 16, 18, 19, 20

*Ingmantoro v. Mukasey,*
    550 F.3d 646 (7th Cir. 2008)...........................................................17

*NLRB v. Keller-Crescent Co.,*
    538 F.2d 1291 (7th Cir. 1976)..........................................................18

*United States v. Crawley,*
    837 F.2d 291 (7th Cir. 1988)...........................................................18

*United States v. Kucik,*
    844 F.2d 493 (7th Cir. 1988)...........................................................17

*United States v. Sineneng-Smith,*
    590 U.S. 371 (2020)........................................................................17

*UnitedHealthcare Insurance Co. v. Becerra,*
    16 F.4th 867 (D.C. Cir. 2021).................................................5, 8, 14

*Waters v. Churchill,*
    511 U.S. 661 (1994)........................................................................17


**Statutes**

Ariz. Rev. Stat. Ann. § 20-385................................................................13

Ill. Comp. Stat. Ann. 5..............................................................9, 10, 11

Kan. Stat. Ann. § 40-955.........................................................................6

Page

Minn. Stat. Ann. § 70A.06 ........................................................ 13

N.M. Stat. Ann. § 59A-17 .......................................................... 6

S.C. Code Ann. § 38-75-1240 ..................................................... 6

Wyo. Stat. Ann. § 26-14-102 ..................................................... 12

Wyo. Stat. Ann. § 26-14-107 ................................................ 12, 13


**Other Authorities**

24 C.F.R. § 100.500 ................................................................. 30

Andrea Wells, *The Price of Price Optimization*,
    Ins. J. (Nov. 17, 2015) ................................................ 24, 27

Brian J. Glenn, *The Shifting Rhetoric of Insurance Denial*,
    34 Law & Soc'y Rev. 779 (2000) ................................... 12, 21

Casualty Actuarial & Statistical Task Force, *Price Optimization
    White Paper*, National Association of Insurance
    Commissioners (2015) .................................... 14, 22, 23, 24

Casualty Actuarial & Statistical Task Force, *Regulatory Review of
    Predictive Models White Paper*, National Association of Insur-
    ance Commissioners (2020) ........................................... 13

Dana Braeunling, *Consumer Credit Info*, National Conference of
    State Legislatures (May 26, 2022) .................................. 27

D.J. Powers, *The Discriminatory Effects of Homeowners Insurance
    Guidelines*, in Insurance Redlining: Disinvestment, Reinvest-
    ment, and the Evolving Role of Financial Institutions 119
    (Gregory D. Squires ed., 1997) ....................................... 21

# TABLE OF AUTHORITIES

Page

Donald Light, *Transforming Underwriting*,
Celent (2004) ......................................................................... 22

*Frequently Asked Questions on the Rate Review Process*,
Illinois Department of Insurance (Jan. 2015) .................................. 10

Gail McGiffin, *Are Underwriters Smarter Than Predictive Models?*
Ernst & Young LLP (2013) .................................................. 22

*Homeowners' Insurance Discrimination: Hearings Before the S.
Comm. on Banking, Housing and Urban Affairs*,
103d Cong. (1994) ................................................................ 1

Ill. Admin. Code tit. 50, § 754.10 .......................................... 13

*Insurance Department Resources Report*, National Association of
Insurance Commissioners (Sept. 2023) .................................... 13, 14

*Introductory Actuarial Standard of Practice*, Actuarial Standards
Board (Mar. 2013) ............................................................... 29

Jordan R. Plitt et al., Couch on Insurance
(3d ed. updated June 2024) ................................................. 19

Jun Yan & Jon White, *Discussion of Using "Tiers" for Insurance
Segmentation*, Casualty Actuarial Society (Mar. 2012) ...................... 6

Kemi Akinyemi et al., *Insurance Regulatory Issues in the United
States*, Society of Actuaries (2019) ...................................... 23

Lizzie Kane, *'Crisis mode': Housing providers are being squeezed
by rising insurance costs, driving rents up. Unlike other states,
Illinois can do little about it.*
Chi. Trib. (Aug. 13, 2024) ................................................. 11, 28

Lyn Elliott, Brandon Vick & Carole Walker, *Re: Revised Rate
Notification and Rule Filing Bill Draft*,
Wyoming Legislature (July 26, 2024) ....................................... 6, 7

# TABLE OF AUTHORITIES

Page

Mallika Bender et al., *Understanding Potential Influence of Racial Bias on P&C Insurance*, Casualty Actuarial Society (2022)........ 29, 30

Meryl Golden & Mike Miller, *Introduction to Price Optimization* Earnix (2014) ............................................................................ 21, 23

Mo. Code Regs. Ann. tit. 20, § 500-9.100 ........................................... 6, 7

*Rate, Rule & Policy Form Filing Requirements*, Rhode Island Department of Business Regulation ................................................... 6

Senate Bill 21-169 (Colo. 2021) ............................................................ 27

*Statement of Principles Regarding Property and Casualty Insurance Ratemaking*, Casualty Actuarial Society (2021) ...................................................................................... 22, 29

Stephen M. Dane, *The Potential for Racial Discrimination by Homeowners Insurers*, 24 J. Ins. Reg. 21 (2006). ............................... 1

*Amici* are the National Fair Housing Alliance, Lawyers' Committee for Civil Rights Under Law, American Civil Liberties Union, Consumer Federation of America, National Consumer Law Center, Chicago Lawyers' Committee for Civil Rights Under Law, Poverty & Race Research Action Council, American Civil Liberties Union of Illinois, Open Communities, South Suburban Housing Center, Fair Housing Center of Central Indiana, HOPE Fair Housing Center, and Metropolitan Milwaukee Fair Housing Council. Each is a non-profit organization that has long sought to eliminate housing segregation and promote equal housing opportunity for all.

The National Fair Housing Alliance is a national organization dedicated to ending discrimination and ensuring equal opportunity in housing for all, including through homeownership, credit access, tech equity, member services, community development, and enforcement

---

[1] All parties consent to the filing of this brief, and no counsel for any party authored it in whole or in part. Apart from the *amici curiae*, no person, party, or party's counsel contributed money intended to fund the brief's preparation and submission.

initiatives. NFHA is a consortium of 167 private, non-profit fair housing organizations, state and local civil rights agencies, and individuals.

Lawyers' Committee for Civil Rights Under Law is a non-partisan, nonprofit organization formed in 1963 at the request of President John F. Kennedy to provide legal services to address racial discrimination and secure equal justice under law. LCCRUL works with communities across the nation to combat and remediate discriminatory housing practices, in particular where doing so helps secure justice for Black communities and other communities of color.

The American Civil Liberties Union is a nationwide, non-partisan organization with nearly two million members and supporters dedicated to the principles of liberty and equality embodied in the United States Constitution. The American Civil Liberties Union of Illinois is a state affiliate of the national ACLU and a statewide, non-profit, non-partisan organization with more than 50,000 members. The ACLU and ACLU-IL work to promote and safeguard individuals' civil rights and civil liberties, including the right of every individual to access housing free from discrimination based on race, national origin, gender, disability, familial status, and other protected characteristics.

National Consumer Law Center is a national non-profit research and advocacy organization focusing on justice in consumer financial transactions, especially for low-income and elderly consumers. NCLC also provides legal and technical consulting and assistance on consumer law issues, and regularly provides comprehensive comments to federal agencies, including HUD, on the regulations under consumer laws that affect low-income consumers.

Consumer Federation of America is an association of over 200 national, state, and local non-profit consumer organizations founded in 1968 to advance the consumer interest through advocacy, research, and education. CFA advocates on behalf of consumers throughout the country, with a focus on the protection of low- and moderate-income consumers. CFA has worked on insurance policy for decades, collecting, examining, and synthesizing data from a variety of sources, including public records, vendors of insurance industry data, and insurers themselves.

The Poverty & Race Research Action Council is a civil rights policy organization committed to bringing the insights of social science research to the fields of civil rights and poverty law. PRRAC's housing

work focuses on the government's role in creating and perpetuating patterns of racial and economic segregation, the long-term consequences of segregation for low-income families of color in the areas of health, education, employment, and economic mobility, and the government policies that are necessary to remedy these disparities.

Chicago Lawyers' Committee for Civil Rights is a public interest law organization founded in 1969 that works to secure racial equity and economic opportunity for all. CLCCR advocates for equitable development and investment in historically disinvested communities of color, supporting the improvement of housing opportunities. CLCCR also investigates complaints of housing discrimination throughout the Chicago metropolitan area. It has litigated numerous discrimination cases under the Fair Housing Act and other federal civil rights statutes, many of which have raised disparate impact claims.

Open Communities is a nonprofit organization that works to ensure that housing in north suburban Chicago is fair and inclusive. Open Communities does this by educating, advocating, and organizing to eradicate housing discrimination.

South Suburban Housing Center is a regional fair housing and comprehensive housing counseling agency primarily serving majority-Black communities in the south suburbs of Chicago. SSHC operates a host of fair housing enforcement, housing counseling, and education and outreach programs.

Fair Housing Center of Central Indiana is a private, nonprofit organization that works to ensure equal housing opportunities by eliminating housing discrimination through advocacy, enforcement, education, and outreach. FHCCI offers four main programs to fight housing discrimination in Central Indiana: Advocacy, Education, Inclusive Communities, and Public Policy.

HOPE Fair Housing Center is a nonprofit organization dedicated to eliminating housing discrimination across Illinois since 1968. HOPE works to create greater housing opportunities for all. Its mission is to ensure everyone has the chance to live in the community, home, or apartment of their choice, free from discrimination. HOPE accomplishes this through education, outreach, enforcement, training, and advocacy.

Metropolitan Milwaukee Fair Housing Council is a private, nonprofit organization that operates a full-service housing program. Its

purpose is to promote fair housing throughout Wisconsin by combating illegal housing discrimination and by creating and maintaining racially and economically integrated housing patterns. MMFHC's programs include case intake and counseling, investigative services, outreach and education, and professional support to government agencies.

**INTRODUCTION & SUMMARY OF ARGUMENT**

Discriminatory access to homeowners' insurance has perpetuated stark racial inequalities in housing. Historically, insurers explicitly refused to sell to people of color. *Homeowners' Insurance Discrimination: Hearings Before the S. Comm. on Banking, Housing and Urban Affairs*, 103d Cong. (1994). Those practices morphed into more covert forms of discrimination, such as refusals to sell based on a home's age or market value. Stephen M. Dane, *The Potential for Racial Discrimination by Homeowners Insurers*, 24 J. Ins. Reg. 21, 21-22 (2006). To defend such practices, as the district court here recognized, "the homeowners insurance industry has [repeatedly] raised risk as a shield for purportedly 'objective' factors." Appellant's App. 116.

PCIA's McCarran-Ferguson argument is more of the same—that is, an appeal to risk that is ultimately a house of cards. The company relies on assumption after assumption, without attempting to prove a single one. And for good reason. Many of the assumptions underpinning PCIA's argument are wrong.

Start with the foundation of PCIA's argument: that all fifty states approve homeowners' insurance rates and underwriting procedures as

"actuarially sound risk assessments." That's the case, says PCIA, because "expert insurance regulators in every State carefully review rates" to ensure that they are not "unfairly discriminatory." And because "rates have been reviewed and approved by state regulators," the argument goes, federal courts cannot assess whether those rates are actuarially sound when adjudicating a disparate impact lawsuit.

PCIA's argument fails for numerous reasons. First, disparate impact lawsuits could not interfere with "careful[]" insurance-approval schemes in every single state, because some states have no such scheme at all. In fact, many states do not require insurers to submit their underwriting guidelines to regulators and thus never review them. The same is true of ratemaking: Many states do not comprehensively review insurance rates. Indeed, insurers in some states do not file their rates with regulators, let alone seek their approval for actuarial soundness. This diversity in state regulatory regimes undermines PCIA's assertion that there is a presumptive nationwide conflict between disparate impact lawsuits and state-level approvals of insurance rates.

Second, PCIA's argument additionally fails because it has not and cannot prove that *prohibiting* "unfairly discriminatory" rates is

universally equivalent to *requiring* rates to be offered and set through—and only through—risk-based practices. States do not uniformly deem rates "unfairly discriminatory" simply because they are not entirely based on risk. And insurers commonly deviate from actuarial factors without running afoul of state insurance law. Because the laws in all fifty states do not monolithically require insurers to use solely risk-based practices in ratemaking and underwriting, a state's approval of rates does not mean that those rates are necessarily risk-based.

These realities also defeat PCIA's fallback McCarran-Ferguson argument: that a disparate impact lawsuit would supersede every state's prohibition of "unfairly discriminatory" rates because that "rating standard . . . requires reliance on objective risk factors," while a disparate impact lawsuit might require deviating from those factors.

PCIA has not, and cannot, show that this "rating standard" universally requires only risk-based practices. What's more, that some states understand "unfairly discriminatory" rates as rates with certain undesirable impacts—*even if* those rates are arguably risk-based—further undercuts PCIA's claim that disparate impact review would displace every state's law by introducing non-risk-based considerations.

But PCIA's concern about superseding risk-based pricing and underwriting rules is misplaced for another reason too. PCIA is wrong that disparate impact lawsuits would always force insurers to adopt non-risk-based practices to ameliorate a disparate racial effect. In fact, disparate impact lawsuits could result in *better* predictions of risk—that is, models with factors more reflective of risk and less reflective of race or other protected characteristics. And HUD's rule *encourages* that outcome by requiring plaintiffs to offer an alternative approach that still serves a company's legitimate interest.

## ARGUMENT

### I. Not every state approves underwriting guidelines and ratemaking procedures as actuarially sound.

To fashion a McCarran-Ferguson argument, PCIA makes an ambitious assertion. It says: All states have essentially approved all homeowners' insurance rates as "actuarially sound risk assessments" by determining that those rates are not "excessive, inadequate, or unreasonably discriminatory." Appellant's Op. Br. 28; *see id.* at 32 ("[A] state insurance regulator has already found the rates not to be excessive, inadequate, or unfairly discriminatory . . . ."); *id.* at 24 ("[T]he laws in every State [] prohibit excessive, inadequate, and unfairly

discriminatory rates—a rating standard that requires reliance on objective risk factors . . . .").

But this narrative has glaring holes: (A) PCIA does not, and cannot, show that regulators in every state review underwriting and ratemaking procedures for compliance with prohibitions on "excessive, inadequate, and unfairly discriminatory" rates; and (B) PCIA does not, and cannot, prove that these state-level prohibitions require those procedures to be purely risk-based.

A.    Numerous states do not comprehensively review underwriting guidelines or rates.

**1.** PCIA fails to substantiate its blanket assertion that states "comprehensively review[] and approve[]" underwriting guidelines. *Id.* at 28. That alone is sufficient to reject PCIA's bid for an exemption for underwriting. *Cf. UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 871 (D.C. Cir. 2021) (insurance company's challenge to rulemaking as contrary to law failed when the company failed to meet its "burden to show the systematically skewed inaccuracies on which its theory depend[ed]").

In any event, PCIA is wrong that regulators in all fifty states approve homeowner insurers' underwriting guidelines. In fact, just

three months ago, PCIA represented the *exact opposite* to insurance regulators. Urging those regulators to reconsider draft regulations that would require approval of underwriting guidelines, PCIA wrote that "[o]nly Connecticut, a state with stringent and burdensome regulations, requires approval of underwriting guidelines." Lyn Elliott, Brandon Vick & Carole Walker, *Re: Revised Rate Notification and Rule Filing Bill Draft*, State of Wyo. Leg. 2 (July 26, 2024), https://bitly.cx/yGrbW.

That statement correctly reflects states' regulatory regimes with respect to underwriting. Most insurers need not file their underwriting guidelines with regulators and thus their underwriting decisions are largely unregulated. Jun Yan & Jon White, *Discussion of Using "Tiers" for Insurance Segmentation*, Cas. Actuarial Soc'y 5 (Mar. 2012), https://bitly.cx/cFbQ6. ("Many states don't require filing approval for underwriting tiers"); *see, e.g.*, S.C. Code Ann. § 38-75-1240 (in South Carolina, underwriting guidelines submitted only when requested); N.M. Stat. Ann. § 59A-17-5.1 (in New Mexico, similar); Kan. Stat. Ann. § 40-955 (in Kansas, similar); *Rate, Rule & Policy Form Filing Requirements*, State of R.I. Dep't of Bus. Regul., https://bitly.cx/HIIb (in Rhode Island, similar); *see also* Mo. Code Regs. Ann. tit. 20, § 500-9.100

(in Missouri, underwriting guidelines only required when they rely on certain factors, such as race and national origin).

In nearly every state that does elicit underwriting guidelines, those guidelines are simply filed—not reviewed and approved. Elliott, Vick & Walker, *Revised Rate Notification* at 2 ("While a number of states currently require the filing of underwriting guidelines, they are not for review and approval."); *see id.* (pointing to Connecticut as the only state that requires approval for underwriting guidelines).

Thus, contrary to PCIA's representations to this Court, homeowner insurers do not have states' stamp of approval for their underwriting guidelines. Many states complete no review of these guidelines—let alone a comprehensive review for actuarial soundness. Accordingly, "federal courts [would not] be stepping on the toes of state insurance commissioners" in all fifty states if they considered a case challenging the unjustified racial impact of a specific insurance company's underwriting guidelines. *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 564 (7th Cir. 1999).

**2.** PCIA also fails to show that regulators in every state deem homeowners' insurance rates actuarially sound. Rather than submitting

a fifty-state survey detailing each state's rate-approval process for homeowners' insurance, PCIA cites regulations in just *four states* to prove its entitlement to a national exemption. Op. Br. 11-12 (citing insurance laws in New Jersey, Indiana, Ohio, and Wisconsin). PCIA makes no effort to show that similar regimes exist in the remaining forty-six states. *See id.*; *id.* at 28 (referring again to these same four states). Without such a showing, PCIA has not carried its burden to show an entitlement to a country-wide exemption for ratemaking. *Cf. UnitedHealthcare Ins. Co.*, 16 F.4th at 888 (insurance company's challenge to rulemaking failed when the company did not prove "[t]he underlying premise of [its] overall position").

In any event, though, PCIA could not make a country-wide showing because numerous states do not review and approve ratemaking procedures as actuarially sound. Consider the following examples:

*(i) Illinois.* Illinois's regulatory regime undermines PCIA's argument in multiple ways. Again, PCIA's state-approval theory relies on prohibitions of all "unfairly discriminatory" rates. As a starting point, PCIA repeatedly emphasizes that "[a]ll States prohibit excessive,

inadequate, or unfairly discriminatory rates." Op. Br. 1; *id.* at 10 (same); *id.* at 24 (same); *id.* at 40 (same); *id.* at 57 (same). On its view, that prohibition alone ensures that rates are risk-based; it cites no other state laws that serve a similar purpose. *See id.* at 28.

But all states do not, in fact, have regulatory regimes prohibiting all "unfairly discriminatory" rates across the insurance industry. Illinois is one example. The state's insurance regulations do not prohibit homeowners' insurers from using all unfairly discriminatory rates. *See* 215 Ill. Comp. Stat. Ann. 5 (prohibiting "excessive," "inadequate," and "unfairly discriminatory" rates in just a few lines of insurance industries, such as medical liability insurance, workers' compensation insurance, and some inland marine insurance). Thus, PCIA's theory does not—indeed cannot—apply to homeowners' insurance rates in every state.

PCIA disagrees, but it misrepresents Illinois law. PCIA points to an Illinois statute that prohibits "unfair discrimination between individuals or risks of the same class or of essentially the same hazard and expense element." Op. Br. 10 (citing 215 Ill. Comp. Stat. 5/424(3)); *id.* at 52 n.7 (same). However, PCIA omits half the provision. By the

statute's own terms, the provision only prohibits unfair discrimination "because of the *race*, *color*, *religion*, or *national origin* of such insurance risks or applicants." 215 Ill. Comp. Stat. Ann. 5/424(3) (emphasis added). In other words, the provision does not prohibit all unfairly discriminatory rates—just very specific ones. Because the provision only prohibits select forms of "unfair discrimination," it cannot possibly function to ensure rates are entirely risk-based.

Illinois undermines PCIA's argument in other ways too: The Illinois Department of Insurance has not been granted the authority to review or approve homeowners' insurance rates. *See* 215 Ill. Comp. Stat. Ann. 5, Article 9; *see Frequently Asked Questions on the Rate Review Process*, Ill. Dep't of Ins. 2 (Jan. 2015), https://bitly.cx/WUzya ("The Department does not have the authority to approve or disapprove proposed rate increases. Therefore, it is possible that a rate increase may go into effect even if the Department determines that the rate increase is 'unreasonable.'").

In fact, in a recent article on rising property insurance costs in the state, the Illinois Department of Insurance commented:

> [T]he department does not have the regulatory
> authority to set property and casualty insurance

> rates, including homeowners and commercial
> property insurance. While some states, such as
> California, have the ability to review and approve
> insurance rate increases, Illinois requires only
> that rates be filed with the department.
>
> The Department stands ready to partner with
> consumer advocates and legislators to increase
> consumer protections and enhance the
> Department's regulatory authority regarding
> homeowners insurance rates in Illinois.

Lizzie Kane, *'Crisis mode': Housing providers are being squeezed by rising insurance costs, driving rents up. Unlike other states, Illinois can do little about it*, Chi. Trib. (Aug. 13, 2024), https://bitly.cx/IGCNC. Accordingly, the state cannot approve or disapprove of insurance rates.

Again, PCIA tells a contrary story, asserting that Illinois regulators regularly assess insurance rates using their investigative powers. Op. Br. 12 (citing 215 Ill. Comp. Stat. 5/132.3). Not so. The Department of Insurance does conduct investigations, but they do not serve as a stamp of approval for actuarial soundness. Rather, investigations focus on *financial* soundness. 215 Ill. Comp. Stat. Ann. 5/132.1 (investigations are intended to "provide an effective system for the financial examination of the activities, operations, financial condition, and affairs of all persons transacting the business of

insurance in this State and all persons otherwise subject to the jurisdiction of the Director").

That focus on insurers' financial soundness—without any comprehensive system for reviewing ratemaking for actuarial soundness—is not uncommon. In many states, insurance departments primarily seek to ensure that the insurance industry remains solvent, not that consumers are treated fairly. *See* Brian J. Glenn, *The Shifting Rhetoric of Insurance Denial*, 34 Law & Soc'y Rev. 779, 780 (2000) ("[I]nsurance commissions can be grossly under-funded, and in any event they tend to focus almost exclusively on the financial aspects of the industry, such as whether companies have sufficient loss reserves and whether their rates are adequate.").

*(ii) Wyoming.* In Wyoming, homeowners' insurers do not file their rates with state regulators, let alone seek their approval. Wyo. Stat. Ann. § 26-14-102(b) ("No insurer shall be required to file any rates with the commissioner other than those for insurance not subject to this act or defined as noncompetitive in this act, after the passage of this act.").

Although the state's insurance commissioner has discretion to review rates, *see* Wyo. Stat. Ann. § 26-14-107(b), there is no meaningful

system for approving rates in the state. The state's insurance department employs zero actuaries with responsibility for reviewing property insurance rates. *Insurance Department Resources Report*, Nat'l Ass'n of Ins. Comm'rs 7 (Sept. 2023), https://bitly.cx/KoCr. And it has only two analysts available for reviewing all aspects of property and casualty insurance in the state. *Id.*

*(iii) Minnesota.* In addition, Minnesota, like Illinois and various other states, does not require homeowners' insurers to file any actuarial support alongside their insurance rates. Minn. Stat. Ann. § 70A.06(1) ("actuarial and statistical methods employed" required only when requested); Ariz. Rev. Stat. Ann. § 20-385(B) (in Arizona, "description of methods used in making the rates" required only when requested); Wyo. Stat. Ann. § 26-14-107(a) (in Wyoming, rates and "supplementary rate information" required only when requested); *see* Ill. Admin. Code tit. 50, § 754.10 (in Illinois, no requirement to file actuarial support).

Without actuarial support (*e.g.*, the computation used to set rates), regulators cannot know how an insurer set a rate and thus cannot determine whether it is risk-based. *See* Cas. Actuarial & Stat. Task Force, *Regulatory Review of Predictive Models White Paper*, Nat'l Ass'n

of Ins. Comm'rs 6 (2020), https://bitly.cx/Nnyhz; *see* Cas. Actuarial & Stat. Task Force, *Price Optimization White Paper*, Nat'l Ass'n of Ins. Comm'rs 10 (2015), https://bitly.cx/a6cHF (agreeing that most "[r]egulators do not currently have the data necessary for an independent evaluation of most of the insurer modeling and calculations").

Minnesota's lax approach to regulation is reinforced by the state's under-resourced insurance department. The department has one actuary and three analysts on staff for reviewing everything related to property and casualty insurance. *Insurance Department Resources Report* at 7.

These accounts of insurance regulation (or lack thereof) in Minnesota, Wyoming, and Illinois are sufficient to defeat PCIA's bid for a national exemption based on state approval of insurance rates. *Cf. UnitedHealthcare Ins. Co.*, 16 F.4th at 888 (insurance company's challenge to a rulemaking failed when its argument depended on the rule lowering reimbursements to insurers but "the different ways the []

reimbursement schemes work[ed] in practice ma[d]e that premise implausible").[2]

**3.** PCIA's willingness to rely on just a few (and sometimes incorrect) sources to show an entitlement to a nationwide exemption is likely due to *Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557 (7th Cir. 1999). On PCIA's view, a single line from that case ("[s]tate regulation of insurance is comprehensive") is enough to show its entitlement to a nationwide McCarran-Ferguson exemption. *See, e.g.*, Op. Br. 9 (citing *Mut. of Omaha*, 179 F.3d at 564). But *Mutual of Omaha* cannot bear the weight PCIA gives it for several reasons.

First and foremost, *Mutual of Omaha* is not binding because the arguments and facts presented in 1999 are starkly different from those in front of this Court today. There, the insurer pointed to a couple state statutes concerning insurance benefits in arguing that states comprehensively regulated insurance benefits. Amici App. 47. And it

---

[2] PCIA does not challenge the applicability of HUD's rule to any aspect of the homeowners' insurance industry other than "risk-based pricing and underwriting practices." Op. Br. 6 (describing PCIA's "narrow[] challenge[]"). So, other parts of the industry (*e.g.*, marketing plans, sales practices, application procedures, claims processing) would still be subject to the rule even if PCIA prevails.

went on to explain why Illinois's benefits scheme "conflict[ed]" with the ADA's application. *Id.*; *id.* at 147-48. Doe did little to push back. Instead, he primarily argued that the insurer had "conceded" this argument below and thus "consisten[cy] with State law [w]as waived as a factual matter and f[e]ll[] outside the scope of issues preserved for appeal." *Id.* at 120, 120 n.18. And while he briefly explained why Illinois law was consistent with the ADA, he did not squarely address the so-called conflict asserted by the insurer. *Id.* at 121.[3]

With largely unrebutted assertions about states' regulation of insurance benefits, this Court concluded that "[s]tate regulation of insurance is comprehensive." *Mut. of Omaha*, 179 F.3d at 564. And "if federal courts are now to determine whether caps on disabling conditions . . . are actuarially sound and consistent with principles of state law they will be stepping on the toes of state insurance commissioners." *Id.* That outcome was not surprising. Courts "follow the principle of party presentation [and] rely on the parties to frame the

---

[3] Doe likely failed to address the insurer's winning McCarran-Ferguson argument because the argument was posed in passing, as an alternative theory. Amici App. 47. Indeed, the insurer dedicated a single page to that theory, *see id.*, mainly focusing on a different argument, *see id.* at 44-46.

issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020).

Nevertheless, this context makes clear that the case is not binding. A case "cannot be read as foreclosing an argument that [it] never dealt with." *Waters v. Churchill*, 511 U.S. 661, 678 (1994); *see also United States v. Kucik*, 844 F.2d 493, 498 (7th Cir. 1988) ("[A]lthough there was deliberation, [if] a particular point was wholly absent from the consideration of the court, then . . . the connection of the decision with that point is not a connection of effect and cause, but is purely accidental, and as to that point the decision is no authority whatever."). Furthermore, "[a]s a general matter, [a] holding in one fact-specific case does not bind [this Court] in another fact-specific case when the two cases have different records." *Ingmantoro v. Mukasey*, 550 F.3d 646, 651 (7th Cir. 2008).

Both rules apply here. The arguments in this case do not concern the regulatory schemes that were the evidentiary and legal focus of the parties in *Mutual of Omaha* (that is, regulation of insurance benefits). And, in any event, HUD and *amici* have shown, with various concrete

examples, that states do not uniformly approve rates as actuarially sound. Because *Mutual of Omaha* never wrestled with these arguments and examples, its language on state regulation of insurance cannot control. *Cf. NLRB v. Keller-Crescent Co.*, 538 F.2d 1291, 1299 (7th Cir. 1976) (language in a prior case that initially appeared controlling was not, in fact, precedential, where prior case "accepted as an established fact" a state of affairs that contradicted the record before the court); *United States v. Crawley*, 837 F.2d 291, 293 (7th Cir. 1988) ("[R]easons [] against a court's giving weight to a passage" as "a fully measured judicial pronouncement" include: "the passage was not grounded in the facts of the case and the judges may therefore have lacked an adequate experiential basis for it"; and "the issue addressed in the passage was not presented as an issue, hence was not refined by the fires of adversary presentation.").

Relatedly, *Mutual of Omaha*'s only citation for characterizing the states' insurance regulation (an insurance treatise) has been updated— and it now *supports* HUD's case-by-case approach, not PCIA's bid for a national exemption. *Mutual of Omaha* cites a 1997-edition of an insurance treatise to support its characterization of state-level

insurance regulation. 179 F.3d at 564 (relying on the edition of *Couch on Insurance* published in 1997). But twenty-seven years have passed since that version of the treatise was published. The updated version now makes clear that there is *no* comprehensive regulation of insurance across the fifty states. Jordan R. Plitt et al., Couch on Insurance § 2:7 (3d ed. updated June 2024) ("The extent of the authority granted to the [insurance] regulatory body varies from jurisdiction to jurisdiction."); *id.* § 2:31 (a state "*may* . . . require approval of rates"; "*may* . . . require rates to be submitted to a state official for review"; and "*may* . . . authorize the superintendent [] to remove discrimination in rates" (emphasis added)).

This recognition of diversity in states' regulatory regimes is reflected in caselaw too. For instance, this Court has itself doubted whether "the Illinois Department of Insurance . . . has the authority to approve or disapprove property-insurance rates." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 607 (7th Cir. 2013).[4]

---

[4] At the very least, *Mutual of Omaha* does not apply to underwriting guidelines. Rather, it discusses the "comprehensive[ness]" of "[s]tate regulation of insurance" with respect to "rate and coverage issues." *Mut. of Omaha*, 179 F.3d at 564. That makes sense for two reasons. First, the case itself concerned a coverage issue (an AIDS cap).

Thus, because numerous states do not comprehensively review underwriting guidelines or rates—and *Mutual of Omaha* does not compel a contrary conclusion—PCIA's state-approval theory fails.

B.   Prohibiting "excessive, inadequate, or unfairly discriminatory" rates is not the same as requiring underwriting and ratemaking to be purely risk-based.

Even if PCIA was correct that all states approve underwriting and ratemaking procedures as not "unfairly discriminatory" (it is not), PCIA still could not prevail. That is because PCIA simply assumes that prohibitions of "unfairly discriminatory" rates prevent insurers from using considerations unrelated to risk. *See, e.g.*, Op. Br. 24 ("Every State [] prohibit[s] excessive, inadequate, and unfairly discriminatory rates—a rating standard that requires reliance on objective risk factors . . . ."). That assumption is incorrect.

Prohibiting "unfairly discriminatory" rates is not universally synonymous with banning non-risk-based practices (and thus, ensuring so-called "actuarial soundness"). Indeed, states generally permit insurers to deviate from their algorithmic risk assessments in deciding

---

*Id.* And second, as *amici* have explained, most states do not regulate underwriting guidelines in any manner whatsoever. *See supra* pp. 5-7.

whether to offer insurance and determining rates. Meryl Golden & Mike Miller, *Introduction to Price Optimization*, Earnix 10 (2014), https://bitly.cx/fhMyS.

**1.** Start with the largely unregulated world of underwriting. Insurance underwriting guidelines are not categorically scientific or directly tied to risk. *See* D.J. Powers, *The Discriminatory Effects of Homeowners Insurance Guidelines*, *in* Insurance Redlining: Disinvestment, Reinvestment, and the Evolving Role of Financial Institutions 119 (Gregory D. Squires ed., 1997). Instead, they are "often based on hunches and subjective stereotypes about classes of consumers and types and geographic location of property." *Id.* at 137; Glenn, *Shifting Rhetoric* at 779 ("The most powerful tool used to exclude unwanted groups from the insurance pool lies in the subjective underwriting guidelines companies utilize . . . .").

Even when underwriters use actuarial calculations, human judgment can modify them. This means that if an insurance company uses an algorithm to calculate risk based on actuarial criteria, someone reviews that calculation to determine whether the insurance application will be accepted, rejected, or requires additional review. *See* Donald

Light, *Transforming Underwriting*, Celent 6-7, 12 (2004)

https://bitly.cx/nTYUT; *see Price Optimization White Paper* at 1

("Making adjustments to actuarially indicated rates is not a new

concept; it has often been described as 'judgment.'").

In fact, even after the calculation of underwriting scores, "half or

more of the underwriting decisions may be ultimately made . . . by

human underwriters." Light, *Transforming Underwriting* at 7; *see* Gail

McGiffin, *Are Underwriters Smarter Than Predictive Models?*, Ernst &

Young LLP 7 (2013), https://bitly.cx/yIrb ("Few, if any, underwriting

decisions are truly binary. That's why insurers still need teams of

people who know how to balance the nuances of risk quality, emerging

exposures, market contexts and competitive strategies as they make

critical underwriting decisions.").

**2.** Next consider ratemaking. Not even PCIA's authorities stand

for the proposition that ratemaking is a purely risk-based endeavor.

Rather, they admit that "other business considerations are also a part

of ratemaking." *Statement of Principles Regarding Property and

Casualty Insurance Ratemaking*, Cas. Actuarial Soc'y 5 (2021),

https://bitly.cx/2Spkp; *id.* at 1 (defining "Ratemaking" as "involv[ing] a

number of considerations including marketing goals, competition and legal restrictions"). And the Society of Actuaries *encourages* companies to "consider practical and operational constraints after identifying the statistical criteria of their variables." Kemi Akinyemi et al., *Insurance Regulatory Issues in the United States*, Soc'y of Actuaries 15 (2019), https://bitly.cx/qCILr.

Thus, just like underwriting, actuarial calculations in ratemaking are often modified for reasons unrelated to risk. Despite what one employee may determine is a fair and reasonable rate for an insurance product based on expected loss costs, company executives may reject that determination for competitive reasons—to beat a competitor's price, to penetrate or withdraw from a specific market, or to respond to agent input or customer response. *See, e.g.*, Golden & Mike, *Price Optimization* at 10 (listing certain competitive adjustments that are often made to indicated loss costs during the rate setting process); *Price Optimization White Paper* at 1 ("[The ratemaking] process may involve a number of considerations, including . . . profit and contingencies, marketing goals, competition, and legal restrictions.").

"Price optimization" is just one concrete example of a non-risk-based practice permitted in some states. The explicit objective of price optimization is to identify the highest possible price to charge customers. *Price Optimization White Paper* at 1-2. In other words, price optimization re-rates customers in *defiance* of risk assessments. *See id.* Nevertheless, many state insurance regulators permit this deviation from risk-based pricing, along with others. Andrea Wells, *The Price of Price Optimization*, Ins. J. (Nov. 17, 2015), https://bitly.cx/4jKo; *see id.* (providing other examples of commonplace deviations from strictly risk-based pricing); *Price Optimization White Paper* at 15 ("While actuarial indications are largely preferred over pure judgment, regulators acknowledge that the actuarial indications are only an estimate of the cost to transfer risk and that some insurer judgment will inevitably enter the rate setting process.").

PCIA does not dispute that homeowner insurers use non-risk-based practices in ratemaking and underwriting. Yet it argues that these practices are "irrelevant" because they do not fall within "risk-based pricing and underwriting"—that is, the practices for which it purports to seek an exemption. Op. Br. 38.

But that is beside the point. The point is that the rates insurers submit to state regulators often reflect both risk-based and non-risk-based considerations (*i.e.*, business-related factors). And yet those rates do not all run up against every state's insurance laws. Thus, there is little reason to believe that prohibitions on "unfairly discriminatory" rates universally function to ensure rates are exclusively based on risk.

Recognizing that ratemaking is not, in fact, a strictly risk-based endeavor also makes PCIA's response nonsensical. Although PCIA purports to seek an exemption only for "risk-based pricing," a holding in its favor would prevent litigants from challenging an insurer's rate under a disparate-impact theory *at all* (because, on PCIA's view, the rate has already been certified as actuarially sound by state regulators). So, litigants could not, in fact, challenge any of the non-risk-based practices that may be folded into rates, so long as those rates have been filed with regulators.

Because prohibiting "excessive, inadequate, or unfairly discriminatory" rates is not the same as requiring underwriting and ratemaking to be purely risk-based, PCIA's argument that states have already approved rates as actuarially sound fails.

## II. Disparate impact liability would not universally displace state law requiring risk-based pricing and underwriting.

Separate and apart from its state-approval theory, PCIA argues that the applicability of the disparate impact framework would supersede states' prohibition of "excessive, inadequate, or unfairly discriminatory" rates. Op. Br. 33-34. That is because, on PCIA's view, "unfair discrimination" is "tie[d]" to "sound risk assessment," and the prospect of disparate impact liability might require deviating from that assessment to address a disparate effect based on race or another protected characteristic. *Id.* at 33. But once again, PCIA's position is plagued by incorrect assumptions.

### A. State prohibitions of unfair discrimination are not strictly tied to accurately assessing risk.

Again, PCIA has not, and cannot, show that state-level prohibitions of "unfair discrimination" universally forbid insurers from adjusting actuarial indications or limiting data inputs for reasons unrelated to risk. *See supra* pp. 20-25. Thus, even assuming a disparate-impact lawsuit would always require insurers to make modifications that less accurately predict risk (it would not, *see infra* pp. 28-31), such a modification to protect consumers from discrimination would be neither remarkable nor universally in tension

26

with the law in all fifty states. Wells, *Price Optimization* (insurance company spokesperson explaining that companies often "exercise judgment" to reduce rates and protect certain consumers, yet "[r]egulators have never objected to this pricing behavior, which strays from strict adherence to indicated rates but reflects market realities").

States' diverse understandings of "unfair discrimination" only confirm this conclusion. Some states understand unfair discrimination to encompass rates with an undesirable effect—such as an unjustified disparate impact based on a protected characteristic—*even if* those rates rely on factors correlated with risk. *See, e.g.*, S.B. 21-169, 2021 Reg. Sess. (Colo. 2021), https://bitly.cx/EILxS (in Colorado, requiring "insurers to remedy any unfairly discriminatory impact in an external data source"); Dana Braeunling, *States Consider Limits on Insurers' Use of Consumer Credit Info*, Nat'l Conf. of State Legs. (May 26, 2022), https://bitly.cx/2JOj7 (California, Hawaii, Maryland and Massachusetts restrict the use of credit information in insurance rates, even though many insurers argue that credit information is a sound predictor of risk).

In fact, because state law can require insurers to deviate from their chosen factors and computations for predicting risk, PCIA itself recently commented: "Having the insurance regulator approve your rates really *impedes* the ability of the insurance industry to charge a rate that is actuarially sound or reflective of underlying risk." Kane, *Crisis mode* (emphasis added). In other words, state regulation does not universally equate with the very best prediction of risk in a rate; other considerations, like those at the heart of disparate impact liability, may matter too.

Thus, because prohibitions of unfairly discriminatory rates are not strictly tied to accurately assessing risk in every single state, PCIA is wrong that disparate impact liability would supersede these prohibitions.

B.  Disparate impact liability would not, in practice, displace risk-based pricing either.

PCIA's concern about displacing risk-based pricing is misplaced for another reason too: PCIA is wrong that insurers would always have to adopt non-risk-based practices, or use factors that poorly predict risk, to ameliorate any unjustified racial effect stemming from a "risk factor[]" in a rating model. The models that insurers use do not

28

perfectly predict risk. Instead, the models seek to provide an *estimate* of risk by relying on different factors correlated with risk. *See Introductory Actuarial Standard of Practice*, Actuarial Standards Bd. 4 (Mar. 2013), https://bitly.cx/PDjb (explaining that actuarial practices involve "the estimation of uncertain events"); *Statement of Principles* at 2. Thus, replacing a so-called "risk-based" factor in an insurer's model would not necessarily reduce the predictive value of that model. Rather, the insurer could substitute that factor with an alternative factor with less of a discriminatory racial effect, and that alternative factor might very well be correlated with risk too—perhaps even more so, because it reduces the impact of race in the insurer's algorithm.

That's especially true because some generally accepted "risk-based" factors suffer from inherent racial bias that impairs risk assessments. Credit information is a good example. *See* Mallika Bender et al., *Understanding Potential Influence of Racial Bias on P&C Insurance*, Cas. Actuarial Soc'y 4 (2022), https://bitly.cx/hnNBT. Credit information is traditionally considered the basis of "objective" criteria correlated with risk. *See id.* But it is well accepted that Black individuals often have worse credit information not because they are

less responsible than similarly situated White individuals, but because racial discrimination arbitrarily lowers their scores. *See id.* at 5 (credit information often reflects multiple forms of racial bias, from banks' discriminatory lending practices to debt collectors' suing Black debtors more often than White ones). That arbitrariness makes credit-based factors less reflective of risk. *See also id.* at 4-19 (discussing various traditional factors that may need to be re-examined).

And HUD's rule *ensures* that companies would not be forced to adopt alternative practices if doing so would undermine their legitimate interest in predicting risk. That's because, in the final step of the disparate impact burden-shifting framework, the rule requires a plaintiff to propose a less discriminatory alternative that still "serve[s]" an insurance company's legitimate interests. 24 C.F.R. § 100.500(c)(3). Thus, any alternative practice imposed by courts would necessarily protect a company's legitimate interest in accounting for risk.

Because changing insurance models could serve to predict risk just as well, and because HUD's rule protects insurers' legitimate interest in predicting risk, disparate impact liability would not

necessarily displace any risk-based pricing or underwriting requirements.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's decision.


Respectfully submitted,

*/s/ Alisa Tiwari*
Alisa Tiwari

Brian Corman
Alisa Tiwari
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Ave., NW, Suite 500
Washington, DC 20005
(202) 408-4600
atiwari@cohenmilstein.com

Thomas Silverstein
Brook Hill
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K St. NW #900
Washington, DC 20005
(202) 662-8600
tsilverstein@lawyerscommittee.org
bhill@lawyerscommittee.org

Morgan Williams
NATIONAL FAIR HOUSING ALLIANCE
1331 Pennsylvania Ave. NW #650
Washington, DC 20004
(202) 898-1661
mwilliams@nationalfairhousing.org

Attorneys for *Amici Curiae*

Dated:     October 17, 2024

## Certificate of Compliance

I hereby certify that this brief complies with the type-volume limitation of Circuit Rule 29 because it contains 6,262 words, excluding the parts exempted by Fed. R. App. P. 32(f). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Century Schoolbook font using Microsoft Word.

/s/ *Alisa Tiwari*
Alisa Tiwari
*Counsel for Amici Curiae*

## Certificate of Service

I hereby certify that on October 17, 2024, I electronically filed this brief with the Clerk of the Court using the appellate CM/ECF system, which effected service to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

/s/ *Alisa Tiwari*
Alisa Tiwari
*Counsel for Amici Curiae*