No. 24-1947
_____

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

_____

PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA,

*Plaintiff-Appellant*,

*v.*

ADRIANNE TODMAN, ACTING SECRETARY OF THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, AND UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of Illinois, No. 1:13-cv-08564
Before the Honorable Chief Judge Rebecca R. Pallmeyer

_____

### *AMICI*'S APPENDIX
### (AMICI APP. 1-155)

_____

Thomas Silverstein
Brook Hill
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St. NW #900
Washington, DC 20005
(202) 662-8600
tsilverstein@lawyerscommittee.org
bhill@lawyerscommittee.org

Brian Corman
Alisa Tiwari
COHEN MILSTEIN SELLERS & TOLL
PLLC
1100 New York Ave. NW,
Suite 500
Washington, DC 20005
(202) 408-4600
atiwari@cohenmilstein.com

Morgan Williams
NATIONAL FAIR HOUSING ALLIANCE
1331 Pennsylvania Ave. NW #650
Washington, DC 20004
(202) 898-1661
mwilliams@nationalfairhousing.org

***Attorneys for Amici***

October 17, 2024

# APPENDIX TABLE OF CONTENTS

**Page**

Brief of Defendant-Appellant,
*Doe v. Mutual of Omaha Insurance Company*...................... Amici App. 1

Brief of Plaintiffs-Appellees,
*Doe v. Mutual of Omaha Insurance Company*....................Amici App. 58

Reply Brief of Defendant-Appellant,
*Doe v. Mutual of Omaha Insurance Company*...................Amici App. 124

ON AIMS

JAN 1 2 1999

U.S.C.A.—7th Circuit
FILED

JAN 1 1 1999

GINO J. AGNELLO
CLERK

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

No. 98-4112

| | |
|---|---|
| JOHN DOE and RICHARD SMITH, | Appeal From The United States District Court For The Northern District Of Illinois, Eastern Division |
| Plaintiffs-Appellees, | |
| v. | |
| | Case No. 98 C 325 |
| MUTUAL OF OMAHA INSURANCE COMPANY, | |
| | Judge Conlon |
| Defendant-Appellant. | |

**BRIEF OF DEFENDANT-APPELLANT**

Joel H. Kaplan
Thomas J. Piskorski
Cassandra A. Curry
Seyfarth, Shaw, Fairweather
   & Geraldson
55 East Monroe Street
Suite 4300
Chicago, Illinois 60603
(312) 346-8000

January 11, 1999

# CERTIFICATE OF INTEREST

Appellate Court No: 98-4112

Short Title:   <u>Doe and Smith v. Mutual of Omaha</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a certificate of interest stating the following information in compliance with Circuit Rule 26.1:

(1)   The full name of every party or amicus the attorney represents in the case:

<u>Mutual of Omaha Insurance Company</u>

(2)   If such party or amicus is a corporation:

   i)   Its parent corporation, if any; and

      <u>Not Applicable</u>

   ii)   A list of stockholders which are publicly held companies owning 10% or more of the stock in the party or amicus:

      <u>Not Applicable</u>

(3)   The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

<u>Seyfarth, Shaw, Fairweather & Geraldson</u>

This certificate shall be filed with the appearance form or upon the filing of a motion in this court, whichever occurs first. The attorney furnishing the certificate must file an amended certificate to reflect any material changes in the required information. The text of the certificate (i.e. caption omitted shall also be included in front of the table of contents of the party's main brief.

Attorney's Signature:  _____

Date: <u>January 11, 1999</u>

Attorney's Printed Name: <u>Joel H. Kaplan</u>
Address: <u>Seyfarth, Shaw, Fairweather & Geraldson</u>
         <u>55 East Monroe Street, Suite 4200</u>
         <u>Chicago, Illinois 60603</u>

Phone Number:  <u>(312) 346-8000</u>
1221822.1

# TABLE OF CONTENTS

                                                                        **Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION . . . . . . . 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A.    Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B.    Course Of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

C.    Disposition Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

D.    Statement Of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      1.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      2.    Relevant Provisions Contained In
            Plaintiffs' Medical Insurance Policies . . . . . . . . . . . . . . . . . . . . . . . . 5

      3.    Other Stipulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.    ADA Title III Does Not Apply To The Content Of Insurance Policies . . . . . . . 10

      A.    The Text and Structure Of ADA Title III Make Clear That It Only
            Covers Access To The Goods And Services Of A Place Of Public
            Accommodation And Not The Content Of Such Goods And Services . . . 10

            1.    Federal Case Law Under ADA Title III . . . . . . . . . . . . . . . . . 12

            2.    Federal Case Law Under CRA Title II . . . . . . . . . . . . . . . . . 17

      B.    Each Of The Reasons Relied On By The District Court Fails To Support
            Its Holding That ADA Title III Regulates The Content And Design Of
            Insurance Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

- ii -

1.    The "Full And Equal Enjoyment" Clause In Section 302(a) Does Not Require A Public Accommodation To Alter The Content Of The Goods And Services It Offers . . . . . . . . . . . . .  22

2.    The Provisions In Section 302(b) Do Not Support The District Court's Interpretation Of ADA Title III To Reach The Content Of Insurance Policies Equally Provided To The Disabled And Non-Disabled  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

3.    The District Court's Reliance On Certain Portions Of The ADA's Legislative History Is Misplaced  . . . . . . . . . . .  27

4.    The District Court's Reliance On The DOJ's Interpretative Guidance Is Misplaced  . . . . . . . . . . . . .  29

5.    ADA Title IV's Construction Provisions Confirm That ADA Title III Does Not Apply To The Benefits, Terms And Conditions Of Insurance Policies . . . . . . . . . . . . . . . .  33

II.    The McCarran-Ferguson Act Precludes The Application Of The ADA To The Benefits, Terms And Conditions Of Insurance Policies . . . . . . . .  35

III.    Limiting Benefits For Certain Medical Conditions And Medical Treatments Is Not Disability-Based Discrimination Under ADA Title III . . . . . .  39

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 32(d)  . . . . . . . . . . . . .  46

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30  . . . . . . . . . . . . . .  47

CERTIFICATE OF SERVICE

APPENDIX

Amici App. 004

# TABLE OF AUTHORITIES

## a.    Cases

Alexander v. Choate, 469 U.S. 287 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

Bailey v. City of Lawrence, Indiana, 972 F.2d 1447 (7th Cir. 1992) . . . . . . . . . . . . 23

Baker v. Hartford Life Ins. Co.,
No. 94-C4416, 1995 WL 573430 (N.D. Ill. Sept. 28, 1995) . . . . . . . . . . . . . 16

Bank One Chicago v. Midwest Bank & Trust Co., 516 U.S. 264 (1996) . . . . . . . . . 29

Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25 (1996) . . . . . . . . . 36, 37

Bennet v. Spear, 520 U.S. 154 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Board of Governors v. Dimension Financial Corp., 474 U.S. 361 (1986) . . . . . . . . . 30

Bragdon v. Abbott, 118 S. Ct. 2196 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . 32, 42

Brewster v. Cooley Associates,
No. 97-00058, 1997 WL 823634 (D.N.M. Nov. 6, 1997) . . . . . . . . . . . . . . 15

Brown v. 1995 Tenet ParaAmerica Bicycle Challenge,
959 F. Supp. 496 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Carparts Distribution Center, Inc. v. Automotive Wholesaler's Assoc.,
37 F.3d 12 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Chabner v. United of Omaha Life Ins. Co., 994 F. Supp. 1185 (N.D. Cal. 1998),
appeal docketed, No. 98-17060 (9th Cir.) . . . . . . . . . . . . . . . . . . . . . . . 16

Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,
467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 32

Clegg v. Cult Awareness Network, 18 F.3d 752 (9th Cir. 1994) . . . . . . . . . . . . . . 19

Cloutier v. Prudential Ins. Co. of Am., 964 F. Supp. 299 (N.D. Cal. 1997) . . . . . . . 16

Conway v. Standard Ins. Co., 23 F. Supp.2d 1199 (E.D. Wash. 1998) . . . . . . . . 15, 42

Daniel v. Paul, 395 U.S. 298 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Amici App. 005

Doe v. Mutual of Omaha Ins. Co., 999 F. Supp. 1188 (N.D. Ill. 1998) . . . . . . . . . . . 3

Doukas v. Metropolitan Life Ins. Co., 950 F. Supp. 422 (D.N.H. 1996) . . . . . . . . . 16

EEOC v. CNA Ins. Cos., 96 F.3d 1039 (7th Cir. 1996) . . . . . . . . . . . . 39, 40, 43, 44

Efstathiou v. Romeo Carryouts & Liqours, Inc.,
      No. 96 C 8553, 1997 WL 603896 (N.D. Ill. Sept. 23, 1997) . . . . . . . . . . . . 20

Erwin v. Northwestern Mutual Life Ins. Co.,
      999 F. Supp. 1227 (S.D. Ind. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 15

Ford v. Schering-Plough Corp., 145 F.3d 601 (3d Cir. 1998),
      petition for cert. filed, 67 U.S.L.W. 3259 (U.S., Sept. 28, 1998)
      (No. 98-529) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, passim

Gonzales v. Garner Food Services, Inc., 89 F.3d 1523 (11th Cir. 1996) . . . . . . . . . . 40

Jane Doe v. Sheriff of DuPage County, 128 F.3d 586 (7th Cir. 1997) . . . . . . . . . . . . 4

John Doe v. Blue Cross & Blue Shield United of Wisconsin,
      112 F.3d 869 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Jones v. Hanley Dawson Cadillac Co., 848 F.2d 803 (7th Cir. 1988) . . . . . . . . . . . . 17

Kotev v. First Colony Life Ins. Co., 927 F. Supp. 1316 (C.D. Cal. 1996) . . . . . . . . . 16

Lenox v. Healthwise of Kentucky, Ltd., 149 F.3d 453 (6th Cir. 1998) . . . . . . 13, 41, 42

Leonard F. v. Israel Discount Bank of New York, 967 F. Supp. 802
      (S.D.N.Y. 1997), appeal docketed, No. 98-7320 (2d Cir.) . . . . . . . . . . . . 11, 15

Lifschultz Fast Freight Corp. v. De Medici, 63 F.3d 621 (7th Cir. 1995) . . . . . . . . . 22

Lorillard v. Pons, 434 U.S. 575 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

McFarland v. South Division Credit Union,
      84 F.3d 943 (7th Cir. 1996), cert. denied, 117 S. Ct. 302 (1996) . . . . . . . . . . 23

Menkowitz v. Pottstown Memorial Medical Center,
      154 F.3d 113 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Modderno v. King, 82 F.3d 1059 (D.C. Cir. 1996),
      cert. denied, 117 S. Ct. 772 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

Amici App. 006

- v -

*Northcross v. Board of Educ. of Memphis City Schools*, 412 U.S. 427 (1973) . . . . . . 17

*Orrego v. 833 West Buena Joint Venture*, 943 F.2d 730 (7th Cir. 1991) . . . . . . . . . . 30

*Pallozzi v. Allstate Life Ins. Co.*, 998 F. Supp. 204 (N.D.N.Y. 1998),
appeal docketed, No. 98-7552 (2d Cir.) . . . . . . . . . . . . . . . . . . . 15, 34, 36

*Pappas v. Bethesda Hosp. Ass'n*, 861 F. Supp. 616 (S.D. Ohio 1994) . . . . . . . . . . 15

*Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006 (6th Cir. 1997) (*en banc*),
cert. denied, 118 S. Ct. (1998) . . . . . . . . . . . . . . . . . . . . . . . . . 12, *passim*

*Phillips v. Interstate Hotels Corp.*, 974 S.W.2d 680 (Tenn. 1998) . . . . . . . . . . . . 20

*Stearnes v. Baur's Opera House, Inc.*, 788 F. Supp. 375 (C.D. Ill. 1992),
rev'd on other grounds, 3 F.3d 1142 (7th Cir. 1993) . . . . . . . . . . . . . . 20, 21

*Stoutenborough v. National Football League*, 59 F.3d 580 (6th Cir. 1995),
cert. denied, 516 U.S. 1028 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Traynor v. Turnage*, 485 U.S. 535 (1988) . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*U.S. Dept. of Treasury v. Fabe*, 508 U.S. 491 (1993) . . . . . . . . . . . . . . . . . 36, 38

*United States Fire Co. v. Barker Car Rental*, 132 F.3d 1153 (7th Cir. 1997) . . . . . . . 23

*United States v. Hayward*, 6 F.3d 1241 (7th Cir. 1993), cert. denied,
511 U.S. 1004 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*United States v. DeRosier*, 473 F.2d 749 (5th Cir. 1973) . . . . . . . . . . . . . . . . . 18

*United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989) . . . . . . . . . . . . . 10

*United States v. Schilling*, 142 F.3d 388 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . 7

*Vaughn v. Sullivan*, 83 F.3d 907 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . 40, 44

*Welsh v. Boy Scouts of America*, 787 F. Supp. 1511 (N.D. Ill. 1992),
aff'd, 993 F.2d 1267 (7th Cir.), cert. denied, 510 U.S. 1012 (1993) . 18, 19, 20, 21

*World Ins. Co. v. Branch*, 966 F. Supp. 1203 (N.D. Ga. 1997),
vacated, 156 F.3d 1142 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 16

**Amici App. 007**

### b.   Federal Statutes

15 U.S.C. § 1012(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 35, 38

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

29 U.S.C. § 794 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42

29 U.S.C. § 300gg-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

42 U.S.C. § 300gg-5(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

42 U.S.C. § 2000a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 2000a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. § 12181(7)(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 35, 36

42 U.S.C.§ 12182(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, *passim*

42 U.S.C. § 12182(b)(1)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

42 U.S.C. § 12182(b)(1)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25, 26

42 U.S.C. § 12182(b)(1)(A)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 26

42 U.S.C. § 12182(b)(2)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. § 12183(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. § 12184 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. § 12201(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 33, 34, 37

Pub. L. No. 105-277 § 901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**Amici App. 008**

- vii -

### c.    State Statutes

215 ILCS 5/364 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

215 ILCS 5/356(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

FLA. STAT. ch. 627.429(5)(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

WIS. STAT. § 631.93 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

### d.    Federal Regulations

28 C.F.R. § 36.202(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

28 C.F.R. § 36.307(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

28 C.F.R. Ch. 1, Pt. 36, App. B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29, 30, 31

### e.    Legislative History

H.R. Rep. No. 101-485(II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 28

S. Rep. No. 116-58 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

### f.    Federal Rules

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

### g.    Other

Title III Technical Assistance Manual § III-3.11000 . . . . . . . . . . . . . . . . . . . . . 29

Title III Technical Assistance Manual § III-3.2000 . . . . . . . . . . . . . . . . . . . . . . 25

4131432.1

Amici App. 009

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The District Court's jurisdiction over Plaintiffs' claims under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12181-89, and the Illinois Insurance Code, 215 ILCS 5/364, was based on 28 U.S.C. §§ 1331, 1343 and 1367.

Defendant seeks review of that portion of the District Court's December 1, 1998 Final Judgment entering judgment in favor of Plaintiffs on their ADA claim.[1]  Defendant's Notice of Appeal was filed on December 4, 1998.

This Court's jurisdiction is based on 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Does ADA Title III's prohibition against discrimination on the basis of disability apply to the content and design of health insurance policies issued to all individuals, both disabled and non-disabled, where there is no claim that Plaintiffs were denied access to a place of public accommodation or the goods and services offered by that place of public accommodation?

2.      Does the McCarran-Ferguson Act preclude the application of ADA Title III to the content and design of health insurance policies?

3.      Does ADA Title III prohibit a health insurance policy (equally available to disabled and non-disabled persons) from providing different benefit levels for different medical conditions?

---

[1]   Judgment was entered in favor of Defendant on Plaintiffs' Illinois Insurance Code claim, and Plaintiffs have not appealed that judgment.

# STATEMENT OF THE CASE

## A.    Nature Of The Case

This is a case which has significant consequences to the insurance industry, as well as all providers of goods and services to the public. Plaintiffs purchased individual health insurance policies from Mutual of Omaha Insurance Company ("Mutual"). Like most insurance policies, these policies contain a number of coverage exclusions and benefit limitations. One benefit limit imposes a certain dollar limit on expenses related to Acquired Immune Deficiency Syndrome ("AIDS") or AIDS-Related Conditions ("ARC"). Plaintiffs contend, and the District Court found, that the AIDS and ARC benefit limits violate the ADA.

## B.    Course Of Proceedings

On January 21, 1998, Plaintiffs filed a two count Complaint against Mutual alleging that the AIDS and ARC benefit limits in health insurance policies they purchased from Mutual violate the ADA and the Illinois Insurance Code (R.1).[2]

On February 19, 1998, Mutual filed a motion to dismiss both counts of Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6) (R.10). Mutual argued that Plaintiffs could not establish their claim under the ADA because ADA Title III, 42 U.S.C. § 12182(a), does not regulate the content and design of goods, such as insurance policies, sold by a place of public accommodation. Rather, the plain language of ADA Title III provides that it only regulates access to physical places of public accommodation and the goods and services

---

[2]    Citations to the Record on Appeal will be designated as "(R.__)" and to Mutual's Appendix as "(App.__)."

-2-

offered by that place of public accommodation.

In addition to the statutory language of Title III, Mutual asserted that ADA Section 501(c), 42 U.S.C. § 12201(c), and the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), expressly preclude the application of ADA Title III to health insurance policies. Relying on decisions by this Court as well as other Courts of Appeals, Mutual also argued Plaintiffs could not state a claim under the ADA because the benefit limits in Plaintiffs' policies are not discrimination based on a disability. Finally, Mutual argued Plaintiffs' claim under Section 364 of the Illinois Insurance Code failed because the Code does not provide for a private right of action.

On April 3, 1998, the District Court entered a Memorandum Opinion and Order denying Mutual's motion to dismiss Plaintiffs' ADA Title III claim and granting Mutual's motion to dismiss Plaintiffs' Illinois Insurance Code claim (App.109).[3]

On April 8, 1998, Mutual filed a motion to certify for interlocutory appeal the issues relating to Plaintiffs' ADA claim (R.25). The District Court denied Mutual's motion on April 14, 1998 (R.26). Thereafter, during the course of discovery, the parties agreed to a judgment which, inter alia, entered judgment in favor of Plaintiffs on their ADA claim, entered judgment in favor of Mutual on Plaintiffs' Illinois Insurance Code claim, and explicitly preserved both parties' right to appeal the District Court's holdings in its April 3, 1998 Memorandum Opinion and Order (App.14).

On December 1, 1998, the District Court independently approved the agreed final judgment (App.13). This appeal followed.

---

[3]    The District Court's decision is reported at 999 F. Supp. 1188 (N.D. Ill. 1998).

Amici App. 012

## C.  Disposition Below

The District Court rejected Mutual's contention that ADA Title III regulates only access to the goods and services of places of public accommodation, and instead held that Title III applies to the content of health insurance policies (App.121). The District Court also concluded that the policy limitations at issue discriminate on the basis of a disability in violation of the ADA (App.128). The District Court went on to hold that Mutual only could justify the benefit limits under ADA Section 501(c) by demonstrating that they are "consistent with sound actuarial principles, reasonably anticipated experience, or bona fide risk classification" (App.124). In reaching its decision, the District Court found that the McCarran-Ferguson Act did not preclude ADA application to the insurance industry because, in its view, the ADA specifically relates to the business of insurance (App.125).

## D.  Statement Of Facts

### 1.  The Parties

Mutual is an insurance company that sells, among other things, individual health insurance policies throughout the country (R.27 at p.3). It is licensed to transact insurance business in the State of Illinois (R.27 at 3), where it is subject to extensive regulation by the Illinois Department of Insurance. 215 ILCS 5/1 et. seq.

Plaintiff Richard Smith[4] is a resident of Illinois (R.1 at p. 2). Smith purchased an

---

[4]  In filing their Complaint (R.1), both Plaintiffs used fictitious names, and Mutual did not initially object (R.13). In order to mount a defense, however, Mutual later sought removal of the fictitious names (R.53). Despite Seventh Circuit cases disfavoring the use of fictitious names, see, e.g., John Doe v. Blue Cross & Blue Shield United of Wisconsin, 112 F.3d 869, 872 (7th Cir. 1997) and Jane Doe v. Sheriff of DuPage County, 128 F.3d 586 (7th Cir. 1997), the District Court denied Mutual's motion (R.55).

-4-

individual health insurance policy from Mutual in April 1992 (App.14). Smith's policy

provided him with 10 days to read and examine the policy, during which he could return the

policy without charge (App.43). In November 1996, four and one-half years after he

purchased his Mutual policy, Smith tested positive for the human immunodeficiency virus

("HIV") (App.76).[5]

Plaintiff Doe is also a resident of Illinois (R.1 at p. 2). From 1990 to approximately

March 1997, Doe had an insurance policy issued by Principal Mutual Insurance Company

("Principal") (App.71). During this time period, Doe tested positive for HIV (App.71). In

1997, Principal went out of the individual health insurance business (R.1 at p.3). Faced with

the termination of his Principal policy and believing he had no viable alternative for

continued health coverage because of his medical condition, Doe elected to purchase

insurance from Mutual as part of an offer Mutual made to former Principal insureds (R.1 at

p.3). Although the Mutual policy issued to Doe contains a preexisting condition limitation,

this limitation was waived for former Principal insureds (R.1 at 3). Doe's policy similarly

provides a 10 day right to read and examine the policy (App.23).

### 2.  Relevant Provisions Contained In Plaintiffs' Medical Insurance Policies

What is at issue in this case is a certain benefit limit in Plaintiffs' policies.

Specifically, the policy issued to Doe in 1997 limits benefits for AIDS or ARC to a lifetime

maximum of $100,000 while the policy issued to Smith in 1992 limits such benefits to a

---

[5]     Mutual has stipulated Plaintiffs' HIV infection imposes substantial limitations on one
or more of their major life activities and constitutes a disability within the meaning of
the ADA (App.16).

**Amici App. 014**

lifetime maximum of $25,000 (App.15). Plaintiffs' policies also state that benefits are not provided for care relating to AIDS or ARC after exhaustion of the these limits (App.15). Once the limits are reached, benefits for AIDS or ARC cannot be reinstated (App.15).

Generally, the policies limit benefits for other, but not all, medical conditions to a lifetime maximum of $1 million (App.15). This $1 million limit may be reinstated if no further expenses are incurred within two years (App.15).

The policies purchased by Doe and Smith contain other benefit limits, as well as coverage exclusions. Section K in Plaintiffs' policies, entitled "Exceptions and Limitations," outlines those expenses which are not covered expenses under each policy (App.35-36, 51-52). For example, Plaintiffs' policies limit benefits for alcoholism and drug addiction treatment: Doe's policy limits benefits to $9,600 in any two consecutive calendar years or $19,200 per insured person's lifetime, while Smith's policy limits benefits to $7,000 in any two consecutive calendar years and $14,000 per insured person's lifetime (App.29, 52). The policies exclude expenses for, among other things, mental or nervous disease and learning disabilities, the promotion of fertility, obesity not caused by sickness or injury, eye refractions, eyeglasses, and hearing aids or their fittings (App.35, 51). Smith's policy limits benefits paid for drugs and medicines to a calendar year maximum of $5,000 (App.47). This maximum does not apply to drugs used for chemotherapy or to immunosuppressant drugs (App.47). Other limitations apply to certain medical conditions and/or procedures (App.35-36, 51-52).

-6-

**Amici App. 015**

### 3.    Other Stipulations

As part of the Final Judgment, and for purposes of this litigation only, Mutual

stipulated it would not produce evidence and could not show that the AIDS and ARC limits

are consistent with sound actuarial principles, actual or reasonably anticipated experience,

bona fide risk classification or state law (App.17).  At the same time, Plaintiffs submitted

evidence, including expert testimony, to establish Mutual has the ability to price risks at

different levels of insurance coverage for a wide variety of insurable conditions, including

the cost of illness arising from AIDS or ARC, and that the benefit limit for AIDS and ARC

expenses is not justified (App.17-18, 83).

### STANDARD OF REVIEW

Because Mutual's appeal involves issues of law decided by the District Court in its

April 3, 1998 Memorandum Opinion and Order, the standard of review is de novo.  United

States v. Schilling, 142 F.3d 388 (7th Cir. 1998).

### SUMMARY OF ARGUMENT

The District Court's decision is wrong for a simple reason -- it badly misconstrues

ADA Title III.  Specifically, it erroneously interprets ADA Title III to regulate the content of

the goods and services of places of public accommodation when the statutory language makes

clear that physical access to the place of accommodation is what ADA Title III was intended

to protect.  Every Court of Appeals which has addressed the issues raised by Mutual in this

appeal has agreed with Mutual.

The District Court's decision also is erroneous because of its consequences, which

unquestionably were not intended by Congress.  Under the District Court's erroneous

-7-

Amici App. 016

construction of the ADA, courts would replace state insurance commissions as regulators of the content and design of insurance policies and play the role of "super-actuaries," thereby displacing states from their historical role as regulators of the business of insurance. The express language of the ADA makes plain, however, that Congress did not intend such a result. Moreover, the McCarran-Ferguson Act further guards against ADA disruption of and intrusion upon state regulation of the insurance industry.

Even more telling, however, the District Court's erroneous construction of ADA Title III goes far beyond health insurance. What is truly at stake in this case transcends the insurance industry and threatens to effect a sea change in the provision of every good and service throughout the American economy. The District Court effectively has held that all businesses that deal with the public must, in order to avoid running afoul of the ADA, provide goods and services tailored for every disability. Although this may sound extraordinary, it is nonetheless the inexorable result of the District Court's decision in this case, i.e., the content of every good and service offered by every place of public accommodation must be changed or altered so that all disabled persons achieve the same enjoyment of the good or service as non-disabled persons. The fact that the plain language of ADA Title III, which limits its scope to "places of public accommodation," does not support such a vast expansion of the scope of protections afforded by the ADA was of little moment to the District Court. Indeed, the District Court wholly ignored the critical limitation of § 302(a) -- "place of public accommodation" -- effectively reading this provision out of the statute.

-8-

This Court and other circuit courts have recognized, however, that both in the context of ADA Title III and Title II of the Civil Rights Act of 1964, the phrase "place of public accommodation" has a distinct meaning and requires a physical nexus to the alleged discrimination. In other words, a place of public accommodation must grant protected groups access to the same goods and services it provides everyone else -- be they white, black, disabled or non-disabled. By its terms, ADA Title III only regulates access to a place of public accommodation, not the content of the goods and services provided by the place of public accommodation. The Sixth and Third Circuits have recognized this is ADA Title III's mandate.

The District Court also erroneously determined that the maximum benefit provisions in the policies sold to Doe and Smith discriminate on the basis of a disability. By doing so, the District Court disregarded four Courts of Appeals, including two decisions in this Court, that have held different benefit levels for different illnesses or medical conditions is not disability-based discrimination. Two Supreme Court cases under the Rehabilitation Act confirm the propriety of these holdings.

In sum, the District Court's decision needs to be overturned because it ignores the plain meaning of ADA Title III, ignores or misconstrues authority from this and other circuits, effectively transforms federal courts into insurance departments and commissions, displaces the authority over the business of insurance historically exercised by the states, and produces extraordinary consequences affecting the sale and delivery of every good and service by every place of public accommodation in the United States.

**Amici App. 018**

## ARGUMENT

I.   **ADA Title III Does Not Apply To The Content Of Insurance Policies**

A.   **The Text and Structure Of ADA Title III Make Clear That It Only Covers Access To The Goods And Services Of A Place Of Public Accommodation And Not The Content Of Such Goods And Services**

The District Court's decision that ADA Title III goes beyond mere access to regulate the content of the goods and services offered by a place of public accommodation (insurance policies in this case) is inconsistent with the text and structure of the ADA. Section 302(a) of the ADA, 42 U.S.C. § 12182(a), provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

(emphasis added). The Supreme Court has stated that "[t]he task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself." United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989). Where the language of the statute is plain, "the sole function of the courts is to enforce it according to its terms." Id. (citations omitted). The District Court's decision ignores this mandate. Indeed, the District Court's decision is remarkable in its failure to analyze or explain how the plain language of the ADA leads to the dramatic conclusion that the ADA reaches the content of goods and services provided by places of public accommodation, unrelated to whether disabled persons are denied access to a place of public accommodation or the goods and services offered by the place of public accommodation.

-10-

The District Court's analysis of the plain language of Section 302(a) fails to explain the meaning of the central phrase "of any place of public accommodation." It is beyond question, however, that one cannot understand either the purpose or scope of Section 302(a)'s mandate without examining these words. See Bennet v. Spear, 520 U.S. 154, 173 (1996) (court has a "duty to give effect, if possible, to every clause and word of a statute"). The language "of any place of public accommodation" clearly evinces Congress' intent to regulate access to the goods and services of physical facilities the ADA defines as "places of public accommodation" as opposed to the content of those goods and services. A "place of public accommodation" is defined in the ADA in terms of a physical place, such as a "laundromat, dry cleaner, bank . . . insurance office, professional office of a health care provider, hospital, or other service establishment." 42 U.S.C. § 12181(7)(F).

Moreover, the statute's nondiscrimination requirement concerns access to the goods and services provided by the place of public accommodation. See Leonard F. v. Israel Discount Bank of New York, 967 F. Supp. 802, 804 (S.D.N.Y. 1997) ("the word 'services' in the statute clearly is modified and limited by the words "of any place of public accommodation"), appeal docketed, No. 98-7320 (2d Cir.). Accordingly, by its express terms, ADA Title III does not prohibit discrimination unrelated to a physical place. As the Third Circuit explained in Ford v. Schering-Plough Corp., 145 F.3d 601, 613 (3d Cir. 1998), petition for cert. filed, 67 U.S.L.W. 3259 (U.S., Sept. 28, 1998) (No. 98-529), the statutory terms "goods and services" are not "free standing concepts but rather all refer to the statutory term 'public accommodation' and thus to what these places of public accommodation provide. [Plaintiff] cannot point to these terms as providing protection from discrimination unrelated to places."

-11-

**Amici App. 020**

In short, the plain language of ADA Title III vividly reflects Congress' intent to regulate access to goods and services provided by a physical place. Indeed, every Court of Appeals to interpret the words "of any place of public accommodation," in both ADA Title III and Title II of the Civil Rights Act of 1964 ("CRA Title II"), 42 U.S.C. § 2000a, has concluded this language refers to access to a physical place and the goods and services provided therein, and does not extend to regulate the content of the goods or services themselves, including insurance policies.

### 1.    Federal Case Law Under ADA Title III

Two Courts of Appeals (and many district courts) have concluded the phrase "of any place of public accommodation" in ADA Title III manifests a congressional intent to limit the scope of Title III to physical access to the goods and services offered by a place of public accommodation.

In Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006 (6th Cir. 1997) (*en banc*), cert. denied, 118 S. Ct. (1998), the Sixth Circuit addressed whether Title III prohibits a disability policy issued by an insurance company from providing longer benefits to persons who become disabled due to a physical disability as opposed to a mental disability. The *en banc* court, overturning a Sixth Circuit panel decision mirroring the District Court's decision in this case, concluded that the plaintiff's policy was not covered by Title III because the language of Title III addresses access to the physical facilities the ADA defines as "places of public accommodation." According to the court, "Title III regulates the availability of the goods and services the place of public accommodation offers as opposed to the contents of

-12-

goods and services offered by the place of public accommodation." Id. at 1012.[6]

In Lenox v. Healthwise of Kentucky, Ltd., 149 F.3d 453 (6th Cir. 1998), a decision

issued subsequent to the District Court's April 3, 1998 Memorandum Opinion and Order, the

Sixth Circuit reaffirmed its *en banc* decision in Parker. In Lenox, the plaintiff argued her

health insurance policy discriminated against her on the basis of a disability because it

excluded coverage for heart transplants, while covering other types of transplants. The Sixth

Circuit held Lenox could not succeed on her claim under ADA Title III, reasoning:

> Even if the policy is deemed a good or service provided by a place of public
> accommodation, Lenox is not complaining about physical access to a place of public
> accommodation or her ability to avail herself of the goods and services offered at a
> place of public accommodation, such as an insurance company office. Rather, she is
> complaining about the mix of goods and services offered by an insurance company.
> Her complaint relates solely to the fact that the Healthwise policy does not cover heart
> transplants but does cover other transplants. The fact that the plan indicated that
> Lenox could direct questions to Healthwise's office and the fact that she was required
> to send her application form to Healthwise's office are immaterial. They do not
> demonstrate the existence of any barrier to her accessing Healthwise's physical
> facility. Nor do they indicate the existence of a barrier to her taking advantage of the
> goods and services that are available to individuals at Healthwise's physical facility.

149 F.3d at 457.

---

[6]    The court in Parker relied in part on its earlier ruling in Stoutenborough v. National
Football League, 59 F.3d 580 (6th Cir.), cert. denied, 516 U.S. 1028 (1995), in
which hearing impaired plaintiffs challenged the National Football League's television
blackout rule preventing some games from being televised. The court recognized that
"while a game is played in a 'place of public accommodation' and may be viewed in
another 'place of public accommodation,'" 59 F.3d at 583, the plaintiffs were not
prevented from entering the football stadium or a local bar to enjoy the game.
Recognizing that "the plaintiff's argument that the prohibitions of Title III are not
solely limited to 'places' of public accommodation contravenes the plain language of
the statute," the court held that the plaintiffs did not state a claim under Title III. Id.
See also Brown v. 1995 Tenet ParaAmerica Bicycle Challenge, 959 F. Supp. 496
(N.D. Ill. 1997) (dismissing plaintiffs' Title III claim because the service the
defendants offered, i.e., the chance to participate in a bicycle race, had no connection
to a place of public accommodation).

-13-

The Third Circuit has reached the same conclusion. In Ford, the court held that a

two-year limit applicable to benefits for mental disabilities, but not for physical disabilities,

is lawful under ADA Title III. The court stated: "[W]e do not find the term 'public

accommodation' or the terms in 42 U.S.C. § 12181(7) to refer to non-physical access or

even to be ambiguous as to their meaning." 145 F.3d at 614. The rationale underlying Ford

was succinctly explained in Menkowitz v. Pottstown Memorial Medical Center, 154 F.3d

113, 120-21 (3d Cir. 1998)[7]:

> With respect to the plaintiff's claim in Ford against her insurance
> carrier, this court concluded that while insurance benefits may be ordinarily
> considered a type of "service," "privilege," or "advantage," they are not
> services of the place of public accommodation. [citation omitted]. We
> reasoned that under the plain meaning of Title III, a public accommodation is
> a physical place and therefore the phrase "goods, services, privileges,
> advantages or accommodations" refer to "what these places of public
> accommodation provide." [citation omitted]. In aligning ourselves with
> [Parker], we required at the very least some "nexus" between the physical
> place of public accommodation and the services denied in a discriminatory
> manner. [citations omitted]. Because the disparate insurance benefits offered
> by an insurance office do not relate to the insurance office itself -- that is, the
> physical place of public accommodation -- the plaintiff in Ford could not state
> a cause of action under Title III of the ADA.

In this case, Plaintiffs' claims under ADA Title III fail because they cannot

demonstrate a nexus between a physical place and the insurance policies they purchased from

---

[7]  In Menkowitz, the plaintiff, a medical doctor, alleged that a hospital discriminated
against him on the basis of his disability in violation of ADA Title III by denying him
the opportunity to participate in the hospital's medical staff privileges. Consistent
with its analysis in Ford, the court first looked for a nexus between the privileges
denied and a place of public accommodation. 154 F.3d at 122. The court determined
that because the plaintiff was suspended from active medical staff and could no longer
enjoy the hospital's physical facilities, the requisite physical access found lacking in
Ford was present, and the plaintiff could properly assert a claim under ADA Title III.

-14-

Mutual.[8] Plaintiffs were not denied access to Mutual or an insurance office selling Mutual products. Likewise, Mutual did not deny Plaintiffs the opportunity to access any good or service provided by Mutual. Rather, like the plaintiff in Lenox, Doe and Smith are complaining the insurance policies they contracted to purchase are now worth less to them because of their HIV-positive status. This complaint simply is not cognizable under ADA Title III.

Many federal district courts likewise have concluded ADA Title III does not extend beyond physical access, and thus does not regulate the content and design of insurance policies provided by a place of public accommodation. See Pappas v. Bethesda Hosp. Ass'n, 861 F. Supp. 616, 620 (S.D. Ohio 1994); Leonard F., 967 F. Supp. at 804; Brewster v. Cooley Associates, No. 97-00058, 1997 WL 823634, at *1 (D.N.M. Nov. 6, 1997); Erwin v. Northwestern Mutual Life Ins. Co., 999 F. Supp. 1227, 1233 (S.D. Ind. 1998); Pallozzi v. Allstate Life Ins. Co., 998 F. Supp. 204, 206 (N.D.N.Y. 1998), appeal docketed, No. 98-7552 (2d Cir.); Conway v. Standard Ins. Co., 23 F. Supp.2d 1199, 1201-02 (E.D. Wash.

---

[8]  No Court of Appeals has held that the content and design of insurance policies is regulated by Title III. One has held, however, that Title III is not limited to physical structures. In Carparts Distribution Center, Inc. v. Automotive Wholesaler's Assoc., 37 F.3d 12 (1st Cir. 1994), the plaintiffs challenged a health-benefit plan containing a provision similar to the one at issue in this case: a cap on benefits for AIDS-related illnesses at $25,000 while lifetime benefits for other illnesses were $1,000,000. The First Circuit held that Title III applies even if the goods or services are purchased by telephone or mail. Beyond this "threshold determination," the court acknowledged it had to "tread with care" in delineating the scope of Title III's reach. Id. at 19. Recognizing that "[o]ne who simply reads the Committee Report describing the operations of Title III could easily come away with the impression that it is primarily concerned with access," id. at 19-20, the court stated: "We think that at this stage it is unwise to go beyond the possibility that the plaintiff may be able to develop some kind of claim under Title III even though this may be a less promising vehicle in the present case than Title I." Id. at 20. The Third and Sixth Circuits expressly rejected this dicta. See Ford, 145 F.3d at 614; Parker, 121 F.3d at 1013. Even the District Court here did not rely on Carparts.

-15-                                    **Amici App. 024**

1998).

In sum, every federal appellate court and numerous district courts to consider the language of ADA Title III has explicitly rejected the expansive interpretation of Title III adopted by the District Court.[9]  Furthermore, one of the cases relied on by the District Court (App.118, 122), World Ins. Co. v. Branch, 966 F. Supp. 1203 (N.D. Ga. 1997), was vacated by the Eleventh Circuit, 156 F.3d 1142 (11th Cir. 1998).  Because the District Court's decision in this case is contrary to the uniform body of federal appellate case law holding that the language "of any place of public accommodation" in ADA Title III prohibits discrimination in access to physical places, not the content of goods and services, it should be reversed.

---

[9]    Significantly, the majority of cases cited by the District Court involve alleged discrimination in denial of access to insurance policies, and thus do not support a contrary finding.  See Baker v. Hartford Life Ins. Co., No. 94-C4416, 1995 WL 573430 (N.D. Ill. Sept. 28, 1995) (plaintiff's application for health insurance coverage denied because plaintiff suffered from seizure disorder); Cloutier v. Prudential Ins. Co. of Am., 964 F. Supp. 299 (N.D. Cal. 1997) (plaintiff's application for personal life insurance denied because domestic partner suffered from HIV); Doukas v. Metropolitan Life Ins. Co., 950 F. Supp. 422 (D.N.H. 1996) (plaintiff's application for an individual mortgage disability insurance policy denied because plaintiff suffered from bipolar disorder); Kotev v. First Colony Life Ins. Co., 927 F. Supp. 1316 (C.D. Cal. 1996) (plaintiff's application for an individual life insurance policy denied because plaintiff's wife was HIV positive); Chabner v. United of Omaha Life Ins. Co., 994 F. Supp. 1185 (N.D. Cal. 1998), appeal docketed, No. 98-17060 (9th Cir.) (plaintiff charged an increased premium for an individual life insurance policy because he suffered from a particular form of muscular dystrophy).  Whatever the merits of these cases, they are plainly inapplicable here as Mutual granted Plaintiffs the very same access to the same health insurance benefits as everyone else -- both the non-disabled and the disabled.

-16-

Amici App. 025

## 2. Federal Case Law Under CRA Title II

That the language "of any place of public accommodation" signals a congressional

intent to regulate access to specific facilities and the goods and services offered by that

facility, not the content of the goods and services themselves, is further supported by federal

case law under Title II of the Civil Rights Act of 1964. CRA Title II provides:

> All persons shall be entitled to the full and equal enjoyment of the
> goods, services, facilities, privileges, advantages, and accommodations of any
> place of public accommodation . . . without discrimination or segregation on
> the ground of race, color, religion or national origin.

42 U.S.C. § 2000a(a) (emphasis added). Because the language in ADA Title III ("No

individual shall be discriminated against on the basis of disability in the full and equal

enjoyment of the goods . . . of any place of public accommodation . . .") tracks the language

of CRA Title II, case law under CRA Title II is persuasive in determining the meaning of the

same language in the ADA. See Northcross v. Board of Educ. of Memphis City Schools,

412 U.S. 427, 428 (1973) ("[S]imilarity of language . . . is, of course, a strong indication

that the two statutes should be interpreted pari passu."); Ford, 145 F.3d at 611 ("[W]here, as

here, Congress adopts a new law incorporating sections of a prior law, Congress normally

can be presumed to have had knowledge of the interpretation given to the incorporated law,

at least insofar as it affects the new statute.") (quoting Lorillard v. Pons, 434 U.S. 575, 581

(1978)); Jones v. Hanley Dawson Cadillac Co., 848 F.2d 803, 807 (7th Cir. 1988) ("[W]e

must assume Congress understood the meaning of the words it incorporated into the

[statute].").

Prior to the enactment of the ADA, federal courts recognized CRA Title II was

intended to secure for all protected persons the full and equal enjoyment of facilities

-17-

Amici App. 026

described in the CRA by prohibiting discrimination in access to those facilities. As the Supreme Court explained in Daniel v. Paul, 395 U.S. 298, 307-308 (1969): "[T]he overriding purpose of Title II [is] to remove the daily affront and humiliation in discriminatory denials of access to facilities ostensibly open to the general public." (emphasis added). See also United States v. DeRosier, 473 F.2d 749, 751 (5th Cir. 1973).[10]

Consistent with this purpose, federal courts, including this Court, have recognized that the phrase "of any place of public accommodation" leads to the conclusion that Title II is about physical access to a place of public accommodation -- not the content of the goods and services provided by a place of public accommodation. In Welsh v. Boy Scouts of America, 993 F.2d 1267 (7th Cir.), cert. denied, 510 U.S. 1012 (1993), this Court considered whether CRA Title II applied to a membership organization that did not maintain a close connection to a physical facility. In Welsh, the plaintiff alleged he was refused admission to membership in the Boy Scouts of America on the basis of his religion in violation of CRA Title II. The District Court found that the use of the term "place" in CRA Title II revealed a congressional intent to limit the scope of Title II to issues of access to physical facilities. Welsh v. Boy Scouts of America, 787 F. Supp. 1511 (N.D. Ill. 1992) (Rovner, J.). In language particularly apt here, Judge Rover made plain that "place of public accommodation" connotes a physical place:

---

[10]    In enacting the ADA, Congress recognized disabled persons often lead isolated lives and do not frequent places of public accommodation as a result of discrimination. Accordingly, in drafting ADA Title III, Congress borrowed the language from the CRA, thereby expressing its intent that people with disabilities "should have equal access to the array of establishments made available to others who do not have disabilities." S. Rep. No. 116-58, 101st Cong., 1st Sess., at 58, 59 (1989).

-18-

> [T]he Court is not free to disregard the plain language Congress has used or
> the ordinary meaning of that language.  Congress enacted a law addressing the
> "place of public accommodation"; and it did not define that term in such a
> way as to signal a departure from the usual connotations of that phrase . . .
>
> \* \* \*
>
> Congress instead chose to highlight the concept of place by listing as examples
> establishments which possess concrete locations and facilities . . .
>
> \* \* \*
>
> The Boy Scouts, lacking a connection to a particular site or facility, does not
> qualify as such a place . . .

Id. at 1538.  And even more telling, Judge Rovner concluded that Title II was designed to

assure access to such physical places:

> [W]hen Congress enacted Title II, it sought to ensure that everyone, regardless
> of their race, color, religion, or national origin, would have access to the
> public facilities which were necessary to everyday travel, sustenance, and
> recreation.

Id. at 1540.

    In affirming the District Court's decision, this Court agreed that "place of public

accommodation" focused on physical facilities, stating:  "It is only in this context -- denial of

access to public facilities -- that courts must interpret Title II broadly."  Welsh, 993 F.2d at

1270 (emphasis added).  See also Clegg v. Cult Awareness Network, 18 F.3d 752, 755 (9th

Cir. 1994) ("From the plain language of the statute, it is clear Congress' intent in enacting

Title II was to provide a remedy only for discrimination occurring in facilities or

establishments serving the public: to conclude otherwise would obfuscate the term 'place' and

render nugatory the examples Congress provides to illuminate the meaning of that term.").

    Significantly, the dissent in Welsh argued that because the ADA expanded the number

of facilities in its definition of "places of public accommodation," the court should expand

-19-

the scope of CRA Title II to encompass organizations lacking a close connection to a specific facility. This Court examined the language of the ADA and concluded the dissent's attempt to interpret the ADA as going beyond the scope of CRA Title II and protecting against discrimination unrelated to a physical place was without support. Id. at 1270.

The decision in Stearnes v. Baur's Opera House, Inc., 788 F. Supp. 375 (C.D. Ill. 1992), rev'd on other grounds, 3 F.3d 1142 (7th Cir. 1993), further establishes Title II's equal access mandate. In Stearnes, a black patron of a dance bar brought suit under Title II alleging the bar discriminated against black persons by refusing to play music black patrons enjoyed. The court rejected the plaintiff's claim. According to the court:

> The Civil Rights Act of 1964 does not require places of public accommodation to cater to the musical tastes of all of its patrons. If music selection was a basis for discrimination suits, a fundamentalist christian could sue a club which played music containing offensive lyrics for religious discrimination; or women could sue employers whose musical selections contained perceived sexist lyrics for sex discrimination. This Court does not believe Congress intended such a result when it passed the Civil Rights Act of 1964. Rather, all the Act requires is that all patrons be admitted and served without discrimination.

Id. at 378. See also Efstathiou v. Romeo Carryouts & Liquors, Inc., No. 96 C 8553, 1997 WL 603896 (N.D. Ill. Sept. 23, 1997) (holding plaintiffs did not state a claim under CRA Title II because they were not denied admission to or any of the services at a place of public accommodation); Phillips v. Interstate Hotels Corp., 974 S.W.2d 680, 686 (Tenn. 1998) ("We believe that the issue is one of choice . . . If an individual chooses to listen to certain styles of music or eat certain types of food, that individual should have access to places of public accommodation providing those preferences. The focus is on access to the business and its products and not on the type of products provided by the business.").

-20-

Amici App. 029

As discussed above, because the language in ADA Title III is virtually identical to the language in CRA Title II, <u>Welsh</u> and <u>Stearnes</u> are controlling in this case. Indeed, in holding ADA Title III does not regulate the content of insurance policies, the Third Circuit in <u>Ford</u> expressly considered these similarities and recognized that "[r]estricting 'public accommodation' to places is in keeping with jurisprudence concerning [CRA Title II]." 145 F.3d at 613.

In this case, Plaintiffs cannot demonstrate a nexus between the insurance policies they purchased and Mutual's status as a place of public accommodation. Plaintiffs were not denied access to a Mutual insurance office or the goods and services it offers. To the contrary, Plaintiffs purchased the very same health insurance policies as non-disabled persons. Just as Title II did not require the bar in <u>Stearnes</u> to change the music it offered to all of its patrons, ADA Title III does not require Mutual to alter the terms of health insurance policies offered to all persons regardless of disability status.

**B.      Each Of The Reasons Relied On By The District Court Fails To Support Its Holding That ADA Title III Regulates The Content And Design Of Insurance Policies**

As discussed above, the District Court's decision flies in the face of uniform federal appellate case law, including this Court's decision in <u>Welsh</u>, recognizing the phrase "of any place of public accommodation" is meant only to assure access to the place of public accommodation. Not only is the District Court's decision contrary to such authority, a careful analysis of the sources relied on by the District Court demonstrates the flawed underpinnings of its decision.

-21-

1.   **The "Full And Equal Enjoyment" Clause In Section 302(a) Does Not Require A Public Accommodation To Alter The Content Of The Goods And Services It Offers**

The District Court's attempt to find support for its expansive interpretation of ADA Title III in the words "full and equal enjoyment" in Section 302(a) is unconvincing. First, it is clear these words do not exist in a vacuum. See Lifschultz Fast Freight Corp. v. De Medici, 63 F.3d 621, 628 (7th Cir. 1995) ("[W]e have a duty to give effect, if possible, to every clause and word of a statute.") (citations omitted). In other words, when this clause is read together with the statutory language "of any place of public accommodation," the meaning of Section 302(a) is unmistakable: Title III, at most, guarantees disabled persons the same opportunity to access the goods and services of places of public accommodation.

Not only does the District Court's decision fail to recognize the meaning and significance of the language "of any place of public accommodation," the District Court does not offer a sensible examination of the words "full and equal enjoyment." In this case, disabled and non-disabled persons have the same right to enjoy the same insurance policies. While the District Court found that the ADA requires more, this finding ignores the legislative history, which makes clear that the words "full and equal enjoyment" mean only that a disabled individual must be afforded an <u>opportunity</u> to enjoy a public accommodation's goods and services that is equal to the <u>opportunity</u> afforded a non-disabled individual:

> "Full and equal enjoyment" does not encompass the notion that persons with disabilities must achieve the identical result or level of achievement of nondisabled persons, but does mean that persons with disabilities must be afforded <u>equal opportunity</u> to obtain the same result.

H.R. Rep. No. 101-485(II), 101st Cong., 2d Sess., at 101 (1990) (emphasis added). To find otherwise produces an absurd and impossible result -- every good and service must provide,

-22-

**Amici App. 031**

or be modified to provide, the same level of enjoyment to all persons. Statutes, however, must be interpreted to avoid absurd results. Bailey v. City of Lawrence, Indiana, 972 F.2d 1447, 1452 (7th Cir. 1992).

> **2.    The Provisions In Section 302(b) Do Not Support The District Court's Interpretation Of ADA Title III To Reach The Content Of Insurance Policies Equally Provided To The Disabled And Non-Disabled**

The District Court also found support for its position in the language of Section 302(b), 42 U.S.C. § 12182(b)(1)(A)(i), (b)(1)(A)(ii) and (b)(1)(A)(iii) (App. 119). According to the District Court, the specific prohibitions in Section 302(b) demonstrate Title III is concerned with more than just access. In reaching this conclusion, the District Court again misreads the statutory language.

As an initial matter, the District Court erred in focusing on Section 302(b) while ignoring the language "of any place of public accommodation" in Section 302(a). See McFarland v. South Division Credit Union, 84 F.3d 943, 946-47 (7th Cir. 1996) ("In our analysis and review, we cannot focus only on the former requirement and ignore the plain meaning of the language immediately preceding it. Such an approach would offend the venerable canon that one must read a statute as a whole and give meaning to each of its constituent parts."), cert. denied, 117 S. Ct. 302 (1996); United States Fire Co. v. Barker Car Rental, 132 F.3d 1153 (7th Cir. 1997) ("When interpreting a statute, we must evaluate the statute as a whole and construe each provision in context with every other section.").[11]

---

[11]    An examination of the structure of the ADA as a whole further leads to the conclusion that Congress, in enacting the ADA, did not intend to regulate the content of goods and services. The ADA does not include standards or provisions addressing what constitutes lawful content versus unlawful content. Nor does the statute address

-23-

Case: 24-1947    Document: 60    Filed: 10/17/2024    Pages: 159

In this case, the subparts in Section 302(b) do not create independent rights. What "entity" does Section 302(b) apply to if not a "place of public accommodation" under Section 302(a)? Indeed, the statute makes plain that Section 302(b) is an aid to construe the language in Section 302(a).

Far from supporting the District Court's decision, a close examination of each of these sections demonstrates Title III is strictly an access-based, and not a content-based, mandate. Section 302(b)(1)(A)(i), entitled "Denial of Participation," provides as follows:

> It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class . . . to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity.

42 U.S.C. § 12182(b)(1)(A)(i) (emphasis added). The District Court found this section evidenced an intent to regulate the content of goods and services. This result, however, can only be reached by reading out of the section the words "denial of the opportunity." Section 302(b)(1)(A)(i), by its terms, prohibits a public accommodation from denying goods or services, whatever their nature, to persons with disabilities. The DOJ's discussion of this section's regulatory counterpart, Section 36.202(a), 28 C.F.R. § 36.202(a), illustrates this principle:

---

the range of goods and services a public accommodation must offer to the general public. This complete lack of guidance stands in sharp contrast to the language in Title III governing access to the goods and services of physical facilities. See, e.g., 42 U.S.C. § 12182(b)(2)(B)(ii) (defining standards for determining equivalent service for the operation of a fixed route transportation service); 42 U.S.C. § 12183(a) (defining standards for determining when a failure to design and construct facilities that are accessible to disabled individuals violates the ADA); 42 U.S.C. § 12184 (defining standards for private entities to provide public transportation services to disabled persons).

-24-

> The ADA prohibits discriminatory denial of services or benefits to individuals with disabilities. Just as under the Civil Rights Act of 1964 a restaurant cannot refuse to admit an individual because of his or her race under the ADA, it cannot refuse to admit an individual merely because he or she has a disability.
>
> ILLUSTRATION: A theater cannot refuse to admit an individual with mental retardation to a performance merely because of the individual's mental disability.

Title III Technical Assistance Manual § III-3.2000. The District Court's interpretation, if correct, would in the above example require a theater to alter the content of an esoteric play because an individual with mental retardation cannot "benefit from" the play to the same extent as an individual who is not mentally retarded.

The District Court's reliance on Section 302(b)(1)(A)(ii) is similarly misplaced. Section 302(b)(1)(A)(ii) provides:

> It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class . . . with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals.

42 U.S.C. § 12182(b)(1)(A)(ii) (emphasis added). The District Court's decision ignores the fact that the phrase "that is not equal to that afforded to other individuals" limits the word "opportunity." Commentary addressing what constitutes an "unequal benefit" underscores that Title III is concerned with access to the goods and services of places of public accommodation. According to the DOJ, a theater would provide an unequal benefit if it limited persons with disabilities to certain performances. 28 C.F.R. Ch.1, Pt. 36, App. B at 593 (1998). In other words, Title III ensures all persons, both disabled and non-disabled, have the same *opportunity* to acquire the goods and services of a public accommodation. In

-25-

**Amici App. 034**

this case, Plaintiffs were afforded the same opportunity to purchase the same insurance policies offered to all persons, whether disabled or not. Thus, Section 302(b)(1)(A)(ii) is not implicated.

The language in Section 302(b)(1)(A)(iii) similarly undermines, rather than supports, the District Court's decision. It provides:

> It shall be discriminatory to provide an individual or class of individuals, on the basis of a disability or disabilities of such individual or class . . . with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such action is necessary to provide the individual or class of individuals with a good, service, facility, privilege, advantage or accommodation, or other opportunity that is as effective as that provided to others.

42 U.S.C. § 12182(b)(1)(A)(iii) (emphasis added). Mutual did not provide Plaintiffs with a good that is separate or different from that provided to other individuals. To the contrary Plaintiffs were provided the very same policies as all other persons.

Finally, the District Court's interpretation of the above sections to require a public accommodation to alter the goods and services it provides to ensure all persons "fully and equally enjoy" the goods and services themselves leads to absurd results. For example, under the District Court's decision, a movie theater must modify the content of a silent movie such as Francis Ford Coppola's "Napoleon" by, for example, creating or adding a sound track, in order to insulate itself from potential Title III claims by sight-impaired individuals. Similarly, restaurants must include speciality foods on the menu to meet dietary requirements of disabled individuals and bookstores are liable under the ADA unless they stock books in Braille. The list of such examples is as infinite as it is absurd, yet these examples are the ineluctable result of the District Court's expansive view of the reach of

-26-

Title III.

In sum, the holding of the District Court can only be justified by ignoring the critical statutory passages which establish that Title III only regulates *access* to goods and services offered by places of public accommodation, not the content of those goods and services. In this case, Plaintiffs were not denied equal access to any of Mutual's facilities, goods or services. Nor did Mutual design its policy for Plaintiffs in a manner that was different or separate from that provided to other individuals. Instead, Plaintiffs were provided with the same opportunity as other persons, regardless of disability status, to purchase the policies at issue.[12] Accordingly, Plaintiffs do not state a cognizable ADA Title III claim.

### 3.    The District Court's Reliance On Certain Portions Of The ADA's Legislative History Is Misplaced

In construing the scope of Title III's requirements, the District Court relied on select portions of the ADA's legislative history. According to the District Court, the text of certain committee reports confirms the applicability of Title III to the substance of insurance policies (App.120). The District Court's reliance on the ADA's legislative history is misplaced for two principal reasons. First, there is no reason to resort to legislative history when the language of a statute is plain and unambiguous, as is the case here. Second, the legislative history is mixed, and thus is a poor indicator of congressional intent.

It is well-established that when a statute's meaning is plain, a reviewing court need not examine the legislative history or other sources to glean the meaning of the statute. See

---

[12]    Indeed, not only did Mutual provide access to health insurance, Plaintiff Doe acknowledges that Mutual was the only insurance company that would issue him a policy, and that Mutual waived pre-existing limitation provisions to provide him coverage (R.1 at 3).

United States v. Hayward, 6 F.3d 1241, 1245 (7th Cir. 1993) ("[W]hen the language of a

statute is clear and unambiguous, no need exists for the court to examine the legislative

history, and the court must give effect to the plain meaning of the statute."), cert. denied,

511 U.S. 1004 (1994). In this case, as discussed above, the language of ADA Title III

makes unambiguously clear that its purpose and intent is to ensure that disabled and non-

disabled persons have *access* to the goods and services of places of public accommodation.

Accordingly, the District Court should not have looked past the express language of Title III;

and indeed, federal appellate courts have declined to do so. See Ford, 145 F.3d at 613

("since we find the plain meaning of 'public accommodation' and 42 U.S.C. § 12182(a) to

be clear, we have no need to analyze the ADA's legislative history").

Even if the legislative history is considered, it provides no definitive answer. While

comments such as those cited by the District Court do appear in certain committee reports,

statements in other committee reports, which the District Court did not acknowledge,

squarely support Mutual's position -- Congress, in enacting the ADA, had no intention of

imposing an affirmative obligation on insurance companies to design policies in a certain

way:

> As indicated earlier in this report, the main purposes of this legislation
> include prohibiting discrimination in employment, public services and places of
> public accommodation. The Committee does not intend that any provisions of
> this legislation should affect the way the insurance industry does business in
> accordance with the State laws and regulations under which it is regulated.

H.R. Rep. No. 101-485(II) at 136.

In short, the snippets of legislative history relied on by the District Court are

nonprobative and should not be permitted to displace the plain and customary meaning of the

-28-

Amici App. 037

words used by Congress. See Hayward, 6 F.3d at 1245. See also Bank One Chicago v.
Midwest Bank & Trust Co., 516 U.S. 264, 645 (1996) (Scalia, J., concurring) ("There is no
escaping the point: Legislative history that does not represent the whole intent of Congress is
nonprobative; and legislative history that does represent the intent of the whole Congress is
fanciful."). By its terms, ADA Title III deals with access to physical places and the goods
and services provided by those places. It does not contemplate substantive review of those
goods and services.

### 4.    The District Court's Reliance On The DOJ's Interpretative Guidance Is Misplaced

The District Court found support for its expansive interpretation of ADA Title III by
selective references to the DOJ's interpretative guidance as expressed in both the regulations
and the technical assistance manual (App.121). According to this part of the DOJ guidance,
Title III "reach[es] insurance practices by prohibiting differential treatment of individuals
with disabilities in insurance offered by public accommodations unless the differences are
justified." 28 C.F.R. Ch.1, Pt. 36, App. B at 601 (1998). The DOJ's technical assistance
manual states:

> Insurance offices are places of public accommodation and, as such,
> may not discriminate on the basis of disability in the sale of insurance
> contracts or in the terms or conditions of the insurance contracts they offer.

Title III Technical Assistance Manual § III-3.11000. The District Court improperly relied on
these sources.    As two Courts of Appeals have recognized, the DOJ's interpretative
guidance is not entitled to deference because it is contrary to the plain language of the statute
and the DOJ's own regulations.

-29-

It is clear that no court must -- or should -- defer to a regulation that is inconsistent

with the relevant statute. See Board of Governors v. Dimension Financial Corp., 474 U.S.

361, 368 (1986) ("The traditional deference courts pay to agency interpretation is not to be

applied to alter the clearly expressed intent of Congress."); Chevron U.S.A. Inc. v. Natural

Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is

clear, that is the end of the matter, for the court, as well as the agency, must give effect to

the unambiguously expressed intent of Congress."). In this case, the plain language of ADA

Title III makes clear that the statute is confined to places of public accommodation and does

not provide protection from discrimination unrelated to physical places. Accordingly, the

DOJ's interpretation of Title III to include the regulation of insurance is not entitled to

deference. See Ford, 145 F.3d at 613 ("[DOJ's] interpretation is 'manifestly contrary' to the

plain meaning of Title III and, accordingly, is not binding on this court").

Not only does the DOJ's interpretative guidance contravene the express language of

ADA Title III, it is contrary to the DOJ's own regulations. See Orrego v. 833 West Buena

Joint Venture, 943 F.2d 730, 736 (7th Cir. 1991) (the degree of deference accorded an

agency's view "depends on the thoroughness, validity and consistency of the agency's

reasoning"). The DOJ's regulations plainly instruct that Title III's provisions regulate access

to goods and services, as opposed to the contents of such goods and services:

> The purpose of the ADA's public accommodations requirements is to
> ensure accessibility to the goods offered by a public accommodation, not to
> alter the nature or mix of goods that the public accommodation provides.

28 C.F.R. Ch. 1, Pt. 36, App. B at 612 (1998). In fact, the DOJ's regulations specifically

state that a public accommodation is not required "to alter its inventory to include accessible

-30-

or special goods that are designed for, or facilitate use by, individuals with disabilities."
28 C.F.R. § 36.307(a). Examples of special goods not required to be provided by a public
accommodation include "[b]railled versions of books, books on audiocassettes, closed
captioned videotapes, special sizes or lines of clothing, and special foods to meet particular
dietary needs." Id.

The impact of these regulations is unmistakable: while a place of public
accommodation must take statutorily mandated steps to make its premises, and the goods and
services offered therein, accessible to the disabled, it is not required to alter the goods and
services it provides. Thus, the ADA requires a bookstore to make its facilities and sales
operations accessible to individuals with disabilities, but it does not require the bookstore to
provide Brailled or large print books. 28 C.F.R. Ch. 1, Pt. 36, App. B at 612 (1998).[13]
Similarly, the ADA does not require Mutual to redesign its insurance products or create new
insurance products to meet the coverage needs of persons who are, or may become, disabled
as a result of HIV infection or any other medical condition. See Ford, 145 F.3d at 608 ("So
long as every employee is offered the same plan regardless of that employee's contemporary
or future disability status, then no discrimination has occurred . . ."). Rather, Title III
affords disabled persons the opportunity to access whatever products and services are
otherwise offered to the general public by places of public accommodation, whether or not

---

[13]    The District Court's decision interpreting ADA Title III to ensure disabled persons
        achieve the same level and quality of enjoyment of a good as a non-disabled person
        (App.119) is in direct conflict with this regulation. The District Court's reading of
        Title III would require a bookstore to stock Brailled books because a blind person
        cannot "fully and equally" enjoy non-Brailled books. The District Court's failure to
        squarely confront this consequence, and articulate a principled reading of Title III,
        underscores why its decision is palpably wrong.

-31-

Amici App. 040

such products and services are ideally or uniquely suited to them.

This conclusion is squarely supported by the Third Circuit's decision in Ford. There, the court flatly rejected the DOJ's attempt to distinguish insurance from other goods and services. According to the court:

> Just as a bookstore must be accessible to the disabled but need not treat the disabled equally in terms of books and store stocks, likewise an insurance office must be physically accessible to the disabled but need not provide insurance that treats the disabled equally with the non-disabled.

Id. at 613.

The Sixth Circuit in Parker similarly recognized there is no rational basis for differentiating between the content of a book and the content of an insurance policy. The court found that the "applicable regulations clearly set forth that Title III regulates the availability of the goods and services the place of public accommodation offers as opposed to the contents of goods and services offered by the public accommodation." 121 F.3d at 1012. Accordingly, the court rejected the DOJ's attempt through a regulatory rewriting of the ADA to expand the reach of Title III to include the regulation of the terms of insurance policies as "inconsistent with its regulations and the statutory text of Title IV." Id. at 1012 n. 5 (citing Chevron, 467 U.S. at 844).

In short, the DOJ's interpretative guidance on insurance cannot be reconciled with the plain language of ADA Title III or the DOJ's own regulations, and thus is entitled to no deference.[14]

---

[14] The Supreme Court's recent decision in Bragdon v. Abbott, 118 S. Ct. 2196 (1998), in which the Court accorded deference to administrative guidance issued by the DOJ in determining whether asymptomatic HIV is a disability under the ADA, does not change this result. The guidance at issue in Bragdon was not inconsistent with the statutory language or other DOJ regulations. In contrast, the DOJ guidance at issue in this case flies in the face of the statutory language and other DOJ regulations.

5.   **ADA Title IV's Construction Provisions Confirm That
ADA Title III Does Not Apply To The Benefits, Terms
And Conditions Of Insurance Policies**

If there is any doubt about the inapplicability of ADA Title III to the content of

insurance policies, that doubt is extinguished in ADA Title IV.  Section 501(c), 42 U.S.C.

§ 12201(c), prohibits any interpretation of ADA Title III which would subject the content of

insurance policies to federal regulation.  Section 501(c), one of four miscellaneous provisions

in Title IV dealing with "Construction," provides:

> Subchapters I through III of this chapter and title IV of this Act shall not be
> construed to prohibit or restrict - (1) an insurer ... from underwriting risks,
> classifying risks, or administering such risks that are based on or not inconsistent with
> State law.

42 U.S.C. § 12201(c).  The District Court concluded this section manifests a congressional

intent to protect insurance practices, but only to the extent they are consistent with "sound

actuarial principles," "reasonably anticipated experience" or "bona fide risk classification"

(App.123-24).  This construction, however, is contrary to the plain language of Section

501(c), federal appellate case law and common sense.

The express language of Section 501(c) mandates that the ADA "shall not be

construed to prohibit or restrict" insurance companies from doing business in accordance

with the state laws and regulations under which insurance practices are regulated.  Section

501(c) was Congress' way of ensuring that the regulation of the content of insurance policies

remain with state insurance departments.

The Third Circuit in Ford recognized Congress did not intend to disrupt state

regulation of the insurance industry in enacting Section 501(c).  In Ford, the plaintiff argued

Section 501(c) required her insurance company to present actuarial data demonstrating the

-33-

**Amici App. 042**

challenged provision was not a subterfuge to elude the purposes of the ADA after she

presented a prima facie case alleging discrimination in benefits. The court recognized this

interpretation of Section 501(c) would "require a seismic shift in the insurance business."

Id. at 612. Accordingly, the court declined to construe the ADA to require "insurers to

justify their coverage plans in federal court after a mere allegation by a plaintiff." In

rejecting the plaintiff's argument, the court stated:

> [R]equiring insurers to justify their coverage plans elevates this court to the
> position of super-actuary. This court is clearly not equipped to become the
> watchdog of the insurance business, and it is exactly unclear what actuarial
> analysis the defendants must have to produce to disprove the charge of
> "subterfuge[.]"

Id. See also Pallozzi, 998 F. Supp. at 206 ("Reading the [ADA] in conjunction with the

'safe harbor' provision, it is clear that Congress intended to protect the insurance industry

and leave the regulation of the insurance business to the states.").

As the above case law makes clear, contrary to the District Court's holding, the ADA

does not impose an affirmative obligation on insurance companies to design policies in a

certain way. Section 501(c) reaffirmed this critical feature by explicitly prohibiting any

construction of Title III that might find otherwise. Logically, if Congress intended Section

501(c) to regulate the content of insurance policies by the ADA, it could have used

unmistakable and inarguable language to communicate such an intent and established specific

standards for compliance. The 1996 enactment of the Mental Health Parity Act, 29 U.S.C. §

300gg-5, illustrates this key principle -- when Congress wants to regulate the content of

-34-

insurance policies, it knows how to do so with clear and specific language.[15] See also

Women's Health and Cancer Rights Act of 1998, Pub. L. No. 105-277 § 901 (Oct. 21,

1998) (requiring group health plans that provide medical and surgical benefits with respect to

a mastectomy to cover reconstructive breast surgery). In Parker, the Sixth Circuit

recognized that Congress' passage of the Mental Health Parity Act indicates Congress did not

believe that the ADA governs the content of insurance policies. 121 F.3d at 1018.[16]

## II.    The McCarran-Ferguson Act Precludes The Application Of The ADA To The Benefits, Terms And Conditions Of Insurance Policies

The District Court misconstrued the McCarran-Ferguson Act in holding that ADA

Title III applies to regulate the benefits, terms and conditions of insurance policies. Section

2(b) of the McCarran-Ferguson Act provides:

> No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such [federal] Act specifically relates to the business of insurance.

15 U.S.C. § 1012(b).

---

[15]    The Mental Health Parity Act mandates that where a group health insurance plan provided by an employer with 50 or more employees contains no lifetime or annual limit for medical or surgical benefits, the plan may not contain a lifetime or annual limit for mental health benefits. Similarly, if such a group health insurance plan includes an annual or lifetime limit on medical or surgical benefits, the plan must apply the same limits to mental health benefits. 42 U.S.C. § 300gg-5(1)-(2). Significantly, Congress did not mandate -- as Plaintiffs seek here -- that all disabilities have either the same benefit level or lifetime cap.

[16]    In ADA Title III, there is a single mention of the word insurance. That single mention involves identifying an "insurance office" as a "place of public accommodation." 42 U.S.C. § 12181(7)(F). There is no mention of insurance policies, coverage or benefits. It is incredible to conclude, as did the District Court, that Congress undertook the regulation of insurance benefits without language saying so.

-35-

Amici App. 044

Under McCarran-Ferguson, unless a federal statute specifically provides otherwise, it must be construed as inapplicable to the business of insurance. U.S. Dept. of Treasury v. Fabe, 508 U.S. 491, 507 (1993). Moreover, in Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 39 (1996), the Supreme Court underscored that McCarran-Ferguson "seeks to protect state [insurance] regulation primarily against inadvertent federal intrusion - say, through enactment of a federal statute that describes an affected activity in broad, general terms, of which insurance business happens to comprise one part." (emphasis in original). According to the Court, only "specific, detailed references to the insurance industry" in a federal statute can overcome the presumption that the statute does not apply to insurance matters. Id. at 41

The District Court's finding that the ADA reflects Congress' intent to have Title III "specifically relate to the business of insurance" is contrary to common sense and federal appellate case law. As discussed earlier, the only mention of insurance in Title III is "insurance office" -- not insurance business, insurance company, insurance benefits, insurance policies, or insurance practices. See Pallozzi, 998 F. Supp. at 206 (finding the fact that "Congress chose to include in the list of places of public accommodations an 'insurance office,' which is open to the public, but not an 'insurance company,' which is where the underwriting decisions are made[,]" significant in deciding ADA Title III does not regulate the business of insurance). Moreover, that single mention only involves identifying an "insurance office" as a type of public accommodation, along with, inter alia, laundromats, dry cleaners, banks, barber shops, and a host of physical business offices into which the public would typically travel. See 42 U.S.C. § 12181(7)(F).

-36-

If Congress intended through ADA Title III to undertake something as significant as the regulation of the content of insurance policies, a subject which by its very nature takes into account differences of physical and mental medical conditions among people and which traditionally has been the domain of state regulation, then it certainly would have done so with language more specific than a single mention of the term "insurance office" in the context of defining places of public accommodation. See discussion at p. 34-35 infra.

Recognizing the single mention of "insurance office" in Title III does not constitute a specific reference to the insurance industry, the District Court turned to the language of Title IV, 42 U.S.C. § 12201(c). However, as already discussed, Section 501(c) reaffirms Congress' intent that Title III does not regulate the content of insurance policies. The District Court's error was recognized in Ford. In Ford, the Third Circuit concluded that "[t]he ADA does not 'specifically relate to the business of insurance[,]' and does not mention the term 'insurance' in its introductory section entitled 'Findings and purpose[.]'" 145 F.3d at 611 (citations omitted). Accordingly, consistent with the court's "statutory duty under the McCarran-Ferguson Act regarding insurance cases," the court declined to "construe Section 501(c) to require a seismic shift in the insurance business, namely requiring insurers to justify their coverage plans in court after a mere allegation by a plaintiff." Id. at 611-12. In short, the ADA does not satisfy the Barnett Bank requirement that a statute contain "specific, detailed references to the insurance industry," and the District Court improperly failed to give proper effect to the mandate of and policies underlying the McCarran-Ferguson Act.

The District Court also determined the McCarran-Ferguson Act was not applicable to this case in view of its finding that Mutual did not identify a conflict between the ADA and

-37-

Illinois law (App.125). The District Court's analysis, however, failed to recognize that conflict exists because the District Court's construction would impose regulation in an area in which the State of Illinois has chosen not to regulate benefits.

There can be no genuine question that states have broad authority to regulate insurance practices. Fabe, 508 U.S. at 508. For example, states can specifically prohibit an insurance company from limiting benefits for certain conditions. Indeed, several states have enacted statutes specifically prohibiting caps or limits on benefits for AIDS or ARC in insurance policies. See, e.g., WIS. STAT. § 631.93. In this case, while Illinois has numerous specific statutory provisions requiring insurance contracts not to exclude or limit benefits for certain conditions, see, e.g., 215 ILCS § 5/356(g) (mandating coverage for mammography on same basis as other radiological examinations), AIDS is not one of those conditions. In other words, while mandating benefits for certain conditions, Illinois has chosen not to regulate benefits for AIDS. Accordingly, the District Court erred in concluding the application of the ADA to the maximum benefit provisions in Plaintiffs' policies does not "invalidate, impair or supersede" Illinois law.

Finally, the District Court erred in focusing solely on whether the benefit limits for AIDS and ARC violate Illinois law, thus effectively measuring compliance with the ADA by resort to a single state. The McCarran-Ferguson Act provides that "no act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . ." 15 U.S.C. § 1012(b) (emphasis added). Thus, the District Court erred by looking only to one state. Moreover, under the District Court's decision, federal courts will be required to analyze the insurance laws of every state to

-38-

Amici App. 047

determine if there is a conflict.  Placing the federal judiciary in the role of interpreting and

nominally enforcing the insurance codes of 50 different states cannot be what Congress

intended.  Indeed, under the District Court's test, an insured could have a cause of action

under the ADA if he lived in one state, but fall outside the protection of the federal statute if

he lived in another.[17]  If Congress wanted the federal courts to assume such obligations, then

McCarran-Ferguson requires that it be expressed in a specific and detailed manner.  Such

expression does not exist in the ADA.

## III.   Limiting Benefits For Certain Medical Conditions And Medical Treatments Is Not Disability-Based Discrimination Under ADA Title III

Section 302(a) prohibits discrimination against individuals "on the basis of a disability

in the full and equal enjoyment of the goods [and] services . . . of any place of public

accommodation."  42 U.S.C. § 12182(a).  The Seventh, Sixth, Third and District of

Columbia Circuits (the latter interpreting the Rehabilitation Act) have all held that the

provision of different benefits for different illnesses or medical conditions in an insurance

policy, as is the case here, does not discriminate "on the basis of a disability" in violation of

the ADA where the same policy is provided to all individuals, regardless of disability status.

In EEOC v. CNA Ins. Cos., 96 F.3d 1039 (7th Cir. 1996), this Court upheld a

benefit plan which limited long-term disability benefits to two years for the mentally

disabled, but not for the physically disabled.  This Court determined that such distinctions do

---

[17]   For example, Florida allows benefit limits under certain conditions for expenses related to AIDS or ARC.  FLA. STAT. ch. 627.429(5)(d).  The District Court's decision conflicts with that law.  That conflict demonstrates why McCarran-Ferguson applies and why the District Court's decision is wrong.  If allowed to stand, the District Court's decision will allow federal courts to regulate insurance throughout the country and displace regulation by every state.

Amici App. 048

not violate the ADA where the same benefits package is provided to disabled and non-disabled individuals alike. In language directly applicable here, this Court held:

> [T]here is no claim here that CNA discriminated on the basis of disability in offering its pension plan to anyone. It did not charge higher prices to disabled people, on the theory that they might require more in benefits. . . . Nor did it vary the terms of its plan depending on whether or not the employee was disabled. All employees -- the perfectly healthy, the physically disabled, and the mentally disabled -- had a plan that promised them long-term benefits from the onset of disability until age 65 if their problem was physical, and long term benefits for two years if the problem was mental or nervous. This may or may not be an enlightened way to do things, but it was not discriminatory in the usual sense of the term.

Id. at 1044 (citations omitted) (emphasis added). Moreover, in a passage controlling to this case, this Court stated:

> Other courts have come to similar conclusions when faced with claims about plans that differentiate among types of benefits. The Eleventh Circuit, for example, recently ruled that a former employee has no standing to challenge as discriminatory under the ADA a limitation on AIDS-related medical expenses in the company's health benefit plans. . . .

Id. (citing Gonzales v. Garner Food Services, Inc., 89 F.3d 1523 (11th Cir. 1996)).

This Court's decision in Vaughn v. Sullivan, 83 F.3d 907 (7th Cir. 1996), likewise makes clear that the ADA does not require an insurance company to provide identical benefits to all disabled persons. In Vaughn, disabled persons brought a class action under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the ADA challenging Indiana's Medicaid plan, which allowed blind persons, but not other disabled persons, to disregard income under the State plan calculating eligibility for Medicaid benefits. The plaintiffs argued the state plan discriminated against them on the basis of a disability because blind persons were allowed to keep more of their income. Recognizing the plaintiffs' argument would essentially require states to extend Medicaid benefits to everyone of the same real

-40-

income level because any difference would discriminate against someone with a disability,

this Court rejected the plaintiffs' "strained" interpretation of the Rehabilitation Act and the

ADA. Id. at 913. Relying on Alexander v. Choate, 469 U.S. 287, 303 (1985), and Traynor

v. Turnage, 485 U.S. 535, 549 (1988) (see n. 18, infra), this Court found that:

> [Neither statute] requires states to provide identical benefits; they retain
> "substantial discretion to choose the proper mix of amount, scope and duration
> limitations on coverage". . . .The Medicaid program is rife with these
> distinctions [based on physical condition], which, the Court held in Choate,
> are compatible with the Rehabilitation Act. Traynor added: "There is nothing
> in the Rehabilitation Act that requires that any benefit provided to one category
> of handicapped persons also be extended to all other categories of handicapped
> persons."

Id. at 912-13 (citations omitted).

In Parker, the Sixth Circuit, *en banc*, also recognized that the ADA does not prohibit

an insurer from differentiating among disabilities. In Parker, the court found lawful an

insurance policy which capped benefits for persons who became disabled due to mental

illness as opposed to physical illness. The court held that an insurance policy can lawfully

provide different benefit levels for different disabilities because the ADA does not mandate

equality among individuals with different disabilities:

> [T]he ADA mandates that the owners, lessors, and operators of public
> accommodations provide equal access to the disabled and non-disabled.
> Because all employees at [the employer], whether disabled or not, received the
> same access to the long-term disability plan, neither the defendants nor the
> plan discriminated between the disabled and the able-bodied.

121 F.3d at 1015-16.

The Sixth Circuit recently reaffirmed Parker's core holding in Lenox. In Lenox, the

plaintiff argued her insurance plan contained a disability-based distinction in violation of the

ADA because it covered some types of transplants, but not heart transplants. 149 F.2d at

-41-

Amici App. 050

457. In rejecting the plaintiff's claim, the court stated: "Lenox cannot use the ADA to complain about a disparity in treatment among individuals with different disabilities under the Healthwise plan." Id. at 457-58.

In Ford, the Third Circuit also recognized that the ADA does not require equal coverage for every type of disability. 145 F.3d at 608. According to the court, "[s]o long as every employee is offered the same plan regardless of that employee's contemporary or future disability status, then no discrimination has occurred even if the plan offers different coverage for various disabilities." Id. The court further acknowledged that a contrary requirement "would destabilize the insurance industry in a manner definitely not intended by Congress when passing the ADA." Id. See also Conway, 23 F. Supp.2d at 1201-02 ("It is enough that all employees are given access to a policy and it is irrelevant that a plan might treat some forms of disability more favorably than others.").

The District of Columbia Circuit reached the same result in Modderno v. King, 82 F.3d 1059 (D.C. Cir. 1996), cert. denied, 117 S. Ct. 772 (1997). In Modderno, the court upheld, under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794[18], a medical benefit

---

[18]    Indeed, the decisions of these four Circuit Courts was foreshadowed by or based on Supreme Court case law under the Rehabilitation Act, which courts have relied on for interpretative guidance. See Bragdon, 118 S. Ct. at 2202. In Traynor, the Supreme Court held that uniformly applied benefit plans that provide different levels of benefits to different categories of disabled individuals do not violate anti-discrimination laws. There, the Court held that the Veterans Administration did not violate the Rehabilitation Act by denying extensions of educational assistance benefits to veterans whose disabilities were attributable to their own "willful misconduct." The Supreme Court stated: "[t]here is nothing in the Rehabilitation Act that requires that any benefit provided to one category of handicapped persons also be extended to all other categories of handicapped persons." 485 U.S. at 549. See also Choate, 469 U.S. at 304 (holding that the state of Tennessee did not violate Section 504 of the Rehabilitation Act by reducing the number of in-patient days for which Medicaid

-42-

Amici App. 051

plan which limited lifetime coverage for mental health benefits to $75,000 while placing no similar restriction on benefits for physical illnesses. The court found that if the Rehabilitation Act permits across-the-board limits on coverage, then "it cannot forbid partial limits that leave some disabled individuals better off and the remainder no worse off." Id. at 1062.

This case is controlled by the above cases. The ADA simply does not require a health insurance policy to extend benefits provided to some disabled persons to all other disabled persons. Rather, the ADA requires only that the disabled and non-disabled be treated in like fashion. Here, all persons, including Plaintiffs, have policies which provide one level of benefits if they become disabled as a result of contracting AIDS and a different level of benefits if they become disabled due to other conditions. The fact that persons "may become disabled for different reasons does not amount to discrimination in providing the policy." Parker, 121 F.3d at 1019.

The District Court failed to respect the core holding of these four Courts of Appeals: differentiation in the types of benefits provided in an insurance policy equally available to all persons does not violate the ADA. Rather, the District Court attempted to distinguish CNA, Parker and Modderno on various grounds, all of which are unconvincing. The District Court first determined the maximum benefit provisions did not fit the rule of CNA because Mutual "var[ied] the terms of its plan depending on whether the employee was disabled" (App.127-28). Contrary to the District Court's suggestion, it is undisputed that Mutual did not alter

---

would reimburse hospitals on behalf of a single employer because the Act "does not . . . guarantee the handicapped equal results from the provision of state Medicaid").

-43-

the terms of its policy depending on whether or not Plaintiffs were disabled or charge Plaintiffs a higher price on the theory they might require more in benefits. Rather, Plaintiffs were subject to the very same Mutual policies as all other persons, regardless of disability status.

The District Court also concluded Mutual's policies discriminate on the basis of a disability because they single out a particular disability as opposed to providing unequal benefits as between broad categories of disabilities (App.127).[19] This distinction, however, is both unfathomable and absurd. According to the District Court, an insurance plan that excludes disability benefits for schizophrenia is unlawful, but one which excludes all mental disabilities (including schizophrenia) is not. Why? Apparently this construction is the only way to circumvent uniform federal appellate case law. It is also a construction that flies in the face of Vaughn.

Because the maximum benefit provisions at issue in this case are similar to the provisions upheld by every federal court of appeals which has decided the issue, the District Court's decision should be reversed.

---

[19]   In its decision, the District Court makes much out of a hypothetical involving pneumonia (App.128). Contrary to the District Court's suggestion, persons who are disabled due to conditions other than AIDS or ARC are entitled to benefits for pneumonia under the policies sold to Plaintiffs. The policy provisions at issue simply provide a different benefit level for AIDS as compared to other medical conditions. Consequently, this case is indistinguishable from CNA and Vaughn, and the District Court erred in failing to recognize this obvious and dispositive fact.

Amici App. 053

## CONCLUSION

For the foregoing reasons, Mutual requests that the Court reverse the District Court's Judgment in favor of Plaintiffs on Count I of their Complaint.

Respectfully submitted,

MUTUAL OF OMAHA INSURANCE COMPANY

By_____
One Of Its Attorneys

Joel H. Kaplan
Thomas J. Piskorski
Cassandra L. Curry
Seyfarth, Shaw, Fairweather
& Geraldson
55 East Monroe Street
Suite 4300
Chicago, IL 60603
(312) 346-8000

January 11, 1999

4131433.1

-45-

# CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 32(d)

I, Thomas J. Piskorski, one of the attorneys for Defendant-Appellant Mutual of Omaha Company, certify that I have been informed by my firm's word processing department that, according to the word count program utilized by them, the attached brief is 13,761 words in length, and therefore complies with Seventh Circuit Rule 32(d)(2)(A). The word processing system used is WordPerfect 6.1.

_Thomas Pils_
Thomas J. Piskorski

January 11, 1999

Amici App. 055

# CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

I, Thomas J. Piskorski, one of the attorneys for Defendant-Appellant Mutual of Omaha Company, hereby certify that all materials required by Circuit Rule 30(a) and (b) are included in the Appendix to this Brief.

Pursuant to Circuit Rule 30(a), the orders and judgments under review are bound with this Brief. There are no materials within the scope of Circuit Rule 30(b).

_Thomas Pill_
Thomas J. Piskorski

January 11, 1999

Amici App. 056

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that he caused two true and correct copies of the foregoing Brief of Defendant-Appellant, and a computer disk containing the same, to be served upon the following by messenger on this 11th day of January, 1999:

Heather C. Sawyer
Lambda Legal Defense
   and Education Fund, Inc.
11 East Adams, Suite 1008
Chicago, Illinois 60603

Stuart I. Graff
Schiff, Hardin & Waite
7200 Sears Tower
Chicago, Illinois 60606

Joel H. Kaplan

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

### No. 98-4112

## JOHN DOE and RICHARD SMITH,
*Plaintiffs-Appellees,*

*v.*

## MUTUAL OF OMAHA INSURANCE COMPANY,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 98 C 325
Judge Suzanne B. Conlon, Presiding

## BRIEF OF PLAINTIFFS-APPELLEES
## JOHN DOE AND RICHARD SMITH

**Of Counsel:**
**Stuart I. Graff**
**Lisa A. Brown**
**Laura B. Weinberg**
**SCHIFF HARDIN & WAITE**
**6600 Sears Tower**
**Chicago, Illinois 60606**
**(312) 876-1000**

**Ann Hilton Fisher**
**AIDS LEGAL COUNCIL OF CHICAGO**
**220 South State Street**
**Suite 1330**
**Chicago, Illinois 60604**
**(312) 427-8990**

**Heather C. Sawyer**
**LAMBDA LEGAL DEFENSE AND**
**EDUCATION FUND, INC.**
**11 East Adams Street**
**Suite 1008**
**Chicago, Illinois 60603-6303**
**(312) 663-4413**

**Attorneys for Plaintiffs-Appellees**
**John Doe and Richard Smith**

COUNSEL VERIFIED

## CERTIFICATE OF SERVICE

I, Stuart I. Graff, hereby certify that on this ninth day of February, 1999, I caused to be

served by messenger two true and correct copies of the attached BRIEF OF PLAINTIFFS-

APPELLEES JOHN DOE AND RICHARD SMITH, and a computer disk containing same,

upon:

> Joel H. Kaplan, Esq.
> Thomas J. Piskorski, Esq.
> Cassandra A. Curry, Esq.
> SEYFARTH, SHAW, FAIRWEATHER
>     & GERALDSON
> 55 East Monroe Street
> Suite 4300
> Chicago, Illinois  60603

and by overnight courier to:

> Stephanie W. Kanwit
> Kirsten M. Pullin
> Epstein Becker & Green, P.C.
> 1227 25th Street N.W. Suite 700
> Washington, DC  20037-1156

> Ann Elizabeth Reesman
> Corrie L. Fischel
> McGuiness & Williams
> 1015 Fifteenth Street N.W.
> Suite 1200
> Washington, DC  20005

**Amici App. 059**

## CERTIFICATE OF INTEREST

Appellate Court No: __98-4112__

Short Caption: __Doe and Smith v. Mutual of Omaha__

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a certificate of interest stating the following information in compliance with Circuit Rule 26.1. **NOTE: Counsel is required to complete the entire certificate and to use N/A for any information that is not applicable.**

**(1)** The full name of every party or amicus the attorney represents in the case:

__John Doe (pseudonym pursuant to Agreed Protective Order; see attached)__

__Richard Smith (pseudonym pursuant to Agreed Protective Order; see attached)__

**(2)** If such party or amicus is a corporation:

**i)** Its parent corporation, if any; and

__N/A__

**ii)** A list of stockholders which are publicly held companies owning 10% or more of the stock in the party or amicus:

__N/A__

**(3)** The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

__Schiff Hardin & Waite__

__Lambda Legal Defense and Education Fund, Inc.__

__AIDS Legal Council of Chicago__

This certificate shall be filed with the appearance form or upon the filing of a motion in this court, whichever occurs first. The attorney furnishing the certificate must file an amended certificate to reflect any material changes in the required information. The text of the certificate (i.e. caption omitted) shall also be included in from of the table of contents of the party's main brief.

Attorney's Signature: _(signature)_

Date: __2 / 9 / 99__

Attorney's Printed Name: __Heather C. Sawyer__

Address: __Lambda Legal Defense and Education Fund, Inc.__

__11 East Adams Street, Suite 1008__

__Chicago, IL  60603-6303__

Phone Number: __(312) 663-4413__

Amended 10/6/97

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOHN DOE AND RICHARD SMITH, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.  98 C 0325 |
| v. | ) | |
| | ) | Judge Conlon |
| MUTUAL OF OMAHA INSURANCE | ) | Magistrate Judge Guzman |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## AGREED PROTECTIVE ORDER

WHEREAS the parties to this action have sought and expect to seek discovery of documents, information and other materials including without limitation  information concerning or otherwise relating to the medical condition of the Plaintiffs and their identities, and business information of Defendant; and,

WHEREAS, the parties wish to ensure that any such document, information, or other materials shall be used only for the purposes of this action and shall not be disclosed or used in any other way;

THEREFORE, all parties stipulate and agree, and jointly move this Court pursuant to Rule 26(c) of the Federal Rules of Civil Procedure and General Rule 10(C) of the U.S. District Court for the Northern District of Illinois for entry of the following PROTECTIVE ORDER:

1.    This Order shall govern the use and disclosure of information and material designated in good faith by a party or a non-party as being confidential medical or personal information, including information relating to the identities of the Plaintiffs, and/or confidential

- 1 -

**Amici App. 061**

business information, which is contained in (a) any documents, correspondence, pleadings, briefs, written discovery responses, or tangible evidence produced in this litigation by means of discovery or trial, and (b) any transcripts of depositions taken in this action. Such information includes, without limitation, medical records, insurance records, names, addresses, telephone numbers, social security numbers, and other information from which the Plaintiffs' identities reasonably may be inferred or determined.

2.    The attorneys of record and all others to whom such designated confidential information and material is disclosed are ordered to maintain such designated confidential material and information in strict confidence, are ordered not to disclose such designated confidential information and material except in accordance with this Order, and are ordered to use such designated confidential information and material solely for purposes of this litigation. Access to confidential information and material shall be permitted only to persons properly having access thereto under the terms of this Order.

3.    Any party or third-party claiming that any materials, including (without limitation) documents, written discovery requests and responses, or tangible evidence constitutes or includes confidential information or material shall mark such material considered to be confidential (in such manner as will not interfere with the legibility thereof) with the following legend

<div align="center">**CONFIDENTIAL**</div>

or any substantially similar legend. Portions of deposition testimony or entire transcripts may be designated as confidential by invoking this Order on the record with respect to specific designated testimony, or by using the procedure described in Paragraph 4. Any document or material so marked, and the information contained therein, shall be held confidential in its

Amici App. 062

entirety unless the producing party clearly indicates on the document that only a portion of the material is to be treated as confidential.

4.     Any party or non-party claiming that any transcript of a deposition taken in this action constitutes or includes confidential information or material may, within ten (10) days of the completion of the deposition, notify the other party or parties that the transcript contains confidential information or material subject to this Order, in which case the entire deposition transcript and all copies thereof shall be deemed confidential for twenty (20) days following receipt by the deponent of the deposition transcript. During this twenty (20) day period, the party or non-party so designating shall designate in writing specific portions of the transcript that the designating party claims to contain confidential information or material. At the conclusion of the twenty (20) day period, only the duly designated portions shall be considered confidential information or material subject to this Order.

5.     Confidential information or material (including any copies thereof, notes made therefrom, and information contained therein) may be disclosed only to attorneys of record in this litigation and Mutual of Omaha in-house attorneys, and to employees or support personnel and staff in such attorneys' offices (such as secretaries and legal assistants). The in-house attorneys of Mutual of Omaha shall execute the Undertaking attached to this Order, which Defendant's outside counsel shall maintain until this litigation is over. Defendant's in-house and outside counsel also may refer to the Plaintiffs by their actual names to make necessary inquiries within Defendant's organization regarding Plaintiffs' insurance policies, claim histories, etc., but shall not in making such inquiries disclose, directly or indirectly, that Plaintiffs are parties to this suit; provided, however, Defendant's in-house and outside counsel may make such

- 3 -

disclosure to Mutual of Omaha employees for reasons relating to this suit following notice to the employee of the terms of this Protective Order.  Any individual who receives such information shall be advised of the terms of this Order and Defendant's outside counsel shall maintain a list of every such individual.

6.     Confidential material or information may be disclosed by counsel of record or Defendant's in-house counsel to any experts or consultants with whom it is necessary for such attorney to consult concerning aspects of this litigation.  Prior to any disclosure of a producing party's confidential information or material to any such expert or consultant, each such outside expert or consultant shall execute an Undertaking in the form annexed hereto prior to the disclosure of any confidential information.   Each party's counsel shall maintain such Undertakings of that party's expert(s) or consultant(s).

7.     Nothing in this Order shall limit or restrict any party's right to inquire about or show confidential information or material to a deponent at the deposition of any officer, director, employee, or agent of the party that produced the confidential information or material.  In any other deposition, the witness may be examined concerning a document or thing containing designated confidential information or material after being advised of the terms of this Order and agreeing to be bound by its terms, including submitting to the jurisdiction of this Court to enforce this Order, or if it appears from the face of the document that the witness authored or received a copy of it.

8.     Only information or material that the parties shall in good faith deem confidential shall be so designated, but an entire document or material may be designated as confidential if any part of it contains confidential information or material, unless a party elects to designate

- 4 -

only portions of the document or material as confidential. The attorneys of record for such designating party shall be deemed to have certified that such counsel believes that the designation has been made in good faith and that there are substantial grounds in law and fact to support the designation.

9.    The disclosure by the producing party or non-party of confidential information or material to third parties, regardless of whether the information was so designated at the time of disclosure, shall not be deemed a waiver in whole or in part of a party's claim of confidentiality, either as to the specific information disclosed or as to any other information relating thereto or on the same or related subject matter.

10.    No party shall be obligated to challenge the propriety of a confidentiality designation at the time made, and a failure to do so shall not constitute an admission by the receiving party that the information is confidential, or preclude a subsequent challenge to the designation of the material as confidential. If the receiving party disagrees with any confidential designation by the producing party, the parties shall first seek in good faith to resolve their difference. If the parties are unable to resolve their difference, the party asserting that designated material or information is not confidential then shall be permitted to file a motion seeking to remove a confidential designation, but the producing party shall have the burden of establishing that the information or material is confidential. The disputed material shall remain confidential and subject to the terms of this Order until the Court rules on such motion. Insofar as the provisions of any protective orders entered in this litigation restrict the communication and use of the documents produced thereunder, such orders shall continue to be binding after the conclusion of this litigation except (a) that there shall be no restriction on documents that are

- 5 -

used as exhibits before the Court, except as the Court may direct, and (b) that a party may seek the written permission of the producing party or further order of the Court with respect to dissolution or modification of such protective orders.

11.    In the event that any confidential information or material is included with, or the contents are in any way disclosed, in any pleading, motion, deposition transcript, or other paper filed with the Clerk of this Court, such information or material shall be filed with the Court as suppressed or sealed documents under Rule 10 of the Rules of the United States District Court for the Northern District of Illinois (the "Local Rules") or such other applicable rules, and shall be prominently marked with the words "CONFIDENTIAL INFORMATION--UNDER PROTECTIVE ORDER." This shall not prevent a similarly marked second copy of any pleading or other document specifically intended for review by the Court from being hand-delivered to the chambers of the presiding judge or magistrate to ensure that it is brought promptly to the Court's attention. Any documents filed with the Court pursuant to this Order are to be returned to the attorneys of record for the party that filed such documents, in the same fashion as provided for in Local Rule 33(C) or such other applicable rule concerning the return of exhibits. Upon the return of such documents, the attorney of record shall treat such documents as continuing to be governed by and subject to this Order.

12.    Within sixty (60) days after the termination of this litigation, counsel of record shall, upon written request of the producing party, (a) destroy or return (as the producing party designates) all tangible documents and other material (including recordings on disk or tape, whether recorded on volatile or nonvolatile media, hard disks, and floppy disks by magnetic or electronic impulse) containing designated confidential information and material received from

- 6 -

the producing party, and copies thereof, and information and material derived therefrom, within such counsel's possession, custody or control, received from or by authorization of the producing party or its agents, (b) destroy all other documents and other material prepared by such counsel or their experts that contain any such designated confidential information or material, and (c) serve upon the producing party a certification that this Order has been fully complied with by such counsel unless there has been any non-compliance, in which event counsel shall state fully in such certification the material facts and circumstances concerning any non-compliance. Notwithstanding the foregoing, outside counsel for a party may retain one copy of each pleading, brief, transcript or other item constituting part of the official record of the litigation and any document or material deemed confidential by the producing party. Nothing contained herein shall require the producing party to take any action regarding any document or record it produced.

13. The parties may at any time stipulate to a modification of this Order by the Court as to any particular portion of the confidential information or material, without affecting the continuing validity of this Order as to any other confidential information or material. Nothing herein shall preclude any party from seeking a further order of the Court modifying this Protective Order in whole or in part.

14. Nothing shall prevent disclosure beyond the terms of this Order if the party designating the information or material as confidential expressly consents to such disclosure, either in writing or in the record of any proceeding in this action, or if the Court, after notice to both parties, enters a final order requiring such disclosure.

- 7 -

15.    In the event that any non-party shall be called upon, by a subpoena or otherwise, to provide or produce documents or information considered confidential by such non-party, such non-party may elect to have its documents and information protected under the terms of this Agreed Protective Order by so notifying counsel for all parties in writing.  Upon service of such notice, such non-party may designate documents and other information as confidential in the manner set forth in this Order.  Such non-party's confidential information shall be treated in the same manner as confidential information of a party to this action.  In the event a non-party that has elected to be governed by this Order is under subpoena issue by this Court or another court, such court that has issued the subpoena shall have jurisdiction to entertain and decide any motion regarding such non-party brought pursuant to this Order or to otherwise enforce the provisions of this Order regarding such non-party.

**ENTERED,** this **19** day of **Feb** , 1998.


_Suzanne B. Conlon_
United States District Judge

1181827

- 8 -

## TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION . . . . . . . . . . . . 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Nature of the Case and Proceedings Below . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            1.    HIV and Plaintiffs' Medical Condition . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            2.    Plaintiffs' Insurance with Mutual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            3.    The Effect of the AIDS Caps on Doe and Smith . . . . . . . . . . . . . . . . . . 5

            4.    The AIDS Caps and Insurance Risk Practices . . . . . . . . . . . . . . . . . . . . 6

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    I.    TITLE III OF THE ADA PROHIBITS MUTUAL'S UNJUSTIFIED
        DISCRIMINATION AGAINST INSUREDS WITH HIV OR AIDS. . . . . . . . . . 9

        A.    The Plain Language of Title III Prohibits Mutual From
            Providing Plaintiffs Different and Less Favorable Insurance
            Coverage Based Solely on Their Disability. . . . . . . . . . . . . . . . . . . . . . 10

            1.    The District Court Properly Held That Title
                III Prohibits Mutual From Denying Plaintiffs
                the "Full and Equal Enjoyment" of the
                Insurance it Sold Them as a Good or Service
                of a Place of Public Accommodation. . . . . . . . . . . . . . . . . . . . . . 12

            2.    The District Court Properly Interpreted
                Sections 302(a) and (b) to Prohibit Mutual's
                AIDS Caps. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

3.  The District Court Properly Joined
    Those Courts That Have Applied
    Title III to Disability-Based
    Distinctions in Insurance Policies;
    This Application is Consistent with
    the Requirement of "Meaningful
    Access" Under the Rehabilitation
    Act.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B.  Section 501(c) Confirms That Title III Reaches the Content of Mutual's
    Facially Discriminatory Insurance Policies.  . . . . . . . . . . . . . . . . . . . . 25

    1.  Section 501(c) Provides a Limited Exemption for
        Insurers When They Make Legitimate Risk-Based
        Decisions; It Does Not Exempt Decisions Based on
        Animus, Speculation, Assumption, or Stereotype.  . . . . . . . . . . 26

    2.  Congress Clearly Intended to Prohibit Unjustified
        Discrimination in Insurance, as the ADA's Legislative
        History Confirms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    3.  The Department of Justice's Clear and Consistent
        Regulations and Guidance Further Confirm that Title
        III Prohibits Mutual's AIDS Caps. . . . . . . . . . . . . . . . . . . . . . . . 31

C.  Title II of the Civil Rights Act of 1964 Supports
    the District Court's Decision.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

II.   MUTUAL'S POLICY OF SINGLING OUT INSUREDS WITH HIV
      OR AIDS FOR DIFFERENT AND LESS FAVORABLE COVERAGE
      IS DISABILITY-BASED DISCRIMINATION THAT VIOLATES
      THE ADA.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

III.  THE McCARRAN-FERGUSON ACT DOES NOT PRECLUDE APPLICATION
      OF THE ADA TO MUTUAL'S PRACTICE OF PROVIDING DIFFERENT
      AND LESS FAVORABLE COVERAGE TO PLAINTIFFS AND OTHER
      INSUREDS WITH HIV OR AIDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Amici App. 070

## TABLE OF AUTHORITIES

**Case Law**

*A. Duda & Sons Coop. Ass'n v. U.S.*,
  504 F.2d 970 (5th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Alexander v. Choate*,
  469 U.S. 287 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 39, 40

*Anderson v. Gus Mayer Boston Store of Del.*,
  924 F. Supp. 763 (E.D. Tex. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Astoria Fed. Sav. and Loan Ass'n v. Solimino*,
  501 U.S. 104 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 25, 27

*Attar v. Unum*,
  No. CA3-96-CV-367-R, 1998 WL 574885 (N.D. Tex. Aug. 31, 1998) . . . 14, 16, 19, 20,
                                                                                          27

*Baker v. Hartford Life Ins. Co.*,
  No. 94 C 4416, 1995 WL 573430 (N.D. Ill. Sept. 28, 1995) . . . . . . . . . . . . . . . . . . 12, 15

*Barnett Bank of Marion County, N.A. v. Nelson*,
  517 U.S. 25 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Black v. Bonds*,
  308 F. Supp. 774 (S.D. Ala. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Bragdon v. Abbott*,
  ___ U.S. ___, 118 S. Ct. 2196 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

*Brewster v. Cooley Assoc.*,
  No. Civ. 97-0058 M/LFG, 1997 WL 823634 (D.N.M. Nov. 6, 1997) . . . . . . . . . . . . . 22

*Carparts Distrib. Center, Inc. v. Automotive Wholesaler's Assoc.*,
  37 F.2d 12 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Chabner v. United of Omaha Life Ins. Co.*,
  994 F. Supp. 1185 (N.D. Cal. 1998) . . . . . . . . . . . . . . . . 13, 15, 16, 18-20, 22, 27, 39, 41

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**Amici App. 071**

*Citicorp Indus. Credit, Inc. v. Brock,*
    483 U.S. 27 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*City of Edmonds v. Oxford House Inc.,*
    514 U.S. 725 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Clegg v. Cult Awareness Network,*
    18 F.3d 752 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Cloutier v. Prudential Ins. Co. of America,*
    964 F. Supp. 299 (N.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*Connecticut v. Teal,*
    457 U.S. 440 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Crandon v. U.S.,*
    494 U.S. 152 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Damato v. Hermanson,*
    153 F.3d 464 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Daniel v. Paul,*
    395 U.S. 298 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Doukas v. Metropolitan Life Ins. Co.,*
    950 F. Supp. 422 (D.N.H. 1996) . . . . . . . . . . . . . . . . . . . 12, 13, 15, 18, 22, 41

*Dunlap v. Assoc. of Bay Area Gov'ts,*
    996 F. Supp. 962 (N.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19, 38

*EEOC v. CNA Ins. Cos.,*
    96 F.3d 1039 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,*
    53 F.3d 55 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Erwin v. Northwestern Mut. Life Ins. Co.,*
    999 F. Supp. 1227 (S.D. Ind. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ford v. Schering Plough Corp.,*
    145 F.3d 601 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24, 40

*G.I.C. Corp. v. United States,*
    121 F.3d 1447 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Gonzales v. Garner Food Serv., Inc.,*
    89 F.3d 1523 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Haddle v. Garrison,*
    ___ U.S. ___, 119 S. Ct. 489 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hamm v. City of Rock Hill,*
    379 U.S. 306 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Henderson v. Bodine Aluminum, Inc.,*
    70 F.3d 958 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*Humana Inc. v. Mary Forsyth et al.,*
    ___ U.S. ___, 119 S. Ct. 710 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42-44

*Jefferson County Pharm. Ass'n, Inc. v. Abbott Labs,*
    460 U.S. 150 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Katzenbach v. Gulf-State Theaters, Inc.,*
    256 F. Supp. 549 (N.D. Miss. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Kotev v. First Colony Life Ins. Co.,*
    927 F. Supp. 1316 (C.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Lenox v. Healthwise of Ky., Ltd.,*
    149 F.3d 453 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Leonard F v. Israel Discount Bank of N.Y.,*
    967 F. Supp. 802 (S.D.N.Y. 1997), *appeal docketed*, No. 98-7320 (2d Cir.) . . . . . . . . 22

*Lewis v. Aetna Life Ins. Co.,*
    982 F. Supp. 1158 (E.D.Va. 1997) . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 19-21, 38-41

*Mackey v. Nationwide Ins. Cos.,*
    724 F.2d 419 (4th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*McCarthy v. Bronson,*
    500 U.S. 136 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Modderno v. King*,
    82 F.3d 1059 (D.C. Cir. 1996), *cert. denied*, 117 S. Ct. 772 (1997) . . . . . . . . . . . . . . 40

*NAACP v. Am. Family Mut. Ins. Co.*,
    978 F.2d 287 (7th Cir. 1991), *cert. denied*, 508 U.S. 907 (1993) . . . . . . . . . . . . . . . . 44

*Nationwide Mut. Ins. Co. v. Cisneros*,
    52 F.3d 1351 (6th Cir. 1995), *cert. denied*, 516 U.S. 1140 (1996) . . . . . . . . . . . . . . . 44

*Newman v. Piggie Park Enter., Inc.*,
    377 F.2d 433 (4th Cir. 1967), *modified on other grounds* 390 U.S. 400 (1968) . . . . . . . 34

*Oncale v. Sundowner Offshore Services, Inc.*,
    __ U.S. __, 118 S. Ct. 998 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 36, 38

*O'Connor v. Consolidated Coin Caterers Corp.*,
    517 U.S. 308 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*PACCAR Fin. Corp. v. Mackey*,
    122 F.3d 1134 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Pallozi v. Allstate Life Ins. Co.*,
    998 F. Supp. 204 (N.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Pappas v. Bethesda Hosp. Ass'n*,
    861 F. Supp. 616 (S.D. Ohio 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Parker v. Metropolitan Life Ins. Co.*,
    121 F.3d 1006 (6th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-24, 40

*Phillips v. Interstate Hotels Corp.*,
    974 S.W.2d 680 (Tenn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*R.E. Dietz Corp. v. U.S.*,
    939 F.2d 1 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Robinson v. Power Pizza, Inc.*,
    993 F. Supp. 1462 (M.D. Fla. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 25, 27, 40

Amici App. 074

*Stanley Works v. Fed. Trade Comm'n*,
    469 F.2d 498 (2d Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Stearnes v. Baur's Opera House, Inc.*,
    788 F. Supp. 375 (C.D. Ill. 1992), *remanded with directions*
    *to dismiss for lack of jurisdiction*, 3 F.3d 1142 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . 35

*Stoutenborough v. Nat'l Football League, Inc.*,
    59 F.3d 580 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Traynor v. Turnage*,
    485 U.S. 535 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 40, 41

*Vaughn v. Sullivan*,
    83 F.3d 907 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Veprinsky v. Fluor Daniel, Inc.*,
    87 F.3d 881 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Welsh v. Boy Scouts of Am.*,
    993 F.2d 1257 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Winslow v. IDS Life Ins. Co.*,
    No. 3-96-75, 1998 WL 852876 (D. Minn. Sept. 30, 1998) . . . . . . . . . . . . . . . . . . . 14, 17

*World Ins. Co. v. Branch*,
    966 F. Supp. 1203 (N.D. Ga. 1997), *vacated on other grounds*,
    156 F.3d 1142 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19, 20

**Statutes**

15 U.S.C. § 1012 *et seq.* (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

28 U.S.C. § 1291 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1294 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1343 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1367 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Amici App. 075**

42 U.S.C. § 12101(a)(8) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

42 U.S.C. § 12101(b)(1) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U.S.C. § 12101(b)(2) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U.S.C. § 12101(b)(4) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

42 U.S.C. § 12113(c) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

42 U.S.C. § 12181(7)(F) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 35

42 U.S.C. § 12181-213 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

42 U.S.C. § 12182(a) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-13, 16, 27

42 U.S.C. § 12182(b) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16, 27, 33

42 U.S.C. § 12182(b)(1)(A)(i)-(iii) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 37-38

42 U.S.C. § 12182(b)(1)(D)(i) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
42 U.S.C. § 12182(b)(2)(A)(i) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. § 12186(b) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

42 U.S.C. § 12187 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

42 U.S.C. § 12188(b) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

42 U.S.C. § 12201(a) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

42 U.S.C. § 12201(c) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10, 21, 25-29, 43

42 U.S.C. § 12206(c) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

42 U.S.C. § 2000a. (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

FLA. STAT. ch. 627.429(5)(b) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

215 ILL. COMP. STAT. 5/364 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 26, 44

Amici App. 076

## **Regulations**

28 C.F.R. ch. 1, pt. 36, App. B (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 32

28 C.F.R. ch. 1, pt. 36, App. B, § 36.212 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

28 C.F.R. ch. 1, pt. 36, § 36.307 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

28 C.F.R. ch.1, pt. 35, § 35.130(c) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

45 C.F.R. § 84.4(c) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

ILL. ADMIN. CODE tit. 50, ch. I, § 2007.6-(e) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## **Legislative History**

136 CONG. REC. E1913, *E1921 (daily ed. June 13, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

H.R. Rep. No. 101-485, pt. II (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 29, 30

H.R. Rep. No. 101-485, pt. III (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 29

S. Rep. No. 101-116 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 30

## **Other Authorities**

BUREAU OF NATIONAL AFFAIRS, AMERICAN WITH DISABILITIES ACT MANUAL,
EEOC: INTERIM POLICY GUIDANCE ON ADA AND HEALTH INSURANCE 70 (June 8, 1993) . . . . 37

DEPT. OF JUSTICE, TITLE III TECHNICAL ASSISTANCE MANUAL § III-3.11000 (1993) . . . . . . . . 31

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Appellant's jurisdictional statement is not complete and correct.

The District Court had jurisdiction over Plaintiffs' claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-213, and the Illinois Insurance Code, 215 ILL. COMP. STAT. 5/364, pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

Defendant seeks review of that portion of the District Court's December 1, 1998 Final Judgment entering judgment in favor of Plaintiffs on their ADA claim. Defendant's Notice of Appeal was filed on December 4, 1998.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291, 1294.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the ADA prohibits an insurer from providing different and less favorable coverage to insureds with HIV or AIDS when that difference is not consistent with or based on sound actuarial principles, actual or reasonably anticipated experience, bona fide risk classification, or state law?

2.      Whether an insurer's practice of providing inferior coverage only to insureds with HIV or AIDS is actionable discrimination "on the basis of disability" under the ADA?

3.      Whether the McCarran-Ferguson Act applies to the ADA at all and, if so, whether it prevents application of the ADA's prohibitions against discriminatory insurance practices that are not based on or consistent with state law?

**Amici App. 078**

## STATEMENT OF THE CASE

**A.    Nature of the Case and Proceedings Below**

Plaintiffs John Doe and Richard Smith, proceeding by pseudonyms pursuant to court order, R.14,[1] filed suit against Defendant Mutual of Omaha Insurance Company ("Mutual") on January 21, 1998, alleging that Mutual violated their rights under Title III of the Americans with Disabilities Act ("ADA" or "Act"), 42 U.S.C. § 12181 *et seq.* ("Title III") by providing insureds with the human immunodefienciency virus ("HIV") or acquired immune deficiency syndrome ("AIDS") markedly inferior limits on coverage ("AIDS Caps") than are provided to others. R.1.[2]

Mutual moved to dismiss. R.10. Plaintiffs and *amicus curiae* the United States, represented by the Department of Justice ("DOJ"), opposed Mutual's motion on the ground that Title III applies to and prohibits Mutual's AIDS Caps. R. 15, 18. The DOJ also argued that its regulations are entitled to deference and prohibit disability-based limitations on benefits. R.18 at 9-12.   On April 3, 1998, the District Court denied Mutual's Motion to Dismiss. App. 109.

On April 17, 1998, Mutual answered Plaintiffs' complaint. R.27.  On October 5, 1998, Mutual amended its answer and withdrew its defense that its policies comply with Section 501(c) of the ADA, 42 U.S.C. § 12201(c), and several affirmative defenses, including defenses relating to state regulation of insurance. R.47 at 11.

On December 1, 1998, the parties reached agreement on a proposed final judgment which contained supporting evidence, stipulations, proposed findings of fact and law and agreed remedies.

---

[1] Citations to the Record on Appeal are designated by docket number of the pleading, "R.__" and page number.  Citations to Mutual's Appendix are shown as "App.___."

[2] Plaintiffs' additional claim that Mutual's conduct violated Illinois' Insurance Code was dismissed, R.21, has not been appealed, and is not discussed further herein.

**Amici App. 079**

R.65. It was submitted to the District Court for independent review and approval. *Id.* In that submission, Mutual withdrew its remaining affirmative defenses. App. 18. Mutual stipulated that its was preserving for appeal only three legal issues raised in its Motion to Dismiss, and expressly waived its right to appeal on any other ground. App. 18-19. On December 1, 1998, the District Court entered final judgment in favor of Plaintiffs on their ADA claim. R.69. Mutual's appeal followed.

**B.    Statement of Facts**

In support of the final judgment, Plaintiffs provided the District Court with affidavits from themselves and from a qualified expert, Dr. Richard Novak, regarding their HIV status and treatment, and how Mutual's AIDS Caps force Plaintiffs to make adverse treatment decisions that they otherwise would not have to make. App. 16-17, 61-80. Plaintiffs also submitted testimony from two other qualified experts, Professor Mark Browne and Dr. Fred Hellinger, regarding the AIDS Caps and insurance underwriting practices, including Mutual's failure to follow those practices in its AIDS Cap provisions. App.17-18, 81-108. Mutual did not rebut the evidence or testimony submitted by Plaintiffs, and expressly agreed to the factual conclusions drawn therefrom. App. 14-17.

1.    HIV and Plaintiffs' Medical Condition

Doe and Smith are infected with HIV. App. 15. Plaintiffs provided extensive testimony, and Mutual stipulated, that Doe and Smith have physical impairments that substantially limit one or more of their major life activities and are disabled, App. 16, 61-62, 71-73, 76-78, and that Mutual regards Doe and Smith as disabled. App. 16.

-3-

HIV is a medical impairment that profoundly affects the body's immune system and its ability to defend itself from agents of disease. App. 61. HIV requires consistent monitoring and medical care to prevent and treat the onset of opportunistic infections or illnesses through the use of prophylactic medication. App. 62. In addition, there are well-established treatment regimens ("combination therapies") that have proven effective in controlling disease progression for many persons infected with HIV. *Id.* These treatments can delay the progression of HIV, and can reduce the likelihood of secondary infections, although such infections remain possible. App. 63. Once started, it is imperative that a person remain on a combination therapy as long as it remains effective. App. 63. Even a short interruption in treatment can lead to the development of drug-resistant strains of the virus, which will not respond to some or all of the drugs in the same class as those previously taken. *Id.*

Both Plaintiffs are on combination therapies for HIV. App. 62-63, 72, 78. Both take medication in a complicated combination every day and both require regular medical monitoring. *Id.*

### 2.    Plaintiffs' Insurance with Mutual

Mutual, which offers and sells insurance directly to members of the public at various office locations and through its agents and employees, R.47 at 3, sold Richard Smith an individual health insurance policy in April, 1992. App. 14, 76. Smith, who is self-employed, has been insured under the same policy with Mutual since that time. *Id.* The policy Mutual sold Smith includes the following AIDS Cap:

-4-

Benefits for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Conditions (ARC)[3] are subject to all certificate provisions, except for Restoring the Maximum Benefit provision. Benefits are limited to a Lifetime Maximum of $25,000.00 for each insured person. Once the Lifetime Maximum has been paid, any further expense incurred for AIDS or ARC will not be paid nor will it be used toward satisfying the Deductible or the Out-of-Pocket Expense Amount.

App. 51. John Doe also is self-employed and first was sold an individual health insurance policy by Mutual in April, 1997. App. 14, 71. Doe has been insured under the same policy with Mutual since that time. *Id.* The policy Mutual sold Doe contains the same AIDS Cap provision as Smith's, except that Doe's lifetime maximum is $100,000. App. 35-36.

Mutual applies the AIDS Caps to any expense relating to AIDS or ARC. App. 15. This includes all expenses relating to HIV, including antiviral or antiretroviral drugs or therapies, prophylaxis for prevention of opportunistic infection or illness, treatment for any opportunistic infection or resulting illness, and any diagnostic testing for HIV or AIDS. *Id.*

In both Smith's and Doe's policies, Mutual provides benefits for medical care other than HIV-related care up to a lifetime maximum of $1,000,000, with limited exceptions. App. 15, 27-29, 46-48. Mutual will "restore" this $1 million—that is, provide another $1 million in coverage—for insureds with expenses other than those relating to HIV or AIDS, if they do not incur any expenses for two consecutive years. App. 15, 27, 46.

### 3.    The Effect of the AIDS Caps on Doe and Smith

Mutual's AIDS Caps force Doe and Smith to make adverse treatment decisions now and in the future that they otherwise would not have to make. App. 16. For example, both Plaintiffs enrolled in clinical drug trials, at personal health risk, in order to receive medication for free and

---

[3]HIV infection was stipulated to be an AIDS Related Condition. App. 15.

**Amici App. 082**

avoid incurring costs against the Caps.  App. 17, 74, 79.  One of the trials entered by Smith was designed to determine if lower doses of a drug could be effective in suppressing viral load.  App. 79.  When it became clear that trial participants who were taking the reduced dosage were experiencing an increase in their viral loads, Smith was moved back to the recommended dosage.  *Id.*  Doe has reduced visits to his physician, and has foregone recommended viral load tests in order to reduce costs that could be counted against his AIDS Cap.  App. 74-75.

Once the AIDS Caps are exhausted, Doe and Smith will not receive coverage for needed medical monitoring and treatments that are afforded to other insureds paying the same premiums.  App.16.  Both Plaintiffs worry about their continued ability to pay for treatment because of Mutual's AIDS Caps.  App. 75, 78-79.  Each faces the risk that a benefit used for necessary treatments now will result in denial of necessary treatments later, with potentially detrimental or fatal results.  App. 16-17.  Mutual agreed that Doe and Smith are adversely affected by the AIDS Caps.  App. 16.

### 4.    The AIDS Caps and Insurance Risk Practices

The District Court found that Plaintiffs had established that the AIDS Caps were not justified by sound actuarial principles, actual or reasonably anticipated experience, bona fide risk classification, or State law.  App. 17-18.  This was based on unrebutted expert evidence which showed that:  (1) Mutual's practice of capping benefits for care relating to AIDS or ARC was not consistent with its actuarial practices with regard to other medical conditions for which no exclusions or limitations are found; (2) Mutual's claims data showed that, consistent with reported industry experience, its AIDS-related claims remained consistently small and presented little, if any, risk to Mutual's operations or premium structure; (3) Mutual's analysis showed that the AIDS Caps were not necessary to the success of its insurance operations or the stability of its premium structure; (4)

-6-

Mutual had no evidence to suggest that its premium structure would vary significantly, or in ways that made Mutual uncompetitive, if it did not have AID Caps; (5) the cost of treating HIV or AIDS is typically less than the cost of treating other severe conditions insured without caps by Mutual under the policies issued to Doe and Smith; (6) the costs of treating HIV and AIDS have been known and publicly available for many years; (7) Mutual's AIDS-related claims constituted less than 1% of Mutual's major medical claims and the proportion of claims relating to AIDS has fallen; and (8) unlike the policies at issue in this case, most health insurance policies do not cap coverage for AIDS or ARC at a lower level than for other medical conditions. App. 83, 95, 96. Mutual's open AIDS-related files total about 70 out of 15,000,000 insureds. R. 39, Attachment 3 at 6.

Mutual offered no contrary evidence and stipulated that it "has not shown and cannot show that its AIDS Caps are or ever have been consistent with sound actuarial principles, actual or reasonably anticipated experience, bona fide risk classification, or state law." App. 17.

## STANDARD OF REVIEW

The issues of law expressly reserved by Mutual as grounds for appeal are subject to *de novo* review. Those three issues are "(1) whether Title III of the ADA applies to the terms and conditions of health insurance coverage; (2) the application of the McCarran-Ferguson Act to the ADA; and (3) whether the AIDS Caps constitute discrimination on the basis of a disability." App. 18-19. Mutual has stipulated to all relevant facts and either does not dispute or has waived its right to challenge the remainder of the District Court's legal rulings; these are not subject to review. *A. Duda & Sons Coop. Ass'n v. U.S.*, 504 F.2d 970, 975 (5th Cir. 1974); *Stanley Works v. Fed. Trade Comm'n*, 469 F.2d 498, 506 (2d Cir. 1972).

**Amici App. 084**

## SUMMARY OF ARGUMENT

Plaintiffs presented the District Court with a classic case of disability-based discrimination. Mutual's policies deny people with HIV or AIDS the full and equal enjoyment of a substantially higher benefit limit that Mutual makes available to its other customers. It is undisputed that Mutual has no legitimate business reason to cap Plaintiffs' benefits for HIV or AIDS at a small fraction of that provided to others. What Mutual seeks is the right arbitrarily to do so, despite the devastating health consequences for Plaintiffs and the clear prohibitions of federal law. This is exactly the type of baseless discrimination that Congress sought to end through passage of the ADA, and the District Court's judgment should therefore be affirmed.

The District Court's ruling finds full support in the ADA's plain language, its broad remedial purposes, legislative history, governing DOJ regulations and analogous decisions under the ADA and the Rehabilitation Act. The District Court correctly rejected Mutual's effort, by pretending that key words and entire sections of the ADA have no meaning, to reduce Title III to a mere prohibition on outright denials of "access," as Mutual narrowly defines that term. Mutual seeks an insurance exemption from the ADA but its theories would allow *any* public accommodation to avoid ADA liability for providing substandard goods and services, such as obstructed views of a movie screen or providing only some items on its standard menu, so long as it let individuals with disabilities in the door. Such a result would make a mockery of the ADA.

There are few rights more critical to the ability of persons with disabilities to participate fully in society than the right to fair treatment in insurance. In seeking to end disability-based discrimination in the private sector through the ADA, Congress prohibited unjustified

-8-

discrimination in insurance.  But Congress was not unmindful of the insurance industry's

business concerns and therefore provided a limited exemption for legitimate risk-based insurance

practices.  By striking this clear balance between the federal government's desire to end

discrimination based on disability and private insurers' business needs, embodied in Section

501(c) of the Act, Congress let it be known that sound underwriting practices could continue but

arbitrary distinctions would be struck down.  Mutual's AIDS Caps fall into the latter category.

Mutual runs afoul of the ADA because there is no legitimate actuarial justification for its

discrimination against policyholders with HIV or AIDS, and its refusal to remove the AIDS Caps

cannot be excused by any genuine concerns about financial harm to the company or to those who

depend upon a financially sound insurance industry.

Barren of any defenses recognized under the Act, Mutual asks the Court to legislate a

wholesale insurance exemption from the ADA where none exists, or to find one in the

McCarran-Ferguson Act.  Because Congress plainly struck a different compromise, the District

Court should be affirmed.

## ARGUMENT

**I.     TITLE III OF THE ADA PROHIBITS MUTUAL'S UNJUSTIFIED DISCRIMINATION AGAINST INSUREDS WITH HIV OR AIDS.**

Congress' express purpose in enacting the ADA was "to provide a clear and comprehensive

national mandate for the elimination of discrimination against individuals with disabilities" through

"clear, strong, consistent, enforceable standards" prohibiting unjustified discrimination on the basis

of disability.  42 U.S.C. § 12101(b)(1), (2).  As one part of Congress' comprehensive scheme, Title

III prohibits discrimination against individuals on the basis of disability in the "full and equal

enjoyment" of goods and services of any place of public accommodation by any person who

-9-

owns or operates such a place. 42 U.S.C. § 12182(a). As the District Court properly found, Title III's guarantee of "full and equal enjoyment" reaches beyond outright denials of access to physical places and prohibits the unequal treatment of individuals with disabilities once access to a place, good, or service has been granted. *See* Sections I.A.1 (§ 302(a)) and 2, (§ 302(b)), *infra*. As the growing majority of courts have found, these prohibitions apply to discriminatory terms and conditions of insurance policies offered to the public. *See* Section I.A.3, *infra*.

Section 501(c) of the Act, 42 U.S.C. § 12201(c), confirms that Title III's prohibitions apply to insurance policies. *See* Section I.B.1, *infra*. Section 501(c) does not exempt insurers from Title III's reach entirely, but, instead, provides insurers with a limited exemption for certain risk-based practices. Under Section 501(c), an insurer may make distinctions based on disability, but only when justified by actual risk. Thus, the ADA does not prohibit all differences in insurance, but does proscribe arbitrary distinctions that are unrelated to actual risk. Both the Act's legislative history, *see* Section I.B.2, *infra*, and DOJ regulations and guidance, *see* Section I.B.3., *infra*, confirm that the ADA bars Mutual's discriminatory practice of capping coverage for its insureds with HIV or AIDS.

### A. The Plain Language of Title III Prohibits Mutual From Providing Plaintiffs Different and Less Favorable Insurance Coverage Based Solely on Their Disability.

Plaintiffs agree that the language of Title III, properly construed, should govern the Court's decision. That language, all of which must be given effect, requires affirmance of the District Court. Section 302(a) of Title III broadly provides:

-10-

> No individual shall be discriminated against on the basis of disability in the full
> and equal enjoyment of the goods, services, facilities, privileges, advantages, or
> accommodations of any place of public accommodation by any person who owns,
> leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). Immediately following this broad prohibition, Section 302(b) of Title III

delineates specific prohibited conduct. 42 U.S.C. § 12182(b); *see* Section I.A.2., *infra*. The

District Court properly applied the plain language of these and other provisions in concluding

that Title III prohibits Mutual's unjustified discrimination against Plaintiffs, based on their

disability, in the full and equal enjoyment of the goods and services it sells to its insureds.

*Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory

language is determined by reference to the language itself, the specific context in which that

language is used, and the broader context of the statute as a whole") (citations omitted); *Damato

v. Hermanson*, 153 F.3d 464, 471 n.9 (7th Cir. 1998). The meaning of statutory language is not

determined by "a single sentence or member of a sentence" in isolation, but rather, by "look[ing]

not only to the particular statutory language, but to the design of the statute as a whole and to its

object and policy." *Crandon v. U.S.*, 494 U.S. 152, 158 (1990); *McCarthy v. Bronson*, 500 U.S.

136, 139 (1991) ("[s]tatutory language must always be read in its proper context"). As a

remedial statute designed to prohibit various forms of discrimination faced by persons with

disabilities in their daily lives, the ADA must be construed broadly. *Jefferson County Pharm.

Ass'n, Inc. v. Abbott Labs*, 460 U.S. 150, 159 (1983); *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d

881, 888-89 (7th Cir. 1996).

Amici App. 088

1.    **The District Court Properly Held That Title III
Prohibits Mutual From Denying Plaintiffs the
"Full and Equal Enjoyment" of the Insurance it
Sold Them as a Good or Service of a Place of
Public Accommodation.**

Title III's prohibition of discrimination against individuals on the basis of disability in the

full and equal enjoyment of goods and services of any place of public accommodation reaches

Mutual's AIDS Caps. 42 U.S.C. § 12182(a). An "insurance office" is expressly declared to be a

"public accommodation" under Title III if its operations affect commerce. 42 U.S.C.

§ 12181(7)(F). Insurance offices were not included because they might sell t-shirts or hats.

Rather, they were included because insurance policies are, as the District Court correctly held,

the goods, services, privileges, or advantages of insurance offices, and Congress intended to

reach discrimination in insurance. App. 18, 119; *see also Doukas v. Metropolitan Life Ins. Co.*,

950 F. Supp. 422, 425 (D.N.H. 1996) ("Under the plain language of Title III, an insurance office

is a 'public accommodation' that is prohibited from discriminating on the basis of disability in

the provision of a good or service, which includes insurance products"); *Baker v. Hartford Life

Ins. Co.*, No. 94 C 4416, 1995 WL 573430 at *3 (N.D. Ill. Sept. 28, 1995) (insurance sold by

telephone and mail is a "service" of a place of public accommodation to which Title III applies).

As noted by the court in *Doukas*, "[t]here can hardly be a 'good' or 'service' more central to the

day-to-day life of a seriously disabled person than insurance—for it is often insurance coverage

that will determine a disabled person's ability to prevent the disability from limiting his or her

participation in society." 950 F. Supp. at 427. Like most insurance companies, Mutual offers

and sells its insurance policies to members of the public at various office locations, and sold the

policies at issue in this case to Doe and Smith. R.47 at 3; App. 14.

-12-

Under Section 302(a), Plaintiffs are entitled to "full and equal enjoyment" of Mutual's insurance policies. Specifically, Plaintiffs are entitled to enjoy the same $1 million restorable benefits that all other policyholders except those with HIV or AIDS enjoy. Through its AIDS Caps, however, Mutual has erected a discriminatory and illegal barrier to that enjoyment.

Mutual's argument that Title III prohibits only the outright denial of access to its offices or the goods and services of those offices, however discriminatory, Mutual Br. at 10-12, 24, 31, finds no support in the text of the Act. Section 302(a) never mentions "access." It does guarantee individuals with disabilities "full and equal enjoyment" of "facilities" but also "goods," "services," "privileges," "advantages," and "accommodations." Recognizing that Mutual's limited interpretation of Title III would render superfluous the statute's use of these many terms, courts repeatedly have rejected it. *See, e.g., Chabner v. United of Omaha Life Ins. Co.*, 994 F. Supp. 1185, 1190 (N.D. Cal. 1998); *Doukas*, 950 F. Supp. at 426 ("The broad wording and diversity of [§ 12182(b)'s] 'specific prohibitions,' are a strong indication that Title III was intended to extend beyond mere access or availability of a good or service").

Moreover, in common parlance, "full and equal enjoyment" is something that can occur only after one gains access to a facility, good, service, privilege, or advantage. A person disabled by leukemia does not fully and equally enjoy a bookstore if, upon entry, he or she is restricted from buying biographies or poetry for no rational reason. A restaurant cannot escape liability under the ADA by arguing that "we let everyone in" if its menu forbids patrons with AIDS from ordering the main course. By its plain language, Section 302(a) is not satisfied simply by allowing individuals with disabilities in the door. *See, e.g., Carparts Distrib. Center, Inc. v.*

-13-

**Amici App. 090**

*Automotive Wholesaler's Assoc.*, 37 F.3d 12, 19 (1st Cir. 1994) (applying the ADA to AIDS Caps).

In *Carparts*, the First Circuit refused to limit Title III to a singular prohibition on access to physical places. In that case, as here, the plaintiff challenged a health insurance plan that limited lifetime benefits for AIDS to $25,000 while otherwise providing up to $1 million in coverage. Limiting Title III to physical access, the district court had dismissed plaintiff's claim because he had not been denied access to a physical structure. The First Circuit reversed. Noting Congress' inclusion of service establishments like insurance offices and travel services as statutorily defined public accommodations, 42 U.S.C. § 12181(7)(F), the First Circuit held that "[t]he plain meaning of the terms do not require 'public accommodations' to have physical structures for persons to enter." *Carparts*, 37 F.3d at 19. Because many service establishments do business without requiring their customers or clients to be physically present at an office (a fact more and more true with the advent of electronic commerce), the court determined that "[i]t would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not." *Id.*

Since the First Circuit's decision in *Carparts*, numerous courts have confirmed that Title III requires equal access not only to physical places but also to goods, services, privileges, or advantages of public accommodations, including insurance policies sold by public accommodations. *See, e.g.*, *Winslow v. IDS Life Ins.* Co., No. 3-96-75, 1998 WL 852876 at *4-6 (D. Minn. Sept. 30, 1998) (Title III applies to an insurer's denial of long-term disability policy based on disability); *Attar v. Unum*, No. CA3-96-CV-367-R, 1998 WL 574885 at *3 (N.D. Tex.

-14-

Aug. 31, 1998) (Title III applies to an insurer's practice of capping benefits for mental illness);

*Dunlap v. Assoc. of Bay Area Gov'ts*, 996 F. Supp. 962, 965-66 (N.D. Cal. 1998) (Title III

applies to an insurer's denial of treatment for a major physical disability under policy); *Chabner*,

994 F. Supp. at 1193 (Title III applies to an insurer's increased premium based on disability);

*Lewis v. Aetna Life Ins. Co.*, 982 F. Supp. 1158, 1165 (E.D.Va. 1997) (same as *Attar*); *World Ins.*

*Co. v. Branch*, 966 F. Supp. 1203, 1208 (N.D. Ga. 1997) (Title III applies to health insurer's

inclusion of AIDS Caps in policies), *vacated on other grounds*, 156 F.3d 1142 (11th Cir. 1998);

*Cloutier v. Prudential Ins. Co. of America*, 964 F. Supp. 299, 302 (N.D. Cal. 1997) (Title III

applies to an insurer's denial of life insurance based on disability); *Kotev v. First Colony Life Ins.*

*Co.*, 927 F. Supp. 1316, 1323 (C.D. Cal. 1996) (Title III applies to an insurer's denial of life

insurance for applicant with HIV-positive partner); *Doukas*, 950 F. Supp. at 425-26 (Title III

applies to an insurer's denial of mortgage disability insurance); *Baker,* 1995 WL 573430 at *3

(Title III applies to an insurer's denial of major medical policy based on disability); *see also*

*Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 960 (8th Cir. 1995) (Title III applies to an

insurer's refusal to cover treatment for breast cancer while covering comparable conditions). In

*Lewis*, looking to the plain language of the Act, the court rejected an insurer's argument that a

plaintiff could not avail himself of Title III's protection because he did not purchase his policy

from an insurance office or other place of public accommodation and explained:

> It is difficult to believe that Congress intended to withhold the protections of the
> ADA from the millions of disabled persons who buy their goods by telephone,
> mail-order, or home delivery without ever entering the physical premises of a
> business establishment. It is even more difficult to believe that Congress intended
> this result to apply to the insurance industry, whose goods and services (insurance
> policies) are routinely purchased by customers who never set foot in an insurance
> office as is the case here. Indeed, under defendants' construction, an insurer could

Amici App. 092

freely discriminate in the provision of insurance without fear of ADA Title III simply by not maintaining a physical office or by marketing its policies via the U.S. mail. This would directly conflict with Congress purpose in enacting the ADA to "provide a clear and comprehensive mandate for the elimination of discrimination against individuals with disabilities."

*Lewis*, 982 F. Supp. at 1165 (quotation omitted).

Only by a construction that ignores most of the Act's words can Mutual find support in the "plain meaning" of Section 302(a). Of course, such an approach grossly violates fundamental canons of statutory construction. *Astoria Fed. Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) ("But of course we construe statutes, where possible, so as to avoid rendering superfluous any parts thereof"). It is also makes a mockery of the ADA's express promises of both "full participation" in society and an end to the "major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. §§ 12101(a)(8), (b)(4). The District Court was correct in rejecting the construction urged by Mutual and in giving Title III's words their plain and intended meaning. App. 119-120.

## 2. The District Court Properly Interpreted Sections 302(a) and (b) to Prohibit Mutual's AIDS Caps.

The broad prohibition contained in Section 302(a) is followed by Section 302(b), 42 U.S.C. § 12182(b), which includes a detailed listing of various forms of prohibited discrimination that make additionally clear Congress' intent to reach discrimination in goods and services provided to the public, including insurance policies. *Chabner*, 994 F. Supp. at 1190; *Attar*, 1998 WL 574885 at *2. The District Court correctly held that these sections prohibit Mutual's AIDS Caps.

Congress explicitly provided in § 302(b)(1)(A)(i) that "an individual or class of individuals" cannot be denied the opportunity "to participate in *or benefit from*" the goods, services, privileges or advantages which an entity offers. 42 U.S.C. § 12182(b)(1)(A)(i) (emphasis added). Further, in subsection § 302(b)(1)(A)(ii) ("Participation in unequal benefits"), the Act expressly states:

> It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with *the opportunity to participate in or benefit from* a good, service, facility, privilege, advantage, or accommodation *that is not equal to that afforded to other individuals*.

42 U.S.C. § 12182(b)(1)(A)(ii) (emphasis added). And, in the subsection entitled, "Separate benefit," the ADA provides:

> It shall be discriminatory to provide an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is *different or separate* from that provided to other individuals . . . .

42 U.S.C. § 12182(b)(1)(A)(iii) (emphasis added).

Mutual violates all of these subsections,[4] by providing individuals with HIV or AIDS only $25,000 or $100,000 in benefits for their HIV-related expenses, while providing $1 million

---

[4]Mutual's AIDS Caps violate other specific provisions as well. For example, by employing criteria or standards (*i.e.,* whether benefits relate to AIDS or ARC) that screen out insureds with HIV or AIDS from enjoying the $1 million cap Mutual otherwise provides, Mutual violates 42 U.S.C. §§ 12182(b)(1)(D)(i) and (b)(2)(A)(i). *See also* 28 C.F.R. ch. 1, pt. 36, App. B at 602 (1998) (*e.g.,* it would violate Title III to establish criteria that would limit individuals with disabilities only to certain seats in a restaurant). Mutual also violates Sections 302(b)(2)(A)(i)-(iii), which further confirm Congress' intent to reach beyond equal "access" by requiring, among other things, that public accommodations make reasonable modifications to "policies, practices, or procedures" as necessary for individuals with disabilities. *See Winslow,* 1998 WL 852876 at *5 (these provisions "would be rendered irrelevant if Title III were held to apply only to physical access to public accommodations.").

-17-

in restorable benefits to other policyholders. Mutual has no more provided equal "access" or equal treatment than if it sold movie patrons tickets to the same theater, but required those with cerebral palsy to sit in seats with restricted views or allowed them only to attend the late show. Considering and applying Sections 302(a) and (b) to Mutual's conduct in this case, the District Court determined:

> The AIDS/ARC caps could alternately be viewed as a discriminatory denial of the "full and equal enjoyment" of goods or a service; as a discriminatory denial of an equal opportunity to benefit from goods or a service . . . or as the provision of goods or a service different from that provided to others.

App. 119 [5]; *see also Chabner*, 994 F. Supp. at 1191-92; *Doukas*, 950 F. Supp. at 426-27; *Cloutier*, 964 F. Supp. at 302.

Mutual misrepresents the court's ruling as requiring Mutual to provide new goods or the "same level of enjoyment to all persons." Mutual Br. at 22-23. What the court held unlawful under the ADA, however, was Mutual's unjustified practice of denying policyholders with HIV or AIDS the opportunity to enjoy fully benefits it already provides to others. Even Mutual concedes that a public accommodation violates Title III when it limits persons with disabilities only to certain of its goods, services, privileges, or advantages. Mutual Br. at 25 ("a theater would provide an unequal benefit if it limited persons with disabilities to certain performances"). This is the exact kind of conduct the District Court found actionable here, and the court's ruling is consistent with Congress' intent to provide individuals with disabilities an "equal opportunity to obtain the same result." Mutual Br. at 22 (citing H.R. Rep. No. 101-485, pt. II, at 101 (1990)).

---

[5]Mutual argues that "the subparts in Section 302(b) do not create independent rights." Mutual Br. at 24. In explaining Section 302, however, Congress explicitly stated that its more specific provisions should control over the general. S. Rep. No. 101-116, at 61 (1989); H.R. Rep. No. 101-485, pt. II, at 104 (1990); H.R. Rep. No. 101-485, pt. III, at 58 (1990).

**Amici App. 095**

This is not, as Mutual attempts to argue, like requiring a restaurant to provide specialty foods not already on its menu, but rather a requirement that the existing menu be offered to all.

### 3. The District Court Properly Joined Those Courts That Have Applied Title III to Disability-Based Distinctions in Insurance Policies; This Application is Consistent with the Requirement of "Meaningful Access" Under the Rehabilitation Act.

Mutual's wish to be completely exempt from Title III's non-discrimination requirements is an understandably common one for private insurers charged with violating the ADA, and some courts have indicated they might grant this wish. But more persuasive decisions have reached the opposite conclusion. In finding that Mutual's AIDS Caps violate the ADA, the District Court joined a growing number of courts that have correctly held that Title III reaches unjustified disability-based distinctions in the content of insurance policies. App. 115-21; *see Chabner*, 994 F. Supp. at 1193; *Lewis*, 982 F. Supp. at 1165; *Attar*, 1998 WL 574817 at *3; *Dunlap,* 996 F. Supp. at 965; *World Ins.*, 966 F. Supp. at 1208; *see also Henderson*, 70 F.3d at 960. The contrary decisions cited by Mutual were rejected as factually inapposite or unpersuasive because of their common failure to give full effect to the language of the Act, relevant legislative history and the DOJ's interpretive guidance. App. 118-19.

In criticizing the District Court's conclusion, Mutual ignores several cases and misrepresents *Chabner* as involving the denial of access to an insurance policy. Mutual Br. at 16 n.9. In fact, the plaintiff in *Chabner* was provided an insurance policy, but at an increased premium. *Chabner*, 994 F. Supp. at 1187. Concluding that "the clear weight of authority supports the court's conclusion that insurance underwriting is covered by Title III of the ADA,"

-19-

994 F. Supp. at 1192, the *Chabner* court recognized that "[f]inding that Title III applies only to physical barriers to entry would render meaningless the provisions providing for equal access to goods and services" and Section 501(c). *Id.* at 1190. In finding that Title III reaches inferior coverage provided to insureds with mental disabilities, the court in *Attar* similarly held that the plain language of Title III "empower[s] plaintiffs to challenge the content of insurance and benefit plans, a fact which is reaffirmed by the ADA's legislative history." *Attar*, 1998 WL 574817 at \*3.

The court in *Lewis*, 982 F. Supp. at 1165, similarly allowed the plaintiff to challenge inferior coverage for insureds with mental disabilities, concluding that "Title III prohibits an insurer from discriminating on the basis of disability in the insurance policies that it offers . . . ." And, in reasoning that remains persuasive and relevant to the issue before this Court, the Northern District of Georgia held that the unjustified practice of capping benefits for AIDS violates the ADA:

> Because access to adequate health care is often integral to a disabled individual's ability to participate in society, the court cannot imagine that an insurer could arbitrarily cap the benefits payable with respect to a particular disability without running afoul of [the ADA's] stated purpose.

*World Ins.*, 966 F. Supp. at 1208.[6] Indeed, solely because of their disability, Mutual's AIDS Caps force Plaintiffs to make adverse treatment decisions to avoid reaching arbitrary policy

---

[6]*World Ins.* involved an insurer's claim for rescission of a policy based on misstatements in the original policy application, and an insured's counterclaim that an AIDS Cap contained in the policy violated the ADA. The Eleventh Circuit rescinded the policy, and therefore vacated as moot the District Court's decision that the AIDS Caps violated Title III. *World Ins. Co. v. Branch,* 156 F.3d 1142 (11th Cir. 1998).

-20-

limits, App. 16, effectively requiring Plaintiffs to roll the dice about whether avoiding costs under the Caps will instead cost them their lives. App. 17.

Cases brought under the Rehabilitation Act, which Mutual agrees are precedential in construing the ADA, Mutual Br. at 42, n.18, *see also* 42 U.S.C. § 12201(a), further support the District Court's conclusion. The Supreme Court has recognized that individuals with disabilities must be provided "with meaningful access to the benefit that the grantee offers." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). *Choate* involved a challenge to Tennessee's across-the-board limitation on paid hospital coverage, which the plaintiffs challenged as having a disparate impact on the disabled. *Id.* at 290. The Court allowed Tennessee's facially *neutral,* uniform limitation, specifically noting that it "does not apply to only particular handicapped conditions and takes effect regardless of the particular cause of hospitalizations." *Id.* at 302 n.22. *Choate* is of no help to Mutual in defending Plaintiffs' challenge to a policy that is facially *discriminatory* and results in disparate treatment of individuals with disabilities. *See Lewis*, 982 F. Supp. at 1167 n.8 (discussing misapplication in case law of *Choate* and *Traynor v. Turnage*, 485 U.S. 535 (1988)). To the contrary, recognizing that anti-discrimination legislation can be "'emptied of meaning'" by the manner in which a benefit is defined as much as by outright denial of access, the Court in *Choate* made clear that "[t]he benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled . . . ." *Choate*, 469 U.S. at 301 (citation omitted).

This principle is fully applicable to the ADA. Congress provided meaningful access to private insurance by requiring that any disparate treatment based on disability be made in accordance with Section 501(c). 42 U.S.C. § 12201(c); *see* Section I.B., *infra* . *See also*

-21-

**Amici App. 098**

*Chabner*, 994 F. Supp. at 1193; *Doukas*, 950 F. Supp. at 429. Through Section 501(c),

individuals with disabilities are protected against insurance practices that are unrelated to risk,

and thereby guaranteed the same access to insurance afforded to those who pose equivalent risk.

Because Mutual's AIDS Caps do not comply with Section 501(c), Mutual has denied Plaintiffs

meaningful access to its insurance coverage, in violation of the ADA.

To justify its discrimination, Mutual relies on a line of cases involving the propriety of

public accommodations challenges when insurance is obtained through an employer. Mutual Br.

at 12-16; *see, e.g.*, *Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1008 (6th Cir. 1997);

*Ford v. Schering Plough Corp.*, 145 F.3d 601, 603 (3d Cir. 1998).[7] Here, it is undisputed that

the health insurance was sold by Mutual to Doe and Smith. App. 14. Therefore, these decisions

do not counsel reversal, and an examination of their reasoning confirms the District Court's

determination that they are factually inapposite and unpersuasive. App.118-19.

In *Parker*, the Sixth Circuit dismissed an employee's Title III challenge to a disability

insurance plan that provided one level of benefits for employees disabled by mental illness and

another level for those disabled by physical illness. 121 F.3d at 1014. A sharply divided *en banc*

court held that, because the employee obtained the disability insurance coverage through her

employer and not directly from the insurance company, Parker could not sue the insurance

---

[7]Of the cases cited by Mutual, the court in *Pallozi v. Allstate Life Ins. Co.*, 998 F. Supp. 204, 207 (N.D.N.Y. 1998), concluded that "an individual may not be denied insurance coverage based on a disability unless such denial is based upon sound risk classification." The remainder of the cases involved disability or health insurance plans obtained through an employer. *See Leonard F v. Israel Discount Bank of N.Y.*, 967 F. Supp. 802 (S.D.N.Y. 1997), *appeal docketed*, No. 98-7320 (2d Cir.); *Lenox v. Healthwise of Ky., Ltd.*, 149 F.3d 453 (6th Cir. 1998); *Pappas v. Bethesda Hosp. Ass'n*, 861 F. Supp. 616 (S.D. Ohio 1994); *Brewster v. Cooley Assoc.*, No. Civ. 97-0058 M/LFG, 1997 WL 823634 (D.N.M. Nov. 6, 1997); *Erwin v, Northwestern Mut. Life Ins. Co.*, 999 F. Supp. 1227 (S.D. Ind. 1998).

company as a public accommodation. *Id.* at 1011-12, 1013 n.8. Even the majority distinguished the facts at issue here, explicitly noting that "[Section 501(c)] *may* address the contents of insurance policies provided by a public accommodation, [but] does not address the contents of a long-term disability plan offered by an employer because it is not a place of public accommodation." *Id.* at 1012-13 (emphasis added). Clearly *Parker* does not control on the facts of this case.

The District Court declined Mutual's invitation to follow other *dicta* in *Parker* opining that Title III does not govern the content of an employer's long-term disability plan. *Parker,* 121 F.3d at 1012. The District Court faulted the Sixth Circuit and those who have followed it for failing to consider the plain language of the statute:

> This court finds the *Parker* and *Leonard F.* courts' limitation on the scope of Article III neither controlling nor persuasive. Contrary to Mutual's suggestions, limitation of Title III's scope to the question of discriminatory access is at odds with the plain language of Title III, relevant legislative history and the Department of Justice's interpretative guidance. As an initial matter, the plain language of Title III's anti-discrimination provisions nowhere indicates that Title III's scope is limited to questions of access. Indeed, in order to arrive at the restrictive interpretation of Title III that Mutual advances, the *Parker* court relied on the language of ADA regulations. The *Parker* court did not comment on the statutory text. The plain language of 42 U.S.C. § 12182(a), (b)(1)A(i), (b)(1)(A)(ii) and (b)(a)(1)(iii) belies the *Parker* court's narrow conclusion. Title III is patently concerned with more than just access to the goods and services offered by places of public accommodation.

App. 118. The same criticisms were leveled in a forceful dissent joined by five of the judges from the Sixth Circuit. *Parker*, 121 F.3d at 1020 (Merritt, J., dissenting) (majority decision "flies

in the face" of Section 501(c), ignores legislative history, and "produces an absurd result"); *see also id.* at 1019 (Martin, J., dissenting).[8]

The Third Circuit tread a path similar to the *Parker* majority in *Ford*, 145 F.3d 601. Faced with comparable facts, and in reliance on *Parker*, the Third Circuit held that where disability insurance is offered through an employer, there is no public accommodation discrimination. *Id.* at 614. In subsequently noting, in *dicta,* that Title III guarantees only physical access, the Third Circuit also failed to consider the statutory language or legislative history or properly analyze DOJ guidance.[9]

In a series of recent, unanimous opinions interpreting civil rights laws, the Supreme Court has unmistakably reminded the courts of their obligation to be guided by the terms of relevant statutes and to redress all forms of discrimination encompassed therein rather than to infer limits on Congressional purposes. *See, e.g., Oncale v. Sundowner Offshore Services, Inc.*, __ U.S. __, 118 S. Ct. 998, 1002 (1998) (Scalia, J.) (rejecting a "bewildering variety" of interpretations of Title VII that strayed from its language to bar remedies for conduct within its terms or to impose conditions not found in that statute); *Haddle v. Garrison*, ___ U.S. ___, 119 S. Ct. 489, 492 (1998) (Rehnquist, C.J.) (refusing to impose a limiting construction on § 1985(2) with respect to the phrase "injured in his person or property" that was inconsistent with the species of harms

---

[8]Judge Martin, who authored the Sixth Circuit's decision in *Stoutenborough v. Nat'l Football League, Inc.*, 59 F.3d 580 (6th Cir. 1995), joined Judge Merritt's dissent but also wrote separately to "emphasize my disagreement with the majority's interpretation of" *Stoutenborough* as limiting Title III to physical structures. *Parker*, 121 F.3d at 1019.

[9]For example, the Third Circuit relied upon DOJ regulations regarding "accessible or special goods" while simultaneously rejecting DOJ regulations specifically relating to insurance as inconsistent with statutory language. *Ford,* 145 F.3d at 613. The court did not examine the specific language of the Act to which either regulation relates in reaching its conclusions.

-24-

sought to be remedied by Congress and the traditional methods for construing injuries under the statute); *Robinson*, 519 U.S. at 341-46 (Thomas, J.) (overturning a construction of Title VII that limited its reach to current employees because that construction was inconsistent with other statutory provisions and Congressional intent). In accord with these cases, the District Court's ruling gives full effect to the statute's plain language and resists the temptation to impose limits not found therein.

### B.   Section 501(c) Confirms That Title III Reaches the Content of Mutual's Facially Discriminatory Insurance Policies.

The District Court's interpretation of Title III is also supported by the text of 42 U.S.C. § 12201(c) ("Section 501(c)"), entitled "Insurance," which contains a limited exemption to full statutory enforcement that would be superfluous if the ADA did not apply to the content of insurance policies. *Astoria*, 501 U.S. at 112. Section 501(c) provides:

> Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict—
>
> > (1) an insurer . . . from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law;
>
> \*       \*       \*
>
> Paragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the purposes of subchapter I and III of this chapter.

Mutual's arguments for a wholesale insurance exemption to the ADA are irreconcilable with this provision.

Following the National Association of Insurance Commissioners ("NAIC") Model Regulation on Unfair Discrimination, most states, like Illinois, prohibit distinctions based on

-25-

disability "except where the distinction or discrimination is based on sound actuarial principles or is related to actual or reasonably anticipated experience." 215 ILL. COMP. STAT. 5/364 (1998). Thus, the standard set forth in Section 501(c)(1) requires risk-based practices to be based on sound actuarial principles or experience. *See* Section I.B.2, *infra*. As the District Court ruled, this section expressly confirms Congressional intent, within risk-based limits, "to subject insurance companies to the full scope of the ADA's anti-discrimination prohibitions." App. 123.

1. **Section 501(c) Provides a Limited Exemption for Insurers When They Make Legitimate Risk-Based Decisions; It Does Not Exempt Decisions Based on Animus, Speculation, Assumption, or Stereotype.**

Mutual offers no actuarial or risk-based defense for its AIDS Caps. As a leader in the insurance industry with extensive experience in risk analysis and underwriting, Mutual analyzed its AIDS-related claims experience and the need for an AIDS Cap. It knew that AIDS-related claims comprised less than 1% of its major medical claims, that the costs of these claims had decreased over time, and that the cost of care relating to HIV or AIDS was similar to or less than the costs of treating other medical conditions that remain uncapped. App. 82-84, 94-96. Yet, Mutual still decided to cap coverage for HIV or AIDS. *Id.* Having admitted to a practice that it concedes *is not and has never been* based on or consistent with State law or actual risk, and having waived factual defenses under Section 501(c), Mutual finds itself arguing that Section 501(c) provides a wholesale exemption as a matter of law for any discriminatory insurance practice. This is simply untenable.

There would be no reason for Congress to provide a limited exemption for risk-based practices in Section 501(c) if Title III did not otherwise reach the terms and conditions of

-26-

insurance coverage. *Chabner*, 994 F. Supp. at 1190-91 ("If Title III were meant only to prevent insurance companies from denying persons with disabilities equal access to the physical plants of insurance offices, there would have been no need for Congress to include the safe harbor provision dealing with underwriting practices."); *Attar*, 1998 WL 574885, at *3 ("[s]uch a 'safe harbor' would be unnecessary unless the ADA empowered plaintiffs to challenge the content of insurance and benefit plans, a fact which is reaffirmed by the ADA's legislative history"). By carving out specific circumstances under which an insurer may write insurance terms that are unfavorable to individuals with disabilities, Section 501(c) confirms that insurance practices unrelated to actual risk are prohibited by Sections 302(a) and (b). *Astoria*, 501 U.S. at 112; *see Robinson*, 519 U.S. at 342-43 (relying on other provisions of the statute which relate to former employment to construe term "employee" to include former employees).

Congress' mandate that Section 501(c)(1) not be used as a "subterfuge" to evade the purposes of the Act reinforces this reading. The legislative history reveals that:

> A specific balance was struck in this area, which ensures that insurance companies may continue to underwrite and classify risks based on sound actuarial principles, but that does not allow such underwriting to be used as subterfuge as a means to evade the purposes of Title I and III of the Act.

136 CONG. REC. E1913, *E1921 (daily ed. June 13, 1990). Section 501(c) was designed to block exactly the sort of end-run around the ADA's clear anti-discrimination mandate that Mutual tries here.

Mutual's suggestion that the reference to allowing practices based on or not inconsistent with State law in Section 501(c) signals an intent to exempt *all* insurance practices from the ADA's reach is mere wishful thinking. If that were the section's purpose, it would simply say

**Amici App. 104**

"nothing in this Act applies to insurance practices." Indeed, where Congress intended to provide a complete exemption from the non-discrimination requirements of the ADA it did so through clear language. *See* 42 U.S.C. § 12113(c) (exempting religious employers) and 42 U.S.C. § 12187 (exempting religious organizations and private clubs). Congress easily could have done the same for insurers and their policies.[10]

Statutory exemptions, particularly those in remedial statutes such as the ADA, must be construed narrowly. *See City of Edmonds v. Oxford House Inc.*, 514 U.S. 725, 731-32 (1995). The limited exemption in Section 501(c)(1) must be interpreted to reach only that conduct that is "plainly and unmistakably" within its "terms and spirit." *Citicorp Indus. Credit, Inc. v. Brock*, 483 U.S. 27, 35 (1987). Here, of course, Mutual conceded that its practices were not based on or consistent with State law and waived its opportunity to claim an exemption under Section 501(c). Its appellate effort to transform Section 501(c) into a free pass to discriminate should be rebuffed.[11]

---

[10]In another effort to stay beyond the reach of the law, Mutual argues that federal courts are not suited to evaluate actuarial data or to determine compliance with Section 501(c). Mutual Br. at 34. Courts frequently are called upon to examine economic, scientific, and technical data to resolve far more complex disputes than the one presented here. Mutual has pointed to nothing special about actuarial data that would make it unsuitable for expert testimony that a court might consider. Indeed, the testimony of Plaintiffs' experts in this case refutes any such claim.

[11]Mutual incorrectly asserts that Congress' subsequent passage of the Mental Health Parity Act and the Women's Health and Cancer Rights Act of 1998 signaled Congress' belief that the ADA does not reach unjustified discrimination in insurance. Mutual Br. at 34-35. Those laws target two particular insurance practices--the provision of inferior coverage for mental health conditions and the refusal to pay for treatments relating to breast cancer--and require, within limits, parity in benefits for these conditions as compared to others. By contrast, the ADA does not require parity but simply ensures that disability-based disparities are related to actual risk. Mutual compares apples to oranges.

-28-

2.    **Congress Clearly Intended to Prohibit
      Unjustified Discrimination in Insurance, as the
      ADA's Legislative History Confirms.**

A review of the legislative history of the ADA also confirms that Mutual's reading of the

Act is wrong. *R.E. Dietz Corp. v. U.S.*, 939 F.2d 1, 6 (2d Cir. 1991) ("Although we need not

consider legislative history where the meaning is plain, . . . we turn to the legislative history to

show that [the defendant's] contention is wide of the mark"). As the District Court correctly

noted, "the text of both House and Senate Reports acknowledges the applicability of the ADA's

anti-discrimination provisions to insurance policies." App. 120. As explained in a report of the

House Committee on Education and Labor, absent actuarial justification, Section 501(c)

prohibits the exact discrimination engaged in by Mutual:

> While a plan which limits certain kinds of coverage based on classification of risk
> would be allowed under [Section 501(c)], the plan may not refuse to insure, or
> refuse to continue to insure, *or limit the amount, extent, or kind of coverage
> available* to an individual . . . solely because of a physical or mental impairment,
> except where the refusal, limitation, or rate differential is based on sound actuarial
> principles or is related to actual or reasonably anticipated experience.

H.R. Rep. No. 101-485, pt. II, at 136-37 (1990) (emphasis added). The Report of the House

Committee on the Judiciary explained that insurers may provide different benefits to individuals

with disabilities only "so long as the standards used are based on sound actuarial data and not on

speculation." H.R. Rep. No. 101-485, pt. III, at 70 (1990). The Report of the Senate Committee

on Labor and Human Resources similarly acknowledged:

> As indicated earlier in this report, the main purposes of this legislation
> include prohibiting discrimination in employment, public services and places of
> public accommodation. The Committee does not intend that any provisions of
> this legislation should affect the way the insurance industry does business in
> accordance with the State laws under which it is regulated. *Virtually all States
> prohibit unfair discrimination among persons of the same class and equal*

**Amici App. 106**

> *expectation of life. The [ADA] adopts this prohibition of discrimination. Under the [ADA], a person with a disability cannot be denied insurance or be subject to different terms or conditions of insurance based on disability alone, if the disability does not pose increased risks.*

S. Rep. No. 101-116, at 84 (1989) (emphasis added). This consistent legislative history makes clear that Section 501(c)(1) was intended as a limited exemption for legitimate risk-based decisions and not as a license for insurers to discriminate on the basis of disability without regard to actual risk.

Given the definitive nature of Section 501(c)'s legislative history, it is little wonder that Mutual begs that it be ignored. Mutual Br. at 27. Mutual's claim that the history is "mixed" and therefore not probative, relies on inferences from an incomplete excerpt. Mutual Br. at 28. Mutual directs the Court to the first half of the paragraph of the Senate Report quoted above, but neglects to include the second portion of the paragraph, set forth above in italics, which demonstrates the Senate's true intent.   As a Report of the House Committee on Labor and Education further clarified:

> In sum, section 501(c) is intended to afford insurers and employers the same opportunities they would enjoy in the absence of this legislation to design and administer insurance products and benefit plans in a manner that is consistent with basic principles of insurance risk classification.  This legislation assures that decisions concerning the insurance of persons with disabilities which are not based on bona fide risk classification be made in conformity with non-discrimination requirements.

H.R. Rep. No. 101-485, pt. II, at 137-38 (1990).  The legislative history is clear in its condemnation of Mutual's practice in this case.

Amici App. 107

3.    **The Department of Justice's Clear and Consistent Regulations and Guidance Further Confirm that Title III Prohibits Mutual's AIDS Caps.**

The clear and consistent construction of Title III and Section 501(c) by the DOJ, unequivocally endorsed in its brief *amicus curiae* below, R. 18, further reinforces the District Court's ruling. Mutual's self-serving and ultimately illogical view of Title III's requirements is rejected in the DOJ's authoritative regulations, which the Supreme Court has consulted in interpreting the ADA. "As the agency directed by Congress to issue implementing regulations, *see* 42 U.S.C. § 12186(b), to render technical assistance explaining the responsibilities of covered individuals and institutions, § 12206(c), and to enforce Title III in court, § 12188(b), the Department's views are entitled to deference." *Bragdon v. Abbott*, ___ U.S. ___, 118 S. Ct. 2196, 2209 (1998) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984)).

The DOJ construes Title III to prohibit insurers from engaging in unjustified discrimination in insurance policies and practices on the basis of disability. The DOJ has explained that the ADA reaches "insurance practices by prohibiting differential treatment of individuals with disabilities in insurance offered by public accommodations unless the differences are justified" by evidence that those disabilities pose increased risks. 28 C.F.R. ch. 1, pt. 36, App. B, § 36.212 at 601 (1998). The DOJ further explains that "[i]nsurance offices are places of public accommodation and, as such, may not discriminate on the basis of disability in the sale of insurance contracts or in the terms or conditions of the insurance contracts they offer." DEPT. OF JUSTICE, TITLE III TECHNICAL ASSISTANCE MANUAL § III-3.11000 (1993).

More specifically, the DOJ has made it clear in this case that Mutual's practice of capping AIDS benefits constitutes unlawful discrimination against Doe and Smith on the basis of disability:

> Terms or conditions in a health insurance policy that deny, because of disability, benefits and privileges that are available to others, discriminate on the basis of disability in violation of [the ADA]. The [ADA] prohibits unjustified disability-based discrimination against individuals who have AIDS or ARC, all of whom have a disability covered by the ADA.

R.18 at 2-3.

Not surprisingly, as with the legislative history, Mutual again argues that the DOJ's regulations, its Technical Assistance Manual, and its unequivocal condemnation of AIDS Caps should be disregarded. According to Mutual, the DOJ's regulations are not consistent with the Act because the Act is limited to access to physical places or goods and services, and cannot be interpreted to reach the content of insurance. Mutual Br. at 30. Just as Mutual's restrictive reading of the statutory text must be rejected, its attempt to undercut the DOJ's regulatory guidance also must fail.

To suit its own purposes, Mutual trumpets DOJ regulations relating to "special or accessible goods," such as hearing aids or books in braille, that are designed to aid individuals with disabilities. Mutual Br. at 30 (citing 28 C.F.R. ch. 1, pt. 36, App. B at 612 (1998) (commentary on 28 C.F.R. ch. 1, pt. 36, § 36.307 (1998), "Accessible or Special Goods")). This DOJ regulation clarifies that, while a public accommodation need not "alter its inventory to include accessible or special goods," it must provide such goods if it would provide other goods not already in stock for its customers. *See* 28 C.F.R. ch. 1, pt. 36, § 36.307(a)-(c) (1998). Again, Mutual complains it is being forced to add new products. In fact, there is nothing inconsistent in

-32-

the requirement of equal treatment found here and that found in the DOJ's regulations on insurance. Plaintiffs and the DOJ do not argue that Mutual must add a new product to its line, just that it must provide Doe and Smith an equal opportunity to benefit from the $1 million restorable benefits others already enjoy. The DOJ's regulations and Technical Assistance Manual are perfectly consistent with both the text and history of the Act and are entitled to deference in construing the ADA. *Bragdon*, 118 S. Ct. at 2209.

### C.    Title II of the Civil Rights Act of 1964 Supports the District Court's Decision.

Finding no support in the plain language of Title III, its legislative history, or the DOJ guidance, Mutual turns for support to a different statute, Title II of the Civil Rights Act of 1964 ("Title II"). 42 U.S.C. § 2000a. Mutual contends that Title II buttresses the conclusion that a denial of equal treatment on the basis disability—as well as race, color, religion, or national origin— is permissible so long as everyone is granted equal access to physical places. Mutual Br. at 18-20. In fact, Mutual's claim conflicts directly with Title II case law.[12]

In *Hamm v. City of Rock Hill*, 379 U.S. 306 (1965), a sit-in case, the Supreme Court condemned as a violation of Title II the practice of department stores that were open to all and allowed black customers to purchase certain products, but which denied service at their lunch counters to black patrons. *Id.* at 309-10. Under Mutual's analysis, the stores would escape liability because all customers were allowed to enter the stores, or because black patrons knew that they would not be allowed to sit at the counter when they entered, or because serving black

---

[12]As discussed *supra*, Section I.A.2., Title III also delineates the specific conduct it prohibits. 42 U.S.C. § 12182(b). Title II has no comparable language. Mutual fails entirely to take this difference into account in its comparison of these two statutes.

Amici App. 110

patrons food at a counter already serving others would illegally require the stores to provide new services. In reality, Mutual already provides the good or service Plaintiffs seek to enjoy, and the fact that Mutual makes known its intention to discriminate against policyholders with HIV or AIDS does not insulate them from liability for doing so.

Under Mutual's view of the law, other classic examples of discriminatory treatment by public accommodations—short of outright denials of service—also could not be redressed because plaintiffs were given some service or allowed onto the premises. Mutual's theory would overturn cases in which black patrons were allowed into a movie theater but forced to sit in a separate section. *Katzenbach v. Gulf-State Theaters, Inc.*, 256 F. Supp. 549, 557 (N.D. Miss. 1966) (enjoining theater owner from practice of segregation inside theater as well as outright denial of access to theaters to black customers). Mutual would also cast doubt on case law condemning the practice of serving black citizens, but only from a kitchen window. *See, e.g., Newman v. Piggie Park Enter., Inc.*, 377 F.2d 433, 434-36 (4th Cir. 1967), *modified on other grounds,* 390 U.S. 400 (1968) (drive-in restaurant that served food for take away or consumption in patrons' cars on the premises violated Title II by refusing service to black patrons or allowing them service only from the kitchen window). *See also Black v. Bonds*, 308 F. Supp. 774, 776 (S.D. Ala. 1969) (practice of delayed service violates Title II as much as an outright denial of service; "both are equally condemned by the Civil Rights Act of 1964" as denials of full and equal enjoyment of goods, services, and facilities). Courts also have rejected Mutual's contention that Title II reaches only denials of equal access to goods and services that occur in physical places. *See, e.g., Robinson v. Power Pizza, Inc.*, 993 F. Supp. 1462, 1466 (M.D. Fla. 1998) (enjoining a pizza delivery company that refused to deliver food to homes in a

-34-

**Amici App. 111**

predominantly black area of central Florida, even though plaintiffs never entered the defendant's physical premises in order to obtain its goods or services).

The cases Mutual cites do not compare to the facts of this case, and Mutual's attempts to argue otherwise are in vain. Some of those cases address only whether a particular defendant ever can be considered a place of public accommodation under the Civil Rights Act. *See, e.g., Welsh v. Boy Scouts of Am.*, 993 F.2d 1257 (7th Cir. 1993); *Clegg v. Cult Awareness Network*, 18 F.3d 752 (9th Cir. 1994). For example, in *Welsh*, this Court was not concerned with an entity like Mutual that is expressly covered by the Act. Rather, *Welsh* concerned and answered only the threshold question of whether a private membership organization was a covered entity under Title II. 993 F.2d at 1275 ("[t]he only question before this court, however, is whether a membership organization such as the Boy Scouts of America is covered by Title II . . . . Title II . . . does not govern membership organizations which do not bear a close connection to a particular 'establishment,' 'place,' or 'facility'."). In contrast to the facts of *Welsh*, there is no doubt that Congress intended to govern an "insurance office," defined as a "public accommodation" subject to Title III's prohibitions. 42 U.S.C. § 12181(7)(F).

Also inapposite is *Stearnes v. Baur's Opera House, Inc.*, 788 F. Supp. 375 (C.D. Ill. 1992), *remanded with directions to dismiss for lack of jurisdiction*, 3 F.3d 1142 (7th Cir. 1993). That case concerned whether Title II required the proprietor of a dance hall to play certain music to cater to black patrons. The court found no discrimination in violation of the Civil Rights Act because, among other things, "when Defendant changed its musical selections, that change affected all patrons' decisions concerning whether to remain on the dance floor, not just black customers." *Id.* at 378; *see also Phillips v. Interstate Hotels Corp.*, 974 S.W.2d 680 (Tenn.

-35-

1998) (same).[13]  These cases have nothing to do with the case at bar, in which those disabled by AIDS or HIV are provided different and less favorable coverage than others and are the only customers affected by that inferior coverage.

Although the "overriding purpose" of Title II was to end race discrimination in the "denial of access to facilities ostensibly open to the general public," *Daniel v. Paul*, 395 U.S. 298, 307-08 (1969), and Title III may share a similar goal, the Court still must interpret these statutes to address other concerns falling within their terms. *Oncale*, 118 S. Ct. at 1002 (recognizing that male-on-male harassment was not "the principal evil Congress was concerned with when it enacted Title VII" but that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils").  Mutual's decision to provide insureds with AIDS only a fraction of the benefits it provides to others is an evil unblessed by Title II of the Civil Rights Act and prohibited by Title III of the ADA.

## II.     MUTUAL'S POLICY OF SINGLING OUT INSUREDS WITH HIV OR AIDS FOR DIFFERENT AND LESS FAVORABLE COVERAGE IS DISABILITY-BASED DISCRIMINATION THAT VIOLATES THE ADA.

It is beyond serious dispute that the AIDS Caps constitute disability-based discrimination. Unlike people without disabilities and those living with other disabling conditions—including serious, and more costly conditions—policyholders with HIV or AIDS are denied access to Mutual's provision of $1 million in restorable benefits and face a much lower limit.  As Mutual concedes, "Mutual's coverage for its insureds with AIDS and ARC is less favorable than Mutual's coverage for its other insureds." App. 16.  This unjustified singling out of individuals

---

[13]A more apt dance hall analogy to the present case might be found in a club in which black patrons were allowed entry but only permitted to dance to six songs while everyone else could dance all night.

with HIV for inferior treatment is classic disability-based discrimination. *Anderson v. Gus Mayer Boston Store of Del.*, 924 F. Supp. 763, 779 n. 49 (E.D. Tex. 1996) ("disability-based distinction means a classification affecting a particular disability, a discrete group of disabilities (*e.g.*, cancers) or disability in general (*e.g.*, non-coverage of all conditions which substantially limit a major life activity).").[14]   The ADA's core purpose is to redress such discrimination, as the District Court did here.

Mutual claims that the AIDS Caps do not disfavor individuals with HIV or AIDS vis-a-vis those policyholders without disabilities.  Mutual Br. at 43.  Even were this legally dispositive, it is untrue.  Mutual admits to providing different, unjustified and less favorable coverage to insureds with HIV or AIDS than it provides  "for its other insureds."  App. 16.  These other insureds include policyholders without disabilities.  Mutual concedes that affording individuals with a particular disability less favorable treatment than that afforded people without disabilities violates the ADA.  Mutual Br. at 43.  Because the AIDS Caps prejudice insureds with HIV or AIDS as compared to insureds without disabilities, Mutual must lose under even its own cramped view of the law.

Of course, Mutual's argument that Title III recognizes discrimination only if a person with a disability is treated differently than someone who is not disabled flies in the face of the statute's plain language.  Title III prohibits discrimination against "an individual or class of individuals *on the basis of a disability* or disabilities of *such* individual or class . . . ." 42 U.S.C.

---

[14]*See also* Bureau of National Affairs, American with Disabilities Act Manual, EEOC: Interim Policy Guidance on ADA and Health Insurance 70 (June 8, 1993) (a term or provision is "disability-based" if it singles out a particular disability (*e.g.*, deafness, AIDS, schizophrenia) for inferior treatment).

§ 12182(b)(1)(A)(i)-(iii) (emphasis added). The statute thus prohibits any discrimination traceable to the particular disability of an individual or class of individuals. "[W]hether a disabled person is treated differently than a non-disabled person or another disabled person, the same wrong has occurred. That is, the person has been discriminated against because of his particular disability." *Lewis*, 982 F. Supp. at 1168. *See also Oncale*, 118 S. Ct. at 1001 (same-sex sexual harassment can be discrimination "because of . . . sex"); *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (holding that intraclass discrimination is actionable under the Age Discrimination in Employment Act and that the dispositive factor is whether discrimination was because of age); *Connecticut v. Teal*, 457 U.S. 440, 453-55 (1982) ("Congress never intended to give an employer license to discriminate against some employees on the basis of race and sex merely because he favorably treats other members of the employees' group").[15] The cases relied upon by Mutual are out of step with the Supreme Court's clear guidance on this issue and are therefore unpersuasive.

Mutual's attempt to shelter its facially *discriminatory* AIDS Caps under case law involving uniformly applied, facially *neutral* limitations also must fail. Mutual Br. at 40-41. As the District Court recognized: "Unlike the claims in each of those cases, the ADA claim in this case focus[es] on Mutual's singling out of individuals with a particular disability, AIDS, for inferior coverage as compared to that afforded non-disabled individuals." App. 127. Thus, in contrast to the facially neutral limitation that affected all insureds and was found permissible in

---

[15]Other courts have held that discrimination among disabilities is actionable under the ADA. *See, e.g., Dunlap*, 996 F. Supp. at 966 (under Title III, "a person with a disability need not prove that she was treated differently from non-disabled individuals"); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58-9 (4th Cir. 1995) (a plaintiff need not prove that she was treated differently vis-a-vis an employee without a disability under Title I).

-38-

*Choate*, 469 U.S. at 302, Mutual provides $1 million of coverage for hospitalizations to every insured with pneumonia unless the insured's pneumonia results from HIV or AIDS. App. 14-15. In that event, Mutual will deny coverage for pneumonia once the lifetime maximum of $25,000 or $100,000 has been exhausted. *Id.* Mutual makes the question of whether an insured has HIV or AIDS the determinative factor in approving or denying coverage; the AIDS Caps are never triggered for insureds without disabilities or those with other disabilities. While courts have permitted facially neutral limitations on particular treatments (*e.g.*, an annual limit on prescription drugs or x-rays), *Choate*, 469 U.S. at 302, they have disapproved limitations that single out individuals with disabilities for inferior coverage. *Chabner*, 994 F. Supp. at 1191-92.

Mutual argues that because it provides the same discriminatory policy to all insureds, it has fulfilled Title III's mandate of equal treatment and is not discriminating by providing disparate coverage based on HIV or AIDS.[16] Mutual Br. at 43-44. This is like arguing that a race-based restrictive covenant in a property deed is not discriminatory because all deeds have them. Even if the record established that the same discriminatory terms (*i.e.*, the AIDS Caps) exist in every insured's policy, only those insureds with HIV or AIDS will ever be subject to them. The distinction made by Mutual is "illusory" and should be rejected. *Lewis*, 982 F. Supp. at 1168-69 ("Both a decision to deny coverage on the basis of [disability] and to provide inferior coverage for [disabilities] target the [disabled] for inferior treatment"). As the District Court

---

[16]Mutual also cites to other coverage limits contained in its policies, Mutual Br. at 6, in an effort to demonstrate that its AIDS Caps do not violate the ADA. Mutual's exclusion of other conditions or treatments, disabling or not, does not excuse its practice of singling out insureds with HIV or AIDS. In addition, each of the exclusions identified by Mutual—except for its AIDS Caps—is specifically *allowed* under Illinois law. ILL. ADMIN. CODE tit. 50, ch. I, § 2007.6-(e) (1998).

Amici App. 116

properly found, Mutual's AIDS Caps subject its insureds with AIDS "to altogether different terms and conditions than non-disabled individuals" in violation of Title III. App. 128.

Mutual further cites this Court's decision in *EEOC v. CNA Ins. Cos.*, 96 F.3d 1039 (7th Cir. 1996), and the decisions in *Parker* and *Modderno v. King*, 82 F.3d 1059 (D.C. Cir. 1996), *cert. denied*, 117 S. Ct. 772 (1997), to support its claim that the ADA permits disparate treatment of insureds with HIV or AIDS.[17]  As the District Court aptly noted, these cases did not turn on the legitimacy of an insurer's singling out of a particular disability for discrimination and, consequently, are inapposite. App. 127.  Both *CNA* and *Parker* were decided on other grounds, with this Court specifically limiting its *CNA* decision (on standing to sue under Title I) to the facts presented in that case. *CNA*, 96 F.3d at 1045. *See also Lewis*, 982 F. Supp. at 1167 n.8 (analyzing the decisions in *Parker*, *CNA*, and *Modderno*, reaching the opposite conclusion and noting that the *Modderno* court's reading of *Choate* and *Traynor* "is not a reasonable extension of the holdings in those cases").  In finding these cases inapposite, the District Court noted that this Court "distinguished its decision [in *CNA*] from a case where an insurer chooses 'to vary the terms of its plan depending on whether the employee was disabled.'" App. 127-28 (citing *CNA*, 96 F.3d at 1044). *See also Modderno*, 82 F.3d at 1066 (approving a plan because it did not make disability-based distinctions between disabling and non-disabling conditions).

---

[17]Mutual also relies upon a passage in *CNA* referring to the Eleventh Circuit's decision in *Gonzales v. Garner Food Serv., Inc.*, 89 F.3d 1523 (11th Cir. 1996), and makes the remarkable claim that it is "controlling to this case." Mutual Br. at 40.  There was no suggestion in *Gonzales* or *CNA* that the AIDS Cap at issue in *Gonzales* did not constitute disability-based discrimination as Mutual incorrectly implies. Mutual Br. at 40. The *Gonzales* outcome was based on the court's conclusion that, as a former employee, Gonzales lacked standing to challenge employment-related benefits. The Third Circuit recently rejected this conclusion in *Ford*, 145 F.3d at 605. *See also Robinson*, 519 U.S. at 346 (finding that former employees have standing to sue under Title VII).

Mutual's reliance on this Court's decision in *Vaughn v. Sullivan*, 83 F.3d 907 (7th Cir. 1996) and the Supreme Court's decision in *Traynor*, 485 U.S. at 545-46 to support its argument is similarly misplaced. At issue in both cases was whether some persons with disabilities were entitled to *greater* government benefits than others. *Vaughn*, 83 F.3d at 909-10; *Traynor*, 485 U.S. at 545-46. In each case, the additional benefits were authorized by statute or regulation, as expressly permitted under Title II of the ADA and the Rehabilitation Act. *See* 28 C.F.R. ch.1, pt. 35, § 35.130(c) (1998) (implementing Title II of the ADA) and 45 C.F.R. § 84.4(c) (1998) (implementing § 504 of the Rehabilitation Act). Indeed, as the Court expressly noted in *Traynor*, "[t]his litigation does not involve a program or activity that is alleged to treat handicapped persons less favorably than nonhandicapped persons." *Id.* at 548. These cases simply do not support a private insurer's singling out of insureds with HIV or AIDS for unfavorable treatment.

Since the Supreme Court's decision in *Traynor*, numerous courts have found that, absent actuarial justification, insurance policies which single out particular disabilities for inferior treatment violate the ADA. *See, e.g., Lewis*; 982 F. Supp. at 1168; *Chabner,* 994 F. Supp. at 1193; *Doukas,* 950 F. Supp. at 432. Mutual makes no pretense that its AIDS Caps have any actuarial basis or that they comply with State law. Indeed, Mutual knew that the AIDS Caps were unnecessary. App. 83, 95. While the ADA gives insurers leeway to engage in legitimate risk-based practices, it does not permit arbitrary denials of coverage that have life-threatening consequences. Accordingly, the District Court's decision to enjoin Mutual's AIDS Caps should be affirmed.

Amici App. 118

**III.    THE McCARRAN-FERGUSON ACT DOES NOT PRECLUDE
APPLICATION OF THE ADA TO MUTUAL'S PRACTICE OF
PROVIDING DIFFERENT AND LESS FAVORABLE COVERAGE TO
PLAINTIFFS AND OTHER INSUREDS WITH HIV OR AIDS.**

The District Court properly held that the McCarran-Ferguson Act, 15 U.S.C. § 1012 *et*

*seq.*, does not preclude application of Title III to Mutual's AIDS Caps both because the ADA

specifically relates to insurance and because application of the ADA in this case would not

"invalidate, impair, or supersede" State law.  App. 125-26.  The McCarran-Ferguson Act

provides, in relevant part, that "[n]o Act of Congress shall be construed to invalidate, impair, or

supersede any law enacted by any State for the purpose of regulating the business of

insurance . . . unless such Act specifically relates to the business of insurance."  15 U.S.C. §

1012(b).  As the Supreme Court very recently confirmed, the purpose of the McCarran-Ferguson

Act is to ensure that silence in federal law is not construed as a barrier to state regulation.

*Humana Inc. v. Mary Forsyth et al.*, __ U.S. ___, 119 S. Ct. 710, 716 (1999) (the McCarran-

Ferguson Act does not bar application of RICO to fraudulent insurance practices).  While

McCarran-Ferguson ensures that federal statutes do not automatically override state insurance

regulation, federal laws that specifically relate to the business of insurance control over state law.

*Id.*  In addition, even those federal laws that do not specifically relate to the business of insurance

are fully enforceable except to the extent that they "invalidate, impair, or supersede" state law.

*Id.* at 716-17.

In its recent decision in *Humana*, the Supreme Court rejected Mutual's argument that the

McCarran-Ferguson Act represents Congress' decision to place regulation of insurance within

the exclusive jurisdiction of the states.  *Id.* at 717 ("We reject any suggestion that Congress

-42-

**Amici App. 119**

intended to cede the field of insurance regulation to the States . . . "). The Court further concluded that McCarran-Ferguson's plain language "belies any congressional intent to preclude federal regulation merely because the regulation imposes liability additional to, or greater than, state law." *Id.*

By its terms, McCarran-Ferguson is inapplicable to the ADA. As the District Court properly held, and as explained more fully in Sections I.A. and I.B., *supra*, Congress' inclusion of "insurance office[s]" in Title III and its explicit reference to "insurers" and "insurance" in Section 501(c) provide "sufficiently specific indicia of an intent to apply its prohibitions to the insurance underwriting practices." App. 125. *See also Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 38 (1996) (where the statute included the word "insurance" it specifically related to the business of insurance).

Even if the McCarran-Ferguson Act applied to the ADA, however, it does not preclude application of Title III in this case because its application does not "invalidate, supersede, or impair" state law. Mutual conceded this below and is barred from arguing otherwise here. *PACCAR Fin. Corp. v. Mackey*, 122 F.3d 1134, 1135-36 (8th Cir. 1997); *G.I.C. Corp. v. U.S.*, 121 F.3d 1447, 1450 (11th Cir. 1997).[18] Plaintiffs established, Mutual conceded, and the District Court held that Mutual's AIDS Caps were not based on or consistent with State law. App. 17. Moreover, Mutual provides no reason to believe its AIDS Caps are consistent with "any law

---

[18]For this reason, the Court should strike or disregard Mutual's arguments. Mutual Br. at 36-38. The claim that the AIDS Caps are consistent with State law has been waived as a factual matter and falls outside the scope of issues preserved for appeal. For the same reasons, the arguments of *amici* Health Insurance Association of America and American Council of Life in Section III of their brief regarding the District Court's order with respect to remedies agreed to in order to avoid trial have been waived by Mutual.

-43-

**Amici App. 120**

enacted by any State." Mutual Br. at 38-39. They certainly are not consistent with Illinois law, which forbids Mutual's discriminatory practice:

> No company, in any policy of accident or health insurance issued in this State, shall make or permit any distinction or discrimination against individuals solely because of handicaps or disabilities . . . in the amount of any dividends or other benefits payable thereon, or in any other terms and conditions of the contract it makes, except where the distinction or discrimination is based on sound actuarial principles or is related to actual or reasonably anticipated experience.

215 ILL. COMP. STAT. 5/364 (1998).[19] Thus, even if McCarran-Ferguson applied and arguments regarding State law had not been waived, the ADA and applicable state laws are completely congruent, and therefore the McCarran-Ferguson Act do not bar plaintiffs' ADA claim. *Humana*, 119 S. Ct. at 719 (looking to the law of the relevant state and holding that McCarran-Ferguson does not bar application of RICO to fraudulent insurance practices); *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 297 (7th Cir. 1991), *cert. denied*, 508 U.S. 907 (1993) (looking to the law of the relevant state and holding that the McCarran-Ferguson Act does not bar application of the Fair Housing Act to prevent an insurer's redlining practice because the FHA was consistent with Wisconsin insurance law); *see also Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1363 (6th Cir. 1995), *cert. denied,* 516 U.S. 1140 (1996)*; Mackey v.*

---

[19]Contrary to Mutual's arguments, the AIDS Caps also are inconsistent with Florida law. Mutual Br. at 39 n.17. Mutual cites one excerpt and suggests that Florida law would allow its AIDS Caps but clearly it does not. Rather, as a prior section of the same code provision provides:

> Subject to the total benefits limits in a health insurance policy, no health insurance policy shall contain an exclusion or limitation with respect to coverage for exposure to the HIV infection or specific sickness or medical condition derived from such infection, except as provided in a preexisting condition clause.

FLA. STAT. ch. 627.429(5)(b) (1998).

-44-

*Nationwide Ins. Cos.*, 724 F.2d 419, 421 (4th Cir. 1984). Mutual's argument, that applying Title III to its patently arbitrary AIDS Caps will somehow trample on any state's rights to regulate insurance, is self-serving and without merit.

## CONCLUSION

For the foregoing reasons, Plaintiffs John Doe and Richard Smith request that the Court affirm the District Court's Judgment in favor of Plaintiffs on Count I of their Complaint in all respects.

Respectfully submitted,

JOHN DOE and RICHARD SMITH

Date: February 9, 1999

By _____
Heather C. Sawyer
LAMBDA LEGAL DEFENSE
  AND EDUCATION FUND, INC.
11 East Adams Street
Suite 1008
Chicago, Illinois 60603-6303
(312) 663-4413

Stuart I. Graff
Lisa A. Brown
Laura B. Weinberg
SCHIFF HARDIN & WAITE
7200 Sears Tower
Chicago, Illinois 60606
(312) 876-1000

Ann Hilton Fisher
AIDS LEGAL COUNCIL OF CHICAGO
220 South State Street
Suite 1330
Chicago, Illinois 60604
(312) 427-8990

-45-

**Amici App. 122**

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 32(d)

I, Stuart I. Graff, one of the attorneys for Plaintiffs-Appellees John Doe and Richard

Smith, certify that according to the word count feature of WordPerfect 8.0, the attached brief is

13951 words in length and therefore complies with Seventh Circuit Rule 32(d)(2)(A).

February 9, 1999

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

No. 98-4112

|  |  |
|---|---|
| JOHN DOE and RICHARD SMITH, | Appeal From The United States District Court For The Northern District Of Illinois, Eastern Division |
| Plaintiffs-Appellees, |  |
| v. | Case No. 98 C 325 |
| MUTUAL OF OMAHA INSURANCE COMPANY, | Judge Conlon  ON AIMS. |
| Defendant-Appellant. | FEB 2 4 1999 |

**REPLY BRIEF OF DEFENDANT-APPELLANT**

U.S.C.A.—7th Circuit
FILED

EF   FEB 2 3 1999

GINO J. AGNELLO
CLERK

DOC. # 1151323-1

February 23, 1999

Joel H. Kaplan
Thomas J. Piskorski
Cassandra A. Curry
Seyfarth, Shaw, Fairweather
   & Geraldson
55 East Monroe Street
Suite 4300
Chicago, Illinois 60603
(312) 346-8000

COUNSEL VERIFIED

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

No. 98-4112

|  |  |
|---|---|
| JOHN DOE and RICHARD SMITH, | ) ) ) Appeal From The United States |
| | ) District Court For The Northern |
| Plaintiffs-Appellees, | ) District Of Illinois, Eastern Division |
| | ) |
| v. | ) |
| | ) Case No. 98 C 325 |
| MUTUAL OF OMAHA INSURANCE | ) |
| COMPANY, | ) |
| | ) Judge Conlon |
| Defendant-Appellant. | ) |
| | ) |

**REPLY BRIEF OF DEFENDANT-APPELLANT**

Joel H. Kaplan
Thomas J. Piskorski
Cassandra A. Curry
Seyfarth, Shaw, Fairweather
   & Geraldson
55 East Monroe Street
Suite 4300
Chicago, Illinois 60603
(312) 346-8000

February 23, 1999

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    Plaintiffs' Statutory Construction Argument
      Ignores Critical Language In ADA Title III . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Plaintiffs Misrepresent The State Of The Law . . . . . . . . . . . . . . . . . . . . . 2

III.  Plaintiffs' Analysis Of Virtually Identical Language In
      CRA Title II Demonstrates The Flaws In Their Argument . . . . . . . . . . . . . . 6

IV    Each Of The Reasons Relied On By Plaintiffs Fails
      To Support Their Argument That ADA Title III
      Regulates The Content Of Insurance Policies . . . . . . . . . . . . . . . . . . . . . . 8

      A.    The "Full And Equal Enjoyment" Clause In Section 302(a)
            Does Not Require A Public Accommodation To Alter The
            Content Of The Goods And Services It Offers . . . . . . . . . . . . . . 8

      B.    Section 302(b) Does Not Reach The Content Of Insurance
            Policies Equally Provided To The Disabled And Non-Disabled . . .   10

      C.    Plaintiffs' Reliance On The ADA's
            Legislative History Is Misplaced . . . . . . . . . . . . . . . . . . . . . . 12

      D.    The DOJ's Interpretative Guidance
            Does Not Support Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . 13

      E.    ADA Title IV's Construction Provisions Confirm That The
            ADA Does Not Apply To The Content Of Insurance Policies . . . .   13

V.    The McCarran-Ferguson Act Precludes The Application Of The
      ADA To The Benefits, Terms And Conditions Of Insurance Policies . . . . . . .   17

VI.   Limiting Benefits For Certain Medical Conditions Is Not
      Disability-Based Discrimination Under ADA Title III . . . . . . . . . . . . . . . .   19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 32(a)(7)(B)(ii) . . . . . . . 24

CERTIFICATE OF SERVICE

- ii -

## TABLE OF AUTHORITIES

### a.    Cases

Aetna Casualty & Surety Co. of Hartford, Conn. v. Kerr-McGee Chemical Corp.,
875 F.2d 1252 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Alexander v. Choate, 469 U.S. 287 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Attar v. Unum, No. CA3-96-CV-367-R, 1998 WL 574885 (N.D. Tex. Aug. 31, 1998) . . 5

Baker v. Hartford Life Ins. Co.,
No. 94-C4416, 1995 WL 573430 (N.D. Ill. Sept. 28, 1995) . . . . . . . . . . . . . 4

Carparts Distribution Center, Inc. v. Automotive Wholesaler's Assoc.,
37 F.3d 12 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12

Chabner v. United of Omaha Life Ins. Co., 994 F. Supp. 1185 (N.D. Cal. 1998),
appeal docketed, No. 98-17060 (9th Cir.) . . . . . . . . . . . . . . . . . . . . . . . . 4

Delta Air Lines, Inc. v. McCoy Restaurants, Inc., 708 F.2d 582 (11th Cir. 1983) . . . . . 5

Doukas v. Metropolitan Life Ins. Co., 950 F. Supp. 422 (D.N.H. 1996) . . . . . . . . . . 4

EEOC v. AIC Security Investigations, Ltd., 55 F.3d 1276 (7th Cir. 1995) . . . . . . . . . . 5

EEOC v. CNA Ins. Cos., 96 F.3d 1039 (7th Cir. 1996) . . . . . . . . . . . . . . . 5, 20, 21

Ford v. Schering-Plough Corp., 145 F.3d 601 (3d Cir. 1998),
cert. denied, 67 U.S.L.W. 3259 (U.S., Jan. 11, 1999)
(No. 98-529) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, *passim*

Hamm v. City of Rock Hill, 379 U.S. 306 (1965) . . . . . . . . . . . . . . . . . . . . . . 7, 8

Henderson v. Bodine Aluminum, Inc., 70 F.3d 958 (8th Cir. 1995) . . . . . . . . . . . . . 5

Holtzman v. Schlesinger, 484 F.2d 1307 (2d Cir. 1973),
cert. denied, 416 U.S. 936 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Humana v. Forsyth, 119 S. Ct. 710 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

J.W. Bateson Co., Inc. v. United States, 434 U.S. 586 (1978) . . . . . . . . . . . . . . . . 5

- iii -

Lenox v. Healthwise of Kentucky, Ltd., 149 F.3d 453 (6th Cir. 1998) . . . . . . . 3, 11, 21

Lewis v. Aetna Life Ins. Co., 982 F. Supp. 1158 (E.D. Va. 1997)
appeal docketed, No. 98-2179 (4th Cir.) . . . . . . . . . . . . . . . . . . . . . . . . 5, 22

Menkowitz v. Pottstown Memorial Medical Center,
154 F.3d 113 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Modderno v. King, 82 F.3d 1059 (D.C. Cir. 1996),
cert. denied, 117 S. Ct. 772 (1997) . . . . . . . . . . . . . . . . . . . . . . . 16, 21, 22

Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006 (6th Cir. 1997) (en banc),
cert. denied, 118 S. Ct. (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, passim

Public Employees Retirement System v. Betts, 492 U.S. 158 (1989) . . . . . . . . . . 15, 16

Stearnes v. Baur's Opera House, Inc., 788 F. Supp. 375 (C.D. Ill. 1992),
rev'd on other grounds, 3 F.3d 1142 (7th Cir. 1993) . . . . . . . . . . . . . . . . . 7

Traynor v. Turnage, 485 U.S. 535 (1988) . . . . . . . . . . . . . . . . . . . . . . . . 22

United Air Lines, Inc. v. McMann, 434 U.S. 192 (1977) . . . . . . . . . . . . . . . . . 15

Welsh v. Boy Scouts of America, 993 F.2d 1267 (7th Cir.),
cert. denied, 510 U.S. 1012 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

World Ins. Co. v. Branch, 966 F. Supp. 1203 (N.D. Ga. 1997),
aff'd in part, vacated in relevant part, 156 F.3d 1142 (11th Cir. 1998) . . . . . . . 4

### b.    Federal Statutes

29 U.S.C. § 621 et. seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C. § 2000a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6

42 U.S.C. § 12162 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. § 12181(7)(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C.§ 12182(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, passim

42 U.S.C. § 12182(b)(1)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

- iv -

42 U.S.C. § 12182(b)(1)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 U.S.C. § 12182(b)(1)(A)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 U.S.C. § 12182(b)(2)(A)(i)-(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 U.S.C. § 12201(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

42 U.S.C. § 12201(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

#### c.    State Statutes

215 ILCS 5/364 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

410 ILCS 50/3(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ILL. ADMIN. CODE tit. 50, ch. I, § 2007.6-(e) (1998) . . . . . . . . . . . . . . . . . . . . 16

#### d.    Federal Regulations

28 C.F.R. § 36.302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 C.F.R. Ch. 1, Pt. 36, App. B (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

#### e.    Other

Title III Technical Assistance Manual § III-3.2000 . . . . . . . . . . . . . . . . . . . . . . . 11

4135376.1

## ARGUMENT

### I. Plaintiffs' Statutory Construction Argument Ignores Critical Language In ADA Title III

Plaintiffs have written a deceptively clever and superficial brief. It purposely distorts Mutual's position, wreaks of inflammatory language and glosses over case law and other relevant authority. Any obstacle to the statutory construction Plaintiffs advocate is easily surmounted -- by ignoring it, belittling it, or calling it dicta.

At its core, however, Plaintiffs' argument that ADA Title III reaches beyond access to regulate the content of goods and services offered by a place of public accommodation is fatally flawed. It ignores and effectively eliminates substantive language in ADA Section 302(a), 42 U.S.C. § 12182(a). Specifically, Plaintiffs read out the critical phrase "of any place of public accommodation."[1] Indeed, Plaintiffs offer no interpretation which accounts for the word "place" in ADA Title III, despite their acknowledgment that every clause and word in the statute should be given effect (Pls. Br. 10, 16). By pretending the word "place" does not exist, Plaintiffs have rewritten the statute to achieve their desired result. But the word "place" does appear in the statute, and that Plaintiffs make believe it does not is telling.

The significance of the "place" language was recognized by the Third Circuit in Ford v. Schering-Plough Corp., 145 F.3d 601, 613 (3d Cir. 1998), cert. denied, 67 U.S.L.W. 3259 (U.S., Jan. 11, 1999) (No. 98-529): "[T]he 'goods, services, facilities, privileges, advantages, or accommodations' concerning which a disabled person cannot suffer

---

[1]   In addition to eliminating language which appears in the statute, Plaintiffs add language such as "risk-based insurance," "sound underwriting practices," and "legitimate actuarial justification" (Pls. Br. 9).

discrimination are not free-standing concepts but rather all refer to the statutory term 'public accommodation' and thus to what these places of public accommodation provide. [Plaintiff] cannot point to these terms as providing protection from discrimination unrelated to places."

Rather than reconciling "place" with a principled interpretation of the ADA, Plaintiffs glibly assert that insurance offices were not included in 42 U.S.C. § 12181(7)(F) because they might sell t-shirts or hats (Pls. Br. 12). According to Plaintiffs, the fact insurance offices are listed reflects Congress' intent to regulate the content of insurance policies (Pls. Br. 12). However, Congress also listed restaurants, theaters, and dry cleaners as examples of public accommodations. Under Plaintiffs' logic, Congress similarly intended to regulate the content of menus, plays, and the manner of cleaning shirts. Not surprisingly, Courts of Appeals interpreting the words "of any place of public accommodation" in both ADA Title III and Title II of the Civil Rights Act of 1964 ("CRA Title II"), 42 U.S.C. § 2000a, have rejected Plaintiffs' argument and concluded these words in fact limit their respective statutes to issues of physical access to places of public accommodation.

## II.    Plaintiffs Misrepresent The State Of The Law

Plaintiffs' contention that the "growing majority of courts" have agreed with their desired construction of Section 302(a) (Pls. Br. 10, 19) is patently wrong. Two Courts of Appeals (and many district courts, see Mutual Br. 15) have explicitly held that the language "of any place of public accommodation" prohibits discrimination in access to physical places and the goods and services provided by those places, and does not extend to regulate the content of the goods and services themselves.

**Amici App. 131**

Plaintiffs respond to uniform federal appellate case law contrary to their position by ignoring it or calling it dicta (Pls. Br. 23, 24). But the holdings by the Sixth and Third Circuits are unambiguous. In Parker v. Metropolitan Life Ins. Co., 121 F.3d 1006, 1012 (6th Cir. 1997) (*en banc*), cert. denied, 118 S. Ct. 871 (1998), the Sixth Circuit concluded "Title III regulates the availability of the goods and services the place of public accommodation offers as opposed to the contents of goods and services offered by the place of public accommodation."

In Lenox v. Healthwise of Kentucky, Ltd., 149 F.3d 453, 457 (6th Cir. 1998), a case wholly ignored by Plaintiffs, the Sixth Circuit reaffirmed that Title III does not regulate the content of insurance policies:

> Even if the policy is deemed a good or service provided by a place of public accommodation, Lenox is not complaining about physical access to a place of public accommodation or her ability to avail herself of the goods and services offered at a place of public accommodation, such as an insurance company office. Rather, she is complaining about the mix of goods and services offered by an insurance company.

In Ford, the court expressly held that Title III is limited to access to physical facilities and does not cover the substance of insurance contracts. 145 F.3d at 613-14.[2] To argue that Ford's central holding is dicta or that "the Third Circuit also failed to consider the statutory language or the legislative history or properly analyze DOJ guidance" (Pls. Br. 24) is absurd.

---

[2]    Plaintiffs, in familiar fashion, completely ignore the Third Circuit's decision in Menkowitz v. Pottstown Memorial Medical Center, 154 F.3d 113, 122 (3d Cir. 1998), reaffirming Ford: "[A] disparity in insurance benefits . . . [has] nothing to do with the facilities of an insurance office, or the 'place' of public accommodation."

-3-

In a classic battle with a straw man, Plaintiffs insist Title III goes beyond outright denials of physical access to places of public accommodation (Pls. Br. 13). Even assuming arguendo, Title III goes beyond the issue of "physical" access to a facility (such as an insurance office), it is unquestionably limited to access to (in the sense of the ability to obtain) the goods and services actually provided by or in a place of public accommodation -- whether such access is by physical entry, telephone, mail, or facsimile. Here, Plaintiffs were undeniably given access to the same insurance products Mutual offers to all individuals. Thus, Plaintiffs' reliance on Carparts Distrib. Center, Inc. v. Automotive Wholesaler's Assoc., 37 F.3d 12 (1st Cir. 1994), and Baker v. Hartford Life Ins. Co., No. 94 C 4416, 1995 WL 573430 (N.D. Ill. Sept. 28, 1995) (Pls. Br. 12, 13, 14) is misplaced.

Plaintiffs rely on several district court decisions which Mutual already has established are access cases (Mutual Br. 16). Several additional points are worth noting regarding some of those cases. First, the court in Doukas v. Metropolitan Life Ins. Co., 950 F. Supp. 422 (D.N.H. 1996), relied primarily on the Sixth Circuit's panel decision in Parker, which was subsequently vacated *en banc*. Moreover, the Sixth Circuit's *en banc* opinion explicitly rejected the reasoning in Doukas. 121 F.3d at 1012, n. 4. Second, regardless of how Plaintiffs choose to characterize Chabner v. United of Omaha Life Ins. Co., 994 F. Supp. 1185 (N.D. Cal. 1998), appeal docketed, No. 98-17060 (9th Cir.), a decision Plaintiffs fail to note has been appealed, it is inapplicable here because Mutual granted Plaintiffs the same access to the same health insurance policies at the same cost as everyone else.

Third, Plaintiffs' repeated reliance on World Ins. Co. v. Branch, 966 F. Supp. 1203 (N.D. Ga. 1997), a decision vacated in relevant part as moot by the Eleventh Circuit, 156

-4-

F.3d 1142 (11th Cir. 1998), is baffling since it has no precedential value. See Delta Air Lines, Inc. v. McCoy Restaurants, Inc., 708 F.2d 582, 585 (11th Cir. 1983) ("[A] district court ruling vacated by a court of appeals as moot has no precedential value."); Aetna Casualty & Surety Co. of Hartford, Conn. v. Kerr-McGee Chemical Corp., 875 F.2d 1252, 1255, n. 2 (7th Cir. 1989) (rules of deciding court determine precedential value in Seventh Circuit).

Finally, Plaintiffs rely on Lewis v. Aetna Life Ins. Co., 982 F. Supp. 1158 (E.D. Va. 1997), appeal docketed, No. 98-2179 (4th Cir. 1998), and Attar v. Unum, No. CA3-96-CV-367-R, 1998 WL 574885 (N.D. Tex. Aug. 31, 1998). These decisions are contrary to uniform appellate case law holding that it is not unlawful for an employer or an insurer to treat mental disabilities differently from physical disabilities. Indeed, they squarely conflict with this Court's decision in EEOC v. CNA Ins. Cos., 96 F.3d 1039 (7th Cir. 1996).[3]

Recognizing federal appellate courts have unanimously rejected their desired interpretation of ADA Title III, Plaintiffs fall back on the maxim that civil rights laws should be interpreted broadly (Pls. Br. 24). However, this "salutary policy does not justify ignoring plain words of limitation." J.W. Bateson Co., Inc. v. United States, 434 U.S. 586, 594 (1978); EEOC v. AIC Security Investigations, Ltd., 55 F.3d 1276, 1282 (7th Cir. 1995) ("A liberal construction does not mean one that flies in the face of the structure of the statute.").

[3]  Contrary to Plaintiffs' representation (Pls. Br. 15), Henderson v. Bodine Aluminum, Inc., 70 F.3d 958 (8th Cir. 1995), did not consider whether Title III applies to the content of insurance policies.

-5-

## III.   Plaintiffs' Analysis Of Virtually Identical Language In CRA Title II Demonstrates The Flaws In Their Argument

Because of its nearly identical language, Mutual relied on CRA Title II and supporting case law which establish that the language "of any place of public accommodation" embodies an intent solely to regulate access to physical facilities. Plaintiffs do not dispute that the language in ADA Title III tracks the language of CRA Title II, or argue case law under CRA Title II is not persuasive in determining the meaning of the same language in the ADA. Instead, Plaintiffs brush aside controlling authority discussing the meaning of this language and grossly distort Mutual's position by citing inapposite cases in which public accommodations denied blacks goods and services provided to the general public.[4]

Plaintiffs' attempt to dismiss Welsh v. Boy Scouts of America, 993 F.2d 1267 (7th Cir.), on the basis that Congress clearly intended to include insurance offices as a public accommodation (Pls. Br. 35), misses the point. Welsh is central because it establishes that by using the phrase "place of public accommodation," Congress intended only to regulate access to physical facilities. Id. at 1270. Congress did not seek to regulate the content of the Boy Scouts' membership rules (or, in this case, insurance policies) unrelated to such physical access.

---

[4]    Plaintiffs misrepresent Mutual's position by suggesting Mutual would permit a place of public accommodation to freely discriminate as long as it lets everyone in the door (Pls. Br. 13). Mutual does not contend ADA Title III is limited solely to physical access to places of public accommodation. Rather, the ADA additionally protects access to the goods and services offered by a place of public accommodation.

Plaintiffs' attempt to dismiss <u>Stearnes v. Baur's Opera House, Inc.</u>, 788 F. Supp. 375 (C.D. Ill. 1992), <u>rev'd on other grounds</u>, 3 F.3d 1142 (7th Cir. 1993), is similarly unconvincing. <u>Stearnes</u>, unlike the cases and examples cited by Plaintiffs, explicitly addressed whether a place of public accommodation is required to alter the content of goods and services provided equally to the general public to ensure all persons achieve the same enjoyment. In <u>Stearnes</u>, the district court concluded CRA Title II did not compel a dance bar to play music black patrons enjoyed provided everyone was admitted and served without discrimination.[5] Similarly, ADA Title III does not require Mutual to alter the terms of health insurance policies which are provided equally to all persons.

Unable to persuasively distinguish this case law, Plaintiffs resort to citing inflammatory and inapposite examples of racial discrimination by public accommodations. For example, Plaintiffs rely on <u>Hamm v. City of Rock Hill</u>, 379 U.S. 306 (1965), a case in which a department store allowed black customers to purchase certain products, but denied them service at the store's white-persons only lunch counter. According to Plaintiffs, "[u]nder Mutual's analysis, the stores would escape liability because all customers were allowed to enter the stores, or because black patrons knew that they would not be allowed to sit at the counter when they entered, or because serving black patrons food at a counter

---

[5]   Plaintiffs argue the present case is analogous to one in which a club allows black patrons entry, but only permits them to dance to six songs while everyone else can dance all night (Pls. Br. 36). That hypothetical simply shows blacks were not provided the same product as whites. In contrast, Plaintiffs were given the same package of benefits as everyone else. Thus, a more apt analogy is a case in which all patrons are allowed to dance six songs -- three polkas and three slow dances -- but the plaintiff cannot dance polkas because of his disability. Under Plaintiffs' theory, the dance hall would have to change the mix of songs it offers to ensure all patrons equally enjoy six dances.

-7-

Amici App. 136

already serving others would illegally require the stores to provide new services" (Pls. Br.

33). Stripped of its racially charged rhetoric and misrepresentation of Mutual's position, the

illogic of Plaintiffs' argument is apparent. In Hamm, black customers were being denied

physical access to the store's lunch counter and the same goods and services offered there to

white patrons. Plaintiffs, on the other hand, were not denied access to an insurance office or

any of the insurance products Mutual offered to non-disabled persons.[6]

**IV.     Each Of The Reasons Relied On By Plaintiffs Fails
          To Support Their Argument That ADA Title III
          Regulates The Content Of Insurance Policies**

> **A.     The "Full And Equal Enjoyment" Clause In Section 302(a)
>          Does Not Require A Public Accommodation To Alter The
>          Content Of The Goods And Services It Offers**

Not only do Plaintiffs violate established principles of statutory construction by failing

to give any meaning or effect to the word "place" in ADA Title III, the language they pin

their hopes on -- "full and equal enjoyment" -- cannot be stretched to encompass the notion

that goods and services must be redesigned to ensure persons with disabilities achieve an

identical result or the same amount or quality of enjoyment as nondisabled persons. Indeed,

CRA Title II utilizes precisely the same "full and equal enjoyment" provision and plainly

does not mandate any change in goods and services.

---

[6]     Mutual's position would similarly condemn other classic examples of discriminatory
treatment cited by Plaintiffs (Pls. Br. 34). A theater which excludes black customers
or forces them to sit in a separate section of the theater is denying black patrons equal
access to the theater. Refusing to allow black patrons to consume their purchases in
the parking lot of a drive-in restaurant denies black citizens equal access to the
restaurant's premises and the full range of services offered by the restaurant.

**Amici App. 137**

Moreover, as Mutual previously noted (Mutual Br. 26), to find otherwise produces an absurd and impossible result -- every good and service must provide, or be modified to provide, the same level of enjoyment to all persons.[7]  Rather than forthrightly responding to Mutual's examples, Plaintiffs propose different examples, which far from supporting their argument, in fact demonstrate the logic and strength of Mutual's position.  Plaintiffs point out that "a person disabled by leukemia does not fully and equally enjoy a bookstore if, upon entry, he or she is restricted from buying biographies or poetry for no rational reason" (Pls. Br. 13).  Plaintiffs' example presents a classic access case.  The bookstore sells poetry books to other patrons, but refuses to sell the same books to persons with leukemia.  Mutual did not refuse to sell Plaintiffs a health insurance policy it offered to non-disabled persons.  See Ford, 145 F.3d at 613 ("Just as a bookstore must be accessible to the disabled but need not treat the disabled equally in terms of books the store stocks [e.g., Braille], likewise an insurance office must be physically accessible to the disabled but need not provide insurance that treats the disabled equally with the nondisabled.").

Plaintiffs similarly argue that "a restaurant cannot escape liability under the ADA by arguing that 'we let everyone in' if its menu forbids patrons with AIDS from ordering the main course" (Pls. Br. 13).  In Plaintiffs' hypothetical, however, the restaurant is denying persons with AIDS access to the same product others can obtain.  This case is precisely the opposite.  Plaintiffs were afforded the same access to the same policies provided to all individuals -- the non-disabled and the disabled.  Far from seeking access to the main course,

---

[7]    Plaintiffs' position also leaves unclear what benchmark federal courts would use to determine whether a disabled person achieves the same "full and equal enjoyment" as a non-disabled person.

-9-

Amici App. 138

Plaintiffs are seeking an interpretation of the ADA which would require the restaurant to change its menu to include different dishes. Under Plaintiffs' interpretation, a person who has diabetes has a valid ADA claim because he cannot order a restaurant's signature crème brulee from the dessert menu. The restaurant would be liable under the ADA because such a person cannot fully and equally enjoy the dessert menu to the same extent as a person who does not have diabetes.

**B.    Section 302(b) Does Not Reach The Content Of Insurance Policies Equally Provided To The Disabled And Non-Disabled**

Plaintiffs rely on Section 302(b), but ignore Mutual's point-by-point analysis of that language, 42 U.S.C. § 12182(b)(1)(A)(i), (b)(1)(A)(ii) and (b)(1)(A)(iii) (Mutual Br. 23-26).[8] Moreover, what Plaintiffs do offer the Court is remarkably shallow -- a regurgitation of Section 302(b) and a bare assertion that the limitations in Plaintiffs' policies violate all three subsections. For example, Plaintiffs assert they were denied the opportunity to "benefit from" the goods offered by Mutual within the meaning of Section 302(b)(1)(A)(i):

> It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class … to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity.

42 U.S.C. § 12182(b)(1)(A)(i) (emphasis added).

Once again, to reach their desired result, Plaintiffs conveniently overlook key statutory phrases. The words "denial of the opportunity" prohibit a public accommodation

---

[8]    Plaintiffs also rely on Section 302(b)(2)(A)(i)-(iii). However, these provisions focus on requiring modifications in "policies, practices or procedures" when such modifications are necessary to afford disabled persons access to goods, services and facilities. See 28 C.F.R. § 36.302 (1998).

from denying disabled persons goods and services provided to non-disabled persons, and DOJ commentary confirms this reading of the statute. According to the DOJ, a theater would violate the above section by refusing to admit an individual with mental retardation to a performance because of the individual's mental disability. See Title III Technical Assistance Manual § III-3.2000. Plaintiffs fail to confront the fact that their interpretation, instead of merely allowing individuals with mental retardation to attend all performances, would require the theater to alter the content of an esoteric play because an individual with mental retardation cannot "benefit from" the play to the same extent as an individual who is not mentally retarded.

Plaintiffs attempt to avoid this contradiction by arguing the District Court's decision requiring Mutual to provide all persons the same $1 million in benefits does not obligate Mutual to provide a new product. Of course it does. The policies sold to Plaintiffs were the only policies Mutual offered to persons seeking to purchase individual health insurance coverage, and those policies contain a specific mix of coverages, limitations and exclusions. That policy is Mutual's product. By demanding Mutual provide an insurance policy which offers a different mix, including no limit for AIDS or ARC, Plaintiffs are undeniably seeking to alter the existing insurance product Mutual offers. See Lenox, 149 F.3d at 456 (recognizing plaintiff's complaint that her insurance policy covered some types of transplants while excluding heart transplants was "exactly equivalent to construing Title III to compel a video store to stock closed caption video tapes because ordinary tapes are worth less to a deaf person than to one with normal hearing").

-11-

**Amici App. 140**

### C.  Plaintiffs' Reliance On The ADA's Legislative History Is Misplaced

Plaintiffs argue that legislative history confirms the applicability of Title III to the content of insurance policies.  There are two principal problems with this argument.  First, legislative history is no substitute for the language of the statute itself (Mutual Br. 27-28).  As two Courts of Appeals have found, looking at the legislative history is unnecessary and improper because the language of ADA Title III makes unambiguously clear that its purpose and intent is to assure disabled persons have the same access to the same goods and services provided to non-disabled persons by places of public accommodation.  See Ford, 145 F.3d at 613 ("[S]ince we find the plain meaning of 'public accommodation' and 42 U.S.C. § 12182(a) to be clear, we have no need to analyze the ADA's legislative history.").

Second, the ADA's legislative history is hardly one-sided.  As even Carparts recognizes, "[o]ne who simply reads the Committee Report describing the operations of Title III could easily come away with the impression that it is primarily concerned with either access in the sense of physical access to a place of public accommodation or something analogous, such as access provided through telephone."  37 F.3d at 19.  See Holtzman v. Schlesinger, 484 F.2d 1307, 1314 (2d Cir. 1973) ("Resort to legislative materials is not permissible where they are contradictory or ambiguous."), cert. denied, 416 U.S. 936 (1974).[9]

---

[9]    If reliance on unclear legislative history were not enough, one of the amici supporting Plaintiffs asks this Court to rely on its version of the "negotiations" leading to the ADA.  See Amicus Brief of AIDS Action Council.  Mutual is unaware of any court decision giving weight to the unverified views of a lobbyist regarding the origination or intent of statutory language.

-12-

**D.    The DOJ's Interpretative Guidance
       Does Not Support Plaintiffs**

Plaintiffs argue the DOJ's "clear and consistent" regulations and guidance are entitled

to deference.  Left unexplained, however, is how the DOJ's pronouncement on insurance can

be reconciled with its own regulations, much less the plain language of ADA Title III.

The DOJ's regulations explicitly provide that "[t]he purpose of the ADA's public

accommodations requirements is to ensure accessibility to the goods offered by a public

accommodation, not to alter the nature or mix of goods that the public accommodation has

typically provided."  28 C.F.R. Ch. 1, Pt. 36, App. B at 612 (1998).  Saying that the ADA

goes beyond access is irreconcilable with this clear and unambiguous regulation.  The impact

of this regulation (which Plaintiffs do not discuss)[10] is unmistakable -- while a place of public

accommodation must be accessible to the disabled, it is not required to alter the goods and

services it provides.  In short, the DOJ's guidance on insurance can only be labeled "clear

and consistent" by ignoring this most significant DOJ regulation.

Not surprisingly, the Third and Sixth Circuits have recognized the conflict between

the statutory language and the DOJ's inconsistent regulations and have rejected the DOJ's

writings on insurance.  See Ford, 145 F.3d at 613; Parker, 121 F.3d at 1012, n. 5.

**E.    ADA Title IV's Construction Provisions Confirm That The
       ADA Does Not Apply To The Content Of Insurance Policies**

Adding new terms which do not appear in the statute, Plaintiffs argue Section 501(c),

42 U.S.C. § 12201(c), is a "limited exemption" for "risk-based" practices (Pls. Br. 26) and

---

[10]    Remarkably (but perhaps not surprisingly), even the DOJ as *amicus curiae* does not
        cite the full text of its own regulation (DOJ Br. 13-14).

-13-

**Amici App. 142**

requires Mutual to actuarially justify the AIDS limits in Plaintiffs' policies.[11]  This construction, however, misreads the statutory language, conflicts with Supreme Court and federal appellate case law, and leads to extraordinary results unintended by Congress.

The fundamental problem with Plaintiffs' argument is that it attempts to convert a rule of construction into a substantive burden of proof.  Section 501(c), contained in ADA Title IV entitled "Miscellaneous Provisions" along with sections dealing with state immunity, attorneys' fees and the Architectural and Transportation Barriers Compliance Board, explicitly provides that ADA Titles I and III "shall not be construed to prohibit or restrict."[12]  This language does not create a burden of proof on an employer or an insurance company.  Instead, it is a "hands off" declaration by Congress unless there is proof of a "subterfuge."  Indeed, Section 501(c) is intended to avoid the exact result produced by the District Court.

Plaintiffs' "actuarial justification" requirement fails for a simple reason -- it does not appear in the statute.[13]  If Congress wanted employers and insurers to actuarially justify every limit or exclusion, then it could easily have said so.  But it did not.  Indeed, in Section 501(c)(3) for example, "risk" is not even mentioned, so Plaintiffs' actuarial justification

---

[11]    As an initial matter, because Plaintiffs cannot demonstrate that they were denied access to Mutual's insurance policies or that the policies they purchased discriminate on the basis of disability (see Section VI, infra), this Court need not reach the meaning of Section 501(c).

[12]    It defies common sense to assert Congress, through Section 501(c), undertook the regulation of insurance.  Something that significant, which would so dramatically impact state regulation (where insurance regulation has historically resided), would surely have been done in a significantly clearer, more painstaking manner.  Cf. 42 U.S.C. § 12162 (extensively regulating rail transportation under the ADA).

[13]    Likewise, the ADA never characterizes Section 501(c) as an "exemption" or a "safe harbor" (Pls. Br. 26; App. 14).

-14-

argument makes no sense.[14]  Just as they violate statutory construction principles by ignoring the "place" language in ADA Title III, they violate another principle by adding substantive burden of proof requirements which simply are not in the statutory language.

Plaintiffs' Section 501(c) argument was specifically rejected by the Supreme Court in Public Employees Retirement System v. Betts, 492 U.S. 158 (1989).  There, the Court interpreted a "subterfuge" provision similar to Section 501(c) in the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et. seq.  In Betts, the plaintiff argued a distinction in disability pension benefits between older and younger disabled retirees could not be justified on a cost basis, and therefore was a "subterfuge" to evade the purposes of the ADEA.  The Court rejected this argument, concluding the term "subterfuge" must be given its ordinary meaning of "a scheme, plan, stratagem, or artifice of evasion."  Id. at 167.

The Court further rejected the contention that a disparity in benefits not justified by actuarial cost data is a subterfuge.  Id. at 175.  This definitive judicial rejection of a cost-justification component to the concept of "subterfuge" in the ADEA disposes of Plaintiffs' attempt to import this concept into the ADA.  See Ford, 145 F.3d at 611-12 (declining to require "insurers to justify their coverage plans in federal court after a mere allegation by a plaintiff," and recognizing a contrary interpretation would contradict the Supreme Court's

---

[14]     Under Plaintiffs' position, an employer-sponsored benefit plan containing an AIDS limitation also would require an actuarial justification.  However, Section 501(c)(3) allows such a limit if it is in a "bona fide benefit plan," i.e., it exists and pays benefits.  United Air Lines, Inc. v. McMann, 434 U.S. 192, 194 (1977).  Thus, an AIDS limit in a bona fide benefit plan would be lawful, but unlawful in an insurance policy.  That makes as little sense as Plaintiffs' tortured reading of Section 501(c).

-15-

decision in Betts and "require a seismic shift in the insurance business"); Modderno v. King, 82 F.3d 1059, 1064 (D.C. Cir. 1996) (relying on Betts definition of "subterfuge" in upholding a limitation on mental health benefits), cert. denied, 117 S. Ct. 772 (1997); Parker, 121 F.3d at 1013, n. 7 (recognizing the DOJ's requirement that an insurance policy be based on sound actuarial principles in order not to be a "subterfuge" under the ADA is inconsistent with Betts). Significantly, Plaintiffs failed to plead subterfuge or offer any evidence of a subterfuge.

Not only do Plaintiffs ignore case law addressing the meaning of "subterfuge," they ignore the implications of their position. Plaintiffs understandably focus on policy provisions limiting benefits for AIDS or ARC. Their policies, however, contain other benefit limitations and exclusions; for example, for alcoholism and drug addiction treatment, mental or nervous disease and learning disabilities, the promotion of fertility, obesity not caused by sickness or injury, and hearing aids (App. 35, 51).[15] Under Plaintiffs' view, Mutual must produce actuarial data to explain every distinction, limitation or exclusion in its insurance products. The massive litigation that is the end result of Plaintiffs' construction of the ADA is reflected in what went on in this case.[16]

---

[15]   Contrary to Plaintiffs' representation (Pls. Br. 39, n. 16), Illinois law does not specifically reference each of the exclusions in Plaintiffs' policies. For example, ILL. ADMIN. CODE tit. 50, ch. I, § 2007.6-(e) (1998) does not specifically reference learning disabilities or limits on benefits for prescription medicines.

[16]   In an effort to have this case decided on the legal issues raised by Plaintiffs' Complaint, Mutual filed a motion to dismiss and a motion to certify issues for interlocutory appeal, both of which were denied by the District Court (R.10, 25). Plaintiffs then engaged in extraordinarily burdensome discovery, requesting all documents relating to Mutual's actuarial data, underwriting practices, or any actual or reasonably anticipated experience concerning differences in coverage related to AIDS

Amici App. 145

**V.    The McCarran-Ferguson Act Precludes The Application Of The ADA To The Benefits, Terms And Conditions Of Insurance Policies**

Plaintiffs argue the McCarran-Ferguson Act does not preclude the application of ADA Title III to insurance policies because the ADA specifically relates to the business of insurance and because the application of the ADA in this case would not "invalidate, impair, or supersede" state law. Plaintiffs' position, however, is contrary to common sense, federal appellate case law and the Supreme Court's recent decision in Humana Inc. v. Forsyth, 119 S. Ct. 710 (1999).

As Mutual previously discussed, the ADA does not specifically relate to the business of insurance, and Plaintiffs' arguments to the contrary conflict with federal appellate case law (Mutual Br. 36-37).

Rather than supporting Plaintiffs' argument that McCarran-Ferguson does not apply because the ADA does not directly conflict with Illinois law, Humana does the opposite. There, the Supreme Court "considered whether a RICO suit based on a health insurer's scheme to secure undisclosed discounts for hospital services "invalidated, impaired, or

---

and ARC and all other medical conditions for which Mutual provides coverage under all policies it issues (R.34). Mutual insures approximately 15 millions persons, and provides coverage for between 14,000 to 21,000 medical conditions (R.39). Notwithstanding nine affidavits filed by Mutual describing the tens of thousands of hours required to respond to Plaintiffs' broad requests (R.39), and its withdrawal of a Section 501(c) defense (R.35), the District Court granted Plaintiffs' motion to compel and sanctioned Mutual (R.42). Although Mutual maintained that it had a legitimate business justification for its AIDS limits (R.34), at that point, Mutual had three options: (1) turn the company inside out to comply with such an onerous discovery order; (2) face continued sanctions in the District Court; or (3) agree to a stipulated final judgment to preserve its appeal rights. Mutual chose the latter and, in this case only, waived the right to produce evidence to show that its AIDS limits are consistent with sound actuarial principles, actual or reasonably anticipated experience or bona fide risk classification (App. 17).

-17-

Amici App. 146

superseded" a Nevada law proscribing the same conduct. The Court set forth the following test to determine whether McCarran-Ferguson precludes application of a federal law: "When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." 119 S. Ct. at 717 (emphasis added). In establishing this test, the Court cautioned that Congress did not intend "a green light for federal regulation whenever the federal law does not collide head on with state regulation." Id. The Humana Court also explicitly rejected a narrow definition of the word "impair": "The dictionary definition of 'impair' is '[t]o weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner.'" Id.

In this case, the application of the ADA would impair state law and run afoul of McCarran-Ferguson by interfering with the State of Illinois' extensive administrative scheme over all insurance practices (Mutual Br. 38). Unlike the Nevada statute at issue in Humana, Section 364 of the Illinois Insurance Code, 215 ILCS 5/364, does not provide a private right of action to insureds. This distinction is critical. By declining to provide a private cause of action, Illinois consciously reserved the exclusive right to determine whether a challenged term or condition in an insurance policy sold in Illinois unlawfully discriminates in violation of Section 364 to the Department of Insurance -- not Plaintiffs and not the District Court.[17]

---

[17]    The District Court properly determined Section 364 of the Illinois Insurance Code does not provide a private cause of action (App.21-22), and Plaintiffs did not appeal that decision. Indeed, Plaintiffs' reading of Section 501(c) -- which would necessitate a judicial determination of whether an insurance policy is "based on or not inconsistent with State law" -- clearly impairs the authority of the Department of Insurance to exclusively make such determinations.

-18-

Amici App. 147

Thus, the application of the ADA to the content of an insurance policy regulated by Illinois "impairs" state law by diminishing the power of the Illinois Department of Insurance to interpret Section 364 and regulate insurance companies' practices.[18]

## VI.    Limiting Benefits For Certain Medical Conditions Is Not Disability-Based Discrimination Under ADA Title III

Plaintiffs argue the policies they purchased from Mutual discriminate on the basis of a disability because AIDS and ARC receive less favorable coverage than other medical conditions. Federal appellate court decisions, however, are legion in holding that the provision of different benefits for different illnesses or medical conditions in an insurance policy is not discrimination "on the basis of a disability" where the same policy is provided to all persons. In this case, all insureds -- whether or not disabled -- received the same benefits. For example, at the time of purchase, everyone, including Plaintiffs, is covered up to $1 million if they suffer a heart attack or break a leg. Similarly, all insureds face the same benefit limits for treatment for AIDS or ARC. Thus, Plaintiffs' and the DOJ's argument that Mutual has singled them out for inferior coverage as compared to non-disabled individuals is plainly wrong.

---

[18]    Plaintiffs contend Illinois law prohibits the AIDS limits, thereby making the ADA consistent with Illinois law. However, Plaintiffs do not point to any Illinois ruling which makes an AIDS limit unlawful. In fact, Illinois law affirmatively contemplates that an insurance company can deny coverage to applicants who test positive for HIV. The Medical Patient Rights Act, 410 ILCS 50/3(c), recognizes insurance companies can require applicants for insurance coverage to be tested for HIV infection and regulates the manner in which insurance companies notify applicants of adverse underwriting or coverage decisions based on the test results. If an insurance company can deny coverage, certainly it can place limits on coverage. Moreover, while several states have enacted statutes specifically prohibiting caps or limits on benefits for AIDS or ARC (Mutual Br. 38), Illinois is not one of those states.

In EEOC v. CNA Ins. Cos., 96 F.3d 1039 (7th Cir. 1996), this Court upheld a

benefit plan which limited long-term disability benefits to two years for the mentally

disabled. In language directly applicable here, this Court stated:

> [T]here is no claim here that CNA discriminated on the basis of disability in offering
> its pension plan to anyone. It did not charge higher prices to disabled people, on the
> theory that they might require more in benefits. . . . Nor did it vary the terms of its
> plan depending on whether or not the employee was disabled. All employees -- the
> perfectly healthy, the physically disabled, and the mentally disabled -- had a plan that
> promised them long-term benefits from the onset of disability until age 65 if their
> problem was physical, and long term benefits for two years if the problem was mental
> or nervous. This may or may not be an enlightened way to do things, <u>but it was not
> discriminatory in the usual sense of the term.</u>

Id. at 1044 (citations omitted) (emphasis added).

Plaintiffs do not persuasively overcome this critical passage.[19] The policy challenged

in CNA provided one level of benefits if the insured became disabled as a result of a

physical condition and a lower level of benefits if the insured became disabled as a result of

mental illness. So here, Plaintiffs' policies guarantee them $1 million in benefits if they

become disabled as a result of certain medical conditions and a lower level of benefits if they

become disabled due to AIDS or ARC. Moreover, it is clear Mutual did not alter or vary

the terms of its policies depending on whether Plaintiffs were disabled. All persons --

whether disabled or not -- were given the same package of insurance protection. This case is

analytically indistinguishable from CNA.[20]

---

[19]    Plaintiffs incorrectly assert CNA was decided on other grounds (standing to sue under
Title I) (Pls. Br. 40). This Court framed the issue in CNA as follows: "We are asked
to decide to what extent, if at all, the Americans with Disabilities Act of 1991
(ADA), 42 U.S.C. §§ 12101 et. seq., requires equality of treatment among
disabilities." Id. at 1040.

[20]    This Court's decision in CNA defeats Plaintiffs' argument that only facially neutral
limitations that affect all insureds equally are permissible (Pls. Br. 38). The policy

-20-

Case: 24-1947 Document: 60 Filed: 10/17/2024 Pages: 159

Plaintiffs' treatment of Sixth Circuit case law further underscores the weakness of their position. Plaintiffs incorrectly assert Parker was decided on other grounds and proceed to ignore an entire section of the court's opinion (Pls. Br. 40). Contrary to Plaintiffs' representations, the Sixth Circuit explicitly held that the ADA "does not prohibit an insurance company from differentiating between different disabilities." 121 F.3d at 1019.

Plaintiffs do not even discuss Lenox. In Lenox, the Sixth Circuit rejected the plaintiff's argument that her insurance plan contained a disability-based distinction in violation of the ADA because it covered some types of transplants, but not heart transplants. 149 F.2d at 457. Plaintiffs cannot avoid the fact that the plan upheld in Lenox "singled out" a particular disability with life-threatening consequences -- cardiomyopathy -- for inferior coverage as compared to other medical conditions.

Modderno also refutes Plaintiffs' argument that Mutual's policies discriminate on the basis of a disability because they "single out" a particular disability as opposed to providing unequal benefits as between broad categories of disabilities (Pls. Br. 40). In Modderno, the District of Columbia Circuit recognized that because the Rehabilitation Act permits across-the-board limits on coverage, that statute "cannot forbid partial limits that leave some

---

limitation challenged in CNA did not affect all insureds equally. The limitation clearly affected only mentally disabled individuals, who received lower benefits than the physically disabled. Id. at 1041. In other words, the policy upheld in CNA provided less favorable coverage to a specific class of disabled persons.

Mutual would also note that Plaintiffs' claim that the ADA requires an insurance company to actuarially justify every disparity in health insurance that affects the disabled (Pls. Br. 28, n. 11) is belied by CNA, which never required such a showing.

-21-

Amici App. 150

disabled individuals better off and the remainder no worse off." 82 F.3d. at 1062.[21]

Plaintiffs' argument also collides with Ford. In Ford, the Third Circuit recognized the ADA does not require equal coverage for every type of disability: "So long as every employee is offered the same plan regardless of that employee's contemporary or future disability status, then no discrimination has occurred, even if the plan offers different coverage for various disabilities." 145 F.3d at 608.

In sum, Plaintiffs cannot overcome uniform federal appellate case law recognizing that the provision of different benefits for different medical conditions in an insurance policy is not discrimination on the basis of disability where, as here, the same policy is equally provided to the disabled and non-disabled.

---

[21]   Relying on Lewis v. Aetna Life Ins. Co., 982 F. Supp. 1158 (E.D. Va. 1997) (a case which directly conflicts with this Court's holding in CNA), Plaintiffs argue the District of Columbia Circuit misconstrued Supreme Court case law in Modderno (Pls. Br. 40). If so, however, so did the Sixth Circuit in Parker, which specifically agreed with Modderno's analysis of the Supreme Court decisions in Traynor v. Turnage, 485 U.S. 535 (1988) and Alexander v. Choate, 469 U.S. 287 (1985). 121 F.3d at 1016. And so did this Court in CNA, which approvingly cited Modderno. 96 F.3d at 1044.

-22-

## CONCLUSION

For the foregoing reasons, as well as those reasons discussed in its opening brief,

Mutual requests that the Court reverse the District Court's Judgment in favor of Plaintiffs on

Count I of their Complaint.

Respectfully submitted,

MUTUAL OF OMAHA INSURANCE COMPANY

By _____
One Of Its Attorneys

Joel H. Kaplan
Thomas J. Piskorski
Cassandra L. Curry
Seyfarth, Shaw, Fairweather
 & Geraldson
55 East Monroe Street
Suite 4300
Chicago, IL 60603
(312) 346-8000

February 23, 1999

1230123.1

-23-

**Amici App. 152**

## CERTIFICATE OF COMPLIANCE WITH FEDERAL
## RULE OF APPELLATE PROCEDURE 32(a)(7)(B)(ii)

I, Joel H. Kaplan, one of the attorneys for Defendant-Appellant Mutual of Omaha

Insurance Company, certify that I have been informed by my firm's word processing

department that, according to the word count program utilized by them, the attached brief is

6,884 words in length, and therefore complies with Seventh Circuit Rule 32(a)(7)(B)(ii). The

word processing system used is Word Perfect 6.1.

_____
Joel H. Kaplan

February 23, 1999

**Amici App. 153**

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on this 23rd day of February, 1999, he caused

to be served by messenger two true and correct copies of the foregoing Reply Brief of

Defendant-Appellant, and a computer disk containing the same, upon:

Heather C. Sawyer
Lambda Legal Defense
   and Education Fund, Inc.
11 East Adams, Suite 1008
Chicago, Illinois  60603

Stuart I. Graff
Schiff, Hardin & Waite
7200 Sears Tower
Chicago, Illinois  60606

and by first-class U.S. mail to:

Roger Leishman
Roger Baldwin Foundation of
   ACLU, Inc.
180 North Michigan Avenue
Suite 2300
Chicago, Illinois 60601-7401

Chai R. Feldblum
Professor of Law
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, DC 20001

Gregory B. Friel
Department of Justice
P.O. Box 66078
Washington, D.C.  20035-6078

Stephanie W. Kanwit
Kirsten M. Pullin
Epstein, Becker & Green, P.C.
1227 25th Street N.W., Suite 700
Washington, D.C.  20037

Daniel Bruner
Whitman-Walker Clinic
   Legal Services Department
1407 S Street, N.W.
Washington, D.C.  20009

Ann Elizabeth Reesman
Corrie L. Fischel
McGuiness & Williams
1015 15th Street N.W., Suite 1200
Washington, D.C.  20005

Matthew A. Coles
Jennifer Middleton
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004-2400

Jeffrey Gabardi
Health Insurance Association
   of America
555 13th Street, N.W., East Tower
Washington, D.C.  20004-1600

Phillip Stano
American Council of Life Insurance
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004-2599

Ann Hilton Fisher
AIDS Legal Council of Chicago
220 South State Street, Suite 1330
Chicago, Illinois 60604

Joel H. Kaplan

Amici App. 155

## **Certificate of Service**

I hereby certify that on October 17, 2024, I electronically filed the foregoing with the Clerk of the Court using the appellate CM/ECF system, which effected service to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

/s/ *Alisa Tiwari*
Alisa Tiwari
*Counsel for Amici Curiae*