# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA,
*Plaintiff-Appellant*,

*v.*

ADRIANNE TODMAN, ACTING SECRETARY OF THE
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, AND
UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Illinois, No. 1:13-cv-08564
Before the Honorable Chief Judge Rebecca R. Pallmeyer

## APPELLANT'S REPLY BRIEF

ANDRES C. SALINAS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

ROWE W. SNIDER
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0700


November 14, 2024

SETH P. WAXMAN
KELLY P. DUNBAR
JEREMY W. BRINSTER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com

COLLEEN MARIE CAMPBELL
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, CO 80202
(720) 274-3135

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ...................................................................................1

ARGUMENT ..........................................................................................3

I.  THE RULE IS PREEMPTED AS APPLIED TO RISK-BASED PRICING
    AND UNDERWRITING OF HOMEOWNERS INSURANCE .......................3

    A.  Each Application Of The Rule To Risk-Based Practices
        Is Preempted By McCarran-Ferguson....................................3

        1.  Interference with state administrative regimes ...........................4

        2.  Conflict with state insurance laws ...........................................15

    B.  PCI's Preemption Claim Is Ripe ........................................17

        1.  Judicial fitness.........................................................17

        2.  Hardship ................................................................20

II. THE RULE'S REJECTION OF AN EXEMPTION FOR RISK-BASED
    PRICING AND UNDERWRITING WAS ARBITRARY AND
    CAPRICIOUS ..............................................................................22

III. THE RULE'S APPLICATION VIOLATES INCLUSIVE COMMUNITIES .....................28

CONCLUSION .....................................................................................32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Avenue 6E Investments LLC v. City of Yuma*, 818 F.3d 493
(9th Cir. 2016) ............................................29

*Boogaard v. National Hockey League*, 891 F.3d 289 (7th Cir. 2018)......................8

*Cantero v. Bank of America, N.A.*, 602 U.S. 205 (2024).........................................19

*Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003) .................................14, 15

*Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020).........................................28

*Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557
(7th Cir. 1999) .................................... 1, 4, 6, 7, 8, 9, 13, 19, 23, 24

*E.F. Transit, Inc. v. Cook*, 878 F.3d 606 (7th Cir. 2018) ......................................18

*Ellis v. City of Minneapolis*, 860 F.3d 1106 (8th Cir. 2017) ................................30

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016).....................................23

*Humana Inc. v. Forsyth*, 525 U.S. 299 (1999).......................................3, 5, 6, 10, 16

*Inclusive Communities Project, Inc. v. Lincoln Property Co.*, 920 F.3d
890 (5th Cir. 2019) ......................................29

*League of Women Voters of Indiana, Inc. v. Sullivan*, 5 F.4th 714
(7th Cir. 2021) .........................................4, 19

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ...........................29

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990)................................21

*Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581
(2d Cir. 2016)................................................29

*Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024)...................................................4

*NAACP v. American Family Mutual Insurance Co.*, 978 F.2d 287
(7th Cir. 1992) .........................................9, 16

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998) ................................20, 21

*Ojo v. Farmers Group, Inc.*, 356 S.W.3d 421 (Tex. 2011) ....................................14

*Ojo v. Farmers Group, Inc.*, 600 F.3d 1205 (9th Cir. 2010) ..................................13

*Owner-Operator Independent Drivers Ass'n v. Federal Motor Carrier
    Safety Administration*, 656 F.3d 580 (7th Cir. 2011) .............................17, 20

*Reyes v. Waples Mobile Home Park Ltd. Partnership*, 903 F.3d 415
    (4th Cir. 2018) ................................................................................................29

*Saunders v. Farmers Insurance Exchange*, 440 F.3d 940
    (8th Cir. 2006) ................................................................................................14

*Saunders v. Farmers Insurance Exchange*, 537 F.3d 961
    (8th Cir. 2008) ................................................................................................14

*Southwest Fair Housing Council, Inc. v. Maricopa Domestic Water
    Improvement District*, 17 F.4th 950 (9th Cir. 2021) ...............................30, 31

*Stowe v. Rybroek,*114 F.4th 630 (7th Cir. 2024).........................................................4

*Texas Department of Housing and Community Affairs v. Inclusive
    Communities Project, Inc.*, 576 U.S. 519 (2015) .................................3, 30, 31

*United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742 (1972)....................22

*West Virginia v. EPA*, 597 U.S. 697 (2022) ............................................................28

*Wisconsin Central, Ltd. v. Shannon*, 539 F.3d 751 (7th Cir. 2008) .................18, 19

## STATUTES AND REGULATIONS

15 U.S.C. § 1012 ......................................................................................................26

Cal. Ins. Code § 1861.05 ..........................................................................................15

Conn. Gen. Stat. Ann. § 38a-686 ..............................................................................15

215 Ill. Comp. Stat. Ann.
    5/132.3 ...........................................................................................................10
    5/424 ..............................................................................................................10
    5/456 ..............................................................................................................10

Idaho Code Ann. § 41-1427 ...................................................................11

Ill. Admin. Code tit. 50 § 754.10 ..........................................................10

Ill. Bulletin No. 2024-8, 2024 WL 1091547 (Mar. 13, 2024) .................10

Iowa Code Ann. § 507B.4 ......................................................................15

Neb. Rev. Stat. § 44-7510 ......................................................................15

Okla. Stat. Ann. tit. 36 § 1204 ..............................................................15

Wyo. Stat. Ann.
    § 26-13-109 ...................................................................................15
    § 26-14-103 ...................................................................................15
    § 26-14-107 ...................................................................................12

24 C.F.R. § 100.500 ...........................................................................6, 7

## OTHER AUTHORITIES

Casualty Actuarial Society, *Statement of Principles Regarding
    Property & Casualty Insurance Ratemaking* (May 1988),
    https://tinyurl.com/3dthyzh3..................................................11, 17

Hartwig, Robert, *The Insurance Industry's Commitment to Fairness in
    Insurance Pricing: A Survey of Historical and Current
    Research Concerning Risk-Based Pricing and Unfair
    Discrimination*, University of South Carolina (Aug. 2023),
    https://tinyurl.com/yzb47rne.........................................................25

Illinois Department of Insurance, *Property & Casualty Examinations*,
    https://idoi.illinois.gov/reports/marketconductexam/property-
    and-casualty-examinations.html (visited Nov. 13, 2024).............10

National Association of Insurance Commissioners, *Price Optimization
    White Paper* (Nov. 19, 2015), https://tinyurl.com/483e66x9.......28

Wisconsin Office of the Commissioner of Insurance, *Policy Form and
    Rate Filing Requirements*, https://oci.wi.gov/Pages/Companies/
    PolicyFormsAndRateFilings.aspx (updated July 1, 2024)............12

Wisconsin Office of the Commissioner of Insurance, *Property and Casualty Rate/Rule Filing Procedures* (rev. Jan. 2017), https://oci.wi.gov/Documents/OCIForms/PropCasFilingProcedure.pdf..................12

**INTRODUCTION**

HUD's opposition brief does little to defend the lawfulness of the Rule as applied to risk-based pricing and underwriting of homeowners insurance in the face of McCarran-Ferguson's reverse preemption provision. HUD concedes that the Rule will be preempted in many applications. HUD-Br.24. The agency's defense hinges on the refrain that McCarran-Ferguson requires a "case-by-case" assessment, *e.g.*, HUD-Br.29, and that PCI's members must therefore await disparate-impact lawsuits under the Rule. This "case-by-case" mantra undergirds both HUD's merits arguments and its ripeness position.

HUD is demonstrably wrong. This Court's decision in *Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557 (7th Cir. 1999)—which HUD first addresses 45 pages into its brief—establishes that the Rule will be preempted in *every* application to risk-based pricing and underwriting because it will force federal courts to decide questions entrusted to state insurance regulators, including whether rates are actuarially sound and necessary to comply with state law. The Rule is independently preempted because it clashes with state insurance laws, which prohibit homeowners insurers from charging rates that treat like risks differently or fail accurately to correspond to the risk presented. By replacing those state laws with a different, federal standard, the Rule upends state regimes governing insurance calibrated to meet the unique needs of each State. It exposes

1

insurers to significant liability for the use of legitimate, actuarially sound, and state-law-compliant pricing and underwriting practices designed to maintain insurer solvency and guarantee that like risks will be treated alike—but that happen to correlate with an unintended discriminatory effect.

HUD's assertion that PCI's preemption claim cannot be adjudicated in a pre-enforcement challenge to the Rule is unavailing. Pre-enforcement review of agency rules has been the norm for decades, and preemption claims are typical examples of purely legal questions fit for judicial resolution. This case is no exception. The administrative record provides this Court with all the information it needs to conclude that the Rule is preempted as applied to risk-based pricing and underwriting, including a survey of insurance laws in all 50 States and D.C. No additional factual development is needed. And HUD's and its amici's repetitive claims about variation in state insurance laws are misguided: under the laws of every State, McCarran-Ferguson preempts the Rule.

As PCI has also shown, the Rule is a textbook example of arbitrary and capricious decision making because, despite repeated opportunities over many years, HUD has never provided a reasoned explanation for failing to exempt risk-based pricing and underwriting of homeowners insurance from the Rule. And the agency has failed to show that the Rule can be applied consistent with the

limitations of *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015).

For these reasons, the Rule should be vacated as applied to risk-based pricing and underwriting of homeowners insurance.

## ARGUMENT

### I. THE RULE IS PREEMPTED AS APPLIED TO RISK-BASED PRICING AND UNDERWRITING OF HOMEOWNERS INSURANCE

#### A. Each Application Of The Rule To Risk-Based Practices Is Preempted By McCarran-Ferguson

Risk-based practices form the cornerstone of solvent, competitive, and healthy homeowners insurance markets and are critical aspects of the state regulation of insurance. The Rule is preempted by McCarran-Ferguson as applied to those well-established practices for two independent reasons: First, it "interfere[s] with a State's administrative regime," *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999), by empowering—indeed, obligating—federal courts to review decisions entrusted to state insurance regulators, PCI-Br.28-32. Second, it "directly conflict[s]" with state insurance laws, *Humana*, 525 U.S. at 310, by opening to federal liability risk-based practices that all States either expressly or effectively embrace, PCI-Br.33-34.

Agreeing that the Rule will often be preempted in practice, *e.g.*, HUD-Br.24, HUD rests its defense on its repeated assertion that preemption will not invariably

occur, owing to purported variations in state insurance laws and unidentified "case-specific variables," HUD-Br.25. But HUD can take this position only by disregarding *Mutual of Omaha*; mischaracterizing PCI's claims; and misdescribing the relevance of *Humana* and other precedent.[1]

## 1.    Interference with state administrative regimes

The Rule is preempted in every application to risk-based pricing and underwriting because it thrusts federal courts into deciding whether state insurance rates are "actuarially sound and consistent with state law." *Mutual of Omaha*, 179 F.3d at 564; *see* PCI-Br.26-32. That strikes at the core of preemption under McCarran-Ferguson: "requiring a federal court to decide whether an insurance policy is consistent with state law … obviously would interfere with the administration of the state law." *Mutual of Omaha*, 179 F.3d at 564.

---

[1] PCI has met its burden to establish the Rule's invalidity as applied to risk-based pricing and underwriting of homeowners insurance whether its McCarran-Ferguson claim is considered "facial" or "as applied." As HUD does not dispute (HUD-Br.38-39), the Supreme Court recently confirmed that plaintiffs can succeed on facial challenges outside the First-Amendment context either if "'no set of circumstances exists under which the [law] would be valid'" or the law "lacks a 'plainly legitimate sweep.'" *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). Although *Stowe v. Rybroek*, 114 F.4th 630, 634 (7th Cir. 2024), cited only the "no set of circumstances" language, it did not suggest that regulations can survive when they lack a "plainly legitimate sweep." Indeed, this Court has recognized that there are reasons to doubt the applicability of the "no set of circumstances" test in the preemption context. *League of Women Voters of Indiana, Inc. v. Sullivan*, 5 F.4th 714, 728-729 (7th Cir. 2021). Ultimately, this Court need not resolve these questions because the Rule is preempted in all applications to risk-based pricing and underwriting.

1.     Largely ignoring *Mutual of Omaha*, HUD's principal position is that PCI's preemption claim (on both interference and conflict grounds) is "incompatible" with "*Humana*, which makes clear that Congress did not preempt the field of insurance for the states." HUD-Br.41. HUD is wrong about PCI's theories and wrong about *Humana*.

To start, HUD attacks a strawman in arguing (HUD-Br.47) that "field preemption" does not apply under McCarran-Ferguson. Neither of PCI's preemption arguments depends on field preemption or anything like it. PCI's interference claim reflects that the Rule will force federal courts to become super-actuaries, improperly reviewing and second-guessing actuarial and other decisions entrusted to state regulators. PCI's conflict claim reflects that the Rule clashes with the risk-based framework that forms the core of state insurance regulation.

HUD also misstates the import of *Humana*. *Humana* considered whether the federal RICO statute, as applied to a health insurance fraud scheme, implicated McCarran-Ferguson by authorizing more substantial remedies than Nevada's insurance regime. The Supreme Court held that RICO—whose remedies mirrored Nevada law—could be applied without "frustrat[ing] any declared state policy or interfer[ing] with a State's administrative regime." 525 U.S. at 310. Despite HUD's insistence that *Humana* hinged on "case-specific factors," HUD-Br.28, the Supreme Court in fact relied on general observations about the remedies available

under Nevada law. 525 U.S. at 312-314. And, critically, there was no suggestion that applying RICO to the insurance fraud alleged would require a federal court to second-guess determinations, such as actuarial judgments, reserved to state insurance regulators or police compliance with state insurance law.

Unlike *Humana*, the Rule's interference with state insurance regimes is direct and inevitable. *See* PCI-Br.28-30. Just as in *Mutual of Omaha*, every application of the Rule to risk-based pricing and underwriting of homeowners insurance will "inject[] the federal courts into the heart of the regulation of the insurance business by the states," 179 F.3d at 564—a result McCarran-Ferguson forbids. *Humana*, a decision this Court applied in *Mutual of Omaha*, *see id.* at 563, is not to the contrary. *Compare* HUD-Br.47-48 (claiming that *Humana* supplies a different preemption framework from *Mutual of Omaha*).

The Rule's burden-shifting framework ensures unlawful interference. *See* PCI-Br.30-32. For example, at step two of HUD's framework, insurers must prove to the satisfaction of a federal court that their rate-setting practices are "necessary" to achieve an insurer's "substantial, legitimate, [and] non-discriminatory interest." 24 C.F.R. § 100.500(c)(2). In practice, then, insurers must persuade federal judges that insurance rates—which have been adopted to satisfy state law and approved or examined by state regulators—are necessary to accurately predict loss and are not excessive, inadequate, or unfairly discriminatory, *i.e.*, actuarially sound. This

6

guarantees a collision with state insurance regimes by "displacing …

administration" of those state-law questions "into federal court." *Mutual of

Omaha*, 179 F.3d at 564.

At step three, federal courts will be compelled to decide whether the state

regulatory interest underlying a risk-based practice could be served by "another

practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3). This too

"injects the federal courts into the heart" of state insurance regulation, *Mutual of

Omaha*, 179 F.3d at 564, by requiring courts to determine whether state interests

could be advanced by means different from those embraced by state regulators.

This federal interference undercuts the ability of state regulators to enforce the

insurer solvency and risk-related concerns at the core of state insurance codes—

concerns that are central to making homeowners insurance available and

affordable.

In these ways, the Rule inevitably "step[s] on the toes" of state insurance

regulators in a manner *Mutual of Omaha* forbids. 179 F.3d at 564. HUD has no

good answer to those critical points. The agency instead seeks to sidestep *Mutual

of Omaha*, HUD-Br.45-48, but its distinctions are unpersuasive.

HUD argues, for example (HUD-Br.46), that *Mutual of Omaha* turned on

the "specific insurance practice" at issue—a cap on benefits for AIDS-related

illnesses—and did not embrace "field" "preemption principle[s]." But PCI does

not advance a field preemption claim. And HUD is incorrect that *Mutual of Omaha* is limited to its facts. Plaintiffs there argued that the ADA prohibited a health insurance coverage limitation because the limitation did not fall under a safe harbor for actuarially sound practices consistent with state law. *Mutual of Omaha*, 179 F.3d at 561-562. The insurer did not contend the safe harbor applied; indeed, it stipulated it could *not* prove the benefits cap was actuarially sound or consistent with state law. *Id.* at 558. Still, this Court held that application of the ADA would trigger McCarran-Ferguson preemption so long as it required a federal court to decide which insurance practices were "actuarially sound and consistent with principles of state law." *Id.* Far from being limited to the facts of the case, *Mutual of Omaha* embraces a framework governing McCarran-Ferguson preemption that is directly applicable here. *See* PCI-Br.29-30.

HUD's amici are wrong to label this alternative holding "dicta." Attorneys-General-Amici-Br.23. *Mutual of Omaha* explained that the district court's "judgment … must be reversed" both because the ADA did not regulate the content of insurance policies and because interpreting the ADA to do so "is barred by the McCarran-Ferguson Act." 179 F.3d at 564. Both holdings "have precedential force as a matter of stare decisis." *Boogaard v. National Hockey League*, 891 F.3d 289, 295 (7th Cir. 2018).

Finally, HUD's apparent view (HUD-Br. 47-48) that *American Family* sets forth a different rule from *Mutual of Omaha* is untenable.  For one thing, *American Family* was decided seven years earlier and was cited in *Mutual of Omaha*, refuting any suggestion of inconsistency.  The Court in *American Family* simply found no conflict triggering McCarran-Ferguson preemption because the federal suit (for intentional discrimination) challenged a practice already prohibited under state law.  *NAACP v. American Fam. Mut. Ins. Co.*, 978 F.2d 287, 295-297 (7th Cir. 1992).  *American Family* did not confront circumstances, present in *Mutual of Omaha* and here, where application of a federal law to regulated insurance practices would force federal courts into deciding questions of actuarial soundness or state law entrusted to state regulators.

2.     Also drawing on *Humana*, HUD and its amici argue that preemption is inappropriate because of supposed variation in state insurance regimes.  HUD-Br.42; Attorneys-General-Amici-Br.14-22; Association-Br.4-25.  This is misdirection.

To start, HUD does not meaningfully dispute that all States "comprehensive[ly]" regulate homeowners insurance.  *Mutual of Omaha*, 179 F.3d at 564.  And while HUD argues (HUD-Br.41) that comprehensive state regulation of rates is not sufficient to trigger McCarran-Ferguson preemption, that is a dodge:

it is the Rule's *interference* with those state regimes, not their existence, that

triggers preemption.  *See Humana*, 525 U.S. at 310; PCI-Br.26-32.

HUD and its amici are also wrong that "significant differences" in "state

insurance regulatory schemes" undermine PCI's preemption claim.  HUD-Br.42.

State insurance laws of course vary, but their variations are not material to the

reverse preemption analysis, as PCI has explained.  *See* PCI-Br.26-33.  *All* state

insurance laws require consideration of objective loss risk in setting rates and *all*

require that rates be actuarially sound; actuarially sound rates, in fact, are the

cornerstone of the insurance industry.  *See* PCI-Br.9-12; *see* App.336-341, 387-

389.  HUD does not and cannot dispute that the substantive prohibition against

rates that are excessive, inadequate, or unfairly discriminatory is universal across

*all* States.[2]  Nor does HUD dispute that this governing rate standard—which,

---

[2] The National Fair Housing Alliance and others ("Association Amici")
claim (Association-Br.9) that Illinois does not prohibit unfairly discriminatory
rates—but the State of Illinois disagrees (Dkt. 309, at 12), as does Illinois law, *see*
215 Ill. Comp. Stat. Ann. 5/456(1); *see also id*. 5/424(3) (prohibiting "unfair
discrimination between individuals or risks of the same class or of essentially the
same hazard and expense element because of the race, color, religion, or national
origin of such insurance risks or applicants"); Ill. Bulletin No. 2024-8, 2024 WL
1091547, at *3 (Mar. 13, 2024).  Amici further argue that Illinois regulators do not
review or approve homeowners' rates (Association-Br.9), but rates must be filed
and multiple provisions call for regulators to actively review property insurers.  *See*
PCI-Br.12; 215 Ill. Comp. Stat. 5/132.3; *see also* Ill. Admin. Code tit. 50
§ 754.10(g) (insurers must file data supporting rate changes);
https://idoi.illinois.gov/reports/marketconductexam/property-and-casualty-

again, is fundamental to state insurance law—requires that rates be actuarially sound and based on objective risk.  PCI-Br.10-11; *see also* Casualty Actuarial Society, *Statement of Principles Regarding Property & Casualty Insurance Ratemaking* 2 (May 1988) ("A rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is … actuarially sound[.]"), https://tinyurl.com/3dthyzh3.  Thus, in every State—and, indeed, in every application—the Rule will compel federal courts to decide actuarial questions reserved to state insurance regulators, violating *Mutual of Omaha*.

Amici question whether all States truly "comprehensively" regulate rates, Association-Br.5-9; Attorneys-General-Amici-Br.18-21, but their arguments are beside the point.  Certainly States ensure compliance with actuarial standards in different ways, but every State entrusts to state regulators the policing of actuarial soundness and other state-law standards governing rates and underwriting. App.318-321; *see also* Idaho Code Ann. § 41-1427.  Federal interference with state insurance regimes is forbidden by McCarran-Ferguson no matter how a State has chosen to regulate insurance.  Preemption does not turn on amici's assessment that, in some States, insurance regulation is too "lax."  Association-Br.13-14.

---

examinations.html (Illinois Department of Insurance webpage reflecting reports of property and casualty examinations).

Amici misunderstand state regulation in other respects. They argue, for example, that regulatory reviews and approvals in some States may be focused on financial soundness of rates rather than protecting consumers. Association-Br.11-12. But financial soundness is fundamental to actuarially sound rates; the solvency and competitiveness of the insurance industry depends on rates and underwriting tied to objective loss risk. *See* PCI-Br.6-8. And contrary to Association Amici's claim (Association-Br.5-7), it does not matter whether and how States regulate "underwriting *guidelines*";[3] what matters is that States regulate and review the *rates* used in underwriting (recall that underwriting is the application of risk-based rates to individual applicants and policyholders, *see* PCI-Br.7).

3.    HUD also seeks to avoid preemption by theorizing that the Rule "complements" certain state regimes that embrace discriminatory effects liability in housing. HUD-Br.42. Some state attorneys general—notably *not* state insurance commissioners—represent that they would welcome an added federal protection. Attorneys-General-Amici-Br.25-26. But PCI has already explained

---

[3] Amici claim that rates are not filed in Wyoming at all, *see* Association-Br.12, but that is incorrect. *See* https://oci.wi.gov/Pages/Companies/PolicyForms AndRateFilings.aspx (Wyoming Office of the Commissioner of Insurance webpage linking rate filing procedures); https://oci.wi.gov/Documents/OCIForms/ PropCasFilingProcedure.pdf (linked instructions for property and casualty insurers regarding rate filing); Wyo. Stat. Ann. § 26-14-107(a), (b) (requiring rate filing in non-competitive markets and rate and supplementary information to be made available to the commissioner upon request in competitive markets).

why this reasoning fails under *Mutual of Omaha*. *See* PCI-Br.50. As this Court there made clear, "requiring a federal court to decide whether an insurance policy is consistent with state law … obviously would interfere with the administration of the state law," "*[e]ven if the formal criteria are the same under federal and state law*." *Mutual of Omaha*, 179 F.3d at 564 (emphasis added). "The states are not indifferent to who enforces their laws." *Id.* Thus, even in States that embrace disparate effects liability as a matter of state housing law, McCarran-Ferguson preemption applies. HUD does not grapple with those key points.

4. Finally, HUD's grab-bag of additional case law does not support its contention that case-by-case adjudication is required. *See* HUD-Br.29-30, 43. Two general points are in order about those cases: first, that some preemption cases have been decided in more individualized contexts hardly demonstrates that all preemption cases must be (they do not, as PCI has explained above); second, this Court is bound, of course, by *Mutual of Omaha*.

What is more, HUD's cases do not support its claims about them. In *Ojo v. Farmers Group, Inc.*, 600 F.3d 1205, 1209 (9th Cir. 2010), for example, the Ninth Circuit recognized that preemption would attach if Texas law "permit[ted] insurance companies to use credit scores" even if that produced a "disparate

impact" under the FHA. It certified that question to the Texas Supreme Court.[4]

That aspect of *Ojo* supports PCI's conflict preemption theory (discussed in detail below). And it does not speak at all to PCI's interference preemption theory (*supra* pp.4-14) because the Ninth Circuit did not address whether application of federal disparate-impact liability would interfere with state administrative regimes, the basis for the *Mutual of Omaha* decision.

*Saunders* is similarly unhelpful to HUD. In *Saunders I*, the Eighth Circuit found that it lacked sufficient information about the nature of "plaintiffs' federal price-discrimination claims," the "relief they seek," or Missouri "insurance rate regulation" to determine whether preemption applied. *Saunders v. Farmers Ins. Exch.*, 440 F.3d 940, 946 (8th Cir. 2006). Later, when the *Saunders II* Court was presented with that information, it easily found preemption as a matter of law. *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 966-967 (8th Cir. 2008); *see* PCI-Br.30. As in *Saunders II*, this Court has all the information that it needs to decide the preemption question. *See supra* pp.4-7.

Finally, *Dehoyos v. Allstate Corp.*, 345 F.3d 290 (5th Cir. 2003), is off-point because it turned on a pleading failure, as PCI has explained (PCI-Br.45). The

---

[4] The Texas Supreme Court easily concluded that the state's insurance code did not permit such suits, observing that statutory text prohibiting "unfairly discriminatory" rates did not extend to disparate impact. *Ojo v. Farmers Group, Inc.*, 356 S.W.3d 421, 425-426 (Tex. 2011).

court in that case, in fact, contrasted *Mutual of Omaha* on the ground that plaintiffs in *Dehoyos* had identified "no state [insurance] law for us to consider." 345 F.3d at 298 n.6. That is obviously not the case here.

## 2. Conflict with state insurance laws

The Rule violates McCarran-Ferguson not only because it imposes on federal courts an inquiry McCarran-Ferguson prohibits, but also because the Rule substantively clashes with state insurance laws, all of which embrace objective risk-based principles. PCI-Br.33-34. HUD does not dispute that the administrative record contains a comprehensive survey showing that the insurance laws of almost all States expressly require risk-based pricing, while the laws in the six remaining States achieve the same result in different ways, including by requiring actuarially sound loss risk projections. App.336-341, 387-389; *see* PCI-Br.33.[5] In the six States that permit risk-based practices, the reality is that insurance rates must be set based on objective risk analysis. As demonstrated, *supra* pp.10-11, reliance on

---

[5] *See, e.g.*, Cal. Ins. Code § 1861.05(b) (prohibiting "excessive, inadequate, [or] unfairly discriminatory rates" and requiring commissioner "consider whether [a] rate mathematically reflects the insurance company's investment income"); Conn. Gen. Stat. Ann. § 38a-686 (defining prohibited rates in a manner requiring calibration of objective loss risks); Neb. Rev. Stat. § 44-7510 (similar); Iowa Code Ann. § 507B.4(3)g(2) (prohibiting unfair discrimination "between insureds of the same class for essentially the same hazard"); Okla. Stat. Ann. tit. 36 § 1204(7)(c) (similar); Wyo. Stat. Ann. § 26-13-109 (similar); *see also* Wyo. Stat. Ann. § 26-14-103(a)(xii) (defining as "unfairly discriminatory" rates "that cannot be actuarially justified").

actuarially sound practices that accurately predict risk is necessary across all States to avoid rates that are inadequate, excessive, or unfairly discriminatory.

Because all States require risk-based pricing, whether expressly or in effect, conflict preemption universally attaches:  imposing federal liability under the Rule on practices that state law requires is a "direct[] conflict with state regulation" of insurance.  *Humana*, 525 U.S. at 310.  Even were it otherwise, McCarran-Ferguson would still preempt laws in those jurisdictions that do not expressly require but nonetheless permit or embrace risk-based practices because McCarran-Ferguson does not allow federal law to "displace states' choices about the proper conduct of the business of insurance."  *American Family*, 978 F.2d at 297; *see also* Chamber-Br.16-17.  Restricting insurers' ability to rely on actuarially sound analyses where state insurance laws permit them displaces the laws of every State by subjecting state-governed standards to a substitute federal rule.  These federal constraints impair all States' laws under *Humana* because they "frustrate a[] declared state policy [and] interfere with a State's administrative regime."  525 U.S. at 310.

Amici argue that prohibiting excessive, inadequate, or unfairly discriminatory rates "is not the same as requiring underwriting and ratemaking to be purely risk-based," claiming that subjective or business considerations can play a role in setting rates.  Association-Br.25.  That is wrong:  As explained (PCI-Br.10; *supra* pp.10-11), a rate is "not excessive, inadequate, or unfairly

discriminatory" only "if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer." Casualty Actuarial Society, *Statement of Principles Regarding Property & Casualty Insurance Ratemaking* 2. By definition, any subjectivity, discretion, or judgment that results in a "non-risk-based" rate (Association-Br.25) is not permitted by state law. And even if some deviation from purely risk-based rates were tolerated, that would not matter: McCarran-Ferguson is violated whenever state laws allowing risk-based practices are displaced with an alternate federal standard. PCI-Br.33-34.

## B. PCI's Preemption Claim Is Ripe

HUD's extended ripeness discussion (HUD-Br.27-36)—which rehashes its merits arguments—is not grounded in precedent or common sense.

### 1. Judicial fitness

To start, HUD cannot dispute the "well-established rule" that plaintiffs "should not be compelled to wait and see if a remedial action is coming" before suing to enjoin an unlawful agency regulation. *Owner-Operator Indep. Drivers Ass'n v. Federal Motor Carrier Safety Admin.*, 656 F.3d 580, 586 (7th Cir. 2011). That is blackletter administrative law: "In the decades since *Abbott Laboratories*, pre-enforcement review of final rules has become the norm." *Id.*

HUD picks an uphill fight in seeking to depart from that "norm," and its effort fails. Again, HUD leans heavily on the refrain that McCarran-Ferugson

preemption "must be considered on a case-by-case basis." HUD-Br.23; *see also* HUD-Br.28. But HUD's "case-by-case" position is untenable for the same reasons its merits arguments fail: whatever variation exists in state law does not matter to PCI's preemption claim, and there is no need for additional factual development. This Court has more than an adequate basis now, on this record, to conclude as a matter of law that all applications of the Rule to risk-based pricing and underwriting of homeowners insurance are preempted.

To borrow HUD's phrasing (HUD-Br.31), given the targeted focus of PCI's preemption claim, this Court knows the "insurance practice being challenged"— *i.e.*, risk-based pricing and underwriting of homeowners insurance; it knows the "relief sought"—*i.e.*, damages and injunctive remedies for FHA disparate-impact liability; and it knows the "the state laws at issue"—*i.e.*, laws in all 50 States and D.C. that regulate homeowners insurance rates and underwriting and that require (either explicitly or in effect) risk-based practices. No "'further factual development,'" HUD-Br.27, is necessary under the framework HUD identifies.

The conclusion that PCI's preemption claim can, and should, be adjudicated now is reinforced by the point that "[p]reemption is a predominantly legal question … 'quintessentially fit' for judicial decision." *E.F. Transit, Inc. v. Cook*, 878 F.3d 606, 610 (7th Cir. 2018). To be sure, certain preemption claims may sometimes benefit from factual development. For example, *Wisconsin Central* (cited by

HUD-Br.30) was deemed unripe because the Railway Labor Act preemption there turned on whether resolution of a state-law claim required judicial interpretation of disputed provisions in a collective-bargaining agreement, and the record was insufficient to tell whether any such dispute would arise. *Wisconsin Central, Ltd. v. Shannon*, 539 F.3d 751, 760 (7th Cir. 2008). McCarran-Ferguson does not require comparable fact development, and no material facts are missing here.

To the extent HUD presses for a rule that case-by-case factual analysis is required for all non-field-based preemption claims, that has no anchor in precedent. *E.g.*, *League of Women Voters*, 5 F.4th at 721-730 (evaluating pre-enforcement express and conflict preemption claims). For example, as the Supreme Court just recently emphasized in the context of National Bank Act preemption, "the nature and degree of the state laws' alleged interference" with federal law can be decided "based on the text and structure of the laws, comparison to other precedents, and common sense." *Cantero v. Bank of Am., N.A.*, 602 U.S. 205, 220 n.3 (2024). That mirrors the approach taken in *Mutual of Omaha*, where this Court drew on the text of the relevant statutes, hornbook insurance law, and common sense to observe that federal suits challenging "caps on disabling conditions" were "certain" to interfere with state insurance law, anticipating the pointless case-by-case litigation that otherwise would ensue. 179 F.3d at 564. Likewise, in this case, the Court has available to it the text of the relevant "laws" (the Rule and applicable state

insurance laws); relevant "precedents" (including *Mutual of Omaha*); and "common sense," as well as logic, regarding how the Rule will interfere with the administration of state insurance law and conflict with state laws that embrace risk-based practices. *Supra* pp.4-17.

HUD's reliance on *Humana* to support its ripeness position (HUD Br.28-29) is doubly flawed. For one thing, *Humana* did not involve a pre-enforcement challenge to an agency rule and did not discuss ripeness. Moreover, as explained above, *Humana* poses no barrier to resolution of PCI's preemption claim because this Court has available to it all of the context necessary to decide that claim.

## 2. Hardship

The second ripeness factor also supports the conclusion that PCI's preemption claim is ripe. At the threshold, if HUD is correct that PCI has brought a "facial challenge" to the Rule, HUD-Br.23, then PCI "need not demonstrate individual hardship to show ripeness" unless HUD "identifies 'institutional interests favoring the postponement of review.'" *Owner-Operator*, 656 F.3d at 586. HUD does not even attempt to identify such interests, and there are none.

If a showing of hardship were required, PCI has satisfied it. The Rule has immediate, ongoing effects on PCI's members. PCI-Br.41-43. As the district court concluded, the Rule "requires [PCI's members] to adjust [their] conduct immediately," meaning its effects "may well be 'felt immediately'" "in conducting

their day-to-day affairs." App.95. Regulations of this type (so-called "substantive rules") are "'ripe' for review at once"; they do not require litigants to take a "case-by-case approach" when challenging their applicability. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 891 (1990). This case is thus a far cry from *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998), cited by HUD (HUD-Br.34-36), where the plaintiff was not forced "to modify its behavior in order to avoid future adverse consequences."

HUD wrongly denies (HUD-Br.35) that the Rule imposes one particular category of ongoing costs: collecting racial data of policyholders. That is indeed the logical effect of the Rule, as PCI's declarations explain. *See* PCI-Br.41. HUD itself confirmed this understanding in promulgating the Rule, encouraging insurers looking "to ensure compliance" to "examine whether a facially neutral policy or practice causes an unjustified discriminatory effect." App.194. Such an examination is not possible without collecting racial data.

Finally, contrary to HUD (HUD-Br.34), the burden of adjusting conduct to defend against costly but meritless lawsuits also establishes hardship. *Ohio Forestry Association* did not hold otherwise—it merely observed that environmental groups faced no hardship if required to bring an affirmative challenge to a specific agency logging decision before a court reviewed the agency's overarching logging policy. 523 U.S. at 734-735. In contrast, PCI's

members will face substantial, unjustified costs from doomed disparate-impact suits, App.325-326, costs that will ultimately be borne by policyholders.

## II. THE RULE'S REJECTION OF AN EXEMPTION FOR RISK-BASED PRICING AND UNDERWRITING WAS ARBITRARY AND CAPRICIOUS

The Rule is also arbitrary and capricious. PCI-Br.44-54. As PCI explained, HUD's 2023 reasoning repeated the same errors from its 2013 reasoning: The agency made no attempt to assess how often McCarran-Ferguson preemption would apply, failed to meaningfully engage with *Mutual of Omaha*, and arbitrarily dismissed the grave costs to insurers and the insurance market.

At the outset, HUD's claim (HUD-Br.51-52) that it lacks the power to define the scope of the Rule, including through exemptions, ignores that it is "well established that an agency's authority to proceed in a complex area … by means of rules of general application entails a concomitant authority to provide exemption procedures." *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 755 (1972). The Rule cited no precedent to the contrary. App.188 (88 Fed. Reg. at 19,463). Pointing to the FHA's statutory exemptions, HUD argues (HUD-Br.51) that "[i]f Congress had intended to exempt homeowners insurers' pricing or underwriting activities, it could have said so." But Congress has *already* spoken through McCarran-Ferguson. If McCarran-Ferguson preempts all (or even virtually all) FHA disparate-impact claims involving risk-based pricing and underwriting, Congress does not need to speak again through a specific exemption

in the FHA. That is why in 2014 the district court deemed it critical for HUD to evaluate "how often McCarran-Ferguson preclusion would apply and whether it would bar entire categories of disparate impact claims against insurers." App.43. A decade later, HUD has still failed to do so. PCI-Br.45.

HUD's claim (HUD-Br.53-55) that assorted case law supports its refusal to create an exemption is also unpersuasive. This line of argument repeats HUD's mistaken contention that McCarran-Ferguson requires case-by-case analysis, which misreads the case law (including *Dehoyos*), as PCI has shown. *See supra* pp.13-15; PCI-Br.45-47. HUD points to various district court decisions cited in the Rule, HUD-Br.54-55, but it never meaningfully addresses the deficiencies PCI raised about each of the cited decisions, *see* PCI-Br.45-47. By uncritically relying on those rulings without any independent analysis, HUD defied the APA's requirement to "articulate a satisfactory explanation" for its rejection of the exemption. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

HUD also fails to rehabilitate the Rule's discussion of *Mutual of Omaha*. Despite previously saying that "HUD disagrees with *Mutual of Omaha*" if read according to its terms, App.201 (88 Fed. Reg. at 19,476), HUD now claims (HUD-Br.58) that it did not "find disagreement … as a sufficient reason to deny an exemption." HUD instead repeats its position (HUD-Br.55, 58) that "*Mutual of Omaha* is consistent with the agency's case-by-case approach." But that badly

23

misreads this Court's decision, as explained. *Supra* pp.7-8; *Mutual of Omaha*, 179 F.3d at 564 (stating where insurers have to defend their practices by reference to federal law, "the federal courts will find themselves regulating" the industry, "which McCarran-Ferguson tells them not to do"); App.336-341.

HUD also imagines (HUD-Br.56) hypothetical "examples of discriminatory-effect claims" that it says would comply with *Mutual of Omaha*, but none of its hypotheticals work. For instance, if a plaintiff claimed that a "purportedly risk-based practice" was "in fact based on business judgment," HUD-Br.56-57, the federal court would still have to conclude that the rate at issue is based on a discretionary business judgment and is not necessary to ensure actuarially sound, state-law compliant rates—forcing federal courts to decide questions reserved by McCarran-Fergson and state law to insurance regulators.

Similarly, HUD imagines a case where "'a plaintiff may not dispute that an insurer's practice complies with state law, but rather may show that there are alternative practices that also comply with state law that do not cause a discriminatory effect.'" HUD-Br.57. PCI explained that the Rule would still require a federal court to examine whether the proposed alternatives were actuarially sound and consistent with state law, contravening *Mutual of Omaha*. PCI-Br.49 n.6. HUD responds that "PCI's disagreement" with this example "does

not undermine" the agency's overall case-by-case determination, HUD-Br.58, but HUD does not even attempt to explain why that is so.

Next, HUD contends (HUD-Br.58-60)—once again—that denying an exemption was not arbitrary because "insurance laws in the states vary greatly." But as PCI has shown, neither variation in the details of those regimes, nor case law interpreting them, alters the McCarran-Ferguson preemption analysis. *Supra* pp.9-15; PCI-Br.45-47. And even if there *were* modest relevant variations, HUD still fails to defend why the agency would create a rule that will be unlawful in most, if not all, applications. *See supra* pp.22-23.

HUD also repeats the Rule's claim that "state insurance laws can change over time." HUD-Br.59; App.200 (88 Fed. Reg. at 19,475). The Rule, however, provided precisely one (two-decade-old) example of such a change and did not explain how it would have impacted the McCarran-Ferguson analysis. App.200 (88 Fed. Reg. 32,788 n.215). The critical point—which HUD has never addressed—is that state laws have long expressly or effectively required risk-based pricing and underwriting. App.318-321. Indeed, many state prohibitions against "unfairly discriminatory" rates trace back over a century. Hartwig, *The Insurance Industry's Commitment to Fairness in Insurance Pricing: A Survey of Historical and Current Research Concerning Risk-Based Pricing and Unfair Discrimination* 4, University of South Carolina (Aug. 2023), https://tinyurl.com/yzb47rne.

25

That some state attorneys general may "welcome" (HUD-Br.60) federal disparate-impact liability is also no sound basis for denying an exemption. As explained (PCI-Br.51), whether federal law complements or interferes with *state fair-housing laws* is not McCarran-Ferguson's concern. McCarran-Ferguson focuses on interference with state laws "enacted … for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). McCarran-Ferguson thus directs amici to state legislatures or insurance commissioners—not to HUD—to determine whether and how disparate-impact liability can be accommodated within state insurance codes. *Supra* pp.12-13.

HUD also fails to grapple persuasively with the significant and unnecessary costs of the Rule that render it arbitrary and capricious. *See* PCI-Br.53-55. HUD argues (HUD-Br.60) that "PCI's alleged costs are based on a misreading of the Rule," but its claim (HUD-Br.60) that the "Rule impose[s] no new liability beyond what was already established under the FHA itself" does not withstand scrutiny, as the district court held in 2014 and 2024. App.35; App.95. The Rule went "beyond established law" because courts had "expressly declined to decide" whether FHA disparate-impact liability extended to risk-based insurance practices. App.35.

HUD misses the point, moreover, in claiming that "risk-based decisions are not prohibited" under the Rule. HUD-Br.61. That may be true as a categorical matter, but the Rule "creates a meaningful risk of increased disparate-impact

litigation" (App.20) and requires insurers immediately to incur significant expenses to prepare for such litigation and ultimately defend risk-based pricing and underwriting practices in federal court in the case-by-case litigation that HUD demands and McCarran-Ferguson precludes. PCI-Br.53. HUD's brief never addresses those costs. HUD also arbitrarily denied that insurers will incur costs to collect racial data; as explained (*supra* p.21), the Rule itself urged insurers to assess their own compliance, an assessment that is impossible to conduct without racial data.

Nor is there merit to HUD's suggestion (HUD-Br.61) that the alleged costs to insurers are overstated because "'all businesses covered by the [FHA] make risk-based decisions.'" The critical point—to which HUD still does not respond—is that those other businesses, including mortgage lending and rental pricing, do not involve the state-regulated actuarial analysis that the insurance pricing and underwriting processes do. PCI-Br.54.

Finally, at page 62 of its brief and for the first time in the 11 years of this litigation, HUD posits that an exemption would immunize practices that are based on "an element of non-actuarially-based subjective judgment or discretion," such as "discounts for bundling homeowners and automobile insurance and price optimization practices." HUD-Br.62. HUD never mentioned "bundling" concerns in the Rule, so this is an "impermissible post hoc rationalization[]." *Department of*

*Homeland Security v. Regents of the Univ. of California*, 591 U.S. 1, 21-22 (2020). And although the Rule briefly referenced price optimization, HUD has never—to this day—produced any evidence that those or any other practices introduce "subjectivity" to the pricing and underwriting processes or somehow enable insurers to circumvent state prohibitions on inadequate, excessive, and unfairly discriminatory rates. Those claims are simply wrong: Indeed, the only source cited in the Rule acknowledges that, as of 2015, "[n]umerous states [had] defined price optimization and issued bulletins prohibiting the defined practice," while other States had determined "that existing state laws are sufficient to deal with price optimization." National Ass'n of Ins. Comm'rs, *Price Optimization White Paper* 12 (Nov. 19, 2015), https://tinyurl.com/483e66x9 (cited at App.193 (88 Fed. Reg. at 19,468) nn.161-163). HUD's entirely unsubstantiated and incorrect claims on this point underscore that HUD has no "comparative expertise" in assessing the insurance industry, *West Virginia v. EPA*, 597 U.S. 697, 729 (2022)—and thus no claim to deference.

## III.    THE RULE'S APPLICATION VIOLATES *INCLUSIVE COMMUNITIES*

*Inclusive Communities* confirms that any application of the Rule to risk-based pricing and underwriting practices violates the FHA. PCI-Br.55-62. As amici explain, such applications "illegally compel[] regulated entities to choose policies that less effectively advance their interests at higher costs, all to secure a

different racial effect." Chamber-Br.14. HUD's attempts to square the Rule's application to risk-based practices with *Inclusive Communities* fail.

Far from implicitly endorsing the Rule in all applications (HUD-Br.63), *Inclusive Communities* announced a "more demanding test" for disparate-impact liability that supersedes the Rule's burden-shifting framework. *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 902-904 (5th Cir. 2019). HUD dismisses the Fifth Circuit's holding as "unpersuasive" without meaningful analysis, relying instead on cases applying the Rule after giving "'great deference'" to HUD under *Chevron*. *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 431-432 & n.10 (4th Cir. 2018); *Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581, 618-619 (2d Cir. 2016); *see* HUD-Br.63-64. But those cases do not survive *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). And *Avenue 6E Investments LLC v. City of Yuma*, 818 F.3d 493 (9th Cir. 2016), did not apply the Rule, much less hold that *Inclusive Communities* endorsed it in all applications.

Critically, HUD concedes that some of the Rule's applications to risk-based pricing and underwriting violate the FHA because "state laws in some cases may sever the requisite causal connection" under *Inclusive Communities*. HUD-Br.64-65. But application of the Rule to risk-based practices will fail *Inclusive Communities*' "robust causality" requirement in *all* cases because *all* States restrict

29

insurer discretion by embracing risk-based principles.  App.336-341; *supra* pp.10-11.  The Rule would expose homeowners insurers to liability for alleged discriminatory effects caused, not by the insurers themselves, but by operation of state laws that either expressly or effectively require that insurers accurately account for risk.

Moreover, *Inclusive Communities* subjects to disparate-impact liability only practices that are "artificial, arbitrary, and unnecessary."  576 U.S. at 544.  But rate-setting practices predicated on actuarial calculations of projected risk of loss are anything but "artificial, arbitrary, and unnecessary."  Thus, a regulation that permits plaintiffs to hold homeowners insurers liable for such practices does not "effectuate[] the safeguards" of *Inclusive Communities*.  HUD-Br.65-66.  While the second step of the Rule's burden-shifting framework would allow insurers to make the case to federal courts that risk-based practices serve unquestionably valid interests, App.314, 320-321, the third step exposes them to liability for these "justified, deliberate, and legitimate policies" anyway, *see Southwest Fair Hous. Council, Inc. v. Maricopa Domestic Water Improv. Dist.*, 17 F.4th 950, 971 (9th Cir. 2021).  Such applications of the Rule would thus "displace valid governmental and private priorities."  *Inclusive Cmtys.*, 576 U.S. at 544; *accord Ellis v. City of Minneapolis*, 860 F.3d 1106, 1112 (8th Cir. 2017).

HUD's choice to reject the requirement that an alternative practice be "equally effective," HUD-Br.67, further ensures that the Rule will displace valid risk-based practices. The Rule would allow plaintiffs to prevail at step three by offering "alternative" practices that are less predictive of loss and thus likely to reduce accuracy in pricing and underwriting. HUD suggests the Rule may lawfully be applied so long as a federal court can determine that an alternative practice will "adequately serve" insurers' interests. HUD-Br.68. But courts have correctly held that "the burden on the plaintiff … is not only to present potential alternatives, but to provide evidence that *equally effective* and less discriminatory alternatives exist," *Southwest Fair Hous. Council*, 17 F.4th at 970 (emphasis added). There is obviously a meaningful difference between adequately and equally effective, but HUD declined to conform the Rule to reflect that important limitation.

Finally, the Rule contravenes *Inclusive Communities* by requiring pervasive consideration of race. App.294, 326; PCI-Br.60-62. The Rule's obvious and foreseeable effect is to require collection of racial data. *Supra* pp.21, 27; PCI-Br.60-61. The Rule thus extends far beyond *Inclusive Communities*' holding that "mere awareness of race" in the pursuit of "affirmative efforts to ensure that all groups have a fair opportunity" comports with the FHA. 576 U.S. at 545.

## CONCLUSION

The Court should reverse and remand with instructions to vacate the Rule as applied to risk-based pricing and underwriting of homeowners insurance.

Respectfully submitted.

/s/ Seth P. Waxman

ANDRES C. SALINAS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

ROWE W. SNIDER
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0700


November 14, 2024

SETH P. WAXMAN
KELLY P. DUNBAR
JEREMY W. BRINSTER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com

COLLEEN MARIE CAMPBELL
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, CO 80202
(720) 274-3135

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Circuit Rule 32(c) in that, according to the word-count function of the word-processing system used to generate the brief (Microsoft Word), the brief contains 6,988 words.

/s/ *Seth P. Waxman*
SETH P. WAXMAN

**CERTIFICATE OF SERVICE**

On November 14, 2024, I filed the foregoing using the CM/ECF system, which effected service on all registered counsel.

/s/ *Seth P. Waxman*
SETH P. WAXMAN