No. 24-1947

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA,
*Plaintiff-Appellant*,

v.

ADRIANNE TODMAN, ACTING SECRETARY OF THE
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, AND
UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Illinois, No. 1:13-cv-08564
Before the Honorable Chief Judge Rebecca R. Pallmeyer

## APPELLANT'S SUPPLEMENTAL BRIEF

ANDRES C. SALINAS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

ROWE W. SNIDER
TROUTMAN PEPPER LOCKE LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0700

January 6, 2025

SETH P. WAXMAN
KELLY P. DUNBAR
JEREMY W. BRINSTER
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com

COLLEEN MARIE CAMPBELL
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, CO 80202
(720) 274-3135

## TABLE OF CONTENTS

                                                                           Page

TABLE OF AUTHORITIES ................................................................................ ii

    A.     Standing Is Self-Evident Because PCI's Members Are Directly Regulated By The Rule ......................................................... 2

    B.     PCI's Evidence Of Compliance Costs Is Independently Sufficient To Establish Standing ......................................................... 5

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ................................................................7

*Association of Private Sector Colleges & Universites v. Duncan*,
    681 F.3d 427 (D.C. Cir. 2012) ......................................................................................6

*Chlorine Chemistry Council v. EPA*, 206 F.3d 1286 (D.C. Cir. 2000) .....................6

*Corbett v. TSA*, 19 F.4th 478 (D.C. Cir. 2021) ................................................................3

*Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) ...............................................6

*Estate of Boyland v. USDA*, 913 F.3d 117 (D.C. Cir. 2019) ........................................3

*Hunt v. Washington State Apple Advertising Communication*,
    432 U.S. 333 (1977) ........................................................................................................1

*NAACP v. American Family Mutual Insurance Company*, 978 F.2d 287
    (7th Cir. 1992) .................................................................................................................4

*National Association of Mutual Insurance Company v. HUD*,
    693 F. Supp. 3d 20 (D.D.C. 2023) ................................................................................4

*Owner-Operator Independent Drivers Association v. Federal Motor
    Carrier Safety Administration*, 656 F.3d 580 (7th Cir. 2011) .........................2

*Silha v. ACT, Inc.*, 807 F.3d 169 (7th Cir. 2015) ...........................................................3

*State National Bank v. Lew*, 795 F.3d 48 (D.C. Cir. 2015) ........................................7

## REGULATIONS

54 Fed. Reg. 3232 (Jan. 23, 1989) .......................................................................................5

78 Fed. Reg. 11,460 (Feb. 15, 2013) ...................................................................................7

88 Fed. Reg. 19,450 (Mar. 31, 2023) ............................................................................2, 3, 7

Membership organizations like PCI have standing to challenge regulations on behalf of their members if (1) at least one member would have standing to sue in its own right; (2) the interests at stake are germane to the organization's purpose; and (3) participation of individual members is not required. *See, e.g.*, *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). In this litigation, HUD has never disputed the second or third elements, for good reason: Advocating for sound regulation of the insurance industry is central to PCI's purpose, and there is no reason why individual members need to participate given the purely legal questions at issue.

As for the first element, the district court correctly held in 2014 and again in 2024 that PCI's members suffer two categories of injuries as a result of HUD's Rule, each of which independently meets Article III's requirements. First, PCI's members are parties directly regulated by the Rule who must conform their conduct to the Rule's requirements and who face "increased exposure" to disparate-impact liability under the Rule. App.35; *see* App.91. Second, the "compliance costs" incurred by PCI's members as a result of the Rule "alone are sufficient" to confer standing. App.36; *see* App.92. For each of these reasons, this Court has jurisdiction and should reach the merits of PCI's claims.

1

### A. Standing Is Self-Evident Because PCI's Members Are Directly Regulated By The Rule

When the plaintiff is "'an object of the [agency] action (or forgone action) at issue … there is ordinarily little question that the action or inaction has caused him injury.'" *Owner-Operator Indep. Drivers Ass'n, Inc. v. Federal Motor Carrier Safety Admin.*, 656 F.3d 580, 585 (7th Cir. 2011). That is certainly the case here. As the district court concluded twice, PCI's members "are among the 'objects' of the Disparate Impact Rule." App.34. Indeed, "HUD has made it abundantly clear from the get-go that the insurance industry is a particular target" of the Rule (App.91), and the Rule's preamble expressly "decline[d] to provide an exemption for the insurance industry" or for "risk-based pricing and underwriting in particular" (*see* App.188 (88 Fed. Reg. at 19,463)). Accordingly, PCI's members must conform their behavior to the Rule's requirements or expose themselves to lawsuits authorized by the Rule. The district court correctly held that standing in circumstances like these is "usually 'self-evident.'" App.91; *see* App.34-35. The injury is caused by HUD's Rule and would be addressed by a favorable court ruling vacating the Rule. No additional evidence is necessary. *E.g.*, *Owner-Operator*, 656 F.3d at 585.

HUD argues (HUD-Br.34) that the Rule "merely sets out a framework for considering disparate-impact claims" and does not "increase insurers' exposure to discriminatory-effects liability." But the Court "must assume, *arguendo*, the

merits" of the underlying claims when assessing standing. *Estate of Boyland v. USDA*, 913 F.3d 117, 123 (D.C. Cir. 2019); *accord Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). And PCI claims that the Rule expands liability beyond what existing law permits. PCI asserts that, by virtue of McCarran-Ferguson, FHA disparate-impact liability cannot lawfully extend to risk-based pricing and underwriting (PCI-Br.26-34); the Rule's preamble, however, repeatedly authorizes claims against those risk-based practices (*e.g.*, App.193, 201 (88 Fed. Reg. at 19,468, 19,476)). And PCI further claims that the Rule's framework contravenes the FHA's own disparate-impact limitations, by, for example, omitting a robust causality requirement or a requirement that proffered alternatives be "equally effective." PCI-Br.55-62; *cf. Corbett v. TSA*, 19 F.4th 478, 484 (D.C. Cir. 2021) (recognizing standing to challenge one of two overlapping regulatory mandates that were not a "one-for-one fit"). When these claims are credited, the Rule plainly inflicts legal injury on regulated entities like PCI's members.

HUD also argued in the district court that any injury suffered by PCI's members would not be traceable to this Rule, because *Inclusive Communities*, other "judicial precedents," and a 1989 HUD regulation together purportedly already "recognize[] that the FHA applies to insurers and that FHA violations may be established by showing an unjustified discriminatory effect." Dist. Ct. Dkt. 296 at 15-17. As just noted, though, PCI claims that McCarran-Ferugson prohibits

federal disparate-impact liability from being applied to insurers' risk-based pricing and underwriting specifically. If that claim is correct (as assumed for purposes of standing), the FHA itself cannot lawfully authorize disparate-impact claims against those practices. And by purporting to authorize such claims under the FHA, the Rule inflicts injuries to PCI's members.

In any event, both district court judges here and another in the District of Columbia all correctly recognized that the Rule "does not simply restate preexisting legal duties." *National Ass'n of Mut. Ins. Co. v. HUD (NAMIC)*, 693 F. Supp. 3d 20, 32 (D.D.C. 2023), *appeal docketed* No. 23-5275 (D.C. Cir.). Rather, the "viability of disparate-impact FHA claims against risk-based insurance practices ha[d] never been conclusively established across all circuits prior to HUD's rule." App.93. Indeed, the Rule goes "beyond established law" in circuits—including this one—that prior to the Rule's issuance had "expressly declined to decide whether disparate impact liability applies" to risk-based insurance pricing and underwriting. App.35 (citing *NAACP v. American Fam. Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992)). That remains true after *Inclusive Communities* because that decision did not confirm the application of FHA disparate-impact liability to insurance pricing and underwriting or even "purport to establish a uniform legal standard or framework." *NAMIC*, 693 F. Supp. 3d at 32. And while HUD's 1989 regulation provided that FHA intentional-discrimination

4

claims could be brought against insurers, the regulation said nothing about disparate-impact claims. *See* 54 Fed. Reg. 3232, 3285 (Jan. 23, 1989).

Thus, as the district court held, "there was no … consensus" about whether disparate-impact liability could reach risk-based pricing and underwriting, and "[b]y purporting to end this debate, the Rule makes a significant difference in the regulatory landscape." App.93. The alleged injuries here accordingly result from the Rule and would be redressed by an order vacating it.

**B.    PCI's Evidence Of Compliance Costs Is Independently Sufficient To Establish Standing**

Even if standing were not "self-evident" here, the district court correctly concluded (both in 2014 and 2024) that "the compliance costs reported by PCI's members alone are sufficient" to establish standing. App.36; *see* App.92. The existence of this injury is itself apparent, because "defending against increased disparate-impact litigation would certainly impose some costs on PCI's members." App.92. And PCI has provided evidence in the form of four member declarations detailing the costs they expect to incur to comply with the Rule, including costs to collect demographic data. *See* Dist. Ct. Dkts. 283-5 to 283-8. One declarant explained, for example, that it will cost her member company an estimated "$250,000 and approximately 2700 hours in employee time to plan, organize, procure, process, and model the data necessary" to assess compliance. Dist. Ct. Dkt. 283-8 ¶11. And those costs will be "ongoing" at an estimated rate of

5

"$25,000 per month" because the member company "will need to continuously monitor the data it collects." *Id.* ¶12. These costs are more than sufficient to confer standing. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017). Moreover, as the district court observed in 2014 (and remains true today), "HUD has put forward no evidence rebutting the declarations PCI submitted," so it is appropriate to accept "the declarants' representations as true." App.35-36.

Rather than rebut their substance, HUD argued below that the declarations are "stale" because they were submitted following issuance of the 2013 Rule. Dist Ct. Dkt. 296 at 17-18. But the 2023 Rule merely reinstates the 2013 Rule; there are no material differences between the two. PCI-Br.21-22. HUD has identified no reason to believe that the declarants' sworn statements involving the 2013 Rule would not apply equally to the 2023 iteration.

HUD also argued below that the declarations are insufficient because they do not show that PCI's members "have actually collected … data" yet, even though the "2013 Rule has been in effect for more than ten years." Dist. Ct. Dkt. 296 at 17. The absence of past injury, however, does not defeat standing in a pre-enforcement challenge. *See Chlorine Chemistry Council v. EPA*, 206 F.3d 1286, 1289 (D.C. Cir. 2000). A non-speculative "'threat of'" compliance costs is enough. *Association of Priv. Sector Colleges & Univs. v. Duncan*, 681 F.3d 427,

6

457-458 (D.C. Cir. 2012); *accord ACLU v. Alvarez*, 679 F.3d 583, 591 (7th Cir. 2012) ("'probability of future injury'" sufficient). And here, the absence of past injury is especially unenlightening because the last decade has been rife with "legal uncertainty regarding [the Rule's] viability and enforcement." App.91; *see* PCI-Br.12-22. As the district court correctly held, the Rule's reinstatement "presents a new flashpoint for [the costs] to manifest." App.91-92. Thus, the declarations demonstrate a concrete threat of compliance costs, sufficient for standing.

Finally, HUD argued below that data-collection costs arise only from "PCI's misapprehension of the Rule's requirements." Dist. Ct. Dkt. 296 at 18. That misses the point: For standing purposes, the Rule need not *explicitly* require data collection, such that failure to collect would itself be a violation. It is enough that PCI's members must incur costs to "monitor" their compliance. *State Nat'l Bank v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (Kavanaugh, J.). PCI's members plainly must do so here: HUD has encouraged insurers "to ensure compliance" by "examin[ing] whether a facially neutral policy or practice causes an unjustified discriminatory effect." App.194 (88 Fed. Reg. at 19,469). Likewise, the 2013 preamble urged "consistent self-testing and compliance reviews." App.164 (78 Fed. Reg. at 11,472). Such compliance monitoring is not possible without ongoing collection of demographic data. Accordingly, PCI's members' compliance costs are traceable to the Rule and would be redressed by a favorable ruling.

7

Respectfully submitted.

/s/ *Seth P. Waxman*

| | |
|---|---|
| ANDRES C. SALINAS<br>WILMER CUTLER PICKERING<br>  HALE AND DORR LLP<br>7 World Trade Center<br>250 Greenwich Street<br>New York, NY 10007<br>(212) 230-8800<br><br>ROWE W. SNIDER<br>TROUTMAN PEPPER LOCKE LLP<br>111 South Wacker Drive<br>Chicago, IL 60606<br>(312) 443-0700<br><br>January 6, 2025 | SETH P. WAXMAN<br>KELLY P. DUNBAR<br>JEREMY W. BRINSTER<br>WILMER CUTLER PICKERING<br>  HALE AND DORR LLP<br>2100 Pennsylvania Avenue NW<br>Washington, DC 20037<br>(202) 663-6000<br>seth.waxman@wilmerhale.com<br><br>COLLEEN MARIE CAMPBELL<br>WILMER CUTLER PICKERING<br>  HALE AND DORR LLP<br>1225 Seventeenth Street, Suite 2600<br>Denver, CO 80202<br>(720) 274-3135 |

## CERTIFICATE OF COMPLIANCE

This supplemental brief complies with the limitations of Circuit Rule 32 and this Court's order on December 13, 2024 because it has a typeface of 14 points, is proportionally spaced, and does not exceed 7 pages.

/s/ *Seth P. Waxman*
SETH P. WAXMAN

## CERTIFICATE OF SERVICE

On January 6, 2025, I filed the foregoing using the CM/ECF system, which effected service on all registered counsel.

/s/ *Seth P. Waxman*
SETH P. WAXMAN