WILMERHALE

January 13, 2025

**Seth P. Waxman**

+1 202 663 6800 (t)
+1 202 663 6363 (f)
seth.waxman@wilmerhale.com

**VIA CM/ECF**

Christopher G. Conway
Office of the Clerk
United States Court of Appeals for the Seventh Circuit
Everett McKinley Dirksen United States Courthouse
219 S. Dearborn Street, Room 2722
Chicago, IL 60604

Re:    *Property Casualty Insurers Association of America v. Todman*, No. 24-1947

Dear Mr. Conway:

Pursuant to Federal Rule of Appellate Procedure 28(j), I write on behalf of appellant Property Casualty Insurers Association of America ("PCI") to advise the Court of two pertinent authorities that have come to counsel's attention while preparing for oral argument.

First, in *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 611-612 (3d Cir. 1998), the Third Circuit held that the McCarran-Ferguson Act precluded a construction of the Americans with Disabilities Act that would require insurers to present actuarial data to justify disparities in benefits for different medical conditions.  Second, in *Ludwick v. Harbinger Group, Inc.*, 854 F.3d 400, 402-403 (8th Cir. 2017), the Eighth Circuit held that McCarran-Ferguson preempted federal RICO claims against an insurer alleging fraudulent conduct in connection with reinsurance transactions that were subject to state insurance regulation.  The holdings and reasoning of *Ford* and *Ludwick* are consistent with this Court's decision in *Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557 (7th Cir. 1999), and provide further support for PCI's argument that McCarran-Ferguson preempts application of HUD's Disparate-Impact Rule to risk-based insurance pricing and underwriting.  *See* PCI-Br.26-34; Reply-Br.3-17.

I do apologize for not having discovered these authorities previously and cited them in our briefing.  Yet because *Ford* and *Ludwick* may have relevance to questions asked at oral argument, PCI believes it is appropriate to provide the Court and opposing counsel advance notice of them.

Sincerely,

/s/ Seth P. Waxman

CC:  counsel of record

Enclosures

trier of fact." *Government of V.I. v. Knight*, 989 F.2d 619, 629 (3d Cir.1993).

Boselli's opinion that Lauria slipped on an extra piece of wood on the tracks easily satisfies these permissive standards. His testimony would have shown the existence of an unforseen obstruction in the exact location where Lauria fell, which, in turn, could have assisted the jury in determining whether the wood posed an unreasonable danger to railroad employees crossing the tracks. Regardless of what other evidence had been presented at trial, Boselli's statements would have informed the jury as to issues of track maintenance and safety encountered in the ordinary course, and would have identified a potential hazard that was central to Lauria's theory of negligence. Moreover, nothing in the record suggests that Boselli lacked the experience or specialized knowledge needed to render an opinion on this issue. In this regard, the instant case differs materially from *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201 (3d Cir.1995), where we held that lay opinions on technical matters such as causation "must derive from a sufficiently qualified source as to be reliable and hence helpful to the jury."

Accordingly, we conclude that the district court erred by prohibiting Lauria from recalling Boselli to the stand, because Boselli's lay opinion testimony certainly would have been "helpful" to the "determination of a fact in issue" within the meaning of Rule 701. Also, given the substance of Boselli's proffered testimony in the context of Lauria's case, we cannot conclude that the court's error in excluding Boselli's testimony was harmless. *See Holbrook*, 80 F.3d at 787.

### IV.

Amtrak has filed a cross-appeal challenging several of the district court's rulings, but we reject these contentions because we agree substantially with the reasoning of the district court. We will thus affirm the February 19, 1997, denial of Amtrak's renewed motion for summary judgment, the March 24, 1997, denial of Amtrak's motion in limine to exclude the testimony of John Mariani, D.O., I. David Weisband, D.O., and Robert T. Slavin, and the March 24, 1997, grant of Lauria's motion in limine to exclude Slavin's personnel and medical records.

### V.

The district court abused its discretion by excluding the testimony of Robert T. Slavin as an expert witness, and by prohibiting Lauria from recalling Carl Boselli to the stand as a lay opinion witness. Accordingly, the district court's Order dated March 27, 1997, will be reversed, and the cause will be remanded for a new trial consistent with this opinion.



**Colleen V. FORD, Appellant,**

v.

**SCHERING–PLOUGH CORPORATION; Schering Corporation; Metropolitan Life Insurance Company**

**No. 96–5674.**

United States Court of Appeals, Third Circuit.

Argued Jan. 28, 1998.

Decided May 22, 1998.

Former employee brought action against former employer and insurance company alleging disparity between insurance disability benefits for mental and physical disabilities violated Americans with Disabilities Act (ADA). The United States District Court for the District of New Jersey, Dickinson R. Debevoise, J., granted defendants' motion to dismiss. Former employee appealed. The Court of Appeals, Cowen, Circuit Judge, held that: (1) employee who was no longer able to perform functions of her former position due to her mental disorder could bring action against employer and insurer carrier alleging that disparity in disability benefits violated ADA, and (2) disparity in employer's insur-

ance benefits for mental and physical disabilities did not violate ADA.

Affirmed.

Alito, Circuit Judge, issued opinion concurring in judgment.

**1. Federal Courts ⇐763.1**

Review by Court of Appeals of district court's order granting motion to dismiss for failure to state a claim is plenary. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**2. Federal Courts ⇐794**

When considering motion to dismiss for failure to state a claim, Court of Appeals accepts as true all allegations set forth in complaint, and must draw all reasonable inferences in plaintiff's favor. Fed.Rules Civ. Proc.Rule 12(b)(6), 28 U.S.C.A.

**3. Federal Civil Procedure ⇐1773**

Dismissal for failure to state a claim occurs only if plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Fed.Rules Civ.Proc. Rule 12(b)(6), 28 U.S.C.A.

**4. Civil Rights ⇐173.1**

A former employee who was no longer able to perform functions of her former position due to her mental disorder could bring action against employer and insurer carrier alleging that disparity in disability benefits for mental and physical disabilities violated ADA. Americans with Disabilities Act of 1990, § 101(8), 42 U.S.C.A. § 12111(8).

**5. Statutes ⇐188, 205, 208**

Plainness or ambiguity of statutory language is determined by reference to language itself, specific context in which that language is used, and broader context of statute as a whole.

**6. Civil Rights ⇐173.1**

Title I of ADA, which prohibits disability discrimination in employment for qualified individual with a disability, allows disabled former employees to sue their former employers regarding their disability benefits so as to effectuate full panoply of rights guaranteed by ADA, despite ADA's general requirement that qualified individual with disability

be able to perform current position with or without accommodation. Americans with Disabilities Act of 1990, §§ 101(8), 501(c), 42 U.S.C.A. §§ 12111(8), 12201(c).

**7. Civil Rights ⇐173.1**

Disparity in employer's insurance benefits for mental and physical disabilities did not violate ADA; while plan differentiated between types of disabilities, every employee had opportunity to join same plan with same schedule of coverage such that each employee received equal treatment. Americans with Disabilities Act of 1990, § 101(8), 42 U.S.C.A. § 12111(8).

**8. Civil Rights ⇐173.1**

ADA does not require employer to provide equal insurance coverage for every type of disability; such a requirement would destabilize insurance industry in manner definitely not intended by Congress when passing ADA. Americans with Disabilities Act of 1990, § 101(8), 42 U.S.C.A. § 12111(8).

**9. Civil Rights ⇐107(1)**

**Courts ⇐96(3, 7)**

Court of Appeals may look to Supreme Court and Third Circuit precedent concerning Rehabilitation Act for guidance in interpreting ADA. Rehabilitation Act of 1973, § 504, 29 U.S.C.A. § 794; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**10. Civil Rights ⇐240(1)**

Safe harbor provision of ADA covering insurance industry does not require insurance company to justify its policy coverage or show actuarial data demonstrating that their plan is not a subterfuge after plaintiff makes prima facie allegation of discrimination in disability benefits. Americans with Disabilities Act of 1990, § 501(c), 42 U.S.C.A. § 12201(c).

**11. Statutes ⇐223.5(.5)**

Where Congress adopts a new law incorporating sections of prior law, Congress normally can be presumed to have had knowledge of interpretation given to incorporated law, at least insofar as it affects new statute.

**12. Civil Rights** ⊗119.1

Disability benefits offered as part of employer's insurance plan for employees does not qualify as public accommodation, and, thus, disparity in benefits for mental and physical disabilities does not violates portion of ADA prohibiting disability discrimination in the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. Americans with Disabilities Act of 1990, §§ 301(7), 302(a), 42 U.S.C.A. §§ 12181(7), 12182(a).

**13. Statutes** ⊗206

Courts should avoid interpreting statutes in manner rendering some words redundant.

**14. Civil Rights** ⊗119.1

Plain meaning of Title III of ADA prohibiting disability discrimination in any place of public accommodation is that "public accommodation" is place, leading to conclusion that it is all of services which public accommodation offers, not all services which lessor of public accommodation offers, which fall within scope of Title III. Americans with Disabilities Act of 1990, §§ 301(7), 302(a), 42 U.S.C.A. §§ 12181(7), 12182(a); 28 C.F.R. Pt. 36, App. B (1996).

> See publication Words and Phrases for other judicial constructions and definitions.

———————

Maureen S. Binetti (Argued) Wilentz, Goldman & Spitzer, Woodbridge, NJ, for Appellant Colleen V. Ford.

Robert J. Gregory (Argued), Washington, DC., for Amicus–Appellant Equal Employment Opportunity Commission.

Corrie L. Fischel, McGuiness & Williams, Washington, DC, for Amicus–Appellee Equal Employment Advisory Council.

Patricia A. Dunn, Jones, Day, Reavis & Pogue, Washington, DC, for Amicus–Appellee American Council Life Insurance.

Ronald S. Cooper, Steptoe & Johnson, Washington, DC, for Amicus–Appellee Association of Private Pension And Welfare Plans Blue Cross and Blue Shield Association.

Thomas F. Campion (Argued) John D. Clemen, Shanley & Fisher, Morristown, NJ, for Appellee Schering Plough Corporation.

Allen I. Fagin, Aaron J. Schindel, Ronald S. Rauchberg, Proskauer, Rose, Goetz & Mendelsohn, New York City, Allan M. Marcus, (Argued) Metropolitan Life Insurance Company Law Department One Madison Avenue New York City, Sondra M. Hirsch, Metropolitan Life Insurance Company, Rutherford, NJ, for Appellee Metropolitan Life Insurance Company.

Before: MANSMANN, COWEN and ALITO, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

This appeal presents the purely legal question of whether a disparity between disability benefits for mental and physical disabilities violates the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12101 *et seq.* (1994). The plaintiff-appellant, Colleen Ford, sued her employer, Schering–Plough Corporation (Schering), and the carrier of Schering's group insurance policy, Metropolitan Life Insurance Company (MetLife), alleging that the two-year cap applicable to benefits for mental disabilities, but not for physical disabilities, violates the ADA. On September 12, 1996, the District Court for the District of New Jersey granted the defendants' motion to dismiss Ford's complaint under Federal Rule of Civil Procedure 12(b)(6). Ford appealed. We will affirm the order of the district court dismissing Ford's complaint even though we differ with the district court by finding Ford eligible to file suit under Title I of the ADA.

### I.

The facts concerning the plaintiff's employment and her disability are not in dispute. Ford was an employee of Schering from 1975 until May of 1992, when she became disabled by virtue of a mental disorder and was unable to continue her employment. While she served as an employee, Ford enrolled in the employee welfare benefits plan offered by Schering through MetLife. The plan provid-

ed that benefits for physical disabilities would continue until the disabled employee reached age sixty-five so long as the physical disability persisted. Regarding mental disabilities, however, the plan mandated that benefits cease after two years if the disabled employee was not hospitalized. Ford found herself in this latter category, suffering from a mental disorder yet not hospitalized and thus ineligible for a continuation of her benefits past the two-year limit. Her benefits expired on Nov. 23, 1994.

Ford filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). The EEOC issued her a "right-to-sue" letter on January 31, 1996. Subsequently, Ford filed a three-count complaint against Schering and MetLife alleging discrimination in violation of the ADA. The defendants filed motions to dismiss the complaint pursuant to Rule 12(b)(6) and, in the alternative, for summary judgment. The district court granted the defendants' Rule 12(b)(6) motion, dismissing the complaint for failure to state a claim. This appeal followed.

## II.

**[1–3]** We have jurisdiction under 28 U.S.C. § 1291 (1994), and our review over the district court's order is plenary. When considering a Rule 12(b)(6) motion, we accept as true all the allegations set forth in the complaint, and we must draw all reasonable inferences in the plaintiff's favor. *See Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991). Dismissal of a plaintiff's claim under Rule 12(b)(6) occurs only if the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

## III.

**[4]** Because the facts of this case are not in dispute, our analysis focuses on the legal question of whether the disparity between mental and physical disability benefits violates the ADA and, as a preliminary issue, whether Ford is even eligible to sue under the ADA. We will address Ford's claims under Titles I and III seriatim.

### A.

Ford's first claim alleges that the defendants' group insurance plan violates Title I of the ADA because of the disparity in benefits between mental and physical disabilities. Title I of the ADA proscribes discrimination in the terms and conditions of employment and mandates in relevant part:

(a) General rule

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

(b) Construction

As used in subsection (a) of this section, the term "discriminate" includes—

.     .     .     .     .

(2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with ... an organization providing *fringe benefits* to an employee of the covered entity[) ] ....

42 U.S.C. § 12112(a)-(b) (emphasis added). As the plaintiff correctly observes, the defendants' group insurance plan is a fringe benefit of employment at Schering. Ford claims that the defendants violated Title I of the ADA because the mental-physical disparity constitutes discrimination against her on the basis of her disability.

### i.

Before addressing the merits of Ford's Title I claim, we must first ascertain whether Ford is eligible to file suit under Title I. While the district court held that Ford lacked "standing[,]" Dist. Ct. Op. at 7, the question of standing is not at issue in this case. Indeed, Ford has been "injured in fact" by the denial of her benefits, which is "an injury to [herself] that is likely to be

redressed by a favorable decision." *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). Furthermore, Ford's interest is arguably within the zone of interests regulated by the ADA. *See id.* at 39 n. 19, 96 S.Ct. at 1925 n. 19. Instead of ascertaining Ford's standing, we must assess Ford's eligibility under the ADA's requirements to file suit.

Title I of the ADA restricts the ability to sue under its provisions to a "qualified individual with a disability[,]" whose characteristics are defined as follows:

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8). Thus, an individual eligible to sue under Title I of the ADA must be disabled but still able to perform his or her job duties with or without a reasonable accommodation by the employer. Ford, however, admits that she is currently unable to work even with a reasonable accommodation. Indeed, her disabled status is the reason for her desire to receive the disability benefits at issue here.

The defendants-appellees argue that Ford is clearly ineligible to sue under Title I of the ADA because she is currently disabled, and they point to our recent statement that "a person unable to work is not intended to be, and is not, covered by the ADA." *McNemar v. Disney Store, Inc.,* 91 F.3d 610, 618 (3d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 958, 136 L.Ed.2d 845 (1997). *McNemar* focused on whether an individual is judicially estopped from claiming to be a "qualified individual with a disability" when he represented to governmental agencies that he was completely disabled. In *McNemar,* an HIV-positive man represented to government agencies that he was completely disabled for the purpose of receiving disability benefits. At the same time, he asserted that he was a "qualified individual with a disability[,]" meaning that he could work with or without a reasonable accommodation, in his suit against his former employer under the ADA for wrongful discharge. As a result, we concluded that the district court was within its discretion in finding that McNemar's representations to government agencies estopped him from claiming that he was a "qualified individual with a disability" under Title I. *See id.* at 617–18.

At first glance, *McNemar* seems to cover the instant case since Ford has asserted she is completely disabled for purposes of disability benefits yet is now asserting she is a "qualified individual with a disability" for purposes of her ADA suit. However, despite its apparent relevance, *McNemar* is distinguishable. In *McNemar,* the plaintiff's situation *vis-a-vis* the ADA did not give rise to the possibility that, for reasons intrinsic to the ADA, there was an ambiguity in the definition of "qualified individual with a disability[.]" The essence of McNemar's suit was that he could still work despite his disability (meaning that he was wrongfully discharged), yet he simultaneously received benefits for being unable to work due to his disability. McNemar's situation did not unearth an internal contradiction in the ADA; instead, the contradiction in McNemar's position arose between McNemar's various representations, namely his claim of wrongful discharge and his assertion to government agencies that he was completely disabled.

In the instant case, Ford is also attempting to qualify under Title I's eligibility requirement, but the factual predicate of her claim (that she is disabled and deserving of disability benefits) matches the representation she made to qualify for the benefits she already received. Unlike the *McNemar* plaintiff, Ford illuminates an internal contradiction in the ADA itself, namely the disjunction between the ADA's definition of "qualified individual with a disability" and the rights that the ADA confers. Title I of the ADA prohibits discrimination by employers regarding the "terms, conditions, and privileges" of em-

ployment, 42 U.S.C. § 12112(a), including "fringe benefits" such as disability benefits. *Id.* § 12112(b)(2). Yet, as Ford and the EEOC as *amicus* argue, restricting eligibility to sue under Title I to individuals who can *currently* work with or without a reasonable accommodation prevents disabled *former* employees from suing regarding discrimination in disability benefits. Once an individual becomes disabled and thus eligible for disability benefits, that individual loses the ability to sue under a strict reading of Title I's definition of "qualified individual with a disability" because that individual can no longer work with or without a reasonable accommodation. In order for the rights guaranteed by Title I to be fully effectuated, the definition of "qualified individual with a disability" would have to permit suits under Title I by more than just individuals who are currently able to work with or without reasonable accommodations.

[5] This disjunction between the explicit rights created by Title I of the ADA and the ostensible eligibility standards for filing suit under Title I causes us to view the contents of those requirements as ambiguous rather than as having an unassailable plain meaning. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. 337, ——, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997) (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 477, 112 S.Ct. 2589, 2594–95, 120 L.Ed.2d 379 (1992), and *McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991)). The locus of the ambiguity is whether the ADA contains a temporal qualifier of the term "qualified individual with a disability[.]" If the putative plaintiff must, at the time of the suit, be employable with or without a reasonable accommodation, then a disabled former employee loses his ability to sue to challenge discriminatory disability benefits. Alternatively, the term "qualified individual with a disability" may include former employees who were once employed with or without reasonable accommodations yet who, at the time of suit, are completely disabled.

The Supreme Court's recent decision in *Robinson,* which concerned the scope of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1994), contributes to this ambiguity by lending support for interpreting Title I of the ADA to permit suits by disabled individuals against their former employers concerning their disability benefits. Cases interpreting Title VII are relevant to our analysis of the ADA because the ADA is essentially a sibling statute of Title VII. Indeed, the ADA's accompanying House report states that the purpose of the ADA is "to provide civil rights protections for persons with disabilities that are parallel to those available to minorities and women." H.R.Rep. No. 101–485, pt. 3, at 48 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 471. Furthermore, the ADA incorporates by reference several terms defined in Title VII. *See* 42 U.S.C. § 12111(7) (incorporating Title VII's definitions of "person", "labor organization", etc.).

In *Robinson,* the Supreme Court analyzed whether former employees are allowed to bring suits against their previous employers under Title VII for post-termination retaliation such as negative job references. The Court found that the term "employees" as used in § 704(a) of Title VII was ambiguous regarding its temporal reach, *i.e.,* whether it covered only current employees or encompassed former employees as well. *See* 519 U.S. at ——, 117 S.Ct. at 846–48. Resolving this ambiguity, the Court held that the term encompassed former employees in order to provide former employees with a legal recourse against post-termination retaliation. *See id.* at ——, 117 S.Ct. at 848–49; *see also Charlton v. Paramus Bd. of Educ.,* 25 F.3d 194, 200 (3d Cir.1994) (former employee may file a retaliation claim against a former employer under Title VII).

As with the term "employees" in Title VII, the ADA contains an ambiguity concerning the definition of "qualified individual with a disability" because there is no temporal qualifier for that definition. Congress could have restricted the eligibility for plaintiffs under the ADA to *current* employees or could have explicitly broadened the eligibility

to include *former* employees. Since Congress did neither but still created rights regarding disability benefits, we are left with an ambiguity in the text of the statute regarding eligibility to sue under Title I.

**[6]** We resolve this ambiguity by interpreting Title I of the ADA to allow disabled former employees to sue their former employers regarding their disability benefits so as to effectuate the full panoply of rights guaranteed by the ADA. This is in keeping with the ADA's rationale, namely "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities . . . [and] to provide clear, strong, consistent, *enforceable* standards addressing [such] discrimination . . . ." 42 U.S.C. § 12101(b)(1)-(2) (emphasis added). Our decision is also in keeping with the Supreme Court's *Robinson* decision, which found that the temporal reach of Title VII encompasses former employees, and our pre*Robinson* decision to that effect in *Charlton*, 25 F.3d at 200.

By adopting this interpretation, we part ways with the Seventh and Eleventh Circuits, both of which tendered decisions prior to *Robinson*.[1] In *EEOC v. CNA Ins. Companies*, 96 F.3d 1039 (7th Cir.1996), the Seventh Circuit rejected the suit of an individual in a position similar to Ford's. Litigating on behalf of the former employee, the EEOC argued that the individual was eligible to sue under Title I by arguing that an analogy may be drawn to decisions allowing former employees to sue employers for retaliation under Title VII. The Seventh Circuit rejected this argument by noting that no discrimination against the plaintiff occurred during her employment, while, in the Title VII retalia-

tion situation, actual harm occurred by virtue of the retaliation. As the Seventh Circuit wrote, "[N]othing happened that discriminated against her during the time she was working at CNA. The only thing that occurred was CNA's 1985 decision to reduce the long-term benefits available to all of its employees for mental health problems." *Id.* at 1045. However, the Seventh Circuit's brief analysis conflates two issues, the first being whether the individual could sue regarding fringe benefits while completely disabled, and the second being whether the individual's suit had merit and was based upon actual discrimination. The Seventh Circuit essentially declined to find the individual eligible to sue because her suit lacked merit. Therefore, we do not find the Seventh Circuit's reasoning persuasive regarding whether Ford is eligible to sue in the instant case as opposed to whether her suit has merit.[2]

We also disagree with the Eleventh Circuit's ruling in *Gonzales v. Garner Food Services, Inc.*, 89 F.3d 1523 (11th Cir.1996). In *Gonzales*, as in the instant case, a disabled former employee sued his former employer under the ADA regarding alleged discrimination in disability benefits. The Eleventh Circuit recognized the possible analogy between the Title VII retaliation context and the ADA situation, but it refused to adopt this analogy and to grant the plaintiff permission to sue. Instead, the Eleventh Circuit argued that, "[a]bsent clearly expressed legislative intent to the contrary, the plain language of the statute should be conclusive." *Id.* at 1528. The Eleventh Circuit concentrated on what it believed to be the plain meaning of the ADA,

---

1. The Sixth Circuit in *Parker v. Metropolitan Life Ins. Co.*, 99 F.3d 181 (6th Cir.1996), analyzed whether a plaintiff was eligible to sue under Title I. However, that decision was vacated by the granting of the plaintiff's petition for rehearing en banc. *See* 6th Cir. R. 14(a). The en banc decision did not address the Title I issue because it was not raised by the plaintiff's petition for rehearing en banc. *See Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1009 n. 2 (6th Cir.1997) (en banc), *cert. denied*, ––– U.S. ––––, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998).

2. The EEOC also argued in *CNA* that the disabled person was in the "employment position"

of "disability benefit recipient." *Id.* at 1043 (internal quotation marks omitted). According to the Seventh Circuit, the EEOC claimed that, "[b]ecause CNA imposes no job-related duties on any of the beneficiaries of its long-term disability plan, [the plaintiff] by definition can perform the essential functions of her position: there are none . . . ." *Id.* at 1043–44. The Seventh Circuit rejected that argument because, in its words, "[a]n 'employment position' is a job[,]" *id.* at 1044, meaning that receiving disability benefits did not qualify as an employment position. However, Ford does not offer this argument in the instant litigation.

that only currently employable individuals could sue. However, it failed to address the possibility that the disparity between the rights created by the ADA and the apparent legal remedy fashioned by the ADA creates an ambiguity in the eligibility requirements for obtaining a remedy.

In sum, we respectfully disagree with the district court and sister courts of appeals. We find that Title I of the ADA does permit disabled individuals to sue their former employers regarding their disability benefits. We reach this conclusion because the ADA's proscription of discrimination in fringe benefits generates the need for disabled individuals to have legal recourse against such discrimination and exposes the temporal ambiguity in the ADA's definition of "qualified individual with a disability[.]" We resolve this ambiguity in favor of a broad temporal interpretation of "qualified individual with a disability[,]" that disabled former employees, no longer able to work with or without reasonable accommodations, can sue their former employers concerning alleged discrimination in their package of disability benefits. Our impetus for this conclusion also comes from the Supreme Court's *Robinson* decision allowing former employees to sue under Title VII of the Civil Rights Act of 1964.

### ii.

**[7]** Having established Ford's eligibility to sue under Title I, we must now ascertain whether she states a claim that survives the defendants' Rule 12(b)(6) motion. Ford essentially claims that the disparity between benefits for mental and physical disabilities violates Title I of the ADA. However, Ford's argument does not support a finding of discrimination under Title I.

**[8]** While the defendants' insurance plan differentiated between types of disabilities, this is a far cry from a specific disabled employee facing differential treatment due to her disability. Every Schering employee had the opportunity to join the same plan with the same schedule of coverage, meaning that every Schering employee received equal treatment. So long as every employee is offered the same plan regardless of that em-

ployee's contemporary or future disability status, then no discrimination has occurred even if the plan offers different coverage for various disabilities. The ADA does not require equal coverage for every type of disability; such a requirement, if it existed, would destabilize the insurance industry in a manner definitely not intended by Congress when passing the ADA.

**[9]** This analysis is supported by Supreme Court and Third Circuit precedent concerning the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1994), to which we may look for guidance in interpreting the ADA. *See Gaul v. Lucent Technologies, Inc.,* 134 F.3d 576, 580 (3d Cir.1998). In *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), plaintiffs sued in response to the Tennessee Medicaid program's reduction in the number of inpatient hospital days for which it would pay. The plaintiffs claimed that the reduction would have a disproportionate effect on handicapped individuals since they would require longer inpatient care than non-handicapped individuals. However, the Supreme Court held that the limit on inpatient hospital care was "neutral on its face[ ]" and did not "distinguish between those whose coverage will be reduced and those whose coverage will not on the basis of any test, judgment, or trait that the handicapped as a class are less capable of meeting or less likely of having." *Id.* at 302, 105 S.Ct. at 720–21. According to the Supreme Court, handicapped citizens did not suffer from discrimination because both handicapped and non-handicapped individuals were "subject to the same durational limitation." *Id.* at 302, 105 S.Ct. at 721.

Building on *Alexander,* the Supreme Court in *Traynor v. Turnage,* 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988), dismissed a challenge to a federal statute precluding the Veterans Administration from granting extensions to a ten-year delimiting period for veterans to claim their benefits if the veterans' disabilities arose from their own willful misconduct, defined by regulations as including alcoholism. The Supreme Court rejected the argument that the statute discriminated against one type of disability, namely alcoholism. "There is nothing in the Rehabilitation

Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons." *Id.* at 549, 108 S.Ct. at 1382.

We have likewise held, in the context of the Rehabilitation Act, that a state's medical assistance statute need not treat every disability equally. In *Doe v. Colautti*, 592 F.2d 704 (3d Cir.1979), we dismissed a challenge to a Pennsylvania statute that provided unlimited hospitalization for physical illness in a private hospital but restricted hospitalization for mental illness in private mental hospitals. We rejected the argument that the differential level of benefits violated the Rehabilitation Act by noting that, "[i]n the treatment of their physical illnesses, the mentally ill receive the same benefits as everyone else. A mental patient with heart disease, for instance, is as entitled to benefits for treatment of the heart disease as would be a person not mentally ill." *Id.* at 708. Our holding in *Doe* is supported by the D.C. Circuit's decision in *Modderno v. King*, 82 F.3d 1059 (D.C.Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 772, 136 L.Ed.2d 717 (1997), in which the D.C. Circuit rejected a challenge brought by a former spouse of a foreign service officer against the Foreign Service Benefit Plan under the Rehabilitation Act based upon the plan's lower level of benefits for mental illness as compared to physical illness.

Aside from Supreme Court and Third Circuit precedent in the Rehabilitation Act context, claims under the ADA similar to Ford's have been rejected by three courts of appeals in published opinions. While we disagree with the Seventh Circuit's reasoning in *CNA* regarding the plaintiff's eligibility to sue, we agree with its discussion regarding the merits of the plaintiff's claim. In rejecting the plaintiff's challenge to the disparity between benefits for mental and physical illnesses, the Seventh Circuit stated:

> One of those terms, conditions, or privileges of employment may be a pension plan, but there is no claim here that CNA discriminated on the basis of disability in offering its pension plan to anyone. It did not charge higher prices to disabled people, on the theory that they might require

more in benefits. Nor did it vary the terms of its plan depending on whether or not the employee was disabled. All employees—the perfectly healthy, the physically disabled, and the mentally disabled—had a plan that promised long-term benefits from the onset of disability until age 65 if their problem was physical, and long-term benefits for two years if the problem was mental or nervous. . . .

> [The plaintiff] raises a different kind of discrimination claim, more grist for the ERISA mill or the national health care debate than for the ADA. She claims that the plan discriminates against employees who in the future will become disabled due to mental conditions rather than physical conditions; their present dollars (unbeknownst to them) are buying only 24 months of benefits, instead of benefits lasting much longer. However this is dressed up, it is really a claim that benefit plans themselves may not treat mental health conditions less favorably than they treat physical health conditions. Without far stronger language in the ADA supporting this result, we are loath to read into it a rule that has been the subject of vigorous, sometimes contentious, national debate for the last several years. Few, if any, mental health advocates have thought that the result they would like to see has been there all along in the ADA.

*CNA*, 96 F.3d at 1044 (citations omitted). Likewise, in *Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674 (8th Cir.1996), the Eighth Circuit rejected a challenge under the ADA to an insurance plan that denied coverage for infertility. Analogizing the infertility exclusion to differential benefits for mental and physical illnesses, the Eighth Circuit stated, "Insurance distinctions that apply equally to all insured employees, that is, to individuals with disabilities and to those who are not disabled, do not discriminate on the basis of disability." *Id.* at 678. Finally, the Sixth Circuit in *Parker* rejected a claim similar to Ford's made against the same defendants as in the instant case. As the Sixth Circuit held, "Because all the employees at Schering–Plough, whether disabled or not, received the same access to the long-term disability plan, neither the defendants nor the

plan discriminated between the disabled and the able bodied." 121 F.3d at 1015–16; *cf. Brennen v. Comptroller of the State of N.Y.*, 100 F.3d 942, 1996 WL 19057 (2d Cir.1996) (unpublished table decision) (benefits extended to one category of disabled persons need not be extended to all other categories).

The cases finding no violation of the ADA by a disparity in benefits between mental and physical disabilities are supported by the ADA's legislative history. As the Senate Labor and Human Resources Committee report states:

In addition, employers may not deny health insurance coverage completely to an individual based on the person's diagnosis or disability. For example, while it is permissible for an employer to offer insurance policies that limit coverage for certain procedures or treatments, e.g., only a specified amount per year for mental health coverage, a person who has a mental health condition may not be denied coverage for other conditions such as for a broken leg or for heart surgery because of the existence of the mental health condition. A limitation may be placed on reimbursements for a procedure or the types of drugs or procedures covered[,] e.g., a limit on the number of x-rays or non-coverage of experimental drugs or procedures; but, that limitation must apply to persons with or without disabilities. All people with disabilities must have equal access to the health insurance coverage that is provided by the employer to all employees.

S.Rep. No. 101–116, at 29 (1989).

In addition, legislative history subsequent to the ADA's passage evinces that Congress did not believe that the ADA mandated parity between mental and physical disability benefits. In 1996, the Senate defeated an amendment to the Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104–191, 110 Stat.1936 (1996) (codified primarily in Titles 18, 26 and 42 of the U.S.Code), which would have mandated parity in insurance coverage for mental and physical illnesses. Such an amendment would have been unnecessary altogether if the ADA already required such parity. *See* 142 Cong. Rec. S9477–02 (daily ed. Aug. 2,

1996) (statement of Sen. Heflin); *see also CNA*, 96 F.3d at 1044. Furthermore, Congress then passed the Mental Health Parity Act of 1996, Pub.L. No. 104–204, Title VII, 110 Stat. 2944 (1996) (codified at 29 U.S.C. § 1185a and 42 U.S.C. § 300gg–5), which mandates, *inter alia*, that a health insurance plan containing no annual or lifetime limit for medical benefits cannot have such limits on mental health benefits. Such congressional action reveals both that the ADA does not contain parity requirements and that no parity requirements for mental and physical *disability* benefits have been enacted subsequent to the ADA.

iii.

**[10]** Ford attempts to buttress her challenge to the disparity between benefits for mental and physical disabilities by pointing to section 501(c) of the ADA, which contains the "safe harbor" provision covering the insurance industry. This section, codified at 42 U.S.C. § 12201(c), reads as follows:

(c) Insurance

Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict—

(1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

(2) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

(3) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance.

Paragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the purposes of subchapter [sic] I and III of this chapter.

42 U.S.C. § 12201(c). Ford essentially claims that, once she presents a *prima facie* case alleging discrimination in disability benefits, Schering and MetLife must present actuarial data demonstrating that their plan is not a "subterfuge[.]" Hence, according to Ford, the district court erred in granting the defendants' Rule 12(b)(6) motion since the defendants had not offered data justifying the actuarial basis for the disparity in benefits.

Ford's argument must fail, however, since it runs contrary to Supreme Court precedent, ignores our statutory duty regarding insurance regulation and distorts the role of this court. First, Ford's argument that Schering and MetLife must justify their insurance plan contradicts the Supreme Court's interpretation of a provision similar to section 501(c) in the context of the Age Discrimination in Employment Act (ADEA), Pub.L. No. 90–202, 81 Stat. 602 (1967) (codified at 29 U.S.C. § 621 *et seq.* (1994)). Prior to Congress's elimination of the term "subterfuge" from the ADEA in 1990, *see* Older Workers Benefit Protection Act of 1990, Pub.L. No. 101–433, 104 Stat. 978, the ADEA granted an exemption from the ADEA's prohibition of age discrimination to an employee benefit plan that was not "a subterfuge[.]" 29 U.S.C. § 623(f) (1988). In *Public Employees Retirement Sys. of Ohio v. Betts,* 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989), the Supreme Court rejected a challenge to an insurance plan that rendered covered employees ineligible for disability retirement once they reached age sixty. Relying on its decision in *United Air Lines, Inc. v. McMann,* 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977), the Supreme Court concluded that the term "subterfuge" must be given its ordinary meaning of " 'a scheme, plan, stratagem, or artifice of evasion.' " *Betts,* 492 U.S. at 167, 109 S.Ct. at 2861 (quoting *McMann,* 434 U.S. at 203, 98 S.Ct. at 450). In addition, the Supreme Court found that requiring an insurance company to justify its coverage scheme had no basis in the statutory language. *See id.* at 170–71,

109 S.Ct. at 2863; *see also McMann,* 434 U.S. at 203, 98 S.Ct. at 450.

**[11]** The Supreme Court's definition and analysis of the ADEA's use of the term "subterfuge" are applicable to the ADA's use of the term "subterfuge[.]" Congress enacted section 501(c) of the ADA in 1990, *see* Pub.L. No. 101–336, 104 Stat. 369 (1990), while the Supreme Court decided *Betts* in 1989. Congress therefore is presumed to have adopted the Supreme Court's interpretation of "subterfuge" in the ADEA context when Congress enacted the ADA. "[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons,* 434 U.S. 575, 581, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978); *see Standard Oil Co. of N.J. v. United States,* 221 U.S. 1, 59, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911) ("[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense unless the context compels to the contrary."). "Had Congress intended to reject the *Betts* interpretation of subterfuge when it enacted the ADA, it could have done so expressly by incorporating language for that purpose into the bill that Congress voted on and the President signed." *Krauel,* 95 F.3d at 679; *accord Modderno,* 82 F.3d at 1064. Accordingly, as the Supreme Court held in the ADEA context, the term "subterfuge" does not require an insurance company to justify its policy coverage after a plaintiff's mere *prima facie* allegation.

The second reason that Ford's argument must fail is that it ignores our statutory duty under the McCarran–Ferguson Act regarding insurance cases. Pursuant to that Act, "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance . . . ." 15 U.S.C. § 1012(b) (1994). The ADA does not "specifically relate[ ] to the business of insurance[,]" *id.,* and

does not mention the term "insurance" in its introductory section entitled "Findings and purpose[.]" *See* 42 U.S.C. § 12101. Accordingly, we will not construe section 501(c) to require a seismic shift in the insurance business, namely requiring insurers to justify their coverage plans in court after a mere allegation by a plaintiff. This second reason is integrally related to the third reason Ford's argument regarding section 501(c) fails, namely that requiring insurers to justify their coverage plans elevates this court to the position of super-actuary. This court is clearly not equipped to become the watchdog of the insurance business, and it is unclear exactly what actuarial analysis the defendants would have to produce to disprove the charge of "subterfuge[.]" *See Modderno*, 82 F.3d at 1062–63 (noting confusion as to exactly what actuarial data would be sufficient).

#### B.

**[12, 13]** Ford's second claim against Schering and MetLife is that the disparity in benefits for mental and physical disabilities violates Title III of the ADA. Title III reads in relevant part as follows: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Relying on the principle that courts should avoid interpreting statutes in a manner rendering some words redundant, *see United States v. Alaska,* ⎯ U.S. ⎯, ⎯, 117 S.Ct. 1888, 1918, 138 L.Ed.2d 231 (1997), Ford and the U.S. Dept. of Justice as *amicus* essentially argue that the phrase "services, . . . privileges, [and] advantages" covers discrimination in realms different than physical access to facilities or else these words would be superfluous. Ford can also

cite to the ADA itself for the proposition that an "insurance office[ ]" is a public accommodation under Title III. 42 U.S.C. § 12181(7)(F) (listing examples of public accommodations including "insurance office[ ]").

The fact that an insurance office is a public accommodation, however, does not mean that the insurance policies offered at that location are covered by Title III. In the instant case, Schering and MetLife offered disability benefits to Ford in the context of her employment at Schering, meaning that the disability benefits constituted part of the terms and conditions of Ford's employment. Terms and conditions of employment are covered under Title I, not Title III. "Title III is not intended to govern any terms or conditions of employment by providers of public accommodations or potential places of employment; employment practices are governed by title I of this legislation." S.Rep. No. 101–116, at 58 (1989); *see* H.R.Rep. No. 101–485, pt. 2, at 99 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 382. Therefore, Ford cannot state a claim against her employer, Schering, pursuant to Title III. *See Parker*, 121 F.3d at 1015.

**[14]** Regarding MetLife, the disability benefits that Ford challenges do not qualify as a public accommodation and thus do not fall within the rubric of Title III. The plain meaning of Title III is that a public accommodation is a place, leading to the conclusion that " '[i]t is all of the services which the public accommodation offers, not all services which the lessor of the public accommodation offers[,] which fall within the scope of Title III.' " *Id.* at 1011 (quoting *Stoutenborough v. National Football League, Inc.,* 59 F.3d 580, 583 (6th Cir.1995) (a television broadcast is not covered by Title III)). This is in keeping with the host of examples of public accommodations provided by the ADA, all of which refer to places. *See* 42 U.S.C. § 12181(7).[3] Since Ford received her disabili-

---

**3.** Section 12181(7) reads as follows:

The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce—

(A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms

for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

(B) a restaurant, bar, or other establishment serving food or drink;

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

ty benefits via her employment at Schering, she had no nexus to MetLife's "insurance office" and thus was not discriminated against in connection with a public accommodation. Furthermore, the "goods, services, facilities, privileges, advantages, or accommodations" concerning which a disabled person cannot suffer discrimination are not freestanding concepts but rather all refer to the statutory term "public accommodation" and thus to what these places of public accommodation provide. Ford cannot point to these terms as providing protection from discrimination unrelated to places.

Restricting "public accommodation" to places is in keeping with jurisprudence concerning Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a (1994). Title II proscribes racial and religious discrimination in "the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation...." 42 U.S.C. § 2000a(a). This proscription has been limited to places rather than including membership in an organization, *see Welsh v. Boy Scouts of Am.,* 993 F.2d 1267, 1269–75 (7th Cir.1993), and rather than encompassing an organization's operations unconnected to any physical facility. *See Clegg v. Cult Awareness Network,* 18 F.3d 752, 755–56 (9th Cir.1994).

Confining "public accommodation" to places is also in keeping with the Dept. of Justice's regulations to this effect:

The purpose of the ADA's public accommodations requirements is to ensure accessibility to the goods offered by a public accommodation, not to alter the nature or mix of goods that the public accommodation has typically provided. In other words, a bookstore, for example, must make its facilities and sales operations accessible to individuals with disabilities, but is not required to stock Brailled or large print books. Similarly, a video store must make its facilities and rental operations accessible, but is not required to stock closed-captioned video tapes.

28 C.F.R. pt. 36, app. B, at 640 (1997). Just as a bookstore must be accessible to the disabled but need not treat the disabled equally in terms of books the store stocks, likewise an insurance office must be physically accessible to the disabled but need not provide insurance that treats the disabled equally with the non-disabled. While the Dept. of Justice has issued other documents stating that Title III does cover the substance of insurance contracts, *see* Dept. of Justice, *Title III Technical Assistance Manual: Covering Public Accommodations and Commercial Facilities* § III3.11000, at 19 (Nov.1993) ("Insurance offices are places of public accommodation and, as such, may not discriminate on the basis of disability in the sale of insurance contracts or in the terms or conditions of the insurance contracts they offer."), such an interpretation is "manifestly contrary" to the plain meaning of Title III and, accordingly, is not binding on this court. *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *see Parker,* 121 F.3d at 1012 n. 5. Furthermore, since we find the plain meaning of "public accommodation" and 42 U.S.C. § 12182(a) to be clear, we have no need to analyze the ADA's legislative history.

We also note that, by aligning ourselves with the Sixth Circuit's *Parker* decision re-

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181(7).

garding the definition of "public accommodation[,]" we part company with the First Circuit in this regard. In *Carparts Distribution Ctr., Inc. v. Automotive Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12 (1st Cir.1994), the First Circuit held that Title III is not limited to physical structures. The First Circuit pointed to the inclusion of "travel service" in the list of public accommodations and noted:

> Many travel services conduct business by telephone or correspondence without requiring their customers to enter an office in order to obtain their services. Likewise, one can easily imagine the existence of other service establishments conducting business by mail and phone without providing facilities for their customers to enter in order to utilize their services. It would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. Congress could not have intended such an absurd result.

*Id.* at 19 (citing 42 U.S.C. § 12181(7)(F)). However, as the Sixth Circuit pointed out in *Parker*, 121 F.3d at 1014, the First Circuit failed to read the examples of public accommodations that piqued the First Circuit's interest in the context of the other examples of public accommodations. The litany of terms, including "auditorium," "bakery," "laundromat," "museum," "park," "nursery," "food bank," and "gymnasium[ ]" refer to places with resources utilized by physical access. 42 U.S.C. § 12181(7)(D)-(F), (H)-(L). Pursuant to the doctrine of *noscitur a sociis*, the terms that the First Circuit finds ambiguous should be interpreted by reference to the accompanying words of the statute "to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961). Accordingly, we do not find the term "public accommodation" or the terms in 42 U.S.C. § 12181(7) to refer to nonphysical access or even to be ambiguous as to their meaning.

In sum, Ford fails to state a claim under Title III of the ADA since the provision of disability benefits by MetLife to Schering's employees does not qualify as a public accommodation.

### IV.

For the above reasons, we will affirm the September 12, 1996, order of the district court dismissing Ford's complaint for failure to state a claim. Unlike the district court, we find that Ford is eligible to sue under Title I. However, Ford fails to state a claim under Titles I or III and errs in asserting that the "safe harbor" provision of Title V requires insurance companies to justify their coverage plans after a plaintiff's *prima facie* allegation.

ALITO, Circuit Judge, concurring in the judgment:

I agree with the majority that Ford fails to state a claim under the Americans with Disabilities Act (ADA). However, I reach this conclusion based solely on the insurance "safe harbor" provision located in section 501(c) of the ADA. *See* 42 U.S.C. § 12201(c).

Section 501(c) provides that Titles I and III of the ADA "shall not be construed to prohibit or restrict" the terms of a bona fide insurance plan. 42 U.S.C. § 12201(c). This exemption applies so long as it is not "used as a subterfuge to evade the purposes of" the ADA. *Id.* As the majority recognizes, the term "subterfuge" must be construed in accordance with the Supreme Court's decision in *Public Employees Retirement Sys. of Ohio v. Betts*, 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989). *See* Maj. Op. at 610–11. *Betts* concerned a "safe harbor" provision that exempted fringe benefit plans from coverage by the Age Discrimination in Employment Act (ADEA). *See* 29 U.S.C. § 623(f)(2) (1988).[1] Like section 501(c), the ADEA exemption provided that it would not protect a plan that was "a subterfuge to evade the purposes of" the Act. *Id.* In interpreting this language, the Court concluded that an employee benefit plan adopted prior to the en-

---

**1.** Following *Betts*, section 623(f)(2) was amended by the Older Workers Benefit Protection Act of 1990, Pub.L. No. 101–433, § 103(1), 104 Stat. 978.

actment of the ADEA could not be considered a subterfuge to evade the purposes of the ADEA. *Betts,* 492 U.S. at 166–69 (reaffirming the holding of *United Air Lines, Inc. v. McMann,* 434 U.S. 192, 203, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977)). Under the same reasoning, the insurance plan challenged by Ford cannot be considered a subterfuge to evade the purposes of the ADA since the plan was adopted prior to the enactment of the ADA.[2] *See Modderno v. King,* 82 F.3d 1059, 1063–1065 (D.C.Cir.1996) (holding that an insurance plan enacted prior to the importation of ADA standards into the Rehabilitation Act could not be considered a subterfuge to evade those standards). Accordingly, the defendants' plan is insulated from attack by section 501(c).

I further note that Ford's complaint as currently framed fails to allege that the defendants ever developed a "specific intent" to evade the purposes of the ADA. *See Betts,* 492 U.S. at 171, 109 S.Ct. 2854. In *Betts,* the Court wrote:

> [W]hen an employee seeks to challenge a benefit plan provision as a subterfuge to evade the purposes of the Act, the employee bears the burden of proving that the discriminatory plan provision actually was intended to serve the purpose of discriminating in some non-fringe-benefit aspect of the employment relation.

*Betts,* 492 U.S. at 181, 109 S.Ct. 2854. Under this reading of "subterfuge," Ford could not successfully challenge the defendants' insurance plan unless she could show that it was intended to serve the purpose of discriminating in some non-insurance-benefit aspect of her relationship with the defendants. Ford's complaint contains no such allegation of intent.

Given the effect of section 501(c) on Ford's claims, I do not think that it is necessary for the court to conclude that distinguishing between people with different disabilities for insurance purposes is not discrimination based on disability. *See* Maj. Op. at 607–08. In fact, it would seem that making such distinctions does constitute discrimination in the most basic sense of the word. *See* Webster's Third New International Dictionary at 648 (defining discrimination as "the making or perceiving of a distinction or difference"). However, we need not wrestle with the question of what might or might not constitute unlawful insurance discrimination under the ADA had Congress not addressed the issue; Congress *did* address the issue and provided an explicit answer in section 501(c).

In light of the ease with which Ford's claims can be resolved under section 501(c), I would not reach the more difficult issues of: 1) whether a former employee who can no longer work can meet Title I's "qualified individual with a disability" requirement; and 2) whether Title III's public accommodation provision guarantees anything more than physical access. These issues have divided the circuits, and I would reserve judgment until we are confronted with a case in which the unique considerations of insurance plans are not at stake.



---

**2.** The disputed portions of the plan have been in effect since at least 1985. App. at 69, 87. The ADA was enacted in 1990. *See* 42 U.S.C. § 12101.

Three justices in *McMann* rejected the majority's conclusion that a plan adopted prior to the enactment of the ADEA could not be a subterfuge to avoid the purposes of that Act. *See* 434 U.S. at 204–05, 98 S.Ct. 444 (White, J., concurring); *id.* at 219 n. 13, 98 S.Ct. 444 (Marshall, J., joined by Brennan, J., dissenting). According to these justices, a pre-Act plan could become a subterfuge if

it was maintained after the passage of the ADEA in order to evade the purposes of that Act. One could argue that this position is stronger under the ADA's "safe harbor" provision due to a difference in the statutory language. *Compare* 29 U.S.C. § 623(f) ("*is not* a subterfuge to evade the purposes of" ADEA) (emphasis added) *with* 42 U.S.C. § 1201(c) ("*shall not be used as* a subterfuge to evade the purposes of" the ADA) (emphasis added). However, I do not believe that this change is sufficient to avoid the mandate of *McMann* and *Betts.*

sentations about the character, amount, or legal status of a debt.

[2] Plaintiffs maintain that § 426.104(4)(b) is preempted by 15 U.S.C. § 1692n, which says that states may add to but cannot subtract from the protections that the FDCPA offers to consumers. Yet § 1692n has nothing to do with interest—or for that matter with any other component of the debt. Section 1692n deals with debt-collection practices, not how to determine the amount owed. The FDCPA itself provides that debt collectors may add interest when permitted by law. See 15 U.S.C. § 1692f(1); *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols & Clark, L.L.C.*, 214 F.3d 872, 876 (7th Cir. 2000). The safe harbor, if not § 138.04 itself, permits defendants to add 5% interest to plaintiffs' debts.

State law is the right source for determining interest on a state-law debt. When federal law creates a debt, it may govern prejudgment interest too. See *Williamson v. Handy Button Machine Co.*, 817 F.2d 1290 (7th Cir. 1987) (Title VII of the Civil Rights Act of 1964); cf. *In re Oil Spill by the Amoco Cadiz off the Coast of France on March 16, 1978*, 954 F.2d 1279, 1331–33 (7th Cir. 1992) (US admiralty law, when parties declined to rely on other nations' rules). But plaintiffs' debts arise under state contract law, so the controlling question is whether state law allows a demand for interest before the debt has been reduced to judgment. Until the Administrator says something more, or a state court lifts the safe harbor under § 426.104(4)(b) (and in addition rules that § 138.04 does not by itself allow the debt collectors' practice), neither state nor federal law forbids dunning letters that demand 5% interest from debtors in Wisconsin.

*Veach v. Sheeks*, 316 F.3d 690 (7th Cir. 2003), on which plaintiffs principally rely, does not concern any feature of Wisconsin law. *Veach* held that a letter demanding a monetary amount plus treble damages that a court might award in the future under Indiana law did not comply with federal law because it did not specify the sum immediately payable. That conclusion has nothing to do with the parties' dispute about interest in Wisconsin. Other provisions of state and federal law mentioned in passing by the plaintiffs, and not addressed above, do not require separate analysis.

AFFIRMED



Dale R. **LUDWICK**, on behalf of Herself and All Others Similarly Situated, Plaintiff-Appellant

v.

**HARBINGER GROUP, INC.; Fidelity & Guaranty Insurance Company; Raven Reinsurance Company; Front Street Re (Cayman), Ltd., Defendants-Appellees**

No. 16-1561

United States Court of Appeals, Eighth Circuit.

Submitted: November 16, 2016

Filed: April 13, 2017

**Background:** Annuity holder brought putative class action against insurance company, its hedge fund owner, and two related subsidiaries, alleging they conducted a fraudulent accounting scheme in violation of Racketeer Influenced and Corrupt Organizations Act (RICO). The United States District Court for the Western District of Missouri, Greg Kays, Chief Judge, 161

F.Supp.3d 769, granted defendants' motion to dismiss. Annuity holder appealed.

**Holding:** The Court of Appeals, Riley, Circuit Judge, held that RICO claims were preempted under McCarran-Ferguson Act. Affirmed.

**1. Federal Courts ⟜3647**

Whether a plaintiff's Racketeer Influenced and Corrupt Organizations Act (RICO) charges would "impair" state insurance regulation, for purposes of determining whether a RICO claim is precluded by the McCarran-Ferguson Act, like the sufficiency of allegations more generally, is a legal issue the Court of Appeals reviews de novo. McCarran-Ferguson Act § 2, 15 U.S.C.A. § 1012(b); 18 U.S.C.A. § 1964(c).

**2. Insurance ⟜1100**
   **States ⟜18.41**

When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application. McCarran-Ferguson Act § 2, 15 U.S.C.A. § 1012(b).

**3. Insurance ⟜1100**
   **States ⟜18.41**

In applying the fact-intensive interpretation of the word impair, for purposes of the McCarran-Ferguson Act, focus must be on the precise federal claims asserted, because a statute might impair state insurance laws when applied in some ways, but not in others. McCarran-Ferguson Act § 2, 15 U.S.C.A. § 1012(b).

**4. Insurance ⟜1105**

Racketeer Influenced and Corrupt Organizations Act (RICO) claims brought by annuity holder alleging that insurance company engaged in sham reinsurance transactions with two subsidiaries to misrepresent its true financial condition in public reports and marketing materials, by artificially inflating its purported assets and surplus, would impair Iowa, Maryland, and Missouri insurance laws by interfering with states' comprehensive regulatory schemes, and thus claims were preempted under McCarran-Ferguson Act; questions regarding an insurance company's solvency were squarely within regulatory oversight by state insurance departments and federal court could not rule in holder's favor without holding that state insurance regulators were wrong to let transactions proceed because alleged negative surplus would be patently unreasonable and inadequate. McCarran-Ferguson Act § 2, 15 U.S.C.A. § 1012(b); 18 U.S.C.A. § 1964(c); Md. Code Ann., Ins. § 7-703(a)(1); Iowa Code Ann. § 521A.5(1)(c)(1).

**5. Federal Civil Procedure ⟜673**

Speculation about the likelihood a particular plaintiff would be the one to catch the misconduct she alleges is no reason to throw out her complaint, all the more so when the speculation is based on thinly veiled assumptions about the party's relative status and sophistication.

**6. Federal Civil Procedure ⟜840**

Appellant could not amend her complaint, either as of right or with court's leave, following final judgment, affirmed on appeal, dismissing the case. Fed. R. Civ. P. 15(a)(1), (2).

———————

Appeal from United States District Court for the Western District of Missouri—Kansas City

Counsel who presented argument on behalf of the appellant was Kevin Kamuf Green, of San Diego, CA. The following attorney(s) appeared on the appellant brief; Steve Berman, of Seattle, WA, An-

drew S. Friedman, of Phoenix, AZ., Diane A. Nygaard, of Kansas City, MO., Charles J. Crueger, of Milwaukee, WI., Erin K. Dickinson, of Whitefish Bay, WI., Francis Joseph Balint, Jr., of Phoenix, AZ., Sean Matt, of Seattle, WA.

Counsel who presented argument on behalf of the appellee was Maeve Louise O'Connor, of New York, NY. The following attorney(s) appeared on the appellee brief; Scott Gregory Knudson, of Minneapolis, MN., Frank A. Taylor, of Minneapolis, MN., Julie H. Firestone, of Minneapolis, MN., Jarrod L. Schaeffer, of New York, NY., Maeve Louise O'Connor, of New York, NY., Julie Keersmaekers, of New York, NY., Mark Spatz, of New York, NY., Stephen Gale Dick, of New York, NY.

Before RILEY,[1] Chief Judge, WOLLMAN and KELLY, Circuit Judges.

RILEY, Chief Judge.

The question in this case is whether letting Dale Ludwick pursue her federal racketeering claims against an insurance company and its affiliates would impair state regulation of the insurance business in Iowa, Maryland, or Missouri. We agree with the district court[2] that it would, and the McCarran-Ferguson Act forbids that result. See 15 U.S.C. § 1012(b). We affirm the dismissal of Ludwick's claims.

## I. BACKGROUND

The essence of Ludwick's case is that Fidelity & Guaranty Insurance Company (F&G)—directed by the hedge fund that owns it, Harbinger Group, Inc., and abetted by two related subsidiaries, Raven Reinsurance Company and Front Street Re

(Cayman), Ltd.—misled her into paying too much for an F&G annuity. F&G did so, Ludwick says, by disseminating reports and marketing materials that did not properly reflect sham transactions F&G undertook to hide its true financial state. The details and ultimate propriety of those transactions are largely immaterial to our resolution of this appeal. As relevant, Ludwick's theory is that between 2011 and 2013, F&G took billions of dollars in liabilities off its books by transferring them to its affiliates Raven and Front Street, even though those companies did not have sufficient assets to cover them. At the same time, F&G marked up its valuation of the Raven stock it owned. And after quickly unwinding one of the transactions and taking some liabilities back from Raven, F&G arranged for an unaffiliated insurance company—apparently gratuitously—to assume those liabilities, plus others, while taking assets worth significantly less (and otherwise lacking the resources to cover them).

According to Ludwick, if F&G had properly accounted for these transactions under the principles promulgated by the National Association of Insurance Commissioners, as F&G claimed to do in its annual statements, F&G would have had to report its "surplus" was in fact negative—in other words, that its liabilities exceeded its assets. Instead, F&G reported billion-dollar surpluses in each of 2011, 2012, and 2013. Based, in part, on F&G's apparent financial good health, Ludwick bought an annuity in 2013.

Ludwick eventually became convinced F&G was not in as good shape as it

---

1. The Honorable William Jay Riley stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 10, 2017. He has been succeeded by the Honorable Lavenski R. Smith.

2. The Honorable David Gregory Kays, Chief Judge, United States District Court for the Western District of Missouri.

seemed, and thus her annuity was not worth what she paid for it. She sued under the Racketeer Influenced and Corrupt Organizations Act (RICO), see 18 U.S.C. § 1964(c), alleging F&G—under Harbinger's control and facilitated by the subsidiaries (collectively, F&G, from here on, except where context dictates otherwise)—committed numerous acts of mail and wire fraud in the course of a book-cooking scheme, most straightforwardly by distributing paper and electronic copies of its deceptive reports and marketing materials.[3] See id. § 1962(c), (d) (imposing liability for conducting an enterprise's affairs through a pattern of racketeering activity and for conspiring to do so); see also id. § 1961(1) (defining racketeering activity). The district court granted F&G's motion to dismiss for failure to state a claim on which relief can be granted, see Fed. R. Civ. P. 12(b)(6), relying on the McCarran-Ferguson Act and not reaching the merits of Ludwick's RICO claims. Ludwick appeals. See 28 U.S.C. § 1291 (appellate jurisdiction).

## II. DISCUSSION

The McCarran-Ferguson Act provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). There is no suggestion RICO "specifically relates" to insurance, and no dispute Iowa, Maryland, and Missouri (re-

spectively, where F&G is based now, where it was based until 2013,[4] and where Ludwick lives) regulate the insurance business. Nor would imposing RICO liability for F&G's alleged misconduct "invalidate" or "supersede" Iowa, Maryland, or Missouri law. See Humana Inc. v. Forsyth, 525 U.S. 299, 307, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999) (giving the terms their ordinary meanings). The only question is whether Ludwick's RICO charges would "impair" state insurance regulation.

[1, 2] This question, like the sufficiency of Ludwick's allegations more generally, is a legal issue we review de novo. See, e.g., Saunders v. Farmers Ins. Exch., 537 F.3d 961, 963 (8th Cir. 2008). The Supreme Court articulated the governing standard in Humana Inc. v. Forsyth: "When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." Humana, 525 U.S. at 310, 119 S.Ct. 710.

[3, 4] Ludwick insists her suit threatens no conflict, frustration, or interference because it is just about F&G's bookkeeping, not the underlying propriety of the transactions or state regulators' approval of them. The distinction cannot bear the weight of Ludwick's argument. "In applying Humana's fact-intensive interpretation of the word 'impair,' our focus must be on

---

3. Ludwick filed her case as a class action, seeking to represent everyone who has bought annuities from F&G since Harbinger acquired the company in April 2011. The district court dismissed the suit before ruling on class certification, and class issues are not relevant to this appeal.

4. Ludwick makes little mention of Maryland law in her briefs, explaining she "does not

contend" it applies. We see no reason why that should matter. Maryland had primary regulatory authority over F&G for most of the time covered by Ludwick's complaint, and the existence of a third state whose regulation of the insurance business might be affected by federal litigation is a potential flaw in Ludwick's case, not a supplemental theory she can choose to forgo or ignore.

the precise federal claims asserted," because "a statute might 'impair' state insurance laws when applied in some ways, but not in others." Saunders, 537 F.3d at 967. The precise claims asserted in this case arise out of F&G, in Ludwick's words, "misrepresent[ing] the true financial condition of [the company] in its public reports and marketing materials, artificially inflating its purported assets and surplus." Ruling on those claims would necessarily involve deciding whether the supposed sham transactions left F&G in the healthy financial position it reported, or whether Ludwick is correct that a proper accounting would have shown liabilities substantially exceeding F&G's assets (as Ludwick says, "a ***negative statutory surplus***").

Questions about insurance companies' solvency are, no surprise, squarely within the regulatory oversight by state insurance departments. In Maryland (as elsewhere) deals like those underlying Ludwick's case—namely, reinsurance transactions with affiliates—must be submitted to the insurance commissioner for review before they can be consummated. See Md. Code Ann., Ins. § 7-703(a)(1), (c), (d)(4); see also Iowa Code § 521A.5(1)(c)(1). See generally Saunders, 537 F.3d at 965 ("Like most States, Missouri thoroughly regulates the business of insurance."). And the commissioner is directed to consider both whether the transaction "potentially adversely affects the interests of policyholders" and whether "after the transaction, . . . the insurer has assets and surplus as regards policyholders that: (i) bear a reasonable relation to the insurer's outstanding liabilities; and (ii) are adequate to meet the insurer's financial needs." Md. Code Ann., Ins. §§ 7-702(3), -703(e); see also Iowa Code § 521A.5(1)(a)(6), (f). For all practical purposes, that is the same inquiry Ludwick's claims seek. A federal court could not rule in Ludwick's

favor without holding, more or less explicitly, that state insurance regulators were wrong to let the transactions proceed, because the negative surplus Ludwick alleges would be patently unreasonable and inadequate. Cf. Saunders, 537 F.3d at 968 (" '[A] more complete overlap with the state [agency's] . . . decisions is impossible to conceive.' " (second alteration in original) (quoting Dehoyos v. Allstate Corp., 345 F.3d 290, 302 (5th Cir. 2003) (Jones, J., concurring in part and dissenting in part))); Doe v. Mut. of Omaha Ins. Co., 179 F.3d 557, 564 (7th Cir. 1999) ("Even if the formal criteria are the same under federal and state law, displacing their administration into federal court—requiring a *federal* court to decide whether an insurance policy is consistent with *state* law—obviously would interfere with the administration of the state law. The states are not indifferent to who enforces their laws.").

This conclusion holds even though Ludwick sometimes describes the relevant misconduct as not the accounting itself, let alone the underlying transactions, but F&G's representation that it arrived at the numbers in its reports without departing from the standard accounting principles it purported to follow. To start, we agree with F&G that this theory is a "Post-Hoc Reformulation" of Ludwick's claims. Yes, Ludwick's case has always been about F&G "fraudulently dup[ing]" her into buying the annuity, but until now her story was that she was duped by lies about the company's financial strength, not lies about its accounting practices. The new theory does not solve the problem. To decide whether F&G's reported financials reflected a significant departure from the accounting principles it claimed to have followed, a federal court would need to ask what the result of the transactions should have been under those principles. That

would drag the court right back into second-guessing state regulators' oversight of F&G's solvency and stability.

Ludwick also warns against "resurrect[ing] field-preemption arguments that the Supreme Court expressly rejected in Humana." See Humana, 525 U.S. at 308, 119 S.Ct. 710 ("We reject any suggestion that Congress intended to cede the field of insurance regulation to the States."). Her concerns are unfounded. The reason Ludwick cannot pursue her RICO claims is not the mere fact that they relate to the insurance business in the abstract, as it would be under a field-preemption analysis, but that, as a practical matter, a federal court ruling on the specific things Ludwick alleges against this particular insurance company would mean asking the same questions as state insurance regulators ask and effectively double-checking their work. In other words, such review is just the sort of case-specific intrusion and interference we have held the McCarran-Ferguson Act forbids. See Saunders, 537 F.3d at 967-68.

The Supreme Court's decision in SEC v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), does not help Ludwick either, despite some superficial similarities to this case. In National Securities, the Court held the Securities and Exchange Commission (SEC) could unwind an insurance-company merger based on allegations that the letters soliciting approval from the target company's shareholders failed to disclose that they would be paying for the takeover of their own company (among other misrepresentations), even though state regulators had already signed off on the deal. Id. at 455, 462-63, 89 S.Ct. 564. Ludwick latches onto the Court's explanation that "[t]he gravamen of the [SEC's] complaint was the misrepresentation, not the merger," id. at 462, 89 S.Ct. 564, which she takes to mean she is safe from the McCarran-Ferguson

Act as long as the federal and state inquiries are technically about different things. The Court did not limit itself to such formalities however—key to its conclusion was that the SEC's arguments for undoing the merger (in short, that it was accomplished by deceiving shareholders) really were entirely separate from the state regulators' review and approval, which centered on the effect of the combination on policyholders. See id. at 463, 89 S.Ct. 564 ("Different questions would, of course, arise if the Federal Government were attempting to regulate in the sphere reserved primarily to the States by the McCarran-Ferguson Act."). In Ludwick's case, by contrast, the federal claims and the state determinations boil down to the same issue, namely, how the alleged sham transactions, properly accounted for, affected F&G's balance sheet. Cf. Doe v. Norwest Bank Minn., N.A., 107 F.3d 1297, 1307-08 (8th Cir. 1997) (concluding state insurance regulation would be impaired by RICO claims against an insurer where, "in contrast to National Securities, the federal and state statutes at issue . . . are directed toward the same end").

Ludwick's final attempt to save at least a subset of her claims is also meritless. Her argument is that because only F&G itself is actually subject to state insurance laws, "surely [the McCarran-Ferguson Act] does not preclude the assertion of a federal RICO claim" as to the other defendants. But the Act is concerned with the practical effect of federal law on state insurance regulation, see 15 U.S.C. § 1012(b); Saunders, 537 F.3d at 967, regardless of whom it targets as a technical legal matter. Litigating claims premised on F&G's conduct and financial condition against Harbinger, Raven, and Front Street would be no less disruptive of state insurance regulation than if F&G were a party as well.

Though we agree with the district court's disposition of the case, we do not adopt the reasoning the district court thought controlling—that "the lack of a private right of action under the states' insurance codes is dispositive" and "the availability of common law remedies [could] not save [Ludwick's] RICO claim from reverse preemption." According to F&G, the district court's rule "makes sense because the lack of a private right of action reflects a state determination that ancillary actions will impair the functioning of the regulatory framework." But why assume, as that explanation implicitly does, that an ancillary common-law action would be any less disruptive? To the contrary, if it were clearly established that a state let aggrieved parties bring common-law claims against insurance companies in a given situation, we would seem to be justified in drawing much the same inference as if the cause of action were written into the insurance code, namely that the state had not found its regulatory efforts frustrated by the availability of private litigation. See Humana, 525 U.S. at 312, 119 S.Ct. 710 (citing the availability of analogues under "other state laws, statutory *or decisional*," as tending to show that allowing RICO claims would not impair Nevada's regulation of the insurance business (emphasis added)); Saunders, 537 F.3d at 968 (reaching the opposite conclusion because, among other reasons, "neither the Missouri insurance laws nor *Mis-*

*souri common law* provide a private right of action for [the alleged misconduct]" (emphasis added)); LaBarre v. Credit Acceptance Corp., 175 F.3d 640, 643 (8th Cir. 1999) ("Minnesota law permits only administrative recourse for violations of [the relevant provision] and, unlike RICO, does not provide a private cause of action.").[5]

Such an inference is not warranted in this case, because Ludwick has failed to establish that the specific sort of misconduct she alleges—an insurer lying about its financial condition and accounting—would be actionable under the common law of each implicated jurisdiction. With respect to Maryland and Missouri, all Ludwick even purports to show is that each state "recognizes a common-law claim for fraudulent inducement" against insurance companies. Yet the fact that the state might allow some claims within such a broad category sheds little light on the disruptive effects of Ludwick's particular theory of liability. Cf. Saunders, 537 F.3d at 967 (calling for a "fact-intensive" and context-specific analysis).

**[5]** Two last points. First, because we conclude Ludwick's federal claims are barred by the McCarran-Ferguson Act, we do not reach F&G's alternative arguments that Ludwick lacked standing to sue under RICO and failed plausibly to allege a scheme or intent to defraud. We do take issue with F&G's contention that Ludwick's allegations are implausible—indeed,

---

**5.** The district court read our ruling against the plaintiff in LaBarre differently, reasoning that because (in the district court's view) Minnesota law did in fact allow some common-law claims for fraud and breach of contract against insurance companies, the existence of such causes of action must be irrelevant, otherwise it would have factored into our analysis. But LaBarre made no mention of the common law and, by all indications, rested on an understanding that "Minnesota law permit[ted] *only* administra-

tive recourse." LaBarre, 175 F.3d at 643 (emphasis added). Regardless of whether that remains an accurate description of Minnesota law, nothing in LaBarre suggests we meant to address a situation where a plaintiff specifically could not sue under the insurance code, but could under some other part of state law. See also Norwest Bank Minn., 107 F.3d at 1306 ("Minnesota law does not provide a private cause of action for violations of these prohibitions.").

"preposterous" and "outlandish"—and we should affirm their dismissal not because of any legal infirmity, but because it is hard to believe someone like Ludwick could have uncovered a fraud that eluded "multiple insurance regulators, a major auditing firm, industry ratings agencies, and the market."[6] It should (but apparently does not) go without saying that speculation about the likelihood a particular plaintiff would be the one to catch the misconduct she alleges is no reason to throw out her complaint, all the more so when the speculation is based on thinly veiled assumptions about the party's relative status and sophistication. Cf. Ashcroft v. Iqbal, 556 U.S. 662, 681, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("To be clear, we do not reject these bald assertions on the ground that they are unrealistic or nonsensical. We do not so characterize them . . . . It is the conclusory nature of [the plaintiff's] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable."). We therefore emphasize that Ludwick's loss in this case reflects Congress's deference to the states as the traditional regulators of insurance business, see 15 U.S.C. § 1012, not a ruling on the truth of Ludwick's claims or a validation of the financial machinations underlying them.

[6] Second, at oral argument Ludwick asked to be given a chance to cure the defects in her complaint if we affirmed the dismissal of her claims, acknowledging she had not sought to do so in the district court. The time for amending the complaint, either as of right or with the court's leave, see Fed. R. Civ. P. 15(a)(1), (2), has passed—there is a final judgment, now affirmed on appeal, dismissing the case. Cf. Geier v. Mo. Ethics Comm'n, 715 F.3d 674, 677 (8th Cir. 2013).

## III.  CONCLUSION

Litigating Ludwick's RICO claims would interfere with state regulation of the insurance business, and the claims are barred by the McCarran-Ferguson Act. The district court was right to dismiss. We affirm.



**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Eleuterio MURILLO–SALGADO,
Defendant-Appellant.**

**No. 16-1959**

United States Court of Appeals,
Eighth Circuit.

Submitted: November 17, 2016

Filed: April 13, 2017

Rehearing and Rehearing En Banc
Denied May 17, 2017

**Background:** Defendant was convicted, on conditional guilty plea entered in the United States District Court for the Western District of Missouri, of one count of possessing cocaine with intent to distribute, and he appealed from decision of the District Court, Dean Whipple, J., 2015 WL 5885810, adopting report and recommenda-

**6.** "Far more plausible," F&G assures us, "is that [Ludwick] does not fully understand these transactions, or simply holds a view of affiliate reinsurance transactions that is not shared by the relevant state regulators."